# INDEX OF EXHIBITS

United States v. Thomas Mario Costanzo, et al.

CR-17-0585-01-PHX-JJT

Exhibit A ..........................................................................................FIN-2013-6001

Exhibit B ...................................................Internal Revenue Manuel, Part 32.1.1.2.6

Exhibit C .................................................. Internal Revenue Service, Notice 2014-21

Exhibit D ..................................................... USAG, Southern District of New York,
Press Release (May 29, 2015)

# EXHIBIT

# A



# Department of the Treasury
# Financial Crimes Enforcement Network

## Guidance

**FIN-2013-G001**

**Issued:** **March 18, 2013**

**Subject:** **Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies**

The Financial Crimes Enforcement Network ("FinCEN") is issuing this interpretive guidance to clarify the applicability of the regulations implementing the Bank Secrecy Act ("BSA") to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies.[1]  Such persons are referred to in this guidance as "users," "administrators," and "exchangers," all as defined below.[2]  A user of virtual currency is *not* an MSB under FinCEN's regulations and therefore is not subject to MSB registration, reporting, and recordkeeping regulations.  However, an administrator or exchanger *is* an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person.  An administrator or exchanger is not a provider or seller of prepaid access, or a dealer in foreign exchange, under FinCEN's regulations.

### Currency vs. Virtual Currency

FinCEN's regulations define currency (also referred to as "real" currency) as "the coin and paper money of the United States or of any other country that [i] is designated as legal tender and that [ii] circulates and [iii] is customarily used and accepted as a medium of exchange in the country of issuance."[3]  In contrast to real currency, "virtual" currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency.  In particular, virtual currency does not have legal tender status in any jurisdiction.  This guidance addresses "convertible" virtual currency.  This type of virtual currency either has an equivalent value in real currency, or acts as a substitute for real currency.

---

[1] FinCEN is issuing this guidance under its authority to administer the Bank Secrecy Act.  *See* Treasury Order 180-01 (March 24, 2003).  This guidance explains only how FinCEN characterizes certain activities involving virtual currencies under the Bank Secrecy Act and FinCEN regulations.  It should not be interpreted as a statement by FinCEN about the extent to which those activities comport with other federal or state statutes, rules, regulations, or orders.

[2] FinCEN's regulations define "person" as "an individual, a corporation, a partnership, a trust or estate, a joint stock company, an association, a syndicate, joint venture, or other unincorporated organization or group, an Indian Tribe (as that term is defined in the Indian Gaming Regulatory Act), and all entities cognizable as legal personalities." 31 CFR § 1010.100(mm).

[3] 31 CFR § 1010.100(m).

## Background

On July 21, 2011, FinCEN published a Final Rule amending definitions and other regulations relating to money services businesses ("MSBs").[4]  Among other things, the MSB Rule amends the definitions of dealers in foreign exchange (formerly referred to as "currency dealers and exchangers") and money transmitters.  On July 29, 2011, FinCEN published a Final Rule on Definitions and Other Regulations Relating to Prepaid Access (the "Prepaid Access Rule").[5]  This guidance explains the regulatory treatment under these definitions of persons engaged in virtual currency transactions.

## Definitions of User, Exchanger, and Administrator

This guidance refers to the participants in generic virtual currency arrangements, using the terms "user," "exchanger," and "administrator."[6]  A *user* is a person that obtains virtual currency to purchase goods or services.[7]  An *exchanger* is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency.  An *administrator* is a person engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency.

## Users of Virtual Currency

A user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is *not* an MSB under FinCEN's regulations.[8]  Such activity, in and of itself, does not fit within the definition of "money transmission services" and therefore is not subject to FinCEN's registration, reporting, and recordkeeping regulations for MSBs.[9]

---

[4] *Bank Secrecy Act Regulations – Definitions and Other Regulations Relating to Money Services Businesses*, 76 FR 43585 (July 21, 2011) (the "MSB Rule").  This defines an MSB as "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(7) of this section.  This includes but is not limited to maintenance of any agent, agency, branch, or office within the United States." 31 CFR § 1010.100(ff).

[5] *Final Rule – Definitions and Other Regulations Relating to Prepaid Access*, 76 FR 45403 (July 29, 2011),

[6] These terms are used for the exclusive purpose of this regulatory guidance.  Depending on the type and combination of a person's activities, one person may be acting in more than one of these capacities.

[7] How a person engages in "obtaining" a virtual currency may be described using any number of other terms, such as "earning," "harvesting," "mining," "creating," "auto-generating," "manufacturing," or "purchasing," depending on the details of the specific virtual currency model involved.  For purposes of this guidance, the label applied to a particular process of obtaining a virtual currency is not material to the legal characterization under the BSA of the process or of the person engaging in the process.

[8] As noted above, this should not be interpreted as a statement about the extent to which the user's activities comport with other federal or state statutes, rules, regulations, or orders.  For example, the activity may still be subject to abuse in the form of trade-based money laundering or terrorist financing.  The activity may follow the same patterns of behavior observed in the "real" economy with respect to the purchase of "real" goods and services, such as systematic over- or under-invoicing or inflated transaction fees or commissions.

[9] 31 CFR § 1010.100(ff)(1-7).

### Administrators and Exchangers of Virtual Currency

An administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person.[10]  FinCEN's regulations define the term "money transmitter" as a person that provides money transmission services, or any other person engaged in the transfer of funds.  The term "money transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency from one person *and* the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."[11]

The definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies.  Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the BSA.[12]  FinCEN has reviewed different activities involving virtual currency and has made determinations regarding the appropriate regulatory treatment of administrators and exchangers under three scenarios: brokers and dealers of e-currencies and e-precious metals; centralized convertible virtual currencies; and de-centralized convertible virtual currencies.

### a.    E-Currencies and E-Precious Metals

The first type of activity involves electronic trading in e-currencies or e-precious metals.[13]  In 2008, FinCEN issued guidance stating that as long as a broker or dealer in real currency or other commodities accepts and transmits funds solely for the purpose of effecting a *bona fide* purchase or sale of the real currency or other commodities for or with a customer, such person is not acting as a money transmitter under the regulations.[14]

However, if the broker or dealer transfers funds between a customer and a third party that is not part of the currency or commodity transaction, such transmission of funds is no longer a fundamental element of the actual transaction necessary to execute the contract for the purchase or sale of the currency or the other commodity.  This scenario is, therefore, money

---

[10]  FinCEN's regulations provide that whether a person is a money transmitter is a matter of facts and circumstances. The regulations identify six circumstances under which a person is not a money transmitter, despite accepting and transmitting currency, funds, or value that substitutes for currency. 31 CFR § 1010.100(ff)(5)(ii)(A)–(F).

[11]  31 CFR § 1010.100(ff)(5)(i)(A).

[12]  Ibid.

[13]  Typically, this involves the broker or dealer electronically distributing digital certificates of ownership of real currencies or precious metals, with the digital certificate being the virtual currency.  However, the same conclusions would apply in the case of the broker or dealer issuing paper ownership certificates or manifesting customer ownership or control of real currencies or commodities in an account statement or any other form.  These conclusions would also apply in the case of a broker or dealer in commodities other than real currencies or precious metals.  A broker or dealer of e-currencies or e-precious metals that engages in money transmission could be either an administrator or exchanger depending on its business model.

[14]  *Application of the Definition of Money Transmitter to Brokers and Dealers in Currency and other Commodities*, FIN-2008-G008, Sept. 10, 2008.  The guidance also notes that the definition of money transmitter excludes any person, such as a futures commission merchant, that is "registered with, and regulated or examined by…the Commodity Futures Trading Commission."

3

transmission.[15]  Examples include, in part, (1) the transfer of funds between a customer and a third party by permitting a third party to fund a customer's account; (2) the transfer of value from a customer's currency or commodity position to the account of another customer; or (3) the closing out of a customer's currency or commodity position, with a transfer of proceeds to a third party.  Since the definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies, the same rules apply to brokers and dealers of e-currency and e-precious metals.

### b.   *Centralized Virtual Currencies*

The second type of activity involves a convertible virtual currency that has a centralized repository.  The administrator of that repository will be a money transmitter to the extent that it allows transfers of value between persons or from one location to another.  This conclusion applies, whether the value is denominated in a real currency or a convertible virtual currency.  In addition, any exchanger that uses its access to the convertible virtual currency services provided by the administrator to accept and transmit the convertible virtual currency on behalf of others, including transfers intended to pay a third party for virtual goods and services, is also a money transmitter.

FinCEN understands that the exchanger's activities may take one of two forms.  The first form involves an exchanger (acting as a "seller" of the convertible virtual currency) that accepts real currency or its equivalent from a user (the "purchaser") and transmits the value of that real currency to fund the user's convertible virtual currency account with the administrator.  Under FinCEN's regulations, sending "value that substitutes for currency" to another person or to another location constitutes money transmission, unless a limitation to or exemption from the definition applies.[16]  This circumstance constitutes transmission ***to another location***, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator.  It might be argued that the exchanger is entitled to the exemption from the definition of "money transmitter" for persons involved in the sale of goods or the provision of services.  Under such an argument, one might assert that the exchanger is merely providing the service of connecting the user to the administrator and that the transmission of value is integral to this service.  However, this exemption does not apply when the only services being provided are money transmission services.[17]

The second form involves a *de facto* sale of convertible virtual currency that is not completely transparent.  The exchanger accepts currency or its equivalent from a user and privately credits the user with an appropriate portion of the exchanger's own convertible virtual currency held with the administrator of the repository.  The exchanger then transmits that

---

[15] In 2011, FinCEN amended the definition of money transmitter.  The 2008 guidance, however, was primarily concerned with the core elements of the definition – accepting and transmitting currency or value – and the exemption for acceptance and transmission integral to another transaction not involving money transmission.  The 2011 amendments have not materially changed these aspects of the definition.

[16] See footnote 11 and adjacent text.

[17] 31 CFR § 1010.100(ff)(5)(ii)(F).

internally credited value to third parties at the user's direction. This constitutes transmission *to another person*, namely each third party to which transmissions are made at the user's direction. To the extent that the convertible virtual currency is generally understood as a substitute for real currencies, transmitting the convertible virtual currency at the direction and for the benefit of the user constitutes money transmission on the part of the exchanger.

### c.     *De-Centralized Virtual Currencies*

A final type of convertible virtual currency activity involves a de-centralized convertible virtual currency (1) that has no central repository and no single administrator, and (2) that persons may obtain by their own computing or manufacturing effort.

A person that creates units of this convertible virtual currency and uses it to purchase real or virtual goods and services is a user of the convertible virtual currency and not subject to regulation as a money transmitter. By contrast, a person that creates units of convertible virtual currency and sells those units to another person for real currency or its equivalent is engaged in transmission to another location and is a money transmitter. In addition, a person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency.

## Providers and Sellers of Prepaid Access

A person's acceptance and/or transmission of convertible virtual currency cannot be characterized as providing or selling prepaid access because prepaid access is limited to real currencies.[18]

## Dealers in Foreign Exchange

A person must exchange the currency of two or more countries to be considered a dealer in foreign exchange.[19] Virtual currency does not meet the criteria to be considered "currency" under the BSA, because it is not legal tender. Therefore, a person who accepts real currency in

---

[18] This is true even if the person holds the value accepted for a period of time before transmitting some or all of that value at the direction of the person from whom the value was originally accepted. FinCEN's regulations define "prepaid access" as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number." 31 CFR § 1010.100(ww). Thus, "prepaid access" under FinCEN's regulations is limited to "access to funds or the value of funds." If FinCEN had intended prepaid access to cover funds denominated in a virtual currency or something else that substitutes for real currency, it would have used language in the definition of prepaid access like that in the definition of money transmission, which expressly includes the acceptance and transmission of "other value that substitutes for currency." 31 CFR § 1010.100(ff)(5)(i) .

[19] FinCEN defines a "dealer in foreign exchange" as a "person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more countries in exchange for the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery." 31 CFR § 1010.100(ff)(1).

exchange for virtual currency, or *vice versa*, is not a dealer in foreign exchange under FinCEN's regulations.

\* \* \* \* \*

Financial institutions with questions about this guidance or other matters related to compliance with the implementing regulations of the BSA may contact FinCEN's Regulatory Helpline at (800) 949-2732.

# EXHIBIT

# B

32.1.1.2.6 (09-23-2011)

Interpretative Regulations

The Administrative Procedure Act (APA) exempts interpretative rules from the APA's notice and comment requirements. Generally, rules or statements issued by an agency to advise the public of the agency's construction of the statutes it administers are considered interpretative. Most IRS/Treasury regulations are considered interpretative because the underlying statute implemented by the regulation contains the necessary legal authority for the action taken and any effect of the regulation flows directly from that statute. See CCDM 32.1.1.2.7 and CCDM 32.1.1.2.8, below, and CCDM 32.1.5.4.7.5.1(2), Administrative Procedure Act, for further discussion on whether a regulation is interpretive or legislative.

Internal Revenue Manual, available at https://www.irs.gov/irm (last accessed October 10, 2017).

Notice 2014-21

SECTION 1. PURPOSE

This notice describes how existing general tax principles apply to transactions using virtual currency.  The notice provides this guidance in the form of answers to frequently asked questions.

SECTION 2. BACKGROUND

The Internal Revenue Service (IRS) is aware that "virtual currency" may be used to pay for goods or services, or held for investment.  Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  In some environments, it operates like "real" currency -- i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance -- but it does not have legal tender status in any jurisdiction.

Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency.  Bitcoin is one example of a convertible virtual currency that can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies.  For a more complete description of convertible virtual currencies to date, see Financial Crimes Enforcement Network (FinCEN) *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (FIN-2013-G001, March 18, 2013).

SECTION 3. SCOPE

In general, the sale or exchange of convertible virtual currency, or the use of convertible virtual currency to pay for goods or services in a real-world economy transaction, has tax consequences that may result in a tax liability.  This notice addresses only the U.S. federal tax consequences of transactions in, or transactions that use, convertible virtual currency, and the term "virtual currency" as used in Section 4 refers only to convertible virtual currency.  No inference should be drawn with respect to virtual currencies not described in this notice.

The Treasury Department and the IRS recognize that there may be other questions regarding the tax consequences of virtual currency not addressed in this notice that warrant consideration.  Therefore, the Treasury Department and the IRS request comments from the public regarding other types or aspects of virtual currency transactions that should be addressed in future guidance.

Comments should be addressed to:

Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

or hand delivered Monday through Friday between the hours of 8 A.M. and 4 P.M. to:

Courier's Desk
Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Alternatively, taxpayers may submit comments electronically via e-mail to the following
address: Notice.Comments@irscounsel.treas.gov.  Taxpayers should include "Notice
2014-21" in the subject line.  All comments submitted by the public will be available for
public inspection and copying in their entirety.

For purposes of the FAQs in this notice, the taxpayer's functional currency is assumed
to be the U.S. dollar, the taxpayer is assumed to use the cash receipts and
disbursements method of accounting and the taxpayer is assumed not to be under
common control with any other party to a transaction.

SECTION 4. FREQUENTLY ASKED QUESTIONS

**Q-1:  How is virtual currency treated for federal tax purposes?**

**A-1:**  For federal tax purposes, virtual currency is treated as property.  General tax
principles applicable to property transactions apply to transactions using virtual
currency.

**Q-2:  Is virtual currency treated as currency for purposes of determining whether
a transaction results in foreign currency gain or loss under U.S. federal tax laws?**

**A-2:**  No.  Under currently applicable law, virtual currency is not treated as currency that
could generate foreign currency gain or loss for U.S. federal tax purposes.

**Q-3:  Must a taxpayer who receives virtual currency as payment for goods or
services include in computing gross income the fair market value of the virtual
currency?**

**A-3:**  Yes.  A taxpayer who receives virtual currency as payment for goods or services
must, in computing gross income, include the fair market value of the virtual currency,

measured in U.S. dollars, as of the date that the virtual currency was received.  See Publication 525, *Taxable and Nontaxable Income,* for more information on miscellaneous income from exchanges involving property or services.

**Q-4:  What is the basis of virtual currency received as payment for goods or services in Q&A-3?**

**A-4:**  The basis of virtual currency that a taxpayer receives as payment for goods or services in Q&A-3 is the fair market value of the virtual currency in U.S. dollars as of the date of receipt.  See Publication 551, *Basis of Assets,* for more information on the computation of basis when property is received for goods or services.

**Q-5:  How is the fair market value of virtual currency determined?**

**A-5:**  For U.S. tax purposes, transactions using virtual currency must be reported in U.S. dollars.  Therefore, taxpayers will be required to determine the fair market value of virtual currency in U.S. dollars as of the date of payment or receipt.  If a virtual currency is listed on an exchange and the exchange rate is established by market supply and demand, the fair market value of the virtual currency is determined by converting the virtual currency into U.S. dollars (or into another real currency which in turn can be converted into U.S. dollars) at the exchange rate, in a reasonable manner that is consistently applied.

**Q-6:  Does a taxpayer have gain or loss upon an exchange of virtual currency for other property?**

**A-6:**  Yes.  If the fair market value of property received in exchange for virtual currency exceeds the taxpayer's adjusted basis of the virtual currency, the taxpayer has taxable gain.  The taxpayer has a loss if the fair market value of the property received is less than the adjusted basis of the virtual currency.  See Publication 544, *Sales and Other Dispositions of Assets,* for information about the tax treatment of sales and exchanges, such as whether a loss is deductible.

**Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?**

**A-7:**  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.  A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or

business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.

**Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?**

**A-8:** Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, *Taxable and Nontaxable Income*, for more information on taxable income.

**Q-9:  Is an individual who "mines" virtual currency as a trade or business subject to self-employment tax on the income derived from those activities?**

**A-9:** If a taxpayer's "mining" of virtual currency constitutes a trade or business, and the "mining" activity is not undertaken by the taxpayer as an employee, the net earnings from self-employment (generally, gross income derived from carrying on a trade or business less allowable deductions) resulting from those activities constitute self-employment income and are subject to the self-employment tax.  See Chapter 10 of Publication 334, *Tax Guide for Small Business*, for more information on self-employment tax and Publication 535, *Business Expenses,* for more information on determining whether expenses are from a business activity carried on to make a profit.

**Q-10:  Does virtual currency received by an independent contractor for performing services constitute self-employment income?**

**A-10:** Yes.  Generally, self-employment income includes all gross income derived by an individual from any trade or business carried on by the individual as other than an employee.  Consequently, the fair market value of virtual currency received for services performed as an independent contractor, measured in U.S. dollars as of the date of receipt, constitutes self-employment income and is subject to the self-employment tax.  See FS-2007-18, April 2007, *Business or Hobby? Answer Has Implications for Deductions,* for information on determining whether an activity is a business or a hobby.

**Q-11:  Does virtual currency paid by an employer as remuneration for services constitute wages for employment tax purposes?**

**A-11:** Yes.  Generally, the medium in which remuneration for services is paid is immaterial to the determination of whether the remuneration constitutes wages for employment tax purposes.  Consequently, the fair market value of virtual currency paid as wages is subject to federal income tax withholding, Federal Insurance Contributions

Act (FICA) tax, and Federal Unemployment Tax Act (FUTA) tax and must be reported on Form W-2, *Wage and Tax Statement*. See Publication 15 (Circular E), *Employer's Tax Guide*, for information on the withholding, depositing, reporting, and paying of employment taxes.

**Q-12: Is a payment made using virtual currency subject to information reporting?**

**A-12:** A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property. For example, a person who in the course of a trade or business makes a payment of fixed and determinable income using virtual currency with a value of $600 or more to a U.S. non-exempt recipient in a taxable year is required to report the payment to the IRS and to the payee. Examples of payments of fixed and determinable income include rent, salaries, wages, premiums, annuities, and compensation.

**Q-13: Is a person who in the course of a trade or business makes a payment using virtual currency worth $600 or more to an independent contractor for performing services required to file an information return with the IRS?**

**A-13:** Generally, a person who in the course of a trade or business makes a payment of $600 or more in a taxable year to an independent contractor for the performance of services is required to report that payment to the IRS and to the payee on Form 1099-MISC, *Miscellaneous Income*. Payments of virtual currency required to be reported on Form 1099-MISC should be reported using the fair market value of the virtual currency in U.S. dollars as of the date of payment. The payment recipient may have income even if the recipient does not receive a Form 1099-MISC. See the Instructions to Form 1099-MISC and the General Instructions for Certain Information Returns for more information. For payments to non-U.S. persons, see Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Q-14: Are payments made using virtual currency subject to backup withholding?**

**A-14:** Payments made using virtual currency are subject to backup withholding to the same extent as other payments made in property. Therefore, payors making reportable payments using virtual currency must solicit a taxpayer identification number (TIN) from the payee. The payor must backup withhold from the payment if a TIN is not obtained prior to payment or if the payor receives notification from the IRS that backup withholding is required. See Publication 1281, *Backup Withholding for Missing and Incorrect Name/TINs,* for more information.

**Q-15: Are there IRS information reporting requirements for a person who settles payments made in virtual currency on behalf of merchants that accept virtual currency from their customers?**

**A-15:**  Yes, if certain requirements are met.  In general, a third party that contracts with a substantial number of unrelated merchants to settle payments between the merchants and their customers is a third party settlement organization (TPSO).  A TPSO is required to report payments made to a merchant on a Form 1099-K, *Payment Card and Third Party Network Transactions*, if, for the calendar year, both (1) the number of transactions settled for the merchant exceeds 200, and (2) the gross amount of payments made to the merchant exceeds $20,000.  When completing Boxes 1, 3, and 5a-1 on the Form 1099-K, transactions where  the TPSO settles payments made with virtual currency are aggregated with transactions where the TPSO settles payments made with real currency to determine the total amounts to be reported in those boxes.  When determining whether the transactions are reportable, the value of the virtual currency is the fair market value of the virtual currency in U.S. dollars on the date of payment.

See The Third Party Information Reporting Center, http://www.irs.gov/Tax-Professionals/Third-Party-Reporting-Information-Center, for more information on reporting transactions on Form 1099-K.

**Q-16:  Will taxpayers be subject to penalties for having treated a virtual currency transaction in a manner that is inconsistent with this notice prior to March 25, 2014?**

**A-16:**  Taxpayers may be subject to penalties for failure to comply with tax laws.  For example, underpayments attributable to virtual currency transactions may be subject to penalties, such as accuracy-related penalties under section 6662.  In addition, failure to timely or correctly report virtual currency transactions when required to do so may be subject to information reporting penalties under section 6721 and 6722.  However, penalty relief may be available to taxpayers and persons required to file an information return who are able to establish that the underpayment or failure to properly file information returns is due to reasonable cause.

SECTION 5. DRAFTING INFORMATION

The principal author of this notice is Keith A. Aqui of the Office of Associate Chief Counsel (Income Tax & Accounting).  For further information about income tax issues addressed in this notice, please contact Mr. Aqui at (202) 317-4718; for further information about employment tax issues addressed in this notice, please contact Mr. Neil D. Shepherd at (202) 317- 4774; for further information about information reporting issues addressed in this notice, please contact Ms. Adrienne E. Griffin at (202) 317-6845; and for further information regarding foreign currency issues addressed in this notice, please contact Mr. Raymond J. Stahl at (202) 317- 6938.  These are not toll-free calls.

# EXHIBIT

# C

Notice 2014-21

SECTION 1. PURPOSE

This notice describes how existing general tax principles apply to transactions using virtual currency.  The notice provides this guidance in the form of answers to frequently asked questions.

SECTION 2. BACKGROUND

The Internal Revenue Service (IRS) is aware that "virtual currency" may be used to pay for goods or services, or held for investment.  Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  In some environments, it operates like "real" currency -- i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance -- but it does not have legal tender status in any jurisdiction.

Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency.  Bitcoin is one example of a convertible virtual currency.  Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies.  For a more comprehensive description of convertible virtual currencies to date, see Financial Crimes Enforcement Network (FinCEN) *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (FIN-2013-G001, March 18, 2013).

SECTION 3. SCOPE

In general, the sale or exchange of convertible virtual currency, or the use of convertible virtual currency to pay for goods or services in a real-world economy transaction, has tax consequences that may result in a tax liability.  This notice addresses only the U.S. federal tax consequences of transactions in, or transactions that use, convertible virtual currency, and the term "virtual currency" as used in Section 4 refers only to convertible virtual currency.  No inference should be drawn with respect to virtual currencies not described in this notice.

The Treasury Department and the IRS recognize that there may be other questions regarding the tax consequences of virtual currency not addressed in this notice that warrant consideration.  Therefore, the Treasury Department and the IRS request comments from the public regarding other types or aspects of virtual currency transactions that should be addressed in future guidance.

Comments should be addressed to:

Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

or hand delivered Monday through Friday between the hours of 8 A.M. and 4 P.M. to:

Courier's Desk
Internal Revenue Service
Attn:  CC:PA:LPD:PR (Notice 2014-21)
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Alternatively, taxpayers may submit comments electronically via e-mail to the following address: Notice.Comments@irscounsel.treas.gov.  Taxpayers should include "Notice 2014-21" in the subject line.  All comments submitted by the public will be available for public inspection and copying in their entirety.

For purposes of the FAQs in this notice, the taxpayer's functional currency is assumed to be the U.S. dollar, the taxpayer is assumed to use the cash receipts and disbursements method of accounting and the taxpayer is assumed not to be under common control with any other party to a transaction.

## SECTION 4. FREQUENTLY ASKED QUESTIONS

**Q-1:  How is virtual currency treated for federal tax purposes?**

**A-1:**  For federal tax purposes, virtual currency is treated as property.  General tax principles applicable to property transactions apply to transactions using virtual currency.

**Q-2:  Is virtual currency treated as currency for purposes of determining whether a transaction results in foreign currency gain or loss under U.S. federal tax laws?**

**A-2:**  No.  Under currently applicable law, virtual currency is not treated as currency that could generate foreign currency gain or loss for U.S. federal tax purposes.

**Q-3:  Must a taxpayer who receives virtual currency as payment for goods or services include in computing gross income the fair market value of the virtual currency?**

**A-3:**  Yes.  A taxpayer who receives virtual currency as payment for goods or services must, in computing gross income, include the fair market value of the virtual currency,

measured in U.S. dollars, as of the date that the virtual currency was received.  See Publication 525, *Taxable and Nontaxable Income,* for more information on miscellaneous income from exchanges involving property or services.

**Q-4:  What is the basis of virtual currency received as payment for goods or services in Q&A-3?**

**A-4:**  The basis of virtual currency that a taxpayer receives as payment for goods or services in Q&A-3 is the fair market value of the virtual currency in U.S. dollars as of the date of receipt.  See Publication 551, *Basis of Assets,* for more information on the computation of basis when property is received for goods or services.

**Q-5:  How is the fair market value of virtual currency determined?**

**A-5:**  For U.S. tax purposes, transactions using virtual currency must be reported in U.S. dollars.  Therefore, taxpayers will be required to determine the fair market value of virtual currency in U.S. dollars as of the date of payment or receipt.  If a virtual currency is listed on an exchange and the exchange rate is established by market supply and demand, the fair market value of the virtual currency is determined by converting the virtual currency into U.S. dollars (or into another real currency which in turn can be converted into U.S. dollars) at the exchange rate, in a reasonable manner that is consistently applied.

**Q-6:  Does a taxpayer have gain or loss upon an exchange of virtual currency for other property?**

**A-6:**  Yes.  If the fair market value of property received in exchange for virtual currency exceeds the taxpayer's adjusted basis of the virtual currency, the taxpayer has taxable gain.  The taxpayer has a loss if the fair market value of the property received is less than the adjusted basis of the virtual currency.  See Publication 544, *Sales and Other Dispositions of Assets*, for information about the tax treatment of sales and exchanges, such as whether a loss is deductible.

**Q-7:  What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?**

**A-7:**  The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer.  A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer.  For example, stocks, bonds, and other investment property are generally capital assets.   A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer.  Inventory and other property held mainly for sale to customers in a trade or

business are examples of property that is not a capital asset.  See Publication 544 for more information about capital assets and the character of gain or loss.

**Q-8:  Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?**

**A-8:**  Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income.  See Publication 525, *Taxable and Nontaxable Income*, for more information on taxable income.

**Q-9:  Is an individual who "mines" virtual currency as a trade or business subject to self-employment tax on the income derived from those activities?**

**A-9:**  If a taxpayer's "mining" of virtual currency constitutes a trade or business, and the "mining" activity is not undertaken by the taxpayer as an employee, the net earnings from self-employment (generally, gross income derived from carrying on a trade or business less allowable deductions) resulting from those activities constitute self-employment income and are subject to the self-employment tax.  See Chapter 10 of Publication 334, *Tax Guide for Small Business*, for more information on self-employment tax and Publication 535, *Business Expenses,* for more information on determining whether expenses are from a business activity carried on to make a profit.

**Q-10:  Does virtual currency received by an independent contractor for performing services constitute self-employment income?**

**A-10:**  Yes.  Generally, self-employment income includes all gross income derived by an individual from any trade or business carried on by the individual as other than an employee.  Consequently, the fair market value of virtual currency received for services performed as an independent contractor, measured in U.S. dollars as of the date of receipt, constitutes self-employment income and is subject to the self-employment tax.  See FS-2007-18, April 2007, *Business or Hobby? Answer Has Implications for Deductions,* for information on determining whether an activity is a business or a hobby.

**Q-11:  Does virtual currency paid by an employer as remuneration for services constitute wages for employment tax purposes?**

**A-11:**  Yes.  Generally, the medium in which remuneration for services is paid is immaterial to the determination of whether the remuneration constitutes wages for employment tax purposes.  Consequently, the fair market value of virtual currency paid as wages is subject to federal income tax withholding, Federal Insurance Contributions

Act (FICA) tax, and Federal Unemployment Tax Act (FUTA) tax and must be reported on Form W-2, *Wage and Tax Statement*. See Publication 15 (Circular E), *Employer's Tax Guide*, for information on the withholding, depositing, reporting, and paying of employment taxes.

**Q-12:  Is a payment made using virtual currency subject to information reporting?**

**A-12:**  A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property.  For example, a person who in the course of a trade or business makes a payment of fixed and determinable income using virtual currency with a value of $600 or more to a U.S. non-exempt recipient in a taxable year is required to report the payment to the IRS and to the payee.  Examples of payments of fixed and determinable income include rent, salaries, wages, premiums, annuities, and compensation.

**Q-13:  Is a person who in the course of a trade or business makes a payment using virtual currency worth $600 or more to an independent contractor for performing services required to file an information return with the IRS?**

**A-13:**  Generally, a person who in the course of a trade or business makes a payment of $600 or more in a taxable year to an independent contractor for the performance of services is required to report that payment to the IRS and to the payee on Form 1099-MISC, *Miscellaneous Income*.  Payments of virtual currency required to be reported on Form 1099-MISC should be reported using the fair market value of the virtual currency in U.S. dollars as of the date of payment.  The payment recipient may have income even if the recipient does not receive a Form 1099-MISC.  See the Instructions to Form 1099-MISC and the General Instructions for Certain Information Returns for more information.  For payments to non-U.S. persons, see Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Q-14:  Are payments made using virtual currency subject to backup withholding?**

**A-14:**  Payments made using virtual currency are subject to backup withholding to the same extent as other payments made in property.  Therefore, payors making reportable payments using virtual currency must solicit a taxpayer identification number (TIN) from the payee.  The payor must backup withhold from the payment if a TIN is not obtained prior to payment or if the payor receives notification from the IRS that backup withholding is required.  See Publication 1281, *Backup Withholding for Missing and Incorrect Name/TINs,* for more information.

**Q-15:  Are there IRS information reporting requirements for a person who settles payments made in virtual currency on behalf of merchants that accept virtual currency from their customers?**

**A-15:**  Yes, if certain requirements are met.  In general, a third party that contracts with a substantial number of unrelated merchants to settle payments between the merchants and their customers is a third party settlement organization (TPSO).  A TPSO is required to report payments made to a merchant on a Form 1099-K, *Payment Card and Third Party Network Transactions*, if, for the calendar year, both (1) the number of transactions settled for the merchant exceeds 200, and (2) the gross amount of payments made to the merchant exceeds $20,000.  When completing Boxes 1, 3, and 5a-1 on the Form 1099-K, transactions where  the TPSO settles payments made with virtual currency are aggregated with transactions where the TPSO settles payments made with real currency to determine the total amounts to be reported in those boxes.  When determining whether the transactions are reportable, the value of the virtual currency is the fair market value of the virtual currency in U.S. dollars on the date of payment.

See The Third Party Information Reporting Center, http://www.irs.gov/Tax-Professionals/Third-Party-Reporting-Information-Center, for more information on reporting transactions on Form 1099-K.

**Q-16:  Will taxpayers be subject to penalties for having treated a virtual currency transaction in a manner that is inconsistent with this notice prior to March 25, 2014?**

**A-16:**  Taxpayers may be subject to penalties for failure to comply with tax laws.  For example, underpayments attributable to virtual currency transactions may be subject to penalties, such as accuracy-related penalties under section 6662.  In addition, failure to timely or correctly report virtual currency transactions when required to do so may be subject to information reporting penalties under section 6721 and 6722.  However, penalty relief may be available to taxpayers and persons required to file an information return who are able to establish that the underpayment or failure to properly file information returns is due to reasonable cause.

SECTION 5. DRAFTING INFORMATION

The principal author of this notice is Keith A. Aqui of the Office of Associate Chief Counsel (Income Tax & Accounting).  For further information about income tax issues addressed in this notice, please contact Mr. Aqui at (202) 317-4718; for further information about employment tax issues addressed in this notice, please contact Mr. Neil D. Shepherd at (202) 317- 4774; for further information about information reporting issues addressed in this notice, please contact Ms. Adrienne E. Griffin at (202) 317-6845; and for further information regarding foreign currency issues addressed in this notice, please contact Mr. Raymond J. Stahl at (202) 317- 6938.  These are not toll-free calls.

# EXHIBIT

# D

10/4/2017    Ross Ulbright, A/K/A "Dread Pirate Roberts," Sentenced In Manhattan Federal Court To Life In Prison | USAO-SDNY | Department of Justice

Case 2:1 7-cr-00585-GMS  Document 52-1  Filed 10/30/17  Page 25 of 27


United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* NEW YORK

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE                                         Friday, May 29, 2015

# Ross Ulbricht, A/K/A "Dread Pirate Roberts," Sentenced In Manhattan Federal Court To Life In Prison

*Convicted of Multiple Counts for Creating and Operating the "Silk Road" Website, Used by More than 100,000 Users to Buy and Sell More Than $200 Million Worth of Illegal Drugs and Other Unlawful Goods and Services*

Preet Bharara, the United States Attorney for the Southern District of New York, announced that ROSS ULBRICHT, a/k/a "Dread Pirate Roberts," was sentenced today in Manhattan federal court to life in prison in connection with his operation and ownership of Silk Road, a hidden website designed to enable its users to buy and sell illegal drugs and other unlawful goods and services anonymously and beyond the reach of law enforcement between January 2011 and October 2013.  ULBRICHT was found guilty of each of the seven charges he faced on February 5, 2015, following a four-week jury trial.  U.S. District Judge Katherine B. Forrest imposed today's sentence.

Manhattan U.S. Attorney Preet Bharara said:  "Make no mistake: Ulbricht was a drug dealer and criminal profiteer who exploited people's addictions and contributed to the deaths of at least six young people. Ulbricht went from hiding his cybercrime identity to becoming the face of cybercrime and as today's sentence proves, no one is above the law."

According to the evidence presented at trial, statements made during other public proceedings including today's sentencing, and other court documents:

ULBRICHT created Silk Road in January 2011, and owned and operated the underground website until it was shut down by law enforcement authorities in October 2013.  Silk Road emerged as the most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black-market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were bought and sold regularly by the site's users.  While in operation, Silk Road was used by thousands of drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other unlawful goods and services to more than 100,000 buyers, and to launder hundreds of millions of dollars deriving from these unlawful transactions.

ULBRICHT deliberately operated Silk Road as an online criminal marketplace intended to enable its users to buy and sell drugs and other illegal goods and services anonymously and outside the reach of law enforcement.  ULBRICHT sought to anonymize transactions on Silk Road in two principal ways.  First,

ULBRICHT operated Silk Road on what is known as "The Onion Router," or "Tor" network, a special network of computers on the Internet, distributed around the world, designed to conceal the true IP addresses of the computers on the network and thereby the identities of the networks' users. Second, ULBRICHT designed Silk Road to include a Bitcoin-based payment system that served to facilitate the illegal commerce conducted on the site, including by concealing the identities and locations of the users transmitting and receiving funds through the site.

The vast majority of items for sale on Silk Road were illegal drugs, which were openly advertised as such on the site. As of September 23, 2013, the Silk Road home page displayed nearly 13,000 listings for controlled substances, listed under such categories as "Cannabis," "Dissociatives," "Ecstasy," "Intoxicants," "Opioids," "Precursors," "Prescription," "Psychedelics," and "Stimulants." From November 2011 to September 2013, law enforcement agents made more than 60 individual undercover purchases of controlled substances from Silk Road vendors. These purchases included heroin, cocaine, ecstasy, and LSD, among other illegal drugs, and were filled by vendors believed to be located in more than ten different countries, including the United States, Germany, the Netherlands, Canada, the United Kingdom, Spain, Ireland, Italy, Austria, and France.

The narcotics distributed on Silk Road have been linked to at least six overdose deaths across the world. These overdose deaths included Jordan M., a 27-year old Microsoft employee who was found unresponsive in front of his computer, which was logged onto Silk Road at the time, and died as a result of heroin and other prescription drugs that he had ordered from Silk Road. Preston B., from Perth, Australia, and Alejandro N., from Camino, California, both 16 years old, died as a result of taking 25i-NBOMe, a powerful synthetic drug designed to mimic LSD (commonly referred to as "N-Bomb"), which was purchased from Silk Road. Additional victims included Bryan B., a 25-year old from Boston, Massachussetts, and Scott W., a 36-year old from Australia, who both died as a result of heroin purchased from Silk Road, and Jacob B., a 22-year old from Australia, who died from health complications that were aggravated by the use of drugs purchased from Silk Road.

In addition to illegal narcotics, other illicit goods and services were openly bought and sold on Silk Road. For example, as of September 23, 2013, there were: 159 listings under the category "Services," most of which offered computer hacking services, such as a listing by a vendor offering to hack into social networking accounts of the customer's choosing; 801 listings under the category "Digital goods," including malicious software, hacked accounts at various online services, and pirated media content; and 169 listings under the category "Forgeries," including offers to produce fake driver's licenses, passports, Social Security cards, utility bills, credit card statements, car insurance records, and other forms of false identification documents.

Using the online moniker "Dread Pirate Roberts," or "DPR," ULBRICHT controlled and oversaw every aspect of Silk Road, and managed a staff of paid, online administrators and computer programmers who assisted with the day-to-day operation of the site. Through his ownership and operation of Silk Road, ULBRICHT reaped commissions worth more than $13 million generated from the illicit sales conducted through the site. ULBRICHT also demonstrated a willingness to use violence to protect his criminal enterprise and the anonymity of its users, soliciting six murders-for-hire in connection with operating the site, although there is no evidence that these murders were actually carried out.

\*          \*          \*

ULBRICHT, 31, of San Francisco, California, was convicted of seven offenses after a four-week jury trial: distributing narcotics, distributing narcotics by means of the Internet, conspiring to distribute narcotics, engaging in a continuing criminal enterprise, conspiring to commit computer hacking, conspiring to traffic in false identity documents, and conspiring to commit money laundering.

In addition to the life sentence prison term, ULBRICHT was ordered to forfeit $183,961,921.

In imposing today's sentence, Judge Forrest said: "There must be no doubt that lawlessness will not be tolerated. There must be no doubt that no one is above the law - no matter one's education or privileges. All stand equal before the law. There must be no doubt that you cannot run a massive criminal enterprise and because it occurred over the Internet minimize the crime committed on that basis."

Mr. Bharara praised the outstanding investigative work of the Federal Bureau of Investigation and its New York Special Operations and Cyber Division, as well as the outstanding investigative work of the DEA's New York Organized Crime Drug Enforcement Strike Force, which comprises agents and officers of the DEA, the IRS, the New York City Police Department, U.S. Immigration and Customs Enforcement's ("ICE") Homeland Security Investigations ("HSI"), the New York State Police, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the U.S. Secret Service, the U.S. Marshals Service, Office of Foreign Assets Control, and NY Department of Taxation. Mr. Bharara also thanked the ICE-HSI Chicago-O'Hare office for its assistance and support, as well as the Department of Justice's Computer Crime and Intellectual Property Section and Office of International Affairs. Additionally, Mr. Bharara praised the foreign law enforcement partners whose contributions to the success of the investigation and prosecution have been invaluable, namely, the Reykjavik Metropolitan Police of the Republic of Iceland, and the French Republic's Central Office for the Fight Against Crime Linked to Information Technology and Communication.

The prosecution of this case is being handled by the Office's Complex Frauds and Cybercrime Unit. Assistant United States Attorneys Serrin Turner and Timothy T. Howard are in charge of the prosecution, and Assistant United States Attorney Christine Magdo is in charge of the forfeiture aspects of the case.

15-135

---

**Component(s):**
USAO - New York, Southern

Updated May 29, 2015