JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona  85007
Telephone: 602-382-2700

MARIA TERESA WEIDNER; #027912
Asst. Federal Public Defender
Attorney for Defendant
maria_weidner@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | No. CR-17-0585-01-PHX-JJT |
|---|---|
| Plaintiff, | **MOTION TO DISMISS PORTIONS OF COUNTS 1 & 2 OF INDICTMENT PREMISED ON ALLEGED VIOLATION OF 18 U.S.C. § 1960(b)(1)(A)** |
| vs. | |
| Thomas Mario Costanzo, et al., | |
| Defendant | |

Defendant Thomas Mario Costanzo submits the attached memorandum of law in support of his Motion to Dismiss the portions of Counts 1 & 2 of the Indictment that rest upon Mr. Costanzo's alleged violation of, or conspiracy to violate, 18 U.S.C. § 1960(b)(1)(A) – the portion of the statute making it a federal crime to operate a money transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law." These portions of the Indictment should be dismissed for the reasons set forth in the following Memorandum.

//
//
//
//
//

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion or from an order based thereon.

Respectfully submitted: November 2, 2017.

JON M. SANDS
Federal Public Defender

*s/Maria Teresa Weidner*
MARIA TERESA WEIDNER
Asst. Federal Public Defender

# **M E M O R A N D U M**

## I. BACKGROUND

The pertinent portions of the Indictment allege that Mr. Costanzo knowingly conducted an unlicensed money transmitting business that "operated without an appropriate money transmitting license in a state where such operation is punishable as a misdemeanor or felony under state law." *See* Doc. 18, First Superseding Indictment, at ¶ 5. The Indictment further alleges that Mr. Costanzo operated a money transmitting business without "obtain[ing] a license from the State of Arizona to operate this money transmitting business, as required by law." *Id*. at ¶¶ 1, 2.

## II. STANDARD OF REVIEW

Rule 12(b)(1) of the Federal Rules of Criminal Procedure provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." Rule 12(b)(3)(B) specifies that claims of defects in the indictment must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits. In addition, claims that the applicable statute is unconstitutional may be raised by way of a motion under Rule 12(b). Fed. R. Crim. P. 12(b)(2) (jurisdictional objections may be raised at any time while the case is pending); *United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989), *amended*, 907 F.2d 115 (9th Cir. 1990) (claims that the applicable statute is unconstitutional qualify as jurisdictional). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

## III. DISCUSSION

The portion of the indictment alleging that Mr. Costanzo operated a money transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law" suffers from six independently-fatal flaws.

### A. Arizona's money-transmitting law does not apply to Bitcoin.

First, because this portion of the Indictment rests on 18 U.S.C. § 1960(b)(1)(A), which makes a federal crime out of operating a money-transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law," its validity rests on the premise that Arizona's money-transmitting law applies to operations that deal in Bitcoin. But this premise is mistaken. In fact, Arizona's money-transmitting law contains a Definitions section that clearly excludes unofficial, "virtual" means of exchange such as Bitcoin.

The pertinent Definitions section defines "Money" as "a medium of exchange that is authorized or adopted by a domestic or foreign government as a part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance." Ariz. Rev. Stat. Ann. § 6-1201(9). Bitcoin may be many things, but it is emphatically *not* "authorized or adopted by a domestic or foreign government as a part of its currency." Indeed, *not* being an official government-regulated currency is Bitcoin's most essential feature and *raison d'etre*. "[T]he whole *point* of Bitcoin is to escape any entanglement with sovereign governments." *United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016) (emphasis added); *see also* Matthew Kien-Meng Ly, *Coining Bitcoin's "Legal-Bits": Examining the Regulatory Framework for Bitcoin and Virtual Currencies*, 27 Harv. J.L. & Tech. 587, 590 (2014) ("No legal entity controls or administers Bitcoin. Additionally, no sovereign or commodity backs the currency.") (footnotes omitted). In short, because Arizona law clearly does not require a license for businesses that transmit Bitcoin, Section 1960(b)(1)(A) is facially inapplicable to Mr. Costanzo's alleged conduct.

### B. Arizona's money-transmitting law does not make unlicensed money transmitting a misdemeanor or felony.

4

Second, even if Arizona law *did* require a license for transmitting Bitcoin, Section 1960(b)(1)(A) *still* would not apply in Arizona because Arizona law does not make unlicensed money-transmitting "a misdemeanor or a felony." 18 U.S.C. § 1960(b)(1)(A); *see generally* Ariz. Rev. Stat. Title 6, Ch. 12.

### C.   18 U.S.C. § 1960(b)(1)(A) unconstitutionally breaches the separation of powers doctrine.

Article I, § 1 of the Constitution declares that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." From this language the Supreme Court has derived the "nondelegation doctrine," which provides "that Congress may not constitutionally delegate its legislative power to another branch of government." *Touby v. United States*, 500 U.S. 160, 165 (1991). This doctrine serves to maintain the separation of powers that underlies our tripartite system of government, by protecting the essential integrity of the legislative function. As John Locke observed, because the power granted by the people to the legislative branch of government is the power "'only to make *laws*, and not to make *legislators*,'" the legislative branch of government "'can have no power to transfer their authority of making law, and place it in other hands.'" *Mistretta v. United States*, 488 U.S. 361, 419-20 (1989) (Scalia, J. dissenting) (quoting J. Locke, *Second Treatise of Government* 87 (R. Cox ed. 1982) (emphases added by Justice Scalia). The nondelegation doctrine serves to advance and protect three crucial components of the separation of powers.

First, it protects the integrity of our democracy by "ensur[ing] to the extent consistent with orderly governmental administration that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will." *Industrial Union Dept., AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 685 (1980) (Rehnquist, J., dissenting) (citing *Arizona v. California*, 373 U.S. 546, 626 (1963) (Harlan, J., dissenting in part) and *United States v. Robel*, 389 U.S. 258, 276 (1967) (Brennan, J., concurring in result)). As the late Professor John Hart Ely

5

observed in his seminal book *Democracy and Distrust: A Theory of Judicial Review* (Harvard University Press 1980) ("*Democracy and Distrust*"), when dealing with difficult social issues, members of Congress often "quite shrewdly prefer not to have to stand up and be counted but rather to let some executive-branch bureaucrat, or perhaps some independent regulatory commission, 'take the inevitable political heat.'" *Id*. at 131-32 (quoting Cutler and Johnson, *Regulation and the Political Process*, 84 Yale L.J. 1395, 1400 (1975)). This tendency is "undemocratic, in the quite obvious sense that by refusing to legislate, our legislators are escaping the sort of accountability that is crucial to the intelligible functioning of a democratic republic." *Id*. at 132; accord *American Petroleum*, 448 U.S. at 686-87 & n.6 (Rehnquist, J., dissenting) (citing *Democracy and Distrust* at 131-34).

Second, it "guarantees that, to the extent Congress finds it necessary to delegate authority, it provides the recipient of that authority with an 'intelligible principle' to guide the exercise of the delegated discretion." *American Petroleum*, 448 U.S. at 685-86 (Rehnquist, J., dissenting) (citing *J. W. Hampton & Co. v. United States*, 276 U.S. 394, 409 (1928), and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935)). The Supreme Court effectuated this purpose in *Panama Refining* and *A.L.A. Schecter Poultry Co. v. United States*, 295 U.S. 495 (1935), by striking down statutes that delegated authority to the Executive Branch without articulating any "intelligible principle" cabining its exercise. *Panama Refining*, 293 U.S. at 414-33; *Schechter Poultry*, 295 U.S. at 522-51.

Third, it "ensures that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *American Petroleum*, 448 U.S. at 686 (Rehnquist, J., dissenting) (citing *Arizona v. California*, 373 U.S. 546, 626 (1963) (Harlan, J., dissenting in part), and *American Power & Light Co. v. SEC*, 329 U.S. 90, 106 (1946)).

6

By effectively delegating to the respective legislatures of the fifty states the power to create and define the contours of a federal money-transmitting felony, Section 1960(b)(1)(A) strongly implicates all three of the concerns underlying the nondelegation doctrine.

This delegation undermines the "accountability that is crucial to the intelligible functioning of a democratic republic" (*Democracy and Distrust* at 132), by blurring and confusing the lines of responsibility for punishment for conducting an unlicensed money-transmitting business. A person punished under Section 1960(b)(1)(A) – facing a *federal* punishment for having violated a *state* law – may be justifiably confused as to the true source of his punishment, as may others who disapprove of it. This naturally complicates and confounds any prospect of mobilizing the democratic process to call for the law's elimination or modification. Blurring the lines of democratic accountability in this fashion makes our system of laws less clearly accountable to the public, and thus less democratic.

This delegation provides no "intelligible principle" to guide the state legislatures that effectively exercise the delegated authority to create federal felonies. *American Petroleum*, 448 U.S. at 685-86 (Rehnquist, J., dissenting). Section 1960(b)(1)(A) simply declares that any operation of an unlicensed money-transmitting business constituting a state misdemeanor or felony shall constitute a federal felony, offering no clue to state legislatures as to how they should exercise this delegated power.

Finally, this delegation fails to "ensure[] that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *American Petroleum*, 448 U.S. at 686 (Rehnquist, J., dissenting). Because there simply *are* no "ascertainable standards" governing the state legislatures' exercise of this delegated authority, courts have no way of ascertaining whether they have been breached or exceeded.

In sum, the untrammeled delegation to state legislature of the power to create federal felonies set forth in Section 1960(b)(1)(A) unconstitutionally violates the essential principle of the separation of powers.

### D. 18 U.S.C. § 1960(b)(1)(A) unconstitutionally breaches essential principles of federalism.

Finally, by declaring that violations of any state's money-transmitting licensure requirements shall constitute a federal felony, Section 1960(b)(1)(A) breaches the essential constitutional principles encapsulated in the Supreme Court's phrase "Our Federalism." As the Court explained in *Younger v. Harris*, 401 U.S. 37 (1971), these principles mandate "a proper respect for state functions" and "a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id*. at 44. Section 1960(b)(1)(A) runs roughsod over these important principles.

When a state creates a licensure system for money-transmitting and determines what punishment shall attach to unlicensed money-transmitting, it has exercised its sovereign prerogatives to pursue policies that it deems to best serve the interests of the state. It may decide to impose a relatively mild punishment in order to avoid the unnecessary chilling of innovation in a cutting-edge field in which the rules are still evolving. It may decide to impose a punishment milder than that imposed by its neighbors, to attract cutting businesses away from them – or it may decide to choose a punishment harsher than that imposed by neighbors, to push questionable business out. It may make any number of careful choices, guided by the particular circumstances and policies of the state.

Into the arena of these careful, state-by-state policy choices stampedes Section 1960(b)(1)(A), trampling the states' deliberately-constructed structures of regulation by declaring that *every* state misdemeanor or felony money-transmitting licensure violation shall constitute a federal felony punishable by a fine and up to five years in federal custody. Notably, this federal "piggyback" felony extends into every

corner of every state – not merely to areas in which the federal government has a special interest and responsibility, such as the special maritime and territorial jurisdiction of the United States. *Cf.* 18 U.S.C. § 113(a). Moreover, the states have no ability to "opt out" of this federally-imposed "piggyback" felony: Their only choices are to accept it, or to refrain from punishing unlicensed money-transmitting as a felony *or* a misdemeanor. (Indeed, as this Indictment shows, even the latter choice may not prevent the federal government from attempting to exercise its "piggyback" felony power under Section 1960(b)(1)(A).) In this manner, Section 1960(b)(1)(A) flies directly in the face of "Our Federalism" by refusing to leave "States and their institutions . . . free to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44. It effectively commandeers states legislatures for a federal program and treats them as subunits of the federal legislature – overlooking the crucial fact that "[t]he positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart." *New York v. United States*, 505 U.S. 144, 188 (1992). Because Section 1960(b)(1)(A) contravenes fundamental principles of federalism, it cannot lawfully be applied.

      **E.**    **18 U.S.C. § 1960(b)(1)(A) creates an irrational distinction between individuals engaging in the same conduct in different states that violates the Fifth Amendment's Due Process Clause.**

Unlike typical federal criminal laws, Section 1960(b)(1)(A) does not apply uniformly across the United States. Instead, its application varies from state to state, according to each state's laws. In a state that either does not require a money-transmitting license or does not treat the failure to have such a license as a felony or misdemeanor, Section 1960(b)(1)(A) has no application. In a state in which unlicensed money-transmitting is treated as a felony or misdemeanor, Section 1960(b)(1)(A) creates a federal felony punishable by up to five years in prison. Whether an individual is guilty of this federal felony turns entirely on the happenstance of the state in which he or she engaged in the pertinent conduct. The statute thus effects a wholly arbitrary and

irrational discrimination between persons engaging in precisely the same conduct in different states. Although the Fifth Amendment contains no equal protection clause, it does forbid discrimination violative of due process, and Fifth Amendment equal protection claims are subject to the same" analysis as Fourteenth Amendment equal protection claims. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017). Pursuant to this analysis, a statute that deprives a citizen of his liberty on the basis of an "arbitrary distinction," violates the Fifth Amendment's Due Process Clause. *Chapman v. United States*, 500 U.S. 453, 465 (1991). Section 1960(b)(1)(A) is such a statute, because "[t]here is no rational statutory basis to distinguish between the class of money transferors operating in states that either do not require a license or do not criminalize the failure to have one, and other states that criminalize the failure to have a license. *United States v. Barre*, 313 F. Supp. 2d 1086, 1090 (D. Colo.), *opinion rev'd on reconsideration*, 324 F. Supp. 2d 1173 (D. Colo. 2004).

**F.  18 U.S.C. § 1960(b)(1)(A)'s exclusion of a mens rea element violates the Fifth Amendment's Due Process Clause.**

As originally enacted in 1992, 18 U.S.C. § 1960 applied solely to a person who conducts a money transmitting business "*knowing* the business is an illegal money transmitting business," and it further specified that an "illegal money transmitting business" is such a business that is "*knowingly* operated" without an appropriate state license. Housing and Community Development Act of 1992, Pub. L. No. 102-550, § 1512(a) (1992) (emphases added). The Congress that enacted the original law appears to have been sensitive to the serious due process difficulty that would be presented if the statute were to lack a clear mens rea element. The same cannot be said of the Congress that enacted the USA PATRIOT ACT, Pub. L. No. 107-56 (Oct. 26, 2001) (Patriot Act). This may be understandable, in light of the then-powerful sense of fear and urgency generated by the attacks of September 11, 2001, but this fact does not insulate that Congress's crucial amendment of Section 1960(b)(1)(A) from constitutional scrutiny.

And that amendment cannot survive scrutiny under the Fifth Amendment's Due Process Clause.

What the Patriot Act did was to insert language in Section 1960(b)(1)(A) expressly excluding any mens rea requirement from this portion of the statute:

> **(b)** As used in this section—
>
> **(1)** the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—
>
> **(A)** is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, *whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable*[.]

Patriot Act, Pub. L. No. 107-56, § 373(a) (2001) (emphasis added). A Department of Justice report explained that this amendment's purpose was to close the "loophole requiring that the defendant know about state licensing requirements" by eliminating Section 1960(b)(1)(A) defendants' "affirmative defense that they had no knowledge of the applicable state licensing requirements." *United States v. Talebnejad*, 342 F. Supp. 2d 346, 349 (D. Md. 2004) (quoting U.S. Department of Justice, *Report from the Field: The USA PATRIOT ACT at Work* (2004)), *rev'd*, 460 F.3d 563 (4th Cir. 2006). Unfortunately, what this amendment also did was to push this statutory provision over a due process cliff.

There is nothing inherently criminal, or even wrongful, about operating a money transmitting business – any more than there is anything inherently criminal or wrongful about operating a shoeshine business or a lemonade stand. To the contrary, like these other businesses, a money transmitting business offers a valuable service to the public. A violation of Section 1960(b)(1)(A) is *malum prohibitum*, rather than *malum in se*: The violation stems not from the act of money transmitting itself, but from

the fact that it is done without a state-mandated license. *Quintero-Salazar v. Keisler*, 506 F.3d 688, 693 (9th Cir. 2007). And yet the Patriot Act provides that this paperwork offense may be punished by up to five years of imprisonment regardless of whether the money transmitter had any idea that he was required to have a license. The imposition of such a harsh penalty for morally blameless, *malum prohibitum* conduct with no mens rea requirement violates long-established principles of due process protected by the Fifth Amendment. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (citing authority establishing that a criminal statute "completely bereft of a scienter requirement" would "raise serious constitutional doubts"); accord *Staples v. United States*, 511 U.S. 600, 616-17 & nn.12-14 (1994); *Lambert v. California*, 355 U.S. 225 (1957); *United States v. Goodell*, 990 F.2d 497, 499 (9th Cir. 1993).

Although there are "'limited circumstances'" in which these principles do not apply, those circumstances are not present with respect to Section 1960(b)(1)(A). *Staples*, 511 U.S. at 607 (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 437 (1978)); *see also X-Citement Video*, 513 U.S. at 468-69. Those circumstances involve statutes addressing "public welfare offenses." *Staples*, 511 U.S. at 607; *X-Citement Video*, 513 U.S. at 468-69. Such statutes typically regulate the handling of "potentially harmful or injurious items," the theory being that "as long as a defendant knows that he is dealing with a dangerous device of a character that places him in responsible relation to a public danger, he should be alerted to the probability of strict regulation." *Staples*, 511 U.S. at 607 (citation and internal quotation marks omitted). There is nothing inherently "potentially harmful or injurious" about transmitting money. In addition, the punishment for "public welfare offenses" are generally "relatively small" and "do[] no grave damage to an offender's reputation." *Id*. at 617-18 & n.15 (internal quotation marks omitted). These things cannot be said of Section 1960(b)(1)(A), which subjects an offender to a federal felony conviction accompanied by a fine, up to five years of incarceration, or both. 18 U.S.C. § 1960(a). In short,

Section 1960(b)(1)(A)'s imposition of harsh penalties for a mens rea-free malum prohibitum offense runs afoul of essential due process limitations imposed by the Fifth Amendment. This portion of the statute thus cannot be constitutionally applied.

## CONCLUSION

Based on any or all of the arguments above, this Court should dismiss the portion of the Indictment premised on an alleged violation of 18 U.S.C. § 1960(b)(1)(A). This portion of the Indictment should not be read to the jury; evidence and argument pertaining solely to it should not be permitted or admitted in trial; and the jury should not be instructed that it may return a guilty verdict on Counts 1 or 2 on the premise that Mr. Costanzo violated or conspired to violate 18 U.S.C. § 1960(b)(1)(A).

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion or from an order based thereon.

Respectfully submitted:  November 2, 2017.

JON M. SANDS
Federal Public Defender

 *s/Maria Teresa Weidner*
MARIA TERESA WEIDNER
Asst. Federal Public Defender

Copy of the foregoing transmitted by ECF for filing November 2, 2017, to:

CLERK'S OFFICE
United States District Court
Sandra Day O'Connor Courthouse
401 W. Washington
Phoenix, Arizona 85003

FERNANDA CAROLINA ESCALANTE KONTI
MATTHEW H. BINFORD
Assistant U.S. Attorneys
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

LEE DAVID STEIN
Counsel for Co-Defendant
Peter Nathan Steinmetz

Copy mailed to:

THOMAS MARIO COSTANZO
Defendant

　s/yc