JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona  85007
Telephone: 602-382-2700

MARIA T. WEIDNER #027912
Asst. Federal Public Defender
maria_weidner@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>Thomas Mario Costanzo,<br><br>　　　　　Defendant. | No. CR-17-0585-001-PHX-GMS<br><br>**MOTION TO DISMISS COUNTS 3, 4, 5, 6, & 7 OF THE FIRST SUPERSEDING INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT**<br><br>**(Evidentiary Hearing Requested)** |

　　　　　Defendant Thomas Mario Costanzo, by and through undersigned counsel, respectfully moves this Court for an order dismissing counts 3, 4, 5, 6, & 7 of the First Superseding Indictment (Dkt. # 18). The grounds for this motion are the Due Process Clause of the Fifth Amendment and the court's inherent supervisory authority over the administration of justice as set forth more fully in the attached Memorandum in support of this motion. The relief requested in the instant motion is based on the actions of government agents in their fabrication of an imaginary and unnecessary ruse for the purpose of enticing persons to commit acts so that more serious criminal charges might be filed against said persons, in violation of defendant's right to due process.

/ / /

/ / /

/ / /

/ / /

**MEMORANDUM**

I.      **Introduction**

Law enforcement uses undercover investigations to ferret out suspected criminal behavior; their operations, including the practice of so-called "sting operations," have long been approved of by the courts. *Weatherford v. Bursey*, 429 U.S. 545, 557 (1976) ("Our cases…have recognized the…necessity of undercover work and the value it often is to effective law enforcement"). The defense of outrageous government conduct is premised on the idea that the due process clause imposes limits upon how far the government can go in ferreting out criminal behavior.

Judicial scrutiny of undercover law enforcement operations involves resolving issues related to the parameters of acceptable government conduct in these operations and whether certain investigative techniques crossed those parameters under the circumstances.

II.     **Summary of Relevant Facts**

        **a.  Introduction**

The following factual averments are taken from the Affidavit in support of an application for search warrant authored by Task Force Officer Chad Martin (TFO Martin), Exhibit A, as well as government disclosures and online sources. TFO Martin is a Scottsdale Police Officer federally deputized as a Task Force Officer for the United States Drug Enforcement Administration (DEA), Phoenix Field Division. *Id.* at ¶ 2.

TFO Martin's affidavit provides a summary of the case background and initial investigation conducted by the Internal Revenue Service (IRS), *see id.* at ¶¶ 27-41, as well as the subsequent DEA investigation, *see id.* at ¶¶ 42-81. The affidavit ultimately concludes that probable cause has been established for purposes of authorizing a search of each co-defendant's residence as regards the following alleged violations of federal law: 18 U.S.C. §§ 371 and 1960(a) (Conspiracy to Operate Unlicensed Money Transmitting Business); 18 U.S.C. §§ 1960(a) and 1960(b)(1)(B) (Operation of Unlicensed Money Transmitting Business); 18 U.S.C. § 1956(a)(3)(B) (Money Laundering to Conceal or Disguise the Nature, Location, Source, or Ownership

of Proceeds of Specified Unlawful Activity (i.e., Drug Trafficking); and 18 U.S.C. §
1956(a)(3)(C) (Money Laundering to Avoid Transaction Reporting Requirements of
Represented by a Law Enforcement Officer to be Proceeds of Proceeds of Specified
Unlawful Activity (i.e., Drug Trafficking). Exhibit A at ¶ 90.

### b. Summary of the IRS Investigation: March 2015-March 8, 2016

The IRS began investigating bitcoin traders in the Phoenix metropolitan area
in March of 2015. *Id.* at ¶ 27. The method reportedly employed was simply to access a
website called LocalBitcoins.com. *Id.* at ¶¶ 26, 27. Local Bitcoins is a "peer-to-peer
Bitcoin exchange."[1] It is further described on its publicly accessible website as "a
marketplace where users can buy and sell Bitcoins to and from each other….[u]sers,
called traders, create advertisements with the price and the payment method they want
to offer."[2] Individuals interested in trading bitcoin are invited to "browse the website for
trade advertisements and search for their preferred payment method."[3]

IRS agents identified the profile of "Morpheus Titania" on
LocalBitcoins.com, which included a phone number, terms of trade, and identified
"meeting preferences" for conducting trades at public locations such as McDonalds,
Starbucks, and Paradise Bakery. Exhibit A at ¶ 27. The profile was reportedly created in
March 2013, had over one hundred confirmed transactions, and a 100% positive
feedback from those who said they had traded with Morpheus. *Id.* at ¶ 28. The profile
also reportedly advised that fees ranging from 7% to 10% above the average market
price were charged by Morpheus for his service and claimed the ability to "sell between
$200-$30,000 worth of bitcoin in a single transaction." *Id.*

Having identified "Morpheus Titania" as Thomas Mario Costanzo, a leading
bitcoin trader in the Phoenix metropolitan area, an IRS undercover agent calling himself

---

[1] LocalBitcoins.com, Frequently Asked Questions, accessible at
https://localbitcoins.com/faq (last accessed Oct. 31, 2017).

[2] *Id.*

[3] *Id.*

Sergei (IRS UCA #1) contacted Mr. Costanzo through LocalBitcoins.com. *Id.* at ¶ 30. They met on March 20, 2015 at a Starbucks in Chandler, Arizona regarding IRS UCA #1's "interest" in purchasing bitcoin; at that meeting, IRS UCA #1 purchased 6.67780664 bitcoins from Mr. Costanzo for $2,000.00. *Id.* at ¶¶ 29-30; *see also* Exhibit B, Bates 5-6. This exchange was not charged in the present indictment and neither the recording nor the memorandum prepared to memorialize the exchange suggest that IRS UCA #1 represented in that meeting that he was involved in drug trafficking. Exhibit B.

At that initial meeting, Mr. Costanzo also invited IRS UCA #1 to a public Bitcoin Meetup scheduled to take place the following day at a Classic Crust Pizza restaurant. Exhibit A at ¶¶ 30-31. The affidavit points out that Mr. Costanzo co-organized the meetup at the pizza place. *Id.* at ¶ 31. It is noted that "Meetup" is an app that allows individuals to connect based on common interests such as and including arts, pets, games, hobbies, etc.[4] An individual may use the app to identify and attend a "meetup" or create a new meetup.[5] There are more than 100 Phoenix-area meetups spanning nearly as many areas of interest.[6] Of these, at least 12 are advertised as bitcoin meetups.[7]

Over the course of the IRS's year-long investigation of co-defendants, IRS UCA #1 conducted a series of in-person undercover meetings with Mr. Costanzo. *Id.* at ¶¶ 30-34, 37. In preparation for each of these meetings, IRS UCA #1, and later, another undercover agent calling himself Tom (IRS UCA #2), would request to trade increasingly larger amounts of money for bitcoin; later, at the meeting; they would make verbal representations that the money was related to drug trafficking. *Id.*; *see also,*

---

[4] *See* https://www.meetup.com (last accessed Oct. 31, 2017).

[5] *Id.*

[6] *See* https://www.meetup.com/cities/us/az/phoenix/ (last accessed Oct. 31, 2017).

[7] *See* https://www.meetup.com/topics/bitcoin/us/az/phoenix/ (last accessed Oct. 31, 2017).

4

*e.g.,* Exhibit C, Bates 7-8. Mr. Costanzo's response: he did not want to know anyone's business; he just wanted to trade bitcoin. *See, e.g.,* Exhibit C.

There is no indication in government disclosures that there was any reason for the IRS to suspect or believe that Mr. Costanzo was in any way involved in any aspect of drug trafficking when the decision was made to make him a target of this sting. It is thus unclear how and why the decision was made for IRS UCAs #1 and #2 to insert the fiction of being drug traffickers—or as individuals involved in any other "specified unlawful activity"—into their cover. The investigation was turned over to the DEA in March 2016. Exhibit A at ¶ 42. Counts 3, 4, and 5 of the present indictment arise from the IRS portion of the investigation. It is altogether unclear why further investigation at this point was even necessary, as regards Mr. Costanzo.

### c.  Summary of DEA Investigation: March 2016-April 2017

TFO Martin's affidavit describes this investigation—of which DEA was a part—in somewhat spectacular terms. *Id.* Reference is made to a "Joint task Force investigating the money laundering and drug trafficking activities of multiple individuals utilizing a hidden portion of the internet known as the Darknet to facilitate the sale, transportation, and distribution of illegal drugs throughout the United States in exchange for the digital crypto-currency Bitcoin. Because transactions on the Darknet are conducted with digital crypto-currency, investigators have identified Bitcoin exchangers in the Phoenix area who are unlawfully exchanging Bitcoin for U.S. Currency with individuals frequenting the Darknet for illicit activities." *Id.*

This characterization at the very least strongly implies that co-defendants in this case were identified via the Darknet. However, this assertion is in direct conflict with the affidavit's earlier assertion that the IRS investigation was not the result of scouring the Darknet, but accessing the publicly available and accessible LocalBitcoins.com website. *Id.* at ¶¶ 26, 27. Further, government disclosures do not indicate that Mr. Costanzo had any involvement in the "Darknet." To the contrary, efforts by the DEA's undercover agent (DEA UCA) to elicit information on this topic

from Mr. Costanzo reveal that his interest was only in trading bitcoin in peer-to-peer situations:

> DEA UCA: Now do you know much…obviously you know, you know everything about bitcoin, do you know much about, like, Darknet? And…
>
> TC: No…I don't use (unintelligible)…Darknet...too much…
>
> DEA UCA: I mean, I'm not trying to come out…but some of the things I do…you have to send products back and forth and it's just well I need a way to pay for it. There's another way I've been learning about, is to buy stuff on the Darknet, they ship it to your house, you can pay with bitcoin…
>
> TC: Mmhmm…
>
> DEA UCA: …and I hear that's even more secure cause you don't have to, everything you use different browsers and stuff where they…
>
> TC: Well the problem is, see, the (stutter) failure in the system is, is that somebody takes down the website…
>
> DEA UCA: Yeah…
>
> TC: Then you're hosed
>
> DEA UCA: But, I mean, (stutter) I don't even know how the website works…
>
> TC: What we're doing is, the risk level is super dooper low…
>
> DEA UCA: Yeah.
>
> TC: Because I don't I don't send you the bitcoin until I get the money.
>
> DEA UCA: Yes.
>
> TC: And once I send them, they're there, there is no customer service…

Exhibit D, Bates 563 at 1:19:09-1:20:04; *compare* Exhibit A, ¶ 50. Finally, there is no evidence whatsoever in government disclosures to support the implication that the bitcoin exchangers who were the target of this investigation—Mr. Costanzo and Dr. Steinmetz—had been involved with anyone associated with the Darknet. When DEA UCA inquires about using the Darknet, Mr. Costanzo, dismisses and redirects the discussion to the virtues of peer-to-peer bitcoin transactions. *Id.*

6

In fact, the closest that the affidavit comes to making a connection with any other person purportedly involved in illicit activity (though not the Darknet) is in regards to an alleged "pimp" Mr. Costanzo mentions in conversation with DEA UCA during a meeting. *Id.* at ¶ 54. The recording of this meeting, however, suggests otherwise:

> TC: I had the other day this guy, he uh, he buys a fair, a lot, you know he buys like a few hundred a week, you know he's a regular, you know what I mean? And then the other day he hands me 600 bucks or 500 and change and but then there's 80 $1 bills there and I'm like dude…
>
> DEA UCA: Give me a break (laughing)
>
> TC: And I'm like dude…
>
> DEA UCA: (laughing)
>
> TC: You wanna give me $1 bills?
>
> DEA UCA: Yeah, does he work in a strip club?
>
> TC: Well he gets them from his girls…
>
> DEA UCA: Alright…
>
> TC: You wanna give me $1 bills, it's 20%. I don't mind takin 'em, 20%
>
> DEA UA: Yeah.
>
> TC: I'm not a fuckin, you know, I don't wanna…
>
> DEA UCA: You don't wanna deal with it
>
> TC: Well yeah, I use it for like, I went out to dinner with my girlfriend and I paid the guy like 40 bucks in ones…

Exhibit E, Bates 677, at 1:12:26-1:13:13. Based on this conversation, it is clear that the DEA UCA made an assumption; the "girls" alluded to by Mr. Costanzo could well have been—and more likely were, given the multitude of $1 bills—exotic dancers and not prostitutes. *See, e.g.,* Exhibit F, Havocscope, Prostitution Prices.

Beginning in September of 2016, the DEA UCA, who called himself Jake, contacted Mr. Costanzo through the publicly available and accessible website LocalBitcoins.com for purposes of discussing trades of cash for bitcoin. Exhibit A at

7

¶ 44; *see also supra* notes 1-3. Like the IRS investigation, the DEA UCA began with smaller amounts (i.e., $2,000), Exhibit A at ¶ 45, and progressed to much larger amounts (i.e., $30,000, $100,000), *id.* at ¶ 63. Each of these transactions was conducted in person, at a local eatery or café, where Mr. Costanzo both accepted and counted the money brought by the UCA for the transaction at the public site. As with the IRS investigation, verbal insinuations were made to Mr. Costanzo by the UCA DEA suggesting that the money sought to be exchanged by the UCA for bitcoin was illegal proceeds. *See e.g.,* Exhibit A at ¶ 63. As with the IRS investigation, Mr. Costanzo reiterated that he had no interest in being made privy to the personal business of others. *Id.*

That bitcoin trader "Morpheus Titania" was Thomas Costanzo is a fact that was developed by law enforcement early on in the investigation. *Id.* at ¶ 29. Government investigation also identified Mr. Costanzo's online presence on his publicly available website, www.titanians.org. *See, e.g.,* Exhibit G, Bates 1114-1117. Likewise, it was determined by law enforcement early on in the DEA portion of the investigation—approximately on or about autumn of 2016—that Mr. Costanzo resided in a rental apartment located at 417 North Loma Vista Circle, Unit #202 in Mesa, Arizona. *Id.* at ¶ 52. Moreover, the DEA UCA's first meeting with Mr. Costanzo at a McDonald's in Mesa, Arizona was delayed due to Mr. Costanzo's vehicle—a 1997 Saturn—breaking down. *See* Exhibit G, Bates 22-23. At subsequent meetings with DEA UCA prior to April 2017, Mr. Costanzo rode a bicycle and/or the Light Rail. Exhibit E, Bates 677 at 1:35:47-1:35:55.

## III.   Legal Analysis

### a.   Dismissal as a remedy where government conduct amounts to a due process violation.

A district court may dismiss all or part of an indictment on the ground of outrageous government misconduct if the conduct amounts to a due process violation. *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). "To violate due process, governmental conduct must be 'so shocking and so outrageous as to violate the universal sense of justice.'" *Id.* at 1091 (citations omitted). A defendant may "invoke

the outrageous government conduct defense if he was subjected to police conduct repugnant to the American system of criminal justice." *United States v. Lomas*, 706 F.2d 886. 890 (9th Cir. 1983). In evaluating the merits of this claim, the focus is solely on the conduct of the government and their agents and not a defendant's mental culpability or predisposition to commit an offense. *United States v. Bogart*, 783 F.2d 1428, 1432 n.1 (9th Cir. 1986) *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986).

A district court may also dismiss all or part of an indictment under its inherent supervisory authority where "the government's conduct…caused substantial prejudice to the defendant and [was] flagrant in its disregard for the limits of professional conduct." *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993)(citations omitted).

In order to show outrageous government conduct, defendants must "show conduct that violates due process in such a way that it is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (internal quotation marks and citations omitted). The defense is "limited to extreme cases in which the government's conduct violates fundamental fairness." *Id.* (citing *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)).

The precise limits in defining what conduct is "so shocking and so outrageous as to violate the universal sense of justice" and what limits should be placed on the government is not easily definable based on the current state of jurisprudence. The majority of decisions in this Circuit have focused on determining what does *not* constitute outrageous government conduct as opposed to what does. *See, e.g., United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) *cert. denied*, 484 U.S. 898 (1987)(*Simpson I*)(no outrageous government conduct where prostitute-informant became sexually and emotionally involved with defendant for purposes of leading him to the FBI); *United States v. Penn*, 647 F.2d 876 (9th Cir. 1980)(*en banc*)(no outrageous

government conduct where officer bribed five-year-old child to point out parent's drug stash); *but see Greene v. United States,* 454 F.2d 783 (9th Cir. 1971).

Other cases have attempted to articulate the parameters of the defense of outrageous government conduct more precisely. *See, e.g, United States v. Bonnano,* 852 F.2d 434, 437 (9th Cir. 1988). The most recent addition to the tools provided to guide analysis is brought in *United States v. Black,* 733 F.3d 294 (9th Cir. 2013). While the panel majority did not introduce a novel approach *per se*, it collected six factors relevant to the question identified from previous outrageous government conduct cases. *Id.* at 303-04. These six factors, while not intended as a formal checklist, assist in focusing the analysis on the totality of the circumstances. *Id.* at 304. These are as follows:

(1) <u>Individualized suspicion</u>. While not required, individualized suspicion that an individual or identifiable group is involved in wrongdoing prior to the government's decision to initiate a sting operation is "an important consideration." *Id.* (citing *United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir. 1991) and *Bonnano*, 852 F.2d at 438).

(2) <u>Known criminal characteristics of defendants</u>. The government's awareness of defendant(s) criminal background and/or propensity at the initiation of its sting operation is another important consideration. *Black*, 733 F.3d at 304-05 (citing *Williams*, 547 F.3d at 1200 (noting that before the government suggested a stash house robbery, the defendant was introduced to the government "as a middleman drug dealer"); *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) ("While…there was no ongoing criminal enterprise that the government was merely trying to join, Mayer was certainly a willing and experienced participant in similar activities [traveling internationally for sex with boys]." (citation omitted)).

(3) <u>Government's role in creating the crime</u>. This factor considers whether "the government approached the defendant initially or the defendant approached a government agent, and whether the government proposed

the criminal enterprise or merely attached itself to one that was already established and ongoing." *Id.* at 306 (citing, e.g., *Williams*, 547 F.3d at 1200; *Mayer*, 503 F.3d at 747).

(4) <u>Government's encouragement of defendant(s)</u>. The extent to which the government encouraged a defendant's participation is an important consideration; "mere encouragement being of lesser concern than coercion." *Id.* at 308.

(5) <u>Government's participation in the crime</u>. This factor involves a three-part inquiry:

    a. The <u>duration</u> of the government's participation in a criminal enterprise is significant in this regard; "participation of longer duration being of greater concern than intermittent or short-term government involvement." *Id.* at 308-09 (citing *Greene*, 454 F.2d at 786 (finding outrageous government conduct where the government's participation "was of extremely long duration," lasting about three years).

    b. Likewise, the <u>nature</u> of the government's involvement—"whether the government acted as a partner in the criminal activity, or more as an observer of defendant's criminal conduct." *Black*, 733 F.3d at 308-09.

    c. Finally, the <u>necessity</u> of the government's participation in the crime, specifically "whether the defendants would have had the technical expertise or resources necessary to commit such a crime without the government's intervention." *Id.* at 309.

(6) <u>The nature of the crime being investigated</u>. This final factor evaluates the need for the investigative technique used in light of the challenges of investigating and prosecuting the type of crime being investigated. *Id.*

While district courts <u>have</u> recently sustained arguments asserting the defense of outrageous government conduct, such rulings have been overruled at the appellate level

11

in recent times. *See e.g.*, *United States v. Dunlap*, 593 Fed. Appx. 619 (9th Cir. 2014) (overruling district court dismissal of indictment for outrageous government conduct in *United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014)).

### b. Dismissal as a remedy pursuant to the supervisory powers of the District Court.

One of the greatest challenges to mounting an outrageous government conduct defense seems to be the subjectivity of the inquiry undertaken by the court. *See, e.g., United States v. Miller,* 891 F.2d 1265, 1273 (7th Cir. 1989) (Easterbrook, J., concurring) (explaining how some sting operations do not trouble him, but "other judges are offended by immorality (such as sponsoring an informant's use of sexual favors as currency) or by acts that endanger informants (such as supplying them with drugs for personal use) but not by [a] traditional sting").

But there is also another path. Where challenged governmental conduct is problematic but does not quite rise to the level of a due process violation, the court may nonetheless dismiss under its own supervisory powers. *Barrera-Moreno*, 951 F.2d at 1091. "These powers may be exercised for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct. *Id.* (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991) (*Simpson II* ).

## IV.  Argument

In his challenge to the reasonableness of both the IRS and the DEA tactics and investigation as regards the instant case, Mr. Costanzo points to factors highlighted in *Black* that, taken together, warrant a finding of outrageous government conduct and dismissal of the money laundering charges in the present indictment: Counts 3, 4, 5, 6, & 7. In the alternative, these factors, taken together illustrate that the "sting tactic" utilized by law enforcement in this case has the effect of undermining the integrity of our judicial system; thus, the money laundering counts in the present indictment must be dismissed to deter such actions by government agents under similar circumstances in the future.

(1) <u>Individualized suspicion</u>. In this case, the bare fact that Mr. Costanzo was a self-identified bitcoin trader using the localbitcoins.com platform piqued the interest of the IRS. *See supra* Part II(b). However, even assuming *arguendo* that bitcoin traders as a group are more likely to commit crimes in violation of 18 U.S.C. § 1960 than members of the general population, there was no basis for the UCAs to insert the fiction of drug trafficking into their ruse in this case. In similar cases where law enforcement pursued prosecution for violations of § 1960 against bitcoin traders identified via localbitcoins.com, such methods do not appear to have been used. *See, e.g., United States v. Mansy,* CR-15-00198-GZS (D. ME); *United States v. Klein*, CR-17-03056-MDH (W.D. MO). The sole case identified by undersigned counsel in which money laundering and drug trafficking charges were pursued in a case arising from a localbitcoins.com investigation was one in which at least one co-defendant appears to have been involved in an actual (non-sting) conspiracy to possess with intent to distribute a controlled substance: Alprazolam. *United States v. Lord*, CR-15-00240-SMH-MLH (W.D. LA). In the instant case, no individualized suspicion exists to support law enforcement's apparent conclusion in this case that bitcoin traders generally and Mr. Costanzo specifically was involved in money laundering activity.

(2) <u>Known criminal characteristics of defendants</u>. At the time of the initiation of the IRS investigation, all that was known of Morpheus Titania a/k/a Mr. Costanzo, was that he was a bitcoin enthusiast who traded the virtual commodity. *See supra* Part II(b). What was learned in the course of this investigation by both IRS and DEA is that Mr. Costanzo, because of his tenuous financial situation, was likely to be vulnerable to a law enforcement ruse, or "sting", that might allow him to better support himself. *See supra* Part II(c). He lived in a bad neighborhood, owned an unreliable vehicle, and relied on the profits he made from trading bitcoin to support himself. *Id.* His reliance on public locations to conduct his transactions argues that the upper limit of trading capacity suggested on his localbitcoins.com profile of $30,000 was aspirational at best. *See supra* Part II. The logistics of attempting to discreetly count thousands of dollars in a public place is impractical, unsafe and untenable. *Compare*, Exhibit A at ¶¶ 77, 78

13

(detailing Steinmetz's plan to bring a computer, money counter and meet in a "pilot room" at the Chandler Airport to conduct the $100,000 exchange); and ¶ 48 (Costanzo stating that he always conducts his exchanges in public places). In a word, Mr. Costanzo's poverty made him an easy target for the government. The result: an upping of the ante from two alleged violations of law, each carrying a 5-year statutory maximum sentence, to five allegations, each carrying a 20-year statutory maximum.

(3) Government's role in creating the crime. The crime of money laundering as charged in the present indictment was entirely the brainchild of the government. The government approached Mr. Costanzo with large amounts of money and awkwardly inserted claims of illegal drug trafficking activity into their transactions. *See, e.g.,* Exhibit C (UCA: "[Y]ou know when I talk about supplier I'm talking about drugs, right? Heroin."). While the government will argue that criminal activity in violation of § 1960 was ongoing; there was no indication or proof of money laundering outside of the government sting. That is, the government did not simply attach itself to a suspected ongoing criminal enterprise—it created a new and more serious one.

(4) Government's encouragement of defendant(s). The government's encouragement in this case took the form of exploiting not only Mr. Costanzo's poverty, but also his so-called anti-establishment political views and utopian notions of the potential for bitcoin to "change the world." *See, e.g.,* Exhibit G.

(5) Government's participation in the crime. This factor considers three distinct elements. First, the duration of government involvement: the government here pursued Mr. Costanzo a substantial amount of time: 25 months. Second, the nature of government involvement: the government was no mere observer of defendant's alleged criminal conduct here; each charged money laundering offense was created and orchestrated by government agents to ensnare Mr. Costanzo. Third, the necessity of the government's involvement: there was no exigency to justify the setting of this trap for Mr. Costanzo, particularly in the absence of extrinsic evidence or investigation to support even a reasonable suspicion that he was otherwise so engaged in money

laundering activities. In a word, § 1960 charges alone were sufficient to halt his allegedly illegal bitcoin trading activities.

(6) <u>Nature of the criminal activity</u>. The instant case is simply not one where an imminent danger of violence or physical harm was present. Had such been the case, there would have been some justification fpr the position that a sting operation was both necessary and prudent under the circumstances. There are certainly operations in which the trickery and deceit inherent in sting operations is legitimate and justified to protect both the public and law enforcement personnel. *See, e.g.,* Exhibit I, CNN: Report RE: FBI sex-trafficking sting Operation Cross Country XI; *see also Black*, 733 F.3d at 309-310 (noting in regard to the justification for the use of stash house stings that "home invasions related to drug deals involve[] disputes between rival gangs, and trying to arrest one gang in the act of robbing another can lead to shoot-outs and hostage taking. The reverse sting tactic was designed to avoid these risks to the public and law enforcement by creating a controlled scenario…").

In the instant case, such rationalization and justification is inapplicable and thus unavailable. The insertion of narcotics trafficking and money laundering into the story line here served no purpose but to increase Mr. Costanzo's personal jeopardy. This end, sadly, gives credence to paranoid professions of anti-establishmentarianism and distrust of the government that appear to be on the rise in American society. *See, e.g.,* Exhibit J, Pew Research Center, *Public Trust in Government: 1958-2017.*

Sting and reverse-sting tactics, though sometimes necessary and justified when undertaking operations so as to avoid risks to the public and law enforcement, or to save innocent victims from imminent or ongoing harms, should not be a go-to tactic for the government. Needlessly resorting to tactics that rely on assuming the worst in our citizenry bring out the worst in our government, foster distrust, and encourage disrespect. Such conduct by the government thus undermines our Constitution's promise of due process and besmirches the integrity of our very judicial system. This cannot stand. Counts 3, 4, 5, 6, and 7 of the present indictment, all fruit of this

15

unnecessary and therefore reprehensible "sting," must therefore be dismissed. *Greene*, 454 F.2d at 787.

Respectfully submitted:  November 6, 2017.

JON M. SANDS
Federal Public Defender

*s/Maria T. Weidner*
MARIA T. WEIDNER
Asst. Federal Public Defender

Copy of the foregoing transmitted by ECF for filing November 6, 2017, to:

CLERK'S OFFICE
United States District Court
Sandra Day O'Connor Courthouse
401 W. Washington
Phoenix, Arizona 85003

MATTHEW BINFORD
CAROLINA ESCALANTE-KONTI
Assistant U.S. Attorneys
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

LEE STEIN and MICHAEL MORRISSEY
Counsel for Co-Defendant
PETER NATHAN STEINMETZ

Copy mailed to:

THOMAS MARIO COSTANZO
Defendant

  *s/yc*