1

**INDEX OF EXHIBITS**

2

United States v. Thomas Mario Costanzo

3

CR-17-0585-01-PHX-GMS

4

5

6

Exhibit A ....................... Affidavit in Support of an Application for Search Warrant

7

Exhibit B ...................................................................................................Bates 5-6

8

Exhibit C ...................................................................................................Bates 7-8

9

Exhibit D ...........................................Bates 563 (Submitted Under Separate Cover)

10

Exhibit E ..........................................Bates 22-23(Submitted Under Separate Cover)

11

Exhibit F ...................................Havoscope, Prostitution Prices in the United States

12

Exhibit G ...........................................................................................Bates 1114-1117

13

Exhibit H.....................................................................................................Bates 22-23

14

Exhibit I ......CNN Reports: FBI Sex-Trafficking Sting Operation Cross Country XI

15

Exhibit J ................. Pew Research Center, Public Trust in Government:  1958-2017

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# A

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

1.     I, Chad Martin, Task Force Officer of the United States Drug Enforcement Administration, Phoenix Field Division, Arizona, being duly sworn, hereby depose and state:

### INTRODUCTION AND BACKGROUND OF AFFIANT

2.     Your Affiant, Task Force Officer (TFO) Chad Martin, Scottsdale Police Department badge number 1294, has been employed by the Scottsdale Police Department since January 14, 2008, and was federally deputized as a Task Force Officer for the United States Drug Enforcement Administration (DEA), Phoenix Field Division (PFD) on July 2, 2015.  Affiant Martin is currently assigned to the DEA PFD Task Force Group One (TFG1).

3.     Your Affiant attended the Mesa, Arizona Law Enforcement Training Academy and received basic training in law enforcement practices and narcotics investigations.   This training included the identification, investigation, and regulation of drug trafficking.

4.     From June 2008, to April 2012, your Affiant worked as a patrol officer and participated in no fewer than one hundred arrests relating to illegal drugs.  During that time, your Affiant became familiar with the ways in which illegal drugs are packaged and transported, as well as some of the common methods of operation used by drug traffickers to conceal and sell illicit drugs.

5.     In May 2010, your Affiant attended the Scottsdale Police Department Narcotics Trained Officer (NTO) School.  NTO School consists of advanced narcotics training, which covered the detailed identification, investigation, and regulation of drug trafficking including additional education in drug recognition and the techniques in which drugs are concealed, packaged, and transported.

6.     In March 2011, your Affiant completed an Arizona Department of Public Safety course in marijuana and powder drug substance field testing.  During this time, your Affiant became certified in the visual identification and chemical testing of marijuana,

1

methamphetamine, cocaine and cocaine base.  Your Affiant was also trained in the classification and varieties of marijuana and the use, growth, packaging, and lifespan of marijuana.

7.  In October 2011, your Affiant completed a 40-hour Scottsdale Police Department Drug Enforcement Unit Undercover School.  During this school, your Affiant received advanced training in drug related surveillance operations, search and seizure procedures, the use and management of confidential informants, and undercover drug purchasing operations.

8.  In April 2012, your Affiant was assigned to the Special Investigations Section of the Scottsdale Police Department, Drug Enforcement Unit.  This Unit is responsible for investigating all aspects of drug related crimes in Scottsdale including narcotic, dangerous, and marijuana-related drug crimes, as well as local drug organizations responsible for the facilitation and distribution of illegal drugs and their related financial crimes.  During this assignment, your Affiant investigated a multitude of drug related crimes including street level drug crimes, established drug trafficking organizations (DTOs), prescription fraud organizations, money laundering, and asset forfeiture investigations.  Since April 2012, your Affiant has operated as both the Case Detective and Undercover Detective on a multitude of investigations, including numerous hand-to-hand drug transactions, and has received first-hand knowledge of how street drugs are packaged, concealed, transported, sold, and used.  Your Affiant has debriefed and managed multiple confidential informants and has gained experience managing confidential informants during covert drug operation.

9.  In July 2012, 2013, and 2014, your Affiant attended the Arizona Narcotics Officers Association (ANOA) Conference.  During these conferences, your Affiant attended numerous seminars related to drug investigations and received advanced training on drug cartels, common drug trafficking methods of criminal

2

motorcycle gangs, and training on the methods and practices of drug trafficking organizations (DTOs).

10.  In May 2013, your Affiant attended a one-week International Narcotics Interdiction Association (INIA) interdiction seminar.  This training provided your Affiant focused information on interstate drug trafficking, including methods commonly used by drug traffickers to covertly transport drugs and currency across state lines and avoid detection by law enforcement.

11.  In May 2015, your Affiant was assigned to the United States Drug Enforcement Administration (DEA), Phoenix Divisional Office, as a Task Force Officer (TFO) and was federally deputized on July 2, 2015.  By virtue of my employment as a Task Force Officer, your Affiant has performed various tasks, which include, but are not limited to:

a) Functioning as a surveillance agent, thus observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;

b) Interviewing witnesses, confidential sources (CS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

c) Functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments;

d) Initiating and monitoring of Title III investigations; and,

e) Conducting complex financial investigation involving the structuring, placement, and layering of large amounts of U.S. currency.

3

12.     In the course of conducting drug investigations, you Affiant has personally interviewed informants and persons involved in the distribution of illegal drugs. These persons include users of illegal drugs, sellers of illegal drugs, and experienced federal, state, and local drug enforcement officers. Your Affiant has consulted with other experienced investigators concerning the practices of drug traffickers and the best methods of investigating them. Your Affiant is familiar with the methods used by those engaged in illegal drug and controlled substance activities to conduct their business, transport and distribute their products, protect their associates, conceal their identities, avoid detection and identification of their assets, activities, and whereabouts. All of these sources of information have provided your Affiant with objective details about the methods and practices of drug crime investigations.

13.     Your Affiant has aided in no fewer than five wiretap investigations. Your Affiant has conducted physical surveillance, acted as a line investigator, line supervisor, conducted follow up investigation, and participated in arrests, the execution of search warrants, and interviews of subjects related to wiretap investigations.

14.     In preparing this Affidavit, your Affiant has conferred with other experienced detectives and law enforcement officers who share the opinions and conclusions stated herein. Furthermore, your Affiant has personal knowledge of the facts discussed in this Affidavit, or learned them from the individuals mentioned herein.

15.     Your Affiant also relies on his experience, training, and background as a Task Force Officer with the DEA in evaluating this information.

16.     Throughout the course of this investigation, your Affiant has extensively researched crypto-currency technology. Your Affiant has learned the ways in which Bitcoin and other digital currencies known as Altcoins are utilized as both a store of value and as a method of payment in a digital environment. Your Affiant has learned that these peer-to-peer decentralized crypto-currencies utilize publicly distributed blockchain technology to facilitate the movement of funds throughout the world. Because of this technology, your Affiant knows that money can be

4

easily laundered and sent anywhere in the world using Bitcoin. Your Affiant has attended multiple meetings related to virtual currency and conferred with experts in the field of Bitcoin and blockchain technology.

## RELEVANT CRIMINAL STATUTES AND PURPOSE OF AFFIDAVIT

17. On the basis of the facts herein, your Affiant submits there is probable cause to believe that violations of Title 18 U.S.C. §§ 371 and 1960(a) (Conspiracy to operate unlicensed money transmitting business), 18 U.S.C. §§1960(a) and 1960(b)(1)(B) (Operation of unlicensed money transmitting business), 18 U.S.C. 1956(a)(3)(B) (Money laundering to conceal or disguise the nature, location, source, or ownership of proceeds represented by a law enforcement officer to be proceeds of drug trafficking in violation of 21 U.S.C. §§ 841 and 846), and 18 U.S.C. 1956(a)(3)(C)    (Money laundering to avoid transaction reporting requirements of proceeds represented by a law enforcement officer to be proceeds of drug trafficking in violation of 21 U.S.C. §§ 841 and 846) have and/or will be committed by subjects described within this Affidavit. Your Affiant requests a warrant to search and seize evidence from the following properties and vehicle which are being utilized to facilitate the crimes described above.

18. The target properties and vehicles requesting to be searched are as follows:

   a) AN APARTMENT UNIT located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ▮▮▮▮▮▮▮▮▮, as further described in attachment A-1. This is a multi-unit, two story apartment complex located on the northeast corner of the intersection of ▮▮▮▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮ Specifically, Unit ▮▮ is located on the second story, far south end of the complex. Unit ▮▮ is the first unit located at the top of the most southern staircase. The front door to the unit faces west and has a tan in color metal security door. At the time of this writing, there is a piece of white paper in the front window to the unit with the numbers "▮▮▮" printed in black.

5



b) A RESIDENCE located at ████████████████████████
████████████████  ████████████████  █ further described in
attachment A-2  This is a single story residence with a tan brick exterior
and a brown shingle roof. ████████████

████████████████████  ████████████

████████████████  lists Peter STEINMETZ as the
owner of the property.  (Further identified in attachment A-2)

c) The VEHICLE identified as a 2000 **Porsche Boxster**, red in color,
displaying Arizona license plate "SATOSHI", assigned VIN:
████████████ currently registered to Peter STEINMETZ at
████████████ (hereinafter referred to as
"**Porsche Boxster**"), as described in attachment A-3.

19. Pursuant to Title 18 U.S.C. § 982 (Criminal forfeiture), incorporating the
procedures governing forfeitures for violations of  Title 18 U.S.C.
§§1956(a)(3)(B), 1956(a)(3)(C), 1960(a), and 371, your Affiant further submits
that there is probable cause for the seizure and forfeiture of the following vehicle:

a) The **Porsche Boxster** referred to as above, which is specifically identified
as a 2000 **Porsche Boxster**, red-in-color, displaying Arizona license plate
"SATOSHI", assigned VIN: ████████████ , currently registered
to Peter STEINMETZ at ████████████
(hereinafter referred to as "**Porsche Boxster**"), as described in attachment
A-3.

## BACKGROUND ON BITCOIN

20. Bitcoin is a digital, non-regulated, crypto-currency which operates independently
of a central bank or single administrator and is held electronically, commonly on a
computer, cellphone or tablet.  It is a peer-to-peer system and transactions take
place between users directly, without an intermediary.  Because there is no central

6

oversight or authority, Bitcoin transactions are verified by network nodes and recorded in a public ledger called the blockchain.

21.   Bitcoin is pseudonymous, meaning that the digital currency is not tied to an identifiable real-world entity but rather to a Bitcoin address. Owners of a Bitcoin address are not explicitly identified and new addresses can be generated for every new transaction to increase anonymity. A digital or paper wallet stores the information necessary to facilitate a Bitcoin transaction and contains an individual's Bitcoin holdings.

22.   The purchase and sale of Bitcoin can be conducted either through an online website exchange such as Coinbase.com, or through an in person peer-to-peer transaction that does not use an established exchanging service as an intermediary. Peer-to-peer transactions can be conducted by individuals meeting in person where the seller sends Bitcoin from their digital Bitcoin wallet directly to buyer's Bitcoin wallet in exchange for a predetermined amount of fiat currency.

23.   The Financial Crimes Enforcement Network (FinCEN) has specific guidelines and regulations pertaining to persons who administer or exchange virtual currencies such as Bitcoin. These regulations define a person who is an administrator or exchanger of virtual currency as someone who accepts real currency or its equivalent from a purchaser, and transmits the value of that currency into virtual currency. This activity is classified as a money transmission business and requires a person acting as a Bitcoin exchanger to be registered as a Money Service Business (MSB) with the United States Secretary of the Treasury.

24.   A lawful Bitcoin exchange should adhere to federal anti-money laundering laws (AML) and Know Your Customer (KYC) guidelines to ensure they are following FinCEN guidelines and not breaking any United States money laundering laws. The objectives of AML and KYC is to prevent MSB's from being used for money laundering activities and allow MSB's to better understand their customers and their financial dealings. There are several legitimate Bitcoin exchanges operating in the United States that follow FinCEN regulations and charge fees as little as 1.5

7

percent for their services to convert fiat currency into Bitcoin.

25.     Your Affiant has learned that there are peer-to-peer Bitcoin transactions conducted with non-registered exchangers typically to avoid reporting requirements under State or Federal law. These non-registered Bitcoin exchangers tend to meet with Bitcoin purchasers in person and typically charge a much higher fee of up to 10 percent for their services. Your Affiant knows based on training and experience that individuals who purchase Bitcoin from non-registered exchangers are willing to pay a higher fee to avoid the filing of a currency reporting form so that their identity and the transaction can remain anonymous, and the origin of the funds is untraceable.

26.     Throughout this investigation, investigators identified a publically accessible website called Localbitcoins.com that facilitates the purchase and sale of Bitcoin by allowing exchangers to list their services and contact information on their website so that customers interested in exchanging U.S. Currency for Bitcoin may contact them. Typically, the customer contacts the Bitcoin exchanger who appealed to their interest. They communicate and if they reach an agreement, they ultimately arrange an in-person meeting where they conduct a peer-to-peer Bitcoin exchange/transaction. The transaction consists of the customer handing a predetermined amount of U.S. Currency to the exchanger, who upon receipt of the currency, electronically transfers the negotiated amount of Bitcoin to the customer's electronic wallet. Localbitcoins.com allows people to create anonymous profiles because they only require users to provide an email address. As a result, many of the Bitcoin exchangers who advertise their services on localbitcoins.com provide an alias or fictitious moniker for their user name and are not registered with the U.S. Secretary of the Treasury.

## PROBABLE CAUSE

### CASE BACKGROUND AND INITIAL IRS INVESTIGATION

27.     In March, 2015, Agents from the Internal Revenue Service (IRS) began

8

U.S. v. Costanzo, et al.          CR-17-00585-PHX-JJT                         003237

investigating localbitcoins.com and identified the Bitcoin exchange profile of "Morpheus Titania," who was the top rated cash Bitcoin exchanger in Phoenix, Arizona. Morpheus Titania advertised the sale of Bitcoin in exchange for cash throughout the Phoenix Metropolitan area and lists his phone number as (602) 434-1725 on the localbitcoins.com website. He states the following in the "Terms of trade" section of his profile:

> Contact hours: I am up late so TEXT me anytime. TEXT me for best and fastest response. I will get you Bitcoins immediately and discretely!

> Meeting preferences: Mcdonalds, Starbucks, Paradise Bakery.

> I have the fastest response times. I travel all over town so u can get the Bitcoins u want and need NOW! TEXT me six-oh-2-four-3-four-one-seven-two-five for fastest and best response.

> All transactions are done complete anonymity. The only only record of the transaction is on the blockchain.

> I am on time, every time. You will see why I have more trades than anyone else around! I love to talk about how Bitcoin is changing the world. I know it has been the best thing I have ever done, IN MY ENTIRE LIFE.

> I can teach u about not getting scammed too. I got scammed by Indian Scammer guy named "William" love to tell you a story about him! BeWARE of anyone wanting to transfer funds to u via Paypal or Venmo. I am available for consultation whether you buy from me or not!

> I love working with both newbie's and pros! Hit me up and u will see why my customers come back to me again and again. I tell u straight how it is.

> I am very friendly and I love to talk. Text me so I know that you want to meet. My customers let you know its worth it to deal with me. :)

> Lately I also trade on mycelium App under Morpheus Titania.

> http://www.titanians.org/who-is-morpheus/

> Have a great Day looking forward to connecting!

9

28.     The localbitcoins.com profile for Morpheus Titania shows the profile was created
on March 12, 2013, and had "100+" confirmed transactions with a 100% feedback
score.   The profile shows that Morpheus Titania charges different prices for
Bitcoin sales depending on what city traveled to and the amount of Bitcoin being
purchased.  Morpheus Titania's fees typically range from a price of 7 percent to 10
percent above the average market price per Bitcoin.  The profile advertises that
Morpheus Titania can sell between $200 - $30,000 worth of Bitcoin during a
single transaction.

29.     Investigators later identified Morpheus Titania as a male named Thomas
COSTANZO (hereinafter referred to as "COSTANZO").  This identification was
based upon subpoenaed information received from T-Mobile USA / MetroPCS for
the (602) 434-1725 telephone number provided by Morpheus Titania on
localbitcoins.com.   Investigators learned that (602) 434-1725 is subscribed to
Thomas COSTANZO, and lists a customer name of "Morpheus Titania."  The
identification was also confirmed from multiple undercover meetings with
COSTANZO where he identified himself as "Morpheus" and was confirmed by
investigators to be Thomas COSTANZO via Arizona Motor Vehicle Department
(MVD) photographs.

30.     On March 21, 2015, an Undercover Agent (UCA1) from the Internal Revenue
Service (IRS) attended a Bitcoin meet up event in Phoenix, Arizona that was
advertised on the internet and is typically held once a month to facilitate the
meeting of people involved in Bitcoin technology and the use of digital currencies.
UCA1 had previously contacted COSTANZO through the localbitcoins.com
website regarding the purchase of Bitcoin and was invited to the meeting by
COSTANZO the day before.

31.     During the meeting, it was learned that COSTANZO is a co-organizer of the
event.  UCA1 sat at a table with a few other individuals who were attending the
meeting.   One of the individuals introduced himself as "Peter" and was later
identified as Peter STEINMETZ (hereinafter referred to as "STEINMETZ") based

10

on his Arizona MVD photograph and a photograph that was posted on http://STEINMETZ.org/peter. STEINMETZ claimed to be a "wholesaler" of Bitcoin during the meeting and explained how he had been conducting Bitcoin transactions with COSTANZO since 2013. STEINMETZ went on to explain that while COSTANZO would meet with just about anyone to do a Bitcoin transaction, he prefers to meet with fewer people and do large transactions. STEINMETZ claimed to be in the business of trading Bitcoin since 2010 and stated that he does a lot of international buying and selling of Bitcoin. STEINMETZ advised that he primarily got into Bitcoin for political reasons and told UCA1 that he likes that Bitcoin is a currency the government can't manipulate. STEINMETZ spoke to UCA1 about Suspicious Activity Reports and how he believes several of those reports have been filed on him due to his large transactions. STEINMETZ also spoke about structuring cash deposits at banks by breaking the large deposits up into smaller amounts. STEINMETZ advised that he uses computer software to keep track of his Bitcoin transactions and trading accounts. He explained that a program called "GNU Cash" is one of the programs he uses. STEINMETZ made it known to UCA1 that he does, and is able to do very large cash to Bitcoin transactions, charging a 5 percent fee to exchange Bitcoin. He explained that he does many thousands of dollars in volume. STEINMETZ and COSTANZO spoke to UCA1 at length about Bitcoin and revealed that they met each other on localbitcoins.com. STEINMETZ also stated that he has worked with COSTANZO for some time exchanging Bitcoin.

32.   On May 20, 2015, UCA1 met with COSTANZO to exchange $3,000 of cash for Bitcoin. During the meeting, the UCA1 began by informing COSTANZO that he needs the Bitcoin to pay his supplier for heroin. UCA1 informed COSTANZO that he buys black tar heroin in Arizona from his supplier for $27,000 a kilo and ships the heroin to New York to sell it for $50,000 a kilo. UCA1 told COSTANZO he needs to exchange between $15,000 - $30,000 at a time and asked COSTANZO if he was able to fulfill that. COSTANZO responded with "Yeah,

11

whatever you want." COSTANZO claimed to have done "about half a million in the last year."

33. UCA1 explained to COSTANZO that he pays his suppliers in Bitcoin to which COSTANZO responded, "Yeah, that is so much easier. Bitcoin makes everything so much easier." They concluded the meeting and successfully exchanged $3,000 U.S. currency into Bitcoin.

34. On October 7, 2015, another IRS Undercover Agent (UCA2) met with COSTANZO at a restaurant in Phoenix, Arizona to conduct a Bitcoin exchange. During the transaction, UCA2 was acting as a partner of UCA1 and stated he was meeting COSTANZO to conduct the Bitcoin purchase related to their business. UCA2 originally set up the meeting telling COSTANZO he wanted to exchange $10,000 cash for Bitcoin. When the meeting took place, UCA2 told COSTANZO he actually had $15,000 in U.S. Currency and would like to exchange all of it for Bitcoin. COSTANZO told UCA2 that he only had enough Bitcoin on him to exchange $13,000, but agreed to meet later that day to exchange the rest. During the meeting, COSTANZO told UCA2 that he was planning to start using a Bitcoin storage device called a "Trezor." Your Affiant knows that a Trezor is an electronic digital currency storage device, similar to a USB memory stick, which contains and encrypts cryptographic private keys used to store digital currency assets such as Bitcoin. COSTANZO then completed the exchange of $13,000 for Bitcoin with UCA2.

35. After the Bitcoin exchange was complete, a surveillance team followed COSTANZO as he left the meeting location. COSTANZO drove directly to [ ]

[ ] address for STEINMETZ. COSTANZO remained at the [ ] for approximately 10 to 15 minutes. Your Affiant believes that COSTANZO traveled to the [ ] so that STEINMETZ could resupply COSTANZO's Bitcoin account since COSTANZO sold $3,000 more Bitcoin to UCA2 than COSTANZO

12

had originally planned. Your Affiant believes COSTANZO needed more Bitcoin to conduct his prearranged sales for the day and maintain his 100% positive feedback on localbitcoins.com. Based on this and the previous communication between STEINMETZ, COSTANZO and UCA1, your Affiant believes that STEINMETZ is a Bitcoin supplier for COSTANZO and has access to large amounts of Bitcoin.

36.     As COSTANZO departed the ▉▉▉▉▉▉▉▉▉▉, surveillance units followed COSTANZO to two public locations and observed him conduct a Bitcoin transaction at each location. Investigators were unable to identify the individuals COSTANZO met with at each location.

37.     On November 21, 2015, UCA1 contacted COSTANZO about doing another Bitcoin exchange. COSTANZO invited UCA1 to a Bitcoin meet-up group event being held at a public venue in Phoenix, Arizona. UCA1 attend the event and observed STEINMETZ was present at the meeting and was conducting a trade with another person. After STEINMETZ completed the exchange with the person, UCA1 then gave $2,000 U.S Currency to STEINMETZ in exchange for Bitcoin. STEINMETZ indicated to UCA1 that he would have more Bitcoin available in the future and provided UCA1 with a business card advising that he could call him to discuss a larger transaction. During this same meeting, UCA1 also met with COSTANZO and exchanged $13,000 worth of U.S. currency for Bitcoin.

38.     Investigators conducted a blockchain analysis of the Bitcoin transfer from STEINMETZ to UCA1 and learned that STEINMETZ used a wallet from a Bitcoin exchange located outside of the United States (hereinafter referred to as "BCE1") to transfer $2,000 worth of Bitcoin to into UCA1's wallet.

39.     Pursuant to a subpoena, investigators learned that in March 2013, STEINMETZ opened an account with BCE1. Investigators learned that BCE1 allows trading between U.S. currency and Bitcoin usually for a fee of 1 to 2 percent. BCE1 also allows U.S. currency and Bitcoin deposits and withdrawals. BCE1 records indicated that over an approximate two-year period, STEINMETZ traded

13

approximately one million dollars' worth of U.S. currency. Investigators also learned that in December 2013, BCE1 asked STEINMETZ a series of Know Your Customer (KYC) questions in order to increase withdrawal thresholds for STEINMETZ. STEINMETZ responded to the KYC questions informing BCE1 that he uses funds to trade between exchanges and listed three banks he was using to withdraw funds. STEINMETZ listed First Bank as one of the three financial institutions where he held an account for the purpose of transferring funds from his BCE1 account. Based on this information and the transfer of Bitcoin to UCA1 from STEINMETZ' BCE1 wallet, your Affiant believes that STEINMETZ holds an account with BCE1 to engage in the unlawful exchange of currency in the United States.

40.    On Feb 29, 2016, UCA1 called STEINMETZ to discuss meeting with him again to exchange cash for Bitcoin and discuss future business together. UCA1 asked STEINMETZ if he could exchange $22,000 to $23,000. STEINMETZ advised that he could do that and it was definitely over his minimum transaction amount. STEINMETZ informed UCA1 that his fee would be 5 percent and that with "those volumes of cash" STEINMETZ wanted to meet at his house where he uses a cash counter. STEINMETZ told UCA1 that his address is

They arranged the meeting for March 8, 2016. STEINMETZ informed UCA1 that his wife does not like him doing business inside the house, so he does it in the garage.

41.    On March 8, 2016, UCA1 met STEINMETZ at the                          where STEINMETZ took UCA1 into his garage to conduct the Bitcoin exchange. Prior to the exchange, UCA1 stated that the cash he brought was from the sale of drugs. STEINMETZ then refused to conduct the transaction with UCA1 explaining he could not complete the transaction because he was now aware the cash was from drug proceeds and would be considered money laundering under federal laws. STEINMETZ told UCA1 that there was a Bitcoin meet-up event that night where someone might be there to conduct the transaction with him.

14

## CURRENT INVESTIGATION

42. Since March 2016, your Affiant, along with other members of the Drug Enforcement Administration (DEA) Task Force Group One (TFG1), members of the United States Postal Inspectors Service (USPIS), the Internal Revenue Service (IRS), and the Department of Homeland Security (DHS) have been conducting a Joint Task Force investigating the money laundering and drug trafficking activities of multiple individuals utilizing a hidden portion of the internet known as the Darknet to facilitate the sale, transportation, and distribution of illegal drugs throughout the United States in exchange for the digital crypto-currency Bitcoin. Because transactions on the Darknet are conducted with digital crypto-currency, investigators have identified Bitcoin exchangers in the Phoenix area who are unlawfully exchanging Bitcoin for U.S. Currency with individuals frequenting the Darknet for illicit activities. Because of the identification of Bitcoin exchangers, the Joint Task Force expanded their investigation to incorporate the money laundering and unlicensed money transmission business activities being conducted by Bitcoin exchangers, including COSTANZO and STEINMETZ.

43. Open source and law enforcement data base queries were conducted on COSTANZO and STEINMETZ to inquire if either has a lawful money transmission business for the purpose of exchanging of U.S. Currency for Bitcoin. Investigators found that while COSTANZO has multiple Bitcoin related videos, interviews, and podcasts posted on the internet explaining Bitcoin technology, COSTANZO does not have any money transmission business documentation filed with FinCEN or with the Arizona Department of Financial Institutions ("AZDFI") that would authorize him to operate a money transmission business and exchange Bitcoin for other forms of currency. In regards to STEINMETZ, investigators learned that the Arizona Corporation Commission lists him as the Statutory Agent of BITCOINANDMORE, LLC, registered in the name of Peter STEINMETZ with an address at the ⬛⬛⬛⬛⬛ A FinCEN and AZDFI query of STEINMETZ and the BITCOINANDMORE, LLC was conducted revealing that

15

neither name was registered as a licensed money transmission business.

44.   In September, 2016, your Affiant, acting in an undercover capacity, reviewed the localbitcoins.com profile being operated by COSTANZO, and then contacted COSTANZO on multiple occasions to conduct cash Bitcoin transactions.  These transactions are described in detail below:

45.   On September 14, 2016, your Affiant, acting in an undercover capacity contacted COSTANZO via a text message at the telephone number COSTANZO advertises on localbitcoins.com (602-434-1725) to initiate the purchase of Bitcoin.  Your Affiant arranged a meeting with COSTANZO for that same day at a restaurant in Mesa, Arizona, to purchase approximately 3 Bitcoins in exchange for $2,000 in U.S. Currency.

46.   Later that day, your Affiant met with COSTANZO (identified via MVD photographs as Thomas Mario COSTANZO) at the previously agreed upon meeting location.  COSTANZO approached your Affiant and introduced himself as "Morpheus" (his alias from localbitcoins.com).  COSTANZO and your Affiant made small talk for approximately twenty minutes where COSTANZO explained his anti-government, anti-banking, anti-establishment views to your Affiant. COSTANZO relayed that he believes the banking system is corrupt and only serves as a means for the government to control its citizens.  COSTANZO explained in detail how Bitcoin works and how peer-to-peer cash Bitcoin transactions are conducted to avoid the need for any banking institutions or government regulations.  COSTANZO informed your Affiant that he knows "a guy" who can get him $100,000 in Bitcoin and advised that he has done approximately a quarter million dollars in transactions with that person (all unreported to the U.S. government).  COSTANZO stated that for large transactions like that, "his guy" purchases Bitcoin off a Bitcoin exchange linked to a bank account.  That person then sells the Bitcoin to COSTANZO at a slightly higher price than he paid, and COSTANZO sells the Bitcoin to his customer at a slightly higher price so they both make money.  Based on the prior IRS

16

undercover meetings with COSTANZO and STEINMETZ, your Affiant believes that the "guy" COSTANZO was referring to is STEINMETZ.

47.   Your Affiant believes based on training and experience that because COSTANZO charges a fee of up to 10 percent above the average market price per Bitcoin, it is unlikely people would conduct business with him if their funds came from a legitimate source. Your Affiant further believes that COSTANZO is aware he is laundering proceeds from illegal activity with Bitcoin by charging such a high exchange price and not following any AML or KYC protocols. This is also based on statements COSTANZO made to your Affiant about his anti-government beliefs and his admissions that Bitcoins allows people to conduct transactions anonymously without any government regulations.

48.   COSTANZO expressed that there are no limits to Bitcoin and that if we wanted to conduct a 10-million-dollar transaction, we could do it. COSTANZO advised that he has no business costs because he utilizes public places for free to conduct his Bitcoin transactions and keeps all of his Bitcoin storages on his cell phone or his electronic Bitcoin storage "Trezor" device. As previously learned during this investigation, your Affiant was aware that a Trezor is an electronic digital currency storage device, similar to a USB memory stick which contains and encrypts cryptographic private keys used to store digital currency assets such as Bitcoin.

49.   Your Affiant asked COSTANZO about the security of Bitcoin and whether the government can track transactions. COSTANZO advised that Bitcoin is pseudonymous and that there are ways to make it difficult to track. COSTANZO also advised that localbitcoins.com is a good way to conceal money transactions.

50.   Your Affiant spoke to COSTANZO about the his use of the Darknet and told COSTANZO that he was looking to purchase items on the Darknet and use Bitcoin as payment method because it is secure. COSTANZO advised that the issue with trusting sites on the Darknet is that the websites can be taken down.

51.   Your Affiant advised COSTANZO that he has a need to transport large quantities

17

of money between Arizona and California and was trying to avoid having the money seized if stopped by law enforcement. COSTANZO stated that this is why Bitcoin is so useful and that there are no limits, especially if you want to transport currency internationally. Your Affiant told COSTANZO that he would like to purchase around $30,000 in Bitcoin on a regular basis. COSTANZO stated, "if you are doing anything illegal, I don't want to know about it". COSTANZO advised that his business model is, "I don't care who you are, what you are, where you are," that he only cares that "you don't get bit, don't get shot, and don't talk to any police". COSTANZO then informed your Affiant about a previous customer he had who wanted to send money and "stuff in car parts to Russia". Your Affiant believes COSTANZO was referring to the drugs conversation he previously had with UCA1. COSTANZO stated that was the kind of stuff he does not need to know, that it does not make any difference to him, and that it is none of his business. Your Affiant then purchased $2,000 worth of Bitcoin from COSTANZO. During the purchase of Bitcoin, COSTANZO charged a 10 percent fee for the exchange service.

52. Your Affiant conducted research of COSTANZO and learned that COSTANZO lists ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (hereinafter referred to as the ▮▮▮▮▮▮▮▮▮▮▮▮▮ as his residential address on his Arizona Motor Vehicle Department (MVD) record.

53. On November 16, 2016, your Affiant, acting in a UC capacity, contacted COSTANZO at his advertised telephone number and initiated a second Bitcoin purchase from COSTANZO in the amount of $12,000 U.S. Currency. Your Affiant met with COSTANZO on that same date at public venue in Tempe, Arizona, where COSTANZO again started the conversation by explaining his anti-government beliefs. Your Affiant told COSTANZO that he is purchasing the Bitcoin to transport currency across the country without having to worry about law enforcement seizing the money. COSTANZO agreed that Bitcoin is great for that and explained that he has a guy who once exchanged $60,000 with him.

18

COSTANZO stated that the guy had to go around to several different banks and withdraw a few thousand dollars at a time to avoid getting a suspicious activity report (SAR) generated on him. COSTANZO explained to your Affiant that anytime someone withdrawals more than $3,000 at a time, the bank will complete a SAR for the government to document the transaction. These statements lead your Affiant to believe that COSTANZO is aware of United States money laundering laws and currency reporting regulations and is knowingly using Bitcoin to circumvent the law and launder proceeds from illegal activity.

54. During the conversation, COSTANZO said "you can do whatever you want, you can do something illegal, I don't want to know about it." COSTANZO again advised that he only cares about three things, "don't get bit, don't get shot, and don't talk to any police". COSTANZO then sold your Affiant $12,000 worth of Bitcoin including his money exchange fee of 7 percent for the exchange. While the exchange was taking place, COSTANZO told your Affiant about another customer of his who regularly exchanges approximately $600 for Bitcoin every week. COSTANZO complained of how that particular customer sometimes pays him in several $1 bills. COSTANZO stated this is because the customer gets the cash from "his girls" because he is a "pimp".

55. After the transaction between your Affiant and COSTANZO was complete, surveillance units followed COSTANZO as he got on his bicycle and rode away from the deal location. Surveillance units followed COSTANZO to a light-rail train station where he took the light-rail to Phoenix. Investigators followed COSTANZO and watched him meet with several other people conducting what appeared to be cash Bitcoin transactions. Investigators then followed COSTANZO as returned to the light-rail and took a train back to the area of E. Main Street / N. Center Street in Mesa. Surveillance was concluded as COSTANZO appeared to be returning to the

56. Based on subpoenaed information received from T-Mobile USA / MetroPCS, your Affiant learned that the telephone number utilized by COSTANZO has a

19

subscriber of Thomas COSTANZO, listing a customer name of "Morpheus Titania" at an address of ███████████████████████     Your Affiant researched the ██████████████ address and learned that it is the address of the ██████████████████." a public shopping complex located in Mesa. Your Affiant believes that COSTANZO is attempting to conceal his identity and residential address by listing a public place as his cell phone billing address.

57. On December 1, 2016, the Honorable Michelle H. Burns, United States Magistrate Judge signed Order 16-543MB authorizing the release of location information and the use of signal tracking technology on COSTANZO's cellular telephone 602-434-1725 between December 1, 2016 and January 14, 2017. Your Affiant obtained and reviewed the location tracking information for the telephone between December 5, 2016 and December 12, 2016 and learned that although the telephone. commonly travels throughout the valley on a daily basis, the telephone typically stays in the area of ██████████████████████████ overnight. It should be noted that although the telephone location information is not accurate enough to give the exact apartment number that the phone in located at in the **417** ██████████████████████ complex, the same complex as the ██████████████████.

58. On December 14, 2016, your Affiant conducted surveillance at the ██████. ████████████████ and observed COSTANZO exit unit ███ COSTANZO was talking on a cell phone and appeared to lock the front door of the ██████ ████████████ with a key. COSTANZO then walked down the stairs and left the area on his bicycle. Investigators followed COSTANZO as he rode his bicycle to a restaurant in Mesa. COSTANZO entered the restaurant and was observed meeting with an unidentified male subject. Investigators overheard COSTANZO talking about Bitcoin, how banks are evil, and how the unidentified male's bank accounts had been frozen. Investigators also observed the unidentified male hand an unknown amount of U.S. Currency (large folded up handful of cash) to COSTANZO under the table. COSTANZO and the

20

unidentified male then appeared to conduct a transaction utilizing their cell phones. Investigators recognized this type of activity to be consistent with how COSTANZO has conducted Bitcoin transactions in the past. COSTANZO then left the area and Investigators followed him back to the ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ , your Affiant reviewed the localbitcoins.com profile for Morpheus Titania (COSTANZO) and learned that he was still advertising the sale of Bitcoin for cash on the website and listing the same telephone number as his contact phone number for Bitcoin transactions.

60.    On January 12, 2017, the Honorable John Z. Boyle, United States Magistrate Judge signed an extension to Order 16-543MB, authorizing the release of location information and the use of signal tracking technology on cellular telephone 602-434-1725 between January 12, 2017 and February 25, 2017. Your Affiant obtained and reviewed the location tracking information for the telephone from January 20, 2017 through January 26, 2017, and again from February 1, 2017 through February 4, 2017, our Affiant saw that the telephone continued to travel throughout the valley on a daily basis and typically stayed in the area of the ▮▮▮▮▮▮▮▮▮▮ overnight. This further confirmed your Affiant's belief that COSTANZO lives at the ▮▮▮▮▮▮▮▮▮▮ as previously observed during surveillance.

61.    On February 2, 2017, your Affiant, acting in a UC capacity, contacted COSTANZO at his telephone number and arranged a third Bitcoin purchase from COSTANZO in the amount of $30,000. Your Affiant met with COSTANZO at a public venue in Tempe, Arizona. During the transacting, COSTANZO explained to your Affiant that he has a "banker" who he uses to help facilitate his larger deals. COSTANZO said that his "banker" will loan him thousands of dollars in Bitcoin whenever he needs it. Based on the prior UC meetings with COSTANZO including the IRS meetings with COSTANZO and STEINMETZ, your Affiant believes that the "banker" COSTANZO was referring to is STEINMETZ. Your

21

Affiant explained to COSTANZO that he is looking to exchange in excess of $100,000 for Bitcoin in the future and that the $30,000 transaction on that day was just a starting point. COSTANZO stated that he would need to make a couple calls to his "bank" to get the Bitcoin transferred for the deal and also mentioned that he has a person who wanted to purchase $14,000 in Bitcoin from him the next day.

62.    Your Affiant sat with COSTANZO as COSTANZO appeared to send a couple of text messages. After approximately 10 minutes, COSTANZO advised that the Bitcoin had been transferred into his account and he could now complete the $30,000 transaction. While sitting with COSTANZO, COSTANZO further explained to your Affiant how he used to launder his cash Bitcoin proceeds through a Casino to exchange his $20's for $100's, but had to stop after he refused to give the casino his personal information (identification, social security number) and got thrown out.

63.    Before completing the $30,000 transaction with COSTANZO, your Affiant spoke to COSTANZO about doing a $100,000 deal in the future. Your Affiant told COSTANZO that the $30,000 that was being utilized for the current transaction was proceeds from one kilo of cocaine. After hearing this, COSTANZO put his finger over his lips and said "shhh I don't want to know that." Your Affiant told COSTANZO that if he does three or four in the future (meaning sell three or four kilos of cocaine) that would be $100,000 in Bitcoin to sell. COSTANZO then completed the sale of approximately $30,000 worth of Bitcoin to your Affiant utilizing his cellphone to complete the transaction.

64.    While waiting for the transaction to complete, your Affiant discussed with COSTANZO how a $100,000 transaction would occur in the future. COSTANZO advised that conducting the transaction is not a problem, but stated the issue with larger transactions is getting the cash onto the Bitcoin exchange to purchase more Bitcoin without setting off any red flags. COSTANZO said this is because a lot of the cash wire transfers are going out of the country because they go to Bitcoin

22

exchanges based in other countries. COSTANZO said that he could still conduct a $100,000 transaction, but would need time to make sure he can accrue all of the Bitcoin to sell. Your Affiant believes that when COSTANZO stated he needed to accrue all the Bitcoin, he was referring to meeting with STEINMETZ to get such a large amount. COSTANZO also told your Affiant to download a cellphone application called "Telegram" to communicate with him in the future. COSTANZO advised that Telegram is a secure messaging application he uses on his cellphone that "keeps the numbers off a server" and that your Affiant could search for his phone number on the Telegram application to contact him. COSTANZO and your Affiant agreed that they would communicate in the future about the upcoming $100,000 Bitcoin deal.

65.    After completing the UC transaction with COSTANZO, your Affiant reviewed the location tracking information for COSTANZO's telephone. The location tracking data showed that the telephone was pinging at the location of the UC deal on February 2, 2017, throughout the entirety of the UC deal. This further confirmed your Affiants belief that COSTANZO controls the telephone and utilizes the phone to conduct his illicit transactions.

66.    On February 23, 2017, the Honorable David K. Duncan, United States Magistrate Judge authorized a second extension of Order 16-543MB, authorizing the release of location information and the use of signal tracking technology on cellular telephone 602-434-1725 between February 23, 2017, and April 8, 2017. Your Affiant obtained and reviewed the location tracking information for the telephone from March 1, 2017, through March 3, 2017, and learned that the telephone continued to travel throughout the valley on a daily basis and typically stayed overnight in the area of the                                          This further confirmed your Affiants belief that COSTANZO continues to live at the

67.    On March 28, 2017, your Affiant reviewed the localbitcoins.com profile of Morpheus Titania (Thomas COSTANZO) and learned that COSTANZO was

23

continuing to advertise the sale of Bitcoin in exchange for cash on the website and that his contact phone number was still listed as (602) 434-1725. The webpage showed that COSTANZO had been active on the website on that same day.

68.   On March 29, 2017, your Affiant contacted COSTANZO at his cell phone (602) 434-1725 to discuss the details of a future $100,000 Bitcoin transaction. Your Affiant sent COSTANZO a text message stating, "my guy wants me to send him 100k in Bitcoin either next week or the week after. Can you go that high." COSTANZO replied, "Sometimes," then told your Affiant to switch to the Telegram messaging application that he previously described during the UC meeting on February 2, 2017. COSTANZO sent your Affiant a message from the Telegram application utilizing his same telephone contact number. COSTANZO asked if your Affiant would be paying in cash and if we could do the deal this week. Your Affiant informed COSTANZO that the deal would be for $100,000 in cash and that it would be a week or two before the cash would be ready because it was coming from a third party. Your Affiant informed COSTANZO that he would talk to his "guy" and get more details about when the cash would be ready. COSTANZO expressed a willingness to conduct the transaction. COSTANZO explained that he would be using his "banker" to finance this transaction because he does not have such a large amount of Bitcoin on hand. Based on the prior UC meetings with COSTANZO, including the IRS meetings with COSTANZO and STEINMETZ, your Affiant believes that the "banker" COSTANZO was referring to is STEINMETZ. It should be noted that during the UC transaction conducted on February 2, 2017, your Affiant advised COSTANZO that the $100,000 transaction they were planning to conduct would be from the proceeds of cocaine sales.

69.   Between March 29, 2017, and April 10, 2017, your Affiant continued to communicate with COSTANZO via the Telegram application and coordinated a meeting with COSTANZO and his "banker" (which was later identified as STEINMETZ) to discuss the terms of a $100,000 Bitcoin purchase in which

24

STEINMETZ would be the source of supply for the Bitcoin. The meeting between your Affiant, COSTANZO, and STEINMETZ was arranged for April 10, 2017.

70.   On April 10, 2017, members of TFG1 conducted a covert operation at a public venue in Tempe, Arizona. Your Affiant, acting in a UC capacity, met with COSTANZO and STEINMETZ to discuss the details of the $100,000 Bitcoin purchase. Your Affiant sat at an outside table and waited for COSTANZO and his "banker" to arrive. COSTANZO arrived in a brown passenger car and backed into a parking space, obscuring his license plate. COSTANZO exited the vehicle and walked into the venue, advising your Affiant that he was going to get a coffee. Approximately one minute later, your Affiant observed STEINMETZ approach the venue from south side of the building. Your Affiant recognized STEINMETZ based on his Arizona Motor Vehicle Department (MVD) photograph and a photograph that was posted of STEINMETZ on http://steinmetz.org/peter. STEINMETZ walked into the venue and met with COSTANZO. It was later learned that STEINMETZ arrived to the meeting location driving his red **Porsche Boxster** bearing Arizona license plate "SATOSHI." An Arizona MVD query on the **Porsche Boxster** revealed that the vehicle was 2000 **Porsche Boxster**, red-in-color, bearing Arizona license plate "SATOSHI," assigned VIN: ███████████ registered to Peter STEINMETZ at ███████████

71.   A few minutes later, COSTANZO and STEINMETZ exited the venue and sat with your Affiant at the outside table. STEINMETZ introduced himself as "Amideo," and never provided his true name. COSTANZO continued to refer to himself as "Morpheus". Throughout the meeting, COSTANZO and STEINMETZ mentioned that they had been conducting business together since 2013. STEINMETZ confirmed that he believes they conducted their first deal together in April 2013. COSTANZO advised that "the other day" he did his first deal where he purchased "Bitcoin, Ethereum, and Dash" all at the same time. Your Affiant recognized that

25

Ethereum and Dash are other types of digital currencies known as Altcoins that can be used as a store of value or as a method of payment much like Bitcoin.

72.     Your Affiant explained to STEINMETZ a need to purchase large amounts of Bitcoin to transport currency across state lines. Your Affiant explained that he has a business partner in California and that their business takes in large amounts of cash from sales. Your Affiant advised that he needs a good way to transport the currency rather than driving the cash from state to state. Your Affiant advised that the last thing your Affiant needs is to get stopped by the police and have to explain the origin money. STIENMETZ interjected and said "they will just seize it all." STEINMETZ then spoke about civil asset forfeiture and said that the problem with forfeiture is that if your money is seized, there is only a small possibility of getting your money back through a court process. STEINMETZ then suggested that your Affiant go home and write an email to Governor Ducey because he believes there is a bill currently in front of Governor Ducey to change the civil asset forfeiture laws in Arizona.

73.     STEINMETZ stated that he could certainly sell your Affiant $100,000 worth of Bitcoin, but advised that he wants his deal to be legal. STEINMETZ stated that he wanted to be assured that the money used for the deal is not illegal proceeds and advised that he might need to see some identification in case he is ever questioned about who he got the money from. STEINMETZ stated that he makes some money from the business transaction but does not want to put himself at risk with the law. STEINMETZ made it clear that he does not file any paperwork, complete any government documentation, or distribute any personal information about the transaction unless he is required to by a court subpoena. STEINMETZ advised that the only way he would even speak to law enforcement would be in the presence of his attorney with a court subpoena. STEINMETZ said that this is always his position.

74.     Your Affiant explained to STEINMETZ that he does not want any government documentation about the transaction and wanted to ensure there is no bank

26

reporting like what would occur at Wells Fargo if someone went in with $100,000 cash. STEINMETZ said that he knows exactly what would happen at a bank if someone came in with that much cash and said that they would file two forms. He advised that one form (STEINMETZ could not remember the exact form number) is for anytime someone deposits over $10,000 cash and the other form is called a Suspicious Activity Report (SAR). STEINMETZ said the he probably gets those forms filed on him all the time. He advised that the forms get sent to FinCEN which he explained stands for financial crimes enforcement. STIENMETZ further explained that he does a fair amount of cash business and advised that if he goes to a bank more than once every two weeks with more than $10,000, he believes there is a whole department that handles that type of activity which he explained is virtually an instrument for the government.

75.     STEINMETZ said that he has some customers who want to remain anonymous. He said that these customers sometimes purchase gold, then he sells them Bitcoin for their gold bars. He advised that he does not even consider that a currency transaction.

76.     Your Affiant expressed concerns to STEINMETZ about his request to take a photograph of your Affiants identification. STEINMETZ advised that he would never release the information to anyone without a court order. STEINMETZ said that he keeps the documents secured in his safe at home and no one will ever see them. STEINMETZ also stated that he keeps records of all the deals he does, but as far as he is concerned, he does not even remember doing the deals.

77.     STEINMETZ then discussed the details of how the $100,000 deal would occur. Your Affiant advised that it would be preferable to conduct the transaction on the Monday or Tuesday (April 17th or 18th) because your Affiant would be collecting the cash over the weekend. STEINMETZ said that he would only need a few days heads-up to assure he has the Bitcoin and that it will be available when your Affiant needs it. It was also decided that the deal would occur at the Chandler airport. STEINMETZ stated that he is a pilot and flies his own plane.

27

STEINMETZ stated that he has access to the pilots lounge at the airport and would prefer to conduct the deal there rather than in a parking lot somewhere where the police might see the deal. STEINMETZ also stated that he would be armed during the deal for everyone's safety.

78. STEINMETZ informed your Affiant that he and COSTANZO are fairly well-known in the Bitcoin community and that there was no reason to be concerned about the deal. Your Affiant verified that STEINMETZ would be charging a 7 percent fee above the average market price of Bitcoin to conduct the transaction. STEINMETZ confirmed the fee and said that he and COSTANZO would be splitting the proceeds from the transaction. STEINMETZ advised that he had another appointment on Monday morning, but that the transaction could still be conducted on Monday afternoon or Tuesday morning. STEINMETZ again confirmed that the deal would be conducted at the Chandler Municipal Airport in one of the pilot rooms. He advised that there would be no security checks to get into the room and that it would not look out of the ordinary to conduct a deal in the room. It was agreed that COSTANZO and STEINMETZ would chose the specific pilot room to meet, bring a money counter and computer for the deal, and inform your Affiant which room to meet in.

79. Before the meeting was concluded, STEINMETZ mentioned that one of the craziest deals he ever conducted was on a dark street in downtown Phoenix. He said that it was with someone he trusted and advised that he has never had a deal go bad and does not plan on ever having a deal go bad. STEINMETZ told your Affiant to contact COSTANZO when your Affiant is ready to do the deal and that COSTANZO will coordinate the deal.

80. At the conclusion of the meeting, as your Affiant was leaving the venue, your Affiant observed STEINMETZ's red **Porsche Boxster** displaying Arizona license plate "SATOSHI" parked on the east side of the building. This confirmed your Affiants belief that STEINMETZ utilizes the **Porsche Boxster** to facilitate his illegal Bitcoin exchange business.

28

81.    Your Affiant believes based on the investigation, including the undercover meetings with COSTANZO and STEINMETZ and their own statements that these individuals are knowingly operating an unlicensed money transmission business and laundering proceeds from illegal activities including drug trafficking by exchanging U.S. Currency/cash for Bitcoin. Based on statements made by COSTANZO, your Affiant believes that COSTANZO stores his proceeds from exchanging and/or money laundering cash for Bitcoin in multiple forms of currency including Bitcoin, precious metals (gold and silver), and cash. Your Affiant believes that since both COSTANZO and STEINMETZ do not trust banks or agree with government regulations, that they store at least a portion of the illicit proceeds obtained from their business at their residences, the **LOMA VISTA RESIDENCE** and the **JULIE RESIDENCE**. Your Affiant further knows that COSTANZO and STEINMETZ utilize electronic communication devices including cellphones to initiate, facilitate, and conduct their currency exchange services. Your Affiant believes based on the amount of cash transactions COSTANZO and STEINMETZ conduct on any given day (as explained during the meetings with both COSTANZO and STEINMETZ) that they are concealing a large amount of United States currency unreported to the United States government at both the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮
▮▮▮▮▮▮▮.

### NECESSITY FOR ANALYSIS OF ELECTRONIC DEVICES

82.    Your Affiant is aware that this investigation involves the peer-to-peer exchange of Bitcoin, which is conducted between at least two individuals each using an electronic device such as a smart cellular telephone, computer, laptop, and/or electronic tablet (hereinafter referred to as "electronic devices"). Electronic digital currency can be accessed, manipulated, and stored on electronic devices. Bitcoin exchangers advertise their services on websites on the internet which are also accessed via electronic devices. Your Affiant knowns that Bitcoin exchangers and

29

their customers, in efforts to conceal their activity and remain undetected, communicate through encrypted communication applications that must be downloaded to electronic devices equipped with the proper technology to run the applications' software.   Your Affiant knows that both COSTANZO and STEINMETZ have used or made mention of using electronic devices to conduct the exchange of Bitcoin for case.   They have both been observed conducting transactions using a cellular telephone device and are planning on using a computer/laptop to conduct the $100,000 exchange in the near future with your Affiant who is acting in a UC capacity.   Additionally, both COSTANZO and STEINMETZ have taken steps to conceal their true identity by using an alias and communicating with encrypted messaging systems.

83.   Based on your Affiants training and experience, your Affiant is aware that encrypted systems and other hidden anonymizing services can be accessed open source but are also highly accessed on the Darknet via a special web browser known as "The Onion Router" (TOR).   TOR utilizes multiple Internet Protocol (IP) relays to obscure a person's IP address and the physical location of that IP address while using the network.   Your Affiant knows that a common computer operating system used for this type of anonymous Darknet activity is called the "TAILS" operating system.   TAILS is a "live operating system" and can be contained on a USB stick, SD card, or DVD. The TAILS system allows users to browse the internet anonymously through TOR and will immediately delete all record of the computers history including messaging, email, and internet history as soon as the device is shut down.   Your Affiant knows that users of this technology are typically savvy when it comes to digital security and remaining anonymous.

84.   Your Affiant is further aware that the TOR browser, as well as access to most electronic Bitcoin accounts can be accessed through cell phones, computers, and tablet devices.   Since Investigators have identified that Bitcoin is the primary form of digital asset used during this investigation, your Affiant believes that "Digital Bitcoin Wallets" and other incriminating digital information logs may be located

30

on multiple computers, cell phones, and tablets located during the execution of the search warrant.

85.   Based on the information from this investigation, your Affiant believes that electronic evidence including computers, cell phones, tablets, and digital storage devices that are being used to facilitate, process, conceal, and document Bitcoin transactions will be located on COSTANZO's person, in COSTANZO'S ▊▊▊ . ▊▊▊▊ E, on STEINMETZ' person, in STEINMETZ' ▊▊▊ ▊▊▊▊ and in STEINMETZ' **Porsche Boxter**. Your Affiant further believes that said electronic devices located at the locations described in this Affidavit are being utilized to store digital Bitcoin wallets containing proceeds from the unlawful exchange of Bitcoin or the laundering of United States currency. Your Affiant also believes that said electronic devices contain ledgers and information documenting details of transactions involving the unlawful exchange of Bitcoin or the laundering of United States currency. Such electronic devices can contain processors, are easily transportable, small in size, store a lot of information, and are capable of securing and encrypting information essential to facilitating a Bitcoin transaction.

86.   Your Affiant knows based on training, experience, and knowledge of this investigation that it is possible for co-conspirators who may be unknown to Investigators at the time this warrant is served, to remotely access electronic devices including computers, cell phones, and tables to alter digital evidence, or entirely remove digital evidence and/or proceeds from said devices for amongst other reasons to destroy inculpating evidence and avoid the seizure of proceeds.

87.   Your Affiant submits that if a computer, laptop, cellular telephone, tablet, or other digital storage medium and/or electronic device is found at any of the locations described within this Affidavit, or in the possession of COSTANZO or STEINMETZ at the time of their arrest, that there is probable cause to believe records described in Attachment B and Attachment C will be stored on that computer, laptop, cellular telephone, tablet, or other digital storage medium and/or

31

electronic device.  Due to the nature of this investigation and based on the exigency that digital forensic evidence may be lost if not immediately analyzed, your Affiant requests that this application allows for Investigators to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers, laptops, cellular telephones, tablets, or other digital storage mediums and/or electronic devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any computer, cell phone, or tablet located because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b) Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of

32

malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

88. *Necessity of seizing or copying entire computers, cell phones, tablets, or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of

33

storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

34

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

89. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant your Affiant is applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant and in Attachment B, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

90. Based on the aforementioned, your Affiant respectfully submits that there is probable cause to believe there have been violations of federal law, specifically, violations of Title 18 U.S.C. §§ 371 and 1960(a) (Conspiracy to operate unlicensed money transmitting business), 18 U.S.C. §§1960(a) and 1960(b)(1)(B) (Operation of unlicensed money transmitting business), 18 U.S.C. 1956(a)(3)(B) (Money laundering to conceal or disguise the nature, location, source, or ownership of proceeds represented by a law enforcement officer to be proceeds of drug trafficking in violation of 21 U.S.C. §§ 841 and 846), and 18 U.S.C. 1956(a)(3)(C) (Money laundering to avoid transaction reporting requirements of proceeds represented by a law enforcement officer to be proceeds of drug trafficking in violation of 21 U.S.C. §§ 841 and 846). Furthermore, your Affiant respectfully submits that there is probable cause to search:

a) AN APARTMENT UNIT located at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as described in attachment A-1. This is a multi-unit, two

35

story apartment complex located on the northeast corner of the intersection ████████████████████████████████████████████████ is located on the second story, far south end of the complex. Unit████ is the first unit located at the top of the most southern staircase. The front door to the unit faces west and has a tan in color metal security door. At the time of this writing, there is a piece of white paper in the front window to the unit with the numbers ████ printed in black.

b) A RESIDENCE located at ████████████████████████████████████████ ████████████████████████ ████ ████████████ as described in attachment A-2. This is a single story residence with a tan brick exterior and a brown shingle roof. The residence is ████████████████████████



████████████████████████████ Peter STEINMETZ as the owner of the property. (Further identified in attachment A-2)

c) The VEHICLE identified as a 2000 **Porsche Boxster**, red in color, displaying Arizona license plate "SATOSHI", assigned VIN: ████████████████ currently registered to Peter STEINMETZ at ████████████████████████ hereinafter referred to as

"**Porsche Boxster**"), as described in attachment A-3.

91. Furthermore, pursuant to Title 18 U.S.C. § 982 (Criminal forfeiture), incorporating the procedures governing forfeitures for violations of Title 18 U.S.C. §§1956(a)(3)(B), 1956(a)(3)(C), 1960(a), and 371, your Affiant further submits that there is probable cause for the seizure and forfeiture of the following vehicle:

a) The **Porsche Boxster** referred to as above, which is specifically identified as a 2000 **Porsche Boxster**, red-in-color, displaying Arizona license plate "SATOSHI", assigned VIN: ████████████████ currently registered to Peter STEINMETZ at ████████

36

(hereinafter referred to as **"Porsche Boxster"**), as described in attachment A-3.

Pursuant to 28 U.S.C. §1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Chad Martin, Task Force Officer
United States Drug Enforcement Administration

Subscribed and sworn to before me on the _____ day of April, 2017.

HONORABLE JOHN Z. BOYLE
United States Magistrate Judge

DAVID K. DUNCAN
U.S. Magistrate Judge

37

# EXHIBIT

# B

# Internal Revenue Service
# Criminal Investigation

## Memorandum of Activity



| | | | |
|---|---|---|---|
| **In Re:** | THOMAS COSTANZO<br>aka MORPHEUS TITANIA | **Locations:** | Chandler, AZ<br>Phoenix, AZ |
| **Investigation #:** | 1000270727 | | |
| **Date:** | 03/17/2013 to 03/23/2013 | | |
| **Participant(s):** | ███████████████ | | |

From March 17, 2015 through March 23, 2015, I was engaged in an undercover activity and incurred expenses while performing duties in an undercover role pursuant to an approved Limited Undercover Contact Operation Project

Activity and expenses are summarized below.

### March 17, 2015
I purchased a JetBlue airline ticket for a round trip flight from JFK Airport, NYC to Phoenix Sky Harbor International Airport, Phoenix, AZ.
I reserved a room for a 4 night stay at Hilton Hotel in Chandler, AZ.

### March 18, 2015
I traveled from JFK Airport in NYC via JetBlue Airline to Phoenix International Airport and checked into the Hilton Hotel in the Chandler, AZ.
Through a Cover Agent, I secured a vehicle registered to an undercover business that I used for the duration of my undercover duties in the Phoenix area.

### March 19, 2015
I attended pre-operational meeting in the Chandler, AZ area.

### March 20, 2015
At approximately 10:10 AM (MST), I met with MORPHEUS TITANIA (known to IRS-CI as THOMAS COSTANZO) at a Starbucks in Chandler, AZ area. During the meeting I handed MORPHEUS cash in amount of $2,000.00 in exchange for 6.6782 in Bitcoins.
*(Details of interaction with MORPHEUS are summarized below)*

| Date | BTC | From | To | |
|---|---|---|---|---|
| 03/20/2015 | 3.3391 | Costanzo to | My LocalBitCoins.com wallet | $1,000 |
| 03/20/2015 | 3.3391 | Costanzo to | My LocalBitCoins.com wallet | $1,000 |
| 03/31/2015 | 3.37 | My LocalBitCoins.com wallet | 1LNSpzydiiEd2QkjjfezwK2ksmKrR5PNFg | MyCelium Wallet |
| 03/31/2015 | 3.30705 | My LocalBitCoins.com wallet | 1aTCrTZSql6sWtbXzVHEYbwFYHseyvvGA | MyCelium Wallet |
| 03/31/2015 | 3.37 | 1LNSpzydiiEd2QkjjfezwK2ksmKrR5PNFg | 1CtimSbVog76h3BB39CbfRvaW4mnsL8enc | Multibit Wallet |

U.S. Treasury Criminal Investigation

U.S. v. Costanzo, et al.          CR-17-00585-PHX-JJT                    000005

| 03/31/2015 | 3.30711335 | 1aTCrTZSqi6sWtbXzVHEYbwFYHseyvvGA | 1CtimSbVog76h3BB39CbfRvaW4mnsL8enc | Multibit Wallet |
| 03/31/2015 | 3.3699 | 1CtimSbVog76h3BB39CbfRvaW4mnsL8enc | 3KGyojx9D1w9D2BaibYZqJumoFRLCBTEma | BitStamp Wallet |
| 03/31/2015 | 3.30701 | 1CtimSbVog76h3BB39CbfRvaW4mnsL8enc | 3KGyojx9D1w9D2BaibYZqJumoFRLCBTEma | BitStamp Wallet |
| 04/01/2015 | 6.67780664 | Sold | | $1,620.50 |

March 21, 2015
At approximately 2:10 PM (MST), I attended a meeting of an Arizona Bitcoin Meetup
group at a Classic Crust Pizza in Phoenix, AZ area. The meeting was attended by
MORPHEUS (who arrived approximately 15 minutes after I did), PETER STEINMETZ
and 3 other unidentified (male) individuals.
*(Details of the meeting are summarized in a separate memo)*

March 22, 2015
I checked out of Hilton Hotel, returned undercover vehicle to the cover agent and
departed to JFK, New York from the Phoenix International Airport via JetBlue Airline.

March 23, 2015
I arrived at JFK Airport in New York and returned to residence

The following expenses were incurred in the course of the above described activity.

| DATE | EXPENSE | AMOUNT | RECEIPT |
|------|---------|--------|---------|
| 03/17/2015 | JetBlue Airline ticket purchased | $1,089.28 | Yes |
| 03/18/2015 | POV uses to drive & park at JFK arprt (30 mi x $0.575) | $17.25 | No |
| 03/20/2015 | Coffee at Starbucks for target | $3.85 | No |
| 03/21/2015 | Fuel for UC vehicle | $33.75 | Yes |
| 03/22/2015 | Hilton Hotel 4 nights and taxes | $1,006.15 | Yes |
| 03/23/2015 | Per Diem (5.5 days @ $71 / day) | $390.50 | No |
| 03/23/2015 | Parking at JFK | $84.00 | Yes |
| 03/23/2015 | POV from airport to residence (30 mi x $0.575) | $17.25 | No |
| 03/23/2015 | Verrazano Bridge toll | $6.24 | No |
| | **TOTAL EXPENSES** | **$2,648.27** | |



Memorandum   Page 2 of 2

U.S. Treasury Criminal Investigation

U.S. v. Costanzo, et al.        CR-17-00585-PHX-JJT        000006

# EXHIBIT

# C



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Activity

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000270727 | **Location:** | Starbuck's |
| **Investigation Name:** | COSTANZO, THOMAS | | 1395 S Arizona Ave |
| | | | Chandler, AZ |
| **Date:** | May 20, 2015 | | 85248 |
| **Time:** | 12:00pm-1:00pm (approx) | | |
| **Participant(s):** | Thomas Costanzo | | |
| | UCA1 | | |

On the above stated date, an undercover operation was conducted.  The purpose of the UCO was to purchase bitcoin from Morpheus Titania (online user name to be Thomas COSTANZO).  UCA1 discussed exchanging approximately $3,000 for bitcoin minus fees charged by Costanzo.  The meeting was recorded and can be referenced for more detail.  Some of the significant detail is listed below.

1.  COSTANZO arrived at approximately 10:15am.  During the meet, the UCA1 exchanged cash for bitcoins and discussed future transactions.

2.  Some excerpts of the conversation UCA1 and Costanzo had regarding the source of the UCA1's cash.

12:20:16
UCA1 -  you know when I talk about supplier Im talking about drugs, right?  Heroin.

Costanzo:  I know nothing, hahahahah

12:21:25 - 12:22:10
C: I like keeping things super confidential
UCA: Heroin
C: Don't say that word out loud, hahaha
C: I can come up with as much (bitcoin) as you want to do, we just have to keep everything on the low

12:22:15
UCA: explains to C that he is picking up black tar heroin for $27k and selling in New York for $50K.  Expalins that he ships in trucks to New York

U.S. Treasury Criminal Investigation

U.S. v. Costanzo, et al.          CR-17-00585-PHX-JJT                    000007

C:  Doesn't mind providing the bitcoin for UCA

12:23:35

UCA:  Im looking to trade $15,000 -$20,000 - $30,000 at a time, are you okay with that
C:  Yeah, I can do whatever you want

UCA :  Yeah, don't want to deal with multiple people

C:  Yeah, minimize your exposure

12:27:30
UCA:  explains that he pays suppliers in bitcoin now
C:  Yeah, That is so much easier.  Bitcoin makes everything so much easier.

12:28:00
UCA:  Big DEA seizure of Heroin seized in New York.  Probably get better prices because of it.

12:33:00
C:  I have done about half a million in the last year

12:35:00
$3000 transaction happens between C and UCA

12:41:40
C:  Bitcoin is going to take over the world

3.  UCA1 exchanged  11.81 bitcoin from his wallet address 14yEFjymoV4c8ZDRyxdeMQFTU7prx54LeG to UCA1 wallet 1CtimSbVog76h3BB39CbfRvaW4mnsL8enc.

4.  The transaction confirmed on the blockchain and UCA1 and Costanzo left Starbucks in separate cars.

Memorandum Author    *Don Ellsworth* E
                     Don Ellsworth
                     Special Agent

Memorandum   Page 2 of 2                                                    U.S. Treasury Criminal Investigation

U.S. v. Costanzo, et al.            CR-17-00585-PHX-JJT                    000008

# EXHIBIT

# D



# EXHIBIT

# E



USA v. Thomas Mario Costanzo

CR-17-585-01-PHX-GMS

Audio Recordings
Exhibits D & E

# EXHIBIT

# F

- Home
- Countries
- Data Sources
- Prices
- Report
- Crime Books
- About



# Prostitution Prices in the United States

in Transnational Crime

The typical price for oral sex charged by street prostitutes in the United States is between $20 to $50. For sexual intercourse, street prostitutes typically charge between $50 to $100.

Most sex acts take up to 10 minutes if performed in the car and up to 25 minutes if performed inside a room.

The typical street prostitute works between 6 to 8 hours a day and between 5 to 6 days a week. During a working day, the street prostitute averages between 3 to 5 clients.

(See more world prostitute prices.)

Source: Michael S. Scott and Kelly Dedel, "Street Prostitution," Second Edition, United States Department of Justice, Office of Community Oriented Policing Services, November 28, 2006.



Previous post: Drug seizures in Iran

Next post: Increase in fines from Foreign Corrupt Practices Act



- Home
- Countries
- Data Sources
- Prices
- Report
- Crime Books
- About



# Prostitution Prices

World prostitution prices posted below and the money paid to prostitutes is quoted in U.S. Dollars. The rates and prices for sex are collected from various reports, such as reports by criminal justice programs and public health programs, as well as news reports on where to find prostitutes . How much the prostitutes charge is often based upon the sex worker being a victim of human trafficking.

**All prices of prostitutes and additional information about the global sex trade are available in our ebook, Prostitution: Prices and Statistics of the Global Sex Trade.**

Click on the price for the original post and source information.

1. Afghanistan$30 to $60
2. Argentina$50 at brothel, $300 at club
3. Australia$150 for Asian woman, $300 for Caucasian woman
4. Bangladesh$0.60
5. Brazil$5.50 for 13 year old girl
6. Brazil – Brothel (Rio)$60 entry fee at Centaurus
7. Brazil – Vila Mimosa, Rio$20
8. Bulgaria$25
9. Canada – Vancouver$147 on Backpage (User Submitted)
10. China – Beijing$100 to $400
11. China – Dongguan$160
12. China – Hotel Spa$130
13. China – Shanghai$650 to $1,600
14. Colombia$200 with Virgin Girl
15. Costa Rica – Brothel$30 at Brothels (User Submitted)
16. Denmark$150 to $200 per hour (User Submitted)
17. Dubai$81 to $136 in studio flat
18. Egypt$400 for Tourists
19. France – Apartment in Paris$207 per client.
20. France – Cannes Up to $40,000 a night
21. Germany Flat Rate of $65
22. Greece$12 to $19 with HIV Positive Girl
23. Hong Kong$40 in a one-room brothel to $232 in hostess bar

24. Hong Kong – 17 y/o minor$50 to $65
25. India$1,000 for virgin, $1 for adult
26. India – Calcutta Prostitute Earnings$1.85 per day
27. India – Delhi$13.50 to $16.80 for foreign women
28. India – Online$573 for two hours
29. Indonesia – Earnings for Prostitute$784 to $1,120 per month
30. Indonesia – Social Media$70 on Facebook
31. Iran – Tehran$50 to $65 for Street Prostitute
32. Iraq$100 per session / $200 per night
33. Ireland$45 to $129 charged by male prostitutes
34. Ireland -Limerick$107 to $133 online, $40 to $66 street price.
35. Japan$125 for 60 minutes with a South Korean prostitute
36. Japan – Minor$100 for sex with 14-year old
37. Japan – Tokyo$118 at brothels
38. Jordan$1,000 for Filipino Woman
39. Kenya$25 for sex with 12 year old girl
40. Kenya Border$11.25 Kenyan Prostitute, $2.00 Ugandan Prostitute
41. Kurdistan$150
42. Kuwait$700 for 3 hours with escort (User Submitted)
43. Madagascar$15 for one session with 15 year-old girl
44. Maldives$9.77 for children
45. Mali$2
46. Malaysia$100 for sex with child
47. Mexico$50 per hour with street walker(User Submitted)
48. Mexico – Male Prostitutes$40 for 40 minuets
49. Netherlands – Amsterdam$68
50. Nigerian women in Italy$13 per transaction
51. Nigerian women in Ivory Coast$2 per act
52. Philippines – Subic Bay$35 at bars
53. Poland$30 to 50 per hour
54. Scotland – Edinburgh$48
55. Serbia$10 to $500, average $60. (User submitted).
56. Singapore$25,000 for 3-day tour
57. Singapore – Minor$47 to $55
58. Singapore – Online$111 to $119 for 90 minutes
59. South Korea – Jongmyo Park$19 – $29 for Elder Women
60. South Korea – Southern Seoul$117
61. South Korea – Underage Girl$275
62. SurinameOne gram of gold
63. SwitzerlandUnion minimum of $100
64. Syrian Women$7 at refugee camp
65. Taiwan$344 for South Korean Prostitute
66. Turkey$500 for VIP service (User Submitted)
67. Ukraine$124 to $248 for foreign language speaking prostitute
68. United Kingdom – London Male Prostitute$229 per hour
69. United Kingdom – Street Prostitute$20
70. United States$50 to $100 for street prostitute
71. United States – High-End Escort in Indianapolis$500 per hour
72. United States – High-End Escort in NYC$10,000 a night
73. United States – Legal Brothel in Nevada$200 to $600
74. United States – Massage Parlor$200 to $400 for oral sex and intercourse
75. United States – Massage Parlor Worker Earnings$8,000 to $10,000
76. United States – Minnesota$60 for oral sex with minor found on Backpage
77. United States – Oregon (Ashland)$200 to $500 per hour (User Submitted)

78. United States – Oregon (Portland)$130
79. United States – Orlando$300 to $400 per hour
80. United States – Pennsylvania Earnings$20,00 a week
81. United States – Phoenix, AZ$1,500 per day for lesbian escorts
82. United States – Prison Guard$150 charged by female guards
83. United States – Santa Ana, CAUnder $100 per act
84. United States – Silicon Valley$350 to $500 per hour
85. United States – Underage Girls$40 to $100 for 15 to 30 minutes of sex
86. United States – Washington, DC$200 an hour

See additional information about the global sex trade in our ebook.



a havocscope report: black market crime

Prices of the Global Sex Trade

Available as ebook from Amazon or as PDF

Additional Prostitution Information:

Prostitution Statistics

Number of Prostitutes in the World

Prostitution Revenue by Country

- 

- **Search Havocscope**

  To search, type and hit enter

- **Folllow Havocscope on Facebook and Twitter to get more news about the black market.**

# EXHIBIT

# G

# Titania – the Open Source Ethical Society

CREATIVITY ETHICS TRUTH PEACE LOVE PERSONAL EVOLUTION

| HOME | Big Problem | SOLUTION | Participate | BitCoins: Free Market | FICTION | Flourish Order Page | Search |

**Mar 06 2013**

## Who is Morpheus?

9/11, Bitcoin, Bob Podolsky, BORG, Government, media, Military Industrial Complex          Add comments

## Who is Morpheus

Wow, what a long strange Trip it's been! Many of my friends know me as Morpheus. You know "The Bringer of the Dream". I use this handle, tongue in cheek, as a way to explain the co-incidences of my experience, living in this kind of science fiction movie. When you find yourself in a movie you have to get a stage name, So Morpheus it is!

After the events of 9/11 i came to the realization that the government is a criminal organization, and therefore I had to quit feeding it. I have chosen to live outside the Matrix, so I have to hustle for my daily bread. The more I move into the future the more I am moving to a Agorist Lifestyle. I like to work and provide value to those I encounter. I have sold cars, home improvement, advertising, home security, windshields, solar power. Now I mostly sell Bitcoin. The main reasons being I don't need a license, bank or permit to do it. All I need is a phone and that's it. Since February 2014 I haven't had a job and I live on what I make selling Bitcoin. I like being semi-retired. No one tells me what to do how to do it when and where to do it, what clothes I can where and when I can use the bathroom! I'm not rich however being able to do what I want to do when I want to do it has incredibly high value for me.

On 2001/09/11, I was running a direct mail company called "The Direct Hit" with my x-wife Keele. In the year 2000, just outta the chute the company did Frn$300,000. Month before 9/11 we did a quarter million bucks in sales and the month before that over a quarter million as well. We had 9 people banging on the phones and we were rocking, it was crazy. Here's where I thought the x-con makes it big. He does, just "Not Today!" as Buzz Lightyear would say. Well the universe had other plans for me. 9/11 hit and that stopped us cold. Then we had the Anthrax in the mail. September all the contracts we had called and canceled. Did 5 Grand in September. I was looking like I was cold cocked in the face.

After all the sales and support people left or we let them go, Keele got this DVD called "911: In Plane Site" by Dave vonKliest It was the first video I saw on the inconsistencies of 9/11. I spent the next few months on the computer researching it all I became aware my own government at least covered up the facts behind 9/11 and quite possibly manufactured the incident for the excuse to go to war. That was our oil under their sand and by golly they were gonna get it! As I was to learn soon, this is the nature of Hierarchies.

### Pages

911 Buildings Blasted Into Dust

Bob Podolsky
  9/11 Free Fall 5/22/14
  Physicist to Psychotherapist to Ethicist
  Soul Bonding

Edwards Deming Evidence

John David Garcia

Big Problem

BitCoins: The New Free Market
  BitCoins:Doom and Freedom?
  The Truth About Cartels

Borg, The
  Life is a zero sum game
  Ethical ends by Unethical means
  Robin Hood was a Hero
  Majority makes best decisions
  Government is here to help you
  Hierarchies are ethical
  Law is the Highest Standard
  Golden Rule Fallacy
  Faith is Better than Truth
  The FED is Good
  Comforting Lies

**Nov 19** **Creativity Enhancement Mastermind Group - Bitcoin Black Friday On Saturday**

Supported By:

### Donate to Titania!

### Recent Posts

SELF OWNERSHIP AND THE N.A.P.

ACT NOW!

The HOLOMAT is coming!

My Recent Adventure

What Is "Authority"?

The Dalai Lama advocates for Ethics Beyond religion

Choosing and Ethic

FBI Child Porn Scandal

Anarchast Ep.239 Bob Podolsky: Ethics and the Titania Project!

Head to Anarchapulco! Feb 19-21st!

### Meta

Register

Log in

Entries RSS

11/17/2016                                              Who is Morpheus? » Titania - the Open Source Ethical Society

I couldn't get myself figure out what was the next best direction to go. Keele was pregnant with my son. We were having house built in Anthem, Arizona. We were bleeding money. We moved the business to working in our dream house, it just wasn't the same. I went into a tailspin. Keele got an offer to work in Florida of a competitor. We sold the house, filed bankruptcy and the IRS had my ass in a sling.

As a result of going to Florida, I met Robert (Bob) Podolsky at a Libertarian meeting near West Palm Beach. I knew right away Bob had some of the answers I was looking for. Bob started talking about **Creativity** and Ethics and how they were linked. He shared with me that hierarchies create the problems so they can justify their existence. Being sort of a Libertarian, even though I have the privilege of never voting, I knew that the Government was bad, almost Evil. The Federal Reserve was Evil, and being a recovering Roman Catholic, I knew **Organized Religion** was a snow job.

Bob let me know these entities were not separate, they were just parts of the same Organization, a cartel really. To be more precise they are parasites operating as part of the Power Brokerage Cartel we call as the B.O.R.G. The B.O.R.G. is an acronym coined by Bob, which stands for Banks and Big Business, Organized Religion, and Government. These are the institutions that most people think of to SOLVE problems, Actually they create the problems first and then they Manage these created problems, for a small fee of course! Many of the concepts Bob was explaining to me made more sense than anything else I had ever heard, especially since Bob had a solution to the Hierarchical problems

The trouble with these **BORG's** created problems is they have to continue to grow, and the small fee gets larger. When some upstart decides they do not like being part of a social contract they have never volunteered into and can never get out of, the government attack them.. They get tired of being a SLAVE, those people who get the B.O.R.G. mad at them, generally will have their lives destroyed, end up in prison, or Dead. Remember the American President who attempted to get out of Vietnam and go around the Federal reserve and print silver certificates, his initials were JFK. Those that hold power when, who when they cross the B.O.R.G. will have war waged on them or be cut off (embargoed) for not participating in their game.

After understanding what the source of ALL the problems in the world were caused by this hierarchical group of Psychopaths known as the BORG, Bob also let me know that there is actually a solution to the BIG PROBLEM. To correct this imbalance, individuals are needed to create competing, non hierarchical groups know as Octologues, which is a group that work unanimously to direct energy in any **ethical** way they see what they fit. Its simple really: in an oc**tologue** members must agree or the group can not make a decision. The simple beauty here is the system actually encourages feedback. In a typical hierarchical construct that most of us live in it boils down to this: If we wanted your opinion we would be giving it to you. The surveys are simply there to understand how well the information is being accepted and how much more marketing needs to be done for whatever threshold is needed for WHATEVER they are selling. These Pyramid structures are created specifically to avoid, eliminate and destroy any feedback and ere as the non hierarchical **Octologue** feedback is fostered and encouraged.

From here, it is part of my Destiny to bring Titania to the world. A Gaiawyrd. I have every reason to believe it is the solution to **humanity's** BIG PROBLEM. Unless it is implemented, NOW, the great science experiment known as the Human race will end. Period!

Constitution of Titania
Desired Outcome
Ethical Means and Ethical Ends
Ethical Principles
Ethics
Ethics Law & Government
Ethics of Intellectual Property
Ethics: Titanian
    Is There A God?
Ethics: Utilitarian
FAQ
Flourish order page
Flourish will change your life.
Gaia's Dream
Government: The BORG Robot
Guns for Goodness Sake
Holomats & Octologues
How did government develop into Power Brokerage Cartels?
Mulder & Scully...
Participate
    Personal Evolution
    The Titania Project
    Titanian Academic Education Project
    Titanian Law Project
    Titanian Organization
Site Map
FICTION
Taxation is Slavery
The Bill of Ethics
The Challenge of AI
Moses and 10 Suggestions
HOME
Titanian Code of Honor
Titanians Store
Today's Bandits

Comments RSS
WordPress.org

2/4

U.S. v. Costanzo, et al.                    CR-17-00585-PHX-JJT                         001115

11/17/2016                                Who is Morpheus? » Titania - the Open Source Ethical Society

Posted by Morpheus Titania at 12:44 pm         Tagged with: 9/11, big problem, Cartels, Comforting lies, ethics, hierarchy, maximizing
                                                        creativity, morpheus, Peace, taxation, THE OCTOLOGUE

### Leave a Reply

| Your Comment |
| --- |
|  |

You may use these HTML tags and attributes: `<a href="" title=""> <abbr title=""> <acronym title=""> <b>`
`<blockquote cite=""> <cite> <code> <del datetime=""> <em> <i> <q cite=""> <s> <strike> <strong>`

| Name |  | (required) |
| --- | --- | --- |

| E-mail |  | (required) |
| --- | --- | --- |

| URI |  |
| --- | --- |

Want to see a better world? Leave a comment. Solving the captia funds Titania! Thank you for your support!

Enter the following:



Your Answer       SOLVэ media

Your Answer: [          ]  [ C | ◄€ | ? ]

[ Submit Comment ]

Archives

October 2016
June 2016
May 2016
March 2016
February 2016
January 2016
October 2015
August 2015
July 2015
February 2015
December 2014
November 2014
August 2014
July 2014
June 2014
April 2014
February 2014
January 2014
December 2013
November 2013
October 2013
September 2013
August 2013
July 2013
June 2013
May 2013
April 2013
March 2013
February 2013

| The Right to travel is Guaranteed | The hour long train wreck |
| --- | --- |

U.S. v. Costanzo, et al.                    CR-17-00585-PHX-JJT                           001116

Who is Morpheus? » Titania - the Open Source Ethical Society

© 2013 Titania - Ethical Creative Society

Suffusion theme by Sayontan Si

U.S. v. Costanzo, et al.

CR-17-00585-PHX-JJT

001117

# EXHIBIT

# H

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | ███████ | ██████████ |
|---|---|---|---|---|

| 5. By: Keith M Landa, SA | | | ███████ | |
|---|---|---|---|---|
| At: PHOENIX, AZ DIVISION OFFICE , | | | ████████████ | |

| 7. ☐ Closed  ☐ Requested Action Completed  ☐ Action Requested By: | 8. Date Prepared 09-22-2016 |
|---|---|

9. Other Officers: GS Christopher DiPiazza, SA Keith Landa, TFO Aric Manore, TFO David Alvarado, and IRS SA Don Ellsworth.

10. Report Re: Surveillance of an undercover meeting between ███ ████ ██████ and Thomas COSTANZO on September 14, 2016, in Mesa, Arizona.

## DETAILS

1. Reference DEA Report of Investigation written to the above-captioned case file by TFO Chad Martin on September 16, 2016, titled "Undercover operation and purchase of Bitcoin from Thomas COSTANZO on September 14, 2016."

2. At approximately 5:00 p.m., GS Christopher DiPiazza, SA Keith Landa, TFO Aric Manore, TFO David Alvarado, and IRS SA Don Ellsworth, established surveillance at the McDonalds Restaurant, 909 N Dobson Rd, Mesa, Arizona, in order to observe a meeting between ██████████████, ███████████████████, ███████████████, and Thomas COSTANZO.

3. At approximately 5:28 p.m., TFO Manore observed ███████████ arrive at the above-referenced McDonalds Restaurant parking lot and subsequently enter said restaurant.

4. At approximately 5:47 p.m., while waiting for COSTANZO to arrive at the restaurant, ████████ received a telephone call from COSTANZO.  COSTANZO advised ████████████ that COSTANZO's vehicle was broken down and that COSTANZO would be running late because he (COSTANZO) would be arriving on foot. ███████████ relayed this information to surveillance agents.

5. At approximately 5:52 p.m., SA Landa and SA Ellsworth observed COSTANZO jogging east on Rio Salado Parkway towards the McDonalds Restaurant.  SA

| 11. Distribution: Division | 12. Signature (Agent) | 13. Date 09-22-2016 |
|---|---|---|
| District | Keith M Landa, SA | |
| Other | 14. Approved (Name and Title)  /s/ Christopher DiPiazza, GS | 15. Date 09-22-2016 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** | ▆▆▆▆▆  ▆▆▆▆▆ | ▆▆▆▆ |
| *(Continuation)* | ▆▆▆▆▆  ▆▆▆▆ | |

| 4. Page  2  of  2 | |
| 5. Program Code | 6. Date Prepared 09-22-2016 |

Ellsworth positively identified COSTANZO base upon his knowledge
of COSTANZO and the investigation.

6. At approximately 6:05 p.m., SA Landa and SA Ellsworth discovered
COSTANZO's vehicle, a black 1997 Saturn, parked on the north side of Rio
Salado Parkway, just west of the 101 Highway.  No license plate was
displayed on the vehicle.  In it's place there was a sign stating, "REG
EXEMPT, NON-COMMERCIAL, NON-RESIDENT, #35321 NOT FOR HIRE, NO CONSENT FOR
TOWING, THE FREE INHABITANTS OF THE WORLD". SA Landa observed the VIN of
said vehicle to be 1G8ZH5284VZ20135.  A records check with the Arizona
Motor Vehicle Department revealed that VIN 1G8ZH5284VZ20135 is registered
to Valencia Ann CARLTON on a 1997 Saturn at 3825 W Anthem Way, Unit 2052,
Anthem, Arizona.

7. At approximately 6:07 p.m., TFO Manore observed COSTANZO arrive at the
above-referenced McDonalds Restaurant and enter said restaurant.

8. At approximately 7:20 p.m., the meeting between ▆▆▆▆▆▆▆ and COSTANZO
terminated.  TFO Manore observed ▆▆▆▆▆▆ depart the McDonalds
Restaurant and leave the area in his vehicle. TFO Manore further observed
COSTANZO depart the McDonalds Restaurant and walk south of the restaurant.

9. Surveillance of COSTANZO was terminated at this time.

**INDEXING**

1. COSTANZO, Thomas Mario ▆▆▆▆▆▆▆▆▆.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. v. Costanzo, et al.          CR-17-00585-PHX-JJT                    000023

# EXHIBIT

# I

**3-month-old and 5-year-old girls rescued in sex trafficking crackdown**

**By Alaa Elassar, CNN**

**Updated 1:42 PM ET, Tue October 24, 2017**

*The 11th iteration of Operation Cross Country took place for three days*

*Eighty-four minors, including a 3-month-old and 5-year-old-girl, were rescued*

(CNN)Two sisters, one 5 years old and the other 3 months old, were rescued in Denver by undercover agents during this year's FBI-led sting operation against sex traffickers, officials said.

The alleged trafficker, a friend of the children's family, made a deal to sell them for sex for $600, the FBI said. The friend communicated with an undercover agent, the FBI said in announcing details of Operation Cross Country XI.

While this alleged crime alone is disturbing, 82 other juveniles were rescued during last week's nationwide sweep. Some 120 people were arrested.

Despite the arrest numbers, the work is far from over.

"Unfortunately, the number of traffickers arrested -- and the number of children recovered -- reinforces why we need to continue to do this important work," FBI Director Christopher Wray said in a statement.

For these young children, life may never return to the way it was before. Holly Gibbs, a child sex trafficking survivor and the director of the Dignity Health Human Trafficking Response (HTR) Program, said, "Human trafficking is a global public health crisis. What happened to these children is a tragedy, and they have a long journey ahead of them. But for the moment, I am glad that they are safe."

*Average age of victims is 15*

On October 13, the second day of the operation, a minor was rescued by the FBI in El Paso, Texas, when a 16-year-old female victim was advertised online for "entertainment," officials said.

The girl was accompanied by a 21-year-old female who offered an undercover agent sexual intercourse with both her and the underage victim for $200, officials said. According to the FBI report, the woman as well as the driver, another female, who took the minor and 21-year-old to the undercover officer's location, were arrested.

Among the recovered victims across the country was one from Russia. Local and state agencies were involved in the operation, as were police as far away as the Philippines and Thailand.

The average age of the victims recovered from this year's operation is 15, the FBI said. Sellers tried to pimp them to outsiders from hotels, truck stops or online.

Sometimes, sex trafficking can involve family members or family friends.

Bradley Myles, CEO of the Polaris Project, which launched a human trafficking hotline, says traffickers often prey on those with trauma in their childhood history. And, he said, there often are problems down the road.

"There are ACEs, adverse childhood experiences, and the more ACEs that someone has the higher likelihood that they'll experience other forms of trauma and abuse in life," said Myles, who was not involved in the operation but said he hopes the children are given the resources they need to someday recover.

*Focusing on the victims*

At a press conference in Denver on Thursday, District Attorney George Brauchler reminded traffickers that undercover agents and task force officers are always lurking, be it behind cameras, on the Internet or in a casino, prepared to make another bust.

"To those out there who are watching this who might avail themselves at the opportunity to exploit children or to engage in even the adult sex trade, this is a bit of a warning. ... The people that you can't see behind those cameras, they are fins. They are fins in the water and they represent sharks who are there all the time."

"And my advice to you is to stay out of those waters where the kids are, to stay out of those waters where exploited adults are for sex, because they are out there and they will get you. And when they get you, my office will handle the rest."

The FBI continues to work with agencies and organization specializing in child protective services for the 84 rescued children.

There are still thousands of children locked in shackles as chess pieces in a game of sex slavery, and without consistent efforts, Myles said he doesn't think it will end

"We are seeing about an average of 23 cases a day. So we need that daily drumbeat of a 24-hour response throughout the country," he said. "Operation Cross Country doesn't happen every day. But these cases are breaking across our country every day."

# EXHIBIT

# J

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

ABOUT FOLLOW DONATE



# Pew Research Center

*U.S. Politics & Policy*

MENU RESEARCH AREAS SEARCH

MAY 3, 2017

# Public Trust in Government: 1958-2017

Public trust in the government remains near historic lows (http://www.people-press.org/2017/05/03/public-trust-in-government-remains-near-historic-lows-as-partisan-attitudes-shift/) . Only 20% of Americans today say they can trust the government in Washington to do what is right "just about always" (4%) or "most of the time" (16%).

## Public trust in government near historic lows

| Chart | Data | Share | Embed |

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN

*% who trust the govt in Washington always or most of the time*



— Moving average ⋯⋯ Individual polls

CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART

PEW RESEARCH CENTER

When the National Election Study began asking about trust in government in 1958, about three-quarters of Americans trusted the federal government to do the right thing almost always or most of the time. Trust in government began eroding during the 1960s, amid the escalation of the Vietnam War, and the decline continued in the 1970s with the Watergate scandal and worsening economic struggles. Confidence in government recovered in the mid-1980s before falling again in the mid-1990s. But as the economy grew in the late 1990s so too did confidence in government. Public trust reached a three-decade high shortly after the 9/11 terrorist attacks, but declined quickly thereafter. Since 2007, the share saying they can trust the government always or most of the time has not surpassed 30%.

Currently, 28% of Republicans and Republican-leaning independents say they can trust government, compared with 15% of Democrats and Democratic leaners. Throughout Obama's tenure, more Democrats than Republicans reported trusting the government, though that has flipped since Trump's election. Since the 1970s, trust in government has been consistently higher among members of the party that controls the White House than among the opposition party. However, Republicans have been much more reactive than Democrats to changes in political power. Republicans have expressed much higher levels of trust during Republican than during Democratic presidencies, while Democrats' attitudes have tended to be more consistent, regardless of which party controls the White House.

### Trust in govt higher among members of party that controls presidency

| Chart | Data | Share | Embed |
|---|---|---|---|

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN

*% who trust the govt in Washington always or most of the time*



**—** Republican/Lean Rep    **—** Democrat/Lean Dem    — No partisan lean

CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART

PEW RESEARCH CENTER

Case 2:17-cr-00585-GMS   Document 63-1   Filed 11/06/17   Page 70 of 72

**Trust in government by party and ideology**

| Chart | Data | Share | Embed |

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN

*% who trust the govt in Washington always or most of the time*



━━━ Conservative Rep/Lean Rep ━━━ Moderate–Lib Rep/Lean Rep
━━━ Cons–Moderate Dem/Lean Dem ━━━ Liberal Dem/Lean Dem ━━━ No partisan lean

CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART

PEW RESEARCH CENTER

Historically, there have been modest differences between generational groups in trust in government and that remains the case today. Currently, 20% of Millennials (now ages 18-36) report trusting the government, similar to the shares of older generations who say the same. Trust in government remains at or near historically low levels across generational lines.

**Trust in government by generation**

| Chart | Data | Share | Embed |

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN



*% who trust the govt in Washington always or most of the time*

**CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART**

right thing. Conversely, during the Democratic administrations of Clinton and Obama blacks were more likely than whites to express trust in government.

---

## Trust in government by race and ethnicity

| Chart | Data | Share | Embed |

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN

% who trust the govt in Washington always or most of the time



CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART