ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

MATTHEW BINFORD
Arizona Bar No. 029019
Matthew.Binford@usdoj.gov
CAROLINA ESCALANTE
Arizona Bar No. 026233
Fernanda.Escalante.Konti@usdoj.gov
GARY M. RESTAINO
Arizona Bar No. 017450
Gary.Restaino@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-17-00585-PHX-GMS |
|---|---|
| Plaintiff, | |
| vs. | **GOVERNMENT'S RESPONSE TO MOTION TO DISMISS COUNTS 3, 4, 5, 6, & 7 OF THE FIRST SUPERSEDING INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT** |
| Thomas Mario Costanzo, | |
| Defendant. | |

Costanzo's motion to dismiss based on outrageous government conduct should be denied.  In this case, undercover government agents approached Costanzo with money purported to be drug proceeds and asked Costanzo to exchange it for Bitcoin.  The investigative techniques used here are commonly used in criminal cases and are not "so shocking and so outrageous as to violate the universal sense of justice."  Instead, this investigation was based squarely on the money laundering sting statute.  Applying the six-factor test recently set forth by the Ninth Circuit, Costanzo cannot meet his burden of establishing outrageous government conduct.

## I.     Background

Bitcoin was the first decentralized digital currency.  The Bitcoin network came into existence in 2009.  *See* Benjamin Wallace, *The Rise and Fall of Bitcoin*, WIRED (Nov. 23, 2011), *available at* https://www.wired.com/2011/11/mf_bitcoin/.  In 2011, when talking about Bitcoin, Senator Charles Schumer said, "It's an online form of money laundering used to disguise the source of money, and to disguise who's both selling and buying the drug."  NBC New York, *Schumer Pushes to Shut Down Online Drug Marketplace* (June 5, 2011), *available at* https://www.nbcnewyork.com/news/local/123187958.html.  In 2013, the Senate Committee on Homeland Security and Government Affairs held a hearing on Bitcoin.  *See* Timothy B. Lee, *Here's How Bitcoin Charmed Washington*, Washington Post (Nov. 21, 2013), *available at* https://www.washingtonpost.com/news/the-switch/wp/2013/11/21/heres-how-bitcoin-charmed-washington/.  Speakers at the hearing included representatives from the Department of Justice, the Secret Service, and the Financial Crimes Enforcement Network (FinCEN).  *Id.*  Jennifer Calvery, the Director of FinCEN, discussed "money laundering vulnerabilities in virtual currencies" and told the Committee that "the idea that illicit actors might exploit the vulnerabilities of virtual currency to launder money is not merely theoretical."  *Statement of Jennifer Calvery, Director, Financial Crimes Enforcement Network, United States Department of the Treasury*, *Before the United States Senate Committee on Homeland Security and Government Affairs* (Nov. 18, 2013).  Even state-level law enforcement began to crack down on virtual currency exchangers.  *See* Krebs on Security, *Florida Targets High-Dollar Bitcoin Exchangers* (February 7, 2014)("undercover officers and agents from the U.S. Secret Service's Miami Electronic Crimes Task Force contacted several individuals who were facilitating high-dollar transactions via localbitcoins.com").  And in January of 2015, the Northwestern University School of Law published an article discussing money laundering in the Bitcoin network.  *See, e.g.*, Kavid Singh, T*he New Wild West: Preventing Money Laundering in the Bitcoin Network*, 13 NW. J. TECH & INTELL. PROP. 37 (2015) ("The use of bitcoins for illicit purposes not only facilitates criminal activity throughout

the world, but also undermines the security of individuals using bitcoins for legitimate purposes . . . ." and stating that money laundering is "a pervasive problem in the world of decentralized virtual currencies"). The article specifically discussed the difference between large mainstream exchanges and smaller "secretive" exchanges. *Id.* at 58–59.

In March of 2015, federal law enforcement began looking into virtual currency exchangers in Arizona. (Doc. 63-1, at 10-11.) They focused on individuals who were conducting peer-to-peer exchanges using a website called localbitcoins.com. (Doc. 63-1, at 10-11.) When reviewing profiles on localbitcoins.com, they identified the profile of Morpheus Titania (later identified as Costanzo), an exchanger who had numerous confirmed transactions, advertised that he could perform multi-thousand dollar deals, and mentioned that he would provide Bitcoins "immediately and discretely [sic]." (Doc. 63-1, at 11.)

That same month, an undercover agent from the Internal Revenue Service contacted Costanzo to exchange cash for Bitcoin. (Bates 000001.) During that first meeting, when the undercover talked about Bitcoin transactions being different than wiring money and suggested that wiring money to Mexico or Panama may draw some attention, Costanzo responded, "It is untraceable, untraceable" and said, "I don't keep no records at all, of anything." (Exhibit A [Bates 001749], at 54:30.) When Costanzo began to rant about rules, the undercover agent responded that there have to be some rules. (Exhibit A, at 55:00.) Costanzo then stated, "Don't get bit, don't get shot, don't talk to any policemen, that's my rule." (Exhibit A, at 55:30.) When the agent brought up the IRS, Costanzo used a series of curse words and other pejoratives to describe that federal law enforcement agency. (Exhibit A, at 55:50.) Later, the agent said, "I have not figured how to get them [referring to the government] off my back yet." (Exhibit A, at 1:15:15.) Costanzo then responded, "Bitcoin is the way to do it because, guess what, now there is no income" and "It's a good way to, at least, lower your visibility." (Exhibit A, at 1:15:30.) During that first transaction, Costanzo exchanged $2,000 for Bitcoins. (Bates 000001.)

It was not until May of 2015, after the review of the Morpheus profile and after the initial comments by Costanzo about untraceable funds, unreported income, and contempt for local and federal law enforcement, that the undercover agent told Costanzo that he was using drug proceeds to purchase Bitcoin. The undercover agent made it clear that the cash he was giving to Costanzo was drug proceeds, specifically saying, "you know when I talk about supplier I'm talking about drugs, right?" (Doc. 63-1, at 44.)  Costanzo responded with, "I know nothing, hahahahah." (Doc. 63-1, at 44.) Costanzo later said, "I like keeping things super confidential." (Doc. 63-1, at 44.) When the undercover agent said, "Heroin," Costanzo responded, "Don't say that word out loud, hahaha," and "I can come up with as much as you want to do, we just have to keep everything on the low." (Doc. 63-1, at 44.) Costanzo then completed the transaction and exchanged $3,000 for Bitcoin. (Doc. 63-1, at 45.)

In October of 2015, a second undercover agent met with Costanzo and claimed to be a business partner of the first undercover agent. (Doc. 63-1, at 14.) Costanzo provided Bitcoin to the undercover agent in exchange for $13,000. (Doc. 63-1, at 14.) The first undercover agent met with Costanzo again in November and gave Costanzo another $13,000 in exchange for Bitcoin. (Doc. 63-1, at 15.)

In March of 2016, a Joint Task Force—comprised of the Drug Enforcement Administration, Internal Revenue Service Criminal Investigators, the United States Postal Inspectors Service, and the Department of Homeland Security—took over the investigation. (Doc. 63-1, at 17.) As part of the investigation, a new undercover agent initiated contact with Costanzo using his localbitcoins.com profile. (Doc. 63-1, at 18.)

In September of 2016, the new undercover agent met with Costanzo. (Doc. 63-1, at 18.) During the conversation, Costanzo told the undercover agent that localbitcoins.com is a good way to conceal money transactions. (Doc. 63-1, at 19.) The undercover agent told Costanzo that he needed to transport large quantities of money between Arizona and California and was trying to avoid having the money seized if stopped by law enforcement. (Doc. 63-1, at 20.) Costanzo told the agent, "If you are doing anything illegal, I don't want

to know about it." (Doc. 63-1, at 20.) Costanzo subsequently provided the agent with Bitcoin, in exchange for $2,000. (Doc. 63-1, at 20.)

During subsequent meetings, the undercover agent told Costanzo that the money he was providing Costanzo was from drug proceeds, specifically cocaine. (Doc. 63-1, at 24.) Costanzo nonetheless conducted the transactions and exchanged $30,000 on February 2, 2017, and $107,000 on April 20, 2017. (Doc. 63-1, at 24; Bates 000066-69.)

## II.     Law

### A.     *18 U.S.C. § 1956(a)(3) – The "Sting" Provision*

The federal money laundering statute specifically provides for situations "involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity." 18 U.S.C. § 1956(a)(3). "Money laundering stings are relatively common, especially where the laundering is tied to drug dealing." Steven Mark Levy, *Federal Money Laundering Regulation: Banking, Corporate and Securities Compliance*, § 22.01, Introducing Section 1956(a)(3) (2d ed. 2017).

### B.     *Outrageous Government Conduct*

The claim of "outrageous government conduct" asserts that government conduct "was so shocking to due process values that the indictment must be dismissed." *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008), *see also United States v. Holler*, 411 F.3d 1061, 1065 (9th Cir. 2005). "For a due process dismissal, the [g]overnment's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013), *quoting United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). The police conduct must be "repugnant to the American system of justice." *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986) (quoting *United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983). This is "an extremely high standard." *Smith*, 924 F.2d at 897. "This standard is met when the government engineers and directs a criminal enterprise from start to finish," but "is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and

necessary items to the venture." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973) (internal quotations and citations omitted)).  There are "only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *See United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)); *see also Hullaby*, 736 F.3d at 1262.

If the government's conduct does not rise to the level of a due process violation, the court can dismiss an indictment under its supervisory powers, but this is a drastic step and therefore disfavored.  *United States v. Rogers*, 751 F.2d 1074, 1076–77 (9th Cir. 1985). Dismissal is appropriate when the investigatory or prosecutorial process has resulted in a violation of a federal constitutional or statutory right and no lesser remedial action is available.  *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991).  If no constitutional or statutory violation can be identified, the remedial or deterrent goals cannot justify dismissal in a case. *Id.*

The six factors identified by the Ninth Circuit as being relevant to a claim of outrageous government conduct are: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. *Black*, 733 F.3d at 303.

**III.    There Was No Outrageous Government Conduct**

In this case, although the government was not aware of the specific identity of all of the participants before it launched the sting investigation, the government knew that peer to peer virtual currency exchangers were involved in money laundering.  Because the government did not initiate the criminal activity, but rather sought to crack an ongoing money laundering operation, its conduct was not outrageous and did not violate due

process. As explained in below, after applying the factors set forth by the Ninth Circuit in *Black*, it is clear that the conduct of the government in this case was appropriate and was not "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011).

### A.   *Known Criminal Characteristics*

In this case, the government focused on a category of persons—peer to peer virtual currency exchangers—that it had reason to believe were laundering money. As explained above, the government was concerned about the use of Bitcoin to further illegal activity. There were congressional hearings, FinCEN was issuing regulations in attempt to combat criminal activity, and academics were publishing articles discussing the use of Bitcoin to launder money. *Gurolla*, 333 F.3d at 950, provides a useful analogy. In *Gurolla*, a money-laundering sting case, the Ninth Circuit explained that the government knew generally before it launched the sting that "Mexican banks were involved in money laundering, although it was not aware of the specific identity of all the participants." Here, the government was aware that peer to peer virtual currency exchangers were often involved in money laundering, although it was not aware of the specific identity of Costanzo when the undercover agents began identifying profiles on localbitcons.com.

### B.   *Individualized Suspicion*

The government had individualized suspicion based on Costanzo's localbitcoins.com profile, where he had numerous confirmed transactions and stressed anonymity. Requiring the government to prove that it knew that each defendant involved in a sting operation had already engaged in a series of similar crimes before it was allowed to proceed or risk facing the penalty of having its conduct later be declared "outrageous" would likely cripple all future attempts to run undercover sting operations. But even if the government wasn't entirely certain that Costanzo had engaged in money laundering before it was first mentioned by the undercover agent, Costanzo's response and reactions created a reasonable basis for the government's belief that he had engaged in prior similar criminal activities. Specifically, Costanzo used an alias and his profile stated, "I will get you

Bitcoins immediately and discretely! [sic]"  The telephone number provided on his localbitcoins.com account was registered with his alias and the address of a public shopping complex.  Costanzo's subsequent statements to the undercover agents bolstered the initial suspicion based on the profile and provided predication to continue.  For example, Costanzo advised that his business model is, "I don't care who you are, what you are, where you are," and said things like, "I like keeping things super confidential" and "you can do whatever you want, you can do something illegal, I don't want to know about it."  In one instance, Costanzo told an undercover agent that he previously laundered his Bitcoin proceeds through a casino to exchange his $20 bills for $100 bills.  Costanzo also recommended the use of an encrypted messaging application.

### C. *Government's Role in Creating the Crime*

The government introduced the fact that the money was proceeds of drug trafficking, but that scheme was not far-fetched given the multiple examples of virtual currency exchangers converting drug proceeds into virtual currency on previous occasions.  Additionally, any concern that the government sought to manufacture a crime that would have not otherwise occurred is mitigated by the fact that Costanzo made statements almost immediately about not wanting to know the source of the money.  *See Black*, 733 F.3d at 307 ("[O]ur concerns are mitigated to a large degree because [the defendants] told [the undercover agent] very early and often that they had engaged in similar criminal activity in the past, in conversations that were recorded on tape.").

### D. *Government's Encouragement of the Defendant to Commit the Offense*

There is no evidence suggesting that a coercive relationship existed between any of the undercover agents and Costanzo.  Costanzo's claim that he was vulnerable because of his "anti-establishment political views" is far-fetched, and his claim that he lived in "poverty" is contradicted by his own claims that he was "semi-retired" and was able "to do what [he] want[ed] when [he] want[ed] to do it."  (Doc. 63-1, at 56.)   At one point, Costanzo claimed to have built a "multi-million dollar business" from localbitcoins.com.  The fact that no coercive relationship existed is bolstered by the fact that the former co-

defendant in this case (who shared similar political views) expressly refused to engage in money laundering when given the opportunity to do so.

### E. *Nature of the Government's Participation*

Although the investigation in this case spanned over a multi-year period, the number of transactions involved were minor, compared to all of Costanzo's transactions. Costanzo is charged with money laundering on five separate occasions with three different undercover agents. In March of 2015, prior to the first transaction with undercover agents, Costanzo's localbitcoins.com profile stated that he had more than 70 confirmed transactions. In May of 2015, Costanzo claimed to have done "about half a million in the last year." The undercover agents in this case were not providing Costanzo with Bitcoin wallets, money counters, money bands, vehicles, or anything else to support his money laundering activity. The only thing provided by any of the agents in this case was money that was identified as drug proceeds—money that Costanzo gladly accepted.

### F. *Nature of the Crime Being Pursued and Necessity for the Actions Taken*

During the time that this investigation was ongoing, the popularity of virtual currency skyrocketed. That popularity provided opportunities for drug traffickers and others to launder proceeds using the emerging technology. Peer to peer virtual currency exchangers, like Costanzo, were making this type of activity possible. *See* Press Release, Dep't of Justice, *Manhattan U.S. Attorney Announces Charges Against Bitcoin Exchangers, Including Ceo Of Bitcoin Exchange Company, For Scheme To Sell And Launder Over $1 Million In Bitcoins Related To Silk Road Drug Trafficking* (January 27, 2014); *see also Beyond Silk Road: Potential Risks, Threats, and Promises of Virtual Currencies: Hearing on S.D. 342 Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 113th Cong. 6, 10, 11 (2013), *available at* http://www.hsgac.senate.gov/download/?id=e92d0cf1-9df0-44d9-b25ad734547c0c30 ("the idea that illicit actors might exploit the vulnerabilities of virtual currency to launder money is not merely theoretical")("Legitimate financial institutions, including virtual currency providers, do not go into business with the aim of laundering money on behalf of

criminals.")("[T]hose institutions that choose to act outside of their AML obligations and outside of the law have and will continue to be held accountable.").

Given the unique nature of peer to virtual currency exchanges—and the lack of any associated paperwork or reporting—investigators had no other option to identify and investigate individuals laundering criminal proceeds. Indeed, Costanzo has not suggested any other investigative strategy that would have worked here. Instead, he simply argues that sting operations are only justified when there is "an imminent danger of violence or physical harm." (Doc. 63, at 15.) But if danger or violence were prerequisites to sting operations, the sting provision of the money laundering statute could never be used. Furthermore, there are numerous examples of money laundering sting investigations where the government agents introduced purported drug proceeds. *See, e.g., United States v. Nelson*, 66 F.3d 1036, 1038 (9th Cir. 1995)(Rahlf took Agents White and Malley for a test drive in a Toyota 4–Runner, during which Agent White told Rahlf that she was "in the dope business" and Malley was her supplier. She added that she wanted to buy a car with cash, but did not want a "paper trail."); *United States v. Castaneda*, 16 F.3d 1504, 1506 (9th Cir. 1994)(denying a judgment of acquittal on substantive money laundering sting counts where an informant working for federal agents provided real estate agents with large amounts of cash hinted to be drug proceeds); *United States v. McLamb*, 985 F.2d 1284 (4th Cir. 1993)(undercover IRS special agent purchasing vehicle from dealership with purported drug proceeds); *United States v. Kaufmann*, 985 F.2d 884 (7th Cir. 1993)(informant working on behalf of IRS purchasing vehicle from dealership with purported drug proceeds); *United States v. Loehr*, 966 F.2d 201, 202 (6th Cir. 1992)("The sting required that Carpenter and Bell attempt the purchase of an automobile after clearly informing the defendant that the purchase price was to be paid from drug proceeds."). As set forth in the examples above, law enforcement officials have—for many years—conducted sting operations where undercover agents or informants used purported drug proceeds in an attempt to launder money through businesses that were capable of

laundering funds. The fact that this case involved Bitcoin, instead of real estate or vehicles, does not make it outrageous.

The six factors set forth by the court in *Black*, all favor the government. The agents knew that peer to peer virtual currency exchangers across the country were engaged in money laundering. Costanzo's profile showing numerous transactions and the ability to conduct high-dollar transactions, combined with his advertisement promising discreetness, justified further investigation. There is no evidence to support Costanzo's claim that the agents encouraged him to commit the offense other than providing him with the opportunity to do so, and his reaction after the agents told him that the money was drug proceeds confirmed their suspicions. Finally, this investigation sought to combat a nationwide problem involving virtual currency money laundering and used a technique that has been used by federal agents for years. Thus, dismissal based on outrageous government conduct is not appropriate.

**IV.    Dismissal based on the Court's supervisory powers is likewise not appropriate**

Costanzo also asks this Court to dismiss the money laundering counts based on its supervisory powers. But such a request is inappropriate here. Costanzo argues that the same facts underlying the due process violation also support an exercise of the Court's supervisory powers to dismiss the charges. Given that the government's investigation did not violate Costanzo's constitutional rights and was not illegal, the only basis for relief would be to protect judicial integrity. Costanzo, however, presents no plausible argument to lead the Court to conclude that judicial integrity was in any way offended by the government's investigation in this case or would be by not dismissing the charges. Dismissal under supervisory powers is limited to extreme cases, *Smith*, 924 F.2d at 897, and even in some of the most egregious situations it has not been met. *See, e.g., Emmert*, 829 F.2d 805, 811–12 (9th Cir. 1987)(confidential informant's offer of $200,000 to college student to locate supplier of cocaine was not outrageous conduct); *United States v. Simpson*, 813 F.2d 1462, 1466 (9th Cir. 1987)(FBI's continued use of female informant after she became intimate with defendant was not outrageous conduct). For the same

reasons that Costanzo has failed to meet his burden of establishing outrageous government conduct, he has failed to provide justification for this Court to use the extreme measure of exercising its supervisory authority to dismiss the charges.

## V. Conclusion

Costanzo has failed to establish that the government's conduct in this case was "outrageous" and his justifications for dismissal fall short.  The motion to dismiss should be denied without a hearing.

Respectfully submitted this 4th day of December, 2017.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/ Matthew Binford*
MATTHEW BINFORD
CAROLINA ESCALANTE
GARY M. RESTAINO
Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record in this case.