1  JON M. SANDS
   Federal Public Defender
2  District of Arizona
   850 W. Adams, Suite 201
3  Phoenix, Arizona  85007
   Telephone: 602-382-2700
4
5  MARIA TERESA WEIDNER; #027912
   Asst. Federal Public Defender
   Attorney for Defendant
6  maria_weidner@fd.org
7
8              IN THE UNITED STATES DISTRICT COURT
9                     DISTRICT OF ARIZONA
10 | United States of America,        |   No. CR-17-0585-01-PHX-JJT
11 |              Plaintiff,          |   **REPLY TO DKT. # 73,**
                                          **GOVERNMENT RESPONSE TO**
12 |        vs.                       |   **DEFENDANT'S MOTION TO SEVER**
                                          **COUNTS [DKT. #58].**
13 | Thomas Mario Costanzo, et al.,   |
14 |              Defendant           |

15         Defendant Thomas Mario Costanzo submits this Reply to the
16 Government's Response to his motion for severance of Count 8 of the superseding
17 indictment, felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1),
18 from Counts 3-7, which each allege violation of 18 U.S.C. § 1956(c**). Severance of**
19 **Count 8, or, in the alternative, bifurcation of Count 8 from Counts 3-7 is**
20 **appropriate in this case.**
21         The government's argument that a sufficient connection exists between:
22 1) ammunition found in the hallway closet of a Mesa apartment and 2) trades conducted
23 in public at cafes and fast food restaurants across the Phoenix metropolitan area for
24 joinder at trial is unconvincing for four reasons: First, no gun was ever recovered, just a
25 box of ammunition. Second, no evidence of money laundering prior to the government's
26 introduction of its ruse to entice unwitting citizens exists; thus undermining the
27 government's argument regarding the ammunition's function for "protection" and "con-
28

cealment." Third, the mere peer-to-peer exchange of bitcoin—which the government characterizes as "under-the-radar, unlicensed, and unregistered"—is not even illegal under current federal or Arizona law. Finally, each of the three statements cited by the government in support of the argument that the hallway shelf ammunition and alleged money laundering were somehow "part of a common scheme or plan" are taken out of context or outright misinterpreted.

### 1. No gun…

The government asks this court to conclude that the mere presence of ammunition in a hall closet, in the absence of a firearm of any kind being recovered from the person or property of Mr. Costanzo, both "suggest[s] that at some point he possessed a corresponding firearm for additional protection…" and is a sufficient basis to join this charge to the remaining counts of the indictment. But for the constitutional fair trial concerns raised by joinder here, this is a comical position. Unfortunately, Mr. Costanzo's substantial rights are affected; there is no room for speculation or jocularity here.

The government cites cases upholding joinder of felon in possession of a *firearm* with other clearly related charges in support of its position; these are readily distinguishable from the case at bar.

- *Nguyen* involves a case where co-defendants were tried on two indictments in a consolidated jury trial. 88 F.3d 812, 814 (9th Cir. 1996). The first indictment charged a conspiracy to transfer an unregistered sawed-off shotgun and aiding and abetting the same. *Id.* The second indictment charged felon in possession of a firearm, specifically, a handgun that defendant attempted to sell to the undercover agent on the same day that transfer of the unregistered sawed-off was negotiated. *Id.* The district court found that all counts in both indictments "ar[o]se out of the same transaction or series of transactions …. [and] all ha[d] to do with …. the sale of guns to this specific investigator." *Id.* at 815 (citing *United*

*States v. Portac, Inc*., 869 F.2d 1288, 1294 (9th Cir.1989) (finding joinder proper when same facts are offered to prove each joined offense). Here not only do we have a situation where the same facts will not be offered to prove the joined offenses, we also have only a box of ammunition sitting on a hallway shelf, miles away from where any bitcoin exchange was occurring.

- *VonWillie* involves a case where defendant was charged both with being a felon in possession of multiple (loaded)[1] firearms and possessing those same firearms in relation to a drug trafficking crime. 59 F.3d 922, 929 (9th Cir. 1995). In finding no misjoinder, the court noted that "[t]estimonial and physical evidence related to location, discovery, and seizure of the firearms" was common to both counts. *Id.* In finding no prejudicial joinder, the court noted statements by the defendant in connection to both the firearms and the drugs found in his home by authorities. *Id.* at 930. In contrast, the bulk of the evidence in the instant case arises from recorded conversations between Mr. Costanzo and undercover agents at cafes and fast food restaurants, far from the box of ammunition on the hallway shelf in Mesa, which was never discussed or even suggested.

**2. No money laundering save the government's money laundering…**

In other filings, the government has conceded that it "found" Mr. Costanzo through localbitcoins.com, not the Darknet. *See, e.g.* Dkt. #85 at 2. Absolutely no evidence beyond the government's general distrust of Bitcoin linked Mr. Costanzo to money laundering before IRS and DEA agents decided to insert that ruse into their investigation. In fact, of recent cases that undersigned counsel was able to identify involving bitcoin traders targeted by federal agents via localbitcoins.com, the instant matter is the only one where money laundering charges were pursued in the absence of some particularized suspicion. *See* Dkt. # 63 at Part IV(1). Thus, apart from the "thousands and tens of thousands of dollars" that the government chose to pour into this

---

[1] 59 F.3d 922, 924 (9th Cir. 1995)

3

masquerade over the course of 25 months, there is little evidence beyond Mr. Costanzo's own unsubstantiated claims to support that he was even successful as a trader of Bitcoin before the government stepped in with its deep pockets. *See e.g., id.* at Part IV(2).

Thus the government cannot claim that it interrupted an ongoing criminal activity (presumably money laundering, since the unlicensed money transmitting counts have been dismissed) where "protection" and "concealment" were necessary; instead, it sought to create one. Now it wishes to shoehorn the unrelated presence of ammunition found by chance in a hall closet (in the absence of any firearm or plausible nexus to the money laundering counts) into this trial.

**3.   Unlicensed money transmitting is not a crime (in Arizona), and by the way, Bitcoin is not money…**

Much of the government's rhetoric in its response is predicated on the very charges it moved to dismiss two days prior to the filing of said response. Specifically, the government repeatedly characterizes unlicensed peer-to-peer Bitcoin exchanges as inherently criminal acts. This position is simply not defensible given the state of Arizona, not to mention federal, law.

The government refers to Mr. Costanzo's peer-to-peer Bitcoin trading activities as "under-the-radar, unlicensed, and unregistered." This appears to be because 18 U.S.C. § 1960(b)(1)(A) makes it a federal crime to operate a money-transmitting business "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law." The counts in the first superseding indictment which alleged violations of § 1960(b)(1)(A) have been dismissed. Dkt. # 74. However, it is worth mentioning that Arizona's money-transmitting law contains a Definitions section that clearly excludes unofficial, "virtual" commodities such as Bitcoin.

The pertinent Definitions section defines "Money" as "a medium of exchange that is authorized or adopted by a domestic or foreign government as a part of

its currency and that is customarily used and accepted as a medium of exchange in the country of issuance." Ariz. Rev. Stat. Ann. § 6-1201(9). Bitcoin may be many things, but it is emphatically not "authorized or adopted by a domestic or foreign government as a part of its currency." Indeed, not being an official government-regulated currency is Bitcoin's most essential feature and raison d'etre. "[T]he whole point of Bitcoin is to escape any entanglement with sovereign governments." *United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016) (emphasis added); *see also* Matthew Kien-Meng Ly, Coining Bitcoin's "Legal-Bits": Examining the Regulatory Framework for Bitcoin and Virtual Currencies, 27 Harv. J.L. & Tech. 587, 590 (2014) ("No legal entity controls or administers Bitcoin. Additionally, no sovereign or commodity backs the currency.") (footnotes omitted). In short, because Arizona law clearly does not require a license for businesses that transmit Bitcoin, Section 1960(b)(1)(A) was—and is—facially inapplicable to Mr. Costanzo's alleged conduct. Moreover, even if Arizona law did require a license for transmitting Bitcoin, Section 1960(b)(1)(A) still would not apply in Arizona because Arizona law does not make unlicensed money transmitting "a misdemeanor or a felony." 18 U.S.C. § 1960(b)(1)(A); *see generally* Ariz. Rev. Stat. Title 6, Ch. 12.

On the federal front, it is a fact that Congress has not passed legislation regarding Bitcoin or other virtual internet-based commodities as of yet. In the absence of action by our legislative branch and a specific provision of authority to the Executive Branch to promulgate regulations, extra-legislative guidance runs afoul of the Separation of Powers. *See, e.g., F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 536-37(2009) (citing *Mistretta v. United States*, 488 U.S. 361, 372-374 (1989) ("If agencies were permitted unbridled discretion, their actions might violate important constitutional principles of separation of powers and checks and balances. To that end the Constitution requires that Congress' delegation of lawmaking power to an agency must be 'specific and detailed…' Congress must 'clearly delineat[e] the general policy'

5

an agency is to achieve and must specify the 'boundaries of [the] delegated authority….' Congress must 'lay down by legislative act an intelligible principle,' and the agency must follow it.")(internal quotations omitted). That is, the Department of Treasury's attempt—through the Financial Crimes Enforcement Network ("FinCEN")—to issue interpretative guidance exempt from public notice or comment and in the absence of clear legislative authority, is simply unconstitutional and unenforceable.

**4. Statements taken out of context…**

The government's reliance on statements taken out of context in attempting to give some substance to its claim that the ammunition in the hallway closet had a nexus to the alleged money laundering is plainly untenable. A more complete explanation of the context of the of the cited statements—as well as the UCA's role in eliciting them when appropriate—is provided here

**a. "I do my best to—you know—screw with anybody who I don't feel safe around."**

This statement occurred on the date of Mr. Costanzo's arrest at a local Starbucks while attempting to conduct a $100K Bitcoin transaction. After discussing any number of topics, including Bitcoin, the human condition, a movie called "The Matrix," and actor Laurence Fishburne, the UCA turns the conversation to the need for self-protection, and Mr. Costanzo discusses at length the steps he has taken to avoid potentially dangerous situations with strangers, including the small knife he carries, which the UCA refers to as a "little jabber." *See* Exhibit A, Bates 1083-97 at 1083-84. Mr. Costanzo then makes the statement cited by the government but also adds that he would not use it "just for whatever reason." *Id.* at Bates 1084.

Later, the UCA appears to try to elicit more from Mr. Costanzo regarding the need for protection by saying, "[w]ell, especially if you're walking around, somebody sees you have money, decides to walk up and…", Exhibit A at Bates 1085, but Mr. Costanzo seizes the opportunity to instead provide a series of accounts of how he avoided a person who seemed to be crazy (by not responding to him), *id.*,

evaded an individual who said he wanted to talk about Bitcoin but started acting suspiciously (by excusing himself to go to the bathroom), *id.* at 1085-87, and doubted the veracity of a gentleman asking for money at a McDonald's (but gave him fifty cents anyway). *Id.* at 1087-88.

Before launching into a tale about a hitchhiker he picked up on a roadtrip from Florida to Arizona—and who he found a roofing job for in Louisiana—Mr. Costanzo pauses to say "[w]ell no, it's just you gotta—you know especially in this business you gotta, like, trust people…" Exhibit A at 1088-93. After Mr. Costanzo's good-samaritan-hitchhiker account is done, the UCA appears to try yet again to elicit some damning statement as to protective measures, saying "Yeah. That's the thing, you got large amounts of cash like that and…" *Id.* 1095. Mr. Costanzo disregards this lure as he launches into another hitchhiker account, *id.,* at 1095-96, then screams are heard—apparently from Starbucks patrons frightened by the unnecessarily dramatic entry of federal agents into the café to arrest Mr. Costanzo. He is heard to say only "[w]hat-whoa-whoa What are you doing?" before being arrested without incident." *Id.* at 1096.

**b. A "reputation for 'reliability' in the community."**

Inclusion of this exchange as part of the government's argument in support of joinder is confusing, considering its obvious context. The excerpted recording provided by the government does not require supplementation: it is clear that Mr. Costanzo and Dr. Steinmetz were simply trying to put the UCA—who was expressing nervousness about the planned $100K exchange—at ease that he would not be "jacked," to use Dr. Steinmetz's terminology. Dr. Steinmetz advised he would bring a firearm for everyone's safety, and Mr. Costanzo shortly thereafter added that they both have good reputations in the community—presumably the Bitcoin community—for reliability. The only reasonable inference there is that reliability means they are not scam artists, they provide the Bitcoin promised and do not take advantage of clients to,

/ / /

for example, rob or short-sell them when they show up with cash for the trade. This interpretation is further supported by the positive customer reviews on Mr. Costanzo's localbitcoins.com account disclosed by the government. *See* Exhibit B, Bates 1127-1129. It is simply wishful thinking on the part of the government to try to infuse that innocuous statement with the promise of weaponry.

   c. **"Like at your house—you have border protection 'cause you don't want somebody comin' in your house…I mean—somebody comes in your house you blow his brains out. You know?"**

This statement is taken entirely out of context. The conversation taking place between the UCA and Mr. Costanzo, which was far longer than the 35-second audio clip relied upon by the government, makes it clear that Mr. Costanzo was simply talking politics as opposed to personal firepower.

Defense Exhibit C picks up as Mr. Costanzo is in the middle of explaining how Bitcoin works to the UCA. Exhibit C, Bates 723-730, at 723-25. In response to the UCA's questions, Mr. Costanzo tries to analogize to the Starbucks business model, *id.* at 726-27, then his explanation becomes a rant against increasing the minimum wage, *id.* at 728-29. Ultimately, Mr. Costanzo explains his political view that "the government has no business being involved in school, being involved in marriage, being involved in education, being involved in - in- in, uh, in- in employment." *Id.* at 729. Mr. Costanzo then adds that "Their [the government's] job is to do two things. Protect our rights and make sure that nobody gets in that comes across the border without, uh, you know, some documentation or having some kind of, uh, border protection." *Id.* He then analogizes the government's border protection duties with that of an owner protecting his home: "Like at your house – you have border protection 'cause you don't want somebody comin' in your house…I mean – somebody comes in your house you blow his brains out. You know? But I mean that – these are the two things they're [the government is] supposed to do and those are the two things they don't do. And it pisses me off." *Id.*

///

8

Again, this statement, taken in context, is simply an expression of Mr. Costanzo's constitutionally protected political views regarding the limited role of government in society. It is not a claim of or insinuation that he personally possesses firepower, a conclusion once again undermined by the absence of firearms on Mr. Costanzo's person or in his property.

## **CONCLUSION**

Based on all the above, joinder of the felon in possession of ammunition charge (Count 8) with the money laundering charges in the indictment (Counts 3-7) is improper; a separate trial for Count 8 should be ordered.

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) may result from this motion or from an order based thereon.

Respectfully submitted:  December 15, 2017.

JON M. SANDS
Federal Public Defender

*s/Maria Teresa Weidner*
MARIA TERESA WEIDNER
Asst. Federal Public Defender

Copy of the foregoing transmitted by ECF for filing December 15, 2017, to:

CLERK'S OFFICE
United States District Court
Sandra Day O'Connor Courthouse

FERNANDA CAROLINA ESCALANTE KONTI
MATTHEW H. BINFORD
GARY RESTAINO
Assistant U.S. Attorneys
United States Attorney's Office

Copy mailed to:

THOMAS MARIO COSTANZO
Defendant

  _s/yc_____