**INDEX OF EXHIBITS**

<u>United States v. Thomas Mario Costanzo</u>

CR-17-585-01-PHX-GMS

Exhibit A - Was Racial Profiling Behind ATF Stash House Sting?
..................................................................... Chicago Tribune, December 13, 2017

Exhibit B - Barnes  & Chemerinsky:  The Disparate Treatment of Race and Class
.................................................................... in Constitutional Jurisprudence

# EXHIBIT

# A

*Was racial profiling behind ATF stash house stings?*

*Chicago judges to take up landmark case today ATF accused of discrimination in 'stash house' stings*

By Jason Meisner and Annie Sweeney•Contact Reporters

**Chicago Tribune**

December 13, 2017, 4:45 PM

The drug stash house sting has been a bread-and-butter part of the federal law enforcement playbook for years.

By dangling the promise of a big score, the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives convinced hundreds of would-be robbers across the country that they were stealing large quantities of narcotics, only to find out the drugs were a figment of the government's imagination.

But the strategy also has been controversial, sweeping up mostly African-American targets — some with only minor criminal backgrounds — and sparking allegations across the country of entrapment and racial profiling. With the way mandatory federal sentencing laws work, the stings have landed many defendants behind bars for decades or even life, even though the drugs never existed.

Now the legal battle is coming to a head in an unprecedented hearing at the Dirksen U.S. Courthouse in Chicago before a panel of nine district judges overseeing a dozen separate cases involving more than 40 defendants.

The hearing, which has been four years in the making, will take place over two days in the courthouse's large ceremonial courtroom. As many as 30 defendants, their relatives and individual attorneys are expected to attend, and an overflow courtroom has been set up to handle the anticipated crowd.

"In my 46 years of practicing law, I've never seen anything like this before," attorney Richard Kling, who represents one of the defendants, told the Chicago Tribune this week.

The testimony will focus on dueling experts who reached starkly different conclusions about the racial breakdown of targets in the stash house cases.

A nationally renowned expert hired by the Federal Criminal Justice Clinic at the University of Chicago Law School — which is spearheading the effort to have the cases dismissed — concluded that disparity between minority and white defendants in the stings was so large that there was "a zero percent likelihood" it happened by chance.

An expert testifying for federal prosecutors, though, will contend that conclusion used an "absurdly overbroad" sample that was designed to show a racial disparity where none exists.

The Tribune first reported the experts' findings in a front-page story in March that highlighted the case of Leslie Mayfield, who has been in jail awaiting a new trial since his conviction and 22-year sentence were overturned on appeal three years ago.

"I'm not nervous about this hearing," Mayfield, 49, wrote in an email to the Tribune from the Metropolitan Correctional Center. "I'm excited. I'm tired of being in jail and I'm ready to get this over."

The groundbreaking hearing is being closely watched in federal districts across the country. How it plays out could have ramifications far beyond the 43 Chicago defendants who are seeking to have their charges thrown out. The judges are expected to issue separate rulings at a later date, although some lawyers think there could be joint opinions issued by several judges if any are in agreement.

"It's impossible to predict," said University of California at Irvine law professor Katharine Tinto, a criminal law expert who has written extensively about the stash house stings. "This is very unusual in the criminal court because every individual defendant typically has a very unique case."

Tinto said the central argument of racial profiling unites the cases in a sort of criminal class action — a legal tool used in civil lawsuits. Aside from the fates of the individuals who were charged, the outcome could also force some soul-searching on behalf of law enforcement, she said.

"It could have an impact on having law enforcement agencies think critically about how they target suspects and how they structure undercover stings," Tinto said. "And that sort of critical self-examination is a good thing."

A spokesmen for the U.S. attorney's office in Chicago declined to comment for this story, citing the ongoing litigation. An ATF spokeswoman was not available for comment Wednesday.

**Prosecuting a 'desperate' target**

Launched in Miami during the cocaine-war days of the early 1990s, stash house stings have been honed over the years and are run by experienced agents who use a tightly controlled playbook.

They typically begin when an informant provides information to the ATF about a potential target who has expressed interest in taking part in a robbery. The informant then introduces the target to an undercover agent who poses as a disgruntled courier for a drug cartel and offers an opportunity to steal large quantities of drugs from a stash house guarded by men with guns.

In a series of conversations captured in undercover recordings, the target is told if he is interested he must assemble an armed team to commit the robbery. The target and his crew are arrested after they show up on the day of the supposed crime.

In order to avoid a defendant raising an entrapment defense, the stings are supposed to target only suspects who are already experienced robbers. ATF criteria also require that at least two of the participants have violent backgrounds and that all must be criminally active at the time the investigation is launched.

The issue of racial profiling started to simmer four years ago after U.S. District Chief Judge Ruben Castillo ordered prosecutors to turn over to defense attorneys in a stash house case detailed information on how the stings are run and the race of the defendants who had been charged so far.

After the University of Chicago team got involved, another ruling in July 2015 by the appellate court in Chicago resulted in the government turning over more data on the stings.

The data showed that the vast majority of those swept up in the stings were minorities, according to defense lawyers. A close examination of the criminal backgrounds of some of those targeted also raised questions about whether they were truly the most dangerous gun offenders ATF was aiming to remove from the street, they said.

Some had trouble even coming up with guns to do the job — including one crew that after months of preparation managed to find only one World War I-era pistol with a broken handle that could barely fire a round, court records show. Others had no history of carrying out high-risk armed robberies — a key provision in the ATF playbook designed to make sure targets were legitimate, defense lawyers have argued.

Mayfield, for one, talked on undercover recordings about his experience robbing stash houses, but in reality he had no arrests for robbing drug dealers. The fact that he was lured into the sting while working a full-time job and apparently trying to better his life has also been heavily criticized by the appellate court.

Another case prosecuted in Chicago involved Tracy Conley, who was ensnared after two acquaintances approached him with a plan to rob a stash house supposedly filled with 50 kilos of cocaine. At the time, Conley was working a full-time job but was struggling to make ends meet. In fact, he was stuck at a gas station with no money for fuel to get home on the day he was approached, court records show.

Conley was convicted by a jury and faced a mandatory minimum 15-year sentence. At his sentencing hearing, U.S. District Judge Sharon Johnson Coleman expressed disgust with the government's conduct, saying that putting Conley in prison for such a long stretch was not only unfair but it also served "no real purpose other than to destroy any vestiges of respect in our legal system and law enforcement that (Conley) and his community may have had."

Last month, the 7th Circuit upheld Conley's 15-year sentence but echoed Coleman's statements, questioning the wisdom of expending so many resources to prosecute an "unsophisticated and desperate" target.

Because Conley lost his appeal, he is not among the 43 defendants whose cases will be heard Thursday. But Coleman, the judge who came down hard on the government for his prosecution, will be on the panel.

**'Overwhelmingly men of color'**

The hearing will focus almost entirely on the likely dry testimony of two experts who analyzed the same data.

For the University of Chicago team, Jeffrey Fagan, a nationally known specialist in police practices who also examined the New York Police Department's stop-and-frisk policy, examined 94 defendants in 24 separate stings conducted between 2006 and 2013 and found that 74 of the defendants were black.

When he compared those numbers to general population statistics, Fagan concluded that minorities were "substantially more likely" than similarly situated whites to be targeted by ATF in the stash house stings, court filings show.

"Each test showed the same pattern: Being black significantly increased a person's chance of being targeted by the ATF," lawyers for the defendants wrote in their motion to dismiss the cases.

But the expert hired by the U.S. attorney's office, Northwestern University law professor Max Schanzenbach, concluded that Fagan had used an "absurdly overbroad" group to compare to stash house defendants, including people with only minor criminal convictions such as simple drug possession and misdemeanor assault, a court filing by prosecutors show.

In all, Fagan's "eligible list" included nearly 300,000 people — a number that equals 10 percent of all males ages 14-49 in the Chicago area, their filing said. Using such a broad swath of the public in a statistical analysis ignores the realities of how the stash house stings work, prosecutors have said.

"ATF agents do not compile a list of citizens with criminal records throughout the district, select people from the list at random, and then cold-call those people and offer them a chance to rob a stash house," prosecutors wrote. "There is no reason the home invasion defendants should resemble Professor Fagan's fantasy home invasion lottery."

Tinto, the University of California law professor, said the key question for the judges will come down to whether there is any logical explanation that so many of the stash house targets were black.

"This is a debate among experts about the fact that the defendants in these cases are overwhelmingly men of color," Tinto said. "How did that come to be? Is that because of their criminal histories? Is it chance? Or is it because of racially biased policing?"

The discrimination does not have to be explicitly stated as a purpose of the stings, according to previous court rulings. It can be inferred from all the evidence, including expert testimony that there's no explanation other than race for why so many targets were black men.

Whatever the outcome, the hearing could put prosecutors in an interesting position, defending their own law enforcement agencies from allegations of racism even as the federal government has slapped city after city — Chicago included — with troubling civil rights findings on policing.

Mayfield, for one, said it's a complex problem, and he doesn't expect it to change anytime soon.

"There is no one thing that will solve the issue of treating everyone equally," he said.

*jmeisner@chicagotribune.com*

*asweeney@chicagotribune.com*

# EXHIBIT

# B

# THE DISPARATE TREATMENT OF RACE AND CLASS IN CONSTITUTIONAL JURISPRUDENCE

## Mario L. Barnes[*]

## Erwin Chemerinsky[**]

### I

### INTRODUCTION

Unlike the constitutions of some other countries,[1] the United States Constitution includes no express protection of socioeconomic rights. Nor has the U.S. Supreme Court either deemed such rights fundamental for purposes of review under the Constitution or found poverty to be a classification, like race, that deserves searching equal-protection analysis. Calls to reform the Court's shabby treatment of socioeconomic interests—interests that have been described as "constitutional welfare rights"—have been long-standing, having commanded at least forty years[2] of sustained scholarly debate.[3] The conversation continues because, even as the plight of the poor worsens in this

Copyright © 2009 by Mario L. Barnes and Erwin Chemerinsky.

This article is also available at http://law.duke.edu/journals/lcp.

* Professor of Law, University of California, Irvine School of Law; LL.M., University of Wisconsin Law School; J.D., B.A., University of California, Berkeley; mbarnes@law.uci.edu. I thank William Nicholson for his diligent and thoughtful research assistance.

** Dean and Distinguished Professor of Law, University of California, Irvine School of Law; J.D., Harvard Law School; B.S., Northwestern University; echemerinsky@law.uci.edu.

1. Among these are the constitutions of the former Soviet Union, Norway, Romania, Hungary, Peru, Bulgaria, Syria, and South Africa. Cass Sunstein, *Why Does the American Constitution Lack Social and Economic Guarantees?*, 56 SYRACUSE L. REV. 1, 2–4 (2005) (listing these countries as providing some measure of protection for social and economic rights and locating the mandate for these types of protections in the Universal Declaration of Human Rights and the International Covenant on Social, Economic, and Cultural Rights).

2. *See, e.g.*, Frank I. Michelman, *The Supreme Court 1968 Term: Foreword: On Protecting the Poor Through the Fourteenth Amendment*, 83 HARV. L. REV. 7 (1969) (providing an early articulation of the moral and political imperative for the recognition of constitutional welfare rights).

3. *See* Frank I. Michelman, *Socioeconomic Rights in Constitutional Law: Explaining America Away*, 6 INT'L J. OF CONST. L. 663 (2008) [hereinafter Michelman, *Socioeconomic Rights*]; Frank I. Michelman, *Welfare Rights in a Constitutional Democracy*, 1979 WASH. U. L.Q. 659 [hereinafter Michelman, *Welfare Rights*]; Erwin Chemerinsky, *Making the Case for Minimum Entitlements*, 44 MERCER L. REV. 525 (1993). *Cf.* Robert Bork, *The Impossibility of Finding Welfare Rights in the Constitution*, 1979 WASH. U. L.Q. 695; Goodwin Liu, *Rethinking Constitutional Welfare Rights*, 61 STAN. L. REV. 203 (2008) (reappraising Michelman's work and finding "his effort to ground the adjudication of welfare rights in a foundational moral theory ultimately confronts intractable problems of democratic legitimacy").

LAW AND CONTEMPORARY PROBLEMS               [Vol. 72:109

country, the role of socioeconomic rights in the debate presents thorny issues. Not only would greater recognition of constitutional welfare rights provide a potential basis to limit certain types of governmental class-based discrimination, such rights, if given full effect, might also be construed as forcing the provision of government benefits or assistance.[4]

The necessary brevity of this essay prevents the in-depth exploration of the broadest variant of the welfare-rights debate: how to effectively structure a constitutionally recognized right to some form of basic subsistence. Justifications, however, can be provided for why discrimination based upon socioeconomic class needs greater constitutional protection and how a more-robust equal-protection analysis can serve as the means to achieve this goal.[5] Toward this end, this essay first articulates just how lean the Court's jurisprudence has been in the area of socioeconomic class: part II initially summarizes the treatment of poverty under the various strands of Fourteenth Amendment jurisprudence, then provides a number of justifications for why socioeconomic class deserves a more-considered approach from the Court. Part III lays out how and explores why the Court's treatment of race as a classification has differed considerably from its treatment of socioeconomic class. Part IV concludes with our suggesting that the Court should abandon its present bifurcated jurisprudence on race and class as a first step toward acknowledging the need for consistent judicial treatment of classifications that operate as overlapping and reinforcing bases of discrimination and subordination.

## II

### THE IMPOVERISHED CONSTITUTIONAL TREATMENT OF SOCIOECONOMIC CLASS

Compared to the U.S. Supreme Court's treatment of race (and other protected classifications), constitutional jurisprudence in the area of socioeconomic class has been somewhat improvised and largely impoverished. That is, wealth, as a classification, and the poor, as a group, have only rarely commanded the full breadth of the Court's attention. Even when poverty has

---

4. *See* Sunstein, *supra* note 1, at 5–6. The creation of this type of constitutional obligation would violate the "negative liberty" principle, which suggests that the U.S. Constitution merely "creates and protects spheres of noninterference" from state action. *See also* SOTIRIOS A. BARBER, WELFARE & THE CONSTITUTION 5 (2003) (discussing the negative-liberties model and asserting that the Constitution "guarantees exemptions *from* governmental action, not rights *to* governmental benefits. It imposes no unconditional *duty* to provide, and therefore it guarantees no *right* to any substantive benefit beyond access to the system of interest representation.") (emphasis in original) (footnote omitted); David Abraham, *Liberty Without Equality: The Property-Rights Connection in a "Negative Citizenship" Regime*, 21 L. & SOC. INQUIRY 1, 38–44 (1996) (discussing, apropos to this essay, how the commitment to negative liberty limits constitutional protection of social inequalities); Robin L. West, *Constitutional Scepticism*, 72 B.U. L. REV. 765, 777–78 (1992) (discussing the concept of negative liberty and locating its origin in the work of Isaiah Berlin).

5. *See infra* III.

been scrutinized, the Court has been largely unwilling to compel states and the federal government to ameliorate the difficulties their actions create for the poor. The reasons for this course of treatment are myriad.[6] Its result, though, has been a patchwork jurisprudence articulating in a number of contexts the limited constitutional protection of class, focusing primarily on questions of wealth disparity or of poverty.

Although socioeconomic rights are not guaranteed within the Constitution, it has been argued that the protections enunciated in Section 1 of the Fourteenth Amendment are germane to issues of class.[7] For a number of reasons, though, these protections have been only infrequently considered, and with marginal success,[8] to ensure constitutional protection of the poor—however one might seek to define the poor as a coherent group. First, class jurisprudence has not involved substantive-due-process analysis because there is currently no recognized fundamental right either to be free of poverty or to ensure some baseline quality of economic stability.[9] Second, procedural-due-

---

6. *See infra* text accompanying notes 8–12.

7. *See, e.g.*, Peter B. Edelman, *The Next Century of Our Constitution: Rethinking Our Duty to the Poor*, 39 HASTINGS L.J. 1, 5 (1987) (theorizing that constitutional protection of the poor could be advanced either as a function of substantive due process or equal protection under the Constitution); Michelman, *supra* note 2, at 9–16 (arguing that social-justice advocates maintain that the Equal Protection Clause requires protection "against economic hazard" for persons suffering a deprivation of "just wants"). The language of Section 1 guarantees equal protection of the laws; that life, liberty, and property shall not be deprived without due process; and that states shall not make laws that abridge the privileges or immunities of citizenship. *See* U.S. CONST. amend. XIV, § 1. Whereas the Fourteenth Amendment applies to the several states, the Fifth Amendment's due-process language captures actions of the federal government, encompassing both the due-process and the equal-protection mandate of the Fourteenth Amendment. *See* U.S. CONST. amend. V. The federal government is also bound by its own Privileges and Immunities Clause. *See* U.S. CONST. art. IV, §2.

8. As one scholar has recently and aptly noted, "Across constitutional doctrines, poor people suffer diminished protection, with their claims for liberty and equality formally receiving the least judicial consideration and functionally being routinely denied." Julie A. Nice, *No Scrutiny Whatsoever: Deconstitutionalization of Poverty Law, Dual Rules of Law, & Dialogic Default*, 35 FORDHAM URB. L.J. 629, 629 (2008). The Court's uneven and de-centered treatment of the concerns of the poor is discussed *infra* II.B, where we see disparate results across the cases. *Compare, e.g.*, Zablocki v. Redhail, 434 U.S. 374 (1978) (invalidating on equal-protection grounds a state law that conditioned marriage on an applicant's proof of compliance with child support obligations), *and* Boddie v. Connecticut, 401 U.S. 371 (1971) (invalidating on due-process grounds a state denial of dissolution of marriage based upon inability to pay court fees and costs), *with* Lindsey v. Normet, 405 U.S. 56 (1972) (finding no due-process violation where rental payments were not suspended during the litigation of alleged wrongdoings of a landlord), *and* Dandridge v. Williams, 397 U.S. 471 (1970) (rejecting an equal-protection challenge to a state statute that capped benefits to recipients of Aid to Families with Dependent Children regardless of family size).

9. The Court long ago decided that federal economic regulations challenged under the Fifth and Fourteenth Amendments would receive only rational-basis review. *See, e.g.*, West Coast Hotel v. Parrish, 300 U.S. 379 (1937) (upholding a state minimum-wage law for women). Additionally, rather than find freedom from indigence a fundamental right, the Court has considered poverty only as a classification affecting the exercise of rights protected under the Fourteenth Amendment. *See infra* notes 28–32; *see also* Harris v. McRae, 448 U.S. 297, 318 (1980) ("[G]overnment [does not have] an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools. . . . Nothing in the Due Process Clause supports such an extraordinary result."). For a claim that freedom from poverty should be protected as a

process claims have been relevant only to cases posing challenges to the deprivation of previously initiated government benefits.[10] Although at least one lower federal court has applied suspect-class characterization to socioeconomic class in an equal-protection analysis, this result was reversed on appeal and the outcome was significantly shaped by the Court's miserly determination of the appropriate level of judicial scrutiny.[11] Finally, in a series of other equal-protection cases challenging government rules and policies that disturb persons in the exercise of recognized fundamental rights, the Court has considered socioeconomic rights tangentially; at times, concern for the impinging effects of these rules upon the poor has held the Court's attention.[12] In each type of case,[13] results have been fairly unsatisfying in terms of either centering class in the judicial analysis or creating a humane and robust constitutional jurisprudence for socioeconomic disparity.

A.   Class as a Suspect Category Under the Equal-Protection Doctrine?

> The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.[14]

Justice Frankfurter famously invoked the above quote to describe the plight of indigent criminal defendant–appellants who were denied access to necessary trial transcripts. Unfortunately, the quote can also be used to describe the Court's current, somewhat laissez faire approach to the constitutional treatment of socioeconomic class. In the limited cases in which the Court has assessed the rights of the poor as a group, it has not been predisposed to consider class as a

---

fundamental right, see Edelman, *supra* note 7; Marc Fleurbaey, *Poverty as a Form of Oppression, in* FREEDOM FROM POVERTY AS A HUMAN RIGHT: WHO OWES WHAT TO THE VERY POOR? 133–34 (Thomas Pogge ed., 2007); and Charles A. Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues*, 74 YALE L.J. 1245, 1254 (1965) (arguing that the liberty interest protected by the Fifth and Fourteenth Amendments should at least cover "personal and family affairs" and that the constitutionally protected privacy interest should be expanded to include matters related to the rise of the welfare state).

10.  The Procedural Due Process Clause analysis for cases involving government benefits is discussed in II.B, below.

11.  *E.g.*, Rodriguez v. San Antonio Indep. Sch. Dist., 337 F. Supp. 280 (W.D. Tex. 1971) discussed in II.A, below. As discussed at length in II.A, socioeconomic class receives only rational-basis review, which typically results in the challenged government action being deemed constitutionally sound. *See, e.g.*, Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 457–58 (1988) ("Unless a statute provokes 'strict judicial scrutiny' because it interferes with a 'fundamental right' or discriminates against a 'suspect class,' it will ordinarily survive an equal-protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose."). The Court, however, has on occasion struck down statutes negatively affecting the interests of the poor, even where only rational-basis review was afforded. *See* U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528 (1973) (finding classification within the 1964 Food Stamp Act that excluded households including persons not related to family members from the food stamp program not rationally related to the purposes of the statute).

12.  The same was true for one case in which the Court applied the Privileges or Immunities Clause. *See infra* notes 36–39.

13.  *See infra* II.A–II.C.

14.  Griffin v. Illinois, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring) (quoting Anatole France in JOHN COURNOS, A MODERN PLUTARCH 35 (1928)).

suspect category that can or should be specially protected.[15] At times, the Court has even stated that "the Constitution does not provide judicial remedies for every social and economic ill."[16] In its most reticent stance, the Court has questioned whether certain denials of services and benefits to the poor even merit constitutional consideration.[17] This position is compounded by the fact that, for equal-protection claims, the Court is generally concerned only with the government's *purposeful* use of invidious classifications;[18] and where class is concerned, even some forms of intentional discrimination are acceptable.[19]

The Court's clearest statement on the specific question of socioeconomic class and suspect classification was articulated in *San Antonio Independent School District v. Rodriguez.*[20] Appellees in that case challenged the disparate effects on poor communities of using property taxes as a means to fund schools. Of lower courts that had treated school-property-tax challenges as wealth-discrimination cases and applied strict scrutiny, the Supreme Court asserted, "[they] have virtually assumed their findings of a suspect classification through a simplistic process of analysis:"

> [S]ince, under the traditional systems of financing public schools, some poorer people receive less expensive educations than other more affluent people, these systems discriminate on the basis of wealth. This approach largely ignores the hard threshold questions, including whether it makes a difference for purposes of consideration under the Constitution that the class of disadvantaged "poor" cannot be identified or defined in customary equal protection terms, and whether the relative—rather than absolute—nature of the asserted deprivation is of significant consequence.[21]

The Court undertook an analysis that demonstrated the difficulty in defining poverty[22] and asserted that poverty was not typically a condition that resulted in

---

15.  As discussed in III below, the use of suspect classifications related to race, national origin, and alienage (at times) triggers the application of strict scrutiny. Classifications based upon gender receive intermediate scrutiny. *See* Craig v. Boren, 429 U.S. 190 (1976).

16.  *Lindsey*, 405 U.S. at 74 (White, J.).

17.  For example, the Court has declared that "the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of th[e] Court." *Dandridge*, 397 U.S. at 487 (Stewart, J.).

18.  *See* McCleskey v. Kemp, 481 U.S. 279 (1987); Washington v. Davis, 426 U.S. 229 (1976).

19.  In at least one particular context—immigration—the Court has acknowledged that the government may intentionally use poverty or a likelihood of becoming poor as basis to deny entry into the country. In *Graham v. Richardson*, 403 U.S. 365, 377 (1971), the Court noted that, pursuant to its immigration and naturalization power, Congress has provided that "[a]liens who are paupers, professional beggars, or vagrants" or aliens who "are likely at any time to become public charges" shall be excluded from admission into the United States, 8 U.S.C. §§ 1182(a)(8), (a)(15), and that any alien lawfully admitted shall be deported who "has within five years after entry become a public charge from causes not affirmatively shown to have arisen after entry. " 8 U.S.C. § 1251(a)(8) (current version at 8 U.S.C. § 1227).

20.  411 U.S. 1 (1973) (refusing to examine the Texas property-tax-based system of funding education under strict scrutiny since there is no fundamental right to education in the Constitution and since the system did not systematically discriminate against all poor people in Texas).

21.  *Id.* at 19 (Powell, J.).

22.  *Id.* at 22–23 ("[A]ppellees have made no effort to demonstrate that [the tax scheme] operates to the peculiar disadvantage of any class fairly definable as indigent, or as composed of persons whose

LAW AND CONTEMPORARY PROBLEMS [Vol. 72:109

the absolute deprivation of the challenged benefit.[23] These assertions ultimately supported the Court's argument that heightened scrutiny was not available for socioeconomic class.[24] Although the advisability of this pronouncement deserves challenge,[25] it has set the table for the ungenerous treatment of socioeconomic class as a suspect classification that permeates contemporary poverty jurisprudence.

## B. Class as a Limited Free Rider in the Exercise of Fundamental-Rights Cases and Privileges or Immunities Cases

Separate from the analysis triggered by the government's use of suspect classifications, the Equal Protection Clause may also be used to require strict scrutiny for state classifications that significantly burden the exercise of a fundamental right.[26] In a number of cases implicating fundamental rights' infringements, the Court has specifically remarked upon the negative effects of these burdens disproportionately or uniquely upon the poor. This variety of equal-protection analysis and attendant concern for the poor has been evident, for example, when the Court has addressed the fundamental right to run for political office,[27] the right of access to criminal trials and appellate processes,[28] the right of access to civil courts when certain other fundamental rights are being contested,[29] the right to vote,[30] and the right to marry.[31] This type of

---

incomes are beneath any designated poverty level. Indeed, there is reason to believe that the poorest families are not necessarily clustered in the poorest property districts.").

23. *Id.* at 23, 25.

24. Specifically, the Court opined that "[t]he system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* at 28.

25. *See infra* III.

26. *See infra* notes 28–32. Although, some scholars have claimed that the Court has negatively treated claims pertaining to the ability of the poor to exercise fundamental rights. *See, e.g.*, Nice, *supra* note 8, at 651 ("[T]he Court has departed from its normal use of heightened scrutiny for alleged infringements of established constitutional rights when those affected are poor.").

27. *See, e.g.*, Bullock v. Carter, 405 U.S. 134 (1972) (holding Texas's primary election system that conditioned candidate participation in the primary election upon ability to pay a filing fee violated equal protection).

28. *See, e.g.*, Douglas v. California, 372 U.S. 353 (1963) (establishing an indigent defendant's right to court–appointed counsel on direct appeal); Griffin v. Illinois, 351 U.S. 12 (1956) (finding an equal-protection violation where indigent prisoners were denied cost–free access to trial transcripts necessary to facilitate appellate review).

29. These cases usually involve two protected rights: the right of access to the courts generally, and the right of access to the courts for the purpose of protecting another fundamental right. *See, e.g.*, M.L.B. v. S.L.J., 519 U.S. 102 (1996) (applying strict scrutiny when a state denied a mother the right to appeal the termination of her fundamentally protected parental rights based upon her inability to pay record–preparation fees); *Boddie*, 401 U.S. at 371.

30. *See* Harper v. Virginia Bd. of Elections, 383 U.S. 663, 666 (1966) ("[A] State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes affluence of the voter or payment of any fee an electoral standard.").

31. *See Zablocki*, 434 U.S. at 374.

analysis, however, could be applied to any right protected under the Bill of Rights or otherwise deemed to be fundamental.[32]

Even when concerns for the poor have been considered along with the analysis of the disturbed exercise of constitutionally protected fundamental rights, the socioeconomic analysis has not been central. Class in these cases tends to be a free-rider, in that the Court may choose to speak to the plight of the poor, too, when considering the infringement upon the right at issue. Still, the outcomes have not always been positive.[33] For example, when the contested activity is deemed to be merely "important" but does not actually involve a fundamental right, the government's consideration of class does not suffice as a separate basis to justify any form of heightened scrutiny.[34] At least one justice

---

32. *See, e.g.*, Washington v. Harper, 494 U.S. 210 (1990) (implicating the right to refuse medical treatment); Wisconsin v. Yoder, 406 U.S. 205 (1972) (implicating the right to parental decisionmaking); Shapiro v. Thompson, 394 U.S. 618 (1969) (implicating the right to travel); Skinner v. Oklahoma, 316 U.S. 535 (1942) (implicating the right to procreate). The preceding list is not exhaustive. As a general matter, the incorporation doctrine holds that most of the guarantees of the Bill of Rights are applied to the states through the Fourteenth Amendment. *See* Duncan v. Louisiana, 391 U.S. 145, 148 (1968) ("[M]any of the rights guaranteed by the first eight Amendments to the Constitution have been held to be protected against state action by the Due Process Clause of the Fourteenth Amendment. That clause now protects the right to compensation for property taken by the State; the rights of speech, press, and religion covered by the First Amendment; the Fourth Amendment rights to be free from unreasonable searches and seizures and to have excluded from criminal trials any evidence illegally seized; the right guaranteed by the Fifth Amendment to be free of compelled self–incrimination; and the Sixth Amendment rights to counsel, to a speedy and public trial, to confrontation of opposing witnesses, and to compulsory process for obtaining witnesses.") (internal footnotes omitted); *see also* Jerold H. Israel, *Selective Incorporation: Revisited*, 71 GEO. L.J. 253 (1982) (providing a thorough examination of selective incorporation and its manifestation in Supreme Court jurisprudence). Additionally, due process may be used in conjunction with the Ninth Amendment to protect emerging fundamental rights that are not explicitly located within the Constitution's text. *See, e.g.*, Griswold v. Connecticut, 381 U.S. 484 (1965) (finding privacy in marital relations to be a fundamental right "retained by the people" within the language of the Ninth Amendment and protected from infringement through the Fourteenth Amendment); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 852 (1992) (reaffirming the holding of *Roe v. Wade*, which recognized the right of a woman to choose to have an abortion before fetal viability without unreasonable interferences by the state) ("Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.") (citation omitted). The effect of these rights being protected, however, is not that the government is completely prohibited from impinging upon the right, only that strict scrutiny applies to review the impingement.

33. *See* Pennsylvania v. Finley, 481 U.S. 551 (1987) (holding that a prisoner had no right to court–appointed counsel in a post-conviction relief proceeding); Ortwein v. Schwab, 410 U.S. 656 (1973) (finding that the state was not required to waive filing fees for the judicial review of adverse welfare benefits determinations); United States v. Kras, 409 U.S. 434 (1973) (holding that there is no common-law or statutory right to proceed in bankruptcy without payment of a filing fee and distinguishing *Boddie*, discussed *supra* note 8, as involving access to court where the court was the only means to resolve an issue related to a fundamental right).

34. *See* San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 30 (1972) (acknowledging the lower court's finding of "'the grave significance' of education," yet commenting, "[b]ut the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause"). After determining that a right to an education was neither explicitly nor implicitly protected by the Constitution, the Court reiterated,

LAW AND CONTEMPORARY PROBLEMS [Vol. 72:109

has suggested that paying special attention to the inability of the poor to exercise protected rights is merely a thinly veiled attempt to impermissibly sidestep the rational-basis review that applies to class.[35]

Outside the area of equal-protection analysis, the concerns of the poor have ostensibly been implicated in a limited fashion in one other area of Fourteenth Amendment jurisprudence. In at least one case, the Court has considered the administration of programs affecting the rights of the poor under the little-used Privileges or Immunities Clause.[36] In *Saenz v. Roe*, California created a limit on the receipt of Temporary Assistance to Needy Families (TANF) benefits until the recipient had been a citizen of the state for a particular duration.[37] Holding the limitation unconstitutional, the Court explicitly asserted the relevance of the Privileges or Immunities Clause to protecting the rights of newly arrived citizens.[38] This case is included in the Court's patchwork jurisprudence in the area of class because the citizens were poor and needed the TANF benefits for basic subsistence. Much as in the cases dealing with the exercise of fundamental rights, the focal point of the Court's analysis was elsewhere. The major impact of *Saenz* was in the apparent reviving of the Privileges or Immunities Clause to protect the right to travel.[39]

## C.   The Procedural-Due-Process and Government-Benefits Cases

Another area in which the interests of the poor have been germane to the Court's analysis is in the provision of government benefits. The Court has been loath to define for states and the federal government how they must allocate limited resources.[40] One set of cases, however, covers the treatment that must be

---

"[T]he undisputed importance of education will not, alone, cause this Court to depart from the usual standard of reviewing a State's social and economic legislation." *Id.* at 33.

35.  *See Zablocki*, 434 U.S. at 407–11 (Rehnquist, J., dissenting).

36.  Saenz v. Roe, 526 U.S. 489 (1999). Prior to *Saenz*, the Privileges or Immunities Clause had been largely dormant within constitutional jurisprudence since 1935. *See* Colgate v. Harvey, 296 U.S. 404 (1935).

37.  *Saenz*, 526 U.S. at 489.

38.  *See id.*, 526 U.S. at 502–03; *see also* Edwards v. California, 314 U.S. 160 (1941) (deeming the right to travel fundamental).

39.  Case law suggests that similar claims can be raised using an equal-protection challenge alleging impingement upon the fundamental right to travel. *See* Graham v. Richardson, 403 U.S. 365 (1971) (overturning a statute that denied benefits to resident aliens by creating different durational residency requirements based upon their alien status and holding that such a regulation infringed upon one's right to travel between states); Shapiro v. Thompson, 394 U.S. 618 (1969) (invalidating state residency requirements for the eligibility of welfare benefits as infringing upon the right of interstate travel).

40.  *See* Maher v. Roe, 432 U.S. 464, 479 (1977) ("Our cases uniformly have accorded the States wider latitude in choosing among competing demands for limited public funds.") (footnote omitted); Dandridge v. Williams, 397 U.S. 471, 487 (1970) ("[T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients."); Michelman, *Socioeconomic Rights*, *supra* note 3, at 677 (discussing judicial underenforcement of constitutional norms, Michelman posits that "[a]ll of these problematic institutional ramifications—inherent contestability of standards, strain on interbranch relations, excessive judicial engineering—are likely to be salient when a claimant seeks judicial

afforded to individuals once government benefits have been initiated. Thereafter, the government cannot terminate the benefit without meeting the requirements for procedural due process, which minimally entail the provision of notice and a hearing.[41] This analysis is relevant to issues of socioeconomic class or poverty only in cases like *Goldberg v. Kelly*, in which benefits, once bestowed, take on the character of protected property.[42]

Interestingly, a subset of the government-benefits cases have made clear that, whereas states are limited in their ability to create obstacles that disturb persons in the exercise of fundamentally protected rights, there is no "constitutional entitlement to the financial resources to avail [oneself] of the full range of protected choices."[43] This is true even when the poor are significantly and disproportionately affected by the government's regulations. The issue has become most contested in a set of Medicaid cases in which women have been provided benefits for prenatal care when carrying children to term but not for abortions.[44] These cases have included a significant discussion regarding the effect of such policies on indigent women. The Court has decided that these cases do not involve a hindrance for poor women, just a choice not to affirmatively assist them. Several justices have been moved to conclude, however, that, in cases of this kind, the hindering–helping dichotomy involves a distinction without a difference.[45] Still, the majority position seems to reflect the current status of class jurisprudence: a world where considerations of wealth are divorced from considerations of rights without acknowledging that one's financial condition can effectively erase any possibility of one's asserting fundamental rights (without government assistance).

## D.  Justifications for Treating Class with Greater Care

Poverty may prevent one from fully exercising protected rights,[46] but discrimination based upon class should receive more-prominent judicial attention for a number of other compelling reasons. One reason to increase the

---

remedies for a state's alleged failure to provide assistance or protection that a norm . . . requires the state to provide.").

41. *See, e.g.*, Goldberg v. Kelly, 397 U.S. 254 (1970) (requiring the provision of procedural due process prior to the termination of welfare benefits once such benefits have been initiated).

42. *See* Charles A. Reich, *The New Property*, 73 YALE L.J. 733 (1964).

43. Harris v. McRae, 448 U.S. 297, 316 (1980).

44. *See, e.g., id.*; Rust v. Sullivan, 500 U.S. 173 (1991); Poelker v. Doe, 432 U.S. 519 (1977); *Maher*, 432 U.S. at 464.

45. *See Maher*, 432 U.S. at 482–83 (Brennan, Marshall, & Blackmun, JJ., dissenting) (claiming that the denial of Medicaid benefits condemned impoverished pregnant women to carry babies to term); Beal v. Doe, 432 U.S. 438, 454–55 (1977) (Marshall, J., dissenting) (asserting that benefits programs that encouraged women to carry pregnancies to term, but that would not fund abortions both imposed a viewpoint that could not be constitutionally enforced and would have the practical effect of preventing all poor women from obtaining safe, legal abortions).

46. *See, e.g.*, Michelman, *Welfare Rights, supra* note 3 at 677 ("[W]hat about life itself, health and vigor, presentable attire, or shelter not only from the elements but from the physical and psychological onslaughts of social debilitation? Are not these interests universal, rock-bottom prerequisites of effective participation in democratic representation . . . ?").

protection of the poor is that the government is implicated in the processes that produce wealth disparity.[47] At the very least, it is understood that a free-market economy that thrives on winners necessarily produces a class of individuals who will be comparatively disadvantaged in their ability to acquire resources, exploit opportunities, and influence majoritarian institutions.[48] This group should garner the Court's concern because the whole purpose of the suspect-classification designation under equal protection analysis is to protect the chronically disadvantaged.[49] This contention is closely related to the argument that the Constitution contains a "caste-abolition principle," which guarantees citizens a minimal stake in an ostensibly classless society.[50] Although eliminating caste has been discussed principally in reference to slavery, one could argue that greater constitutional scrutiny should be applied to any state actions that produce extreme and chronic social inequalities.[51]

Our normative expectations of how the poor will be treated involve other issues. Professor Michelman, a constitutional scholar who has extensively considered constitutional protections of minimum entitlements, has recently suggested that lawmakers have essentially taken on the burden of using "their best effort to devise, adopt and execute policies and measures that will result in desired social-outcome targets."[52] Based upon these lawmaker objectives, the government's best efforts essentially represent a "socioeconomic commitment" that takes on the stature of a legal norm.[53] The existence of the norm and the expectations it creates provide another basis to argue for the greater protection

---

47. *See* Edelman, *supra* note 7, at 25, 43–48 (alleging that the government is complicit in economic arrangements that have resulted in the unequal distribution of income).

48. *See* Michelman, *Welfare Rights*, *supra* note 3, at 675–78 (arguing that constitutional protection is needed for the poor because their lack of resources places them at a political disadvantage vis-à-vis majoritarian institutions).

49. *See* David S. Schwartz, *The Case of the Vanishing Protected Class: Reflections on Reverse Discrimination, Affirmative Action, and Racial Balancing*, 2000 WIS. L. REV. 657, 657 ("The courts used to talk about the idea of a 'protected class,' people who were historically disadvantaged in a caste system with white men on the top."); Edelman, *supra* note 7, at 43 (claiming the government owes a duty to all those who have been formerly oppressed to ensure their full participation in society).

50. Here "caste" represents the idea of an inherited system of social stratification. According to Akhil Amar, the Thirteenth Amendment served as proof that "[w]e the people of the United States will not allow a degraded caste of people to exist in our society." Akhil Reed Amar, *Forty Acres and a Mule: A Republican Theory of Minimal Entitlements*, 13 HARV. J.L. & PUB. POL'Y 37, 39 (1990) (discussing this vision of the Thirteenth Amendment and further suggesting that it provided a right to minimum sustenance and shelter); Donald P. Judges, *Bayonets for the Wounded: Constitutional Paradigms and Disadvantaged Neighborhoods*, 19 HASTINGS CONST. L.Q. 599, 665–77 (1992) (advocating that the Civil War Amendments establish the constitutional illegitimacy of caste, at least in the realm of education). *See also* Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 469 (1988) (Marshall J., dissenting) ("The intent of the Fourteenth Amendment was to abolish caste legislation.") (citing Plyler v. Doe, 457 U.S. 202, 213 (1982)).

51. *See* Judges, *supra* note 50, at 665–66, 671–72; Abraham, *supra* note 4, at 43 (discussing the anti-caste position of Justice Marshall and surmising, "[T]he 'nexus' of *caste* and *class* is such that the gap between formal and substantive rights, negative and positive liberties, begs to be bridged.") (emphasis in original).

52. *See* Michelman, *Socioeconomic Rights*, *supra* note 3, at 668.

53. *Id.*

Case 2:17-cr-00585-GMS   Document 100-1   Filed 12/15/17   Page 19 of 30

of class. Perhaps, however, one should need no other basis to call for closer scrutiny than the obvious truth that poverty takes on the character of a stigmatizing identity category.[54] This stigma alone is powerful but also interacts in myriad and complex ways with race[55]—a classification that receives strict scrutiny.

These reasons for affording greater protection to certain types of socioeconomic deprivation are not exhaustive, but are helpful for illuminating why class is ripe for a more-searching constitutional analysis.

## III

## WHY THE FAILURE TO PROTECT AGAINST SOCIOECONOMIC CLASS DISCRIMINATION?

### A.  The Constitutional Treatment of Racial Discrimination

The failure to provide constitutional protection for discrimination against the poor is in marked contrast to the Court's treatment of race discrimination. It is firmly established, of course, that racial classifications will be allowed only if the government can meet the heavy burden of demonstrating that the discrimination is necessary to achieve a compelling government purpose.[56] In other words, the government must show an extremely important reason for its action, *and* it must demonstrate that the goal cannot be achieved through any

---

[54.] *See* Michelman, *supra* note 2, at 21 ("[C]lassification of the 'poor' as such may, like classification of racial minorities as such, be popularly understood as a badge of inferiority."); *see also* Inez Smith Reid, *Law, Politics and the Homeless*, 89 W. VA. L. REV. 115 (1986) (advocating for higher scrutiny for homelessness due to the stigma associated with the category); Francisco Valdes, *Identity Maneuvers in Law and Society: Vignettes of a Euro-American Heteropatriarchy*, 71 UMKC L. REV. 377 (2002).

[55.] In his well-known book, *The Declining Significance of Race*, William Julius Wilson surmised, for example, that "class has become more important than race in determining black life-chances in the modern industrial period." WILLIAM J. WILSON, THE DECLINING SIGNIFICANCE OF RACE 150 (1st ed. 1978). The far more typical discussion of race and class has been about how the categories operate together to create negative life outcomes. *See* Martha R. Mahoney, *Class and Status in American Law: Race, Interest and the Anti–Transformation Cases*, 76 S. CAL. L. REV. 799 (2003) (describing the complex interrelation of race and class interests in the workplace); john a. powell, *The Race and Class Nexus: An Intersectional Perspective*, 25 LAW & INEQ. 355, 356–58 (2007) (criticizing as facile the claim that race and class are analytically separable). *See also* EMMA COLEMAN JORDAN & ANGELA P. HARRIS, ECONOMIC JUSTICE: RACE, GENDER IDENTITY AND ECONOMICS 452–55, 848–59 (2005) (discussing how race, gender, culture and economics are intertwined in historical and contemporary contexts); Beverly Moran & Stephanie M. Wildman, *Race and Wealth Disparity: The Role of Law and the Legal System*, 34 FORDHAM URB. L.J. 1219, 1219 (2007) (discussing the book RACE AND WEALTH DISPARITIES: A MULTIDISCIPLINARY DISCOURSE (Beverly Moran ed., 2007) and claiming that "many authors" appearing in the collection, "assume that law plays some role in the creation and maintenance of wealth disparities based upon race"). Moran and Wildman themselves claim that "[t]he disparate, distributional result that ties race and wealth has been supported throughout American history by government programs." *Id.* at 1223.

[56.] *See, e.g.*, Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274 (1986); Palmore v. Sidoti, 466 U.S. 429, 432–33 (1984).

less-discriminatory alternative. The Court has expressly declared that all racial classifications, to be constitutional, must satisfy this strict-scrutiny standard.[57]

The Supreme Court first articulated the requirement for strict scrutiny for discrimination based on race and national origin in *Korematsu v. United States*, which, ironically, *upheld* the constitutionality of the relocation of Japanese Americans during World War II.[58] The Court declared,

> [A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny. Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can.[59]

Over the last two decades, the Supreme Court has been clear that all racial classifications—whether they invidiously disadvantage racial minorities or benignly benefit minorities—are subject to strict scrutiny, even in contexts where the Court has traditionally displayed great deference to the government.[60] For example, in *Johnson v. California*, the Court held that racial segregation of prisoners is permissible only if strict scrutiny is met.[61]

The Supreme Court has identified many reasons why strict scrutiny is appropriate for race and national-origin classifications, some that would appear to apply equally to discrimination against the poor. The Supreme Court has long recognized that the primary historical purpose of the Fourteenth Amendment was to protect African Americans; in fact, the initial Supreme Court decisions construing the Equal Protection Clause suggested that it could be used to protect only Blacks.[62]

The Court has also emphasized that the long history of racial discrimination makes it very likely that all racial classifications will be based on stereotypes and prejudices.[63] Additionally, such heightened scrutiny for government actions

---

57. *Wygant*, 476 U.S. at 280 n.6.; *Palmore*, 466 U.S. at 432–33 ("[Racial] classifications are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of their legitimate purpose.") (quoting McLaughlin v. Florida, 379 U.S. 184, 196 (1964)); *see also* Loving v. Virginia, 388 U.S. 1, 11 (1967) ("At the very least, the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the 'most rigid scrutiny,' and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate.") (quoting Korematsu v. United States, 323 U.S. 214, 216 (1944)).

58. 323 U.S. 214 (1944).

59. *Id.* at 216.

60. *See, e.g.*, Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995) (holding federal affirmative-action programs are subject to strict scrutiny); Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) (finding that state and local affirmative-action programs must meet strict scrutiny).

61. 543 U.S. 499 (2005).

62. Slaughter-House Cases, 83 U.S. 36, 81 (1872). If followed literally, of course, this would limit strict scrutiny under equal protection solely to race discrimination, but the Court has rejected that approach since the 1970s, when it expanded heightened scrutiny to encompass discrimination based on gender, alienage, and legitimacy. *See supra* note 15.

63. Chief Justice Warren Burger wrote, "A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race. Classifying persons according to

discriminating against racial and national-origin minorities is justified because of the relative political powerlessness of these groups: prejudice and the history of discrimination against these groups makes it less likely that racial and national origin minorities can protect themselves through the political process. In the famous *United States v. Carolene Products* footnote, the Supreme Court indicated that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities" and thus "may call for a correspondingly more searching judicial inquiry."[64]

The Court has also emphasized that race is an immutable trait.[65] It is unfair to discriminate against people for a characteristic that is acquired at birth and cannot be changed.

### B.   Harmonizing the Court's Treatment of Race- and Class-Based Discrimination

Poverty certainly shares many of the characteristics that warrant heightened scrutiny for race. There has been a long history of discrimination against the poor, often in ways that are invisible to those with resources.[66] The poor are politically powerless.[67] In a society where elected officials respond to those who spend money on their campaigns, the poor are uniquely ill-equipped to exercise influence. Special-interest groups are crucial to success in the political process; the poor, by definition, lack the resources to be an effective special interest

---

their race is more likely to reflect racial prejudice than legitimate public concerns." *Palmore*, 466 U.S. at 432 (1984) (internal citations removed).

64.   304 U.S. 144, 152 n.4 (1938).

65.   *See, e.g.*, Lockhart v. McCree, 476 U.S. 162, 175 (1986) (indicating that removal of a juror based upon immutable characteristics such as race, gender, or national origin would violate the requirement that a jury constitute a fair cross-section of the community); Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 360–61 (1978) (Blackmun, J., concurring and dissenting) ("While a classification is not per se invalid because it divides classes on the basis of an immutable characteristic, it is nevertheless true that such divisions are contrary to our deep belief that legal burdens should bear some relationship to individual responsibility or wrongdoing.") (internal citations and quotation marks removed); Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (comparing the immutable nature of gender to that of race and national origin).

66.   *See generally* PAUL KRUGMAN, THE CONSCIENCE OF A LIBERAL (2007) (looking at politics of inequality from pre-New Deal America to modern times); Chemerinsky, *supra* note 3, at 528–29.

67.   For support of this claim, see Edelman, *supra* note 7, at 2, 6, 31–32; Michelman, *Welfare Rights*, *supra* note 3, at 675–78; Michelman, *supra* note 2, at 21 ("For if money is power, then a class deliberately defined so as to include everyone who has less wealth or income than any person outside it may certainly be deemed . . . to be especially susceptible to abuse by majoritarian process."); Stephen Loffredo, *Poverty, Democracy and Constitutional Law*, 141 U. PA. L. REV. 1277, 1281–82 (1993) ("While the convergence of political and economic power marginalizes the poor from democratic processes, the myth of political equality simultaneously serves as a justification for denying them heightened protection that constitutional doctrine has elsewhere accorded politically powerless minorities and other suspect classes.").

group—a fact powerfully illustrated by the lack of major new poverty programs over the last several decades.[68]

People are born into poverty, just as each is born with a race and a gender. The perception, though, is that, unlike race and gender, poverty is not immutable: the American Dream is that, through hard work, a person can rise from even a seriously disadvantaged background. Although class mobility is an integral aspect of the American Dream, the extent of class mobility is far less than is generally assumed. How very much the Dream fails to accord with reality is loudly evident in these statistics:

- Children from low-income families have only a 1 percent chance of reaching the top 5 percent of the income distribution while children of the rich have about a 22 percent chance.
- Children born to the middle quintile of parental family income ($42,000 to $54,300) had about the same chance of ending up in a lower quintile than their parents (39.5 percent) as they did of moving to a higher quintile (36.5 percent). Their chances of attaining the top five percentiles of the income distribution were just 1.8 percent.
- African American children who are born in the bottom quartile are nearly twice as likely to remain there as adults than are white children whose parents had identical incomes and are four times less likely to attain the top quartile.
- The difference in mobility for blacks and whites persists even after controlling for a host of parental background factors, children's education and health, and whether the household was female-headed or receiving public assistance.
- By international standards, the United States has an unusually low level of intergenerational mobility: our parents' income is highly predictive of our incomes as adults. Intergenerational mobility in the United States is lower than in France, Germany, Sweden, Canada, Finland, Norway and Denmark. Among high-income countries for which comparable estimates are available, only the United Kingdom had a lower rate of mobility than the United States.[69]

Because the poor, like those discriminated against because of their race or national origin, share many of the criteria that warrant heightened discrimination for those classifications—a history of discrimination, political powerlessness, immutability—discrimination against the poor should also be subjected to rigorous review. Yet discrimination based on poverty and social class is subject only to the very deferential rational-basis test, rather than to the strict scrutiny used for race and national-origin discrimination or even the intermediate scrutiny used for gender discrimination.[70] The Supreme Court has

---

68. FRANK STRICKER, WHY AMERICA LOST THE WAR ON POVERTY—AND HOW TO WIN IT 117–234 (2007) (analyzing every administration between Nixon and George W. Bush and discussing the persistence of poverty and the lack of significant positive government programs to end poverty since the War on Poverty in the 1960s). The book also contains seventeen suggestions for a positive approach to ending poverty. *Id.* at 235–43.

69. TOM HERTZ, CTR. FOR AM. PROGRESS, UNDERSTANDING MOBILITY IN AMERICA i–ii (2006), *available at* http://www.americanprogress.org/kf/hertz_mobility_analysis.pdf.

70. *See supra* text accompanying notes 11 and 15.

instead declared that it has "never held that financial need alone identifies a suspect class for purposes of equal protection analysis."[71]

Why have courts ignored social class in their equal-protection analysis? There is of course no single answer; rather, many factors explain the judicial unwillingness to subject discrimination based on socioeconomic class to heightened scrutiny. First, since the early 1970s, the Supreme Court has been unwilling to expand the categories of discrimination that are subjected to heightened scrutiny. In 1971, the Court held that strict scrutiny is generally used for alienage classifications.[72] In 1976, the Court settled upon intermediate scrutiny for gender discrimination[73] and for discrimination against non-marital children.[74] Since then, however, the Court has never used more than rational-basis review in evaluating any type of discrimination.

Some cases preceding the seventies, though, implied that the Court would apply a higher level of scrutiny for discrimination against the poor. In *Griffin v. Illinois*, in 1956, the Court held that denying free trial transcripts to indigent criminal defendants who were appealing their convictions violated equal protection.[75] "In criminal trials," the Court said, "a State can no more discriminate on account of poverty than on account of religion, race, or color."[76] Likewise, in *Harper v. Virginia Board of Elections*, the Supreme Court declared unconstitutional a poll tax for state and local elections and said, "Lines drawn on the basis of wealth and property, like those of race, are traditionally disfavored."[77] But such language vanished from Supreme Court cases by the 1970s.

What happened? The end of the Warren Court era, brought about by the appointment of four Nixon Justices, closed the door on the Court's finding poverty to be a suspect classification.[78] Generally, more conservative justices tend to favor the government in cases involving claims of discrimination (except when there are challenges to affirmative-action programs).[79] Conservative

---

71. Maher v. Roe, 432 U.S. 464, 471 (1977).

72. Graham v. Richardson, 403 U.S. 365, 371–72 (1971).

73. Craig v. Boren, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.").

74. Mathews v. Lucas, 427 U.S. 495, 505–07 (1976).

75. 351 U.S. 12 (1956).

76. *Id.* at 17.

77. 383 U.S. 663, 668 (1966) (internal citations removed).

78. *See* Loffredo, *supra* note 67, at 1282–83 ("Throughout the 1960s and 1970s, courts and commentators debated whether poverty should be considered a suspect classification for purposes of equal protection analysis, and whether a right to subsistence inheres in the Constitution . . . . But by the early 1970s, the Burger Court, in a swift series of cases affecting welfare, housing, and education, essentially announced a principle of judicial noninterference with political determinations regarding the poor.") (citation omitted).

79. *Compare* Washington v. Davis, 426 U.S. 229 (1976) (holding that, when the law is facially neutral, proof of a discriminatory intent or purpose was necessary for a finding of government discrimination in violation of the Equal Protection Clause), *and* Arlington Heights v. Metro. Housing Devel. Corp., 429 U.S. 252 (1977) (holding, in part, that a government decision to deny a rezoning

justices can effectively ensure the result they want—the government prevailing—by selecting rational-basis review.[80] In 1973, the four Nixon Justices, joined by Justice Potter Stewart, did just that, ensuring that the government would prevail in *San Antonio School District v. Rodriguez* by holding that poverty is not a suspect classification, so discrimination against the poor receives only rational-basis review.[81]

Second, the social focus on race—and other group identities, such as gender, sexual orientation, and disability—has shifted attention away from socioeconomic class. As people tend to identify themselves by these group identities, and to seek political benefits based on them, the emphasis on class decreases. Although many special interest groups have been organized along such other group identities,[82] it is difficult to even think of an organization that exists to advocate for the interests of the poor.

Indeed, those who seek race- or gender-based remedies are concerned that a competing focus on socioeconomic class will undercut their own efforts. For example, advocates of affirmative action believe that replacing race-based affirmative action with class-based considerations, as advocated by its opponents, will not achieve the benefits of race-consciousness.[83] Thus, they do not want to focus on or emphasize class out of the concern that it will undercut their claims of a need for race-based remedies.[84] They perceive a tension

---

request was not unconstitutional solely because it resulted in a racially disproportionate impact, but that proof of racially discriminatory intent or purpose was required to show an equal protection violation), *with* Wygant v. Jackson Bd. of Educ., 476 U.S. 267 (1986) (striking down a city's faculty diversity program which retained black teachers with less seniority than white teachers who were laid off), Richmond v. J. A. Croson Co., 488 U.S. 469 (1989), *and* Adarand Constructors, Inc. v. Pena, 515 U.S. 200 (1995).

80. This connection between desired outcome and the selected level of judicial scrutiny is borne out in the Burger Court's application of rational-basis review to the complaints of the poor. *See* Loffredo, *supra* note 67, at 1306 ("The Burger Court declined even to address the idea that poor people might comprise a politically powerless group undemocratically denied a fair share of influence in the processes of public decisionmaking. Instead the Court summarily consigned the constitutional claims of the poor to the feeblest form of rationality review. Under this regime, the Court mechanically attaches the usual presumption of constitutionality to classifications that affect the poor, without inquiring into the democratic legitimacy of the underlying process.").

81. 411 U.S. at 17 (1973). *See also supra* notes 20–24 and accompanying text.

82. Groups such as the NAACP and the NAACP Legal Defense Fund (racial-minority special-interest groups), the National Organization for Women and the Feminist Majority Foundation, Lambda Legal Defense (sexual orientation special interest group), and Mexican American Legal Defense and Education Fund (MALDEF) immediately come to mind.

83. For an excellent explanation for why class-based affirmative action cannot substitute for race-based remedies, see Deborah C. Malamud, *Assessing Class-Based Affirmative Action*, 47 J. LEGAL EDUC. 452 (1997); Deborah C. Malamud, *Class Based Affirmative Action: Lessons and Caveats*, 74 TEX. L. REV. 1847 (1996).

84. Richard Kahlenberg, an opponent of this philosophy, describes the beliefs that class-based remedies will undercut tools to combat race-based discrimination and that class should supplement, rather than replace, race-based remedies, as myths. RICHARD D. KAHLENBERG, *Sixth Myths About Class-Based Preferences*, *in* THE REMEDY: CLASS, RACE, AND AFFIRMATIVE ACTION 153–65 (1996). One reason that class analysis can be provocative to those who favor race-based remedy is the long-standing criticism that race-based affirmative action programs disproportionately favor wealthier minorities. This was a chief complaint of William Julius Wilson's book on the underclass. WILLIAM J.

Case 2:17-cr-00585-GMS   Document 100-1   Filed 12/15/17   Page 25 of 30

between race-based and class-based remedies; the focus on race means not focusing on social class.

Third, there are doctrinal problems with focusing on class as a basis for legal protection. Class is much more elusive to define than race, gender, alienage, or legitimacy. This does not minimize the problems in determining a person's race in a nation that is increasingly multiracial. And there may be no less-difficult cases in defining a person's gender. But the difficulties in determining an individual's social class are far more daunting. Moreover, under current equal-protection jurisprudence, discriminatory impact against a group is not sufficient to trigger heightened judicial scrutiny; there also must be proof of a discriminatory intent.[85] But most laws that disadvantage the poor do so through their impact; it will usually be difficult, if not impossible, to show that the intent was to harm the poor.[86]

Finally, society overall seems to have lost interest in the problems of the poor. The last poverty program adopted was the 1996 welfare-reform bill, which *decreased* eligibility for benefits.[87] Put another way, there is social guilt and a sense of social responsibility for discrimination based on race or gender because of the long history of subjugation and discrimination; but, rightly or wrongly, no such concern or guilt exists for discrimination against the poor.

Instead, there is a deep-seated belief that the poor are responsible for their own fate. In fact, in recent years, attempts by politicians to raise issues of social class have been met with the accusation that it is an attempt to wage "class warfare," with the implication that this is something awful and to be avoided in politics.[88] These accusations have not been met with strong responses explaining the need to focus on social class or the extent to which the widening gap between rich and poor in American society is its own form of class warfare. Strikingly, in the 2008 presidential campaign, neither John McCain nor Barack Obama focused on the problems of the poor or offered any new solutions.

---

WILSON, THE TRULY DISADVANTAGED 110 (1987). *See also* Jonathan Goldman, *Fresh Start: Redefining Affirmative Action to Include Socioeconomic Class, in* RACE VERSUS CLASS: THE NEW AFFIRMATIVE ACTION DEBATE 187–91 (Carol M. Swain ed., 1996). *Cf.* GERTRUDE EZORSKY, RACISM AND JUSTICE: THE CASE FOR AFFIRMATIVE ACTION 63–72 (1991) (challenging the claim that affirmative action has not helped the truly disadvantaged).

85. *See, e.g., Washington*, 426 U.S. at 229.

86. *See* Edelman, *supra* note 7, at 47–48 (examining *Washington v. Davis* and *Arlington Heights v. Metropolitan Housing Development Corp.* discussed *supra* note 79, but finding the discriminatory intent standard for facially neutral statutes proof standard unworkable for adjudicating the problems of the extremely poor).

87. *See* STRICKER, *supra* note 68, at 217 (discussing the 1996 Act and asserting, "States were required to push recipients off welfare and into the workforce regardless of training or mental health or child-care issues," and that "[s]oon it appeared that the goal of ejecting people from the rolls was a huge success. The national numbers fell by half and in Wisconsin by 90%.").

88. *See, e.g.*, Stephen Dinan, *McCain Accuses Obama of Class Warfare*, WASH. TIMES, Oct. 16, 2008, at A01.

All of this has contributed to courts' being consistently unwilling to protect the poor or provide relief for those who are victims of discrimination based on wealth.

## IV

### CONCLUSION

Certainly much more can and should be said about the disparate constitutional treatment of race and socioeconomic class. Our hope is that collectively, the articles in this symposium will contribute to furthering a necessary dialogue on the continuing effects of race- and class-based discrimination within this country. The way forward must involve a political and judicial commitment to assessing race and class together.

One of the great contributions of feminist and critical race theory has been to draw attention to how the separable facets of one's identity intersect and overlap to provide the bases for discrimination and subordination.[89] This concept is no less true for socioeconomic class than it is for other identity classifications, such as gender and sexuality. Indeed, scholars have built upon intersectional theories to demonstrate that oppression is, in fact, multidimensional—that multiple sources of disempowerment affect our lives in concrete ways.[90] It is the refusal by federal courts to consider precisely how class interacts with race and other protected classifications that partially explains the radically different constitutional treatment of these interconnected classifications.

---

89. This concept of intersectionality has been thoroughly articulated and explored with regard to race and gender in the germinal work of Kimberlé Crenshaw. *See, e.g.,* Kimberlé W. Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics and Violence Against Women of Color,* 43 STAN. L. REV. 1241 (1991). Professor Elizabeth Iglesias has spoken specifically to the challenges of managing one's individual sense of self when inhabiting multiple, largely socially constructed, identity categories:

> For women of color, whose individual self-consciousness is developed at the intersection of multiple practices of oppression and resistance, the difference between socially constructed group identity and individual self-consciousness is palpable and often painfully debilitating. Both the practices through which groups are constructed externally (namely, the racist, sexist and capitalist practices of dominant social actors) and maintained internally (namely, the practices through which internal elites suppress differences and maintain group cohesiveness around their self-privileging agendas) fragment our consciousness of our individual reality and assault our ability to act *self-consciously* in the world.

Elizabeth M. Iglesias, *Structures of Subordination: Women of Color at the Intersection of Title VII and the NLRA. Not!,* 28 HARV. C.R.-C.L. L. REV. 395, 397–98 n.14 (1993) (emphasis in original).

90. *See* Darren Lenard Hutchinson, *Out Yet Unseen: A Racial Critique of Gay and Lesbian Legal Theory and Political Discourse,* 29 CONN. L. REV. 561, 638 (1997); Elizabeth M. Iglesias & Francisco Valdes, *Expanding Directions, Exploding Parameters: Culture and Nation in LatCrit Coalitional Imagination,* 5 MICH. J. RACE & L. 787, 798 (2000) (noting that multidimensionality is not merely a recitation of the multiple diversities constituting racial and ethnic categories, but, "a profound and far–reaching recognition that the particularities of religion, geography, ability, class, sexuality, and other identity fault lines run through, and help to configure and to interconnect, all 'racial' or 'ethnic' communities").

The courts, and equal-protection jurisprudence, could benefit from analyzing the interplay of race and class in at least three ways. First, there is a powerful link between the social debilitation conferred by minority racial status and that conferred by poor socioeconomic background.[91] Class and race can create similar types of systemic disadvantage vis-à-vis encounters with societal structures of power in general, and the legal system, in particular.[92] For this reason, studies that locate negative correlations between minority status and legal outcomes also identify some similar effects based on socioeconomic factors.[93] This connection, then, has the power to confirm how class, just like race, transmits a message of lessened social value. Seeing the relevance of the analogy between race and class can serve as a stepping stone to justify a more nuanced equal-protection analysis of poverty across race. It can also set the table for our next point—that class can create a significant, added disadvantage within minority racial groups.

---

91. *See, e.g.*, Michelman, *supra* note 2.

92. At times, it is not clear whether the effects of socioeconomic class and race (and other identity factors) are considered together or separately when legal contestations are examined. For example, within the criminal law, many have written of the combined effects of one's race and class on outcomes. *See, e.g.*, DAVID COLE, NO EQUAL JUSTICE: RACE AND CLASS IN THE AMERICAN CRIMINAL JUSTICE SYSTEM (1999); Marjorie S. Zatz & Nancy Rodriguez, *Conceptualizing Race and Ethnicity in Studies of Crime and Justice*, *in* THE MANY COLORS OF CRIME: THE INEQUALITIES OF RACE, ETHNICITY, AND CRIME IN AMERICA 41–42 (2006) (Ruth D. Peterson et al. eds., 2006). *But see* MICHAEL J. LYNCH, BIG PRISON, BIG DREAMS: CRIME AND THE FAILURE OF AMERICA'S PENAL SYSTEM 195–96 (2007) (using a multiple regression to separately look at the connection between imprisonment rates and racial composition and imprisonment rates and class, and noting statistically significant positive correlations for race and class). Outside of the criminal context, others have discussed identity factors, including class, as separate bases for marginalization in legal encounters. For example, in the pathbreaking book, *The Commonplace of Law*, authors Ewick and Silbey noted that persons socially marginalized via membership in certain groups—including those marked by race, ethnicity, gender, and poverty (one's status as poor or a member of the working poor)—within their myriad legal encounters often evinced resistance or "against the law" consciousness in response to perceived disadvantage. PATRICIA EWICK & SUSAN S. SILBEY, THE COMMONPLACE OF LAW: STORIES FROM EVERYDAY LIFE 234–38 (1998). *See also* JOHN GILLIOM, OVERSEERS OF THE POOR: SURVEILLANCE, RESISTANCE, AND THE LIMITS OF PRIVACY (2001) (discussing the disadvantages poor Appalachian women face in their encounters with welfare agencies that maintain deeply intrusive policies and practices).

93. For example, a group of researchers led by Professor David Baldus famously identified that the races of the defendant and the victims significantly affected who received the death penalty in Georgia. *See* DAVID C. BALDUS ET AL., EQUAL JUSTICE AND THE DEATH PENALTY: A LEGAL AND EMPIRICAL ANALYSIS 140–88 (1990). Defendants were 4.3 times as likely to receive the death penalty when the victim was white rather than black. *Id.* at 154. In a later study of the death penalty in Nebraska, Professor Baldus found that socioeconomic status was also important to punishment, in that the death-sentencing rate was 5.6 times greater in cases with high socioeconomic-status victims than it was for low socioeconomic–status victims. David C. Baldus et al., *Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973–1999)*, 81 NEB. L. REV. 486, 607–09 (2002). Baldus found the socioeconomic status of the defendant had no effect on outcomes, *id.* at 608, but certainly others have claimed that poor capital defendants, like poor defendants generally, are significantly disadvantaged by their lack of resources, *see* Bryan Stevenson, *Close to Death: Reflections on Race and Capital Punishment*, *in* DEBATING THE DEATH PENALTY: SHOULD AMERICA HAVE CAPITAL PUNISHMENT? 76, 94–95 (Hugo Adam Bedau & Paul G. Cassel eds., 2005) (describing the inadequate funding of services for capital defendants as a national problem).

Certainly poverty enhances the burden of race,[94] and the two classifications work together to create negative legal outcomes.[95] These consequences are not merely legal; they are also social. For an example, one need look no further than Ian Ayres' and Peter Siegelman's provocative studies depicting how race, gender, and socioeconomic status can work in concert to negatively shape the treatment one receives in consumer-credit markets.[96] A more-recent example is a news story describing mortgage-loan practices in Detroit neighborhoods.[97] The article noted that residents in predominantly black and Hispanic neighborhoods were at least twice as likely as those in predominantly white neighborhoods to be given high-cost, subprime loans, even after controlling for loan amounts and incomes.[98] These are race stories, but they are not merely race stories. They are race stories demonstrating that people of color do not easily receive the benefit of their ostensibly improved socioeconomic status. This truth is complicating for judicial analysis, meaning that not only do courts need to consider the potential combined negative effects of race and class on poor minorities, but also that enhanced financial stature does not necessarily undermine race, gender and other forms of discrimination. This interplay of race and class may, at times, be vexing; the difficulty involved, however, does not warrant avoidance by the Court.

Finally, it is a truism to state that persons of color are overrepresented among the poor.[99] This overrepresentation also creates another basis for

---

94. *See supra* note 93.

95. *See* Stevenson, *supra* note 93, at 94 ("Poverty and economic disadvantage among people of color increase the risk of wrongful or unfair treatment in the criminal justice system and compound the problem of race in the death penalty cases."). Others have claimed that federal policies such as those that provide greater sentences for crack versus powder-cocaine offenses disproportionately affect inner-city African Americans and are therefore discriminatory. *See, e.g.,* Paul Butler, *(Color) Blind Faith: The Tragedy of Race, Crime, and the Law,* 111 HARV. L. REV. 1270, 1276–80 (1998) (reviewing RANDALL KENNEDY, RACE CRIME AND THE LAW (1997)) (characterizing the sentencing scheme under the federal Anti-Drug Abuse Act as racially discriminatory).

96. Ian Ayres & Peter Siegelman, *Gender and Race Discrimination in Retail Car Negotiations, in* IAN AYRES, PERVASIVE PREJUDICE?: UNCONVENTIONAL EVIDENCE OF RACE AND GENDER DISCRIMINATION 19–44 (2003) (presenting empirical data indicating that African Americans, especially black women, were given inferior car-financing products for reasons unrelated to their credit-worthiness). Essentially, the privilege or penalty conferred through socioeconomic status is contingent upon the other identity categories one inhabits.

97. Vikas Bajaj & Ford Fessenden, *What's Behind the Race Gap?* N.Y. TIMES, Nov. 4, 2007, Weekend, at 16.

98. One particular example involved a black neighborhood in which the median income was $49,000 and a nearby white neighborhood where the median income was $51,000. *Id.* In the black neighborhood, seventy percent of the loans carried a high interest rate while only seventeen percent of those in the white neighborhood did. High interest rates were defined as three percentage points greater than the yield on a comparable treasury note.

99. A recent report by the Center for American Progress provides the following confirming statistics: In 2006 the median family income of whites ($52,423) was 1.4 times greater than that of Hispanics ($37,781) and 1.7 times greater than that of Blacks ($32,132); for 2006, 8.2% of whites were in poverty, while 20.6% of Hispanics and 24.2% of Blacks, respectively, were within the category. The report further details the negative comparative statistics for Blacks and Hispanics versus whites in the areas of health-care coverage, retirement savings, employment, and home ownership. AMANDA

requiring a careful, combined analysis of race and class discrimination. Government decisions affecting the poor will almost always disproportionately affect racial minorities. Subjecting class to only rational-basis review encourages governmental actors to have little concern for the effect of policies on economically disadvantaged minorities. Essentially, actions producing disparate racial outcomes are explainable not as a function of race discrimination, but as matters simply (and inadvertently) disadvantaging the poor, more generally.[100] This allows those actors to pretend that class can be isolated from race,[101] when most understand all too well that class status often serves as a proxy for race.[102] Additionally, subjecting class to only rational-basis judicial review forces poor plaintiffs of color to assert, perhaps absurdly, that they were discriminated against because of their race, alone, if for no other reason than to undermine the government's reliance on class as a pretext.[103]

The goal of this essay was not to definitively list all of the many ways race and class intersect and reinforce each other as bases for oppression. Rather, our goal was to demonstrate that the connection between race and class is significant and complicated enough to command a fuller measure of the Supreme Court's attention. Socioeconomic class both takes on the important characteristics of a protected classification, like race, and interacts with race and other identity categories to create societal and legal disadvantages. Forcing the Court to struggle repeatedly with the saliency question—what is the individual

LOGAN & TIM WESTRICH, CTR. FOR AM. PROGRESS, THE STATE OF MINORITIES: HOW ARE MINORITIES FARING IN THE ECONOMY 1, 3 (2008), *available at* http://www.americanprogress.org/issues/2008/04/minorities_economy.html.

100.  The overlap of race and class creates a situation where poverty may extensively operate as the plausible "neutral ground" to explain away a disparate racial impact resulting from government decisions and actions. *See* Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 275 (1979). Rather than this standard, which flows from the *Washington v. Davis* requirement of purposeful discrimination, the alternative would be a rule that presumed where the government took actions disproportionately affecting minorities, that they intended the likely consequences of their actions. *See Washington*, 426 U.S. at 253 (J. Stevens, concurring) ("For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation.").

101.  Katheryn K. Russell, *Affirmative (Re)Action: Anything But Race*, 45 AM. U. L. REV. 803, 808 (1996) (analyzing a proposed hypothetical and demonstrating the fallacy of isolating race from socioeconomic status). A perceived benefit of this isolation would be the use of class-based affirmative-action programs as a constitutionally viable method of extending opportunities to people of color. *See, e.g.*, Richard D. Kahlenberg, *Getting Beyond Racial Preferences: The Class Based Compromise*, 45 AM. U. L. REV. 721 (1996). *Cf. supra* note 83, in particular, the articles by Deborah Malamud analyzing the limits of class-based affirmative action.

102.  This concept of using proxies for race that are not themselves subject to heightened scrutiny is well-developed in the employment discrimination literature. *See* Angela Onwuachi-Willig & Mario L. Barnes, *By Any Other Name?: On Being "Regarded As" Black, and Why Title VII Should Apply Even if Lakisha and Jamal are White*, 2005 WIS. L. REV. 1283; Camille Gear Rich, *Performing Racial and Ethnic Identity: Discrimination by Proxy and the Future of Title VII*, 79 N.Y.U. L. REV. 1134 (2004).

103.  Disaggregating race from class then becomes a part of the phenomenon criticized by commentators such as Crenshaw, Hutchinson, and Iglesias & Valdes. *See supra* notes 89–90 (explaining that this disaggregation would force people to attempt to discern which separate facet of their identity served as the purported sole basis for oppression).

and combined work being done by race and class in a given situation—at most, could produce the improved equal-protection standard for class suggested here. At the very least, it might help the Court to understand that no individual thinks of him- or herself as a function of just the separate categories that together constitute his or her identity and neither should the Court.