UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 4, 2018 |
| Thomas Mario Costanzo, | ) | 9:06 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2

3    For the Government:

4                   U.S. Attorneys Office
                    By: CAROLINA ESCALANTE, ESQ.
5                        MATTHEW H. BINFORD, ESQ.
                         GARY RESTAINO, ESQ.
6                   40 North Central Avenue, Suite 1200
                    Phoenix, AZ  85004
7

     For the Defendant Thomas Mario Costanzo:
8

                    Federal Public Defenders Office - Phoenix
9                   By: MARIA TERESA WEIDNER, ESQ.
                         ZACHARY D. CAIN, ESQ.
10                  850 W. Adams Street, Suite 201
                    Phoenix, AZ  85007
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2               (Proceedings resume at 9:06 a.m.)

3          THE COURT:  Please be seated.

4          COURTROOM DEPUTY:  This is CR17-585, United States of

5     America versus Thomas Mario Costanzo, on for motion hearing.

6          MS. ESCALANTE:  Good morning, Your Honor.

7          Carolina Escalante, Gary Restaino, and Matthew Binford

8     on behalf of the United States, and also present is Chad

9     Martin, the case agent in the matter.

10         THE COURT:  Good morning.

11         MS. WEIDNER:  Good morning, Your Honor.

12         Maria Weidner present for Mr. Costanzo.  He is present

13    and in custody.  Also Zachary Cain, cocounsel, and Linda

14    Ondrovic, our paralegal.

15         THE COURT:  I was informed that counsel would like to

16    see me at sidebar, so let's go to sidebar.

17       (At sidebar on the record.)

18         THE COURT:  You know, let me just tell you,

19    Mr. Binford, that this microphone is not all it should be, so

20    whoever is going to speak, I would ask you to move close to the

21    microphone and identify yourself before you begin speaking so

22    the record is clear.

23         Mr. Binford?

24         MR. BINFORD:  Yes, Your Honor.

25         This is A.U.S.A. Matthew Binford.

1          The thing I wanted to bring to the Court's attention,

2     and I spoke to Ms. Weidner briefly about, is that I know she

3     has no control over this, and she told me that, but in previous

4     proceedings with this defendant, we had individuals in the

5     courtroom that were attempting to film or record the

6     proceedings.  We got our district office security manager from

7     our office involved.  We also had the marshals involved in

8     that.

9          When we were approaching the courthouse today, people

10    that we know are associated with the defendant had a video

11    camera, a camcorder, and were videotaping one of the undercover

12    agents, along with me and Ms. Escalante as we were walking

13    across the street to enter the courthouse.  And so we were just

14    hoping the Court could possibly advise the parties that they

15    should not be recording, just a friendly reminder, because we

16    are concerned about our security and the security of the

17    agents.

18          THE COURT:  Any objection to that, Ms. Weidner?

19          MS. WEIDNER:  No, Your Honor.  We, as I stated to

20    Mr. Binford, have zero control about what individuals who are

21    not my client do.  My client's been in custody since April.

22    And, you know, I don't know these individuals.  I don't have

23    communication with them.

24          THE COURT:  Okay.  I'm glad to do that.

25          If either party becomes aware that anybody in the

```
1    courtroom is recording the proceedings, I would appreciate it

2    if you would alert the Court because it is against the rules of

3    this Court, the local rules of the Court.  And I will now

4    inform the parties that that's the case.

5               MR. BINFORD:  Thank you, Judge.

6               MR. RESTAINO:  One more, Judge.

7               We had -- this is Gary Restaino for the United States.

8               We had filed an ex parte --

9               THE COURT:  Oh, yes.  That's fine.  I'm granting that.

10              MR. RESTAINO:  You're granting it?  Okay.

11              THE COURT:  Uh-huh.  And I grant the motion -- and

12   just so the defense knows -- and you can object if you want --

13   it was a Henthorn request, and I -- and usually on Henthorn

14   requests, I let the defendant know what the material is because

15   I just want your comment.  I think this material is so far out

16   there that there's just no way it's relevant.  And I don't even

17   mind disclosing it to you, but I'm not going to, in the spirit

18   of Henthorn.  But I am going to grant the request.  I think

19   the -- there is no particular value to you or to anybody else,

20   the disclosure of the material.  So I'm granting that request.

21              MR. RESTAINO:  Fine, thank you.

22          (End of discussion at sidebar.)

23              THE COURT:  All right.

24              A couple of matters as to how I would like to proceed.

25              First, I do note that there are -- and we welcome the
```

1   public here, and you are welcomed here -- but I do note that

2   there are certain people that have cell phones out and

3   available, and I will tell you that it is against the local

4   rules of this District Court to record or videotape, audio

5   record, or take photos of any part of the proceeding that's

6   here.  If I become aware that anybody is recording, you will be

7   removed and you will be referred to the United States Marshals

8   Service.  We have two marshals here.  I invite the marshals to

9   be aware of -- throughout the proceeding if you become aware of

10  anybody who may be recording it.

11          I have read all of the motions.  I have, as I've just

12  indicated, granted motion 103.  But I also think it will be

13  helpful to -- I've read everything.  I've read the responses --

14  the motions, the responses, the replies.  I think it will be

15  helpful and focus the evidentiary hearing if we go over some of

16  the motions first, and I intend to rule on some of them, or at

17  least indicate what my ruling will be, because I think although

18  the motions weren't necessarily filed in any sort of an order,

19  I do believe that they do have a cascading effect, one on

20  another.

21          And the first motion I would like to take up is the

22  motion to dismiss Count 8 of the indictment, which is docket

23  67.  I don't know who for the government is going to be

24  speaking, but it does seem to me, for what it's worth, that the

25  motion is well-founded.  I do not believe that Murillo can

1    change state law, and I think state law is quite clear that the

2    maximum penalty that Mr. Costanzo could receive under state law

3    for the possession of marijuana is one year, not one year and

4    one day; and hence, I do not believe that the United States

5    Government, at least based on the papers and the research I've

6    done as a result of the papers, has a basis to bring Count 8

7    against him.

8         I'm glad to hear from the government, if they wish to

9    be heard.

10        MR. RESTAINO:  Your Honor, the -- as a preliminary

11   matter, we think that the defense argument that these states

12   should be clumped into either Washington-type states or

13   California-type states, depending on how determinative the

14   judge's discretion is bound, is a little bit too -- it's just a

15   little bit too vague a way to do it.  And I say that because

16   Arizona law is different from the North Carolina law in the

17   Kerr cite that was cited in the reply by the defendant.

18        THE COURT:  Well, Ring makes it pretty clear,

19   though -- at least I was on the Arizona Court of Appeals at the

20   time that the underlying case -- what are we thinking, what are

21   we talking here? -- Blakely was decided, and I think it was

22   pretty clear after Blakely that Arizona viewed itself as a

23   California-type state.

24        But even if it doesn't, even if you view it as a

25   separate state, you have Arizona statute that now designates

1   that the maximum sentence is the presumptive sentence, unless

2   you have some sort of aggravating factor that is found by a

3   jury or admitted by the defendant.

4          MR. RESTAINO:  That's --

5          THE COURT:  Isn't that the case?

6          MR. RESTAINO:  That's, Your Honor, why we would

7   distinguish the North Carolina model from Arizona.  It's the

8   number of columns.  It's five columns versus three columns.

9   North Carolina is a mitigated, a presumptive, and an

10  aggravated.  Arizona has that confusing word "maximum" in

11  there, which is more than presumptive and less than aggravated.

12  And if the maximum sentence is counted here, the maximum

13  sentence that someone like Mr. Costanzo could face, then it

14  would be more than a year and a day.

15         THE COURT:  Well, I mean, it is kind of different

16  though than Murillo because the maximum count that somebody

17  like Mr. Costanzo could face, the maximum sentence that

18  somebody like Mr. Costanzo could face in Arizona is one year.

19         MR. RESTAINO:  But I don't think that's right, Judge.

20  We don't disagree that he, under the circumstances of this

21  particular pleading, faced one year, but he had a prior felony.

22  And although his civil rights have been restored for that prior

23  felony, he was not.  The judge easily could have found the

24  aggravating factor --

25         THE COURT:  Was it even pled?

1    MR. RESTAINO:  It was not, Judge.

2    THE COURT:  So --

3    MR. RESTAINO:  Again, we acknowledge that it wasn't

4    pled.  But here, if you focus on the offense, the possible

5    offense, the possible amount in which an offense is punishable

6    rather than punished, then we think Murillo still stands for

7    the proposition that in Arizona he is a felon under both state

8    and federal law.

9    THE COURT:  Even though the prior offense that we're

10   talking about, possession of marijuana, it would be

11   unconstitutional for the Court to have given him a sentence

12   more than one year.  You're not denying that.

13   MR. RESTAINO:  I'm a little bit --

14   THE COURT:  The way it was pled and proven here, the

15   underlying offense, we're talking --

16   MR. RESTAINO:  Sure.

17   THE COURT:  -- it would have been unconstitutional for

18   the Court to have sentenced Mr. Costanzo to more than one year.

19   MR. RESTAINO:  Yes.  So though that is a factor that

20   the judge can find rather than the jury.  It's not a Sixth

21   Amendment jury determination.

22   THE COURT:  Well, be that as it may.  I'm not

23   contesting that.  And I'm not even contesting that Murillo

24   would be decided differently after Cunningham.  But it seems to

25   me that Washington state's sentencing system is a guideline

1   system, and Arizona's is not.

2         MR. RESTAINO:  Judge, I have one final point that I

3   would make on this, and that is that we know from the

4   sentencing documents, the judicially noticeable documents, that

5   he was prohibited from having a firearm.  He wouldn't have been

6   prohibited from having a firearm if this were not a felony

7   offense.  And we think that that's also a factor that the Court

8   should take into determination.

9         THE COURT:  Well, even if it's a felony offense, the

10  maximum sentence is one year; right?

11        MR. RESTAINO:  Under -- under this particular

12  pleading, the way that the Court is -- is looking at it.

13        We disagree, Judge.  We believe that Murillo does

14  control and that the District Court cannot put aside the Ninth

15  Circuit ruling.

16        I don't really have any additional argument for that.

17  If anything else is illuminated on this through the testimony

18  today, I'd ask the Court to reserve its final position on that

19  until the end of the hearing.

20        THE COURT:  Well, I may reserve it to the end of the

21  hearing, but I am clearly indicating that I'm not sure I have

22  to set aside Murillo.  That's the way you characterized what

23  I'm doing, Mr. Restaino.  I don't think it's setting aside

24  Murillo because, as I've indicated, I don't think Murillo

25  necessarily comes up with a different result today than it did

1    in 2005, even though you have Cunningham as an intervening

2    case.

3              MR. RESTAINO:  But Kerr talks positively of Murillo --

4    Murillo as well.  Again, still under Washington law.

5              We've got the Oregon case that we cited as well, which

6    is a District Court case where the district judge there found

7    he was bound by Murillo.

8              THE COURT:  Well, that may well be, but I -- I'm not

9    sure that Oregon law is the same as Arizona law.  So I will

10   reserve ruling until the end of the hearing today.  But unless

11   you can come up with something new, I'm not sure -- I'm giving

12   you what my at least strong indication is, which is I'm likely

13   to dismiss Count 8.  And if you have issues or factual hearings

14   that go to that, then I'd appreciate you highlight them during

15   the hearing today.

16             MR. RESTAINO:  Yeah, I -- I wouldn't expect that we

17   have too much that goes to that, but we will certainly keep our

18   eyes open for you.

19             THE COURT:  Certainly if I dismiss Count 8, then the

20   motion seeking relief from misjoinder or prejudicial joinder,

21   with is docket 58, is moot.

22             Would you agree with that?

23             MR. RESTAINO:  Absolutely, Judge.

24             THE COURT:  Do you agree with that, Ms. Weidner?

25             MS. WEIDNER:  I would, Your Honor.

1    THE COURT:  Do you wish to be heard on your motion to

2    dismiss Count 8 before we move on to other matters?

3    MS. WEIDNER:  Your Honor, it appears that the position

4    of the Court is identical to the position of defense, as the

5    Court has stated; and therefore, I do not believe that

6    additional argument is necessary.

7    We agree that Arizona is a statutory framework like

8    California, like North Carolina, and unlike the guidelines

9    framework of Washington, which is what Murillo was talking

10   about.

11   THE COURT:  All right.

12   So then we have the motion to disclose Grand Jury

13   instructions and transcripts.

14   Does the state intend to proceed on Counts 3 through 7

15   based solely on -- let's see, how did I -- how would I

16   characterize it?

17   Give me one moment.  I need to find my notes.

18   Do you plan to prosecute based on the avoidance

19   charges pursuant to A3C, or are you just going to do A3B?

20   MR. RESTAINO:  Your Honor, we would intend to prove

21   the case under either B or C.  So we would plan on moving

22   forward certainly on C, as well.

23   THE COURT:  All right.  And so you've already

24   disclosed to the defendant Mr. Ellsworth's transcript in

25   which -- which is the indication of what federal regulations

1    you believe that the defendant desired to evade, and you won't

2    be exceeding those during trial?  In other words, you won't be

3    asserting other regulations, statutes, or law that you didn't

4    disclose to the defendant already?

5            MR. RESTAINO:  I wouldn't say that, Judge, nor do I

6    think that we're bound by that.  We've disclosed the transcript

7    of the testimony --

8            THE COURT:  Uh-huh.

9            MR. RESTAINO:  -- that was presented to the Grand Jury

10   before the Grand Jury returned their true bill.

11           THE COURT:  All right.

12           So what authority do you have, Ms. Weidner, that

13   suggests that the government has to set forth all of the

14   possible statutes and regulations before the Grand Jury that it

15   claims your client was trying to avoid to support the

16   indictment?

17           MS. WEIDNER:  Your Honor, in the government's response

18   to the original motion for Grand Jury transcript, there was

19   information provided, but that information did not speak to the

20   specific request that was made by the defense in its joinder,

21   and that is the --

22           THE COURT:  You want the specific regulations given to

23   the Grand Jury that you claim -- or that the government is

24   going to try to demonstrate your client was seeking to avoid.

25           MS. WEIDNER:  Yes, Your Honor.  What federal

1   transaction reporting requirement and the --

2          THE COURT:  And so my question is, what authority do

3   you have that suggests that the government has to provide you

4   with -- provide you and/or the Grand Jury with specific

5   regulations?  I mean, you -- you've received the transcript

6   where the testimony outlines FinCEN, or however you call it,

7   and some other regulations that have been generally referred

8   to.

9          MS. WEIDNER:  Well, Your Honor, I think that this

10  goes, first of all, to the Federal Rule of Criminal Procedure

11  7C requiring that the indictment be plain, concise, and

12  definite.  We're talking about a federal regulation that has

13  not been identified.  That is not definite, that is not

14  concise, and that is definitely not plain.

15         We also have the Fifth Amendment issue of --

16         THE COURT:  Well, I mean, that is a different motion;

17  right?  You've been provided with the transcript in which

18  the -- to the extent these matters were disclosed to the Grand

19  Jury, they have now been identified to you.  So if you want to

20  bring a 7C motion, you can bring a 7C motion.  That's not the

21  motion that you've now brought.

22         MS. WEIDNER:  Your Honor, the other issue is the issue

23  of Grand Jury presentment, and also the interest in ensuring

24  that there is not variance from what was presented to the Grand

25  Jury.

1      THE COURT:  Do you have a case that says that there

2  can be no variance?

3      MS. WEIDNER:  Well, Your Honor, United States v.

4  Cotton requires presentment, and here there's no evidence --

5      THE COURT:  What is the citation on that?

6      MS. WEIDNER:  535 U.S. 625, 634, requiring that no

7  person shall be held to answer for capital or other infamous

8  crime unless on presentment or indictment of a Grand Jury.

9      THE COURT:  Well, yeah, the crime has been specified;

10  correct?

11      MS. WEIDNER:  Yes.

12      THE COURT:  And you have been provided, unless I

13  misunderstand the government's response, you have been provided

14  through the transcripts that were provided by way of response

15  all of the regulations that were indicated to the Grand Jury

16  with whatever specificity they were identified; correct?

17      MS. WEIDNER:  Yes, Your Honor.

18      THE COURT:  And so now what I have is, it looks to me,

19  like a moot motion.  I'm not telling you can't bring a 7C or

20  another motion, but the government has provided you with

21  everything it provided to the Grand Jury concerning the

22  regulations or the statutes that were violated by -- or that

23  they allege were violated by your client.  So you now have that

24  basis.  So the -- what do you need more from what happened in

25  front of the Grand Jury?

1          MS. WEIDNER:  Well, I'm sorry, Your Honor.  What I

2   understood the government provided was a portion of the

3   transcript.  I am not privy --

4          THE COURT:  Maybe I misunderstand.

5          Mr. Restaino?

6          MR. RESTAINO:  Judge, we provided the transcript of

7   the testimony of Agent Ellsworth.  What we did not provide, but

8   which we identified and characterized in our motion response,

9   was the colloquy, the legal colloquy, that goes back and forth

10  between a prosecutor and a Grand Jury prior to or after the

11  testimony.  We didn't produce that.

12          THE COURT:  What -- what's the problem with producing

13  that?

14          MR. RESTAINO:  Well, Judge, there's -- there's not a

15  particularized need.  It's a big bar to get the Grand Jury

16  colloquy, and a supervising Grand Jury judge could in the

17  future be dealing with tons and tons of these motions.  So it's

18  really an efficiency thing.

19          It's not a big deal for us to disclose these.  I don't

20  think this in this case is going to in any way hurt our

21  process, but it's just a matter of policy that we don't

22  disclose the colloquy absent an order of the Court, and we

23  really would ask the Court not to order it unless there were

24  particularized need consistent with the case law.

25          THE COURT:  Well, I'll tell you what my concern is.

1   My concern is the Wolf case.  I didn't read the Wolf case, but

2   I did see it in the motions on this case, which suggest that

3   FinCEN is a civil regulation that's incapable of giving rise to

4   criminal liability.  And that is what causes me concern.  That

5   may not say that.  That may have been an over-citation by

6   previous counsel who has withdrawn, or who -- the charges have

7   been dismissed against Mr. Steinmetz, and it was Mr. Steinmetz'

8   counsel who originally brought this motion in which the

9   government now joins.  They are the ones who cited the Wolf

10  case.  But they cited the Wolf case for the proposition that

11  Financial Crimes Enforcement Network regulations were

12  insufficient to produce criminal liability.  That may be an

13  inaccurate statement of law, but you did not join it, nor did

14  you question it in your reply.

15          And that is what gives me concern that -- I don't -- I

16  don't want to see this defendant on trial if you don't have

17  some sort of criminal -- if you don't have some sort of

18  regulation that you're alleging that he sought to avoid that

19  can give rise to criminal liability.  That's what causes me the

20  concern with this motion.

21          Do you understand what I'm saying, even if I'm

22  misunderstanding things?

23          MR. RESTAINO:  I understand what you're saying, Judge.

24  I -- I don't think that that is -- first of all, the colloquy,

25  as we identified, it doesn't have any regulations in it.  So in

1    that sense, maybe it's the easiest thing to provide it.  I

2    again, don't think that there's particularized need.  I think

3    this is a jury instruction question when we get down to the

4    road as to what we can do and what the government can rely on

5    to prove that element.

6              THE COURT:  Well, I will tell you, Mr. Restaino, that

7    it is not my intention to open the floodgates to the defense

8    every time they want Grand Jury testimony.  But I have the

9    concern that I just have indicated that you didn't respond to.

10   So I don't think there's any problem with giving the colloquy

11   to the extent that all you were doing was providing the Grand

12   Jury with the statutes on which you were relying.  And then if

13   the defense wants to make a motion on that, they can make a

14   motion on that and I'll determine whether or not the charges

15   ought to be dismissed.  But...

16             MR. RESTAINO:  If I could just make one more point on

17   that, Your Honor, and then I think if you're going to rule on

18   that one now, we'd be happy to produce that colloquy now to the

19   extent that it helps the defense during this hearing.

20             THE COURT:  Thank you.

21             MR. RESTAINO:  The one thing I want to say is, we do

22   have still residual argument here about the money transmitting

23   counts that are no longer part of this indictment.  And so --

24             THE COURT:  What is that residual argument?  I suppose

25   that goes to the motion for refund the defense has also

brought.

        MR. RESTAINO:  I think that it does.  And at this
point, the -- the money laundering sting statute has predated
money transmitting businesses, and it certainly has predated
bitcoins.  And so to the extent that there is residual concern
about FinCEN -- and at the right time, if we have to
reinvigorate the argument here, we can do that.  But at this
point, that's really a moot point, we think, and it has to do
with whether -- stand-alone.  The money laundering charges
support the actions the government is taking, and there is
nothing all that unusual about the money laundering charges.
Sure, it's got bitcoin, but it's not as though the money
laundering charges are some new-fangled provision of the United
States Code.  I would just rest with that.

        THE COURT:  Well, I get that, but I don't know how
that relates to the instant motion in terms of showing the
colloquy to the defendants in this, under the facts of this
particular case.

        MR. RESTAINO:  Because of the Wolf case and whether or
not FinCEN regulations are civil or criminal in nature.  That's
the type of thing that really is going to resonate more toward
Counts 1 and 2 which have been dismissed, rather than existing
Counts 3 through 7.

        THE COURT:  And I recognize that is a possibility.
But the government did not join that point in its response.

1    And so I'm sitting here with an argument made on one side that

2    has not been joined by the government, and we need to move

3    forward with this case.

4          And so out of the -- in the interests of complete

5    disclosure and providing whatever information needs to be

6    provided to the defense, I would ask that you provide the

7    defense with colloquy.

8          MR. RESTAINO:  If the record can reflect, we are doing

9    that now, Your Honor.  I would ask that this be produced in

10   conjunction with the existing protective order.

11         THE COURT:  That is -- that motion is granted.

12         COURTROOM DEPUTY:  What was the number of that motion?

13         THE COURT:  I'm sorry?

14         COURTROOM DEPUTY:  What was the number of that motion?

15         THE COURT:  I'm sorry.  You want the number on that

16   motion?

17         COURTROOM DEPUTY:  Yes, Judge.

18         THE COURT:  That was docket 54.

19         COURTROOM DEPUTY:  Thank you, Judge.

20         THE COURT:  And it was joined in by the -- it was

21   actually brought by the codefendant and joined in by the

22   remaining defendant.

23         COURTROOM DEPUTY:  Thank you.

24         THE COURT:  All right.

25         So then we move to docket 63.  Is that going to be a

1    subject of the evidentiary hearing?  That's the shocking and

2    outrageous motion to dismiss Counts 3 through 7.

3              MR. BINFORD:  Your Honor, there is some information

4    that would be presented in Oscar Martin's testimony that will

5    be helpful, I think, in resolving that motion, unless the Court

6    thinks that it can deny the motion based on the record before

7    it, which I think it can do.

8              THE COURT:  Well, I will say that I -- since you've

9    asked me to hold off on dismissing Count 8 until after I've

10   heard all the testimony, if you think there's testimony that

11   cuts there, I will hold off on ruling on docket 63.

12             But I will tell you, Ms. Weidner, that I didn't see

13   much in the motion that rose to the level -- I mean, I

14   understand that it was the government -- from your perspective,

15   that it was the government that introduced the fraudulent

16   notion that it was involving -- that the bitcoin it was

17   purchasing was involved in drug sales.  I understand that.  And

18   I think that's about as close as you get to making allegations

19   that are so shocking and so outrageous as to violate the

20   universal sense of justice.

21             But given what I understood to be by your own motion

22   the nature of the market for unregulated bitcoin, I do not find

23   it to be so shocking and so outrageous as to violate the

24   universal sense of justice.  But I will wait until I've heard

25   the evidence before I rule on that motion.

1          If you want to be heard now, you can be heard now.

2          MS. WEIDNER:  Your Honor, I think that there's

3  actually going to be testimony, most likely, and I expect in

4  cross-examination, information that goes to both the motion to

5  suppress, document 65, and the motion to dismiss for outrageous

6  government conduct, document 63.

7          THE COURT:  All right.  As it pertains to docket 65, I

8  expect that that is the subject of the evidentiary hearing, to

9  the extent we're going to have one today.  But I will say that

10  I am most interested -- I reviewed the affidavit, I reviewed

11  the arguments, I reviewed the motions made by counsel.  I will

12  tell the government I don't see much in the affidavit -- maybe

13  you're going to argue to the contrary, you did in your

14  motion -- but I'm not very persuaded by the argument that there

15  was any probable cause to believe that drugs might be found in

16  Mr. Costanzo's home.

17          However, I don't view any of the rest of the arguments

18  made by the defendant has having much merit as it pertains to

19  the bitcoin operation.  Seems to me like there was probable

20  cause there.

21          If, in fact, I am going to dismiss Count 8 at any

22  rate, it doesn't seem to me that the defense, Ms. Weidner, has

23  identified with any particularity anything that was found in

24  the -- in the search that would not have been found based on

25  probable cause as it pertains to Counts 3 through 7, as opposed

1    to Count 8.  And I would appreciate your highlighting anything

2    that you think cuts to that.

3            MS. WEIDNER:  Your Honor, actually, I think the Court

4    is exactly right.  I think the dismissal of Count 8 will

5    basically treat a lot of our concerns as to the search warrant.

6    And our greatest concern with the search warrant is not the

7    assertion that probable cause was not established for the

8    financial crimes as set forth in the affidavit, but that the

9    improper inclusion of the Title 21 offense in the search

10   warrant itself, even though it was pretty substantively absent

11   from the affidavit, resulted in an improper expansion of the

12   search motion.  But as far as items that would not be

13   admissible, I think the greatest concern is -- is the

14   ammunition that was uncovered, and the dismissal of Count 8

15   would obviate that concern.

16           THE COURT:  All right.  So you know what at least I'm

17   interested in as it pertains to that motion.  Both sides know.

18           Docket 95, which is -- did you want to be heard on

19   that, Mr. Restaino?

20           MR. RESTAINO:  On what, Judge?

21           THE COURT:  On my observations about docket 65.

22           MR. RESTAINO:  That -- that's the Franks motion?

23           THE COURT:  Yes.

24           MR. RESTAINO:  Judge, the only thing I was thinking in

25   consulting with my colleagues is it's not clear that we need an

| | |
|---|---|
| 1 | evidentiary hearing, if that is the only issue that's in play, |
| 2 | whether Count 8 is dismissed.  The only thing that I can tell |
| 3 | you is that from our standpoint, the -- the department would |
| 4 | have the right to appeal the dismissal of Count 8.  And so we |
| 5 | really can't say whether or not that comes back in at this |
| 6 | point.  But I wonder if the Court has some guidance, |
| 7 | particularly for Ms. Escalante and Ms. Weidner if they're |
| 8 | examining the witness, as to the topics so that we can more |
| 9 | efficiently go through the hearing. |
| 10 | THE COURT:  Well, I've just indicated -- |
| 11 | MR. RESTAINO:  Okay. |
| 12 | THE COURT:  I think I've indicated what my concern is, |
| 13 | and maybe -- and I'm certainly not trying to prevent the |
| 14 | government from appealing my dismissal of Count 8, if that's |
| 15 | what I do.  And I don't know, though, and Ms. Weidner -- maybe |
| 16 | we should allow Ms. Weidner to consult with the defendant and |
| 17 | Mr. Cain to determine if there is a reason for the Franks |
| 18 | hearing to go forward, if I'm inclined to dismiss Count 8 |
| 19 | anyway. |
| 20 | MS. WEIDNER:  Your Honor, in the event that the |
| 21 | government were to appeal a potential finding -- or order of |
| 22 | this Court to dismiss Count 8, we could reassert the Franks |
| 23 | motion issue, but we do not have additional bases that -- under |
| 24 | which we would be seeking a Franks hearing in the absence of |
| 25 | Count 8. |

1    THE COURT:  All right.

2    So that brings up docket 95, which is the motion to

3    restore Mr. Costanzo's bitcoins.

4    Now, I must admit that the motions were hastily

5    written and hastily responded to, which don't give me a very

6    clear response of what's going on here.  But it seems to me

7    like Mr. Costanzo's asking to have returned to him bitcoins he

8    sold to the government for a particular price point as part of

9    the government's undercover operation.  That's one subset of

10   bitcoin.

11   It strikes me that another subset of bitcoin that

12   Mr. Costanzo might be seeking the return of is bitcoin that was

13   in his possession that is not attributable to any purchases by

14   the government in this operation.  And I am not clear whether

15   or not that amount of bitcoin is at issue in the defendant's

16   motion, and/or whether the government seized any bitcoins that

17   exceed those that were -- in other words, if there was actually

18   any bitcoin in Mr. Costanzo's possession that were seized by

19   the government, that the government holds, that cannot be tied

20   to any counts that remain in the complaint.  So I would

21   appreciate that clarification.

22   MR. RESTAINO:  Would you like me to start, Your Honor?

23   THE COURT:  Well, it's Ms. Weidner's motion.  That's

24   why I was looking to Ms. Weidner.

25   MS. WEIDNER:  Sorry, Your Honor.  I was having a

1    coughing fit.

2         With regard to the -- the bitcoin that's involved in

3    this case, there were a number of undercover agent meetings

4    between individuals posing as people interested in trading

5    bitcoin and Mr. Costanzo.

6         When interactions were completed, Mr. Costanzo

7    transferred the bitcoin from his possession to their possession

8    by way of the Internet, essentially, from his account to

9    someone else's, to the undercover agents'.  Those are obviously

10   already in the government's possession.  They were bought and

11   paid for.

12        Then there is the bitcoin that was seized.  That

13   bitcoin was not sold to the government; and as a result, there

14   is no indication that it was illegal proceeds or that it was --

15   it was -- or that it was forfeitable.  And given the value of

16   that asset, especially the value of that asset since it was

17   seized, we have, I think, a really interesting issue, which is,

18   is Mr. Costanzo indigent, should Mr. Costanzo have a reasonable

19   bond so that he could be released on conditions?  He was

20   penniless when he was originally apprehended.  That would no

21   longer be the case.  And is the government permitted when it is

22   seeking to prosecute an individual like Mr. Costanzo, to simply

23   take everything from them so that they are unable to post bond,

24   unable to hire counsel?  And I think that that's an untenable

25   approach from -- from a -- from a policy perspective.  I mean,

1    it -- it simply -- it simply makes no sense.  And that -- the

2    fact that the government dismissed the unlicensed money

3    transmitting charges opens up that whole question.  And -- and

4    I think that Mr. Costanzo should have his assets returned to

5    him, and the government should be allowed to confiscate no more

6    than that which was expended in the money laundering sting

7    investigation.

8            MR. RESTAINO:  Your Honor, the -- the simple answer to

9    your question is no.  There is no other bitcoin that was seized

10   from Mr. Costanzo or subject to forfeiture in this case, other

11   than the 80-ish bitcoins that were the subject of Count 7 in

12   the indictment.  The evidence would show that those bitcoins

13   were actually exchanged, actually went from Costanzo's

14   electronic wallet to the undercover wallet before he was

15   arrested.

16           THE COURT:  So all of the bitcoin, the defendant is

17   seeking to have returned to him, is bitcoin that was purchased

18   by the government?

19           MR. RESTAINO:  That is correct, Your Honor.

20           THE COURT:  Do you dispute that, Ms. Weidner?

21           MS. WEIDNER:  Your Honor, I guess what is confusing is

22   that in this final count -- and the transaction and -- perhaps,

23   government counsel can illuminate this a little -- but it

24   appeared to me that the transaction was incomplete, that it was

25   not complete, that the money was not counted.  The law

1   enforcement basically busted into Starbucks --

2          THE COURT:  Let me ask you a more direct question,

3   which may help me.

4          MS. WEIDNER:  Yes, sir.

5          THE COURT:  Does the government have any bitcoin that

6   was not part of its purchases from Mr. Costanzo in the

7   undercover operations that are at issue in Counts 3 through 7?

8          MS. WEIDNER:  Let me just have a moment, Your Honor.

9                 (Pause in proceedings.)

10         MS. WEIDNER:  Actually, no, Your Honor.

11         THE COURT:  Okay.  Thank you.

12         Motion is denied.  Docket number 95 is denied.

13         All right.  So it seems to me that we are at a point

14  here where -- if the government wants to put on any evidence

15  that relates to this Court's contemplations in dismissing Count

16  8, that's the evidence we ought to put on.  If you don't want

17  to put on any evidence and want me to rule on that, it seems to

18  me like if I dismiss Count 8, we don't have any need to have a

19  Franks hearing, at least not until such time as the Ninth

20  Circuit may or may not reverse my decision to dismiss Count 8.

21         MR. RESTAINO:  I think that's true, Judge.  And to be

22  clear, I'm not advocating that the government will or won't

23  appeal.  That's a decision that our folks in D.C. would make.

24         We have no factual evidence to present after I've

25  consulted with my colleagues, and I didn't think that we would.

UNITED STATES DISTRICT COURT

1    It's a largely legal matter on Count 8.  So we would -- we have

2    nothing to present.  We would decline to present anything.

3              I just have one question for the Court.  To the extent

4    there were an appeal and there were successful appeal and Count

5    8 were restored, does the Court have an objection to then doing

6    that evidentiary hearing later?  We wouldn't want to be

7    prejudiced from that.

8              THE COURT:  I understand that.  And I don't think I

9    would have any objection.

10             Does the defense have any objection?

11             Do you understand what Mr. Restaino's question is,

12   Ms. Weidner?

13             MS. WEIDNER:  I do, Your Honor.  You're -- I guess the

14   concern that the defense would have in that regard is that --

15   we have a firm trial date right now in March.

16             THE COURT:  And I suspect that we will go through the

17   firm trial date before this issue is ever heard by the Ninth

18   Circuit.

19             MS. WEIDNER:  Which means that as long as this doesn't

20   interfere with Mr. Costanzo's trial, then we wouldn't have a

21   problem.  I don't want to continue or delay his -- his right to

22   a speedy trial, as speedy trial as possible, any further.

23             THE COURT:  We do have a firm trial date; correct?

24             MR. RESTAINO:  We do, Your Honor.  And by no means am

25   I asking the Court to take that off its calendar.  It may well

1    be that this issue gets resolved very neatly by the department

2    exercising its right not to appeal this adverse decision.  I

3    simply want to preserve the department's ability.

4              THE COURT:  I get that.

5              All right.  With that in mind then, I am going to

6    dismiss Count 8 of the indictment against Mr. Costanzo.  So

7    docket 67 filed by the defense is granted.

8              Docket 54, motion to disclose Grand Jury instructions

9    and transcripts, has been granted, and the government has

10   provided all such information at this point to the defendant.

11             Is that correct?

12             MR. RESTAINO:  That is correct, Your Honor.

13             MS. WEIDNER:  Yes, Your Honor.  I confirm that.

14             THE COURT:  The motion seeking relief from misjoinder

15   or prejudicial joinder is denied as moot in light of the

16   dismissal of Count 8.

17             The motion to dismiss Counts 3, 4, 5, 6, and 7 of the

18   first superseding indictment for outrageous government conduct,

19   which is docket 63, is denied, unless the defense wants to put

20   on some sort of case of which I'm not aware, and evidence.

21             Do you -- does the defense wish to put on any such

22   evidence?

23             MS. WEIDNER:  Your Honor, we have no additional cases

24   to present.

25             I would point the Court to -- if I could just have

1    some time for argument for just a moment?

2         THE COURT:  You may.  But before we hear that

3    argument, the motion to suppress evidence from the April 20th,

4    2017, search, which is docket 65, is also denied without

5    prejudice to you renewing the motion should the United States

6    of America seek and obtain a reversal of my dismissal on Count

7    8, at which time that motion would again become relevant

8    because the question would be, if there was a basis on which I

9    could determine that they would not have appropriately

10   discovered any ammunition in Mr. Costanzo's home pursuant to

11   their search.

12        Is that what we've all agreed upon?

13        MS. WEIDNER:  I believe so, Your Honor.

14        MR. RESTAINO:  Yes, Your Honor.

15        THE COURT:  All right.

16        So I don't think I have any pending motions.  Docket

17   82 and 102, which pertain to what I would call procedural

18   motions, are granted.

19        And that leaves, Ms. Weidner, your docket 63, which is

20   the motion to dismiss Counts 3, 4, 5, 6, and 7 of the first

21   superseding indictment for outrageous government conduct.

22        MS. WEIDNER:  Your Honor, the concern here is that the

23   government essentially launched on a fishing expedition with no

24   particularized or individualized suspicion.

25        THE COURT:  Well, they did know -- maybe I

1    misunderstood, and I hope you don't mind if I interrupt you.

2           MS. WEIDNER:  No, that's okay.

3           THE COURT:  Because I just want to make sure I get --

4    I understand every little thing as we go along.

5           But it looked to me like the government had looked at

6    the bitcoin market.  They had concerns about the bitcoin

7    market.  And they determined that the premier bitcoin trader in

8    the Phoenix area was an alias that I don't think you contest is

9    used by your client.

10          MS. WEIDNER:  That is correct, Your Honor.

11          THE COURT:  So if all of that is true, how is it that

12   the government went on a fishing expedition to the extent that

13   they targeted your client for their undercover activity?

14          MS. WEIDNER:  Well, Your Honor, I don't think it was a

15   fishing expedition in regards to targeting Mr. Costanzo for

16   suspicion of unlicensed money transmitting.  And in fact, this

17   is an investigative technique that has been used across the

18   country.  Cases that were cited in the defense motion to

19   dismiss for outrageous government conduct list just some of

20   those, like Mansy and Klein.

21          Now, the issue is that in this case, unlike the Lord

22   case, which was a case that started with local bitcoin dot com,

23   like this case, but then included a money laundering and drug

24   trafficking component because the targets were doing just that.

25   The government instead, without any further investigation or

```
 1    indication, moved to add money laundering based on the
 2    specified unlawful activity of drug trafficking into the mix
 3    here.  There was no reason --
 4            THE COURT:  And they did it by saying they were
 5    involved in drug trafficking themselves?
 6            MS. WEIDNER:  Just by -- yes, just by mentioning it.
 7    There was no investigation in government disclosures --
 8            THE COURT:  I get that.  But here is my concern.  Why
 9    is it that it's so outrageous for the government to do that in
10    their sting operation when they have reasonable suspicion that
11    that's exactly what this kind of a market supports?
12            MS. WEIDNER:  Well, Your Honor, that is simply
13    incorrect on the part of the government.  I think that this has
14    been borne out --
15            THE COURT:  Well, you -- you are not proposing to
16    present to me here that Mr. Costanzo has never engaged in
17    bitcoin operations, other than those with the government, which
18    may have involved illicit underlying activity.
19            MS. WEIDNER:  No, Your Honor.  In fact, there are --
20    and -- and Mr. Costanzo's local bitcoins dot com profile, he
21    provided that he had numerous clients and was involved in
22    numerous transactions.  The government's investigation noted
23    that Mr. Costanzo was a busy man, moving all over the valley,
24    conducting interactions.  Yet the government did not
25    investigate those interactions or those clients, and the
```

1    government built no foundation for the assumption that

2    Mr. Costanzo's peer-to-peer transactions were money laundering.

3    And that is the problem.  I think that has been borne out,

4    definitely in 2017, that bitcoin is legitimate.  Bitcoin is a

5    legitimate store of value, and that people are interested in

6    investing in and trading in and speculating on.  And that

7    doesn't mean that you are, per se, involved in some kind of

8    nefarious activity.

9         I think that what makes this outrageous, what makes

10   this shocking, is this notion of the government being this

11   creepy, lurking entity that is looking to entrap its citizens.

12   And I think that the absence of a legitimate basis for

13   utilizing this tactic is -- is one of the -- the clear

14   indicators.  This isn't like a child trafficking situation

15   where there is imminent and ongoing harm, or even a stash house

16   situation where there are the potentialities of -- of injury or

17   death to the public or law enforcement.  This is just basically

18   setting traps for unsuspecting citizens.  It's -- it's a very

19   distasteful way for our government to proceed.

20        The other thing that I think, though, is of particular

21   interest, and this was included in the reply, in mid December,

22   a panel of District Court judges sat in Chicago to consider the

23   stash house sting operations of -- of the ATF.  One of the

24   things that they discussed in that was the ATF's supposed

25   playbook that the agency had developed so as to avoid

1    allegations of entrapment of defendants.  For instance, ATF's

2    stash house playbook involved only targeting suspects who were

3    experienced robbers; at least making sure that participants, at

4    least two of them, had a violent background; and making sure

5    the participants were criminally active when the investigation

6    was launched.

7            Now, in the affidavit and -- in support of the search

8    warrant and in government disclosures, there's zero indication

9    that anything like an ATF playbook, anything like the kind of

10   at least profile that the ATF would create to identify its

11   sting targets was utilized by the DEA or the IRS before in

12   targeting Mr. Costanzo.

13           I think that this is a distasteful and despicable way

14   for our government to comport itself.  And for that reason, the

15   government needs to get the message that this is not how we

16   treat our citizens.  This is not the role of government.  This

17   isn't -- we're not -- we're not in Cold War Russia, we're not

18   sneaking around, informing on people and setting traps for

19   people.  And that is the concern.

20           I have nothing further.

21           THE COURT:  Mr. Restaino -- or is it --

22           MR. BINFORD:  I will take this one, Your Honor.

23           THE COURT:  All right.

24           MR. BINFORD:  While there may be some current concerns

25   about the legitimacy of bitcoin and whether or not it's a valid

1    investment or things like that, the United States Government

2    has long gone after legitimate businesses that allow people to

3    launder funds from illegal activity, especially drug

4    trafficking.  I laid it out in our response.  There were car

5    dealerships, there were real estate managers that were involved

6    in money laundering stings.  The fact that legitimate

7    businesses can be used to launder funds is -- is out there.

8              So whether or not you think bitcoin is legitimate or

9    not, these virtual currencies are legitimate or not is not at

10   issue.  Even if you think they are legitimate, even if they do

11   serve some purposes -- and, you know, obviously it's popular

12   nowadays -- it can be used to launder money, and that was a

13   concern of the United States Government going back to at least

14   2011 and probably earlier.

15             I laid out some of the public records in our response

16   that talked about some of the concerns that some of our elected

17   officials, senators, had, the concerns that the Department of

18   Treasury had.  There were hearings in Congress about virtual

19   currencies being used to lauder funds, and there were academic

20   articles written about this.  This wasn't some wild

21   speculation.  This was a problem.  And the government sought

22   ways to combat it.

23             And if you stick to the six-factor test set forth in

24   Black by the Ninth Circuit recently from the case that came out

25   of this district with the ATF, you look at those factors and

1    apply them to this case, the government wins.

2            Now, I know there was some questions about whether

3    Mr. Costanzo had engaged in business like this with someone who

4    wasn't a government agent, and we've disclosed reports to the

5    defense, we were ready to present testimony today -- and we can

6    still do that, if you want -- but we have evidence that

7    Mr. Costanzo was engaged in transactions with people that were

8    operating on the Darknet, and that he was involved in

9    converting drug money that they had into bitcoin.  We've

10   disclosed that information to the defense.  We have examples of

11   that.

12           So although the government wasn't aware of those

13   individuals at the time they started this investigation, we've

14   subsequently come to learn that it wasn't -- he wasn't just

15   doing this with government agents.  He was doing with this

16   everyone.

17           If you look at those six factors set forth in Black,

18   the first factor is known criminal characteristics.

19   Peer-to-peer virtual currency exchangers were known to launder

20   proceeds, were known to be involved in the laundering of drug

21   money specifically.  And the Gurolla case from 2003 I cited in

22   our response talks about targeting Mexican banks.  And while

23   the government didn't have individualized suspicion of

24   individual banks, they did have suspicion that Mexican banks

25   were laundering proceeds and they went after that group of

entities.

Here the IRS began an investigation of a group of people, peer-to-peer virtual currency exchangers. Like the Court said, he was the top-rated person. He was a large profile exchanger here in Arizona.

The IRS agent met with him for the first time in March of 2015. During that first meeting, nothing was mentioned about drugs. During that meeting, Mr. Costanzo expressed his dislike for the federal government, his dislike for local law enforcement. He talked about bitcoin and said it's untraceable. He said: I don't keep no records at all. This can lower your visibility. He said things to make the government believe that he was more than likely involved in money laundering.

So during the next meeting, they purported that the money was -- he was -- the undercover purported that the money he was bringing was drug proceeds. And instead of saying no, stop, I can't do the deal, Mr. Costanzo took the money, said shhh, don't say that out loud. He said: I can get -- later on in subsequent deals, he said: I can get you whatever you need. We just have to keep it on the low.

During the course of investigation, Mr. Costanzo suggested using Telegram, an encrypted messaging app. The evidence that we've reviewed showed that he has used that encrypted messaging app with other people. So that kind of

1    goes on to the nature of the government's participation.

2           I'll jump ahead to the fifth factor.

3           And the government never provided Mr. Costanzo with

4    anything other than purported drug proceeds.  They didn't give

5    him a virtual currency wallet, they didn't give him a TREZOR

6    device, they didn't give him money bands, a money counter, they

7    didn't drive him to the meeting.  They met him at a public

8    place, gave him cash.  He -- he made it happen.

9           Going back to factor number 3, that's the government's

10   role in creating this crime, yes, we introduced purported drug

11   proceeds, but that was based on the first meeting with him

12   where he seemed receptive to this, you know, illegal use of the

13   currency system.  As I mentioned, we've since learned that

14   Mr. Costanzo has engaged in this type of activity with other

15   people that were not government agents, and that he knew that

16   they were obtaining drugs from the Darknet.  Mr. Costanzo

17   himself asked for some of these drugs from the Darknet.

18          The fourth factor, the government's encouragement, the

19   defense claims that we encouraged or coerced Mr. Costanzo into

20   conducting these activities, but I think it's pretty clear in

21   the transcripts, pretty clear in the recordings, that he

22   engaged in this activity on his own.  He was never coerced.  He

23   talked at points about making half a million dollars in the

24   last year.  He said that he was semiretired.  There was no

25   evidence that he was low on money or that he was having a tough

1    time, at least not in the statements that he made to the

2    undercover agents.  He was going around, promoting this thing.

3    He didn't -- as far as we can tell, he didn't have any other

4    job at this time where he was recording income to the

5    Department of Economic Security.

6              And then the last factor, number 6, is the nature of

7    the crime being pursued and the necessity for the actions.

8              Money laundering is a -- is a secret activity.  I

9    think there's a reason that we have a money laundering sting

10   statute.  It's so that agents can go in and crack these

11   criminal organizations, these people that are laundering drug

12   proceeds or proceeds from other SUAs.

13             In this case, we're talking about people that are

14   using a virtual currency that a lot of people think is

15   untraceable.  Mr. Costanzo said it himself:  It's untraceable.

16   I keep no records.

17             So this isn't a case where the government could send

18   Grand Jury subpoenas to Mr. Costanzo's banks.  He doesn't have

19   any.  They had to go in.  They had to meet with him in order to

20   find out whether or not he was engaged in this criminal

21   activity.  This is someone who is using an encrypted app,

22   someone who isn't keeping financial documents.  Really, the

23   only way to get this information is by meeting with him,

24   sending an undercover agent in because there's nothing to

25   subpoena.  That's no other investigative technique.  And as I

1    pointed out in our response, the defense hasn't suggested any

2    other investigative technique that would have worked here that

3    could have identified the activity Mr. Costanzo was engaged in.

4         So I think if you look a those six factors, you apply

5    the most recent case law from this Circuit, it's very clear

6    that there was no outrageous government conduct.  There was

7    nothing even close to it.  This is a typical sting case.  It

8    involves some newer technology, but it's something that

9    government agents have been doing for decades.

10        So we ask that you deny the motion.

11        THE COURT:  Any final words, Ms. Weidner?

12        MS. WEIDNER:  Your Honor, if I could have just a

13   moment.

14                    (Pause in proceedings.)

15        MS. WEIDNER:  Your Honor, I have nothing further.

16        THE COURT:  All right.

17        For reasons I've already stated in part but will

18   repeat, docket 63, which is the defense motion to dismiss in

19   light of outrageous government conduct, is denied.  In this

20   case, Mr. Costanzo was known to be a substantial operator in

21   the bitcoin exchanges.  The government agents did identify that

22   the exchanges were being used to facilitate at least some

23   illegal activity in the Phoenix area, although they didn't

24   directly tie that to Mr. Costanzo prior to engaging in the

25   scene.

1          To the extent that they did identify the drugs as

2    being -- or the money as being drug proceeds, I don't think

3    that under the circumstances of this case, and under the

4    circumstances of investigation into the bitcoin exchanges, that

5    that is outrageous and violates fundamental fairness.

6          And so, having considered the six factors and having

7    considered the arguments submitted in the motions, the motion

8    is denied.

9          I do not think we now have any currently pending

10   motions.

11         Am I incorrect?

12         MR. BINFORD:  That's correct, Your Honor.

13         MS. WEIDNER:  Agreed, Your Honor.  That's correct.

14         THE COURT:  All right.  So we have a trial date set.

15         We -- do we have a date set for a final pretrial

16   conference?

17         COURTROOM DEPUTY:  Yes, Judge.

18         MR. BINFORD:  I think that was set by the Court, Your

19   Honor.

20         THE COURT:  All right.  So I suppose the only other

21   thing we might want to discuss -- I can't remember whether it

22   was -- I think it was the government in its reply on the motion

23   to restore the bitcoin to Mr. Costanzo indicated that they'd be

24   willing to liquidate the bitcoin, if the defense wanted to do

25   that, and hold it in trust determining whether or not you're

1    going to get some sort of restitution order or award?

2            MS. WEIDNER:  Your Honor, it would be -- the defense

3    would prefer for the bitcoin not to be liquidated at this

4    point.  Not to be sold.

5            MR. RESTAINO:  That probably makes it easier for us.

6    We wouldn't do anything without the Court's permission anyway.

7    I think unless we were to get a push from the other claimant to

8    a portion of that bitcoin, we likely would not proceed with the

9    somewhat cumbersome process of liquidation, unless the Court

10   wants us to go down that path.

11           THE COURT:  No, I don't -- it makes no difference to

12   me.

13           MR. RESTAINO:  We agree that these are important

14   policy considerations that Ms. Weidner raises on some of these

15   issues.  Just ultimately at this point leaving it where it is

16   is fine with us, as well, in that wallet.

17           THE COURT:  All right.  Then I will see you at the

18   final pretrial conference.

19               (Proceedings in recess at 10:05 a.m.)

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3              I, CHARLOTTE A. POWERS, do hereby certify that I am

4     duly appointed and qualified to act as Official Court Reporter

5     for the United States District Court for the District of

6     Arizona.

7              I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion of

9     the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control.

12             DATED at Phoenix, Arizona, this 5th day of January,

13    2018.

14

15                              s/Charlotte A. Powers

16                              Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**