# Exhibit A



Office of the Inspector General
U.S. Department of Justice

# Review of the Department's Oversight of Cash Seizure and Forfeiture Activities

# EXECUTIVE SUMMARY

## Introduction

The U.S. Department of Justice (DOJ, Department) has authority to seize property associated with violations of federal law and then assume title to that property through a process known as asset forfeiture. The Department views asset forfeiture as an important means of removing the proceeds of crime used to perpetuate and incentivize criminal activity and uses forfeited funds to both compensate victims of associated crimes and to fund certain Department and state and local law enforcement activities.[1] Over the past 10 years, forfeitures through the Department's Asset Forfeiture Program have grown to over $28 billion. The annual total value of forfeited assets has fluctuated during this time, in part because in certain years the Department has reached large financial settlements resulting in forfeiture.

While the Department views asset forfeiture as an important law enforcement tool, concerns have been raised about its use. Advocates of asset forfeiture reform, including Members of Congress and public interest groups, have expressed concerns that the ability to use forfeiture revenues to fund law enforcement activities may incentivize the Department and state and local law enforcement to use asset seizure and forfeiture beyond the purpose of deterring and punishing criminal conduct and in a manner that creates risks to civil liberties. This concern is heightened because Department law enforcement officers have the authority to seize and forfeit cash or property without independent judicial oversight and without charging the owner or possessor of the cash or property with a crime. Advocates of reform also have argued that the Department's historical, but now largely proscribed practice of "adopting" state seizures for federal forfeiture inappropriately allows state and local law enforcement to circumvent their own state laws so that they can obtain a greater share of forfeiture proceeds than they would receive otherwise.

## Previous Reviews Related to Asset Seizure

The Office of the Inspector General (OIG) has conducted numerous reviews, audits, and investigations pertaining to the Department's asset seizure and forfeiture activities. For example, in our report on the Drug Enforcement Administration's (DEA) *Use of Cold Consent Encounters at Mass Transportation Facilities,* we found that the DEA needed to better train its task forces and collect

---

[1] The Criminal Division's response to the formal draft of our report (attached as Appendix 4) suggests that the OIG does not fully appreciate the importance of asset seizure and forfeiture in addressing our nation's crime and illegal drug problems. To the contrary, we have long recognized that a well-run asset seizure program can be an important law enforcement tool, and this report takes no issue with the Department's view in this regard. Still, we believe the Criminal Division's comments indicate that it has missed a key point — that regardless of the importance of the law enforcement tool, it must be used appropriately, with effective oversight, and in a way that does not place undue risks on civil liberties.

i

and analyze more data to ensure that its law enforcement encounters and searches are conducted in an unbiased and effective manner.[2]  A separate OIG investigation found that a task force led by Florida's Village of Bal Harbour Police Department (BHPD) conducted investigative money laundering operations in which the task force laundered over $56 million.  Based on intelligence collected from the money laundering operations, other federal law enforcement agencies conducted additional investigative work which, according to the task force, resulted in the arrest of 84 individuals and the seizure of approximately $49 million.  The OIG found that the BHPD received over $6 million in revenue derived, in part, from equitable sharing payments related to these seizures.  However, according to a task force official, the task force did not file a single criminal indictment related to its money laundering investigative operations.  Such outcomes can raise questions about whether seizures are intended to serve legitimate law enforcement interests or to bolster law enforcement budgets.

The OIG initiated the current review to evaluate the Department's oversight of cash seizure and forfeiture activities.  We focus primarily on the activities of the DEA because it was responsible for 80 percent of the Department's cash seizures from fiscal years 2007 to 2016.  Of those DEA seizures that resulted in forfeiture, 81 percent were forfeited administratively.  These forfeitures totaled approximately $3.2 billion during this 10-year period.

## Results in Brief

The current review identified specific weaknesses in the Department's oversight of asset seizure and forfeiture activities.  We believe that effective oversight by the Department of these activities is essential to assure the public that these authorities are being used appropriately.

We found that the Department and its investigative components do not use aggregate data to evaluate fully and oversee their seizure operations, or to determine whether seizures benefit criminal investigations or the extent to which they may pose potential risks to civil liberties.  The Department and its components can determine how often seizure and forfeiture advance or relate to criminal investigations only through a manual, case-by-case review of component case management systems.  Although the Department can aggregate data that can be used to identify associated risk factors and the outcomes of seizure activity, such as instances in which a portion or all of a seizure was returned to the owner as the result of a successful challenge, the Department's investigative components do not actively use this type of aggregate data to evaluate and oversee seizure operations.  We do not doubt the financial and deterrent effect seizures can have on criminal organizations and that intelligence collected during seizure operations can assist investigations.  However, without evaluating data more systemically, it is impossible for the Department to determine (1) whether seizures benefit law enforcement efforts, such as advancing criminal

---

[2] DOJ OIG, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities,* Evaluation and Inspections Report 15-3 (January 2015).

investigations and deterring future criminal activity, or (2) the extent to which seizures may present potential risks to civil liberties.

In the absence of data and seizure-specific metrics that would have allowed the OIG to assess how seizures and forfeitures related to criminal investigations, we reviewed a judgmental sample of 100 DEA cash seizures. In addition to providing the opportunity to assess some seizures that are particularly susceptible to civil liberties concerns, this sample allowed us to better understand an important subset of the Department's seizure activity and also allowed us to identify additional potential risk factors that can help the Department better understand and oversee its seizure activity. We selected these 100 cash seizures based on the presence of characteristics that we believe made them particularly susceptible to civil liberties concerns. In that regard, we selected cash seizures that, according to Department data, appeared to have occurred without a court-issued warrant and without the presence of narcotics, the latter of which would provide strong evidence of related criminal behavior. Our analysis of these seizures and their related outcomes revealed three important areas for the Department's consideration.

First, we found that 85 of the 100 seizures occurred as a result of interdiction operations at transportation facilities, such as airports, parcel distribution centers, train stations, and bus terminals, or as a result of a highway interdiction or traffic stop. All but 6 of the 85 encounters or situations that led to interdiction seizures were initiated on the observations and immediate judgment of DEA agents and task force officers absent any preexisting intelligence of a *specific* drug crime (the remaining six were based on preexisting intelligence). This is particularly relevant in light of the findings in our 2015 report highlighting potential risks to civil liberties associated with cold consent encounters that occur during transportation interdiction operations.[3]

Second, the DEA could verify that only 44 of the 100 seizures, and only 29 of the 85 interdiction seizures, had (1) advanced or been related to ongoing investigations, (2) resulted in the initiation of new investigations, (3) led to arrests, or (4) led to prosecutions. When seizure and administrative forfeitures do not ultimately advance an investigation or prosecution, law enforcement creates the appearance, and risks the reality, that it is more interested in seizing and forfeiting cash than advancing an investigation or prosecution.

Third, our review revealed an area in which policy and training were inadequate for ensuring consistency in seizure operations. If seizure operations are not conducted consistently, this may foster a public perception that law enforcement officers are using their seizure authority in an arbitrary manner.

We also found that the Department's investigative components do not require their state and local task force officers to receive training on federal asset seizure and forfeiture laws and component seizure policies prior to conducting federal seizures. As a result, state and local task force officers, who wield the same

---

[3] DOJ OIG, *Cold Consent Encounters.*

authorities to make seizures as the Department's Special Agents, may not have received training on these topics beyond what is included in their respective law enforcement academy curriculum.

In January 2015, Attorney General Eric H. Holder, Jr., issued an order that eliminated most opportunities for state and local law enforcement to use adoptive seizure to avail themselves of federal forfeiture and related equitable sharing proceeds. Our analysis determined that the elimination of most adoptions contributed to a reduction in the annual number of DEA cash seizures by over half and the annual value of DEA cash seizures by more than a third. However, the Attorney General's Order and related guidance do not preclude the federal forfeiture of property seized through joint task forces or as a result of federal/state investigations. This may be of particular concern because, as demonstrated in this report, seizures derived from joint interdiction operations may not always advance a federal criminal investigation or lead to a prosecution.

Based on our analysis, we also determined that the limitation on adoptions resulting from the Attorney General's Order has financially affected state and local law enforcement, especially in at least two states where law enforcement frequently had used federal adoption in the past because laws in those two states placed limitations on state forfeiture. Prior to the issuance of the Attorney General's Order, law enforcement in these two states had received significant revenues from adoption. Department, DEA, and state and local law enforcement officials in these states told us that, consistent with congressional intent, they believe these funds do foster cooperation among all levels of law enforcement by enabling them to contribute personnel to federally led task forces and joint investigations. To the extent that these funds do in fact foster cooperation, we believe it is important for the Department to monitor the effects of the Attorney General's Order and take steps to ensure that it does not negatively impact law enforcement cooperation.

**Recommendations**

Federal seizures and forfeitures should advance federal criminal investigations, be consistent with civil liberties, and facilitate cooperation among law enforcement. In this report, we make four recommendations to help the Department develop policy and practices to appropriately direct and oversee its asset seizure and forfeiture activities to achieve these goals.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

    Background ........................................................................................... 1

    Scope and Methodology of the OIG Review ........................................... 15

RESULTS OF THE REVIEW ........................................................................... 16

    The Department Does Not Measure How Its Asset Seizure and Forfeiture
    Activities Advance Criminal Investigations............................................. 16

    The DEA Conducts Cash Seizures that May Not Advance or Relate to
    Criminal Investigations and May Pose Potential Risks to Civil Liberties ....... 20

    The Department Does Not Require Its State and Local Task Force Officers
    to Receive Training on Federal Asset Seizure and Forfeiture Laws Prior to
    Conducting Federal Seizures................................................................. 30

    The Attorney General's Order Eliminates Most Opportunites for State
    and Local Law Enforcement to Use Federal Forfeiture When Federal
    Involvement in a Seizure is Limited; However, Current Policy Does Not
    Address All Areas of Concern ................................................................ 32

    The Attorney General's Order Seeks to Prevent Law Enforcement from
    Using Adoption to Circumvent State Seizure Laws; It Also May Have
    the Potential to Affect Cooperation between Federal and State and
    Local Law Enforcement ........................................................................ 35

CONCLUSION AND RECOMMENDATIONS......................................................... 38

    Conclusion ......................................................................................... 38

    Recommendations ............................................................................... 40

APPENDIX 1:   EXPANDED METHODOLOGY ..................................................... 41

    Standards ........................................................................................... 41

    Data Analysis ...................................................................................... 41

    Site Visits ........................................................................................... 41

    Interviews........................................................................................... 42

    Document Review ................................................................................ 42

    Sample of DEA Seizure and Forfeiture Activities..................................... 43

APPENDIX 2:   ATTORNEY GENERAL'S ORDER PROHIBITING CERTAIN
FEDERAL ADOPTIONS ............................................................. 44

APPENDIX 3:   POLICY DIRECTIVE 15-2:  ADDITIONAL GUIDANCE .................... 46

APPENDIX 4:   THE CRIMINAL DIVISION'S RESPONSE TO THE DRAFT REPORT.... 49

APPENDIX 5:   OIG ANALYSIS OF THE CRIMINAL DIVISION'S RESPONSE ........... 59

    The Criminal Division's General Comments and the OIG's Reply................ 59

# INTRODUCTION

## Background

The U.S. Department of Justice (DOJ, Department) has authority to seize property associated with violations of federal law, and then assume title to that property through a process known as asset forfeiture.  The Department views asset forfeiture as an important means of dismantling criminal organizations and removing the proceeds of crime used to perpetuate criminal activity.[4]  The Department uses forfeiture proceeds to compensate victims of the associated crimes and to fund other DOJ asset seizure and forfeiture activities.[5]  Through the Equitable Sharing Program, the Department has distributed substantial forfeiture proceeds to state and local law enforcement partners to encourage and support their cooperation.  According to the Department, it has returned more than $4 billion in forfeited funds to crime victims since fiscal year (FY) 2000 and has provided over $6 billion to state and local law enforcement through equitable sharing during the same period.[6]

*Civil Liberties Concerns regarding Asset Seizure and Forfeiture Activities*

Members of Congress, public interest groups, and various commentators have raised concerns about the potential risks to civil liberties that are posed by certain aspects of the Department's law enforcement seizure and forfeiture activities.  Specifically, these groups have expressed concern that asset forfeiture authorities allow law enforcement officers to seize and forfeit cash or property without independent judicial oversight and without charging the owner or possessor of the cash or property with a crime.  Further, there are concerns that the Department's Equitable Sharing Program may improperly incentivize state and local

---

[4] The Criminal Division's response to the formal draft of our report (attached as Appendix 4) suggests that the OIG does not fully appreciate the importance of asset seizure and forfeiture in addressing our nation's crime and illegal drug problems.  To the contrary, and as detailed in our analysis of the Criminal Division's response (attached as Appendix 5), we have long recognized that a well-run asset seizure program can be an important law enforcement tool, and this report takes no issue with the Department's view in that regard.  Still, we believe that the Criminal Division's comments indicate that it has missed a key point — that regardless of the importance of the law enforcement tool, it must be used appropriately, with effective oversight, and in a way that does not place undue risks on civil liberties.

[5] The Department also uses forfeiture proceeds to support Joint Law Enforcement Operations, a program the Department uses to pay for officer overtime and equipment needs.

[6] For example, the Department will use forfeited assets associated with Bernard Madoff's crimes to compensate his victims.  The Department anticipates making additional payments of $4 billion in this matter, bringing the total amount of victim compensation to over $8 billion by the close of the Madoff compensation process.  The Department also deposits the proceeds of forfeiture in the Assets Forfeiture Fund, which is used to cover the costs associated with accomplishing the legal forfeiture of property and payments to law enforcement partners.

law enforcement seizures by providing access to a greater share of forfeiture proceeds than may be available under state law.[7]

The DOJ Office of the Inspector General (OIG) has conducted several reviews, audits, and investigations related to the Department's asset seizure and forfeiture activities.  Through this body of work, we have discussed:

- seizure-centric law enforcement operations that may be prone to racial profiling,

- instances in which a lack of data collection impeded the ability of law enforcement to ensure that such activities were conducted in an unbiased and effective manner,

- instances in which additional training was needed to ensure that law enforcement officers conduct seizure operations appropriately, and

- instances in which a task force appeared to be conducting seizures without pursuing criminal investigations.

In January 2015, the OIG issued a report on the Drug Enforcement Administration's (DEA) use of cold consent encounters at mass transportation facilities.  The OIG initiated that review after receiving complaints from two African-American women who claimed that they were inappropriately racially profiled during separate DEA-initiated cold consent encounters at an airport.[8]  Although neither complaint was substantiated, the Department has noted that consent encounters can be susceptible to racial profiling.  This is because cold consent encounters can occur in one of two ways:  (1) when an agent approaches an individual based on no particular behavior by the individual or (2) when an agent approaches an individual based on the officer's perception that the person is exhibiting characteristics indicative of a drug crime without any independent predicating information.

Because of the potential sensitivity of these types of encounters that often lead to searches and seizures, effective oversight by management is necessary to ensure that these encounters are conducted appropriately.  However, we found that the DEA had not collected sufficient data on cold consent encounters to assess whether they are conducted in an unbiased or effective manner.  Further, we found that the DEA

---

[7] For example, U.S. Senate Committee on the Judiciary, *The Need to Reform Asset Forfeiture,* 114th Cong., 1st sess., April 15, 2015.  The Institute for Justice, a public interest group, also expressed concerns about the use of seizures and administrative forfeiture that occur without court involvement, as well as equitable sharing, in its report *Policing for Profit:  The Abuse of Civil Asset Forfeiture,* 1st ed. (March 2010) and 2nd ed. (November 2015).  Many news organizations have published articles on these topics, including "Stop and Seize," *Washington Post,* September 6, 2014; "Efforts to Curb Asset Seizures by Law Enforcement Hit Headwinds," *Wall Street Journal,* June 4, 2015; "Government Shouldn't Seize Assets without Greater Proof of Crime," *Chicago Sun-Times,* April 20, 2016; and "DEA Regularly Mines Americans' Travel Records to Seize Millions in Cash," *USA Today,* August 11, 2016.

[8] DOJ OIG, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities,* Evaluation and Inspections Report 15-3 (January 2015).

had not ensured that training and operational requirements were clearly established and communicated to the interdiction task force members who conduct these encounters or that all group members had attended the DEA's interdiction training.[9]

In or around 2012, the OIG investigated concerns about the forfeiture activities of a money laundering task force led by Florida's Village of Bal Harbour Police Department (BHPD).  The investigation, initiated based on information received from the Department's Money Laundering and Asset Recovery Section (MLARS), found that the money laundering task force had conducted operations that were purportedly designed to build cases against members of drug cartels and criminal organizations that attempted to launder drug proceeds through undercover task force officers.  During the investigation, witnesses told the OIG that between 2008 and 2011 the task force had conducted 227 cash pickups in which it laundered over $56 million.  Based on intelligence collected from the cash pickups, other federal law enforcement agencies had conducted surveillance operations and investigations, which, according to the task force, resulted in the arrest of 84 individuals and the seizure of approximately $49 million.  Following the seizure, the task force submitted an equitable sharing claim against subsequent seizures.  Consequently, the OIG found that the BHPD received over $6 million in equitable sharing funds in FYs 2010 and 2011, a significant increase from the years prior to the formation of the task force.  The OIG did not determine the extent to which other federal investigations resulted in federal prosecutions, but we found that no BHPD-led task force cases were presented to or prosecuted by the Florida State Attorney's Office and that the BHPD did not maintain files or documentation related to the individuals arrested.[10]

*Methods of Seizure*

There are two primary methods by which federal law enforcement officers may legally seize assets:  (1) an officer may request a seizure warrant from a federal judge if, prior to a seizure, the officer can establish that there is probable cause that an asset is subject to forfeiture or (2) an officer may seize assets pursuant to a lawful arrest or search, or when another exception to the Fourth Amendment warrant requirement applies and there is probable cause to believe that the property is subject to forfeiture.[11]  An interdiction operation at a mass

---

[9]  The DEA told us that these types of encounters and searches are used primarily by DEA interdiction task force groups that interdict drug-related cash proceeds carried through transportation facilities by cash couriers.  Interdiction task force groups are teams of DEA Special Agents and deputized state and local law enforcement officers.

[10]  DOJ OIG, *Village of Bal Harbour Police Department, Bal Harbour, Florida,* Case No. 2012-005018 (September 2012).  The OIG investigation was initiated based upon information received from the DOJ's MLARS that the BHPD had failed to provide adequate documentation to ensure compliance with DOJ policy and to determine whether funds had been obligated in regard to impermissible expenditures.  The MLARS also requested that the OIG determine the nature of the BHPD-led task force.  Due in part to the OIG investigation, the Department removed the BHPD from the equitable sharing program and the BHPD returned over $1.2 million equitable sharing funds to the Department.

[11]  The FBI's Forfeiture Corporate Policy Directive and Policy Implementation Guide (2012) states that "some courts have defined probable cause 'as a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'"  See *United States* v.

(Cont'd)

transportation facility is one example of a law enforcement operation in which federal agents, working in conjunction with state and local task force officers, may initiate an encounter with an individual without a warrant or without prior knowledge of a specific drug crime.[12] During an encounter, the officer may either receive consent from an individual or determine that there is probable cause to search the individual and his or her personal effects without consent based on observations and/or questioning the individual. If, as a result of the questioning, search, or other investigatory action, the officer establishes probable cause that property has been used in the commission of a crime, the officer may seize the property. State and local law enforcement officers also perform highway interdictions, during which they obtain consent or establish probable cause to search vehicles after making traffic stops based on observed traffic infractions. Although DOJ agents do not typically perform highway interdiction operations, they sometimes provide investigative support to such operations when state and local officers identify criminal activity that justifies federal involvement.

Federal law enforcement officers may make probable cause seizures as a result of a federal investigation or through federal involvement in a joint investigation. Joint investigations are investigations in which federal law enforcement officers work with state and local law enforcement agencies, other federal agencies, or foreign countries to enforce federal laws. Seizures may originate from a joint federal, state, or local task force investigation or from state or local investigations that become state or federal cases.

According to Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); DEA; and Federal Bureau of Investigation (FBI) asset forfeiture policies, following a seizure, the federal agent or task force officer who made the seizure must complete an investigative report explaining the circumstances and probable cause that led to the seizure.[13] These policies explain that the agent's supervisor or an agency legal advisor must then review and approve the report to ensure that there was sufficient probable cause to warrant federal forfeiture.[14] Investigative agencies also use the investigative report for reference purposes to record the names of all persons from whom cash was seized or who they believe to be related to the crime underlying the seizure. For example, DEA personnel enter the names identified in an investigative report into the DEA's Narcotic and Dangerous Drug Information System (NADDIS) so

---

*$64,000 in U.S. Currency,* 722 F.2d 239, 244 (5th Cir. 1984) (quoting *United States* v. *One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir. 1980)).

[12] DOJ OIG, *Cold Consent Encounters.*

[13] ATF, Review of Probable Cause Statements Standard Operating Procedures (2014); DEA Agents Manual (2015); and FBI, Forfeiture Corporate Policy Directive and Policy Implementation Guide (2012).

[14] When determining whether to make a seizure, DOJ law enforcement officers and task force officers must also consider DOJ policies. For example, DOJ policies provide that, unless there is an overriding law enforcement interest, the minimum amount of a cash seizure must be at least $5,000 unless the person from whom the cash was seized either was or is being prosecuted by state or federal authorities for criminal activities related to the property. In the latter case, the policy provides that the amount should be at least $1,000.

that other DEA agents and law enforcement officers can use this information to identify links between past, present, and potential future investigations.

*Federal Adoptive Seizure*

Federal law permits law enforcement components to "adopt" seizures made under state law, as long as the conduct giving rise to the seizure is also a violation of a federal law that provided for forfeiture.[15]  On January 16, 2015, Attorney General Eric H. Holder, Jr., issued an Order entitled Prohibition on Certain Federal Adoptions of Seizures by State and Local Law Enforcement Agencies (the Attorney General's Order).[16]  This Order ended most federal adoptions of assets such as vehicles, valuables, and cash seized by state or local law enforcement under state law.  The Attorney General's Order stipulated that only property that directly relates to public safety (firearms, ammunition, explosives, and property associated with child pornography) remained eligible for federal adoption, though the Order provided that it did not apply to property seized through joint task forces or as a result of federal/state investigations or activities coordinated with federal authorities as part of ongoing federal investigations.[17]  Shortly after the Attorney General's Order, on February 10, 2015, the Department issued Policy Directive 15-2, which required that an Assistant United States Attorney (AUSA) determine whether there is sufficient federal involvement for a seizure made by state and local law enforcement to be eligible for federal forfeiture under the provision of the Attorney General's Order that allows seizures resulting from joint task forces and investigations.[18]

According to the Department, in the 1980s, when adoption policies initially were implemented, few states had forfeiture statutes similar to the federal asset forfeiture laws.  Consequently, when state and local law enforcement agencies seized criminal proceeds and property used to commit crimes, they often lacked the legal authority to forfeit the seized items.  Adoption allowed state and local law enforcement to turn over seized assets to the federal government instead of returning those assets to criminals.  In a press release accompanying the Attorney General's Order in 2015, the Department explained that it regularly reviews its asset forfeiture policies and had determined that most federal adoptions were less necessary because all states now have civil or criminal forfeiture laws.

---

[15] 18 U.S.C. 981(b)(2)(C).  If a DOJ component declines to adopt a seizure made by a state or local law enforcement agency, a U.S. Attorney may request permission, from the Department's MLARS, to directly adopt the seizure for federal forfeiture.  If the MLARS approves the request, the U.S. Marshals Service (USMS) will take custody of the asset in support of a related judicial forfeiture action.

[16] U.S. Attorney General Order, Prohibition on Certain Federal Adoptions of Seizures by State and Local Law Enforcement Agencies, January 16, 2015 (see Appendix 2).

[17] According to the Attorney General's Order, seizures of property that do not fall within the public safety provision can still be adopted with the approval of the Assistant Attorney General for the Criminal Division.

[18] DOJ Policy Directive 15-2, Additional Guidance on the Attorney General's January 16, 2015, Order on Adoptions, February 10, 2015 (see Appendix 3).

Department officials from the Office of the Deputy Attorney General and the MLARS explained to us that the Attorney General's Order was designed, in part, to limit federal involvement in state and local seizures that previously had resulted in federal forfeiture. The officials explained that the Department had very little oversight of seizures made independently by state and local law enforcement and that many of these seizures may not have justified federal forfeiture because they did not help to advance federal investigations. They added that in some instances state and local law enforcement agencies had used adoption to obtain a greater percentage of forfeiture revenue through federal equitable sharing (discussed below) than was available through state forfeiture laws.

Before the Attorney General's Order, from FY 2007 through FY 2014, ATF, the DEA, and the FBI adopted approximately 32,000 seizures, according to an OIG analysis of data from the Department's Consolidated Asset Tracking System (CATS). As shown in Figure 1, the prohibition on adoptive seizure most significantly affects the DEA because, from FY 2007 through FY 2014, the DEA accounted for 88 percent of the total number of ATF, DEA, and FBI adoptive seizures, amounting to $742 million of the $880 million total.[19]

**Figure 1**

**ATF, DEA, and FBI Adoptive Seizures, FY 2007 – FY 2014**



Source: CATS

*Types of Forfeiture*

Title to seized assets may be transferred to the federal government through three types of forfeiture: (1) criminal, (2) civil, or (3) administrative. Criminal

---

[19] The adoptive seizures that we detail above and throughout this report do not include firearms and ammunition. This is because the Attorney General's Order does not apply to the adoption of these asset types.

forfeiture occurs after an individual has been found guilty of an underlying criminal offense. Civil and administrative forfeiture do not require the owner to be arrested or convicted of a crime, but they do require that the government demonstrate, by a preponderance of the evidence, that the seized property was connected to a crime. Assets may be forfeited through either civil or criminal proceedings only if a court or jury determines that the seized asset constituted proceeds or instrumentalities of a crime. By contrast, administrative forfeiture requires only an agency finding, as opposed to a court finding, that the seized asset constituted proceeds or instrumentalities of a crime. All administrative forfeiture proceedings may, however, be terminated in favor of a civil forfeiture proceeding involving a court determination, if requested by the property owner.

The Department's Asset Forfeiture Policy Manual and the U.S. Attorneys' Manual provide that administrative forfeiture must be used in all but specified situations.[20] Assets such as cash, vehicles, and other personal property valued at $500,000 or less may be administratively forfeited.[21] According to the MLARS, administrative forfeiture may be the only avenue available for forfeiture when a criminal case is not possible, such as in instances when property is in the possession of a third party or is linked to an unavailable criminal defendant, such as a fugitive or a deceased person. Further, the MLARS asserts that many administratively forfeited assets are seized pursuant to court-issued seizure warrants or are linked to ongoing criminal investigations.[22]

According to an OIG analysis of data from CATS, between FY 2007 and FY 2016, ATF, the DEA, and the FBI forfeited 77 percent of the number and 23 percent of the value of all assets through the administrative process. The large disparity between the proportional number of administratively forfeited assets compared to the proportional value of administratively forfeited assets is due to a small number of large financial settlements resulting in civil forfeiture. For example, in FY 2012, ATF, the DEA, and the FBI administratively forfeited approximately 27,500 assets, with a total value of $551 million. In the same year, the Department civilly forfeited one asset worth $7.2 billion related to the crimes of Bernard Madoff.

*Equitable Sharing of Forfeiture Revenues*

In 1984, to encourage cooperation among all levels of law enforcement, Congress authorized the Attorney General to transfer federally forfeited property to state and local law enforcement agencies and required that the value of a transfer bear "a reasonable relationship to the degree of direct participation of the state or

---

[20] DOJ MLARS, Asset Forfeiture Policy Manual (2016), Ch. 2, and DOJ Offices of the U.S. Attorneys, U.S. Attorneys' Manual (2016), Ch. 9.

[21] Real property and personal property valued over $500,000 must be civilly or criminally forfeited.

[22] As we detail in the Results of the Review, the MLARS acknowledges that the Department lacks an automated way to link forfeited assets to particular criminal investigations and prosecutions, which makes it difficult to demonstrate these connections in larger data sets.

local agency in the law enforcement effort resulting in the forfeiture."[23]  The Department facilitates these transfers through its Equitable Sharing Program, which allows participating state and local law enforcement agencies to receive up to 80 percent of the proceeds of joint investigative or adoptive forfeitures.[24]

Although equitable sharing revenues can enhance law enforcement collaboration and provide state and local law enforcement additional resources to fight crime, advocates of forfeiture reform assert that equitable sharing may incentivize seizure and forfeiture because it allows state and local law enforcement to keep a substantial portion of the forfeiture revenues.  As noted at the outset of this report, between FYs 2000 and 2016, the Department's Equitable Sharing Program distributed over $6 billion to state and local law enforcement agencies.

On December 21, 2015, in response to a combined $1.2 billion rescission to the Assets Forfeiture Fund, the Department temporarily deferred all equitable sharing payments to its state, local, and tribal partners.[25]  The Department subsequently announced that it would resume making payments under the program as of March 28, 2016.

*Law Enforcement Purposes and Civil Liberties Concerns Related to Asset Seizure and Forfeiture*

There are valid law enforcement purposes for asset seizure and forfeiture; however, if misused, they can undermine civil liberties and public confidence in law enforcement.  During congressional hearings on civil asset forfeiture reform in 1997, the Assistant Chief of the Department's Asset Forfeiture and Money Laundering Section (subsequently renamed the Money Laundering and Asset Recovery Section) at the time stated:

> No matter how effective asset forfeiture may be as a law enforcement tool — and this is a very effective law enforcement tool — that no program, no tool of law enforcement, however effective at fighting crime, can survive long if the public thinks that it violates the basic

---

[23]  21 U.S.C. § 881(e)3 (1984).

[24]  The MLARS is responsible for managing the Equitable Sharing Program and overseeing equitable sharing participants; however, the MLARS is responsible for determining distributions only in cases in which the forfeited assets total $1 million or more.  If assets are administratively forfeited and the total appraised value of all items forfeited is less than $1 million, the head of an investigative agency, or designated agency headquarters official, decides the appropriate equitable sharing amount to be distributed.  U.S. Attorney's Offices decide equitable sharing amounts in judicial cases in which seized assets total less than $1 million.  The USMS is responsible for distributing equitable sharing payments.

[25]  The *Bipartisan Budget Act of 2015* included a $746 million permanent reduction of Asset Forfeiture Program Funds.  This reduction, or "rescission," means that $746 million was transferred from the Asset Forfeiture Program Funds to the General Treasury Fund.  The *Consolidated Appropriations Act of 2016* included an additional $458 million reduction in the FY 2016 Asset Forfeiture Program Funds.

principles of fairness and due process that lie at the core of the American system of justice.[26]

Table 1 summarizes the Department's stated law enforcement purposes and the commonly expressed concerns about federal seizure authorities and different elements of the Department's asset seizure and forfeiture activities.

**Table 1**

**Law Enforcement Purposes and Civil Liberty Concerns regarding the Department's Asset Seizure and Forfeiture Activities**

| | Law Enforcement Purposes | Civil Liberties Concerns |
|---|---|---|
| **Non Warranted Seizure** | Allows agents to quickly seize suspected criminal proceeds on site without having to seek a warrant | Seizure can occur without judicial review or prior knowledge of a specific crime. |
| | | Seizure can occur without an arrest or prosecution of the owner. |
| **Administrative Forfeiture** | Increases the speed and efficiency of uncontested forfeiture actions * | Forfeiture can occur without an arrest or prosecution of the owner. |
| | | Forfeiture can occur without independent judicial oversight. |
| **Equitable Sharing** | Enhances cooperation between state and local law enforcement and federal law enforcement | May incentivize seizure and forfeiture because it allows state and local law enforcement to keep some of the forfeiture revenues |
| | Provides state and local law enforcement additional resources to fight crime and cover expenses associated with participation in federal task forces and joint investigations | |
| **Adoption** | Provides federal forfeiture authority in cases where state law does not support forfeiture | Incentivizes state and local law enforcement to pursue forfeitures that are not supported by state law due to the availability of federal equitable sharing revenues |
| | Strengthens collaboration with federal law enforcement because it offers additional opportunities to (1) share information regarding state and local seizure activity and (2) access additional resources to cover expenses associated with participation in federal task forces and joint investigations | Department investigative agencies have limited oversight into the law enforcement activity surrounding an adoptive seizure. |

* DOJ MLARS, Asset Forfeiture Policy Manual (2014)

Source: OIG analysis

---

[26] Stephan D. Casella, Assistant Chief, Asset Forfeiture and Money Laundering Section, before the Committee on the Judiciary, U.S. House of Representatives, concerning the "Civil Forfeiture Reform Act" (June 11, 1997).

*The Department's Seizure Activities*

We analyzed data in CATS, the Department's system for tracking asset seizures, to assess the seizure activity of ATF, the DEA, and the FBI because these are the Department's investigative components with the asset seizure authorities most relevant to our review.[27]  As explained below, we focused our analysis on the DEA because it accounts for the great majority of cash seizures.  Table 2 describes the investigative responsibilities of these agencies that can give rise to seizure.

**Table 2**

**DOJ Investigative Component Responsibilities that May Give Rise to Seizure**

| Component | Responsibilities |
|---|---|
| ATF | ATF enforces federal laws and regulations relating to alcohol, tobacco, firearms, explosives, and arson.  ATF has the authority to seize and forfeit firearms, ammunition, explosives, alcohol, tobacco, currency, conveyances, and certain real property involved in criminal activity. |
| DEA | The DEA enforces federal drug laws and implements major investigative strategies against drug networks and cartels.  The DEA has the authority to seize a wide range of money and property used or acquired in connection with federal drug crimes. |
| FBI | The FBI enforces a broad range of criminal violations, integrating the use of asset forfeiture into its overall strategy to eliminate targeted criminal enterprises.  Seizures conducted by the FBI are, for example, the result of white collar crime, organized crime, drug crime, violent crime, and terrorism investigations.  The FBI has the authority to seize a wide range of property used or acquired through illegal activity. |

Source:  DOJ Asset Forfeiture Program

ATF, the DEA, and the FBI seize many different types of assets, including cash, jewelry, vehicles, real property, financial instruments, firearms, and ammunition.  CATS data indicates that these three components were involved in approximately 425,000 asset seizures between FY 2007 and FY 2016, of which 52 percent were seizures of firearms and ammunition involved in criminal activity.[28]  Despite the large volume of firearms and ammunition seizures, most of which are seized by ATF, this report does not focus on these types of seizures.  The Department does not sell forfeited firearms and ammunition and, as a result, these

---

[27] The USMS is the Department's primary custodian of seized property.  The USMS manages and disposes of all valued assets that are not considered evidence, contraband, or targeted for use by individual law enforcement agencies.  Although an investigative component, the USMS has limited seizure authority and seizes assets primarily when a U.S. Attorney's Office brings a forfeiture action.  This occurs in a relatively small number of cases relative to the seizures conducted by the DEA and other law enforcement components.

[28] Multiple assets may be seized during a law enforcement operation or encounter.  In certain instances, multiple pieces of property may be seized from one or more individuals.  Each piece of property is generally given its own CATS Asset ID number.  For the purposes of this report, we calculated the unique number of CATS Asset ID numbers provided to us and defined these unique occurrences as "seizures."

types of assets do not result in deposits to the Assets Forfeiture Fund.[29] Instead, we focused our attention on the seizure of cash because, of the remaining categories of seized assets, cash is the asset most frequently seized and is of particular concern in the public debate about asset seizure and forfeiture. Figures 2 and 3 show the cash seizure activities of ATF, the DEA, and the FBI, and indicate that the DEA accounts for a substantial majority of the Department's cash seizures, both in terms of overall number of seizures and their value.

**Figure 2**

**Number of ATF, DEA, and FBI Cash Seizures
FY 2007 – FY 2016**



Notes: These numbers represent the aggregate adoptive and non-adoptive cash seizure activities of ATF, the DEA, and the FBI and therefore include all cash seizures that may have resulted in criminal, civil, and administrative forfeiture.

These numbers reflect the total number of assets that are coded as the asset type "Cash/Currency" in CATS. The Department acknowledges that errors in coding occur and that as a result these numbers may be over- or understated.

Source: CATS

---

[29] Forfeited firearms and ammunition are generally destroyed; however, a small number of forfeited firearms are transferred to the Department for official use.

**Figure 3**

**Approximate Value of ATF, DEA, and FBI Cash Seizures
FY 2007 – FY 2016**



Note: These numbers represent the aggregate value of adoptive and non-adoptive cash seizure activities of ATF, the DEA, and the FBI and therefore include the value of all cash seizures that may have resulted in criminal, civil, and administrative forfeiture.

These numbers reflect the total value of assets that are coded as "Cash/Currency" in CATS. The Department acknowledges that errors in coding occur and that as a result these numbers may be over- or understated.

Source: CATS

In Table 3 below, we further break down DEA cash seizures by asset value category demonstrating that, although the amount of cash the DEA most frequently seizes is less than $100,000, the overall value of the DEA's cash seizures is largely driven by seizures of greater than $100,000. According to the MLARS, this distinction is important because the ongoing public debate about asset seizure and forfeiture has focused particularly on low-value cash seizures, and the MLARS asserts that seizures in excess of $100,000 generally do not trigger the same type of civil liberties concerns as lower value seizures because it is unlikely that an individual suspected of a drug crime would have a legitimate claim to suspected drug proceeds in excess of $100,000.

**Table 3**

**Number, Value, and Percentages of DEA Cash Seizures
FY 2007 – FY 2016**

| Asset Value Category | Number of Assets | % of Number | Cumulative Value of Assets | % of Cumulative Value |
|---|---|---|---|---|
| Less than $100,000 | 71,478 | 89% | $1.24 | 30% |
| $100,000 and over | 8,663 | 11% | $2.91 | 70% |
| **Total** | **80,141** | **100%** | **$4.15** | **100%** |

Notes:  We express Cumulative Value of Assets in billions of dollars.  These figures
represent the aggregate cash seizure activities of the DEA and therefore include all cash
seizures which may have resulted in criminal, civil, and administrative forfeiture.

Source:  CATS

According to CATS, approximately 65,000, or 81 percent, of all DEA cash
seizures have been forfeited administratively at a value of over $3.2 billion.  While
DEA and Department law enforcement officers have the authority to seize and
administratively forfeit cash without independent judicial oversight and without
charging the owner or possessor of the cash or property with a crime, as we
detailed above, the MLARS asserts that many administratively forfeited assets are
seized pursuant to court-issued seizure warrants or linked to ongoing criminal
investigations.

*Post-Seizure Claim and Petition Process and the Disposition of the DEA's Cash
Seizures*

The post-seizure claim and petition process begins when an investigative
agency, such as the DEA, seizes property and seeks to forfeit the property
administratively.  Within 60 days after the date of seizure, the agency must provide
notice to possible claimants of the government's intent to forfeit the property.  If an
individual contests the forfeiture by filing a claim against the property,
administrative forfeiture proceedings are terminated, and the government has
90 days to proceed with a civil or criminal forfeiture action or return the property
and initiate a forfeiture action a later date.  If no individual files a timely, valid
claim, the seizing agency's counsel evaluates the probable cause for seizure and
forfeiture, as documented in investigative files and other relevant materials, and
either enters a declaration of forfeiture, transferring title and ownership of the
property to the federal government, or declines forfeiture and returns the asset.

Alternatively, any interested parties, such as innocent owners of the asset,
lienholders, victims of the crimes underlying the forfeiture, or any other interested
parties can petition the seizing agency to return the administratively forfeited asset.
Upon receipt of the petition, the seizing agency evaluates the petitioner's interest in

the asset and then rules on the merits of the petition; this may result in the return of a portion or the entire value of the forfeited asset.[30]

Given the volume of DEA cash seizures, we analyzed how much of the DEA's seized cash was forfeited and deposited into the Department's Assets Forfeiture Fund versus being returned to the individual from whom the asset was seized or to another party such as an owner, lienholder, or crime victim. Of the DEA's 80,141 cash seizures that occurred between FYs 2007 and 2016, a claim or a petition was filed for 15,867 (20 percent). Of these 15,867 seizures with a related claim or petition, 6,232 (39 percent) resulted in a full or partial return. The DEA also returned part or all of an additional 492 cash seizures for which it had not received a claim or a petition.

Overall, the DEA returned all or part of 6,724 cash seizures, or 8 percent of the seizures it made, between FYs 2007 and 2016. In terms of value, we also found that the DEA returned approximately $153 million of its cash seizures, while approximately $3.8 billion was forfeited and deposited into the Department's Assets Forfeiture Fund. Because, as was mentioned above, the MLARS asserts that cash seizures of less than $100,000 may raise more civil liberties concerns than those above $100,000, we distinguish between the disposition for cash seizures less than and greater than $100,000 in Tables 4 and 5.

**Table 4**

**Number and Percentage of DEA Cash Seizures by Disposition Type
FY 2007 – FY 2016**

| Disposition Type | Number of Dispositions of Seizures Less than $100,000 | | Number of Dispositions of Seizures Greater than $100,000 | |
|---|---|---|---|---|
| | Number | % | Number | % |
| Full Deposit to Assets Forfeiture Fund | 63,454 | 79% | 7,694 | 10% |
| Full Return to Owner, Lienholder, or Victim | 3,170 | 4% | 155 | <1% |
| Partial Return * | 2,997 | 4% | 402 | 1% |
| Not Adjudicated at Time of Data Request ** | 1,680 | 2% | 395 | <1% |
| Other *** | 177 | <1% | 17 | <1% |
| **Total** | **71,478** | **89%** | **8,663** | **11%** |

* The Department may forfeit a portion of seized property and return the remainder to an owner, lienholder, or victim.

** At the time of our data request, not all seized assets were adjudicated through the forfeiture process.

*** A small percentage of seized assets were disposed of by other means (e.g., adoptive seizures returned to state authorities for potential state seizure).

Source: CATS

---

[30] The MLARS rules on petitions for cases in which a civil or criminal forfeiture has occurred.

**Table 5**

**Value and Percentage of DEA Cash Seizures by Disposition Type
FY 2007 – FY 2016**

| Disposition Type | Value of Dispositions of Seizures Less than $100,000 | | Value of Dispositions of Seizures Greater than $100,000 | |
|---|---|---|---|---|
| | Approx. Value | % | Approx. Value | % |
| Deposited to Assets Forfeiture Fund | $1,122,100,000 | 28% | $2,668,800,000 | 68% |
| Returned to Owner, Lienholder, or Victim | $74,200,000 | 2% | $78,900,000 | 2% |
| Other Disposal Type * | $3,400,000 | < 1% | $6,200,000 | <1% |
| **Total** | **$1,199,700,000** | **30%** | **$2,753,900,000** | **70%** |

Note:  There are more than 2,000 assets not yet adjudicated as of February 2017.  Therefore, disposal value is not yet available for the full population of assets seized between FYs 2007 and 2016.

*A small percentage of seized assets were disposed of by different means (e.g., adoptive seizures returned to state authorities for potential state seizure).

Source:  CATS

## Scope and Methodology of the OIG Review

We analyzed the asset seizure and forfeiture policies, practices, and performance management capabilities of the Department as a whole.  We also analyzed data from CATS to examine asset seizure and forfeiture activities of ATF, the DEA, and the FBI between FY 2007 and FY 2016.  However, this review focused specifically on the DEA's use of cash seizure.  Among the Department's investigative components, the DEA is responsible for the majority of cash seizures, the vast majority of which are in turn forfeited administratively.

In the absence of sufficient data to permit a thorough analysis, we reviewed a judgmental sample of 100 DEA cash seizures that were administratively forfeited under certain conditions that we believe, without effective oversight, may pose potential risks to civil liberties.  In addition to providing the opportunity to assess some seizures that are particularly susceptible to civil liberties concerns, this sample allowed us to better understand an important subset of the Department's seizure activity and also allowed us to identify additional potential risk factors that can help the Department better understand and oversee its seizure activity. Because the Attorney General's Order prohibiting certain federal adoptions was issued in January 2015, during the course of our review, we also examined how the Order and related policy guidance affected the Department's asset seizure and forfeiture activities and its relationship with state and local law enforcement.

Finally, we interviewed Department and law enforcement component officials responsible for asset seizure and forfeiture activities and we spoke with officials from the Office of the Deputy Attorney General, ATF, DEA, FBI, and AUSAs.  We also spoke with state and local law enforcement leadership, as well as state and local law enforcement officers serving on federal task forces.  A detailed description of the methodology of our review is in Appendix 1.

# RESULTS OF THE REVIEW

## The Department Does Not Measure How Its Asset Seizure and Forfeiture Activities Advance Criminal Investigations

The Department asserts that asset forfeiture is an effective law enforcement tool that dismantles criminal organizations by removing the proceeds of crime used to perpetuate criminal activity, and the Department's investigative components all state that forfeiture should be used in a manner that advances criminal investigations.  However, we found that although Department investigative components have the authority to and do forfeit cash from individuals without charging these individuals with a crime, they do not collect data to measure, among other factors, how often seizures and forfeitures advance or relate to criminal investigations.  Without fully evaluating the relationship between seizures and law enforcement efforts, the Department cannot effectively assess whether asset forfeiture is being appropriately used and it risks creating the impression that its law enforcement officers prioritize generating forfeiture revenue over dismantling criminal organizations.

We found that the Department and its investigative components could determine how often seizure and forfeiture advance or relate to criminal investigations only by performing a manual, case-by-case review of component case management systems.  Further, we found that the Department can aggregate data that can be used to identify associated risk factors and the outcomes of seizure activity, such as instances in which a portion or all of a seizure was returned to the owner as the result of a successful challenge; but the Department's investigative components do not actively use this type of aggregate data to evaluate and oversee seizure operations.  Without evaluating this data, the Department cannot determine (1) whether certain types of seizures, such as those effected without a warrant that result in administrative forfeiture, benefit law enforcement efforts or (2) the extent to which seizures may present potential risks to civil liberties.

The OIG's 2015 review of the Drug Enforcement Administration's (DEA) *Use of Cold Consent Encounters at Mass Transportation Facilities* found that the DEA did not use data sufficiently to assess whether cold consent encounters were conducted in an unbiased or effective manner.[31]  This was a concern because seizures resulting from these encounters can be random or triggered by an individual's behavior rather than foreknowledge of the individual's involvement in criminal activity; thus, such seizures can present risks to civil liberties.

In comments on a draft of this report, the Department's Money Laundering and Asset Recovery Section (MLARS) asserted that administrative forfeiture may be the only avenue available for forfeiture when a criminal case is not possible and that many administratively forfeited assets are seized pursuant to court-issued seizure warrants or linked to ongoing criminal investigations.  The MLARS also

---

[31] DOJ OIG, *Cold Consent Encounters,* ii.

acknowledges that the Department lacks an automated way to link forfeited assets to particular criminal investigations and prosecutions. We recognize that there are challenges to fully measuring the relationship between asset seizure and criminal investigations and prosecutions. However, without making efforts to obtain the best such measurements, particularly for those seizures and forfeitures that occur without judicial involvement, the Department cannot effectively oversee its asset seizure and forfeiture activities to ensure these activities sufficiently benefit law enforcement's efforts to dismantle criminal organizations and do not present significant risks to civil liberties.

*Department Case Management and Asset Tracking Systems Do Not Collect Data Sufficient to Measure How Asset Seizure and Forfeiture Advances Criminal Investigations*

The Department does not fully collect and analyze data on seizure and forfeiture activities sufficient to enable it to determine (1) whether seizures benefit law enforcement efforts or (2) the extent to which seizures present potential risks to civil liberties. Specifically, we learned that the Department-wide Consolidated Asset Tracking System (CATS) does not collect data sufficient to measure whether asset seizure and forfeiture advance criminal investigations and the individual investigative component case management systems do not aggregate data that would allow the components, the Department, or the OIG to measure this relationship. We also found that although CATS tracks and can aggregate those seizures that include a claim, petition, or return, Department's components do not actively use this aggregate information to identify issues or determine whether seizures are being conducted appropriately.

An official at the Department's Asset Forfeiture Management Section (AFMS) explained that CATS cannot be used to measure the performance of law enforcement operations. Instead, CATS maintains programmatic and financial data that is used to track seized and forfeited assets through the asset forfeiture lifecycle. CATS is also used to fulfill the data-reporting mandates of the *Civil Asset Forfeiture Reform Act of 2000* (CAFRA).[32] CAFRA requires the Department to provide annual reports detailing its seizure and forfeiture activities, including the type of assets seized and the financial results of forfeiture. CAFRA reports contain the following:

- total deposits to the Assets Forfeiture Fund by state of deposit;

- total expenses paid from the Assets Forfeiture Fund, by category of expense and recipient agency, including equitable sharing payments;

- number, value, and types of properties placed into official use by federal agencies, by recipient agency;

---

[32] *Civil Asset Forfeiture Reform Act of 2000,* 106th Cong., 2d Sess., H.R. 1658.

- number, value, and types of properties transferred to state and local law enforcement agencies, by recipient agency;

- number, value, and types of forfeited property disposed of during the year, by type of disposition;

- year-end inventory of property under seizure, but not yet forfeited, which reflects the type of property, its estimated value, and the estimated value of outstanding liens and mortgages;

- list of each property in the year-end inventory, not yet forfeited, with an outstanding equity of not less than $1,000,000; and

- audited financial statements for each fiscal year for the Assets Forfeiture Fund.[33]

The same AFMS official also told us that although the CAFRA reports are the main source of publicly available data about asset forfeiture, he does not believe that the reports allow the public to fully understand the Department's seizure and forfeiture activities. Publicly available reports provide only a cumulative and broad explanation of the Department's seizure and forfeiture activities. They focus on the financial benefit to federal, state, and local government, rather than providing information as to whether seizure and forfeiture advance investigative efforts, and they do not include information on returned assets that might be useful in determining whether there are issues in the Department's seizure efforts. This official explained that the only current way to fully evaluate how seizure and forfeiture contribute to advancing criminal investigations is to review narrative reports from individual investigative case files in components' case management systems. Moreover, the MLARS acknowledges that the Department lacks an automated way to link forfeited assets to particular criminal investigations and prosecutions, which makes it difficult to demonstrate these connections in larger data sets.

During our document review and discussions with frontline supervisors and legal counsel from the investigative components, we learned that these officials review individual investigative case files and seizure documentation to ensure that seizures justify federal forfeiture according to the criteria discussed below, and that they also receive claims before forwarding the claim to a U.S. Attorney's Office and evaluate petitions to determine instances in which it may be appropriate to return forfeited property. However, they do not have metrics to evaluate whether seizures and forfeitures advance criminal investigations and they generally do not use aggregate seizure data, such as the number and value of seizures and the proportion of those seizures that include a claim, petition, or return, to help measure performance of seizure-related enforcement activities or identify systemic

---

[33] In accordance with CAFRA, the OIG supervises an annual audit, performed by KPMG LLP, of the Department's Assets Forfeiture Fund and Seized Asset Deposit Fund. The audit details the financial position of the Assets Forfeiture Fund, its net costs, changes in net position, and budgetary resources for the period of review. The audit also issues reports on internal controls over financial reporting, compliance, and other matters.

issues.[34]  For example, we found that the DEA returned only 4 percent of the value of seizures made between FY 2007 and FY 2016.  Although CATS contains raw data regarding claims, petitions, and returns, without an evaluation of aggregate data that would indicate, for example, whether these actions are more likely to occur in one jurisdiction versus another or whether the frequency of these actions indicates potential problems in certain seizure operations, the Department cannot fully assess its seizure activities.

We recognize that cases can develop over a long period of time and that it may take years to determine whether a seizure advanced a larger investigation or resulted in a prosecution.  This may be especially true for the DEA because it will commonly seize assets and use administrative forfeiture at the outset or during the course of an investigation, prior to the initiation of formal charges.  DEA officials explained that, as a result, it is difficult to measure the relationship between seizure and forfeiture and other law enforcement outcomes without reviewing all of the related case information.[35]  For example, DEA officials told us that, in some cases, it is better for the long-term investigation to make a seizure of cash without arresting a possible courier or taking any other immediate law enforcement action.  Multiple DEA agents we spoke with mentioned the general scenario that we detail in the text box.

#### Scenario in Which Seizure Is Made without an Arrest

During the course of an investigation of a drug trafficking organization, the DEA may learn that a large amount of currency is about to be transported by a courier working for a drug trafficking organization.  In these situations, the DEA may ask state and local law enforcement to make the seizure consistent with routine law enforcement activities, such as a traffic stop, without making an arrest.  According to DEA agents, this allows the DEA to collect intelligence that it can use to build the investigation without revealing to higher echelon members of the drug trafficking organization that they are targets of a federal investigation.  This is because the seizure appears to be incident to a routine traffic stop by state or local officers, as opposed to a larger, federal investigation.  The DEA may then administratively forfeit the currency without revealing the investigation.  The higher echelon targets of the investigation do not have to be involved or even made aware of the investigation until the government is ready to initiate a prosecution, which may happen well after the seizure.

We understand that assessing the relationship between asset seizure and criminal investigations can be complex; but, without such measurements, the Department and its investigative components cannot fully evaluate and oversee their seizure and forfeiture activities to ensure they advance investigations that help to dismantle criminal organizations and do not present a potential risk to civil liberties.  Therefore, it is important that the Department collect and evaluate data to determine, for example, under what circumstances a seizure occurred; the

---

[34]  Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and DEA headquarters officials confirmed that their agencies do not analyze aggregate data to monitor claims, petitions, or returns. Federal Bureau of Investigation (FBI) headquarters officials explained that the FBI does not actively analyze this data but that may review it on an as-needed basis.

[35]  FBI and ATF agents explained that they may use administrative forfeiture during the course of an investigation as well; however, they generally make seizures as an investigation concludes or a case is ready to be prosecuted, thereby making the connection between a seizure and a federal investigation more readily apparent than a DEA seizure made early during the course of an ongoing investigation.

relationship between the seizure and other criminal activity; how seizures benefit law enforcement efforts; and any claims, petitions, and returns of assets resulting from a seizure.

We made a similar finding during our review of the DEA's *Use of Cold Consent Encounters at Mass Transportation Facilities*. We determined that the DEA does not sufficiently use data to assess whether these consent encounters are conducted in an unbiased and effective manner. The DEA concurred with our recommendations and reported to us that it (1) is actively researching ways to reach an appropriate determination about the viability of collecting demographic data and (2) has developed a proposed policy for documenting consensual encounters at mass transportation facilities that will allow the DEA to track certain information about these encounters, including their frequency and whether they result in seizures or arrests. We will continue to assess the DEA's progress in responding to our recommendations, and we believe that the additional data analysis discussed in our current report, if implemented, would further assist the DEA with its ongoing efforts to assess the effectiveness of its interdiction activities.

## The DEA Conducts Cash Seizures that May Not Advance or Relate to Criminal Investigations and May Pose Potential Risks to Civil Liberties

In the absence of specific metrics that would allow us to use aggregate data to evaluate how the Department's seizures and forfeitures relate to criminal activity, we reviewed a judgmentally selected sample of DEA cash seizures to assess this relationship. This review of sampled seizures provided evidence that many of the DEA's interdiction seizures may not advance or relate to criminal investigations.

We selected a sample of DEA cash seizures because the DEA was responsible for approximately 80 percent of the Department's cash seizures from FY 2007 through FY 2016. Specifically, we sampled 100 DEA cash seizures resulting in administrative forfeiture that met 2 criteria we believe make the seizures particularly susceptible to civil liberties concerns. First, we selected seizures that occurred without a warrant, which indicates no judicial oversight prior to the seizure. Second, we selected seizures that, according to CATS data, seemed to indicate the absence of illicit narcotics.[36] We believe that this second criterion is particularly important because, when illicit narcotics are not present at the time of a seizure, DEA agents and task force officers must use considerable discretion to

---

[36] See Appendix 1 for a full description of our sampling methodology. We used case-type codes and method-of-seizure indicators that accompany asset seizure records in CATS to identify which seizures occurred absent a warrant and illicit narcotics. DEA managers explained that they are not confident that these fields are reliable because they are subject to staff interpretation and case-type codes are subject to change throughout the course of an investigation. Therefore, we do not aggregate this information for calculating overall number of seizures that occurred absent a warrant and illicit narcotics; however, we believe that this data was adequate for selecting our sample.

Consistent with the DEA's assessment that CATS data may not be reliable to assess these criteria, we identified 12 sampled seizures in which either bulk or personal-use amounts of illicit narcotics were present at the time of seizure.

distinguish a criminal cash courier from an ordinary individual who possesses cash legally.  DEA agents and task force officers must regularly make these judgments because, they explained, it is rare for drug trafficking organizations to transport illicit narcotics and related cash proceeds together and cash couriers often use widely available commercial transportation to move large quantities of drug-related currency.  As a result, DEA agents and task force officers must quickly assess whether there is sufficient legal basis for seizure.  They base their assessment on observations of behavior and circumstances that separately may appear innocent but, when considered collectively, can be consistent with illegal cash couriering.

Our analysis of the sampled case files revealed three important areas for the Department's consideration.  First, most of the sampled seizures occurred in interdiction settings, in which trained law enforcement officers rely on their immediate, on-the-spot judgment to determine whether their observations justify initiating an encounter which may lead to seizure, in the absence of predicating information regarding involvement in drug trafficking activities.  This is particularly relevant in light of the OIG's findings in our 2015 report highlighting potential risks to civil liberties associated with cold consent encounters that occur during such interdiction operations.[37]  Second, as a result of our review of DEA records and subsequent discussions with DEA officials, we determined that the DEA could verify only 44 of the 100 seizures we sampled as having advanced or having been related to criminal investigations.  This means that in over half the cases there was no discernable connection between the seizure and the advancement of law enforcement efforts.  Third, we identified an aspect of DEA seizure practice that its policies and training did not fully address.  Specifically, we found that different task force officers made different decisions in similar situations when deciding whether to seize all of the cash discovered.  These differences demonstrate how seizure decisions can appear arbitrary, which should be a concern for the Department, both because of potentially improper conduct and because even the appearance of arbitrary decision-making in asset seizure can fuel public perception that law enforcement is not using this authority legitimately, thereby undermining public confidence in law enforcement.  As a result of these findings, we believe that the DEA and the Department should take additional steps to ensure that its seizure activities align with its priorities to advance criminal investigations and that seizures are conducted consistently.  We discuss each of these three areas of concern below.

*Most of the Sampled Seizures Occurred during Interdiction Operations in Which Trained Law Enforcement Officers Often Rely on Their Immediate Judgment to Initiate Encounters that Lead to Seizure*

We found that 85 of the 100 seizures we reviewed occurred as a result of a DEA or joint law enforcement interdiction operation.  Department and non-federal task force officers conduct these operations at transportation facilities including airports, parcel distribution centers, train stations, and bus terminals.  State and local law enforcement officers also regularly conduct interdiction on highways and contact a local DEA office if they need DEA investigative support.  We believe that

---

[37] DOJ OIG, *Cold Consent Encounters,* i.

interdiction operations at transportation facilities and on highways can be particularly susceptible to civil liberties concerns.  Absent a court-issued warrant and preexisting intelligence of a specific drug crime, DEA agents and task force officers make on-the-spot assessments of fast-moving situations.  These assessments are sometimes informed by tips from paid confidential informants, but may also be based only on their observations and law enforcement experience, to initiate an encounter that leads to seizure.  Table 6 shows the type of enforcement operation and the value of cash at seizure for our sample.

**Table 6**

**Sampled DEA Currency Seizures by Type of Enforcement Operation and Amount**

| Type of Enforcement Operation | Total Seizures | Total Amount Seized | Lowest Amount Seized | Highest Amount Seized |
|---|---|---|---|---|
| **Interdiction Operations** | **85** | **$3,970,000** | | |
| Airport Interdictions | 46 | $1,720,000 | $3,000 | $325,010 |
| Parcel Interdictions | 18 | $320,000 | $5,000 | $45,920 |
| Bus/Rail Interdictions | 13 | $710,000 | $3,140 | $164,159 |
| Highway Interdictions or Traffic Stop | 8 | $1,220,000 | $8,740 | $599,730 |
| | | | | |
| **Non-Interdiction Operations** | **15** | **$2,570,000** | $1,045 | $494,966 |
| **Total** | **100** | **$6,540,000** | | |

Note:  We rounded Total Amount Seized values to the nearest tens of thousands.

Sources:  OIG Analysis of CATS data and DEA documentation

Of the 85 interdiction seizures in our sample, all of which were conducted without a warrant, 79 were initiated based on the observations and immediate judgment of DEA agents and task force officers absent any preexisting intelligence of a *specific* drug crime.  The remaining six seizures were connected to enforcement operations that were initiated as a result of preexisting intelligence of a specific drug crime.

Establishing Reasonable Suspicion to Question a Suspect

Our sample showed that DEA agents and task force officers reported establishing reasonable suspicion to initiate questioning of an individual suspected of illegal cash couriering based on factors consistent with those described in the DEA's Interdiction Manual.[38]  For example, our review of seizure event narratives indicated that DEA agents and task force officers may initiate consensual encounters to question individuals based on factors including, but not limited to,

---

[38] The DEA's Interdiction Manual (2010) cites *United States* v. *Sokolow*, 490 U.S. 1 (1989) as the seminal Supreme Court case with respect to the legality and parameters of airport interdiction. The Manual relies on *Sokolow* for the proposition that "seemingly innocent behavior and/or circumstances may give rise to reasonable suspicion when viewed by a trained agent."

traveling to or from a known source city for drug trafficking, purchasing a ticket within 24 hours of travel, purchasing a ticket for a long flight with an immediate return, purchasing a one-way ticket, and traveling without checked luggage.[39]

Our evaluation of seizure narratives and our discussions with DEA agents and task force officers indicate that they often learn about a traveler's ticket purchase method and travel itinerary from confidential sources who work for airlines, airports, or bus or rail companies.  DEA agents and task force officers may also initiate contacts that lead to seizures after receiving information from airport security screeners that a large volume of currency was packaged within an individual's carry-on or checked luggage.  As our recent audit of the DEA's Confidential Source Program outlined, some of these confidential sources are engaged in long-term and lucrative relationships with the DEA.  The report states that this could have implications relating to compliance with the Fourth Amendment's protections against unreasonable searches and seizures.[40]

Our sample also indicated that during the course of a routine traffic stop a state or local law highway interdiction officer may suspect that a driver is involved in cash couriering or other illegal activity as a result of observations such as nervous behavior, inconsistent answers to questioning, or the odor of narcotics.  Officers may also search relevant law enforcement databases to determine the past criminal history of the driver.  As a result of these observations and database searches, the officer can extend the traffic stop to continue questioning and may request that a police dog sniff the vehicle in an attempt to identify narcotics residue.

<u>Establishing Probable Cause to Perform a Search and Make a Seizure</u>

Sampled seizure narratives showed that during interdiction operations, probable cause to search an individual or to search and seize packages, luggage, or a vehicle was generally established when a dog alerted to the presence of narcotics residue on currency.  Of the 85 interdiction seizures we sampled, the narratives indicated that a dog had positively alerted to the presence of narcotics residue 79 times, or in more than 90 percent of the cases.  For the remaining six seizures, either a dog was not used or the dog had not positively alerted to the currency, although other factors had been used to develop probable cause to support a search and seizure.

Our review of seizure narratives also showed that, following a search that led to the discovery of currency, DEA agents and task force officers further sought to establish probable cause to seize by detailing that the currency had been packaged or concealed in a manner consistent with drug trafficking activities.  DEA agents

---

[39] Based on our review of non-interdiction seizures, we learned that during the course of an ongoing investigation DEA agents and task force officers also may develop probable cause to search for and seize assets from sources such as surveillance of suspected drug and cash couriers, observation of criminal activity, consensual monitoring or wiretaps, and intelligence from confidential sources about a known drug crime.

[40] DOJ OIG, *Audit of the Drug Enforcement Administration's Management and Oversight of Its Confidential Source Program,* Audit Report 16-33 (September 2016).

and task force officers described the condition of currency, its packaging, and the manner of concealment as establishing probable cause to support seizure in 66 of the 85 interdiction seizures we sampled.  For example, seizure narratives indicated that currency appeared "worn from street use" or "bundled in rubber bands consistent with narcotic proceeds."  Seizure narratives also stated that currency had been wrapped in carbon paper to deter x-ray scanners and/or dryer sheets to obscure the odor of narcotics.  Our review showed that, during the course of searches, law enforcement often found currency hidden in secret compartments or trapdoors in luggage and vehicles, supporting the inference that the currency represented illegally couriered drug proceeds.  For example, we identified in our sample an instance in which a task force officer had identified over $7,000 hidden inside a travel neck pillow.

As referenced above, we also found that DEA agents and task force officers describe the condition or packaging of the currency to establish probable cause to make a seizure after receiving notification of a suspicious package from security officials working for parcel transport companies.[41]  Of the 18 narratives in our sample describing parcel interdiction seizures, 17 document that seizures had been initiated after law enforcement officers discovered an anomaly with the package or its contents.  For example, seizure narratives describe packages that contained a label with an inaccurate return address or that emitted an odor of illicit narcotics.

In trying to further support the existence of probable cause for seizure after cash has been identified, DEA agents and task force officers also will ask questions to ascertain whether the suspected courier has a reasonable explanation for the source of the currency or a reasonable explanation for travel.  For example, seizure narratives indicated that DEA agents and task force officers also had asked questions to determine whether a suspect's employment history was consistent with the amount of currency in their possession and whether they could clearly state details about the purpose of and plans for their travel.  In these narratives, DEA agents and task force officers often stated that because the suspect could not provide reasonable and consistent answers to questions, the suspect's answers did not substantiate their claim to the currency.  Finally, our review of sampled seizure narratives indicated that DEA agents or task force officers may search relevant law enforcement databases in an effort to identify the traveler's prior criminal history, which may reveal related drug and cash courier offenses supporting the existence of probable cause to seize.

*We Determined that the DEA Could Not Verify that All Sampled Seizures Had Advanced or Were Related to Criminal Investigations*

According to the DEA Agents Manual, any seizure should be "an action that takes place incident to a major drug investigation."  However, we determined that

---

[41]  The DEA's Interdiction Manual cites the 1921 Supreme Court Decision *Burdeau* v. *McDowell*, 256 U.S. 465 (1921), to highlight the government's right to use materials seized by a private party in a private search without the knowledge or involvement of the government.  The Interdiction Manual further details a freight company's right to inspect packages, citing *United States* v. *Rodriguez*, 596 F. 2d 169, 173 (6th Cir. 1979).

the DEA could verify that only 44 of the sample of 100 total seizures and only 29 of the sample of 85 interdiction seizures had advanced or were related to ongoing investigations, initiated new investigations, led to arrests, or led to prosecution.[42] Table 7 shows that as of December 2016 the DEA could verify that 100 percent of the non-interdiction seizures in our sample had advanced or were related to a criminal investigation, but that only 34 percent (29 out of 85) of the interdiction seizures had advanced or were related to a criminal investigation, again highlighting the potentially problematic nature of such operations.[43]

### Table 7

**Sampled DEA Seizures by Type of Enforcement Operation
and whether the DEA Could Verify that Seizures
Had Advanced or Related to a Criminal Investigation**

| Type of Enforcement Operation | Could the DEA Verify that the Seizure Advanced or Related to a Criminal Investigation? | |
|---|---|---|
| | Yes | No |
| Interdiction | 29 | 56 |
| Non-Interdiction | 15 | 0 |
| **Totals** | **44** | **56** |

Sources:  OIG analysis of CATS documentation and DEA case descriptions reflecting information received throughout 2016

An important factor that differentiates the sampled non-interdiction seizures from the sampled interdiction seizures is that the non-interdiction seizures always derived from enforcement operations that were initiated as a result of preexisting intelligence of a specific drug crime, and therefore may not pose the same risks to civil liberties as do standalone interdiction seizures.  For example, three of our sampled seizures were part of the same long-term non-interdiction investigation, involving court-ordered surveillance, in which the DEA made multiple arrests as well as significant seizures of firearms, drugs, and additional personal property.[44]

---

[42]  DEA officials explained to us that it may take years for a related arrest or prosecution to occur following a seizure.  Therefore, we sampled seizures that occurred during FY 2012 and assessed whether they advanced or related to ongoing investigations at any time within 3 years after the seizure.

[43]  To determine whether a seizure had advanced or was related to an ongoing investigation, we reviewed narratives documenting the probable cause underlying each seizure that the DEA had uploaded to CATS.  From this review we were able to determine that 29 of the sampled seizures had advanced or were related to ongoing investigations, initiated new investigations, led to arrests, or led to prosecution.  For the remaining 71 seizures, we asked the DEA to provide us additional documentation that would indicate whether a seizure met the above conditions.  Based on this additional documentation, we made our final determinations, detailed in Table 7, as to the number of sampled seizures that advanced or were related to a criminal investigation.

[44]  We believe that successfully identifying instances in which multiple seizures are associated with the same investigation could help the Department and its investigative components evaluate its asset seizure activities and determine when seizures are more likely to advance or relate to ongoing investigations.  For example, because of the concerns raised about whether low-value seizures

(Cont'd)

Conversely, the encounters leading to the sampled interdiction seizures were generally made in the absence of preexisting intelligence of a specific drug crime. This is reflected in our conclusion that non-interdiction seizures in our sample were far more likely than interdiction seizures, on a percentage basis, to advance or relate to a criminal investigation. When an interdiction seizure advances or relates to an ongoing criminal investigation, the benefits are obvious. For example, our sample indicated that a DEA airport interdiction group based in San Juan, Puerto Rico, had initiated a random consensual encounter and seized $180,000 from an individual. After the seizure, law enforcement established that the individual was a cash courier who worked for a known drug trafficker and strip club owner who sent cocaine to the mainland United States using strippers as drug mules. Our sample also indicated that DEA agents and task force officers use evidence of past seizures and data from the Narcotic and Dangerous Drug Information System (NADDIS) to establish probable cause for a new seizure and to identify links to other investigations.[45] According to the DEA, this information can prove helpful for other ongoing investigations. Illustrative of this, we sampled an airport interdiction seizure that occurred in Tennessee in which a DEA agent, acting on knowledge of suspicious travel activity, had found a prior notice of seizure while searching a piece of luggage, indicating that the individual who owned the luggage may have couriered cash in the past. The DEA agent used NADDIS to link the individual from whom cash was seized to an ongoing DEA investigation in Texas.[46]

When interdiction seizures do not advance or relate to an ongoing investigation, the benefits of interdiction are less obvious. The DEA asserts that, even if an interdiction seizure does not advance or relate to a current criminal investigation, information collected during the course of the seizure can be used in future investigations and the seized cash cannot be used to fund future criminal activities. We do not doubt that intelligence collected during a seizure can be useful, and that seizures of illegal proceeds can negatively impact criminal organizations. However, without a specific connection establishing that seized funds would otherwise have been used to fund criminal activity or that seizures provided intelligence tied to the same, it is difficult to determine whether seizures benefit law enforcement efforts to advance investigations. This is true even for

---

significantly contribute to federal investigations, we conducted an analysis of the 10 lowest value seizures from the population we used to select our overall sample. In 9 of the 10 instances, we found that the low-value seizures (ranging from $100 to $1,500) were related to ongoing investigations and in all 10 instances these seizures were incident to larger seizures. For the one seizure that was not related to an ongoing investigation, the probable cause statement indicates that that the subject had multiple prior drug arrests. These results were consistent with DEA agents and task force officers' statements that low-value seizures are often incident to law enforcement operations that result in higher value seizures.

[45] The DEA report of investigation, which is reviewed by a supervisory agent, is also used for entering information into NADDIS. At the bottom of a report of investigation, DEA agents and task force officers identify the names of all persons from whom cash was seized, as well as other related parties, for entry into NADDIS.

[46] The individual was not arrested at the time of the seizure, but court records indicate that the individual later pleaded guilty to a charge of conspiracy to import marijuana and was sentenced to 37 months of incarceration.

high value seizures.  For example, 7 of the 19 seizures in our sample that were over $100,000 did not advance or relate to an identified criminal investigation.  This indicates that the value of a seizure alone is not exclusive criteria for determining the law enforcement benefit of a seizure.

Further, the risks to civil liberties are particularly significant when seizures that do not advance or relate to an investigation are conducted without a court-issued seizure warrant, the presence of illicit narcotics, or subsequent judicial involvement prior to administrative forfeiture.  We highlight one such seizure in our sample that was of particular concern because DEA agents and task force officers seized concealed currency from a piece of checked luggage without attempting to question the owner or otherwise conduct any investigation (Case 1).

### Case 1

After Transportation Security Administration agents discovered U.S. currency artfully concealed in a manufactured compartment within the pulley of a checked bag, a task force officer assigned to a DEA group responded with a drug dog to assess the bag.  The dog positively alerted to the presence of a controlled substance, and the group seized $70,460 concealed in the bag and its pulley.  According to the DEA's documentation, the group that effected the seizure had no immediate way to contact the traveler who had checked the bag; the traveler already had boarded the plane and the ticket had not been purchased through the airline.  No effort was made to alert law enforcement in the arrival airport to stop and speak with the passenger claiming the bag; rather, a DEA agent placed a receipt for the currency and DEA contact information inside the bag and the airline sent the bag to its final destination.

The person who had purchased the ticket was different from the traveler but shared the same address.  The DEA sent a notice of seizure to the address; but, after receiving no response, the DEA took no further action, such as following up, in person, at the known address to interview the traveler or the person who purchased the ticket.  CATS records indicate that this seizure did not receive any petitions or claims and that it ultimately resulted in an administrative forfeiture of $70,460 to the federal government.

As discussed above, the DEA confirmed that its agents made no effort to follow up with the ticket purchaser or the traveler to further investigate this matter and that neither the purchaser nor the traveler contacted the DEA to reclaim the seized cash.  Even accepting that the circumstances surrounding the discovery of this large volume of concealed currency justified law enforcement suspicion and seizure, we find it troubling that the DEA would make an administrative forfeiture without attempting to advance an investigation, especially considering that the DEA had opportunities to contact the potential owners of the currency instead of simply providing written notice of the seizure.

Even though the DEA does not have a policy explicitly detailing the extent to which its agents should conduct an investigation following all cash seizures, the DEA Agents Manual states that seizure of any asset is to be viewed as "an action that takes place incident to a major drug investigation."  Therefore, we believe that the lack of investigative follow-up in the scenario documented above was inconsistent with the intent of DEA policy governing asset seizure and forfeiture.[47]  Moreover, when the DEA used its seizure and administrative forfeiture authority without even

---

[47]  DEA Agents Manual (2015).

attempting to investigate or advance an investigation, the DEA and its state and local partners risked creating the appearance that they are more interested in seizing and forfeiting cash than advancing a potential criminal investigation.

### Petitions, Claims, and Returns for Sampled Seizures

We found that the Department had administratively forfeited part or all of the 100 seizures we sampled, collectively valued at approximately $6.5 million. For 14 of the 100 seizures we sampled, an individual such as an owner, lienholder, or victim filed a petition or a claim. For five of these seizures, the Department returned a portion of the seized cash, totaling $46,000, but went forward to administratively forfeit the remainder, totaling $58,000.[48] Overall, that means that of the $6.5 million forfeited from our seizure sample, the Department returned just over $46,000 — or less than 1 percent — to petitioners and claimants. Further, we found that 73 percent ($4.7 million of the $6.5 million) of the Department's forfeiture proceeds came from the 19 cash seizures greater than $100,000.

The number of petitions and claims filed, as well as the amount of seized cash returned, from our sample further parallel the general conclusion we drew from our analysis of petitions, claims, and returns for the overall population of DEA seizures — that few of the petitions and claims filed resulted in a return of seized cash. According to a DEA official we interviewed, the small number of claims or petitions, and the even smaller number of instances in which assets were returned, demonstrate that the DEA is correctly targeting criminals when making seizures. However, advocates for asset forfeiture reform assert that the claim process is unduly onerous and unfair, especially when claimants contest low-value seizures. Reform advocates therefore assert that few claims are filed because the process to file a claim is confusing and the cost to contest a low-value administrative forfeiture, particularly if the claimant believes they need a lawyer to assist them, is often greater than the value of the asset itself.[49] In response to these criticisms, officials from the MLARS explained to us that they have created a Department-wide notice of seizure and claim form to improve and clarify the process for filing a claim to contest a forfeiture.[50]

In our above finding, we explained that the Department does not collect and analyze data on seizure and forfeiture activities that would enable it to fully evaluate and monitor whether these efforts advance or are related to criminal

---

[48] When an owner makes a claim against seized assets and a U.S. Attorney's Office negotiates a settlement, the government may return part of the seized property and forfeit the remainder.

[49] Both the House of Representatives and the Senate have expressed concern with the potential cost of legal representation when an individual seeks to contest a seizure. Recent legislative proposals have sought to guarantee legal counsel to those financially unable to obtain representation when contesting an administrative forfeiture. See *Due Process Act of 2016,* 114th Cong., 2nd sess., H.R. 5283, and *Due Process Act of 2016,* 114th Cong., 2nd sess., S. 3045. The Institute for Justice also expressed concerns about this issue in its report *Policing for Profit: The Abuse of Civil Asset Forfeiture,* 1st ed. (March 2010) and 2nd ed. (November 2015).

[50] The claim form is now available at DOJ, "forfeiture.gov," www.forfeiture.gov (accessed March 24, 2017).

investigations and/or present potential risks to civil liberties. Our sample further demonstrates the significance of this finding because, for more than half of the interdiction seizures we sampled, which were seized without a warrant, the DEA could not verify whether they had advanced a criminal investigation. These outcomes further illustrate the importance that the Department collect and evaluate data that would allow it and its investigative components to identify those seizures that do and do not achieve their legitimate law enforcement objectives.

*We Identified a Certain Aspect of DEA Seizure Practice that Its Policies and Training Did Not Fully Address*

Our analysis of the seizures in our sample identified two instances in which task force officers made different decisions in similar situations, which demonstrates how seizure decisions can appear arbitrary. In both instances, the person from whom cash was to be seized asked to retain some of the cash. In one instance, task force officers agreed, and in one instance they did not. (See Cases 2.A and 2.B.)

### Case 2.A

A DEA confidential source gave information to DEA agents and task force officers working at an airport about the suspicious travel activity of a passenger scheduled to arrive on a flight later in the day. The source told officers that the passenger had paid for his ticket with a prepaid debit card and cash. A task force officer later learned that the passenger had no checked luggage and previously had been arrested for vehicle theft, firearms violations, and gambling violations.

When the passenger arrived, task force officers engaged in a consensual conversation with the passenger that included questioning him about his travel plans, work history, and possession of large sums of U.S. currency. The passenger confirmed that he was in possession of cash and provided other details about his travel plans, as well as the origin and intended use of the currency — details that the task force officers believed to be suspicious or false.

The task force officers obtained the passenger's consent to search his duffel bag, which contained four rubber-banded bundles of $100 bills in a toiletry bag. An officer noted that the passenger's hands were nervously shaking and his face was flushed during the interview. After the seizure, a dog positively alerted to the presence of a controlled substance on the duffel bag.

When a task force officer explained that the U.S. currency in the bag was going to be seized pending further investigation, the passenger asked whether he could keep some of the currency to travel home. The passenger asserted that all of the currency in the bag was his, and the task force officers allowed him to retain $1,000. This seizure resulted in an administrative forfeiture of $27,000 to the U.S. government, and the DEA explained to the OIG that, other than the events surrounding the seizure, there was no subsequent investigative activity or additional law enforcement benefit.

We identified a comparable situation, at a different airport, during which a suspected drug cash courier made a similar request to another group of task force officers, who denied the request.

**Case 2.B**

A task force officer at an airport received information from a confidential source regarding the suspicious travel activity of an airline passenger who paid cash for her ticket about 90 minutes prior to her flight's departure.  The officer referred the information to the task force at the passenger's destination airport, where task force officers engaged in a consensual conversation with the passenger.  The conversation included questions about her travel plans and whether she was in possession of large sums of U.S. currency or transporting illegal narcotics.  She explained that she was on her way to visit family and go shopping in a U.S. southwest border city.  She denied that she was transporting illegal narcotics and stated that she was carrying $500.

A task force officer asked the passenger whether he could search her purse, and she agreed.  The search revealed U.S. currency closer to $5,000 after a base count.  The passenger then stated that she was carrying a "little over $5,000" but that only $525 of it was hers.

The passenger explained that she was transporting currency for an unknown individual in a southeastern U.S. city and was traveling to the southwest border city to deliver the currency to another unknown individual.  When informed that the U.S. currency might be seized, the passenger argued that $500 of the money was hers as payment for transporting the currency.  When the officer asked whether she realized that transporting narcotics proceeds was illegal, she stated that $525 was hers and that she had removed it from an automatic teller the day before.  She could not provide documentation supporting this assertion or provide any documentation explaining why the $525 was mixed in with the remainder of the money she was transporting.  Task force officers did not return any money to the passenger.  The DEA seized $5,110, including the $525, all of which was subsequently administratively forfeited to the federal government.  According to the DEA, it later determined that the passenger was working for a known crack cocaine dealer.

In both cases, task force officers concluded that the statements the passengers provided were suspicious or untruthful and these conclusions contributed to their decisions to seize the currency.  However, while there are factual differences between the situations, the inconsistent decisions of task force officers indicate that more guidance may be needed to clarify how to best handle such situations.  The DEA confirmed that it does not have a policy governing whether or under what circumstances a DEA agent or task force officer may or should seize part of the value of an asset that he/she suspects to be entirely drug proceeds and, conversely, when some currency may be returned to a suspected courier.  Without such a policy, DEA Special Agents and task force officers also cannot receive consistent training on how to handle these situations.  Although Case 2.A may demonstrate the task force officer's compassion for the suspected cash courier and Case 2.B may demonstrate a higher level of suspicion regarding the courier's explanations, such disparate results risk creating the appearance that decisions made during the course of seizure operations are arbitrary.

### The Department Does Not Require Its State and Local Task Force Officers to Receive Training on Federal Asset Seizure and Forfeiture Laws Prior to Conducting Federal Seizures

We identified another gap in training, which pertains to state and local task force officers.  Specifically, we found that the Department does not require its task force officers to receive training on federal asset seizure and forfeiture laws and component seizure policies prior to conducting federal seizures.  As a result, state and local task force officers, who wield the same authorities to make seizures as the Department's Special Agents, may make federal seizures without receiving training beyond what is included in their respective law enforcement academy

curricula. We highlight the lack of federal asset seizure training for state and local task force officers as a concern because, as documented by the news media, state and local officers sometimes receive training from commercial vendors that teach aggressive search and seizure practices.[51]

Although the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); the DEA; and the Federal Bureau of Investigation (FBI) all have slightly different training requirements, each requires its Special Agents to receive training on federal asset seizure and forfeiture laws and component seizure policies during basic training. According to component officials responsible for asset seizure training, this training includes civil rights and civil liberties issues as well as various legal issues pertaining to asset seizure. Components have also developed specialized training courses for asset seizure for Special Agents and Supervisory Special Agents who regularly conduct seizure operations or have oversight of these operations. Additionally, the MLARS offers a series of courses to federal, state, and local law enforcement officials focused on asset seizure policy and practices, financial investigations, and money laundering.

While ATF, the DEA, and the FBI require that their prospective Special Agents receive component-developed asset seizure training before making seizures in the field, we found that none of these three components mandates that its state and local task force officers do so. Although task force officers told us that they receive refresher or policy update trainings that convey important information, these trainings occur after officers are federally deputized and already have had opportunities to conduct Department-led seizure operations.[52] As a result, ATF, the DEA, and the FBI cannot instruct all task force officers on Department- and component-specific seizure policy and practices before task force officers make federal seizures. This is of added significance, because the Department does not have oversight of the asset seizure training curricula that state and local law enforcement agencies provide to their officers, including trainings offered by commercial vendors that may teach aggressive search and seizure practices.

We noted in our report on the DEA's *Use of Cold Consent Encounters* that the DEA Agents Manual describes search and seizure as "one of the most dynamic and potentially confusing areas of the law today." For this reason, we concluded that interdiction training for members of interdiction task forces is "of the utmost importance." In that report, we found that not all DEA transportation interdiction task force members received the DEA's official transportation interdiction training,

---

[51] In September 2014, the *Washington Post* published the "Stop and Seize" series of articles that identified issues related to how contract training vendors teach aggressive highway interdiction seizure techniques. During this review, we found that between FY 2007 and FY 2014 the Department regularly used funds derived from its Assets Forfeiture Fund to hire the vendors identified in this series. As of FY 2015, the MLARS no longer allows DOJ components to use funds derived from the Assets Forfeiture Fund to hire any external training vendors.

[52] Some task force officers explained that they received on-the-job refresher or policy update training delivered by component management or Assistant U.S. Attorneys. In particular, when ATF received authority to make seizures related to certain drug crimes, it held asset forfeiture refresher training in all field divisions.

and therefore that the DEA could not ensure that these officers would receive training that is consistent with prevailing seizure and forfeiture law and DEA standards. Similarly, we believe that unless the state and local officers serving on Department task forces receive uniform training, the Department cannot ensure that all of its task force officers will be working from the same base of seizure and forfeiture knowledge as their Department partners.

**The Attorney General's Order Eliminates Most Opportunities for State and Local Law Enforcement to Use Federal Forfeiture When Federal Involvement in a Seizure is Limited; However, Current Policy Does Not Address All Areas of Concern**

On January 16, 2015, Attorney General Holder issued an Order limiting adoptions, eliminating most opportunities for state and local law enforcement to utilize federal forfeiture to access equitable sharing funds in situations in which there is no active federal involvement in a state or local seizure. The impact of the Order is evidenced by significant reductions in both the number and value of DEA cash seizures since the issuance of the Attorney General's Order. Despite the policy changes discussed in this section, state and local law enforcement still have access to equitable sharing funds derived from seizures resulting from joint transportation interdiction operations although, as demonstrated above, these operations do not always advance a federal criminal investigation or lead to federal prosecution.

As we discussed in the Introduction, the Attorney General's Order ended federal adoption of purely state and local law enforcement seizures (other than certain public safety exceptions) and on February 10, 2015, the Department issued Policy Directive 15-2 to help law enforcement officers and Assistant United States Attorneys (AUSA) implement these limitations.[53] Policy Directive 15-2 requires the Department's law enforcement components to submit a request to an AUSA when they want to pursue federal forfeiture for a seizure made by a state or local law enforcement officer, pursuant to which the AUSA must determine whether there is sufficient federal participation or oversight at the time of seizure to justify federal forfeiture. If the AUSA determines that federal involvement was insufficient at the time of the seizure to justify federal forfeiture, then, as set forth in in the Attorney General's Order, a federal seizure warrant must be obtained in order to pursue federal forfeiture, apart from the public safety exception referenced above.

Officials in the Office of the Deputy Attorney General told us that one of the purposes of the Attorney General's Order was to prevent state and local law enforcement from using federal forfeiture to access equitable sharing revenue that otherwise would be unavailable to them under state seizure laws. As discussed above, the prohibition on adoptive seizure affects the DEA most significantly because, from FY 2007 through FY 2014, the DEA accounted for 88 percent of the

---

[53] U.S. Attorney General Order, Prohibition on Certain Federal Adoptions of Seizures by State and Local Law Enforcement Agencies, January 16, 2015 (see Appendix 2); DOJ Policy Directive 15-2, Additional Guidance on the Attorney General's January 16, 2015, Order on Adoptions, February 10, 2015 (see Appendix 3).

number of the Department's adoptive seizures, amounting to $742 million of the $880 million total.

To determine whether the elimination of adoptions reduced the overall number of DEA cash seizures, which would in turn reduce those DEA cash seizures eligible for equitable sharing, we analyzed DEA cash seizure data from CATS.  As shown in Figure 4, there is a strong correlation between the issuance of the Attorney General's Order in January 2015 and the reduction in overall DEA cash seizures.  Specifically, as of the end of FY 2016, there was a 51 percent reduction in the number of DEA cash seizures since a high of 9,502 in FY 2012, and a 34 percent reduction in the value of DEA cash seizures since a high of $498 million in FY 2011.

**Figure 4**

**DEA Cash Seizures, Inclusive of Adoptions, by Value and by Number FY 2007 – FY 2016**



Note:  We rounded monetary values to the nearest million.

Source:  CATS

While the Attorney General's Order and related guidance has limited state and local law enforcement's ability to access equitable sharing funds through adoptive seizure, it does not preclude the federal forfeiture of property seized through joint task forces or as a result of federal/state investigations, the proceeds of which may then be eligible for equitable sharing.  This may be of particular concern because, as demonstrated above, seizures derived from joint transportation interdiction operations may not always advance a federal criminal investigation or lead to a prosecution.

According to the Department's Asset Forfeiture Policy Manual, as a general rule seizures should follow the investigation from which they arose.  A federal seizure should follow a federal investigation or prosecution, and a state seizure

should follow a state investigation or prosecution. An MLARS official told us that this general rule should prevent state and local law enforcement from using federal forfeiture to access equitable sharing funds in situations in which there is not active federal involvement in an investigation related to the seizure. However, this official acknowledged that it is difficult to determine whether a seizure merits federal forfeiture when it is derived as a result of a transportation interdiction operation in which there is not an ongoing investigation precipitating or related to the seizure.

This official also added that the Department is still vulnerable to criticism of seizures derived from transportation interdiction operations and that the MLARS continues to work with the DEA to update policy to clarify what seizures involving state and local law enforcement do or do not justify federal forfeiture. While the Attorney General's Order and related policy guidance limiting the use of adoption may help to focus the use of federal forfeiture authority, as we emphasized above, the Department has not yet fully leveraged data that would help to identify those seizures that do and do not achieve their legitimate law enforcement objectives. Until the Department does so, it cannot develop and implement policy to fully ensure federal forfeiture is used appropriately.

During the course of the current review, we also became aware that DEA agents in the field may not have been interpreting Policy Directive 15-2 as intended. In reviewing the sample of 100 seizures, we identified multiple transportation interdiction seizures in which a DEA agent formally made a seizure, even though a state or local law enforcement officer independently initiated the encounter that led to seizure or had developed much or all of the probable cause referenced as supporting the seizure.[54] Although our sampled seizures occurred prior to the issuance of the Attorney General's Order and Policy Directive 15-2, we asked the DEA whether these seizures would require AUSA review had they occurred subsequent to the issuance of these directives. The DEA initially responded that if DEA agents formally made these types of seizures, they would not have to seek AUSA review; however, after we issued the working draft of this report, DEA headquarters officials acknowledged that the initial response was incorrect and that such review would have been required.[55]

---

[54] We do not provide the specific number of seizures formally made by DEA, based largely on the actions of state and local law enforcement, because the documentation does not always include enough information to determine the precise level of involvement of DEA agents.

[55] DEA headquarters personnel explained there was early confusion regarding the application of the Attorney General's Order and Policy Directive 15-2 and that the initial responses, likely provided by field agents, reflect this confusion. DEA headquarters personnel added that while the initial answers were incorrect, and that some confusion among field agents may still exist regarding the application of these directives, field office and DEA headquarters supervisory review would identify when the directives were interpreted inconsistently and would ensure compliance with the directives when comparable seizures occur under the new policies. Given the timing of our fieldwork, we did not review seizures occurring after the issuance of the Attorney General's Order and Policy Directive 15-2. Therefore, we cannot fully determine the extent to which incorrect interpretations of guidance affect current seizure activities.

**The Attorney General's Order Seeks to Prevent Law Enforcement from Using Adoption to Circumvent State Seizure Laws; It Also May Have the Potential to Affect Cooperation between Federal and State and Local Law Enforcement**

Congress intended for equitable sharing to increase cooperation between federal and state and local law enforcement through the distribution of forfeiture revenues to state and local law enforcement.[56]  We were told about two ways in which equitable sharing can facilitate such cooperation.  First, because Department guidelines governing equitable sharing allow police departments to use these funds to pay the salary and benefits of officers hired to fill vacancies created when a law enforcement agency assigns officers to a federal task force, it financially supports state and local participation in such task forces.[57]  Second, it facilitates information sharing by providing an opportunity that might not otherwise exist for DEA agents to develop DEA investigations using information collected by state and local law enforcement.

In order to consider the impact of the Attorney General's order on cooperation between federal and state and local law enforcement, we looked at CATS equitable sharing data and identified two states in which adoptions appeared to form a key component of the funding to support such collaborative efforts — Nebraska and North Carolina.[58]  Table 8 below shows equitable sharing distributions derived from DEA seizures made between FY 2007 and FY 2014 to these states.  As a result of the DEA's adoptive seizures, state and local law enforcement in Nebraska and North Carolina received equitable sharing distributions of $24.6 million and $56.1 million, respectively, which represented 91 and 55 percent, respectively, of the value of the total equitable sharing revenues distributed in these states.  By comparison, the DEA's overall adoptive seizure activities accounted for only 18 percent of the value of equitable sharing revenues distributed to state and local law enforcement nationwide during this time.

---

[56]  21 U.S.C. § 881(e)(3).

[57]  DOJ MLARS, Guide to Equitable Sharing for State and Local Law Enforcement Agencies (2009).

[58]  We focused our analysis of CATS data on DEA adoptive seizure activities and related equitable sharing distributions because the DEA was responsible for the vast majority — 88 percent — of the Department's adoptive seizures between FY 2007 and FY 2014 (non-inclusive of firearms and ammunition).  Our further analysis identified specific states in which law enforcement received relatively high proportions of equitable sharing revenues derived from the DEA's adoptive seizure activities between FY 2007 and FY 2014, the 8 full fiscal years prior to the issuance of the Attorney General's Order.  In particular, we found that among all state and local law enforcement agencies throughout the country, agencies in North Carolina and Nebraska were the only ones to rank in the top six of both the total value and the higher proportion of equitable sharing revenues derived from the DEA's adoptive seizures.

**Table 8**

**Equitable Sharing Distributions to State and Local Law Enforcement in Nebraska and North Carolina Derived from DEA Adoptive and Non-Adoptive Seizures, FY 2007 – FY 2014**

|  | Equitable Sharing Distributions Derived from Adoptions | % | Equitable Sharing Distributions Derived From Non Adoptions | % | Total |
|---|---|---|---|---|---|
| **Nebraska** | $24.6 | 91% | $2.5 | 9% | $27.1 |
| **North Carolina** | $56.1 | 55% | $45.8 | 45% | $101.9 |
| **DEA Overall** | $515.6 | 18% | $2,273.5 | 82% | $2,789.1 |

Notes:  We express equitable sharing values in millions.  All values include distributions to state, local, and tribal law enforcement agencies.

Source:  CATS

We visited sites in Nebraska and North Carolina to learn why law enforcement used adoptive seizure disproportionately to non-adoptive seizures, and to attempt to determine the effects of the Department's decision to limit adoptions. We found, through our interviews with law enforcement officials, that the primary reason law enforcement in these states has disproportionately used adoptive seizure is that their states' forfeiture laws restrict law enforcement's use of forfeiture.  In 1999, Nebraska's Supreme Court ruled that civil forfeiture cannot be pursued in addition to a criminal prosecution — a ruling that was in force up to April 2016.[59]  As a result, at the time of our review, local police and county prosecutors in Nebraska had to pursue either criminal prosecution or the forfeiture of assets related to the underlying crime.[60]  Conversely, in North Carolina, asset forfeiture related to drug crimes can be pursued only in addition to criminal prosecution, effectively eliminating law enforcement's option to use state administrative or civil forfeiture to take possession of the seized proceeds of crime.[61]

DEA and Nebraska and North Carolina law enforcement officials told us that the Department's limitation on adoptions can diminish the extent of law enforcement cooperation.  These officials explained that this is because of the ability to use equitable sharing funds to support its contribution of personnel to federally led task forces and joint investigations.  However, we could not verify this assertion because it was beyond the scope of our review to perform an in-depth analysis that would allow us to assess whether the Attorney General's Order has resulted in these two states diminishing their participation in DEA task forces and, if

---

[59] *State of Nebraska* v. *Franco,* 257 Neb. 15, 594 N.W.2d 633 (1999).

[60] In April 2016, Nebraska amended its forfeiture laws, which now require a criminal conviction related to an illegal drug, child pornography, or illegal gambling offense in order to forfeit property.  Additionally, state and local agencies are now prohibited from transferring from other authorities seized cash and property under $25,000, though this restriction does not apply to property physically seized by a federal agent.  See Neb. Rev. Stat. § 28-1463.01 (2016).

[61] N.C. Gen. Stat. §§ 75D-5, 90-112; *State* v. *Jones,* 158, N.C. App. 465 (2003).

they have diminished their participation, whether their reduced participation has had a measurable impact on drug enforcement in those two states.

DEA and Nebraska and North Carolina state and local law enforcement officials further explained that the Attorney General's Order is likely to adversely affect the information sharing between federal and state and local law enforcement that comes with such cooperation. These officials pointed to the information sharing that can result from DEA agents receiving information from state and local law enforcement. However, we do not know the extent to which adoption has assisted the DEA in developing investigations because, as discussed earlier in this report, Department investigative components do not collect data that would allow them to evaluate how often any seizure, including adoptive seizure, advances criminal investigations. Therefore, we cannot fully evaluate the degree to which restricting adoption has impacted drug investigations in states like Nebraska and North Carolina. Indeed, some DEA officials told us that the contribution to criminal investigations of state and local highway interdiction seizures that resulted in adoptions may have been limited even before the Attorney General's Order because most were "one and done": the adopted state or local seizure was likely a one-time event and unlikely to contribute to a criminal investigation, be it state or federal.

According to officials from the Office of the Deputy Attorney General and the MLARS, two of the purposes of the Attorney General's Order were to prevent state and local law enforcement from using adoption to obtain federal forfeiture revenue that is unavailable under state seizure laws and to prevent the Department from forfeiting assets seized by state and local law enforcement without federal oversight. Our analysis indicates that the Department has accomplished these objectives to a significant extent. However, given the potential described to us for the Attorney General's Order to also affect law enforcement cooperation, especially in states that have restrictive forfeiture laws, we believe that the Department also should monitor the effects of the Attorney General's Order and seek to mitigate any negative impact it may have on law enforcement cooperation.

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

Asset seizure and forfeiture can provide considerable benefits to law enforcement. Seizure and forfeiture can financially undermine criminal organizations and deter illegal behavior by taking the profit incentive out of crime. Intelligence gathered incident to and as a result of a seizure can also contribute to case development and criminal prosecutions. However, asset seizure and forfeiture also present unique potential risks to civil liberties. This is especially true for cash seizures made without a court-issued warrant that result in administrative forfeiture because law enforcement can seize and forfeit this fungible property without charging the owner with a crime and without any court involvement or review.

In light of these concerns, we believe that it is important for the Department to assess (1) whether these types of seizures benefit law enforcement efforts and (2) the extent to which these types of seizures present potential risks to civil liberties. We found that the Department neither formally collects nor evaluates the data necessary to determine whether its seizures and forfeitures advance or relate to federal investigations. Instead, we found that the Department uses the data it collects primarily to report on the types of assets seized and the financial results of its forfeiture efforts. As a result, the Department and its investigative components cannot fully evaluate and oversee their seizure and forfeiture activities to ensure that they are used to advance investigations that help to dismantle criminal organizations and that they do not present a potential risk to civil liberties.

In the absence of seizure-specific metrics that would allow us to use aggregate data to evaluate how seizures and forfeitures have related to criminal law enforcement activities, we reviewed a judgmental sample of DEA cash seizures. We focused our analysis on DEA operations because the DEA conducted 80 percent of the Department's cash seizures between FY 2007 and FY 2016.

Our analysis revealed three important areas for the Department's consideration. First, most of these seizures occurred in interdiction settings, in which trained law enforcement officers make on-the-spot assessments of fast-moving factual situations to initiate encounters that lead to seizure. This is particularly relevant in light of the OIG's findings in a recent report highlighting potential risks to civil liberties associated with cold consent encounters that occur during transportation interdiction operations.[62] Second, as a result of our review of DEA records and subsequent discussions with DEA officials, we determined that the DEA could verify that only 44 of the 100 seizures we sampled had advanced or were related to criminal investigations. Third, we identified instances, not addressed by DEA policy, in which task force officers had made different decisions in similar situations when deciding whether to seize all of the cash they had discovered. While the factual situations vary from case to case, such differences in treatment demonstrate how seizure decisions can appear arbitrary, which in turn

---

[62] DOJ OIG, *Cold Consent Encounters*, i.

can fuel public perception that law enforcement is not using this powerful authority legitimately.

We also learned the Department's investigative components do not require their state and local task force officers to receive training on federal asset seizure and forfeiture laws and component seizure policies prior to conducting federal seizures, despite the fact that they work with and wield the same seizure authorities as the Department's Special Agents. We believe that the Department and its components should take additional steps, in policy and training development, to ensure that seizures are conducted consistently and that all law enforcement officers who have the authority to make federal seizures are aware of federal seizure and forfeiture laws and component seizure policies prior to conducting seizures.

We also found that the Attorney General's 2015 Order and related guidance eliminates most opportunities for state and local law enforcement to use federal forfeiture to avail themselves of equitable sharing proceeds when federal involvement in a seizure is limited. This is evidenced by a one-half reduction in the annual number of DEA cash seizures and a one-third reduction in the annual value of DEA cash seizures following the 2015 Order. However, this policy and related guidance do not preclude the federal forfeiture of property seized through federal/state investigations or joint task force operations, such as joint transportation interdiction operations. This may be of particular concern because, as demonstrated in this report, these seizures may not always advance a federal criminal investigation or lead to a prosecution.

Based on our analysis, we also determined that the limitation on adoptions resulting from the Attorney General's Order has financially affected state and local law enforcement, especially in at least two states where law enforcement frequently had used federal adoption because of restrictive state forfeiture laws. Prior to the Attorney General's Order and Department guidance, law enforcement in these states had received significant equitable sharing revenues from adoption, which they told us they had used in part to fund the participation of officers on federally led task forces and in joint investigations. We believe that it is important for the Department to monitor the effects of the Attorney General's Order and take steps to ensure that its financial impacts do not undermine valuable law enforcement cooperation.

**Recommendations**

To improve the Department's ability to manage its oversight of asset seizure and forfeiture activities, we recommend that the Money Laundering and Asset Recovery Section work with the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Drug Enforcement Administration; the Federal Bureau of Investigation; the Asset Forfeiture Management Section; and the U.S. Attorney's Offices to:

1.  Develop ways to collect relevant data related to seizure and forfeiture activities sufficient to identify and evaluate whether seizures advance or are related to federal investigations.

2.  Review seizure practices to determine whether more-specific policy guidance and/or training is needed to ensure consistency in seizure operations.

3.  Ensure that state and local task force officers receive training on federal asset seizure and forfeiture laws and component seizure policies before they conduct or participate in federal seizures.

4.  Monitor the effects of the Attorney General's 2015 Order that eliminated most types of federal adoptions of state and local seizures, and seek to mitigate any negative effects on law enforcement cooperation.

**APPENDIX 1**

# EXPANDED METHODOLOGY

### Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

### Data Analysis

We requested from the Department's Asset Forfeiture Management Section (AFMS) summary data detailing the seizure and forfeiture activities of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); the Drug Enforcement Administration (DEA); and the Federal Bureau of Investigation (FBI) between FY 2007 and FY 2016. The AFMS provided this data from the Department's Consolidated Asset Tracking System (CATS). From this data, we sought to identify the number and value of assets seized, returned, forfeited, and distributed to state, local, and tribal law enforcement through equitable sharing during the scope of our review.

During a law enforcement operation or encounter, multiple assets may be seized. In certain instances, multiple pieces of property may be seized from one or more than one individual. We do not include the Department's seizures of firearms and ammunition in our calculation of adoptive seizures because the Attorney General's Order does not apply to the adoption of these asset types. Additionally, our analysis of cash seizures includes the total number of assets that are coded as "Cash/Currency" in CATS. The Department acknowledges that errors in coding occur, and as a result these numbers may be overstated or understated.

### Site Visits

We selected sites based on a variety of factors to gain an understanding of the diversity of seizure activities throughout the country. These factors include geographic location, volume of seizure activities, volume of adoptive seizure activities, and amount of equitable sharing revenues derived from those adoptive seizures. Because the DEA was involved in 88 percent of all DOJ adoptive seizures between FY 2007 and FY 2014 (excluding firearms and ammunition) and due to the volume of DEA cash seizure activities that resulted in administrative forfeiture during that period, we conducted the majority of our site visits at DEA locations. We visited eight DEA offices within four field divisions: Los Angeles and Riverside, California (Los Angeles Division); Greensboro, Raleigh, and Wilmington, North Carolina (Atlanta Division); Milwaukee and Madison, Wisconsin (Chicago Division); and Omaha, Nebraska (St. Louis Division). Though ATF and the FBI are involved in considerably fewer cash seizures resulting in administrative forfeiture, we also wanted to understand their seizure operations in the field. We visited one ATF field office in Wilmington, North Carolina, and one FBI field office in Los Angeles, California.

During these site visits, we interviewed federal law enforcement officers and state and local law enforcement officers who serve as members of federal law enforcement or task force groups. Our questions focused on law enforcement's role in seizure and forfeiture activities; oversight controls on these activities; and how ATF, the DEA, and the FBI are implementing the Attorney General's 2015 Order prohibiting certain federal adoptions and related guidance. We also sought to determine how the Department measures the performance of seizure activities and evaluates their benefits to law enforcement.

## Interviews

We interviewed current ATF, DEA, and FBI officials about their roles in asset seizure and forfeiture activities. These interviews occurred at component headquarters and regional field office locations. While at headquarters locations, we spoke with management staff responsible for the administration of asset seizure and forfeiture activities. We also spoke with headquarters officials to discuss the capabilities of their investigative agencies' case management systems.

While at field locations, we spoke with Assistant Special Agents in Charge, supervisory Special Agents, non-supervisory Special Agents, non-federal task force officers, and contract support personnel. Additionally, in Nebraska, we spoke with senior leadership from state and local law enforcement agencies that partner with federal law enforcement.

We met with officials from the Department's Money Laundering and Asset Recovery Section and discussed their roles in overseeing the Department's asset seizure and forfeiture activities, developing seizure and forfeiture policy, and managing the Equitable Sharing Program. We also met with officials from the Office of the Deputy Attorney General to discuss how and why the Department decided to issue the Attorney General's Order. In addition, we interviewed officials from the Asset Forfeiture Management Section to gain a better understanding of their role in administering CATS.

We conducted our final series of interviews by telephone with 12 Assistant U.S. Attorneys who are responsible for asset forfeiture in their respective U.S. Attorney's Offices. During these interviews, we asked how they review seizures made by state and local law enforcement to determine whether federal involvement in a seizure has been sufficient to justify federal forfeiture.

## Document Review

We reviewed the federal laws, Department policy, and investigative component policy relevant to asset seizure, asset forfeiture, adoption, and equitable sharing. We paid particular attention to the Attorney General's Order, as well as related guidance. We also examined state laws, congressional testimony, news articles, and public interest group reports relevant to Department asset seizure and forfeiture activities. Given the timing of our fieldwork, we did not review seizures occurring after the issuance of the Attorney General's Order and related guidance. Therefore, we cannot fully determine the extent to which incorrect interpretations of guidance are currently affecting seizure activities.

**Sample of DEA Seizure and Forfeiture Activities**

We evaluated a judgmental sample of cash seizures from a population of seizures that we believed were particularly susceptible to civil liberties concerns — seizures in which the DEA pursued administrative forfeiture, the CATS seizure method field indicated that seizure was effected without a warrant, and the accompanying DEA Geo-Drug Enforcement Program code indicated that the seizure was made without the presence of illicit narcotics. We identified a total population of 765 DEA cash seizures that occurred during FY 2012 that met the above criteria and selected a random sub-sample of 100 seizures to evaluate further.

We analyzed CATS data, including probable cause narratives uploaded to CATS by the DEA, related to these 100 seizures in an attempt to determine the following:  (1) the type of enforcement operations used to generate the seizures; (2) the factors the DEA and its state and local partners used to develop reasonable suspicion to initiate encounters that led to seizures; (3) the factors the DEA and its state and local partners used to establish probable cause for seizures; (4) the number of seizures that were returned to the owner prior to forfeiture; and (5) the extent to which seizures advanced or were related to ongoing investigations, initiated new investigations, led to arrests, or led to prosecution.  From our review of these narratives we were able to determine that 29 of the sampled seizures had advanced or were related to ongoing investigations, initiated new investigations, led to arrests, or led to prosecution.  For the remaining 71 seizures, we asked the DEA to provide us additional documentation that would indicate whether a seizure met the above conditions.  Based on this additional documentation, we made our final determinations, detailed in Table 7, as to the number of sampled seizures that advanced or were related to a criminal investigation.

According to the DEA, it is difficult to assess whether seizures advanced or related to a federal investigation, as it can take years for the broader law enforcement benefits of a seizure to become evident.  For example, a seizure may occur at the beginning of an investigation, and it may take many years before an arrest or prosecution related to that investigation occurs.  Therefore, we selected seizures made during FY 2012 in an attempt to capture all the law enforcement activities that occurred during the 3 full years following the seizure.

**APPENDIX 2**

# ATTORNEY GENERAL'S ORDER PROHIBITING CERTAIN FEDERAL ADOPTIONS



Office of the Attorney General
Washington. D. C. 20530

ORDER NO.

PROHIBITION ON CERTAIN FEDERAL ADOPTIONS OF SEIZURES
BY STATE AND LOCAL LAW ENFORCEMENT AGENCIES

By virtue of the authority vested in me as Attorney General, including 28 U.S.C. §§ 509 and 510, 18 U.S.C. §§ 981 and 982, and the other civil and criminal forfeiture statutes enforced or administered by the Department of Justice, I hereby direct that the following policy be followed by all Department of Justice attorneys and components, and all participants in the Department of Justice Asset Forfeiture Program concerning the federal adoption of property seized by state or local law enforcement under state law in order for the property to be forfeited under federal law ("federal adoption"):

Federal adoption of property seized by state or local law enforcement under state law is prohibited, except for property that directly relates to public safety concerns, including firearms, ammunition, explosives, and property associated with child pornography. To the extent that seizures of property other than these four specified categories of property are being considered for federal adoption under this public safety exception, such seizures may not be adopted without the approval of the Assistant Attorney General for the Criminal Division. The prohibition on federal adoption includes, but is not limited to, seizures by state or local law enforcement of vehicles, valuables, and cash, which is defined as currency and currency equivalents, such as postal money orders, personal and cashier's checks, stored value cards, certificates of deposit, travelers checks, and U.S. savings bonds.

This order does not apply to (1) seizures by state and local authorities working together with federal authorities in a joint task force; (2) seizures by state and local authorities that are the result of joint federal-state investigations or that are coordinated with federal authorities as part of ongoing federal investigations; or (3) seizures pursuant to federal seizure warrants, obtained from federal courts to take custody of assets originally seized under state law. This Order also does not affect the ability of state and local agencies to pursue the forfeiture of assets pursuant to their respective state laws.

This order is effective January 16, 2015, and applies prospectively to all federal adoptions. To the extent that prior Department of Justice orders, directives, and policies are inconsistent with this Order, those orders, directives, and policies are superseded.

January 16, 2015
_____
Date

Eric H. Holder, Jr.
Attorney General

45

**APPENDIX 3**

# POLICY DIRECTIVE 15-2:  ADDITIONAL GUIDANCE



**U.S. Department of Justice**

Criminal Division

*Washington, D.C.  20530*

**POLICY DIRECTIVE 15-2**

**TO:**  Heads of Department of Justice Components
Participants in the Department of Justice Assets Forfeiture Fund

**FROM:**  M. Kendall Day, Acting Chief
Asset Forfeiture and Money
Laundering Section

**SUBJECT:**  Additional Guidance on the Attorney General's January 16, 2015 Order on
Adoptions

On January 16, 2015, the Attorney General issued an order strictly limiting situations in which agency participants in the Department of Justice Asset Forfeiture Program are authorized to adopt assets seized by state or local law enforcement under state law in order for the property to be forfeited under federal law (referred to in the Attorney General's order as "federal adoptions"). The order does not apply to the following circumstances: (1) seizures by state and local authorities working together with federal authorities in a joint task force; (2) seizures by state and local authorities that are the result of joint federal-state investigations or that are coordinated with federal authorities as part of ongoing federal investigations; or (3) seizures pursuant to federal seizure warrants, obtained from federal courts to take custody of assets originally seized under state law.

This policy directive provides guidance regarding whether a seizure falls within the first and second circumstances mentioned above, namely whether it (1) is a seizure by state and local authorities working together with federal authorities in a joint task force (a "task force seizure"), or (2) results from a joint federal-state investigation or is coordinated with federal authorities as part of an ongoing federal investigation (a "joint investigation seizure").

Central to the application of the Attorney General's order is whether there was federal law enforcement oversight or participation at the time of seizure by state and local law enforcement. To ensure sufficient federal participation in all seizures that lead to federal forfeiture, an attorney from a federal agency must provide justification in writing for the federal forfeiture of an asset that is seized by a state or local law enforcement officer as a task force or joint investigation seizure, applying the factors outlined below. A prosecutor at the U.S. Attorney's Office for the district where the seizure took place (or if the seizure is part of an ongoing investigation, a prosecutor at the relevant U.S. Attorney's Office or Department litigating section) then must agree, in writing, that the forfeiture is permissible under the

2

Attorney General's order.[1]  This requirement extends to all types of forfeiture, including administrative.[2]  Federal prosecutors asked to provide such agreement must also consider the factors below when determining whether the seizure constitutes either a task force or joint investigation seizure.

## Factors to Consider When Deciding Whether a Seizure Qualifies as a Task Force or Joint Investigation Seizure

- **Was the Seizure Effected by a Federal Task Force Officer?** -- Is the state and local law enforcement officer who effected the seizure a task force officer on a joint federal and state task force? Is the officer deputized to enforce federal criminal law under either Title 18 or Title 21? Does the officer possess credentials issued by a federal law enforcement agency? Is the officer assigned to work on a task force full-time? Is the officer bound by the rules, regulations, and policies that otherwise govern the conduct of federal agents employed by the agency that issued the credentials to the officer? If the officer is assigned to the task force only part time or for a specific investigation, do the facts clearly demonstrate that the seizure was part of the officer's task force duties rather than a state or local law enforcement action, as described below?

- **Were Federal Authorities Involved Prior To and At the Moment of Seizure?** – Was the seizure made with direct, pre-seizure involvement by federal law enforcement? For example, at the time of the seizure, was the seizing officer acting under the direction of, or in real-time, hand-in-hand cooperation with, federal law enforcement? Was the seizure made as part of a preexisting federal or joint federal-state investigation in which federal agents are involved in the pursuit of federal criminal charges?

- **Does the Seizure Relate Primarily to State or Local Law Enforcement Action?** – Was the seizure made pursuant to a state seizure warrant without federal involvement? Is the state pursuing a criminal case under state law against the owner of the property? Did the officer seize the asset pursuant to his or her authority as a state or local law enforcement officer?

If the application of these factors by a federal prosecutor leads to the conclusion that there was insufficient federal law enforcement oversight or participation at the time of seizure, then, as set forth in the Attorney General's order, a federal seizure warrant must be obtained in order to pursue federal forfeiture, unless the seized asset qualifies for federal agency adoption under the narrow public safety exception.

---

[1] The requirement of written justification from federal agency counsel and written agreement from a U.S. Attorney's Office or Department litigating section will take effect March 1, 2015.
[2] In implementing this requirement, federal prosecutors must strive to respond in a timely manner given the 60-day notice requirements contained in 18 U.S.C. § 983 and 19 U.S.C. § 1607, as well as the asset custody timelines and policies implemented by the U.S. Marshals Service and the federal seizing agencies.

3

Each asset seized by state and local law enforcement that is forfeited federally must be reported to the Justice Management Division (JMD) through the Consolidated Asset Tracking System (CATS), with an indication as to whether the seizure qualified for the public safety exception, fell into the task force or joint investigation seizure categories, or was seized federally through a seizure warrant.[3]  In addition, all electronic and paper records relating to the federal forfeiture of each asset seized by state and local law enforcement must be maintained in a central location by the Asset Forfeiture Coordinator of the U.S. Attorney's Office or by the Asset Forfeiture and Money Laundering Section, for the purposes of review, as needed.

If you have questions regarding this policy directive or the application of the Attorney General's order, please contact the Asset Forfeiture and Money Laundering Section at (202) 514-1263.

---

[3]  Later this year, JMD will be updating CATS to allow agencies to electronically track this information, namely whether the person who effected the seizure was a state or local officer, whether the seizure initially was made as part of a federal task force or joint investigation, and the date and name of the federal prosecutor approving the pursuit of federal forfeiture.  The approval documents for such seizures must be uploaded to eDocs for review.  Until the CATS update is complete, agencies must manually track this information so that it is available for subsequent submission and review.

**APPENDIX 4**

## THE CRIMINAL DIVISION'S RESPONSE TO THE DRAFT REPORT

**U.S. Department of Justice**

**Criminal Division**

*Office of the Assistant Attorney General*                                    *Washington, D.C.  20530*

March 17, 2017

**MEMORANDUM**

TO:         Nina S. Pelletier
            Assistant Inspector General, Evaluation and Inspections
            Department of Justice Office of Inspector General

FROM:       Kenneth A. Blanco
            Acting Assistant Attorney General
            Criminal Division

SUBJECT:    Response to the Office of the Inspector General's February 2017 Formal
            Draft "Review of the Department's Oversight of Cash Seizure and
            Forfeiture Activities"

The Department of Justice (Department) appreciates the opportunity to respond to the Office of the Inspector General's February 2017 formal draft of its *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* Formal Draft (Formal Draft). In addition, we thank the Office of Inspector General for the consideration that it has given to some of our prior remarks as evidenced by changes to the Formal Draft. Nevertheless, the Department still has significant concerns regarding the Formal Draft, and specifically the sample of 100 assets that forms the core of the Formal Draft's discussion of the Department's forfeiture activities. As an initial matter, there is a fundamental disconnect between the Formal Draft's title—and its conclusions and recommendations—and the sample of cases upon which the Formal Draft relies. Worse still, the conclusions the Formal Draft draws from this sample are unsupported by the data—indeed, the data in many cases contradicts the Formal Draft's conclusions.

When the Inspector General began its review of the Asset Forfeiture Program (Program) in 2014, a robust public debate about the Department's use of asset forfeiture was already well underway. In order for the Formal Draft to meaningfully contribute to that debate, however, it must rely on accurate and timely information or it risks unfairly undermining a vitally important law enforcement tool. Indeed, the Formal Draft fails even to acknowledge the scale of the problem that asset forfeiture is intended to combat—that is, the staggering volume of illicit proceeds (often cash) that are generated globally and which criminal actors move and conceal in increasingly creative ways. In fact, the United Nations Office of Drugs and Crime previously noted that criminals may have laundered as much as $2 trillion dollars—a staggering 5 percent of

49

Case 2:17-cr-00585-GMS Document 172-3 Filed 03/23/18 Page 58 of 75

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

the global GDP—in 2016, but only a small fraction of those proceeds were seized or frozen. *See*
United Nations Office on Drugs and Crime, Money Laundering and Globalization
(https://www.unodc.org/unodc/en/money-laundering/globalization.html; last visited March 13,
2017). Closer to home, asset forfeiture is a critical tool to fight the current heroin and opioid
epidemic that is raging in the United States,[1] as it allows law enforcement to seize the proceeds
of drug-related crimes and deter future criminal activity.

The use of asset forfeiture is thus essential to combatting some of the most sophisticated
criminal actors and organizations—including terrorist financiers, cyber criminals, fraudsters,
human traffickers, and transnational drug cartels—and it is therefore essential that any review of
the Department's policies presents policymakers with meaningful and reliable information. This
response provides the requested formal, written response to the Formal Draft's findings and
recommendations and details the Department's concerns about the use of a highly
unrepresentative sample of data and the subsequent misunderstanding of that data in the Formal
Draft.

The Department stands ready to continue to share its extensive data, and to assist the
Inspector General in sorting through and making sense of that data, to ensure that this report is as
accurate and informative as possible.

**Executive Summary**

Asset forfeiture is, first and foremost, a law enforcement program. Both criminal and
civil asset forfeiture enable the Department to compensate victims, deprive criminals of the
proceeds of their crimes, remove the tools of crime from criminal organizations, and deter crime.
Because asset forfeiture is a powerful and effective law enforcement tool, the Department is
committed to ensuring that it is used appropriately. The Department therefore agrees that
effective oversight may help to assure the public that component agencies continue to use seizure
and forfeiture authorities appropriately.

We further agree that the ongoing public debate about asset forfeiture is healthy, and that
the Formal Draft can contribute to the debate about how best to balance the law enforcement
goals of the Program with the protection of property holders; but to do so, the Formal Draft must
include accurate and timely information and provide an accurate picture of the Department's use
of asset forfeiture.

The Department has two main concerns with the data set relied upon by the Inspector
General in the Formal Draft. First, the majority of the 100 sampled assets appear to be linked to
ongoing cases and do not appear to implicate civil liberties concerns in the ways that the Formal

---

[1] In a September 2016 press release, the Department observed, "The heroin and prescription opioid epidemic is one
of the most urgent law enforcement and public health challenges facing our country. The Department of Health and
Human Services recently announced that 3.8 million people ages 12 and older are currently misusing prescription
pain relievers in our country. In 2014, more than sixty percent of the 47,000 drug overdose deaths in America
involved opioids, reflecting a dramatic increase over the past two decades." *See*
https://www.justice.gov/opa/pr/department-justice-releases-strategy-memo-address-prescription-opioid-and-heroin-
epidemic.

2

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

Draft concluded. Second, the data analysis significantly underrepresents the amount of funds
returned to petitioners and claimants. The Department's concerns about these two data-related
issues are further discussed below.

This response is designed to assist the OIG in including more complete, accurate, and
representative information in its review and recommendations. We emphasize that the
Department is firmly committed to the OIG's goal of conducting an independent and fair
investigation of the Department's asset forfeiture policies and practices. The Department
remains committed to assisting the OIG in analyzing and understanding the most accurate and
current data available to support its independent conclusions and recommendations.

## I.   THE ASSET FORFEITURE PROGRAM – OVERSIGHT AND DUE PROCESS

Given the Formal Draft's extensive discussion of—and concerns about—administrative
forfeiture, it is important to note at the outset that federal courts have consistently held that
administrative forfeiture complies with due process and is permitted under federal law. *See, e.g.,
United States v. Robinson*, 434 F.3d 357, 362 (5th Cir. 2005). Administrative forfeiture is a
useful tool because it allows the government to avoid burdening the courts in order to forfeit
uncontested asset seizures. In many cases, administrative forfeiture allows the Department to
return the proceeds of crime to victims faster than would be possible in criminal or civil judicial
forfeiture proceedings. Following seizure, the government is required to send direct written
notice of the administrative forfeiture proceeding to every person who appears to have an interest
in the seized property and whose identity is known to the government. To ensure notice to
interested persons whose identities are not known to the government, the government publishes
notice of the administrative forfeiture proceeding on a dedicated website, www.forfeiture.gov. If
anyone files a claim with the seizing agency contesting the administrative forfeiture, the agency
refers the case to a United States Attorney's Office, which then decides whether to proceed with
a judicial forfeiture action or to return the property. If no claim is filed, the administrative
forfeiture still is not finalized until it has been reviewed for legal sufficiency by agency counsel.
Additionally, the procedure to file a claim is simple, as it only requires that an individual identify
the property, state an interest in the property, and swear to the accuracy of their claim under
penalty of perjury. A uniform claim form is available to aid individuals wishing to file a claim to
seized property.

It is also important to note that criminal and civil forfeiture are not mutually exclusive. In
some instances, the Department's investigative agencies—in conjunction with a U.S. Attorney's
Office—will run parallel criminal and civil forfeiture cases. Parallel proceedings help ensure
assets can be civilly forfeited if the defendant flees or dies before a defendant is criminally
convicted and a criminal forfeiture order is issued.

Significantly, the Formal Draft appears to assume that, because administrative forfeitures
do not require the involvement of a judicial officer, they are conducted without adequate
oversight by the Department. This misunderstands the procedural protections already in place.
As noted above, all administrative forfeitures are first reviewed by agency counsel. Moreover,
many cases that end as administrative forfeitures did not begin that way: for example,
approximately 70 percent of the FBI's administrative forfeiture cases in FY 2015 began with

3

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

either a search warrant or a seizure warrant issued by a court, requiring the involvement of a U.S.
Attorney's Office. All federal administrative forfeitures, even when the seizure of the property is
not contested – the only circumstance that does not include judicial involvement – must still
comport with all due process requirements, as well as the requirements set by statute, regulation,
and Department policy.

Moreover, the government must have at least probable cause linking an asset directly to
criminal activity before it can be seized. Often, probable cause is found by a judge pursuant to a
sworn application for a seizure warrant; otherwise, probable cause is found by a law enforcement
officer pursuant to an exception to the warrant requirement. In either instance, however, the law
requires that there be probable cause linking the asset directly to criminal activity. The probable
cause requirement is a core tenet of our legal system. It is the same standard applicable to
placing an individual under arrest. The forfeiture process, civil or otherwise, does not allow for
the seizure of property in the absence of probable cause. Indeed, even when probable cause is
present, Department policy imposes threshold requirements for cash seizures. Specifically, the
minimum amount of cash that can be seized is $5,000, unless the person from whom the cash
was seized either was, or is, being criminally prosecuted by state or federal authorities for
criminal activities related to the property, in which case the amount must be at least $1,000.

## II.   OBJECTIONS TO THE FORMAL DRAFT'S DATA ANALYSIS

The data analysis used in the Formal Draft is fundamentally flawed in two significant
ways: (1) the sample of 100 DEA assets used in the Formal Draft does not support the
conclusions drawn by the Formal Draft, and (2) the sample significantly underreports the return
of seized assets to claimants and petitioners.

### A.   The Formal Draft Focuses on a Small, Outdated Sample of 100 DEA
Seizures That Do Not Support the Formal Draft's Conclusions

We note as an initial matter that the Formal Draft is entitled a "Review of *the
Department's* Oversight of Cash Seizure and Forfeiture Activities," while it actually focuses its
analysis on a very limited aspect of the Department's asset forfeiture activities, specifically, a set
of 100 DEA cash seizures that occurred in 2012. It is important, in the Department's view, to
carefully distinguish this unrepresentative set of selected samples from a review of the Program
as a whole. Moreover, as the Formal Draft itself concedes, the 100 cases selected were not a
random sample. The decision to forego building a statistically representative set of cases
fundamentally undermines the OIG's and the Department's ability to extrapolate findings and
make informed judgments about the use of asset forfeiture.

The Formal Draft concluded on the basis of its 100-asset sample that 1) the majority of
the sampled seizures did not advance or relate to criminal investigations, and 2) the seizures may
pose risks to civil liberties. However, a close analysis of those 100 assets reveals that the data
does not support these two conclusions. In fact, the data shows precisely the opposite: the
majority of these assets were, in fact, connected with broader criminal investigations and were
not the sorts of seizures that pose risks to civil liberties. Furthermore, there remains a question
as to whether or not the existence of an ongoing criminal matter in the context of an asset

4

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

forfeiture proceeding is as relevant to the presence of civil liberties concerns as the Formal Draft
appears to reflect.

The Formal Draft concludes that in over half of the sampled cases, there was no
discernable connection between the seizure and the advancement of law enforcement efforts. A
close analysis of the Consolidated Asset Tracking System (CATS) data—and specifically the
various flags associated with each asset—shows there were connections between the seizures and
law enforcement efforts in 81 of the 100 seizures. Eighteen of the 100 sampled assets show that a
United States Attorney's Office was involved in the seizure and forfeiture via a parallel criminal
action or claim, which indicates, contrary to the Formal Draft's conclusion, that the asset was
connected in some way with an ongoing criminal investigation or civil action. An additional 17
assets were connected to cases with multiple seizures, which again indicates an ongoing criminal
investigation as opposed to a "one-off" interdiction wholly unrelated to an ongoing investigation.
Thirty-two additional assets were flagged for a "forfeiture dependent award," which may
indicate the presence of an informant and preexisting intelligence of a federal criminal violation
in connection with the seizure—both of which may be indicative of a connection between those
seizures and a broader criminal investigation. Finally, 14 additional assets in the Formal Draft's
data set were identified by the seizing agents as being connected with serious criminal activity
such as smuggling, money laundering, and priority target/foreign-based organizations—which
again indicates a larger criminal investigation. Therefore, **81** of the 100 assets sampled by OIG
were likely tied to a criminal investigation or prosecution, while only 19 of the assets could
potentially be seizures that did not advance an ongoing criminal investigation—although even
those seizures may have yielded intelligence that advanced other criminal investigations. This
data analysis shows that the conclusions reached by the Formal Draft are erroneous.

The Formal Draft also concluded that 79 of the 100 seizures were particularly susceptible
to civil liberties concerns, specifically, warrantless seizures and seizures that occurred without a
contemporaneous narcotics seizure. However, these conclusions are inaccurate and misleading.
First, 20 of the 100 assets were valued at over $100,000. Seizures of that magnitude are vastly
more likely to involve ongoing significant criminal activity and thus are extremely unlikely to
implicate potential innocent owners. Indeed, a number of states and forfeiture reform groups
have agreed and have introduced asset forfeiture legislation targeting only federal adoptive
seizures under either $50,000 or $100,000, reasoning that cash amounts above $50,000 or
$100,000 have additional indications of criminality. In addition, three of the assets included in
the sample were derived from a single DEA case involving 50 individual assets, including cash
and firearms worth over $4.9 million. Three other assets included in the sample were derived
from a single DEA case involving 17 assets, including cash, a weapon, and a $2 million bank
account. The bottom line is that most of the 100 assets selected for this sample contradict the
conclusion that these cases implicate civil liberties concerns as they indicate a high probability of
criminal activity and a linked criminal investigation.

The difficulty in building a system that links seizures with ongoing criminal matters is a
persistent problem, as the Inspector General noted throughout the Formal Draft. The Formal
Draft found that investigative agencies do not use the aggregate data contained in CATS and
their law enforcement databases to make clear connections between seizures and ongoing
investigations, and the Department agrees. Indeed, the detailed analysis of these 100 DEA

5

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

seizures by the Department has required the extensive assistance of individuals with an expert
knowledge of criminal investigations and the CATS system, a feat that an average agent or
paralegal in a field office cannot achieve during a routine case. As explained in the
Department's response to Recommendation #1 of the Formal Draft, the Department is
undertaking a new initiative to develop a public-facing data system that will help link assets and
case-related information in order to address the shortfalls of CATS.

In addition, there are flaws in the Formal Draft's identification of two instances in which
task force officers made different decisions in supposedly similar situations. First, these two
instances appear to be distinguishable from each other. In example 2.B, when the task force
officer did not allow the individual to keep a portion of the seized cash, the passenger denied
ownership of the cash seized except for $500 (or $525 – the amount appeared to vary), and the
passenger changed her story about the source of the $500 on at least 2 occasions. In example
2.A, the passenger consistently asserted that all of the cash was his, and asked for $1,000 to
travel home. The Formal Draft recognizes that there were factual differences between the
situations, but nonetheless concludes that "more guidance may be needed to clarify how to best
handle such situations." Formal Draft, P. 24. Respectfully, the conclusion is not supported by
the examples cited and should be eliminated. While consistency is important, the two examples
OIG cites in the Formal Draft fail to identify a lack of consistency sufficient to support a
recommendation for corrective action.

### B. The Formal Draft Underreports the Return of Forfeited Assets to Claimants and Petitioners

The Formal Draft's analysis of returns of property to claimants and petitioners
underrepresents the actual rate of return. The Formal Draft found that the Department had
administratively forfeited part or all of the one hundred DEA cash seizures, collectively valued at
approximately $6.5 million. For 14 of the 100 seizures, an owner, victim, or lienholder filed a
claim or petition. The Formal Draft therefore concludes that of the $6.5 million forfeited in the
sample, the Department returned just over $26,000, or less than 1%, to petitioners and claimants,
and that few of the petitions and claims resulted in the return of seized cash. The Formal Draft
goes on to agree with asset forfeiture critics who suggest that the claim process is unduly onerous
and unfair, especially when claimants contest low-value seizures.

These conclusions are highly misleading. First, claims and petitions were only asserted
against 3.2% of the amount seized. The Formal Draft assumes that the low claim and petition
rate means that unfairness is baked into the system, and the claimants are prevented from filing
claims because of an opaque and labyrinthine claims process. That assumption, however, fails to
acknowledge that money couriers rarely file claims for funds that are not theirs, and many
drivers disavow any ownership or knowledge of the currency during the seizure. Furthermore,
criminals often will decline to file a claim in order to avoid law enforcement scrutiny of their
activities. Bulk cash smuggling, which includes moving large amounts of currency in vehicles,
is a principal international money laundering technique. Every year, tens of millions of dollars
in cartel proceeds are seized from the nation's highways and airports by state, local, and federal
law enforcement. The Formal Draft fails to acknowledge these realities of law enforcement.

6

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

The Formal Draft concluded that the claim or petition process is unfair for those
contesting low-value seizures. However, the total assets seized in the 14 seizures for which a
claim or petition was filed totaled only $210,526, an average of just $15,000 per seizure. In all,
there were 20 claims or petitions filed for those 14 assets. Nine of those 20 claims and petitions
were filed for amounts of $10,500 or less. Overall, $46,012, or 22%, of the 14 seizures were
returned. In fact, one of the claimants in the sample received a $20,000 petition for remission
payment after forfeiture was complete, a fact that was entirely overlooked in the OIG analysis.
All told, more than a quarter of the petitions filed with respect to the assets in the Formal Draft's
sample resulted in a return of funds to the claimant. In short, the sample demonstrates that
individuals actually do file claims or petitions against the small seizures, and that the Department
carefully considers petitions, granting those which have merit.

An owner or lienholder has multiple opportunities to challenge a forfeiture. First, a
person may file a petition for remission of an administrative forfeiture. That procedure allows a
filer to challenge a seizure at an administrative level, and does not require the filer to hire an
attorney or appear in front of a judge. A person may also file a claim in conjunction with that
petition for remission. If the claim is deemed valid, the seizure will be referred to the United
States Attorney's Office (USAO) for review and a decision to proceed with civil or criminal
judicial forfeiture. The USAO may decline and return the asset to the owner, may settle with the
claimant, or may proceed with a judicial forfeiture. During the judicial forfeiture proceeding, the
owner will have an opportunity to file a claim that a federal judge will decide. Even if the judge
rules against the claimant and forfeits the asset, the claimant has an opportunity to file a petition
for remission or mitigation of the forfeiture, which is essentially a request for the Department to
"pardon" a completed judicial forfeiture, despite the judge's decision. In short, there are
multiple remedies available to an owner seeking the return of his property.

Beginning in 2016, the Department has revamped its claim and petition submission
process to make it easier for owners to file claims and petitions for remission. The Department
has revised its claim and petition forms and instructions to make the forms user-friendly and
straightforward for unrepresented individuals. An online claims-submission process will be
introduced soon, where individuals who have received direct notice, or have read about a seized
asset on forfeiture.gov, may file a claim or petition if they believe they have an interest in the
asset. The Department believes that these advances will ease any filing burden for individuals
who have had their property seized by the government. In addition, the Department plans to
issue revised, plain-language remission regulations that make the remission process clearer to
potential claimants.

Because the sample focuses solely on DEA seizures, the Formal Draft ignores the
dispositions of forfeitures conducted by the rest of the Department. In 2012, the same fiscal year
as the sample, the Department returned approximately $1.49 billion in forfeited funds to victims,
while additional amounts were returned to lienholders or innocent owners across the forfeiture
program. Furthermore, of the $1.75 billion in assets seized by the Department in 2012 alone,
$609 million, or one-third, of the funds were eventually returned to victims. The inaccurate one
percent return rate reported in the Formal Draft thus misrepresents the program as a whole and
serves to undermine public confidence in the Department's stated goals of forfeiting assets and
returning funds to victims.

7

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

Despite the Department's disagreement with the data analysis and methodology, the
Department believes that the policy concerns that have been raised in the public debate and in the
Formal Draft should not be ignored. For that reason, the Department also believes it is important
continually to review department forfeiture policy and procedures to ensure the appropriate and
judicious use of asset forfeiture.

## III.   THE OIG'S FINDINGS AND RECOMMENDATIONS

The Department appreciates that the OIG shared information with Department leadership
during the review. The Department's views on the four findings and four recommendations
outlined in the Formal Draft are noted below.

*Recommendation #1 – Develop ways to collect relevant data related to seizure and forfeiture
activities sufficient to identify and evaluate whether seizures advance or are related to federal
investigations.*

As stated above, it remains a question as to whether or not the existence of an ongoing
criminal matter in the context of an asset forfeiture proceeding is as relevant to the presence of
civil liberties concerns as the Formal Draft appears to reflect. That being said, as our response to
the Formal Draft makes clear, the Department believes that a more extensive review of the
information in CATS provides a more accurate understanding of the Department's use of asset
forfeiture in connection with ongoing criminal matters.

For some background, the CATS database was designed to serve primarily as an asset
tracking system, not an investigative or judicial case management system. CATS does not link
directly with the investigative agencies' case management systems or the various judicial case
management systems managed by the Administrative Office for the U.S. Courts or various other
litigation case management systems within the Department. In addition to the monumental
technical and cost challenges, the Department has not attempted to import that investigative and
judicial case database information into the CATS environment for a variety of law enforcement,
security, privacy, and efficiency reasons. This makes CATS a poor vehicle for generating
automated reports about which individual assets, seizures, and forfeitures are directly linked to
individual criminal investigations or judicial cases. That said, virtually all assets tracked in this
system have a data field with a case number issued by the seizing federal investigative agency.
In addition, the other data fields associated with both individual assets and associated
investigative case numbers can provide substantial indicators about the nature of federal
investigations involved.

As the Formal Draft notes, the only current method to determine if an earlier
administrative seizure and forfeiture advanced a later criminal investigation is to obtain and
manually compare case files from both the federal seizing agency and the relevant USAO, along
with any available court database information. In light of the security, privacy, and
technological challenges associated with linking so many disparate databases, the Asset
Forfeiture Management Staff (AFMS) responsible for operating CATS received $2.147 million
dollars in FY 2017 for a new initiative to define the project scope for development of a new
public-facing data system that will help link assets and case-related information. This initial
phase will bring together litigation, law enforcement, court system, and information technology

8

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

experts from the stakeholder communities to define requirements for linking existing data
sources and for developing and integrating those with any needed, yet currently non-existent data
sources.

*Recommendation #2 – Review seizure practices to determine whether more specific policy
guidance and/or training is needed to ensure consistency in seizure operations.*

        As noted above, the finding on which this recommendation is based is not well supported.
Furthermore, the specificity that a policy would need to include to ensure the same result in the
two examples cited in the Formal Draft is likely not realistic, especially since the two examples
contain factual differences. That being said, the Department agrees that similar matters should be
handled consistently in the broader sense, and the training that the Department agrees to conduct
pursuant to recommendation 3 will seek to achieve that result.

        *Recommendation #3 - Ensure that state and local task force officers receive training on
federal asset seizure and forfeiture laws and component seizure policies before they conduct or
participate in federal seizures.*

        The Department concurs in this recommendation. However, it should be noted that the
Formal Draft did not include detailed information on the Department's existing training
programs, which we provide here, as well as proposed enhancements.

        The Department provides robust training in asset forfeiture law, practice, and policy.
Specifically, the Money Laundering and Asset Recovery Section (MLARS, formerly AFMLS)
delivers numerous instructor-led training courses for Assistant United States Attorneys, support
staff, and federal, state, and local law enforcement. These courses include the Financial
Investigation Seminar, Introduction to Asset Forfeiture, Introduction to Money Laundering,
Advanced Money Laundering, Suspicious Activity Report (SAR) Review Team Seminar, Legal
Issues for Advanced Asset Forfeiture Support Staff Seminar, and the Asset Forfeiture Chiefs and
Coordinators Skills Seminar. Since FY 2012, MLARS has instructed over 4,700 participants,
including those who have attended the 33 Financial Investigation Seminars and the 21 courses at
the National Advocacy Center during that time.

        MLARS also has an extensive intranet page available to Program participants, which
includes a library of resources on asset forfeiture, such as the *Asset Forfeiture Policy Manual*,
the monthly *Quick Release* case law update publication, and case outlines. The site receives
approximately 12,500 hits per month.

        Additionally, MLARS provides outreach and training to state and local law enforcement
agencies participating in the Equitable Sharing Program. This outreach includes training on
Department law, practice, and policy. The Section conducts approximately 10-12 equitable
sharing trainings per year, with an average of 500-600 participants per year.

        In order to address the recommendations proposed by the OIG Report, MLARS is
considering establishing specific training requirements for state and local law enforcement
officers who participate as task force officers with federal law enforcement. Specifically, all task
force officers (TFOs) could be required to certify that they completed two types of training

                                        9

Response to the OIG's February 2017 Formal Draft "Review of the
Department's Oversight of Cash Seizure and Forfeiture Activities"

before participating in or conducting federal seizures: (1) a module on federal asset forfeiture law
and procedures, and (2) a module on component-specific policies regarding asset forfeiture.
Once both trainings are completed, the TFOs will certify their completion to the federal law
enforcement agency. Agencies would be required to provide an annual certification indicating
that all TFOs received the required training before participating in or conducting federal seizures.

If the Department elects to institute this additional training, MLARS would oversee the
design and implementation of both modules, including the component-specific modules designed
by the agencies. Given the number and location of TFOs, and to ensure that TFOs can begin
working on federal cases in a timely manner, the Section recommends that these modules be
designed as e-learning/distance learning modules to ensure broad, timely access. A training
resource also would be developed to assist with remediation and reinforcement.

*Recommendation #4 – Monitor the impact of the Attorney General's 2015 Order eliminating
most types of federal adoptions of state and local seizures, and seek to mitigate any negative
effects on law enforcement cooperation.*

The Department is conducting a review of the Attorney General's 2015 Order to
determine all potential negative effects on law enforcement – federal, state and local. One key
underpinning of that review is that the Department continues to rely on critical cooperation with
its state and local law enforcement partners. It is imperative that these partnerships remain
strong.

The Department is exploring innovative methodologies for determining equitable sharing
payments that would allow for payments that recognize more forms of cooperation, not just the
forfeiture of specific assets. This could include, for example, recognizing law enforcement
efforts that contributed to cases that result in victim compensation, rather than proceeds retained
in the Assets Forfeiture Fund. The Department will continue to explore these possibilities and
evaluate whether changes to statutory authorities would be required to implement them. In the
meantime, the Department will provide additional training to the individuals that decide
equitable sharing percentages in order to ensure that equitable sharing decisions are fair and
proportional to the participating agencies' contributions.

10

# OIG ANALYSIS OF THE CRIMINAL DIVISION'S RESPONSE

The OIG provided a draft of this report to the Criminal Division for its comment. The Criminal Division's response is in Appendix 4 of this report. We discuss the OIG analysis of the Criminal Division's response and the actions necessary to close the recommendations below.

## The Criminal Division's General Comments and the OIG's Reply

At the outset of the response, the Criminal Division asserts that, because the OIG gave our report a broad title but included a detailed analysis of a sample of 100 Drug Enforcement Administration (DEA) cash seizures, there is a fundamental disconnect between the report's title and its content. We note that the first, third, and fourth finding areas of this report do not directly discuss the sample of DEA cases. The first and third finding areas identify Department-wide issues, the Department's inability to determine how often seizures and forfeitures advance or relate to criminal investigations, and the lack of a requirement to provide training to state and local task force officers prior to conducting federal seizures. The fourth finding area relates to the need to monitor the effects of the Attorney General's 2015 Order that eliminated most types of federal adoptions of state and local seizures and to mitigate any negative effects on law enforcement cooperation. We therefore continue to believe that the report's title appropriately reflects the review that we conducted of the Department's oversight of its cash seizure and forfeiture activities.

The Criminal Division next complains that the 100 DEA cash seizures we sampled were not appropriately representative and that the conclusions we reached based on this sampling are unsupported by the data. We disagree. As we state in our report, we selected our sample from a subset of the universe of DEA's cash seizure activity precisely because they presented certain risk characteristics that we judgmentally identified. Our use of this sample to help assess the Department's cash seizure activities was entirely appropriate because it aligns with the OIG's standard and accepted practice of identifying and then evaluating areas of Department operations that present higher levels of risk. By focusing our analysis on DEA cash seizures, specifically those that were conducted without a warrant and without the presence of illicit narcotics, we appropriately identified and analyzed one of the Department's most significant areas of risk in its cash seizure activity. Our decision to focus on this area also was informed by public and congressional concerns about the Department's use of cash seizure and administrative forfeiture, as well as our analysis of Consolidated Asset Tracking System (CATS) data, which indicates that the DEA is responsible for the vast majority of the number and value of the Department's cash seizures, most of which result in administrative forfeiture.

Moreover, we reached our conclusions based on data that we collected and evaluated in the manner that multiple Department officials told us was most appropriate for determining whether a seizure had advanced or related to a criminal investigation — reviewing case-specific narrative information about each seizure. Specifically, we collected DEA-developed probable cause narratives that detailed the

conditions surrounding each seizure and supplemented these narratives with discussions with DEA officials about seizures for which the narrative did not provide sufficient information that would allow us to determine whether the seizure advanced or related to an investigation.

By contrast, the Criminal Division used its own methods, which are based on assumptions and speculation, to reach its own conclusions regarding the connection of these 100 cases to criminal investigations and prosecutions. The result is a series of assertions by the Criminal Division in its response about how the cases connect to a criminal investigation, but it uses words such as "may" or "indicates" or "likely" to condition the claims; for example, one sentence contends that the presence of certain information "may be indicative of a connection between these seizures and a broader criminal investigation." We believe that the Criminal Division identified a different number of seizures as possibly connecting to a criminal investigation because it based its analysis solely on a review of non-narrative CATS data fields using four assumptions that are not entirely warranted for the purposes of this analysis:

1. **If a payment was made to a confidential source, as may be evidenced by a "forfeiture dependent award," there was preexisting intelligence of a federal criminal violation.** Our review of sampled seizures revealed numerous ways the DEA uses confidential sources, including as providers of routine tips based on standard profiles rather than as suppliers of information about a specific drug crime. This former method is described in our *Audit of the Drug Enforcement Administration's Management and Oversight of Its Confidential Source Program.* In that report, we found that DEA interdiction units relied heavily on confidential sources who were employees in the travel and parcel industries and had access to passenger information or private facilities. This report further details that some agents requested that sources provide them with suspicious travel itineraries that met criteria defined by the agents and, in some cases, requested entire passenger manifests almost daily. Similarly, some parcel employees were told to provide information related to suspicious parcels and, at times, followed DEA instructions to directly transfer customer packages to the DEA.[63] We believe that this type of information is fundamentally different than the type of information provided by a confidential source who offers substantive information about a specific drug crime, and we therefore do not consider seizures initiated with this type of information to indicate a relationship to an investigation absent other connections.

---

[63] DOJ OIG, *Audit of the Drug Enforcement Administration's Management and Oversight of Its Confidential Source Program,* Audit Report 16–33 (September 2016). Some of the sources the OIG reviewed had received significant payments for their assistance, including an airline employee who received more than $600,000 in less than 4 years and a parcel employee who received more than $1 million over 5 years.

2. **A seizure with a data field that indicates smuggling activity likely advanced or related to a criminal investigation.** The Criminal Division used a data field that, according to DEA officials, its agents do not use consistently. Our in-depth review found that many of the seizures with the "smuggling" indicator did not advance or relate to an investigation and were generally transportation or parcel interdiction seizures.

3. **If multiple seizures share a common case number, the seizures likely advanced or were related to an ongoing criminal investigation.** Our review of narrative seizure information and DEA responses reveals that during a transportation interdiction operation, agents and task force officers may seize multiple assets from one or more individuals using the same case number. As we discuss in footnote 44 of the report, multiple seizures with the same case number can sometimes indicate connection to an ongoing investigation. However, our review indicates that not all of the sampled seizures that accompanied other seizures and have the same case number actually advanced or related to an investigation.

4. **If a U.S. Attorney's Office becomes involved in a seizure, the seizure likely advances or relates to a criminal investigation.** While this generally may be true when there is a parallel criminal or civil forfeiture related to an administrative forfeiture, we observed that U.S. Attorney's Office involvement does not necessarily indicate connection to a broader criminal investigation where the involvement is solely for the purpose of resolving a claim initiated by a property owner.

In sum, we stand by the soundness of our methodology and conclusions and believe that the need for the Department to keep better data is demonstrated by the fact that the Criminal Division had to engage in assumptions and speculation in an effort to respond to our findings. Moreover, even the Department's own speculative calculations recognize that almost 20 percent of the universe of cases that we examined has no identifiable connection to criminal investigations.

The Criminal Division also asserts that the current OIG report does not fairly describe the amount of forfeiture proceeds that are returned to victims of crime. This claim is not accurate. On page 1 of the report, we explain that the Department states that it has returned more than $4 billion in forfeited funds to crime victims since FY 2000 and that it anticipates returning an additional $4 billion during the ongoing Madoff victim compensation process. The seizures underlying these victim returns largely result in civil or criminal forfeiture and are generally related to fraud investigations conducted by the Federal Bureau of Investigation. This type of investigative activity is considerably different from the investigative activity that results in DEA cash seizures. Although we do not have data that specifically shows the amount of forfeiture proceeds that the DEA specifically returned to victims as a result of its cash seizures, Asset Forfeiture Management Section (AFMS) data indicates that between FY 2000 and FY 2016, the DEA returned approximately $14 million in forfeiture proceeds to victims of crime,

regardless of asset type.  Additionally, the Criminal Division implies that we are projecting the return rate from the seizures in our sample to the total amount of returns for all of the Department's seizure activity.  However, throughout the report we provide summary data about asset seizure activity and, specifically in Table 5 of the report, we present the value of returns from all DEA cash seizures.  Further, the Criminal Division incorrectly claims that we misreported the total amount returned from our sample of DEA cash seizures as $26,000, when, in fact, on page 30 of the report we reported this figure as $46,000.

Additionally, the Criminal Division believes that the OIG has overstated the risks associated with administrative forfeiture by not fully describing the various opportunities for judicial involvement in the administrative forfeiture process.  We did not intend for this review to portray every Department seizure that results in administrative forfeiture as a warrantless interdiction-style seizure; however, the Department is unable to systematically differentiate these types of higher risk seizures that do not advance or relate to investigations from those less risky seizures that include judicial involvement and do advance or relate to investigations.  Until the Department can better draw these distinctions, and identify areas of increased risk, it cannot effectively and efficiently oversee its asset seizure and forfeiture activity.

Finally, the Criminal Division suggests that we do not fully appreciate the importance of law enforcement's use of asset seizure and forfeiture authorities in effectively addressing our nation's crime and illegal drug problems.  While we have long recognized that a well-run asset forfeiture program can be an important law enforcement tool, we believe that the Criminal Division's comments on our report indicate that it has missed a key point:  regardless of the importance of the tool, it must be used appropriately, with effective oversight, and in a way that does not place undue risks on civil liberties.  We further believe that the Department has an increased responsibility to protect civil liberties when its investigative components use a tool that permits seizure and forfeiture of property without judicial involvement or apparent connection to investigative activity, and then uses the proceeds of that property as a funding mechanism for law enforcement operations.

Having considered the Criminal Division's general comments, below we discuss the actions necessary to close the recommendations.

**Recommendation 1:**  Develop ways to collect relevant data related to seizure and forfeiture activities sufficient to identify and evaluate whether seizures advance or are related to federal investigations.

**Status:**  Unresolved.

**Criminal Division Response:**  The Criminal Division indicated that the OIG may have overstated the relevance of the existence of an ongoing criminal investigation to civil liberties concerns in the context of an asset forfeiture proceeding.  Further, the Criminal Division stated that the Department believes that a more extensive review of the information in CATS provides a more accurate understanding of the Department's use of asset forfeiture in connection with

ongoing criminal matters. However, because of technical, cost, security, privacy, and efficiency reasons, the Department has not attempted to import investigative and judicial case database information into CATS. This, and other related information, is necessary to determine whether an earlier administrative seizure and forfeiture advanced a later criminal investigation.

The Criminal Division also stated that in light of the security, privacy, and technological challenges associated with linking so many disparate databases, the AFMS, which is responsible for operating CATS, received $2.147 million in FY 2017 for a new public-facing data system that will help link assets and case-related information. The initial phase of this project will bring together litigation, law enforcement, court system, and information technology experts from the stakeholder community to define requirements for linking existing and new data sources.

**OIG Analysis:** We believe that instances in which a seizure does not advance or relate to an ongoing criminal investigation can raise civil liberties concerns because such instances raise the question of whether law enforcement is seizing property for a purpose other than deterring and punishing criminal behavior. This has been an ongoing concern of Members of Congress as well as civil liberties organizations that advocate for asset forfeiture reform. We identify this as one of many risk factors the Department should consider in its efforts to effectively oversee asset seizure operations. The Criminal Division stated that it agrees that effective oversight may help assure the public that component agencies continue to use seizure authority appropriately. The Criminal Division also agrees with the OIG's basic premise that the Department must ensure that asset seizure and forfeiture authorities are used appropriately.

The data initiative that the Criminal Division discussed in its response is a promising step toward greater transparency in the Department's seizure and forfeiture program, and one that can play an important role in the healthy debate about asset forfeiture that the Criminal Division supports. However, based on the information provided in the Criminal Division's response, this initiative does not address the need that we identified in our report for the Department to have data that allows it and its investigative components to fully evaluate and oversee their seizure and forfeiture activities. While we understand that assessing the relationship between asset seizure and criminal investigations can be complex, the Department will have difficulty fully overseeing its asset seizure and forfeiture operations if it does not collect and evaluate the relevant information, such as the circumstances under which a seizure occurred; the relationship between the seizure and other criminal activity; the benefits of seizure activities for law enforcement efforts; and any claims, petitions, and returns of assets resulting from a seizure.

It is unclear whether the Criminal Division concurs with this recommendation. Please provide a statement of concurrence or non-concurrence on or before June 30, 2017. If the Criminal Division concurs with this recommendation, on or before June 30, 2017, please also provide information on the steps the Department plans to take to develop ways to collect relevant data related to seizure and

63

forfeiture activities sufficient to identify and evaluate whether seizures advance or are related to federal investigations.

**Recommendation 2:**  Review seizure practices to determine whether more-specific policy guidance and/or training is needed to ensure consistency in seizure operations.

**Status:**  Unresolved.

**Criminal Division Response:**  The Criminal Division expressed general agreement that similar matters should be handled consistently and stated that the training that the Department agrees to conduct to respond to Recommendation 3 will seek to achieve this result.  The Criminal Division also asserted that the finding on which this recommendation is based is not well supported.  Further, the Criminal Division asserted that developing a policy specific enough to ensure consistent outcomes in the two instances that the OIG provided is not realistic.

**OIG Analysis:**  Handling similar matters consistently in seizure operations is necessary to avoid the risk of creating the appearance that decisions in these sensitive operations are arbitrary.  Such an appearance can undermine public trust in law enforcement and its use of this important tool.  Although both the OIG and the Criminal Division note that there are factual differences in the two seizures we compare, we believe that these seizures illustrate how operational differences about a sensitive topic — whether cash in a subject's possession will be seized — can appear arbitrary.  Therefore, this example is useful for showing the type of differences that can create the perception that law enforcement does not follow established protocols for asset seizure activity, which can in turn erode the public's trust.  Using the comparison of these instances as an example, our recommendation asks the Department to review its seizure practices to identify any such inconsistencies and then determine the best way to minimize them.  We do not identify a specific list of inconsistencies to address or say how the Department should address them.

It is unclear whether the Criminal Division concurs with this recommendation.  Please provide a statement of concurrence or non-concurrence on or before June 30, 2017.  If the Criminal Division concurs with this recommendation, on or before June 30, 2017, please also provide steps the Department plans to take to determine whether, and in what areas, more-specific policy guidance or training is needed to ensure consistency in seizure operations.

**Recommendation 3:**  Ensure that state and local task force officers receive training on federal asset seizure and forfeiture laws and component seizure policies before they conduct or participate in federal seizures.

**Status:**  Resolved.

**Criminal Division Response:**  The Criminal Division indicated that it concurred with this recommendation, and stated that the Money Laundering and Asset Recovery Section (MLARS) is considering specific training requirements for

state and local law enforcement officers who participate as task force officers with federal law enforcement.  The training would require them to certify that they have completed two types of training before participating in or conducting federal seizures:  (1) a module on federal asset forfeiture law and procedures and (2) a module on component-specific policies regarding asset forfeiture.  Once both trainings are completed, the task force officers would certify their completion to the responsible federal law enforcement agency and each agency would be required to provide an annual certification indicating that all task force officers received the required training before participating in or conducting federal seizures.  The Criminal Division stated that the MLARS would oversee the design and implementation of both modules, which could be designed as e-learning/distance learning to ensure broad and timely access.  In addition, a training resource would be developed to assist with remediation and reinforcement.

**OIG Analysis:**  The Criminal Division's planned actions are responsive to our recommendation.  On or before June 30, 2017, please indicate whether the training under consideration is approved and provide curricula and implementation plans for the specific training courses that the MLARS develops for state and local law enforcement officers who participate as task force officers with federal law enforcement.

**Recommendation 4:**  Monitor the effects of the Attorney General's 2015 Order that eliminated most types of federal adoptions of state and local seizures, and seek to mitigate any negative effects on law enforcement cooperation.

**Status:**  Unresolved.

**Criminal Division Response:**  The Criminal Division stated that the Department is conducting a review of Attorney General Holder's 2015 Order to determine all potential negative effects on federal, state, and local law enforcement.  The Criminal Division noted that it is imperative that the Department's relationships with state and local law enforcement partners remain strong.  The Criminal Division also noted that the Department is exploring "innovative" methodologies for determining equitable sharing payments that would allow for payments that recognize more forms of cooperation beyond the forfeiture of specific assets.  As the Department continues to explore these possibilities and evaluate whether changes to statutory authorities would be required to implement them, the Criminal Division stated that the Department will also provide additional training to the individuals who decide equitable sharing percentages to ensure that equitable sharing decisions are fair and proportional to the participating agencies' contributions.

**OIG Analysis:**  It is unclear whether the Criminal Division concurs with this recommendation.  Please provide a statement of concurrence or non-concurrence on or before June 30, 2017.  If the Criminal Division concurs with this recommendation, on or before June 30, 2017, please also provide documentation of the steps the Department plans to take to monitor the impact of the Attorney General's 2015 Order and to mitigate any negative effects it may have on law enforcement collaboration.  These steps may include, but are not necessarily

limited to, possible new methodologies for determining equitable sharing payments. Also provide the curricula and implementation plan for training the individuals who decide equitable sharing payments.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig