# Exhibit B

# *TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION*



## *Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses*

**March 30, 2017**

**Reference Number:  2017-30-025**

This report has cleared the Treasury Inspector General for Tax Administration disclosure review process and information determined to be restricted from public release has been redacted from this document.

**Redaction Legend:**
1 = Tax Return/Return Information
2 = Risk Circumvention of Agency Regulation or Statute
4 = Attorney Client/Attorney Work Product
5 = Information Concerning a Pending Law Enforcement Proceeding
11 = Information Prohibited by Statute or Federal Regulation

*Phone Number  /  202-622-6500*
*E-mail Address  /  TIGTACommunications@tigta.treas.gov*
*Website  /  http://www.treasury.gov/tigta*



*HIGHLIGHTS*

**CRIMINAL INVESTIGATION ENFORCED STRUCTURING LAWS PRIMARILY AGAINST LEGAL SOURCE FUNDS AND COMPROMISED THE RIGHTS OF SOME INDIVIDUALS AND BUSINESSES**

# Highlights

**Final Report issued on March 30, 2017**

Highlights of Reference Number: 2017-30-025 to the Internal Revenue Service Chief for Criminal Investigation.

## IMPACT ON TAXPAYERS

The Currency and Foreign Transactions Reporting Act of 1970, referred to as the Bank Secrecy Act, requires U.S. financial institutions to file reports of currency transactions exceeding $10,000. Title 31 of U.S. Code Section 5324(a) states that no person shall, for the purpose of evading the reporting requirements, cause or attempt to cause a U.S. financial institution to fail to file a report required or structure. Whoever violates the structuring law can be fined, imprisoned, or both. Any property involved in violation of this law may be seized and forfeited.

## WHY TIGTA DID THE AUDIT

In October 2014, a new policy was instituted by IRS Criminal Investigation (CI) that it would no longer pursue the seizure and forfeiture of funds related to legal source structuring. In the same month the policy changed, the New York Times reported that CI had been seizing funds in structuring investigations without filing a criminal complaint. Property owners were left to prove their innocence, and many gave up trying. This audit was initiated to evaluate the IRS's use of seizures against property owners suspected of structuring transactions to avoid Bank Secrecy Act reporting requirements.

## WHAT TIGTA FOUND

Most of the seizures for structuring violations involved legal source funds from businesses. While current law does not require that the funds have an illegal source (*e.g.*, money laundering or criminal activity other than alleged

structuring), the purpose of CI's civil forfeiture program is to interdict criminal enterprises. As a result, $17.1 million was seized and forfeited to the Government in 231 legal source cases. CI primarily relied on patterns of banking transactions to establish probable cause to seize assets for structuring violations.

In most instances, interviews with the property owners were conducted after the seizure to determine the reason for the pattern of banking transactions and if the property owner had knowledge of the banking law and had intent to structure. CI procedures required agents to give subjects advice of rights in Title 26 cases (*i.e.*, Internal Revenue Code) but not in Title 31 cases. In only five of the 229 interviews conducted, noncustodial statements of rights, such as the right to remain silent, were provided. For 54 investigations, the property owners provided realistic defenses or explanations, and for 43 of those cases, there was no evidence they were considered by CI. In 202 interviews, the property owners were not adequately informed of important information, such as the purpose of the interview, by CI during the interview. The outcomes for legal source cases lacked consistency. In 37 investigations, the Government appeared to have bargained nonprosecution to resolve the civil case.

CI also needs to improve its process for identifying grand jury information.

## WHAT TIGTA RECOMMENDED

TIGTA recommended that the Chief, CI, establish controls to ensure that CI is selecting cases that meet the IRS's goals and policies, return funds forfeited from legal source cases with no illegal activity, ensure that reasonable explanations are considered when interviews are conducted, ensure appropriate referrals to IRS's Examination function, and improve the process for designating grand jury information.

In response to the report, CI agreed with and implemented changes for five of the nine recommendations and partially agreed with another. CI disagreed with establishing guidance on bargaining nonprosecution and procedures that strive for fair and consistent outcomes, and did not agree to improve its grand jury information designation process.



**To report fraud, waste, or abuse, call our toll-free hotline at:**

1-800-366-4484

**By Web**:

*www.treasury.gov/tigta/*

**Or Write:**

Treasury Inspector General for Tax Administration
P.O. Box 589
Ben Franklin Station
Washington, D.C. 20044-0589

Information you provide is confidential and you may remain anonymous.



TREASURY INSPECTOR GENERAL
FOR TAX ADMINISTRATION

**DEPARTMENT OF THE TREASURY**

**WASHINGTON, D.C. 20220**

March 30, 2017

**MEMORANDUM FOR** CHIEF, CRIMINAL INVESTIGATION

**FROM:**     Michael E. McKenney
              Deputy Inspector General for Audit

**SUBJECT:**  Final Audit Report – Criminal Investigation Enforced Structuring Laws
             Primarily Against Legal Source Funds and Compromised the Rights of
             Some Individuals and Businesses (Audit # 201530030)

This report presents the results of our review to evaluate the Internal Revenue Service's use of
seizures for property owners suspected of structuring transactions. This review is included in our
Fiscal Year 2017 Annual Audit Plan and addresses the major management challenge of
Protecting Taxpayer Rights.

Management's complete response to the draft report is included as Appendix VIII. Copies of
this report are also being sent to the Director, Office of Audit Coordination, for appropriate
distribution within the Internal Revenue Service.

If you have any questions, please contact me or Matthew A. Weir, Assistant Inspector General
for Audit (Compliance and Enforcement Operations).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

# Table of Contents

Background..............................................................................................................Page   1

Results of Review ...............................................................................................Page   8

    Structuring Seizures Primarily Involved Legal
    Source Funds From Businesses, and Tax Crimes
    Were Rarely Established..........................................................................Page   8

        Recommendation 1:..............................................................Page 11

        Recommendation 2:..............................................................Page 12

    Seizures Were Based on the Pattern of Currency
    Transactions, and Interviews With Property Owners
    Were Conducted After the Seizure ....................................................Page 13

    Interviews With Property Owners Did Not Meet
    All Criminal Investigation Requirements, and
    Advice of Rights Was Not Provided..................................................Page 16

        Recommendation 3:..............................................................Page 21

        Recommendation 4:..............................................................Page 22

    In Some Civil Forfeiture Cases, the Government
    Appeared to Have Bargained Nonprosecution
    to Resolve the Civil Case....................................................................Page 22

        Recommendation 5:..............................................................Page 24

    Consents to Forfeiture Lacked Proper Oversight
    and Controls..........................................................................................Page 25

        Recommendation 6:..............................................................Page 26

    Cases Were Generally Not Referred to the IRS's
    Examination Function for Audit .........................................................Page 26

        Recommendation 7:..............................................................Page 27

    Outcomes in Cases Lacked Consistency...........................................Page 28

        Recommendation 8:..............................................................Page 31



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

Some of the Government's Actions Have
Been Inconsistent With the New IRS Policy ...............................................Page 32

Processes Need to Be Improved for Identifying
Whether Information Is Protected by Grand Jury
Secrecy Rule or Court Order..........................................................................Page 34

    Recommendation 9:.......................................................Page 36

## Appendices

Appendix I – Detailed Objective, Scope, and Methodology ......................Page 37

Appendix II – Major Contributors to This Report .....................................Page 41

Appendix III – Report Distribution List ....................................................Page 42

Appendix IV – Outcome Measures..............................................................Page 43

Appendix V – Detailed Charts of Population and Sample Data .................Page 45

Appendix VI – Example of an E-Mail and Two Letters Sent by
Assistant United States Attorneys...............................................................Page 50

Appendix VII – Glossary of Terms ............................................................Page 51

Appendix VIII – Management's Response to the Draft Report ..................Page 54



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

## *Abbreviations*

| | |
|---|---|
| AFTRAK | Asset Forfeiture Tracking and Retrieval System |
| AUSA | Assistant United States Attorney |
| BSA | Bank Secrecy Act |
| CTR | Currency Transaction Report |
| CIMIS | Criminal Investigation Management Information System |
| CI | Criminal Investigation |
| FY | Fiscal Year |
| IRM | Internal Revenue Manual |
| IRS | Internal Revenue Service |
| TIGTA | Treasury Inspector General for Tax Administration |
| U.S. | United States |
| USAO | United States Attorney's Office(s) |
| U.S.C. | United States Code |

 **_Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses_**

# _Background_

The Currency and Foreign Transactions Reporting Act of 1970,[1] referred to as the Bank Secrecy Act (BSA), requires U.S. financial institutions to assist U.S. Government agencies by filing reports concerning currency transactions that are used to detect and prevent money laundering.[2] It requires U.S. financial institutions to file reports, known as Currency Transaction Reports (CTRs), when currency transactions exceed $10,000 or multiple currency transactions aggregate over $10,000 in a single day. The reports are deemed useful in criminal, tax, terrorism, and other investigations.[3] The BSA also requires U.S. financial institutions to file reports, known as Suspicious Activity Reports, of suspicious activity that might signify money laundering, tax evasion, or other criminal activities. Title 31 of United States Code (U.S.C.) Section (§) 5324(a) states that "no person shall, for the purpose of evading the reporting requirements … (1) cause or attempt to cause a domestic financial institution to fail to file a report required [CTRs]; (2) cause or attempt to cause a domestic financial institution to file a report … that contains a material omission or misstatement of fact; or (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

Structuring can take two basic forms. First, a customer might deposit currency on multiple days in amounts under $10,000 (_e.g._, $9,900) for the intended purpose of circumventing a financial institution's obligation to report any cash deposit over $10,000 on a CTR. Although such deposits do not require aggregation for currency transaction reporting because they occur on different business days, they nonetheless meet the definition of structuring under the BSA implementing regulations. Second, a customer or customers may engage in multiple transactions during one day, or over a period of several days or more, in one or more branches of a bank or credit union, in a manner intended to circumvent the currency transaction reporting requirement. While structuring may be indicative of underlying criminal activity, structuring itself is unlawful under the BSA. Whoever violates the structuring law may be fined, imprisoned, or both.[4] Any property involved in a violation of § 5324 may be seized and forfeited.[5]

Federal Rules of Criminal Procedure Rule 41[6] states that probable cause is required for issuing a warrant to seize property. The burden of proof in a civil forfeiture action is on the Government

---

[1] 31 U.S.C § 5311 et seq.
[2] See Appendix VII for a glossary of terms.
[3] 31 U.S.C. § 5311 provides: "It is the purpose of this subchapter (except § 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism."
[4] 31 U.S.C. § 5324(d).
[5] 31 U.S.C. § 5317(c).
[6] FED. R. CRIM. P. 41.



**Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses**

to establish, by preponderance of the evidence, that the property is subject to forfeiture. Preponderance of the evidence means that there is a greater weight of evidence, on balance, as to an allegation, than that is offered in opposition to it, *i.e.*, greater than 50 percent of the evidence points to a violation of § 5324. To prove a structuring violation, the Government must establish three elements—that a person has: (1) engaged in acts of structuring; (2) with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) acted with the intent to evade this reporting requirement.[7] Proof of willfulness and that the person was aware that structuring is illegal are not required.[8] In January 1994, the Supreme Court ruled that the Government had to prove that an account holder was aware that structuring was unlawful and intentionally violated the law.[9] In reaction to the Supreme Court's decision, Congress removed the term "willfully" from 31 U.S.C. § 5324. In addition, current law does not require that the funds have an illegal source (*e.g.*, money laundering or other criminal activity).

The history of the BSA requirements are long and complex, but the purpose of the BSA reporting requirements is focused on detecting and deterring criminal behavior. In other words, the BSA reporting requirements were not put in place just so that the Government could enforce the reporting requirements.[10] They were put in place to give the Government tools to address criminal behavior. Criminal Investigation's (CI) procedures confirm that the intent of the Internal Revenue Service's (IRS) seizure and forfeiture program is to pursue illegal activities:

> *The Criminal Investigation (CI) Asset Seizure and Forfeiture Program utilizes CI's seizure and forfeiture authority as an investigative tool and/or to disrupt and dismantle criminal enterprises. The program seeks to deprive criminals of property used in, or acquired through, illegal activities by directing CI's financial expertise and resources towards significant seizure and forfeiture investigations in which CI can take a leading or key role.[11]*

On October 17, 2014, a new policy was issued by the IRS indicating that CI will no longer pursue the seizure and forfeiture of funds related to legal source structuring cases unless exceptional circumstances justify it. CI officials indicated that there were a number of reasons for the change, including reputational risk and the desire to focus resources in a more strategic manner. In the same month, a New York Times article was published that claimed, "*The Government can take the money without ever filing a criminal complaint, and the* [property]

---

[7] *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005).

[8] *United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir. 2004).

[9] *Ratzlaf v. U.S.*, 510 U.S. 135 (1994).

[10] Courtney J. Linn, 50 Santa Clara Law Review 407 (2010), *Redefining the Bank Secrecy Act: Currency Reporting and the Crime of Structuring* (Jan. 1, 2010).

[11] Internal Revenue Manual (IRM) 9.7.1.1 (July 31, 2002).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

*owners are left to prove they are innocent.   Many give up.*"[12]  In response to the New York Times article, a statement from Richard Weber (Chief, CI) was issued:

> *After a thorough review of our structuring cases over the last year and in order to provide consistency throughout the country (between our field offices and the U.S. Attorneys' Offices [USAO]) regarding our policies, IRS CI will no longer pursue the seizure and forfeiture of funds associated solely with "legal source" structuring cases unless there are exceptional circumstances justifying the seizure and forfeiture and the case has been approved at the director of field operations level.*[13]

In February 2015, the Institute for Justice issued a report which alleged that the IRS was seizing funds without sufficient proof of criminal wrongdoing.[14]  The Treasury Inspector General for Tax Administration (TIGTA) asked CI to comment on allegations in the report.  In response, CI stated that it, as well as other law enforcement agencies, has the authority under the BSA to conduct structuring seizures and that it has had the authority to conduct these types of seizures pursuant to Title 31 since the BSA was passed in the late 1970's.  CI also asserted that the cases were largely pursued under the direction of the local Assistant U.S. Attorneys (AUSA) through *******11*************** Review Teams.

A similar policy announcement followed from the U.S. Department of Justice in March 2015.[15]  The Attorney General noted that structuring laws enacted by Congress are critical tools that law enforcement employs to safeguard the integrity, security, and stability of our Nation's financial system.  After a comprehensive review of the Department of Justice's Asset Forfeiture Program, the Attorney General indicated that the Department of Justice's resources will be focused against actors that structure financial transactions to hide significant criminal activity and will further other compelling law enforcement interests.

According to data provided by CI, during Fiscal Years (FYs) 2012 through 2015, a total of 1,997 assets were seized with a total value of $193.1 million in 736 criminal investigations for which structuring was the primary statutory basis for the seizure.  These included assets that were seized using either a civil or criminal forfeiture process.  Figure 1 below shows a breakdown of the number of criminal investigations and the number and value of assets for which civil forfeiture was pursued during FYs 2012 through 2015 and structuring was the

---

[12] New York Times, *Law Lets I.R.S. Seize Accounts on Suspicion, No Crime Required* (Oct. 25, 2014).
[13] New York Times, *Statement of Richard Weber, Chief of I.R.S. Criminal Investigation* (Oct. 25, 2014).
[14] Dick Carpenter II and Larry Salzman, Institute for Justice, *Seize First, Question Later:  The IRS and Civil Forfeiture* (Feb. 2015).
[15] U.S. Department of Justice, Press Release 15-400, *Attorney General Restricts Use of Asset Forfeiture in Structuring Offenses* (Mar. 31, 2015).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

primary statutory basis for the seizure.[16] Before the policy changed, the number of structuring seizures worked in the field offices was decreasing. After the policy changed, the number of structuring seizures significantly decreased.

### Figure 1: Criminal Investigations and Assets Seized by Civil Forfeiture for Which Structuring Was the Primary Basis for Seizure (FYs 2012–2015)

| Fiscal Year | Number of Criminal Investigations[17] | Number of Assets Seized | Dollar Amount of Assets Seized[18] |
|---|---|---|---|
| **Before the October 2014 Policy Change** | | | |
| 2012 | 241 | 513 | $41.0 |
| 2013 | 227 | 464 | $51.6 |
| 2014 | 171 | 411 | $31.8 |
| **After the October 2014 Policy Change** | | | |
| 2015 | 22 | 56 | $6.2 |
| **Total** | **649[19]** | **1,444** | **$130.6** |

*Source: TIGTA analysis of Asset Forfeiture Tracking and Retrieval System (AFTRAK) and Criminal Investigation Management Information System (CIMIS) information on asset seizures made during FYs 2012 through 2015 for which structuring was the primary basis for the seizure.*

As Figure 1 shows, a total of 1,444 (72.3 percent) of the 1,997 assets were seized using a civil forfeiture process. These assets, with a total value of $130.6 million, were seized in 649 criminal investigations during FYs 2012 through 2015.[20] Some field offices conducted more of these types of seizures. According to our analysis of data in the CIMIS database, five of the 25 field offices conducted 45 percent of the criminal investigations that resulted in the seizure of assets

---

[16] Our review of the case information indicated that some assets were surrendered as part of a legal agreement and not seized by the Government; for example, assets surrendered as a condition of a consent agreement. We characterize those as seizures because CI included them in its asset forfeiture database and they were subject to the legal process required for forfeitures.

[17] These are the numbers of criminal investigations associated with the seized assets conducted during the fiscal year. There were 649 criminal investigations related to the 1,444 seized assets listed. In some instances, the investigation had seized assets in more than one year listed on the chart. These investigations could have been initiated prior to the fiscal year noted.

[18] The amounts in this column are rounded. The total is $130.6 million.

[19] The number of criminal investigations from each fiscal year above rows total to 661 (241+227+171+22). There were instances where the same investigation had seizures in multiple years. There were a total of 649 investigations.

[20] Appendix V, Figure 1, contains a breakdown by field office.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

using a civil forfeiture process. Figure 2 below shows the disposition status on September 30, 2015, of the 1,444 assets seized that were seized civilly during FYs 2012 through 2015 as noted in Figure 1.[21]

### Figure 2: Disposition Status of the Assets Seized Civilly During FYs 2012–2015 for Which Structuring Was the Primary Statute Violated

| Disposition Type | Number of Assets Seized[22] | In Millions Dollar Amount of Assets Seized[23] |
|---|---|---|
| Forfeited to U.S. Treasury Department | 981 | $57.5 |
| Returned to Property Owner | 513 | $43.7 |
| Pending (In-Process) | 196 | $25.9 |
| Other | 25 | $3.8 |

*Source: TIGTA analysis of AFTRAK information of asset seizures made during FYs 2012 through 2015 for which structuring was the primary criminal statute violated as of September 30, 2015.*

These asset seizures eventually led to the civil forfeiture of $57.5 million to the U.S. Department of the Treasury, while $43.7 million was eventually returned to the property owner. The amount remaining consisted primarily of the seized assets that were still being processed as of September 30, 2015. The proceed from assets seized that are eventually forfeited is deposited into the Treasury Forfeiture Fund.

The structuring investigation cases were largely initiated by the **********11*********** ***** Team or the Financial Crimes Task Force. The *************11**************** Team and Financial Crimes Task Force are comprised of Federal, State, and local law enforcement agencies focused on specific allegations of criminal conduct in which BSA data are reviewed to select investigations to pursue. Federal, State, and local law enforcement agencies that participate in a criminal investigation with CI that results in the seizure and eventual forfeiture of assets can request a share of the net proceed forfeited through a process known as "equitable sharing," which allows them to request and receive up to 80 percent of the assets

---

[21] Appendix V, Figure 2, contains a breakdown by field office.

[22] The number of assets will not total the 1,444 noted in Figure 1 because an asset could be disposed of using multiple methods. For instance, in a typical civil settlement, some of seized funds would be forfeited and some would be returned to the property owner.

[23] The total of $131.2 million for these four categories was slightly higher than the original seizure amount of $130.7 million. There were some assets that were disposed of at a different amount than the original seizure amount. This typically occurred with the seizure of real property when the original seizure amount was an appraised value.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

forfeited into the Treasury Forfeiture Fund.[24]  As previously shown (in Figure 2), $57.5 million was forfeited for FYs 2012 through 2015 for which structuring was the primary basis for asset seizure.  The amount shared with State and local agencies totaled $24.6 million, and the amount shared with other Federal agencies totaled $0.7 million, for a total of $25.3 million (44 percent) of the $57.5 million forfeited as of September 30, 2015.[25]

CI can also request funds from the Treasury Forfeiture Fund.[26]  The reimbursements are not limited to Title 31 structuring forfeitures.  Funds in the Treasury Forfeiture Fund may also be derived from Title 18 money laundering investigations.  Collectively, these funds form a source for the reimbursements.  This includes reimbursement to cover mandatory expenses of the Asset Seizure and Forfeiture Program or for discretionary use including requests from the Secretary's Enforcement Fund and Super Surplus Funds.[27]  Figure 3 shows the amounts CI received as reimbursements for both mandatory and discretionary use.

### Figure 3:  Amounts Reimbursed From the Treasury Forfeiture Fund to CI During FYs 2012–2015 (in millions)

| Fiscal Year | Dollar Amount of Mandatory Reimbursements | Dollar Amount of Discretionary Reimbursements | Total |
|---|---|---|---|
| 2012 | $23.1 | $29.4 | $52.5 |
| 2013 | $25.4 | $15.0 | $40.4 |
| 2014 | $25.4 | $29.9 | $55.3 |
| 2015 | $25.9 | $10.2 | $36.1 |
| **Total** | **$99.8** | **$84.5** | **$184.3** |

*Source:  Data provided by the IRS.  The amounts reimbursed from the Treasury Forfeiture Fund are for all assets forfeited under Title 18 and/or Title 31 by CI, including Title 31 § 5324 structuring forfeitures.*

TIGTA undertook this audit to determine: (1) whether the IRS followed procedures in its civil forfeiture cases, (2) whether those procedures were fair to property owners, (3) whether the

---

[24] The Equitable Sharing Program is based on the participation level and unique and indispensable factors a particular agency contributes to an investigation.

[25] These were the amounts approved to be shared as of September 30, 2015.  This does not include sharing requests that were still pending.  See Appendix V, Figure 3, for a breakdown by field office.

[26] The sources of deposits to the Treasury Forfeiture Fund include seized funds that were forfeited and any net proceeds from the sale of forfeited property.

[27] Represents the remaining unobligated balance after an amount is reserved for Treasury Forfeiture Fund operations in the next fiscal year.  Super Surplus Funds can be used for authorized law enforcement purposes as prescribed within the particular Federal law enforcement agency's policies.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

program involved risks to innocent property owners, and (4) whether the IRS is following the new procedures, such that it is only pursuing structuring activities if the source of funds are illegal. This review was performed at the IRS National Headquarters in Washington, D.C., in the Office of the Chief, CI, with information obtained from IRS field offices in Phoenix, Arizona; Los Angeles and Oakland, California; Denver, Colorado; Washington, D.C.; Miami and Tampa, Florida; Atlanta, Georgia; Chicago, Illinois; New Orleans, Louisiana; Boston, Massachusetts; Detroit, Michigan; St. Paul, Minnesota; St. Louis, Missouri; Las Vegas, Nevada; Newark, New Jersey; New York, New York; Charlotte, North Carolina; Cincinnati, Ohio; Nashville, Tennessee; Dallas, Houston, and San Antonio, Texas; and Seattle, Washington, during the period February 2015 through October 2016. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. However, in the course of this audit, we encountered significant delays and a substantial amount of information we requested was initially either improperly withheld or redacted. This is detailed later in the report under the finding "*Processes Need to Be Improved for Identifying Whether Information Is Protected by Grand Jury Secrecy Rule or Court Order*" beginning on page 34. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective. Detailed information on our audit objective, scope, and methodology is presented in Appendix I. Major contributors to the report are listed in Appendix II.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

## Results of Review

Our review of the case documentation supporting seizures indicates that CI largely pursued cases against legal source funds from business accounts and primarily relied on the pattern of banking transactions to establish that a structuring violation occurred. For forfeiture, CI relied on interviews that occurred after the seizure, generally on the same day, when the account owners were unaware of the seizure and answered questions that established knowledge and intent. While a few cases were pursued for other illegal activity such as the sale of narcotics or a criminal violation of the Internal Revenue Code, the majority of these cases were pursued for structuring violations. While the law allows CI to conduct these investigations, including seizures and forfeitures of property when structured transactions are derived from legal sources, the results of this audit led us to conclude that the Asset Seizure and Forfeiture Program was not conducted in a manner consistent with its stated goal of interdicting criminal enterprises.

### Structuring Seizures Primarily Involved Legal Source Funds From Businesses, and Tax Crimes Were Rarely Established

We randomly selected for review a total of 306 investigations that had 575 assets seized with a value of $55.3 million from a population of 431 criminal investigations that had 773 assets seized with a value of $70.5 million using a civil process during FYs 2012 through 2014 for which structuring was the primary basis for asset seizure according to data provided by CI. During the course of the audit, we dropped five of the sampled cases totaling $2.3 million because upon review of the case information we determined they did not meet the criterion for inclusion in our audit.[28] For the remaining 301 investigations, all documents (seizure warrant affidavit, memorandum of interview, complaint, indictment, judgment, *etc.*) that we received were considered to determine if the sources of funds were legal or illegal and if tax violations were pursued. For 23 investigations, we could not determine the sources of the structured funds or if the structuring involved illegal activity.[29] For the 278 remaining investigations, we determined that 252 involved legal source funds and 26 involved illegal activity or an illegal source of funds. Of the 252 legal source cases, tax law violations were identified by CI in 21 cases (8 percent).[30]

---

[28] See Appendix I for more information regarding our sample selection.

[29] For the 23 investigations, the documents were either sealed, grand jury material, or insufficient.

[30] We determined this number by reviewing documents that resolved the cases, such as plea agreements in cases where property owners were charged with Title 31 and/or Title 26 violations and where taxpayers acknowledged the tax law violations in the plea agreements. In other cases, taxpayers agreed to amend their tax returns as a term of the settlement agreement used to resolve the civil forfeiture case.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

### _Structuring seizures primarily involved legal source funds from businesses_

One of the reasons why people structure banking transactions is to conceal the fact that the funds came from an illegal activity, such as involvement in the sale of narcotics. In some instances, the structured funds may have a legal source but were involved in an illegal activity such as withdrawing funds from a bank account to facilitate bankruptcy fraud. In 26 (9 percent) of the 278 structuring cases, we were able to establish that the funds came from a Title 18 illegal source or involved any other illegal activity.[31] In the other 252 (91 percent) of the 278 cases, we did not find evidence that the structured funds came from an illegal source or involved any other illegal activity. Businesses that deal with currency transactions (retail, wholesale, service, automobile, restaurant, gas station, *etc.*) were primarily (210 of the 252 legal source cases) affected by the structuring seizures.[32] While most of the currency seized involved deposits into a bank account, 41 (16 percent) of the 252 legal source cases involved withdrawals from a bank account. When interviewed by CI, the property owners explained that the funds withdrawn were used for business purchases (*e.g.*, jewelry stores, pawn shops, and scrap metal dealers).[33]

One of the reasons why the legal source cases were pursued may have been that some USAOs promoted the use of the "quick hit" seizure after the identification of the structuring activity. Using this approach, the Government recognized the benefit of quickly identifying the criminal activity, seizing funds, and reaching a negotiated resolution of these types of matters and using its resources on other investigations. This type of quick hit action was emphasized in the Suspicious Activity Report Review Team's standard operating procedures:

```
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
********************************//****************************************
```

---

[31] The 26 illegal source or illegal activity cases include bank fraud, bankruptcy fraud, illegal gambling, money laundering, narcotics, tax evasion, *etc.*

[32] For the 252 legal source cases, 210 (83 percent) were from a business and 42 (17 percent) were from individuals (the 42 cases consist of 19 from savings; 14 from loan, gift, or inheritance; and nine other income sources such as a sale of an asset).

[33] For the 252 legal source, 205 (81 percent) were deposits, 41 (16 percent) were withdrawals, and six (3 percent) were both deposits and withdrawals or could not be determined.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

*******************************//***************************************
*******************************//***************************************
*******************************//*******.[34]

The anti-structuring provisions do not distinguish between legal source and illegal source structuring, and the law allowed investigators to seize funds using a seizure warrant upon showing probable cause of a structuring violation even if there was no evidence that the structured funds were involved in any type of other illegal activity. It appears that the description of quick hits in the standard operating procedures characterizes most of the cases in our audit. For example, only one of the property owners in the 252 legal source cases actually took the case far enough along the process to be adjudicated by a judge, and in that case, the civil forfeiture case was dismissed because the Government did not timely file the action.[35]

However, in October 2014, the IRS stated that, absent "exceptional circumstances," it will no longer pursue the seizure and forfeiture of funds associated solely with a legal source. Because CI will no longer pursue legal source structuring investigations unless exceptional circumstances apply, cases like the 252 legal source cases identified in this report (of which 21 also contained investigations of possible tax violations discussed below) would generally no longer be pursued under this policy.

### *Tax crimes were rarely established*

Another reason why people would want to structure their banking transactions is to hide income from taxing authorities, such as the IRS. It appears that the pattern of transactions in many of these cases was compelling and may indicate tax avoidance, which is discussed further below. However, tax violations associated with the structuring of banking transactions were established by CI in only 21 of the 252 legal sources cases. In the remaining 231 legal source cases, there was no evidence that the property owner structured funds to hide income from illegal activity (other than structuring) or to underreport income on their tax return. Current law does not require that the funds have an illegal source (*e.g.*, money laundering or criminal activity other than the alleged structuring). In these 231 cases, $17.1 million was seized and forfeited to the Government.

---



34*******************************************//****************************************************
*******************************************//****************************************************
*******************************************//****************************************************
*************************//***********************************.

[35] Only one property owner pursued her civil forfeiture case to judgment, and she prevailed. In *U.S. v. Funds from Fifth Third Bank Account in the Amount of $59,675.03*, Case No. 2:13-CV-11728-SFC-MKM (E.D. MI), the property owner prevailed because the civil complaint was filed after the required 90-day deadline. Attorneys' fees awarded to the property owner included expenses related to the completion of counterclaims against the Government because the court deemed them to not be unreasonable counterclaims.



### *Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses*

The Government Accountability Office's *Standards for Internal Control in the Federal Government* recommends the implementation of internal controls in all Federal agencies to achieve program objectives. An essential element of an effective internal control system includes the collection of relevant data given to management so they can assess whether program objectives were achieved.[36] CI needs effective internal control processes to inform its leadership as to the investigations its field offices are undertaking. If those internal control processes had been in place, CI would have been aware that it was primarily pursuing structuring cases against individuals with legal sourced income. With the exception of the 47 investigations (26 for illegal activity or illegal source funds and 21 for tax evasion), CI generally did not pursue structuring cases in a manner consistent with its goals and procedures which indicates that seizure and forfeiture is a tool used to disrupt and dismantle criminal enterprises.

The House of Representatives Ways and Means Subcommittee on Oversight held two hearings (February 11, 2015, and May 25, 2016) on the IRS's structuring seizures and forfeitures. In these hearings, individuals who were engaged in legal source businesses testified about the experience of having their accounts seized and the impact of the seizures on their businesses. On June 10, 2016, the IRS Commissioner wrote a letter to the both the Chairman and Ranking Member of the Subcommittee explaining that the IRS was notifying individuals and businesses whose assets had been seized and forfeited after FY 2009 informing them of the opportunity to submit or resubmit a petition seeking return of their funds.[37] If the cases were resolved administratively, the IRS will make a determination on the petition. If the cases were resolved judicially, the IRS will make a recommendation to the Department of Justice as to whether the petition should be granted. For cases that were resolved administratively, petitioners must demonstrate that the funds were from legal sources and there is no evidence that the property owners were engaged in illegal activity or were seeking to cover up illegal activity. This process is ongoing, and we have not reviewed the extent to which the IRS has received petitions in response to the letters or whether the IRS returned funds to qualifying petitioners.[38]

---

[36] Government Accountability Office, GAO-14-704G, *Standards for Internal Control in the Federal Government*, p. 59 (Sept. 2014).

[37] Letter dated June 10, 2016, from Commissioner John Koskinen to Chairman Peter Roskam and Ranking Member John Lewis, Committee on Ways and Means, Subcommittee on Oversight.

[38] An attachment to the letter shows the summary of seizure investigations for prior to the October 2014 policy change for 76 investigations, of which 22 were investigations in which petitions were already decided upon and 54 were not petitions but were investigations in which forfeiture actions had not been completed. Of the 76 petitions: 17 petitions resulted in all of the funds being returned, 16 petitions resulted in recommendations for return of the funds to the Department of Justice, 35 petitions resulted in recommendations for forfeiture and referral for prosecution, and eight petitions were denied or withdrawn, partially returned, or transferred to another Federal agency.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

## Recommendations

The Chief, CI, should:

**Recommendation 1:** Establish controls to ensure that CI personnel working on Suspicious Activity Report Review Teams or Financial Crime Task Forces are selecting cases and conducting investigations consistently in such a manner as to best meet organizational goals and policies as well as foster confidence in the tax system.

> **Management's Response:** The IRS agreed with this recommendation. IRS CI implemented internal guidance prior to the issuance of this audit that addresses this recommendation. This includes the Structuring Policy dated October 14, 2014, and an update to the BSA Standard Operating Procedures, enhanced reviews, and training in the administration and enforcement of the BSA program in FY 2016. Additionally, CI sets investigative priorities pursuant to the Annual Business Plan and Chief Criminal Investigation Priorities memorandum.

**Recommendation 2:** In structuring forfeiture cases that were resolved administratively, return all funds forfeited from legal sources for which there was no illegal activity (other than the alleged structuring) or tax evasion to the property owners. In structuring forfeiture cases that were resolved judicially, recommend to the Department of Justice that all funds forfeited from legal sources for which there was no illegal activity (other than the alleged structuring) or tax evasion be returned to the property owners.

> **Management's Response:** The IRS agreed with this recommendation. Beginning in June 2016, CI noticed property owners who forfeited assets pursuant to structuring violations for the period beginning October 1, 2009, to present. This period exceeds the audit period of FYs 2012 through 2015 to include FYs 2010, 2011, and 2016. As of this date, 454 petitions have been received and have been timely evaluated. Beginning in June 2016, CI has mailed approximately 1,861 letters to property owners advising them that they may have an ownership interest in property that was previously seized and forfeited by the U.S. Government. The letters also provided information on how to file a proper petition if the property owner chose to do so. CI has established procedures to review these petitions on certain Title 31 structuring cases that conform to the Code of Federal Regulations and the IRM. Among the factors evaluated in this review is whether there was any evidence of illegal activity connected to the structuring activity, such as an illegal source, money laundering, or tax evasion. Additionally, CI advertised the Petition for Remission of Mitigation process on the IRS.gov website from June 17 through December 31, 2016, and provided e-mail and phone number contacts to assist potential filers.
>
> Management did not agree with our outcome measure for the return of $17.1 million to the 231 property owners with legal source funds, asserting that "Structuring



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

investigations are not required to be tied to illegal source of funds.  The audit incorrectly made this distinction throughout the report."

***Office of Audit Comment:***  CI is in the process of inviting over 1,800 individuals and businesses, whom it previously informed had committed felony structuring violations, to send in petitions for the return of forfeited funds.  CI's disagreement with our outcome measure appears to focus on the fact that it was permissible under the law to pursue these cases, and it is only returning funds to property owners not because it is compelled to do so but rather because it changed the policy to no longer pursue legal source investigations.  As we have observed, its internal procedures provide that the purpose of the civil forfeiture statute was to interdict criminal enterprises, whereas in 231 of our cases the property owners were not engaged in criminal activity other than the alleged structuring.  Had the program been pursued as intended, the focus of the civil forfeiture cases would have been on investigations with other criminal activity associated with the case rather than on the 231 individuals in our sample.  Additionally, our report found significant inconsistency in outcomes in cases with similar facts and that there was no evidence in some cases that CI considered some reasonable explanations given by some property owners.  We have demonstrated to CI that in these 231 cases there was no evidence of other criminal activity other than the alleged structuring.  In light of the fact that some property owners may be reluctant to again engage with the Government and may not file petitions or that CI may again treat property owners who do file petitions inconsistently, CI should simply return the forfeited funds (and recommend to the Department of Justice to do so in judicial cases) to these 231 property owners.

## *Seizures Were Based on the Pattern of Currency Transactions, and Interviews With Property Owners Were Conducted After the Seizure*

To prove a structuring violation, the Government must satisfy three elements:  (1) acts of structuring, (2) awareness of a financial institution's CTR filing requirement, and (3) the intentional structuring of transactions to evade those reporting requirements.

### *Structuring seizures primarily based on the pattern of currency transactions*

Overall we found that, in enforcing the structuring laws, \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.  We also observed that, in some cases, \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*2\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
.  Property may be seized pursuant to a judicially obtained seizure warrant that is issued once probable cause is established.  A sworn affidavit in support of an application for a seizure



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

warrant sets forth the facts that provide probable cause for the seizure.[39]  For the 301 sample investigations, we determined that 282 (94 percent) of the investigations had a seizure warrant issued and 19 (6 percent) of the investigations did not have a seizure warrant issued.  The 19 investigations without a seizure warrant are discussed further below.

To establish probable cause to seize, ************************2**************************
*******************2***************************.  For example, for  documents
(*e.g.*, applications for a seizure warrant and other documents used to demonstrate probable cause of structuring) related to 235 sample investigations,[40] we observed similar criteria being used to show that the property owner engaged in acts of structuring including, but not limited to, ********************************************2*************************************************
*********************************************2*************************************************
*********************************************2*************************************************
*****************************2*********************************.

**Figure 4:  Example of Currency Transactions and Acts of Structuring**

| Description | Date | Currency Amount |
|---|---|---|
| **209 (89 percent) listed currency transactions between $9,000 and $10,000.** | | |
| Example: | 1/3/2000 | **$10,000** |
| | 1/5/2000 | **$9,000** |
| **203 (86 percent) listed currency transactions made on consecutive days.** | | |
| Example: | **1/6/2000** | $8,000 |
| | **1/7/2000** | $7,000 |
| **151 (64 percent) listed multiple currency transactions on the same day.** | | |
| Example: | **1/10/2000** | $6,000 |
| | **1/10/2000** | $5,000 |

---

[39] The process for CI's Asset Seizure and Forfeiture Program is described further in Appendix V, Figure 4.

[40] We requested the applications for seizure warrants to determine the criteria used to seize assets.  Of the 282 investigations with a seizure warrant issued, CI provided the application for 158 investigations and did not provide it for 124 investigations.  For the 124 investigations, we discussed with CI if any alternative documents were available and received 77 alternative documents that were sufficient to review.  As a result, CI provided either a seizure warrant application or alternative document for 235 investigations and either did not provide documents or provided documents insufficient to review for 47 investigations.  The seizure warrant application or alternative document provided a listing of currency transactions to show that the subject of the investigation engaged in acts of structuring.  The listing of currency transactions included dates, dollar amounts, number of U.S. financial institutions, number of bank accounts, total dollar amount structured, *etc*.



### Criminal Investigation Enforced Structuring Laws
### Primarily Against Legal Source Funds and Compromised
### the Rights of Some Individuals and Businesses

*Source: Example for a listing of currency transactions for one month and acts of structuring.*

We also observed:

- Information for 93 (40 percent) of 235 documents reviewed included bank employee interviews to help establish that the subjects of investigation had knowledge of the banking laws. An example is a bank teller remembering that a subject: (1) pulled or tried to pull back cash if the amount exceeded $10,000 or (2) cancelled a transaction if the currency transaction required a report to be completed.

- For 87 (37 percent) of the 235 documents, CTRs for multiple currency transactions totaling over $10,000 on the same day were filed. This is called "imperfect structuring." This occurs when two or more transactions are conducted at the same financial institution, or different branches of the same financial institution, on the same business day and the total amount of currency involved in the transactions exceeds the $10,000 reporting threshold, thus triggering the financial institution's legal duty to file a CTR.[41] As such, separate deposits or withdrawals in amounts under $10,000.01 may result in the filing of a CTR. The depositor is generally unaware that banks have filed CTRs in these instances.

- While the pattern transactions just under $10,000 seemed suspicious to the Government because there appeared to be a motive to avoid CTR filing, we also observed that for 68 (29 percent) of 235 documents reviewed, some currency transactions exceeded $10,000, indicating that the persons conducting the transactions did not appear to always be concerned about CTRs being filed on their transactions.

- For only six (3 percent) of the 235 documents reviewed was there any evidence of interviews conducted with the property owners prior to the seizures that were considered in establishing probable cause.

### *Interviews with the property owners were primarily conducted after the seizure*

We found that 210 (92 percent) of 229 interviews reviewed occurred after the seizure, of which 128 were on the same day. Because of the interview timing, the property owner was at that point unaware of the IRS's investigation or the seizure of the funds. For the 301 sample investigations, interviews were conducted for 250 investigations, and interviews were not conducted for the other 51 investigations. We requested documentation of interviews conducted for the 250 investigations and received interview documents for 229 investigations. We did not

---

[41] U.S. Department of Justice, Criminal Division, Asset Forfeiture and Money Laundering Section, *Money Laundering Monitor*, October–December 2014 Issue.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

receive interview documents for the other 21 investigations for which interviews were conducted.[42]

The contents of interviews are required to be recorded in a document referred to as a Memorandum of Interview. The interviews are important towards establishing what the property owner knew or did not know about CTRs and if the property owner intended to structure to evade the reporting requirement. Based on the interviews, we found:

- For 166 of 229 investigations, the property owner had knowledge that some type of form was required when currency transactions exceeded $10,000.[43]

- For 166 of 229 investigations, the property owner admitted to intentionally keeping transactions under $10,000.[44]

- For 141 of 229 investigations, the property owner **both** had knowledge that some type of form was required when a currency transaction exceeded $10,000 **and** admitted to intentionally keeping transactions under $10,000.

Interviews were conducted only after the seizure warrant was signed by a judge and the property was seized; therefore, judges did not possess information from interviews with the property owner when making their probable cause determination. This could have provided the judge with a possible explanation for the banking transactions to consider before signing the seizure warrant. We are not suggesting that CI should always conduct interviews of subjects prior to obtaining a seizure warrant. In fact, CI indicated that seizures are often conducted before the interview to protect the interest of the Government by ensuring that the assets are not moved. However, when 91 percent of the property owners are not believed to be conducting any illegal activities (other than structuring), conducting the interviews after the seizure leaves judges without relevant information about what subjects knew about CTRs and what their intent was behind their currency transaction patterns. This lack of information may have affected the judges' decisions to approve the seizure warrants.

---

[42] When we did not receive 21 interview documents, we contacted CI and determined if an alternative document was available. While CI provided documents such as interviews with employees, claims, and petitions, these documents were generally not sufficient to review in determining knowledge or intent; therefore, no alternative document was available to TIGTA.

[43] For the 229 interview documents received: for 59 interviews, the property owner did not have knowledge that some type of form was required when currency transactions exceeded $10,000, and for four interviews, we could not determine if the property owner had knowledge that some type of form was required when currency transactions exceed $10,000.

[44] For 63 of the 229 interview documents received, the property owner did not admit to intentionally keeping transactions under $10,000.



**Criminal Investigation Enforced Structuring Laws**
**Primarily Against Legal Source Funds and Compromised**
**the Rights of Some Individuals and Businesses**

## Interviews With Property Owners Did Not Meet All Criminal Investigation Requirements, and Advice of Rights Was Not Provided

Generally using transaction patterns to establish probable cause and seize property, CI usually interviewed property owners after the seizures in most of the cases in order to establish the required elements for forfeiture (knowledge and intent).

### There was a lack of evidence that property owners' reasonable explanations were considered

While some of the interviews established that the property owners generally had knowledge of their bank's obligation to file a CTR for transactions above $10,000 and admitted to structuring, we found that some property owners had reasonable explanations that should have been considered by CI. This fact was particularly important when the property owners were conducting legal activities and could provide a legitimate reason for the pattern of transactions that CI considered to be structuring. CI procedures require that all "realistic" defenses be considered before a seized asset is forfeited. We found that:

- For 54 of the 229 investigations, the property owners provided reasonable explanations, such as depositing business funds, withdrawing funds for inventory purchases, or conducting transactions under $10,000 due to insurance policy restrictions. In most instances, we found no evidence that CI attempted to verify the property owners' explanations.[45]

- For 30 of the 229 investigations, the property owners provided other types of reasonable explanations, such as friends or unidentified bank representatives told them to conduct transactions under $10,000, they did not want to handle more than $10,000 cash due to the time and "hassle" of filling out forms, a desire to avoid bank fees, or for personal safety reasons. Although not all of these explanations were verifiable, we found no evidence that CI considered the defense offered.

- For 39 of 229 investigations, the property owners acknowledged that their motivation was to keep their financial transactions from the Government. These cases are discussed further below.

---

[45] For the 54 investigations in which the property owner provided reasonable explanations, we found in 11 investigations that the property owner explanation was considered or verified by the special agent. For the remaining 43 investigations, we could not determine if the property owner explanation was considered by the special agent in 24 investigations, and we found that the property owner explanation was not considered by the special agent in 19 investigations.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

## *Property owners were not adequately informed of pertinent information*

The Memorandum of Interview is a record of what occurred at the interview.[46] Figure 5 below contains a breakdown of the procedural issues found with the interviews. For 202 of the 229 interviews, the evidence showed that the property owners were not adequately informed of the Government's inquiry as follows (some cases fit in more than one category):

- For 171 of 229 cases, the interview indicates that the special agents did not properly identify themselves as assistants to the USAO for the Government when they were assisting on an investigation classified as grand jury or we could not find evidence they did. For grand jury investigations, the IRM states *"that IRS employees… should advise those contacted that they are acting as assistants to the attorney for the government in conjunction with an investigation."*[47] For 148 cases, the interview indicates that the special agents did not properly identify themselves as acting as assistants to the USAO for the Government, and for 23 cases, the interview does not document whether the special agents properly identified themselves.

- For 106 of 229 cases, the agents did not state the purpose of the interview or we did not find evidence they did. IRM procedures in Title 26 cases require special agents to advise the property owner regarding the purpose of the contact.[48] For 62 cases, the special agents did not identify the purpose of the contact, and for 44 cases, the interview does not document whether the special agent explained the purpose of the interview to the property owner. While in Title 31 cases (as opposed to Title 26 tax cases) CI's procedures do not require agents to provide the purpose of interview to subjects prior to the interview, as we discuss in the next section with respect to the advice of rights, Title 26 cases are performed alongside Title 31 cases. These rights are too important to ignore, especially when agents are not sure prior to the interview whether the property owner may have violated the tax laws thereby necessitating a Title 26 case.

- For 181 of 229 cases, we identified a problem with the information provided to the property owner about the seizure. In 110 cases, the property owners were not informed until the end of the interview that a seizure took place. In 60 cases, the property owners were not informed that a seizure took place, and in 11 cases we could not determine if the property owner was informed that their funds had been seized. As previously stated, for Title 26 cases, the IRM procedures require special agents to advise the property owner regarding the purposes of the contact, and we believe this also relates to the requirement in Title 26 cases for special agents to advise the property owner that a seizure took place. However, there is no such requirement in the IRM procedures for Title 31 investigations.

---

[46] IRM 9.4.5.7.4 (May 15, 2008).

[47] IRM 9.4.5.11.3.1.2 (February 1, 2005).

[48] IRM 9.4.5.11.3.1.1(1) – (3) (February 1, 2005).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

### Figure 5: Memorandum of Interview Procedural Issues

Bar chart with categories showing values:
- Proper Identification by Agents: No = 148, Cannot Determine = 23
- Informed of Interview Purpose: No = 62, Cannot Determine = 44
- Informed of Seizure: No = 60, Cannot Determine = 11

Legend: No (blue), Cannot Determine (gray)

*Source: TIGTA analysis of interview documents received from the IRS.*

### *Noncustodial advice of rights were generally not provided*

Miranda rights are required for custodial interrogations.[49]  Additionally, IRS procedures require that CI special agents give similar warnings even in noncustodial interviews in Title 26 cases.[50] Title 26 criminal tax violations associated with the structuring of banking transactions were established by CI in 21 of the 252 legal sources cases.[51]  In June 2014, the IRS formally adopted the Taxpayer Bill of Rights, the first right of which is to be *informed*, though it made clear that these rights have always existed.  In December 2015, Congress codified those same rights into law.[52]

In only five of 229 interviews were property owners provided the noncustodial advice of rights prior to the interview.  Businesses that deal with currency transactions were primarily affected by the structuring seizures (210 [83 percent] of the 252 legal source cases were businesses). Individuals and businesses who are not engaged in unlawful conduct may be less guarded in speaking with law enforcement about their banking transactions, and the absence of information about what their rights are might lead them to make statements that are later used against them.

---

[49] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

[50] IRM 9.4.5.11.3.1.1 (February 1, 2005) requires special agents to provide the following rights: "In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions.  However, first I advise you that under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken.  I advise you further that you may, if you wish, seek the assistance of an attorney before responding.  Do you understand these rights?"
[51] ***************************************************|***************************************************.

[52] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Title IV, § 401(a) (2015) (codified at I.R.C. § 7803(a)(3)).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

With respect to the advice of rights, CI asserts the following: (1) that property owners in a Title 31 structuring case are not "taxpayers" for purposes of the application of taxpayer rights; (2) that the noncustodial advice of rights are only required to be provided when CI is pursuing investigations under Title 26 of the U.S.C., which contains the Federal tax laws (the Internal Revenue Code), and not Title 31, which contains BSA provisions; and (3) noncustodial advice of rights does not apply to "grand jury investigations."

It is evident that grand jury subpoenas were used to obtain bank statements and other bank information, which may classify the case as a "grand jury case." The IRM also states that noncustodial advice of rights does not apply in grand jury investigations, and that the AUSAs will instruct special agents what rights to provide subjects.[53] CI also provided us its training materials that reflect that the advice of rights is not required in "grand jury investigation cases" because it is practice for the Department of Justice to send what is known as an "Advice of Rights letter" to the subject of an investigation that advises them of their rights. However, according to CI, no property owner in our cases appeared to have received such a letter.

In most cases, we did not find any evidence from the documentation provided by CI that special agents or task force officers displayed coercive tactics with property owners during interviews. However, in two cases, the approach to property owner interviews was such that the reading of Miranda rights may have been required by law. In the one case we can discuss publicly, the property owner alleged that special agents and local police arrived at the property owner's place of business and used police search dogs in the search. The entrance and exit to the store were allegedly blocked, and it was alleged that the taxpayer was asked to answer questions. The property owner, who spoke limited English, was told that his account was seized, and he was presented with a Consent to Forfeiture to sign. He alleged that officers spoke in loud tones at him instructing him that he should sign. After the Institute for Justice was retained to represent the property owner, all of his funds were returned. With respect to these two cases, in one case, the seizure warrant was served in concert with a search warrant. Search warrants require a security sweep and potential searches of occupants to ensure the safety of the occupants and special agents. In the case we discuss above, CI denies that any person was "in custody" for the purposes of Miranda rights as defined by relevant court cases.

It is unclear as to whether some or all of the Taxpayer Bill of Rights applies when CI is pursuing both a Title 31 case and a Title 26 case at the same time. However, if CI is going to pursue both a Title 26 case and a Title 31 case against the same individual or business, it should consider taxpayer protections. For Title 31 violations, the interview is critical because it is used to establish the subject's knowledge about the financial institutions' obligations to file a CTR for currency transactions exceeding $10,000 and the subject's intent to structure transactions to avoid the filing of a CTR. As described above, we also observed in the interviews that CI special agents: (1) did not always properly identify themselves, (2) did not always make clear the

---

[53] IRM 9.4.5.11.3.1.2 (February 1, 2005).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

purpose of the Government's inquiry, or (3) did not always make clear that a seizure took place before the interview.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*| \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*. While IRS procedures and training materials do not require that advice of rights be provided in Title 31 cases, those same procedures and training also suggested that the advice of rights would be provided in another manner, *i.e.*, through the Department of Justice. With the exception of five cases, rights were generally not provided in these cases. The IRS should consider changing these procedures to require IRS agents to provide advice of rights in Title 31 cases as well as Title 26 cases. Internal Revenue Commissioner Koskinen testified on May 25, 2016, regarding the IRS's attempts to make improvements to the Asset Seizure and Forfeiture Program and assured members of Congress that the IRS is intent on protecting taxpayer rights in this program.[54]

## Recommendations

The Chief, CI, should:

*Recommendation 3:* Consider revising the IRM to require a clear explanation for the purpose of interviews at the outset and the reading of noncustodial advice of rights to all subjects under investigation during interviews.

> *Management's Response:* The IRS partially agreed with this recommendation. CI agrees that subjects of administrative investigations to be interviewed should be read noncustodial rights that advise them of their constitutional rights. To clarify this responsibility, the Acting Director, Operations Policy and Support, issued updated guidance on August 29, 2016, requiring, with limited exceptions, that special agents conducting an administrative Title 31 structuring investigation advise subjects of their constitutional rights during noncustodial interviews. CI disagrees with the recommendation that advice of rights be presented to those subjects interviewed pursuant to an ongoing grand jury investigation. A grand jury investigation is not controlled by CI, but rather it is an investigation controlled by the USAO. CI special agents must follow the procedures as directed by the AUSA assisting the grand jury. Management disagrees with our outcome measure that in cases in which Title 26 investigations occurred advice of rights should have been provided to property owners because the cases were grand jury investigations.

> *Office of Audit Comment:* For many property owners in our sample, special agents did not introduce themselves as required, did not inform interviewees as to the purpose of the interview, and in all but five cases, did not inform property owners that they had the

---

[54] Testimony of IRS Commissioner John Koskinen Before the House Committee on Ways and Means Subcommittee on Oversight; *Protecting Small Businesses from IRS Abuse* (May 25, 2016).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

right to remain silent. When property owners were informed that their assets had been seized, it was generally at the end of the interview. CI's August 29, 2016, guidance allows for the notice of rights prior to an interview in administrative Title 31 cases; however, it is unclear whether this guidance would have benefited any of the property owners in our sample. The guidance is ambiguous in that "grand jury investigations" are excluded from the requirement that rights be provided and the term "grand jury investigation" is not clearly defined. In the guidance, the term grand jury investigation is defined as follows: "A grand jury investigation is evidenced by the issuance of grand jury subpoenas, the receipt of a Rule 6(e) grand jury secrecy warning letter, and/or the existence of a grand jury reference number." It appears that the use of a grand jury subpoena without a warning letter or grand jury reference number can be a "grand jury investigation" if an AUSA deems it to be so.

Grand jury subpoenas were used in most of the civil forfeiture cases in our sample to obtain bank records; therefore, even under the new guidance, there is no clear requirement that a notice of rights be provided to property owners. CI's explanation that "special agents must follow the procedures directed by the AUSA *assisting the grand jury*" does not account for situations in which a grand jury subpoena is used to obtain records but the matter never appears before a grand jury. CI has failed to provide a reasonable explanation as to why property owners, such as those in our sample, should not be provided a notice of rights before being interviewed.

*Recommendation 4:* Ensure that relevant CI procedures are communicated and emphasized to all CI agents and task force partners regarding the requirement to fully investigate all reasonable explanations provided in interviews conducted during investigations.

> *Management's Response:* The IRS agreed with this recommendation. CI established a policy to address "legal source" seizures arising from structuring activity. Over two years ago, CI made a policy decision to pursue civil forfeiture cases involving structuring only when they are predicated upon an underlying specified unlawful activity. As part of CI's investigation of such criminal activity, any potential exculpatory information that arises will necessarily be investigated and reviewed by CI and the Department of Justice. Any reasonable explanation will be explored and the merits of such determined and documented. This is standard investigative protocol.

## *In Some Civil Forfeiture Cases, the Government Appeared to Have Bargained Nonprosecution to Resolve the Civil Case*

A complaint was raised at the congressional hearings and in media reports on CI's Asset Seizure and Forfeiture Program that potential criminal charges were used as leverage to resolve civil forfeiture cases. After reviewing the settlement agreements that resolved the civil forfeiture cases, we determined that in at least 37 cases the Government bargained nonprosecution in order



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

to resolve the civil forfeiture.[55] Some State Codes of Professional Responsibility governing the conduct of attorneys bar threatening criminal prosecution *solely* to obtain an advantage in a civil matter.[56] While we could determine from the settlement agreements that nonprosecution was an element of the negotiations in at least 37 of the civil forfeiture cases, we could not determine whether the leverage of criminal prosecution was asserted solely to obtain an advantage in the civil forfeiture case. Additionally, CI special agents are not subject to rules governing the professional conduct of attorneys. However, in a congressional hearing on February 11, 2015, the IRS Commissioner agreed with the Congressman during the hearing that leveraging a civil case by threatening a criminal case would be unethical. He further testified that the USAO entered into the settlement agreements. The IRS Commissioner testified he did not think that special agents participated in leveraging the resolution of the civil case with the suggestion of prosecution if the case was not settled.[57] We believe that in five of our sample cases, CI was more involved in the resolution in that the signed Consents to Forfeiture stated that the case would not be referred for prosecution. However, we could not determine in these cases whether the promise to terminate the criminal investigation was made solely to leverage the resolution of the civil forfeiture case. CI contends that those Consents to Forfeiture were between the USAO, the property owner, and the property owner's counsel and that CI did not play a part in their completion. Information on these cases is described more fully below in the next section of this report.

Like many of the issues reviewed for this audit, settlement practices varied substantially depending on the jurisdiction in which the case was brought. With some exceptions, AUSAs appeared to take the lead role in negotiating cases after the taxpayer filed a claim with the IRS, which caused the case to be sent to the USAO for filing of the civil forfeiture suit. In some jurisdictions, the AUSAs expressly settled the case on the agreement that no criminal case would be filed.[58] In other cases, the proposed arrangement not to prosecute as part of the resolution of

---

[55] It is likely that the actual number of cases for which this occurred exceeds 37 because we relied on there being written evidence that nonprosecution or nonreferral for prosecution was a bargained for element of negotiations, whereas there was testimony at two congressional hearings that the negotiations were frequently through verbal negotiations.

[56] The American Bar Association Model Code of Professional Responsibility provides in DR 7-105 "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." *See also*, *May a Lawyer Threaten Criminal Prosecution in Order to Obtain Advantage in a Civil Matter?* Patrick O'Gray, 21 J. Legal Prof. 207 (1996–1997).

[57] Testimony of John A. Koskinen; Commissioner, IRS; Before the House Committee on Ways and Means, Subcommittee on Oversight; *Protecting Small Businesses From IRS Abuse* (February 11, 2015).

[58] These are examples from the sample cases reviewed. *United States of America vs. $17,102.03 in Funds From Comerica Bank Account #1852633401, in the name of Uganski Roll-Off Services*, Case No. 1:12-CV-837 (W.D. MI); *United States of America v. $247,500.00 Seized From Alabama One Credit Union, Safe Deposit Box No. XX05*, Case No. 13-CV-2119-LSC (N.D. AL).



*Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses*

the civil forfeiture case was referred to in other documents.[59]  In other jurisdictions, settlement agreements expressly stated that no promise was made with respect to any potential criminal case.[60]

The nature and extent of the bargaining of prosecution to resolve the civil cases is unclear.  For example, it is unclear whether the reference to criminal charges in the settlement agreements and Consents to Forfeiture represented the account owners' belief that charges would likely be filed if the civil case was not resolved or whether they considered it a remote possibility.  However, it is clear that account owners were told they had committed the felony crime of structuring, and the lack of clarity about the Government's intention to pursue a criminal case may have caused some account holders to forgo contesting the merits of the Government's civil forfeiture case.

**Recommendation 5:**  The Chief, CI, should develop guidance or training for special agents stating that it is not appropriate to bargain nonprosecution as a means of encouraging settlement of a civil forfeiture case.

> **Management's Response:**  The IRS disagreed with this recommendation, stating that standard operating procedures direct that special agents are not to participate in independent settlement or consent forfeitures with property owners.

> **Office of Audit Comment:**  CI's response does not appear to take into consideration that comments by special agents to property owners may affect whether and to what extent property owners are willing to pursue their rights in the civil forfeiture processes. When law enforcement personnel communicate that charges may be filed and say anything that implies that delaying resolution of the civil forfeiture case could increase the chances of charges being filed, they may appear to property owners as participating in the negotiation process.  In some of our sample cases in which there was no evidence of any illegal activity (other than the alleged structuring), property owners did not respond to the IRS's notice of intent to forfeit, thereby forfeiting 100 percent of the seized amount.  In only one case out of 301 investigations did a property owner take the civil forfeiture case to resolution by a court, and the property owner prevailed on procedural grounds.  We were unable to determine from materials reviewed whether the subjects believed that the Government was referencing the potential of criminal charges solely to influence the resolution of the civil forfeiture case.  However, we believe that it is reasonable for individuals to forgo legitimate defenses to civil forfeiture actions if they thought there was an increased risk of criminal prosecution if they participated in the civil forfeiture process.  In other words, the protections put in place for property owners

---

[59] Arrangement not to prosecute referred to in taxpayer's *Answer and Verified Claim for Forfeiture in REM,* wherein it was indicated that a settlement was reached.  *United States of America v. $483,000.00 in United States Currency,* Case No. 4:13CV529 (E.D. TX).

[60] *United States of America v. Approximately $67,509.69 in Funds Seized From Bank of America Account XXXXXXXX3126,* Civil Action No. 1:12-CV-1150-MHS (N.D. GA).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

referenced in CI's response to this audit (such as the innocent owner defense provided for in the Civil Asset Forfeiture Reform Act) may be meaningless if a property owner thinks he or she will be prosecuted if those rights are exercised. CI should have guidelines for civil forfeiture cases to ensure that statements made by special agents referencing potential criminal charges would not be perceived by reasonable person as discouraging participation in the civil forfeiture process.

## *Consents to Forfeiture Lacked Proper Oversight and Controls*

While for 282 (94 percent) of the 301 sample cases agents had obtained seizure warrants following a judge's probable cause determination, there were exceptions. No seizure warrants were issued for 19 cases. Six of these 19 cases were resolved with signed Consents to Forfeiture, and we observed that this activity continued after the October 2014 policy change whereby CI will no longer pursue the seizure and forfeiture of funds related to legal source structuring cases unless exceptional circumstances justify it.[61]

Consents to Forfeiture do not involve a judge's probable cause determination or have the same internal review process as a seizure warrant.[62] Since no seizure warrant was available to review, we were limited to reviewing the interviews with the property owners. During the interviews with these property owners, special agents and task force officers confronted the property owners with the evidence from the investigation prior to any seizure action. After the interview and prior to any seizure action by CI, the property owner and the property owner's attorney went to the appropriate USAO to resolve the case. Subsequently, the property owners agreed to a Consent to Forfeiture and submitted payment to the Government. CI has stated that the use of a judge's determination of probable cause is an important procedural protection. As the IRS Commissioner testified in February 2015:

> *Before it can seize property in a structuring case, IRS-CI special agents prepare a seizure warrant affidavit, which is reviewed and approved internally by CI management. The affidavit is then reviewed by an Assistant U.S. Attorney (AUSA) and his/her manager and if they agree the affidavit is legally sufficient, the AUSA and the special agent appear before a Federal magistrate judge where the special agent swears to the information contained in the affidavit. If the magistrate judge determines sufficient evidence was presented to establish probable cause, a seizure*

---

[61] For the 19 cases, we determined that six cases were resolved with signed Consents to Forfeiture, nine cases involved the filing of Complaints to Forfeiture, and four cases had other types of enforcement activities. These 19 cases came from 11 of the 25 field offices.

[62] According to the revised IRS CI BSA Program, Standard Operating Procedures (January 2016), special agents are no longer authorized to create or use a Consent to Forfeiture or otherwise solicit a forfeiture.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

> *warrant is issued. IRS-CI agents then serve the warrant, and assets (cash and/or property) are seized.*[63]

In cases for which there is no probable cause determination by a judge, there is less assurance of a sufficient basis for the Government to seize and forfeit the property.

### Consents to Forfeiture were used to settle some cases

Consents to Forfeiture were sometimes used to settle a case after a seizure warrant was issued by CI. One field office obtained two signed consents (on separate investigations) on the same day the funds were seized. We reviewed the interviews for these two cases, and the property owners appeared to have been coerced into signing the Consents to Forfeiture. The agents used tactics (*e.g.*, according to the property owner, police dogs were used to search a convenience store, blocking the entrance and exit to the store, and intimating that family members could be prosecuted if the case was not resolved) that may have given the property owners the belief that they would be prosecuted unless they signed the Consents to Forfeiture. This type of practice should not be tolerated. CI needs to implement proper oversight and controls to ensure that this type of action does not continue.

## Recommendation

**_Recommendation 6:_** The Chief, CI, should establish proper oversight and controls to prevent Consents to Forfeiture from being used by field offices as a general practice.

> **_Management's Response:_** The IRS agreed with this recommendation. On June 1, 2016, the Chief, CI, issued guidance on this matter contained in the BSA standard operating procedures. This guidance states that special agents are not permitted to solicit Consents to Forfeit or otherwise solicit a forfeiture settlement. Annual operational reviews of Financial Crimes Task Forces will review this matter to identify any violation of this guidance.

## _Cases Were Generally Not Referred to the IRS's Examination Function for Audit_

One purpose for maintaining the BSA reporting regime is to assist the Government in tax proceedings.[64] When CI is pursuing a structuring case that has an illegal activity as its source of funds, the suspect may be structuring to conceal other illegal activity from law enforcement. However, in legal source structuring cases, the attempt to avoid the bank reporting requirements

---

[63] Testimony of John A. Koskinen; Commissioner, IRS; Before the House Committee on Ways and Means, Subcommittee on Oversight, *Protecting Small Businesses From IRS Abuse* (February 11, 2015).

[64] 31 U.S.C. § 5311.



*Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses*

may indicate that taxes were not paid when the income was earned.  Notwithstanding this important consideration, there was no evidence of civil income tax examinations for most of these criminal and civil forfeiture cases.  For example, of the 301 asset seizures for which structuring was the primary basis for seizure using a civil or criminal forfeiture process since FY 2011, only five seizure cases had any evidence of civil income tax examinations on the property owners' tax accounts.

In 39 of the 229 cases for which interview documentation was received, the property owners acknowledged that their motivation was to keep their financial transactions from the Government.  Twelve of these cases were referred to the Small Business/Self-Employed Division.  Statements such as these were given by the property owner during interviews:

- "Thought deposits over $10,000 could cause a 'red flag'."

- "Wanted to avoid an audit."

- "Wanted to stay off the IRS's radar."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*1\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*1\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*1\*\*.  In at least 52 cases, the property owners authorized disclosure of their tax returns to the special agents by signing Form 8821, *Tax Information Authorization*.  The largest component of the Tax Gap is due to underreporting of income.  Those participating in the cash economy are at a higher risk of not complying with the tax code.[65]  CTRs and other required financial institution reports provide important insight (and sometimes the only insight) into taxpayers participating in the cash economy who may be intent on evading taxes.  The task force was using the BSA data to enforce alleged structuring violations and not to assess and collect tax.  Civil income tax examinations are an appropriate response to taxpayers engaged in legal businesses with currency transactions that appear designed to avoid the Government's detection when there are indications of underreporting of income.

## Recommendation

*Recommendation 7:*  The Chief, CI, should ensure that referrals of potential civil tax matters derived from Title 31 structuring leads are referred to the appropriate IRS business unit.

> *Management's Response:*  The IRS agreed with this recommendation, which is addressed in the BSA standard operating procedures as follows: If the Suspicious

---

[65] The Net Tax Gap is the annual difference between what taxpayers owe and what they pay voluntarily less collections through enforcement.  It was last estimated by the IRS in April 2016 to be $406 billion dollars.  The largest share is due to underreporting $387 billion.  The most significant portion of underreporting is the cash economy, which the IRS estimated to exceed $100 billion annually during Tax Year 2001.  IRS; National Taxpayer Advocate *2007 Annual Report to Congress*; Volume 2, *Taxpayer Advocate Service Research Studies and Reports*; Section One – *A Comprehensive Strategy for Addressing the Cash Economy* (Dec. 2007).



***Criminal Investigation Enforced Structuring Laws***
***Primarily Against Legal Source Funds and Compromised***
***the Rights of Some Individuals and Businesses***

Activity Report Review Team or a special agent assigned a referral determine that the Suspicious Activity Report or referral lacks criminal potential, but they believe that civil tax potential exists, that lead is forwarded to Small Business/Self-Employed Division using the Prime Lead referral process.

## *Outcomes in Cases Lacked Consistency*

The Eighth Amendment to the Constitution of the United States, which precludes excessive fines, requires that penalties be proportionate to the offense. Additionally, under 18 U.S.C. § 983(g)(1), a court is required to consider whether a forfeiture is proportional to the gravity of the offense giving rise to it. Figure 6 below shows the sample disposition results of the 301 sampled investigation cases, which includes the amounts seized, forfeited, and returned.

***Figure 6:  Disposition Results (in millions) for the 301 Sample Cases***
***Reviewed for Which Structuring Was the Primary Statute Violated***

| Sample Data | | | Disposition Results | | | |
|---|---|---|---|---|---|---|
| Number of Investigations | Number of Seized Assets | Asset Value Seized | Amount Forfeited[66] | % of Asset Value Seized | Amount Returned | % of Asset Value Seized |
| 301 | 559 | $54.2 | $28.3 | 52% | $26.1 | 48% |

*Source:  TIGTA analysis of sample case information and related AFTRAK information.*

After a seizure, property owners are notified that they can either file a Petition for Remission or Mitigation (which acknowledges that they engaged in structuring but are seeking the return of some of the funds) or file a claim (if it is their intent to contest the merits of the Government's structuring allegations).  If a claim is filed, CI refers the case to the respective USAO for the commencement of a civil forfeiture case.  These cases are initiated by the Government through the filing of a civil complaint in the appropriate U.S. District Court.  Property owners must file an answer to the complaint if they want to contest the forfeiture, and the case proceeds towards a trial unless there is a settlement.  For administrative resolutions of forfeiture cases when property owners file a Petition for Remission or Mitigation, the IRS maintains a formula that begins with a 10 percent base penalty of the amount alleged to have been structured, which can be increased

---

[66] The amount forfeited of $28.3 million and the amount returned of $26.1 million equals $54.4 million (numbers do not add exactly due to rounding), which is higher than the amount seized due to the value of forfeitures being higher when the asset was sold than the value when it was seized.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

for aggravating circumstances (*i.e.*, repeated instances of structuring or willful conduct) or decreased for mitigating circumstances (*i.e.*, no intent to violate law or language barriers).[67]

Many of the individual outcomes in seizure cases appeared to be disproportionate to the conduct of the property owners as well as disproportionate to the outcomes in cases of similarly situated property owners. Figure 7 shows the disposition results for 142 sample investigations (from our sample of 301) for the top five CI field offices (based on number of cases in our sample); it includes the number of investigations, number of assets seized, and value of the assets (in millions) seized for which structuring was the primary statute violated. It also shows the percentages of the amounts forfeited and returned based on the amounts seized.

***Figure 7:  Top Five CI Field Office Disposition Results for Seizures
for Which Structuring Was the Primary Statute Violated
(in Millions, as of September 30, 2015)***

| Sample Data | | | | Disposition Status | | | |
|---|---|---|---|---|---|---|---|
| Field Office | Number of Investigations | Number of Assets Seized | Asset Value Seized | Amount Forfeited | % | Amount Returned | % |
| Nashville | 35 | 52 | $2.7 | $1.6 | 59% | $1.1 | 41% |
| Oakland | 32 | 54 | $3.4 | $2.5 | 69% | $1.1 | 31% |
| Newark | 27 | 82 | $10.6 | $4.8 | 46% | $5.8 | 54% |
| Chicago | 25 | 31 | $2.4 | $1.5 | 63% | $0.9 | 37% |
| Detroit | 23 | 30 | $2.8 | $1.2 | 44% | $1.6 | 56% |
| **Total** | **142** | **249** | **$21.9** | **$11.6** | **53%** | **$10.5** | **47%** |

*Source:  TIGTA analysis of sample case information and related AFTRAK information.*

As shown in Figure 7, the forfeiture rate for the five field offices with the most cases in our sample ranged from 44 percent to 69 percent, and the amount returned to the property owner ranged from 31 percent to 56 percent. Substantially the same facts led to different results in many cases. As we described above, some property owners admitted to IRS special agents or task force officers that they structured deposits of legal source funds to avoid the CTR filing, while others provided plausible explanations for why their transactions were routinely below $10,000. In similar fact patterns, property owners who engaged in activities that generated legal source funds had very different results; specifically, some:

---

[67] IRM Exhibit 9.7.7-5 (Nov. 2001).



*Criminal Investigation Enforced Structuring Laws*
*Primarily Against Legal Source Funds and Compromised*
*the Rights of Some Individuals and Businesses*

- Had most or all of their money returned.

- Were required to forfeit most or all of their money.

- Were prosecuted and forfeited funds even though they engaged in legal businesses.

Outcomes across the CI Asset Seizure and Forfeiture Program did not appear to be consistently determined by the facts of the cases but rather by property owners' risk tolerance to the high costs of litigation against the Government with the potential of a criminal prosecution if settlement was not reached. Generally, the amount subject to seizure is limited to the amount structured. In most cases, the amount that was seized was less than the amount structured. Figure 8 shows the five field offices with the most cases in our sample and compares the amount forfeited to the amount structured.

**Figure 8: Amount of Structured Transactions Compared to Amount Forfeited for the Top Five Field Offices (in millions, as of September 30, 2015)**

| Sample Data | | | | |
|---|---|---|---|---|
| Field Office | Number of Investigations | Amount of Potentially Structured Transactions[68] | Amount Forfeited | % of Potentially Structured Transactions |
| Nashville | 20 | $4.35 | $1.21 | 28% |
| Oakland | 23 | $14.73 | $2.1 | 15% |
| Newark | 23 | $9.97 | $4.80 | 48% |
| Chicago | 18 | $25.08 | $1.35 | 5% |
| Detroit | 17 | $9.44 | $0..98 | 10% |
| **Total** | **101** | **$63.57** | **$10.49** | **17%** |

*Source: TIGTA analysis of sample information and related AFTRAK information.*

While any amount structured is subject to seizure and forfeiture, the amount actually forfeited ranged from 5 percent to 48 percent for these five field offices. There were also numerous examples of property owners who admitted intentionally structuring deposits to avoid a CTR filing yet who fared better in settlements than property owners who provided a plausible explanation as to why deposits were below $10,000. For example, in a case involving an auto dealership, the owner denied structuring and asserted it routinely deposited under $10,000 as a business practice. There was alleged structuring up to approximately $359,000. Approximately, $262,000 was seized. No funds were returned to the dealership, and in the settlement agreement,

---

[68] Of the 142 sample cases selected for the top five field offices, we could not determine the amount potentially structured for 29 cases because the seizure warrant affidavit was either deemed grand jury material or sealed by court order and no alternative document was available to review. This also reduces the number of investigations and amounts forfeited by 29 and $1.6 million, respectively, when compared to Figure 5.



**Criminal Investigation Enforced Structuring Laws**
**Primarily Against Legal Source Funds and Compromised**
**the Rights of Some Individuals and Businesses**

the AUSA agreed not to prosecute in lieu of settling the case.[69]  In contrast, in a different case out of the same CI field office, where there was evidence that a gun dealer structured $940,000 in deposits to avoid an IRS audit, CI agents seized $500,000 and returned $450,000.[70]

The most disproportionate outcomes identified for our sample results included cases for which the property owners were criminally charged and entered into plea agreements solely for legal source structuring.  In nine cases from our sample, legal businesses and their owners were indicted for structuring cash transactions for which there was no evidence of any unlawful conduct other than structuring.  The businesses included water amusement parks, pharmacies, used car sales, and coin and stamp dealers.

CI personnel indicated that they generally are not involved in the negotiations between the USAO and the property owner's defense counsel.  This includes plea negotiations for which they indicated that the USAO has sole authority.  While we agree that settlement agreements are typically negotiated by the USAO, the seizing agency does have input in the process.  According to the Department of Justice Asset Forfeiture Policy Manual, all settlement agreements must be negotiated in consultation with the seizing agency.[71]  The manual indicates that the seizing agency's input is essential in order to reach a settlement that is based on a common understanding of the facts and circumstances surrounding the seizure.  CI should strive to ensure that the results of its seizures are consistent and not disproportionate compared to others with similar facts and circumstances.

As was described above, CI acknowledged that letters were sent to the property owners who had civil forfeiture investigations pursued against them for alleged structuring offenses inviting them to submit or resubmit a Petition for Remission or Mitigation.  The decision to issue these letters is an important step demonstrating that the IRS is intent on improving the fairness of its civil forfeiture program.  However, these letters may not convince property owners who were told that they may be facing prosecution unless they settled their cases to once again engage the Government on the merits of their cases.  Additionally, the letters will do nothing for property owners engaged in legal businesses who were prosecuted.

### Recommendation

**Recommendation 8:**  The Chief, CI, should (1) establish procedures that strive to assure consistent and fair outcomes in resolutions for similarly situated property owners and (2) monitor settlements to ensure that the procedures are working to assure consistency and fairness.

---

[69] *U.S. v. $261,974.39 Seized From Alabama One Credit Union Account No. XXXXX-71*, Case No.: 7:13-cv-00807-TMP (N.D. AL).

[70] *United States of America v. $500,000 in United States Funds*, Case No.: 3:13-CV-62 (M.D. GA).

[71] U.S. Department of Justice, Criminal Division, Asset Forfeiture Policy Manual (2013).



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

**_Management's Response:_** The IRS disagreed with this recommendation, stating that procedures, such as an examination of a settlement agreement, will have an impact on the consistency of outcomes. CI's new mitigation and remission procedures in structuring cases now require the CI Chief's approval and should address cases under IRS control. However, CI does not control outcomes driven by the Department of Justice or the legal process overseen by the Federal Courts.

**_Office of Audit Comment:_** In its response to this audit, CI expressed concern that our report found Eighth Amendment violations in the sample of cases and disagreed with that conclusion. This is incorrect. We did not report findings of specific Eighth Amendment violations. Rather, we noted the importance of the Eighth Amendment to outcomes in forfeiture cases. As part of the process of civil forfeiture cases, Criminal Tax Counsel provided opinions to CI on whether there was sufficient basis to proceed with forfeiture. Most of those Criminal Tax Counsel opinions contained analysis of the applicability of the Eighth Amendment limitation as to the amount subject to forfeiture based on the facts of each case and referred to CI's mitigation and remission procedures, which begin with a base penalty amount of 10 percent of the amounts structured and can be increased for aggravating circumstances and decreased for mitigating circumstances.

Our finding is that there were numerous instances in which substantially similar facts had significantly different outcomes. In cases for which there was no evidence of illegal activity (other than the alleged structuring), the spectrum of those differences ranged from all funds being returned to no funds being returned, and in nine cases, property owners were prosecuted for legal source structuring. We do not express an opinion about whether any of these inconsistent outcomes might rise to the level of an Eighth Amendment violation. Consistency of some outcomes will likely be improved by the involvement of the CI Chief in the mitigation and remission process. However, most cases in our sample were not resolved with the property owner filing a petition for remission and mitigation. Most cases were resolved after the property owner filed a claim contesting the merits of the civil forfeiture. CI's new procedures will assist the property owners who concede the Government's case (*i.e.*, those who file a petition) but will do nothing for those who contest the merits of the case (*i.e.*, those who file a claim). CI is the lead of the Financial Crimes Task Forces responsible for these investigations and, as such, should take the lead in working towards greater consistency in outcomes.

## Some of the Government's Actions Have Been Inconsistent With the New IRS Policy

As part of this audit, we reviewed all 28 criminal investigations that had asset seizures with a value of $7.9 million where structuring was the primary criminal basis for the seizure during



**Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses**

FY 2015 to determine if CI complied with the new policy.[72]  Under the change in policy, CI will no longer pursue legal source structuring cases unless exceptional circumstances justify the seizure and the seizure is approved by the appropriate CI executive.  CI has not yet defined what circumstances rise to the level of "exceptional."  We reviewed available supporting documentation from these 28 investigations to determine whether the seizure and forfeiture of these assets were consistent with the new policy.  We determined that for 20 of the 28 investigations, the seizures either conformed to policy, were not actually for structuring violations, or occurred well before the policy change.

However, for five cases, we believe that the actions taken by the Government were inconsistent with the new policy, and for three cases, we did not find evidence that CI conformed to the new policy in making those seizures for structuring violations.  CI contends that, for all three investigations, the seizure was either not related to structuring or there was reason to believe that the source of the structured funds was the result of illegal activity.  Listed below are the specifics of these three seizures as well as CI's perspective.

- ******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************5******************************************
*****************5*********.

- ******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************
******************************************5******************************************

---

[72] We selected these investigations for review if according to the AFTRAK database assets were seized during FY 2015.  The 28 criminal investigations include 22 criminal investigations for which funds were seized using a civil forfeiture process and six criminal investigations for which funds were seized using a criminal forfeiture process.  We also included two investigations that had seizures on October 14, 2014, and one investigation that had seizures on October 16, 2014, to evaluate whether CI's disposition of these assets was consistent with policy.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*

- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*5\*\*\*\*\*\*\*.

## *Processes Need to Be Improved for Identifying Whether Information Is Protected by Grand Jury Secrecy Rule or Court Order*

The IRS is required by law to provide TIGTA with all documents requested to conduct our audit unless barred by specific legal authority. However, in the course of this audit, we encountered significant delays, and a substantial amount of information was initially either improperly withheld or redacted. The reasons given by CI for withholding or redacting information varied and were as follows: grand jury secrecy provisions under Rule 6(e) of the Federal Rules of Criminal Procedure prevented disclosure, the information was sealed by court order, and in some instances, the USAOs instructed CI not to provide the information to TIGTA. Because in many instances the reasons CI initially gave us turned out to be incorrect, it is clear that CI needs to substantially improve its process for making these types of determinations. Ultimately, TIGTA was able to obtain sufficient information needed to conduct this audit; however, there were substantial unnecessary delays caused by the IRS.

### *Some information was initially incorrectly classified as grand jury information*

On April 15, 2015, we made our initial request for information on 322 sample cases from 24 field offices. As of July 20, 2015, we had received information on 151 sample cases from 16 field offices.[73] Of those 151 sample cases, five cases had signed consents for the seizure, two cases were prepared by other Federal agencies, and two were dropped from our review, leaving 142 sample investigations for our review to determine the basis upon which the IRS seized the property. CI informed us that of the 151 sample cases it provided, 119 cases contained grand jury material that was either withheld or redacted, and 39 cases contained sealed

---

[73] For the 151 sample cases: 18 case file documents were received for five field offices by May 22, 2015; 28 case file documents were received for five field offices by June 4, 2015; and 105 case file documents were received for six field offices on June 24, 2015. For the initial document request, CI provided information for the first field office on May 22, 2015, and the last field office on September 22, 2015.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

court documents that were withheld.[74]  Without this information, we could not have conducted this audit.  For instance, CI only provided sufficient information for 33 (23 percent) of the 142 sample cases to enable us to determine the basis upon which IRS seized the property.

Because the purpose of the grand jury process is to facilitate criminal proceedings, and few civil forfeiture cases involved criminal prosecution, we questioned CI as to the possible over-designation of information as "grand jury information."  CI Headquarters personnel indicated that they did not initially coordinate with the USAO in making this determination.  They applied the standard of the most conservative judicial district in making these determinations even though other judicial districts are less restrictive in classifying information as grand jury information.

### Determining what information is covered by grand jury secrecy rules

According to the IRM, when TIGTA makes a request for case information, CI will allow the review of all information except for those matters that occurred before a grand jury.[75]  The IRM further indicates that CI may consult Criminal Tax Counsel if there is a question about which information is covered by grand jury secrecy rules.[76]  CI is responsible for the segregation of information and should have the information clearly marked as grand jury or non–grand jury. When we asked that CI provide us, for each case, what specifically caused the case contents to be protected grand jury information, CI indicated that it could not respond without the assistance of the respective USAOs.  Over several months of discussions, CI worked with the Executive Office for U.S. Attorneys and the respective AUSAs to provide TIGTA with enough information to conduct this audit.[77]  However, it remains unclear whose responsibility it is to classify information as grand jury material.  For instance, e-mails from USAOs to CI stated that CI is responsible for determining if the case file contains grand jury information.

### Sealed cases and other reasons for not providing information

USAOs can request that warrant applications be placed under seal in appropriate circumstances, such as when the Government does not want to alert a suspect prior to the seizure of property. TIGTA's review of various judicial motions to seal warrant applications filed by AUSAs reflects that only warrant applications and materials filed with them are placed under seal.  The seal of a warrant application does not extend to other documents in the related civil forfeiture case, such as settlement agreements.  Yet at the request of some AUSAs, CI withheld some documents on the incorrect basis that the entire civil forfeiture case was under seal, when in fact only the

---

[74] The numbers do not equal 151 because some cases contained both grand jury material and had sealed court documents.

[75] IRM 9.5.2.4.2(1) (November 5, 2004).

[76] IRM 9.5.2.4.2(1) (November 5, 2004).

[77] CI provided the first field office information on October 6, 2015, and last field office information on November 18, 2015.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

application for the seizure warrant was under seal. Moreover, certain USAOs requested that CI withhold information on certain other cases from TIGTA and cited reasons that were not legally valid (see Appendix VI).

Ultimately, CI management created a checklist of the documents needed from each case and directed the field offices to coordinate with the Executive Office for U.S. Attorneys on each case in determining which information on the checklist was actually restricted. Subsequently, a significant volume of information that was originally not provided to us was then provided because, as it turned out, the information was not actually grand jury information. As we noted previously, CI only initially provided sufficient information for 31 (22 percent) of 143 sample cases; after this process, we received sufficient information for 123 cases. The creation of the checklist along with the direction to the field offices to coordinate with the Executive Office for U.S. Attorneys appears to be a good start to ensuring that documents are properly classified. However, additional guidance and training is needed to improve this process.

## Recommendation

**Recommendation 9:** The Chief, CI, should use a checklist and coordinate with the respective USAO to determine on each case which information requested is restricted under the grand jury secrecy rules and, if restricted, whether an alternative document is available.

> **Management's Response:** The IRS disagreed with this recommendation, and CI points out that this recommendation has been largely obviated by the recently enacted Inspector General Empowerment Act of 2016 (Act). This Act, which the President signed on December 16, 2016, amends the Inspector General Act in several important ways. It resolves the long-standing issue of Inspector General access to protected information, including grand jury Rule 6(e) material. Under it, Inspectors General are allowed access to Rule 6(e) material if the Attorney General grants a request made by the "head of the establishment" for Federal grand jury materials. The Attorney General is instructed to grant access to Federal grand jury materials unless certain criteria are satisfied. The implementation of the Act should address this recommendation.

> **Office of Audit Comment:** The problem identified in this and other TIGTA audits of CI with respect to grand jury information is that CI overdesignates information as grand jury information,[78] which impedes and delays TIGTA's audit work. TIGTA was able to complete this audit without access to grand jury information, but only after months of

---

[78] This resulted in improperly withheld or redacted information that impaired our ability to conduct those audits. For examples, see TIGTA Ref. No. 2005-10-054, *The Criminal Investigation Function Has Made Progress in Investigating Criminal Tax Cases; However, Challenges Remain* (Mar. 2005); TIGTA Ref. No. 2010-30-058, *The Criminal Investigation Division Can Take Steps to Ensure Its Seizure Opportunities Are Maximized* (June 2010); TIGTA Ref. No. 2014-30-081, *Improvements Are Needed to Ensure That the Search and Seizure Warrant Process Is Adequately Documented and That Evidence Is Property Secured* (Sept. 2014).



***Criminal Investigation Enforced Structuring Laws***
***Primarily Against Legal Source Funds and Compromised***
***the Rights of Some Individuals and Businesses***

having to inquire as to why specific information was inexplicably designated as grand jury information. The Act allows Inspectors General access to grand jury information provided the Attorney General determines that the information does not interfere with an ongoing criminal investigation; interfere with an undercover operation; result in the disclosure of a confidential source; pose a serious threat to national security; or result in significant impairment to trade or economic interests of the United States. The Attorney General cannot make this determination without reviewing the materials. It is unacceptable and unreasonable that CI would prefer to have the Attorney General engage in this time-consuming effort of reviewing materials that may not even contain grand jury information rather than improving its own grand jury information designation process.



**Criminal Investigation Enforced Structuring Laws**
**Primarily Against Legal Source Funds and Compromised**
**the Rights of Some Individuals and Businesses**

**Appendix I**

# *Detailed Objective, Scope, and Methodology*

The overall objective of this review was to evaluate the IRS's use of seizures against property owners suspected of structuring transactions to avoid BSA reporting requirements.[1]  To accomplish this objective, we:

I.   Evaluated IRS policies, procedures, and guidance as well as the legal requirements for seizures conducted by CI when property owners are suspected of structuring transactions to avoid BSA reporting requirements.

   A.  Obtained and reviewed IRS policies, procedures, and guidance as well as the legal requirements governing CI's seizure and forfeiture process prior and subsequent to the New York Times article.

   B.  Interviewed CI executive management, the director of CI's Warrant and Forfeiture section, and program analysts to determine:

      1.  How structuring transactions are identified by CI.

      2.  The process used for conducting seizures both prior and subsequent to the New York Times article.  This also included determining what happens to the property owners and their money (including any due process protections) as a result of the structuring transaction seizures.

      3.  How structuring transaction seizures are controlled on the CIMIS and the AFTRAK databases.

   C.  Interviewed a judgmental sample[2] of four special agents in charge, six special agents, and four asset forfeiture coordinators from the Oakland, California; Chicago, Illinois; Newark, New Jersey; and Nashville, Tennessee, field offices and discussed the process for conducting criminal investigations involving structuring violations that resulted in the seizure and forfeiture of assets.

   D.  Interviewed three Criminal Tax Counsel attorneys and determined the legal requirements in conducting structuring transaction seizures and their role in reviewing and approving these seizures.  These attorneys were interviewed at the Oakland, California; Chicago, Illinois; and Nashville, Tennessee, field offices.

---

[1] See Appendix VII for a glossary of terms.

[2] A judgmental sample is a nonprobability sample, the results of which cannot be used to project to the population.



**Criminal Investigation Enforced Structuring Laws**
**Primarily Against Legal Source Funds and Compromised**
**the Rights of Some Individuals and Businesses**

II.  Determined the impact of structuring transaction seizures on property owners.

A.  Obtained data from the AFTRAK for all 1,997 asset seizures for which structuring was the primary basis for the seizure from FYs 2012 through 2015.[3]

B.  For the 1,997 assets seizures, obtained the corresponding criminal investigation data for the 736 investigations from the CIMIS. These investigations could have been initiated prior to the FYs 2012 through 2015 seizures.

C.  Analyzed the second data extract obtained in Steps II.A and II.B and determined the number of structuring transaction seizures by year and any related population information (such as average number of days from seizure to forfeiture, total and average dollars seized, total and average dollars kept by the Government, and the total and average dollars returned to the property owners).

D.  From the data identified from the first data extract, selected a statistically valid random stratified sample using a 95 percent confidence level, 5 percent error rate, and ± 3 percent standard deviation from 431 criminal investigations that had 773 assets seized with a value of $70.5 million for which civil forfeiture was pursued during FYs 2012 through 2014. This was the population of investigations for which both the criminal investigation and seizure activities were closed.[4] According to the TIGTA statistician, we needed at least 156 cases to allow us to statistically report on the population of 431 investigations. We oversampled by 150 cases in anticipation of grand jury restrictions for some cases. Our sample was a total of 306 criminal investigations that had 575 assets seized with a value of $55.3 million. During the course of the audit, we dropped five of the sampled cases (totaling $2.3 million) because, upon review of the case information, we determined they did not meet the criterion for inclusion in our audit.

E.  Discussed with CI executive management and U.S. Department of Justice personnel our access to information from our sample of criminal investigations for structuring violations that resulted in the seizure of assets.

F.  Analyzed available case information obtained from CI for each criminal investigation selected in Steps II.D and determined:

---

[3] We obtained two separate data extracts of AFTRAK and CIMIS data during this audit. This second data extract was obtained in October 2015. The first, obtained in March 2015, was used for our sample selection; see Step II.D for more details on that extract and the sample.

[4] The data extract obtained in March 2015 was used for our sample selection and contained 1,874 seized assets from 726 criminal investigations. A total of 1,376 assets, with a value of $126 million, were seized using the civil forfeiture process from 636 criminal investigations during FYs 2012 through 2014. This included 204 criminal investigations with 602 seized assets that we did not consider for our sample selection because at the time either the criminal investigation or the seizure activities were still in process. One investigation that had one seizure totaling $240,000 was erroneously excluded from our sample population.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

1. If CI followed its established policies, procedures, and guidance as well as legal requirements related to structuring transaction seizures. This included analyzing the following:

    a) Notices sent to all parties with interest in the seized asset.

    b) Claims filed by the property owner (or third party).

    c) Petitions for Remission or Mitigation filed by the property owner (or a third party).

2. If a seizure warrant affidavit was used by CI to establish probable cause that structuring transactions occurred.

3. If an interview was conducted with the property owner, reviewed the Memorandum of Interview and evaluated the following:

    a) The property owner's knowledge of CTR requirements.

    b) Whether the property owner admitted to evading CTR requirements.

    c) If CI special agents and task force officers properly identified themselves and the reason for the interview.

    d) If advice of rights were provided to the property owner.

    e) If the property owner provided a defense or reasonable explanation that could be verified or considered by the IRS, and if the IRS considered the explanation.

5. If Criminal Tax Counsel was consulted to assure that there was sufficient evidence to show probable cause for the seizure.

6. If Criminal Tax Counsel was consulted to ensure that there was sufficient evidence to forfeit the asset and that hazards of litigation were identified.

7. The case's outcome as well as the final disposition of the seized assets.

8. The extent to which the property owner, whose funds were seized, was subjected to criminal prosecution.

G. From data identified in Step II.C, selected all 28 criminal investigations that had 117 assets seized during FY 2015, after the policy change in October 2014. We obtained and reviewed available information from the IRS and determined if CI adhered to the policy to no longer pursue legal source cases except in exceptional circumstances.



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

H.  Interviewed one property owner and one representative of a property owner that had assets seized by the IRS for structuring violations and obtained their perspective on CI's seizure and forfeiture process.

I.  Provided our case analysis results from Steps II.D and II.I to CI and obtained its feedback on our results.

### Data validation

We were unable to independently validate the accuracy and reliability of the AFTRAK and CIMIS data.  We validated the data used from the AFTRAK and CIMIS through specific tests related to the case reviews included in this audit.  We found the limited data that we used from the CIMIS to be generally accurate and reliable.  However, our testing revealed that while the seizure date and forfeiture amounts on the AFTRAK were generally accurate, our review identified claims and petitions submitted by the property owner for which there was no valid entry on the AFTRAK.  This led us to conclude that the AFTRAK was not entirely accurate and reliable.

### Internal controls methodology

Internal controls relate to management's plans, methods, and procedures used to meet their mission, goals, and objectives.  Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations.  They include the systems for measuring, reporting, and monitoring program performance.  We determined that the following internal controls were relevant to our audit objective:  CI's policies, procedures, and practices relating to the seizure of assets in criminal investigations involving structuring violations.  We evaluated these controls by interviewing CI personnel; reviewing CI policies, procedures, and guidelines; analyzing AFTRAK and CIMIS data; and selecting and reviewing available case file information from the criminal investigations in our sample.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

**Appendix II**

## *Major Contributors to This Report*

Matthew Weir, Assistant Inspector General for Audit (Compliance and Enforcement Operations)
Bryce Kisler, Director
Christina Dreyer, Audit Manager
Jeff Jones, Senior Auditor
Todd Anderson, Senior Auditor
Shalin Basnayake, Senior Auditor



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

**Appendix III**

## *Report Distribution List*

Commissioner
Office of the Commissioner – Attn:  Chief of Staff
Deputy Chief, Criminal Investigations
Chief, Criminal Investigations
Chief of Staff, Criminal Investigations
Deputy Director, Operations and Policy Support, Criminal Investigations
Director, Warrants and Forfeiture
Director, Office of Audit Coordination



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

**Appendix IV**

## *Outcome Measures*

This appendix presents detailed information on the measurable impact that our recommended corrective actions will have on tax administration. These benefits will be incorporated into our Semiannual Report to Congress.

### *Type and Value of Outcome Measure:*

- Taxpayer Burden – Potential; $17.1 million was seized and forfeited to the Government for which there was no evidence of the property owner structuring funds to conceal income or any other type of illegal activity (other than the alleged structuring) (see page 8).

### *Methodology Used to Measure the Reported Benefit:*

For the 301 selected sample investigations, all documents (seizure warrant affidavit, Memorandum of Interview, complaint, indictment, judgment, *etc.*) received for the investigation were considered to determine if the source of funds were legal or illegal. For 23 investigations, the source of structured funds could not be determined because the documents were either sealed, grand jury material, or insufficient. For 252 (91 percent) of the 278 remaining investigations, we did not find evidence that the structured funds came from an illegal source or involved illegal activity. In 26 (9 percent) of the structuring cases, it was established that the funds came from an illegal source or involved illegal activity.

Current law does not require that the funds have an illegal source (*e.g.*, money laundering, tax evasion, or other criminal activity) to be seized. However, in October 2014, the IRS stated that it will no longer pursue the seizure and forfeiture of funds associated solely with legal sources.

Taxpayers may want to structure their banking transactions to hide income from taxing authorities, such as the IRS. It does appear that the pattern of transactions in many of these cases was compelling and suggested tax avoidance. However, tax violations were pursued for only 21 of the 252 legal sources cases even though it is CI's mission to investigate potential criminal violations of the Internal Revenue Code.[1] For the remaining 231 cases, there was no evidence that the property owner structured funds to conceal income. In fact, there was no evidence that

---

[1] According to the IRM, CI serves the American public by investigating potential criminal violations of the Internal Revenue Code and related financial crimes in a manner that foster confidence in the tax system and compliance with the law.



### *Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses*

CI investigated whether a tax crime had occurred in most of these 231 cases. Despite this, $17.1 million was forfeited to the Government for these 231 for these property owners.

### *Type and Value of Outcome Measure*:

- Taxpayer Rights and Entitlement – Potential: \*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* (see page 16).

### *Methodology Used to Measure the Reported Benefit*:

We previously identified that tax violations were established by CI in only 21 of the 252 legal source cases. For the 21 cases, \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*|\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*. In June 2014, the IRS formally adopted the Taxpayer Bill of Rights, the first right of which is to be *informed*, though it made clear that these rights have always existed. In 2015, Congress codified those same rights into law.[2] Additionally, IRS procedures require that CI special agents give similar warnings even in noncustodial interviews.[3] Taxpayers have a right to be informed as to what their rights are.

---

[2] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Title IV, § 401(a) (2015) (codified at I.R.C. § 7803(a)(3)).

[3] IRM 9.4.5.11.3.1.1 (February 1, 2005) requires special agents to provide the following rights as follows: "In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions. However, first I advise you that under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding. Do you understand these rights?"



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

### Appendix V

# *Detailed Charts of Population and Sample Data*

*Figure 1:  Criminal Investigations and Assets Seized for Which Structuring
Was the Primary Basis for Seizure by Field Office (FYs 2012–2015)*

| Field Office | Number of Investigations | Number of Seized Assets | Dollar Amount of Seized Assets |
|---|---|---|---|
| Atlanta | 26 | 46 | $4,128,496 |
| Boston | 20 | 30 | $2,485,096 |
| Charlotte | 21 | 40 | $5,295,859 |
| Chicago | 52 | 94 | $14,255,614 |
| Cincinnati | 6 | 20 | $2,388,287 |
| Dallas | 42 | 148 | $16,958,791 |
| Denver | 6 | 23 | $548,600 |
| Detroit | 40 | 86 | $5,124,484 |
| Four Field Offices (*) | 14 | 32 | $4,143,135 |
| Houston | 7 | 8 | $418,368 |
| Las Vegas | 23 | 72 | $7,152,309 |
| Los Angeles | 40 | 63 | $9,133,844 |
| Miami | 27 | 48 | $2,602,091 |
| Nashville | 80 | 118 | $5,757,981 |
| New York | 35 | 57 | $9,855,417 |
| Newark | 57 | 247 | $23,272,140 |
| Oakland | 58 | 121 | $7,599,591 |
| San Antonio | 12 | 25 | $664,978 |
| Seattle | 21 | 34 | $1,740,675 |
| St. Louis | 24 | 36 | $3,201,982 |
| St. Paul | 6 | 15 | $1,105,284 |
| Washington, D.C. | 32 | 81 | $2,783,662 |
| **Total** | **649** | **1,444** | **$130,616,684** |

*Source:  TIGTA analysis of AFTRAK information on asset seizures made during FYs 2012 through 2015
for which structuring was the primary basis for seizure.  (*) Four field offices' results were combined.*



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

**Figure 2:  Disposition Status of the Value of Assets Seized Civilly for Which
Structuring Was the Primary Basis for Seizure (by Field Office, FYs 2012–2015)**

| Field Office | Amount Seized | Forfeited to U.S. Treasury Department | Returned to Taxpayer | Pending (in Process) | Other[1] |
|---|---|---|---|---|---|
| Atlanta | $4,128,496 | $1,355,305 | $2,028,669 | $623,046 | $0.00 |
| Boston | $2,485,096 | $1,177,756 | $705,853 | $554,587 | $46,900 |
| Charlotte | $5,295,859 | $1,979,544 | $2,152,111 | $249,799 | $786,814 |
| Chicago | $14,255,614 | $3,387,424 | $1,532,459 | $8,856,946 | $465,211 |
| Cincinnati | $2,388,287 | $347,837 | $45,787 | $215,013 | $1,000,000 |
| Dallas | $16,958,791 | $10,646,991 | $5,872,092 | $493,803 | $0.00 |
| Denver | $548,600 | $208,600 | $340,000 | $0.00 | $0.00 |
| Detroit | $5,124,484 | $1,955,066 | $1,887,838 | $1,029,448 | $205,800 |
| Four Field Offices (*) | $4,143,135 | $754,411 | $1,242,259 | $2,217,465 | $0.00 |
| Houston | $418,368 | $168,379 | $70,999 | $150,000 | $0.00 |
| Las Vegas | $7,152,309 | $3,332,293 | $3,308,408 | $467,609 | $0.00 |
| Los Angeles | $9,133,844 | $4,176,401 | $4,611,243 | $1,538,046 | $12,747 |
| Miami | $2,602,091 | $1,810,401 | $754,014 | $0.00 | $31,675 |
| Nashville | $5,757,981 | $3,083,888 | $2,337,752 | $263,776 | $0.00 |
| New York | $9,855,417 | $6,312,334 | $2,412,566 | $984,434 | $150,895 |
| Newark | $23,272,140 | $8,292,439 | $8,896,008 | $5,557,960 | $450,734 |
| Oakland | $7,599,591 | $3,867,370 | $2,936,437 | $996,656 | $49,470 |
| San Antonio | $664,978 | $367,061 | $162,495 | $135,422 | $0.00 |
| Seattle | $1,740,675 | $975,848 | $572,563 | $183,865 | $0.00 |
| St. Louis | $3,201,982 | $833,889 | $1,234,673 | $834,409 | $291,611 |
| St. Paul | $1,105,284 | $749,022 | $126,460 | $229,803 | $0.00 |
| Washington, D.C. | $2,783,662 | $1,748,449 | $435,246 | $267,984 | $325,995 |
| **Total** | **$130,616,684** | **$57,530,708** | **$43,665,932** | **$25,850,070** | **$3,817,852** |

*Source:  TIGTA analysis of AFTRAK information on asset seizures made during FYs 2012 through 2015 for which
structuring was the primary basis for seizure.  (\*) Four field offices' results were combined.*

---

[1] This category includes assets that were returned to a party other than the owner from which they were seized,
without forfeiture occurring, and seized assets that were transferred to another Federal agency.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

### Figure 3:  Amounts Shared From Assets Forfeited Civilly for Which Structuring Was the Primary Statute Violated (by Field Office, FYs 2012–2015)

| Field Office | Forfeited to U.S. Treasury Department | Shared With State and Local Agencies | Shared With Other Federal Agencies | Net Proceeds |
|---|---|---|---|---|
| Atlanta | $1,355,305 | $1,018,633 | $0.00 | $336,672 |
| Boston | $1,177,756 | $86,285 | $0.00 | $1,091,471 |
| Charlotte | $1,979,544 | $945,325 | $0.00 | $1,034,219 |
| Chicago | $3,387,424 | $923,801 | $0.00 | $2,463,623 |
| Cincinnati | $347,837 | $52,840 | $0.00 | $294,997 |
| Dallas | $10,646,991 | $4,304,837 | $37,262 | $6,304,892 |
| Denver | $208,600 | $5,760 | $25,000 | $177,840 |
| Detroit | $1,955,066 | $616,465 | $15,000 | $1,323,601 |
| Houston | $168,379 | $14,610 | $2,202 | $151,567 |
| Las Vegas | $3,332,293 | $2,004,488 | $56,409 | $1,271,396 |
| Los Angeles | $4,176,401 | $2,736,172 | $204,573 | $1,235,656 |
| Miami | $1,810,401 | $971,641 | $0.00 | $838,760 |
| Nashville | $3,083,888 | $1,511,075 | $0.00 | $1,572,813 |
| New Orleans | $140,124 | $30,399 | $0.00 | $109,725 |
| New York | $6,312,334 | $1,361,329 | $0.00 | $4,951,005 |
| Newark | $8,292,439 | $4,554,830 | $50,000 | $3,687,609 |
| Oakland | $3,867,370 | $1,904,843 | $228,750 | $1,733,777 |
| Philadelphia | $150,000 | $0.00 | $79,500 | $70,500 |
| Phoenix | $380,229 | $105,964 | $0.00 | $274,265 |
| San Antonio | $367,061 | $113,725 | $0.00 | $253,336 |
| Seattle | $975,848 | $267,184 | $0.00 | $708,664 |
| St. Louis | $833,889 | $259,441 | $0.00 | $574,448 |
| St. Paul | $749,022 | $0.00 | $0.00 | $749,022 |
| Tampa | $84,058 | $33,989 | $0.00 | $50,069 |
| Washington, D.C. | $1,748,449 | $736,281 | $0.00 | $1,013,602 |
| **Total** | **$57,530,708** | **$24,558,483** | **$698,696** | **$32,272,529** |

*Source:  TIGTA analysis of AFTRAK information on asset seizures made during FYs 2012 through 2015 for which structuring was the primary basis for seizure.*



***Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses***

### *Figure 4: CI's Asset Seizure and Forfeiture Program*

The civil forfeiture process was pursued by task forces comprised of CI special agents, task force officers, AUSAs, and, depending on the jurisdiction, other Federal agencies as well as State and local law enforcement personnel.  The process followed in the sample cases we reviewed generally involved the following steps:

| Activity | Description |
|---|---|
| Investigation | ****************************************************2****************************************** ********************************************2************************************************* ****************************************************2****************************************** ****************2********** ***************11******** *****************************2******************** ***************************************2************************************************** *************************2******************************. |
| Application for Seizure Warrant | The investigating agent, with the assistance of the USAO, would present an Application and Affidavit for Seizure Warrant (warrant application) to request a seizure warrant containing specific factual information before a judge to assess whether there was probable cause to authorize a seizure warrant.  After the seizure warrant was signed, CI would serve the warrant on the bank holding the funds alleged to have been structured and seize the funds in the accounts. |
| Counsel Opinion | CI agents sometimes obtained opinions from IRS Criminal Tax Counsel for probable cause to seize. |
| The Interview | Following the seizure of property, usually the same day, the IRS would attempt to interview the taxpayer, who at this point would be unaware of the IRS's investigation or the seizure of the funds.  The interview is required to be memorialized in a document referred to as a Memorandum of Interview. |
| Counsel Law and Fact Memorandum | CI agents are required to obtain opinions from the IRS Criminal Tax Counsel as to whether sufficient evidence exists to forfeit funds. |
| Notice of Intent to Forfeit | Property owners were sent Notices of Intent to Forfeit that informed them of the Government's intent to forfeit the seized property as well as their rights to file a claim contesting the forfeiture or to file a petition seeking the return of some or all of the money based on hardship. |
| Claim vs. Petition for Remission or Mitigation | If the property owner wants to contest the merits of the Government's forfeiture, a claim needs to be filed within the specified period of time contained in the Notice of Intent to Forfeit.[2]  Alternatively, if the property owner does not want to contest the merits of the claim, a Petition for Remission or Mitigation can be filed seeking the return of funds based on either hardship relief or a mitigation of the penalty.[3] |

---

[2] 18 U.S.C. § 983(a)(2).

[3] 18 U.S.C. § 983(f); 19 U.S.C. §1618.



### Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses

| Activity | Description |
|---|---|
| Civil Forfeiture Complaint | If the property owner does not file a claim, the funds are deemed forfeited. If a claim is filed, the IRS refers the matter to the respective AUSA office and formal civil judicial forfeiture proceedings are initiated by the filing of a complaint for forfeiture. The Government has 90 days from the date of the taxpayer's claim to file a civil forfeiture complaint.[4] The Government's burden of proof is by a preponderance of the evidence. |
| Criminal Proceedings | Structuring is a crime punishable by fines, imprisonment for not more than five years, or both. If structuring is combined with other crimes or a pattern of structuring exceeds $100,000 in a 12-month period, perpetrators can be subject to twice the fines, imprisonment for more than 10 years, or both.[5] |

*Source: Produced from review of the Internal Revenue Manual, applicable Public Laws, interviews with CI personnel, and review of case file information.*

---

[4] 18 U.S.C. § 983(a).
[5] 31 U.S.C. § 5324(d).



**Criminal Investigation Enforced Structuring Laws**
**Primarily Against Legal Source Funds and Compromised**
**the Rights of Some Individuals and Businesses**

**Appendix VI**

## Example of an E-Mail and Two Letters
## Sent by Assistant United States Attorneys

*Figure 1:* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.

*Figure 2:* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.

*Figure 3:* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*4\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*.

Page 51



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

**Appendix VII**

# *Glossary of Terms*

| Term | Definition |
|------|------------|
| Asset Forfeiture Tracking and Retrieval System | The AFTRAK database tracks assets seized by CI during investigations, reports on their status while in Government custody, and reports on the disposition of assets and distribution of proceeds from asset sales and other disposal methods for forfeited assets. |
| Bank Secrecy Act | Legislation that requires certain businesses to submit reports of large-dollar transactions for use by law enforcement agencies in identifying terrorist funding, money laundering, and other illegal activity. |
| Criminal Investigation | An investigation developed when an individual or entity alleged to be in noncompliance with tax laws. |
| Criminal Investigation Management Information System | A database that tracks the status and progress of criminal investigations and the time expended by special agents. |
| Criminal Tax Counsel | The section within IRS Chief Counsel that provides legal advice to CI throughout the criminal investigation process. |
| Currency Transaction Report | Federal law requires financial institutions to report currency (cash or coin) transactions over $10,000 conducted by, or on behalf of, one person as well as multiple currency transactions that aggregate to be over $10,000 in a single day.  These transactions are reported on CTRs. |
| Field Office | Offices within the four CI geographical areas throughout the country with boundaries that range from a portion of a single State to inter-State areas.  There were 25 CI field offices at the time of our audit. |
| Financial Institution | A company engaged in the business of dealing with monetary transactions, such as deposits, loans, investments, and currency exchange. |
| Fiscal Year | Any yearly accounting period, regardless of its relationship to a calendar year.  The Federal Government's fiscal year begins on October 1 and ends on September 30. |
| Grand Jury | A grand jury is established to hear testimony to determine whether there is probable cause to believe that the person to be indicted committed the crime in question.  The grand jury adheres to the strictest rules of secrecy, and violators are subject to severe penalties. |



***Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses***

| Term | Definition |
|------|------------|
| Illegal Source | Crimes involving illegally earned income including crimes involving money laundering, 18 U.S.C. §§ 1956 and 1957; sections of U.S.C. Title 31, Money and Finance; and U.S.C. Title 26 violations investigated in conjunction with other agencies. |
| Internal Revenue Manual | Contains the policies, procedures, instructions, guidelines, and delegations of authority that direct the operation for all divisions and functions of the IRS.  Topics include tax administration, personnel and office management, and others. |
| Legal Source Investigation | Investigation of crimes involving legal industries and occupations and legally earned income. |
| Money Laundering | The process of disguising criminal proceeds; it may include the movement of clean money through the United States with the intent to commit a crime in the future (*e.g.*, terrorism). |
| Plea Agreement | Agreements between defendants and prosecutors in which defendants agree to plead guilty to some or all of the charges against them in exchange for concessions from the prosecutors. |
| Probable Cause | A reasonable basis for believing that a crime may have been committed and that evidence of the crime is present in the place to be searched. |
| Sealed | The process used in the courts to keep some of their proceedings and records confidential. |
| Secretary's Enforcement Fund | Derived from equitable shares received from the U.S. Department of Justice forfeiture fund for work done by Treasury law enforcement bureaus leading to justice forfeitures.  Secretary Enforcement Fund revenue is available for law enforcement purposes of any Federal law enforcement organization or law enforcement bureau that participates in the Treasury Forfeiture Fund. |
| Seizure Warrant | A court order issued by a magistrate that authorizes law enforcement officers to seize property. |
| Special Agent | CI law enforcement employee who investigates potential criminal violations of the Internal Revenue laws and related financial crimes. |
| Special Agent in Charge | A law enforcement employee responsible for directing, monitoring, and coordinating the criminal investigation activities within a field office's area of responsibility. |
| Structuring | A person structures a transaction if that person, acting alone or in conjunction with or on behalf of other persons, conducts or attempts to conduct one or more transactions in currency in any amount, at one or more U.S. financial institutions, on one or more days, in any manner, for |



***Criminal Investigation Enforced Structuring Laws***
***Primarily Against Legal Source Funds and Compromised***
***the Rights of Some Individuals and Businesses***

| Term | Definition |
|------|------------|
| Structuring (continued) | the purpose of evading the [CTR filing requirements]." This includes, but is not limited to, breaking down a single currency sum exceeding $10,000 into smaller amounts that may be conducted as a series of transactions at or less than $10,000. |
| Super Surplus | Represents the remaining unobligated balance after an amount is reserved for Treasury Forfeiture Fund operations in the next fiscal year. Super Surplus can be used for any Federal law enforcement purpose. |
| Tax Gap | The estimated difference between the amount of tax that taxpayers should pay and the amount that is paid voluntarily and on time. |
| Title 18 | Title 18, United States Code, *Crimes and Criminal Procedure*. Various sections of Title 18 apply to violations that are within the jurisdiction of CI. Examples include § 286, Conspiracy to Defraud the Government With Respect to Claims; § 287, False, Fictitious, or Fraudulent Claims; § 371, Conspiracy to Commit Offense or to Defraud United States; and §§ 1956 and 1957, Laundering of Monetary Instruments and Engaging in Monetary Transactions in Property Derived From the Specified Unlawful Activity. The most common section investigated under this statute is money laundering. |
| Title 26 | Title 26, United States Code, *Internal Revenue Code*. |
| Title 31 | Title 31, United States Code, *Money and Finance*. Several sections of Title 31 apply to violations that are within the jurisdiction of CI. Examples include § 5322, Criminal Penalties (for willful violations of Title 31 sections), and § 5324, Structuring Transactions to Evade Reporting Requirement Prohibited. |
| Treasury Forfeiture Fund | The receipt account for the deposit of nontax forfeitures made pursuant to laws enforced or administered by law enforcement bureaus that participate in the Treasury Forfeiture Fund. The Fund is a "special receipt account." This means that the fund can provide money to other Federal entities toward the accomplishment of a specific objective for which the recipient bureaus are authorized to spend money and toward other authorized expenses. The use of fund resources is governed by law, policy, and precedent as interpreted and implemented by the U.S. Department of the Treasury, which manages the fund. The Treasury Executive Office for Asset Forfeiture, which provides management oversight of the fund, falls under the auspices of the Under Secretary for Terrorism and Financial Intelligence. |



***Criminal Investigation Enforced Structuring Laws***
***Primarily Against Legal Source Funds and Compromised***
***the Rights of Some Individuals and Businesses***

## **Appendix VIII**

# ***Management's Response to the Draft Report***



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

CHIEF
CRIMINAL INVESTIGATION

March 2, 2017

MEMORANDUM FOR MICHAEL MCKENNEY
DEPUTY INSPECTOR GENERAL FOR AUDIT

FROM: Richard Weber
Chief, Criminal Investigation

SUBJECT: Criminal Investigation Enforced Structuring Laws Primarily
Against Legal Source Funds and Compromised the Rights of
Some Individuals and Businesses

During the past two years, IRS Criminal Investigation (IRS-CI) has implemented
policies that effectively addressed the recommendations in your draft report. IRS-CI's
Title 31 enforcement program never violated the structuring laws and related forfeiture
provisions. The Bank Secrecy Act does not differentiate between legal or illegal
sources in terms of violating the structuring laws. Despite this lack of differentiation,
IRS-CI instituted changes over the past two years to its Title 31 structuring program. A
policy change was enacted in October 2014 and subsequent procedures and guidance
followed in support of the policy change. As a result, IRS-CI no longer pursues
forfeitures based solely on legal source structuring. As such, the recommendations
offered by TIGTA in the report have been addressed or obviated.

On February 28, 2017, IRS-CI concluded its petition for remission and mitigation
project in which prior legal source structuring forfeitures were reviewed in light of the
structuring policy and resulted in significant funds being returned to property owners.
We believe IRS-CI's efforts cited below are significant and address the concerns
identified in the audit report. The Department of Justice (DOJ), noting the IRS change,
followed our lead and adopted a similar policy in March 2015. Accordingly, based on
the IRS initiative, DOJ federal law enforcement bureaus have now implemented
measures to limit judicial seizure and forfeiture of legal source funds associated with
structuring activity.

**Proactive Measures**

Since implementing the October 2014 policy, more than 2 years ago, IRS-CI has been
proactive in revising the way in which the structuring statutes are enforced to seek
uniformity throughout the country. We note that while IRS-CI has implemented
significant changes to this program in the past two years, TIGTA has not included
within the report many of the corrective actions taken. The policy enhancements,
guidance and remediation actions adopted include: (1) the proactive implementation



**Criminal Investigation Enforced Structuring Laws Primarily Against Legal Source Funds and Compromised the Rights of Some Individuals and Businesses**

2

of the Petition for Remission or Mitigation (PFRM) process in which IRS sent notices to over 1600 property owners of their option to file PFRMs (2) revised Standard Operating Procedures (SOP) relative to BSA investigations; (3) Notification of Non-Custodial Rights guidance; (4) Task Force Officer (TFO) and Financial Crimes Task Force (FCTF) coordinator training; and (5) Enhanced internal reviews.

Petition For Remission or Mitigation Process (PFRM)

Beginning in June 2016, IRS-CI mailed over 1800 notice letters to property owners advising them of the opportunity to file a PFRM which could result in a return of previously forfeited funds pursuant to a violation of the structuring laws. The PFRM process concluded on February 28, 2017 after receipt and processing of 454 petitions. Petitions were typically decided within 60 days of receipt by the IRS. The Chief, IRS-CI was the deciding official and made the determination whether to grant the petition in administrative cases or made a recommendation to the DOJ in judicial cases. A total of 362 property owners received a favorable decision or a recommendation was made to DOJ to return the forfeited funds. Petitioners who did not receive a favorable decision had the option to request a reconsideration of the denial. Over $6 million has been returned to property owners as of this date with the expectation that approximately $20 million additional will be returned in the coming months.

Standard Operating Procedures

In June 2016, Standard Operating Procedures (SOPs) relative to the Bank Secrecy Act (BSA) violations were implemented that strengthen the oversight of BSA investigations and the special agents and TFOs who work them. The SOPs place emphasis on documenting within the seizure affidavit that the probable cause element is met to support evidence of illegal source funds. Moreover, all seizure affidavits must be sworn by an IRS special agent and document the specified unlawful activity underlying the seizure. The Special Agent in Charge (SAC) must verify that seizures are not conducted independent of an ongoing criminal case. Seizures must generally be tied to an approved subject criminal investigation (SCI).

The practice of "Quick Hits" and "Consents to Forfeiture" are no longer authorized. It is important to note that as of 2013, the "quick hits" terminology was removed from the BSA SOPs. Similarly, the issuance of a Notification of Law must be made by an IRS Special Agent.

Quarterly BSA conference calls are conducted by our Financial Crimes section at Headquarters and attended by the field office special agents, Taskforce Officers (TFOs), and supervisors who are assigned to a FCTF and are typically the agents reviewing BSA data and enforcing BSA statutes. These calls emphasize policy guidance and provide a forum to communicate and reinforce proper administration of the program.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

3

Notification of Non-Custodial Rights Guidance

On August 29, 2016, the Acting Director, Operations Policy and Support (OPS) issued updated guidance requiring, with limited exceptions, that special agents conducting an administrative Title 31 structuring investigation advise subjects of their constitutional rights during non-custodial interviews.

TFO and Coordinator Training

In June and August 2016, supervisors, coordinators, and TFOs attended formal training at the National Criminal Investigation Training Academy (NCITA). This training focused on those items emphasized in the revised SOPs as noted above and highlighted their responsibilities under the October 2014 policy on legal source structuring.

Enhanced Internal Reviews

Formal case reviews of open structuring investigations are required under the BSA enforcement program. Directors, Field Operations (DFO) must conduct a periodic review of each FCTF verifying they are in compliance with IRS-CI policies relative to BSA enforcement and are focusing on high impact investigations. In addition, the Headquarters Review and Program Evaluation (RPE) staff must now conduct comprehensive reviews of field office BSA enforcement programs.

**Major Points of Concern**

We disagree with TIGTA's findings regarding the following: (1) IRS-CI compromised the rights of some individuals and businesses to include Eighth Amendment violations; (2) IRS-CI ignored property owners reasonable explanations; (3) IRS-CI bargained civil resolutions with the threat of criminal prosecution including the use of consent resolutions; and (4) the mischaracterization of Commissioner Koskinen's testimony to Congress.

Compromised Rights

The audit title states that IRS-CI compromised rights of some individuals and businesses. We clarified our policy regarding reading rights to include the reading of rights to those not in custody with respect to Title 31 investigations. Moreover, the audit report alleges: (1) a requirement existed to provide property owners with non-custodial rights to include the right to remain silent and this purported requirement was not satisfied in the majority of cases; and (2) possible violations of the Eighth Amendment relative to the disparity of outcomes and that the resulting forfeitures amounted to excessive fines. We object to these characterizations.

TIGTA infers Eighth Amendment violations occurred because outcomes lacked consistency[1] across the country and in some cases produced excessive fines. As a

---

[1] Consistency is not part of the Excessive Fines analysis. IRS-CI issued its new policy, in part, to address inconsistencies in the enforcement of the Bank Secrecy Act amongst U.S. Attorney's Offices. Notably, U.S.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

4

general rule, in structuring cases the amount subject to forfeiture is equal to the amount structured. When comparing outcomes across Field Offices, TIGTA looked to the amounts seized as it related to the amount forfeited with limited consideration to the amount structured. The findings suggest one judicial district had a disproportionately high percentage forfeited.[2] We again stress the dominant role of the respective United States Attorney in resolution of the judicial forfeiture matter

We further note when determining disparate outcomes, TIGTA placed more emphasis on the percentage forfeited as compared to the amount seized. Instead, TIGTA should have been comparing the amount forfeited to the total amount structured. This would have been a more accurate measure of the gravity of the offense. The Supreme Court held in United States v. Bajakajian, 524 U.S. 321, 336 (1998), that a forfeiture of property will violate the Excessive Fines Clause only if it is grossly disproportional to the gravity of the offense.

Reasonable Explanations

TIGTA asserts that IRS-CI failed to consider property owner's reasonable explanations as to their structuring activity. TIGTA cites property owners' explanations such as the extra "hassle" of filling out the form as one such explanation that should have been considered. TIGTA argues that these examples offer a legitimate reason for the structuring activity. As we previously stated, a desire to avoid the "hassle" of filling out a form is not a defense to structuring; to the contrary, it evidences intent to avoid the required report. In United States v. Vazquez, 53 F.3d 1216, 1218 n. 2 (11th Cir. 1995), "[t]he only mental state apparently required . . . is a purpose to evade the filing requirement." The Civil Asset Forfeiture Reform Act ("CAFRA") created a uniform innocent owner provision which provides for affirmative defenses to the forfeiture. Property owner's explanations of their conduct may not rise to the level of a legally recognizable defense under CAFRA. Finally, we note that a Federal judge reviews and approves all seizure warrant applications, making an independent probable cause determination.

Leveraged Results with Respect to Negotiated Settlements and Consent Forfeitures

TIGTA alleges that the Government bargained resolution of the civil forfeiture case by promising not to prosecute property owners criminally. We note that some settlement agreements contain non-prosecution clauses. The United States Attorney's Manual ("USAM") recognizes that there are many non-criminal alternatives to prosecution and Attorneys for the Government are encouraged to consider pursuing these alternatives if appropriate. USAM 9-27.250, Non-Criminal Alternatives to Prosecution. With respect to these agreements, IRS-CI did not have settlement authority. Such authority rested with the United States Attorney's Office ("USAO") which had sole discretion to resolve the matter and worked directly with represented property owners to negotiate

---

Attorney's Offices did not use IRS structuring mitigation guidelines to negotiate settlements. Disparate settlements may have been the result. IRS Special Agents do not negotiate settlements and have no authority to do so. Moreover, all judicial settlement agreements are approved by a Federal judge.
[2] Most, if not all, the forfeiture matters from the Newark FO/New Jersey USAO were resolved judicially



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

5

the terms of the settlement agreement. While IRS-CI could have been consulted, the USAO often did not seek input from IRS-CI.

Mischaracterization of Commissioner's Testimony

The report ties the Commissioner's testimony to the above negotiated settlement process implying that he testified contrary to factual matters regarding warrantless seizures and leveraging outcomes. As a whole, the portrayal of the Commissioner's testimony in the audit report is inaccurate and fails to reflect the totality of the Commissioner's statements. The excerpted section presented in the report (page 22) relates to the Commissioner's pre-written testimony from the February 11, 2015 hearing before the House Ways and Means Subcommittee where he described the general judicial process to obtain seizure warrants which includes a review by a Federal judge. This pre-written testimony was not in response to a particular question related to the negotiated settlement process (Consent Forfeitures) that occurred in a limited number of cases. Further, TIGTA summarizes a portion of the Commissioner's testimony that occurred during the Question and Answer section of the hearing with respect to leveraged resolution (page 20) and ties this to eight cases. The Commissioner, in this instance, was testifying relative to the Clyde case and was trying to point out that it would not have been an IRS special agent that would have negotiated a settlement. As such, this testimony should not be attributed to the eight cases. As noted above, these negotiated settlements (Consent Forfeitures) were independent actions usually initiated by property owner's counsel with the USAO who worked together to resolve matters prior to the filing of a seizure warrant.

Outcome Measures

Finally, we disagree with the outcome measures as presented. Outcome measure number one states that the Government seized funds from property owners when there was no evidence that the structuring was conducted to conceal income or any other type of illegal activity (other than the alleged structuring activity). Structuring violations are not required to be tied to illegal source funds. The audit incorrectly made this distinction throughout the report. Outcome measure number two states that taxpayers received no advice of rights when tax violations were pursued against them. We disagree that in these instances advice of rights were required to be provided to the property owner. In these instances, the cases could be considered grand jury



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

6

investigations in which non-custodial rights are given at the direction of the United
States Attorney or the investigation was not elevated to a criminal tax investigation at
the time of contact with the property owner.

### Conclusion

We believe IRS-CI's efforts cited above are significant and address the concerns
identified in the audit report.



*Criminal Investigation Enforced Structuring Laws*
*Primarily Against Legal Source Funds and Compromised*
*the Rights of Some Individuals and Businesses*

**ATTACHMENT A:**

*Recommendation 1:* Establish controls to ensure that CI personnel working on Suspicious Activity Report Review Teams or Financial Crime Task Forces are selecting cases and conducting investigations consistently in such a manner as to best meet organizational goals and policies, as well as foster confidence in the tax system

CORRECTIVE ACTION: IRS-CI has implemented internal guidance prior to the issuance of this audit that addresses this recommendation. This includes the Structuring Policy dated October 14, 2014 and an update to the Bank Secrecy Act Standard Operating Procedures (BSA-SOPs), enhanced reviews, and training in the administration and enforcement of the BSA program in FY 2016. Additionally, IRS-CI sets investigative priorities pursuant to the Annual Business Plan and Chief Criminal Investigation Priorities memorandum.

IMPLEMENTATION DATE:
Completed as of June 1, 2016

RESPONSIBLE OFFICER:
Director, Operations, Policy and Support

*Recommendation 2:* In structuring forfeiture cases that were resolved administratively, return all funds forfeited from legal sources for which there was no illegal activity (other than the alleged structuring) or tax evasion to the property owners. In structuring forfeiture cases that were resolved judicially, recommend to the Department of Justice that all funds forfeited from legal sources for which there was no illegal activity (other than the alleged structuring) or tax evasion be returned to the property owners.

CORRECTIVE ACTION: Beginning in June 2016, IRS-CI noticed property owners who forfeited assets pursuant to structuring violations for the period beginning October 1, 2009 to present. This period exceeds the audit period of fiscal years 2012 – 2015 to include fiscal years 2010, 2011, and 2016. As of this date, 454 petitions have been received and have been timely evaluated. Beginning in June 2016, IRS-CI has mailed approximately 1,861 letters to property owners advising them that they may have an ownership interest in property that was previously seized and forfeited by the U.S. Government. The letters also provided information on how to file a proper petition if the property owner chose to do so. IRS-CI has established procedures to review these petitions on certain Title 31 structuring cases which conform to the Code of Federal Regulations and the IRM. Among the factors evaluated in this review is whether there was any evidence of other illegal activity connected to the structuring activity, such as an illegal source, money laundering, or tax evasion. Additionally, IRS-CI advertised the PFRM process on the IRS.gov website from June 17, 2016 through December 31, 2016 and provided email and phone number contacts to assist potential filers.



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

IMPLEMENTATION DATE:
Completed as of February 28, 2017

RESPONSIBLE OFFICER:
Chief, Criminal Investigation

***Recommendation 3:*** Consider revising the IRM to require a clear explanation for the purpose of interviews at the outset and the reading of noncustodial advice of rights to all subjects under investigation during interviews.

CORRECTIVE ACTION: IRS-CI agrees that subjects of administrative investigations to be interviewed should be read non-custodial rights that advise them of their constitutional rights. To clarify this responsibility, the Acting Director, Operations Policy and Support (OPS) issued updated guidance on August 29, 2016, requiring with limited exceptions, that special agents conducting an administrative Title 31 structuring investigation advise subjects of their constitutional rights during non-custodial interviews.

IRS-CI disagrees with the recommendation that advice of rights be presented to those subjects interviewed pursuant to an ongoing Grand Jury investigation. A grand jury investigation is not controlled by the IRS-CI, but rather it is an investigation controlled by the U.S. Attorney's Office. IRS-CI special agents must follow the procedures as directed by the Assistant United States Attorney assisting the grand jury.

IRM 9.4.5.11.3.1.1 (3) is instructive on providing the purpose of the interview to the interviewee. As such, no further action will be commenced.

IMPLEMENTATION DATE:
Completed as of August 29, 2016

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

***Recommendation 4:*** Ensure that relevant CI procedures are communicated and emphasized to all CI agents and task force partners regarding the requirement to fully investigate all reasonable explanations provided in interviews conducted during investigations.

CORRECTIVE ACTION: IRS-CI established a policy to address "legal source" seizures arising from structuring activity. Over two years ago, IRS-CI made a policy decision to pursue civil forfeiture cases involving structuring only when they are predicated upon an underlying specified unlawful activity. As part of IRS-CI's investigation of such criminal activity, any potential exculpatory information that arises will necessarily be investigated



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

and reviewed by IRS-CI and DOJ. Any reasonable explanation will be explored and the merits of such determined and documented  This is standard investigative protocol.

IMPLEMENTATION DATE:
Completed as of June 1, 2016

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

*Recommendation 5:* The Chief, CI, should develop guidance or training for special agents stating that it is not appropriate to bargain nonprosecution as a means of encouraging settlement of a civil forfeiture case.

CORRECTIVE ACTION: The SOPs direct that special agents are not to participate in independent settlement or consent forfeitures with property owners.

IMPLEMENTATION DATE:
Completed June 1, 2016

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

*Recommendation 6:* The Chief, CI, should establish proper oversight and controls to prevent Consents to Forfeiture from being used by field offices as a general practice.

CORRECTIVE ACTION:  On June 1, 2016, Chief, CI issued guidance on this matter contained in the BSA-SOP.  This guidance states that special agents are not permitted to solicit Consents to Forfeit or otherwise solicit a forfeiture settlement.  Annual operational reviews of Financial Crimes Task Forces will review this matter to identify any violation of this guidance.

IMPLEMENTATION DATE:
Completed as of June 1, 2016

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

*Recommendation 7:* The Chief, CI, should ensure that referrals of potential civil tax matters derived from Title 31 structuring leads are referred to the appropriate IRS business unit.

CORRECTIVE ACTION: This recommendation is addressed in the BSA-SOP as follows:  If the SAR-RT or a special agent assigned a referral determine that the SAR or



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

SAR referral lacks criminal potential; however believes that civil tax potential exists, that lead is forwarded to SB/SE using the Prime Lead referral process.

IMPLEMENTATION DATE:
Completed as of June 1, 2016

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

**Recommendation 8:** The Chief, CI, should (1) establish procedures that strive to assure consistent and fair outcomes in resolutions for similarly situated property owners and (2) monitor settlements to ensure that the procedures are working to assure consistency and fairness.

CORRECTIVE ACTION: IRS disagrees that procedures, such as examination of a settlement agreement will have an impact on the consistency of outcomes. IRS-CI's new mitigation and remission procedures in structuring cases now require the Chief, CI approval and should address cases under our control. However, IRS-CI does not control outcomes driven by the Department of Justice or the legal process overseen by the Federal Courts.

IMPLEMENTATION DATE:
Not applicable

RESPONSIBLE OFFICER:
Director, Operations Policy and Support

**Recommendation 9:** Chief, Criminal Investigation, should use a checklist and coordinate with the respective USAO to determine on each case which information requested is restricted under the grand jury secrecy rules and if restricted, whether an alternative document is available

CORRECTIVE ACTION: IRS-CI points out that this recommendation has been largely obviated by the recently enacted Inspector General Empowerment Act of 2016 (Act). This Act, which the President signed on December 16, 2016, amends the Inspector General Act of 1978 in several important ways. The Act resolves the long standing issue of Inspector General access to protected information, including grand jury 6(e) material. Under the Act, Inspector Generals are allowed access to 6(e) material if the Attorney General grants a request made by the "head of the establishment" for Federal grand jury materials. The Attorney General is instructed to grant access to Federal grand jury materials unless certain criteria are satisfied. The implementation of the Act should address this recommendation.
IMPLEMENTATION DATE:
Not Applicable



**Criminal Investigation Enforced Structuring Laws
Primarily Against Legal Source Funds and Compromised
the Rights of Some Individuals and Businesses**

RESPONSIBLE OFFICER:
Director, Operations Policy and Support