UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 20, 2018 |
| Thomas Mario Costanzo, | ) | 9:03 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRAIL - DAY 1

(Pages 1 - 217)

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2


3    For the Government:

4                    U.S. Attorney's Office
                     By: GARY M. RESTAINO, ESQ.
5                        MATTHEW H. BINFORD, ESQ.
                         FERNANDA CAROLINE ESCALANTE KONTI, ESQ.
6                    40 North Central Avenue, Suite 1200
                     Phoenix, AZ  85004
7

    For the Defendant Thomas Mario Costanzo:
8
                     Federal Public Defenders Office - Phoenix
9                    By: MARIA TERESA WEIDNER, ESQ.
                         ZACHARY D. CAIN, ESQ.
10                   850 W. Adams Street, Suite 201
                     Phoenix, AZ  85007
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      **UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | **INDEX** | |
| 2 | | |
| 3 | **SUMMARY OF COURT PROCEEDINGS** | **PAGE:** |
| 4 | Discussion re motions and exhibits | 5 |
| 5 | Jury panel enters the courtroom | 12 |
| 6 | Jury panel sworn | 17 |
| 7 | Voir dire | 19 |
| 8 | Discussion at sidebar | 53 |
| 9 | Challenges for cause | 55 |
| 10 | Challenges for cause | 109 |
| 11 | Questions by the Government | 156 |
| 12 | Questions by the Defense | 160 |
| 13 | Challenges for cause | 164 |
| 14 | Jury sworn | 172 |
| 15 | Preliminary jury instructions | 173 |
| 16 | Discussion at sidebar | 181 |
| 17 | Discussion with unidentified men | 184 |
| 18 | Discussion re exhibits, motions | 189 |
| 19 | Opening statement by the government | 201 |
| 20 | Jury excused | 215 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**UNITED STATES DISTRICT COURT**

```
 1                    INDEX OF WITNESSES

 2   WITNESSES FOR THE      Direct    Cross    Redirect
     GOVERNMENT:
 3

 4

 5            * * * * * NO WITNESSES CALLED * * * * *

 6

 7

 8

 9                    INDEX OF EXHIBITS

10

11   EXHIBIT NO.:        DESCRIPTION:              RECEIVED:

12

13

14          * * * * * NO EXHIBITS RECEIVED * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                   **P R O C E E D I N G S**

2           (Proceedings resume at 9:03 a.m.)

3       THE COURT:  Please be seated.

4       COURTROOM DEPUTY:  This is CR17-585, United States of

5 America versus Thomas Mario Costanzo, on for jury trial.

6       MR. RESTAINO:  Good morning, Your Honor.

7       Gary Restaino, Matt Binford, and Carolina Escalante

8 for the United States, along with Task Force Officer Chad

9 Morton at counsel table.

10       THE COURT:  Good morning.

11       MS. WEIDNER:  Good morning, Your Honor.

12       Maria Weidner and Zachary Cain for Mr. Costanzo.

13       We also are joined by Linda Ondrovic, our paralegal.

14       THE COURT:  All right.  Good morning.

15       What can we -- what do we need to take care of before

16 we bring the jury up -- jury panel up?

17       MS. WEIDNER:  Well, Your Honor, the supplemental

18 motion in limine that the defense filed on Sunday, and I guess

19 the government responded yesterday.

20       THE COURT:  Yes.  I knew that we'd have to take care

21 of that.  I must confess to you, though, Ms. Weidner, I have

22 not yet had a chance to read the government's response.  I

23 figured I could do that this morning in the breaks in between

24 jury selection, and we can take it up at the noon break or when

25 we -- if we don't get down to finally selecting the jury,

| | |
|---|---|
| 1 | whenever we do that long break when we're selecting the jury, I |
| 2 | can address the motions in limine as well.  But I'm not quite |
| 3 | ready because I haven't yet read the government's response. |
| 4 | MS. WEIDNER:  And, Your Honor, there was just one |
| 5 | other issue that I raised with government counsel this morning. |
| 6 | That is, defense reviewed Government Exhibit 78, which is |
| 7 | intended to be a demonstrative video, featuring SA Ellsworth |
| 8 | and SA Klepper doing a demonstration of a Bitcoin exchange with |
| 9 | two side-by-side phones -- |
| 10 | THE COURT:  Yes. |
| 11 | MS. WEIDNER:  -- that is introduced with -- |
| 12 | THE COURT:  Is this when they do the dollar for the 85 |
| 13 | cents exchange? |
| 14 | MS. WEIDNER:  About.  It starts off with SA Klepper |
| 15 | saying:  Okay, he's going to be the UC and I'll be the bad guy, |
| 16 | which is problematic. |
| 17 | I also believe, Your Honor, that in this day and age, |
| 18 | a demonstration -- a little movie demonstration explaining how |
| 19 | one purchases something using their phone is completely |
| 20 | unnecessary.  It's -- it's -- iPhones are everywhere.  People |
| 21 | purchase things with their iPhones all the time.  I pay my |
| 22 | mortgage on my phone and get a confirmation.  So I -- I -- this |
| 23 | is not -- it's not brain surgery, and I don't think that the |
| 24 | proposed exhibit does anything but -- but attempt to bolster |
| 25 | the government's witnesses by showing something that is already |

1    pretty well common knowledge as to the way that phones work and

2    how we buy and receive confirmation about things we buy with

3    our phones.

4              THE COURT:  Mr. Restaino?

5              MR. RESTAINO:  Your Honor, the -- the exhibit

6    technically is 123 that we'd be using, because that's the first

7    redacted version that the government redacted to take out some

8    drug talk between the UC agents at --

9              THE COURT:  Is this the same one that was shown -- do

10   you know if it's the same one that was shown at the district

11   conference a couple of weeks ago?

12             MR. RESTAINO:  Oh.  I anticipate that it was then,

13   Your Honor.

14             THE COURT:  All right.  So I've seen it, for whatever

15   that's worth.  So, go ahead.

16             MR. RESTAINO:  So we've taken out the drug chatter.

17   Ms. Weidner makes a fair point about the initial reference as

18   well.  The government's intent has only been to use this as a

19   demonstrative evidence, that it wouldn't come into evidence, to

20   the extent the Court permits that after we lay the foundation

21   with Agent Fleischmann, we would simply start it after the talk

22   about which Ms. Weidner objected most substantively.

23             THE COURT:  And the – and the nature of your

24   objection, Ms. Weidner, is what?

25             MS. WEIDNER:  Your Honor, I think it is cumulative,

1    given that the -- given that it is -- there is no need to show

2    someone how to conduct a purchase and receive confirmation of

3    that purchase with a phone, given how basically everyone these

4    days has an iPhone.  For that reason, I think it is a waste of

5    time, and it's also just -- its relevance is really

6    superfluous, given -- they're trying to show us something so

7    basic.  It's like, these are -- this is how somebody has a

8    conversation:  First, someone talks to someone else.

9         THE COURT:  Okay.  I think I -- so if I can state your

10   objections, your objection is relevance and cumulative; 401 and

11   403?

12        MS. WEIDNER:  Yes, 403, and also a waste of time.

13        THE COURT:  Okay.  I'm going to overrule the objection

14   without prejudice because I, of course, can't determine the

15   cumulative nature of the evidence when I haven't heard any

16   evidence.  I don't know whether it will be cumulative or not.

17   To the extent that it is the same video that I -- that I saw --

18   and Ms. Weidner, if it isn't, please let know -- I thought it

19   was helpful to -- I think that it's not unhelpful, and I think

20   that the jury is going to be required here to understand both

21   for purposes of the prosecution and the defense what Bitcoin is

22   and how it works.

23        If this is the same video that I saw, it's a video

24   where they basically set up a wallet, touch cell phones, and

25   then determine that the transaction is not confirmed until

```
1    three -- a minimum of three independent, apparently, voluntary
2    computers in the world have verified the transaction, at which
3    point it becomes irrevocable.  Because that is what is
4    demonstrated, as I recall, on the video, I do believe that it
5    demonstrates facts pertaining to Bitcoin transactions that are
6    slightly different from the payment of your mortgage on it, in
7    terms of the need to have verification from this outlying
8    computer network, the fact that it cannot then be revoked or
9    adjusted.
10           I also seem to recall that it started off with a rate
11   of exchange given the fees charged on the top that would have
12   resulted in 85 cents for a dollar, and then by the time the
13   transactions were verified, the rate of exchange had exchanged
14   because so they got 86 cents.  Is this the same video?
15           MR. RESTAINO:  That is.  That's the version we're
16   showing, yes, Your Honor.  That's the video.
17           THE COURT:  I do think that all of those things --
18   again, I'm not preventing you from raising the objection again
19   if you believe there remains a cumulative objection.  But to
20   the extent that you have a relevance objection, I think all of
21   those things are help -- would and will be helpful to the jury
22   in understanding what a Bitcoin transaction is, and how it is
23   at least in certain aspects a little bit more complicated that
24   a regular transaction.
25           Anything else, or can we bring up the jury pool?
```

UNITED STATES DISTRICT COURT

1          MR. RESTAINO:  Your Honor, just two brief issues from

2     the government's perspective.

3          I hadn't intended to raise evidence this morning, but

4     there is another video that we are planning to get in through

5     an agent, which is a short one-and-a-half-minute cartoon that

6     describes Bitcoin.  We'll continue to have discussions with

7     Ms. Weidner and Mr. Cain about that, if we can do anything to

8     ameliorate their concerns.

9          THE COURT:  All right.

10          MR. RESTAINO:  And then secondly, Your Honor, we --

11     there was an issue on the jury instructions, even with respect

12     to the preliminary instruction on what the elements are of

13     money laundering.  And I'm not asking to argue that now, I just

14     was wondering if you were going to provide us that at some

15     point this morning.

16          THE COURT:  I had forgotten that that went to the

17     preliminary instructions.  I had taken a look at it as it

18     pertained to the final instructions.  And I -- we can take it

19     up again before we do the preliminary instructions, but it

20     seemed to me that your instruction -- that Nelson -- your

21     argument about Nelson is correct mostly.  But I do think that

22     there's some language that Ms. Weidner proposes that needs to

23     go in to part of what you've said on the mens rea, although I

24     mostly am accepting -- or I am mostly inclined to accept the

25     government's version.

 1              I'll reconstruct that and tell both parties what it

 2    is, and give you a chance to present your -- your viewpoints on

 3    that, because I am not prepared -- although I have reviewed it,

 4    I'm not prepared to tell you right now, and we are still

 5    several hours away from giving preliminary instructions.  I'll

 6    make sure that I do that.

 7              MR. RESTAINO:  Great.

 8              Thank you, Your Honor.

 9              THE COURT:  Do you know what I'm talking about when I

10    talk about the Nelson case?  Am I on point about what your

11    concern was?

12              MR. RESTAINO:  Yes, Your Honor.

13              THE COURT:  Do you know what I'm talking about?

14              MS. WEIDNER:  Yes, Your Honor.  I'm -- I'm aware.

15              THE COURT:  All right.  Anything else, or can we bring

16    up the jury panel?

17              MR. RESTAINO:  Nothing from the government.

18              MS. WEIDNER:  Nothing from the defense, Your Honor.

19              THE COURT:  All right.  Thank you.

20              (Discussion was had off the record.)

21              THE COURT:  We are going to have 67 jurors.  I know I

22    said we're only going to have 60.  We're going to have 67 on

23    the jury panel.  The reason we're going to do that is we've had

24    a number of jury trials in the building today.  They've all

25    canceled except for us.  There are a few extra jurors, and I

UNITED STATES DISTRICT COURT

1   figured we might as well bring them up so we don't run short,

2   because we are looking at a three-week trial.

3          Oh.  I do want to remind folks, when we deal with the

4   jury materials that you'll be receiving that identify names and

5   cities, that's not to be shared.  We've had a little bit of a

6   problem with counsel sharing that with other people.  It's not

7   to be shared, and it's to be turned back in at the end of jury

8   selection to make sure that our jurors remain -- their

9   identities remain protected.

10          Thank you.

11                (Proceedings in recess at 9:16 a.m.)

12          (Jury panel enters the courtroom at 9:28 a.m.)

13                 (Proceedings resume at 9:33 a.m.)

14          THE COURT:  Please be seated.

15          COURTROOM DEPUTY:  This is criminal case number

16   17-585, United States of America versus Thomas Mario Costanzo,

17   on for jury trial.

18          Counsel, please announce your appearance.

19          MR. RESTAINO:  Good morning, Your Honor.

20          Gary Restaino, Matt Binford, and Catalina Escalante

21   for the United States.  And seated with us at counsel table is

22   Task Force Officer Chad Morton with the DEA.

23          THE COURT:  Good morning.

24          MS. WEIDNER:  Good morning, Your Honor.

25          Maria Weidner and Zachary Cain for Mr. Costanzo.

1    Seated with us at counsel table is Linda Ondrovic, our

2    paralegal.

3    THE COURT:  Good morning.

4    Good morning to you, ladies and gentlemen, and we

5    welcome you to the United States District Court for the

6    District of Arizona.

7    This a federal court, but it is a federal court for

8    the District of Arizona, meaning that what we do is take up

9    federal matters that arise within the state of Arizona.  And

10   this morning -- probably part of this afternoon, at least -- we

11   will be choosing a jury for a federal criminal trial.

12   We do appreciate each of you being here.  We do

13   recognize that it is an inconvenience for you, that it takes

14   you away from your jobs, your homes, your families, and

15   disrupts your daily routine.

16   However, one of the great protections provided by the

17   United States Constitution is a right to the -- to a jury

18   trial.

19   I tell every jury that I seat that on the 4th of July

20   every year, I make my kids read the entire Declaration of

21   Independence before they get their breakfast.  And one of the

22   things that you will find if you ever bother to read the entire

23   Declaration of Independence is that one of the reasons the

24   colonists agreed that they should -- they were entitled to

25   declare their independence from Great Britain is the King of

1       England had deprived them of the right to a jury trial.

2              The right to a jury trial is also contained in the

3       body of the United States Constitution, as well as in the

4       amendments to the United States Constitution.  And so it is an

5       extremely important right, and that is why the law gives us the

6       authority to summon you, to make you come, to inconvenience

7       your life, so that you can fulfill a very basic obligation of

8       citizenship which provides a great protection for all of us.

9              I will talk to you a little later this morning about

10      the schedule of this trial, and I will give you an opportunity

11      to explain whether that schedule would create undue hardship

12      for you.  As I will explain at that time, "undue hardship"

13      means real, significant hardship, not merely inconvenience.

14      But we can take that up at a later date -- later date.

15             Let me just tell you how we're going to proceed.

16             As you can understand, it is very important that we

17      seat jurors in this case who can be fair and impartial to both

18      sides.  Now, what do I mean by being "fair and impartial"?

19      What I really mean is being neutral, coming into this case

20      recognizing that the government has the burden of proof.  It is

21      the government's obligation to prove the guilt of the

22      defendant.  And if they fall short by -- beyond a reasonable

23      doubt standard, and if they fall short of that standard, the

24      defendant is innocent.

25             In evaluating the government's case and any defense

1    the defense puts on, we want to have jurors who can be neutral

2    and fair, both to the government in evaluating whether it's met

3    its burden, and to the defendant in making that same

4    evaluation.  We don't want people with us who are already going

5    to assume things before they've heard any part of the evidence.

6              And to assist us in arriving at that conclusion, I am

7    going to ask a number of questions to the entire jury panel

8    this morning.  Please understand that the questions I will ask,

9    although sometimes they involve quite personal information, are

10   not to embarrass you or to pry into your personal life.  They

11   are to find out if you have had any contact with or familiarity

12   with what may be some of the facts in this case; and if you do,

13   whether that predisposes you in one way or another that would

14   make it impossible for you to be a fair juror in this trial.

15             Really, we're going to depend on you to be honest and

16   truthful in making that assessment, and we are going to do our

17   best to help you do that courteously, but we must be -- we must

18   sometimes ask some direct -- direct questions.

19             Now, as I said, I will begin by asking all of the

20   questions.  If, when I ask a question, you have a response, you

21   should raise your hand, and my law clerk, Carmel Dooling, will

22   bring to you the microphone, and then I may have a few

23   follow-up questions for you.

24             After I am -- I will ask questions to the entire jury

25   panel.  And after I am through asking my questions, I will

1    allow the attorneys for each side to ask a few follow-up

2    questions to individual jurors that I may not have covered that

3    they have some concerns about.

4         Before I ask you the questions or the attorneys ask

5    you the questions, we're going to place you under oath to tell

6    the truth.  If you do not tell the truth when you are under

7    oath, you will have committed a federal crime.  The reason why

8    we put you under oath is this is a very important undertaking

9    and you must tell the truth, just as if you were a witness in

10   this action.

11        Now, I do recognize there are some realities about

12   being called to jury service.  Usually when people are called

13   in, most everybody comes in with the attitude of, I hope I'm

14   not picked.  I understand that.  But as I've said, this is a

15   very important obligation of citizenship, and you must not

16   attempt to manufacture or answer -- or answer the questions in

17   a way to avoid jury service that would be untruthful.  Nor --

18   and I also recognize that sometimes you might think it would be

19   nice to take a break from work or do something different, or

20   fulfill your jury service, and you -- you might want to be on

21   the jury.  It is just as important for you to answer the

22   questions truthfully as it is for someone who doesn't want to

23   be on the jury.  You both -- all of you have to answer the

24   questions truthfully, honestly, and completely.  And that is

25   just your obligation.

1          If you were one of the parties in this case, you would

2   want jurors who are capable of deciding the case fairly,

3   neutrally, honestly, and completely.

4          Now, I do recognize that even though many -- very few

5   of you will have known each other before this morning, if any

6   of you, that it may be difficult to answer personal questions

7   in front of a crowd that you're in.  Please realize that

8   everybody is in the same boat.  They all -- you're all going to

9   have to answer the same questions.  But if there's just a

10  question that you just can't answer in front of this big group,

11  please indicate that to me when I'm asking the questions, and

12  what I will do is ask you to remain behind during one of the

13  breaks, and then I will ask you the question and you can answer

14  it with the other jurors gone.  The lawyers still have a right

15  to be here and hear the answers to your questions, and so they

16  will not be excused, but everybody else will be.

17         Are there any questions about how we're about to

18  proceed?

19         I realize that I might not have offered the clearest

20  of explanations.

21         All right.  Then will the entire jury panel please

22  stand to be sworn in.

23         (Jury panel sworn.)

24         THE COURT:  All right.  Now, I have a couple

25  preliminary questions.

1          First, do any of you have any difficulty hearing me?

2          All right.  Kathleen?  I think we had four.

3          What we're doing is we have little sets that you --

4     you just put in your ears.  They really work quite remarkably

5     to assist in being able to hear what -- what is being said.  So

6     we're just making sure that we have working sets that are

7     clean, and we'll distribute them to you as soon as we make sure

8     that they're all on the right channel.

9          We will ask you, if you take one and use it, that when

10    we go on the break and you leave the courtroom, if you will

11    just leave your own set on your chair.  We are going to ask you

12    when you come back from break to sit in the very same chairs

13    that you're in now so that we can keep track of you

14    appropriately.

15         Was there anybody else who wanted one of these sets?

16         Well, he can have one anyway.  We'll ask you as --

17    we'll ask you to leave it in your chair when you leave too.

18         All right.  I'm giving you a test.  Can you all hear

19    better now with them?

20         Okay.  Good.

21         The very first substantive question I'm going to ask

22    you all is whether any of you who are on the jury panel who did

23    not take the oath?

24         All right.  I see no responses.

25         Let me read to you a statement of what this case is

1    about, as agreed to by the parties:

2           This is a criminal case brought by the United States

3    of America government.  The government charges the defendant

4    with five counts of money laundering.  Specifically, the

5    government alleges that on five occasions, Mr. Costanzo

6    accepted money represented by undercover agents to be proceeds

7    of drug transactions, and exchanged that money for Bitcoin.

8    The government further alleges that Mr. Costanzo intended to

9    avoid federal currency transaction reporting requirements and

10   to conceal and disguise the nature of the money when he

11   exchanged the money for Bitcoin.

12          This is a sting case, which means that the money

13   provided to Mr. Costanzo was not actually drug proceeds, and

14   the undercover agents involved were not actually drug dealers.

15          The charges against Mr. Costanzo are contained in the

16   first superseding indictment.  The first superseding indictment

17   simply describes the charges made by the government against the

18   defendant and does not constitute evidence.

19          Mr. Costanzo denies that he intended to evade federal

20   currency transaction reporting requirements when he exchanged

21   the Bitcoins for money.  Mr. Costanzo asserts that he did not

22   rely on representations made by the undercover agents that the

23   money involved was drug trafficking proceeds.

24          Have any of you read or heard anything about this case

25   from any source whatsoever?

```
1              All right.  I see no responses.

2              Given this brief description of the facts, is there

3     anything about this case that would cause you to believe that

4     you could not consider the evidence fairly and impartially,

5     according to the law?

6              All right.  Carmel?

7              Would you please stand, sir, and identify yourself by

8     the number on your front.

9              PROSPECTIVE JUROR 17:  Number 17.

10             THE COURT:  All right, sir.

11             What is it that gives you a concern about your

12    inability to consider the case fairly and impartially?

13             PROSPECTIVE JUROR 17:  I've -- was just involved in a

14    two-year legal case where my business partner sued me, claiming

15    I mis -- misappropriated funds from our business accounts.

16             THE COURT:  Yes?

17             PROSPECTIVE JUROR 17:  And, you know, I'm not sure I'd

18    be fully objective.

19             THE COURT:  You understand that -- well, there isn't

20    anything about the facts of this case, as I understand it, that

21    cause you concern.  It's your own experience; is that right?

22             PROSPECTIVE JUROR 17:  Excuse me?

23             THE COURT:  Well, there isn't -- if I understood you

24    correctly -- and I do not want to put words in your mouth, so

25    if I say something that's wrong, correct me -- but from what
```

```
 1      I've understood, there isn't anything about the facts in this
 2      case that cause you concern about your ability to be fair;
 3      rather, it is your own recent experience; is that correct?
 4                PROSPECTIVE JUROR 17:  Correct.
 5                THE COURT:  And if I were -- well, what is it about
 6      your recent experience, if I can explore it a little bit with
 7      you, that makes you think you would not be able to serve as an
 8      impartial juror, or as a neutral juror in this case?
 9                PROSPECTIVE JUROR 17:  I -- it would probably depend
10      on how the case unfolds, I suppose.  I mean, I'm just, you
11      know, a little disgruntled, I suppose, with the system as far
12      as, you know, some of the process goes with the way my case
13      transpired.
14                THE COURT:  All right.  So because of your own
15      experience with the system, you don't -- you have doubts about
16      its efficacy and fairness?
17                PROSPECTIVE JUROR 17:  Correct.
18                THE COURT:  And as a result, you don't know that you
19      could serve as an objective and fair juror?
20                PROSPECTIVE JUROR 17:  Correct.
21                THE COURT:  You will hear, likely, me tell other
22      jurors -- jury panel members what I am about now to tell you.
23                I'm going to instruct every juror in this case who
24      might have a reason why they -- they have doubts about their
25      own ability to be fair, that if they're selected to be jurors
```

UNITED STATES DISTRICT COURT

1    in this case, I would instruct them that they have to put their

2    own feelings aside and try this case based only on the facts

3    and the evidence that they hear in this courtroom.

4           Now, I do recognize that I could well tell you you've

5    got to put something aside, and even though you might try your

6    very best to do it, you can't do it.  So I guess what I'm

7    asking you is, if I were to instruct you that you have to put

8    your own feelings aside that arise from your own experience and

9    try this case fairly based on only what you'll hear in this

10   courtroom, is that something you think you can do?

11          PROSPECTIVE JUROR 17:  It is something I would do to

12   the best of my ability.

13          THE COURT:  Okay.  And I think you indicated that just

14   depends a little bit on how the facts play out?

15          PROSPECTIVE JUROR 17:  Correct.

16          THE COURT:  Okay.  Is there any -- based on --

17   before -- and I realize you don't know anything yet -- but is

18   there anything about what you've heard so far that makes you

19   think you couldn't do that?

20          PROSPECTIVE JUROR 17:  Not at this time, no.

21          THE COURT:  All right.  Thank you very much, sir.

22          Anyone else?

23          Let me introduce myself to you.  My name is Murray

24   Snow.  I'm a Federal District Court judge.  You may have

25   guessed that.  And I'm going to be the judge who tries this

1    case.

2          Down to my immediate right is my court reporter, and

3    her name is Charlotte Powers.  I'm not going to have her stand

4    or wave or anything else because it is her job to record

5    simultaneously everything that I say, everything that you say,

6    everything that anybody says in this trial.  And so you will

7    see her very busily tapping away during the entirety of the

8    trial.  It may be that on occasion I will ask a witness to slow

9    down because sometimes we talk too quickly, and she does an

10   amazing job recording everything everybody says as it is.  I've

11   also given her license to tell people to slow down herself, is

12   if I'm missing that.  So you may hear her speak up

13   occasionally.  But otherwise, she's too busy to speak.

14         To my left -- Kathleen, please stand -- is Kathleen

15   Zoratti.  Kathleen is my courtroom deputy clerk.  Kathleen will

16   handle all of the evidence during trial, she will swear in the

17   witnesses, and she will take the jury back and forth from the

18   jury room each day.

19         In the middle of trial, in addition to handling all

20   the evidence and exhibits for this trial, Kathleen is in charge

21   of dealing with about 250 to 300 other criminal cases that I

22   have on my docket.  And so she will be -- if you wonder what

23   she's doing when she's tapping away during trial, it may be

24   handling my other criminal docket.  But she will be here

25   throughout trial.

1          Carmel Dooling.

2          Carmel, would you please stand?

3          Carmel is a recent law school graduate from the

4    University of Chicago.  I have the good fortune of having

5    Carmel work for me this year.  It's something like a judicial

6    internship before she begins her law practice on her own.  And

7    she has a compatriot, Jason Despain, who you may be exposed to

8    throughout trial, who graduated recently from Stanford Law

9    School.

10         If you're on the jury, you will also certainly have

11   interaction with my judicial assistant, whose name is Armie

12   Gonzales.  You will interact with her when you call my chambers

13   to let me know -- at a minimum, you will interact with her on

14   those occasions to call me to let me know that you're ready to

15   go.

16         Do any of you know me or any member of my staff that

17   I've just introduced to you on any basis; social, professional,

18   or otherwise?

19         Carmel?

20         PROSPECTIVE JUROR 49:  I know Carmel dated my son.

21              (Laughter in the courtroom.)

22         THE COURT:  Well --

23         PROSPECTIVE JUROR 49:  Congratulations on your

24   graduation.

25              (Laughter in the courtroom.)

1          THE COURT:  Does that cause you any concern about your

2     ability to be a neutral and a fair juror if you're seated as a

3     juror in this matter?

4          PROSPECTIVE JUROR 49:  No.

5          THE COURT:  All right.  Carmel will likely be

6     designated as the bailiff in this matter.  So after your --

7     after the jury is allowed to deliberate in this case, Carmel

8     would bring you back and forth, and she's principally

9     responsible to make sure nobody bothers the jury.  But I can

10    promise you that Carmel will not be speaking with you.  Even

11    though she doesn't want to be unfriendly, she won't be speaking

12    with you or anybody else about this case, and I can give you

13    that assurance.  And with that assurance and a little piece of

14    instruction, is there any -- do you have any concern about

15    knowing Carmel?

16         PROSPECTIVE JUROR 49:  No.

17         THE COURT:  Thank you very much.

18         Anyone else?

19         All right.  The United States is represented in

20    this -- in this action by Gary Restaino, Matthew Binford, and

21    Carolina Escalante.

22         Counsel, please stand.

23         They are all Assistant United States Attorneys.  The

24    Acting United States Attorney is Elizabeth A. Strange.

25         Do any of you know these counsel, or the Acting United

1    States Attorney, or any of the employee in their office on any

2    basis; social, professional, or otherwise?

3              I see no responses.

4              Mr. Restaino, please introduce your investigator or

5    client representative.

6              MR. RESTAINO:  Thank you, Your Honor.

7              Members of the jury, this is Chad Morton.  Officer

8    Morton is employed by the Scottsdale Police Department, and

9    he's currently tasked or assigned the DEA.

10             THE COURT:  When you say "DEA," Mr. Restaino --

11             MR. RESTAINO:  I mean, Your Honor, the Drug

12   Enforcement Administration.  Thank you.

13             THE COURT:  All right.  Thank you.

14             Do any of you know -- I'm sorry, I've forgotten his

15   name already -- Agent?

16             MR. RESTAINO:  Chad Morton, Your Honor.

17             THE COURT:  Agent Martin, or any of the employees of

18   the Scottsdale Police Department or the Drug Enforcement

19   Administration on any basis; social, professional, or

20   otherwise?

21             All right.  I see no responses.

22             Thank you.  Please be seated.

23             The defendant is represented by Maria Weidner and

24   Zachary Cain.

25             Please stand.

1    Do any of you know either Ms. Weidner or Mr. Cain, or

2  any of the employees of their office, on any basis; social,

3  professional, or otherwise?

4    Do you want to introduce your investigator,

5  Ms. Weidner?

6    MS. WEIDNER:  Yes, Your Honor.

7    Our investigator is actually seated in the back of the

8  courtroom.  Tony Dunbar.

9    And our paralegal is seated with us at counsel table,

10  Linda Ondrovic.

11    THE COURT:  All right.  Do any of you know Mr. Dunbar

12  or Ms. Ondrovic on any basis at all?

13    All right.  I see no responses.

14    Please introduce your client, Ms. Weidner.

15    MS. WEIDNER:  Our client is Mr. Thomas Costanzo.

16    THE COURT:  Do any of you know Mr. Costanzo on any

17  basis whatsoever?

18    All right.  Thank you.  Please be seated.

19    There are a number of witnesses who may be called in

20  this matter.  I am now going to read their names slowly and,

21  hopefully, correctly.

22    If I mispronounce a name of any of the witnesses,

23  please correct my pronunciation.

24    If you know or think you may know the names of any of

25  these witnesses as I read them, please raise your hand.

1          Michael Fleischmann, who is a Special Agent for the
2  Internal -- Internal Revenue Service.
3          Sergei Kushner, who is similarly a Special Agent for
4  the Internal Revenue Service.
5          Thomas Klepper, also a Special Agent for the Internal
6  Revenue Service.
7          Chad Martin, who you've already met.
8          Aric Manore, a task officer for the Drug Enforcement
9  Administration.
10          John Nelson, a Special Agent for the Drug Enforcement
11  Administration.
12          Keith Landa, a Special Agent for the Drug Enforcement
13  Administration.
14          Schuyler Kennedy -- or Schuyler Kenny, a Special Agent
15  for the Drug Enforcement Administration.
16          William Green, a special agent for Homeland Security
17  Investigations.
18          Don Ellsworth, a Special Agent for the Internal
19  Revenue Service.
20          Marcus Hernandez, a task officer for the Drug
21  Enforcement Administration.
22          David Alvarado, a task officer for the Drug
23  Enforcement Administration.
24          Ed Goodyear, a Special Agent for Homeland Security.
25          Chris Hemerka, a Special Agent for Homeland Security.

1          Erin McLoughlin, a Special Agent for Homeland

2     Security.

3          Brandon Lopez, a Special Agent for the IRS.

4          Justin Owens, a Special Agent for the IRS.

5          Alicia Aldecoa, a Special Agent for the IRS.

6          David Votaw, a Special Agent for the IRS.

7          Robin Newgren, a Special Agent for the IRS.

8          Sergeant Dietrich, from the MCSO S.W.A.T. team.

9          Jason L. -- "MCSO" meaning Maricopa County Sheriff's

10    office, I'm sorry -- S.W.A.T. team.

11         Jason L. Shadle, a forensic computer analyst, senior,

12    from the United States Postal Service.

13         Marcella Preciado, custodian of records.

14         Aaron Medina.

15         Nolan Sperling.

16         Kelly Westbrook.

17         Michael Baysek.

18         Todd Kandaris.

19         Michael Shoen.

20         Tom Westbrook.

21         I didn't see anybody indicate that they thought they

22    might have known any of those witnesses.  Did I miss anybody

23    who was trying to indicate to me that they might -- they

24    thought they might have known any of those witnesses?

25         All right.

1          Have you or any members of your family ever been

2     convicted of a felony?  And when I ask about members of your

3     family, let me define that term for you because I'm going to be

4     using it throughout the morning.

5          I don't mean distant cousins or distant relatives, or

6     even close -- closely related relatives who you never know or

7     never speak to.  I'm talking about people in your family who

8     are close to you.  Your sons, your brothers, your sisters, your

9     daughters, your mothers or fathers, or even a member of your

10    family who may be very close to you that doesn't fall into that

11    category.

12         I would also include in that category a close personal

13    friend.  But we're really not concerned about relatives that

14    you don't have an interaction with and might not affect your

15    viewpoints.

16         So have any of your -- have any -- have you or any

17    members of your family ever been convicted of a felony?

18         Okay.  Did we have anybody in the jury box raise their

19    hand?

20         All right.

21         Please stand, sir.

22         PROSPECTIVE JUROR 18:  I'm juror 18, and -- oops.

23    Sorry.

24         THE COURT:  It's all right.

25         PROSPECTIVE JUROR 18:  Juror 18.

1          I have a brother-in-law that's currently in federal

2   prison in Tucson.

3          THE COURT:  What was the offense for which he's been

4   incarcerated?

5          PROSPECTIVE JUROR 18:  He was a prior convicted felon,

6   was caught with a weapon.

7          THE COURT:  All right.

8          PROSPECTIVE JUROR 18:  And he was in the import/export

9   business as well.

10         THE COURT:  Did you -- did he have a trial?

11         PROSPECTIVE JUROR 18:  Yes.

12         THE COURT:  Were you present at the trial?

13         PROSPECTIVE JUROR 18:  No, I was not.

14         THE COURT:  Did you form any conclusions based on the

15  way your brother-in-law has been treated about the efficacy of

16  the justice system or its fairness?

17         PROSPECTIVE JUROR 18:  Yes and no.  I think he

18  received a fair trial, like, you know, but I do think that

19  there were mitigating circumstances that were not allowed,

20  but...

21         THE COURT:  All right.  Do you think that experience

22  or those conclusions would in any way affect your ability to be

23  a neutral juror?

24         PROSPECTIVE JUROR 18:  Not in this particular case, I

25  don't think so, no.

```
1              THE COURT:  You think you could be fair to both
2      parties?
3              PROSPECTIVE JUROR 18:  I think so.
4              THE COURT:  All right.  Do you have any doubt about
5      that?
6              PROSPECTIVE JUROR 18:  No, not really.
7              THE COURT:  Thank you, sir.
8              PROSPECTIVE JUROR 30:  I'm number 30.  My uncle is --
9      was convicted of murder of my aunt.
10             THE COURT:  How long ago, ma'am?
11             PROSPECTIVE JUROR 30:  2002.
12             THE COURT:  Were you -- was he tried or did he plead
13     guilty?
14             PROSPECTIVE JUROR 30:  He was tried.
15             THE COURT:  Were you present at the trial?
16             PROSPECTIVE JUROR 30:  Yes.
17             THE COURT:  Did you form any conclusions as being --
18     in being involved in that process about the justice system?
19             PROSPECTIVE JUROR 30:  Not that I know -- oh, I
20     can't -- it's hard to say.  It was a while ago.
21             THE COURT:  Well, let me ask a more direct question
22     then that might be easier.
23             Do you have any concern because of that experience
24     about your ability to be a neutral and fair juror to both
25     parties in this action?
```

```
1              PROSPECTIVE JUROR 30:  A little bit, yeah.
2              THE COURT:  Why?
3              PROSPECTIVE JUROR 30:  It -- I don't -- I don't know.
4     I just form judgments on people more since that happened.
5              THE COURT:  Okay.  Well, let me ask you this.  Would
6     you be willing to base your judgments based only on the facts
7     and evidence that you -- that are presented in this courtroom?
8              PROSPECTIVE JUROR 30:  Yes.
9              THE COURT:  And do you think that you could be fair to
10    the defendant in evaluating whether or not the government has
11    met its burden of proof?
12             PROSPECTIVE JUROR 30:  Yes.
13             THE COURT:  Do you think you could be fair to the
14    government in evaluating whether the government has met its
15    burden of proof?
16             PROSPECTIVE JUROR 30:  Yes.
17             THE COURT:  Thank you, ma'am.
18             PROSPECTIVE JUROR 37:  Juror number 37.
19             THE COURT:  Good morning, ma'am.
20             PROSPECTIVE JUROR 37:  It was my son.
21             THE COURT:  And what crime?
22             PROSPECTIVE JUROR 37:  Identity theft.
23             THE COURT:  And did he go through trial?
24             PROSPECTIVE JUROR 37:  No, he did not have a trial.
25             THE COURT:  What was the disposition of the charge?
```

UNITED STATES DISTRICT COURT

1    In other words, what happened; was he found guilty?

2            PROSPECTIVE JUROR 37:  He was found guilty.

3            THE COURT:  Okay.  How long ago was this, ma'am?

4            PROSPECTIVE JUROR 37:  He was 20, so about 13 years

5    ago.

6            THE COURT:  Did you form any opinions about the

7    fairness of the justice system in going through the process

8    with your son?

9            PROSPECTIVE JUROR 37:  No, I thought it was a fair

10   process.

11           THE COURT:  All right.  Do you have any concerns about

12   your ability to be a fair and neutral juror in this case?

13           PROSPECTIVE JUROR 37:  No.

14           THE COURT:  Thank you, ma'am.

15           PROSPECTIVE JUROR 44:  Juror number 44.

16           It is my son.

17           THE COURT:  Do you know what, Juror 44?  I'm afraid

18   that our battery is going out on that microphone.  If you give

19   us a minute, and we'll change it.

20           Juror number 23, is that not working for you?

21           PROSPECTIVE JUROR 2:  It works okay if I hold it.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR 2:  But for this, I don't really

24   need it.

25           THE COURT:  All right.  Just checking to make sure it

UNITED STATES DISTRICT COURT

```
 1    wasn't being faulty.
 2              PROSPECTIVE JUROR 2:  Okay.
 3                      (Pause in proceedings.)
 4              PROSPECTIVE JUROR 44:  Juror number 44, and it was my
 5    son.
 6              THE COURT:  What was the offense?
 7              PROSPECTIVE JUROR 44:  Sex offender.
 8              THE COURT:  And what was the disposition?
 9              PROSPECTIVE JUROR 44:  Beg your pardon?
10              THE COURT:  What happened; was he found guilty or not
11    guilty, or --
12              PROSPECTIVE JUROR 44:  He was found guilty.
13              THE COURT:  Was there a trial?
14              PROSPECTIVE JUROR 44:  Yes.
15              THE COURT:  Did you attend the trial?
16              PROSPECTIVE JUROR 44:  No, sir.
17              THE COURT:  Did you -- did you form any conclusions
18    about the justice system in light of your son's interaction
19    with it?
20              PROSPECTIVE JUROR 44:  No, sir.
21              THE COURT:  Do you think you could be a fair and a
22    neutral juror in this case if you're asked to serve as a juror?
23              PROSPECTIVE JUROR 44:  Yes.
24              THE COURT:  Thank you, ma'am.
25              PROSPECTIVE JUROR 45:  I'm juror number 45.  And --
```

```
 1    excuse me -- my ex-son-in-law was charged with a felony.
 2             THE COURT:  And what was the nature of the felony?
 3             PROSPECTIVE JUROR 45:  It was a drug trafficking.
 4             THE COURT:  What was the disposition of the case?
 5             PROSPECTIVE JUROR 45:  He was found guilty and served
 6    a sentence.
 7             THE COURT:  Did you form any conclusions in
 8    conjunction with the experience he went through?
 9             PROSPECTIVE JUROR 45:  No.  That all happened before
10    he became my son-in-law.  And the marriage lasted about two
11    years, and he's not in the picture anymore.
12             THE COURT:  Is there anything about any of that that
13    you think would affect your ability to be a neutral and fair
14    juror if you were selected to serve as a juror in this case?
15             PROSPECTIVE JUROR 45:  No.
16             THE COURT:  Thank you.
17             PROSPECTIVE JUROR 38:  Hi, I'm Jury 38 -- Juror 38,
18    and it was my brother-in-law who was convicted of accomplice to
19    a murder.
20             THE COURT:  How long ago?
21             PROSPECTIVE JUROR 38:  Probably about 15 years ago, up
22    in Oregon.
23             THE COURT:  Did you -- did you attend the trial?
24             PROSPECTIVE JUROR 38:  No.
25             THE COURT:  Did you form any conclusions about the
```

UNITED STATES DISTRICT COURT

```
 1    fairness of the proceeding?
 2              PROSPECTIVE JUROR 38:  No.
 3              THE COURT:  Do you have any concerns about your
 4    ability to be a neutral and a fair juror in this case?
 5              PROSPECTIVE JUROR 38:  No.
 6              THE COURT:  Thank you, ma'am.
 7              PROSPECTIVE JUROR 57:  Juror number 57.
 8              I was convicted of a felony for possession of
 9    marijuana and para -- paraphernalia.
10              THE COURT:  How many years ago?
11              PROSPECTIVE JUROR 57:  2005.
12              THE COURT:  Have your civil rights been fully
13    restored?
14              PROSPECTIVE JUROR 57:  Yes.
15              THE COURT:  Did you go to trial; did you plead guilty?
16              PROSPECTIVE JUROR 57:  Yeah.
17              THE COURT:  You went to trial?
18              PROSPECTIVE JUROR 57:  Well, I just saw the judge, and
19    I was guilty, and that was it.
20              THE COURT:  The judge gave you your sentence, whatever
21    it was?
22              PROSPECTIVE JUROR 57:  Right.
23              THE COURT:  Do you have any concerns, in light of your
24    experience, about the fairness of the judicial process?
25              PROSPECTIVE JUROR 57:  No.
```

1          THE COURT:  Do you have any concerns about your

2    ability to be a neutral and a fair juror in this case, if you

3    were asked to serve?

4          PROSPECTIVE JUROR 57:  No.

5          THE COURT:  Do you think you could be fair to the

6    government?

7          PROSPECTIVE JUROR 57:  Yeah.

8          THE COURT:  Do you think you could be fair to the

9    defendant?

10         PROSPECTIVE JUROR 57:  Yes.

11         THE COURT:  Thank you, sir.

12         PROSPECTIVE JUROR 60:  Number 60.  My nephew is going

13   through the process.  He has trial on the second -- July 2nd

14   for assault.

15         THE COURT:  What was -- for an assault, did you say?

16         PROSPECTIVE JUROR 60:  Uh-huh.

17         THE COURT:  Do you know whether that's been charged as

18   a felony or a misdemeanor?

19         PROSPECTIVE JUROR 60:  It's felony.

20         THE COURT:  Do you -- does that experience that you're

21   aware of with your nephew cause you any concern about your

22   ability to be a neutral and a fair juror in this case, if you

23   were asked to serve?

24         PROSPECTIVE JUROR 60:  No.

25         THE COURT:  Thank you.

1          PROSPECTIVE JUROR 61:  Juror number 61.

2          THE COURT:  Yes, sir.

3          PROSPECTIVE JUROR 61:  My brother -- my brother shot

4   someone at The Taste of Chicago in 2003 or '4.

5          THE COURT:  And was he convicted?

6          PROSPECTIVE JUROR 61:  Yes.  He was found guilty.  He

7   actually shot an innocent bystander.

8          THE COURT:  Did you -- did he go to trial or did he --

9          PROSPECTIVE JUROR 61:  Yes.

10          THE COURT:  Did you attend trial?

11          PROSPECTIVE JUROR 61:  Yes.

12          THE COURT:  Were you a witness at trial?

13          PROSPECTIVE JUROR 61:  No.

14          THE COURT:  Did you form any conclusions about the

15   fairness of the law process or the legal process in conjunction

16   with what you observed?

17          PROSPECTIVE JUROR 61:  He -- I felt he got a heavy

18   sentence.

19          THE COURT:  Does that cause you any concern about your

20   ability to be neutral in this case, if you were selected as a

21   juror?

22          PROSPECTIVE JUROR 61:  A little bit.

23          THE COURT:  And is that based on your concern about

24   the fairness of the process?

25          PROSPECTIVE JUROR 61:  Yes.

1          THE COURT:  You've heard, as I've indicated to juror

2     number 17 and others, that if you were selected to be a juror

3     in this action, I would ask you to set aside any of your own

4     personal biases and prejudices that -- or concerns that might

5     result from your own experience.  As I said, I expect

6     everybody -- everyone would do their best to do that, if I

7     instructed them to do it.  But I also recognize that merely

8     because I tell you to do it doesn't mean that you'll be able

9     to, even if you try.

10          Do you have concerns that even if I gave you that

11     instruction, as to your ability to put that aside in your

12     deliberation in this case?

13          PROSPECTIVE JUROR 61:  I do, because we are really

14     close, and it was just -- it -- it was hard for me to see what

15     he went through because he had three kids.  And for him to be

16     put in jail for eight-and-a-half years to a decade of his life.

17     He lost a lot, and after -- after the process, he -- he was

18     completely clean and sober and actually on a different path

19     with work and everything, and they still came after him.

20          THE COURT:  All right.  Thank you, sir.

21          PROSPECTIVE JUROR 61:  Yep.

22          PROSPECTIVE JUROR 63:  Juror 63.

23          THE COURT:  Yes, ma'am.

24          PROSPECTIVE JUROR 63:  My brother was convicted --

25     tried and convicted of distribution.  He served 15 years and

1    three years' probation.

2          THE COURT:  Did you attend his trial, or did he go to

3    trial?

4          PROSPECTIVE JUROR 63:  He did, and I did.

5          THE COURT:  Were you a witness at trial?

6          PROSPECTIVE JUROR 63:  No.

7          THE COURT:  Did you form any conclusions about the

8    fairness of the judicial process?

9          PROSPECTIVE JUROR 63:  No.

10          THE COURT:  Do you have any concerns about your

11   ability to be neutral and fair --

12          PROSPECTIVE JUROR 63:  No.

13          THE COURT:  -- between the parties here if you were

14   asked to serve as a juror in this case?

15          PROSPECTIVE JUROR 63:  Not at all.

16          THE COURT:  Thank you, ma'am.

17          PROSPECTIVE JUROR 39:  Juror 39.

18          In 2008 I was arrested for possession of a narcotic,

19   and I just was placed on Task for a year, and I had to pay

20   fines.

21          THE COURT:  Do you know whether it was a misdemeanor

22   or a felony?

23          PROSPECTIVE JUROR 39:  I'm not sure.  It was dropped

24   after I took care of everything.

25          THE COURT:  All right.  So, in fact, you don't have a

1    criminal record --

2              PROSPECTIVE JUROR 39:  No.

3              THE COURT:  -- is that correct?

4              PROSPECTIVE JUROR 39:  No, no.  I just don't know if

5    being arrested counted as --

6              THE COURT:  I appreciate you very much sharing with us

7    that detail.

8              Let me ask.  Was there anything about that experience

9    that causes you any concern about whether or not you could be a

10   fair juror in this matter if you were asked to serve?  And by

11   "fair," I mean neutral and impartial between the sides.

12             PROSPECTIVE JUROR 39:  No.

13             THE COURT:  In other words, you think you can be

14   neutral and impartial?

15             PROSPECTIVE JUROR 39:  Yes.

16             THE COURT:  Thank you, ma'am.

17             PROSPECTIVE JUROR 50:  Juror 50.

18             I am not sure that this would be relevant, but my

19   father, who I haven't seen for about a decade, has a fairly

20   lengthy criminal history of mostly felony charges.  But he is

21   my father, so I thought perhaps I ought to bring that up.

22             THE COURT:  Yes.  Thank you.

23             Is there anything about your father's experiences with

24   law enforcement and the justice system that caused you concern

25   about your ability to be a neutral and fair juror in this

```
 1    action?

 2            PROSPECTIVE JUROR 50:  None whatsoever.

 3            THE COURT:  Thank you.

 4            PROSPECTIVE JUROR 67:  Juror 67.

 5            It's my son.  He was convicted of marijuana charges

 6    back in 2008.  He served probation for five years.

 7            THE COURT:  Did you form any conclusions about the

 8    fairness of the law enforcement or judicial processes --

 9            PROSPECTIVE JUROR 67:  No, I thought they were

10    completely fair with him.

11            THE COURT:  All right.  Do you have any concerns about

12    your ability to be a neutral and fair juror in this case?

13            PROSPECTIVE JUROR 67:  No, I do not.

14            THE COURT:  Thank you.

15            Anyone else that we've missed?

16            PROSPECTIVE JUROR 3:  Hi.  Juror number 3.

17            I have close friends I grew up with, as a matter of

18    fact --

19            THE COURT:  Wait one moment, please, sir.

20            Sir?

21            Do you need a break?

22            PROSPECTIVE JUROR 8:  I need to go to the restroom.

23            THE COURT:  Well, give me 10 minutes, and I'll give

24    everybody a break.  But we all kind of need to stay together

25    when we're together so we can all hear the questions.
```

1          Yes, sir?

2          PROSPECTIVE JUROR 3:  And they were brought up on

3    charges and had to appear for assault charges.  And upon doing

4    so, they were accused of rape, and convicted, and sent to

5    prison for well over 10 years plus.  And it was disturbing for

6    the fact for witnesses that were present gave testimony that

7    weren't believed by the jury panel, and they were -- they were

8    all just townspeople amongst a handful of relatives also.  And

9    they actually were re-tried or appealed and brought up and

10   released, but it wasn't until the damage was done.  So, you

11   know, I'm kind of -- this case involving a sting operation, I

12   just have a -- different views about being trapped in a certain

13   situation.  So...

14         THE COURT:  All right.  So you have concerns about

15   your ability to be --

16         PROSPECTIVE JUROR 3:  Well, yeah.  I'll probably...

17         THE COURT:  You've heard me indicate that I --

18         PROSPECTIVE JUROR 3:  Sure.

19         THE COURT:   -- instruct people they need to put aside

20   their own views.

21         PROSPECTIVE JUROR 3:  Sure.  I did.

22         THE COURT:  And you've also heard me indicate that I

23   realize that people will try to do that, and if they can do it,

24   they will.  But we need to know if you feel like you could do

25   it.

1          PROSPECTIVE JUROR 3:  Probably not.

2          THE COURT:  Thank you, sir.

3          PROSPECTIVE JUROR 3:  Sure.

4          THE COURT:  Anyone else?

5          Have any of you -- are any of you or any members --

6    close family members or close friends, ever served as a law

7    enforcement officer?

8          PROSPECTIVE JUROR 4:  My cousin -- he's a close

9    cousin -- he served on the Phoenix Police Department and lost

10   his leg.

11         THE COURT:  Do you think that relationship would

12   prevent you from being fair and impartial in this case?

13         PROSPECTIVE JUROR 4:  No.

14         THE COURT:  Do you think you could be neutral and fair

15   to the defendant?

16         PROSPECTIVE JUROR 4:  Yes.

17         THE COURT:  Neutral and fair to the government?

18         PROSPECTIVE JUROR 4:  Yes.

19         THE COURT:  Thank you, sir.

20         PROSPECTIVE JUROR 21:  Juror 21.

21         My brother-in-law is law enforcement for Rockford,

22   Illinois.  He's a career police officer.

23         THE COURT:  Is he still serving?

24         PROSPECTIVE JUROR 21:  He is retired.

25         THE COURT:  How long has he been retired for?

1          PROSPECTIVE JUROR 21:  Ten years.

2          THE COURT:  Do you think your relationship with your

3     brother-in-law would prevent you from being fair and impartial

4     as a juror in this case if you were asked to serve?

5          PROSPECTIVE JUROR 21:  No, it would not interfere.

6          THE COURT:  All right.  If -- I'm going to give you a

7     hypothetical situation.

8          If you heard all the facts and the evidence in this

9     case and ultimately determined that the government had not met

10    its burden of proof, would you have any hesitancy in telling

11    your brother-in-law that you served on a jury and found someone

12    not guilty?

13         PROSPECTIVE JUROR 21:  I'm sorry.  I don't quite

14    understand.

15         THE COURT:  That's all right.

16         Let's say that you are seated as a juror in this case,

17    and you heard all the evidence and all the testimony.  And

18    after you heard all the evidence and testimony, let's assume --

19    and I'm not saying you would -- this would be the case -- but

20    let's assume that you determined that the government did not

21    meet its burden of proving the guilt of the defendant beyond a

22    reasonable doubt.

23         If that was the case, would you have any hesitancy

24    telling your brother-in-law that you served as a juror in a

25    case in which you found the defendant not guilty?

1          PROSPECTIVE JUROR 21:  I would be okay telling him.

2          THE COURT:  All right.  Thank you, ma'am.

3          PROSPECTIVE JUROR 24:  Juror 24.

4          I have a son-in-law, as well as my son's birth father,

5   both serve on the Phoenix Police Department presently.

6          THE COURT:  Do you think that that would prevent you

7   from being a fair and impartial juror in this case?

8          PROSPECTIVE JUROR 24:  No, sir.

9          THE COURT:  Do you think you could be fair to all

10  parties here?

11         PROSPECTIVE JUROR 24:  Yes, sir.

12         THE COURT:  Thank you, ma'am.

13         PROSPECTIVE JUROR 29:  Juror number 29.

14         I've got a cousin that was a psychologist for the

15  Atascadero facility for the criminally insane.  I've got a

16  guard -- or a cousin that's a guard at Folsom prison.  I've got

17  another cousin that's a captain in the Pasco, Washington,

18  police department, and I've got a childhood friend who was part

19  of the internal affairs of the Spokane sheriff's county.

20         THE COURT:  Do any of those relationships cause you

21  concern about your ability to be a neutral and fair juror, if

22  you were asked to serve as a juror in this case?

23         PROSPECTIVE JUROR 29:  No.

24         THE COURT:  Thank you.

25         PROSPECTIVE JUROR 46:  Juror number 46.

1          I currently have a brother who is a police officer in

2     New Mexico.  He also served as a detective for that same

3     agency, as well as a S.W.A.T. officer.

4          THE COURT:  Does that cause you any concern about your

5     ability to be a fair, neutral juror in this case?

6          PROSPECTIVE JUROR 46:  No.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR 53:  Juror number 53.

9          I have a brother who is a correctional officer in the

10    Tucson Sheriff's Department.

11         THE COURT:  Does that cause you any concern about your

12    ability to be fair?

13         PROSPECTIVE JUROR 53:  No.

14         THE COURT:  Thank you.

15         PROSPECTIVE JUROR 35:  Juror number 35.

16         I have four fairly close friends that are all in law

17    enforcement, three retired and one active.

18         THE COURT:  Any concern about that effect -- or any

19    effect it might have on you if you were asked to serve as a

20    juror in this matter in terms of being fair and neutral to the

21    parties in your deliberations?

22         PROSPECTIVE JUROR 35:  No, sir.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR 40:  Juror number 40.

25         I have a cousin that's a police officer in the town of

```
 1    Gilbert, and then I have an uncle who retired from the U.S.

 2    border patrol.

 3              THE COURT:  Do you think either of those relationships

 4    would prevent you from being fair and impartial in this case?

 5              PROSPECTIVE JUROR 40:  No, Your Honor.

 6              THE COURT:  All right.  Thank you.

 7              PROSPECTIVE JUROR 58:  Juror number 58.

 8              My husband is a detention officer, his brother is a

 9    current Phoenix police officer, his father is retired Glendale

10    officer, and a few cousins, as well.

11              THE COURT:  So it's your husband that's the detention

12    officer?

13              PROSPECTIVE JUROR 58:  Correct.

14              THE COURT:  His brother that's the police officer?

15              PROSPECTIVE JUROR 58:  Correct.

16              THE COURT:  And other members of his family are

17    involved in law enforcement?

18              PROSPECTIVE JUROR 58:  Correct.

19              THE COURT:  Do you identify with law enforcement?

20              PROSPECTIVE JUROR 58:  Yes.

21              THE COURT:  Would you do so in a way that would

22    prevent you from being a neutral and fair juror in this matter?

23              PROSPECTIVE JUROR 5:  I worry that I would, yes.

24              THE COURT:  All right.  And you've heard me indicate

25    that I would instruct you that you need to put all such
```

UNITED STATES DISTRICT COURT

```
 1    feelings aside.
 2            PROSPECTIVE JUROR 58:  Right.
 3            THE COURT:  Do you think you can do that?
 4            PROSPECTIVE JUROR 58:  I'm really not sure.
 5            THE COURT:  All right.  Thank you, ma'am.
 6            PROSPECTIVE JUROR 63:  Juror 63.
 7            My brother is the deputy chief probation officer for
 8    the District of Arizona.
 9                          (Pause.)
10                   (Laughter in the courtroom.)
11            THE COURT:  Is there anything about your relationship
12    with your brother that you think would prevent you from being a
13    neutral and fair juror in this matter?
14            PROSPECTIVE JUROR 63:  No, sir.
15            THE COURT:  All right.  Thank you.
16            PROSPECTIVE JUROR 65:  Hi, I'm juror 65, and my uncle
17    and cousin are both retired Chicago policemen, and my husband's
18    uncle is retired FBI.
19            THE COURT:  All right.  You know what I'm asking.  Do
20    you think -- do you have any concern --
21            PROSPECTIVE JUROR 65:  No.
22            THE COURT:   -- that you, if you were asked to serve,
23    would not be able to be neutral and fair because of your
24    relationships?
25            PROSPECTIVE JUROR 65:  No.
```

```
1              THE COURT:  All right.  Thank you.

2              PROSPECTIVE JUROR 66:  Juror 66.

3          I have a grandfather who was sheriff's mounted posse

4    for Scottsdale and a cousin -- and a cousin who was, I believe,

5    FBI in California, and I can't remember if she's now in Arizona

6    with FBI.  Something to do with paperworks on drug raids and

7    that kind of a thing.  Her husband was retired Border Patrol,

8    and a uncle who was a detective and who was in on a drug raid

9    that went wrong to where he ended up losing his badge.  And I

10   can't remember if there was time served, as well.  That kind of

11   a thing.  But I don't believe that it would impact anything of

12   this.

13             THE COURT:  Well, let me be sure I understand what

14   you're saying.

15             You've indicated a number of relationships that you

16   have, both with career police officers and police officers who

17   got in trouble, apparently.

18             JUROR 66:  Yeah.

19             THE COURT:  You have stated in summary, I think, that

20   you believe, regardless of all those relationships, that you

21   would be able to be a fair and neutral juror to all parties in

22   this case.  Is that a correct understanding?

23             PROSPECTIVE JUROR 66:  Correct.

24             THE COURT:  Thank you.

25             Anyone else?
```

1           All right, ladies and gentlemen, I'm going to let you
2    go for a break.  Some of you need it.
3           However, when you go, there are three things you need
4    to know:  First, you need to line up outside in 15 minutes when
5    we're ready to let you back in.  Kathleen will bring you back
6    in.  You're to sit in the same chairs you're sitting in.
7           It may be that you will see attorneys or parties
8    outside in the hallway.  They are not going to talk to you, so
9    don't try and talk to them.  Don't be polite to them, because
10   they understand some -- and they're not trying to be rude to
11   you, but they understand something that you need to understand,
12   which is in a law case, lawyers and parties only speak to the
13   jury here in open court when I am present and court is
14   convened.  Otherwise, they're not allowed to speak to you
15   because it looks like they might be -- because it gives an
16   appearance that they might be trying to influence you, and
17   they're not trying to influence you.  So they're just not going
18   to speak to you, and I'll ask you not to speak to them.
19          Finally, when I seat the actual jury in this action,
20   I'm going to instruct them they shouldn't even discuss this
21   case with each other until they've heard all the evidence at
22   the end of trial.  That's when they begin to discuss the case.
23   So if they can't begin to discuss the case until they've heard
24   all the evidence, you shouldn't begin to discuss this case with
25   each other when you've heard none.

1           So don't discuss this case among yourselves, do not

2     approach the parties or their attorneys.  Please remember to

3     return to your seats when you come back in 15 minutes.

4           Thank you.

5           Leave your headsets, if you have one.

6              (Jury leaves the courtroom at 10:32 a.m.)

7           THE COURT:  Ms. Weidner?

8           MS. WEIDNER:  Yes.

9           THE COURT:  Do you want to approach with your

10    investigator?  With your investigator.

11          Do you want to approach too, Government, please.

12        (At sidebar on the record.)

13          UNIDENTIFIED MAN:  Good morning.

14          THE COURT:  Good morning.

15          When we have a jury panel that is sitting as close to

16    the audience as they are, I cannot have discussion about this

17    case or anything else that's distracting between you, sir, or

18    anybody else in the audience.

19          UNIDENTIFIED MAN:  Judge, I hear what you're saying.

20    And I think that -- I've been doing this 37 years.  What she

21    thinks she heard me say, I don't know where she gets that from.

22    Some people there asked -- maybe the comment, I was talking

23    about something, but, no --

24          THE COURT:  All right.  Well, we're hypersensitive.  I

25    admit that.

1          UNIDENTIFIED MAN:  I've been doing this 37 years.

2          THE COURT:  All right.

3          UNIDENTIFIED MAN:  Okay.  So --

4          THE COURT:  I'm just indicating what the rule is, and

5    if -- if there is any, you know -- with all due respect, I've

6    got marshals in this room, and if they tell me people are

7    talking about the case, then I feel like I've got to issue a

8    warning.

9          UNIDENTIFIED MAN:  Sure.  I don't even know those

10   people, any of them back there.  I don't even know.  I never

11   met them before.

12         THE COURT:  It might be better if you actually came

13   back to counsel --

14         UNIDENTIFIED MAN:  I didn't come with a tie.  I didn't

15   come with a tie.  I was getting clothes this morning --

16         THE COURT:  I appreciate your desire to be courteous

17   to the Court.

18         UNIDENTIFIED MAN:  Yes, yes.

19         THE COURT:  I'll make an exception today.  And you can

20   put a tie on tomorrow if you're going to sit there.

21         Do we have any challenges for cause?

22         MR. RESTAINO:  No.

23         THE COURT:  Do you want me to go back to the bench?

24         MR. RESTAINO:  Yeah.

25      (End of discussion at sidebar.)

```
1              THE COURT:  Do we have any challenges for cause?

2              MR. RESTAINO:  Yes, Your Honor.

3              THE COURT:  Let's take them.

4              MR. RESTAINO:  3, Your Honor.

5              THE COURT:  Ms. Weidner, any objection?

6              MS. WEIDNER:  Yes, Your Honor.  I think that the Court

7    rehabilitated sufficiently.

8              THE COURT:  I don't think so.  Juror number 3 is

9    dismissed for cause.

10             MR. RESTAINO:  I don't know if we're there yet, but

11   17, Your Honor.

12             THE COURT:  Ms. Weidner?

13             MS. WEIDNER:  Your Honor, I -- I agree with the first

14   statement that the government made.  I don't think we're there

15   yet.  He -- he voiced some concerns.

16             THE COURT:  I agree.  So let's just wait and see.

17             Anybody else?

18             MR. RESTAINO:  In fairness, Judge, we would say 29

19   might be there.  I certainly wouldn't mind being overruled by

20   Ms. Weidner on that one.

21             THE COURT:  Ms. Weidner?

22             MS. WEIDNER:  Your Honor, I -- no objection to

23   dismissal of juror 29 for cause.

24             THE COURT:  All right.  Juror number 3, juror number

25   29, are dismissed for cause.  Anybody else?
```

1    MR. RESTAINO:  61, Your Honor.

2    THE COURT:  Ms. Weidner?

3    MS. WEIDNER:  Your Honor, I don't -- I understand the

4    government's concern.  I don't think that we're there yet.

5    THE COURT:  Well, if you want to question him, I'll

6    let you question him.  But I do think he said he didn't think

7    he could overcome his feelings.  And that's what my note is.

8    So if you want to question him before I dismiss him, I'll let

9    you.  But I do have concerns about him, as well.

10    MS. WEIDNER:  Your Honor, I would like to have the

11    opportunity to question him before he's dismissed.

12    THE COURT:  All right.

13    Anyone else?

14    MR. RESTAINO:  Nothing from the government, Your

15    Honor.

16    THE COURT:  Ms. Weidner, anyone from you at this

17    point?

18    MS. WEIDNER:  Yes, Your Honor.

19    Your Honor, I think for the same reasons that 29

20    was -- that the government raised 29, we raise 58.  This was

21    the juror who said that she had a brother, cousin, and husband,

22    as well as most of her husband's family, involved in law

23    enforcement, and that she identified strongly with law

24    enforcement.

25    MR. RESTAINO:  Judge, we didn't hear the same thing as

1    with 29 though, where there was hesitation as to whether she

2    could overcome that.

3            THE COURT:  Well, my notes say that she's not sure she

4    could put her feelings aside, even if I asked her to do it.  So

5    again, I'll give you the opportunity to question her, if you

6    want it, but I -- as with juror number 61, I have some doubts

7    about that.

8            MR. RESTAINO:  If we can reserve that right, Your

9    Honor.

10           THE COURT:  All right.

11           MS. WEIDNER:  Your Honor, if I could just -- 29 -- and

12   maybe the government -- 29 was actually a male.  That was the

13   gentleman who had tons of family that were involved in -- so it

14   wasn't -- the female is 58.  29 was the male who said he had,

15   you know, a family member who was a psychiatrist or

16   psychologist at the Atascadero place for the criminally insane

17   and a host of other connections.  And when this Court asked him

18   if he would be able to proceed fairly, he said "yes" in a

19   very -- pretty much like that.

20           And 58 is the female that has lots of law enforcement

21   in the family, and as -- I remember it as the Court provided

22   it.

23           MR. RESTAINO:  Do you want me to -- can we just take

24   29 back then if I got it wrong, Judge?  We'll defer to what you

25   want to do on that.

1          THE COURT:  Well, I mean, you both submitted to 29, so

2    I let 29 go.  My recollection is the same as Ms. Weidner's.  My

3    notes are too.

4          MR. RESTAINO:  We're fine on 58, Your Honor, then.

5          THE COURT:  You're fine with what?

6          MR. RESTAINO:  With dismissing 58.

7          THE COURT:  All right.  So number 3, number 29, and

8    number 58?

9          MR. RESTAINO:  Can you say that again, Your Honor?

10          THE COURT:  Number 3, number 29, and number 58,

11    dismissed for cause.

12          MR. RESTAINO:  Can I just have a moment to consult,

13    Your Honor?

14                    (Pause in proceedings.)

15          MR. RESTAINO:  Judge, I don't think we have had a

16    concern, in consulting with my colleagues, with 29.  If the

17    Court had an independent concern, I obviously defer to the

18    Court.

19          THE COURT:  Well, I didn't, because I recollect -- at

20    least my recollection at this point of juror 29's testimony is

21    the same as Ms. Weidner's --

22          MR. RESTAINO:  Okay.

23          THE COURT:  -- which he affirmatively stated he would

24    not have a problem.

25          MR. RESTAINO:  Right.  Then we would not like to have

1    29 dismissed for cause at this time.

2            THE COURT:  Ms. Weidner?

3            MS. WEIDNER:  Your Honor, I will leave that up to the

4    Court.

5            THE COURT:  All right.  Well, you can challenge 29

6    again, if you choose to do so.  But because I believe it was an

7    error on the government's part, I'm not going to strike 29, at

8    least at this point.

9            So who we've stricken for cause at this point is

10   number 3 and number 58; correct?

11           MS. WEIDNER:  That's my understanding, Your Honor.  I

12   think we're letting 29 stay, and then I -- the Court is going

13   to allow me to inquire of 61 before making a final decision.

14           THE COURT:  All right.

15           MS. WEIDNER:  Is that correct?

16           THE COURT:  Yes.

17           MR. RESTAINO:  That's what I have.

18           THE COURT:  And then 17, I didn't bring the challenge

19   for cause, at least at this point.

20           MS. WEIDNER:  Yes.

21           MR. RESTAINO:  Judge, can we be heard at sidebar again

22   to continue that discussion?

23           THE COURT:  Yes.

24        (At sidebar on the record.)

25           MR. RESTAINO:  Judge, this is Gary Restaino.  And just

| | |
|---|---|
| 1 | to -- the Court's done, I think, an admirable job of trying to |
| 2 | balance the spectators' rights to be here, as well.  Is there a |
| 3 | possibility of some kind of admonition to the spectators to not |
| 4 | speak about the case to the jurors, as well? |
| 5 | MS. WEIDNER:  No objection. |
| 6 | THE COURT:  Okay.  I'll do that. |
| 7 | MR. RESTAINO:  Thank you. |
| 8 | (End of discussion at sidebar.) |
| 9 | (Proceedings in recess at 10:42 a.m.) |
| 10 | (Jury enters the courtroom at 10:52 a.m.) |
| 11 | (Proceedings resume at 10:56 a.m.) |
| 12 | THE COURT:  Please be seated. |
| 13 | Just a few bookkeeping items before we resume. |
| 14 | We appreciate that when we select a jury, we have a |
| 15 | larger pool to select from than just in the jury box, and so we |
| 16 | do overflow into the audience. |
| 17 | When we overflow into the audience, it is very crucial |
| 18 | that members of the public who are here and have every right to |
| 19 | be here also not discuss this case or otherwise -- in any other |
| 20 | manner be disruptive during jury selection.  So I'd just ask |
| 21 | for the cooperation of those in attendance while we are |
| 22 | involved in this very important process of serving -- or of |
| 23 | selecting neutral and fair jurors.  Do not attempt in any way |
| 24 | to disrupt into that process. |
| 25 | Second.  Juror number 3, we thank you for your |

UNITED STATES DISTRICT COURT

```
 1    service, and excuse you.  You are free to go home.
 2              I do not believe we need to have him report to the
 3    jury office?
 4              COURTROOM DEPUTY:  Correct.
 5              THE COURT:  Juror number 58.  Similarly, we thank you
 6    and excuse you at this time.
 7              Some of the witnesses in this case will be employees
 8    of the Drug Enforcement Agency -- otherwise known as the DEA --
 9    the Scottsdale Police Department, the Department of Homeland
10    Security, or the Internal Revenue -- Revenue Service, and the
11    United States Postal Inspection Service.
12              Have any of you had any contact or experience with the
13    DEA, the Scottsdale Police Department, DHS -- meaning the
14    Department of Homeland Security -- HSI, IRS, or the United
15    States Postal Inspector, or any other law enforcement agency,
16    that would affect your ability to be a fair and impartial juror
17    in this case?
18              Okay.  I see no responses.
19              There will be witnesses called during this trial who
20    are members of law enforcement and who may have been in that
21    profession for a number of years.  Would any of you give
22    greater or lesser weight to their testimony solely because of
23    their employment and experience in law enforcement?
24              I see no responses.
25              Do any of you have strong feelings about the criminal
```

UNITED STATES DISTRICT COURT

1    justice system in this country, including feelings about

2    judges, lawyers, police officers, or other law enforcement

3    agents that would prevent you from giving either the United

4    States or the defendant a fair hearing in this matter?

5              PROSPECTIVE JUROR 61:  Juror 61.

6              Just from what I said earlier, Your Honor.

7              THE COURT:  All right.  Just that you had -- and if

8    you want to just restate that so I don't misstate it.  I

9    remember about your brother and the sentence he received,

10   and --

11             PROSPECTIVE JUROR 61:  Yes, yes.  So after the

12   sentencing, like I said, he had three children to raise, and he

13   got eight -- eight to 10 years.  And then after his case, he

14   was still on parole, and while he was on parole he was -- he

15   had two businesses and he was trying to take care of

16   everything, and they kind of still came after him a little bit.

17             THE COURT:  All right.  And for that reason, you do

18   not -- you have doubts about your ability to be a fair and

19   impartial juror?

20             PROSPECTIVE JUROR 61:  Yes.

21             THE COURT:  Thank you.

22             Anyone else?

23             Have you, a family member, or a close friend had any

24   negative experiences with the United States Government -- for

25   example, an Internal Revenues Service audit -- that would

1    affect your ability to be a fair and impartial juror in this

2    case?

3              I see no responses.

4              Have any of you or members of your family been a party

5    or a witness in any litigation, excluding divorce or child

6    custody cases, traffic cases, or will contests?  Have any of

7    you been a party or witness in any other kind of lawsuit?

8              PROSPECTIVE JUROR 35:  Juror number 35.

9              I've been an expert witness in a medical malpractice.

10             THE COURT:  All right.  So you're a healthcare

11   provider?

12             PROSPECTIVE JUROR 35:  Yes, sir.

13             THE COURT:  One time, or several times?

14             PROSPECTIVE JUROR 35:  Once.

15             THE COURT:  By that I mean, how many times have you

16   been an expert witness?

17             PROSPECTIVE JUROR 35:  Oh, just once.

18             THE COURT:  All right.  Was there anything about that

19   experience that would prevent you from being fair and impartial

20   in this case?

21             PROSPECTIVE JUROR 35:  No, sir.

22             THE COURT:  Thank you.

23             Do you or any close members of your family have legal

24   training?  Any lawyers?

25             Okay.

1      PROSPECTIVE JUROR 11:  Juror number -- juror number

2  11.

3      I have several cousins and family members who are

4  attorneys.

5      THE COURT:  All right.

6      PROSPECTIVE JUROR 11:  My father-in-law was an

7  attorney.

8      THE COURT:  Any of them practice in Arizona?

9      PROSPECTIVE JUROR 11:  No, sir.

10      THE COURT:  Any of them practice criminal law?

11      PROSPECTIVE JUROR 11:  No, sir.

12      THE COURT:  Do you think that anything about your

13  relationship with them would affect your ability to be fair and

14  impartial?

15      PROSPECTIVE JUROR 11:  No, sir.

16      THE COURT:  Thank you.

17      PROSPECTIVE JUROR 30:  Juror number 30.

18      My brother is a lawyer in Chicago, and my uncle is a

19  judge in Wisconsin.

20      THE COURT:  All right.  Is there anything about

21  their -- your relationship with either of them that would

22  affect your ability to be fair to all the parties here?

23      PROSPECTIVE JUROR 30:  No.

24      THE COURT:  Thank you.

25      PROSPECTIVE JUROR 41:  Juror number 41.

UNITED STATES DISTRICT COURT

```
 1              My sister is an attorney in Northern Virginia, working
 2    for the CPSC.
 3              THE COURT:  What's the CPSC?  I'm sorry.
 4              PROSPECTIVE JUROR 41:  Oh.  Consumer Product Safety
 5    Commission.  Sorry.
 6              THE COURT:  Thank you very much.
 7              Anything about that that you think would affect your
 8    ability to be fair and impartial in this case?
 9              PROSPECTIVE JUROR 41:  No, sir.
10              THE COURT:  Thank you.
11              PROSPECTIVE JUROR 55:  Juror 55.
12              I am a member of the state bar of Arizona.
13              THE COURT:  Do you practice law?
14              PROSPECTIVE JUROR 55:  Yes.
15              THE COURT:  Do you practice -- is your practice
16    criminal or civil?
17              PROSPECTIVE JUROR 55:  Civil.
18              THE COURT:  Is there anything about your training that
19    you think would affect your ability to be fair and impartial if
20    asked to serve as a juror in this case?
21              PROSPECTIVE JUROR 55:  No.
22              THE COURT:  You understand that I will instruct the
23    jury on what the law is at the end of the case.
24              PROSPECTIVE JUROR 55:  Yes, Your Honor.
25              THE COURT:  Would you be willing to accept that law,
```

1    whether you agree with it or not?

2              PROSPECTIVE JUROR 55:  Yes, Your Honor.

3              THE COURT:  You also understand -- I suspect you

4    understand, but I'm going to state it anyway -- that the

5    parties in this case, both parties, have a right to have this

6    case decided based only on the facts and the evidence that they

7    hear in court, and only on the law that I instruct the jurors

8    as to.  So if you were to get back there, and you would

9    understand that it would be inappropriate for you to opine on

10   matters of the law that were in addition to my instructions.

11   You understand that?

12             PROSPECTIVE JUROR 55:  Yes.

13             THE COURT:  Or that would attempt to clarify my

14   instructions.  Do you understand that?

15             PROSPECTIVE JUROR 55:  Yes.

16             THE COURT:  All right.  Thank you.

17             Anyone else?

18             Do you own or have you ever owned or purchased a

19   virtual currency such as Bitcoin, or do you know anyone else

20   who has owned or purchased it?

21             Okay.

22             PROSPECTIVE JUROR 9:  Juror number 9.

23             My son owns a lot of cryptocurrency, and I don't know

24   if in particular Bitcoin, but he does have -- and actually he

25   gave some to my other son, so they do.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.  Is there anything about your sons'
 2    ownership of cryptocurrency that you think would have any
 3    effect on your ability to be a neutral and a fair juror in this
 4    matter?
 5              PROSPECTIVE JUROR 9:  No.
 6              THE COURT:  Thank you.
 7              PROSPECTIVE JUROR 5:  Juror number 5.
 8              My son-in-law has dabbled in it.  I don't know much
 9    about it, but I distrust it.
10              THE COURT:  All right.  Well, let me ask you about
11    that.  I mean, when you say you distrust it, do you mean you
12    distrust it as an investment?
13              PROSPECTIVE JUROR 5:  Uh-huh.
14              THE COURT:  Do you believe that because you distrust
15    it as an investment, that would affect your ability to be a
16    neutral and a fair juror in this case?
17              PROSPECTIVE JUROR 5:  I have no idea.  I've just
18    recently been hearing news reports and what they report about
19    it.  I have no -- no in-depth knowledge at all.
20              THE COURT:  All right.  Well, you --
21              PROSPECTIVE JUROR 5:  But I just naturally distrust
22    it.
23              THE COURT:  All right.  Well, let me explore that with
24    you some more.
25              You understand that when I talk about deciding the
```

1    case based only on facts and evidence you hear in court, one of

2    the things I mean -- and you've given me a good example to

3    instruct the rest of the jury, so thank you very much -- one of

4    the things I mean to say is, you're not to take into account

5    what you hear -- have heard from newspaper or other sources in

6    deciding this case.  And so it's natural, perhaps, that after

7    you hear and read those stories, you form opinions.  But to the

8    extent that they would bear on the guilt or the innocence of

9    the defendant, he is entitled to have a fair jury.

10             PROSPECTIVE JUROR 5:  Yes.

11             THE COURT:  And if you feel like you have formed

12   opinions about Bitcoin that might affect your view of his guilt

13   or innocence, that's kind of what I'm inquiring into.

14             Do you understand what I'm saying?

15             PROSPECTIVE JUROR 5:  Yes.  I would hope that I could

16   be impartial.  I distrust it, just like I do the stock market,

17   so...

18                  (Laughter in the courtroom.)

19             THE COURT:  Okay.  But you understand -- let me just

20   explore this with you a little bit further.

21             As with the stock market, you understand that it is

22   not illegal to own or even to trade in Bitcoin.

23             PROSPECTIVE JUROR 5:  Correct.

24             THE COURT:  All right.  And so given that fact, even

25   though you distrust it, you understand that owning it is not

```
1    illegal.
2              PROSPECTIVE JUROR 5:  I understand that.
3              THE COURT:  And purchasing it is not illegal.
4              PROSPECTIVE JUROR 5:  Yes.
5              THE COURT:  Do you have any concern about your ability
6    to be neutral and fair to the defendant?
7              PROSPECTIVE JUROR 5:  I don't think so.  I hope not.
8              THE COURT:  All right.  Well, I'm going to ask you one
9    more question.  When you say you "hope not," I'm sure that's
10   true, and we hope not too.  But what we really are charged
11   doing here is -- is seating a jury that can be neutral and
12   fair.  And so when I say to you, as I will, if you are selected
13   as a juror, you have to put all those other notions aside, and
14   you have to try this case based only on what you hear here.
15   Can you do that?
16             PROSPECTIVE JUROR 5:  I think I can.
17             THE COURT:  All right.  What I'm really looking for is
18   "yes" or "no."
19             PROSPECTIVE JUROR 5:  Yes.
20             THE COURT:  All right.  Thank you.
21             PROSPECTIVE JUROR 12:  Juror number 12.
22        I own some Bitcoin now.  Not a lot.  I have co-workers
23   that religiously follow it ever since its inception, so I am
24   aware of the process of data mining it and the trading.
25             THE COURT:  Let me ask.  You understand -- or at least
```

1    from what I've read you of the description of the case -- you

2    understand that this involved -- this case involved Bitcoin.

3              PROSPECTIVE JUROR 12:  Correct.

4              THE COURT:  Does -- does your ownership of Bitcoin or

5    your awareness of friends who are very aware of Bitcoin, does

6    any of that, do you have any concern, would affect your ability

7    to a neutral and fair juror here?

8              PROSPECTIVE JUROR 12:  Well, I'm pro-Bit -- virtual

9    currency, so I don't know that that plays a role in this.

10             THE COURT:  Well, when you say you're pro-virtual

11   currency, let me drill down.  Does that mean that you would be

12   in favor of the defendant because he traded in virtual

13   currency, or does it mean that you think that you could listen

14   fairly to determine whether or not the government meets its

15   burden of proof in the case to establish that he traded virtual

16   currency in a transaction that is otherwise illegal?

17             Now, that wasn't a super great question --

18             PROSPECTIVE JUROR 12:  Right.

19             THE COURT:  -- but did you understand --

20             PROSPECTIVE JUROR 12:  Yeah, I -- I'd be neutral to

21   the use of how Bitcoin was used.  So if it was used in an

22   illegal manner, then, yeah, then I would be neutral in hearing

23   both sides.

24             THE COURT:  Yeah.  But you'd be neutral, meaning

25   you're not going to presume one way or another.

1          PROSPECTIVE JUROR 12:  Correct.

2          THE COURT:  But just because Bitcoin is involved one

3     way or another isn't going to really affect your view about the

4     legality.

5          PROSPECTIVE JUROR 12:  Yeah.  To me it's just another

6     currency.

7          THE COURT:  All right.  Thank you, sir.

8          PROSPECTIVE JUROR 21:  Juror number 21.

9          My son invested in cryptocurrency.

10         THE COURT:  I'm sorry.  I didn't hear you.  You have a

11    very soft voice, and I don't have very good ears.  So could I

12    get you to repeat that, please.

13         PROSPECTIVE JUROR 21:  Juror 21, and my son is

14    investing in cryptocurrency.

15         THE COURT:  All right.  You've heard my discussion

16    with others.

17         PROSPECTIVE JUROR 21:  It would not affect my

18    listening to evidence.

19         THE COURT:  All right.  You think you could be neutral

20    and fair?

21         PROSPECTIVE JUROR 21:  Yes.

22         THE COURT:  Thank you.

23         PROSPECTIVE JUROR 24:  Juror 24, and I have a brother

24    who has been -- dabbled in some Bitcoin.  And I do not believe

25    that that will affect my judgment, and I feel I could be

UNITED STATES DISTRICT COURT

```
 1    neutral.
 2              THE COURT:  Thank you.
 3              PROSPECTIVE JUROR 37:  I'm juror number 37, and I have
 4    no understanding of Bitcoins.  I have an aunt that's 75, and
 5    she does Bitcoin mining.  I have several nieces and nephews
 6    that do Bitcoin, and I believe that through my aunt I may have
 7    something set up as ownership.  But I have no idea --
 8              THE COURT:  Okay.  So --
 9              PROSPECTIVE JUROR 37:  -- yeah, what the process is.
10              THE COURT:  I think if I understood what you just
11    said, you said you think that through your aunt you may
12    actually, yourself, be the owner of Bitcoin, or have the rights
13    to some Bitcoin.  Is that correct?
14              PROSPECTIVE JUROR 37:  Right, she -- correct.
15    Exactly.  Yes.
16              THE COURT:  But I think you also said you don't have
17    any understanding --
18              PROSPECTIVE JUROR 37:  I have no understanding of it,
19    so ...
20              THE COURT:  And do you have any concern about your
21    ability to be neutral and fair because this case involves
22    Bitcoin?
23              PROSPECTIVE JUROR 37:  Yes.  Because I have no
24    understanding of it.  They've tried to explain.  I don't get
25    it.
```

1          THE COURT:  Well --

2          PROSPECTIVE JUROR 37:  I don't understand it, so ...

3          THE COURT:  All right.  So if I can state your

4    concern, your concern isn't that you couldn't be neutral and

5    fair between the parties, your concern is that you don't

6    understand what Bitcoin is.

7          PROSPECTIVE JUROR 37:  Right.  I don't understand.  I

8    can be fair, but I just don't understand.  I haven't seen it as

9    a negative effect.

10          THE COURT:  Right.

11          PROSPECTIVE JUROR 37:  I'm not sure exactly what it is

12   or how it operates.

13          THE COURT:  Well, can I share with you, ma'am, that to

14   some extent, you're no more ignorant than everybody else in the

15   jury pool about what Bitcoin is.  And to the extent that it has

16   relevance to whether or not the defendant did with -- what he's

17   charged to do, it will be the government's burden to educate

18   you during the course of this trial about what it is.  And to

19   some extent, should the defense choose to -- and the defense

20   doesn't have any obligation to put on any evidence -- but the

21   defense might also offer evidence about what Bitcoin is or

22   isn't.

23          So do you have any concern about your ability to

24   learn, be open-minded and learn what Bitcoin is?

25          PROSPECTIVE JUROR 37:  Hopefully they can explain it

| | |
|---|---|
| 1 | better than the rest of my family, because I just don't have a |
| 2 | grasp of it. |
| 3 | THE COURT:  All right. |
| 4 | PROSPECTIVE JUROR 37:  Unless it's tangible, I just |
| 5 | don't get it. |
| 6 | THE COURT:  Well, again, I don't think you're that |
| 7 | different than probably other members of the jury pool.  But -- |
| 8 | but -- thank you, ma'am. |
| 9 | PROSPECTIVE JUROR 35:  Juror number 35. |
| 10 | I also have a son and friends that are involved with |
| 11 | Bitcoin.  I, like the others, don't have -- little to no |
| 12 | knowledge how it all works, and I feel like I can be neutral |
| 13 | and fair. |
| 14 | THE COURT:  Thank you. |
| 15 | PROSPECTIVE JUROR 50:  Juror number 50. |
| 16 | I own, like, 35.10 thousandths of one Bitcoin, but I'm |
| 17 | also on the board of directors for a company that's looking for |
| 18 | blockchain technology for secured voter verification and |
| 19 | election integrity technology. |
| 20 | THE COURT:  Does -- do either of those things cause |
| 21 | you any concern about your ability to be a neutral juror? |
| 22 | PROSPECTIVE JUROR 50:  Nope. |
| 23 | THE COURT:  All right.  Thank you. |
| 24 | Anyone else? |
| 25 | PROSPECTIVE JUROR 66:  Juror 66. |

1          I have some friends that chase a variety of the

2    cryptocurrencies.  I don't -- I -- I believe that it's a

3    garbage, you know, thing, so I don't know if that would be

4    anything...

5          THE COURT:  Well, you have to help us out a little bit

6    with that.  So maybe -- maybe I could ask you a question or two

7    that would help you frame that.

8          PROSPECTIVE JUROR 66:  Sure.

9          THE COURT:  Your own view about the value of Bitcoin

10   is only relevant to the extent that you think it might unfairly

11   affect your ability -- your views about the guilt or innocence

12   of the defendant.  As we've already said, it is no crime to own

13   Bitcoin.

14         PROSPECTIVE JUROR 66:  I understand.

15         THE COURT:  It is no crime to trade in Bitcoin.  And

16   everybody, all of us, can have different views about the value

17   of Bitcoin or the advisability of investing in it.

18         What I'm trying -- and simply because you think

19   Bitcoin may be a poor investment doesn't mean you can't be a

20   fair juror in this case.

21         Do you understand the distinction?

22         PROSPECTIVE JUROR 66:  Yes.

23         THE COURT:  Do you have any concern that you wouldn't

24   be able to be a fair juror in this case because of your views

25   about the legitimacy of Bitcoin as an investment?

1          PROSPECTIVE JUROR 66:  I -- I suppose only in how it

2    was shown in the case, that --

3          THE COURT:  In other words, you'd have to rely on the

4    evidence that's shown you here in court.

5          PROSPECTIVE JUROR 66:  Yes, yes.

6          THE COURT:  And are you willing to do that?

7          PROSPECTIVE JUROR 66:  Yes.

8          THE COURT:  Thank you, sir.

9          Anyone else?

10         Have any of you ever used encrypted messaging

11   applications or software, or do you have -- do you know -- are

12   you close with someone who has used it?

13         PROSPECTIVE JUROR 5:  I'm retired Department of

14   Defense, worked in IT for many years, and the data is encrypted

15   there for the medical record.

16         THE COURT:  Is there anything about that that you

17   think would affect you one way or another if you were asked to

18   serve as a juror here?

19         PROSPECTIVE JUROR 5:  No.

20         THE COURT:  Thank you.

21         PROSPECTIVE JUROR 7:  Juror 7.

22         I have an IPVanish tool and encrypted messaging

23   technology for general privacy and security from hacking.  I

24   don't think it would affect me to be impartial.

25         THE COURT:  In other words, you still think you can be

1    impartial?

2            PROSPECTIVE JUROR 7:  Correct.

3            THE COURT:  Thank you.

4            PROSPECTIVE JUROR 12:  Juror 12.

5            Software engineer, so we use it for software to do

6    some data encryption.

7            THE COURT:  Do you have any concern about that posing

8    any difficulty for you to be impartial?

9            PROSPECTIVE JUROR 12:  No.

10           THE COURT:  Thank you.

11           PROSPECTIVE JUROR 55:  Juror 55.

12           I've used numerous encrypted email programs as part of

13   my practice.

14           THE COURT:  Do you have any concern about that posing

15   any challenge to your impartiality in this case?

16           PROSPECTIVE JUROR 55:  I do not.

17           THE COURT:  Thank you.

18           PROSPECTIVE JUROR 50:  Juror 50.

19           I use encryption software for data protection and

20   protection of client confidentiality and intellectual property,

21   but I don't see how that would have any impact on my ability to

22   remain impartial.

23           THE COURT:  Thank you.

24           Do any of you have any experience, training, or

25   education --

```
1               LAW CLERK:  Excuse me.
2               THE COURT:  Oh, I'm sorry.  Jumped the gun.
3               PROSPECTIVE JUROR 47:  Juror 47.
4               Similar to the others, I use encrypted software for my
5       emails.
6               THE COURT:  Anything about that that you have any
7       concern would cause you to be less than impartial?
8               PROSPECTIVE JUROR 47:  No, sir.
9               THE COURT:  All right.
10              Do any of you have any experience, training, or
11      education in financial regulations or financial services?
12              PROSPECTIVE JUROR 13:  I'm juror number 13.
13              I'm a mortgage loan officer, so -- excuse me -- we
14      have training every year for money laundering, all the aspects
15      that go behind there of -- of lending correctly.
16              THE COURT:  All right.  Is there anything about that
17      you think would cause you any difficulty or would affect your
18      deliberations in this case if you were asked to serve as a
19      juror?
20              PROSPECTIVE JUROR 13:  I would have to say probably
21      yes because I am upfront and honest.  And even going with the
22      law, you know, I -- I try to think of the -- the logic.  And if
23      I had a customer come in and --
24              THE COURT:  Well, just -- just -- if I could ask you a
25      question or two.
```

1          PROSPECTIVE JUROR 13:  Okay.

2          THE COURT:  Thank you.  I didn't mean to be rude, but

3   I --

4          PROSPECTIVE JUROR 13:  Oh, no, it's okay.

5          THE COURT:  You understand that I'll be giving the

6   legal -- the instructions as to the law at the end of the case.

7          PROSPECTIVE JUROR 13:  Uh-huh.

8          THE COURT:  Do you have any problem following those

9   instructions?

10          PROSPECTIVE JUROR 13:  No.  But, I mean, I still have

11   the stuff still in the back of my mind, all the stuff that I...

12          THE COURT:  Right.  And you understand that I would

13   tell you you've got to put that aside.

14          PROSPECTIVE JUROR 13:  I do.

15          THE COURT:  But you're just telling me you don't think

16   you could put that aside.

17          PROSPECTIVE JUROR 13:  Probably not, because of doing

18   stuff day in and day out and knowing what I believe in my mind.

19          THE COURT:  Okay.  Thank you.

20          PROSPECTIVE JUROR 29:  Juror number 29, and I received

21   regular training while I was still working on a maximum amount

22   that -- for a legal transaction before it's reported to the

23   government, specifically what it was designed to do is to make

24   sure they're notified of anything over $10,000.

25          THE COURT:  Right.  But you understand that I'll give

1    instructions about what the law is.

2           PROSPECTIVE JUROR 29:  So it shouldn't be an issue, I

3    don't think.

4           THE COURT:  You think you can be neutral and fair?

5           PROSPECTIVE JUROR 29:  Yes.

6           THE COURT:  Thank you.

7           PROSPECTIVE JUROR 46:  Juror number 46.

8           I am a senior underwriter for a commercial lines

9    insurance company, and it is my job to look at applications and

10   detect if they are fraudulent or not using Experian.  And I

11   also have to go through fraudulent training every year.  I do

12   not feel that I would be impartial.

13          THE COURT:  Well, I want to understand what you just

14   said.  You have training about how to detect fraud in insurance

15   applications or other applications for benefits.

16          PROSPECTIVE JUROR 46:  Yes, per the state of

17   California because our company is a national underwriting

18   company.

19          THE COURT:  You believe that because you have that

20   training, for some reason you would not be able to be impartial

21   in this case.

22          PROSPECTIVE JUROR 46:  No.

23          THE COURT:  You understand that I would instruct you

24   that you were to put that -- to the extent you felt that

25   training reflected on this lawsuit, you would be required to

1   put that aside.

2        PROSPECTIVE JUROR 46:  Correct.

3        THE COURT:  Do you have think you could do that?

4        PROSPECTIVE JUROR 46:  I could, based on the evidence,

5   and make my decision from there.

6        THE COURT:  All right.  So you think you could decide

7   this case.

8        I'm not sure that I'm understanding what you're

9   telling me.  Do you think you could be neutral in deciding this

10  case between the parties?

11       PROSPECTIVE JUROR 46:  Yes.

12       THE COURT:  And do you think you could be fair?

13       PROSPECTIVE JUROR 46:  Based on the evidence?

14  Depends.

15       THE COURT:  Yes.  And decide the case only on evidence

16  you hear here.

17       PROSPECTIVE JUROR 46:  Correct.

18       THE COURT:  Thank you, ma'am.

19       PROSPECTIVE JUROR 54:  I'm juror 54, and I currently

20  am employed as a financial adviser.

21       THE COURT:  All right.  Is there anything about that

22  that you have a concern would affect your deliberations in this

23  case in a way that wouldn't be fair to the parties?

24       PROSPECTIVE JUROR 54:  No.

25       THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

1              PROSPECTIVE JUROR 9:  Juror number 9, and I'm a

2     comptroller of an engineering firm.

3              THE COURT:  All right.  Anything about that that you

4     think would make you be less than fair to the parties?

5              PROSPECTIVE JUROR 9:  No.

6              THE COURT:  Thank you.

7              Any of you ever worked at a bank?

8              PROSPECTIVE JUROR 13:  Juror number 13.

9              Yes.  I've worked directly in a bank and in a

10    corporate office of the bank.

11             THE COURT:  In what capacity?

12             PROSPECTIVE JUROR 13:  Mortgage loan officer.

13             THE COURT:  Okay.  So the same issues that we've

14    already talked about.

15             PROSPECTIVE JUROR 13:  (Nods head in the affirmative.)

16             THE COURT:  You need to answer verbally.

17             PROSPECTIVE JUROR 13:  Yes, yes.

18             THE COURT:  Is there anything else you wanted to add

19    to that?

20             PROSPECTIVE JUROR 13:  No.

21             THE COURT:  Thank you.

22             PROSPECTIVE JUROR 37:  Juror number 37, and I have

23    worked at banks in the capacity of tellers and service

24    assistants.

25             THE COURT:  What does a service assistant do?

1          PROSPECTIVE JUROR 37:  It's customer service, doing

2   some applications for lending.  Mostly helping people with

3   their initial sign-up, new sign-ups of accounts, and things

4   like that.

5          THE COURT:  Is there anything about that that you

6   think --

7          PROSPECTIVE JUROR 37:  No, not at all.

8          THE COURT:   -- might cause you concern about your

9   ability to be fair?

10          PROSPECTIVE JUROR 37:  No.

11          THE COURT:  Thank you.

12          Have any of you had a negative experience with a bank

13   that would affect your ability to fairly consider evidence

14   about banking rules and regulations?

15          I see no responses.

16          This is a sting case in which the defendant was

17   communicating with undercover law enforcement agents.  Do you

18   have any strong feelings about the use of stings or other

19   undercover activities that would prevent you from giving either

20   the United States or the defendant a fair hearing in this

21   matter?

22          All right.  I see no responses.

23          You are likely to hear that the defendant used a

24   nickname or pseudonym, Morpheus Detainia, in addition to his

25   legal name.  Will this information affect your ability to give

1      the defendant a fair hearing in this matter?

2              I see no responses.

3              You may have to listen to recorded statements in the

4      course of this case that include the use of profanity in

5      conversation by the defendant.  Will this information affect

6      your ability to give the defendant a fair hearing in this

7      matter?

8              I see no responses.

9              You may hear evidence that the defendant is generally

10     distrustful of government entities and institutions.  Will this

11     information affect your ability to give the defendant or the

12     government a fair hearing in this matter?

13             I see no responses.

14             You may hear evidence that references recreational

15     drug use in this case.  Do any of you have strong feelings

16     about recreational drug use that would make you unable to sit

17     as a juror in such a case?

18             Is there anything, in short, that would affect your --

19     about that information that would affect your ability to give

20     either the United States or the defendant a fair hearing in

21     this matter?

22             I see no responses.

23             If the United States meets its burden of proof under

24     the law, would you have difficulty finding a person guilty

25     because of your own personal beliefs or attitudes about a case

Case 2:17-cr-00585-GMS   Document 197   Filed 05/16/18   Page 85 of 217

85

1   of this nature, because of your sympathy for the defendant's

2   circumstances, or because it might otherwise be an unpleasant

3   task?

4           I see no responses.

5           If the United States does not meet its burden of proof

6   under the law, would you have difficulty finding a person not

7   guilty because of your own personal beliefs or attitudes about

8   a case of this nature, because of your sympathy for the

9   government or because it might otherwise be an unpleasant task?

10          I see no responses.

11          Do you have any other beliefs, experiences, feelings,

12  or other reasons that you feel would prevent you from fairly

13  deliberating in this case?

14          I will instruct you what the law is at the conclusion

15  of the case.  If selected as a juror, you will take an oath to

16  follow the law.  Does anyone think that they would have trouble

17  following the law, even if they disagree with it?

18          I see no responses.

19          In a civil case, the burden of proof is a

20  preponderance of the evidence.  That is not a civil case.  This

21  is a criminal case in which the government must prove guilt

22  beyond a reasonable doubt.  Does anyone have any difficulty in

23  holding the government to its burden?

24          Here are some fundamental principles of law:

25          Number 1:  The fact that an indictment has been filed

UNITED STATES DISTRICT COURT

raises no presumption whatsoever about the guilt of the
defendant.

Number 2:  The United States Government must satisfy
you beyond a reasonable doubt of the guilt of the defendant.

Number 3:  The defendant does not have any obligation
to testify or to produce any evidence, and you may not draw an
adverse inference if the defendant chooses not to testify.

Number 4:  The defendant is presumed to be innocent
unless and until his guilt is established beyond a reasonable
doubt.

Number 5:  You must wait until all of the evidence has
been presented before making up your minds as to the innocence
or guilt of the defendant.

Does anyone believe that they would have any
difficulty following any of these principles of law I have just
outlined for you?

I see no responses.

Ladies and gentlemen, we recognize that jury service
is probably an inconvenience for you.  It takes away from your
jobs and families, and disrupts your daily routine.

Many employers will reimburse you for your jury
service.  If you are a government employee, they're required by
law to reimburse you for your jury service at your full salary.
Some employers, however, do not reimburse you for your jury
service.  In those cases, this court pays the princely sum of

1    $40 a day for jury service, as well as transportation costs.

2            Jury service is one of the most important duties that

3    the citizens of this country can perform.  And for this reason,

4    from time to time, as I've told you, we ask, even require

5    citizens to make sacrifices and serve on juries even when it is

6    inconvenient to do so.

7            However, prospective jurors can be excused from jury

8    service if the length of the trial or the daily schedule would

9    impose undue hardship.  By "undue" hardship, I mean more than

10   inconvenience.  I mean genuine hardship that would be

11   experienced by you or by your family.

12           This case is expected to last eight days.  I can

13   not -- it may last not quite that long, but I can't be sure of

14   that.  Nor do I control how long you as a jury would choose to

15   deliberate on this case.

16           I do not conduct trial every day of the week.  As I

17   told you, I do have other criminal matters, although I

18   overestimated that amount when I previously told you.  And I

19   have other civil matters which require that I take some time

20   during the days of the week.  But I expect to conduct trial on

21   these dates and at these times.  We will conduct trial for the

22   rest of the day after the jury is selected.  We will conduct

23   trial tomorrow, and we will conduct trial on Thursday.

24           Friday, we will not conduct trial.  Saturday and

25   Sunday, of course, are the weekend.  Monday, I have other

UNITED STATES DISTRICT COURT

1    matters.  So we will conduct trial Tuesday, Wednesday, and

2    Thursday of this week, Tuesday, Wednesday, and Thursday of next

3    week, and Tuesday and Wednesday, if necessary, of the following

4    week.  That will give you two out of the five days that you can

5    resume your normal schedule.  But the three days in the midst

6    of the week would be reserved for trial.  So that makes

7    March 20th, 21st, and 22nd, March 27th, 28th, and 29th, and

8    April 3rd and 4th.

9            I generally begin trial at nine o'clock in the

10   morning.  We go until noon, with a 15-minute break in the

11   morning; we resume about 1:15 and go until five o'clock with a

12   15-minute break in the afternoon.

13           Would this schedule create an undue hardship for any

14   of you?

15           PROSPECTIVE JUROR 1:  Juror number 1.

16           I am the only licensed driver in my family, and I have

17   to take my wife and son to work and school during Tuesday,

18   Wednesday, and Thursdays.

19           THE COURT:  How far away is school?

20           PROSPECTIVE JUROR 1:  It is approximately two to three

21   miles away from our home, and my wife is walking distance from

22   our home.

23           THE COURT:  Your wife's work is walking distance?

24           PROSPECTIVE JUROR 1:  Yeah.

25           THE COURT:  Could you arrange to have someone else

take your son to school?  I mean, I think you could take your

son to school in the morning.  We don't start until

nine o'clock.

PROSPECTIVE JUROR 1:  His school starts at 9:00 a.m.

I can get him probably there before 8:00, but he has to be

picked up before five o'clock.

THE COURT:  Well, who picks him up now?

PROSPECTIVE JUROR 1:  I do.  Well, he's on spring

break with his mom right now until next week, Monday.

THE COURT:  Well, can you arrange to have someone else

pick him up?

PROSPECTIVE JUROR 1:  I can look for somebody, Your

Honor.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR 1:  Thank you.

PROSPECTIVE JUROR 2:  I'm juror number 2, and I live

about 200 miles from the courthouse, and it's difficult for me

as far as the finances to come and stay here for three days.

THE COURT:  Well, we do recognize that in this jury

district, because we pull from all over the state, some people

live far away.  We reimburse -- we would arrange for you to be

reimbursed for a hotel here, as well as transportation

expenses.  So -- I didn't explain that.  But you would be

reimbursed for your hotel.

Does that make it possible for you to serve?

1          PROSPECTIVE JUROR 2:  Um, I mean, I'd be able to be

2     away for two to four weeks to -- for my reimbursement to pay

3     for that and then wait for the money.

4          THE COURT:  I'm sorry.  What?

5          PROSPECTIVE JUROR 2:  I'm afraid I don't have the

6     money to cover for those expenses.

7          THE COURT:  Well, we can work that out, if that's the

8     only problem.

9          Do you live in the Yuma area, sir?

10         PROSPECTIVE JUROR 2:  No.  Payson, Arizona.

11         THE COURT:  Payson, Arizona?  That's not 200 miles

12    away, sir.  You'd still probably get your hotel.  That's only

13    60 miles away; right?

14         PROSPECTIVE JUROR 2:  Well, it's actually more than

15    that.

16         THE COURT:  Well, I've driven it quite a few times.

17    It may be more than 60, but it's not 200; right?

18         PROSPECTIVE JUROR 2:  Back and forth.

19         THE COURT:  Thank you, sir.

20         PROSPECTIVE JUROR 2:  Thank you.

21         PROSPECTIVE JUROR 4:  Juror number 4.

22         I don't have a hardship, as long as we have breaks.  I

23    have a bad back.

24         THE COURT:  Listen, I'll tell you, I've got a bad back

25    too.

1          PROSPECTIVE JUROR 4:  Okay.

2          THE COURT:  And I was already going to tell you, you

3   may see me stand up and down through this trial, because I've

4   got to do it.

5          PROSPECTIVE JUROR 4:  Okay.

6          THE COURT:  And if I've got to do it, I let anybody

7   else who has to do it do the same.  So don't -- don't hesitate.

8          PROSPECTIVE JUROR 4:  Okay.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR 5:  I'm struggling with this because

11  my mom is under hospice.  She's 86, and I'm one of her

12  caregivers.  It would be difficult, but, I mean, if -- if -- if

13  you want me anyway, then we'll -- I'm give it my best shot.

14         THE COURT:  I appreciate it.  Can you make other

15  arrangements, do you think, for the few --

16         PROSPECTIVE JUROR 5:  We can.  Care -- caregivers are

17  expensive, but I can do some switching in the schedule.  It's

18  just that I won't be there with her.

19         THE COURT:  Well, I understand that emotional --

20         PROSPECTIVE JUROR 5:  Yeah.

21         THE COURT:   -- obligation, and I do recognize that as

22  an inconvenience.  But if you're willing to give it a try, we'd

23  appreciate that.

24         PROSPECTIVE JUROR 5:  Okay.  Thank you.

25         THE COURT:  Thank you.

1          PROSPECTIVE JUROR 14:  Hi.  Juror 14.

2          I'm one of two people in my company that travel three

3     weeks out of the month, which is why I offered to serve this

4     week because I knew I'd be home.  I have two trips booked the

5     next couple week after this.  Next week would not be impossible

6     to get out of, but the week after is part of our annual

7     retailer event that I'm counted on -- excuse me -- counted on

8     to be at, and that would create a hardship just within my

9     company itself, more than for me, because they do expect me to

10    be there.

11          THE COURT:  Where is that, your convention?

12          PROSPECTIVE JUROR 14:  It's in Chicago.

13          THE COURT:  And that's the third week?

14          PROSPECTIVE JUROR 14:  That would be that first week

15    of April.  Next week I'm in El Paso, but I could find a way out

16    of that.

17          THE COURT:  Okay.  Thank you, sir.

18          PROSPECTIVE JUROR 14:  Sure.

19          PROSPECTIVE JUROR 19:  Hi, I'm juror number 19, and I

20    work for a small charter school, which I can find a bus driver.

21    I'm a school bus driver for next week.  We're on spring break

22    this week.  But the first week in April we have AzMERITs, so we

23    have 500 kids that we're trying to get back and forth with

24    three bus drivers.  I have a sub bus driver, but I'm one of the

25    main ones, and I have another main one.  So we start AzMERITs

```
1    on April 4th and 5th and 6th.
2              THE COURT:  So on the third week, you start AzMERITs?
3              PROSPECTIVE JUROR 19:  Yes.
4              THE COURT:  And that would be your employer's problem,
5    not your problem.
6              PROSPECTIVE JUROR 19:  But I'm the bus driver, I'm the
7    head bus driver.  So I --
8              THE COURT:  I appreciate your sense of responsibility,
9    ma'am --
10             PROSPECTIVE JUROR 19:  Yeah.
11             THE COURT:  -- but it sounds to me like you would be
12   able to give them at least two weeks' warning.
13             PROSPECTIVE JUROR 19:  Yes, sir.
14             THE COURT:  Thank you.
15             PROSPECTIVE JUROR 19:  Thanks.
16             PROSPECTIVE JUROR 22:  I'm juror number 22.
17             We own a small business.  I'm the only employee, so
18   I -- it would be hard for me to shut down our company a couple
19   days a week.
20             THE COURT:  Thank you, sir.
21             PROSPECTIVE JUROR 24:  I have two issues.  One is I am
22   the main caregiver for my husband who has Alzheimer's.  And so
23   for me to be away all that time would be difficult.
24             And the second piece is, I just work part time out of
25   the house, and depend -- we depend on my income for that,
```

```
1   and -- for living expenses.  And so to take -- and I don't get
2   paid because I'm only working -- I'm on -- just a consultant.
3           THE COURT:  You can't pay yourself, basically.
4           PROSPECTIVE JUROR 24:  Unfortunately not.  I wish I
5   could.
6           THE COURT:  All right.  Thank you.
7           PROSPECTIVE JUROR 24:  Thank you.
8           PROSPECTIVE JUROR 26:  I'm juror 26.
9           Right now, I'm -- got a blood vessel that's busted in
10  my nostrils, and I got a balloon that's in my nose right now
11  that's keeping the blood from flowing down.  Tomorrow I go see
12  the surgeon or the specialist to find out what they're going to
13  do.  And I don't know what it's going to become for the rest of
14  the week, what I have to do or where I have to go to.
15          And I'm also on, like, painkillers, so I'm kind of,
16  like, not fully --
17          THE COURT:  With it?
18          PROSPECTIVE JUROR 26:  -- yeah, with it.  So that's my
19  point right now.
20          And it's hard to breathe, and I --
21          THE COURT:  So it's a matter of cauterizing a blood
22  vessel in your nose?
23          PROSPECTIVE JUROR 26:  Well, that they don't know
24  because the vessel is way back, and that's what they want to
25  look at to see if it's going to be even possible to do it.
```

UNITED STATES DISTRICT COURT

1        THE COURT:  What time is your appointment tomorrow?

2        PROSPECTIVE JUROR 26:  It's at 11:00.

3        THE COURT:  Okay.  Thank you, sir.

4        PROSPECTIVE JUROR 28:  Juror 28.

5        I have -- I'm a stay-home mom.  Four kids.  One of

6    the -- I had jury duty on March 7th already this month, and

7    then to have it again would be a lot for me to -- with my kids,

8    figuring that out.  I have two at home, and figuring out

9    babysitters and everything.  That would be a lot.

10        THE COURT:  Were you selected as a juror?

11        PROSPECTIVE JUROR 28:  I was not selected, but I went

12   down there for a day.

13        THE COURT:  Could you -- if you were asked to, could

14   you figure out a replacement?

15        PROSPECTIVE JUROR 28:  It would be really difficult.

16   My husband owns his own business, and he's helping out today.

17   He had already done that earlier this month.  And to do that

18   for that long would be really hard for our family.

19        THE COURT:  Really hard financially, or --

20        PROSPECTIVE JUROR 28:  Financially, and just the time,

21   like driving to school, picking up, and watching them during

22   the day.  It's hard finding people to be able to take them all

23   to their places.

24        THE COURT:  Thank you.

25        PROSPECTIVE JUROR 32:  Hi, I'm juror 32.

1          I manage a small office in San Diego, so I commute

2     back from Monday to Thursday every other week.  And next week

3     I'm scheduled to be back in San Diego.  But my only other

4     manager on-site is on vacation next week.  So it's a work

5     issue, but it's -- I already have all my flights and travel

6     arrangements.  I'd have to rearrange.

7          THE COURT:  Could you rearrange them?

8          PROSPECTIVE JUROR 32:  If need be, yeah, I would have

9     to.  Like you said, it's the employer's problem, but it is my

10    responsibility.

11         THE COURT:  Is there someone else who can manage the

12    office if you are here?

13         PROSPECTIVE JUROR 32:  No one that has the knowledge

14    of all the projects that we're doing, just the only other guy

15    is the one that's on vacation.  We're -- it's a start-up out

16    there, so we have limited staff out there.

17         THE COURT:  All right.  Thank you.

18         PROSPECTIVE JUROR 34:  Juror number 34.

19         I have two kids.  I have to take them to school.

20    Their mom works at night, and she can not make it in the

21    morning to drop them.  I cannot substitute any person.

22         And also I work part time.  The company I work is --

23    they give me a project to do, and if I miss that one, they are

24    not going to pay me or they are not going to give me any job.

25    So I have to keep in contact with them to keep working.

```
 1                THE COURT:  Thank you.

 2                What's the company you work for, sir?

 3                PROSPECTIVE JUROR 34:  It's called PH Structure.  It's

 4    a structure and engineering consulting firm.

 5                THE COURT:  Do you work for them part time?

 6                PROSPECTIVE JUROR 34:  Yes.

 7                THE COURT:  And have you asked them if they would

 8    reimburse you for jury service?

 9                PROSPECTIVE JUROR 34:  They don't have that benefit.

10    Yes, I do.  I talked to them yesterday.

11                THE COURT:  I'm sorry?

12                PROSPECTIVE JUROR 34:  Yes, I did, but they said no.

13                THE COURT:  And that would be the sort of financial

14    burden your family couldn't handle?

15                PROSPECTIVE JUROR 34:  Sure.  Yes.  Absolutely.

16                THE COURT:  Thank you.

17                PROSPECTIVE JUROR 33:  Juror number 33.

18                I recent -- we recently had one of our employees

19    leave, and I was moved up into that position.  And at the

20    present, I'm trying to learn the position and train a brand-new

21    employee for my old position.  So I would have to go in after

22    the trial each day and work probably three, four, five hours in

23    the evening during those days to get caught up on those things

24    that no one else can do at this point in time.  And I'm just

25    not sure how alert I would be during the trial.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Is the person who you replaced still in --
2   still in the employ of your employer?
3          PROSPECTIVE JUROR 33:  No, they are not.
4          THE COURT:  What's the position?
5          PROSPECTIVE JUROR 33:  I'm an accountant.
6          THE COURT:  Are there no other accountants that work
7   for your employer?
8          PROSPECTIVE JUROR 33:  Our CFO will be out of town for
9   the next two -- actually out of the country for the next couple
10  of weeks.  She could cover some of those duties, but the new
11  person is -- I'm still getting her acclimated to what the
12  duties are, so I'm spending a lot of time with her, as well as
13  learning my new, you know, my new duties.
14         THE COURT:  Well, is there any immediacy to it if you
15  had to put it off for two weeks?
16         PROSPECTIVE JUROR 33:  My duties?
17         THE COURT:  Training.
18         PROSPECTIVE JUROR 33:  Like, it's issuing checks, it's
19  working with our auditors which we have for loan requirements,
20  processing payroll, those type of things that no one else can
21  do at this point.
22         THE COURT:  Thank you.
23         PROSPECTIVE JUROR 33:  Thank you.
24         PROSPECTIVE JUROR 51:  Juror 51.
25         I'm a student, and so to miss that much school right

```
 1    before finals would be almost impossible.
 2              THE COURT:  What are you studying?
 3              PROSPECTIVE JUROR 51:  Nonprofit leadership and
 4    management.
 5              THE COURT:  What institution?
 6              PROSPECTIVE JUROR 51:  At Arizona State.
 7              THE COURT:  Good luck on finals.
 8              PROSPECTIVE JUROR 51:  Thanks.
 9              PROSPECTIVE JUROR 50:  Juror 50.
10              I had a work-related crisis that requires some
11    government reporting that has deadlines coming up in the next
12    couple of weeks that I had dropped on my lap essentially last
13    week.  So the number of work hours I'm putting in to try to get
14    everything taken care of while managing my typical workload is
15    pretty severe, and I -- I didn't know if this would constitute
16    a sufficient hardship or if I just have to not sleep, but that
17    is the alternative for the moment.  So...
18              THE COURT:  Well, what about if it got dumped on your
19    lap, can your employer dump it on somebody else's lap?
20                        (Laughter in the courtroom.)
21              PROSPECTIVE JUROR 50:  I cannot, actually.  But if I
22    have to not sleep, I would be willing to try.
23              THE COURT:  Thank you.
24              PROSPECTIVE JUROR 39:  I was just recently involved in
25    a -- two car accidents in less than three months, one in
```

1   November and one in February.  So I had my brother drive down

2   here with me because I'm not familiar with this area, and the

3   traffic is crazy.  It took us an hour-and-a-half to get here,

4   which isn't bad, but I don't know if he would be willing to

5   come with me every single day just because I have anxiety

6   driving.

7           THE COURT:  Do you live anywhere in the metropolitan

8   area?

9           PROSPECTIVE JUROR 39:  It's in Buckeye off of Watson.

10  There's not nearly any traffic like there is over here.

11  There's not one-ways or anything like that.

12          THE COURT:  Is there an express bus in from Buckeye?

13          PROSPECTIVE JUROR 39:  I think there's, like, a

14  shuttle, something down there.

15          THE COURT:  Are you willing to explore that and see if

16  that can get you in and out?

17          PROSPECTIVE JUROR 39:  If I had to.

18          And then the other thing is, I'm also a supervisor at

19  the -- at my job.  I already asked for today.  They don't pay.

20  She told me they would just be able to excuse it.  So I don't

21  know if $40 a day would be enough for me.

22          THE COURT:  Are you the sole income for your family?

23          PROSPECTIVE JUROR 39:  Not the sole, but I'm one of

24  the incomes.

25          THE COURT:  Well, let me just instruct you, and I

UNITED STATES DISTRICT COURT

1    don't mean to be threatening any employers, it is true that

2    employers don't have to reimburse you, but they cannot

3    terminate you or take adverse employment action against you

4    because you're seated on a jury.  It's against the law for them

5    to do that.  And if you need to inform them of that, please

6    tell them that I said so.

7                    (Laughter in the courtroom.)

8              THE COURT:  Thank you.

9              PROSPECTIVE JUROR 39:  Thank you.

10             PROSPECTIVE JUROR 25:  Juror 25.

11             I am currently a student at Midwestern, a pharmacy

12   student, and then I work nights at John C. Lincoln Hospital as

13   a pharmacist intern.

14             THE COURT:  Thank you.

15             PROSPECTIVE JUROR 42:  Juror number 42.

16             I'm a middle school language arts teacher, and we have

17   AzMERITS testing coming up in less than two weeks, so to miss

18   the test as well as two weeks of preparation would leave my

19   students underprepared for the state testing.

20             THE COURT:  What a nice example it would be about

21   fulfilling your civic responsibilities.

22                    (Laughter in the courtroom.)

23             PROSPECTIVE JUROR 42:  Thanks?

24             THE COURT:  Thank you.  Thank you.

25             PROSPECTIVE JUROR 44:  Juror number 44.

1          I'm having a hard time.  I have arthritis in both of

2     my knees, and sitting swells and inflame inflammation, so my

3     problem would be the sitting an extended amount of time.

4          THE COURT:  Well, let me ask, is there anything we

5     could do that would make it possible for you to serve?  For

6     example, you can stand anytime you want.  Would that help?

7          PROSPECTIVE JUROR 44:  If that's what I'd have to do,

8     I guess I'd try.

9          THE COURT:  Well --

10         PROSPECTIVE JUROR 44:  I use a cane.

11         THE COURT:  I don't want to put you through a torture

12    test.  But would it be possible and comfortable for you to

13    serve if we could -- I mean, we'd do anything we could to

14    accommodate you physically if there's anything we can do.  So

15    you could stand, you could sit, you could walk around as long

16    as you felt like you could pay attention to the testimony while

17    you were doing that.  Would that make it possible for you to

18    serve, or would it just still be too difficult?

19         PROSPECTIVE JUROR 44:  It would be still a little

20    difficult.

21         THE COURT:  All right.  Thank you.

22         PROSPECTIVE JUROR 44:  Thank you.

23         PROSPECTIVE JUROR 48:  So this is not -- sorry.  Juror

24    number 48.

25         I'm a bone marrow transplant physician at Phoenix

1    Children's, and I have responsibility --

2              THE COURT REPPORTER:  You're a?

3              THE COURT:  Bone marrow transplant.

4              PROSPECTIVE JUROR 48:  -- physician, and I have

5    responsibility to my patients that, yes, it is a financial

6    responsibility, but they're my patients and if I'm not there

7    for them, I think this is kind of a long period of a time to be

8    without -- for them to go without care.

9              Thank you.

10             THE COURT:  Well, wait a minute.

11             PROSPECTIVE JUROR 48:  Oh.

12             THE COURT:  You're a bone marrow transplant physician

13   at Phoenix Children's?

14             PROSPECTIVE JUROR 48:  Yes.

15             THE COURT:  Are you a surgeon; do you actually do the

16   surgery?

17             PROSPECTIVE JUROR 48:  Well, we're not surgeons, we

18   have -- we take care of the patients after because immune

19   compromised.

20             THE COURT:  Is there anyone who for those eight days

21   could take your place in rotations or rounds?

22             PROSPECTIVE JUROR 48:  It would be -- it's possible,

23   but it would be extremely difficult.  But it's possible.

24             THE COURT:  When you say "difficult," help me

25   understand why it would be difficult.

1          PROSPECTIVE JUROR 48:  It is the volume of patients

2     that we have.  There are three of us, and unfortunately one of

3     us is out, so just the two of us.  And so taking care of

4     patients, inpatient and outpatients.  And so, yes, they can get

5     someone to see those patients, but it will be -- it will be

6     very tough on them.

7          THE COURT:  What about the physician who is out; will

8     he or she be back?

9          PROSPECTIVE JUROR 48:  I don't know.  Within the eight

10    days? -- I'm sorry, within the three-weeks period, yeah, later

11    on, like maybe the next one -- in the next two weeks, yes,

12    they'll be back.

13         THE COURT:  Okay.  Thank you, sir.

14         PROSPECTIVE JUROR 48:  Thank you.

15         PROSPECTIVE JUROR 47:  Juror 47.

16         My wife will have cataract surgery on April 2nd.  And

17    she'll be convalescing on April 3rd, and then have a follow-up

18    cornea surgery on -- the following week.  But that is after the

19    period you were mentioning.  But we have no family to take care

20    of her or take her to the doctor, and she won't be able to

21    drive herself.  So she'd be relying on me.

22         THE COURT:  Well, I -- you have two weeks to make

23    other arrangements; right?

24         PROSPECTIVE JUROR 47:  We do.  But it takes a long

25    time to arrange these surgeries, so this is as soon as we could

UNITED STATES DISTRICT COURT

1  get it.  So it would be pushed off --

2         THE COURT:  I'm not suggesting you reschedule the

3  surgery, but it does seem to me that in two weeks' time you

4  could arrange to have an Uber take her there and pick her up

5  and take her back, couldn't you?

6         PROSPECTIVE JUROR 47:  Yes, we could have a friend do

7  it.  It is more than just driving, of course.  It is

8  convalescing and helping her at home.

9         THE COURT:  Let me give you a piece of advice that's

10  personal.  My wife had cataract surgery.  She didn't stay down

11  when the doctors told her to stay down.  She stood up and broke

12  her nose.  So tell your wife, stay down.

13                   (Laughter in the courtroom.)

14         PROSPECTIVE JUROR 47:  Thank you.

15         THE COURT:  And if you're here during the jury, tell

16  her I doubly said that.

17         PROSPECTIVE JUROR 47:  Thank you.

18         THE COURT:  Thank you.

19         Anyone else?

20         PROSPECTIVE JUROR 59:  Hi.  I'm juror 59.

21         I'm a home healthcare nurse.  I work six -- I think

22  about six out of the eight days, without having my phone open

23  to see the schedule.  I have a lot of patients that count on

24  me.  I do feel it would be a hardship for them if I'm not out

25  there because we're short-staffed at our company right now.

```
 1            THE COURT:  If need be, though --
 2            PROSPECTIVE JUROR 59:  If I have to.  That's going to
 3  be up to them, but I do feel it would be a hardship for them.
 4            THE COURT:  Appreciate it.  Thank you.
 5            PROSPECTIVE JUROR 64:  Juror 64.
 6            I was diagnosed with a kidney infection last week.
 7  I'm supposed to be drinking lots of water.  Kind of
 8  uncomfortable in this situation.
 9            Also, I -- I juggle quite a bit.  We have a
10  family-owned business that's very shorthanded right now.  I
11  also watch my granddaughter on Wednesday and Fridays, which
12  normally we have a lot of flexibility with that.  It's just
13  kind of a perfect storm where things are not quite as flexible
14  as they usually are.
15            THE COURT:  Well, let's see if we can address some of
16  it.
17            PROSPECTIVE JUROR 64:  All right.
18            THE COURT:  I get this nice little pitcher of water.
19  It gets refilled at every wake.
20            PROSPECTIVE JUROR 64:  Right.  Going in is not the
21  problem.
22                 (Laughter in the courtroom.)
23            THE COURT:  Well, I will tell you that if it would
24  help you serve, all you have to do is give me a signal and
25  we'll take a break.
```

UNITED STATES DISTRICT COURT

1          PROSPECTIVE JUROR 64:  All right.

2          THE COURT:  Is there any other reason that you

3     wouldn't be able to serve?

4          I realize that you've described some things that would

5     require some adjustment.  But didn't sound to me like they

6     would be -- it sounded to me kind of like an inconvenience, but

7     not necessarily undue hardship.

8          PROSPECTIVE JUROR 64:  I can go deeper into it, if you

9     would -- I wouldn't call them inconveniences.  We have a small

10    business.  We're very shorthanded.  I'm working there when I'm

11    not watching my grandchild or taking my grandchild there.  It's

12    just going to throw one more, you know, problem on top of

13    another.  She just started daycare about a month ago.  She's

14    come home with everything in the book.  She's been sick more

15    than she's been well.  Her mother has taken a lot of time off

16    already.  She's also -- generally can be flexible with it at

17    home and work from home.  She does nursing records and things

18    like that.  And until April 2nd, she's in training where she

19    can't be as flexible as she normally is.  And the other grandma

20    had shoulder surgery, so she cannot take up any slack because

21    she cannot pick her up.  It's just a number of things like

22    that.

23         THE COURT:  Thank you.

24         He's just invoking the right to stand.

25              (Laughter in the courtroom.)

1          THE COURT:  All right.  Thank you, ladies and

2     gentlemen.  We are --

3          LAW CLERK:  Oh.

4          PROSPECTIVE JUROR 8:  I'm juror number 8, and I'm from

5     Yuma.  And I don't have any transportation to drive around

6     here.  My wife brought me in.  And I'm also diabetic, and I

7     need to go to the restroom, just like right now, again.  Sorry.

8          THE COURT:  That's all right.  We're going to let you

9     go right now.

10          PROSPECTIVE JUROR 8:  Okay.

11          THE COURT:  I will tell you that we reimburse for

12     transport back and forth to Yuma when you go on the weekends,

13     and we reimburse for a hotel here.

14          PROSPECTIVE JUROR 8:  Yep.

15          THE COURT:  So hopefully that will take care of --

16          PROSPECTIVE JUROR 8:  I also have a severe cough, and

17     I haven't been able to sleep for two nights.

18          THE COURT:  Thank you, sir.

19          PROSPECTIVE JUROR 8:  Okay.

20          THE COURT:  We are going to take a noon break, ladies

21     and gentlemen.  We will ask you -- there is -- I will just tell

22     you there is kind of a snack booth that sells sandwiches

23     downstairs in this building.  There are -- most of the

24     restaurants go that way, and you don't have to go very far

25     until you run into restaurants, and you'll run into quite a few

| | |
|---|---|
| 1 | of them.  But if you could be back by 1:15 ready to go, we'd |
| 2 | appreciate it very much.  If you would wait outside, and again |
| 3 | you'll be shown back to your same seats. |
| 4 | Thank you. |
| 5 | COURTROOM DEPUTY:  All rise. |
| 6 | (Jury leaves the courtroom at 12:04 p.m.) |
| 7 | THE COURT:  Do you want to go to lunch, or do you want |
| 8 | to do anything else at this time? |
| 9 | MR. RESTAINO:  Whatever the Court prefers, Judge. |
| 10 | THE COURT:  Well, do you have more challenges for |
| 11 | cause?  Either party have challenges for cause, or do you want |
| 12 | to deal with the undue hardship cases? |
| 13 | MR. RESTAINO:  I suppose it wouldn't hurt to see what |
| 14 | the Court is going to excuse on undue hardships, Judge. |
| 15 | MS. WEIDNER:  I did not understand what the government |
| 16 | said. |
| 17 | MR. RESTAINO:  Your Honor, if the Court were inclined |
| 18 | to strike for undue hardship, it would help us to know that |
| 19 | sooner rather than later. |
| 20 | Did you want us to be heard on those as well? |
| 21 | THE COURT:  Sure. |
| 22 | I'll tell you the ones that I am inclined to consider, |
| 23 | if you're ready to review them.  And then if you have |
| 24 | additional ones that you would like to excuse, I'll hear you on |
| 25 | those as well. |

UNITED STATES DISTRICT COURT

1    Are you ready, Ms. Weidner, or would you rather do it

2    in an hour?

3    MS. WEIDNER:  Your Honor, if -- if the Court does want

4    to let us know about the hardship and -- and -- I have actually

5    a couple for cause that I wanted to bring to the Court's

6    attention.  I think that for both parties to start thinking

7    about peremptories, it would probably be good to go ahead and

8    do that.

9    THE COURT:  All right.

10   I'm inclined -- number 14 says he has to travel in the

11   third week in Chicago.  It's a small business.  There's only

12   two people.  They both have to be there the third week.  I'd

13   let him go.

14   Number 22 is a small business.  He's the sole

15   employee.  I would let him go.

16   Number 24, she has a husband who has Alzheimer's,

17   she's the sole support financially, and she is his sole

18   caregiver.  I would be inclined to let her go.

19   The guy with the nose problem who's got a physician's

20   appointment tomorrow at 11:00 o'clock, he doesn't know what

21   they're going to do, I would be inclined to let him go.

22   MS. WEIDNER:  What number was the gentleman with the

23   nose problem?

24   THE COURT:  26.

25   Number 34, she has two kids, part-time worker, can't

1   take the financial hit.  It's number 34.

2           Number 51, getting a degree as a student, full-time

3   student, getting a degree in nonprofit leadership.

4           Number 25 is also a pharmacy student who works

5   part-time.

6           Number 44 with the arthritic knees and said there's no

7   way that we could really help her serve that would be

8   physically possible.

9           Number 68, the bone marrow physician.

10          I would also consider, but I am not convinced, but I

11  would consider number 50, who had the work-related crisis

12  dropped on his lap.  He said he couldn't really reassign that

13  to somebody else, but he would be willing to try it, but he

14  wouldn't get much sleep.

15          Those would be the ones that I'd be inclined to strike

16  for hardship.

17          Any objections to those?  Are there any additions to

18  those?

19          MS. WEIDNER:  Your Honor, just for clarification, in

20  order, the Court said 14, 24, 25 --

21          THE COURT:  No, no.  14, 22 --

22          MS. WEIDNER:  Oh.

23          THE COURT:  -- 24, 26, 34, 51, 25, 44, 68.

24          MS. WEIDNER:  I thought we had 67 jurors, Your Honor.

25          MR. BINFORD:  Judge, I believe you're referring to 48,

```
 1   who is the physician.

 2              THE COURT:  Is it 48?  I had "68" down.

 3              MR. CAIN:  It's 48.

 4              MS. WEIDNER:  The physician at Children's is 48.

 5              THE COURT:  That's the one I meant.  So it would be

 6   44, 48.

 7              I would also consider, I said, number 50, who's

 8   work-related and had a pretty severe crisis, and number 28 who

 9   is the four kids stay-at-home mom.

10              Any objection?  Do you want me to consider any others?

11              MR. RESTAINO:  No objections, and nothing else to add

12   on those, Judge, including, I guess, 50 and 28.

13              THE COURT:  All right.

14              Ms. Weidner?

15              MS. WEIDNER:  Your Honor, no objection on those listed

16   by the Court.

17              I would also consider -- ask the Court to consider

18   number 64, the individual with the kidney infection.

19              THE COURT:  Any objection, Mr. Restaino, to adding 64?

20   She's the one --

21              MR. RESTAINO:  No, Your Honor.

22              THE COURT:  Okay.  So we'll add 64.

23              COURTROOM DEPUTY:  So those are all stricken?

24              THE COURT:  Yes.

25              COURTROOM DEPUTY:  Just want to make sure.
```

1          THE COURT:  Okay.  So, I'll read them again:  14, 22,

2     24, 26, 28, 34, 51, 50, 25, 44, and 48.

3          MR. RESTAINO:  And 64, Judge?

4          COURTROOM DEPUTY:  64.

5          THE COURT:  And 64.  Thank you.

6          MS. WEIDNER:  Your Honor, I thought that 33 had been

7     on the list.  She was the one -- the accountant where the CFO

8     was gone, and she was the only one who could do payroll.

9          THE COURT:  I didn't put her on my list.

10          MS. WEIDNER:  Oh.  Okay.

11          THE COURT:  Do you have any objections, Mr. --

12          MR. RESTAINO:  What's that, Judge?

13          THE COURT:  Well, I don't know whether you wanted 33,

14     or you just wanted clarification.

15          MS. WEIDNER:  Well, Your Honor, I had done my little

16     code for that, that I would want to consider her, and possibly

17     also 32, the individual who is supposed to be in San Diego

18     where the other manager is on vacation and he's booked the

19     travel.

20          MR. RESTAINO:  Neither of them from our standpoint,

21     Judge, were particularly elaborate in their rationales.

22          THE COURT:  I just didn't feel like they met the

23     standard.  I felt like they both could make accommodation.

24          MS. WEIDNER:  And, Your Honor, I guess I share the

25     Court's concern regarding 50.

1          THE COURT:  He's been dismissed.

2          MS. WEIDNER:  Okay.

3          THE COURT:  Correct?

4          MR. RESTAINO:  Correct, Your Honor.

5          THE COURT:  Any objection if we dismiss these as soon

6  as they come back from lunch?

7          MR. RESTAINO:  No objection, Judge.

8          MS. WEIDNER:  And, Your Honor, I apologize, but could

9  we just read through the list one more time?

10          THE COURT:  Sure.  I think that's a good idea.

11          COURTROOM DEPUTY:  Do you want to read it off my list

12  in numerical order?

13          THE COURT:  Yeah.  Go ahead.  You read them.

14          COURTROOM DEPUTY:  Okay.  So from the beginning, we

15  have 3, 14, 22, 24, 25, 26, 28, 34, 44, 48, 50, 51, 58, and 64.

16          MR. BINFORD:  Just for the record, 3 and 58 were both

17  struck for cause while the remaining were hardship?

18          THE COURT:  Hardship, correct.

19          Any objections to any of those at this point?

20          MR. RESTAINO:  No, Your Honor.

21          MS. WEIDNER:  Your Honor, the only one that the

22  defense would be interested in inquiring more of was 50.

23          MR. RESTAINO:  We'd probably put 28 on the list,

24  Judge, in that case, to examine a little more.

25          THE COURT:  So you don't care if she looks at 50?

1          MR. RESTAINO:  Well, no.  I'm saying if the defense is

2     going to pull 50, we might have some questions for 28.

3          THE COURT:  Well, let's make a call right now.  Do you

4     want -- do you want to question further 50 and 28?  Which you

5     can do?

6          MS. WEIDNER:  Your Honor, withdrawn.

7          MR. RESTAINO:  Withdrawn as well.

8          THE COURT:  Okay.  So 50 and 28 are dismissed.

9          MR. RESTAINO:  Did you want to hear cause strikes?

10          THE COURT:  Sure.

11          MR. RESTAINO:  Judge, I think I've got this one right

12     this time on one that is favorable to the defense.  Number 13,

13     we think likely is a for-cause strike.

14          MS. WEIDNER:  No objection.

15          THE COURT:  Number 13 is dismissed.

16          MR. RESTAINO:  And I would just re-urge 61 at this

17     point.  I don't want to take away Ms. Weidner's chance at

18     possible rehabilitation.  We just think it's gotten more

19     difficult.

20          THE COURT:  I do think it's gotten more difficult,

21     Ms. Weidner.  He made an effort to make it clear that he has an

22     anti-governmental bias.

23          MS. WEIDNER:  Your Honor, I -- I understand.  I -- I

24     guess my concern is I think that his experience was very

25     personal and specific to him.  And I'm wondering --

1    Mr. Costanzo is not his brother.  This is not an accidental

2    homicide case.  This is a very, very different situation.

3              THE COURT:  Well, if you want to question him, you

4    may.  It is going to be a pretty high bar, I would think.

5              MS. WEIDNER:  I understand.

6              Your Honor, is -- we would assert juror number 5 for

7    cause.  And I -- Your Honor, she was very equivocal in her

8    responses about whether or not she thought she could be fair.

9    And then on top of that, her responses regarding hardship, I

10   think, taking those two things in combination, the concerns

11   about her mother in hospice, being her caregiver, and also just

12   her very equivocal responses to the Court about whether or not

13   she could be fair.

14             MR. RESTAINO:  Judge, she distrusts the investment

15   aspect of Bitcoin.  We would disagree that her answers have

16   given rise to a for-cause challenge here.

17             THE COURT:  I didn't -- I didn't sense equivocation

18   about whether she could be fair.  I do think she was -- she was

19   pretty affirmative about thinking Bitcoin was not a very good

20   investment, but I did -- she's the one, I believe, that I made

21   the point that it was not illegal to invest or even trade in

22   Bitcoin.  And so if her concerns were about Bitcoin as an

23   investment, she understood that it was perfectly legal to make

24   bad investments.  She said she did, and she wouldn't hold that

25   against the defendant in any way.

1          So I -- I mean, you can question her further, if you

2     feel like you can establish bias.  I don't think it's there

3     yet.

4          Anything else?

5          MS. WEIDNER:  Nothing -- oh, can we have just a

6     moment, Your Honor?

7                    (Pause in proceedings.)

8          MS. WEIDNER:  Nothing further, Your Honor.  Defense is

9     done.

10          THE COURT:  All right.  See you at 1:15.

11          By the way, just to be sure, it is eight and 12.  I

12     did check that.  You get eight peremptories, you get 12,

13     because we're seating 15 jurors, three alternates.

14          I believe Carmel gave you both.

15          MR. BINFORD:  We have copies of the jury instructions.

16          THE COURT:  Take a look at it.  And if you've got

17     issues, let me know.

18          MR. BINFORD:  Great.

19                 (Proceedings in recess at 12:18 p.m.)

20                  (Proceedings resume at 1:18 p.m.)

21          THE COURT:  Please be seated.

22          All right.  Do we have issues?

23          MR. BINFORD:  Your Honor, we had an opportunity to

24     speak with Ms. Weidner and look at the proposed jury

25     instructions, and I think we have an agreement regarding those

UNITED STATES DISTRICT COURT

1    instructions.

2              THE COURT:  All right.

3              MR. BINFORD:  We would keep the first and second

4    sentences the same way you have them.  So it would say:

5              First:  The defendant conducted or attempted to

6    conduct a financial transaction.

7              Second:  The property involved in the transaction was

8    represented by an undercover law enforcement officer to be the

9    proceeds of specified unlawful activity.

10             We would add a third sentence there that would say:

11             Third, the defendant believed that the property was

12   the proceeds of specified unlawful activity.

13             And then it would say:

14             Fourth:  Either the defendant conducted the

15   transaction with the intent to avoid a transaction reporting

16   requirement under federal law, or the defendant conducted the

17   transaction with the intent to conceal or disguise the nature,

18   location, source, ownership, or control of the property.

19             Essentially what we did was take the bold at the end

20   and make sure that it applies to both ways of committing this

21   offense.

22             THE COURT:  Read me third and fourth again.

23             MR. BINFORD:  Third would say:  The defendant believed

24   that the property was the proceeds of specified unlawful

25   activity.

1        THE COURT:  And fourth?

2        MR. BINFORD:  Fourth:  Either the defendant conducted

3   the transaction with the intent to avoid a transaction

4   reporting requirement under federal law, or the defendant

5   conducted the transaction with the intent to conceal or

6   disguise the nature, location, source, ownership, or control of

7   the property.

8        THE COURT:  I'll look at that.  I think there may be a

9   problem with it, but I'll take a look at it.

10        MR. BINFORD:  Yes, Your Honor.

11        THE COURT:  It may not be a problem with it too.  If

12   I'm convinced there isn't, I won't worry about it.  I think

13   there may be, and I'm going to double-check it.  Still, I will

14   allow the government to present its own case.  I just want to

15   make sure we're not making a misstatement of law.

16        Anything else?

17        MR. RESTAINO:  Nothing from the government, Your

18   Honor.

19        MS. WEIDNER:  May I have just a moment, Your Honor?

20                (Pause in proceedings.)

21        MS. WEIDNER:  Your Honor, after consulting with the

22   government, we have agreed to dismiss, if it is okay with the

23   Court, both jurors 61 and 8.

24        THE COURT:  All right.

25        So, Kathleen, do you have those, 61 and 8?

1          COURTROOM DEPUTY:  Yes, Judge.

2          THE COURT:  I must confess that I read the statute

3    differently than you do, Mr. Binford.  But if you want to

4    stipulate and that's the instruction you want, and you've

5    stipulated to it with the defense, I'll let you have it.

6          MR. RESTAINO:  Judge, if I can, we think this is safer

7    for us on appeal on this case.  I also just wanted to make sure

8    that I was reading the tea leaves right, that at the end of the

9    day the instruction likely would not have the willfulness,

10   because when we talk about scienter, it is helpful to talk

11   about both aspects.

12         THE COURT:  I don't know what you mean, Mr. Restaino.

13   But it seems to me that what you've said is exactly the

14   opposite of what you've done.  But that's okay.  I'll let you

15   live with your own case.

16         MR. RESTAINO:  No, I appreciate that, Judge, and

17   that's why I want to make -- make sure of this.  We've always

18   thought of this as being two scienter requirements:  The belief

19   in the -- that the property was from an SUA, and the specific

20   intent to commit the money laundering.  It's the willfulness

21   instruction that most concerned us because that sets a higher

22   burden, most useful in tax cases.  It seemed as though the

23   Court were inclined to not give the specific intent and

24   willfully instruction at the end of the day.

25         THE COURT:  Let me tell you what my concern is here --

1    and maybe I misread the statute.  But it seems to me that you

2    can -- you can violate the statute either one of two ways:  Way

3    number one is to promote the carrying on of specified unlawful

4    activity and concealing or disguising the nature, location,

5    source, ownership, or control of property believed to be the

6    proceeds of specified unlawful activity.  That's one way you

7    can violate the statute.

8           Way number two is to avoid a transaction reporting

9    requirement under state or federal law.

10          The way you have it now, you have melanged those in a

11   way that is completely inseparable and requires a lot more

12   elements on option number 2.  But if that's the way you read

13   the statute, that's the way you read the statute.

14          MR. RESTAINO:  It -- it is possible that I am reading

15   the statute wrong, as I look at it again.

16          I really had thought that that belief applied to all

17   of the prongs.  But in looking at it again, I -- I -- I think

18   the Court is likely right, and I don't want to prejudice us

19   beyond proving the case.

20          THE COURT:  What about I simply don't give 1.2 at all?

21   It's not required.  And then that will give Ms. Weidner a

22   chance to look at what I've said, and it will give you a chance

23   to look at what I've said, and to re-read the statute.

24          MR. RESTAINO:  You'll still read the presumption of

25   innocence, just not the specifics of the elements of the

UNITED STATES DISTRICT COURT

1    offense.

2           THE COURT:  Correct.

3           MR. RESTAINO:  That would be fine with us, Judge, if

4    that's not required.

5           MS. WEIDNER:  Your Honor, we wouldn't object to that

6    either.  It's the position of the defense that this is a

7    specific-intent offense, and we've gone back and forth with the

8    government about how that should be incorporated in the jury

9    instructions.  But the legislative history is clear, and so

10   that is what we insist on being the mens rea for the statute

11   across the board.  It's what Congress said about how it wanted

12   to handle sting cases.

13          THE COURT:  Well, follow me, Ms. Weidner, so that

14   we're on the same page, and so that you can respond to me if

15   you think I've got it wrong.  And I'm not talking about a

16   separate mens rea requirement right now.  I'm just talking

17   about the statute.

18          The statute says:  Whoever with the intent, A, to

19   promote the carrying on of specified unlawful activity; B, to

20   conceal or disguise the nature, location, source, ownership, or

21   control of property believed to be the proceeds of specified

22   unlawful activity.  So that strikes me as one way you can

23   commit the crime.

24          Or B, whoever with the intent to avoid a transaction

25   reporting requirement under state or federal law, that seems to

1    me to be another way to commit the crime.

2           The two ways seem to me to have separate elements that

3    do not necessarily equate with one another, although I would

4    acknowledge that they both seem to have specified intent, or at

5    least knowledge and belief requirements.

6           Now, maybe I have that wrong.  I invite you to correct

7    me.  But that's the way I read the statute.  And maybe it's all

8    read together because of the final paragraph.  But it seems to

9    me that the final paragraph does do something to keep those

10   elements separate, even under A and B and C.

11          Do you understand what I'm trying to convey here?

12          MS. WEIDNER:  I do, Your Honor.  And when I was

13   studying the statute and trying to prepare jury instructions, I

14   was a bit flummoxed by the first line of sub 3 where it says

15   "whoever with the intent" and it doesn't clarify, which is why

16   I tracked down the legislative history where they say expressly

17   that they're talking about specific intent, that knowingly,

18   which is the mens rea required for 1956(a), is not sufficient

19   under the sting provision of the statute.  And so I attempted

20   to take that --

21          THE COURT:  Well, it looks to me like the statute

22   reads -- and maybe I'm wrong -- whoever with the intent either

23   to avoid a transaction reporting requirement -- that would be

24   C -- or with the intent to promote the carrying on of specified

25   unlawful activity to conceal or disguise the nature, location,

| | |
|---|---|
| 1 | source, ownership, or control of property believed to be the |
| 2 | proceeds of specified unlawful activity, seems to me like |
| 3 | there's almost a double-requirement under that one. |
| 4 | MS. WEIDNER:  Your Honor, it -- it -- |
| 5 | THE COURT:  Well, I -- let's not wait -- make the jury |
| 6 | panel wait while we discuss what is a conundrum.  We can talk |
| 7 | after we're not burning their time. |
| 8 | And -- bring them in, unless there's some reason not |
| 9 | to. |
| 10 | (Jury enters the courtroom at 1:24 p.m.) |
| 11 | THE COURT:  Please be seated. |
| 12 | Welcome back.  We appreciate your cooperation.  We |
| 13 | shortly will have a few more questions for you.  And then we |
| 14 | will shortly begin with the presentation of this case. |
| 15 | I'm going to try one more time a name just to make |
| 16 | sure it doesn't mean anything to any of you. |
| 17 | Do any of you know the name Jason Despain?  He is one |
| 18 | of my law clerks. |
| 19 | Juror 28? |
| 20 | PROSPECTIVE JUROR 28:  Hi.  He's a family friend. |
| 21 | THE COURT:  Any concern that he's my law clerk? |
| 22 | PROSPECTIVE JUROR 28:  No. |
| 23 | THE COURT:  Any -- does that make any difference in |
| 24 | your ability to correctly decide the case based on -- |
| 25 | PROSPECTIVE JUROR 28:  No. |

UNITED STATES DISTRICT COURT

1      THE COURT:  -- based only on the facts and the

2  evidence?

3      PROSPECTIVE JUROR 28:  No.

4      THE COURT:  All right.  Thank you.

5      During the break, the parties and I met, consulted

6  about those of you who had requested that I consider you for

7  undue hardship; and as a result, we have a number of people

8  that we are now going to dismiss.  If you are dismissed, we

9  thank you for your participation here this morning.  You do not

10  need to report back to the jury office.  You may just go home.

11      Kathleen, are you able to read that list, please?

12      COURTROOM DEPUTY:  Juror number 8, juror number 13,

13  juror number 14, juror number 22, juror number 24, juror number

14  25, juror number 26, juror number 28, juror number 34, juror

15  number 44, juror number 48, juror number 50, juror number 51,

16  juror number 61, and juror number 64.

17      THE COURT:  We have a list of 10 questions.  We're

18  going to give you, juror number 1, that list.  When you get

19  that -- it's going to be on -- it will also be on the screens

20  that are in front of you, and it will also be on that screen up

21  there for those of you who are in the audience.  But we will

22  hand the list to you as it is your turn to stand up.

23      I'll ask you, when it becomes your turn, to stand and

24  answer the questions, first identifying yourself by juror

25  number.

1          When it asks for the general location of your

2    residence, we are trying to preserve confidentiality for

3    jurors, so don't give us your address.  Just tell us generally

4    where you live.

5          It does ask about education after high school, if any,

6    and state your major.  Please state your major even if you

7    didn't complete a college degree.

8          And then give your marital status, the number of

9    children you have and their ages, if they are under 18.

10          And then when it talks about employment, if you are

11    married, we would like not only your current job and the types

12    of jobs you had throughout your lifetime, but your spouse's

13    current job and the types of jobs she had throughout her live

14    time.

15          Number 8 asks for your civil, social, fraternal,

16    union, or professional organizations, and if you held offices

17    in them.  It's just any kind of a club, organization, or other

18    entity in which you may be involved.

19          And then just give us your hobbies or recreational

20    activities.

21          With respect to the last question, which asks about

22    prior jury service, with respect to civil cases, just tell us

23    the number of civil juries on which you've served, if you have

24    served on a civil jury; with respect to criminal cases, please

25    indicate the nature of the crime involved and the result of the

```
1    case, meaning guilty, not guilty, hung jury, for each of the
2    criminal juries you've served on.
3            Any questions about that?
4            PROSPECTIVE JUROR 1:  No, Your Honor.
5            THE COURT:  All right.  Thank you, sir.  Go ahead.
6            PROSPECTIVE JUROR 1:  Juror number 1.
7            I stay in Chandler, Arizona.  I have lived in
8    Chandler, Arizona, for five years.
9            Education, finished high school.  I have an
10   associate's degree in computer science.
11           I am married.  I have one child.  He is nine.  I am
12   currently employed as a semiconductor operator.
13           Do you need previous; how far back?
14           THE COURT:  Just generally your previous employment,
15   types of employment.
16           PROSPECTIVE JUROR 1:  I used to be a caregiver also
17   here in Chandler.
18           My spouse is -- used to be a semiconductor operator.
19   She is now a pre-school teacher.
20           Civil, social, fraternal, I have no connections with
21   any clubs whatsoever.
22           My hobbies are automotive, really.
23           And prior jury service, I have no prior jury service.
24           THE COURT:  Thank you.
25           PROSPECTIVE JUROR 2:  Juror number 2.
```

UNITED STATES DISTRICT COURT

1        I reside in Payson, Arizona, and I've been there for

2   12 years.

3        Education, finished high school.

4        I have a wife and three children.

5        My employment is with -- truck driver, and I'm a

6   current employee for the same company.  I've been there for 14

7   years.

8        And my wife, she worked for the Gila County, and she's

9   the front desk.

10        And I served as a baseball coach and play some

11   baseball.

12        And I have never served on a civil or criminal jury.

13        THE COURT:  Thank you.

14        PROSPECTIVE JUROR 4:  Juror number 4.

15        I live in Mesa.  We moved there a year-and-a-half ago.

16        I have a master's degree in business.

17        Married.  I have three children; one is seven, one is

18   13, and one is 15.

19        I'm a senior accountant for my employment.

20        My wife's employment, she -- she's the communications

21   officer for the Higley School District.  Before that, she

22   worked for -- she was a journalist and an editor.

23        Social is Sigma Chi fraternity back in college.

24        Hobbies is playing with the kids.

25        Prior jury service, never was in it.  Just this.

```
1              THE COURT:  Thank you.
2              PROSPECTIVE JUROR 5:  Juror number 5.
3              I live in Mesa, and moved there in 2002.
4              I have a bachelor of arts degree and a master's
5    certificate in project management.
6              I am married.  I have three adult stepdaughters.
7              I spent 30 years in the Department of Veterans
8    Affairs; 24 of those were in IT.
9              My husband was also -- also retired from the
10   Department of Veterans Affairs, primarily in finance; first as
11   an accountant, and then implementing financial systems.
12             I served on a -- oh.  No professional organizations.
13             And my hobbies are traveling and reading.
14             And I served on a criminal jury in Texas for a robbery
15   case.
16             THE COURT:  What was the verdict?
17             PROSPECTIVE JUROR 5:  I can't remember.
18             THE COURT:  How long ago was it?
19             PROSPECTIVE JUROR 5:  Twenty years.
20             THE COURT:  Thank you.
21             PROSPECTIVE JUROR 6:  Hello.  Juror number 6.
22             I also live in Mesa.  I've owned a home there for
23   about three-and-a-half years.  Prior to that I owned a home in
24   Scottsdale for 16 or 17 years.
25             I have my associate's degree in culinary arts.
```

```
1            I am married.  I have four -- four grown children.

2            I'm currently employed as a truck driver.  Before that

3     I spent my entire working life in the restaurant business as a

4     cook and a chef.

5            Don't -- I'm sorry.  My spouse is a registered nurse,

6     has been for about 15 years.

7            No real fraternal organizations or whatever.

8            Hobbies, I enjoy woodworking and making pottery at

9     home.

10           I did serve jury duty 17 or 18 years ago.  It was a

11    criminal case, and I believe the gentleman was guilty.  It was

12    a long time ago.

13           THE COURT:  Do you remember what the charge was?

14           PROSPECTIVE JUROR 6:  Well, specifically, no.  I do

15    know there was -- there was armed robbery involved as well as

16    kidnapping.  It was kind of a big deal.  So...

17           THE COURT:  Okay.  Thank you.

18           PROSPECTIVE JUROR 7:  I'm juror 7.

19           I live in Scottsdale.  I've been there for

20    two-and-a-half years.

21           I have bachelor of science degrees in finance and

22    supply chain management, and an MBA and working towards a CPA.

23           I'm single, no children.

24           I work for a large technology company, mostly in

25    financial roles.
```

```
 1              I'm a hockey coach, and part of a couple volunteer
 2    organizations.  I play hockey.
 3              And I reported for jury service twice.  One, I was not
 4    selected; the other was settled before the trial began.
 5              THE COURT:  Thank you.
 6              PROSPECTIVE JUROR 9:  I'm juror number 9.
 7              I live in Scottsdale.  I've been there 25 years.
 8              I have a bachelor's in chemistry.
 9              I'm married.  I have two adult children.
10              My husband and I have owned a company for 20 years
11    that we just sold recently to a larger engineering company, and
12    I am the comptroller of the new company and he's a senior
13    hydrogeologist with the current company.
14              We both belong to professional organizations that are
15    involved with Geo Business, and he's the current national
16    president of the American Institute of Professional Geologists.
17    And I've sat on boards and different things with -- let's see.
18              And I've been called for jury service, but never
19    served.
20              THE COURT:  Thank you.
21              PROSPECTIVE JUROR 10:  I'm juror number 10.
22              I live in Glendale, Arizona.  I've been there for 12
23    years.
24              No education after high school.
25              Single.  No kids.
```

```
1              I'm currently a janitor, slash, flunky at a helicopter
2      company.
3              No professional profession.
4              I like to play hockey, and haven't served.
5              THE COURT:  Thank you.
6              PROSPECTIVE JUROR 11:  Juror number 11.
7              I live on the -- just outside downtown Phoenix.  I've
8      lived there for about 15 years.
9              I have a master's in international affairs.
10             I'm married with four kids; older -- the oldest is
11     more than 18, 17, 13, and 10.
12             I currently serve as the director of the Business
13     Improvement District here in downtown Phoenix.
14             My wife is in fundraising for charitable
15     organizations.
16             I recently was on the board of downtown Phoenix Public
17     Market.
18             Hobbies, taking kids to soccer games.
19             And I was a juror on a civil trial, probably 20, 22
20     years ago.  It was a minor fender bender, and quite honestly I
21     don't remember the outcome of it.
22             THE COURT:  Thank you.
23             PROSPECTIVE JUROR 12:  Juror number 12.
24             I reside in Tempe.  I've been there for eight years.
25     Bachelor's in computer science, master's in information
```

```
 1    management.  Single, no children.
 2            Currently employed.  Been in my field for 10 years.
 3            No professional organization.
 4            Hobbies are soccer, hiking, and dance.
 5            And no prior jury service.
 6            THE COURT:  Thank you.
 7            PROSPECTIVE JUROR 15:  I'm juror number 15.
 8            We live in Gilbert, for the past 28 years.
 9            I have a master of science in chemistry.
10            I'm married with three children; their ages, 36, 34,
11    and 29.
12            I'm a retired engineer with -- in a semiconductor
13    industry; and my husband is the same, retired engineer in the
14    semiconductor industry.  And right now, he's doing farming
15    as -- as his hobby.
16            I do not belong to any organization.
17            I like gardening, I enjoy doing that.
18            I've been called for jury service, but wasn't
19    selected.
20            THE COURT:  Thank you.
21            PROSPECTIVE JUROR 16:  I'm juror 16.
22            I live in north Phoenix.  I lived there for 17, 18
23    years.
24            I have a bachelor degree in global business.
25            Divorced.  No kids.
```

1        I employ in the food industry.

2        I'm not -- I like to -- traveling.  That's my hobby.

3        Never been called for the criminal jury service.

4        THE COURT:  Do you belong to any organizations, sir?

5        PROSPECTIVE JUROR 16:  No.

6        THE COURT:  Thank you.

7        PROSPECTIVE JUROR 17:  Juror 17.

8        Reside in Mesa.  Been there 25 years.

9        Attended college for mechanical engineering.

10        Divorced.  Two children over the age of 18.

11        Currently employed as a plant manager for a

12   manufacturing company.  Before that, I owned my own.

13        Not affiliated with any professional organizations.

14        Hobbies are backpacking, mountain biking, and auto

15   racing.

16        I have not served on a jury before.

17        THE COURT:  Thank you.

18        PROSPECTIVE JUROR 18:  I'm juror 18.

19        I live in Scottsdale.  Been there 25 years.

20        I have a master's in business.

21        I am married.  Four -- excuse me -- three adult

22   children.  Too many grandkids.

23        My employment, I am now retired, but I spent 35 years

24   in telecom.

25        My spouse is a speech therapist for Scottsdale

1    Unified.

2          I belong to two organizations that advocate education,

3    higher education.  And I was a member of CWA and United Food

4    Workers at one time.

5          My hobbies are golf, skiing, traveling.

6          I've done prior jury service.  Last year was a trial

7    for criminal negligent homicide and aggravated assaults.  It

8    ended up as a hung jury.  The trial prior to that was for

9    possession of heroin with intent to distribute.  Hung trial --

10   also hung jury.

11         THE COURT:  Thank you.

12         PROSPECTIVE JUROR 19:  I'm juror number 19.

13         I reside in Goodyear, Arizona.  I've been at my

14   residence 13 years.

15         I have high school, and I went to cosmetology school,

16   and now I am a school bus driver.

17         I'm -- I have a fiancé.  We've been together 18 years.

18   We both have grown children.

19         And I'm -- I work at a charter high school in Peoria.

20         My significant other is -- works for Pepsi-Cola for 25

21   years.

22         We don't belong to any organizations.  Our hobbies are

23   traveling and spending time with our kids, and going to the

24   beach.

25         And I served on a jury.  I -- it was a DUI case, and

1    we found him guilty.

2             THE COURT:  Thank you.

3             PROSPECTIVE JUROR 20:  I'm juror number 20.

4             And I reside in the City of Peoria.  We just moved to

5    the city of Peoria.  I've been in the valley for 53 years.

6             I work for the city of Phoenix.  I have a

7    communications -- I was a communications major.

8             I'm married with three children.

9             My wife works for the City of Tolleson.

10            And I was actually the former vice mayor of the City

11   of Surprise.  I served on the city counsel for 12 years.

12            And my hobbies are playing the piano, RV-ing, and

13   watching football.

14            And I've been called twice to serve -- for jury duty,

15   but never called.

16            THE COURT:  Thank you.

17            PROSPECTIVE JUROR 21:  Juror number 21.

18            I live in southeast Mesa.  We moved there four years

19   ago.

20            I have a bachelor of science in general business

21   administration from Arizona State University.

22            I'm divorced for 18 years now.  I have two children,

23   both in their 20s.

24            I was a planner and schedule -- scheduling person for

25   30 years.  I'm retired currently.

```
1              I do not belong to any organizations.

2              My hobbies are reading and in-home pet care while

3    people are on vacation.

4              No prior jury service.

5              THE COURT:  Thank you.

6              PROSPECTIVE JUROR 23:  I'm juror number 23.

7              I live in Scottsdale.  Have been for 25 years.

8              Graduated high school, and went to Phoenix Institute

9    of Technology and learned drafting.  I got a drafting degree.

10   I'm a custom home designer now.

11             Married 33 years.  We have three daughters, and one

12   granddaughter that's going to turn one next week.

13             Self-employed.  I work at home by myself.

14             My wife works at American Family Insurance.  She's a

15   claim adjuster.  She's been there 15 years.

16             No professional organizations.

17             Golf.

18             And prior -- prior jury service, I served on one jury.

19   It lasted, like, six months.  It was crazy.  It was a capital

20   case.  We found the person guilty and we had to go back and

21   serve -- do the sentence, and we voted for the death penalty.

22             THE COURT:  Thank you.

23             PROSPECTIVE JUROR 27:  Juror number 27.

24             I live in Ahwatukee, for about 10 years.

25             I -- no college.  Just high school.
```

UNITED STATES DISTRICT COURT

```
1              I am married.  I have two adult children.

2              I worked for Macy's for 25 years in the fraud

3     department as a supervisor.

4              My husband works for DHL.

5              No organization.

6              Hobbies are, I collect jigsaw puzzles.

7              And I've never served on a jury.

8              THE COURT:  Thank you.

9              PROSPECTIVE JUROR 29:  Juror number 29.

10             I live in Yuma.  Been there for five years.

11             I went to college after high school, didn't finish it.

12    My study was business and finance.

13             I'm married.  I have two sons.

14             Retired from UPS nine years ago.

15             My wife's a retired teacher.

16             Really don't belong to any professional organizations.

17             I golf and travel.

18             And I've been called twice, and served on one for DWI.

19    And we didn't find out what actually happened.  He -- he

20    settled it with the judge later.

21             THE COURT:  Thank you.

22             PROSPECTIVE JUROR 30:  I'm juror number 30.

23             I live in Gilbert.  I've been there 12 years.

24             I have a master's in community counseling.

25             I'm married.  I have two children, ages 3 and 6.
```

1          I am currently a school guidance counselor at a K

2    through -- well, at three K through 8 schools in Tempe.

3          My husband is the operations supervisor for a cargo

4    airline company.

5          No professional organizations.

6          My hobbies are running my kids around to their

7    activities, and I do CrossFit.

8          And no jury service.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR 31:  I'm Judy -- juror -- juror 31.

11         I live in Central Phoenix.  I've been there for about

12    10 years in the Arcadia area.

13         I have a bachelor's in humanities, and also ASN in

14    nursing.

15         Single.  I have two children, 18 and 15.

16         I'm a registered nurse right now.  I've also done

17    editing and writing.

18         I don't have a spouse.

19         I don't belong to any organizations.

20         I like movies.

21         And I have been called for jury duty a number of

22    times, but I've never served.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR 32:  I'm juror 32.

25         I've lived in Gilbert for over 43 years.  I've been at

1    my current house for about 13 years.

2            I went to college for wildlife biology.

3            I'm married.  I have three adult children that are

4    over 18.

5            I am a director of service for a security and life

6    safety company in Arizona and California.

7            My wife is a surgery scheduler for an orthopedic

8    surgeon.

9            I've been sitting as chairman for a local -- for the

10   local chapter of the Mule Deer Foundation, a wildlife

11   conservation group.  And I also belong to several professional

12   organizations.

13           My hobbies are hunting, fishing, hiking, fishing --

14   everything outdoors.

15           And I've had no prior -- prior jury experience.

16           THE COURT:  Thank you.

17           PROSPECTIVE JUROR 33:  I'm juror number 33.

18           I've lived in Phoenix for 36 years.  I've been at my

19   current residence for about 30 -- 30 of those years.

20           I have a -- I have a bachelor in business, and a

21   master's in elementary education.

22           I am married.  I have two adult children.

23           I'm currently employed as the accountant for a small

24   to mid-size manufacturing distribution company.

25           My spouse is a business consultant and advises on

```
 1     start-up businesses.
 2               I have no professional organizations.
 3               My hobbies are reading, yardwork, and hiking.
 4               I've been called to jury duty many times and have
 5     served twice in criminal -- in criminal -- for criminal -- I
 6     can't think of the word.
 7               THE COURT:  Cases?
 8               PROSPECTIVE JUROR 33:  So the first one was for a
 9     burglary, and the person was convicted.  The second one was for
10     a car theft, and it was -- it ended in a mistrial.
11               THE COURT:  Thank you.
12               PROSPECTIVE JUROR 35:  Hi.  I'm juror number 35.
13               I live in south Tempe, been there for 30 --
14     approximately 30 years.
15               I have a degree in nursing.
16               I'm married.  I have two adult children.
17               I'm currently employed at HonorHealth in the operating
18     room.  I'm an operating room nurse at HonorHealth.  I'm also a
19     Realtor.
20               My spouse -- I am married -- and he's a retired school
21     teacher, junior high Special Ed.
22               I belong to a couple -- operating -- or excuse me,
23     operating room nursing associations, as well as real estate
24     organization.
25               I am also very active at my local church where I do a
```

1    lot of volunteering there, as well as volunteering for an

2    organization for foster care children.

3              And I have never served on a jury.

4              THE COURT:  Thank you.

5              PROSPECTIVE JUROR 36:  I'm juror number 36.

6              I live in Casa Grande.  I've lived there 51 years.

7              I have a degree in nursing.

8              I'm married.  We have five children, adult children.

9              I'm currently employed as a nurse at Banner Casa

10   Grande.

11             My husband is self-employed general contractor.

12             I do not belong to any professional organizations.

13             Hobbies, I like to read and gardening.

14             And I served on one DUI case, and it was a hung jury.

15             PROSPECTIVE JUROR 37:  I'm juror number 37.

16             I live in Sun City.  I've been there for about six

17   months.  Prior to that, we lived in California.

18             My education, I have an associate's degree in health

19   information management, a bachelor's in business

20   administration, and a master's in public health.

21             I've been married 35 years.  I have two adult

22   children.  "Adult" children?

23             My current employment, I am a reception tech for a

24   donation -- plasma donation center.  Spent most of my time in

25   banking and finance and eligibility management for the County

1    of San Diego.

2            My spouse is a retired Army.  In addition, just

3    recently retired from the San Diego Unified School District as

4    a ROTC instructor.

5            I don't belong to any professional organizations.  I

6    have not held any offices.

7            Our hobbies -- my hobbies, I love to travel, reading,

8    and bicycling.

9            I have been called for service, selected once, but

10   the -- the litigants came to an agreement.

11           THE COURT:  Thank you.

12           PROSPECTIVE JUROR 38:  I'm juror number 38.

13           I live over in east Mesa for seven months.  Prior to

14   that, in Gilbert for four years.

15           Education is nothing beyond high school.

16           Marital status is married.  I have one child who is in

17   his 30s.

18           Currently I work as an ophthalmology technician.  I

19   have been doing that since the '80s.

20           My husband works as an endoscopy technician.  He's

21   been doing that for over 30 years.

22           I don't belong to any professional organization other

23   than church.

24           My hobbies are, I'm very heavily involved in church

25   activities, and music, and I love to go camping and traveling.

1          Prior jury service, none.  I've been called, but
2    didn't have to attend.
3          THE COURT:  Thank you.
4          PROSPECTIVE JUROR 39:  Juror 39.
5          I live in Buckeye, Arizona.  I've been there for 12
6    years.
7          Some college.  I have a certificate for MA.
8          I've been with my boyfriend for four years.  We have a
9    two-year-old daughter.
10         I am a supervisor at a radiology clinic called
11   SimonMed Imaging.
12         He works on Amazon warehouse.  He's been there for six
13   years.
14         No professional organizations.
15         Hobbies are spending time with my daughter.
16         And this is my first jury.  I've never been called.
17         THE COURT:  Certificate for MA is what?
18         PROSPECTIVE JUROR 39:  Medical assistant.
19         THE COURT:  Thank you.
20         PROSPECTIVE JUROR 40:  I'm juror number 40.
21         I live in Coolidge, Arizona, for 20 years.
22         Graduated high school.
23         Single.  No kids.
24         Ranch and farm.
25         Elks member.

```
1              I like to be outdoors hunting and fishing, but
2       normally working all the time.
3              And I've been called for jury service but never
4       selected.
5              THE COURT:  Thank you.
6              PROSPECTIVE JUROR 41:  I'm juror 41.
7              I live in Fountain Hills.  Been there about eight
8       years.
9              Two years of college with a major of computer science.
10      No degree.
11             Married with four kids, all adults.
12             Employment.  My current job, I've been there at the
13      same company for 29 years in the IT department, designing
14      financial software.
15             My wife is a personal assistant for a rancher in
16      Scottsdale.
17             Belong to no union or professional organizations.
18             Hobbies are poker and video games.
19             And no prior jury service.
20             THE COURT:  Thank you.
21             PROSPECTIVE JUROR 42:  I'm juror 42.
22             I live in Chandler.  I've lived there for about four
23      years.
24             I have a bachelor's in English secondary education.
25             I'm married, no kids.
```

```
 1              I'm currently an English teacher.  I've worked in
 2      childcare before.
 3              My husband is a science teacher.  He's worked at a few
 4      labs doing neuroscientific research.
 5              I don't belong to any organizations.
 6              My hobbies are teaching.
 7              And I have no prior jury service.
 8              THE COURT:  Thank you.
 9              PROSPECTIVE JUROR 43:  I'm juror 43.
10              Live in east Phoenix for the past 20 years.  Prior to
11      that, Scottsdale.  Born here in Arizona.
12              Education.  Two degrees.  One in graphic art and the
13      second one, a registered nurse.
14              Married.  Two adult children.
15              And I currently work for the Veterans Health
16      Administration.  Endoscopy.
17              My spouse is medically retired, and he was -- worked
18      for Arizona Department of Revenue.
19              Not currently in any organizations.
20              Hobbies, I used to volunteer painting theater sets for
21      a children's youth theater.  Gardening.  Anything art, I love.
22              Been summonsed four or five times to jury, and never
23      served.
24              THE COURT:  Thank you.
25              PROSPECTIVE JUROR 45:  I'm juror number 45.
```

```
1              And I live in Surprise, Arizona.  I've been there for
2     two-and-a-half years now.
3              I retired --
4              THE COURT:  Hold the microphone up, sir.  Sir, could
5     you hold your microphone up?
6              PROSPECTIVE JUROR 45:  Oh.
7              No formal education after high school.
8              I am married.  I have two children, adult children.
9              And I -- I retired from the construction industry.  I
10    served on the board of directors for two different trade
11    associations and was involved in their training programs.
12             My wife, when our children were small, she was a
13    full-time homemaker.  And around that she did clerical work for
14    two or three different companies during our marriage.
15             Hobbies, golf, RV-ing, boating.
16             And I've been called for jury service one other time,
17    and was not selected.
18             THE COURT:  Thank you.
19             PROSPECTIVE JUROR 46:  Juror number 46.
20             I currently live in Phoenix for the last 12 years.
21             I have a bachelor's degree in business management.
22             I'm married.  I have an 18-year-old.
23             I am currently an underwriter at a commercial
24    underwriter company.
25             My husband is the same.  Same company.
```

1          Only professional organizations I belong to are

2    insurance.

3          My hobbies are reading and traveling.

4          I've been called for jury service, but never served.

5          THE COURT:  Thank you.

6          PROSPECTIVE JUROR 47:  I'm juror 47.

7          I live in Tempe, for 33 years.

8          I have a bachelor's in chemical engineering.

9          I'm married.  No children.

10         I'm employed with the Department of Environmental

11   Quality for about 35 years.

12         My wife is retired, formerly with the Department for

13   about 35 years.

14         I'm a member of the Sierra Club.

15         I hike on the weekends.

16         And I served twice on juries.  First time was a

17   criminal assault, found guilty.  The second time was a lawsuit,

18   civil lawsuit, and we did not hold for the sue-er.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR 49:  Juror 49.

21         I live in north Phoenix.  And I've lived there since

22   '69.  Current residence, 13 years.

23         High school, then technical school.

24         Fiancée.  Between the two of us, we have three

25   children, all over -- well, close to 30 and up.

1          I've been self-employed for 38 years as a commercial

2     photographer.

3          I'm an Elks member as well.

4          And hobbies:  Mountain biking, outdoors, fishing.

5          Called for jury, but never selected.

6          THE COURT:  Thank you.

7          PROSPECTIVE JUROR 52:  I'm juror number 52.

8          I've lived in the Phoenix area for five years.

9          I have a bachelor in arts and a master's in

10     architecture.

11          I am single.  I do not have any children.

12          I'm employed as an architect at HKS in Phoenix.

13          I do not have a spouse.

14          I belong to the American Institute of Architects, as

15     well as the evidence-based design association.

16          My hobbies are outdoor activities and sports.

17          And I've been summoned before for jury duty, but

18     never selected.

19          THE COURT:  Thank you.

20          PROSPECTIVE JUROR 53:  I'm juror number 53.

21          I am located in -- just a little bit from here in

22     Phoenix.  Been here for eight years.  Currently at the same

23     residence for six months.

24          I have an associate's in business management.

25          I'm not married, but I am engaged.  I have no

1    biological children, but we do have a six-year-old of my

2    fiancé's.

3              Currently I'm employed with a video doorbell company

4    as a billing lead.

5              And my fiancé is at the same company, but he's in a

6    chat department.

7              No civil, social organizations.  Never held office.

8              My hobbies include puzzles and crafts.

9              And I've been summoned for prior jury service, but

10   I've never served.

11             THE COURT:  Thank you.

12             PROSPECTIVE JUROR 54:  I'm juror number 54.

13             I live in Phoenix, and have for the last 22 years.

14             I have a bachelor's degree in business with an

15   emphasis in finance.

16             I am married.  I have a 17-year-old son.  I'm employed

17   as a financial adviser, and prior to that worked in Human

18   Resources.

19             My spouse is currently retired, but was an independent

20   claims adjuster.

21             I don't belong to any organizations.

22             I like to travel, read, and hike.

23             And I did serve on a jury for an extreme DUI, and the

24   person was found guilty.

25             THE COURT:  Thank you.

1              PROSPECTIVE JUROR 55:  Juror number 55.

2         I've been in Gilbert for 12 years.

3         Education, I have a bachelor of science in economics,

4    and a juris doctorate degree.

5         I am married.  I have one child that is four years

6    old.

7         My employment, I've been practicing in intellectual

8    property as a patent and trademark attorney, as well as

9    currently employed in litigation support, providing consulting

10   in ediscovery.

11        I'm a member of the state bar of Arizona, and on a

12   consulting subcommittee.  I've also been in some town

13   committees in the town of Gilbert.

14        Hobbies are golf and four-year-old activities.

15        And I've never been called for jury duty.

16        THE COURT:  Thank you.

17        PROSPECTIVE JUROR 56:  Juror number 56.

18        I currently reside in east Mesa, for the last three

19   years.

20        What else here?

21        Length of time -- three years.

22        I currently seeking a bachelor's degree in culinary

23   arts.

24        I'm single.  No children.

25        I work in the education financial aid industry.

```
1              I live -- belong to no organizations.

2              Hobbies are sports and traveling.

3              And I have no prior service -- jury service.

4              THE COURT:  Thank you.

5              PROSPECTIVE JUROR 57:  Juror number 57.

6              I currently live in east Mesa.  I've had a house there

7      for four years.

8              Education is just high school diploma.

9              I'm married.  I've got three kids; eight, four, and

10     two years old.

11             I am a general manager of a grocery store.

12             My wife works at a gym.

13             I'm not part of any organizations.

14             Hobbies are musician and I hike.

15             And I've never been on a jury before.

16             THE COURT:  Thank you.

17             PROSPECTIVE JUROR 59:  I'm juror 59.

18             I'm in east Mesa for three months; Ahwatukee before.

19             I have an RN.

20             I'm divorced.  Four children, all 17 and older.

21             I'm a home healthcare nurse.

22             No professional organizations.

23             Garden and travel.

24             Been called, but never served.

25             THE COURT:  Thank you.
```

1          PROSPECTIVE JUROR 60:  Juror number 60.

2          Phoenix for four years.

3          Master's of architecture.

4          Married.  I have a three-year-old and one on the way.

5          I work at a small architecture firm.

6          My spouse is working at SRP.

7          I'm part of the National Council of Architecture

8     Registration.

9          No prior jury service.

10          THE COURT:  Thank you.

11          PROSPECTIVE JUROR 62:  I'm juror 62.

12          I've lived in El Mirage for 48 years.

13          I didn't finish high school.

14          I'm single.  I have six grown children.

15          I work as a cashier at Bealls Outlet.

16          I don't belong to any organizations.

17          My hobbies are reading and doing jigsaw puzzles.

18          I don't have any prior experience.

19          THE COURT:  Thank you.

20          PROSPECTIVE JUROR 63:  Juror 63.

21          I reside in Scottsdale.  I've been there for 13 years.

22          I have a master's in special education.

23          I am married.  We have two adult children.

24          I was an elementary Special Ed teacher.

25          My husband is a vice -- the vice president of project

```
 1    operations for an international firm.

 2              I do not belong to any organizations.

 3              I like hiking and reading.

 4              And I have no prior service.

 5              THE COURT:  Thank you.

 6              PROSPECTIVE JUROR 65:  I'm juror number 65.

 7              I live in Surprise, Arizona, for the past 11 years.

 8              Graduated high school.

 9              I'm married, with three adult children.

10              I am a senior accounts payable specialist for a

11    restaurant.

12              My husband is disabled.

13              Don't belong to any organizations.

14              My hobbies are gardening and playing with my

15    grandkids.

16              And no prior jury service.

17              THE COURT:  Thank you.

18              PROSPECTIVE JUROR 66:  I'm juror 66.

19              Chandler.  I've been there for about 10 years.

20    Arizona all my life.

21              High school education.  No college.

22              Married; two children, 10 and 13.

23              My employment is I'm currently doing contract work for

24    low-income veteran housing.  Previously, outreach and case

25    management for veteran -- homeless veterans and homeless
```

1    families.

2          My spouse, her current job is banking for about 22

3    years.

4          And civil, social fraternal, all those organization,

5    it's been pretty much within the homeless field, sitting on

6    boards and planning for different homeless get-together things.

7          Hobbies and recreational activities:  Musician, arts,

8    creative stuff.

9          This is my fourth jury selection.  I did serve on one

10   jury that was a criminal -- criminal one.  Only me and one

11   other guy were released before the final decision as to whether

12   he was guilty or not.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR 67:  I'm juror 67.

15         I live in Maricopa.  I've lived there for five years.

16         Education, I have a little bit of college in business

17   and finance.

18         A widow.  I have three grown children and two

19   grandchildren.

20         Currently employed as a client support manager for a

21   mortgage servicing company in Tempe.

22         I don't have a spouse, so I'm single.

23         My civil, fraternal, I have none.

24         Hobbies, I like to read, walk, and play with my

25   grandchildren.

```
1              And I know have -- I don't have any prior jury
2    service.
3              THE COURT:  Thank you.
4              Ladies and gentlemen, did any of you know each other
5    before this morning?  Do any of you know each other?
6              Does the government have any questions of the
7    individual jurors?
8              MR. BINFORD:  Thank you, Your Honor.
9              THE COURT:  Mr. Binford, I'll ask you to come to the
10   podium, if you will.
11             MR. BINFORD:  Yes, Judge.
12             Do you want me to address you?
13             THE COURT:  No.  Feel free to address the individual
14   juror.
15                  QUESTIONS BY THE GOVERNMENT
16             MR. BINFORD:  Juror number 17, you had mentioned that
17   you were involved in some civil litigation.  I was just
18   curious.  During the course of that litigation, did you
19   interact with law enforcement at all?
20             PROSPECTIVE JUROR 17:  No, I didn't.
21             MR. BINFORD:  It seemed like -- well, do you think you
22   were treated fairly during that process?
23             PROSPECTIVE JUROR 17:  Yes.
24             MR. BINFORD:  Okay.  Is there anything about that
25   litigation that you think would affect your ability to be fair
```

UNITED STATES DISTRICT COURT

1    and impartial in this criminal case?

2            PROSPECTIVE JUROR 17:  No.

3            MR. BINFORD:  Thank you.

4            The next question I have is for juror 38.

5            You mentioned a family member that had had some legal

6    trouble, and I was wondering if you had had any interaction

7    with law enforcement during the course of that case?

8            PROSPECTIVE JUROR 38:  No.

9            MR. BINFORD:  Okay.  Thank you.

10           Juror 39, I think you mentioned a prior arrest, but it

11   didn't result in a conviction.

12           PROSPECTIVE JUROR 39:  Uh-huh.

13           MR. BINFORD:  Did you feel that you were treated

14   fairly throughout that process?

15           PROSPECTIVE JUROR 39:  Yeah.

16           MR. BINFORD:  Do you have any negative feelings about

17   those -- that incident?

18           PROSPECTIVE JUROR 39:  No.

19           MR. BINFORD:  Do you think that that incident would

20   have any impact on your ability to be fair and impartial on

21   this criminal case?

22           PROSPECTIVE JUROR 39:  No.  I did what I was told to

23   do:  I paid some fines, and I was on TASC for a year.  So

24   everything was dropped after that.

25           MR. BINFORD:  Thank you.

1           I believe, juror number 57, you mentioned a prior

2    conviction for possession.  You mentioned earlier that your

3    rights were restored.  Do you feel that you were treated fairly

4    throughout that process of restoring your rights?

5           PROSPECTIVE JUROR 57:  Yes.

6           MR. BINFORD:  Do you feel that you had any negative

7    experiences during that situation that would affect your

8    ability to be fair and impartial in this criminal case?

9           PROSPECTIVE JUROR 57:  No.

10          MR. BINFORD:  Thank you.

11          Juror number 60, I believe you mentioned your nephew

12   had an assault trial coming up.

13          PROSPECTIVE JUROR 60:  Yes.

14          MR. BINFORD:  Have you had any interaction with law

15   enforcement as a result of those charges or that trial?

16          PROSPECTIVE JUROR 60:  No.

17          MR. BINFORD:  Have you had any conversations with your

18   nephew about that trial?

19          PROSPECTIVE JUROR 60:  No.

20          MR. BINFORD:  Is there anything about his upcoming

21   trial that would affect your ability to be fair and impartial

22   here?

23          PROSPECTIVE JUROR 60:  No.

24          MR. BINFORD:  Thank you.

25          Juror number 12, you mentioned that you owned some

UNITED STATES DISTRICT COURT

1    virtual currency.  And you also mentioned that your co-workers

2    follow it religiously.

3              PROSPECTIVE JUROR 12:  Right.

4              MR. BINFORD:  In this case, you may hear evidence from

5    either a government witness or a defense witness that attempts

6    to explain or describe virtual currencies.  Would what you know

7    from your friends and what you know from your ownership of

8    virtual currency have an impact or prevent you from taking the

9    evidence that they present when they're on the stand?

10             PROSPECTIVE JUROR 12:  If I feel that there's

11   something that's said that kind of contradicts what I've

12   already learned about it, then I think it would have an effect.

13   So if there's something that I -- I know that I've researched

14   or that I've been spoken to about in the past and it kind of

15   contradicts what I already know about it, then I'd feel like it

16   would play a role.

17             MR. BINFORD:  So you don't think that you could set

18   aside something that you may have learned from your friends or

19   read, and -- and listen to the evidence fairly from whatever

20   witness is on the stand.

21             PROSPECTIVE JUROR 12:  No, because it's been years

22   that this topic has been discussed.  I mean, it's something

23   that we talked about every day, so it's -- something I would

24   hear today wouldn't really change my mind if I've heard it so

25   many times in the past.

1          MR. BINFORD:  And -- and you're saying you wouldn't be

2     able to set aside that past knowledge?

3          PROSPECTIVE JUROR 12:  No.

4          MR. BINFORD:  Thank you.

5          May I have a moment, Your Honor?

6          THE COURT:  Yes.

7          MR. BINFORD:  Those are all the questions from the

8     government, Your Honor.

9          THE COURT:  Thank you.

10         Defense?

11         MS. WEIDNER:  Your Honor, may I proceed?

12         THE COURT:  You may.

13         MS. WEIDNER:  Thank you.

14                    QUESTIONS BY THE DEFENSE

15         MS. WEIDNER:  Juror number 5, earlier today you

16    responded to Judge Snow that you hoped you could be impartial,

17    and it sounded like you might have some misgivings about that.

18         PROSPECTIVE JUROR 5:  In association with the Bitcoin?

19         MS. WEIDNER:  Well, in association with being able to

20    sit as a juror on this case.

21         PROSPECTIVE JUROR 5:  No.  I don't think I do.

22         MS. WEIDNER:  And with Bitcoin, is it just linked to

23    your distrust of, I guess -- I'm not even really -- of -- of

24    Bitcoin as -- as an investment?

25         PROSPECTIVE JUROR 5:  Yes.

                   UNITED STATES DISTRICT COURT

1          MS. WEIDNER:  And so you could set aside your distrust

2     and just look at the facts of this case --

3          PROSPECTIVE JUROR 5:  I believe I could.

4          MS. WEIDNER:  -- and follow the law?

5          PROSPECTIVE JUROR 5:  Uh-huh.

6          MS. WEIDNER:  Thank you.

7          Juror number 46.

8          Earlier in questioning today, you had initially said

9     that you have training in, I guess, insurance fraud, and you

10    initially said that you would not be able to be impartial.

11         What about your training that makes you think that

12    that is the case?

13         PROSPECTIVE JUROR 46:  Because basically, um, the law

14    is the law, and if someone has committed fraud or done

15    something fraudulently, it is in my profession to -- to

16    basically make a decision based on just those facts.

17         MS. WEIDNER:  And so you're saying that -- well, the

18    judge would instruct the jury on the law in this case, and then

19    as finders of fact, you all would weigh those facts against the

20    instruction of law.  Will the -- you be able to stick with the

21    judge's instruction of what the law is, and not insert the law

22    as you understand it from your training?

23         PROSPECTIVE JUROR 46:  Yes.

24         MS. WEIDNER:  Juror 29, you mentioned in some of your

25    answers that you have a number of relatives that are involved

UNITED STATES DISTRICT COURT

```
 1    in law enforcement as a field.  Isn't that -- is that correct?
 2              PROSPECTIVE JUROR 29:  Excuse me?
 3              MS. WEIDNER:  That you have a number of relatives
 4    involved in corrections and law enforcement --
 5              PROSPECTIVE JUROR 29:  Yes.
 6              MS. WEIDNER:  Do you identify strongly with law
 7    enforcement as a result of all of your family?
 8              PROSPECTIVE JUROR 29:  I got my own views, but I
 9    couldn't say because of the family.  You know, just 64 years of
10    living, is all.
11              MS. WEIDNER:  Right.  And so if you were to be seated
12    on a jury and you were to find the defendant not guilty, would
13    you have issues about telling your family members and law
14    enforcement about that?
15              PROSPECTIVE JUROR 29:  No, I don't think so.
16              MS. WEIDNER:  Okay.  Thank you.
17              And last, juror number 12.
18              The information you're likely to hear is rather basic
19    as -- as far as virtual currency and Bitcoin goes.  And it
20    sounds like you've had some more experience yourself with this
21    topic.  Is that correct?
22              PROSPECTIVE JUROR 12:  Correct.
23              MS. WEIDNER:  And so if the experience that you've
24    had -- or the knowledge that you've gained is beyond what you
25    hear in trial, would you be able to set aside the additional
```

UNITED STATES DISTRICT COURT

```
1   knowledge that you have and just focus on what is presented at
2   trial?
3              PROSPECTIVE JUROR 12:  Yes, as long as it doesn't
4   contradict something that I already know.
5              MS. WEIDNER:  So if a witness were to testify to
6   something and it was incorrect, you would be less likely to
7   believe that witness, if you knew from, basically, your
8   experience that was incorrect?
9              PROSPECTIVE JUROR 12:  Correct.
10             MS. WEIDNER:  So that would go to your ability to
11  assess that witness's credibility as someone testifying on a
12  particular topic.
13             PROSPECTIVE JUROR 12:  Yeah.  I mean, it's -- it's
14  just prior knowledge that if I have on something, and something
15  was brought up, and I knew for a fact that it was incorrect,
16  then I couldn't make a correct judgment on what they're saying.
17  I couldn't believe their testimony, because based on my
18  experience, it kind of contradicts what I've learned.  So I
19  couldn't -- couldn't really validate the testimony.
20             MS. WEIDNER:  Thank you.
21             THE COURT:  Ladies and gentlemen, we've reached the
22  point now where the attorneys and I are going to have to do
23  some work, and we're going to select the jurors who will try
24  this case.
25             Because it's going to go over three weeks, we are
```

```
 1    going to seat 15 jurors.  And the reason we do that is because
 2    the -- both parties are entitled to have 12 jurors decide the
 3    case, no more/no less.  So when a case is going to go over the
 4    course of a few weeks, we seat several alternate jurors to make
 5    sure we'll have 12 at the end.  We don't designate who the
 6    alternate jurors are until the very end of the case, so
 7    everybody is presumed -- presumes that they will be a juror.
 8              In order for us to do our job, though, it's going to
 9    take us about an hour, and there's no reason for you to sit
10    here while we do that.  So I'm going to ask you one more time
11    to give us about an hour, and to be back, ready to come in --
12    and we'll try and be ready to come in -- by 3:30 outside the
13    doors.
14              This time when you come in, please just come in and
15    take seats in the audience section, and then we will call up
16    those who are selected to try the case.
17              I thank you for your understanding, and have a nice
18    break.
19              Remember what I told you before.
20                 (Jury leaves the courtroom at 2:38 p.m.)
21              THE COURT:  All right.
22              Mr. Restaino, any challenges for cause?
23              MR. RESTAINO:  We'd move to strike number 12, Your
24    Honor.
25              THE COURT:  Ms. Weidner?
```

```
 1            MS. WEIDNER:  Your Honor, I -- I guess I understand

 2   the government's position, but it -- it's a bit of a conundrum.

 3   If somebody testifies to something that's patently incorrect

 4   about Bitcoin -- in the same way that if someone were to

 5   testify as to facts that, you know, testify that the sky is

 6   green, would the jurors be compelled to say, well, yes, indeed,

 7   the sky is green?

 8            I -- the fact that this person seems to have more

 9   knowledge about Bitcoin and the elementary level of -- of

10   Bitcoin that it is my understanding is going to be presented

11   based on, you know, what we've sent seen in the government

12   exhibits, I don't think that there's -- that there's going to

13   be an issue, because ultimately this is about money laundering,

14   and Bitcoin just happens to be the medium.  And so I -- I don't

15   think that goes to whether or not he can follow the law; just

16   if it gets complicated enough, can he limit his assessment of

17   facts to what is presented in court.

18            THE COURT:  And the reason I'm going to grant the

19   challenge for cause is he testified he couldn't do that because

20   he couldn't and wouldn't do that.  I mean, I agree with much of

21   what you said.  But because he said he could not and would not

22   limit his knowledge of evaluation to what he heard in court,

23   I'm granting the government's motion.  Juror number 12 is

24   excused for cause.

25            MR. RESTAINO:  We have no further strikes for cause,
```

1    Your Honor.

2              THE COURT:  Ms. Weidner?

3              MS. WEIDNER:  Your Honor, we didn't have any

4    additional challenges for cause.

5              THE COURT:  All right.  So the government gets eight

6    peremptories, the defense gets 12.  How long is it going to

7    take you to exercise them?  Can you do it in a half-an-hour?

8              MR. RESTAINO:  That should work, Judge.

9              MS. WEIDNER:  Yes, Your Honor.

10             THE COURT:  All right.  So at 3:15, I'll ask you to

11   exchange your lists with each other and determine -- and

12   Kathleen is going to give you a copy.

13             COURTROOM DEPUTY:  They give the list to me.

14             THE COURT:  I'm sorry.  You're going to give your list

15   to Kathleen, she'll make a master copy and give it back to you,

16   and then you'll determine whether or not you're going to make

17   any Batson challenges.  And if you are, you'll let me know, and

18   I'll rule on those challenges.  And then we'll call in and seat

19   the jury.

20             Is the government ready to present its case?

21             MS. ESCALANTE KONTI:  Yes, Your Honor.

22             THE COURT:  Is there going to be anything on -- I will

23   try and review the motion in limine, the supplemental motion in

24   limine in response while you're doing your challenging, and

25   then you can tell me if I need to rule.  You're just going to

1   have time probably for your opening and your opening.

2         Are we going to present any witnesses today?

3         MR. RESTAINO:  We're prepared to, Your Honor,

4   depending on the Court's schedule and what the Court wants to

5   do.  I can tell you that I don't think we are getting into any

6   of the challenged issues on the motion in limine today.

7         THE COURT:  All right.  The reason -- I will tell you

8   that normally I said I'd go to five o'clock, and normally I do.

9   But I don't know that we won't have out-of-town jurors on the

10  jury.  And in any event, the first time that we meet with the

11  jurors, it usually takes a few minutes extra to kind of orient

12  them to where the jury room is, what the combination access is.

13  And so we probably will not be going to five o'clock today in

14  any event.  And if we go long enough -- yeah, we're not going

15  to take another afternoon break.  So we're going to probably

16  end about sometime between 4:30 and 4:40.

17        Do you have a long opening, Ms. Weidner or --

18        MR. CAIN:  No.

19        THE COURT:  I'm sorry.  Mr. Cain.

20        All right.  Thank you.

21             (Proceedings in recess at 2:43 p.m.)

22              (Proceedings resume at 3:28 p.m.)

23        THE COURT:  Please be seated.

24        All right.  The parties have engaged in their strikes,

25  peremptory strikes.  You've reviewed each other's lists.

```
 1              Are there any Batson challenges?
 2              MR. RESTAINO:  Nothing from the government, Your
 3    Honor.
 4              THE COURT:  So does the government pass the panel?
 5              MR. RESTAINO:  Yes, and the government passes the
 6    panel, Judge.
 7              THE COURT:  Ms. Weidner?
 8              MS. WEIDNER:  No Batson challenges, Your Honor.  And
 9    we do pass the panel.
10              THE COURT:  All right.  Shall we seat the jurors then?
11              MR. BINFORD:  Yes, Your Honor.
12              THE COURT:  The -- there's no problem with the
13    preliminary instructions.  You do want me to read 1.2; you just
14    don't want me to read after "in order to help you follow the
15    evidence"?
16              MR. RESTAINO:  You're going to read up until that
17    point, Judge?
18              THE COURT:  Yes.
19              MR. RESTAINO:  That's fine from the government's
20    perspective, Judge.
21              THE COURT:  Ms. Weidner?
22              MS. WEIDNER:  Your Honor, just a moment.
23                    (Pause in proceedings.)
24              MS. WEIDNER:  Your Honor, we're going to -- we're
25    talking about the -- I have not seen -- which -- which document
```

```
1    are -- are --
2              THE COURT:  We're talking about your modified 1.2.
3    You wanted me to go through the various elements of everything,
4    and I have declined to do it because we don't have a
5    stipulation -- well, you do have a stipulation.  Then I
6    expressed some hesitancy, and then -- I mean, I'll read your
7    stipulation, if you want.
8              MR. RESTAINO:  No, Judge.  We want to take another
9    look at it.  We're going to have our appellate folks look at it
10   as well, and we'll be back in touch with Ms. Weidner.  It seems
11   like this is the type of thing we can settle in advance of
12   final instructions and get it right.
13             MS. WEIDNER:  Your Honor, we would not object to the
14   Court reading the jurors modified 1.2 up to line 14.
15             THE COURT:  Well, I don't have that in front of me.
16   Is it just where it starts "in order to"?
17             MS. WEIDNER:  Yes.  It would cut off -- "in order to"
18   is --
19             THE COURT:  Yeah.
20             MS. WEIDNER:  -- line 15.
21             THE COURT:  That's good.
22             Okay.  Let's -- we can seat the jury now, Kathleen.
23   Thank you.
24             (Jury enters the courtroom at 3:31 p.m.)
25             THE COURT:  Please be seated.
```

1           Let the record show the presence of the defendant, the

2    presence of the jury panel with role call waived.

3           Ladies and gentlemen, let me just say we are now going

4    to call up the 15 jurors who are selected to try this case.

5           The way that the jurors are selected is a result of a

6    statutory process with the participation of the Court and the

7    attorneys for the parties.  Whether or not you're selected does

8    not reflect this Court or anybody else's view about whether or

9    not you are capable of trying this case fairly and accurately.

10   We don't want you to view it as a representation if you're not

11   called that we think you weren't able to.  But it is the result

12   a statutory process specified.

13          We do appreciate those of you who have been

14   participating today in the selection of this panel, and we of

15   course particularly appreciate the sacrifice of those who have

16   been selected to serve as jurors.

17          Kathleen, will you please call the numbers of those

18   selected.

19               COURTROOM DEPUTY:  Juror number 4.

20               THE COURT:  Please come forward.

21               COURTROOM DEPUTY:  Right up here, sir.  Right up.

22               PROSPECTIVE JUROR 4:  Okay.

23               COURTROOM DEPUTY:  Juror number 6.

24               Juror number 9.  Right here.  All the way down.

25               Juror number 15.

1          PROSPECTIVE JUROR 15:  All the way down?

2          COURTROOM DEPUTY:  That will be your seat.  Don't take

3    your numbers off just yet.

4          Juror number 16.

5          Juror number 27.

6          Juror number 31.

7          Juror number 32.

8          Juror number 33.  Ma'am, I'm going to have you come

9    down to this front row.

10          Juror number 35.

11          Juror number 40.

12          Juror number 42.

13          Juror number 43.

14          Juror number 45.

15          And juror number 47.

16          THE COURT:  Ladies and gentlemen, before we begin this

17    trial, have any of you thought of anything that might affect

18    your ability to serve as a fair and impartial juror in this

19    case?

20          I see no responses.

21          Those members of the jury panel who are not selected

22    as trial jurors are excused.  You may go home.  We appreciate

23    very much your participation today.

24          (Jury panel leaves the courtroom at 3:37 p.m.)

25          THE COURT:  As I've explained, ladies and gentlemen,

UNITED STATES DISTRICT COURT

1    at the end of the case, three of you will be designated as

2    alternate jurors.  We don't make that designation until the end

3    of the case, because, frankly, we wouldn't expect you to be

4    designated as an alternate and sit there and pay attention,

5    feeling like you weren't going and to deliberate.  We

6    appreciate all of you, and your agreement to serve.

7          I am now going to give you some preliminary

8    instructions.

9          COURTROOM DEPUTY:  Did you want me to swear them in?

10         THE COURT:  Oh, yes, thank you, Kathleen.

11         We'd ask you now to please stand and be sworn in as

12   jurors in this case.

13         (Jury sworn.)

14         THE COURT:  Now -- well, ladies and gentlemen, I have

15   made a mistake.  I thought I had the preliminary instructions

16   here ready to read for you, and I must have left them back in

17   my office.  So I need to go get them.  Please feel free to

18   stand and stretch, and I will be right back.

19         Thank you.

20              (Proceedings in recess at 3:40 p.m.)

21               (Proceedings resume at 3:44 p.m.)

22         THE COURT:  Thank you for your patience.  I appreciate

23   it.

24         Please be seated.

25         Ladies and gentlemen, you are now the jury in this

1    case, and I want to take a few minutes to tell you something

2    about your duties as jurors and to give you some preliminary

3    instructions.

4            At the end of the trial, I will give you more detailed

5    written instructions that will control your deliberations.

6            When you deliberate, it will be your duty to weigh and

7    to evaluate all the evidence received in the case; and in that

8    process, to decide the facts.

9            To the facts as you find them, you will apply the law

10   as I give it to you, whether you agree with the law or not.

11   You must decide the case solely on the evidence and the law

12   before you.

13           Perform these duties fairly and impartially.  Do not

14   allow personal likes or dislikes, sympathy, prejudice, fear, or

15   public opinion to influence you.  You should also not be

16   influenced by any person's race, color, religion, natural

17   ancestry or gender, sexual orientation, profession, occupation,

18   celebrity, economic circumstances, or position in life or in

19   the community.

20           This is a criminal case brought by the United States

21   Government.  The government charges the defendant with

22   conducting financial transactions involving property

23   represented to be the proceeds of specified unlawful activity,

24   which is a form of money laundering.

25           The charges against the defendant are contained in the

first superseding indictment.  The first superseding indictment
simply describes the charges the government brought against the
defendant.  The first superseding indictment is not evidence
and does not prove anything.

        The defendant has pleaded not guilty to the charges
and is presumed innocent unless and until the government proves
the defendant guilty beyond a reasonable doubt.

        In addition, the defendant has the right to remain
silent, and never has to prove innocence or present any
evidence.

        The evidence you are to consider in deciding what the
facts are consists of:

        One, the sworn testimony of any witness.

        And two, the exhibits which are received in evidence.

        And if the parties agree to any facts during the
course of this trial, we will so inform you.

        The following things are not evidence, and you must
not consider them as evidence in deciding the facts of this
case.

        1.  The statements and arguments of the attorneys.

        2.  The questions and objections of the attorneys.

        3.  Any testimony that I instruct you to disregard.

        And 4.  Anything you may see or hear when the Court is
not in session, even if what you see or hear is done or said by
one of the parties or by one of the witnesses.

1          Evidence may be direct or circumstantial.  Direct

2     evidence is direct proof of a fact such as testimony by a

3     witness about what that witness personally saw or heard or did.

4          Circumstantial evidence is indirect evidence; that is,

5     it is proof of one or more facts from which you can find

6     another fact.

7          You are to consider both direct and circumstantial

8     evidence.  Either can be used to prove any fact.  The law makes

9     no distinction between the weight to be given to either direct

10    or circumstantial evidence.  It is for you to decide how much

11    weight to give to any evidence.

12         There are Rules of Evidence that control what can be

13    received in evidence.  When a lawyer asks a question or offers

14    an exhibit in evidence, and the lawyer on the other side thinks

15    that it is not permitted by the Rules of Evidence, that lawyer

16    may object.  If I overrule the objection, the question may be

17    answered or the exhibit received.  If I sustain the objection,

18    the question cannot be answered or the exhibit cannot be

19    received.

20         Whenever I sustain an objection to a question, you

21    must ignore the question and must not guess what the answer

22    would have been.

23         Sometimes I may order that the evidence be stricken

24    from the record and that you disregard or ignore the evidence.

25    That means that when you are deciding the case, you must not

1    consider the evidence that I told you to disregard.

2           In deciding the facts of this case, you may have to

3    decide which testimony to believe and which testimony not to

4    believe.  You may believe everything a witness says, or part of

5    it, or none of it.

6           In considering the testimony of any witness, you may

7    take into account:

8           1.  The witness' opportunity and ability to see or

9    hear or know the things testified to.

10          2.  The witness' memory.

11          3.  The witness' manner while testifying.

12          4.  The witness's interest in the outcome of the case,

13   if any.

14          5.  The witness's bias or prejudice, if any.

15          6.  Whether other evidence contradicted the witness's

16   testimony.

17          7.  The reasonableness of the witness' testimony in

18   light of all the evidence.

19          And 8.  Any other factors that bear on believability.

20          The weight of the evidence as to a fact does not

21   necessarily depend on the number of witnesses who testify about

22   it.  What is important is how believable the witnesses are and

23   how much weight you think their testimony deserves.

24          I will now say a few words about your conduct as

25   jurors.

1          First, keep an open mind throughout the trial and do

2     not decide what that verdict should be until you and your

3     fellow jurors have completed your deliberations at the end of

4     the case.

5          Second, because you must not -- because you must

6     decide this case based only on the evidence received in the

7     case and on my instructions as to the law that applies, you

8     must not be exposed to any other information about the case or

9     to the issues it involves during the course of your jury duty.

10    Thus, until the end of the case, or unless I tell you

11    otherwise, do not communicate with anyone in any way, and do

12    not let anyone else communicate with you in any way about the

13    merits of the case or anything to do with it.  This includes

14    discussing the case in person, in writing, by phone or

15    electronic means, via email, via text messaging or any Internet

16    chat room, blog, website, or application, including but not

17    limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

18    Snapchat, or any other form of special media.

19         This applies to communicating with your fellow jurors

20    until I give you the case for deliberation, and it applies to

21    communicating with everyone else, including your family

22    members, your employer, the media or press, and the people

23    involved in the trial, although you may notify your family and

24    your employer that you have been seated as a juror in this

25    case, and how long you expect the trial to last.  But if you

are asked or approached in any way about your jury service or
anything about this case, your must respond that you've been
ordered not to discuss the matter, and to report the contact to
the Court.

Because you will receive all the evidence and legal
instruction you properly may consider to return a verdict, do
not read, watch, or listen to any news or media accounts or
commentary about the case, or anything to do with it.  Do not
do any research such as consulting dictionaries, searching the
Internet, or using other reference materials, and do not make
any investigation or in any other way try to learn about the
case on your own.  Do not visit or view any place discussed in
this case, and do not use Internet programs or other devices to
search for or view any place discussed during the trial.

Also, do not do any research about this case, the law
or the people involved, including the parties, the witnesses or
the lawyers, until you've been excused as jurors.

If you happen to read or hear anything touching on
this case in the media, turn away and report it to me as soon
as possible.

These rules protect each party's right to have this
case decided only on evidence that has been presented here in
the court.  Witnesses here in court take an oath to tell the
truth, and the accuracy of their testimony is tested through
the trial process.  If you do any research or investigation

outside the courtroom, or gain any information through improper

communications, then your verdict may be influenced by

inaccurate, incomplete, or misleading information that has not

been tested by the trial process.

Each of the parties is entitled to a fair trial by an

impartial jury.  And if you decide the case based on

information not presented in court, you will have denied the

parties a fair trial.  Remember:  You have taken an oath to

follow the rules, and it is very important that you follow

those rules.  A juror who violates these restrictions

jeopardizes the fairness of these proceedings, and a mistrial

could result that would require the entire trial process to

start over.

If any of you is exposed to any outside information,

any contact by any third party, please notify the Court

immediately.

At the end of the trial, you will have to make your

decision based on what you recall of the evidence.  Except in

very unusual circumstances, you will not have a written

transcript of the trial.  I urge you to pay close attention to

the testimony as it is given.

If you wish, you may take notes to help you remember

the evidence.  If you do take notes, please keep them to

yourself until you and your fellow jurors go to the jury room

to decide the case.  Do not let note-taking distract you from

being attentive.  When you leave court for recess, your notes should be left in the jury room.  No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The next phase of the trial will now begin.  First, each side may make an opening statement.  An opening statement is not evidence.  It will be simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.  The government will then present evidence, and counsel for the defendant may cross-examine.  Then if the defendant chooses to offer evidence, counsel for the government may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments.  After that, you will go to the jury room to deliberate on your verdict.

Does the government have an opening statement?

MS. ESCALANTE KONTI:  Yes, Your Honor.  But could we have a sidebar prior to opening?

THE COURT:  You may.

Ladies and gentlemen, from time to time during the trial, it may become necessary for me to take up legal matters with the attorneys privately, either by having a conference at

1   the bench when the jury is present in the courtroom, which I'm

2   going to do now, or by calling a recess.

3          Please understand that while you are waiting, we are

4   working.  The purposes of these conferences is not to keep

5   relevant information from you, but to decide how certain

6   evidence is to be treated under the Rules of Evidence, and to

7   avoid confusion and error.  Of course, we will do what we can

8   to keep the number and length of these conferences to a

9   minimum.  I may not always grant an attorney's request for a

10  conference.  Do not consider my granting or denying a request

11  for a conference as any indication of my opinion of the case or

12  what your verdict should be.

13         (At sidebar on the record.)

14             THE COURT:  All right.  Ms. Escalante?

15             MS. ESCALANTE KONTI:  Hi, Judge.

16         It came to our attention from one of the other AUSAs

17  that two of the individuals that are here for the defendant are

18  wearing shirts that say Google Jury Nullification, and that

19  they are either turned inside out or covered up with their

20  hoodies.  And it's a huge concern that they would unzip them

21  and show them during opening statement.

22             THE COURT:  Okay.

23         Ms. Weidner?

24             MS. WEIDNER:  Your Honor, I suggested to Mr. Restaino

25  that perhaps now would be a good time to acclimate the jurors

UNITED STATES DISTRICT COURT

```
1    to the jury room and the combination, and all that, and then do
2    openings before excusing them for the day, just so that the --
3    we can make sure that this is something that is as disturbing
4    to the defense as it is to the prosecution, because I don't
5    want this kind of stuff to inure against my client in front of
6    the jury.  So it's -- it's -- we're very concerned and would
7    suggest that as a way to deal with it.
8             THE COURT:  Ms. Escalante?
9             MS. ESCALANTE KONTI:  That's fine, if that's the best
10   way to remedy it.  Then we can go ahead and instruct the jurors
11   outside the presence, and then Ms. Weidner can maybe also speak
12   with those individuals.
13            THE COURT:  Well, wait a minute.  What I understand
14   Ms. Weidner to be suggesting is that we recess for the day, so
15   you won't be doing your opening.
16            MS. WEIDNER:  I don't know if we would recess for the
17   day.  But I was thinking that my understanding from our
18   conversation -- my conversation -- my brief conversation with
19   Mr. Restaino would be to take this opportunity to acclimate the
20   jury to the jury room and the facilities there, and the Court
21   can take the opportunity while the jury is thus engaged to
22   advise of, you know, messages to the jury are inappropriate.
23            THE COURT:  Who are the AUSAs who brought this to your
24   attention?
25            MR. RESTAINO:  I believe it's Ms. Klapper, Your Honor,
```

1   who handed me the note.  I actually didn't see.  I will figure

2   that out, if you want, right now.

3          THE COURT:  Yes, please.  I'm going to let the jury go

4   right now.

5          MR. BINFORD:  Your Honor, this is AUSA Matthew

6   Binford.  I did see --

7          THE COURT:  You need to get up here closer.

8          MR. BINFORD:  I did see part of the pink shirt, the

9   gentleman with the black hooded sweatshirt and the pink shirt

10  appear to have consistent language.

11         THE COURT:  What did it say?  Were you able to read

12  it?

13         MR. BINFORD:  I wasn't able to read any of the words.

14                 (Pause in proceedings.)

15         THE COURT:  Okay.  I'm going to handle it as you have

16  suggested.  We will bring them back in in about 25 minutes, and

17  then -- can you do your opening in 35 minutes?

18         MS. ESCALANTE KONTI:  Yes, Your Honor.

19         THE COURT:  What about you?

20         MR. CAIN:  That's fine, Judge.  We can make it work.

21         THE COURT:  All right.

22         I've been asked to remind you that one of the jurors

23  is wearing a headset.  When they have the headset, unless you

24  press -- when you're conferencing at your table, unless you

25  press that little thing that turns off the green light, they'll

```
1    hear everything you're saying at counsel table.  So please
2    remember, if you're having a consultations at counsel, because
3    we have a juror who needs a headset, you need to press that
4    button.  Please.
5            All right?  Thank you.
6        (End of discussion at sidebar.)
7            THE COURT:  Ladies and gentlemen of the jury, a matter
8    has arisen which I need to take care of right away.
9            What I propose to do is you need to be oriented to the
10   jury room.  Some of you may be from out of town, and you need
11   to be told how you can gain accommodations and transportation.
12   All those matters will need to be taken care of before the end
13   of the day anyway.
14           So we're going to take about 20 or 25 minutes and take
15   care of those matters right now, while I handle some other
16   business.  And when we're through with that, we will have
17   opening statements.
18           Thank you very much.
19           COURTROOM DEPUTY:  If you could just grab your
20   notebooks and follow me, please.
21             (Jury leaves the courtroom at 4:04 p.m.)
22           THE COURT:  Please be seated.
23           Sir, you in the orange, would you please stand.
24           UNIDENTIFIED MAN:  Sure.
25           THE COURT:  And you in the jacket, would you please
```

```
 1    stand.

 2              Would you unzip your jacket, please.

 3              SECOND UNIDENTIFIED MAN:  Yes.

 4              THE COURT:  And would you open it up?

 5              SECOND UNIDENTIFIED MAN:  (Witness complies.)

 6              THE COURT:  Sir, does your shirt say the same thing?

 7              SECOND UNIDENTIFIED MAN:  It does.  Underneath.

 8              THE COURT:  All right.

 9              Let me be clear about a couple of things.  I think

10    that you already know that I have been very solicitous of

11    having the right to have the public be here.  And you do have

12    the right to be here.  But you do not have the right to be here

13    if you're going to try to influence the jury.  And if you're

14    going to try to send them messages by the T-shirts you're

15    wearing or anything else that you're doing, and if you do that,

16    and if you interfere with this jury, I will make sure that

17    actions are taken that are appropriate.

18              I do not mean in any way to threaten you.  You have

19    the right to be here, and I'm going to enforce your right to be

20    here, as long as you enforce the right for this trial to be

21    fair.  But if you're trying to send a message to the jury by

22    what you wear, by what you say, or anything else, I will not

23    tolerate it.

24              Is that clear?

25              UNIDENTIFIED MAN:  Absolutely.
```

1          SECOND UNIDENTIFIED MAN:  Yeah.

2          THE COURT:  So, sir, you're either going to keep your

3     jacket zipped up completely and not zip it down, or if you'd

4     like, you may do what the gentleman to your left has done and

5     wear your shirt inside out so it doesn't present any threat of

6     being presented to the jury.

7          I would appreciate it, to the extent that you may have

8     colleagues or friends that are going to attend, again, I want

9     them to feel free to attend, but they need to understand they

10    can't try to influence this process in any way.  So if you want

11    to share that with them, please do so.  We are going to do our

12    very best to provide a fair trial here for all concerned.

13          Any questions?  Anything that the prosecution or the

14    defense wants to add or have any concern about anything that

15    I've said?

16          Sir?

17          SECOND UNIDENTIFIED MAN:  I --

18          THE COURT:  Do you want to approach a microphone?

19          SECOND UNIDENTIFIED MAN:  Sure.

20          This one?

21          THE COURT:  Yes.

22          SECOND UNIDENTIFIED MAN:  I respect the judge's

23    concerns, and that's why, from the get-go, the only time I've

24    unzipped my jacket was for Security briefly.  Other than that,

25    the entire time I've been in this building, I've had my

1    sweatshirt opened up.

2           However, my question to the judge would be, if there

3    is any problem he has with me having my sweatshirt on outside

4    in public areas when I'm going out and getting food.

5           THE COURT:  Well, I'm going to tell you, the only

6    thing that I would be concerned about is to the extent you're

7    trying to influence the jury, I would appreciate it if you

8    didn't do it.  I can't -- I don't have any control over things

9    outside the courtroom, but if the juror is going to come back

10   and tell me that they saw you and they've seen you in the

11   courtroom and you're wearing that T-shirt, it -- it poses a

12   problem.  Okay?  So I would suggest -- I'm not going to

13   enforce -- I'm going to enforce things in this courtroom -- but

14   I would suggest that you not try to wear things that are going

15   to influence members of the jury or to send messages to the

16   jury outside this courtroom either, because I believe -- and so

17   in other words, if you're walking in the hallways, the jurors

18   sometimes walk in the hallway.  And, you know, if you want to

19   stand outside the building and do that, very little I can do

20   unless a juror tells me that they've seen you and you're doing

21   that, and they wonder why you're here in the courtroom.

22          I would make a request, though, and the request would

23   be this:  Come as a member of the public, and don't come trying

24   to influence the jury or the result, and don't do that by

25   anything you're wearing or anything else.  That would be my

1    request.  It will -- it will make the trial go much neater for

2    you and for both the defense and the prosecution, and hopefully

3    we can have a fair trial here.

4            SECOND UNIDENTIFIED MAN:  I understand.

5            THE COURT:  Thank you for asking.

6            SECOND UNIDENTIFIED MAN:  Thank you.

7            THE COURT:  Is there anything the prosecution or

8    defense wants to add to what I've said?

9            MR. RESTAINO:  Yes, Your Honor, just to put on the

10   record the shirt said Google Jury Nullification.

11           We appreciate the Court's comments and efforts to both

12   respect the rights of people to be at this trial today, but

13   also to ensure a fair trial from the standpoint of the

14   government and the defense.

15           But I would also say that there are federal criminal

16   penalties that can apply in these circumstances on efforts to

17   corruptly impede a juror, and we would certainly put any of the

18   spectators that are intending to display messages like that on

19   notice.

20           THE COURT:  Well, I appreciate your putting them on

21   notice.

22           I do not want to threaten anybody, but certainly what

23   Mr. Restaino said is correct, that jury tampering is, to the

24   extent it actually occurs, is a crime.  And so you want to be

25   careful.

UNITED STATES DISTRICT COURT

1          Ms. Weidner?  Anything you want to say?

2          MS. WEIDNER:  We have nothing to add, Your Honor.

3          THE COURT:  All right.  As long as we're here, we

4  might as well take care of a few other matters and -- while the

5  jury is getting instructed, and then we can break before

6  they're ready to come back in.

7          First off, I should have checked this.  I didn't.  My

8  jury instructions require you to submit full copies of the jury

9  instructions.  The reason I had to go back there is you haven't

10 done that.  You didn't submit any preliminary instructions or

11 any final instructions.  So by the time we get to the final

12 instructions, I would ask you to print out full copies of the

13 instructions.

14         Second, to the extent that we've already taken this

15 up -- and we've gone past the point where it's going to be

16 relevant now -- but I just want to make sure that both parties

17 understand that it seems to me that the statute provides three

18 alternative ways in which the crime can be committed.  The

19 government has only charged two.  So the third -- the first,

20 actually -- is not relevant.

21         The paragraph below B and C seems to apply both to

22 paragraph B and to paragraph C.  So:  Whoever, with the intent

23 to conceal, disguise the nature, location, source, ownership,

24 or control of the property believed to be the proceeds of

25 specified unlawful activity or to avoid transaction reporting

1    requirement under state or federal law, conducts or attempts to

2    conduct a financial transaction involving property represented

3    to be the proceeds of specified unlawful activity, it seems to

4    me, if I read the statute correctly, that under either B or C,

5    the property has to be represented to be the proceeds as

6    specified, unlawful activity.  It also seems to me, however,

7    that under B there may be a separate requirement that the

8    defendant believed them to be the proceeds of specified

9    unlawful activity; that something is represented to be

10   something and that something is believed to be something are

11   two, it seems to me, separate requirements.  And that -- and

12   that separate requirement would apply, it seems to me, to one

13   of the subsections, but not necessarily the other.  And I don't

14   know if that clarifies any what we were talking about earlier,

15   but that's what I was talking about earlier.

16          And that being said, if the government and the -- you

17   know, I'll listen to what the government and defense have to

18   say, and if they stipulate, I'll look at it pretty carefully.

19   I just want to make sure that we get this law accurately

20   delivered to the jury.

21          Do you want to take up motions in limine at this

22   point?  I've read the supplemental motion in limine, and I've

23   read the response.

24          It seems to me that the government response is willing

25   to preclude Exhibit 95.

1          You're not going to introduce Exhibit 95; is that

2    correct?

3          MR. RESTAINO:  That is correct, Your Honor.

4          THE COURT:  You're also not -- is there any part of

5    Exhibit 96 that you're going to try to introduce?  You've

6    indicated you don't want to introduce anything about money

7    laundering.  Is there any part -- anything left in 96 that you

8    want to introduce?

9          MR. RESTAINO:  There might be, Judge.  I think it's

10   probably not going to be something that we need to introduce at

11   the end of the day, letter to Maximus.  But we did want the

12   opportunity to use it when the defendant talks about the scope

13   of his Bitcoin operation.  We think that that would be

14   relevant.

15         THE COURT:  All right.  Well, to the extent that you

16   are not going to -- you've indicated that you will not

17   introduce any -- the money laundering statements in 96, which

18   pertain to, apparently, the defendant's belief that he was

19   going to be charged for money laundering?

20         MR. RESTAINO:  Correct.  And we agree under these

21   circumstances, that's not admissible.

22         THE COURT:  All right.  So that will not be admissible

23   under 96.

24         95 is not admissible.

25         The Bitcoin flyer, you've indicated you're not going

1    to seek to admit.  I don't know what exhibit number that is.

2            MR. RESTAINO:  It was never even exhibited, Your

3    Honor, because we did not intend to exhibit.

4            THE COURT:  All right.

5            As it pertains to document 120, Ms. Weidner, I do want

6    to discuss this with you.

7            It does seem to me that I am a little concerned

8    about -- I'm not concerned about the statement being admitted

9    for the truth of the matter.  It seems to me that the

10   government has a good point that what they're seeking to admit

11   it for is the idea that such transactions were conducted by

12   Mr. Costanzo secretively and with Bitcoin.  It does seem to me

13   that that is fairly probative, but I am open if you have

14   suggestions about how to limit the prejudice while not

15   prohibiting the point.

16           MS. WEIDNER:  Well, Your Honor, the defense's concern

17   is that, again, the charges Mr. Costanzo are facing are money

18   laundering charges.  And Exhibit 20 -- Exhibit 120 is a text

19   conversation with an unknown individual who is on there as Kuro

20   Bubble, and it's -- it's about, essentially, buying a small

21   amount of -- of a hallucinogen.  The fact that it's bought with

22   Bitcoin, it could have been bought with cash.  It was almost

23   bought with cash.

24           THE COURT:  Yeah.  Well, let me be more specific then.

25           The issue here is to the extent that you intend to

```
 1    preserve -- and you have every right to do so -- the entrapment
 2    defense.  So the question really is predisposition.
 3              MS. WEIDNER:  Your Honor, our argument there would be
 4    that predisposition to purchase a recreational drug is quite
 5    different than predisposition to launder the proceeds of a
 6    specified unlawful activity.  And, Your Honor, we could provide
 7    additional briefing to the Court on this, but there is
 8    definitely case law that supports such a notion, saying that,
 9    you know, tax evasion and reckless driving, reckless driving
10    doesn't show predisposition for tax evasion.  Likewise, I would
11    argue that perhaps having a recreational drug problem or using
12    recreational drugs from time to time does not make anyone more
13    likely to become a money launderer.
14              THE COURT:  And purchasing them with Bitcoin?
15              MS. WEIDNER:  Your Honor, Bitcoin can be used to
16    purchase pretty much anything.  And actually in one of the
17    government's exhibits that they --
18              THE COURT:  Well, I don't question that.  But the
19    point is, you can't trace Bitcoin; right?
20              MS. WEIDNER:  You can, but with great difficulty.
21              And if Your Honor were to review Exhibit 120, there is
22    a discussion about cash versus Bitcoin, and my client offers
23    Bitcoin because he does not have cash on hand.  That does
24    not -- I don't think that that goes to the same issues that are
25    underlying the money laundering counts.
```

1          THE COURT:  Mr. Restaino?

2          MR. RESTAINO:  Judge, there's really two types of

3     tracing problems here.  There's the fact that the Bitcoin is

4     going to be used, and Bitcoin is significantly more difficult

5     to trace; and that there's going to be a telegram encrypted

6     application used which the defendant says:  Hey, please be way

7     more discreet when over open communications.  Apprizing grams

8     is quoted over the open chat.  That encryption also goes

9     towards the predisposition to conceal in this case.

10          And we believe that because entrapment is still being

11     offered as a possible element that the government needs to

12     overcome, that this Kuro chat is particularly appropriate for

13     admissibility in this case.

14          THE COURT:  All right.  Well, I'm going to deny the

15     motion in limine without prejudice, Ms. Weidner, to you raising

16     it again in the context in which it will be offered.  And I

17     may -- may deal with limiting -- limiting that evidence at that

18     point.

19          121, is that the wife?

20          MR. RESTAINO:  That's the long one, Judge, from --

21          THE COURT:  Oh.  I never got a copy of 121.  I don't

22     even know what 121 says.

23          MR. RESTAINO:  Yeah, Judge.  Judge, I think we can

24     certainly -- it's a mess because is it's a super-long text.

25     There are aspects in there that could be relevant.

1          We would ask you to deny the motion in limine.  And --

2    and in the event that we do intend to try these portions,

3    require us to get the redacted version to the defense in

4    advance of using it with any witness, because there -- there

5    could be some portions in there that still are made applicable

6    based on the testimony that comes out.  We have no intention of

7    introducing that entire thing.

8          THE COURT:  Well, how about I do this.  How about I

9    just indicate that because I haven't seen a copy of 120, and I

10   don't know what's in it, that you are not allowed to introduce

11   it unless and until you've raised it with the Court and

12   received advance permission to introduce whatever portion of it

13   you want to introduce.

14         MR. RESTAINO:  That would be fine, Judge.  Thank you.

15         THE COURT:  All right.

16         MS. WEIDNER:  And, Your Honor, the Court means 121?

17         THE COURT:  That is correct.  Thank you for the

18   correction, Ms. Weidner.

19         Is 122 the conversation with the putative wife?

20         MR. RESTAINO:  That is correct, Your Honor.

21         THE COURT:  All right.

22         Ms. Weidner?  It's not being offered for the truth, is

23   it?

24         MS. WEIDNER:  Your Honor, it's -- I -- I think that

25   that text exchange is a bit confusing.  This is -- and I think

1    one of the things that sticks out about it in particular is

2    that unlike the other texts that the government will introduce,

3    both text strings that were in connection with some of the

4    other witnesses in this case, there was some kind of a --

5    usually some kind of a moniker that would be attached:  So,

6    Steve from Tempe, Miss 500, Jake, Mack D's, when the car

7    crapped out.  Those are the kind of names -- this is just a

8    phone number.  And it ends up being an exchange that I think

9    makes very -- I don't see how that exchange helps to prove

10   anything.  And again, you have a woman or a man -- I don't

11   know -- a person saying that their husband is using Bitcoin to

12   buy drugs.  You can use cash to buy drugs.  You can trade

13   things for drugs.  Anything can be used for some illicit

14   purpose, I guess.  You know, a car.  Anything.  And so I don't

15   see the relevance of this exhibit, and I think it is misleading

16   and confusing.

17            THE COURT:  Mr. Restaino?

18            MR. RESTAINO:  Your Honor, the particular salient

19   point here is in defendant's response to that statement, which

20   is:  That's none of my business.

21            That is consistent with the statements that are made

22   to the undercover law enforcement officers.  But in this case,

23   it's to a conversation that is actually on his phone, helps to

24   bolster and corroborate those, and it helps to get us again

25   towards pre-disposition.

1          I will say it is a little snarky.  And if there were a

2     403 objection as to the specific snarkiness at the end where

3     the defendant tells the putative wife that she should go use

4     Bitcoins to purchase marriage counseling, that might be

5     something that isn't -- that is overshadowed in terms of its

6     probative value.  But that exchange in the middle really is

7     very salient to us, and we believe that that should be

8     admissible based on the entrapment instruction the defense is

9     seeking.

10          THE COURT:  All right.  It doesn't seem to me -- much,

11     of course, of the defendant's statements are not hearsay.  The

12     statements that give context to his statements seem to me to be

13     not moved for the truth.

14          I would ask you then to omit the snarkiness, if it's

15     not necessary.  And that motion in limine is denied.

16          Do we have anything else that is outstanding on the

17     supplemental motion in limine, Ms. Weidner?

18          MS. WEIDNER:  Your Honor, I guess my -- my final

19     concern with these -- and with 122, for example, is it does

20     seem like what the government is doing is essentially not

21     defending against an entrapment defense, but shifting the

22     burden altogether.  So not only do we have, you know, the jury

23     instruction that we haven't worked out yet for money

24     laundering, but someone who is a Bitcoin trader now has to take

25     on responsibility for somehow determining what is the purpose

1    of anyone who they purportedly sell Bitcoin to, and we don't

2    even know that he ever sold Bitcoin to this unnamed individual

3    who contacted him.

4              It -- it is far -- it is our position that it is far

5    afield.  It is basically a smear to his -- to his character by

6    the government that is -- is not probative of the money

7    laundering charges.

8              THE COURT:  Do you want to suggest a limiting

9    instruction?

10             MS. WEIDNER:  Your Honor, I don't have a lot of faith

11   in limiting instructions.

12             Is -- did the Court deny the defense supplemental

13   motion in limine about or without prejudice as to 122?

14             THE COURT:  If you have a basis for raising it again,

15   I'll hear you.  So I'll deny it without prejudice.

16             (Electronic noise heard in courtroom.)

17             MS. WEIDNER:  Wow.

18             THE COURT:  That was bothersome.

19             MS. WEIDNER:  I'm sorry?

20             THE COURT:  You can raise it again if you have a

21   separate reason for wanting to keep it out.  But it does seem

22   to me that it does go to predisposition.  It also isn't

23   hearsay.  So I'm not -- as it pertains to defendant's

24   statements themselves, and to the extent that statements are

25   being offered to provide context for the hearsay, they're not

| | |
|---|---|
| 1 | being admitted for the truth of the matter.  So if you want me |
| 2 | to keep it out, you're going to have to give me a reason that I |
| 3 | can keep it out under the Rules of Evidence.  It doesn't seem |
| 4 | to me like we're there yet. |
| 5 | MS. WEIDNER:  Yes, Your Honor.  We'll revisit that |
| 6 | later. |
| 7 | MR. RESTAINO:  There was one other in the motion in |
| 8 | limine, Judge.  It's 97, which was the one-sentence text from |
| 9 | the defendant to Amideo, who we know to be Peter Steinmetz, |
| 10 | the, hey, this is better, it's not on the phone company's |
| 11 | servers text. |
| 12 | THE COURT:  I -- |
| 13 | MR. RESTAINO:  And again, we -- we're just responding |
| 14 | to the motion here.  But we've laid out our grounds on why we |
| 15 | think that that is relevant, both as a use of encrypted |
| 16 | technology and as a means of saying how to avoid -- how to |
| 17 | avoid information becoming public.  We think that also goes |
| 18 | towards pre-disposition and is relevant separately for -- for |
| 19 | the laundering activities. |
| 20 | THE COURT:  But do you have that tied to any |
| 21 | particular transaction theory or anything else? |
| 22 | MR. RESTAINO:  No, Your Honor.  But it is within the |
| 23 | time frame of -- of these transactions.  This is in between |
| 24 | Officer Martin's November transaction and the February charged |
| 25 | transaction in early 2016.  I think the timing fits pretty |

1  well.

2          THE COURT:  Well, I think you're getting pretty close

3  to 403 there, unless you can give me some sort of context.

4          MR. RESTAINO:  Your Honor, we'll see then if we can

5  develop that with a witness.  Again, the tricky thing for us is

6  to how to get this at least into a level where we can get it

7  into evidence through the computer forensic person.  I

8  anticipate we will not seek then to introduce this one through

9  the computer forensic tech, but we'll lay the proper foundation

10  and then in the event that we develop the appropriate

11  predication with a particular witness, we'll try to lay that

12  foundation to satisfy the Court.

13          THE COURT:  All right.

14          Anything else we need to do?

15          Do we know whether the jury is back, Kathleen, and all

16  ready?

17          COURTROOM DEPUTY:  One of the jurors had to go down to

18  the jury office, so I doubt that they're back just yet, and

19  they'll call when they're ready.

20          THE COURT:  All right.  How long was it going to take

21  for you to do your opening, Ms. Escalante?

22          MS. ESCALANTE KONTI:  About 20 minutes, Your Honor.

23          THE COURT:  Mr. Cain, what do you think?

24          MR. CAIN:  Ten, 15 minutes.

25          THE COURT:  I'll tell you what.  We have a juror who

1    resides out of the area and had to go back down to the jury

2    office to arrange --

3              COURTROOM DEPUTY:  They don't reside out of the area.

4    She had a question.

5              THE COURT:  Oh.

6              COURTROOM DEPUTY:  But they are all back right now.

7              THE COURT:  They're all back?

8              All right.  Let's bring them in.

9              MR. RESTAINO:  Judge, can we pull the podium up?

10             THE COURT:  You may.

11                (Jury enters the courtroom at 4:29 p.m.)

12             THE COURT:  Thank you.  You may be seated.

13             Ms. Escalante?

14             MS. ESCALANTE KONTI:  Good afternoon, ladies and

15   gentlemen.

16             This is a case about money laundering; specifically,

17   the defendant's illegal and secret conversion of what he

18   believed to be dirty drug money into a virtual currency called

19   Bitcoin.

20             Now, as you heard, Bitcoin is not illegal.  The

21   defendant is not on trial for using or possessing Bitcoin.  He

22   is on trial for his illegal and secret conversion of dirty drug

23   money into Bitcoin for the purposes of concealing the nature of

24   that money, hiding its owner, where it came from, and in trying

25   to circumvent federal reporting requirements.

1          Now, this case is no different than other money

2     laundering cases you may be familiar with, such as when drug

3     dealers will take a large amount of drug proceeds and purchase

4     a house, a car, or a business with them.

5          Now, purchasing a house, a car, or business isn't

6     illegal.  But when it is done with drug proceeds and it's known

7     to be or believed to be drug proceeds, it's illegal, and it's

8     money laundering.

9          So, for instance, if a real estate agent accepted what

10    he or she believed to be drug proceeds to enable the

11    transaction of a house purchase, that's money laundering.  And

12    this case is no different, except that the vehicle for the

13    money laundering is Bitcoin.

14         So why Bitcoin, you might wonder?  Well, you're going

15    to learn a lot about Bitcoin during this trial.  You're going

16    to hear that Bitcoin is not regulated by the government, and

17    that it's decentralized, meaning there's no authority managing

18    Bitcoin.  You're going to hear that Bitcoin, unlike actual hard

19    cash or physical property, it's virtual, meaning it's easy to

20    conceal, it's easy to transport, you can store it on a digital

21    wallet on your phone.  That's primarily how it's held.

22         Also, it's difficult to seize.  It's difficult to

23    detect.  Law enforcement wouldn't necessarily know that an

24    individual had a lot of Bitcoin as opposed to a lot of cash due

25    to the virtual nature.  And even if it is detected, it's very

1    hard to put an identity, a first name and a last name, with the

2    Bitcoin.  Because you're going to learn that Bitcoin is

3    identified by a wallet address, and that wallet address is

4    alphanumeric, meaning it's made up of a bunch of numbers and a

5    bunch of letters, and that's the Bitcoin address.

6           Typically at a bank account, for instance, you will

7    have an account number, and that's associated to your first

8    name and your last name.  But a Bitcoin wallet address, it's a

9    bunch of numbers and a bunch of letters.

10          Now, you're going to learn that there are two ways,

11   two common ways to purchase Bitcoin.  One is through a

12   commercial exchange, and another is through individual sellers

13   called peer-to-peer exchangers.  You're going to learn about

14   differences from both.

15          Commercial exchanges require a person's identity, a

16   driver's license, first name, last name.  They require

17   personally identifying factors such as a date of birth, or

18   Social Security number, a bank account.  Individual

19   peer-to-peer exchangers rarely do.

20          You're going to hear how commercial exchangers comply

21   with federal reporting requirements.  Individual peer-to-peer

22   exchangers rarely do.

23          You're going to hear how commercial exchanges will

24   report when a transaction of over $10,000 has occurred.

25   Peer-to-peer exchangers rarely do.

UNITED STATES DISTRICT COURT

1          You're going to also hear how commercial exchangers

2    will report if they believe that the funds or the person they

3    are doing a financial transaction with, if there's suspicious

4    activity related to that individual.  For instance, if an

5    individual went to a commercial exchange and reported that his

6    money came from the selling of drugs, a commercial exchange

7    will report a suspicious activity report.  Individual

8    peer-to-peer exchangers rarely do that.

9          Commercial exchanges will charge approximately a

10   1.5 percent fee to conduct a transaction.  Peer-to-peer

11   exchangers go up as high as 10 percent, sometimes even higher.

12   But that's probably a fee worth the anonymity and the lack of

13   reporting.

14         The defendant was a peer-to-peer exchanger who

15   secretly converted dirty drug money -- what he believed to be

16   dirty drug money into Bitcoin.  And he didn't care that it was

17   represented to be dirty drug money.  The defendant stated he

18   didn't care who his customers were, where they came from, or

19   what they did.  He had one rule in his business:  Don't get

20   bit, don't get shot, and don't talk to the police.

21         Well, ladies and gentlemen, as you've heard, this was

22   a sting case.  And unbeknownst to the defendant, three of his

23   customers were the police.  Three of his customers were federal

24   undercover agents that you're going to meet who were posing as

25   drug dealers and gave the defendant large sums of cash that

UNITED STATES DISTRICT COURT

1    they represented to be from drug sales.  Their names -- the

2    defendant knew them as Sergei, Tom, and Jake.  And you're going

3    to hear from all the undercover agents.  You're going to hear

4    about their interactions with the defendant -- they were all

5    audio recorded -- and you're also going to see the text

6    messages that he exchanged with each of the undercover agents.

7            But you'll see that in every occasion when an

8    undercover agent went to the defendant, it was represented as

9    drug money, the defendant accepted it and completed a

10   transaction.  Not once did he back away, not once did he get up

11   and leave.  Completed the transaction.

12           Now, this investigation began in late 2014.  Due to

13   the fair anonymity associated with Bitcoin, and the difficulty

14   in detecting and identifying individuals who were using Bitcoin

15   to further criminal activity, the IRS or the Internal

16   Revenue -- Revenue Service, began an undercover investigation.

17           They began by going to a website that you're going to

18   hear about called local Bitcoins dot com.  And at the time,

19   that was one of the most common websites where individual

20   peer-to-peer sellers advertised the sale of Bitcoin for a

21   particular region.

22           The IRS investigators in the Phoenix area Googled who

23   was near Phoenix, and immediately the defendant popped up.  He

24   advertises to sell Bitcoin under an alias, Morpheus Titania.

25   And his website had a lot of features that really piqued the

1    attention of IRS investigators.  For instance, he listed that

2    he could do up to a 50,000-dollar cash transaction at a time;

3    he listed his phone number, said that he could be texted at any

4    time; that he would go anywhere to conduct a deal, and that he

5    loved working with newbies.

6          He also stated on his website that he used mycelium.

7    Now, you're going to learn that mycelium is an application that

8    you can download on your phone where you go to your app store

9    and maybe downloaded Facebook before, Instagram, that's how you

10   download mycelium.  And mycelium is an application that allows

11   a sender to send Bitcoin to a recipient, but it breaks up the

12   sender's address into multiple addresses, making it harder to

13   identify the original sender.  It's as if a person sent an

14   email, and the recipient received five different emails from

15   five unknown email addresses, and each email contained a piece

16   of the original email from the sender.  That's sort of what

17   mycelium does.  And you're going to hear a lot more about that

18   during the trial.  But that's just basically what mycelium

19   does.  It makes it hard to detect the original source of a

20   transaction.

21         The defendant also listed on his profile a website, a

22   website that -- a link that was basically all about him.  It

23   was called Who Is Morpheus?  If you clicked on that link, the

24   defendant stated that he sold Bitcoin, that he didn't need a

25   bank to do it or a license, just a phone.  And that he

1   basically made a living off selling Bitcoin.

2           So based on the allure of the defendant's page, the

3   investigation or contact by the IRS agents began.  And the

4   first one to contact him was IRS Agent Sergei Kushner, who used

5   the undercover name that is his true first name as Sergei, and

6   that's how the defendant knew him.  He texted the defendant to

7   the phone number listed on the local Bitcoin's profile, and the

8   defendant responded.  Sergei told the defendant that he wanted

9   to conduct a deal remotely because he was in New York and that

10  he would wire the cash to him for the Bitcoins.  The defendant

11  didn't want to do that.  He rejected and said he prefers to

12  meet in person.

13          So three months later in March 2015, Sergei meets the

14  defendant, and they conduct a 2,000-dollar transaction.

15          Now, Sergei did not introduce the fact that he was a

16  drug dealer right then and there.  He didn't portray the money

17  to be from drug proceeds.  But he did give enough hints to set

18  the stage for future introduction.

19          He told the defendant that he was in the import/export

20  business, and that his supplier had told him about Bitcoin.

21  They then exchanged in a communi -- had a communication, which

22  is all recorded and you will hear, and the defendant told

23  Sergei that the IRS doesn't bother him because he doesn't have

24  banks, and he also told him that he does not keep records of

25  any of his transactions.  And that Bitcoin's pretty

1    untraceable.

2         They continued to talk, and Sergei gave more hints.

3    And Sergei told him that the government -- he needs to get the

4    government off of his back, and the defendant said that Bitcoin

5    is a way to do it.  Sergei told him that, you know, the

6    government a lot of times doesn't know what he imports or

7    exports, and the defendant told him that also Bitcoin will be

8    really good with that because it's untraceable.

9         They also discussed how if a 10,000-dollar transaction

10   occurs at a bank, that the radar goes off.

11        And after discussing all of this and the need to want

12   to stay away from the government and not have any radars go

13   off, the defendant told Sergei to download the mycelium app,

14   and then they conducted a transaction.

15        Three -- a few months afterwards, Sergei met with the

16   defendant again in person, and they conducted a 3,000-dollar

17   transaction.  But this time, Sergei told the defendant that the

18   supplier that he mentioned during their first meeting was a

19   supplier for heroin.

20        Ladies and gentlemen, the defendant didn't stop the

21   transaction there.  He didn't tell Sergei that he was done.  He

22   proceeded with the transaction; in fact, completed it.  He told

23   the defendant that he didn't need to know or want to know that

24   stuff.  But never did he stop.  He went forward.

25        And after that transaction, Sergei let the defendant

1   know that they would be doing more business in the future.  And

2   although Sergei couldn't meet with the defendant again, he

3   introduced another undercover agent, and that is Tom.  You're

4   going to meet Tom.  And Tom reached out to the defendant and

5   told him that he was Sergei's business partner.

6          The defendant already knew that Sergei was in the

7   business of heroin, and so the defendant directed Tom to use an

8   encrypted messaging system to talk about this over -- or text

9   about it.  Why?  You're going to learn that the encrypted

10  messaging system that the defendant recommended called Telegram

11  cannot be intercepted.  Only the sender and the recipient will

12  know the communication.  No one else.  So as soon as Tom said

13  that he wanted to conduct a deal, the defendant instructs him

14  to use the Telegram encrypted messaging app.

15         Tom meets with the defendant, and they conduct a

16  13,000-dollar deal.  And Tom tells him, it's about heroin, and

17  I need you to know that.  Because equally for Tom, he wants to

18  be able to trust the defendant.  He wants to gauge him.  But

19  what's important, ladies and gentlemen, is that you're going to

20  hear Tom gave the defendant an opportunity to back out of the

21  deal, and the defendant didn't back out.  In fact, he told him

22  he could provide the Bitcoin and that he was okay with it.

23         The few months pass by after that deal with Tom, which

24  was in October of 2015.  And the IRS partners up with the DEA,

25  and they introduce yet another undercover agent.  That is

UNITED STATES DISTRICT COURT

1    Special Agent Chad Martin.  But he was known to the defendant

2    as Jake.

3         Now, before Jake contacted the defendant, he went back

4    on the local Bitcoin's profile to see if the defendant was

5    still advertising the sale of Bitcoin.  And he certainly was,

6    ladies and gentlemen.  He had a hundred percent feedback.  He

7    stated that -- listed the same phone number that he had listed

8    before, stated that he was, again, willing to go anywhere.  But

9    his terms changed a little bit.  He said that he will do

10   Bitcoin transactions discreetly and immediately, and that

11   anonymity was one of his main focuses.

12        So shortly after that -- seeing that profile, Jake

13   contacted the defendant at the same phone number that Sergei

14   contacted the defendant with.  And similar to Sergei, when Jake

15   met with the defendant, he didn't immediately introduce the

16   drug talk.  He set the stage.  They met two times prior to

17   the -- Jake introducing the drug talk.  But on those two

18   occasions, which were in September and November of 2016, Jake

19   said that he was going to come in to a large amount of cash

20   that he needed cleaned through Bitcoin, and that it was really

21   important to him that law enforcement not seize that cash.  The

22   defendant said that Bitcoin was great for that.

23        Then they met again in February of 2017, and they

24   conducted a 30,000-dollar transaction.  But that time, Jake

25   told the defendant that that cash was for a sale of

UNITED STATES DISTRICT COURT

1    approximately 1 kilogram of cocaine.

2            Ladies and gentlemen, after Jake told the defendant

3    that that sale was -- that the cash came from the sale of

4    cocaine, he didn't stop the transaction, he didn't walk away,

5    he didn't report to anyone that Jake was a drug dealer or that

6    he believed that to be drug proceeds.  He completed the

7    transaction.  And Jake told the defendant that he was probably

8    going to come in to a large amount of cash in the future,

9    probably in the amount of $100,000, representing the sale of

10    two, three kilos of cocaine.  And the defendant told Jake to

11    download the Telegram app for further business communications.

12            Well, he did, and they spoke over the Telegram app.

13    And while it's pretty protected, Jake took photographs of their

14    communications, and you're going to see that in trial.  And

15    you're going to see how they set up another transaction.  And

16    this time, it was worth $107,000, what was represented to be

17    the sale of two, three kilos of cocaine.  And the defendant

18    conducted that transaction, gave Jake the Bitcoin, and thanked

19    him for his business, as always, but then got arrested that

20    day.

21            What you're going to see is that you heard that this

22    is a sting case, and you've heard that all the transactions

23    happened with federal agents.  But you're going to hear from

24    another individual who was a customer of the defendant.  His

25    name is Nolan Sperling.  And he's a young drug dealer.

1           Nolan Sperling broke one of the defendant's rules

2      because he talked to the police.  Remember the rule?  Don't get

3      shot, don't get bit, don't talk to the police.  Well, Nolan

4      talked to the police.  That's because Nolan got arrested for

5      the importation of drugs into the United States, and the

6      further distribution of those drugs.

7           Nolan has pled guilty to importation, and he is on a

8      three-year probationary period wherein if he complies with all

9      the terms for the next three years, in this agreement that he

10     has with the government, which includes cooperating, the case

11     will be dismissed against him.

12          By the time you meet Nolan, he's only -- he's only

13     going to be at least nine months in to that agreement.  So when

14     he leaves here, he still has to be complicit for two years.

15          But Nolan is going to tell you that he met the

16     defendant after he need to figure out a more secure and

17     anonymous way to buy Bitcoin for his drug business.

18          Nolan was about 18 years old when he met the

19     defendant, and he was buying drugs online, importing them into

20     the United States, and selling them.  And he was buying his

21     Bitcoin originally from a commercial exchange.  So when he

22     created the account at the commercial exchange, which you're

23     going to hear about -- it's called Coinbase -- Nolan had to

24     provide a driver's license and a bank account.  And Coinbase

25     also had daily limits for how much Bitcoin Nolan could buy.

1            So his drug business was booming, and he started

2    getting concerned that the government was going to identify him

3    or detect him because he provided his -- his ID and a bank

4    account to buy his Bitcoin.  So he deleted his Bitcoin account.

5            He went to the local Bitcoins profile and found the

6    defendant.  He liked that the defendant marketed that he would

7    work with newbies, and had -- seemed like he had a lot of

8    knowledge about Bitcoin.

9            And so they met, and throughout the course of their

10   relationship, the defendant sold Nolan $40,000 worth of

11   Bitcoin.  And when they would talk about -- or when Nolan would

12   mention drugs, the defendant told him to download the Telegram

13   app.  And you're going to see some of the text messages between

14   the defendant and Nolan.

15           So you see, ladies and gentlemen, once you hear from

16   all of the witnesses, once you hear from the three undercover

17   agents and Nolan, what you're going to see is that the

18   defendant never asked for their identification.  He never

19   confirmed if their name was truly what they reported it to be.

20   He never reported any transaction that he conducted with them

21   over $10,000.  And he never reported any suspicious activity.

22   He never reported that he believed them to be drug dealers, he

23   never reported that he believed their money to be from the sale

24   of drugs.

25           And why would he do that?  Why would he not ask for a

1    license?  Why would he not report anything?  Why would he

2    communicate with them when he knew it was about drugs?  Why

3    would he direct them to download some encryptic messaging

4    system?  Because, ladies and gentlemen, this is a case about

5    money laundering.  This is a case about the defendant's illegal

6    and secret conversion of dirty drug proceeds, of what he

7    believed to be dirty drug proceeds, into Bitcoin.

8         And when you hear all the evidence, when you review

9    all the text messages, when you hear the audio recordings from

10   the undercover agent, the government is going to ask you to

11   find the defendant guilty.

12        THE COURT:  Ladies and gentlemen, I -- I think we've

13   gone far enough into the day.  I don't want to make the

14   defendant try to cram his -- or the cram his opening statement

15   because you're getting tired.  So what we're going to do is go

16   home for the evening.

17        I will ask you to be back in the -- and you got

18   instructions how to get into the jury assembly room; right?

19   I'm going to ask you to be back, all ready to go at five

20   minutes to 9:00 -- I promise you we will be ready -- and we

21   will resume at nine o'clock with the defendant's chance to give

22   their opening statement.  And then we will begin with the

23   testimony.

24        I just want to remind you, we are going to be having

25   trial Tuesday, Wednesday, and Thursday this week.  We will not

1    be having trial Friday or the following Monday.  Then the next

2    Tuesday, Wednesday, and Thursday.  And then depending on how

3    long the trial lasts, we will again go the next Tuesday and

4    Wednesday.  So we're not trying the case on Mondays or Fridays.

5    You'll be able to go to your regular jobs or pursue your

6    regular functions.  Just Tuesdays, Wednesdays, and Thursdays.

7              Is there any question or unclarity about your

8    obligation not to discuss this case with anyone, not to attempt

9    to do any research, not to let anyone try to talk to you about

10   this case or otherwise communicate to you about this case?

11             If that happens, I ask you -- if that happens or

12   anything like that happens, and you're not sure if you should

13   communicate it to me, I'm going to ask you to communicate it to

14   me, okay?  Just by a signed note through the bailiff.  We want

15   to be sure that everyone has -- everyone has a fair trial here.

16             We thank you very much for your willingness to serve.

17             Drive home safely, come back safely, have a pleasant

18   evening.  We'll see you tomorrow morning.

19             Thank you.

20             COURTROOM DEPUTY:  All rise.

21               (Jury leaves the courtroom at 4:53 p.m.)

22             THE COURT:  All right.  Anything we need to raise?

23             MR. RESTAINO:  Nothing from the government, Judge.

24             THE COURT:  All right.

25             MR. CAIN:  Nothing, Your Honor.

UNITED STATES DISTRICT COURT

1          Thank you.

2          THE COURT:  We'll hear from you tomorrow, Mr. Cain,

3    then.   Everybody be ready.

4          I'll see you tomorrow.

5              (Proceedings in recess at 4:55 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

<u>**C E R T I F I C A T E**</u>

        I, CHARLOTTE A. POWERS, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.
        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.
        DATED at Phoenix, Arizona, this 16th day of May, 2018.


                          <u>  s/Charlotte A. Powers  </u>
                           Charlotte A. Powers, RMR, FCRR

**UNITED STATES DISTRICT COURT**