UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 21, 2018 |
| Thomas Mario Costanzo, | ) | 9:07 a.m. |
| | ) | |
| Defendant. | ) | |
|_____| ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRAIL - DAY 2

(Pages 218 - 426)

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2

 3    For the Government:

 4          U.S. Attorney's Office
            By: GARY M. RESTAINO, ESQ.
 5              MATTHEW H. BINFORD, ESQ.
                FERNANDA CAROLINE ESCALANTE KONTI, ESQ.
 6          40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004
 7
      For the Defendant Thomas Mario Costanzo:
 8
            Federal Public Defenders Office - Phoenix
 9          By: MARIA TERESA WEIDNER, ESQ.
                ZACHARY D. CAIN, ESQ.
10          850 W. Adams Street, Suite 201
            Phoenix, AZ  85007
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        <u>INDEX</u>

2

<u>SUMMARY OF COURT PROCEEDINGS</u>                    <u>PAGE</u>:

3

4   Opening statement of Defense                    223

5   Discussion at sidebar                           237

6   Discussion re Darknet                           271

7   Discussion at sidebar                           393

8   Jury in recess                                  419

9   Discussion re exhibits                          419

10

11

12                  <u>INDEX OF WITNESSES</u>

13  <u>WITNESSES FOR THE</u>      <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>
    <u>GOVERNMENT</u>:

14

15  Michael Fleischmann      227       251      273

16  Sergei Kushner           278       348      360

17  David Alvarado           365

18  Jason Shadle             382       401

19  Thomas Klepper           405

20

21

22

23

24

25

              UNITED STATES DISTRICT COURT

## INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| EX. 7 | Photo Bitcoin Digital Money Brochure link to "we use coins" | 373 |
| EX. 11 | Photo Bitcoin Challenge Coin | 373 |
| EX. 12 | Photo Drawer Money Bands | 373 |
| EX. 16 | Photo of Living Room close-up | 373 |
| EX. 17 | Photo of Living Room | 373 |
| EX. 18 | Photo Morpheus Titania Bitcoin Business Card | 373 |
| EX. 19 | Photo Samsung phone | 373 |
| EX. 20 | Photo table money bands | 373 |
| EX. 31 | Placeholder for Samsung Phone Seized at Search Warrant | 373 |
| EX. 32 | Sperling Chat Extraction | 393 |
| EX. 34 | Bitcoin Quick Start Pamphlet Inside (See Ex.10) | 373 |
| EX. 35 | Bitcoin Quick Start pamphlet Outside (See Ex. 10) | 373 |
| EX. 36 | Precious Metals in Residence | 373 |
| EX. 67 | Jake UC3 Chat Report | 393 |
| EX. 70 | Nokia cell extraction with UC1 | 284 |
| EX. 75 | 10-27-14 Morpheus Titania Localbitcoins Sale profile (redacted Ex. 71) | 242 |
| EX. 76 | 10-27-2014 Who is Morpheus Titania (Redacted Exhibit 72) | 247 |
| EX. 80 | Placeholder precious metals seized at search warrant | 373 |

UNITED STATES DISTRICT COURT

```
 1                    INDEX OF EXHIBITS

 2    EXHIBIT NO.:          DESCRIPTION:              RECEIVED:

 3     EX. 94   UCI screenshots 5-20-15              330

 4     EX. 97   Amideo-Costanzo telegram chat        399
                12-13-15 (redacted)
 5
       EX. 101  Audio transaction 1 3-3-15 (Clips    289
 6              A through R)

 7     EX. 102  Audio transaction 2 5-20-15          311
                (Clips A through J)
 8
       EX. 104  Audio transaction 4 11-21-15         337
 9              (Clips A through F)

10     EX. 120  Kuro Bubble DMT Report August        397
                2015
11
       EX. 122  Wife of Drug User Chat Report        397
12              January 2015

13     EX. 124  Klepper-Morpheus Text String         410
                October 2015
14
       EX. 125  Klepper-Costanzo Telegram String     413
15              October 2015

16     EX. 336  Photo - Bitcoin retailer gift        405
                cards (Bates 004214 Ex. 35)
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S
 2              (Jury enters the courtroom at 9:07 a.m.)
 3                 (Proceedings resume at 9:08 a.m.)
 4              THE COURT:  Good morning.
 5              Please be seated.
 6              Mr. Cain, are you ready?
 7              MR. CAIN:  Yes, Judge.
 8              THE COURT:  Hope you had a pleasant evening.  Thank
 9     you for being here.
10              We will now have the defense's opening statement.
11              MR. CAIN:  Good morning.
12              This is not a case about dirty drug money.  This is a
13     case where the government and its agents designed an operation,
14     they made a plan; they made a plan where they designed an
15     objective, and they hoped for a certain outcome.  They selected
16     an individual, and they rolled out that plan against that
17     individual using highly experienced law enforcement agents,
18     with the hope that they would get the outcome that they hoped
19     for.  And that's why we're here.
20              The individual they selected is Thomas Costanzo, our
21     client.  When they selected Mr. Costanzo, what you're going to
22     hear is that they did not have any specific knowledge or
23     information that indicated that he was doing anything illegal.
24     All they knew at that time was that he was an individual that
25     was identified on that local Bitcoin dot com website, and that
```

UNITED STATES DISTRICT COURT

1    they believed that he was the individual who was involved in

2    trading Bitcoin, along with all the other individuals that were

3    identified on that website.

4            You're going to hear that at least three highly

5    trained undercover agents set out to meet with Mr. Costanzo to

6    try to convince him to trade certain amounts of Bitcoin with

7    them; and that Mr. Costanzo met with them, and that when he met

8    with them, that he was extremely enthusiastic about Bitcoin,

9    and that the agents asked him to provide certain amount in

10   Bitcoin, and that Mr. Costanzo ultimately provided those

11   amounts.

12           In this case, the government is going to present a

13   number of deals that kind of increase in value.  You heard the

14   government already talk about the very first deal was a deal

15   for $2,000.  You're going to hear about another deal that was

16   $3,000.

17           In each of these deals, what you're going to hear was

18   that it was the government's agents who were pushing the dollar

19   amount up.  It was not Mr. Costanzo who was encouraging the

20   agents to do more money.  It was the agents who were

21   encouraging Mr. Costanzo to increase the money.

22           You've also heard the government already tell you that

23   when the agent first met with Mr. Costanzo to do that very

24   first 2,000-dollar exchange, Mr. Costanzo didn't solicit the

25   agent to do anything illegal, he didn't say anything about drug

1    money.  And the agent didn't say anything to him about drug

2    money.  It was at a subsequent deal that that agent then tried

3    to introduce that element to the deal.

4         You've heard the government talk about an individual

5    named Nolan Sperling, and we anticipate that you're going to

6    hear from Mr. Sperling.  And you're going to have to evaluate

7    the importance of Mr. Sperling's testimony.

8         Mr. Sperling is an individual that did some Bitcoin

9    exchanges with Mr. Costanzo.  We anticipate that he's going to

10   tell you that he told Mr. Costanzo that he was in business,

11   that he never told Mr. Costanzo that he was involved in drug

12   activity; that you'll hear that Mr. Sperling was actually

13   involved in importing drugs that actually started back when he

14   was in high school.  And that as this case against Mr. Costanzo

15   developed from the government's standpoint, that they felt like

16   they needed to try to bring in somebody else to help bolster

17   their case, and that they gave Mr. Sperling some significant

18   benefit in exchange for his testimony.

19        But you're going to have to evaluate whether that

20   testimony is important or not, and you're going to have

21   evaluate the benefits he received and how that impacts his

22   credibility as a witness.

23        At the end of this case, we're going to ask you to

24   take a careful look at the actions that the agents used in

25   dealing with Mr. Costanzo, particularly with respect to the

1    fact that they didn't have information at the beginning that

2    suggested that he was involved in any illegal activity.

3            We're also going to ask you to take a hard look at the

4    government's reliance on Nolan Sperling and the benefits he

5    received for his testimony.

6            But lastly and most importantly, you guys are going to

7    have to decide what Mr. Costanzo intended when he did these

8    Bitcoin exchanges with the undercover agents.  The government's

9    going to argue to you that he did these exchanges because he

10   was trying to avoid transaction reporting requirements or

11   because he was trying to conceal the fact that this was drug

12   money.  And what we're going to tell you, or what we're going

13   to argue that the evidence shows, is that he wasn't motivated

14   by any of these things; that he was motivated by his enthusiasm

15   for Bitcoin, and that he was motivated by the fact that he

16   received a nominal -- well, not -- a fee, as you will hear most

17   people do, they will receive a fee for these exchanges, and

18   that's how he supported himself, and that he would have been

19   willing to do the deal regardless of the government's efforts

20   to try intro -- kind of introduce this alleged illegal element

21   to the day.

22           Thank you.

23           THE COURT:  First witness?

24           MR. RESTAINO:  Your Honor, the government calls

25   Special Agent Michael Fleischmann.

```
 1              May I move the podium, Your Honor?

 2              THE COURT:  I'm sorry?

 3              MR. RESTAINO:  May I move the podium?

 4              THE COURT:  You may.

 5         (MICHAEL FLEISCHMANN, Government's witness, is sworn.)

 6                        DIRECT EXAMINATION

 7    BY MR. RESTAINO:

 8    Q.  Good morning, Agent Fleischmann.

 9    A.  Good morning, sir.

10    Q.  Please introduce yourself to the jury.

11    A.  Sure.  My name is Michael Fleischmann.  I am a Special

12    Agent for Internal Revenue Service, Criminal Investigation.

13    Q.  So what type of work do Internal Revenue Service, Criminal

14    Investigations, agents do?

15    A.  We investigate tax and other financial crimes, such as

16    money laundering.

17    Q.  What was --

18              THE COURT:  Agent, could I get you to slow down and

19    sort of enunciate --

20              THE WITNESS:  Oh, sorry.

21              THE COURT:  -- so the jury can hear you and I can hear

22    you too?

23              THE WITNESS:  Sorry.

24              THE COURT:  Thank you.

25
```

UNITED STATES DISTRICT COURT

1    BY MR. RESTAINO:

2    Q.  What was your involvement in this case?

3    A.  In this case, I was the initial case agent.

4    Q.  Let's talk about your background first.

5            Did you go to college?

6    A.  I did.

7    Q.  Where did you go?

8    A.  I went to the University of Arizona down in Tucson, and I

9    studied accounting and finance.

10   Q.  Following your college, what did you do?

11   A.  I became a -- well, after -- about a year out of college, I

12   became a revenue agent with the Internal Revenue Service.

13   Revenue agent is basically a tax auditor.  That was in 2001.

14   And then in 2005, I became a Special Agent.

15   Q.  Are you a certified public accountant?

16   A.  I am.  In the state of Arizona.

17   Q.  What does that mean?

18   A.  It means I passed a rigorous exam, and then I did two years

19   of work under another Certified Public Accountant.

20   Q.  What made you want to switch from being a revenue agent to

21   a criminal investigator?

22   A.  Just wanted to change --

23            MS. WEIDNER:  Objection.  Relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  Just to change to something different.

1   BY MR. RESTAINO:

2   Q.  And so did you receive any additional training as a

3   criminal investigator with IRS?

4   A.  I did.  I received approximately 26 weeks of training at

5   Glynco, Georgia, at our Federal Law Enforcement Training

6   Center.  The -- the first half of the training was the criminal

7   investigator portion, and then the second half was our IRS

8   add-on.

9   Q.  Have you also had training in undercover cases?

10  A.  Yeah.  Approximately probably seven or eight years ago now,

11  I became a cover agent.  So as a cover agent, it's my

12  responsibility for the safety and security of the undercover

13  agent and of the operation during an undercover operation.

14  Q.  And just to be clear, there were no safety or security

15  incidents during your role as a cover agent in this case, were

16  there?

17  A.  Well, I was the case agent in this case, but there were no

18  safety and security issues.

19  Q.  Now, have you always worked in Phoenix --

20  A.  I have.

21  Q.   -- with the IRS?

22  A.  I have.

23  Q.  Were you ever reassigned to a unit that's headquartered

24  outside of the Phoenix Division?

25  A.  Yeah.  In 2015, I was reassigned to a unit out of our

MICHAEL FLEISCHMANN - DIRECT EXAMINATION

1    Washington, D.C. field office.  It's the -- our cyber crime
2    unit.
3    Q.  Where is -- where have you been physically located during
4    that time?
5    A.  My desk is in Mesa.
6    Q.  What do you do with the cyber unit?
7    A.  We investigate Internet crimes and virtual currency data
8    breaches.
9    Q.  Have you developed any experience on virtual currency cases
10   through your work with the cyber unit?
11   A.  I have.
12   Q.  So let's talk about that.
13            In simple terms, what is virtual currency?
14   A.  Virtual currency is an unregulated currency based on
15   mathematical algorithms.
16   Q.  So what does it mean to be "unregulated"?
17   A.  Means it's not controlled by any bank, any individual, or
18   any country.
19   Q.  Can Bitcoin be used to purchase -- or, sorry.
20            Can virtual currency be used to purchase everyday
21   goods and services, to your knowledge?
22   A.  Yes, it can.
23   Q.  Can you give the jury one type of virtual currency?
24   A.  Bitcoin would be an example of virtual currency.
25   Q.  Can Bitcoin also be used to purchase illegal goods and

1    services, to your knowledge?

2    A.   Absolutely.

3    Q.   What does virtual currency look like?

4    A.   It doesn't really look like anything.  I mean, it sits in a

5    virtual wallet.  So it's something that you download mostly to

6    a phone, and it would sit in a virtual wallet.  But there's no

7    actually physical -- there's nothing physical behind it.

8    Q.   Could it be seized by law enforcement agents?

9    A.   It can be.

10   Q.   Is seizing virtual currency harder than seizing cash?

11   A.   Yes.

12   Q.   Why is that?

13   A.   Well, because a lot of times we don't -- it's hard to know

14   where the -- the virtual currency sits.  Cash is a lot easier

15   in the sense that we can go straight to a bank account; whereas

16   virtual currency, it's unregulated.

17   Q.   In your work with IRS CI, have you developed an

18   understanding of how one can purchase Bitcoin?

19   A.   Yes.

20   Q.   So how can one buy Bitcoin?

21   A.   You can buy it through a commercial -- commercial

22   exchanger, and you can also buy it via peer-to-peer method.

23   Q.   Let's talk about the commercial exchanger first.

24           Can you give an example of a commercial exchanger?

25   A.   Coinbase would be a commercial exchanger.

MICHAEL FLEISCHMANN - DIRECT EXAMINATION

1    Q.  What type of information does one have to provide in order

2    to purchase information from a commercial exchanger?

3    A.  Personally identifiable information, so you would have to

4    provide your name, your address, last four of the Social.  In

5    some instances if you want to move money back and forth, you

6    would have to provide either a bank account, credit card.

7    Q.  In your lifetime, have you opened bank accounts before?

8    A.  Yeah, I have.

9    Q.  In your experience, is the type of information one has to

10   provide to open a bank account similar to the information one

11   would have to provide to open a commercial exchange?

12   A.  Yes.

13   Q.  Now, is an exchange a physical location where a person

14   could go to buy Bitcoin?

15   A.  No.

16   Q.  Where is that commercial exchange then?

17   A.  Via based on the Internet.

18   Q.  And how would one typically pay?

19   A.  For a commercial exchange?

20   Q.  Yes.

21   A.  You would most likely either have a bank account linked or

22   you would have -- or you could also use a credit card.

23   Q.  Are you familiar with the exchange rates typically charged

24   by exchanges like Coinbase?

25   A.  It's typically one to one-and-a-half percent.

UNITED STATES DISTRICT COURT

1   Q.  So let's do an example a here.  If someone purchased $1,000

2   worth of Bitcoin with a credit card from Coinbase, how much

3   would Coinbase typically deduct for its fee?

4   A.  It would be between 10 and $15.

5   Q.  Now, as part of this case, Agent Fleischmann, have you seen

6   a cartoon video that explains how to purchase Bitcoin from a

7   commercial exchange?

8   A.  I have.

9   Q.  What else does that video describe?

10  A.  Basically just the process of Bitcoin and how it works.

11  Q.  Where is the video available?

12  A.  It's available on the Internet.

13  Q.  In general terms, how does the video come up in this

14  investigation?

15  A.  So, there was a search warrant on April 20th of 2017, and

16  there was a flyer that had the information on that.

17  Q.  I'd like you to take a look at what's been marked as

18  Exhibit 77 -- if we can have the document camera up for the --

19  sorry -- the VGA up for the agent.

20          COURTROOM DEPUTY:  Are you using VGA or a digital?

21          MR. RESTAINO:  I'm using the digital.  Sorry.

22          COURTROOM DEPUTY:  Thank you.

23  BY MR. RESTAINO:

24  Q.  Taking a look at that, is this the video -- do you

25  recognize this video?

MICHAEL FLEISCHMANN – DIRECT EXAMINATION          234

1    A.  I do.

2    Q.  Is this, in fact, the video that you have seen that

3    explains Bitcoin?

4    A.  Yes, sir.

5         MR. RESTAINO:  Your Honor, request permission to show

6    this video, Exhibit 77, purely for demonstrative purposes.

7         MS. WEIDNER:  No objection, Your Honor.

8         THE COURT:  You may do so.

9              (Portion of videotape played.)

10   BY MR. RESTAINO:

11   Q.  So Agent Fleischmann, to your knowledge, does this video

12   accurately describe how one can purchase Bitcoin from a

13   commercial exchange?

14   A.  It does.

15   Q.  And to your knowledge, does it fairly describe how one can

16   use Bitcoin to make purchases?

17   A.  It does.

18   Q.  At the end, the video describes the minimization of

19   transaction fees paid by a business.  Can you explain to a jury

20   how Bitcoin can minimize transaction fees by businesses?

21   A.  Yeah.  Typically the transaction fees charged by Bitcoin

22   are less than transaction fees charged by credit card

23   companies.

24   Q.  Like a Visa or a MasterCard payment, for example?

25   A.  Correct.

1   Q.  All right.  Now, is there another way to buy Bitcoin aside

2   from these commercial exchanges described in that video?

3   A.  You can also by it via the peer-to-peer network.

4   Q.  What is a peer-to-peer network?

5   A.  So "peer-to-peer" would be two people meeting and

6   exchanging Bitcoin for cash.

7   Q.  Does that involve a physical exchange?

8   A.  Correct.

9   Q.  How can a seller transfer the Bitcoins in that type of

10  exchange?

11  A.  You would transfer it via virtual wallets, via phones.

12  Q.  And how can a purchaser pay?

13  A.  Via cash.

14  Q.  What type of identifying information would you expect to be

15  collected in a peer-to-peer exchange?

16  A.  Typically no identifying information is collected.

17  Q.  So can peer-to-peer exchangers make your work more

18  difficult as an IRS agent?

19  A.  Absolutely.

20  Q.  Why is that?

21  A.  Because it's harder to track.  If we don't have any

22  information as far as who bought and/or sold the Bitcoin, it's

23  hard to track.  It's almost impossible to track.

24  Q.  But the video talks about there being a transparent public

25  ledger.  Does that assist you?

MICHAEL FLEISCHMANN - DIRECT EXAMINATION

1   A.  It does.  But if we don't know which the -- if we don't

2   know either individual that are part of that transaction,

3   there's no way that we'd be able to figure out anything about

4   that transaction.

5   Q.  Now, are you familiar with the transaction rates charged on

6   peer-to-peer transactions?

7   A.  I am.

8   Q.  And what is the range of rates that can be charged?

9   A.  Typically it's about 7 to 10 percent.

10  Q.  So do the math again.  Same $1,000.  What would the

11  peer-to-peer exchanger earn at 7 percent interest?

12  A.  Seventy dollars.

13  Q.  Now, through your work with IRS, are you familiar with how

14  that peer-to-peer process works to exchange cash for Bitcoins?

15  A.  I am.

16  Q.  Have you observed Bitcoin exchanges as part of your case

17  agent work?

18  A.  I have.

19  Q.  Does your agency provide training for undercover agents?

20  A.  They do.

21  Q.  Have you seen a training video on peer-to-peer

22  transactions?

23  A.  I have.

24  Q.  What does that video demonstrate?

25  A.  That demonstrates two agents participating in a

1    peer-to-peer Bitcoin exchange.

2    Q.  Does it actually show the agents?

3    A.  It doesn't show their faces, but it shows -- I mean, you

4    hear their voices.

5    Q.  Whose voices are in the video?

6    A.  Special Agent Thomas Klepper and Special Agent Donald

7    Ellsworth.

8    Q.  And if it doesn't show the agents' faces, what does it

9    show?

10   A.  It shows both of their phones and the transaction

11   occurring.

12   Q.  I'd like you to take a look on your screen -- I'd like you

13   to take a look on your screen, Agent Fleischmann, at

14   Exhibit 123.

15           Does this look like the beginning of the training

16   video that you have described?

17   A.  I don't have anything on my screen.

18                    (Pause in proceedings.)

19           THE WITNESS:  It does.

20           MR. RESTAINO:  Your Honor, at this time I would like

21   to play the excerpted portion of this video for demonstrative

22   purposes, starting at 14 seconds in.

23           MS. WEIDNER:  Your Honor, may we have a quick sidebar?

24           THE COURT:  All right.

25       (At sidebar on the record.)

MICHAEL FLEISCHMANN - DIRECT EXAMINATION          238

1          MS. WEIDNER:  This is Maria Weidner.

2          I just want to confirm with the government -- we did

3     not talk about this earlier this morning -- that everything has

4     been properly redacted as we requested yesterday.

5          MR. RESTAINO:  Yes, Your Honor.  This is Gary

6     Restaino.

7          We'll start it at 14 seconds because it's just for

8     demonstrative purposes here.  That will eliminate the "bad guy"

9     reference.  This is Exhibit 123, so the drug references have

10    already been redacted from that.

11         MS. WEIDNER:  That's good with us.

12         THE COURT:  Thank you.

13       (End of discussion at sidebar.)

14         MS. WEIDNER:  No objection from the defense, Your

15    Honor, to the government playing this video for demonstrative

16    purposes.

17         THE COURT:  You may.

18         MS. WEIDNER:  Thank you, Your Honor.

19              (Portion of videotape played.)

20    BY MR. RESTAINO:

21    Q.  Who is speaking here at this point in the video?

22    A.  That's Special Agent Thomas Klepper, who is one of the

23    undercover agents in this investigation.

24              (Portion of videotape played.)

25

UNITED STATES DISTRICT COURT

MICHAEL FLEISCHMANN - DIRECT EXAMINATION     239

1    BY MR. RESTAINO:

2    Q.  And who is speaking here in this video?

3    A.  That's Special Agent Ellsworth who, after I went to the

4    cyber unit, the case was -- the case, because it was a Phoenix

5    case, was reassigned to Agent Ellsworth.

6                    (Portion of videotape played.)

7    BY MR. RESTAINO:

8    Q.  What is the QR code?

9    A.  QR codes are found in everyday products.  Basically the QR

10   code is what's used to scan to send Bitcoin from one phone --

11   from one wallet to the other wallet.

12   Q.  So what is the Blockchain?

13   A.  The Blockchain is -- it's readily available on

14   Blockchain.info.  It basically lists every Bitcoin transaction

15   that's ever occurred.

16   Q.  Is the Blockchain part of the public ledger that the

17   cartoon video described?

18   A.  It is.

19   Q.  Can you search the Blockchain by name?

20   A.  No.

21                    (Portion of videotape played.)

22   BY MR. RESTAINO:

23   Q.  Does that "common fee" refer to what Agent Klepper was

24   charging Agent Ellsworth?

25   A.  No.

1  Q.  What does the "common fee" refer to?

2  A.  That's going to be the miner transaction fee.

3  Q.  So that's in addition to the cost of purchasing the Bitcoin

4  in the peer-to-peer exchange?

5  A.  Correct, because Agent -- Agent Klepper charged Agent

6  Ellsworth 15 percent.  So Agent Ellsworth gave him one dollar,

7  and he only sent over .85, or 85 cents' worth of Bitcoin.

8                    (Portion of videotape played.)

9  BY MR. RESTAINO:

10  Q.  Now, Agent Fleischmann, have you ever investigated a

11  peer-to-peer exchanger?

12  A.  I have.

13  Q.  What made you interested in investigating a peer-to-peer

14  exchanger?

15  A.  I think -- I think it was the fact that Agent Ellsworth and

16  I started looking at virtual currency-type cases, and we

17  noticed that there was a bottleneck as far as there was a lot

18  of websites out there that would sell products, illegal

19  products, and how these individuals got their -- and a lot of

20  these products, they charged Bitcoin.  And so we were

21  interested in seeing how these individuals were able to get

22  their money into Bitcoin from fiat currency such as cash.

23  Q.  Did you, in fact, commence an undercover investigation into

24  a Bitcoin exchanger?

25  A.  We did.

MICHAEL FLEISCHMANN - DIRECT EXAMINATION

1    Q.   How did you find the Bitcoin exchanger?

2    A.   On localbitcoins.com.

3    Q.   What is that?

4    A.   It's a -- just a website.

5    Q.   What does it show?

6    A.   It shows individuals that are willing to buy and sell

7    Bitcoin.

8    Q.   So how did you figure out, among all the people on that

9    website, who to approach?

10   A.   So, on the localbitcoins website, you can search by area.

11   And so we searched by the Phoenix area.  And there was one

12   individual that had received a lot of -- a lot more feedback

13   than all the other individuals.  So much like eBay, it kind of

14   operates on a feedback system.  At the time, I believe -- I

15   believe it was about 70, and everyone one else was

16   significantly less than that.  And that individual was Morpheus

17   Titania.

18   Q.   And so let me show you what's been marked for

19   identification purposes as Exhibit 75.

20        Do you recognize the first page of this document?

21   A.   I do.

22   Q.   How do you recognize it?

23   A.   I recognize it by the date, 10-27-2014, which was about the

24   time when we started the investigation -- or started looking at

25   localbitcoins.com.

1    Q.   Do you know who obtained this document?

2    A.   I did.

3    Q.   And is that -- that date is consistent with the timing of

4    your investigation?

5    A.   Correct.

6    Q.   Is it in substantially the same condition now as when you

7    first saw it?

8    A.   It is.

9    Q.   And taking a look at the second page of this document, is

10   this also substantially in the same form as when you first saw

11   it?

12   A.   It is.

13           MR. RESTAINO:  Your Honor, at this time I would move

14   for admission of Exhibit 75 into evidence.

15           MS. WEIDNER:  No objection.

16           THE COURT:  Exhibit 75 is admitted.

17           You may publish.

18               (Exhibit 75 is received into evidence.)

19   BY MR. RESTAINO:

20   Q.   So, what is this document?

21   A.   This document is Morpheus Titania's.  This is his profile

22   on localbitcoins.com.

23   Q.   Were you ever able to identify the name, the true name, of

24   Morpheus Titania?

25   A.   We were.  On the second page, there's a link to another

MICHAEL FLEISCHMANN - DIRECT EXAMINATION          243

1   website, which was some additional information that we used to

2   be able to figure out his true name.

3   Q.  And we'll get to that.

4          What was the true name that you were able to figure

5   out?

6   A.  Thomas Costanzo.

7   Q.  Do you see Thomas Costanzo here in the courtroom today?

8   A.  I do.

9   Q.  Can you describe where he's sitting and what he is wearing?

10  A.  He's sitting in between his two attorneys.  He's wearing

11  glasses and a suit.

12          MR. RESTAINO:  Your Honor, may the record reflect the

13  identification of the defendant?

14          THE COURT:  It may.

15  BY MR. RESTAINO:

16  Q.  Now, taking a look at the first page of Exhibit 75, what do

17  the trade limits tell you?

18  A.  "Trade limits" tells us that he's willing to do between

19  15,000 and up to 50,000 of -- of U.S. currency for Bitcoin.

20  Q.  Why was that important to you in determining who to

21  approach in your investigation?

22  A.  Well, one of the things that we were wondering is if he'd

23  be willing to exchange over $10,000 for Bitcoin and not file

24  any paperwork such as a CTR or an A300.

25  Q.  What would you expect to happen if someone walked into a

1    bank and deposited $15,000 in cash?

2    A.  I would expect the bank to file a currency transaction

3    report.

4    Q.  Would you expect a peer-to-peer exchanger to file any such

5    report?

6    A.  No.

7    Q.  Now, is this the first page that came up on your local

8    Bitcoin search?

9    A.  No.  The first page would have been the Phoenix area, which

10   would have listed all the individuals in the Phoenix area that

11   were willing to conduct Bitcoin transactions.

12   Q.  And that's where you were able to find out who had the most

13   trades at the time?

14   A.  Correct.

15   Q.  Do you see that information on this Exhibit 75?

16   A.  No.

17   Q.  Were you ever -- did you ever print out the home screen

18   where you found that information?

19   A.  Unfortunately, I did not.

20   Q.  Why was the number of trades important to you?

21   A.  Well, we wanted to see -- I mean, we wanted to select the

22   individual who had -- who had done the most trades and who had

23   the -- the best feedback.  So he had over 70-plus -- it said

24   70-plus transactions and 100 percent feedback.

25   Q.  Let's go on to second page then.

1          And taking a look at the second page, it says there on

2    the screen that the meeting preferences are at McDonald's and

3    Starbucks.

4          Is that, in fact, consistent with what your

5    investigation revealed?

6    A.  Yes.

7    Q.  It also notes that Morpheus Titania travels all over for

8    work.

9          Was that consistent with what your investigation

10   revealed?

11   A.  Yes.

12   Q.  Was the phone number listed on Exhibit 75 consistent with

13   the phone number used by Thomas Costanzo?

14   A.  Yes.

15   Q.  It says that he loves working with newbies.  What do you

16   take "newbies" to mean there?

17   A.  People that are new to Bitcoin or are interested in

18   Bitcoin.

19   Q.  And based on your listening to undercover recordings in

20   this case, is that consistent with the defendant's approach?

21   A.  It is.

22   Q.  It says he loves to talk, as well.

23          Is that consistent with what your investigation

24   revealed?

25   A.  It is.

1   Q.  And finally, it references Mycelium, on the bottom of this

2   highlighted segment.  Do you have a limited understanding of

3   what Mycelium is?

4   A.  I would say a very limited understanding of Mycelium.

5   Q.  And so what is your very limited understanding?

6   A.  It's basically that it takes -- it takes the Bitcoin,

7   breaks it up, and then brings it back together in a virtual

8   wallet.

9   Q.  Who would have a more sophisticated understanding in this

10  case about what Mycelium is?

11  A.  Our undercover -- our undercover agents who use that

12  application.

13  Q.  And finally, this page from localbitcoins.com has a web

14  link.  Did you click on that link?

15  A.  I did.

16  Q.  And what did that take you to?

17  A.  It took us to a second website, web page.

18          MR. RESTAINO:  I'd like to take it off of the

19  publication view then and show just the witness only the

20  digital feed.

21  BY MR. RESTAINO:

22  Q.  Taking a look at the first page of Exhibit 76, do you

23  recognize this document?

24  A.  I do.

25  Q.  How are you able to recognize this document?

1    A.   It's the same date, 10-27-2014.

2    Q.   Is this also a document that you viewed and printed off the

3    Internet?

4    A.   It is.  I mean, it's been redacted, but it's -- it's -- the

5    relevant parts appear to be the same.

6    Q.   Okay.  And that would be my next question.  Is this in

7    substantially the same form as when you first printed it out

8    from the Internet?

9    A.   Yes.

10          MR. RESTAINO:  Your Honor, the government would move

11   for the admission of Exhibit 76 into evidence.

12          MS. WEIDNER:  No objection.

13          THE COURT:  76 is admitted.

14          MS. WEIDNER:  And may I publish, Your Honor?

15          THE COURT:  You may.

16          (Exhibit 76 is received into evidence.)

17   BY MR. RESTAINO:

18   Q.   So what is this document generally?

19   A.   This basically just describes who he is, what he's about,

20   that he's interested in Bitcoin.

21   Q.   How did this document specifically advance your

22   investigation?

23   A.   Well, I think it -- it lists that he has -- he doesn't need

24   a license, bank, or permit to conduct Bitcoin transactions,

25   which was significant because one of the things that we were

1   interested in seeing is if he was willing to conduct

2   transactions without filing any -- any paperwork.

3   Q.  Did it also help you identify who Morpheus was?

4   A.  It did.

5   Q.  How?

6   A.  So in the -- looks like the third paragraph here that's

7   listed, it lists a mail company called the Direct Hit, and an

8   ex-wife's name.  So by Googling that business and that

9   individual's name, I was able to determine that that individual

10  and Thomas Costanzo had a house in Anthem, which I believe is

11  also listed somewhere in this document.

12  Q.  Is this the part you're referring to that references

13  Anthem?

14  A.  Correct, sir.

15  Q.  And did this also help you identify Morpheus as Thomas

16  Costanzo, the defendant here?

17  A.  That is correct.

18  Q.  So what was the next step?

19  A.  The next step for us was writing a limited undercover

20  request, which is a request to conduct an undercover operation

21  within our agency.

22  Q.  Now, this document was printed out in October of 2014.

23  Were you ultimately able to conduct test transactions?

24  A.  We did.

25  Q.  When was the first one?

MICHAEL FLEISCHMANN - DIRECT EXAMINATION

1    A.  The first one was in March of 2015.

2    Q.  And what was involved in the test transactions?

3    A.  Agent Sergei Kushner met with -- with the defendant and did

4    a Bitcoin transaction in the amount of $2,000.

5    Q.  Was that transaction recorded?

6    A.  It was recorded.

7    Q.  And in addition to that first one in March of 2015, was

8    there another test transaction conducted?

9    A.  Yeah.  Agent Kushner did another transaction in May,

10   May 20th of 2015.

11   Q.  And was that second transaction recorded?

12   A.  It was.  And that was in the amount of $3,000 this time.

13   Q.  And were you able to stay up to date on this investigation

14   at this point?

15   A.  I was.

16   Q.  And what was your role at those first two test

17   transactions?

18   A.  Those first two test transactions, I was the case agent

19   assigned to the investigation.

20   Q.  Now, following the test transactions, are you familiar with

21   what happened in the investigation?

22   A.  I am.

23   Q.  How is it that you stayed familiar with it?

24   A.  Don and I were in the same office, Don -- Don Ellsworth

25   being the case agent that took over the investigation.

1    Q.  And so what happened next after the test transactions?

2    A.  Agent Klepper met with the defendant in October,

3    October 7th of 2015.  He exchanged $13,000 for Bitcoin.  And

4    then Agent Kushner met with him again November 21st, 2015, and

5    he exchanged $11,700 in Bitcoin.

6    Q.  And again, each of those transactions was recorded and

7    preserved; correct?

8    A.  Correct.

9    Q.  Now, what happened after November of 2015 from the IRS'

10   perspective?

11   A.  So after that, the IRS case continued.  And at that point,

12   the DEA, Drug Enforcement Agency, also came on to the

13   investigation.  So it became a joint investigation between the

14   two agencies.

15   Q.  Were there more undercover transactions with the defendant

16   following November 2015?

17   A.  Yes.

18   Q.  Who conducted those?

19   A.  That would be Task Force Officer Chad Martin.

20   Q.  And which agency had the lead as to the undercover buys

21   from that point forward?

22   A.  That would be the DEA.

23   Q.  Were those transactions as well, to your knowledge,

24   recorded and preserved?

25   A.  They were.

1    Q.  So when did the investigation wrap up?

2    A.  The investigation wrapped up April 20th of 2017, with an

3    arrest and a search warrant.  Agent -- Task Force Officer Chad

4    Martin did a 107,000-dollar transaction on that date.

5             MR. RESTAINO:  Your Honor, may I just have a moment?

6             THE COURT:  You may.

7                       (Pause in proceedings.)

8             MR. RESTAINO:  Thank you, Your Honor.

9             I have no further questions on direct for Agent

10   Fleischmann.

11            THE COURT:  Cross-examination?

12                       CROSS-EXAMINATION

13   BY MS. WEIDNER:

14   Q.  Good morning, Agent Fleischmann.

15            How are you doing?

16   A.  Good morning, ma'am.

17   Q.  So, you testified that you have almost 20 years of

18   experience now with the IRS?

19   A.  That would be incorrect.  I started in 2001.

20   Q.  And now we're in 2018, so that would be about 17 years?

21   A.  Correct.

22   Q.  So that's almost 20.

23            And how long have you been in the cyber unit?

24   A.  Since 2015.

25   Q.  And upon joining the cyber unit, that is when you began to

MICHAEL FLEISCHMANN – CROSS-EXAMINATION

1    specialize in virtual currency?

2    A.  No, that would be before.  So, I mean, in 2014, I started

3    this investigation.

4    Q.  Uh-huh.  So 2014 was when you began to specialize in

5    virtual currency?

6    A.  2014 is when I started working this investigation in

7    virtual currency.

8    Q.  So when did you start to specialize in virtual currency,

9    Agent Fleischmann?

10   A.  I wouldn't say it's a specialty, but in 2014 is when I

11   started working on this investigation.

12   Q.  So when you came on to this investigation, you were

13   unfamiliar with virtual currency?

14   A.  I was learning about virtual currency at that time.

15   Q.  When did you begin to learn virtual -- when did you begin

16   to learn about virtual currency in your field, Agent?

17   A.  2014.

18   Q.  Now, you know that Bitcoin has been around since 2010,

19   about?

20   A.  Correct.

21   Q.  And to your knowledge, Congress has not passed legislation

22   regarding Bitcoin?

23   A.  That's my understanding.

24   Q.  And Congress has not provided us with a legal definition of

25   Bitcoin.

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1          MS. WEIDNER:  Objection, Your Honor.  Goes to a legal

2    conclusion.  Argumentative.

3          THE COURT:  I'll allow him to answer, if he knows.

4          THE WITNESS:  I do not know.

5    BY MS. WEIDNER:

6    Q.  You mentioned the Blockchain earlier, and you said that it

7    was -- it was open and transparent; correct?

8    A.  The Blockchain is available on the Internet.

9    Q.  And so anyone can access it --

10   A.  Correct.

11   Q.  -- correct?

12          And the IRS can access it?

13   A.  Correct.

14   Q.  But you also testified that it can be difficult to analyze.

15   A.  Correct, because there's no names associated with any of

16   the Bitcoin wallets that are on there; no names, addresses,

17   Social Security numbers, date of births.

18   Q.  Yes.

19          And likewise, Bitcoin is not impossible to track, but

20   it's difficult for the IRS to track; correct?

21   A.  Correct.

22   Q.  So it's not an anonymous kind of exchange.  It's

23   pseudomonas?

24   A.  That's correct.

25   Q.  You testified about commercial exchanges.  These commercial

UNITED STATES DISTRICT COURT

MICHAEL FLEISCHMANN – CROSS–EXAMINATION

1    exchanges, they typically have high volume in the sense of

2    having many accounts.

3    A.  I wouldn't know.  I don't know.

4    Q.  So a commercial exchange like Coinbase could have only one

5    account?

6    A.  I would assume that they have more than one account.  But

7    specifically as far as how many accounts, I can't speak to

8    that.

9    Q.  So that is not part of the work that you did in preparation

10   for this undercover operation.  You -- you basically knew how

11   commercial exchanges functioned, but not whether or not or how

12   much they were used?

13   A.  That's correct.

14   Q.  But it is safe to say that with the commercial exchange,

15   any user would be entrusting their information to the exchange?

16   A.  Correct.

17   Q.  They would be entrusting their name?

18   A.  Correct.

19   Q.  Their bank account number possibly?

20   A.  Correct.

21   Q.  Their Social Security number possibly?

22   A.  Correct.

23   Q.  And also potentially the value of the Bitcoin they've

24   invested in.

25   A.  Correct.

UNITED STATES DISTRICT COURT

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1    Q.  Now, as someone who has spent some time in the cyber unit

2    focusing on virtual currencies, you've heard that there have

3    been significant security breaches at some major currencies.

4    A.  Specifically what are you referring to?

5    Q.  Security breaches at major exchanges that resulted in the

6    loss of hundreds of thousands, if not millions, of account

7    holders' holdings.

8    A.  Can you be more specific as far as which exchange?

9    Q.  Yes.

10          Are you familiar -- you're familiar with the

11   January 2015 breach of Bitstamp for 5 million?

12   A.  Yes.

13   Q.  Of the 460 million-dollar breach at Mount Box in March of

14   2014?

15   A.  Correct.

16   Q.  And the 250,000-dollar breach at Bitfloor in September of

17   2012?

18   A.  I don't think I'm familiar with that one.

19   Q.  I see.  But you are familiar with Bitstamp and Mount Box?

20   A.  Yes.

21   Q.  And Bitstamp and Mount Box are situations where a

22   commercial exchange, as a result of a security breach, lost

23   substantial customer value and information?

24   A.  Correct.

25   Q.  You had also mentioned that you specialized in data

```
 1   breaches in the cyber unit.
 2   A.   That's one of the investigations that I have.
 3   Q.   And data breaches don't just happen in -- with Bitcoin
 4   exchanges, though clearly they have in the past?
 5   A.   Can you rephrase your question?
 6   Q.   Yes.
 7            Data breaches don't just happen with Bitcoin
 8   exchanges; correct?
 9   A.   I wouldn't be able to answer that.
10   Q.   I'll ask it a different way.
11            There have been other significant data breaches.  For
12   example, you're familiar with the breach of personal
13   information with -- in the federal government with the Office
14   of Personnel Management?
15            MS. WEIDNER:  Objection, Your Honor.  Relevance.
16            THE COURT:  I'll allow it.
17            THE WITNESS:  Yes.
18   BY MS. WEIDNER:
19   Q.   You're familiar with the significant data breach of
20   individuals' personal information through the major credit
21   reporting company Equifax?
22   A.   Yes.
23   Q.   And you are familiar with -- with customer credit
24   information taken by malicious hackers from Target and Home
25   Depot, for example?
```

MICHAEL FLEISCHMANN – CROSS-EXAMINATION          257

1    A.   Yes, I'm familiar with that.

2    Q.   And so there is an interest an individual these days might

3    have in protecting their personal information?

4              MS. WEIDNER:   Objection.   Calls for speculation.

5              THE COURT:   Overruled.

6              THE WITNESS:   (Pause.)

7              THE COURT:   You may answer.

8              THE WITNESS:   Oh.   I'm sorry.

9              Can you repeat the question?

10             MS. WEIDNER:   Yes.

11   BY MS. WEIDNER:

12   Q.   So these days, an individual has an interest in protecting

13   their personal information?

14   A.   Correct.

15   Q.   And one way to protect one's personal information is to

16   assume responsibility for it?

17   A.   That's correct.

18   Q.   And one way to assume responsibility for your own

19   information is not to go through a commercial exchange?

20   A.   That would be one way.

21   Q.   A peer-to-peer option allows for exchange while maintaining

22   control of your own information?

23   A.   That's correct.

24   Q.   And maintaining control of the security of the value you

25   purchase when you purchase, for example, Bitcoin?

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1   A.  Correct.

2   Q.  Because that video that we showed earlier, it mentioned

3   that a Bitcoin exchange is irrevocable?

4   A.  Correct.

5   Q.  And that means that once the exchange goes through, it

6   can't be undone, can it?

7   A.  That's correct.

8   Q.  That means if someone accidentally sends to the wrong

9   address, they can't get it back?

10  A.  You'd have to try to reverse -- reverse it or redo the

11  transaction.

12  Q.  But it would be difficult --

13  A.  Correct.

14  Q.  -- and you might not get it back.

15  A.  Correct.

16  Q.  In taking that example a step further, if your value is

17  stolen by malicious other individuals, hackers, it makes it

18  very hard to get your Bitcoin back.

19  A.  Well, it could be stolen.  I mean, it could be stolen in a

20  peer-to-peer.  You get ripped off.

21  Q.  It could be.  And that's -- that's a very good observation,

22  because not every peer-to-peer trader is necessarily

23  trustworthy?

24  A.  I mean, you could get ripped off.  Yeah.

25  Q.  And so that -- that's part of the reason why the reviews

1    would be important for someone looking to do a peer-to-peer

2    trade?

3    A.  Well, we were looking for who would do -- who would be

4    willing --

5    Q.  That wasn't the question I asked you.

6            Someone looking to do a peer-to-peer trade wants to

7    check out reviews of Bitcoin traders presumably?

8    A.  Correct.

9    Q.  And someone wanting to trade their hard-earned money for

10   Bitcoin wants to make sure they're not going to get ripped off.

11   A.  That would be speculative -- I mean, speculative, though.

12   Anybody could rip you off.

13   Q.  That's -- the government gets to object.

14           But -- let's see.

15           I wanted to back up.

16           On the issue of -- of getting ripped off, and as a

17   customer having a good experience, you're familiar with Yelp?

18   A.  Yes.

19   Q.  And Yelp is a website wherein individuals review

20   restaurants or other services; correct?

21   A.  That's my understanding.  I don't use it that frequently.

22   Q.  And when one is looking for a restaurant, one doesn't go

23   for the one-star?

24   A.  Most likely not.

25   Q.  One wants to go for the five-star?

1    A.   Sure.

2    Q.   That's pretty much true across the board when we are

3    looking to get the best value for our money.  We want the best

4    quality and the best service.

5    A.   Correct.

6    Q.   And that is the function of the reviews on localbitcoin.

7    A.   Is that a question or...

8    Q.   That is a question.

9          The purpose of the reviews on localbitcoin is to

10   provide potential purchasers of Bitcoin with a look at how

11   sellers are rated.

12   A.   Correct.

13   Q.   I wanted to ask you.  You mentioned earlier about banks and

14   bank accounts.  It's not required for individuals in this

15   country to maintain bank accounts; correct?

16   A.   Correct.

17   Q.   If we wanted to, we could store our money in our mattress

18   or, really, anywhere else.

19   A.   That's correct.

20   Q.   And the Blockchain, though, it can be hard to decipher.

21   It's -- it's not illegal, is it?

22   A.   The Blockchain is public --

23   Q.   The Blockchain.

24   A.   -- it's publicly available.

25   Q.   Yes.  But it's hard to decipher, but it's not illegal;

1    correct?

2    A.   I don't understand your question.

3    Q.   The Blockchain has not been -- has not been criminalized.

4    It's not illegal.

5    A.   The Blockchain is readily available.  So in that instance,

6    no, it would not be illegal.

7    Q.   And owning Bitcoin is not illegal?

8    A.   Correct.

9    Q.   And trading Bitcoin is not illegal?

10   A.   Correct.

11   Q.   And trading Bitcoin peer-to-peer is not illegal?

12   A.   Correct.

13   Q.   And the localbitcoins.com website, so it's still up and

14   running --

15   A.   Yes.

16   Q.   -- it hasn't been shut down.

17   A.   It's still up and running.

18   Q.   I want to turn now to the investigation aspect of this

19   case.

20          So, in December of 2014, you submitted a request for

21   your undercover operation with the Internal Revenue Service.

22   A.   That's correct.

23   Q.   And your request was approved?

24   A.   Yes.

25   Q.   And the purpose of your requested operation was to

 1    investigate one Morpheus Titania?

 2    A.  Correct.

 3    Q.  And as you already testified, the IRS had identified

 4    Morpheus through the localbitcoins.com website?

 5    A.  Correct.

 6    Q.  Specifically, the IRS had viewed his profile on

 7    localbitcoins?

 8    A.  Correct.

 9    Q.  And at the time of your request, IRS intelligence on

10    Morpheus' Bitcoin exchanges was based only on his localbitcoins

11    profile.

12    A.  That's correct.

13    Q.  The profile advertised him as a Bitcoin trader?

14    A.  Correct.

15    Q.  Which is someone who buys and sells Bitcoin.

16    A.  Yeah.  It was based on that, and then on the link that was

17    attached.

18    Q.  Yes.

19            Now, I want to revisit Exhibit 75, which is the

20    localbitcoins.com ad that you had printed out.

21            MS. WEIDNER:  And can we show Exhibit Number 75 once

22    again to Agent Fleischmann and the jury?

23            I've got it on the ELMO.

24    BY MS. WEIDNER:

25    Q.  So this is the first page of Exhibit 75.

1              Do you recognize it?

2    A.  Do you mind just going to the bottom so I can see the date?

3    Q.  Oh.  Sure.

4    A.  I just want to be sure this is the same -- yes.

5    Q.  There you go.

6    A.  Thank you.

7    Q.  No problem.

8              So this is the same one that you reviewed with

9    Mr. Costanzo; correct?

10   A.  It appears to be the same, correct.

11   Q.  And we have trade limits here as 15,000 to $50,000;

12   correct?

13   A.  Correct.

14   Q.  Let's look at the second page.

15             And on the bottom of that page, it lists a couple of

16   other ads that can also be accessed on localbitcoins.com.

17             Do you see those?

18   A.  Yes.

19   Q.  And those are also for Morpheus Titania's ads; correct?

20   A.  Correct.

21   Q.  And the first one lists a range of $20 to $1,500.

22   A.  Correct.

23   Q.  And the second, 7,000 to $15,000?

24   A.  Yep.

25   Q.  So he was willing to do trades for very small amounts, as

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1   little as $20?

2   A.  That's the way I read this ad.

3   Q.  And up to the $50,000 that's on the first page.

4   A.  Correct.

5   Q.  And you mentioned earlier in one of the questions I asked

6   you how the localbitcoins page connected to yet another page

7   of -- that would be the already published Exhibit 76.

8           I'm going to put that one on the ELMO.

9           And you'll note --

10  A.  I see the date.

11  Q.  Here is the date at the bottom.

12  A.  Yeah.

13  Q.  Is this the same one that you looked at with Mr. Restaino?

14  A.  Appears to be the same one.

15  Q.  And let's look through what is contained here.

16          At the top, the first paragraph, it explains the

17  source of the moniker "Morpheus"; correct?

18  A.  Specifically where are you referring?

19  Q.  The first three lines.

20          It mentions a science fiction movie.  It sounds like

21  The Matrix, doesn't it?

22  A.  I don't think I ever watched that movie.

23  Q.  You're making me feel old.

24          This information, though, the information provided

25  here, it gives us a look at information that Morpheus wanted to

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1    share about himself with potential Bitcoin buyers.  He tells
2    about his direct mail -- mail business that he had in 2001.
3    You used that to find him; correct?
4    A.  Correct.
5    Q.  And he even gives the name of the business, Direct Hit?
6    A.  Correct.
7    Q.  He gives his -- well, he mentioned that the business
8    failed.
9    A.  Correct.
10   Q.  That he lost his house in the aftermath, and I believe it
11   even says it was in Anthem?
12   A.  Correct.
13   Q.  And he even gives his then wife's name?
14   A.  Correct.
15   Q.  And going on, this information -- this page mentions his
16   distrust of the government; his belief that the Federal Reserve
17   is evil?
18   A.  Correct.
19   Q.  And that he rebuilt a life for himself around Bitcoin.
20   A.  Can you show me where that is?
21   Q.  If you would look on the second paragraph where he mentions
22   that no one tells him what to do.
23   A.  I see where he says:  I now mostly sell Bitcoin.  I don't
24   see where -- specifically where it states he rebuilt his life.
25   Q.  It does not say that.  That is a summary.

UNITED STATES DISTRICT COURT

1              You -- your undercover investigation, it had defined

2      goals; correct?

3      A.   That's correct.

4      Q.   First was to confirm the identity of Morpheus Titania?

5      A.   Correct.

6      Q.   And the IRS believed at that point that Morpheus was

7      probably Thomas Costanzo.

8      A.   Correct.

9      Q.   And that was because his phone number was on the Bitcoin --

10     the local -- let me change that question.  That's a poor

11     question.

12             Because of the wealth of information he provided about

13     himself on localbitcoins and the linked page; correct?

14     A.   Correct.

15     Q.   Second, the IRS wanted to determine whether Morpheus would

16     do a Bitcoin exchange for $10,000 or more.

17     A.   $10,000 or more without filing any paperwork --

18     Q.   Yes.

19     A.   -- such as a Currency Transaction Report.

20     Q.   That was the second half of my question.

21             And third, the third objective of your investigation,

22     was to see whether Morpheus would conduct a Bitcoin exchange

23     even if an undercover agent said that the cash for the trade

24     was from a specified unlawful activity.

25     A.   Correct.

MICHAEL FLEISCHMANN - CROSS-EXAMINATION                267

1    Q.  Now, specified unlawful activities are also referred to as

2    SUAs?

3    A.  That's correct.

4    Q.  And -- just basically shorthand; right?

5    A.  Correct.

6    Q.  And there's actually a very long list of SUAs.

7    A.  That's correct.

8    Q.  And of all of the SUAs in the universe of those, the IRS

9    chose drug trafficking.

10   A.  Correct.

11   Q.  Could have chosen murder for hire.  Didn't.

12   A.  That's correct.  We didn't choose murder-for-hire.

13   Q.  Didn't choose kidnapping either?

14   A.  No.

15   Q.  Or arson?

16   A.  Correct.

17   Q.  Not human trafficking?

18   A.  Nope.

19   Q.  Not sex trafficking?

20   A.  No.

21   Q.  Not destruction of an aircraft?

22   A.  No.

23   Q.  Drug trafficking is probably the least offensive SUA.

24   A.  I guess that's open for interpretation.

25   Q.  Pardon me?

UNITED STATES DISTRICT COURT

MICHAEL FLEISCHMANN - CROSS-EXAMINATION

1    A.  I said, that would be open for interpretation.  I mean, I

2    don't --

3    Q.  Yes.  But the IRS chose drug trafficking and not any of the

4    ones I listed; correct?

5    A.  Correct.

6    Q.  You testified earlier that there were about five in-person

7    meetings conducted between the IRS undercover agents and

8    Morpheus.

9    A.  I don't know if I testified to that specific number.

10   Q.  There were a number.  We can say there were a number.  I

11   just counted them up, but --

12   A.  Yeah, I think there was four.

13   Q.  Okay.

14   A.  Four or five, yeah, I believe.

15   Q.  At some point during some of the transactions, the

16   undercover IRS agent supposed to make reference to drugs or

17   drug dealing.  That was --

18   A.  That was one of the listed in our plan of action.  But that

19   wasn't on the first meet.

20   Q.  Yes.

21   A.  I mean, on the first meet it was about building rapport.

22   Q.  And the purpose of making that reference was to see if

23   Morpheus would go ahead with the trade anyway.

24   A.  Correct.

25   Q.  After, of course, a rapport had been established.

MICHAEL FLEISCHMANN – CROSS–EXAMINATION

1   A.   Correct.

2   Q.   And by "rapport," you mean that the agent basically formed

3   a –– a trusted relationship with Mr. Costanzo or Morpheus.

4   A.   I mean, I would say it's just getting to know each other.

5   Q.   And in each of the exchanges that occurred, the undercover

6   IRS agents used actual cash, U.S. currency?

7   A.   Correct.

8   Q.   But, of course, the undercover agents were not actually

9   drug dealers.

10  A.   They were not.

11  Q.   Because that was –– that was the ruse.

12  A.   Well, they were undercover agents.

13  Q.   Right.  But that was the ruse.  That was –– that was the

14  storyline.

15  A.   They were not drug dealers.

16  Q.   If you'll just give me a second, I want to make sure that I

17  hit on everything that I wanted to, and then we'll be done.

18                    (Pause in proceedings.)

19  BY MS. WEIDNER:

20  Q.   One more thing.

21          You mentioned that each of the meetings that was

22  conducted between the undercovers and Mr. Costanzo was

23  recorded.

24  A.   I believe so, yes.

25  Q.   Was it just audio recorded or also video recorded?

UNITED STATES DISTRICT COURT

```
1    A.   That I don't know.  I believe some were both, and some

2    might have just been audio.

3    Q.   But in each instance then, the IRS undercovers were

4    wearing, as they say, a wire?

5    A.   I don't necessarily know how to refer to it as wearing a

6    wire.  Sometimes -- I don't want to give away our techniques,

7    so to speak --

8    Q.   Okay.

9    A.   -- but they were recorded.

10              MS. WEIDNER:  No further questions.

11              MR. RESTAINO:  Your Honor, can we get a sidebar before

12   the redirect?

13              THE COURT:  Ladies and gentlemen, why don't we take a

14   break.  It's time for a morning break.  Take 15 minutes, and

15   then we'll be back and resume redirect testimony.

16              Thank you.

17              COURTROOM DEPUTY:  All rise.

18                (Jury leaves the courtroom at 10:28 a.m.)

19              THE COURT:  You can step down and take a break while

20   we handle this.

21              THE WITNESS:  Thank you, Your Honor.

22              THE COURT:  You need to be back for redirect in 15

23   minutes.

24              THE WITNESS:  Okay.  Thank you.

25              THE COURT:  Mr. Restaino?
```

1          MR. RESTAINO:  Your Honor, this sort of cues up that

2    issue that we've been discussing on when/if the Darknet comes

3    up or anything else, because the defense questioning went

4    towards the absence of predication towards Mr. Costanzo in --

5    it went there in two ways.  One, directly, about the choice of

6    the SUA.  I very much need to ask Agent Fleischmann now --

7          THE WITNESS:  Would you like me to step out?

8          MS. WEIDNER:  I would like him to step out, Judge, so

9    as not to cue up any response.

10          THE COURT:  Yes.  Yes.

11          MR. RESTAINO:  I very much am going to need to ask him

12    why the IRS chose drugs.  He's been cautioned, he's been talked

13    to about not saying the Darknet, but -- but that's where this

14    comes from is that there is predication that people were using

15    localbitcoins for drug transactions.  So I at least am going to

16    ask why drugs.  I'm confident the answer won't say -- won't

17    reference the Darknet from what he's said, but we're sort of in

18    a box here.

19          The second problem on this is, there's a gap between

20    the limited undercover request and the actual first undercover,

21    and at that point they know Mr. Costanzo's criminal history.

22    We're not suggesting we need to get into that, but at some

23    point in this case, the defense is going to open the door to

24    that if they continually try to pick at the absence of

25    predication as to why the approach was made to Mr. Costanzo.

UNITED STATES DISTRICT COURT

```
1            THE COURT:  Well, maybe they will, but they haven't
2    yet.
3            MR. RESTAINO:  I'm not disagreeing with that, Your
4    Honor.
5            THE COURT:  All right.  So we're not getting into the
6    Darknet on redirect.
7            MS. WEIDNER:  I do not anticipate that we will.  I'm
8    happy to talk to Agent Fleischmann now for the limited purpose
9    of reinforcing that I will not be seeking a Darknet response.
10            THE COURT:  That will be fine.
11            MR. RESTAINO:  Thank you.
12            THE COURT:  Thank you.
13            MS. WEIDNER:  Your Honor, actually, I have one quick
14    thing I want to raise now, just based on the testimony of Agent
15    Fleischmann.
16            It appears that the government has already presented
17    expert testimony about Bitcoin and commercial exchanges and
18    peer-to-peer exchanges, and I question the need to have Agent
19    Ellsworth again testify on what Agent Fleischmann already
20    reviewed.
21            THE COURT:  I'm going to allow it.  I think Bitcoin is
22    not a clear concept.  I think that there was some discussion of
23    it during this agent's direct testimony.  You can, of course,
24    during the course of the testimony, if you feel it's getting
25    duplicative, you can make that objection.  I don't think we're
```

1    there yet either.

2              MS. WEIDNER:  Thank you.

3                   (Proceedings in recess at 10:32 a.m.)

4                 (Jury enters the courtroom at 10:50 a.m.)

5                   (Proceedings resume at 10:53 a.m.)

6              THE COURT:  Please be seated.

7              Mr. Restaino, redirect?

8              I do want to remind you, even though I have before,

9    witnesses and lawyers tend to speed up after I've reminded them

10   to slow down a little bit, so I'll ask you -- and I'll ask you,

11   if you would -- be slow and clear, and I appreciate that very

12   much.

13             MR. RESTAINO:  Thank you, Your Honor.

14                       REDIRECT EXAMINATION

15   BY MR. RESTAINO:

16   Q.  Agent Fleischmann, you had the opportunity to speak before

17   the break with the defense counsel; correct?

18   A.  Correct.

19   Q.  And you disagreed on a few areas with her.

20   A.  That's correct.

21   Q.  Were you trying to be difficult?

22   A.  No, sir.

23   Q.  So for example, you were asked if you were familiar with

24   the movie The Matrix.  You're really not familiar with that

25   movie?

1   A.  Correct, sir.  I might have seen bits and pieces of it, but

2   I believe you and I also talked about it, and I think you were

3   surprised as well that I was unfamiliar with that movie.

4   Q.  Let's talk about one other area.

5           You've worked for the IRS for how many years?

6   A.  Since 2001.  July of 2001.

7   Q.  You disagreed that was 20 years.

8   A.  That's correct.

9   Q.  Why?

10  A.  Because it's not 20 years.

11  Q.  In your 17 or so years of service with the IRS, have you

12  handled different types of cases?

13  A.  Yes, sir.

14  Q.  You would agree -- would you agree that your virtual

15  currency casework is limited to about four years?

16  A.  Correct.

17  Q.  How many years of money laundering investigation experience

18  do you have?

19  A.  Since I started with -- as a Special Agent, so 2005.  So

20  about 13 years.

21  Q.  Now, you were also asked about various hacks; correct?

22  A.  Correct.

23  Q.  Including hacks of exchanges?

24  A.  Yes, sir.

25  Q.  Let me ask you this:  If one purchases Bitcoin from

MICHAEL FLEISCHMANN - REDIRECT EXAMINATION

1    Coinbase, do they have to keep their Coinbase there -- their

2    Bitcoin there?

3    A.  No, sir.  You can keep it actually on a paper wallet, as

4    well.

5    Q.  What does that mean?

6    A.  It's basically a physical piece of paper which is -- which

7    is -- is your wallet.  So it has the two QR codes.  It would

8    have your private code and then a public code.  So the public

9    code would be the one, as we saw in the video, that the two

10   agents were sharing in order to transfer Bitcoin from one to

11   the other.  The private code would be your own code that you

12   wouldn't want to share because if you share it, then your

13   Bitcoin can basically be stolen.  But that's -- that could be

14   just kept on a piece of paper.

15   Q.  Now, let's talk about some of the larger hack areas that

16   you were asked about.

17             You're familiar with the fact that there have been

18   hacks and intrusions into various websites; correct?

19   A.  Correct.

20   Q.  To your knowledge, has that stopped people from using

21   computers?

22   A.  No, sir.

23   Q.  Has it stopped them from using online commerce?

24   A.  No.

25   Q.  In your experience as a law enforcement officer, you've

UNITED STATES DISTRICT COURT

MICHAEL FLEISCHMANN – REDIRECT EXAMINATION

1  heard of bank robberies?

2  A.  Yes, sir.

3  Q.  Have you heard of armed bank robberies?

4  A.  Yes, sir.

5  Q.  Do those actions, in your knowledge, cause people to stop

6  putting money in banks?

7  A.  No.

8  Q.  You were also asked some questions by defense counsel about

9  how you were able to trace Morpheus to Mr. Costanzo; correct?

10 A.  Correct.

11 Q.  Would it have been easier to identify the defendant if he

12 had used his real name in lieu of "Morpheus"?

13 A.  Yes, sir.

14 Q.  You were also asked a series of questions about the

15 specified unlawful activity that was chosen; correct?

16 A.  Correct.

17 Q.  Who chose the specified unlawful activity in this

18 investigation?

19 A.  We did.

20 Q.  You, meaning you as the case agent?

21 A.  Correct.

22 Q.  Were there other people involved in that decision in your

23 agency?

24 A.  Yeah.  I mean, we obviously talked to -- talked to our

25 manager about it.  I believe Agent Ellsworth and I were the two

MICHAEL FLEISCHMANN - REDIRECT EXAMINATION          277

```
 1    that kind of started looking at cyber crime, and so I think we
 2    probably discussed it.
 3    Q.  All right.  And you agree you didn't use aircraft
 4    highjacking; correct?
 5    A.  Correct.
 6    Q.  You didn't use any of the other crimes that defense counsel
 7    represented?
 8    A.  That would be correct.
 9    Q.  Did you use Hobbs Act extortion?
10    A.  No.
11    Q.  Did you use wire fraud or mail fraud?
12    A.  No, sir.
13    Q.  Did you use healthcare fraud?
14    A.  No.
15    Q.  Why did you choose drugs?
16    A.  Well, when our undercovers would meet with the defendant,
17    everybody knows that -- I mean, everyone knows what heroin is.
18    Q.  What do you mean by that?
19    A.  So, I mean, it's -- it's cut and dry.  It's black and
20    white.  You know, if you say "heroin" on tape, everyone knows
21    that heroin is an illegal drug.
22            MR. RESTAINO:  Your Honor, may I just have a moment?
23            THE COURT:  You may.
24                    (Pause in proceedings.)
25            MR. RESTAINO:  Thank you, Agent Fleischmann.
```

SERGEI KUSHNER – DIRECT EXAMINATION          278

1              Your Honor, we have no further questions for this

2    witness.

3              THE COURT:  You may step down.  Thank you.

4              Next witness?

5              MR. BINFORD:  United States calls Sergei Kushner.

6         (SERGEI KUSHNER, Government's witness, is sworn.)

7              MR. BINFORD:  May I approach the lectern, Your Honor?

8              THE COURT:  You may.

9                          DIRECT EXAMINATION

10   BY MR. BINFORD:

11   Q.  Good morning, Agent Kushner.

12   A.  Good morning.

13   Q.  Can you tell us where you work?

14   A.  I work for the Internal Revenue Service, Criminal

15   Investigation Division.

16   Q.  And what is your title?

17   A.  I'm a Special Agent.

18   Q.  How long have you been a Special Agent?

19   A.  I've been a Special Agent approximately 20 years.

20   Q.  What did you do before becoming a Special Agent?

21   A.  I was employed as a revenue agent, also with Internal

22   Revenue Service, but with the civil division.

23             THE COURT:  Agent, could I get you to slow down a

24   little bit and speak distinct, as distinctly as possible?

25             THE WITNESS:  Yes, sir.

UNITED STATES DISTRICT COURT

1          THE COURT:  Thank you.

2   BY MR. BINFORD:

3   Q.  Prior to serving as a revenue agent, did you do anything

4   else?

5   A.  I was employed as a revenue officer with Collection

6   Division of the IRS.

7   Q.  What type of training did you receive in order to become a

8   Special Agent?

9   A.  I completed Special Agent and criminal investigative

10  training in 1998 at the Federal Law Enforcement Training Center

11  in Georgia.

12  Q.  And do you have any specialized assignment at the moment?

13  A.  Yes.  I -- my special assignment is an undercover agent,

14  and also I have another title, which is a computer

15  investigative specialist.  I do computer forensics also for the

16  Criminal Investigation Division.

17  Q.  How long have you been working in an undercover capacity?

18  A.  Since 2003.

19  Q.  And I notice today you're speaking with what appears to be

20  an accent.  What is that accent?

21  A.  This is Russian accent.  I was born in Russia.

22  Q.  Now, can anyone become an undercover agent?

23  A.  No.  Anyone can apply to become undercover agent.  However,

24  they have to pass an interview process and to be subjected to

25  psychological evaluation, and pass the training successfully,

1   complete the training successfully.

2   Q.  Are you currently assigned to a field office in the United

3   States?

4   A.  I'm currently assigned to headquarters in Washington, D.C.,

5   but I work out of New York City field office.

6   Q.  Have you done any undercover work here in Arizona?

7   A.  Yes, I have.

8   Q.  Tell us about that.

9   A.  In early 2015, I was assigned an investigation.  It was a

10  limited undercover contact investigation.  That's how it was

11  classified.  And the purpose of that -- the purpose of that

12  assignment was for me to contact individual known as Morpheus

13  Titania and conduct a Bitcoin transaction with him.

14  Q.  Did you ever learn the true name of the person you knew as

15  Morpheus Titania?

16  A.  Yes, I -- yes, I did.

17  Q.  And what was his name?

18  A.  Thomas Costanzo.

19  Q.  And do you see that individual here in the courtroom today?

20  A.  Yes, he's sitting right there.

21  Q.  Will you describe him.

22  A.  He's wearing a dark jacket, glasses, balding hairline.

23          MR. BINFORD:  May -- may the record reflect that the

24  witness has identified the defendant?

25          THE COURT:  It may.

1   BY MR. BINFORD:

2   Q.  All right.  So what was your role in that investigation?

3   A.  It was an undercover agent.

4   Q.  How were you selected?

5   A.  I was selected based on my previous experience with

6   investigations involving Bitcoins, and also due to the fact

7   that I speak Russian, it was believed that I could fit a role

8   for this particular assignment.

9   Q.  So, a role.  Did you have a specific plan or theme that you

10  were going to go with during your meeting?

11  A.  Yes.  I prepared for the meeting, and my role was to be

12  business owner, specifically import/export business, which was

13  my cover business for my identity.

14  Q.  And let's talk about your plan.

15          It's my understanding that you had several meetings

16  with Mr. Costanzo?

17  A.  Yes, I had several meetings.

18  Q.  What was your plan going into the first meeting?

19  A.  In the first meeting, my plan was basically just to meet

20  Costanzo, to establish rapport, to find out a little bit more

21  information about him.  Basically to build a relationship where

22  we can continue working together.

23  Q.  Was there a plan at all to introduce a specified unlawful

24  activity at some point?

25  A.  There was a plan to introduce specified unlawful activity,

1    but not during the first meeting.

2    Q.  Do you recall what the specified unlawful activity was that

3    was selected?

4    A.  The activity that was selected was drugs, narcotics;

5    specifically heroin.

6    Q.  And why was that selected?

7    A.  Because there's no question that heroin is illegal, unlike

8    some other drugs that may be considered acceptable.  It's

9    pretty clear that heroin is an illegal narcotic.

10   Q.  All right.  What did you know about the person you were

11   meeting with before you first contacted him?

12   A.  What I -- what I knew about him is what was disclosed to me

13   in the memo that I received with the assignment, and what I

14   learned from looking at Costanzo's web page on

15   localbitcoins.com.

16          MR. BINFORD:  All right.  At this point, I would like

17   to show the witness what's been previously identified as

18   Exhibit 75, identified and admitted.

19          COURTROOM DEPUTY:  Just the witness?

20          MR. BINFORD:  We can go ahead and publish it for the

21   jury, as well, with the Court's permission.

22          THE COURT:  You may.

23   BY MR. BINFORD:

24   Q.  Do you recognize that document?

25   A.  Yes.  This is Morpheus' or Costanzo's page on

1    localbitcoins.com website.

2    Q.  All right.  And did you use any information from that

3    profile when you reached out to Mr. Costanzo?

4    A.  Yes.  His web page showed his phone number, cell phone

5    number, and also showed that he preferred meeting at McDonald's

6    and Starbucks.  So I -- useful information was the phone

7    number.

8    Q.  How did you first contact Mr. Costanzo?

9    A.  I contacted him via text to the phone number that I

10   obtained from localbitcoins.com.

11   Q.  Was that the only time that you exchanged text messages

12   with Mr. Costanzo throughout this investigation?

13   A.  No, I exchanged numerous text messages with Mr. Costanzo.

14   Q.  And were you able to preserve your text message

15   conversations with Mr. Costanzo?

16   A.  Yes.

17   Q.  How did you do that?

18   A.  I downloaded text messages from my phone that I was using,

19   using forensic tools that I have been trained on as a computer

20   investigator specialist.

21   Q.  All right.

22        MR. BINFORD:  I'd like to show the witness only what's

23   been previously marked for identification as Exhibit 70.

24   BY MR. BINFORD:

25   Q.  Agent Kushner, without going into what's contained in that

SERGEI KUSHNER - DIRECT EXAMINATION

```
 1    document, do you recommend that -- can you identify that
 2    document?
 3    A.  Yes, this is report of -- my forensic report of the text
 4    messages that I downloaded from my cell phone which documents
 5    all the text messages between myself and Mr. Costanzo.
 6    Q.  And do you recall how many pages that document was?
 7    A.  I believe it was five pages, and the text message is in
 8    reverse chronological order.
 9    Q.  All right.  Is that document a fair and accurate accounting
10    of the text messages that you exchanged with Mr. Costanzo
11    throughout the investigation?
12    A.  Yes, it is.
13           MR. BINFORD:  At this time, I'd move to admit
14    Exhibit 70 and publish for the jury.
15           MR. CAIN:  No objection, Your Honor.
16           THE COURT:  Exhibit 70 is admitted.
17              (Exhibit 70 is received into evidence.)
18           THE COURT:  You may publish.
19    BY MR. BINFORD:
20    Q.  Agent Kushner, what are we looking at here on the screen?
21    A.  This is just a summary of some of the technical information
22    from my download of the messages.
23    Q.  All right.  And I think you mentioned previously that the
24    messages were extracted in reverse chronological --
25    A.  Yes.
```

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.  What does that mean to us with this document?

2    A.  Well, it means the most recent messages will appear first.

3    Q.  So if we wanted to look at your first messages, we would

4    have to go --

5    A.  You have to go to the last page and look at the very last

6    message.

7    Q.  Can you read the information on the screen there?

8    A.  Yes.  Yes, I can.

9    Q.  All right.  So what was -- how did you first reach out to

10   Mr. Costanzo?

11   A.  On January 27th, 2015 -- excuse me -- I contacted

12   Mr. Costanzo via text message to his phone number, and I

13   explained that I wanted to buy $3,000 worth of Bitcoins from

14   him.

15   Q.  And what were you trying to do there?

16   A.  I was attempting to buy Bitcoins from Mr. Costanzo, see if

17   he was willing to conduct the trade.

18   Q.  Were you in Arizona at the time?

19   A.  No, I was not.  I was in New York, and I explained to

20   Mr. Costanzo that I was in New York and I -- obviously not able

21   to give him cash, so I wanted to do a wire at the time.

22   Q.  And what did he say?

23   A.  Well, first he wasn't sure who I was, so he questioned who

24   am I and how I had found him.  So I mentioned that I saw his ad

25   on the localbitcoins.  And he asked me if I wanted to do a

1    trade with -- why -- why wouldn't I want to do a trade with

2    someone in New York, and I explained that I would rather deal

3    with someone who is in the area where I lived, and I explained

4    I lived in Chandler, Arizona, and I was only temporarily in New

5    York.  So I would be more comfortable working with someone --

6    with one individual.

7    Q.  And were you ever able to complete that transaction?

8    A.  Not via wire, no.

9    Q.  Okay.  And now I'm going to zoom in on another part of this

10   document at the top.

11           This is page 5 of Exhibit 70.

12           Do you see when your conversation resumed?

13   A.  Excuse me.

14           Yes.  On March 17th, 2015, I contacted Mr. Costanzo

15   again via text message to his cell phone number, and I

16   mentioned that I would -- wanted to buy $2,000 worth of

17   Bitcoins.

18   Q.  And did you plan to meet in person that time?

19   A.  Yes.

20   Q.  And did you eventually meet with Mr. Costanzo?

21   A.  Yes, sir.  We arranged a meeting at Starbucks in Chandler,

22   Arizona.

23   Q.  Do you recall the date of that meeting?

24   A.  It was March 20th, 2015.

25   Q.  So what did you wear when you showed up for that meeting?

1    A.  I believe I was dressed casually, jeans and -- I don't

2    remember specific shirt, but dressed casually for that meeting.

3    I do recall wearing jewelry, gold Rolex, gold chain, gold ring,

4    gold diamond ring.

5    Q.  Do you recall what Mr. Costanzo was wearing?

6    A.  Not specifically.  I just remember he was dressed very

7    casually also.

8    Q.  During that meeting, were you carrying or wearing a

9    recording device?

10   A.  Yes, I was -- I was carrying a recording device and a

11   transmitting device.

12   Q.  And where was -- was that device hidden underneath your

13   clothing?

14   A.  Yes, both devices were hidden in pockets in my clothing.

15   Q.  Have you had an opportunity to review the audio since that

16   meeting?

17   A.  Yes, I have.

18   Q.  And did you notice anything about the audio based on where

19   the recording device was placed?

20   A.  Well, due to the fact that the devices were in my pocket

21   and the fact that we were meeting outside -- outside in a

22   common area of Starbucks outside, there were a lot of

23   extraneous noises that affected some parts of the recording.

24   Plus, any movement by myself resulted in some static noises

25   during the recording.

1   Q.  So it's -- it's not the clearest recording?

2   A.  It's not -- it's not.  It's not the clearest, but under the

3   circumstances it was the best that could have been

4   accomplished.

5   Q.  All right.  Have you also had an opportunity to review a

6   transcript that was prepared based on the audio from that

7   meeting?

8   A.  Yes.

9   Q.  And do you believe that the audio and the transcript are a

10  fair and accurate account of that meeting?

11  A.  I do believe so.

12          MR. BINFORD:  Your Honor, at this time the government

13  would move to admit what's been previously marked as

14  Exhibit 101, and, too, there are subparts A through R.  We move

15  to admit the audio and play the transcripts for the jury,

16  without admitting the transcripts into the record.

17          THE COURT:  Any objection?

18          MR. CAIN:  No objection, Your Honor.

19          THE COURT:  All right.

20          Ladies and gentlemen, you're about to hear a recording

21  that I have -- I am admitting into evidence.  Please listen to

22  it carefully.  There will be a transcript attached to the

23  recording.  However, bear in mind that the recording is the

24  evidence, not the transcript.  If you hear something different

25  from what the -- what you believe is in the transcript, what

1    you hear is controlling.  You will not have the transcript with

2    you when you go to the jury room, although you will have the

3    recording.

4              (Exhibit 101 is received into evidence.)

5              MR. BINFORD:  Thank you, Judge.

6    BY MR. BINFORD:

7    Q.  All right.  I'm cueing up what's been previously marked as

8    Exhibit 101A.

9              (Portion of audiotape played.)

10             MR. BINFORD:  Before I ask you a question, I just want

11   to make sure the volume is turned all the way up on the court

12   system.

13             COURTROOM DEPUTY:  I'm turning it up now.

14             Try that.

15   BY MR. BINFORD:

16   Q.  The first question I have, so here you've mentioned that

17   you have an import/export business.

18   A.  Yes, sir.

19   Q.  What are you trying to do there?

20   A.  I'm trying to establish -- this is my cover, basically.

21   This is my legitimate business cover for my drug business.

22   Q.  All right.

23             (Portion of audiotape played.)

24   Q.  All right.  And it seems like he is asking you questions at

25   this point.  Did you get the impression that he wanted to know

1      what you were doing?

2      A.  Yes.  He appeared curious about my business.

3                     (Portion of audiotape played.)

4      BY MR. BINFORD:

5      Q.  You mention a supply there.  What -- why are you saying

6      that?

7      A.  I said "supplier."  Well, I'm sure during this first

8      meeting I'm throwing little hints that perhaps the -- my

9      import/export business is not really what it appears to be,

10     that it's just a cover for something else.  So the "supplier"

11     is potentially a drug supplier, but not -- without mentioning.

12     Q.  At this point, there's no overt talk about drug activity?

13     A.  No, not at all.

14                     (Portion of audiotape played.)

15     BY MR. BINFORD:

16     Q.  What are you referring to there?

17     A.  The Currency Transaction Report, required to be filed on

18     any transaction over $10,000 -- cash transactions over $10,000.

19     Q.  Is there a reason that you mentioned depositing 10 grand

20     during that conversation?

21     A.  I wanted to see -- wanted to see, wanted to gauge if

22     Mr. Costanzo knew of those requirements.

23     Q.  Did you get the sense that he did know about that

24     requirement?

25     A.  Yes, I did.

SERGEI KUSHNER – DIRECT EXAMINATION

1           (Portion of audiotape played.)

2    BY MR. BINFORD:

3    Q.  What amount had you set up to purchase from Mr. Costanzo

4    that day?

5    A.  $2,000.

6    Q.  When he mentions $20,000 here, is that important to the

7    investigation?

8    A.  Yes.

9    Q.  Why?

10   A.  Because $20,000 exceeds the threshold for reporting

11   requirements.

12           (Portion of audiotape played.)

13           MR. BINFORD:  All right.  At this time I'd like to

14   play what's been previously marked as 101B.

15           (Portion of audiotape played.).

16   BY MR. BINFORD:

17   Q.  What was your understanding of his statement, "this is what

18   I do"?

19   A.  Well, my understanding was that trading Bitcoins was his

20   only occupation.

21           (Portion of audiotape played.)

22   BY MR. BINFORD:

23   Q.  He talks about a meet-up there.  Did you end up attending

24   that meet-up?

25   A.  Yes, I attended the meet-up the next day, March 21st, 2015.

UNITED STATES DISTRICT COURT

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.  How many people were at that meet-up?

2    A.  There were at least four individuals present during the

3    meet-up.

4    Q.  Did you have an opportunity during that meet-up to talk to

5    Mr. Costanzo one-on-one at all?

6    A.  No, it was a group setting.  We didn't talk privately at

7    all during that meeting.

8    Q.  So during that meet-up, did you make any attempt to at

9    least further your conversations with Mr. Costanzo about what

10   you were trying to do?

11   A.  No, not on November -- not -- I'm sorry -- not on

12   March 21st.

13   Q.  All right.

14                    (Portion of audiotape played.)

15   BY MR. BINFORD:

16   Q.  So you dropped the "IRS" there.  What --

17   A.  Well, I mean --

18   Q.  -- what was that?

19   A.  -- he appears to -- again, I wanted to gauge his feeling

20   for the government, for the authority.  And he'd already

21   mentioned that he believes government is, in his words, you

22   know, is a bunch of criminals.  So I wanted to see, to further

23   that discussion.

24         MR. BINFORD:  And -- I'll just play it.

25                    (Portion of audiotape played.)

UNITED STATES DISTRICT COURT

1    BY MR. BINFORD:

2     Q.  Who is he talking about there?

3     A.  He's talking about the Internal Revenue Service.

4                    (Portion of audiotape played.)

5    BY MR. BINFORD:

6     Q.  You said "good luck."  Give us a frame of reference for

7    that.  What were you trying to convey?

8     A.  Well -- well, with the Bitcoin, it's very hard to trace the

9    transaction, basically.

10                    (Portion of audiotape played.)

11   BY MR. BINFORD:

12    Q.  So here you say, everybody else takes -- what are you

13   referring -- who is "everybody else"?

14    A.  Well, most listings on localbitcoins.com advertise

15   transactions of maybe up to $2,500.  There were very few that

16   appeared to be similar to Costanzo's where he was willing to

17   trade up to $50,000 worth of Bitcoins.

18    Q.  And you were aware that he was willing to do smaller

19   amounts as well; right?

20    A.  Yes.  He had several listings on the localbitcoins.  Some

21   of them for much smaller amounts.

22                    (Portion of audiotape played.)

23   BY MR. BINFORD:

24    Q.  Did he one-up you there?

25    A.  I'm sorry?

UNITED STATES DISTRICT COURT

1    Q.  Did -- did he increase the amount on you there?

2    A.  Yes.  I mentioned 20,000, 30,000, and he said, you know, go

3    up to 50,000.

4    Q.  Did he say more than 50,000?

5    A.  Hundred.  Hundred thousand.

6                      (Portion of audiotape played.)

7    BY MR. BINFORD:

8    Q.  All right.  So he talks about a personal banker there.

9    What did you understand that to mean, based on his prior

10   statements?

11   A.  Well, I understood that he had -- had an ability to come up

12   with a large amount of Bitcoins very quickly, if it was

13   necessary.  He previously mentioned he didn't have a bank

14   account, but, you know, he said he has a banker who was able to

15   provide Bitcoins to him.

16   Q.  All right.  And after the small talk and the conversation,

17   did you eventually get around to the business?

18   A.  Yes.  After we talked for a while, we got to the business

19   of actually me purchasing Bitcoins from Mr. Costanzo.

20            MR. BINFORD:  All right.  At this point I would like

21   to play Exhibit 101C.

22                      (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  Talks about scanning a code.  What -- what type of code is

25   that?

SERGEI KUSHNER - DIRECT EXAMINATION                    295

1    A.   It's a QR code.  I don't know how to explain the QR code.

2    But it is a code that can be scanned with a smartphone and --

3    to initiate the transfer of Bitcoins, whether to send or

4    receive.

5    Q.   Did you fly out here to testify?

6    A.   I'm sorry?

7    Q.   Did you fly out here to testify?

8    A.   Yes.

9    Q.   And did you get a boarding pass when you flew out?

10   A.   Yes.

11   Q.   Was there any code on that boarding pass?

12   A.   It's similar, yes.  A secure code that would appear on a

13   boarding pass.  It's very common in a lot of other

14   transactions, aside from Bitcoin.

15   Q.   Thank you.

16                  (Portion of audiotape played.)

17   BY MR. BINFORD:

18   Q.   Is that important to your investigation?

19   A.   Yes, obviously.  It appears that he's been successful

20   and -- with the Bitcoin trade, and had multiple transactions

21   resulting, you know, multimillion-dollar business, as he

22   mentions.

23                  (Portion of audiotape played.)

24   BY MR. BINFORD:

25   Q.   Did you end up completing this transaction through

1    localbitcoins?

2    A.  Yes.

3            MR. BINFORD:  I'm now pulling up Exhibit 101D.

4                (Portion of audiotape played.)

5    BY MR. BINFORD:

6    Q.  Would you say he's enthusiastic about Bitcoin?

7    A.  Very enthusiastic.  I mean, he went on for a while

8    explaining the benefits of Bitcoin.

9    Q.  Is your understanding that there's nothing illegal about

10   owning Bitcoin?

11   A.  No, there's nothing illegal about owning Bitcoins.

12   Q.  And nothing illegal about buying Bitcoin?

13   A.  Nothing illegal about buying Bitcoins, no.

14   Q.  All right.

15           MR. BINFORD:  I'm now going to play Exhibit 101E.

16               (Portion of audiotape played.)

17   BY MR. BINFORD:

18   Q.  Why do you mention a bank there?

19   A.  Well, I wanted to see what -- what happens with the cash

20   that he receives for Bitcoins.

21               (Portion of audiotape played.)

22           MR. BINFORD:  The next clip is 101F.

23               (Portion of audiotape played.)

24   BY MR. BINFORD:

25   Q.  What are you doing there?

SERGEI KUSHNER - DIRECT EXAMINATION

1    A.   Throwing little hints that -- that perhaps my business --

2    my import/export business is not what it appears to be.

3    Because in the beginning of the conversation, I mentioned that

4    I do business mostly were Latvia and Russia, you know, import

5    and export.   So now I'm talking about wiring money south of the

6    border.

7    Q.   How did he react?

8    A.   Didn't faze him at all.

9    Q.   How would you expect someone else to react in that

10   situation?

11   A.   Well, expect that --

12            MR. CAIN:   Objection.   Relevance.

13            THE COURT:   Overruled on relevance.

14            You may answer.

15            MR. CAIN:   Objection.   Calls for speculation.

16            MR. BINFORD:   I'll withdraw the question, Your Honor.

17   BY MR. BINFORD:

18   Q.   How would you react if someone was talking to you and

19   telling you about their import/export business related to

20   Russia and Latvia, and then mentioned money coming from Panama

21   or Mexico?

22            MR. CAIN:   Objection.   Relevance.

23            THE COURT:   Overruled.

24            You may answer.

25            THE WITNESS:   I would be at least curious.   I would

1    ask what does it have to do with -- what does it have to do

2    with the business you're doing with Russia and Latvia, if

3    that's what you're claiming your business is.

4    BY MR. BINFORD:

5    Q.  Did he ask more about those South America or Central

6    America connections?

7    A.  No, not at that time.

8                    (Portion of audiotape played.)

9    BY MR. BINFORD:

10   Q.  What did he say there?

11   A.  So he says basically it's untraceable.

12   Q.  And that's after you mentioned that --

13   A.  After I mentioned Panama.

14   Q.  Did you get the sense that he was stressing that point?

15   A.  Yes, he -- I guess at this point he believed that it was

16   important to me to be discreet, and he was stressing that

17   Bitcoin is untraceable and anonymous.

18   Q.  Is that something you would expect to hear if you were

19   talking about a legitimate business?

20   A.  No.

21                    (Portion of audiotape played.)

22   BY MR. BINFORD:

23   Q.  When he mentioned that he didn't keep any records, was that

24   important to your investigation?

25   A.  Yes, absolutely.

1    Q.  And was that related to one of the goals of this

2    investigation?

3    A.  Yes.

4    Q.  What was that goal?

5    A.  Was to determine if Mr. Costanzo keeps any records relating

6    to large -- large cash transactions.

7              MR. BINFORD:  At this time, I'm going to play

8    Exhibit 101G.

9                        (Portion of audiotape played.)

10   BY MR. BINFORD:

11   Q.  Do you recall him telling you those rules?

12   A.  Yes, he mentioned them several times.

13                       (Portion of audiotape played.)

14   BY MR. BINFORD:

15   Q.  If he knew at that time you were a law enforcement officer,

16   would he be violating his own rules?

17   A.  I believe he would not be continue -- he would not be

18   talking to me at this time.

19             MR. BINFORD:  The next clip I have is 101H.

20                       (Portion of audiotape played.)

21             MR. BINFORD:  The next clip is 101I.

22                       (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  Did he ever ask for your last name?

25   A.  No.

1    Q.  Did he ever ask to see your driver's license?

2    A.  No.

3    Q.  Did he ask whether you had a family?

4    A.  No.  Not that I recall.

5            MR. BINFORD:  All right.  The next clip is 101J.

6                (Portion of audiotape played.)

7    BY MR. BINFORD:

8    Q.  Do you recall what rate he charged you during this

9    transaction?

10   A.  It was approximately -- approximately 10 percent.

11               (Portion of audiotape played.)

12   BY MR. BINFORD:

13   Q.  He mentions an address to you there.  Is he talking about

14   your physical address?

15   A.  No, he's talking about Bitcoin address, which is

16   combination -- often a combination of letters and numbers which

17   is used to identify a Bitcoin wallet, and is used to either

18   send or receive Bitcoins.

19   Q.  He also mentioned something called Mycelium.  Do you know

20   what "Mycelium" is?

21   A.  Yes, Mycelium is an application which can be downloaded on

22   the smartphone, and it's essentially a Bitcoin wallet which

23   allows you to send or receive Bitcoin -- Bitcoins and store

24   them in your smartphone.

25               (Portion of audiotape played.)

1   BY MR. BINFORD:

2    Q.  What are you doing there?

3    A.  Again, I'm following with the same theme.  I'm trying to

4   set the stage for later on to do drug talk, and basically

5   trying to indicate that my suppliers are -- the people I deal

6   with are serious, you know, people, that they're not being very

7   happy if I didn't get the money that I owe them.

8    Q.  Did you ever get a sense that he thought you were joking or

9   boasting?

10   A.  No, no.

11                  (Portion of audiotape played.)

12   BY MR. BINFORD:

13   Q.  Did you ever tell him that you had no income?

14   A.  No.

15                  (Portion of audiotape played.)

16   BY MR. BINFORD:

17   Q.  What did you take him to mean when he said you could lower

18   your visibility?

19   A.  Well, basically to be, you know, to be more discreet, more

20   anonymous.

21          MR. BINFORD:  This next clip is 101K.

22                  (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  What's going on here?

25   A.  Counting money.

UNITED STATES DISTRICT COURT

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.  How much cash did you give him that day?

2    A.  $2,000.

3              MR. BINFORD:  The next clip is 101L.

4                  (Portion of audiotape played.)

5    BY MR. BINFORD:

6    Q.  Is that important to your investigation?

7    A.  Yes.

8    Q.  Why?

9    A.  Because $90,000, again, it's an amount that's -- greatly

10   exceeds the reporting threshold for cash transactions.

11                 (Portion of audiotape played.)

12   BY MR. BINFORD:

13   Q.  So earlier you testified that you were aware he did lower

14   amounts.  Is his statement there consistent with that?

15   A.  Yes.

16   Q.  Were you surprised that he engaged in transactions with

17   lower amounts?

18   A.  Somewhat, yes.

19             MR. BINFORD:  This is clip 101M.

20                 (Portion of audiotape played.)

21   BY MR. BINFORD:

22   Q.  Why -- why are you telling -- why are you asking him

23   whether it can be traced to you?

24   A.  Well, again, I would be concerned if -- if law enforcement

25   found out what my true business was, I don't want any --

1    anything come back to me, to myself.

2    Q.  But again at this point, you haven't mentioned any drugs or

3    other illegal activity?

4    A.  No, I did not, but it was, again, throwing hints.

5    Q.  Did he seem receptive to those hints?

6    A.  Again, it didn't same to faze him, and he just continued.

7    He seemed very receptive to -- when I mentioned I wanted

8    discretion or I wanted to -- not -- for the transaction not to

9    be traced to me, he just continued explaining how it would be

10   very difficult to trace those transactions to myself.

11                    (Portion of audiotape played.)

12            MR. BINFORD:  This is clip 101N.

13                    (Portion of audiotape played.)

14   BY MR. BINFORD:

15   Q.  What are those letters?

16   A.  Basically those are four letters that are part of the

17   Bitcoin address.  And again, Bitcoin address, wallet address is

18   too long -- it's very long.  It's over, perhaps, 20, 25

19   characters.  So -- and he's reading off the last four digits of

20   the Bitcoin address, just so we -- this way he doesn't have to

21   read the whole thing.  We can just confirm it's the correct

22   address.  I mean, each address is so unique that it's

23   impossible to have the same letters -- you know, any four

24   letters repeated in any given address combination.

25                    (Portion of audiotape played.)

SERGEI KUSHNER - DIRECT EXAMINATION

1    BY MR. BINFORD:

2    Q.  Did you ever tell him you didn't want anyone to triangulate

3    your position?

4    A.  I didn't say I didn't want anybody to triangulate my

5    position.  I did say I didn't want it to be traced to me.

6    Q.  So was that consistent with your inquiry?

7    A.  Yes.

8                       (Portion of audiotape played.)

9    BY MR. BINFORD:

10   Q.  What do you think he was trying to stress with you at that

11   point?

12   A.  Well, what he's trying to explain during this conversation

13   is that if -- if I use localbitcoins -- localbitcoin.com wallet

14   for transactions, the Bitcoin -- the address for each

15   transaction will be different, so it would be so much more

16   difficult to trace.

17             MR. BINFORD:  This is clip 1010.

18                       (Portion of audiotape played.)

19   BY MR. BINFORD:

20   Q.  Earlier in the conversation it seemed like he wanted to

21   know a lot about your business.  Did you feel that he still

22   wanted to know more about your business at this point?

23   A.  No, does not appear that he is interested anymore.

24                       (Portion of audiotape played.)

25

UNITED STATES DISTRICT COURT

SERGEI KUSHNER - DIRECT EXAMINATION

```
 1   BY MR. BINFORD:
 2    Q.  When he says they scrambled it all up, what's he talking
 3    about?  Who is he talking about?
 4    A.  He's talking about the transaction at localbitcoins.com.
 5                      (Portion of audiotape played.)
 6   BY MR. BINFORD:
 7    Q.  Why -- why do you mention that?
 8    A.  Well, again, I'm very concerned that I don't want anything
 9    to be traced to me, obviously.  And again, he's emphasizing
10    that if I set up, you know, if myself and supplier sets up at
11    localbitcoins.com, it would be so much more difficult to trace
12    the transactions because Bitcoins' address changes each time.
13                      (Portion of audiotape played.)
14            MR. BINFORD:  All right.  This next clip is 101P.
15                      (Portion of audiotape played.)
16   BY MR. BINFORD:
17    Q.  He can do what?
18    A.  He can do, you know, up to 50 grand.  Up to $50,000.
19                      (Portion of audiotape played.)
20            MR. BINFORD:  This next clip is 101Q.
21                      (Portion of audiotape played.)
22   BY MR. BINFORD:
23    Q.  Did he ask you why you might get arrested?
24    A.  No, he did not.
25    Q.  Did he ask you why you -- why you might want to stay out of
```

UNITED STATES DISTRICT COURT

```
 1    trouble?
 2    A.  He did not ask me.
 3                    (Portion of audiotape played.)
 4    BY MR. BINFORD:
 5    Q.  Did he at any point tell you his real first name?
 6    A.  No.
 7    Q.  Did he at any point tell you his real last name?
 8    A.  No.
 9          MR. BINFORD:  This is clip 101R.
10                    (Portion of audiotape played.)
11    BY MR. BINFORD:
12    Q.  What are you -- what are you saying there about engine
13    blocks?
14    A.  Well, saying engine blocks, he describes -- you know, when
15    you take the car apart and the engine is by itself, you'd be
16    surprised what you can hide inside.
17    Q.  So you're talk -- talking about actually hiding items
18    inside?
19    A.  Engine blocks, yes.
20                    (Portion of audiotape played.)
21    BY MR. BINFORD:
22    Q.  All right.  At any point during that -- well, did you
23    ultimately complete the -- the Bitcoin for cash transaction
24    that day?
25    A.  Yes.
```

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.   And how much cash did you give him?

2    A.   $2,000 in cash.

3    Q.   And what was the rate you paid for the Bitcoin?

4    A.   I don't recall the -- well, the fee he charged me was

5    approximately 10 percent above the going rate at the time.  I

6    do not recall the rate at the time.

7    Q.   Thank you.  And that's what I meant to ask --

8    A.   Yes.

9    Q.    -- was the fee above the market rate.

10   A.   Yes.

11   Q.   At any point did Mr. Costanzo ask for your full name?

12   A.   No, he did not.

13   Q.   Did he ask for your street address?

14   A.   No.

15   Q.   Did he ask for your Social Security number?

16   A.   No.

17   Q.   Your Taxpayer Identification Number?

18   A.   No.

19   Q.   Did he ask to see your identification?

20   A.   No.

21   Q.   After that meeting, did he send you any text messages that

22   day?

23   A.   Yes.  I believe so.

24   Q.   And what did he send you?

25   A.   I have to -- I don't recall, but I have to --

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.  If I pull up Exhibit 70 that's already been admitted, would

2    that refresh your recollection?

3    A.  Yes, it will.

4    Q.  Is there a message there?

5    A.  Yes, he's sending me his email address.

6    Q.  And what was his email address?

7    A.  It was morpheus@titanians.org.

8              MR. BINFORD:  Thank you.

9              Judge, I think it's getting close to noon.  I don't

10   know if this is a good stopping point.

11             THE COURT:  If it's a good stopping point for you,

12   it's a nice stopping point for lunch.

13             Ladies and gentlemen, please remember the admonitions:

14   Don't discuss this case.  Don't let anybody else discuss this

15   case.

16             Have an enjoyable lunch.  We'll resume at 1:15.

17             Thank you very much.

18               (Jury leaves the courtroom at 11:57 a.m.)

19             THE COURT:  I'll see you after lunch.

20             THE WITNESS:  Thank you.

21             THE COURT:  Anything?

22             MR. RESTAINO:  Just a quick technical point on those

23   jury instructions, Your Honor.  I was remiss in not printing

24   out the entire portion from the Ninth Circuit website.

25             Can we have until tomorrow at 8:30 to get those in to

UNITED STATES DISTRICT COURT

```
 1    your JA?

 2              THE COURT:  Yes.

 3              MR. RESTAINO:  Thank you.

 4                  (Proceedings in recess at 11:58 a.m.)

 5                (Jury enters the courtroom at 1:17 p.m.)

 6                  (Proceedings resume at 1:25 p.m.)

 7              (SERGEI KUSHNER resumes witness stand.)

 8              THE COURT:  Please be seated.

 9              Thank you.  Hope you had a pleasant lunch.

10              Ready to resume?

11              MR. BINFORD:  May I approach the lecturn, Your Honor?

12              THE COURT:  You may.

13                  DIRECT EXAMINATION (continued)

14    BY MR. BINFORD:

15    Q.  Welcome back, Agent Kushner.

16    A.  Thank you.

17    Q.  I believe, when we left off, you had told us that you had

18    wrapped up the March 20th meeting; is that correct?

19    A.  That's correct.

20    Q.  Do you recall when you set up the next meeting with

21    Mr. Costanzo?

22    A.  I believe I talked to him by mess -- text message again.  I

23    have to refresh my memory from the text messages.

24    Q.  All right.  At this point I'm going to pull up what's been

25    previously admitted as Exhibit 70, and I'm on page 4 of that
```

1    document.

2    A.  Yes.  I talked to him on May 13th, 2015, and I informed him

3    that I wanted to buy $3,000 worth of Bitcoins.

4    Q.  Now, I notice there are date and time stamps on this

5    document, and it says:  UTC plus zero.

6         Do you understand what that means?

7    A.  Yes.  "UTC" stands for Universal Coordinated Time.  It's

8    similar to Greenwich Mean Time.  It's a universal civil time

9    standard.  To adjust for Phoenix, you have to subtract seven

10   hours from the given -- from the stated time.

11   Q.  So the times listed next to the messages on this entire

12   document are seven hours off?

13   A.  Seven hours off.  So to determine the correct time, you

14   have to subtract seven from all the times that are listed in

15   this document.

16   Q.  All right.  So you reach out to him via text message, you

17   tell him you want to do a deal for 3,000.

18         Did you end up meeting with him?

19   A.  Yes.  We met -- we arranged a meeting again at the same

20   Starbucks that we met on previous occasion.

21   Q.  And during that meeting, were you wearing a recording

22   device?

23   A.  Yes.

24   Q.  And have you had an opportunity to review that -- the audio

25   recording from that meeting?

311

1    A.  Yes, I -- yes, I have.

2    Q.  And have you also reviewed a transcript that was prepared

3    based on that audio?

4    A.  Yes, I did.

5    Q.  And was the audio and the transcript, were they both a fair

6    and accurate account of that meeting?

7    A.  Yes.

8           MR. BINFORD:  Your Honor, at this time I'd like to

9    introduce into evidence Exhibit 102.  There are sections A

10   through J which are excerpts from that meeting.  I'd like to

11   introduce the audio and display the transcript for the jury.

12          MR. CAIN:  No objection.

13          THE COURT:  All right.  Exhibit 102 admitted.

14             (Exhibit 102 is received into evidence.)

15          THE COURT:  You may remember, as I told you last time,

16   that what you will see is the audio, together with the

17   transcript portion.  What you hear is the admitted exhibit.  So

18   if you hear something different than what the transcript

19   indicates, that's what you should accept.

20          MR. BINFORD:  Thank you, Judge.

21   BY MR. BINFORD:

22   Q.  One last question.

23          Before that May 20th meeting, was that -- how was that

24   transaction completed; what software did you use?

25   A.  I used Mycelium wallet.

1    Q.  I'm sorry.  For the March 20th meeting.

2    A.  I'm sorry.  For March 20th?

3    Q.  Yes.

4    A.  I apologize.  For March 20th, I used the localbitcoins.com

5    wallet.

6    Q.  All right.  I want to start the audio from the May 20th

7    meeting right now.  This is Exhibit 102A.

8                    (Portion of audiotape played.)

9    BY MR. BINFORD:

10   Q.  So this audio sounds a little different than what we

11   previously heard.  What -- what type of -- or, I guess, where

12   was the recording device placed this time?

13   A.  It was -- I cannot disclose specifically, but I wore

14   different -- I try not to wear the same attire to each meeting,

15   so I used a different attire.  It was in a different pocket.

16   So it was just -- that's the way the quality of the recording

17   turned out based on what I was wearing and based on extraneous

18   noises from outside.

19   Q.  Is this a covert recording device?

20   A.  Yes, it's covert, obviously.  Yes.

21   Q.  All right.  Since you mentioned wearing different clothes,

22   do you recall what you were wearing at this meeting?

23   A.  Again, I was -- usually for meetings I dress very casually,

24   perhaps jeans, maybe a Polo shirt.  But I do wear flashy

25   jewelry and, again, gold Rolex watch, gold chain, gold --

```
 1    diamond ring -- gold diamond ring, bracelet.
 2    Q.  Thank you.
 3                    (Portion of audio played.)
 4    BY MR. BINFORD:
 5    Q.  Do you know what the Bhakti Fest is?
 6    A.  I'm not familiar with it, but it's something to do with
 7    some spiritual things maybe.
 8                    (Portion of audiotape played.)
 9    BY MR. BINFORD:
10    Q.  All right.  For this -- this May 20th meeting, you said you
11    were at the Starbucks.  Where were you sitting at the
12    Starbucks?
13    A.  In outside area.
14              MR. BINFORD:  Okay.  This next clip is-on 02B.
15                    (Portion of audiotape played.)
16    BY MR. BINFORD:
17    Q.  When he says that's her, what's he -- what's he doing?
18    A.  He's showing me a picture on his smartphone.
19                    (Portion of audiotape played.)
20    BY MR. BINFORD:
21    Q.  What's a -- do you know what a deity is?
22    A.  It's a -- some kind of -- it's -- not 100 percent sure, no.
23    Q.  Was he showing you anything when he was --
24    A.  Showed me pictures on a smartphone.  I don't recall what
25    those exact pictures were.
```

UNITED STATES DISTRICT COURT

1                    (Portion of audiotape played.)

2    BY MR. BINFORD:

3     Q.  Do you recall what was going on at that point?

4     A.  I don't recall what was going on.  I know we were -- we

5     just making some small talk.  We might have been getting

6     coffee.  I'm not sure what was going on exactly.

7                    (Portion of audiotape played.)

8    BY MR. BINFORD:

9     Q.  Is your understanding that he was telling you about someone

10    that was selling a product at this fest he went to?

11    A.  Yes, that's my understanding.  Someone selling products

12    like deities for -- at festivals.

13    Q.  And he was encouraging that business person to do what?

14    A.  To accept Bitcoins.

15          MR. BINFORD:  This next clip is 102C.

16                    (Portion of audio played.)

17    BY MR. BINFORD:

18    Q.  Do you know what Coinbase is?

19    A.  Yes, it's the -- it's a Bitcoins exchanger.  It's -- it's

20    on the web -- it's available on a web -- on the Internet.  It's

21    a place where you can buy and sell Bitcoins.

22    Q.  Did he ever suggest to you that you should use Coinbase for

23    any of your purchases or sales?

24    A.  No, he never mentioned it to me, never recommended that

25    I -- specifically I use it.

UNITED STATES DISTRICT COURT

SERGEI KUSHNER - DIRECT EXAMINATION

1    Q.  Did you get the impression that anything that this person

2    was selling at this festival was illegal at all?

3    A.  No.

4                      (Portion of audiotape played.)

5    BY MR. BINFORD:

6    Q.  All right.  So are we leading up to an important moment in

7    the conversation here?

8    A.  Yes.

9                      (Portion of audiotape played.)

10   BY MR. BINFORD:

11   Q.  How does he react when you say:  You know it's drugs;

12   right?

13   A.  It doesn't -- doesn't same to faze him.

14                     (Portion of audiotape played.)

15   BY MR. BINFORD:

16   Q.  It sounded like there was something after "nothing."  Did

17   you see what he was doing there?

18   A.  He was laughing.

19                     (Portion of audiotape played.)

20   BY MR. BINFORD:

21   Q.  How would you react -- how would you react if someone told

22   you that the money they were about to give you was from drugs?

23          MR. CAIN:  Objection.  Relevance.

24          THE COURT:  Sustained.

25                     (Portion of audiotape played.)

```
 1    BY MR. BINFORD:
 2    Q.  Why do you think -- well, I guess -- was it important to
 3    the investigation when he said, "I like keeping things
 4    super-duper, like, confidential"?
 5    A.  Yes.
 6    Q.  And why is that important to your investigation?
 7    A.  Well, again, because now that he knows it's drug money
 8    and -- the money is drug proceeds, and he already stated he
 9    doesn't keep any records, and he doesn't -- does any paperwork.
10    Q.  At this point, have you said anything other than "drugs"?
11    A.  No.  At this point, I didn't.  No.
12    Q.  Do you get more explicit as the conversation goes on?
13    A.  Yes.
14                    (Portion of audiotape played.)
15    BY MR. BINFORD:
16    Q.  Why are you -- why are you mentioning a person from New
17    York?  What's your goal in -- in getting that across?
18    A.  Well, because I'm trying to emphasize that, you know, first
19    of all, I'm trying to emphasize that I only want to deal with
20    the one person.  That's why I contacted Costanzo in the first
21    place.  And I'm -- and when I dealt with someone in New York
22    and they found out what my real source of the cash was, they
23    didn't want to have anything to do with me.  So I wanted to see
24    what Costanzo's reaction would be.
25                    (Portion of audiotape played.)
```

UNITED STATES DISTRICT COURT

1   BY MR. BINFORD:

2   Q.  So he says:  Don't say that word out loud.

3           What word did you say?

4   A.  I said "heroin."

5   Q.  Did you say it again after he said don't --

6   A.  I said it twice.

7                   (Portion of audiotape played.)

8   BY MR. BINFORD:

9   Q.  It sounded like the volume dropped there.  Did his -- the

10  way he was talking to you change at all at that point?

11  A.  Yes, his tone went down a little bit.

12  Q.  Now, you picked the drug heroin to bring up in this

13  conversation.  Why heroin?

14  A.  Because heroin, it's pretty clear it's an illegal narcotic.

15  There's no -- there's no fine line there.  It's clear to

16  everybody that it's illegal.  And it -- it was the best -- this

17  situation was the best drug -- narcotic to use in the scenario.

18                  (Portion of audiotape played.)

19  BY MR. BINFORD:

20  Q.  What are you referring to there when you're talking about a

21  kilo?

22  A.  Referring to prices of heroin, that you can pick up a kilo

23  of heroin in Arizona for 27,000, and you can sell it in New

24  York for 50,000.  So it's kind of describing the extent of

25  my -- the business and how it operates.

1    Q.  And what was his reaction when you said that?

2    A.  He wasn't surprised at all, you know.  He was curious.

3    Q.  At that point, did he tell you he could no longer do any

4    exchanges with you?

5    A.  No, he did not.

6                    (Portion of audiotape played.)

7    BY MR. BINFORD:

8    Q.  What is "black tar"?

9    A.  Black tar is the type of heroin that comes from Mexico

10   illegally, and it's -- it's imported -- actually, it's imported

11   from Mexico to New York.  All over the country, basically, but

12   it's a brand of heroin that was available at the time.

13   Q.  And that's information you know from your experience as a

14   Special Agent?

15   A.  Yes.

16                    (Portion of audiotape played.)

17   BY MR. BINFORD:

18   Q.  And again, when you mention these numbers, what are you

19   referring to?

20   A.  Prices in thousands of kilogram of heroin.

21                    (Portion of audiotape played.)

22   BY MR. BINFORD:

23   Q.  So at this point you've made it clear what your business is

24   about, at least your undercover persona?

25   A.  Yes.

1    Q.  And at that point, did he walk away?

2    A.  He did not.

3                    (Portion of audiotape played.)

4    BY MR. BINFORD:

5    Q.  So you tell him the story about a person in New York.  Did

6    that really happen?

7    A.  No.

8    Q.  Why do you say something like that in this conversation?

9    A.  Well, because I want to -- you know, because I want to -- I

10   want to be clear with him that would there be -- typical

11   reaction of someone in New York would have been -- was,

12   actually -- when he found out I was dealing with heroin, he

13   didn't want anything to do with me.  So I wanted to see what

14   Costanzo's reaction would be.

15   Q.  And is that your way of giving him an opportunity?

16   A.  Yes.

17   Q.  An opportunity to do what?

18   A.  An opportunity not to do any business with me, to walk

19   away.

20   Q.  Did he take you up on that offer?

21   A.  No, he did not.

22                    (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  Did he seem reluctant at all?

25   A.  Not at all.  He actually seemed eager to provide for more

```
 1    Bitcoins for more cash.

 2                    (Portion of audiotape played.)

 3    BY MR. BINFORD:

 4    Q.  What do you mean when you say "put stuff in the car parts"?

 5    A.  Well, putting drugs in the car parts to hide them.

 6    Q.  And are you talking about the car parts that you're --

 7    you're shipping overseas?

 8    A.  Right.

 9                    (Portion of audiotape played.)

10    BY MR. BINFORD:

11    Q.  As -- as a drug dealer, what type of risks were you

12    concerned about?

13    A.  Well, always concerned about being found out through -- the

14    police finding out, discovering drugs in your shipments and

15    then tracing everything back to myself.

16                    (Portion of audiotape played.)

17    BY MR. BINFORD:

18    Q.  How was his demeanor when he said "keep a low profile"?

19    A.  He seems very -- he was laughing also.  He seems, you know,

20    he seems to like my story I was telling him.

21                    (Portion of audiotape played.)

22    BY MR. BINFORD:

23    Q.  So you mention a seizure of heroin in New York.  Why do you

24    bring that into the conversation?

25    A.  Well, this was from actual event.  So I wanted to see --
```

```
1    again, I wanted to see what his reaction was, you know.  Again,

2    give him a chance to maybe walk away from it, to, you know, to

3    say, you know, it's too dangerous for him to be involved in.

4    Q.  Did he walk away at that point?

5    A.  No.

6                    (Portion of audiotape played.)

7            MR. BINFORD:  The next clip is 102D.

8                    (Portion of audiotape played.)

9    BY MR. BINFORD:

10   Q.  So of all the things you mentioned, what did he seem to be

11   concerned about?

12   A.  The only thing he was simply concerned about was to make

13   sure that I give him legitimate money, not counterfeit.

14                    (Portion of audiotape played.)

15   BY MR. BINFORD:

16   Q.  What was he talking about when he said that's the only

17   thing he cares about?

18   A.  The money -- the cash.  Cash being good, in other words.

19   Q.  Not the source of the cash?

20   A.  Not the source of the cash, but the actual bills being

21   real.

22                    (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  How much did he say he did last year?

25   A.  Half a million dollars.
```

SERGEI KUSHNER - DIRECT EXAMINATION

1   Q.  Now, if you were to walk into a bank and tell the teller or

2   one of the bankers everything you just told Mr. Costanzo in

3   that conversation, how would you expect them to react?

4   A.  I expect them to not be doing business with me, and I

5   expect them to be doing some reporting of this -- this

6   conversation.

7           MR. BINFORD:  The next clip is 102E.

8                   (Portion of audiotape played.)

9           MR. BINFORD:  And the clip after that is 102F.

10                  (Portion of audiotape played.)

11  BY MR. BINFORD:

12  Q.  You mention two numbers there.  What are those numbers?

13  A.  The $3,000 in cash that I was preparing to buy Bitcoins

14  with, and 254 was the exchange rate that Mr. Costanzo agreed to

15  change cash for Bitcoins at.

16  Q.  Is that 254 the market value of Bitcoin that day?

17  A.  It's a volatile market value, and it includes approximately

18  10 percent fee that he charged me.

19  Q.  So that price includes the fee that he was charging you?

20  A.  It already -- it was already included in 254.

21          MR. BINFORD:  All right.  The next clip is 102G.

22                  (Portion of audiotape played.)

23  BY MR. BINFORD:

24  Q.  All right.  We had a similar -- similar question like this

25  before.  There is a string of letters there.  What is he

1    referring to?

2    A.  To the Bitcoin wallet address.  We just want to make sure

3    that he's sending the Bitcoins to the correct address, that

4    it's not -- there's no mistake.

5                      (Portion of audiotape played.)

6    BY MR. BINFORD:

7    Q.  Did he seem to be detail-oriented when it came to the

8    transaction?

9    A.  Yes, he was very thorough when he came to actual mechanics

10   of the transaction.

11                     (Portion of audiotape played.)

12   BY MR. BINFORD:

13   Q.  Was there some confusion there?

14   A.  Well, yeah, because I was getting ready for him to scan --

15   to send me the Bitcoins, but then he -- he reminded me again

16   that the money came first, that I should give him the cash

17   first.

18                     (Portion of audiotape played.)

19   BY MR. BINFORD:

20   Q.  During the conversation during the exchange, did he ever

21   ask you if you used drugs?

22   A.  Yes, he did.

23           MR. BINFORD:  I'm now playing 102H.

24                        (Portion of audio played.)

25

324

```
 1   BY MR. BINFORD:

 2   Q.  And is this the part of the conversation?

 3   A.  Yes.

 4                    (Portion of audiotape played.)

 5   BY MR. BINFORD:

 6   Q.  Do you know whether heroin is a drug that you can inject in

 7   your arm?

 8   A.  Yes.

 9   Q.  Is that why you made that reference there to a needle?

10   A.  Yes.

11           MR. BINFORD:  The next clip is 102I.

12                    (Portion of audiotape played.)

13   BY MR. BINFORD:

14   Q.  At that point, what products had you told him about?

15   A.  Well, the product we'd been discussing was drugs.

16   Q.  Any other products that you told him about?

17   A.  No.

18   Q.  Did you talk about concealing the drugs inside of anything

19   else?

20   A.  Well, earlier we talked about concealing drugs inside of

21   car parts.

22                    (Portion of audiotape played.)

23   BY MR. BINFORD:

24   Q.  So you had talked about car parts as a product, but also

25   heroin.
```

1              Based on your subsequent statements and his responses,

2    do you think it was clear which product you were talking about

3    at that point?

4    A.  I believe it was pretty clear.  We were talking about

5    drugs.  Heroin, specifically.

6                    (Portion of audiotape played.)

7    BY MR. BINFORD:

8    Q.  How did you get the Bitcoin from Mr. Costanzo during this

9    transaction?

10   A.  Through Mycelium wallet.

11   Q.  And is that a wallet that you already had, or was that

12   something that was recommended to you?

13   A.  Mr. Costanzo recommended that I use Mycelium wallet

14   earlier, and I downloaded it to my smartphone, and I used that

15   to receive Bitcoins from him.

16   Q.  And do you know how that app works; do you know the details

17   of it?

18   A.  I don't know the details.  I just know that it's used to

19   send and receive Bitcoins, and it also has a feature -- there's

20   other features that Mycelium wallet has, such as encrypted

21   chat.

22   Q.  But it was simple enough for you to use without having an

23   in-depth understanding?

24   A.  Yes, it does not require in-depth understanding of how

25   Bitcoin process works.  It's pretty clear and easy to use.

1          MR. BINFORD:  This next clip is 102J.

2                  (Portion of audiotape played.)

3    BY MR. BINFORD:

4    Q.  Did you have any intention of actually bringing a million

5    dollars to Mr. Costanzo?

6    A.  No.

7                  (Portion of audiotape played.)

8    BY MR. BINFORD:

9    Q.  There he says, "I like playing it as safe as I can."

10           Would you expect him to say that to you if he knew you

11   were a law enforcement agent?

12   A.  No, of course not.  Absolutely not.

13                  (Portion of audiotape played.)

14   BY MR. BINFORD:

15   Q.  He says, "Don't tell me anything I don't need to know."

16           What don't you think he wanted you to tell him?

17   A.  Well, he -- you know, at this point he realized --

18           MR. CAIN:  Objection.  Calls for speculation.

19           THE COURT:  Sustained.

20   BY MR. BINFORD:

21   Q.  At the beginning of your conversation on March 20th, was he

22   interested in your business?

23   A.  He -- in the car business or the...

24   Q.  Yes.

25   A.  On March 20th, yes, he was interested in the car business.

SERGEI KUSHNER – DIRECT EXAMINATION

1   Q.  At this point in the conversation on May 20th, did he seem

2   to be less interested in the details of your business?

3   A.  He was not interested at all in the car business.

4   Q.  Was he interested in your other business?

5   A.  He was more interested in my drug business.

6                   (Portion of audiotape played.)

7   BY MR. BINFORD:

8   Q.  Did you get the sense that he was talking about a

9   traditional financial institution at that point?

10  A.  No.

11  Q.  Based on your conversation with him, what did you

12  understand that to mean, when he's referring to a banker?

13  A.  I believed that he was not referring to an actual banker

14  with a conventional bank, but someone, perhaps not individual,

15  who is able to provide him with large amounts of Bitcoins when

16  needed.

17  Q.  Now, as part of this investigation, would it be important

18  to identify who that person was that was supplying him when the

19  Bitcoin?

20  A.  It would have been important to find out.

21                  (Portion of audiotape played.)

22  BY MR. BINFORD:

23  Q.  Why do you bring up selling flowers there?

24  A.  Well, it was just something that popped into my head,

25  because I said, you know, if there was any question where the

UNITED STATES DISTRICT COURT

```
1    cash is from, you know, I just said, selling flowers.  Just
2    something to put somewhere, with a piece of paper.
3    Q.  Is it legal to sell flowers?
4    A.  No -- no, it's not illegal to sell flowers.  It's legal.
5    It's legal to sell flowers, yes.
6                    (Portion of audiotape played.)
7    BY MR. BINFORD:
8    Q.  And how much cash did you give Mr. Costanzo on May 20th?
9    A.  $3,000.
10   Q.  And do you recall the approximate rate above market price
11   that you paid for the Bitcoin?
12   A.  Approximately 10 percent.
13   Q.  At any point during that conversation, did Mr. Costanzo ask
14   for your full name?
15   A.  He did not.
16   Q.  Did he ask for your street address?
17   A.  He did not.
18   Q.  Did he ask for your Social Security number?
19   A.  He did not.
20   Q.  Taxpayer ID?
21   A.  No.
22   Q.  Did he ask to see your identification?
23   A.  No, he did not.
24   Q.  After that meeting, did you give the undercover wallet
25   address that you used to someone else, or document it in some
```

1    way?

2    A.  I documented my wallet address, yes.

3    Q.  And however you documented it, would that be available to

4    other agents in this investigation?

5    A.  I documented a memo.

6    Q.  And would that memo be available to other agents from the

7    IRS?

8    A.  Yes.

9    Q.  Did you communicate with Mr. Costanzo after that meeting?

10   A.  Yes.

11   Q.  And was that via text message or a different method?

12   A.  It was a text message.

13   Q.  Did you use any other non-text message way to communicate

14   with him after that meeting?

15   A.  Not immediately after that meeting, no.  Later on.

16   Q.  All right.

17            MR. RESTAINO:  At this point, I'd like to show the

18   witness only an exhibit that's been previously marked for

19   identification as number 94.

20   BY MR. BINFORD:

21   Q.  Without going into the content of what you're looking at in

22   front of you, what does that appear to be?

23   A.  That appears to be Mr. Costanzo's -- who is also known as

24   Morpheus, obviously.  It's his listing that was found via

25   Mycelium.

1    Q.  Can -- can I show you a few more pages of this Exhibit 94?

2    A.  Sure.

3    Q.  This is the second page.

4            This is the third page.

5            And this is the fourth page.

6            Do you recognize this item?

7    A.  Yes.  It's communication that I -- text messages that I

8    exchanged with Mr. Costanzo via Mycelium app.  As I mentioned,

9    it allows you to communicate via text messaging -- via

10   encrypted text messaging.

11   Q.  Do you know how I got these -- these -- this exhibit here?

12   A.  I provided it from -- those are screenshots from my

13   smartphone.

14   Q.  And are those a fair and accurate representation of the

15   screenshots from your phone and your conversations with

16   Mr. Costanzo?

17   A.  Yes, that's correct.

18           MR. BINFORD:  All right.  At this point I would move

19   to admit Exhibit 94 into evidence.

20           MR. CAIN:  No objection.

21           THE COURT:  Exhibit 94 is admitted.

22           MR. BINFORD:  And I would like to publish it for the

23   jury, please.

24           THE COURT:  You may.

25           (Exhibit 94 is received into evidence.)

1    BY MR. BINFORD:

2    Q.  All right.  Will you tell us what we're looking at here?

3    A.  Well, Mr. Costanzo advised me earlier that the best way to

4    communicate would have been -- the most secure way to

5    communicate would have been from Mycelium text messaging.

6    Q.  Did he -- did he tell you that before or after you had

7    mentioned that your business involved heroin?

8    A.  After I mentioned heroin.

9    Q.  So you had not communicated through the Mycelium app prior

10   to that?

11   A.  No, I did not.

12   Q.  Okay.  So after he suggested you look at this -- or that

13   your use this app, what did you do?

14   A.  Well, in the beginning I didn't know how to communicate via

15   this app, so I exchanged several text messages with

16   Mr. Costanzo on the conventional means on my smartphone.  And

17   he advised me what, you know, what to do in order to start

18   communication.  So I had to place a small trade off -- start a

19   small trade on his page, and that opened up Mycelium to

20   communication.

21   Q.  All right.  What I'm going to do for everyone's awareness,

22   I'm going to split the screen into two, and I'm going to pull

23   up what's been previously admitted into evidence as Exhibit 70,

24   and show that on one side of the screen and keep this up on the

25   other side of the screen.

SERGEI KUSHNER - DIRECT EXAMINATION

1          Do you see that -- that message there that I've
2   highlighted on the right side of the screen from Exhibit 70?
3   A.  Yes.  Again, this is after we concluded our meeting, May --
4   May 20th.  He send -- Mr. Costanzo sent a message saying --
5   advising me to use Mycelium for secret communication.
6   Q.  Would you read that message that's on the screen there?
7   A.  "Thank you for your business, Sam.  Use Mycelium to
8   connect.  Has encrypted chat."
9   Q.  All right.  And this message was sent after your May 20th
10  transaction?
11  A.  Yes.
12  Q.  And so did you reach out to him through Mycelium?
13  A.  Yes.  Not right away.  I had not -- I did not know at the
14  time how to initiate a chat, so I think we exchanged a couple
15  of messages to -- in order for me to figure out how to use it.
16  And then we exchanged a few messages on Mycelium.
17  Q.  And he call -- he says "Sam" in that message.  Do you know
18  why he says "Sam"?
19  A.  Because I used "Sam" as my -- "Sam Stone" was my moniker on
20  the, you know, Mycelium.
21  Q.  And is that -- looking at your screenshot from your
22  Mycelium app, is that what you have listed on there?
23  A.  Yes.
24  Q.  All right.  So that conversation with him seems to be
25  pretty brief.

1      Did you have any further conversation, other than

2   what's shown on the screen right there?

3   A.  No, that was -- that was it.  He just showed me how to use

4   this, and there was -- I did not communicate with him further

5   through Mycelium.

6   Q.  Did you reach out again -- or again to Costanzo in October

7   of 2015?

8   A.  Yes.

9   Q.  And what was your goal in reaching out to him in October of

10  2015?

11  A.  I was attempting to set up another transaction with

12  Mr. Costanzo to purchase more Bitcoins.

13  Q.  All right.  I'm going to pull those up on the screen here.

14      This is Exhibit 70 on the screen now.

15      Do you recognize that exchange of messages there on

16  the screen that's been highlighted or enlarged?

17  A.  Yes.  This is my communication with Mr. Costanzo.

18  Q.  All right.  So it looks like you say you want him to meet

19  your business partner; is that correct?

20  A.  Yes.  So I contacted him on October 5th, 2015, and with

21  attempt to arrange purchase of Bitcoins of at least $10,000.

22  Q.  And does he seem agreeable to that?

23  A.  Yes.  I did tell him at the time that I was not able to

24  meet with him for whatever reasons, and my partner -- my

25  business partner, Tom, would be meeting with him.  And if he

1    had any objections.

2    Q.  And who is Tom?

3    A.  Tom is another -- is an undercover agent with IRS.

4    Q.  Do you know if Tom ever met with Mr. Costanzo?

5    A.  Yes, he did.

6    Q.  All right.  Were you present at that meeting?

7    A.  No, I was not.

8    Q.  When did you next meet with Mr. Costanzo?

9    A.  The next time I met with Mr. Costanzo was in November 21st,

10   2000 -- 2015.

11   Q.  And you recall going to a Bitcoin meet-up on that day?

12   A.  Yes.  I went to Bitcoin meet-up on November 21st, 2015.  It

13   was held at the Oasis Café.

14   Q.  And during that meeting, were you wearing a recording

15   device?

16   A.  I was wearing a recording and transmitting devices.

17   Q.  And have you had an opportunity to review the audio from

18   that meeting?

19   A.  Yes.

20   Q.  And have you an opportunity to review a transcript that was

21   prepared based on that audio?

22   A.  Yes.

23   Q.  And is the audio and the transcript a fair and accurate

24   depiction of what took place during that conversation?

25   A.  Yes, it is.

1    Q.  Now, I want to just kind of set the stage for the jury here

2    and ask you, how many people were at that meeting?

3    A.  There were at least four or five individuals present at the

4    meeting, including Mr. Costanzo.

5    Q.  Did you have an opportunity to engage in some transactions

6    on that day?

7    A.  Yes.

8    Q.  How many people did you purchase Bitcoin from that day?

9    A.  Mr. Costanzo and one other individual.

10   Q.  Who was that other individual?

11   A.  The other individual is named Peter Steinmetz.

12   Q.  What type of transaction did you conduct with Peter

13   Steinmetz?

14   A.  I purchased $2,000 worth of Bitcoins from Mr. Steinmetz.

15   Q.  During your conversation with Mr. Steinmetz, did you make

16   any mention of illegal activity?

17   A.  No.

18   Q.  Did you attempt any subsequent transactions with

19   Mr. Steinmetz?

20   A.  Yes, I did.

21   Q.  Tell us about that.

22   A.  In March, approximately -- I believe it was March 8th,

23   2016, I met with Mr. Steinmetz at his residence for purposes of

24   purchasing $20,000 worth of Bitcoins.  I telephoned him on

25   February 29th to arrange that meeting, and he asked me to come

1    to his house.  And I came to his house on March 20 -- I'm

2    sorry -- March 8th, 2016.

3    Q.  Do you remember where his house was located?

4    A.  I do not recall the address.  I'd have to refresh my

5    memory.

6    Q.  Do you remember the city?

7    A.  I believe it was Tempe.

8    Q.  And do you remember the street?

9    A.  Julie Road?

10   Q.  Thank you.

11   A.  I believe.  I think it was 1700 Julie Road.

12   Q.  Now, during that transaction with Mr. Steinmetz -- or I

13   guess the attempted transaction -- did you make any mention of

14   illegal activity?

15   A.  Yes.  I -- I mentioned to Mr. Steinmetz that $20,000 of

16   cash that I was going to buy Bitcoins with were proceeds from

17   drug sales, from heroin.

18   Q.  Were you able to complete that transaction after you have

19   said that?

20   A.  No.

21   Q.  And without telling us what he said, why not?

22   A.  Mr. Steinmetz refused to do any business with me once I

23   mentioned that proceeds were from drugs.

24   Q.  All right.  Did you have any subsequent transactions with

25   Mr. Steinmetz after that?

```
 1    A.  No.  Not at all.

 2    Q.  All right.  Let's go back to November 21st.

 3            I can't recall.  Did you tell us where that meet-up

 4    was?

 5    A.  It was at the Oasis Café.

 6    Q.  All right.  And I believe you previously said that you've

 7    reviewed the transcripts and the audio, and they are a fair and

 8    accurate representation of that conversation?

 9    A.  Yes.

10            MR. BINFORD:  At this time, Your Honor, I would move

11    to admit Exhibit 104, which is A through F.

12            MR. CAIN:  No objection, Your Honor.

13            THE COURT:  Exhibits 104A through F are admitted.

14            You may publish.

15            MR. BINFORD:  And like the other exhibits, the audio

16    is being admitted, but the transcripts will only be shown.

17            THE COURT:  Correct.

18                (Exhibit 104 is received into evidence.)

19    BY MR. BINFORD:

20    Q.  So did you end up conducting a transaction with

21    Mr. Costanzo that day?

22    A.  Yes.

23                    (Portion of audiotape played.)

24    BY MR. BINFORD:

25    Q.  All right.  There's a lot of numbers being thrown out
```

```
 1    there.  Can you give us some context for that?
 2    A.  Yeah.  Again, we trying to figure out what the exchange
 3    would be, including his fee at the time.  So I believe it was
 4    $354.75, if I'm not mistaken.
 5    Q.  And would that have included his fee for the transaction?
 6    A.  Yes, his fee was already built in, whatever rate we agreed
 7    on.
 8    Q.  Do you recall what that fee was?
 9    A.  Yeah, it was approximately 10 percent.
10    Q.  And there's a number listed, 8200.  What does that refer
11    to?
12    A.  $8,200, there was in cash.
13    Q.  And was that all the cash that you gave him that day?
14    A.  No.  I conducted three transactions with Mr. Costanzo that
15    day.
16                    (Portion of audio played.)
17    BY MR. BINFORD:
18    Q.  Does he seem to be pretty detail-oriented?
19    A.  He's very detail-oriented.
20                    (Portion of audiotape played.)
21    BY MR. BINFORD:
22    Q.  When he says he can still do some more, based on the
23    context of your conversation, your understanding, what is he
24    referring to?
25    A.  He can do more -- more Bitcoins, sell more Bitcoins.
```

1    Q.  How much were you -- what is the amount that you were

2    prepared to purchase in dollars that day of Bitcoin?

3    A.  Well, when I first contacted him, I said I wanted to buy

4    $20,000 worth, and so I was prepared to buy as much as 20,000.

5                    (Portion of audiotape played.)

6    BY MR. BINFORD:

7    Q.  Did you tell him prior to the meeting that you wanted to do

8    $20,000?

9    A.  Well, yes.  When I called -- I called him earlier in the

10   day and let him know that I would be at the meet-up and see if

11   he could tell sell me $20,000 worth of Bitcoins.

12   Q.  Was there a reason you didn't give him more advance notice?

13   A.  It was -- no, not particular reason, no.

14                    (Portion of audiotape played.)

15   BY MR. BINFORD:

16   Q.  What is HHTEO?

17   A.  Again, it's five characters of the Bitcoin address.

18                    (Portion of audiotape played.)

19   BY MR. BINFORD:

20   Q.  What's going on there?

21   A.  We're taking money out from my pocket, I guess.

22   Q.  Does that have an impact on the recording?

23   A.  Yeah.  Yes, it did.

24                    (Portion of audiotape played.)

25

1   BY MR. BINFORD:

2   Q.  Sounds like there's another voice there.  Do you know who

3   that was?

4   A.  Well, we were in a coffee shop, so there were some

5   extraneous noises, employees serving coffee and such.  That was

6   about it.

7   Q.  Other than that, were you in a fairly private area?

8   A.  Yes, this was toward the end of the meet-up.  Most of --

9   most of the people had already left.  So me and Costanzo were

10  on the side by ourselves.

11                      (Portion of audiotape played.)

12  BY MR. BINFORD:

13  Q.  So he says, "This is between you and me."  Was there anyone

14  else there?

15  A.  There was nobody -- nobody else in our immediate area.

16                      (Portion of audiotape played.)

17  BY MR. BINFORD:

18  Q.  When he says "I don't ever want to hear what you do," do

19  you know what he -- what did you understand him to mean by

20  that?

21  A.  My understanding is referring to my drug business.

22                      (Portion of audiotape played.)

23  BY MR. BINFORD:

24  Q.  So you say again, "If you find out, I don't want any

25  issues."

1        What are you referring to there?

2    A.  Well, I don't want to be exposed, basically.  I don't

3    want -- I want to stay under the radar.  I don't want to be --

4    I don't want my business to be exposed or myself exposed, you

5    know, to the law enforcement, the government screwed me.

6    Q.  And had you previously given him some sort of example that

7    was something you made up as part of your undercover operation?

8    A.  Yes.

9    Q.  And what was that example?

10   A.  Referring to the...

11   Q.  I guess in your May conversation, my understanding of your

12   testimony was that you mentioned someone from New York --

13   A.  Oh, yes.

14   Q.  -- that you had previously done deals with?

15   A.  Yes, yes.  An individual that I attempted to make deals

16   with in New York, he had to purchase Bitcoins with drug

17   proceeds.  He got concerned, didn't want to do any business

18   with me, yes.

19   Q.  And are you making a reference to that at this point?

20   A.  Yes.

21                (Portion of audiotape played.)

22   BY MR. BINFORD:

23   Q.  What did you understand that he meant, "I know"?

24   A.  Well, he -- basically Mr. Costanzo knows, definitely knows

25   what, you know, we're dealing with here, that it's drug money.

```
 1                    (Portion of audiotape played.)
 2    BY MR. BINFORD:
 3    Q.  What did you understand him to mean when he said, "Don't
 4    tell anybody else"?
 5    A.  Well, don't tell anybody else about my drug business, where
 6    the money is coming from.  And he lowered his voice.
 7    Q.  He did what with his voice?
 8    A.  He lowered his voice a little bit.
 9                    (Portion of audiotape played.)
10    BY MR. BINFORD:
11    Q.  All right.  So you said that 8,200-dollar transaction
12    wasn't the only transaction?
13    A.  No, there was two additional transactions.
14            MR. BINFORD:  All right.  At this time I'm going to
15    play what's marked as 104B.
16                    (Portion of audiotape played.)
17    BY MR. BINFORD:
18    Q.  What's going on right here?
19    A.  Counting -- counting cash.
20    Q.  Several bills?
21    A.  Yeah, a few bills.  $8,200 worth.
22                    (Portion of audio played.)
23    BY MR. BINFORD:
24    Q.  On this day, what did $8,200 in cash look like?
25    A.  Stack of maybe, I don't know, half an inch, three-quarters
```

1    of an inch.

2    Q.  Not too bulky?

3    A.  No, it wasn't too bulky.

4            MR. BINFORD:  All right.  This next clip is 104C.

5                    (Portion of audiotape played.)

6    BY MR. BINFORD:

7    Q.  Did you get an understanding that he had more than one

8    account?

9    A.  He had more than one account, and I understood it was

10   coming from more than one wallet.

11                   (Portion of audiotape played.)

12   BY MR. BINFORD:

13   Q.  Towards the end of the conversation that day, did he seem

14   eager to want to do more business?

15   A.  Yes.

16           MR. BINFORD:  I'm now playing 104D.

17                   (Portion of audiotape played.)

18   BY MR. BINFORD:

19   Q.  Didn't seem to be a big fan of government regulation?

20   A.  No, not at all.

21   Q.  Did he seem reluctant at all to continue to engage in

22   Bitcoin transactions with you?

23   A.  Not at all.  He seemed opposite.  He seemed very eager to

24   do more.

25           MR. BINFORD:  This is 104E.

1            (Portion of audiotape played.)

2    BY MR. BINFORD:

3    Q.  Did you hear that sound?

4    A.  Yeah.  That was me receiving a text message, Mr. Costanzo

5    sending me the link to his podcast.

6    Q.  And is that text message reflected in the extraction report

7    that you run that's been identified as Exhibit 70?

8    A.  Yes, that's correct.

9            (Portion of audiotape played.)

10   BY MR. BINFORD:

11   Q.  All right.  At the end of the conversation, was he talking

12   about an online program or an online gaming type of thing?

13   A.  He was talking about online poker, gambling program or

14   website.

15   Q.  And did he talk about how Bitcoin could be used for that?

16   A.  Yes, he said Bitcoin's accepted and could be used for

17   online gambling.

18          MR. BINFORD:  All right.  I'm going to play what's

19   been identified as 104F.

20            (Portion of audiotape played.)

21   BY MR. BINFORD:

22   Q.  All right.  During that meeting, did he ever ask for your

23   full name?

24   A.  No.

25   Q.  Did he ever ask for your street address?

1   A.  No.

2   Q.  Did he ever ask for your Social Security number?

3   A.  No.

4   Q.  Taxpayer ID?

5   A.  No.

6   Q.  Did he ask to see your identification?

7   A.  No.

8   Q.  Did he send you a text the day after the transaction?

9   A.  Yes.

10  Q.  And in that text, did he seem eager to do more business

11  with you?

12  A.  Yes, he did.

13          MR. BINFORD:  I'm going to pull up page 2 of

14  Exhibit 70.

15  BY MR. BINFORD:

16  Q.  All right.  At the bottom of that part that's been

17  enlarged, do you see a message there that talks about a Bitcoin

18  interview?

19  A.  Yes.  The number 15, the message number 15 is link -- the

20  message about his podcast and the link to his podcast.

21  Q.  And is that the message you received during that meeting?

22  A.  Yes.

23  Q.  And so we talked about the time stamp.  Do you know what

24  time 1:00 a.m. is in Arizona time?

25  A.  So it's minus seven, which would have been 6:18 p.m., I

1    believe, of the 21st --

2    Q.  And is that --

3    A.  2015.

4    Q.  And is that when you were having the transaction with

5    Mr. Costanzo?

6    A.  Yes.  Yes.

7    Q.  All right.  There's a message above that.  Is that message

8    consistent with the last clip we just heard about?

9    A.  Yes.  He sent me a link to the -- referencing the poker,

10   online poker that we discussed.  And again, he sent it during

11   that meeting.

12   Q.  And then did he thank you for your business?

13   A.  Yes.

14   Q.  And tell you that he has more Bitcoin to sell you?

15   A.  Yes.

16   Q.  Did you have any subsequent transactions with Mr. Costanzo?

17   A.  Not after November 21st.

18   Q.  And that phone number listed there on the screen where it

19   says "from," the text messages, is that the phone number you

20   contacted him on to set up the deal?

21   A.  Yes, this is the phone number that I always contacted

22   Mr. Costanzo on.

23   Q.  All right.

24              MR. BINFORD:  May I have a moment, Your Honor?

25              THE COURT:  You may.

1              (Pause in proceedings.)

2          MR. BINFORD:  Thank you for that, Judge.

3    BY MR. BINFORD:

4    Q.  Agent Kushner, I just have one question that my colleagues

5    brought to my attention.

6              What was the total amount of cash that you gave

7    Mr. Costanzo during that November 21st meeting?

8    A.  November 21st, 2015, meeting, I gave Mr. Costanzo a total

9    of $11,700 to purchase Bitcoins.

10   Q.  And do you remember the rate that he charged you for the

11   Bitcoin you purchased that day?

12   A.  He was always around 10 percent.

13   Q.  Above the market value?

14   A.  Above the market rate.

15   Q.  All right.  And do you remember how many transactions it

16   took to get to that 11,700 mark?

17   A.  We did a total of three transactions:  $8,200, $2,000, and

18   $1,500.

19   Q.  And were the Bitcoin wallet addresses that you used for

20   those transactions documented in a memo somewhere?

21   A.  Yes, they are.

22   Q.  And is that memo available to other agents in your agency?

23   A.  Yes, it is.

24          MR. BINFORD:  I have no further questions, Your Honor.

25          THE COURT:  Okay.

1           Cross-examination?

2                        CROSS-EXAMINATION

3    BY MR. CAIN:

4    Q.  Good afternoon, Agent Kushner.

5    A.  Good afternoon.

6    Q.  Your first face-to-face meeting with Mr. Costanzo was

7    March 20th, 2015.

8    A.  That's correct.

9    Q.  At a Starbucks?

10   A.  That's correct.

11   Q.  Prior to that meeting, the due diligence that you had done

12   to learn about Mr. Costanzo included reviewing that profile

13   that he had put up on localbitcoins.com?

14   A.  That's correct.

15   Q.  And you reviewed that during your testimony.

16   A.  That's correct.

17   Q.  That profile that we reviewed, it's fair to say that there

18   isn't anything in that profile from Mr. Costanzo that appears

19   to be inviting -- that appears to be inviting people to contact

20   him if they're drug dealers, if they want to do Bitcoin

21   business, does it?

22   A.  No, it does not.

23   Q.  That very first meeting you had with Mr. Costanzo, you

24   described how you dressed to come to that meeting.

25   A.  Correct.

                    UNITED STATES DISTRICT COURT

SERGEI KUSHNER - CROSS-EXAMINATION

1    Q.  And you talked a little bit about how Mr. Costanzo dressed.

2    I think you said he dressed casually.

3    A.  Correct.

4    Q.  There wasn't anything about the way that he dressed that

5    was flashy?

6    A.  No, there was not.

7    Q.  There wasn't anything about his jewelry that was flashy?

8    A.  No.

9    Q.  There wasn't anything about his clothing that was flashy?

10   A.  No, not that I recall.

11   Q.  You didn't see him pull up in any vehicle that was flashy?

12   A.  That's correct.

13   Q.  And in your subsequent meetings with Mr. Costanzo, again,

14   he continued to be an individual that, when you encountered

15   him, he dressed casually?

16   A.  Correct.

17   Q.  He didn't wear flashy clothing?

18   A.  Correct.

19   Q.  He didn't wear flashy jewelry?

20   A.  Correct.

21   Q.  He didn't drive flashy transportation?

22   A.  Yes.  No, he did not.

23   Q.  And so even though in the conversations that we've listened

24   to, he apparently boasted about doing a lot of business, there

25   wasn't anything from his appearance that really supported that,

SERGEI KUSHNER - CROSS-EXAMINATION

1    was there?

2    A.  His appearance?  No.

3    Q.  When you first -- I think you mentioned that prior to that

4    March 20th initial meeting back in 2015 that there was actually

5    some text message contact with Mr. Costanzo.

6    A.  Before March -- before our first meeting, yes, there was

7    some text messages exchanged between us.

8    Q.  Where you indicated that you were interested in doing a

9    Bitcoin trade.

10   A.  Yes.

11   Q.  When you had that initial exchange with Mr. Costanzo,

12   during that exchange, Mr. Costanzo didn't communicate to you

13   that he was interested in engaging in any illegal activity with

14   you?

15   A.  No, he did not.

16   Q.  He didn't indicate that he was interested in accepting

17   money that was involved in illegal activity?

18   A.  During the first meeting, no.

19   Q.  Well, I'm talking about just that communication before that

20   first face-to-face meeting.

21   A.  No, he did not indicate in that communication that he

22   was -- he wanted to -- he was willing to accept money from

23   illegal activity.

24   Q.  Okay.  And then we have that first face-to-face meeting at

25   the Starbucks in March?

UNITED STATES DISTRICT COURT

1    A.  Right.

2    Q.  During that meeting -- we've listened to it -- he didn't

3    indicate to you that he -- he didn't indicate to you that he

4    only wanted to do that deal or that trade if it was drug money?

5    A.  He -- can you repeat the question again?

6    Q.  Sure.  Let me ask it.

7    A.  Okay.

8    Q.  That first trade on March 20th of 2015 --

9    A.  Yes.

10   Q.  -- he didn't indicate to you that -- that he was interested

11   in doing anything illegal with you with respect to that trade?

12   A.  Right.  He didn't -- no, he didn't.

13   Q.  The next trade you did with him was the May 20th, 2015;

14   correct?

15   A.  Correct.

16   Q.  And that's the 3,000-dollar trade?

17   A.  That's correct.

18   Q.  That's the trade where you introduced this idea that you

19   were involved in heroin?

20   A.  That's correct.

21   Q.  Now, you've already done a 2,000-dollar trade with him?

22   A.  Correct.

23   Q.  And you indicated that you wanted to meet up with him to do

24   a 3,000-dollar trade --

25   A.  Correct.

SERGEI KUSHNER – CROSS–EXAMINATION

1    Q.   -- right?

2          Now, it was pretty clear to you at that point that he

3    was willing to do a 3,000-dollar trade?

4    A.   Yes.

5    Q.   Meaning that you showed up at that meeting with the

6    understanding that he wanted to do that 3,000-dollar trade?

7    A.   Well, he agreed during our text -- exchange of text

8    messages before May 20th that he -- he had -- he would be able

9    to do a 3,000-dollar trade.  So when I showed up, we both

10   showed some, were both on the same page, so to speak.

11   Q.   My point -- I guess my point is that it was already agreed

12   that you guys were going to do a trade that day.

13   A.   Correct.

14   Q.   And that this -- this idea that you introduced about the

15   heroin wouldn't have affected whether or not you did the trade

16   or not.  You had already agreed that you were going to do the

17   trade.

18   A.   Well, it should have affected it, once I brought it up.

19   Q.   I understand that that's your position as a law enforcement

20   officer.  But -- but he was -- had you not introduced that

21   element, you guys were going to do a 3,000-dollar trade?

22   A.   Trade would have still happened if I did not introduce the

23   heroin, yes.

24   Q.   Okay.  And the $3,000 amount, that was an amount that you

25   proposed; correct?

UNITED STATES DISTRICT COURT

SERGEI KUSHNER – CROSS-EXAMINATION

1    A.   Yes.

2    Q.   It was a modest increase from the 2,000-dollar amount.

3    A.   Correct.

4    Q.   It wasn't an amount that Mr. Costanzo proposed.

5    A.   It's the amount that I proposed initially, yes.

6    Q.   The -- the next trade was actually a trade that occurred in

7    October of 2015 that you helped set up with one of your

8    partners; correct?

9    A.   That's correct.

10   Q.   And in that instance, you -- you kind of started that deal

11   by contacting Mr. Costanzo?

12   A.   That's correct.

13   Q.   And you indicated to him that up thought you guys were

14   going to want to trade $10,000.

15   A.   Correct.

16   Q.   But again in that instance, it was you proposing that

17   amount; correct?

18   A.   Correct.

19   Q.   So it was -- it was the IRS criminal investigations

20   increasing the amount.  It was not Mr. Costanzo.

21   A.   It was myself, right, that proposed the amount.

22   Q.   And then we just -- the government was just asking you

23   questions about that November 2015 meeting.

24   A.   Yes.

25   Q.   And I believe you testified that the trade was for $11,700?

1    A.  That's correct.

2    Q.  And again, that was a trade where you initiated contact

3    with Mr. Costanzo.

4    A.  That's correct.

5    Q.  Indicating that you wanted to do a deal.

6    A.  I did.

7    Q.  And you indicated the amount that you wanted to do.

8    A.  I indicated I wanted to do 20,000.

9    Q.  And he wasn't able to come up with it all?

10   A.  It was a very short notice, because I called a few hours

11   before the meet-up.  Very short notice.

12   Q.  Let me ask you some questions about that because when we --

13   when you answered some questions about that initial

14   localbitcoins.com profile --

15   A.  Sure.

16   Q.  -- Mr. Costanzo seemed to indicate that he was capable and

17   willing to do these much larger trades?

18   A.  Right.  I believe up to 15 and then 75,000, if I'm not

19   mistaken.

20   Q.  And even in his conversations with you, he kind of boasted

21   about being capable of doing large trades.

22   A.  Correct.

23   Q.  But in one of those conversations we listened to, he said

24   he'd actually never done a trade any larger than 20,000; right?

25   A.  He did mention that in one of the conversations.

SERGEI KUSHNER - CROSS-EXAMINATION

1   Q.  And so even though he kind of boasted about wanting to do

2   large dollar amounts, as you, the undercover agent, were

3   proposing larger amounts, he seemed to be struggling to put

4   together those amounts, as we talk about the deals we've talked

5   about so far.  Isn't that true?

6   A.  He -- well, he was -- he referred to timing issues usually.

7   Q.  He -- he was coming up short.

8   A.  He was coming up short.  And with the -- when he mentioned

9   he -- the most he had was 20,000.  I'm not sure that was

10  referring to any particular time frame or -- so it's -- it was

11  kind of open to interpretation.

12  Q.  He wasn't...

13          One of the things that you -- you spoke about in your

14  direct testimony was he did appear to be an individual that was

15  extremely enthusiastic about Bitcoin?

16  A.  He was.

17  Q.  He could talk and talk and talk about Bitcoin?

18  A.  Yes.

19  Q.  About --

20  A.  And he did.

21  Q.  About how he thought it was just going to be really

22  important in the world?

23  A.  Yes, he was very enthusiastic about it.

24  Q.  And you talked about how he sent you a podcast that he had

25  done, talking about Bitcoin.  And -- is that a "yes"?

SERGEI KUSHNER - CROSS-EXAMINATION

1   A.   Yes, he did.   Of course.

2   Q.   And he wanted you to listen to it?

3   A.   Yes.

4   Q.   And in fact, he pestered you to listen is to it; yes?

5   A.   Yes.

6   Q.   And he wanted you to share it with your friends?

7   A.   Yes.

8   Q.   And he talked to you about coming and showing up at his

9   meet-ups to talk about Bitcoin?

10  A.   Correct.

11  Q.   And I think you talked about this a little bit earlier, but

12  these meet-ups were basically meetings that people who are

13  interested in Bitcoin could come and talk about Bitcoin issues.

14  A.   That's correct.

15  Q.   He also talked about setting up a booth at the Home and

16  Garden Show.

17  A.   Right.

18  Q.   Where he would talk to people who attended the Home and

19  Garden Show to try to get them interested in Bitcoin.

20  A.   That's correct.

21  Q.   You indicated that you've been working as an undercover

22  agent for many years.

23  A.   That's correct.

24  Q.   And you've received a tremendous amount of training in that

25  regard?

SERGEI KUSHNER - CROSS-EXAMINATION

1    A.   I received training in this regard, yes.

2    Q.   Both kind of formal training and on-the-job training?

3    A.   Correct.

4    Q.   When you were deployed in this investigation --

5    A.   Okay.

6    Q.   -- one of the objectives was to investigate potential

7    money laundering; would you agree with that?

8    A.   Correct.

9    Q.   And so as we listened to your recorded meetings with

10   Mr. Costanzo, and as we listened to you describe why you made

11   certain statements to Mr. Costanzo, is it fair to say that you

12   were saying those things because it was part of your money

13   laundering investigation?

14   A.   Correct.

15   Q.   Meaning that you were -- would say things in a calculated

16   way to see if you could get a certain reaction out of

17   Mr. Costanzo?

18   A.   No, not necessarily certain reaction, but to see if he

19   would be willing to do business with me, given the set of

20   circumstances that I outlined.

21   Q.   You knew, though, that -- obviously you knew that it was

22   being recorded --

23   A.   Correct.

24   Q.   -- because you -- I don't know how this works exactly, but

25   do you set up your own recording device?

SERGEI KUSHNER – CROSS-EXAMINATION

1   A.  No, we have agents who are trained in technical equipment

2   who assist us.

3   Q.  But -- but you know that you're recording that meeting in

4   order to preserve what has happened.

5   A.  Oh, yes.  Correct.

6   Q.  And you know that there's the potential that that recording

7   may someday be played in a court proceeding.

8   A.  Of course.  There's always the assumption that someday it

9   would be played in court.

10  Q.  So as you're sitting in those meetings that are being

11  recorded, you are making statements that are helping you

12  potentially build a case against the individual that you're

13  sitting across from.

14  A.  Okay.  Yes.  That's part of the investigation.

15          MR. CAIN:  Your Honor, may I have a moment?

16          THE COURT:  You may.

17                  (Pause in proceedings.)

18  BY MR. CAIN:

19  Q.  Agent Kushner, Counsel for the United States asked you

20  questions about whether Mr. Costanzo asked you to provide

21  certain information about yourself.

22  A.  Yes.

23  Q.  Like your last name.

24  A.  Right.

25  Q.  You didn't ever ask him for his last name, did you?

SERGEI KUSHNER – CROSS-EXAMINATION                    359

1    A.  No, I did not.  I did ask him about his -- if his name was

2    real or not.

3    Q.  The government also asked if Mr. Costanzo ever asked you

4    for your Tax Identification Number; correct?

5    A.  Right.

6    Q.  And you indicated that he did not?

7    A.  He did not.

8    Q.  But you didn't intend to give him your Tax Identification

9    Number?

10   A.  If he -- well, if he would have asked...

11   Q.  You weren't going to give him your actual Tax

12   Identification Number?

13   A.  Not my actual -- not the actual Tax Identification Number.

14   Q.  And you weren't going to give him your actual street

15   address?

16   A.  I would have given him my cover street address.

17   Q.  But not your actual street address?

18   A.  Not my real street address.

19            MR. CAIN:  I have no further questions.

20            Thank you, Your Honor.

21            THE COURT:  Thank you.

22            MR. BINFORD:  I'll be very brief, Your Honor.

23            THE COURT:  All right.

24   ///

25   ///

```
 1                      REDIRECT EXAMINATION
 2    BY MR. BINFORD:
 3    Q.  Mr. Costanzo's attorney asked you whether there was
 4    anything specifically that invited drug dealers on that
 5    localbitcoins page.
 6             Despite the fact that there was nothing that said
 7    Welcome, Drug Dealers, were there things on that page that
 8    might appeal to people engaged in drug activity?
 9    A.  I think the reference to discretion.
10    Q.  Would the use of an alias appeal to someone?
11    A.  Yes.
12    Q.  And would the opportunity to provide large amounts of cash
13    appeal to someone?
14    A.  Oh, absolutely, yes.  They were -- there were not a lot of
15    listings that provided -- that listed such large amounts of
16    cash to be available.
17    Q.  Do you know of any other place where you could transfer
18    that amount of cash without more details being asked of you?
19    A.  Not --
20             MR. CAIN:  Objection.  Relevance, outside the scope.
21             THE COURT:  Overruled.
22             You may answer.
23             THE WITNESS:  I know of no other place, no.
24    BY MR. BINFORD:
25    Q.  How long have you been an undercover agent?
```

UNITED STATES DISTRICT COURT

1    A.   For 15 years this year.

2    Q.   And as part of that being an undercover agent, do you have

3    certain backstopping that's necessary to protect you and --

4    A.   Yes.   It's -- backstopping involves -- it's a continuous

5    process from the day you finish the training.   It's creating a

6    persona, undercover persona, creating documents, creating your

7    backstopping story, and profile to fit the role.

8    Q.   Can that backstopping include an undercover address?

9    A.   Yes.

10   Q.   An undercover Tax Identification Number?

11   A.   Yes.

12   Q.   And are those things that you could provide to someone if

13   asked?

14   A.   Yes, I did have all those things:   Undercover address,

15   undercover Taxpayer Identification Number.

16   Q.   Were you prepared in this case to provide that information

17   to Mr. Costanzo if he asked?

18   A.   Well, I would have been very curious why he's asking me

19   that, but ultimately I would have given, if he would have

20   provided adequate -- acceptable enough answer to me.

21   Q.   So 15 years as an undercover agent, would there be a need

22   for undercover agents if people engaged in criminal activity

23   out in the open?

24   A.   Would you repeat that again?   Sorry.

25   Q.   Would there be a need for undercover agents if people

1    engaged in criminal activity out in the open?

2              MR. CAIN:  Objection.  Outside the scope.

3              THE COURT:  I'm going to sustain that.

4              MR. BINFORD:  All right.

5    BY MR. BINFORD:

6    Q.  During your conversations with Mr. Costanzo, did he

7    repeatedly reference a bank that was his source of Bitcoin?

8    A.  He referenced a banker that was his source of Bitcoins

9    several times.

10   Q.  And is it your understanding that that was actually a real

11   financial institution?

12   A.  My understanding was not.  My understanding was perhaps

13   another individual.

14   Q.  Were the amounts you suggested for your transactions --

15   2,000, 3,000, 10,000, and then the last 20,000 -- were those

16   all amounts within or under his advertised amounts?

17   A.  It's well below his advertised amounts.

18   Q.  And were those less than other amounts he told you he had

19   previously engaged in?

20   A.  Yes.

21   Q.  And were those amounts less than the amounts that he

22   suggested that he could do during your conversations?

23   A.  Yes.  He suggested several -- several occasions he could do

24   larger amounts.

25   Q.  The attorney for Mr. Costanzo mentioned that you had

SERGEI KUSHNER – REDIRECT EXAMINATION

```
 1    already set up the May 20th deal before you referenced heroin.
 2    A.  Uh-huh.
 3    Q.  Had you already set up the deal with Peter Steinmetz before
 4    you referenced drugs during that discussion?
 5    A.  I -- yes, I set up the meeting with Peter --
 6            MR. CAIN:  Objection.  Outside the scope.
 7            THE COURT:  Overruled.
 8            THE WITNESS:  So, yes, I set up the meeting with Peter
 9    Steinmetz before I mentioned the drugs.
10    BY MR. BINFORD:
11    Q.  And were you able to complete that transaction?
12    A.  No, I did not.
13    Q.  Did he refuse to engage in that transaction?
14            MR. CAIN:  Objection.  Relevance.
15            THE COURT:  Sustained.
16    BY MR. BINFORD:
17    Q.  Did you give Mr. Costanzo multiple opportunities to walk
18    away from engaging in a transaction involving drug proceeds?
19    A.  Yes.
20    Q.  Did he ever take you up on any of those opportunities?
21    A.  No.
22    Q.  And even after your last transaction, was he enthusiastic
23    to do business with you again?
24    A.  I would say very enthusiastic.
25            MR. BINFORD:  No further questions, Your Honor.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Thank you, Agent.
 2              You may step down.
 3              Ladies and gentlemen, we're going to take an afternoon
 4    break.  Please return, and be ready to return about 3:20.
 5    We'll try and promptly begin at that time.
 6              COURTROOM DEPUTY:  All rise.
 7                  (Jury leaves the courtroom at 3:07 p.m.)
 8              THE COURT:  Anything the parties need to raise?
 9              MR. BINFORD:  Not from the government, Your Honor.
10              MS. WEIDNER:  Nothing from the defense, Your Honor.
11              When are we supposed to be back?
12              THE COURT:  3:20.
13              MS. WEIDNER:  Thank you.
14              THE COURT:  Thank you.
15                  (Proceedings in recess at 3:08 p.m.)
16                  (Jury enters the courtroom at 3:26 p.m.)
17                    (Proceedings resume at 3:28 p.m.)
18              THE COURT:  Please be seated.
19              Hope you had a pleasant break and you can stay with us
20    for this last portion of the afternoon.
21              Next witness?
22              MS. ESCALANTE:  Your Honor, the government would call
23    Officer David Alvarado.
24              Permission to approach the lecturn, Your Honor.
25              THE COURT:  Oh, yeah.  I'm just going to grant blanket
```

```
 1    permission to approach the lecturn.
 2              MS. ESCALANTE:  Thank you.
 3              THE COURT:  Only if you're going to approach the
 4    witness or the bench or the jury do you need to request it.
 5              (DAVID ALVARADO, Government's witness, is sworn.)
 6                        DIRECT EXAMINATION
 7    BY MS. ESCALANTE:
 8    Q.  Good afternoon, Officer Alvarado.
 9              Could you introduce yourself to the members of the
10    jury and tell us where your work.
11    A.  Yes.  Task -- Task Force Officer Dave Alvarado.  I'm
12    assigned to the Task Force Group 1 with the DEA, employed by
13    the Scottsdale Police Department.
14    Q.  How long have you been employed with Scottsdale Police
15    Department?
16    A.  For a little over 17 years.
17    Q.  Did you have any previous law enforcement experience prior
18    to joining Scottsdale Police Department?
19    A.  Yes.  I worked for the U.S. Army military police for five
20    years.
21    Q.  Any previous experience prior to that?
22    A.  No, I did not.
23    Q.  Do you have any college or education?
24    A.  I have two years of college.
25    Q.  And what were you majoring in?
```

DAVID ALVARADO - DIRECT EXAMINATION

1    A.   Law enforcement.   Criminal justice.

2    Q.   Okay.   And what did it take for you to become employed with

3    Scottsdale Police Department?

4    A.   At the time you had to have 60 credit hours, you had to go

5    through an extensive background check, you had to do a physical

6    fitness test, a written test, oral board, polygraph, and then

7    you'd get an offer to be hired.

8    Q.   Okay.   And upon joining, what unit did you get sent to?

9    A.   I initially worked patrol coming out of the academy.   I

10   worked patrol for a couple years, and then went to the canine

11   unit where I worked a narcotics detection canine for about 10

12   or 11 years.   Once I left the canine unit, then I went to our

13   Street Crimes Unit, which is the High Enforcement Arrest Team,

14   which we investigated different various crimes that occurred

15   within the city of Scottsdale.

16   Q.   And you stated that you are a task force officer with the

17   DEA.

18   A.   That is correct.

19   Q.   What is a task force officer?

20   A.   We're assigned to the -- to assess the DEA in a task force

21   to investigate large-level drug investigations happening within

22   the state of Arizona.

23   Q.   And how long have you been a task force officer?

24   A.   Just coming up on two years.

25   Q.   And what do you have to do to become a task force officer?

UNITED STATES DISTRICT COURT

1  A.  You need to test for the position, which usually occurs

2  with an oral board and a background check, in which they look

3  at how many cases I've investigated and look through to see if

4  I'm a thorough investigator, look to see if I know what I'm

5  doing as far as an investigator.

6  Q.  Okay.  And just for the court reporter, I'm just going to

7  ask you to speak a little bit slower.  Okay?

8  A.  Sure.

9  Q.  Slower and louder.

10         Were you a task force officer on April 20th, 2017?

11  A.  Yes, I was.

12  Q.  And were you on duty that day?

13  A.  Yes, I was.

14  Q.  And when did you, I guess, come on duty that day?

15  A.  What time?

16  Q.  Uh-huh.

17  A.  I would estimate 0900.

18  Q.  Okay.  And what were you going to do that day; what were

19  you assigned to do that day?

20  A.  Initially we were assigned to provide surveillance during a

21  UC meet, and then I was assigned to -- I was assigned to a

22  search party.

23  Q.  And who were you conducting surveillance of?

24  A.  Thomas Costanzo.

25  Q.  Okay.  And you said of a "UC meet."  What does "UC" mean?

1    A.   Undercover.

2    Q.   Oh.

3    A.   Undercover officer or detective.

4    Q.   And what were you aware was going to happen that day?

5    A.   The officer or detective was going to meet with Thomas

6    Costanzo, and he was going to exchange money for Bitcoin at the

7    time.

8    Q.   Okay.  And what -- who is the officer that was going to

9    meet with Thomas Costanzo?

10   A.   Task Force Officer Chad Martin.

11   Q.   Okay.  And do you see Task Force Officer Chad Martin here

12   in the courtroom today?

13   A.   Yes, I do.

14   Q.   And where is he seated and what is he wearing?

15   A.   He is directly in front of me wearing a suit with a tie

16   with white dots on it.

17   Q.   Okay.  And did you provide surveillance for the undercover

18   meeting?

19   A.   Yes, I did.

20   Q.   Where did that meeting occur?

21   A.   At the Starbucks on Scottsdale Road just south of the 202.

22   Q.   And what did you see while on surveillance?

23   A.   I was inside the Starbucks right next to the UCDO.  I saw

24   Task Force Officer Chad Martin meet with Thomas Costanzo.  They

25   exchanged a bag, and then they put their phones together; and

1    then shortly after that, there was an arrest.

2    Q.  Okay.  And do you see Thomas Costanzo here in the courtroom

3    today?

4    A.  I do.

5    Q.  Can you identify where he is seated and what he is wearing?

6    A.  He's to your right, to my left, between a male and a

7    female.  He's wearing a black jacket and a -- looks like a gray

8    shirt.  And he's wearing some glasses, as well.

9    Q.  Okay.

10           MS. ESCALANTE:  Your Honor, may the record reflect

11   that Officer Alvarado has identified the defendant?

12           THE COURT:  Yes.

13   BY MS. ESCALANTE:

14   Q.  Okay.  And after you provided surveillance at the Starbucks

15   and observed the deal, what did you do later that day?

16   A.  I was assigned to the search warrant at Mr. Costanzo's

17   apartment.

18   Q.  Okay.  And is that at 417 North Loma Vista in Mesa,

19   Arizona?

20   A.  Yes.

21   Q.  Okay.  And did you go over there?

22   A.  I did.

23   Q.  And what did you do upon arrival?

24   A.  Search warrant was served by the Maricopa County S.W.A.T.

25   team.  Once the building was secured, we took over the scene,

1   and I began taking pictures and label each room with inside the

2   apartment.

3   Q.  Describe the apartment as you enter for the jurors.

4   A.  As you enter the front door, you immediately come into the

5   living room.  To your right is a kitchen, slash, dining room.

6   If you make an immediate right, there is a small little laundry

7   room.  If you proceed through the living room, you'll walk into

8   a small hallway.  There's a closet in that hallway.  If you

9   proceed straight across that -- that hallway, you'll go into

10  the master bedroom or the bedroom where Mr. Costanzo --

11  Mr. Costanzo's things were, his clothes and items and his bed.

12  If you come out of the room, directly to your right is a

13  secondary bedroom, and then there's a bathroom off that hallway

14  as well.

15  Q.  Okay.  So how many bedrooms were in the apartment?

16  A.  Two.

17  Q.  Okay.  And were you able to identify which one was the

18  master and which one was the spare?

19  A.  Yes.

20  Q.  And how were you able to do that?

21  A.  Master bedroom had the -- mainly most of the clothes and

22  the bed was made -- or there was sheets on that bed.  There was

23  no sheets on the other bed.

24  Q.  Okay.  And were there any individuals in the apartment when

25  the search warrant was executed?

DAVID ALVARADO - DIRECT EXAMINATION                371

1    A.   No.  Nobody else was there.

2    Q.   Okay.  And were you able to identify who lived in there

3    from the items that you saw during the search warrant?

4    A.   Yes.

5    Q.   And who was that?

6    A.   Thomas Costanzo.

7    Q.   Okay.  And did you take photographs during the search

8    warrant?

9    A.   Yes, I did.

10   Q.   Okay.  In front of you -- and did you also seize certain

11   items during the search warrant?

12   A.   Yes, I did.

13   Q.   In front of you are multiple exhibits.  Can you -- they are

14   numbers 17, 16, 34, 35, 7, 11, 9, 12, 36, 18, 20, and 19, and

15   80.

16          Will you review all of those, and once you're done

17   reviewing, if you can just look up so I'm aware you're done.

18                    (Pause in proceedings.)

19   BY MS. ESCALANTE:

20   Q.   Okay?

21   A.   Sorry.

22   Q.   It's okay.

23          Are all of those photographs and items that you saw on

24   the day of the search warrant?

25   A.   Yes, they are.

UNITED STATES DISTRICT COURT

DAVID ALVARADO - DIRECT EXAMINATION

1   Q.  Are they true and accurate depiction of what you saw the

2   day of the search warrant?

3   A.  Yes.

4   Q.  And do you recognize each of those items?

5   A.  I do.

6        MS. ESCALANTE:  Your Honor, the government would move

7   to admit all of those exhibits.

8        THE COURT:  I think I'm going to have to have you name

9   them specifically, Ms. Escalante.

10        MS. ESCALANTE:  Yes, Your Honor.  The government would

11   move to admit Exhibits 17, 16, 34, 35, 7, 11, 9, 12, 36, 80,

12   18, 20, 19, and 31.

13        THE COURT:  Ms. Weidner, I'll give you a minute to let

14   me know if you have any objections to any of those.

15        MS. WEIDNER:  Thank you.

16        Your Honor, may I -- may we consult with counsel very

17   quickly to make sure that we have the list correct?

18        THE COURT:  You may certainly do so.

19            (Pause in proceedings.)

20        THE COURT:  Ladies and gentlemen of the jury, if you

21   want to stand up and stretch, I going to certainly take the

22   opportunity.

23            (Pause in proceedings.)

24        MR. CAIN:  Your Honor, of the exhibits that the

25   government has moved to admit, we only object to the admission

```
 1    of Exhibit 9.

 2              THE COURT:  All right.

 3              MR. CAIN:  We would object --

 4              THE COURT:  All right.  So here's how we're going to

 5    handle this.  I haven't seen Exhibit 9.  I don't know what it

 6    is, and I don't know what your objection is.  I do have a

 7    binder here.  But I'm going to admit Exhibit 17, Exhibit 16,

 8    Exhibit 34, Exhibit 35, Exhibit 7, Exhibit 11, Exhibit 12,

 9    Exhibit 36, Exhibit 80, Exhibit 18, Exhibit 20, Exhibit 19, and

10    Exhibit 31.

11              What's your objection to Exhibit 9, Mr. Cain?

12              MR. CAIN:  Relevance.  Outside the scope of the

13    indictment, Your Honor.  And hearsay.

14              MS. ESCALANTE:  Your Honor, it goes to predisposition.

15    It's an item that was found during the search warrant.

16              THE COURT:  Well, it may be that it does, but it still

17    seems to me you're going to have to lay foundation before it

18    comes in, and I mean foundation other than just that it was

19    found.

20              MS. ESCALANTE:  Okay, Your Honor.  One moment.

21                   (Exhibits 17, 16, 34, 35, 7, 11, 12, 36,

22            80, 18, 20, 19, and 31 are received into evidence.)

23    BY MS. ESCALANTE:

24    Q.  Officer Alvarado, do you see Exhibit 9 before you?

25    A.  Yes.
```

1    Q.  Okay.  Where did you find that item?

2    A.  Exhibit 9 was found in the spare bedroom in a box with

3    other items of paperwork.

4    Q.  Okay.  And is that exhibit the same place where Exhibit 34,

5    35, 7, and 11 were also found?

6    A.  Yes.

7    Q.  Okay.  And when you located those items, was Officer Martin

8    present with you and also observed those items?

9    A.  No.

10   Q.  No.  Did he -- where was he?

11   A.  I believe he was offsite at the time.

12   Q.  Did Officer Martin also attend the execution of the search

13   warrant?

14   A.  No.

15   Q.  He was not there the day that the search warrant got

16   executed?

17   A.  No.

18   Q.  Were you there the entire time?

19   A.  Yes.

20   Q.  Okay.

21        MS. ESCALANTE:  Your Honor, I will lay more foundation

22   for Exhibit 9 through other witnesses.

23        THE COURT:  Well, let me be specific so you

24   understand, Ms. Escalante, what kind of foundation I'm

25   interested in.  It seems to me that the hearsay objection here

1    is well-founded, as long as you're offering it for the truth of

2    the matter asserted.  If that is the case, then you're going to

3    have to lay foundation that this fits the hearsay exception.

4         MS. ESCALANTE:  Your Honor, we're not offering it for

5    the truth to the matter asserted that those individuals --

6         THE COURT:  The truth of the statement made in the

7    paper?

8         MS. ESCALANTE:  Right.  We are offering it for the --

9    to show predisposition in this case.

10        THE COURT:  Well, I don't see how that demonstrates

11   predisposition unless I assume the truth of the matter

12   asserted.

13        Do you understand what I'm saying?

14        MS. ESCALANTE:  Yes, Your Honor.

15        THE COURT:  All right.

16        MS. ESCALANTE:  The government is also offering, it,

17   Your Honor -- strike that.

18        THE COURT:  If you want to discuss Exhibit 9 at

19   sidebar, we can do that.  If you need to do it right now, we

20   can do it right now.  If you can go on to the rest of your

21   testimony, why don't we do that and we can take up Exhibit 9

22   later if we need to.

23        MS. ESCALANTE:  Okay.

24        THE COURT:  Do you need to be heard, Mr. Cain?

25        MR. CAIN:  No, Judge.  I was just going to say, if we

1    wanted to talk sidebar, we could do that, or we could take it

2    up later.

3            THE COURT:  All right.  Thank you.

4            MS. ESCALANTE:  Your Honor, permission to publish the

5    admitted exhibits.

6            THE COURT:  You may do that.

7    BY MS. ESCALANTE:

8    Q.  Okay.  Officer Alvarado, could you please tell the members

9    of the jury what this is a picture of?

10   A.  That's a picture of the living room from about where the

11   front door is.

12   Q.  And that is Exhibit 17.

13            Now I'm moving on to Exhibit 16.

14            What is that a picture of?

15   A.  That is a picture of a dry erase board that was on the

16   north wall of the living room.

17   Q.  And did you review what was written on this board on the

18   day of the search warrant?

19   A.  Yes.

20   Q.  What does that say, Officer Alvarado?

21   A.  "Avoid banks."

22   Q.  And to the right in the middle, what does that say?

23   A.  "Encrypted columns."

24   Q.  And to the right at the very top, what does that say?

25   A.  "Hand to hand."

1      MS. ESCALANTE:  One moment, Your Honor.

2                 (Pause in proceedings.)

3      MS. ESCALANTE:  Sorry.  Technical difficulties on my

4  end.

5  BY MS. ESCALANTE:

6  Q.  Exhibit 34 is next.

7         What is that, Officer Alvarado?

8  A.  It was a pamphlet that is located in the same area.

9  Q.  Exhibit 35 now?

10  A.  That's the other side of that pamphlet.

11  Q.  And where was this pamphlet found?

12  A.  In the -- the spare bedroom.

13  Q.  And did you review this pamphlet?

14  A.  I did.

15  Q.  Start with the left side of the pamphlet.  What does that

16  say?

17  A.  (Reading)  Bitcoin is an alternative currency that can be

18  transferred electronically anywhere in the world with no bank

19  and no government forms.  It's cheaper than any other online

20  payment system, and thousands of websites already accept it.

21  The Bitcoin network uses state-of-the-art cryptography to

22  provide superior privacy protection, making it difficult to

23  confiscate by governments or other thieves, but accessible from

24  any Wi-Fi connection or mobile device.

25  Q.  Continue.

1    A.   (Reading) Bitcoin does not discriminate.  You can open a

2    Bitcoin wallet without showing ID or providing a physical

3    address.  Unlike traditional banks, Bitcoin is accessible to

4    the undocumented and the homeless, giving the unbanked a means

5    of savings and access to a vibrant global market.  Bitcoin is

6    radically changing the economy from top to bottom.  It's not

7    tied to any central bank, so it's not subject to dollar

8    inflation, which is at the root of systemic poverty and

9    homelessness in any otherwise wealthy economy.  The global

10   dollar hegemony now has serious competition, giving us an easy

11   exit off of the dollar's worthlessness.

12   Q.   Okay.  Now we'll go to the middle portion of the pamphlet.

13        Can you read that from your screen?

14   A.   Yes.

15   Q.   Okay.  What does it say?

16   A.   The heading is The Honey Badger of Money.

17        (Reading)  This is Bitcoin.  It's the most fearless

18   currency on the Internet.  Oh, Bitcoin is just crazy.  It's

19   distributed all over the place.  Watch out, banks.  Bitcoin

20   does all the work.  We don't need you anymore, stupid.  Eew.

21   Oh, my gosh.  Transactions are super fast.  How disgusting is

22   that?  Bitcoin is so nasty.  Bitcoin has no regard for any

23   national borders anywhere, allowing it to move about freely.

24   Here comes a fierce battle between the State and Bitcoin, FYI.

25   It's got encryption.  Nothing can stop Bitcoin.  Now the feds

DAVID ALVARADO - DIRECT EXAMINATION

```
1    want to tax Bitcoin.  Don't -- do you think Bitcoin cares?

2    Bitcoin don't give a Bit.  Just do -- just -- it just does what

3    it does -- or what it wants.

4    Q.  And now the right side.

5    A.  Bitcoin Quick Start Guide.  Bitcoin.  Distributed network.

6    Instant transfers.  Global markets.  No frozen accounts.  Free

7    to start.

8    Q.  And this was found in the defendant's residence; correct?

9    A.  Yes, it was.

10   Q.  Now Exhibit Number 7.  What is this?

11   A.  It's a flyer that was also found in the same location.

12   Q.  And do you see a phone number on that flier?

13   A.  Yes, I do.

14   Q.  And what is that?

15   A.  (602)434-1275.

16   Q.  And is there a reference to a video there?

17   A.  Yes, there is.

18   Q.  And what's the name of the video?

19   A.  Quotations, We Use Coins.

20   Q.  Okay.  Now Exhibit Number 12.  What is this?

21   A.  This is the desk -- or the drawer next to the bed in the

22   master bedroom.

23   Q.  And was that inside the drawer?

24   A.  Yes, it was.

25   Q.  And what is that?
```

1    A.  They're wraps for increments of $5,000 in U.S. currency.

2    Q.  Okay.

3           Now, Exhibit 36.  What is that?

4    A.  These are coins that came out of that drawer, various

5    different metals.

6    Q.  Okay.  And do you have Exhibit 80 in front of you?

7    A.  Yes, I do.

8    Q.  And is that the coins that are depicted in this picture?

9    A.  Yes, they are.

10   Q.  Okay.  Now Exhibit 18.

11   A.  Those are business cards that were located in the same

12   drawer.

13   Q.  Okay.  And is there a phone number and email associated

14   with this?

15   A.  Yes.  (602)434-1725.  The email is morpheus@titanians.org.

16   Q.  Now Exhibit 20.  What is this a picture of?

17   A.  Picture of the dining room table.

18   Q.  And where is this in proximity to -- in the apartment?

19   A.  It's adjacent to the kitchen.  As soon as you enter the

20   front door, it's right to your right.

21   Q.  And what are those items enlarged on the screen?

22   A.  Those are U.S. currency wraps for 2,000, and I believe the

23   other one is a thousand.  It's kind of blurred on my screen.

24   Q.  Okay.  And then Exhibit 19?

25   A.  That is a cell phone that was located in the kitchen, and

1    it was plugged in right where it was at.

2    Q.  And what kind of cell phone is that?

3    A.  I'd have to refer to my report, or look at it right now.

4    Q.  Okay.  And you have Exhibit 31 before you; correct?

5    A.  I do.

6    Q.  And is that a -- is that the actual cell phone?

7    A.  Yes.

8    Q.  Does it tell you there what it is?

9    A.  It's a Samsung.

10   Q.  Okay.

11          MS. ESCALANTE:  May I have a moment, Your Honor?

12          THE COURT:  You may.

13                (Pause in proceedings.)

14   BY MS. ESCALANTE:

15   Q.  Officer Alvarado, when you did -- did you do -- conduct an

16   initial walk-through of the apartment?

17   A.  Yes.

18   Q.  And Officer Martin was or wasn't with you?

19   A.  I don't recall if he was with me or not.

20   Q.  Would it refresh your recollection to read a report that

21   was taken about the day the search warrant got executed?

22   A.  Yes.

23   Q.  And that's Exhibit 153.

24          May I approach, Your Honor?

25          THE COURT:  You may.

```
 1    BY MS. ESCALANTE:
 2    Q.  Will you review that report and let me know if it refreshes
 3    your recollection.
 4    A.  It does.
 5    Q.  Okay.  So was Officer Martin there during the search
 6    warrant?
 7    A.  Are you asking, like, the initial search warrant?
 8    Q.  Yes.  The initial walk-through.
 9    A.  I believe he did the walk-through, but then he had to leave
10    to go offsite.
11    Q.  Okay.  Thank you.
12              MS. ESCALANTE:  No further questions, Your Honor.
13              THE COURT:  Cross-examination?
14              MR. CAIN:  No questions for this witness, Your Honor.
15              THE COURT:  Thank you.
16              You may step down.
17              MR. BINFORD:  United States calls Jason Shadle.
18              THE COURT:  Thank you.
19          (JASON SHADLE, Government's witness, is sworn.)
20              MR. BINFORD:  And, Judge, I'd like your deputy clerk
21    to give the witness what's been previously admitted as
22    Exhibit 31 before he starts.  It should be in an evidence bag.
23                          DIRECT EXAMINATION
24    BY MR. BINFORD:
25    Q.  Good afternoon, Mr. Shadle.
```

1    A.  Good afternoon.

2    Q.  Mr. Shadle, where do you work?

3    A.  I work for the United States Postal Inspection Service.

4    Q.  And what do you do for the Postal Inspection Service?

5    A.  I'm a senior forensic computer analyst.

6    Q.  How long have you been doing that?

7    A.  With the Inspection Service, for the last six years.

8    Q.  And where were you employed prior to that?

9    A.  I was a contract employee of the DEA in Lorton, Virginia.

10   Q.  What did you do for the DEA?

11   A.  I was a senior computer forensic examiner.

12   Q.  And did you have any experience with electronic devices

13   prior to that?

14   A.  Yes, I did.

15   Q.  What did you do prior to working for the DEA?

16   A.  If was a police officer in Ohio, and part of my duties were

17   to do computer forensic examinations.

18   Q.  How long have you been involved in computer forensic

19   examinations?

20   A.  Since 2005.

21   Q.  What do you do now as a senior computer -- senior forensic

22   computer analyst?

23   A.  Part of our duties -- my duties are to assist postal

24   inspectors in the execution of search warrants, so we will help

25   search for and seize electronic devices.  If a computer is

1   running, I will help to triage it to make sure it's not

2   encrypted before seizure.  And sometimes I will make forensic

3   images of computers on-scene.

4           Back in the laboratory, I will write block, make what

5   we call a forensic image or copy of the data.  I will archive

6   it to optical disc.  I will examine the data, I'll issue a

7   report, and testify as needed.

8   Q.  Have you received any training in examining computers or

9   other electronic devices?

10  A.  Yes, I've been through four training programs.  One was

11  through the Ohio Peace Officer Training Academy, which led to a

12  certification as an evidence recovery specialist in a digital

13  environment.

14          My next training program was through the DEA.

15          My third training program was through the Department

16  of Defense Cyber Investigations Training Academy, which led to

17  a certification as a certified digital media collector.

18          And then my final one was also through Department of

19  Defense, and that led to a certification as a certified digital

20  forensic examiner.

21  Q.  And do you have a graduate degree related to forensics?

22  A.  I do.  I have a master of science in digital forensic

23  management.

24  Q.  And do you belong to any professional organizations?

25  A.  I do.  I belong to HTCIA.  That's the High Technology Crime

1   Investigation Association.  And I'm a member of AAFS.  That's

2   the American Academy of Forensic Sciences.

3   Q.  Now, when you examine electronic devices as part of a

4   criminal case, is there specialized software that you use?

5   A.  Yes, there is.

6   Q.  And is that software generally used throughout the

7   industry?

8   A.  Yes, it is.

9   Q.  Can you tell the jury a little bit more about that software

10  that you use?

11  A.  Okay.  The software will -- will vary depending on whether

12  I'm examining computer and computer storage media, or if I am

13  examining cell phones and other mobile devices like a tablet.

14        When it comes to the mobile devices, there's a company

15  called Cellebrite, which provides both a hardware and software

16  solution for copying data out of those mobile devices.  The

17  package includes cables, the extraction tool, software for

18  analyzing the data, and software for reviewing a report of that

19  data that's been extracted.

20  Q.  Can you approximate how many electronic devices you've

21  analyzed during your career?

22  A.  I've never totaled it up.

23  Q.  Do you think it's more or less than 1,000?

24  A.  Probably right around there.

25  Q.  Do you recall analyzing any electronic evidence that was

1    recovered from the apartment of Thomas Costanzo?

2    A.  I received -- yes.

3    Q.  Let me -- I want to show you what's been previously

4    admitted and marked as Exhibit 19.

5            I'm going to pull it up on the screen there in front

6    of you.

7            Do you see an electronic device in the center of that

8    photograph?

9            THE COURT:  He's not seeing anything right at the

10   moment.

11           MR. BINFORD:  You should have it now.  Maybe.

12           THE WITNESS:  Yes, I do.

13   BY MR. BINFORD:

14   Q.  And I'm going to zoom in on that electronic device.

15           Does that device look familiar to you?

16   A.  Yes.  That's one of the pieces of evidence I examined.

17   Q.  And what -- what is that?

18   A.  That's the LG -- or, sorry -- the Samsung Galaxy S2 cell

19   phone that you had presented to me here.  I guess Court's

20   Exhibit 31.

21   Q.  And for the record, you're holding what's been marked as

22   Exhibit 31 and admitted into evidence.

23           Will you take a look at that and tell us if it looks

24   familiar to you.

25   A.  Yes, this is -- this is the same device that I examined.

1   These are my -- my seals, my initials and dates, and my

2   indication of our laboratory's exhibit number 33.

3   Q.  And is that the same device that's depicted in the

4   photograph in front of you, Exhibit 19?

5   A.  Yes, it is.

6   Q.  Did you analyze that cell phone?

7   A.  Yes, I did.

8   Q.  And how did you analyze that device?

9   A.  When the device came in, I first of all began by examining

10  the exterior and saw there was damage to the face of it, which

11  I photographed.  The battery had already been removed, so I

12  placed the device and the battery in what's called a Faraday

13  Box.  It's an enclosure which blocks out radiofrequency.

14  Allowed the phone to charge.  I attempted to extract data using

15  what's called a boot loader, and that was not successful.  So I

16  powered the device on inside the enclosure, placed it into

17  airplane mode, and removed it so that I could examine the

18  device.

19  Q.  And did you -- were you ultimately able to obtain

20  information from that device?

21  A.  Yes, I was.

22  Q.  What software did you use to do that?

23  A.  It was Cellebrite's.  The device is called a UFED Touch.

24  UFED is spelled U-F-E-D, and it stands for the universal

25  forensic extraction device.  And I used that tool to pull

1    information from the phone, and I reviewed it with their

2    software called physical analyzer.

3    Q.  And is Cellebrite, that's the software you mentioned

4    earlier on?

5    A.  That's the company that provides it, yes.

6    Q.  What type of information does that extract from the device,

7    from the cell phone?

8    A.  There's a large number of categories of data which can be

9    extracted, from text messages, call logs, contacts, chat

10   conversations, pictures, videos, files that were saved on the

11   phone, browsing history, Internet browsing history.

12   Q.  Did you -- sorry.  Didn't mean to cut you off.

13            Sounds like there's a lot that is stored on mobile

14   devices.

15   A.  Yes.

16   Q.  Did you find information on each of those devices that

17   indicated usage?

18   A.  On this device?

19   Q.  Yeah, I'm sorry.  On this device.

20   A.  Yes, I did.

21   Q.  The Samsung cell phone.

22            Were you able to identify a phone number associated

23   with that device?

24   A.  When I extracted the data, the phone had recorded the phone

25   number of the last SIM card that had been in the phone.  So it

JASON SHADLE - DIRECT EXAMINATION

1    had recorded it as area code (602)434-1725.

2    Q.  Was there other information on that Samsung cell phone that

3    indicated who might have been using it?

4    A.  Yes, there was a Telegram chat app with a user name of

5    Morpheus, and a full name of Morpheus Titania.  There was a

6    Gmail account synced to the phone.  The Gmail address was

7    morpheus2150@gmail.com.  And it had a user name of Thomas Mario

8    Costanzo.  And there was also a photograph on the phone of an

9    Arizona identification card in the name of Thomas Mario

10   Costanzo.

11   Q.  Did you provide a report documenting your findings to other

12   investigators in this case?

13   A.  Yes, I did.

14         MR. BINFORD:  And I'd like to show the witness only

15   what's been previously marked as Exhibit 168:  Just to the

16   witness.

17   BY MR. BINFORD:

18   Q.  Do you recognize that?  Without going into what it is, do

19   you recognize that document?

20   A.  Yes, I do.

21   Q.  And is that the report you authorized -- or you wrote,

22   authored?

23   A.  Yes, that's the report I authored.

24   Q.  All right.  Now, did you also provide the other

25   investigators on this case with a forensic image that you

UNITED STATES DISTRICT COURT

1   created from the extraction of the device?

2   A.   What I provided was a report of the data extraction in a

3   format that made it so that the reviewer of it could introduce

4   search terms to search the data, could sort the information and

5   could generate their own reports in a variety of formats, if

6   needed.

7   Q.   So, for example, would it be possible for the other

8   investigators to create a report documenting text messages that

9   were exchanged between the user of the phone and another

10  individual?

11  A.   Yes.

12  Q.   So you could pick a contact in the phone's message list and

13  their contact list and get a report of all text messages

14  exchanged with that person?

15  A.   Correct.

16  Q.   All right.  Now, I'm going to pull up just for you to look

17  at what's been previously marked as Exhibit 32.  And I can zoom

18  in, if that will help you.

19          Do you recognize that document?

20  A.   If you could zoom in, it would help me.

21  Q.   (Counsel complies.)

22  A.   Yes.

23  Q.   Is -- is that document an extraction of text messages that

24  were contained on that Samsung cell phone?

25  A.   Yes.

Q.  How do you know that?

A.  Because this is what a report looks like that is run from the report I provided.  It indicates the Cellebrite software that was used.  I see information about the model of cell phone that this was, and I recall -- and I recall reading some of this content.  So...

Q.  All right.  Now I want to show you what's been previously marked as Exhibit 67, and I will zoom in on this as well.

        Do you recognize this report?

A.  Yes.

Q.  And is this a fair and accurate report of text messages that were extracted from that Samsung device?

A.  Yes.

Q.  And how do you know that?

A.  Again, the Cellebrite software name is on the header of it. I see information indicating that Telegram messenger name of Morpheus on it, and again I recall having read some of this content.

Q.  All right.  Now I'm going to direct your attention to the screen and I'm going to show you what's been previously marked for identification as Exhibit 120.

        Do you also recognize this report?

A.  Yes.

Q.  And is this an extraction of text messages from the Samsung phone?

JASON SHADLE - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  And how do you know that?

3    A.  For the same -- same reasons.  It's indicated that it's a

4    Cellebrite UFED report.  The data is from the same model of

5    Samsung that I analyzed, and I recall reading some of this

6    content.

7    Q.  All right.  And is that a fair and accurate representation

8    of the text messages that were contained on that phone to that

9    user?

10   A.  Yes.

11   Q.  Now I'm going to ask you to keep your eyes on the screen,

12   and I'm pulling up what's been previously marked for

13   identification as Exhibit 122.

14          And I'm actually going to go -- do you recognize that

15   document?

16   A.  Yes.

17   Q.  And is that document an extraction of text messages that

18   were contained on the Samsung phone, which is in front of you,

19   Exhibit 31?

20   A.  Yes.  They are.

21   Q.  And how do you know that?

22   A.  From the same reasons.  The same header on the report, the

23   same reference to the device's model number, and in the

24   content -- some of the content I -- I read when I reviewed the

25   extraction.

UNITED STATES DISTRICT COURT

1    Q.  Thank you.

2              MR. BINFORD:  Your Honor, at this time I would move to

3    conditionally admit Exhibits 32, 67, 120, and 122.

4              THE COURT:  Any objection?

5              MS. WEIDNER:  Your Honor, a moment.

6                        (Pause in proceedings.)

7              MS. WEIDNER:  Your Honor, the government has moved to

8    admit Exhibits 32, 67, 120, and 122?

9              THE COURT:  Correct.

10             MS. WEIDNER:  The defense does not object to the

11   admission of Exhibits 32 and 67.  The defense does object to

12   the exhibits at 120 and 122, and would request a sidebar to

13   elaborate on that objection.

14             THE COURT:  32 and 67 are admitted.

15         (Exhibits 32 and 67 are received into evidence.)

16             THE COURT:  I will give you a sidebar.

17        (At sidebar on the record.)

18             MS. WEIDNER:  This is Maria Weidner, and, Your Honor,

19   it is the position of the defense that to the extent that the

20   120 --

21             THE COURT:  120 and 122.

22             MS. WEIDNER:  Yes.  Thank you.  Exhibits 120 and 122

23   would be admissible as rebuttal only, rebuttal on an entrapment

24   defense.

25             At this point, Your Honor, the government seems to

JASON SHADLE – DIRECT EXAMINATION

1   have conflated the issue of intent and the defense of

2   entrapment.  They are not necessarily the same thing.  So we

3   would -- we object to the presentation of 120 and 122 in the

4   government's case in chief.  If they feel rebuttal and the

5   Court feels rebuttal is appropriate, then we can progress to

6   that.  But at this point, it is our position that we are not

7   there.

8           THE COURT:  Haven't you already presented evidence of

9   entrapment?

10          MS. WEIDNER:  Your Honor, we have presented evidence

11  that this was not something that our client had the specific

12  intent to be involved in, but rather something that was

13  presented to him.

14          THE COURT:  All right.  So let me understand again the

15  nature of your objection.

16          MS. WEIDNER:  Yes.

17          THE COURT:  You think this is only rebuttal evidence,

18  so the government can't present it in its case in chief why?

19          MS. WEIDNER:  Government can't present rebuttal

20  evidence in its case in chief as --

21          THE COURT:  No, no, no.  Why can't the government

22  present this now?  What kind of thing are you going to do in

23  your case in chief that would raise this for rebuttal that is

24  not appropriately raised now?

25          MS. WEIDNER:  Well, Your Honor, we would argue that

UNITED STATES DISTRICT COURT

1    now it is not appropriately raised because we are -- the

2    defense that we have raised thus far goes to the mens rea, not

3    necessarily to an entrapment defense.

4         THE COURT:  Well, "not necessarily" is not a division

5    I'm going to make at this point.  It is what it is, and it can

6    be used for both.  It seems to me that you have raised it, and

7    you've raised it for both.  And so I'm going to allow -- I am

8    going to overrule that objection.  To the extent -- we've

9    already ruled on motions of limine.

10        MS. WEIDNER:  Yes.

11        THE COURT:  To the extent that it contains -- I do

12   think that there is probably enough foundational evidence to

13   suggest that this is the conversation of the defendant, at

14   least there are statements of the defendant here.  To the

15   extent that it also contains statements of third parties,

16   they're not admitted for the truth of the matter asserted.  So

17   I'm going to admit the exhibits conditionally.

18        MS. WEIDNER:  Okay.  The only -- the last issue with

19   the exhibits that the defense would raise is, I don't really

20   understand why, but it's -- they repeat themselves.  Have you

21   noticed --

22        THE COURT:  Yeah, you mean that there's double

23   entries?

24        MS. WEIDNER:  Yes.

25        MR. BINFORD:  I can certainly --

UNITED STATES DISTRICT COURT

1              MS. WEIDNER:  I don't know if there's any way to clean

2      it up.

3              MR. BINFORD:  I can certainly have the expert explain

4      why that happened.

5              MS. WEIDNER:  Okay, yeah.  Because it's -- it's a

6      little confusing.

7              THE COURT:  All right.  Do we want to handle Exhibit

8      Number 9 at this point?  Are you going to seek to introduce it,

9      or do you want to just do it at the end of the day since we're

10     in a different witness?

11             MR. RESTAINO:  This is Gary Restaino, Your Honor.

12             I think that we are content with the foundation that

13     we've made.  We'll do some mulling over the next couple of days

14     whether it's something we can get in.

15             THE COURT:  All right.  Let me just say then, if I

16     recall correctly, there was a hearsay objection.  It seems to

17     me that it is hearsay, unless you can establish that it is a

18     statement of the defendant or there's some hearsay exception

19     that applies for the reasons that I indicated to Ms. Escalante,

20     which is, to the extent that you're asking it be admitted to

21     show predisposition, I have to accept the truth of the matters

22     as asserted in the note.  And so I am excluding Exhibit 9

23     unless you can give me a foundation.

24             MR. RESTAINO:  That's fine, Your Honor.  We would

25     reserve the opportunity to see if there was a foundation, to

JASON SHADLE – DIRECT EXAMINATION

1    the extent there's handwriting comparisons and the like.  I

2    don't expect we'll get there.

3              THE COURT:  Okay.  That's what -- just so you know.

4    That's the basis of ruling.

5              MR. RESTAINO:  Thank you, Judge.

6         (End of discussion at sidebar.)

7              THE COURT:  Exhibits 32, 67, 120, and 122 are

8    admitted.

9              (Exhibits 120 and 122 is received into evidence.)

10                (Exhibit 122 is received into evidence.)

11   BY MR. BINFORD:

12   Q.  Mr. Shadle, on those exhibits that were just conditionally

13   admitted that we looked at previously, those extraction

14   reports, it appears that some of the messages are repeated.

15   Can you explain why that occurs?

16   A.  In -- in the extractions, plural, that I was able to get

17   from the phone, one is called a logical extraction and one is

18   called a file system extraction.  The way the tool is

19   programmed, the product is actually designed to go after the

20   same data in both extraction types.  So when it's reported, it

21   can occur twice, if the same data was read in the logical

22   extraction as was read in the file system extraction.

23   Q.  And that doesn't necessarily mean that those messages were

24   sent twice or received twice?

25   A.  Correct.

1    Q.  All right.  I want to show you one last item, and this is

2    just for you, not for the jury.  This is what's been previously

3    marked as Exhibit 97.  And I'm going to pull it up on the

4    screen in front of you.

5             Without going into the content of that document, what

6    is it?

7    A.  It's a partial report.

8    Q.  And does that report show you -- well, is that a report

9    that was generated based on an extraction from the Samsung cell

10   phone?

11   A.  Yes.

12   Q.  Do you know whether or not that is a SMS text message or

13   some other type of message?

14   A.  It is a Telegram chat conversation.

15   Q.  And how do you know that?

16   A.  Because some of the -- some of the data on it is not just

17   the chat content, but the source of the information.  And the

18   information -- thank you -- the information came from a

19   database belonging to the Telegram messenger app.

20   Q.  All right.  Is this a fair and accurate depiction of the

21   extraction from the -- the Samsung cell phone?

22   A.  Yes.

23   Q.  And -- and based on this report, are you able to see

24   whether that message was sent or received from the cell phone?

25   A.  It indicates it was sent from the cell phone.

1    Q.  And does it indicate the user name of the person that sent

2    it?

3    A.  Yes, it does.

4          MR. BINFORD:  Your Honor, at this time I'd move to

5    admit Exhibit 97.

6          MS. WEIDNER:  Objection, Your Honor.  403.  And if the

7    Court would like to hear more, I'm happy to approach the

8    sidebar again.

9          THE COURT:  Overruled.  Exhibit 97 is admitted.

10          (Exhibit 97 is received into evidence.)

11   BY MR. BINFORD:

12   Q.  Now, who sent this message; what user name?

13   A.  The user name is Morpheus.

14   Q.  Okay.  And you mentioned this is Telegram.  Do you know

15   what Telegram is?

16   A.  Yes.

17   Q.  What is it?

18   A.  It is a chat application.

19   Q.  And does it have any specialized technology?

20   A.  Yes.  Some of the features of it are that it transmits the

21   communications in an encrypted fashion.  It allows for users to

22   set a self-destruct so that the message is erased after a

23   particular period of time.  And one of its features is also

24   that a user can have the software on multiple devices, and if

25   they're logged in with the same user name, it will synchronize

1    the conversation across all the devices.

2    Q.  Can you see who that message was sent to, the user name?

3    A.  Yes, I can.

4    Q.  What is that user name?

5    A.  The user name is Amideo, A-M-I-D-E-O.

6    Q.  And can you see what time and date that message was sent?

7    A.  Yes.

8           COURTROOM DEPUTY:  Counsel, do you want this

9    published?

10          MR. BINFORD:  Sure.  At this point, I'd move to

11   publish this -- oh.  No, I wouldn't.

12          May I have one moment, Your Honor?

13          THE COURT:  You may.

14                  (Pause in proceedings.)

15          MR. BINFORD:  At this point, I'm going to refrain from

16   publishing that exhibit, and I have no further questions for

17   this witness.

18          THE COURT:  All right.

19          Cross-examination?

20          MS. WEIDNER:  May I approach the lectern, Your Honor?

21          THE COURT:  Yes.  I think I have given generalized

22   permission for everybody to approach the lectern without asking

23   for permission.

24          MS. WEIDNER:  Thank you.

25          THE COURT:  It's only if you're going to approach the

1    witness, the jury, or the bench that you need to ask for

2    permission.

3              MS. WEIDNER:  And, Your Honor, may I ask a question

4    very quickly of opposing counsel?

5              THE COURT:  Sure.

6                        (Pause in proceedings.)

7                        CROSS-EXAMINATION

8    BY MS. WEIDNER:

9    Q.  Good afternoon, Agent Shadle.

10   A.  Good afternoon.

11   Q.  So you conducted the forensic exam of all of the seized

12   devices from the April 20th, 2017, search; correct?

13   A.  Yes.

14   Q.  And that was the search of Mr. Costanzo's home that

15   resulted in the recovery of those electronic devices?

16   A.  That's my understanding, yes.

17   Q.  And you produced a report?

18   A.  Yes.

19   Q.  And it's dated November 15th, 2017, I believe?

20   A.  Yes.

21   Q.  That report contains a run-through of all of the devices

22   that you extracted information from.

23   A.  Yes.

24   Q.  And each of those devices is numbered as a separate

25   exhibit?

1    A.   Correct.

2    Q.   And Exhibit Number 35 is a Dell laptop computer?

3    A.   Okay.

4    Q.   Would it -- I know -- I know this is a big report.  Would

5    it assist you in recalling this if I were to direct you to

6    Exhibit -- Government Exhibit 168?

7              MS. WEIDNER:  This would be just for the agent.

8              And, I guess, may I approach so I can give him the --

9              THE COURT:  Kathleen will get it for you.

10             MS. WEIDNER:  So may I approach to get the report and

11   a take it to the witness, Your Honor?

12             Oh, you'll take it to the witness.  Sorry.

13             THE COURT:  That's all right.

14             THE WITNESS:  Thank you.

15             COURTROOM DEPUTY:  You're welcome.

16   BY MS. WEIDNER:

17   Q.   So if I could direct, that is your forensic report, Agent

18   Shadle?

19   A.   Yes, it is.

20   Q.   And you'll notice that on the bottom right-hand corner,

21   there's a numeral, which is basically what we call a Bates

22   number.

23             Do you see that there?

24   A.   Yes, I do.

25   Q.   And the first one would be 4196?

1   A.   Okay.

2   Q.   So if I could direct you to 4923.

3           And if you moved down the first -- you see the first

4   exhibit that's listed in bold is Exhibit 31-3?

5   A.   I do see Exhibit 31-3.

6   Q.   And you move down to the next exhibit in bold, and that's

7   Exhibit 35?

8   A.   I don't think we have the same reports in front of us.

9   Mine shows Exhibit 32 as the next one.

10          MS. WEIDNER:  Well, in that case, I would move to

11  provide Agent Shadle with Defense Exhibit 348.

12          THE COURT:  Mr. Binford?

13          MR. BINFORD:  Your Honor, may I have a moment to speak

14  with defense counsel?

15          THE COURT:  Yes.

16               (Pause in proceedings.)

17          THE WITNESS:  Thank you.

18  BY MS. WEIDNER:

19  Q.   So Agent Shadle, on that report, if you could turn to

20  page 4923.

21  A.   In both reports I do see where Exhibit 35 is.

22  Q.   Yes.  And it lists Exhibit 35 was a Dell laptop computer?

23  A.   Yes.

24  Q.   And that in your exam -- your examination of the laptop,

25  you observed a number of files?

1   A.  That is correct.

2   Q.  And those files contained Bitcoin-related images, videos,

3   and documents?

4   A.  That is correct.

5   Q.  And if we could show Agent Shadle Defense Exhibit 336.

6            COURTROOM DEPUTY:  Might you need any other exhibits?

7            MS. WEIDNER:  Pardon me?

8            COURTROOM DEPUTY:  Might you need any other exhibits?

9            MS. WEIDNER:  That's the only one.

10           COURTROOM DEPUTY:  336?

11           MS. WEIDNER:  Yes, ma'am.

12           THE WITNESS:  Thank you.

13           COURTROOM DEPUTY:  You're welcome.

14  BY MS. WEIDNER:

15  Q.  Agent Shadle, do you see that -- that image?

16  A.  I do.

17  Q.  Do you recognize that image?

18  A.  It's hard to say in a vacuum, because I hadn't had a chance

19  to review this particular image.

20           When I extract the files from the computer, I also

21  extract file information, which lists the file name and where

22  it was found.  So without some reference tying it back to the

23  specific exhibit, that's why I say it's kind of hard to say.

24           MR. BINFORD:  Your Honor, we would stipulate to the

25  admission of Exhibit 336.

1            THE COURT:  Do you move the admission of 336?

2            MS. WEIDNER:  Yes, Your Honor.

3            THE COURT:  Admission -- or Exhibit 336 is admitted.

4               (Exhibit 336 is received into evidence.)

5            MS. WEIDNER:  Just a moment.

6                    (Pause in proceedings.)

7            MS. WEIDNER:  No further questions.

8            THE COURT:  Thank you.

9            Redirect?

10            MR. BINFORD:  I have no questions, Your Honor.

11            THE COURT:  You may step down.  Thank you.

12            THE WITNESS:  Thank you.

13            THE COURT:  Next witness?

14            MR. RESTAINO:  United States calls Special Agent Tom

15      Klepper, Your Honor.

16            THE COURT:  Come forward, Agent Klepper, please.

17         (THOMAS KLEPPER, Government's witness, is sworn.)

18                    DIRECT EXAMINATION

19      BY MR. RESTAINO:

20      Q.  Good afternoon, Agent Klepper.

21      A.  Good afternoon.

22      Q.  Please introduce yourself to the jury.

23      A.  My name is Tom Klepper.  I'm a Special Agent with IRS,

24      Criminal Investigation Division.

25      Q.  And what was your role in the investigation of this case?

1   A.  I was an undercover agent, and I met with the defendant.

2   Q.  Did you -- did you go to college before being an IRS CI

3   agent, Agent Klepper?

4   A.  Yes, I went to ASU.

5   Q.  And what was your degree in?

6   A.  Accounting.

7   Q.  Are you a C --

8   A.  Accountancy.

9   Q.  Pardon?

10  A.  It's officially accountancy.

11  Q.  And after receiving your accountancy degree, did you get a

12  CPA certificate as well?

13  A.  Yes, I did.

14  Q.  What does that entail?

15  A.  That entails a large test.  Once you pass that, then you

16  have to take continuing professional education every two years

17  to keep up your certification.

18  Q.  And did you have any experience in accountancy in the

19  private sector before you joined IRS?

20  A.  Yes.  Briefly.

21  Q.  What did you do?

22  A.  I worked at a bank as internal auditor.

23  Q.  For how long have you been with Internal Revenue Service

24  criminal investigations?

25  A.  Since 1995.

1    Q.   Where have you worked for IRS CI in that time?

2    A.   My entire career has been here in Phoenix.

3    Q.   And to what type of work are you currently assigned?

4    A.   I'm assigned to undercover work.

5    Q.   For how long have you been assigned to undercover work?

6    A.   Since 2013.

7    Q.   Prior to that, what was your role with IRS CI?

8    A.   I worked criminal investigations as a case agent.

9    Q.   What types of cases were those?

10   A.   Tax cases, money laundering cases, fraud cases,

11   white-collar type crimes.

12   Q.   And now, in the role as an undercover officer, what does

13   that mean?

14   A.   That means I help out other people on their cases, and I

15   get involved in an undercover capacity when it's needed.

16   Q.   Did you have any training to be an undercover agent?

17   A.   Yes, I did.

18   Q.   What did that training generally involve?

19   A.   That generally involved three weeks of rather intense

20   scenario-based training.

21   Q.   Now, have you had experience in undercover operations

22   involving virtual currency?

23   A.   Yes, I have.

24   Q.   This case is one of them; right?

25   A.   It's one of them, yes.

1  Q.  Did you have to educate yourself about virtual currency

2  prying -- prior to engaging in those undercover operations?

3  A.  Oh, yes.  Yeah.

4  Q.  How did you go about doing that?

5  A.  A lot of it, honestly, was trial and error.  When we got

6  involved in this, it was relatively new, so it involved a lot

7  of research, and it is primarily research.

8  Q.  Have you had the opportunity in your capacity as an

9  undercover agent to train other agents about virtual currency?

10 A.  I have.

11 Q.  And how have you done that?

12 A.  We've done that in numerous ways:  Face-to-face trainings,

13 electronic media-type trainings.  A number of different ways.

14 Q.  Did you also have the opportunity to participate in a video

15 that showed two cell phones engaged in a transaction?

16 A.  Yeah, I was one of those two cell phones in that video.

17 Q.  Now, as part of this investigation, did you contact a man

18 named Thomas Costanzo?

19 A.  Yes, I did.

20 Q.  Do you recognize him in the courtroom today?

21 A.  Yes, I do.

22 Q.  Can you describe where he's sitting and what he's wearing?

23 A.  He's sitting to the table to your right in the dark suit

24 and dark hair, glasses.

25         MR. RESTAINO:  Your Honor, if the record may reflect

```
 1        the identification of the defendant.
 2               THE COURT:  Yes.
 3   BY MR. RESTAINO:
 4   Q.  When was your contact with the defendant?
 5   A.  I met with him face-to-face October 7th, 2015, and I had
 6   some electronic text communications with him prior to that.
 7   Q.  What was your cover story when you reached out to him?
 8   A.  Well, I didn't explain all this right up front, but the
 9   cover story, in general, built into the investigation was that
10   I was a heroin wholesaler, bought heroin here, sold it to an
11   associate in New York, another undercover agent.
12   Q.  Do you know Sergei Kushner?
13   A.  Yes.
14   Q.  Who is he?
15   A.  He is the other undercover agent in this case that -- he
16   was the one that, in our cover story, that I would have
17   purchased heroin here and sold it to him in New York.
18   Q.  Step one then.  How did you make contact with the defendant
19   in your role?
20   A.  Through text messaging.
21   Q.  Were you able to save your text messages to and from the
22   defendant?
23   A.  Yes, I was.
24   Q.  Let me ask you to take a look at Exhibit 124, which we'll
25   put up on the screen just in front of you.
```

1            Are you able to recognize this document?

2   A.   Yes, this is the document of the text messages that I had

3   with the defendant that I pulled off my cell phone.

4   Q.   Where was it saved?

5   A.   It was saved on my cell phone device.

6   Q.   And is it in substantially the same condition now as it was

7   in October 2015?

8   A.   Yes.

9            MR. RESTAINO:  Your Honor, at this time we would move

10  the admission of Exhibit 124 into evidence.

11           MR. CAIN:  No objection.

12           THE COURT:  Exhibit 124 is admitted.

13             (Exhibit 124 is received into evidence.)

14           MR. RESTAINO:  And if we may publish, Your Honor.

15           THE COURT:  You may.

16  BY MR. RESTAINO:

17  Q.   So taking a look at the top of this, what is the date of

18  this?

19  A.   The date is October 5th, 2015.

20  Q.   And that's how long before your face-to-face meeting?

21  A.   Two days prior.

22  Q.   And what are you trying to do in your first entry?

23  A.   I'm trying to introduce myself to him.

24  Q.   What do you call him?

25  A.   What do I call the defendant?

1    Q.  Correct.

2    A.  I call him "Tom."

3    Q.  And how did you come to know the defendant in this

4    investigation?

5    A.  I came to know him as Thomas Costanzo.

6    Q.  Okay.  Were there other names that are used?

7    A.  Yes, he was -- he used the handle "Morpheus Titania," I

8    believe it was, on localbitcoins.com.

9    Q.  And in fact, how would -- how would that entry in yellow

10   that says "Morpheus" have come to be entered on this text

11   message chain?

12   A.  I put his contact information in my covert cell phone.  His

13   phone number I associated with the name Morpheus.

14   Q.  So what was the defendant's response to your invitation?

15   A.  He said:  Do you know about Telegram app for texting?

16   Let's use that.  Okay?

17   Q.  As it turns out, do you know about Telegram?

18   A.  I do.

19   Q.  What is Telegram?

20   A.  It's a smartphone app that allows you to text back and

21   forth with other individuals, and the texts are encrypted.

22   Q.  What does it mean for those texts to be encrypted?

23   A.  It means if anyone were to intercept those texts between

24   the two users, the person intercepting the text wouldn't be

25   able to read it.

1   Q.  Is one -- were you able to save your texts sent on the

2   Telegram app?

3   A.  Was able to save them?  I recreated them in that I typed

4   those texts from the -- from my cell phone onto a Word

5   document.

6   Q.  Let me try and ask my question a different way.

7           You said no one could intercept the communication.

8   Could someone get it from your cell phone?

9   A.  So.  I understand.  Yes.  Absolutely.

10  Q.  Could they get it, do you think, from the cell phone of the

11  person you're sending the message to?

12  A.  Yes.

13  Q.  What is the protection then; at what point in the chain?

14  A.  When it's sent, is my understanding.  Is -- when it's in

15  the air, going from myself to the defendant, it's encrypted

16  while it travels.

17  Q.  Thank you.

18          And were you, in fact, able to then communicate with

19  the defendant via this Telegram app?

20  A.  Yes, I was.

21  Q.  If I can -- if we can unpublish so I can show Exhibit 125

22  just to the witness.

23          Taking a look at what's been marked Exhibit 125, what

24  is this document?

25  A.  This is a document that I created that I alluded to

1    earlier.  This is verbatim what came off the Telegram --

2    Telegram app that was on my cell phone.

3    Q.  Where was it saved?

4    A.  It was saved on the app in the -- in the smartphone.

5    Q.  Is there a reason it doesn't look like the bubble text in

6    Exhibit 124?

7    A.  Yeah.  It -- at the time I didn't know how to pull it off

8    my cell phone in the same way, so I put the cell phone next to

9    my computer and typed it directly from the cell phone.

10   Q.  So other than the formatting, is Exhibit 125 in

11   substantially the same condition as when it was saved to your

12   cell phone back in October of 2015?

13   A.  Yes.  Everything after the identifier -- there's a date, a

14   time, an identifier, and then a colon.  Everything after that

15   colon is exactly what appeared on the Telegram app.

16          MR. RESTAINO:  Your Honor, at this time the Government

17   would move for the admission of Exhibit 125 into evidence.

18          MR. CAIN:  Objection.  Not best evidence.

19          THE COURT:  Overruled.  The exhibit is admitted.

20             (Exhibit 125 is received into evidence.)

21          MR. RESTAINO:  May I publish, as well, Your Honor?

22          THE COURT:  You may.

23   BY MR. RESTAINO:

24   Q.  So up on the screen in front of you, you have the first

25   page of Exhibit 124, on the right side of screen, and then 125

1    on the left side of the screen.

2            Do you see that?

3    A.  Yes, I do.

4    Q.  And so moving on October the 5th onto the left side of the

5    screen, what was the discussion there on the encrypted Telegram

6    app?

7    A.  I started the text, and I said:  Tom, Sergei's partner

8    here.  How does your Wednesday early late afternoon look?  And

9    then I signed it Tom.

10           He responded and said:  What time are you thinking?

11           And I then answered and said:  Around 12:30 or

12   1:00 p.m.

13   Q.  All right.  And then let's move on to the next day on the

14   Telegram app.  October 6th.  What happens there?

15   A.  The next afternoon, I hadn't heard from him yet so I

16   reached back out, and I said:  Does this work for you?

17           And he responded and said:  That's great.  Where are

18   you thinking to meet at?

19           And I responded and said:  Around 17 and Happy Valley.

20   Do you know a good spot around there?

21   Q.  So the actual location of the meeting was sent on the

22   encrypted channel rather than the public channel; correct?

23   A.  That's correct.

24   Q.  Now, let's go back to the right side and talk about the

25   public communication on October 7th.

1              You're able to see that?

2    A.  Yes, I am.

3    Q.  It says:  Gonna meet your boy today.

4              Do you see that?

5    A.  Yes, I do.

6    Q.  Who did you intend to send that to?

7    A.  I intended to send that to Sergei.  I inadvertently sent it

8    to the defendant.

9    Q.  How did you feel when you realized what you had done?

10   A.  I felt rather silly.  That was a mistake.  That's not what

11   I intended to do.

12   Q.  What did you -- what did you do next then?

13   A.  I texted him and said:  Disregard.  Meant for someone else.

14   Q.  In the remainder of your interaction with the defendant,

15   did he ever raise this inadvertent text again?

16   A.  No, he didn't.

17   Q.  Now, back to the encrypted side again on the left, on

18   October 7th, this is the day of the meet; correct?

19   A.  That's correct.

20   Q.  So what's the intent of your discussion here?

21   A.  We're discussing logistics of the meeting.  We're talking

22   about how much the transaction is going to be for from a value

23   standpoint, and time and location.

24   Q.  So let's take that in order.

25              The first question from the defendant was, "How much

1   we doing?"  Correct?

2   A.  That's correct?

3   Q.  What did you take that to mean?

4   A.  How much value are we trading here?

5   Q.  And how did you respond?

6   A.  I responded initially "10."  And then I followed that up

7   with "10K," meaning 10,000 U.S. dollars, was the "10" there.

8   Q.  And here where it says SA followed by a four digit number,

9   who is that?

10  A.  That's me.

11  Q.  Okay.  As it turns out, was 10 -- sorry -- what do you mean

12  by "10K"?

13  A.  $10,000.

14  Q.  And as it turns out, was $10,000 the amount that you wound

15  up transacting on that day?

16  A.  No, it wasn't.

17  Q.  What did you find up transacting?

18  A.  13,000.

19  Q.  And how did it go from 10,000 to 13,000?

20  A.  When I met with him face-to-face, I asked him if he could

21  increase the amount to 15,000.  And he said:  I don't know.

22  Let me see.  Essentially.  Looked at his phone and said:  No,

23  but I can do 13 right now.

24  Q.  Was that a plan you had going into that meeting?

25  A.  Yes.

1   Q.  Why?

2   A.  We wanted to -- the case agents wanted to see how much

3   Bitcoin he had, so we were going to see how much we could get

4   him to do and see what he had on him.  And then try to tap him

5   on it, essentially use all the Bitcoin he had, so that he could

6   be surveilled and see where he went after that.

7   Q.  What was the point -- what was going to be the point of

8   that surveillance; what did you want to find out?

9   A.  It would show where he would replenish his Bitcoins from.

10  If -- if I tapped all his Bitcoins out by increasing the

11  volume, then where he went next might be indicative of where he

12  was going to refill.

13  Q.  And below the yellow highlights then, there's a further --

14  is there a further refinement of the location of the meeting?

15  A.  Yes.  I said:  How about a Starbucks or something like

16  that?

17          And he responded:  Sure.  What location and time?

18          I said:  Let's do 10:00 p.m.  Let me get an address.

19  Hold on.

20          And then he responded:  Ask 265.84.

21  Q.  Let me stop you there.

22          Can you repeat the time that you said you would meet

23  him?

24  A.  1:00 p.m.  One o'clock p.m.

25  Q.  And is that what you recollect, this was an afternoon

1   meeting then?

2   A.  Yes, it was.

3   Q.  All right.  And once the address was settled then, what

4   does "ask 265.84" mean to you?

5   A.  I took that to mean that was the -- the price that he was

6   charging per Bitcoin, because I was taking cash to the deal and

7   buying Bitcoin from him.  And that was his price.

8   Q.  And finally, were you able to -- were you able to get a

9   description of what the person you were going to meet look

10  like?

11  A.  Yes.  If you -- you drop down to the bottom there at

12  1:01 p.m. -- well, to back up, I texted him about 30 minutes

13  prior to that and said I am running a little late, about 10

14  minutes.

15          And he responded and just said:  NP.  I am gray shirt,

16  shades.

17          I took that to mean:  No problem.  I'm wearing a gray

18  shirt and sunglasses.

19          MR. RESTAINO:  And if I could unpublish then.

20          THE COURT:  Mr. Restaino, we're looking -- about five

21  minutes to closing down.  If you have a good ending spot

22  anywhere between now and then, that would be --

23          MR. RESTAINO:  This is pretty good now, Judge.

24          THE COURT:  All right.

25          Ladies and gentlemen of the jury, we're ending for the

```
 1    day.  We appreciate your attention.
 2            Please remember the admonitions:  Don't discuss this
 3    case with anyone, including among yourselves.
 4            Travel home safely.  Come back tomorrow same time, and
 5    remember that tomorrow is the last day.  We will be having
 6    trial next week, and then it's not until next Tuesday.  We look
 7    forward to seeing you tomorrow morning.
 8            Thank you.
 9            COURTROOM DEPUTY:  All rise.
10            JUROR 1:  9:00 a.m?
11            COURTROOM DEPUTY:  9:00; correct, Judge?
12            THE COURT:  I'm sorry?
13            COURTROOM DEPUTY:  9:00 a.m.?
14            THE COURT:  Yes, 9:00 a.m.
15               (Jury leaves the courtroom at 4:55 p.m.)
16            THE COURT:  Anything?
17            MR. RESTAINO:  Few matters on exhibits, Judge.
18            THE COURT:  All right.
19            MR. RESTAINO:  The two easy ones are just for the
20    record, so --
21            THE COURT:  You may step down.
22            THE WITNESS:  Thank you.
23            MR. RESTAINO:  Exhibit 12 was shown to the jury in
24    redacted form at the request of the defense, and so we will
25    endeavor to print out a new version of that for the binders, as
```

```
 1    well as the original.
 2              I think that Exhibit 122, which was just admitted, the
 3    text string with the angry putative wife, needs to be redacted
 4    to get the snark factor out.  We will do that from our end,
 5    share that with the defense, and endeavor to replace both in
 6    our database and on the binders.
 7              THE COURT:  That's fine.  Just make sure we have the
 8    stipulation of the defense that they've seen the exhibit
 9    replacement and they stipulate to it.
10              MR. RESTAINO:  We will do that, Your Honor.
11              I have 97, I just wanted to explain a little bit more,
12    which was the one that was discussed --
13              THE COURT:  Yes, yes.  I remember which 97 is.
14              MR. RESTAINO:  So -- so, Judge, you had a concern
15    yesterday on that with the motions in limine.  It may be that
16    Mr. Binford in his eloquence completely ameliorated your
17    foundational concern on that.  But I did want to ensure that
18    the defense had an opportunity to raise any objections before
19    it was actually shown to the jury.
20              MS. WEIDNER:  Your Honor, the defense's concern with
21    Exhibit 97 -- and I guess I didn't want to give -- launch into
22    an entire speaking objection -- is that unlike exhibits that
23    Court ruled should be admitted because, you know, the otherwise
24    potentially hearsay statements of third parties were okay in
25    that they contextualize Mr. Costanzo's statements.
```

1          Here we have a statement in a vacuum, and the 403

2     concern that -- that we had, even though it does appear to be a

3     statement from Morpheus and, therefore, not hearsay, is that it

4     is devoid of context.  There is no real way to tell what that

5     floating statement is all about.

6          And for that reason, I think it's potentially

7     confusing.  It could be misleading.  It definitely doesn't

8     explain itself, and there is nothing that the government has

9     offered yet that would explain it.

10         THE COURT:  Well, I may be overly technical, but I

11    tend to rule based on the objections that were offered.  I'm

12    not sure that what the defense says doesn't have purchase with

13    me, but it wasn't the objection they raised at the time the

14    exhibit was admitted into evidence.

15         I'm not sure that there's a whole lot here one way or

16    the other, but it is a statement of the defendant.  I think

17    that you -- that the witness established that it's a statement

18    of the defendant, and maybe I'm -- maybe I misunderstood your

19    objection at the time, Ms. Weidner, but I don't think it was

20    relevance.

21         MS. WEIDNER:  Your Honor, it wasn't.  It was 403.  And

22    it was 403 based on the notion that it was confusing because

23    they had no context.

24         THE COURT:  How are you going to seek to introduce

25    this, and for what purpose, Mr. Restaino?

UNITED STATES DISTRICT COURT

1          MR. RESTAINO:  Well, I think, A, Judge, that's one

2    reason for not showing it to the jury today.  I think it likely

3    comes in through Agent Martin.  I think we will be able to tie

4    this up through Task Officer Martin as he discusses both the

5    undercover deals he did and the remainder of his investigations

6    as the case agent.  So we would like to try.

7          THE COURT:  Well, thank you.  Thank you for raising

8    it.  You can try.  But it does seem to me -- it is a statement

9    of the defendant, so it's not hearsay, but it is untethered,

10   and I'm not sure that it means anything, and I'm not sure that

11   Agent Martin can offer testimony that will provide any.  But I

12   can't -- can't say that he won't.  I haven't heard what he'll

13   say.  So we'll deal with it when we deal with it.

14         MR. RESTAINO:  Great.  Thank you, Your Honor.

15         THE COURT:  Anything else?

16         MS. WEIDNER:  Your Honor, I'd just like to ask a quick

17   question about speaking objections.  I -- I did not want to

18   elaborate on my --

19         THE COURT:  No, you're right, and I probably should

20   have given you a sidebar.  I just -- and I hope you won't take

21   any personal offense -- I just don't like sidebars because they

22   disrupt the trial a lot.  And I had felt like we had had enough

23   today, and I guess I thought I understood your 403 objection.

24   And now that you say what it was, I realize that really it was

25   probably an appropriate objection.  I was just thinking of it

```
1    in a different way.
2              MS. WEIDNER:  I understand.
3              THE COURT:  Let me raise one other issue that has --
4    that has just been brought to my attention by the United States
5    marshals.
6              You will remember yesterday I discussed with two --
7    the two men who were wearing Google Jury Nullification -- one
8    of them was here until a few minutes ago and has left -- Jury
9    Nullification, and indicated to them that they shouldn't be
10   attempting to make communications to the jury.
11             I've received a report from the marshals today that
12   the two of them were observed talking out loud about the case
13   at the break while the jury was milling around.
14             Does either party want me to take any action with
15   respect to that, with respect to the jurors and/or with respect
16   to those two men?
17             MR. RESTAINO:  Judge, we were sort of more generally
18   aware of that issue and elected not to bring it to the Court's
19   attention, because what we had heard was similar to what the
20   Court has announced.  They were speaking loudly in the hallway
21   rather than approaching jurors to speak directly with jurors.
22   So we were not able to come up with a particularly helpful way
23   to suggest to the Court.
24             I will say, we have additional anecdotal evidence
25   suggesting that they were speaking loudly at -- on an outside
```

1    table at Crazy Jim's as jurors were walking by, but I'm not

2    sure that we can really do anything about that either.

3            THE COURT:  Yeah, it strikes me that that -- I mean,

4    I -- I do not want to have any participants in this trial

5    trying to influence the jury.  And if I have better evidence

6    that they are, I will do something.  But, of course, as

7    everybody recognizes, they have the right as members of the

8    public to be here.

9            I think what I will do, I would propose to the parties

10   doing and see if you have any objections, is just repeat to the

11   jurors before the break tomorrow, or maybe first thing in the

12   morning, that if they're out and about and they hear anybody

13   discussing the case, they should not listen to it, they should

14   move away.  If they feel like anyone is trying to discuss the

15   case in a way that they hear and have concerns about it, they

16   should raise it with the Court.

17           Does either party have any objection to that?

18           MR. RESTAINO:  No objection from the government, Your

19   Honor.

20           MS. WEIDNER:  No objection from the defense.  We would

21   just ask the Court to also just include -- and I think that

22   this is appropriate, given the kind of media coverage, even

23   though nobody in the jury pool had heard of it before, that

24   this case has already had, it -- to include in that, you know,

25   and if you see something in the media --

1          THE COURT:  Yeah.

2          MS. WEIDNER:  -- and --

3          THE COURT:  If you want to write something up and you

4   can stipulate to it, I'll read it.  Otherwise, I'll just say

5   that generally.  I don't think it's inappropriate to include

6   the media at all.

7          Was there something else you wanted me to include,

8   other than the media?

9          MS. WEIDNER:  No.

10          THE COURT:  Okay.

11          All right.  See you tomorrow morning.

12              (Proceedings in recess at 5:05 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3          I, CHARLOTTE A. POWERS, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 16th day of May, 2018.

13

14                     s/Charlotte A. Powers
                    Charlotte A. Powers, RMR, FCRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT