UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 22, 2018 |
| Thomas Mario Costanzo, | ) | 9:08 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRAIL – DAY 3

(Pages 427 – 645)

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                        A P P E A R A N C E S

 2

 3    For the Government:

 4                 U.S. Attorney's Office
                   By: GARY M. RESTAINO, ESQ.
 5                      MATTHEW H. BINFORD, ESQ.
                        FERNANDA CAROLINE ESCALANTE KONTI, ESQ.
 6                 40 North Central Avenue, Suite 1200
                   Phoenix, AZ  85004
 7
      For the Defendant Thomas Mario Costanzo:
 8
                   Federal Public Defenders Office - Phoenix
 9                 By: MARIA TERESA WEIDNER, ESQ.
                        ZACHARY D. CAIN, ESQ.
10                 850 W. Adams Street, Suite 201
                   Phoenix, AZ  85007
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2
        SUMMARY OF COURT PROCEEDINGS                      PAGE:
 3

 4      Discussion re exhibits                            479

 5      Discussion at sidebar                             540

 6      Discussion at sidebar                             540

 7      Discussion at sidebar                             568

 8      Discussion re hearsay objection                   584

 9      Discussion at sidebar                             611

10      Discussion at sidebar                             631

11      Jury in recess                                    641

12      Discussion re jury instructions                   641

13      Court in recess                                   644

14


15                        INDEX OF WITNESSES

16      WITNESSES FOR THE       Direct    Cross   Redirect
        GOVERNMENT:
17

18      Thomas Klepper (cont'd) 432        459

19      Nolan Sperling          467        513      543

20      Aric Manore             559        571

21      Schuyler Kenney         573        588

22      Chad Martin             593

23

24

25
```

UNITED STATES DISTRICT COURT

INDEX OF EXHIBITS

EXHIBIT NO.:          DESCRIPTION:                    RECEIVED:

EX. 21    Surveillance Photo 12/14/16 -         579
          Bicycle and Phone

EX. 22    Surveillance Photo - 12/14/16 -       579
          Bicycle

EX. 23    Surveillance Photo 12/41/16 -         581
          Table McDonald's

EX. 24    Costanzo Bitcoin Meet-up Public       603

EX. 28    9/7/16 Morpheus Titania               616
          Information and Confirmed
          Transactions on LocalBitcoins.com

EX. 37    10/7/15 Trade Confirmation            455

EX. 38    Costanzo Phone Photo 10/7/15          451

EX. 41    Photo of UC Money for 9/14/16         624
          with UC3

EX. 43    9/14/16 Text Messages with            621
          Morpheus

EX. 73    11/17/16 Who Is Morpheus Titania      619
          (Redacted Ex. 26)

EX. 74    9/7/16 Morpheus Titania               606
          LocalBitcoins Sale Profile
          (Redacted Ex 27)

EX. 105   Audio Transaction 5  9/14/16          625
          (Clips A through Q)

EX. 320   Sperling Plea Agreement 11/27/17      528

EX. 321   Sperling Deferred Sentencing          534
          Cooperation Addendum 11/27/17

EX. 362   Photo - Costanzo and UC Martin        571

UNITED STATES DISTRICT COURT

1                     **INDEX OF EXHIBITS**

2

  **EXHIBIT NO.:**        **DESCRIPTION:**            **RECEIVED:**

3

4    EX. 363  **Photo – Exterior Costanzo**      593
           **apartment**

5

   EX. 364  **Photo – Costanzo on bicycle**    593

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                    P R O C E E D I N G S

 2             (Jury enters the courtroom at 9:08 a.m.)

 3              (Proceedings resume at 9:09 a.m.)

 4         THE COURT:  Good morning.

 5         Thank you for being here.

 6         Hope you had a pleasant evening.

 7         Please be seated.

 8         Ready to resume?

 9         MR. RESTAINO:  Yes, Your Honor.

10         THE COURT:  Please do so.

11          (THOMAS KLEPPER resumes the witness stand.)

12              DIRECT EXAMINATION (continued)

13    BY MR. RESTAINO:

14    Q.  Good morning, Agent Klepper.

15    A.  Good morning.

16    Q.  Do you recollect that yesterday when we left off, you were

17    talking about setting up a meeting for October 7th, 2015, with

18    the defendant?

19    A.  Yes.

20    Q.  And did that meeting take place?

21    A.  Yes, it did.

22    Q.  So let's talk about what happened on October 7th, 2015.

23          What time was the meeting for?

24    A.  It was an afternoon meeting around one o'clock.

25    Q.  And you had settled on a meeting where?
```

THOMAS KLEPPER - DIRECT EXAMINATION

1   A.  At the Starbucks at I-17 and Happy Valley.

2   Q.  And so when did you arrive?

3   A.  I arrived a few minutes after one o'clock.

4   Q.  And what were you wearing?

5   A.  I was probably -- I don't remember exactly, but I would

6   have gone to a meeting like this dressed in blue jeans and

7   probably a Polo shirt or something of that sort.

8   Q.  You -- you weren't wearing the suit you're wearing now, for

9   example?

10  A.  No, I was not.

11  Q.  And where -- did you -- did you get there first?

12  A.  I don't believe so.

13      I think the defendant was there before I was.

14  Q.  And where did you wind up sitting with him?

15  A.  We met briefly in the Starbucks, and then we moved down the

16  sidewalk and ended up sitting in front of the Café Rio

17  restaurant.

18  Q.  All right.

19      And where were each of you facing?

20  A.  I was sitting at a small table, facing the defendant.

21      I was facing the Café Rio; he was facing the parking

22  lot.  We were across from each other.

23  Q.  Were you able to record your conversation with the

24  defendant?

25  A.  Yes, I was.

```
 1    Q.  In general terms, how did you do so?

 2    A.  I had a covert recording device that I placed on the table.

 3    Q.  Okay.

 4            Did you also have a cell phone that you placed on the

 5    table?

 6    A.  Yes.

 7    Q.  So were both of those devices on the table?

 8    A.  Yes.

 9    Q.  Have you had an opportunity to listen to the recording?

10    A.  I have.

11    Q.  And does the recording fairly and accurately reflect your

12    conversation with the defendant?

13    A.  Yes, it does.

14    Q.  Now, is there also a video?

15    A.  Yes.  There is video.

16    Q.  Okay.  What does the video show most -- most of the time?

17    A.  Most of the time it shows the sky.

18    Q.  Were you able to get some video clips during the audio

19    presentation?

20    A.  Yes.  If I was to take the device and -- and lean it

21    towards the defendant at any point during our conversation, I

22    could pan across him and pick up his picture.

23            MR. RESTAINO:  Your Honor, at this time the government

24    moves to admit Exhibit 103, the audio clips A through K of the

25    October 7, 2015, transaction.
```

```
1              MR. CAIN:  No objection.

2              THE COURT:  All right.

3              I take it that you have a transcript attached to

4    these?

5              MR. RESTAINO:  We do, Your Honor.

6              THE COURT:  All right.

7              So ladies and gentlemen of the jury, you remember as

8    I've told you before, that when we listen -- thank you,

9    Kathleen.

10             COURTROOM DEPUTY:  You're welcome.

11             THE COURT:  -- that when you're listening to these

12   recordings, it is the recordings themselves that is the

13   evidence.

14             The parties have agreed to attach a transcript to

15   you -- for your convenience.  But if you hear something

16   different than what the transcript says, the recording is the

17   evidence; the transcript is not.

18             Okay?

19             MR. RESTAINO:  And if I may publish, Your Honor.

20             THE COURT:  You may.

21   BY MR. RESTAINO:

22   Q.  So we'll start with clip 103A, Agent Klepper.

23   A.  Okay.

24                   (Portion of audio played.)

25
```

UNITED STATES DISTRICT COURT

```
 1    BY MR. RESTAINO:
 2     Q.  Who is Sergei?
 3     A.  Sergei is the other undercover agent in this case, and
 4    Sergei had previously met with the defendant before my meeting.
 5                    (Portion of audio played.)
 6    BY MR. RESTAINO:
 7     Q.  What was the defendant's demeanor like during this part of
 8    the conversation?
 9     A.  He was just kind of like, ah, I don't want to know.
10            He was friendly, but I felt that he was making it
11    clear that he was trying to cut me off from going down that --
12    that road of the business that we were in.
13            He said:  Hey, hey, I don't want to know, I don't want
14    to know.
15                    (Portion of audio played.)
16            MR. BINFORD:  Now I'll move to clip 103B.
17                    (Portion of audio played.)
18    BY MR. RESTAINO:
19     Q.  So a couple questions for you on this clip.
20            First of all, the defendant references himself as a
21    "teacher."  Did you find his explanation of Bitcoin to be
22    generally accurate?
23     A.  Yes.
24     Q.  And what did you mean when you said that "moving it" around
25    is a lot safer?
```

1   A.   If you're in the drug business, which I had purported to

2   be, it would be much easier to move something of value in the

3   form of a virtual currency versus bulk cash.

4            If I were to sell drugs to Sergei and have a large

5   chunk of currency, I'd have to transport that back to Arizona,

6   or do something with it.

7            It takes up a lot of space, raises a lot of questions

8   if I'm found with a large amount of currency.

9            But if it's in the form of virtual currency like

10  Bitcoin, it would be on my cell phone and nobody would ever

11  know.

12  Q.   Great.

13            Let's move on to clip 103C.

14                      (Portion of audio played.)

15  BY MR. RESTAINO:

16  Q.   When assets are stored as Bitcoin, can that make your work

17  as a law enforcement officer more difficult?

18  A.   Yes.   If we're trying to trace financial transactions, it

19  absolutely could make it more difficult.

20            MR. BINFORD:   And I'll move on to clip 103D.

21                      (Portion of audio played.)

22  BY MR. RESTAINO:

23  Q.   To your understanding, what is a Trezor?

24  A.   A Trezor is a device.   It's similar to, like, a thumb

25  drive, would be one way to think about it, where you plug a

1    thumb drive into your computer so it's external to the

2    computer.  It's external to your phone, and it can hold virtual

3    currencies.  And you just plug it into your phone and you can

4    access it through your phone.

5    Q.  Also earlier in that conversation you talked about wallets.

6    Did you set up a wallet for this transaction?

7    A.  Yes, I did.

8    Q.  And how did you go about setting up a wallet?

9    A.  It's very simple.  You just go to the app store in Apple,

10   search for Bitcoin wallet, and you'll have dozens to choose

11   from.  You just download one, and it's available for use.

12   Q.  What type of personally identifying information did you

13   have to use to set up a wallet?

14   A.  On the cell phone?  None.

15   Q.  Did you have to provide your name, for example?

16   A.  No.

17   Q.  Any other personal information?

18   A.  No.

19   Q.  In your experience, can wallets easily be traced to the

20   owner of the wallet?

21   A.  If they're on a smartphone, no, they can't.  Not easily.

22                   (Portion of audiotape played.)

23   BY MR. RESTAINO:

24   Q.  And there's a discussion of Mycelium there.  What's your

25   understanding of Mycelium?

THOMAS KLEPPER – DIRECT EXAMINATION

1    A.  Mycelium is one of many Bitcoin wallets.  It's one of the

2    apps that you can download and use as a Bitcoin wallet.  That's

3    the name of it.

4    Q.  Are there other functions that you've used with Mycelium?

5    A.  I have not.  I am aware that Mycelium also has a chat

6    function embedded in it.

7    Q.  It's not anything you used in your transactions with the

8    defendant though?

9    A.  No.

10                    (Portion of audiotape played.)

11   BY MR. RESTAINO:

12   Q.  Just for clarity's sake, there is some noise in the

13   background.  What did that appear to be?

14   A.  It was a crying baby.  There were many people in the

15   background.  You'll hear that throughout.

16                    (Portion of audiotape played.)

17   BY MR. RESTAINO:

18   Q.  So what are "keys" that you're referring to here?

19   A.  Those would be the public and private keys that control the

20   Bitcoin wallet.

21                    (Portion of audiotape played.)

22   BY MR. RESTAINO:

23   Q.  Do you know what the 12 or 24 words are that the defendant

24   is referencing there?

25   A.  Yes.

1    Q.  What is that?

2    A.  When you set up a smartphone Bitcoin wallet, you set it up

3    and, like you asked me, you don't put any personal information

4    in there.  So one way that you can access that is whoever

5    physically is holding the phone when the wallet is set up will

6    see the app display a phrase of, say, 12 words in a specific

7    order.  And you can record that, write it down on a piece of

8    paper, or something to that effect.  And then if something

9    happens to your cell phone, it gets run over by a truck or

10   something, you could download the app again on a new cell phone

11   and use those 12 words or that phrase in that order as a pass

12   phrase, if you will, and then it would reload whatever Bitcoins

13   you had in that wallet onto your new phone.  It's just -- it's

14   essentially a password.

15                    (Portion of audiotape played.)

16   BY MR. RESTAINO:

17   Q.  So you mentioned here that you were using Coinbase for your

18   wallet.  Is that correct?

19   A.  Yeah.

20   Q.  And is that actually what you were using for an undercover

21   wallet?

22   A.  I also mentioned Breadwallet, and the Breadwallet is what I

23   used to actually do the transaction with then.

24   Q.  Have you used Coinbase, as well, as a wallet?

25   A.  Yeah.

THOMAS KLEPPER - DIRECT EXAMINATION

1    Q.  When one uses a wallet for Coinbase, do you know where that

2    Bitcoin is actually stored?

3    A.  I'm not sure I understand your question.

4    Q.  If you have a wallet from Coinbase, does Coinbase control

5    the Bitcoin, or does the wallet have the Bitcoin?

6    A.  Coinbase controls the Bitcoin.  They have the keys.

7                    (Portion of audiotape played.)

8    BY MR. RESTAINO:

9    Q.  In your experience, what -- what steps does the government

10   need to take before going into a bank account and taking money?

11   A.  Well, in a -- in a criminal investigation, if the

12   government can trace that funds in a specific bank account are

13   derived from a criminal activity, they can apply for a warrant

14   and get a judge's signature to go in and seize that bank

15   account -- or seize the money in that bank account.

16   Q.  And does it make it more difficult to seize funds when they

17   are held in virtual currency rather than cash or an account?

18   A.  Yes.  Especially if it's in a virtual currency wallet

19   that's set up on a small phone where you don't put any

20   identifying information in it.

21                    (Portion of audiotape played.)

22   BY MR. RESTAINO:

23   Q.  What happened there at the end?

24   A.  When he made the comment that the government can come in

25   and take your money and say "fuck you very much," he actually

1   made a gesture as a "fuck you very much."  And he was sitting

2   across from me.  So I think he was explaining, hey, I didn't

3   mean to flip you off.

4   Q.  What was his body language like during this ending portion

5   of that clip in talking about the government seizing money?

6   A.  You know, he was animated.  He was using his hands to talk,

7   and that sort of thing.

8   Q.  Because Coinbase came up in that clip, let me ask a few

9   more questions on that.  Let's say you actually made a purchase

10  through a commercial exchange like Coinbase.  Would you be able

11  to take the Bitcoin out of Coinbase's control and put it in a

12  wallet of your own choosing?

13  A.  Yes, you could do that.

14          MR. RESTAINO:  Let's go on to 103E.

15              (Portion of audiotape played.)

16  BY MR. RESTAINO:

17  Q.  So what was the defendant's demeanor like in this portion

18  of the conversation?

19  A.  He was, to use a term, he was geeked out.  He enjoyed this

20  stuff.  It was clear that this is something that he got into,

21  and he was excited to be able to explain it to somebody.

22  That's the way I felt.

23  Q.  Again, in -- in your experience at this part of the

24  conversation, was his recitation of Bitcoin generally accurate?

25  A.  Yes.

```
 1    Q.  Did he appear to have a sophisticated understanding of

 2    Bitcoin?

 3    A.  Yes, he did.

 4                    (Portion of audiotape played.)

 5    BY MR. RESTAINO:

 6    Q.  So you recognized that, from your familiarity with the

 7    recording, these clips of the longer audio are being played

 8    chronologically?

 9    A.  Yes.

10    Q.  So at this point, has there been any discussion of the

11    exchange of Bitcoin for cash?

12    A.  Between the defendant and I?  No.  We haven't gotten to

13    that point yet here in this discussion.

14              MR. RESTAINO:  We'll now go to 103F.

15                    (Portion of audiotape played.)

16              MR. RESTAINO:  Let me just keep going.

17                    (Portion of audiotape played.)

18    BY MR. RESTAINO:

19    Q.  So, how did the defendant react when you said it's

20    expensive?

21    A.  A little bit defensive.  He was, like, ah, I'm not -- I

22    felt like he was trying to say, I'm not that expensive.

23    Q.  Are his rates expensive?

24    A.  Yes.

25    Q.  What did he wind up charging you for your transaction as a
```

1    percentage?

2    A.  About 7 percent.

3    Q.  So let's take the $10,000 you started with.

4          How much would a purchaser pay the defendant on

5    $10,000 at that 7 percent rate?

6    A.  It would be a 700-dollar fee to do the transaction.

7    Q.  What about going to a commercial exchange like Coinbase;

8    what would you expect to be taken out of that transaction?

9    A.  Coinbase charges about a percentage-and-a-half.  So on a

10   $10,000 transaction, that would be about 150 instead of 700.

11                  (Portion of audiotape played.)

12             MR. RESTAINO:  And I'll move on to 103G.

13                  (Portion of audiotape played.)

14   BY MR. RESTAINO:

15   Q.  Do you think cash outside the banking system is as

16   difficult to trace as Bitcoin outside a commercial exchange?

17   A.  Yes.  It is -- yeah.  It's very, very difficult to trace.

18   Q.  Are there aspects that make Bitcoin more difficult to trace

19   than cash?

20   A.  Yes, especially because you don't have physical cash that

21   you have to transport.  At some point, cash outside the banking

22   system has to move around, and it's vulnerable when it's moving

23   around.  If it's in Bitcoin, it's in a cell phone, and it can

24   be sitting on the table here and you'd never -- I could have

25   $100,000 worth of Bitcoin in it, and you'd never know.

1                    (Portion of audiotape played.)

2    BY MR. RESTAINO:

3    Q.  Did the defendant ever get to know your full name?

4    A.  No.

5    Q.  Did he ever ask you for your full name?

6    A.  No.

7            MR. RESTAINO:  I will move on to 103H.

8                    (Portion of audiotape played.)

9    BY MR. RESTAINO:

10   Q.  Your voice seems to get lower here on the recording.  Why

11   is that?

12   A.  It's a technique used to -- to let the person that you're

13   talking to know that, hey, I'm -- I'm about to tell you

14   something that I don't want other people to overhear.  It's

15   common to lean in when -- when you do that, and it's kind of a

16   signal that, hey, we're going to talk business here.

17   Q.  How did the defendant react to that signal?

18   A.  I don't recall if he leaned in.  I don't believe he lowered

19   his voice either.  But he continued the conversation.

20   Q.  Did he continue to do the transaction with you?

21   A.  Yes.

22   Q.  And did he ever hesitate to sell you Bitcoin on that day?

23   A.  No.

24                   (Portion of audiotape played.)

25

UNITED STATES DISTRICT COURT

1    BY MR. RESTAINO:

2    Q.  Are purchases of trips and yachts something you've seen in

3    prior investigations you've worked?

4    A.  Oh, yeah.  I mean, people that earn money dispose of it in

5    a number of ways, and that's -- that's one way that they would

6    do it.

7                    (Portion of audiotape played.)

8    BY MR. RESTAINO:

9    Q.  Under your scenario, why couldn't you just go to a

10   commercial exchange to buy your Bitcoins?

11   A.  We could, but if we did that and we really were heroin

12   dealers, if we went to a commercial exchange like Coinbase,

13   we'd have to put -- you have to tell them your name, you have

14   to tell them your Social Security number, your address; you can

15   link bank accounts and credit cards to it.  Even have to take a

16   digital image of your driver's license and send it in to them

17   so they would know who you are.  And that -- one of the

18   beautiful things about Bitcoin is that if it's in a smartphone

19   wallet and you have possession of that wallet, they're your

20   coins.  But if law enforcement figures out that those coins in

21   that wallet were from some fraudulent activity, they still

22   can't tie that wallet to the person holding it.

23          If I went to Coinbase and set up that wallet through

24   Coinbase, they can drop a subpoena on Coinbase and figure out

25   whose account it was.

1    Q.  All right.  We'll move on.

2                    (Portion of audiotape played.)

3    BY MR. RESTAINO:

4    Q.  Did the defendant at any time say "I'm out" during this

5    discussion?

6    A.  He did not.

7                    (Portion of audiotape played.)

8    BY MR. RESTAINO:

9    Q.  So there's talk of a burner there.  What's a "burner"?

10   A.  A burner phone.  It would be a throw-away phone, if you

11   will.  Generally it's something you'd buy at Walmart and you'd

12   buy a card with minutes, and you'd load that card up and then

13   you could use that phone until you didn't want to use it

14   anymore, throw it away.

15   Q.  And Telegram there refers to Exhibit 25 that we looked

16   at -- Exhibit 125 that we looked at yesterday?

17   A.  Yes.  That's the encrypted chat application on smartphone.

18                    (Portion of audiotape played.)

19   BY MR. RESTAINO:

20   Q.  You talk here about getting the confirmation in.  How --

21   what does that process involve?

22   A.  When we do a transaction, like when the defendant sent me

23   Bitcoins on my phone, you have to wait a certain amount of time

24   while the Blockchain is -- is crunching the numbers and -- and

25   running their algorithms, and they are confirming all the coins

1   in that -- that block.  And that takes some time.  And once all

2   those coins are confirmed, you get a notification on your phone

3   that says, okay, they've been confirmed, and then it will get

4   confirmed a second, third, fourth, and fifth time.  And you get

5   notations of that each time.  So it would be a security for me,

6   if I had handed him cash, which I did, and he sent me Bitcoins,

7   if he'd gotten up and walked away at that point, I wouldn't

8   know for sure that I'd gotten my Bitcoins.

9           I would have to wait that amount of time until my

10  phone told me, yes, this transaction has been confirmed and you

11  have the Bitcoins.

12                  (Portion of audiotape played.)

13  BY MR. RESTAINO:

14  Q.  Do you recollect talking about upping the amount yesterday?

15  A.  Yes.

16  Q.  And -- and is this the portion of the conversation where

17  you did that?

18  A.  Yeah.

19           This is the first time I had mentioned that I wanted

20  to do more than the 10 we had originally set up.

21                  (Portion of audiotape played.)

22  BY MR. RESTAINO:

23  Q.  So were you ever able to do more than the original $10,000?

24  A.  Yes.

25  Q.  How much were you able to transact?

1   A.   13,000.

2   Q.   Did you ever wind up meeting with him to do the additional

3   $2,000?

4   A.   No.

5   Q.   Why not?

6   A.   I talked to the case agents after the meeting and said:  Do

7   you want me to still meet with him?  And the decision --

8   decision was made, no, we don't need to have that meeting.

9   Q.   Did he seem to you interested in doing more that evening at

10   this point?

11   A.   He was certainly willing to.

12   Q.   So how many Bitcoins did you eventually get for that

13   $13,000?

14   A.   It was about 48.9.

15   Q.   And how many transactions did that come to you in?

16   A.   It was two transactions.

17   Q.   For what?

18   A.   One was 40 Bitcoins, 40.0, and the other was 8.9 something

19   cents, but it was about 8.9.  Not "cents."  Bitcoin, rather.

20   Q.   I'm sorry?

21   A.   I said 8.9 "cents."  It wasn't cents.  It was Bitcoins.

22             MR. RESTAINO:  I'll move on to 103I.

23                 (Portion of audiotape played.)

24   BY MR. RESTAINO:

25   Q.   What's happening here in this part of conversation?

THOMAS KLEPPER – DIRECT EXAMINATION

```
 1    A.  I'm getting ready to hand him the cash.

 2                  (Portion of audiotape played.)

 3    BY MR. RESTAINO:

 4    Q.  So can you describe the way in which the money was

 5    organized?

 6    A.  Yeah.  I had the money bundled in rubber band --

 7    rubber-banded in three groups of 5,000 apiece.  I took 15 to

 8    the meeting.  So I was handing him two bundles of money and

 9    telling him that each of these is 5,000 apiece.

10    Q.  And then what did you have to do for the third chunk of

11    5,000?

12    A.  While he was counting the 10,000 I gave him, I took my

13    third bundle of 5,000, broke it apart, and counted out 3,000 to

14    give to him later.

15                  (Portion of audiotape played.)

16    BY MR. RESTAINO:

17    Q.  Now, shortly after this money exchange, did you notice the

18    presence of someone else nearby you?

19    A.  I did.

20    Q.  What did you see?

21    A.  Well, as I had described, I was sitting across from the

22    defendant, and he had his back to the Café Rio restaurant.  And

23    there was a glass window to his back, and I could see the

24    reflection in that window.  So I saw a police officer in a

25    police uniform walking up, approaching the restaurant.  And I
```

UNITED STATES DISTRICT COURT

THOMAS KLEPPER - DIRECT EXAMINATION

1    could see that in the window.

2    Q.  Great.

3         MR. BINFORD:  Let me ask to unpublish at this point,

4    and then I'll show on the witness screen digitally Exhibit 38.

5    BY MR. RESTAINO:

6    Q.  Taking a look at Exhibit 38 on the screen in front of you,

7    what is this?

8    A.  This is a -- a scene capture from that video that I had

9    mentioned that I had taken with the recording device.  I tipped

10   it up at that point to get a picture of the defendant, and

11   that's -- that's the defendant while he's talking to me.

12   Q.  Does this still photograph of the video fairly and

13   accurately represent where you and Mr. Costanzo were sitting on

14   that day?

15   A.  Yes, it does.

16        MR. RESTAINO:  Your Honor, at this time we'd move the

17   admission of Exhibit 38.

18        MR. CAIN:  No objection.

19        THE COURT:  Exhibit 38 is admitted.

20        (Exhibit 38 is received into evidence.)

21        MR. RESTAINO:  And if we may publish.

22        THE COURT:  You may.

23   BY MR. RESTAINO:

24   Q.  So how is it that you're able to see the police officer

25   then, if you are facing the window?

1   A.  Well, you can see in the window, over on Mr. Costanzo's

2   right shoulder, you can see that red square there, that's an

3   umbrella.  You can see the top of it in the top of the picture

4   as well.  So that's -- that's a reflection.  You can see the

5   clouds.  So I was -- I don't know if it was tinted or mirrored,

6   but I could easily see a reflection of the parking lot and what

7   was behind me.

8   Q.  And just to be clear, you're not saying that this

9   photograph was from the moment when the police officer walked

10  up behind you?

11  A.  No.

12  Q.  But this is the way that you were able to see?

13  A.  Right.

14  Q.  So what did you say -- what did you say to Mr. Costanzo?

15  A.  I brought it to his attention, something to the effect of,

16  do you see this or have you got this?  Just so that he was

17  aware of the police officer's presence.

18  Q.  And what did he say at first?

19  A.  He said, yeah, I got it.  No -- no worries.

20  Q.  Did he subsequently change his position?

21  A.  He did.  He -- he backed away from that because he said:

22  Well, hold on, let's wait until he passes.

23          MR. RESTAINO:  And we'll move on to clip 101 -- 103J.

24                  (Portion of audiotape played.)

25

UNITED STATES DISTRICT COURT

1    BY MR. RESTAINO:

2    Q.  Can you describe the defendant's demeanor in that portion

3    of the conversation?

4    A.  Yeah, he was -- he was emphatically making a point that,

5    you know, "I don't care."  He was emphasizing that point.

6                    (Portion of audiotape played.)

7    BY MR. RESTAINO:

8    Q.  During your conversations with the defendant, were you ever

9    posing as a medical marijuana dealer instead of a heroin

10   dealer?

11   A.  No, I wasn't.

12   Q.  Now, elsewhere on the audio, were you able to verify the

13   wallet addresses that were used --

14   A.  Yes.

15   Q.   -- to send the Bitcoin?

16   A.  Yes.

17   Q.  And was the transaction confirmed?

18   A.  Yes, it was.

19   Q.  Do you have a record of the confirmation of the

20   transaction?

21   A.  Yes.

22           MR. RESTAINO:  If we can unpublish.

23   BY MR. RESTAINO:

24   Q.  And I'd like to show you what's been marked for

25   identification purposes as Exhibit 37.

1              Taking a look at the first page of what's been marked

2    as Exhibit 37, do you recognize this document?

3    A.  Yes, I do.

4    Q.  And what is this document?

5    A.  This is a printout from my Coinbase account when I took the

6    48.9 Bitcoin that I purchased from Mr. Costanzo and eventually

7    deposited it -- or transferred it to a Coinbase account, and

8    this is the record of that transaction.

9    Q.  So just for the record, describe how that money -- how that

10   Bitcoin flowed, and which step of the transaction this document

11   represents.

12   A.  This would have been the final step of the transaction.  I

13   did the transaction with Mr. Costanzo with my Breadwallet on my

14   smartphone.  Then I transferred it to two other wallets, two

15   other smartphone wallets, and then transferred it from there to

16   Coinbase to cash it out.

17   Q.  And is the amount of Bitcoins here generally consistent

18   with the amount that you received from Mr. Costanzo?

19   A.  Yes.  This is slightly lower because each one of those

20   transfers incurred a nominal fee.  But aside from that, yes.

21              MR. RESTAINO:  Your Honor, at this time the government

22   would move for the admission of Exhibit 37 into evidence.

23              MR. CAIN:  Objection.  Foundation, hearsay.

24              THE COURT:  Do you want to lay some foundation for the

25   hearsay exception?

1    BY MR. RESTAINO:

2    Q.  From where did you get this record?

3    A.  I printed it from my Coinbase account.

4    Q.  And are you able to print out such a document from the

5    Coinbase account?

6    A.  Yes.

7    Q.  And to your knowledge, are these maintained in the regular

8    course of the business of Coinbase?

9    A.  Yes.  I could access my Coinbase account at any point and

10   access the transactions.  I have done that.  Just like a bank

11   account.

12   Q.  Have you, in fact, accessed those transactions --

13   A.  Yes.

14   Q.  -- in the past?

15   A.  Yes.

16   Q.  Have you found these transaction reports to be reliable

17   assertions of the Coinbase transactions?

18   A.  Yes, I have.

19           MR. RESTAINO:  Your Honor, we would -- that's the best

20   we can do on the foundation.

21           We'd move for the admission of Exhibit 37.

22           THE COURT:  Exhibit 37 is admitted.

23              (Exhibit 37 is received into evidence.)

24           THE COURT:  You may publish.

25           MR. RESTAINO:  If we may publish?

UNITED STATES DISTRICT COURT

1              THE COURT:  You may.

2   BY MR. RESTAINO:

3   Q.  And so again, looking at page 1, this represents the amount

4   of the Bitcoins --

5   A.  That's correct.

6   Q.  -- that you received for that transaction?

7   A.  Yes.

8              MR. RESTAINO:  And finally we'll move to clip 101 --

9   103 -- I'm sorry.  103K.

10                  (Portion of audiotape played.)

11  BY MR. RESTAINO:

12  Q.  What did you take that to mean?

13  A.  The defendant was telling me the benefits of Bitcoin for a

14  drug dealer, in that if I carried product from -- heroin from

15  Arizona to New York, I'm exposed then.  And then I convert that

16  heroin into currency in New York, I've got a large amount of

17  U.S. currency, then I have to transport that back to Arizona,

18  and I'd be exposed both directions.

19             His point was if I used Bitcoin and converted the cash

20  into Bitcoin, I'd only -- my -- I'd cut my exposure in half.

21  I'd be exposed with the drugs in one direction, but I wouldn't

22  have to transport the currency, the bulk currency back.

23  Q.  And did the defendant, in your understanding, have a

24  sophisticated understanding of the logistics problems in a drug

25  trafficking organization?

```
 1    A.  He --
 2           MR. CAIN:  Objection.  Foundation.  Calls for
 3    speculation.
 4           THE COURT:  Sustained.
 5    BY MR. RESTAINO:
 6    Q.  Were you able to provide the wallet address and a memo to
 7    the case agent in this case?
 8    A.  Yes.
 9    Q.  And who was that at the time?
10    A.  The case agent?
11    Q.  Correct.
12    A.  Don Ellsworth.
13           MR. RESTAINO:  Might I just have a moment, Your Honor?
14           THE COURT:  You may.
15                      (Pause in proceedings.)
16    BY MR. RESTAINO:
17    Q.  So did you ever have any more communication with the
18    defendant after your meeting with him on that day?
19    A.  Not two-way communication, but he did send me some texts
20    after that.
21    Q.  Let's take a look at what's been admitted as Exhibit 124.
22           All right.  So taking a look at this document, are you
23    able to date some of the post-transaction communications?
24    A.  Yes.  This occurred on October 14th.  And I stand
25    corrected.  This was a two-way communication that we did have
```

458

1    after the transaction.  And then after that, they were one-way

2    communications.

3    Q.  Right.  So what predicates the communication; what starts

4    it?

5    A.  It's a text that I get from the defendant that says:  Thank

6    you for your business, Tom.  By the way, recently I was invited

7    to talk about Bitcoin on podcast Bad Business.  Would you let

8    me know how you liked it.  And then there's a link there.

9         And he says:  I'll answer any questions that you have.

10   Okay.

11        And I responded and said:  Thanks, Tom.  I'll check

12   this out.  I'm sure we'll do more business in the future too.

13   Have a good evening.

14   Q.  And what did the defendant respond?

15   A.  He said:  Who is Tom?

16   Q.  And why did you call him "Tom"?

17   A.  Because I knew his name to be Tom, and I was under the

18   impression that he had told Sergei that his name was Tom.

19   Q.  And did the -- what did the defendant do when you called

20   him "Tom" then?

21   A.  His response is:  Who is Tom?

22   Q.  And how does he continue?

23   A.  Well, I -- I said:  Well, I thought you said your name was

24   Tom.  Did I get that wrong?

25        He said:  I'm Morpheus.  Your name is Tom.

1          And I said:  Yeah, I'm Tom.  My bad on your name.

2     Morpheus it is.

3          And he said:  Make sure we're on the same page.

4     Q.  And that was the end of that conversation?

5     A.  Yes.

6          MR. RESTAINO:  Thank you, Agent Klepper.

7          Your Honor, at this time we have no further questions

8     on direct.

9          THE COURT:  All right.

10         Cross-examination?

11                    CROSS-EXAMINATION

12    BY MR. CAIN:

13    Q.  Agent Klepper, you testified on direct that it was you that

14    upped the amount of the trade.

15    A.  That's correct.

16    Q.  And you did it because you wanted to try to tap him out?

17    A.  Correct.

18    Q.  Originally you'd agreed on 10,000 bucks, basically.

19    A.  Yes.

20    Q.  And then you upped the amount to 15,000?

21    A.  Yes, I did.

22    Q.  And you had the instinct that he wasn't going to have

23    enough to cover it?

24    A.  I thought that was a possibility.

25    Q.  But in your dealing with him, he wasn't suggesting the

1    amount to you.  It was you suggesting the amount to him?

2    A.  We had agreed on $10,000, and I asked to up the amount,

3    that's correct.

4    Q.  In your dealings with him, I think in your words, he was

5    pretty "geeked out" about Bitcoin.

6    A.  Yes.

7    Q.  Pretty enthusiastic about it.

8    A.  I think that's fair to say.

9    Q.  He seemed to think that Bitcoin was going to be a -- pretty

10   important in the world in the future?

11   A.  Yeah.  He -- he -- he enjoyed talking about the subject,

12   certainly.

13   Q.  We got to listen to some of your conversation with him on

14   that October day.  Is it fair to say that in that conversation,

15   he didn't introduce the discussion about heroin, that it was

16   you that introduced the discussion about heroin?

17   A.  That is fair to say.  It was clear to me that he would

18   rather not talk about that.

19   Q.  So along that same line, is it fair to say that he would

20   have done that deal with you, whether you talked about heroin

21   or not?

22   A.  I have no idea whether he would have or not, but he didn't

23   stop when I told him it was heroin.

24   Q.  Well, but let's -- let's talk about what you knew about him

25   up until that point.  I'm assuming that you'd done some due

1    diligence on him before you met with him that day.

2    A.   Correct.

3    Q.   You'd been briefed on the investigation.

4    A.   Yes.

5    Q.   You knew that he was an individual who essentially made a

6    living out of trading Bitcoin?

7    A.   I don't know if he made a living, but I know that he

8    regularly traded Bitcoin.

9    Q.   Right, which meant he ran around town trading Bitcoin with

10   individuals.

11   A.   Correct.

12   Q.   And you knew that he'd already done some trades with

13   Sergei?

14   A.   Yes.

15   Q.   And you knew he'd done a trade with Sergei where there was

16   no discussion of heroin?

17   A.   I don't know exactly what he discussed with Sergei.  I know

18   that before I got there, Sergei had told him that we were in

19   the business of heroin.  I don't know how many deals he did

20   with Sergei prior to that.

21   Q.   But don't you think it's fair to say that had you not said

22   anything about Sergei, had you not said anything about heroin,

23   he still would have done the 13,000–dollar deal with you that

24   day?

25   A.   I think he probably would have.

1  Q.  He certainly didn't make it a condition of the deal with

2  you that it had to be used for heroin; right?

3  A.  He did not.

4  Q.  And in the recordings that we heard, it -- it was you

5  telling the story about your business; right?

6  A.  Yes.

7  Q.  He wasn't telling you to tell him your story.

8        It was you deciding to share your story?

9  A.  Yes and no.  Part of the reason that I went into the

10  explanation of why we told him is because he brought up the

11  fact that, hey, when I talked to Sergei, the first time he told

12  me, I was, like, why did he tell me for?

13        And then that's why I said:  Well, I'll explain to you

14  why he told you.  This is why.

15  Q.  But -- but the other reason you're -- you're sharing that

16  story is you're -- you're recording this; right?

17  A.  I did have a recording device, yeah.

18  Q.  And -- and you knew that as you're inserting those elements

19  of drug activity, that by inserting those elements, those

20  potentially would be used against Mr. Costanzo in a later

21  prosecution?

22  A.  Yes.  That's possible.  Yeah.  Absolutely.

23  Q.  The government asked you some questions about your

24  appearance for that meeting, and I think you testified that you

25  were dressed casually?

1    A.  Yes.

2    Q.  Jeans and a Polo.  You weren't dressed in a -- I'm sorry.

3    Did you -- I don't think you answered audibly.  Is that a

4    "yes"?

5    A.  Yes.  I did testify to that.

6    Q.  Okay.  You weren't dressed in a flashy manner?

7    A.  I'm not sure what you mean by "flashy," but jeans and a

8    Polo is not -- it is what it is.

9    Q.  You weren't -- you weren't -- well, you weren't dressed in

10   a way where you were trying to communicate "I'm made of money"?

11   A.  I was wearing a nice watch, and that's -- that's about it.

12   Q.  And we got to hear your voice in that audio; right?

13   A.  Uh-huh.  Yes.

14   Q.  And we kind of got to hear your demeanor in the way that

15   you interacted with Mr. Costanzo; right?

16   A.  Correct.

17   Q.  And would you agree that your demeanor in that audio is

18   very similar to your demeanor today?

19   A.  Yeah.  That's fair.

20   Q.  You were very conversational?

21   A.  Uh-huh.

22   Q.  "Yes"?

23   A.  Yes.  Yes.

24   Q.  You were very approachable?

25   A.  I tried to be.

THOMAS KLEPPER — CROSS-EXAMINATION

1    Q.  You were trying to come off as likable so that he would

2    engage with you?

3    A.  Yeah, that -- yeah.

4    Q.  You weren't presenting yourself as somebody who is hardened

5    from the streets.

6    A.  Yeah, that's fair to say.  My cover story was not that I

7    was a street dealer, I was wholesaler.  And that's why my cover

8    story is like that.  I can't pull off a street dealer.  Your

9    point is well made.  But that's not what I said I was.

10   Q.  Fair.  You know, you were -- you didn't come in with a

11   bunch of fake tattoos to make it look like you'd been living a

12   hard life?

13   A.  No.

14         MR. CAIN:  May I have a moment, Your Honor?

15         THE COURT:  You may.

16               (Pause in proceedings.)

17   BY MR. CAIN:

18   Q.  Mr. Costanzo, when you met with him that day, he was also

19   dressed casually.

20   A.  Yes.  He was in shorts and a Polo shirt.

21   Q.  He wasn't dressed in a -- in a way that -- well, you didn't

22   like my word "flashy."  He wasn't dressed in a way that

23   indicated that he'd spent a lot of money on his clothing.

24   A.  No, he did not stand out in that way.

25   Q.  He didn't appear to have any expensive jewelry?

UNITED STATES DISTRICT COURT

1    A.  Not that I recall.

2    Q.  You didn't see him pull up in what appeared to be an

3    expensive vehicle?

4    A.  I didn't see him pull up, so I don't know what he drove

5    there.

6    Q.  Okay.  You talked a little bit about the Telegram app.

7    A.  Yes.

8    Q.  And that's an application that you can use on a smartphone?

9    A.  Correct.

10   Q.  Now, that's an app that anybody could put on a smartphone?

11   A.  Yes.  It's available in the app store.

12   Q.  So it's not an app that is illegal to use?

13   A.  No, it's not illegal to use.

14   Q.  It's not illegal to download?

15   A.  Nope.

16   Q.  So law-abiding individuals could use that if they wanted to

17   have encrypted communications that couldn't be intercepted?

18   A.  Yes.

19   Q.  You talked a little bit about Trezor, and we heard that

20   discussion; correct?

21   A.  We did.

22   Q.  And you explained it as being like a thumb drive for a

23   smartphone?

24   A.  Yes.

25   Q.  Same thing.  A Trezor, if that's the correct way to refer

| 1 | to it, it's essentially a storage device? |
|---|---|

1   to it, it's essentially a storage device?

2   A.  Yes, it is.

3   Q.  So there's nothing illegal about a Trezor storage device.

4   A.  It's all in how you use it, but it's not illegal to -- to

5   own it or use it, depending on how you're using it.

6   Q.  So an average citizen could be using it to store

7   information they wanted to safely store from their phone?

8   A.  I think that's fair to say, yeah.  That could be used that

9   way.

10  Q.  Okay.

11          MR. CAIN:  I pass the witness.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Redirect?

15          MR. RESTAINO:  No, thank you, Your Honor.

16          THE COURT:  You may step down.

17          THE WITNESS:  Thank you.

18          THE COURT:  Mr. Restaino, next witness?

19          I'm looking to take a break in about 15 minutes.

20          Oh, I'm sorry.

21          MS. ESCALANTE:  It's okay.

22          Thank you, Your Honor.

23          The government would call Nolan Sperling.

24          (NOLAN SPERLING, Government's witness, is sworn.)

25  ///

```
 1                    DIRECT EXAMINATION

 2   BY MS. ESCALANTE:

 3   Q.   Okay.  Good morning, Mr. Sperling.  Can you introduce

 4   yourself to the jurors, please.

 5   A.   Hi.  My name is Nolan Sperling.  I'm 22 years old, and I'm,

 6   you know, currently living in Scottsdale, Arizona.

 7   Q.   Thank you.  What do you do?

 8   A.   Currently I am a full-time student at Arizona State

 9   University, and I also work two jobs, two part-time jobs.

10   Q.   Okay.  What are you studying at ASU?

11   A.   It's called technological entrepreneurship and management.

12   So it's in the polytechnic school.  And it's -- it's like a

13   business-focused tech degree, so it prepares the students for,

14   essentially, to create value in a business, so in terms of,

15   like, product creation, marketing, branding, as well as, like,

16   operations management.  It's a very well-rounded business

17   degree.

18   Q.   Okay.  Now, Mr. Sperling, on September 27th, 2016, you were

19   indicted in federal court for two charges; correct?

20   A.   That is correct.

21   Q.   What are those charges?

22   A.   Importation of a controlled substance, and intent to

23   distribute, I -- I believe.

24   Q.   And what was the controlled substance that you were

25   importing?
```

NOLAN SPERLING - DIRECT EXAMINATION

1    A.   It was MDMA, which is a, I guess, like a -- it's an

2    abbreviation, an acronym, for ecstasy, Molly.  I don't know

3    what MDMA stands for.  It's a long technical name.

4    Q.   And on October 12, 2016, you came to court to make your

5    first appearance for that indictment; correct?

6    A.   That is correct, yes.

7    Q.   Prior to your first appearance, did you have the two jobs

8    that you have currently?

9    A.   I did.

10   Q.   And prior to your first appearance, were you enrolled at

11   ASU?

12   A.   I was.

13   Q.   Had you enrolled at the community college first?

14   A.   I was -- so I went to ASU first in fall of 2016.  And, you

15   know, I went to the dorms and I, you know, messed around too

16   much and I failed out, and that was in 2013.  And then after

17   that I went to community college for a semester-and-a-half or

18   two years, something like that.  And then I came back to ASU.

19   Q.   And prior to your first court appearance, you were doing

20   drugs; correct?

21   A.   That is correct, yes.

22   Q.   Tell the members of the jury the drugs that you were doing.

23   A.   So, I guess going back to, I believe it would be late 2012,

24   you know, I had done LSD, ecstasy, 'shrooms; I've done Xanax,

25   smoked marijuana.  You know.  I'd done OxyContin before.

UNITED STATES DISTRICT COURT

1    That's about it.

2    Q.   Okay.  And when was the last time that you consumed drugs?

3    A.   It would have been October of 2016.

4    Q.   Okay.  And on November 27th, 2016, you pleaded guilty to

5    importation; correct?

6    A.   That is correct.  Yeah.

7    Q.   You accepted a plea agreement?

8    A.   I did, yeah, with the government.

9    Q.   What was your -- what was your understanding of the

10   consequences that you were facing for the charges against you

11   prior to entering into a plea agreement?

12   A.   So to my knowledge, I would be prosecuted, you know, for

13   the MDMA that I imported.  I believe I was facing anywhere from

14   four to five years, I think it was, in federal prison.

15   Q.   That was your understanding?

16   A.   That was my understanding, yeah.

17   Q.   Okay.  And what was your understanding of what the plea

18   agreement meant to you?

19   A.   Um, so, you know, to my understanding, the plea agreement

20   basically says that, you know, pending my cooperation and, you

21   know, my good -- goodwill, and just doing the best I could to

22   help in anything that would relate to my case or anything that

23   would help the government, I would -- you know, I would perform

24   to the best of my ability something, you know -- like, for

25   example, giving a testimony in trial or helping out with an

```
 1    ongoing investigation -- and, you know, also, of course,
 2    cooperating with Pretrial Services and Probation, and
 3    cooperating with that.  That's what that entailed to me.
 4    Q.  Okay.  So you entered into a cooperation agreement with the
 5    government; correct?
 6    A.  That is correct.
 7    Q.  Which is separate than the plea agreement; correct?
 8    A.  Yes, that is correct.
 9    Q.  Okay.  So are you right now describing what your
10    understanding is of the cooperation agreement?
11    A.  Yeah, I guess essentially so.  I reviewed both documents at
12    the exact same time and signed them both at the same time, so
13    the plea agreement would be in -- with, you know, me
14    cooperating, I would take a plea, and my sentence would be
15    reduced at the discretion of the judge presiding over my case,
16    James Teilborg, and he'd be the one who would oversee that
17    agreement and decide what happened.
18    Q.  Okay.  And when you entered into the plea agreement and the
19    cooperation addendum, did you know that you were going to have
20    to testify against an individual who you knew as Morpheus
21    Titania?
22    A.  No.  I had no idea what -- what I would be doing, who --
23    you know, what would be important to the government.  I -- I
24    had no idea what I would be doing, but I knew I was -- it was
25    in my best interests to cooperate with whatever needed to be
```

1    done, and I had no idea who it would be against or anything.

2    Q.  Was the name "Morpheus Titania" directly written or

3    included in either your plea agreement or the cooperation

4    addendum?

5    A.  No, absolutely not.  It wasn't mentioned at all.

6    Q.  Okay.  And we'll get more into specifics as to how you know

7    Morpheus Titania.

8            But do you see him here in the courtroom today?

9    A.  Yes, I do.

10   Q.  Could you tell us where he is seated and what he is

11   wearing?

12   A.  I believe he is sitting right over there with glasses on,

13   in the middle of those three people -- that lady, and then he's

14   in the middle, and then the gentleman in the blue stripe

15   suit -- to his right, my left.

16           MS. ESCALANTE:  Your Honor, may the record reflect the

17   witness has identified the defendant?

18           THE COURT:  Yes.

19   BY MS. ESCALANTE:

20   Q.  You just stated that you also had to comply -- or part of

21   your corporation includes complying with Pretrial Services

22   and/or the Probation Department.  What do you mean by that?

23   A.  Yes.  So with Pretrial Services, it's very similar to

24   probation.  So, I entered into a contract, I believe it was

25   October 12th -- maybe it wasn't a contract.  I just -- you

1    know, it was an agreement where I can't, you know, take any

2    drugs, I can't drink any alcohol; and it's, you know, part of

3    my release conditions on not being in -- you know, being held

4    in jail while the duration of my -- of my case is going on.  So

5    it's part of my release agreement.

6    Q.  Okay.  And prior to your first appearance in court, you had

7    a medical marijuana card; correct?

8    A.  That is correct, yes.

9    Q.  Do you still have that?

10   A.  No, I do not.  It expired -- it expired in May of 2016.

11   Q.  Okay.  Let's talk about the offense conduct that let you

12   to -- that led to the federal charges against you, the

13   importation and the drug distribution.  When did you begin to

14   sell drugs?

15   A.  I guess -- I guess it would be when I started to buy them.

16   That was -- that was, like, late 2012.

17   Q.  How old were you then?

18   A.  I had just turned 17.

19   Q.  Okay.  Were you still in high school?

20   A.  Yes, it was -- it was my senior year.  It would have been

21   November/December of my senior year or 2012.  You know,

22   December of 2012.  Yeah.  That's when that started.

23   Q.  Okay.  And how were you purchasing the drugs that you were

24   both using and selling at that time?

25   A.  You know, right when I started there, I used Bitcoin to

1    purchase the drugs online.

2    Q.   Okay.  And where were you purchasing your Bitcoin when you

3    started?

4    A.   I think when I first started, there is this website called

5    Mt. Gox where you would do a wire transfers, like MoneyGram or

6    something.  But that got taken down within, I don't know, maybe

7    a year or something, eight months.  And then after that, I

8    switched to a website called Coinbase.

9    Q.   Okay.  Let's talk about Mt. Gox.  What did you have to do

10   to set up an account with Mt. Gox?

11   A.   To my knowledge, I don't think there was an account set up.

12   I think you -- you know, you had to go into anywhere that had

13   that red telephone, you know, like a -- I think it was, like, a

14   CVS or something, you know, that had like a MoneyGram wire

15   transfer, and you would -- I believe you'd just transfer money,

16   I think, to a wallet or something.  Maybe you did have to set

17   up an account.  I didn't really remember.  I was -- I only used

18   it briefly.

19   Q.   Okay.  Did you have to provide any identification,

20   telephone number, bank account number?

21   A.   I think I had to provide my name and stuff, yeah.  I don't

22   think a bank account was necessary because it was a wire

23   transfer.  But I had to give my name, maybe my email address or

24   something, yeah.  There was something about it.  You can't

25   just -- yeah.  You can't just call.  They had to know, like,

1    who I was.  I think they got my name, yeah.

2    Q.  Okay. And then you switched to Coinbase.

3    A.  Yes.  That is correct, because I think Mt. Gox got taken

4    down.  It was shut down or something.

5    Q.  Did you lose any Bitcoin when Mt. Gox got taken down?

6    A.  No, I did not.  I did not.  I don't -- I don't recall

7    having, like, an account there.  I would transfer it to an

8    outside wallet once I, you know, wired the money.  So, no, I

9    didn't -- I didn't have any, like, money in that account, no.

10   Q.  Let me take a step back.

11        Why were you purchasing your drugs with Bitcoin?

12   A.  Because it provided a level of anonymity.  You didn't have

13   to -- you know, it's not like you were using PayPal or

14   something where they know who you are.  It's -- it's a way to

15   keep yourself anonymous online.

16   Q.  Okay.  Now, tell us what you had to provide or what you do

17   to use Coinbase.

18   A.  So, Coinbase was a little bit more thorough.  I think they

19   wanted to cooperate more with, I guess, maybe the U.S.

20   government or something because they didn't want to get shut

21   down.  So you had to provide your -- at least full name.  I

22   believe you have had to provide, like, a phone number or email

23   address, and you had to verify it.  And then in most

24   situations, you know, enable to purchase Bitcoins, you had to

25   either link a credit card or a debit card or, like, a bank

1   account, or something like that.  And so that provided another

2   layer of authen -- to auth -- you know, to authenticate your

3   identity.  And you could -- by authenticating your identity,

4   unlock, you know, be able to buy more coins at a certain time,

5   you know.  So if you only had, like, your phone number, it

6   might take five days to buy your Bitcoin.  But once you, you

7   know, linked your bank account, email, a number of things, you

8   could instantly get, like, a thousand dollars without waiting.

9   And that was appealing to me, so I subsequently linked a lot of

10  my information to that website.

11  Q.  And what was the maximum amount that you were able to

12  purchase on a daily basis?

13  A.  Um --

14  Q.  Based on the level of your account.

15  A.  Sure.  So I believe I was at the maximum level.  And it was

16  a thousand dollars was the cap for, like, a one-time purchase.

17  I don't recall if that was the daily limit.  It might have

18  been, like -- it might have been the daily limit, a thousand

19  dollars a day, or something.  It might have been, like, a

20  weekly limit?  No.  Maybe it was a biweekly thing, or

21  something.  But it was a thousand dollars at once, was what it

22  was.

23  Q.  And you just stated that you had to provide a phone number

24  or an email for a verification process.  What do you mean by

25  that?

1    A.  So, you know, with a lot of websites, you enter an email

2    address, and they'll send you an email with a code or a link or

3    something, and you have to provide that code or click on the

4    link, and basically verify that you have access to that email.

5            And, you know, it's a similar thing for a phone.  You

6    know, they text you a code or something, similar to, like,

7    Amazon or some company would do, you know.

8    Q.  And how long did you use Coinbase for?

9    A.  Maybe like a year-and-a-half or something.  Eighteen months

10   about.

11   Q.  And did you use the Bitcoin that you purchased on Coinbase

12   to purchase drugs online?

13   A.  Yes.  That was the only thing I used it for.

14   Q.  Okay.  And during the time that you were using Coinbase and

15   purchasing drugs online, you had a lot of drugs seized;

16   correct?

17   A.  Yes, that is correct.

18   Q.  And where were you -- what country were you ordering these

19   drugs from?

20   A.  It -- it varied.  It was -- it depended on what I was

21   buying.  There's certain vendors from different countries.  So,

22   like, for example, I ordered LSD from Canada, or, for example,

23   that MDMA that was seized, that was from The Netherlands.  So

24   it -- it just -- it would depend on what I was getting.

25   Q.  Okay.  And the fact that it got seized didn't prevent you

1    from abstaining from purchasing drugs online?

2    A.   Definitely scared me.   I wasn't aware most of the time that

3    my drugs did get seized, like the first couple times it

4    happened, I -- you know, it wouldn't show up, but, you know,

5    things wouldn't show up, oftentimes it wasn't surprising.   And

6    I never got, like, a seizure letter in the mail or anything.

7           But the time that I knew that my -- that something had

8    got seized was when I lost -- I had a lot of Xanax ordered in

9    from -- from Canada, and it was -- it was, like, $10,000 worth.

10   And that was seized by the Canadian government.   And that's

11   when I -- that's when I knew that -- you know, that scared me a

12   lot.   I was -- I was kind of waiting for something to happen.

13   I think -- I think that was, like, I think that was, like,

14   September of 2015, somewhere around there.

15   Q.   Okay.   Prior to that seizure of the $10,000 worth of Xanax,

16   you were no longer using Coinbase; correct?

17   A.   That is correct.

18   Q.   Why did you stop using Coinbase?

19   A.   Because I was starting to purchase a larger dollar amount

20   of drugs online, you know.   I was selling more, bigger

21   quantities.   And so that thousand-dollar limit was inhibiting

22   me from, you know, I -- because like you said, it was -- they

23   wouldn't just let you purchase more than a thousand dollars at

24   once.   You had to wait.   And so that was a nuisance.   And then

25   also because I was buying a higher dollar amount, I knew that

1   after a while I -- you know, there would be statements on my

2   bank statement saying that I had, you know, purchased this from

3   Coinbase, because that's how I was buying it, with a linked-up

4   bank account.  So if I purchased more than a couple thousand

5   dollars at a time, I just figured, you know, they would report

6   it to the IRS or something, you know.

7           THE COURT:  Ms. Escalante, I'm looking for a good time

8   for a morning break.  So when you get there, let me know.

9           MS. ESCALANTE:  Now is fine, Your Honor.

10          THE COURT:  All right.

11          Ladies and gentlemen, we are going to take the morning

12  break now, and you'll have 15 minutes so that you can recruit

13  your energy and pay attention for the rest of the morning.

14          I will remind you of the admonitions.  And I would

15  also remind you that you should not pay any attention, or

16  should try -- be sure that you don't let anybody talk to you

17  about this case, that you don't overhear any discussions about

18  this case from the media, maybe outside of the courtroom, or

19  anywhere else where you may hear it.  It's just your job to

20  keep yourself untainted by anything that you might hear, other

21  than what's in this courtroom.  We appreciate your cooperation.

22  I know it's difficult, and I hope you understand why we ask you

23  to do that.

24          You're now excused for your break.

25          Thank you very much.

```
 1              COURTROOM DEPUTY:  All rise.

 2                  (Jury leaves the courtroom at 10:31 a.m.)

 3              THE COURT:  Anything?

 4              MS. ESCALANTE:  No, Your Honor.

 5              MR. RESTAINO:  Judge, just briefly on exhibits.

 6              THE COURT:  Yes.

 7              MR. RESTAINO:  I just want to put on the record that

 8      we have replaced Exhibit 12 with the redacted version that was

 9      shown electronically to the jury yesterday, and we've replaced

10      admitted Exhibits 11 and 122, which were admitted but not

11      shown, with the redacted versions.  I understand that the

12      defense stipulates to the redactions but, of course, the

13      defense would preserve its objection to the admissibility of

14      122.

15              THE COURT:  Is that correct?

16              MS. WEIDNER:  Yes, it is, Your Honor.

17              THE COURT:  All right.  Thank you.

18              Anything else that we need to put on the record or

19      otherwise take up?

20              MR. RESTAINO:  Nothing from the government, Your

21      Honor.

22              MS. WEIDNER:  Nothing from the defense, Your Honor.

23              THE COURT:  All right.

24              Thank you.

25                  (Proceedings in recess at 10:33 a.m.)
```

UNITED STATES DISTRICT COURT

```
 1                    (Jury enters the courtroom at 10:48 a.m.)

 2                      (Proceedings resume at 10:50 a.m.)

 3               THE COURT:  Thank you.

 4               Please be seated.

 5               Ms. Escalante, please.

 6               MS. ESCALANTE:  Thank you.

 7   BY MS. ESCALANTE:

 8   Q.  Mr. Sperling, where were you getting the money to purchase

 9   the drugs for -- from?

10   A.  Well, you know, I guess in the beginning, it was just money

11   I earned from my jobs that I had.  And, you know, after selling

12   drugs, you know, make money, and then I'd reinvest money from

13   selling drugs into buying more drugs.

14   Q.  Okay.  So I think we left off with you were no longer going

15   to use Coinbase.

16   A.  Yeah.  Yeah.

17   Q.  What did you do with your Coinbase account?

18   A.  I -- I closed it.  I wanted to permanently shut it down.

19   Yeah.

20   Q.  Okay.  And why was that?

21   A.  Kind of going off on why I switched from Coinbase too is

22   because it, you know, linked my bank account, kind of linked to

23   me.  And, you know, those purchases I was making at the time of

24   a thousand dollars I knew weren't serious, I wouldn't raise any

25   flags.
```

1              But I didn't want to raise any flags in the future, so

2    I just decided it was best for my own interest to shut down the

3    account.  You know, I wasn't sure if it would erase the

4    information off the website servers, but, you know, I was -- I

5    would hope it would.

6    Q.  And what was your concerns with Coinbase linking to your

7    bank account?

8    A.  You know, just linking to my identity.  You know, that's --

9    almost defeats the purpose of using Bitcoins because Bitcoins

10   can help to conceal your identity; at least, you know, if you

11   already have them in your possession, then you can just use

12   them online and no one can trace them back to you.  So if you

13   have to sync up who you are to get them in the first place, it

14   almost defeats the purpose of, you know, the anonymity it gives

15   you.

16   Q.  Who were you concerned would be able to identify you?

17   A.  I guess just -- just anyone, like -- you know, like for

18   example, like the government, you know.  If I made, like, too

19   high of a purchase, it might get, you know, like reported to

20   the IRS, or maybe just a suspicious behavior, you know, for my

21   bank.  And then, you know, like an investigation might get

22   started or something.

23   Q.  And were you concerned about an investigation for drug

24   trafficking?

25   A.  Yeah.  Drug trafficking, drug -- you know, just sell --

 1    drug selling.  Just everything I was doing.  I was -- I was --

 2    yeah, yeah -- scared for that.

 3    Q.  Okay.  And you met with the government on three occasions

 4    after you were indicted federally; correct?

 5    A.  Yes.  That is correct.

 6    Q.  I believe one was in December of 2016, another time in May

 7    of 2017, and then as recent as of March of this year; correct?

 8    A.  Yes.  That's correct.  That first one in December was

 9    almost Christmastime.  I believe it was, like, the 21st or

10    something.

11    Q.  Okay.  And the first time that you met with the

12    government -- and to be fair, you've never met with defense

13    counsel; correct?

14    A.  No, I've never met with any -- I've never seen them before

15    this, besides Morpheus.

16    Q.  And the first time that you met when the government, did

17    anyone -- any representative from the government bring up

18    Morpheus Titania?

19    A.  No.  That first meeting, no.  Nothing was brought up.

20    Q.  Who is the first -- who was the first person to mention

21    Morpheus Titania?

22    A.  I -- I believe I brought him up.  And I think I was asked,

23    you know, who I bought Bitcoins from, and I went through almost

24    the whole story I went through right now, like how I went to

25    Coinbase, and then I switched to buying them in person.

1   Q.  Okay.

2   A.  And then, you know, revealed I bought them through this guy

3   with, you know, code name Morpheus.

4   Q.  Okay.  Well, let's -- let's pick up right there.  You ended

5   purchasing Bitcoin on Coinbase.  What did you do next?

6   A.  I think I did a little research online.  I think more like

7   Reddit or something, or some forum website.

8   Q.  What is Reddit?

9   A.  So Reddit is a -- I guess it's like a peer-to-peer

10  community.  It's like an online almost like forum-type website,

11  where you can go into these different sub Reds, they're called,

12  almost sub forums, so each sub Reddit can be about a different

13  topic.  And so members of, you know, a similar community can

14  kind of meet together and talk about similar issues related to,

15  you know, any topic you can imagine.

16          So I was, you know -- I think I went on to, like,

17  Bitcoin, you know, Bitcoin sub Reddit or something.  It's like,

18  how do you guys buy Bitcoin or some -- I don't think I posted.

19  I was just reading, like, what other people had gone through,

20  and I decided to use this website called, I think,

21  localbitcoins.com.

22  Q.  Okay.

23          THE COURT:  Mr. Sperling?

24          THE WITNESS:  Yes?

25          THE COURT:  Can I ask you to slow down and speak a

```
 1        little bit more clearly?

 2                THE WITNESS:  Yes, yes.

 3                THE COURT:  Sometimes we have a tendency to slur our

 4        words --

 5                THE WITNESS:  Yeah.

 6                THE COURT:  -- but it's important that we get

 7        everything you're saying in the record.

 8                THE WITNESS:  Yes, Your Honor.  Okay.  Yeah.  I can --

 9        I can slow down.

10                THE COURT:  Thank you.

11                MS. ESCALANTE:  And maybe just pull the mike up a

12        little closer to you.

13                THE WITNESS:  Sure.

14        BY MS. ESCALANTE:

15        Q.  So you went to localbitcoins.com?

16        A.  Yes, that is correct.

17        Q.  And what did you do upon entering that website?

18        A.  So on the website, I believe there was an area where you

19        could look at a map of, you know, around where you -- where you

20        type in your ZIP Code or something.  And it pops up, you know,

21        a map of your area, and it shows, you know, little pin marks of

22        people who you can by Bitcoins from locally.

23        Q.  And how did you come across Morpheus Titania?

24        A.  I think it was just the closest one to me.  One of -- you

25        know, the closest dot on there.  I don't really recall looking
```

NOLAN SPERLING - DIRECT EXAMINATION

1   at anyone else's profile.  I just -- I think I clicked on his.

2   Q.  Did you find anything appealing about his profile?

3   A.  I don't know.  I mean, it wasn't -- you know, like I said,

4   I think it was the first one I clicked on.  I looked at it.  He

5   was -- you know, seemed friendly.  He was, like, you know, I

6   love working with new people.  Just shoot me a text.  And,

7   yeah, it was, you know -- seemed good enough.

8   Q.  And how did you contact Morpheus?

9   A.  I believe I sent him a text message.

10  Q.  And did you guys meet?

11  A.  Yeah.  Yeah.  We ended up meeting up.

12  Q.  And so why did you want to use a peer-to-peer exchanger?

13  A.  Because localbitcoins.com, I knew you could buy from people

14  in person, and it was a way to buy Bitcoins anonymously because

15  you could, you know, just essentially meet up with someone in

16  person, give them money, and then sit down and they'd send

17  Bitcoins to your account.  And, you know, you'd wait until it

18  showed up, and then you guys could leave.

19  Q.  Okay.  When -- when was it that you first contacted

20  Morpheus?

21  A.  It was probably like early springtime, like 2015, I think.

22  Yeah.  That sounds right.

23  Q.  Okay.  And how long did you buy Bitcoin from Morpheus?

24  A.  I think all the way up until -- until my -- until, you

25  know, my -- until I was caught, per se, in -- in May of 2016.

1    So it was at least a full year.

2    Q.  Okay.  And all of the Bitcoin that you purchased from

3    Morpheus, what were you using for?

4    A.  Just to buy drugs online.

5    Q.  Okay.  And you just mentioned being caught in May.  But

6    you -- you were indicted in September of 2016, and your first

7    Court appearance was in October 2016.  What do you mean by

8    getting caught in May?

9    A.  So I was -- I was out of the country, and my -- my house

10   was raided by Homeland Security while I was out of the country.

11   And --

12   Q.  Do you know why?

13   A.  I believe they had a warrant that they had acquired because

14   I had ordered an MDMA from The Netherlands, and I believe it

15   came to New York, and I believe it was seized there.  And I

16   think they used that as probable cause to get a warrant to

17   search my residence.

18   Q.  Did you list your first name and last name to be -- as the

19   recipient for the drugs that you ordered in The Netherlands?

20   A.  Yes, I did.

21   Q.  Okay.  And where were those drugs supposed to be shipped

22   to?

23   A.  So, I had a PO box they were supposed to be shipped to, you

24   know, down the street from my house.

25   Q.  When did you get that PO box?

1    A.  Did you say "why"?

2    Q.  When.  When and then why.

3    A.  When?  It was maybe, like, a year-and-a-half before.  So

4    maybe like just before I met Morpheus.  Might have been, like,

5    two years.  Probably a year-and-a-half.  I got it because, you

6    know, I was living at home at the time, and I didn't want to

7    order any of these drugs to my parents' house, you know, and

8    have them be, oh, Nolan, you got a package from Germany or

9    something; like, why are you getting these?  I didn't want to,

10   like, raise suspicion with my parents.  So I got a PO box.

11   Q.  Okay.  Did your PO box also get raided, as you state?

12   A.  It -- it did, yeah.  I believe both of them did.  I had two

13   at the time.

14   Q.  Okay.  What did agents from Homeland Security find in your

15   bedroom when they went to your house in May?

16   A.  So, I believe they found, like, $5,000 in cash.

17   Q.  Were there drugs in your room?

18   A.  Yes, there were.  There was, like, mushrooms, magic -- you

19   know, magic mushrooms; maybe some of the -- some MDMA.  Yeah, I

20   believe there was some MDMA.  And then some Xanax, probably, as

21   well.

22   Q.  Was there marijuana also?

23   A.  There might -- yeah, I think there was maybe small amounts,

24   like some paraphernalia and -- yeah, some -- some concentrate

25   marijuana.

NOLAN SPERLING – DIRECT EXAMINATION

1   Q.   Did you also have MD capsules?

2   A.   Yes, I did have MD capsules.

3   Q.   What were you using those for?

4   A.   So, there was a dual purpose for those capsules.  So the

5   first one was I would capsule-up MDMA, which is ectasy, and

6   sell those.  And then I also bought capsules because I was

7   looking at this class of new drugs called nootropics.  They're

8   kind of like a -- like a brain-enhancing drugs.  And that

9   was -- you know, they're legal in the United States, and I was

10  researching different ones.  And so it's -- you know, it's

11  really common for, I guess you would say, like younger people,

12  like a lot of people in, like, California, like Silicon Valley,

13  they use them to, like, just, you know, give themselves more

14  energy, more clarity and focus.  And so I was exploring those

15  drugs, and I had a lot of those pill capsules because I was

16  capping up a lot of different, like, supplements and stuff.

17  Q.   Okay.  Did you also have a digital scale and metal

18  grinders?

19  A.   Yes, I did.

20  Q.   What are those for?

21  A.   So, the digital scale would have been to weigh out, like,

22  powders, for example, like the powders I was using, like those

23  supplements.  You know, I'd also, like, weighed out, like,

24  cocaine on it before.  It was a little -- a tiny, little metal

25  scale.  You know, I guess marijuana sometimes.  I never used it

NOLAN SPERLING – DIRECT EXAMINATION

1    too frequently, but...

2    Q.  And you had cocaine in your bedroom that day, too; correct?

3    A.  Yes, that got seized as well.

4    Q.  What did agents from Homeland Security find at the post

5    mailbox that you had leased?

6    A.  On the PO boxes?  I believe they seized, I think, 4,000

7    pills of Xanax.

8    Q.  Anything else?

9    A.  I think -- I think that was it.

10   Q.  Was there any MDMA?

11   A.  Yeah, I think -- okay, yeah.  I think half of it was seized

12   at the box, and the other half was what was seized in New York,

13   if I recall collect -- correctly.

14   Q.  And the drugs that were seized by Homeland Security that

15   May, did you purchase those drugs with Bitcoin that you

16   purchased from Morpheus?

17   A.  Yes, I did.

18   Q.  Okay.  And what were the other kinds of drugs that were

19   seized prior to you meeting Morpheus?

20   A.  So, I think I mentioned this previously.  I had LSD that

21   was -- I ordered in earlier.  Maybe, like, 2014 or something.

22   So I know that got seized.  The one that I know of, that I

23   remember, is when I got the $10,000 worth of Xanax seized.  I

24   believe that was seized in Montreal by the Canadian government.

25   Q.  Okay.  And that was seized after you met Morpheus; correct?

1    A.  Yes, that is correct.

2    Q.  Okay.  So you mentioned to meeting him in the spring of

3    2015, and you texted him.  Where did you guys first meet?

4    A.  I believe we originally met at Whole Foods in North

5    Scottsdale.

6    Q.  Okay.  And who suggested that location?

7    A.  I think it was me.  I think I suggested it.

8    Q.  Okay.  And tell us about your first meeting, what you can

9    recall of it.

10   A.  I don't know, you know.  We sat down, I guess introduced

11   ourselves.  You know, I bought some Bitcoin and, you know, it

12   takes like 25, 35 minutes to clear before, you know, I see it

13   in my account.  So we were just talking, I guess, just -- I

14   think we were talking about, like, Bitcoins and, you know, how

15   did you get involved, and, you know, how did you hear about it.

16   I think that first meeting was just kind of an introductory,

17   like, hey, like, what's up.

18   Q.  Okay.  And what did you tell him your name was?

19   A.  I believe I told him my name was Nolan.  I'm not sure I

20   specified my last name or anything.

21   Q.  Did he --

22   A.  The --

23   Q.  Sorry.  Go ahead.

24   A.  No.  I'm finished.

25   Q.  Okay.  Did he ask for your ID?

NOLAN SPERLING - DIRECT EXAMINATION

1   A.   No, he did not ask for my ID.

2   Q.   Did he ask for your Social Security number?

3   A.   No, definitely not.

4   Q.   Your date of birth?

5   A.   No.  Not my date of birth.

6   Q.   A tax ID?

7   A.   No.

8   Q.   Or a bank account?

9   A.   No, he didn't.  He didn't ask for a bank account or

10   anything.

11   Q.   How would you have reacted if he had asked for that?

12   A.   For what; all of those things or which, you know?

13   Q.   Any one.

14   A.   Any one?  Like even my ID or something?  I don't know,

15   other than, like, um, all right, like -- I'd be kind of

16   wondering why, you know, like -- I assume he works -- he would

17   work on his own.  I don't know.  I would kind of wonder why he

18   wanted to see my ID.

19   Q.   Did you tell him during your first meeting that you were

20   purchasing Bitcoin for drugs?

21   A.   No.  I -- I did not.  That first meet-up I -- no, I

22   definitely wouldn't have mentioned that.

23   Q.   Okay.  And did he tell you his true name?

24   A.   No, I -- I never found out, I guess, as he called his legal

25   name, until -- until this trial.

NOLAN SPERLING - DIRECT EXAMINATION

1   Q.   Okay.  So how often did you meet with Morpheus?

2   A.   I guess it varied.  It was whenever I texted him and wanted

3   to meet up.  You know, maybe at least once a month maybe.

4   Maybe sometimes it would, you know -- like for example, when I

5   lost that $10,000 worth, I think.  I don't think I ordered

6   anything for, like, two months because I was -- you know, I

7   lost a lot of money and I was discouraged.  But on average, you

8   know, maybe once a month or so, once every six weeks.

9   Q.   And what were the amounts of the transactions that you were

10  doing?

11  A.   Again, it varied a lot.  I'd say typically it was anywhere

12  from maybe, like, two, 3,000, all the way up to, you know,

13  eight, 9,000, 10,000 maybe.

14  Q.   What is your best guess of the total amount that you spent

15  with Morpheus?

16  A.   Just all together over the course of, like, everything?

17  It's probably at least, like, 30,000.  Yeah.  Yeah.  30,000,

18  around, maybe 35 or something.

19  Q.   Okay.  And during the times that you were meeting with him,

20  how would you hand him the cash?

21  A.   So I'll just have, you know, a white envelope, you know,

22  stuffed with 20s.  And, you know, just put in my pocket and,

23  you know, we'd walk up.  It was Whole Foods, and we sat outside

24  at the tables they have there, and that was it.  You know, I'd,

25  you know, put it on the table or hand it to him under the table

1     or something.  And that's it.

2     Q.  And would he count the cash after you would hand it to him?

3     A.  Yeah, he would.  Basically almost always count the cash,

4     yeah.

5     Q.  Okay.  And there was once an occasion where you completed a

6     transaction at the Lifetime Fitness?

7     A.  Yeah.

8     Q.  Can you tell the jury about that?

9     A.  Sure.  So, I guess the Lifetime Fitness, it's the one in

10    north Scottsdale.  Yeah.  The reason we went there is because,

11    you know, in order to buy Bitcoins, you have to transfer it to

12    a wallet.  And I think my phone died, and, you know, I needed

13    to trans -- we needed to transfer the Bitcoins.  So I -- I

14    didn't have a phone charger, and we were at Whole Foods, and I

15    was, like, how do I get my -- how do I get my phone charged?

16    So I go to this gym, and I just thought maybe one of the guys

17    at the front check-in desk was, like, charging their phone

18    there.  And we went there, and sure enough, someone had a phone

19    charger.  So we -- I just plugged in my phone, we waited for,

20    like, 10 minutes, and then we did the transaction in, like, the

21    lobby of the Lifetime Fitness.

22    Q.  Okay.  And originally that transaction was at the Whole

23    Foods?

24    A.  I believe we originally were at Whole Foods, yeah.

25    Q.  Did you guys drive to the Lifetime Fitness together, or --

1   A.   No.   In fact, maybe, in fact, maybe -- I think we

2   originally planned for Whole Foods, and then maybe my phone

3   died, and I think I might have showed up there just to tell

4   him, hey, let's go to Lifetime, it's right there,

5   da-da-da-da-da.   And then we drove separately, you know.

6   Q.   Was Morpheus any different during the time that the

7   transaction occurred in the Lifetime as opposed to the Whole

8   Foods?

9   A.   Was he any "different"?

10  Q.   Uh-huh.

11  A.   I -- I don't know.   I mean, he didn't -- I don't think he

12  counted the cash because we were in, like, you know -- we were

13  in the lobby of a gym.   So I think he just -- you know, I

14  handed it to him and he looked at it, and I think he was just,

15  like, put it away.   He was, like, all right, I think it's all

16  there.   But besides that, I don't know.   I feel like it was

17  usual.

18  Q.   Typically how would he arrive to the meetings?

19  A.   He would almost always be there before I got there.   I

20  believe he would drive there, if that's what you're asking.

21  Q.   Yeah.

22  A.   Yeah.

23  Q.   Do you recall specifics to the vehicle he was driving?

24  A.   I don't think I ever saw him pull up.   But it was, you

25  know, it was, like -- maybe like a late '90s, like, Dodge Neon,

1   something, just a small, two-door car, kind of an older car.

2   Q.   Okay.  In the course of your relationship, did you ever

3   mention to Morpheus that you were purchasing drugs online?

4   A.   I think after a while that, like, that came up because

5   like, you know, going back to that story where I lost the

6   $10,000, you know, that was in September 2015.  So I'd known

7   him for, I don't know, like, six, seven, eight months,

8   something at that point.  And I believe I told him about that

9   when I had those -- that drug -- that amount seized in -- in

10  drugs.

11  Q.   Okay.  Did he ever ask you to purchase drugs for him?

12  A.   There was this one time he asked me if I could get DMT.

13  Q.   And what is DMT?

14  A.   So, it's a -- it's an extremely powerful psychodelic

15  substance.  It's -- you know, it's a naturally occurring

16  substance.  It's in a lot of actual living things.

17  Q.   Do you know what "DMT" stands for?

18  A.   I -- I could try and say it, but I -- I don't really

19  remember.  It's like di -- dimatried -- I don't -- I don't

20  remember.  It's a technical -- you know, it's an abbreviation.

21  Q.   Okay.  So let's go back.  How -- so how -- when -- did he

22  ask you to get him DMT after you told him about your Xanax

23  seizure, or before?

24  A.   I -- I guess it was after, but I don't think that's what

25  led to it necessarily.  I think, you know, it's not like that

NOLAN SPERLING - DIRECT EXAMINATION

1   was, like, the next conversation we had.  But I believe it was

2   after that point in time when he asked me to do that.  It would

3   have been after that, you know, September of 2015.

4   Q.  Okay.  And did you get the DMT for him?

5   A.  Yes, I did.

6   Q.  On how many occasions?

7   A.  I think it was once, maybe twice.  Yeah.

8   Q.  Okay.  And where did you purchase the DMT from?

9   A.  Online.

10  Q.  And did you purchase it with Bitcoin?

11  A.  I did.

12  Q.  And how did he pay you for the DMT?

13  A.  I -- I think he just transferred me Bitcoin.  You know, I

14  told him how much I was going to charge him for it, and then I

15  think he just transferred it to me.  He might have given me

16  cash, but he would have had to give me just Bitcoin to buy it,

17  because he's, you know, who I buy my Bitcoin from.  So I'd

18  imagine, yeah, it was with the Bitcoins.

19  Q.  Okay.  After you told him about the 10,000 Xanax pills

20  seizure, did he stop doing business with you?

21  A.  It was $10,000.  It wasn't 10,000 pills.

22  Q.  I'm sorry.  $10,000 worth.

23  A.  No, he never stopped doing business with me.

24  Q.  Okay.  What was your phone number at the time?

25  A.  It would have been (480)686-7050.

1    Q.  And is that the phone number that you had every time you

2    texted Morpheus?

3    A.  Yes.  That's the phone number I had for a really long time,

4    you know, since I got a phone.

5    Q.  Okay.  And did you ever communicate through a different

6    means, other than the regular text messages, on your phone?

7    A.  So, yeah, he -- I think he one day wanted me to get an app

8    called Telegram, and it was a -- it's like an encrypted

9    messaging app.  So --

10   Q.  Had you had Telegram prior to meeting Morpheus?

11   A.  No, I never heard of it before that.

12   Q.  Did you download it after he told you about it?

13   A.  Yeah.

14   Q.  Okay.  And you were describing it.  It was an encrypted

15   messaged app?

16   A.  Sure.  So, I guess it's similar, like WhatsApp or

17   something, where it's just a peer-to-peer messaging service,

18   but I guess they emphasized the fact that it was encrypted

19   messaging and it was secure, like encrypted on their own

20   servers as well.  I think that was, like, an advertising staple

21   of theirs, you know, because like other apps, like WhatsApp

22   also, I think, encrypt their messages.  But this one, I think,

23   like heavily advertised it or something.

24   Q.  And what is your understanding of what "encrypted" means?

25   A.  So, encryption is a, you know, it's a way to, I guess,

 1   scramble up a message.  And in order to de-scramble the

 2   message, you need an encryption key.  Typically those keys are

 3   long and complex.  And depending on the level of encryption,

 4   you know, it could be so complex that, like, computers can't

 5   figure it out because, you know, the key might change every 30

 6   seconds, or something like that.  So it -- it scrambles up the

 7   message so you can't do it unless you have the key to

 8   unscramble it.

 9   Q.  And approximately when did he tell you to download

10   Telegram?

11   A.  I don't really remember, maybe around that time in fall of

12   2015.

13   Q.  Okay.  Did he ever tell you -- did he ever mention

14   something called Mycelium to you?

15   A.  Yeah.  I believe Mycelium, that's the coin -- the Bitcoin

16   wallet.

17   Q.  Tell the jury how that came up.

18   A.  So, you know, I think it was the same way he brought up

19   Telegram.  It's, like, hey, man, there's this app that acts as

20   a Bitcoin wallet -- which if you don't know what a Bitcoin

21   wallet is, it's a wallet where -- you know, it's a digital

22   wallet you have on your phone where you can store Bitcoins.  So

23   it's your own account, essentially, that will transfer Bitcoins

24   to.  And I think before that I wasn't using my phone.  I was

25   just transferring directly to, like, an online website.  And so

1    I -- I just -- yeah, I think it just added, like, a level of

2    convenience, you know.  It was on your phone.  It was, you

3    know, like you could scan a QR code.  It was really nice.

4    Q.  Okay.  Did you download the Mycelium?

5    A.  Yeah.  Yeah, it was.  It was great.

6    Q.  Prior to your testimony, did you get the opportunity to

7    review text messages that you had exchanged with Morpheus?

8    A.  Yes, I did get a chance to do that.

9    Q.  Okay.  And was your phone number on those text messages?

10   A.  Yes, it was.

11   Q.  Okay.  And were those true and accurate conversations that

12   you had via text message with Morpheus?

13   A.  Yeah, those were the original texts that we sent.

14           MS. ESCALANTE:  Your Honor, I would like to publish

15   what has been previously admitted as Exhibit Number 32.

16           THE COURT:  You may do so.

17   BY MS. ESCALANTE:

18   Q.  Mr. Sperling, are these the text messages that you

19   reviewed?

20   A.  (Pause.)

21   Q.  It's on the screen in front of you.

22   A.  It looks similar.  It's kind of blurry on my screen.  I

23   can't read line by line, but it looks like the exact document I

24   reviewed, yes.

25   Q.  Okay.  And I can try and make it larger here.

1    A.  Yeah, it looks -- it looks like the exact document I

2    reviewed.

3    Q.  Do you see that on the screen?

4    A.  Yeah, I can read that.

5    Q.  Are these your text messages?

6    A.  Yeah.  Yeah, those look like my texts.

7    Q.  Okay.  Let's go through them.

8    A.  Okay.

9    Q.  Do you see number 10?

10   A.  Yes.

11   Q.  And I guess 10-1 is a duplicate of 10.  What is the date

12   for that text message?

13   A.  It looks like 2-5-15.  So, February 5th, 2015.

14   Q.  Okay.  And who is that text message from?

15   A.  It looks like it's from my phone number, (480)686 -- yeah,

16   it's my phone.

17   Q.  And what's the name stored for that phone number?

18   A.  It says Nolan Whole Foods 4:30 furry -- Ferreri -- furry?

19   Q.  And your first meeting with Morpheus was at Whole Foods?

20   A.  Yeah.  Yeah, I believe so.

21   Q.  Okay.  And what does the text message say?

22   A.  (Reading)  Morpheus, I was looking for some coins today.

23   When can you meet?

24   Q.  Do you believe that's your first text message sent to him?

25   A.  I don't think so, because I feel like -- yeah, maybe it

1    might have been.  I don't know.  Over the -- yeah.  Could have

2    been.

3    Q.  Okay.  Let's go down.

4    A.  I feel like I would, like, introduce myself for, like, a

5    first message.  That's why I was only hesitant to say it

6    might -- it might not have been.

7    Q.  Okay.  So there may have been a text message prior to the

8    February 2015 one?

9    A.  Yeah, I think it was on here, too.  I think it might have

10   been lost somewhere in the page, because I do remember looking

11   at a message.

12   Q.  Okay.  Let's keep going.

13   A.  All right.

14   Q.  Then there is a message to you, 11-1.  Who is that from?

15   A.  I -- I imagine it's from Morpheus.

16   Q.  Okay.  And what does the message say?

17   A.  It says:  Sure.  Where you at?

18   Q.  And what do you respond?

19   A.  (Reading)  I'm in Cave Creek, but I'm heading Scottsdale in

20   a couple hours.

21   Q.  Is that consistent with your text messages for that time?

22   A.  Just -- was what consistent?

23   Q.  What you're reading.

24   A.  Yeah, yeah.  It's the same day.  It's -- yeah.

25   Q.  Did you -- did you guys meet that day?

1    A.  I believe so, yeah.

2    Q.  Okay.  Let's look at text 13.  What is that?

3    A.  So, that looks like a Bitcoin address to send to a Bitcoin

4    wallet.  So it's the address you send to.

5    Q.  And based on when this is sent, had you already received

6    Bitcoin?

7    A.  Yeah.  I bought it through Coinbase and whatnot, so I had

8    received Bitcoin at this point in time.

9    Q.  So, I'm sorry.  Let me clarify that.  For number 13, did

10   Morpheus send that to you or did you send that to him?

11   A.  I sent that to him.

12   Q.  And what was that for?

13   A.  That was so he could send me Bitcoins to that address.  I

14   was providing him the key to my address.

15   Q.  And did he send Bitcoin to that address?

16   A.  Yeah, I -- to my recollection, I believe he did.

17   Q.  Okay.  Go to text 14.

18            What does that say?

19   A.  Number 14?

20   Q.  Uh-huh.

21   A.  So it says:  Nolan, great to meet and do business.  Hit me

22   up any time you're buying or selling.

23   Q.  And who was that from?

24   A.  That would be from Morpheus.

25   Q.  Okay.  Let's talk about text 15.

1    A.   Okay.

2    Q.   What does that say?

3    A.   (Reading)  Sounds good and will do.  Thanks for being so

4    professional.

5    Q.   And did you send that to him?

6    A.   Yeah.  I did.

7    Q.   And how did he respond in text 16?

8    A.   (Reading)  Birds of a feather.

9    Q.   What did that mean to you?

10   A.   I have no idea.  "Birds of a feather."  I assume it was a

11   saying.

12   Q.   Okay.  After this meeting, did you guys continue to have

13   communications and interactions?

14   A.   Yeah.  Yeah, we did.

15   Q.   Did he ever send you links to look at?

16   A.   Yeah.  Yeah.  He sent me stuff before.

17   Q.   Okay.  Let's go to text 26.

18            Do you see text 26?

19   A.   Yes, I do.

20   Q.   And what's the date?

21   A.   That would be 8-9-15.  So, August 9th, 2015.

22   Q.   Okay.  And what does it say?

23   A.   Says:  Hey, Nolan, how's it going?

24   Q.   So Morpheus reached out to you?

25   A.   Yes, that's correct.

1   Q.  And how did you respond?

2   A.  I said:  Pretty swell.  I'm just here to talk a little

3   business.  Last time we met I was purchasing coins for a

4   friend.  I get my coins off Coinbase, so I don't usually need

5   to buy in person.  I'm now starting to purchase rather large

6   amounts of coin; and as such, I am looking for the cheapest

7   in-person buyer to anonymously get my coins from.

8   Q.  Okay.  Let's go to text 28.

9   A.  Do you want me to read it?

10  Q.  Uh-huh, if you could read it and tell us who it's from.

11  A.  So that's from my phone number, that's from my cell.  I

12  wrote that.  And it says:  I remember your rate was 10 percent,

13  but you must have felt -- felt I was nice or something because

14  you gave me a slight discount per my request.  I'm wondering

15  what's the best rate you can give me on $3,500 and $6,500 worth

16  of coin.

17  Q.  Okay.  So let's stop there and just discuss the previous

18  text messages.

19          So where you tell him that the last time you were

20  purchasing coins for a friend, was that true?

21  A.  Yeah, I believe so.

22  Q.  Okay.

23  A.  Yeah.

24  Q.  And when you told him you wanted to look for the cheapest

25  buyer to anonymously get your coin from, what did you mean by

1   that?

2   A.   I mean exactly what it says.   I was trying to find someone

3   in person who would sell me Bitcoins, and that was one thing

4   that you, I guess, could call sacrificed when you switched from

5   Coinbase, which Coinbase charged, like, a percent-and-a-half,

6   but a standard for a lot of the in-person meet-ups was, like,

7   10 percent.

8   Q.   Okay.  And why make the sacrifice?

9   A.   Again, I felt like it was a small price to pay to maintain

10  my level of ana -- anonymity.

11  Q.   Okay.  Okay.  Let's go to text 29.  If you could read it,

12  who it's from, and what it says.

13  A.   Yeah, sure.  So, that's to me.  It says:  When you want to

14  do it?

15  Q.   And then let's go to 30.

16  A.   So that's from me, and I said:  This wouldn't be for a few

17  weeks.  I'm just scooping -- scooping out -- around beforehand.

18  Q.   Okay. 31?

19  A.   Scoping.  Sorry.  Not "scooping."  Scoping.

20          And then 31 would say -- that's to me from Morpheus,

21  and he says:  Usually I do 7 percent for over 10K.  What if I

22  do that for 6500?  What kind of volume you want to do, question

23  mark?  If you're going to be a baller, I might come down more.

24  Q.   Okay.  Did text 31 convey to you that he's willing to do

25  large volumes?

1   A.  Yeah.  Yeah, it does, because you usually do 7 percent for

2   over 10K, and implies that he would have done that at least

3   once before.

4   Q.  And that's larger than the daily limit you could purchase

5   off Coinbase?

6   A.  Yeah, that would be, like, 10 times larger.  Would be

7   exactly 10 times larger.

8   Q.  Go to text 32.

9   A.  Okay.  So that was from me.  And it says:  LOL.  Let's keep

10  that 7 percent the first time around, and how about every time

11  I make that same 6,500-dollar purchase after that, the rate

12  goes down to a fixed 5.5 percent.  I'd hopefully -- hopefully

13  be making that every one to two months.

14  Q.  Okay.  Text 33?

15  A.  (Reading)  Making that purchase.

16          With asterisk marks, you know, correcting my --

17  correcting what I had previously said.

18  Q.  Text 34?

19  A.  That was to me from Morpheus, and it says:  Sounds good.

20  Q.  Text 35?

21  A.  That's from me, it says:  All right.  So the big orders are

22  still in the works.  Then in the meantime, could I get 1550

23  worth today?

24  Q.  Text 36?

25  A.  So, that's to me from Morpheus:  Sure thing.  Where meet.

1  Q.  Okay.  And did you guys meet to conduct the purchase?

2  A.  I believe so, yeah.

3  Q.  Okay.  And these text messages, you had not reviewed them

4  the first and second -- the first and second time that you met

5  with the government; correct?

6  A.  No, I -- I just looked over these maybe a few weeks ago, a

7  month ago, for the first time since writing them.

8  Q.  And the second time that you met with the government, you

9  had stated that you had not told Morpheus what your -- what you

10  were using your Bitcoin for; correct?

11  A.  Yeah, I might have said that, because I feel like, yeah, I

12  never -- I feel like I never, like -- he never asked.

13  Q.  But then after you reviewed these text messages, did that

14  refresh your recollection?

15  A.  Yeah.  Because, like I said, I hadn't read these texts

16  since I sent them, until a few weeks ago.  And, yeah, it

17  refreshed my memory, you know.  I can -- yeah.  Yeah, it did.

18  Q.  And so -- and we're going to keep going into a few more.

19  But after reading these text messages, you feel that -- or you

20  believe that you did tell Morpheus that you were purchasing

21  Bitcoin to buy drugs online?

22  A.  I'm not -- I'm not sure if I ever explicitly said that, but

23  I think, you know, when I said I lost -- I told him I lost

24  $10,000 in a deal, I -- I think I told him it was for Xanax.

25  Yeah.  That would make -- I mean, it would make sense.

```
 1    Q.  Okay.  So you at least were telling him that the Bitcoin
 2    that you were buying --
 3              MR. CAIN:  Objection.  Leading.
 4              THE COURT:  Do you want to rephrase your question?
 5              MS. ESCALANTE:  Okay.
 6   BY MS. ESCALANTE:
 7    Q.  So although you never directly told him what -- why you
 8    wanted the Bitcoin from him, you told him what you were using
 9    it for?
10              MR. CAIN:  Objection.  Leading.
11              THE COURT:  Sustained.
12   BY MS. ESCALANTE:
13    Q.  What is your understanding of what you told him, how he --
14    how did you tell him -- or how did -- yes.  How did you tell
15    him that the Bitcoin that you were using was associated to
16    drugs?
17    A.  I think it came up over a while, you know.  We -- we'd just
18    done so many deals together.  I was doing large volumes with
19    him.  And I believe in one of these texts here I mentioned how
20    I lost $10,000 worth of -- I'm not sure that I said coins, I
21    might have said drugs -- and I think that might have prompted
22    later discussions on what I was using the coins for.
23    Q.  Okay.  And these text messages that we see here, are
24    they -- do these include the Telegram text messages?
25    A.  No, I believe these are just SMS text messages.
```

1    Q.   Okay.

2    A.   So this doesn't include anything that we would have

3    corresponded over the Telegram encrypted messaging app.

4    Q.   Okay.  Let's go to text 56.

5    A.   All right.  So that was from myself.  It says:  I'm sending

6    my buddy Jake your way.  He's looking for 40 BTC.

7    Q.   Okay.  And who is Jake?

8    A.   Jake is an old friend of mine, yeah.  He lives in, I think,

9    like, Montana now, or maybe, like -- I think he might have

10   moved to Oregon or something.  I forget.

11   Q.   Do you know what he was buying Bitcoin for?

12   A.   I believe he was buying Bitcoin to buy drugs.

13   Q.   And let's look at text 57.

14   A.   That's to me from Morpheus.  (Reading)  How well you know

15   Jake?  We are meeting tomorrow.

16   Q.   Let's look at text 58.

17   A.   So that's from me.  It says:  He was the friend who I

18   originally bought these coins off of you at Whole Foods that

19   one time.  I think it was a few thousand worth.

20   Q.   And then text 59.

21   A.   So, that's from me.  (Reading)  The thing is is that he

22   will send the money.  He's various -- he's very serious about

23   that for sure.

24   Q.   Why did you feel the need to send that message?

25   A.   I guess I was just backing my friend up, vouching for him.

 1    Q.   Okay.  Let's look at text 60.

 2    A.   That's from myself:  This is the guy I was buying for that

 3    time at Whole Foods.

 4    Q.   Okay.  Then let's look at 61.  This is different -- a

 5    different day.

 6    A.   Sure.  So that would be September 2nd from myself:  Could

 7    you do -- I think it says -- 3850 at 7 percent later today or

 8    sometime tomorrow?

 9    Q.   Is this approximately around the time where your Xanax got

10    seized?

11    A.   Yeah, it's around the same time.  I don't remember exactly

12    when it happened, but it was around this time, yeah.

13    Q.   Let's look at text 62.

14    A.   So it says:  Let's talk on Telegraph.  Okay?

15              It's an app.  And it looks like that was sent to me

16    from Morpheus.

17    Q.   Okay.  63.

18    A.   So that's from me:  Sounds good.  I'll download it now.

19    Q.   64?

20    A.   And that's also from me:  What's your email or full name so

21    I can add you?

22    Q.   Did he ever -- did he ever send you his full name?

23    A.   I -- I don't think he did, no.

24    Q.   65.

25    A.   So that's to me:  Whoops.  It's called Telegraph.

1    Q.  66?

2    A.  Telegram.  I think he was correcting himself because I

3    think it's called Telegram, not Telegraph.

4    Q.  68?

5    A.  So that would be from myself and it says:  Oh, ha-ha.  All

6    right.  That's funny because there's a private messaging app

7    called Telegraph as well.

8    Q.  69?

9    A.  That's to me from Morpheus:  Telegram is the one I've been

10   using.

11   Q.  Okay.  And did you guys, from that point on, use Telegram

12   to communicate?

13   A.  Yeah.  And I believe anytime we talked, I -- especially

14   about business, we would just use that app.  He might have

15   texted me once or twice outside of the app.

16   Q.  Okay.

17   A.  -- after that, but it was dominantly through the app after

18   he told me about it.

19   Q.  Let's look at text 84.

20   A.  Okay.  So that's to me.

21   Q.  And when is that?

22   A.  That would be November 16th of 2015.

23   Q.  And what does it say?

24   A.  It says:  Okay.  You know info.  You can send to your

25   customer so they can understand.

1    Q.   Actually, let me back up so we can see the preceding text.

2         83-1.

3    A.   So that's from me.  It says:  Listen to the first 15

4    minutes and got bored.  Ha-ha.  But it was good.  I'm just busy

5    and can't listen to the whole thing.  It was similar to the

6    last talk show thing you did a while back.

7    Q.   Okay.  So he had sent you a link to a talk show that he

8    did?

9    A.   Yeah.  I think he was interviewed on, like, a radio talk

10   show.

11   Q.   Okay.  And then in text 84, he was telling you so you could

12   share that or send that to your customers?

13   A.   I -- I guess that's what he was saying with that, yeah.

14   That's what appears.

15   Q.   And who -- who were the customers that you had?

16   A.   Just various people I knew.

17   Q.   And what were those customers buying from you?

18   A.   They were buying Xanax and MDMA, predominantly.

19   Q.   So he's aware that you had customers.

20   A.   Yes.  This -- this would imply that, yeah.

21   Q.   Nolan, what is your understanding of the duration for your

22   cooperation agreement?

23   A.   So, I believe I entered into the plea agreement and the

24   cooperation agreement on -- I think that was at the beginning

25   of the year, maybe around December, January-ish.  And it was a

1    three-year probation period.

2    Q.   Okay.  And so right now as you testify, how much longer do

3    you think you have?

4    A.   Like at least two-and-a-half years.

5    Q.   And you're expected to graduate this May?

6    A.   That is correct, yeah.

7    Q.   And what is your current GPA?

8    A.   I think it's like a 3.77, 3.76 or something like that.

9    Q.   Okay.

10          MS. ESCALANTE:  May I have a moment, Your Honor?

11          THE COURT:  You may.

12               (Pause in proceedings.)

13          MS. ESCALANTE:  No further questions.

14          THE COURT:  Thank you.

15          Cross-examination?

16                    CROSS-EXAMINATION

17   BY MR. CAIN:

18   Q.   Mr. Sperling, when you say that you knew that your buddy

19   Jake was going to use the Bitcoin to buy drugs -- you don't

20   have to look at those right now.

21   A.   Okay.

22   Q.   When you say you knew your buddy Jake was going to use that

23   Bitcoin to buy drugs, you didn't tell that to Mr. Costanzo, did

24   you?

25   A.   I don't believe I did.

1   Q.  Okay.  And you knew -- you didn't explain to us how you

2   knew, but I'm assuming you knew that because you knew your

3   buddy Jake.

4   A.  You're saying -- I'm sorry.  Can you rephrase the question?

5   Q.  You knew that your buddy Jake used drugs.

6   A.  I knew that he sold them, yeah.

7   Q.  Okay.  And you knew that because you guys were friends.

8   A.  Yes.

9   Q.  Had you guys used drugs before together in the past?

10  A.  I mean, we'd smoke weed together.

11  Q.  Had you sold drugs together in the past?

12  A.  Yeah.

13  Q.  Now, when the government was asking you questions about

14  whether or not you ever told Mr. Costanzo that you were selling

15  drugs, and you kept talking about the 10,000-dollar loss, you

16  said that, maybe I said something about 10,000 -- losing

17  $10,000 in coin or $10,000 in Xanax, I'm not sure.

18  A.  Uh-huh.

19  Q.  We need you to be sure about what you recall.  So, what is

20  it that you recall saying precisely to Mr. Costanzo?

21  A.  I recall that I mentioned that my -- a package was seized,

22  and I lost $10,000 as a result of a seizure -- a "seizure"

23  being a seized package, not someone having a seizure, of

24  course.

25  Q.  At that point -- prior to that point, had you ever told

1   Mr. Costanzo that you were a drug dealer?

2   A.  I never flat-out told him that I was a drug dealer.

3   Q.  Did you ever tell him that you were selling pills?

4   A.  I never probably used the terminology "pills," but I -- no,

5   I don't believe I ever told him I was -- I sell drugs.

6   Q.  I want to ask you some questions about some of the packages

7   that you imported that were seized.

8   A.  Okay.

9   Q.  Do you understand?

10          So you mentioned already that you were arrested by

11  Homeland Security in May of 2016.

12  A.  I was never arrested.  My house was -- they had a warrant

13  to search my house, and I was out of the country at the time.

14  Q.  You were in Canada at the time?

15  A.  I was in Canada at the time.

16  Q.  But there was a seizure of drugs in San Francisco in May of

17  2016.

18  A.  Was it in San Fran?  Okay.  I -- I thought -- I thought it

19  got -- I thought it was New York.  But there was a seizure of

20  drugs at some international port, yes.

21  Q.  And it was a seizure of MDMA?

22  A.  Yes, it was.

23  Q.  Approximately 133 grams.

24  A.  Yes, I believe it was, yeah.

25  Q.  And that was a package that you had ordered from The

NOLAN SPERLING – CROSS–EXAMINATION

1    Netherlands?

2    A.  Yes.

3    Q.  And that was a package that you intended to have delivered

4    to you at your post office box in Cave Creek?

5    A.  That is 100 percent correct.

6    Q.  Now, in -- on March 31st, 2013, so that would have been --

7    A.  That would have been --

8    Q.   -- spring of your senior year --

9    A.  Yes.

10   Q.   -- does that sound right? --

11   A.  Yes, that is correct.

12   Q.   -- there was a package seized in Chicago; correct?

13   A.  Yes, I believe that is correct.

14   Q.  And that was another package that was coming from The

15   Netherlands; right?

16   A.  I -- I don't recall where it came from.  It could have

17   been -- it could have been The Netherlands, yeah.  Could have

18   been Canada.  It came from somewhere out -- out of the country.

19   Q.  And that was a sizable quantity of LSD that you ordered.

20   A.  I think it was, like -- I don't remember.  It was either 25

21   or 50 tabs.  So 25 to 50 hits.

22   Q.  And that was an order that you placed?

23   A.  Yes, that was an order I placed online.

24   Q.  Okay.  About a month-and-a-half later on May 19th of 2013,

25   also in Chicago, another package was seized.  Is that correct?

NOLAN SPERLING – CROSS-EXAMINATION

1    A.  Yes, I believe that is correct.

2    Q.  And was that also LSD?

3    A.  I -- I'd have to look at the report.  It might have been,

4    yeah.

5    Q.  Well, at that time, what do you recall that you were

6    ordering from The Netherlands; were you ordering both LSD --

7    A.  Yeah, it was -- it could have been LSD, it could have

8    been -- there's, like, some research chemicals I was ordering

9    in, like 25I.  Yeah, because I was -- that would have been my

10   senior year.  Yeah.  It could have -- it could have been

11   marijuana, honestly.  I don't really recall at this -- at this

12   point.  I never got, you know, like a letter in the mail,

13   telling me it was seized.  So I don't have a recollection of it

14   being seized.  It just didn't show up.  I would assume it was

15   seized, you know.

16   Q.  But you came to know about these seizures as part of this

17   investigation.

18   A.  Absolutely, yeah.

19   Q.  Because after you became aware of this investigation,

20   you've had meetings with the federal agents where they have,

21   obviously, interviewed you about your activities.

22   A.  That is correct.

23   Q.  And they've brought to your attention all of these seizures

24   and let you know that you've been under their radar for a

25   while?

1    A.  Yes, that is correct.

2    Q.  So in September, specifically September 29th of 2013, there

3    was another seizure also in Chicago; is that correct?

4    A.  Yes, that sounds correct.

5    Q.  And that was an MDMA package from The Netherlands.

6    A.  That sounds right.

7    Q.  And then in February of 2014, another package seized in

8    Chicago; correct?

9    A.  I believe so, yes.

10   Q.  And that was a package containing marijuana?

11   A.  That sounds right.

12   Q.  So at this point, by my count, we've -- we've covered five

13   importations of drugs from other countries; is that fair to

14   say?

15   A.  Yeah, I believe so.  I think this marijuana was from Oregon

16   or something, so -- or it might have been from Canada.  Again,

17   I don't recall exactly where it came from, but...

18   Q.  I will circle back with you on that.

19   A.  Sure.

20   Q.  I want to ask you some more questions about that.

21   A.  Okay.

22   Q.  The government did ask you some questions about the search

23   warrants.  Do you recall answering some questions about those?

24   A.  Uh-huh, yeah.

25   Q.  So in this case, as part of the investigation, there was a

NOLAN SPERLING – CROSS-EXAMINATION

1    search warrant served at your parents' home?

2    A.  That is correct.

3    Q.  And there was a search warrant served at the Post Office --

4    A.  Yes.

5    Q.  -- box.  Let's talk about the search warrant at the Post

6    Office box.

7    A.  Okay.

8    Q.  There was a package in the Post Office box that was seized

9    that contained a large quantity of Xanax; correct?

10   A.  That is correct.

11   Q.  And that was a package that was imported from Canada; is

12   that correct?

13   A.  Yes.  I believe so.  Yeah.

14   Q.  Specifically from Montreal?

15   A.  Uh-huh.

16   Q.  Is that a "yes"?

17   A.  That is a "yes."

18   Q.  Sorry.  I -- I have to ask you to say -- make a verbal

19   answer.

20   A.  Of course, yeah.  My bad.

21   Q.  And how many pills or how many doses were part of that

22   package?

23   A.  I think a thousand or 2,000.  I think it was split up into

24   one or two packages.  It might have been -- I think it was

25   2,000.

1    Q.  And I may have made a mistake.  There were actually two

2    parcels from -- there were actually two parcels from Montreal;

3    were there not?

4    A.  I believe so, yes.

5    Q.  Okay.  And then there was actually a third package found in

6    that Post Office box that was -- that contained another

7    133 grams of MDMA?

8    A.  Yes, that would have been the other half of the shipment

9    that was seized.

10   Q.  And so that would have come from The Netherlands?

11   A.  Yes, it would have.

12   Q.  Okay.  So right now we're talking about seven or eight

13   importations --

14   A.  Yes.

15   Q.  -- if we talk about those packages that were found;

16   correct?

17   A.  Yes.  Yes, we are.

18   Q.  Now, the -- the agents who served the search warrant on

19   your parents' home obviously found a large quantity of drugs in

20   your bedroom; is that correct?

21   A.  That is accurate, yes.

22   Q.  Okay.  And those drugs were drugs that you imported, as

23   well?

24   A.  Yes.  Yes, they were.

25   Q.  And that included MDMA; right?

 1    A.   Uh-huh, MDMA, yes.

 2    Q.   Cocaine?

 3    A.   Yes.   That cocaine was not imported, though.   I bought it

 4    from some acquaintance, a friend of a friend.

 5    Q.   So that was purchased here in Arizona?

 6    A.   That was local, yes.

 7    Q.   Okay.   There were Adderall pills?

 8    A.   That was also locally.

 9    Q.   There were Xanax pills?

10    A.   Yes, that was imported.

11    Q.   Mushrooms?

12    A.   That was also locally.

13    Q.   And I'm sure this goes without saying, but your parents

14    were not aware that you were selling drugs out of their home?

15    A.   They were -- they were completely unaware.   It was --

16    Q.   They were -- I didn't mean to cut you off.

17    A.   Sorry.   It was --

18    Q.   Your parents were unaware that you were receiving packages

19    that you had imported that contained illegal controlled

20    substances?

21    A.   They were completely unaware.

22    Q.   And you were being dishonest with them by not letting them

23    know that you were doing that?

24    A.   I guess "dishonest," that implies that I lied at some

25    point.   They never found out about it, so I never had the

 1    opportunity to lie.  So I guess I was devious, you could say.

 2              MR. CAIN:  Your Honor, this may be a good time to

 3    break.

 4              THE COURT:  All right.  Ladies and gentlemen, it's

 5    time for our noon break.  Remember the admonition.  Please be

 6    back about 1:15.  We'll be ready to resume.

 7              Thank you very much.

 8              COURTROOM DEPUTY:  All rise.

 9                (Jury leaves the courtroom at 11:58 a.m.)

10              THE COURT:  Just so all parties are aware,

11    Mr. Sperling informed me that our witness box is falling apart.

12    We'll try to have it fixed at lunchtime.

13              THE WITNESS:  I think -- I see Velcro on here as if

14    someone had a Velcro unstrapped or something.

15              THE COURT:  Maybe.  We'll check it out.

16              Is there anything else that either party has to raise?

17              MS. WEIDNER:  Nothing from the defense, Your Honor.

18              MS. ESCALANTE:  No, Your Honor.

19              THE COURT: All right.  Thank you.

20                (Proceedings in recess at 11:59 a.m.)

21                (Jury enters the courtroom at 1:22 p.m.)

22                  (Proceedings resume at 1:23 p.m.)

23              THE COURT:  Please be seated.  Hope you had a nice

24    lunch.  Ready to proceed, Mr. Cain?

25              MR. CAIN:  Yes, Your Honor.

NOLAN SPERLING – CROSS-EXAMINATION

1              THE COURT:  Please do so.

2                  (NOLAN SPERLING resumes witness stand.)

3     BY MR. CAIN:

4     Q.  Mr. Sperling, when Homeland Security served the warrant on

5     your parents' house, your parents were very surprised.

6     A.  Yes.  That is an understatement.

7     Q.  You had successfully concealed from them that you were

8     involved in this type of drug activity.

9     A.  Yeah, you could say that, during this time.  You know, they

10    weren't very snoopy, they never really -- you know, my mom

11    never cleaned my room or anything.  They were never really in

12    there, you know.

13    Q.  Your parents did not know that for approximately three to

14    four years, that you were involved in international drug deals?

15    A.  That is correct.  But they did know that I was doing drugs.

16    Back in high school, they found out about me using, like, Molly

17    and acid, whatnot.  That was probably back in February of 2013.

18    But after that, they -- they had no idea I was buying these

19    drugs online and keeping at their house, no.

20    Q.  Right.  They didn't know you were buying drugs in bulk and

21    then distributing them to others.

22    A.  Yeah.  Absolutely not.

23    Q.  And you had been able to carry on in your life in a way to

24    conceal that from them so that they didn't catch on.

25    A.  That is correct.

1    Q.  You told us that you had imported drugs from The

2    Netherlands and from Canada; correct?

3    A.  Correct.

4    Q.  Were there other countries that you had also imported

5    substances from?

6    A.  Yeah.  I think I might have gotten -- once gotten MDMA from

7    Germany.  That's -- Germany and The Netherlands were the two

8    most popular countries for doing that.

9    Q.  On how many occasions did you import drugs from Germany?

10   A.  I don't know.  Maybe half a dozen.  Maybe more or less.

11   You know, the country changed all the time, just depending on

12   what vendors were available.  You know, vendors -- new vendors

13   popped up all the time, and others went away.  You had to

14   constantly find new people.

15   Q.  I don't want you to guess.  I want you to give us your best

16   accurate estimate.  Let's talk about The Netherlands.  How many

17   times -- how many orders or packages did you order from The

18   Netherlands?

19   A.  If you count orders, because, for example, with the MDMA, I

20   ordered one order, but they ship it in multiple packages.  So

21   would you want to count each package or an order?

22   Q.  Each package.

23   A.  Each package.  I would say maybe 10, 10, 12, 10 to 12.

24   That's -- you know, it's a loose estimate based on what you

25   want me to supply.

NOLAN SPERLING - CROSS-EXAMINATION

1   Q.  How many packages did you order from Canada?

2   A.  It's more than 10.  Maybe around 20.  You could say 15

3   maybe.  Fifteen to 20.

4   Q.  Did you ever obtain or order drugs from another state?

5   A.  I think I might have ordered marijuana once from Oregon.

6   It might have gotten seized, though, to my knowledge.  I don't

7   recall ever getting it.  Although I don't believe that was one

8   of the items brought up today.

9   Q.  When we talked about some of the items that were found in

10  your bedroom during the service of the search warrant, you

11  talked about some of the drugs you had actually bought locally;

12  correct?

13  A.  That is correct.

14  Q.  In that three to four-year time period, how many times had

15  you bought drugs locally for the purpose of reselling them, or

16  redistributing them?

17  A.  Maybe 10, 15 times.  Fifteen, 20 individual times.  Yeah,

18  maybe closer to 15 to 20.

19  Q.  Between 2012 and the time of the bust in May of 2016, how

20  much money do you think you spent on buying drugs that you were

21  going to then distribute?

22  A.  Probably $30,000, give or take five grand.  In my mind, at

23  least 30, maybe $35,000.

24  Q.  And between 2012 and 2016, how much money did you make from

25  selling drugs?

1    A.  Are we accounting for that 10,000-dollar loss that I had?

2    Q.  Well, let's not include the loss.

3    A.  Okay.  So assuming that loss never happened, and assuming

4    all the money that was seized at my residence was still in

5    play, I don't know, maybe 50,000, 40,000; 45, 50,000.

6    Q.  How much money was seized?

7    A.  Five grand.

8    Q.  That's the money that was found in your bedroom?

9    A.  I believe so.  Maybe 5400, I think, was the number.

10   Q.  You have two exhibits that have been marked, sitting in

11   front of you, Exhibits 320 and 321.  Have you had an

12   opportunity to review those exhibits?

13   A.  Yes, I had an opportunity to look at each one.

14   Q.  I'm going to ask you to look again at what has been marked

15   as Exhibit 320.

16           Do you recognize that exhibit?

17   A.  Yes, I do.

18   Q.  That is the plea agreement that you entered in your

19   criminal case?

20   A.  That is correct.

21   Q.  That is essentially the written agreement that you have

22   entered with the federal prosecutor in your case?

23   A.  That is correct.

24   Q.  It has your name written in the caption; correct?

25   A.  Yes, that is correct.

NOLAN SPERLING - CROSS-EXAMINATION

1    Q.   And it has a case number written in the caption, as well;

2    correct?

3    A.   Yes, that is correct.

4    Q.   And that case number is CR16-1198-PHX-JAT?

5    A.   That is accurate.

6    Q.   And to your understanding, that is the case number assigned

7    in your matter?

8    A.   That is correct.

9    Q.   And across the top of that document, there is some case

10   filing information that indicates that this document has

11   actually been filed through the Clerk of the Court.

12   A.   Yes, there's a stamp on here that says that.

13   Q.   And it says Clerk of the U.S. District Court, District of

14   Arizona; correct?

15   A.   Yes.  And then by a -- a signature deputy.

16   Q.   And it's -- that stamp is dated November 27, 2017?

17   A.   That is correct.  November 27th of 2017.

18   Q.   And this is a document that you've actually signed with

19   your own signature?

20   A.   Yes.  Yes, I did.

21   Q.   On page 10?

22   A.   That is correct.

23   Q.   And this is a document that you reviewed very carefully

24   before you signed it?

25   A.   Yes, I did.  I read every single line with my lawyer.

1              MR. CAIN:  Your Honor, we would move for the admission

2     of Exhibit 320.

3              MS. ESCALANTE:  No objection, Your Honor.

4              THE COURT:  Exhibit 320 is admitted.

5                 (Exhibit 320 is received into evidence.)

6     BY MR. CAIN:

7     Q.  Mr. Sperling, I'm going to ask you to set that exhibit

8     aside, and take a look at what has been marked as Exhibit 321.

9              Actually, let's -- let's hold off on that.

10             I'm going to put up what has been admitted as

11    Exhibit 32200 on the screen.

12             COURTROOM DEPUTY:  Are you using VGA or --

13             LINDA ONDROVIC:  VGA.

14             COURTROOM DEPUTY:  Is this for the witness or --

15             MR. CAIN:  May we also publish for the jury?

16             THE COURT:  Yes.

17    BY MR. CAIN:

18    Q.  Now, Mr. Sperling, in Exhibit 320, we can see that the

19    title of this document is Plea Agreement; is that correct?

20    A.  That is correct.

21    Q.  And if we look at line 19, we have a paragraph that is

22    titled Plea.

23             Do you see where I'm talking?

24    A.  Yes, I do.

25    Q.  Okay.  And that describes the charge to which you've pled

1   guilty?

2   A.   That is correct.

3   Q.   And it says that you've pled guilty to importation of a

4   controlled substance in violation of federal law; correct?

5   A.   That's correct.  Yes.

6   Q.   And below that in paragraph 2, there is a paragraph that

7   says:   Maximum penalties.

8            Do you see that?

9   A.   I -- yeah, I'm looking at that right now.

10  Q.   Now, to your understanding, this describes the maximum

11  penalty under the law for the crime that you have pled guilty

12  to.

13  A.   That is my understanding, yes.

14  Q.   And so for the crime of one count of importation of a

15  controlled substance, you could receive up to 20 years in

16  federal prison; correct?

17  A.   Correct.

18  Q.   You could receive a fine of up to $1 million; correct?

19  A.   Correct.

20  Q.   You could be placed on a term of supervised release for any

21  period between three years -- correct? --

22  A.   Yes.

23  Q.   -- and up to the rest of your life?

24  A.   Yes.

25  Q.   Now, as part of your deal with the federal prosecutor in

1    this case, you've only been required to plead guilty to one

2    criminal charge.

3    A.   That is correct.

4    Q.   You understand, though, that each one of your prior

5    importations really constitutes a separate violation of the

6    law.

7    A.   Yes, I -- I suppose they do.

8    Q.   Well, they do, don't they?

9    A.   Yes.   Technically, they would, yes.

10   Q.   They very clearly do, don't they?

11   A.   Yes, absolutely.

12   Q.   I mean, even though you've pled guilty to one importation,

13   your prior six importations from Germany, your prior 10 to 12

14   importations from The Netherlands, and your prior 15 or 20

15   importations from Canada theoretically under federal law at a

16   minimum would each carry at least zero to 20 years in prison

17   each; right?

18   A.   Yes, that is correct.

19   Q.   So -- so based upon your estimate, you've imported drugs

20   into this country on the low end 31 times, and on the high end

21   38 times; right?

22   A.   Number of packages, yeah, that sounds right.

23   Q.   So theoretically, you could be facing up to 20 years in

24   prison for 38 separate counts of importation; correct?

25   A.   That sounds correct, yes.

```
 1    Q.  Theoretically, you also face prosecution by other
 2    authorities, as well.  Would you agree with that?
 3    A.  Yes, I would agree with that.
 4    Q.  Meaning you could also be prosecuted by state authorities.
 5    A.  Yes, I -- I very well could be.
 6    Q.  Meaning the numerous packages that were found in Chicago,
 7    for instance, you could be prosecuted out of that district.
 8    A.  Yes.  Yes, it is possible.  Yes.  I could be.
 9    Q.  So you could be prosecuted out of the Federal District
10    Court in Chicago; correct?
11    A.  If they chose to do so, correct.
12    Q.  But you could also be prosecuted by the state or county
13    courts?
14    A.  Of Illinois.
15    Q.  Of Illinois.
16    A.  Yeah, correct.
17    Q.  And this package that was seized in San Francisco, you
18    could have been prosecuted in the -- that district in
19    California in federal court; correct?
20    A.  Yes.
21    Q.  And you could also have been prosecuted in -- I don't know
22    my California districts very well in state court -- but the
23    relevant state or county District Court there, you could have
24    also been prosecuted?
25    A.  Yes, that is correct.
```

NOLAN SPERLING - CROSS-EXAMINATION

1   Q.  And here in Arizona, you've obviously committed numerous

2   local violations of Arizona state law; is that correct?

3   A.  Yes, that is correct.

4   Q.  For possession with the intent to sell --

5   A.  Yes.

6   Q.   -- dangerous drugs; correct?

7   A.  Drugs, yes.

8   Q.  And under Arizona law, you would face many years in prison

9   for those, each of those acts, as well, wouldn't you?

10  A.  Yes.

11          MS. ESCALANTE:  Objection, Your Honor.  Foundation.

12          THE COURT:  I'm going to sustain the objection.

13          THE WITNESS:  I believe under current Arizona state --

14          THE COURT:  When I sustain the objection, you're not

15  to answer the question.

16          THE WITNESS:  Sorry, Your Honor.

17          THE COURT:  That's all right.

18  BY MR. CAIN:

19  Q.  Are you aware of the penalties that you face under state

20  law for violating state law related to possessing drugs for

21  sale?

22  A.  I am not specifically aware of the exact sentence, but I am

23  aware that there are steep penalties at the state level that

24  I'm sure in Arizona would be either similar to the federal or

25  greater than the federal punishments.

NOLAN SPERLING - CROSS-EXAMINATION

1   Q.  And by "steep," what you mean is they would require steep

2   incarceration time.

3   A.  Yes.  Because I know Arizona is a -- you know,

4   Republican-leaning state and we have relatively harsh drug

5   conviction laws that are probably equally extreme as the

6   federal laws, if not more.

7   Q.  And so you recognize by entering this deal with the federal

8   prosecutors in this case, and by your cooperation in this

9   matter, you are getting some very significant benefits.

10  A.  Absolutely, yes.

11  Q.  I'm going to ask you to take is a look at what has been

12  marked as Exhibit 321.

13  A.  All right.  I am looking at that now.

14  Q.  And have you had a chance to review that exhibit?

15  A.  Yes, I have.

16  Q.  And you're familiar with this document?

17  A.  Yes.  I, again, reviewed every single line with my lawyer,

18  and I signed this document.

19  Q.  Okay.  And I'm just going to go through and describe it so

20  that we can make a record of what it is.

21  A.  Awesome, yeah.  That sounds good.

22  Q.  Okay.  This is essentially an addendum to your plea

23  agreement; correct?

24  A.  Yes.  Yes, it is.

25  Q.  And it's a document that is titled Deferred Sentencing

NOLAN SPERLING – CROSS-EXAMINATION

1   Cooperation Addendum to the Plea Agreement.

2   A.  That is correct.

3   Q.  And it is a -- an eight-page document; correct?

4   A.  Yep.  That is correct.

5   Q.  That has also been filed with this Court.

6   A.  Yes, it has.

7   Q.  And it also has your name on it?

8   A.  That is correct.

9   Q.  And it is also a document that you signed?

10  A.  Yes, I did.

11  Q.  Along with the assigned prosecutor in your case?

12  A.  That is correct.

13  Q.  And it contains additional agreements that you have made

14  with the government in your case?

15  A.  Yes, it does.

16          MR. CAIN:  Okay.  Your Honor, at this time we would

17  move to admit Exhibit 321.

18          MS. ESCALANTE:  No objection, Your Honor.

19          THE COURT:  Exhibit 321 is admitted.

20              (Exhibit 321 is received into evidence.)

21          MR. CAIN:  And I would ask we put 321 on the screen

22  and publish to the jury.

23  BY MR. CAIN:

24  Q.  Just for the benefit of the jury, this is the document

25  we've been discussing, Mr. Sperling?

 1    A.  Yes, this is the document.

 2    Q.  And if we could go to page 2.  And Mr. Sperling, it may be

 3    easier if you just follow along on the screen.

 4    A.  Sure.

 5    Q.  This document describes your obligations with respect to

 6    cooperating with the -- the government; correct?

 7    A.  Yes, it does.

 8    Q.  It essentially says, this is what you have to do in part to

 9    get the benefits of your plea agreement.

10    A.  It says if it's requested of me, yes.

11    Q.  Right.  But it's, you know, basically here are some things

12    we may ask you to do, and you must do them to get the benefits.

13    A.  I feel like that's implying that they're forcing me.  I'm,

14    you know, very cooperative.  I feel like I'm acting out of good

15    faith doing this because not only will it help me, but I feel

16    like it's currently the right thing to do.  So the verbiage

17    sounded -- it was being, like, almost forced upon me.

18    Q.  I appreciate that.  That's not what I'm trying to -- I'm

19    just trying to explain for the benefit of the jury, because

20    they don't have as much understanding and knowledge of this

21    document.  So part of what we're doing is just trying to

22    describe what this is so the jury understands what it is.

23          This just describes some of your duties and

24    obligations that you've agreed to with the government; correct?

25    A.  Yes, that is correct.

1   Q.  So if we look at this page, if we go to paragraph C, which

2   is on line 10, one of the things that you have agreed to do is

3   that you've agreed to testify at any time and place that is

4   essentially requested by the government.  Is that true?

5   A.  That is true.

6   Q.  And you essentially agree that you won't invoke your right

7   to remain silent.

8   A.  That is correct.

9   Q.  And then if we go down to line 25 on that same page, which

10  is paragraph F --

11  A.  I see it.

12  Q.  There is an agreement that says that the United States

13  Attorney's Office will not use your statements against you in

14  any criminal proceeding.

15          Do you see that?

16  A.  Yes, I do.

17  Q.  And you understand that to mean that you're essentially

18  being given immunity for your statements.

19  A.  Yes, that is exactly what I interpret.

20  Q.  Meaning that as you sit here and talk about other things

21  that you may have done in your life that are illegal, that

22  you're not going to be prosecuted for them.

23  A.  That is correct.

24  Q.  You're -- you're protected from criminal liability?

25  A.  Yes.

1   Q.  Now, if could go to page 4, and at the bottom of page 4,

2   paragraph 3, line 26 --

3   A.  I see that.

4   Q.  -- there's a paragraph titled Breach of the Plea Agreement

5   or the Addendum.

6          This is a section that talks about ways in which you

7   could potentially violate the agreement and lose the

8   protections of the agreement; correct?

9   A.  That is correct.

10  Q.  And it says:  If you fail to comply with any of the

11  obligations -- and then we're going to go to the top of the

12  next page, page 5 -- or promises in this agreement, that the

13  government, or the United States, in its sole and absolute

14  discretion, can declare any provision of this plea agreement or

15  the addendum null and void, basically meaning you could lose

16  the benefits.  Is that correct?

17  A.  Yes, that's correct.

18  Q.  Meaning that you have to be really sure that you're meeting

19  your obligations.

20  A.  Yes, absolutely.

21  Q.  And that if you fail to meet those obligations -- I'm

22  looking at subparagraph 2 on line 5 -- that the prosecutor --

23  prosecutor could recommend any sentence up to and including

24  that statutory maximum sentence of 20 years?

25  A.  Yes, that is correct.

1  Q.  And if we go down to line 13, one of the other benefits you

2  could lose is that they could also advise the Bureau of Prisons

3  that you were no longer a cooperating witness and recommend

4  that you be redesignated to a higher custodial level.  Is that

5  true?

6  A.  That is true.

7  Q.  Meaning that if you ultimately received a prison sentence

8  in this case, that you could be housed in a higher security

9  level?

10  A.  Yes, that's what I interpreted from that.

11  Q.  So that would be a benefit that you would lose?

12  A.  That is correct.

13         MR. CAIN:  Okay.  We can unpublish 321.

14         Thank you.

15  BY MR. CAIN:

16  Q.  So in summary, Mr. Sperling, if you satisfy the government

17  in this case with your cooperation, your single felony charge

18  is going to be dismissed; correct?

19  A.  That is correct, at the end of the three-year probation

20  period.

21  Q.  It's going to be dismissed with prejudice?

22  A.  I'm not sure what that means.

23  Q.  Well, why don't you take a look at --

24  A.  "With prejudice"?

25  Q.  Why don't you take a look at your plea agreement again.

NOLAN SPERLING – CROSS–EXAMINATION

1    A.   To what line were you referring?

2    Q.   Take a look at Exhibit 321, page 4, line 23.

3    A.   Yes, that is correct.

4    Q.   Dismissal with prejudice means that the government could

5    not refile that charge against you.

6         MS. ESCALANTE:  Objection, Your Honor.  Defense

7    counsel is testifying.

8         THE COURT:  Sustained.

9         You got a question?

10   BY MR. CAIN:

11   Q.   Is it your understanding that that means that the

12   prosecutor could not file that charge against you again in the

13   future?

14   A.   At the end of the -- of the probation period, yes, at the

15   end of all this, that is what that means.

16   Q.   Meaning the charge would essentially be wiped clean from

17   your record?

18   A.   Yes.

19   Q.   Is it also your understanding that you would be escaping

20   felony charges for any of the other criminal acts that we've

21   discussed in your testimony today?

22        MS. ESCALANTE:  Objection, Your Honor.  403.  It

23   mischaracterizes what's contained in the plea agreement.

24        THE COURT:  Okay.  I'm going to see the parties at

25   sidebar.

UNITED STATES DISTRICT COURT

1          (At sidebar on the record.)

2              THE COURT:  I, of course, don't know if this is the

3      standard plea agreement, Mr. Cain, but if it is, I think your

4      question does mischaracterize it.

5              Objection is sustained.

6          (End of discussion at sidebar.)

7              THE COURT:  Objection is sustained.

8  BY MR. CAIN:

9  Q.  As part of this deal, Mr. Sperling, you are going to escape

10     having to pay a fine in this case.

11 A.  That is correct.

12 Q.  You're going to not be required to pay back any of the

13     money that you earned from selling drugs?

14             MS. ESCALANTE:  Objection, Your Honor.  Same objection

15     as previous.

16             MR. CAIN:  Let me rephrase the question.

17 BY MR. CAIN:

18 Q.  Other than the $5,400 that was seized in your bedroom, the

19     government is not going to require you in this case to repay

20     any of the money that you earned from importing drugs from

21     other countries?

22             MS. ESCALANTE:  Objection, Your Honor.  403.  If we

23     could have a sidebar.

24         (At sidebar on the record.)

25             MS. ESCALANTE:  Your Honor, this is Carolina

1    Escalante.  Civil forfeiture is not part of the agreement.

2    Although criminal charges will be dismissed, civil forfeiture

3    is still fair game.

4             THE COURT:  I get that.

5             MS. ESCALANTE:  Okay.

6             THE COURT:  But I think that you can handle that on

7    redirect --

8             MS. ESCALANTE:  Okay.

9             THE COURT:  -- can't you?

10            MS. ESCALANTE:  Yes.

11            THE COURT:  All right.

12        (End of discussion at sidebar.)

13   BY MR. CAIN:

14   Q.  Let me ask this a different way.  Have you been informed by

15   the federal prosecutors in this case that they intend to try to

16   forfeit or take away from you any money that you earned from

17   selling drugs from your importations?

18   A.  No, they have not.

19   Q.  Is it your understanding from this deal that they intend to

20   do that in the future?

21   A.  It is my understanding that they do not intend to do that

22   in the future.

23   Q.  Is it also part of your understanding that as part of this

24   deal, that you're not going to have to have spent a single day

25   in jail?

1    A.  That is my understanding.

2    Q.  You're not going to have to have spent a single day in a

3    federal prison?

4    A.  That is my understanding, correct.

5    Q.  You're going to get to remain at ASU?

6    A.  That is correct.

7    Q.  You're going to get to complete your studies?

8    A.  I hope so, yes.

9    Q.  You're -- you're going to get to continue to spend time

10   with your family?

11            MS. ESCALANTE:  Objection.  Asked and answered.

12            THE COURT:  I'm going to allow it.

13            THE WITNESS:  Yes, I will.

14   BY MR. CAIN:

15   Q.  And you're going to get to continue to do the things that

16   are important to you, and you're going to have the time and the

17   freedom to do that?

18   A.  Yes, I will.

19            MR. CAIN:  May I have a brief moment, Your Honor?

20            THE COURT:  You may.

21                  (Pause in proceedings.)

22            MR. CAIN:  No further questions.

23            THE COURT:  Redirect?

24            MS. ESCALANTE:  Yes, Your Honor.

25

1                        REDIRECT EXAMINATION

2     BY MS. ESCALANTE:

3     Q.   Okay.  Mr. Sperling, defense counsel asked you about the

4     amount of money that you made selling drugs, and you, I

5     believe, stated was somewhere in the 50,000-dollar range, give

6     or take.

7     A.   Yes, that's true.

8     Q.   And that the day that the search warrant was executed at

9     your residence, about $5,400 was seized?

10    A.   Yes, that is correct.

11    Q.   Did you use your drug proceeds to purchase a Ferrari?

12    A.   No.

13    Q.   Have you ever had a Ferrari?

14    A.   Never.

15    Q.   What -- what happened to the remainder of the 50,000 minus

16    the 5400 that was seized?

17    A.   Well, virtually all of that money was the money that I

18    spent on drugs, like 30, 35,000.  You know, it's all money I

19    spent back into it.  It's the money I got.  I kept bringing it

20    back in.  I kept putting it into the system, per se.  You know,

21    I didn't start off buying $10,000 worth of drugs.  It was a

22    hundred dollars' worth.  And I just kept on building it up be

23    up and up.  And like I said sometime in the fall of 2015, I

24    lost $10,000, and I had to rebuild again.  And --

25    Q.   And when you're talking about that money got lost, you're

1   actually talking about the Bitcoin equivalent of that cash;

2   correct?

3   A.  Yes, because I used $10,000 worth of Bitcoin to buy Xanax.

4   Q.  Who actually had the $10,000?

5   A.  Whoever I bought the Xanax from.

6   Q.  I mean, the actual hard cash that you used to purchase the

7   Bitcoin?

8   A.  Oh.  That was from previous drug sales.

9   Q.  Okay.  And who did you give those $10,000 to?

10  A.  That was Morpheus.

11  Q.  Okay.  And who had also the cash -- who had the hard cash

12  for all of your Bitcoin purchases, starting in February of

13  2015?

14  A.  Who had the hard cash?

15  Q.  Uh-huh.  Who did you give the cash to?

16  A.  Oh.  Morpheus.

17  Q.  Okay.  Let's look at your plea agreement, which has been

18  admitted, and that's Exhibit 320.

19          MS. ESCALANTE:  Permission to publish, Your Honor?

20          THE COURT:  Yes.

21          MS. ESCALANTE:  Defense Exhibit 320.

22          It is the government's Exhibit 81.

23          THE COURT:  Do you care which one is put up?

24          MS. ESCALANTE:  If we could put 81, just because it's

25  synced to the computer.  Is that okay?

1          THE COURT:  Well, 320 has been stipulated -- or has

2     been entered into evidence.  So it is easier.  Maybe the

3     defense counsel will cooperate with you and put that up for

4     you.

5          MR. CAIN:  Can you put 320 up.

6          MS. ESCALANTE:  Your Honor, I could use the ELMO.

7          THE COURT:  All right.  Thank you.

8     BY MS. ESCALANTE:

9     Q.  Okay.  Mr. Sperling, on paragraph -- beginning on

10    paragraph 25 where it says number 2 maximum penalty.

11    A.  I see that.

12    Q.  Okay.  Does it state what the minimum penalties are?

13    A.  No, it does not.

14    Q.  And what are your understanding -- what is your

15    understanding that the minimum penalty is, regardless of your

16    cooperation?

17    A.  I'm not sure what the minimum penalties are.  But if -- I

18    would assume it's nothing.

19    Q.  Okay.

20    A.  For three years.  Three years' probation maybe.  I don't

21    know.  I assume it's nothing.

22    Q.  And when you say "nothing," you mean no jail, no prison?

23    A.  Yeah, yeah.  I do.

24    Q.  Now, on page 2 of the -- page 3 of the exhibit, on

25    paragraph 16, read -- can you read what that says?

1   A.  So that's the Non-binding Recommendations.  And it says:

2   The defendant understands that recommendations are not binding

3   on the Court.  The defendant further understands that the

4   defendant will not be permitted to withdraw the guilty plea if

5   the Court does not follow a recommendation.

6   Q.  Okay.  So what is your understanding of who has the

7   ultimate decision in what happens in your case?

8   A.  It's the Court.

9   Q.  Is it the prosecution?

10  A.  No, it's the judge.  It's Judge James Teilborg, who is

11  presiding over my case.

12  Q.  Now, defense counsel asked you a lot of questions about

13  whether you could be charged in another district, in another

14  state, by the county, by the sea authority, all that line of

15  questioning.  Do you recall?

16  A.  I do recall that.

17  Q.  Can you read paragraph number 23, please.

18  A.  So that says:  This agreement does not in any manner

19  restrict the actions of the United States and any other

20  district or bind any other United States Attorney's Office.

21  Q.  What is your understanding of that?

22  A.  It doesn't restrict the actions of another jurisdiction if

23  they wanted -- if they wanted, you know, to -- in any --

24  anything they want to do, this doesn't limit another -- another

25  investigation.

1   Q.  Now, defense counsel asked you about fines and fees and the

2   forfeiture of cash; correct?

3   A.  That is correct.

4   Q.  Can you read paragraph 14, where it begins at the number 8?

5   A.  Yes.  So it says:  Forfeiture civil and administrative

6   proceedings.  Nothing in this agreement small be construed to

7   protect the defendant from administrative or civil forfeiture

8   proceedings, or prohibit the United States from proceeding with

9   and/or initiating an action for civil forfeiture.  According to

10  18 U.S.C. 3613, all monetary penalties, including restitution

11  imposed by the Court, shall be due immediately upon judgment,

12  shall be subject to immediate enforcement by the States United

13  States, and shall be submitted to the Treasury Offset Program

14  so that any federal payment or transfer of returned property

15  the defendant receives may be offset and applied to federal

16  debts, which offset will not affect the periodic payment

17  schedule.  If the Court imposes a schedule of payments, the

18  schedule of payments shall be merely a schedule of minimum

19  payments and shall not be a limitation on the methods available

20  to the United States to enforce the judgment.

21  Q.  Okay.  So is that your understanding, that actual civil

22  forfeiture can still continue, despite your agreement?

23  A.  Yes.

24  Q.  Okay.  And I know we just spoke about what happened to the

25  remainder of the $50,000 that was --

```
 1            THE COURT:  Ms. Escalante?

 2            MS. ESCALANTE:  Sorry.  My apologies.

 3   BY MS. ESCALANTE:

 4   Q.   I know that we spoke about a -- a little bit about what

 5   happened to the remainder of your, we'll call it, drug

 6   profits --

 7   A.   Uh-huh.

 8   Q.   -- and you stated that you don't -- you don't have it.

 9   A.   Yeah.  I mean, after everything was seized, I didn't keep

10   any money in my bank account, you know.  I was afraid of, you

11   know, the bank reporting it, you know, to the IRS or somewhere

12   for unreported income.  So, you know, I only had, like, a

13   couple hundreds dollars to my name after that happened.

14   Q.   So the only amount that you actually had access to was the

15   amount that was taken from your bedroom drawer?

16   A.   Yes.  But I did still, you know, of course make money at

17   the two jobs I had, and I deposited that, you know, by direct

18   deposit to my bank account.  And most of my drug money was all

19   in cash, and I usually kept that in my bedroom.  So they were

20   all -- it was pretty well separated.

21   Q.   Okay.  So let's just focus on your drug proceeds.

22            Can you read paragraph B to the end of the first?

23   A.   So that's line 26?

24   Q.   Yes.  26, 27.

25   A.   Can you move it up a little bit for me, please.
```

1    Q.  Yes.

2    A.  Thank you.  (Reading)  The defendant agrees to forfeit and

3    hereby forfeits all interest in any asset that defendant owns

4    or over which defendant exercises control directly or --

5    Q.  And now we'll go to the next.

6    A.  (Reading) -- directly or indirectly, as well as any

7    property that is traceable to, derived from, fungible with, or

8    a substitute for property that constitutes the proceeds of his

9    offense, or which was used to facilitate the commission of his

10   offense, including the following property:  $5,400 of United

11   States currency.

12   Q.  So is that the only property that you had control of that

13   was a direct result of your drug proceeds?

14   A.  Yes.  And -- and the computer that was seized was also, but

15   that was -- you know, that's seized.

16   Q.  So a computer was taken from your bedroom that day?

17   A.  No.  My -- my mistake.  It wasn't taken.  It was seized

18   when I landed in Seattle, coming back from Vancouver.

19   Q.  Okay.  And have you received that computer back?

20   A.  No.  I forfeited it with my plea agreement.

21   Q.  Okay.  Defense counsel asked you a lot about the potential

22   sentences that you could receive, which would be addressed

23   right now in discussing the minimums.  Did you discuss

24   sentencing guidelines with your attorney?

25   A.  Yes, I did.

1    Q.  And explain to the jury what your understanding is of the

2    sentencing guidelines.

3    A.  So, my current understanding of the sentencing guidelines

4    is that the United States federal government does not have

5    formal sentencing guidelines for MDMA, which is what I was

6    charged with.  And so I was charged with the importation of

7    500 grams, I believe, or -- I don't think I -- it was that

8    amount, but -- anyway, so the point is that how they sentence

9    you is they'll convert MDMA to marijuana, and so I believe it's

10   1 gram of MDMA converts to, I believe, it's 2 kilograms of

11   marijuana.  So however much MDMA you had, they convert that to

12   marijuana and then use the marijuana sentencing guidelines to

13   give you a time period of sentence in jail.  So it was around

14   four to five years, I think, was the period.

15   Q.  And you learned this information from discussing with your

16   attorney?

17   A.  I did, yes.

18   Q.  Okay.  Here is page 9 of the plea agreement.

19          Can you read 26 and 27, please?

20   A.  (Reading)  I have been advised by my attorney of the nature

21   of the charges to which I'm entering my guilty plea.  I have

22   further been advised by my attorney of the nature, and --

23   Q.  We're going to page 10, and it's line 1 and 2.

24   A.  Can you scoot it down a little bit?

25          There you go.  That's good.

1          (Reading) -- range of the possible sentence, and that

2    my ultimate sentence shall be determined by the Court after

3    consideration of the advisory sentencing guidelines.  My guilty

4    plea is not the result of force, threats, assurances or

5    promises, other than the promises contained in this agreement.

6    I voluntarily agree to the provisions of this agreement, and I

7    agree to be bound according to its provisions.  I understand

8    that if I am granted --

9    Q.  Nolan?  Okay.  Let's look at paragraph 17.

10   A.  Okay.  (Reading) I further agree that promises, including

11   any predictions as to the sentencing guideline range or to any

12   sentencing guideline factors that would apply, made by anyone,

13   including my attorney, that are not contained within this

14   written plea agreement, are null and void and have no force and

15   effect.

16   Q.  Okay.  Now, if we could go over your cooperation addendum,

17   and that's what's been admitted as Defense Exhibit 321.

18          MS. ESCALANTE:  Your Honor, permission to publish?

19   And I'll use the ELMO.

20          THE COURT:  All right.

21   BY MS. ESCALANTE:

22   Q.  Mr. Sperling -- okay.  Defense counsel asked you --

23   emphasized about the benefit that you were receiving, and the

24   compliance that you had to follow in this agreement; correct?

25   A.  That is correct.

1    Q.  But you guys did not go over a few portions.

2            Can you please read, beginning at paragraph number 5.

3    A.  Yes.  So:  (Reading)  Answer all questions asked about any

4    topic whatsoever, and provide full and complete information

5    about the topics discussed in each interview, if necessary, by

6    volunteering information about which no questions are asked.

7    Q.  What is your understanding as to what it means to provide

8    full and complete information?

9    A.  To answer any question asked of me to the best of my

10   ability, and include any related information that would, you

11   know, be important or, you know, maybe not that important, to

12   be -- to the question asked.

13   Q.  Okay.  Another subsection skipped was subsection C, which

14   begins on paragraph 10.

15   A.  So:  (Reading)  If requested by the United States --

16   Q.  I'm sorry.  That one was actually not skipped.

17            I meant paragraph D, beginning on paragraph 13.

18   A.  So:  (Reading)  All information, evidence, and testimony

19   provided by the defendant pursuant to this addendum on any

20   topic whatsoever shall be truthful, honest, candid, and

21   complete with no knowing material omissions or false

22   statements.  The defendant shall not attempt to either protect

23   or falsely implicate any person or entity through false

24   information or omission.

25   Q.  What do you take that paragraph to mean in terms of your

UNITED STATES DISTRICT COURT

1    cooperation?

2    A.   That means, you know, I'm expected to and required to act

3    out of good faith and not to sugarcoat anything or, as it says,

4    purposefully omit certain things that might not qualify as

5    lying, but would qualify as devious behavior.  And again,

6    wouldn't be performing these -- this time to the best of my

7    ability, you know.

8    Q.   And line 14, what does that require you to be?

9    A.   Truthful, honest, and candid.

10   Q.   Let's look at page 3, paragraphs J and K.  Can you read

11   those?

12   A.   (Reading)  The defendant shall not violate any local,

13   state, federal, or foreign laws.  The defendant shall comply

14   with all terms and conditions of the defendant's pretrial

15   release.

16   Q.   Are you currently on some sort of monitoring program while

17   you're on release?

18   A.   Yes.  I'm on the Pretrial Services program.

19   Q.   Okay.  And what is your understanding that you're supposed

20   to do?

21   A.   So, part of my pretrial agreement is --

22           MR. CAIN:  Objection.  Cumulative.

23           THE COURT:  I don't know that until I hear the answer,

24   so I'm going to allow the answer.

25           THE WITNESS:  So as part of this, the pretrial

1    program, it allows people like me to not be in jail while the

2    trial is going on.  So part of that conditions of release is

3    that I will cooperate with my pretrial officer, and I am to

4    report in, similar to a probation program, where I'm called

5    down randomly to take drug tests.  I have to have a job or be a

6    full-time student, or be actively looking for work.  The first

7    of every month I have to report in to my pretrial officer.  I

8    have to call them, tell them what's new in my life, you know,

9    are things still the same.  I have to send proof of -- proof of

10   employment, a copy of my pay stub and -- it's just a ongoing

11   compliance.  And I also, of course, am not allowed to ingest

12   any sort of drugs or drink alcohol during this entire time

13   frame, so I've been sober since, I think, October 12th, or

14   around October 12th.  Since 2016.

15   BY MS. ESCALANTE:

16   Q.  Okay.  And those conditions will apply to you for up until

17   the three-year period ends?

18   A.  Yes, that is correct.  The entire term of the probation

19   period.

20   Q.  On page 4, please read paragraph D for the jury.

21   A.  (Reading)  During the period of deferred sentencing, the

22   Court, for good cause shown, may revoke or modify the terms of

23   this agreement or, on a willful violation of the conditions of

24   this agreement, sentence the defendant on Count 1 of the

25   indictment.  The maximum sentence which defendant could receive

 1    if sentenced on Count 1 is 20 years' imprisonment, a

 2    1 million-dollar fine, or both, and a term of supervised

 3    release of at least three years up to life.

 4    Q.  Okay.  Thank you.  And on page 5, please read paragraph B.

 5    A.  (Reading)  If there is a dispute regarding the obligations

 6    of the parties under this agreement, the United States District

 7    Court shall determine whether the United States or the

 8    defendant has failed to comply with this agreement, including

 9    whether the defendant has been truthful.

10    Q.  Thank you.  Nolan -- or Mr. Sperling, sorry -- there we

11    go -- how old was your friend Jake?

12    A.  How old was he?

13    Q.  Uh-huh.

14    A.  Like, when these text messages were going on?

15    Q.  Yeah.

16    A.  I think he was 19 or 20.

17    Q.  And did he -- are you aware whether or not he met with

18    Morpheus?

19    A.  I believe he did meet up with Morpheus, yes.

20    Q.  Okay.  And do you know how much cash Jake gave Morpheus in

21    exchange for Bitcoin?

22              MR. CAIN:  Objection, foundation.

23              THE COURT:  Sustained.

24              THE WITNESS:  Um, I can't --

25              MS. ESCALANTE:  Oh, wait.

```
 1                THE COURT:  You can't answer the question.  I
 2      sustained the --
 3                THE WITNESS:  Oh, sorry.
 4      BY MS. ESCALANTE:
 5      Q.  A lot of questions were asked what you specifically told
 6      Morpheus regarding your drug purchases online.  When you bought
 7      the DMT from Morpheus, did you tell him you bought it online?
 8                MR. CAIN:  Objection.
 9                Outside the scope of cross.
10                THE COURT:  I'll allow it.
11                THE WITNESS:  Yes, to my knowledge, I did tell him
12      that I got it online.
13      BY MS. ESCALANTE:
14      Q.  Okay.  And how he -- what did you ever say that indicated
15      you had customers?
16                MR. CAIN:  Objection.  Outside the scope.
17                THE COURT:  Sustained.
18      BY MS. ESCALANTE:
19      Q.  Defense counsel asked you whether your parents knew you
20      were involved in international drug deals.  Do you recall that?
21      A.  Yes, I remember that.
22      Q.  Did you want your parents to know you were involved in
23      international drug deals?
24      A.  Absolutely not, you know.  I mean, what -- what child wants
25      their parents to know that?
```

1   Q.  Isn't that your goal, to remain anonymous?

2   A.  Yes, absolutely.

3   Q.  Is that why you were using Bitcoin?

4   A.  Yeah.  That's exactly why I was using Bitcoin.

5   Q.  When you opened up your bank account, did you list the

6   address for your parents' residence?

7   A.  So I never opened up my bank account.  It was opened up for

8   me by my parents.  It's a joint account with their account.

9   Q.  Okay.

10  A.  So it has their address on it, yes.

11  Q.  Okay.  And so it would have their information, as well?

12  A.  Yeah.  All their bank account information, everything.

13  Q.  And so that potentially was linked to your Coinbase

14  account?

15  A.  It was.

16  Q.  But you never gave that information to Morpheus; correct?

17  A.  No.

18  Q.  Now, defense counsel asked you a lot about the number of

19  times that you imported drugs into the United States.  Do you

20  recall?

21  A.  Yes, I recall.

22  Q.  There is no question whether or not you were a drug dealer;

23  correct?

24  A.  That is correct.

25  Q.  Okay.  And eventually, you got caught; correct?

1   A.  Yes, that is correct.

2   Q.  Did you get caught because somehow Bitcoin provided your

3   identity to law enforcement?

4   A.  No.

5   Q.  Would you have been able to order drugs from Germany or The

6   Netherlands without Bitcoin?

7   A.  Some online places might have accepted other forms of

8   crypto currency.  But a crypto currency was required.  Bitcoin

9   was the predominant one, but you might have been able to use,

10  for example, Litecoins on another one of these websites.  But

11  it's the same thing.

12  Q.  Okay.  Well, specifically all the drugs that you purchased

13  and imported to the United States, you used Bitcoin; correct?

14  A.  Yes.  It was the predominant currency to use and it was --

15  yeah.  Yes, I did.  I used Bitcoins.

16  Q.  And did you start buying bigger bulks of drugs online after

17  you began meeting with the defendant?

18  A.  That is correct.

19  Q.  And why the -- why the correlation?

20          MR. CAIN:  Objection.  Outside the scope.

21          THE COURT:  Sustained.

22          MS. ESCALANTE:  May I have a moment, Your Honor?

23          THE COURT:  You may.

24                  (Pause in proceedings.)

25

```
 1    BY MS. ESCALANTE:

 2    Q.  Mr. Sperling, you said you brought -- bought the prior --

 3    you said you bought your drugs, primarily the ones that you

 4    bought internationally using Bitcoin, what was your primary

 5    source of that Bitcoin?

 6             MR. CAIN:  Objection.  Outside the scope.

 7             THE COURT:  One moment, please.

 8             Sustained.

 9             MS. ESCALANTE:  Okay.  May I have one more moment,

10    Your Honor?

11             THE COURT:  You may.

12                       (Pause in proceedings.)

13             MS. ESCALANTE:  No further questions.

14             THE COURT:  Thank you.

15             You may step down, Mr. Sperling.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Next witness?

18             MR. RESTAINO:  United States calls Task Force Officer

19     Aric Manore.

20             (ARIC MANORE, Government's witness, is sworn.)

21             MR. RESTAINO:  May I proceed, Your Honor?

22             THE COURT:  You may.

23                        DIRECT EXAMINATION

24    BY MR. RESTAINO:

25    Q.  Good afternoon, Officer Manore.
```

1    A.  Good afternoon.

2    Q.  Please your introduce yourself to the jury.

3    A.  My name is Aric Manore, a detective with the Scottsdale

4    Police Department.  I'm assigned to our special investigations

5    section, specifically the U.S. Drug Enforcement Task Force,

6    Group 1.

7    Q.  And what was your involvement in this investigation?

8    A.  I worked associated with TFO Martin, was conducting an

9    investigation and asked if I could assist him on several

10   occasions for surveillance purposes.

11   Q.  Now let's talk about your background.  Did you go to

12   college?

13   A.  I did.

14   Q.  Where did you go?

15   A.  I went to a bible college down in Greenville, South

16   Carolina.  And then I went to Detroit Baptist Theological

17   Seminary in Detroit following that.

18   Q.  And were you able to use what you studied in the seminary

19   in a career?

20   A.  Well, when it comes to building relationships with people

21   and thing like that, I suppose.

22   Q.  What did you do right after graduating from the seminary?

23   A.  I worked at Ford Motor Company for, I guess, about a year

24   or so.  And then I went from there to a -- become a family

25   pastor at a church just north of Detroit.

 1    Q.   When did you get into law enforcement?

 2    A.   2006.  August of 2006, I believe.

 3    Q.   And what law enforcement agency did you join?

 4    A.   The Scottsdale Police Department.

 5    Q.   What type of training have you received as a Scottsdale

 6    police officer?

 7    A.   Well, there's our formal academy training where we learn

 8    general police tactics and principles, things like that, you

 9    know, criminal law, at least as it applies to, you know, police

10    officers.  And from there, specialized training based on

11    various assignments that you get and things like that, a lot of

12    it informal, some of which is formal.

13    Q.   Did you receive any additional training when you became a

14    detective?

15    A.   I did.

16    Q.   What type of training there?

17    A.   General investigations training, laboratory analysis

18    training, things like that.  And then as I got into -- into the

19    persons crime investigation section, we were taught undercover

20    techniques, CS -- confidential source training, things like

21    that.

22    Q.   And when did you become a Task Force Officer with the DEA?

23    A.   About three years ago.

24    Q.   Did you receive any additional training there?

25    A.   Just what I learned by being mentored on the task force,

1   and, of course, by doing the job, you know, learning things

2   like -- kind of as we go.  And then there is some formal

3   training that comes with -- that's offered by the DEA to

4   accompany that as well.

5   Q.  Let's talk about your surveillance in this investigation.

6         What does it mean, to surveil someone?

7   A.  Well, it's basically to monitor their activities; sometimes

8   it means monitoring their conversations, what they're saying;

9   their movements, what they drive.  And it's to do so in a way

10  that's not detectable by them.  So we, generally speaking, are

11  not in uniform, not driving marked vehicles.  We kind of blend

12  in.

13  Q.  And who did you surveil in this case?

14  A.  In this particular case, it was Mr. Costanzo.

15  Q.  Do you recognize Mr. Costanzo here in the courtroom today?

16  A.  I do.  He's seated at the defendant's table wearing a black

17  suit and glasses.

18        MR. RESTAINO:  Your Honor, may the record reflect that

19  the witness has identified the defendant?

20        THE COURT:  It may.

21        Officer Manore, can I get to you slow down just a

22  little bit?

23        THE WITNESS:  Oh, I'm sorry.  Absolutely.

24        THE COURT:  Thank you.

25

BY MR. RESTAINO:

Q.  So what was the date of the first surveillance you did?

A.  I believe our first -- or my first involvement as far as surveillance goes was on September 14th, 2016.

Q.  And what was going on in the investigation on that day?

A.  TFO Martin had advised that he was meeting with Mr. Costanzo, and had asked if I would assist in the surveillance, and also to provide what we call UC support or UC rescue support, where I basically keep my eyes on the officer that's going to be meeting with somebody, at least as best I can, and also to monitor a sound device that he had so that if he needed help or needed assistance, I could be there to render that aid as quickly as possible.

Q.  So where did you wind up going on that day in that surveillance role?

A.  On that particular day, I believe it was the McDonald's restaurant in Mesa.  The number 909 sticks in my mind.  I believe it was on Dobson Road maybe.

Q.  Do you remember what time of day it was?

A.  I believe it was between 5:00 or 5:30, somewhere in there.

Q.  And where were you stationed to observe?

A.  I parked my vehicle in the parking lot, which gave me a good view of the south-facing wall of the restaurant, which I believe was probably going to be the most likely entrance point for somebody arriving at the restaurant.  So I was in a parking

1    stall in the parking lot that allowed me to see that side --

2    that side of the wall and into the restaurant a little bit.

3    Q.  Again, I think if you could try to speak a little bit

4    slower still.

5    A.  Sorry.

6    Q.  Were you able to see the defendant arrive in September of

7    2016 on that day?

8    A.  I was.

9    Q.  And did he arrive by car?

10   A.  He did not.  He was on foot.  And as I recall, the first

11   time I saw him, he was actually in a jog, running towards the

12   restaurant.

13   Q.  Aside from observing the defendant arrive in a jog and

14   staying put for his meeting with Task Force Officer Martin, did

15   you have any other involvement with the case on that date?

16   A.  I don't believe so.  Again, I was monitoring conversation

17   just for any kind of support that he might need.  And then he

18   left, and I think we broke off surveillance at that point, or

19   at least I did.

20   Q.  What was -- did you do a follow-up surveillance later in

21   the investigation?

22   A.  I did.

23   Q.  What was the date of your second surveillance in this

24   investigation?

25   A.  That would have been November 16th, 2016, if memory serves.

ARIC MANORE - DIRECT EXAMINATION

1  Q.  And what was going on in the investigation on that date?

2  A.  On that particular date, TFO Martin advised that he was

3  going to be meeting with Mr. Costanzo, possibly at a Starbucks

4  restaurant in Tempe, and asked me to again serve as support in

5  a surveillance capacity, and also as a rescue capacity if he

6  needed assistance.

7       THE COURT:  Officer Manore, I'm going to remind you

8  one more time.  Some of us just speak more quickly than others.

9  You speak very fast just habitually.  We need to have you slow

10  it down just a little bit.

11       THE WITNESS:  Fair enough.  I'll try and slow it down.

12  BY MR. RESTAINO:

13  Q.  So, on that second surveillance date, what did you do; were

14  you able to observe the defendant with Task Force Officer

15  Martin?

16  A.  Yes, I did.  I was again parked in my vehicle within a

17  parking stall in the parking lot.  I believe that Mr. Costanzo

18  arrived on a bicycle.  I saw him arrive, and then I saw TFO

19  Martin move from the Starbucks restaurant to, I believe, a

20  Jersey Mike's restaurant that was located just a couple doors

21  down in that same retail area.

22  Q.  Were you able to take any photographs on that surveillance

23  day?

24  A.  I did.

25  Q.  And after the defendant arrived at Jersey Mike's, were you

1   able to continue following him?

2   A.  Yes.  The meeting concluded.  Mr. Costanzo then got on his

3   bicycle and we initiated -- I say "we," myself and the team

4   that was with me -- initiated a rolling surveillance of him as

5   he rode to, I believe, a train depot at Miller and Third, if

6   memory serves, in Tempe.

7   Q.  And where was the rolling surveillance able to surveil him

8   to?

9   A.  To a Panda Express restaurant.  So he got on the train.  We

10  parallelled that train to the 24th Street station, if memory

11  serves.  We observed him get out, got back on his bike, and

12  then he went up 24th Street, went along a canal bank that took

13  him to Glendale Avenue, and I believe he ended up at the Panda

14  Express, which is located at 16th and Glendale Avenue, I

15  believe.

16  Q.  Did he seem to be moving at a good speed on the bicycle?

17  A.  He was.  He was moving very quickly.  We learned later that

18  it was a motorized bicycle which allowed that to happen, so....

19  Q.  Were you able to recollect how the defendant was dressed on

20  that date?

21  A.  I believe that he was in, I guess, normal street attire, a

22  Polo shirt, and I think he had sunglasses and a fanny pack of

23  some sort.  And it was difficult to tell if it was two fanny

24  packs on top of each other, or just one with two pockets.  But

25  he had a black fanny pack on.

1   Q.  And were you eventually able to observe the defendant

2   within the Panda Express restaurant on or around 24th Street?

3   A.  Yes.  I went into the Panda Express after he did, and

4   grabbed a bite to eat, and I sat down at a table approximately

5   15 feet away from where he was seated.

6   Q.  And while you were eating, did you have an opportunity to

7   observe the defendant?

8   A.  I did.

9   Q.  Was he sitting alone?

10  A.  Initially, yes.

11  Q.  And then what happened?

12  A.  Several minutes later, I would say maybe five or 10 minutes

13  later, a Caucasian male came into the restaurant.  They

14  greeted, he and Mr. Costanzo.  And then he sat at the table

15  across from Mr. Costanzo.

16  Q.  Were you able to overhear portions of what the defendant

17  said to the man?

18  A.  Yes.  Portions of the conversation.

19  Q.  In particular, what were you able to overhear?

20  A.  I heard Mr. --

21          MR. CAIN:  Objection.  Hearsay.  Relevance.

22          THE COURT:  Sustained, unless it's being -- is it

23  being -- what's it being offered for?

24          MR. RESTAINO:  May I try to lay a --

25          THE COURT:  Do you want to see me at sidebar?

 1              MR. RESTAINO:  Sure, Judge.

 2          (At sidebar on the record.)

 3              MR. RESTAINO:  This is Gary Restaino, Your Honor.

 4    This is pretty straightforward.  This is an overhear of what

 5    this defendant said from the report that's been disclosed.

 6    It's about banks and about banks being evil.  That's all that

 7    we anticipate eliciting, and we think that has pretty direct

 8    relevance towards the charges and elements in this case.

 9              THE COURT:  All right.  To the extent you're only

10    asking about what you heard the defendant say, you've got no

11    hearsay objection; right?

12              MR. CAIN:  Yes.

13              THE COURT:  All right.  Overruled.

14          (End of discussion at sidebar.)

15              THE COURT:  All right.  Overruled.  You may answer.

16              MR. RESTAINO:  May I rephrase that question then, Your

17    Honor?

18              THE COURT:  You may.

19    BY MR. RESTAINO:

20    Q.  So I'm only asking you about anything you were able to hear

21    the defendant say.  What were you able to hear the defendant

22    say?

23    A.  Mr. Costanzo said to the male -- he started talking about

24    banking systems.  He referred to the banking systems as

25    criminal and not always operating in the best interests of the

1    clients.

2    Q.  Now, following what you heard the defendant say, were you

3    able to observe anything between the defendant and the man

4    seated with him?

5    A.  Yes.  There was, like I say, ongoing conversation.  He

6    mentioned something about --

7    Q.  Let me stop you there.  I'm only asking about what you

8    observed and not anything that you heard at this point.

9    A.  If see.

10   Q.  What did you observe after that con -- after what you heard

11   the defendant say?

12   A.  Mr. Costanzo passed a telephone across to the male.  It was

13   a smartphone, it had a screen on it.  It went back and forth a

14   couple of times.  I heard the word "it's confirmed" or

15   "confirmed" as they were talking.  And then I heard the male

16   that he was with say something to the effect of --

17           MR. CAIN:  Objection.  Hearsay.

18           MR. RESTAINO:  I'm not seeking to get that in.

19   BY MR. RESTAINO:

20   Q.  Officer Manore -- if I may, Your Honor?

21           THE COURT:  You may.

22   BY MR. RESTAINO:

23   Q.  What we're asking for here is observations and not anything

24   that you heard.  So in addition to the phones being passed back

25   and forth, did you see the man give anything to the defendant?

1    A.  Yes.  The male produced a stack of -- of cash and laid it

2    on the table, and Mr. Costanzo took receipt of the cash and

3    began to count the cash out there on the table.  I was able to

4    get a look at the cash, and I could see that it was -- they

5    were 100-dollar denominations.

6    Q.  What did the defendant do with the cash?

7    A.  Mr. Costanzo, after he was done counting the cash, took it

8    and unzipped the fanny pack, one of the pockets on the fanny

9    pack, and he put it into the fanny pack.  And just before he

10   did that, I could see that there was also another pretty large

11   stack of currency or cash already in the pack.  And so he put

12   it in there, and zipped it up.  They exchanged some more

13   conversation, and then the male left.

14   Q.  Did you have any other actions on that day with respect to

15   the investigation?

16   A.  I remained in the restaurant for a few more minutes.  A

17   second male arrived, they greeted, at which point I exited, and

18   we followed him away from -- from the restaurant eventually.

19            MR. RESTAINO:  Your Honor, may I just have a moment?

20            THE COURT:  You may.

21                 (Pause in proceedings.)

22            MR. RESTAINO:  Thank you, Your Honor.

23            We have no further questions for Task Force Officer

24   Manore on direct.

25            THE COURT:  All right.

```
 1            Cross-examination?

 2                      CROSS-EXAMINATION

 3   BY MR. CAIN:

 4   Q.  Officer Manore, I believe you said that you took some

 5   photographs on November 16th when you were doing that

 6   surveillance.

 7   A.  I believe it was September -- yes, it was November.

 8   November 16th, yes.

 9   Q.  Can I ask you to take a look at what has been marked as

10   Exhibit 362.

11   A.  Yes, sir.

12   Q.  That's a photograph that you took on that date?

13   A.  Yes, sir.

14   Q.  And that's a photograph that depicts Mr. Costanzo seat --

15   seated at a table with Task Force Officer Martin?

16   A.  Yes, sir.

17   Q.  That's a fair and accurate representation of the scene that

18   you photographed at that time?

19   A.  Yes, sir.

20            MR. CAIN:  Your Honor, at this time we would move for

21   the admission of Exhibit 362.

22            MR. RESTAINO:  No objection, Your Honor.

23            THE COURT:  Exhibit 362 is admitted.

24               (Exhibit 362 is received into evidence.)

25            MR. CAIN:  And, Your Honor, permission to publish just
```

```
 1    briefly for the jury.

 2              THE COURT:  You may do that.

 3              MR. CAIN:  And may I have a brief moment, Your Honor?

 4              THE COURT:  You may.

 5                        (Pause in proceedings.)

 6              MR. CAIN:  Sorry for that delay.  We can unpublish

 7    362, and I pass the witness.

 8              THE COURT:  Redirect?

 9              MR. RESTAINO:  No, Your Honor.  Thank you.

10              THE COURT:  You may step down, Officer.  Thank you.

11              THE WITNESS:  Thank you, sir.

12              THE COURT:  Next witness?

13              MR. BINFORD:  The United States calls Special Agent

14    Schuyler Kenney.

15              THE COURT:  Just so you know, Mr. Binford, I'm looking

16    to break for the afternoon about three o'clock.

17              MR. BINFORD:  I may be done by then, Your Honor.

18              THE COURT:  All right.

19              MR. BINFORD:  If not, I will find a good stopping

20    point around there.

21              THE COURT:  Okay.  Thanks.  It doesn't have to be

22    right at 3:00.

23              MR. BINFORD:  Yes, sir.

24              THE COURT:  If you can finish, fine.

25         (SCHUYLER KENNEY, Government's witness, is sworn.)
```

```
 1                    THE COURT:  Please.

 2                         DIRECT EXAMINATION

 3    BY MR. BINFORD:

 4    Q.   Agent Kenney, welcome.

 5              Where do you work?

 6    A.   I am employed by the United States Drug Enforcement

 7    Administration.

 8    Q.   And what do you do for the DEA?

 9    A.   I'm a Special Agent.

10    Q.   And what was required to become a Special Agent with the

11    DEA?

12    A.   Eighteen weeks of specialized training at our academy in

13    Quantico, Virginia.

14    Q.   And did you receive any specialized training during that

15    academy?

16    A.   I did.

17    Q.   And what was that?

18    A.   Lots of different subjects, everything from the trading in

19    the Controlled Substances Act, which we are tasked with

20    enforcing, to street tactics, surveillance, common law

21    enforcement, arrest tactics, law, Fourth Amendment law, search

22    and seizure.  Stuff like that.

23    Q.   What did you do before becoming a Special Agent?

24    A.   I was in law school.

25    Q.   And did you graduate from law school?
```

1   A.  I did.

2   Q.  Were you admitted to the bar?

3   A.  I was.

4   Q.  And did you go to college before that?

5   A.  I did.

6   Q.  Did you have any involvement in the investigation of Thomas

7   Costanzo?

8   A.  Yes.

9   Q.  What was your involvement?

10  A.  I primarily served as a surveillance agent.

11  Q.  Do you recall conducting surveillance on the afternoon of

12  November 16th, 2016?

13  A.  I do.

14  Q.  And where was that surveillance conducted?

15  A.  In multiple cities here in the Phoenix metro area.

16  Q.  So what was happening that day that required you to work as

17  a surveillance agent?

18  A.  I was tasked with assisting in a surveillance capacity of

19  a -- of a undercover -- undercover deal.

20  Q.  And do you recall where that deal took place,

21  approximately?

22  A.  Yes.  Tempe, Arizona.

23  Q.  And were you present during that deal?

24  A.  I was.

25  Q.  You weren't at the table, right?  But...

1    A.  No, I couldn't observe it, but I was in the area.

2    Q.  Okay.  And did you see -- well, we mentioned Thomas

3    Costanzo earlier.  Do you see the person you know as Thomas

4    Costanzo here in the courtroom today?

5    A.  Yes.

6    Q.  Can you point out where he's sitting and identify something

7    that he's wearing?

8    A.  Certainly.  He's sitting at the table to my left, which

9    would be to your right, and he's wearing a black coat with

10   glasses.

11          MR. BINFORD:  Your Honor, may the record reflect that

12   this witness has identified the defendant?

13          THE COURT:  It will.

14   BY MR. BINFORD:

15   Q.  Did you see Mr. Costanzo that day?

16   A.  Yes.

17   Q.  And so tell us about your surveillance.  You said you were

18   there for the meeting, in the neighborhood.  What did you do

19   after that?

20   A.  After the meeting concluded, I participated in surveillance

21   of the defendant as he left the meeting area.

22   Q.  And what did you see him do?

23   A.  Observed him travel using a bicycle to a nearby train

24   station.

25   Q.  And what did he do at the train station?

1    A.  He boarded the train and eventually got off at another

2    train station, at which point I resumed surveillance.

3    Q.  And where did he go at that point?

4    A.  He left the train station using his bicycle, traveled north

5    to the area of 16th Street and Glendale.

6    Q.  And --

7    A.  -- Avenue.

8    Q.  What was he doing at 16th Street and Glendale?

9    A.  We observed the defendant enter a Panda Express restaurant.

10   Q.  Did you go inside that restaurant?

11   A.  I did not.

12   Q.  Did you see him leave that restaurant?

13   A.  I did.

14   Q.  And where did he go after he left?

15   A.  He proceeded to a bus stop in the area.

16   Q.  And did he get on the bus?

17   A.  He did.

18   Q.  Where did he go?

19   A.  He traveled a short distance to a nearby train station.

20   Q.  And what did he do at that train station?

21   A.  He entered a train, eastbound train.

22   Q.  And can you describe that train in a little more detail,

23   what type of train it was?

24   A.  It's a commuter train.  It connects the Tempe area to Mesa.

25   That was the direction he was traveling.

SCHUYLER KENNEY – DIRECT EXAMINATION

1   Q.  And do you know whether that train is commonly referred to

2   as the Light Rail?

3   A.  Yes.

4   Q.  Okay.  Did you get on the Light Rail with him?

5   A.  I did.

6   Q.  And how far did he take the Light Rail?

7   A.  He was traveling for approximately a half-hour, maybe a

8   little bit more.  Forty-five minutes.

9   Q.  And were you on the Light Rail with him during that entire

10  time?

11  A.  I was.

12  Q.  Did you notice anything that stood out to you while you

13  were on the Light Rail with Mr. Costanzo?

14  A.  Yes.

15  Q.  What did you notice?

16  A.  While I was observing the defendant, a couple police

17  officers entered the train.  May have been security personnel.

18  I don't know what agency or who they worked for, but they were

19  in uniform.  I observed the defendant observe the officers.

20  And at that point the defendant, at that point he had

21  sunglasses resting on his forehead, and as he observed the

22  officers, he moved to place the sunglasses over his eyes in a

23  very obvious manner.

24  Q.  And did he keep the sunglasses on for the remainder of the

25  trip?

1    A.  He removed the sunglasses when the officers departed the

2    train.

3    Q.  Was there anything else that stood out to you during your

4    surveillance that day, besides what you've already told us?

5    A.  No.

6    Q.  Do you also recall conducting surveillance on the morning

7    of December 14th, 2016?

8    A.  I do.

9    Q.  And where were you conducting surveillance on that day?

10   A.  We initiated surveillance at his place of residence in

11   Mesa.

12   Q.  And did you actually see Mr. Costanzo that day?

13   A.  I did.

14   Q.  Did you see how he was traveling?

15   A.  Yes, he was using his bicycle.

16   Q.  All right.  At this point, I'd like to show the witness

17   only what's been previously identified as Exhibit 21.

18   BY MR. BINFORD:

19   Q.  Do you recognize what's on the left side of your screen

20   there in front of you?

21   A.  I do.

22   Q.  Is that -- what is it?

23   A.  It's a photograph of the defendant on that day,

24   December 14th, 2016, on his bicycle.

25   Q.  And is that a fair and accurate depiction of what you saw

1    that day?

2    A.  It is.

3    Q.  All right.  Now, I want to direct your attention to the

4    right side of that screen, and that's what's been previously

5    marked for identification as Exhibit 22.

6            Do you recognize that image?

7    A.  I do.

8    Q.  What is it an image of?

9    A.  It's also an image of the defendant on his bicycle on that

10   date.

11   Q.  And is that a fair and accurate representation of what you

12   saw that day?

13   A.  Yes.

14           MR. BINFORD:  Your Honor, at this time I'd move to

15   admit Exhibits 21 and 22 into evidence.

16           MS. WEIDNER:  No objection, Your Honor.

17           THE COURT:  Exhibits 21 and 22 are admitted.

18       (Exhibits 21 and 22 is received into evidence.)

19           MR. BINFORD:  And I'd like to publish them to the

20   jury, please.

21           THE COURT:  You may.

22   BY MR. BINFORD:

23   Q.  So you saw him on his bike.  Did you see where he went?

24   A.  Yes.

25   Q.  Where did he go?

1    A.  We followed the defendant from his residence in Mesa to a

2    local McDonald's not far down the road.

3    Q.  Did he go inside the McDonald's?

4    A.  He did.

5    Q.  Did anyone else go inside the McDonald's?

6    A.  (Pause.)

7    Q.  Did you go inside the McDonald's?

8    A.  Yes.

9    Q.  And what did you do inside the McDonald's?

10   A.  I observed the defendant sitting at a table in the corner

11   of the restaurant with an unidentified male.

12   Q.  And did you also take a seat in the restaurant?

13   A.  I did.

14   Q.  How far away from Mr. Costanzo were you while you were in

15   the restaurant?

16   A.  Approximately 10 to 15 feet at an adjacent table.

17   Q.  Could you hear what Mr. Costanzo was saying from your

18   location?

19   A.  I could, yes.  Parts of his conversation.

20   Q.  And did you have a clear view of Mr. Costanzo and the

21   person he was with from where were you sitting?

22   A.  Yes.

23   Q.  From where you were sitting, could you see under the table

24   that Mr. Costanzo was sitting at?

25   A.  Yes.

1    Q.  All right.

2          MR. BINFORD:  At this time, I'd like to just show the

3    witness only what's been previously marked for identification

4    as Exhibit 23.

5    BY MR. BINFORD:

6    Q.  Do you recognize what you're looking at on the screen in

7    front of you?

8    A.  I do.

9    Q.  What is that?

10   A.  That is a photograph I took at that moment while the

11   defendant was seated in McDonald's.

12   Q.  And is there -- that a fair and accurate photograph of what

13   you saw on that day?

14   A.  It is.

15          MR. BINFORD:  At this time, I'd move to admit

16   Exhibit 23 into evidence and publish for the jury.

17          MS. WEIDNER:  No objection.

18          THE COURT:  Exhibit 23 is admitted.  You may publish.

19          (Exhibit 23 is received into evidence.)

20   BY MR. BINFORD:

21   Q.  All right.  At this time, without going into what the man

22   in the black tracksuit was saying, could you hear what

23   Mr. Costanzo was saying?

24   A.  Yes.

25   Q.  And what was he talking about?

1   A.  He was talking in general about the U.S. banking system,

2   how banks in the United States are large, powerful, and greedy

3   organizations.

4   Q.  During that conversation, did you hear the man in the black

5   tracksuit say anything about his bank accounts?

6           MS. WEIDNER:  Objection, hearsay.

7           MR. BINFORD:  Your Honor, I'm not looking to introduce

8   the statement for the truth of the matter asserted, simply to

9   show the defendant's reaction after hearing that statement.

10          MS. WEIDNER:  Objection.  Hearsay.  403.

11          THE COURT:  I'll allow it.

12  BY MR. BINFORD:

13  Q.  What did the man in the black tracksuit say about his bank

14  accounts?

15  A.  The man in the black tracksuit explained to the defendant

16  that his bank accounts in the United States were frozen.

17  Q.  What did you see the two men do after you heard that

18  statement?

19  A.  There was an exchange of cash underneath the table.  Both

20  parties appeared to look around their surroundings in the

21  restaurant while the transaction was ongoing underneath the

22  table.

23  Q.  And after that, did you see the two men doing anything?

24  A.  Yes.  After the cash traded hands, the two parties appeared

25  to look at their cell phones and discuss an electronic

UNITED STATES DISTRICT COURT

SCHUYLER KENNEY – DIRECT EXAMINATION

1   transaction on their cell phones.

2   Q.   And can you approximate how long that process took?

3   A.   Approximately five to 10 minutes.

4   Q.   And after they spent some time looking at their phones,

5   what happened?

6   A.   At that point, the unidentified male in the black departed

7   the restaurant.

8   Q.   Were you ever able to identify the man in the black

9   tracksuit and the black hat?

10  A.   No.

11  Q.   Did you see where Mr. Costanzo went -- or did he leave

12  after the man in the black tracksuit left?

13  A.   Yes, he waiting for approximately 20 minutes before leaving

14  McDonald's, and then accessed his bicycle outside the

15  restaurant and traveled to a grocery store in the same business

16  complex.

17  Q.   Did he go anywhere after he was at the grocery story?

18  A.   Yes, he was observed traveling back towards his residence.

19  Q.   Did you conduct any additional surveillance of Mr. Costanzo

20  that day?

21  A.   No.

22           MR. BINFORD:  Those are all the questions I have for

23  direct, Your Honor.

24           THE COURT:  All right.

25           Ladies and gentlemen, I think it's time for an

1    afternoon break.  So please take 15 minutes.  Remember the

2    admonitions.

3            We'll see you back here in 15 minutes for the rest of

4    the afternoon.

5            COURTROOM DEPUTY:  All rise.

6                (Jury leaves the courtroom at 2:58 p.m.)

7            THE COURT:  Anything from the parties?

8            MR. BINFORD:  Nothing from the government.

9            MS. WEIDNER:  Nothing from the defense, Your Honor.

10           THE COURT:  All right.  See you back in 15 minutes.

11               (Proceedings in recess at 2:59 p.m.)

12                (Proceedings resume at 3:25 p.m.)

13           THE COURT:  All right.  I've considered the defense --

14   the defendant is now present.  I've considered something that

15   happened over the break, and I've decided -- I had initially

16   decided I wasn't going to intervene, and now I've decided I am

17   going to intervene.

18           Ms. Weidner, I asked -- you made a hearsay objection

19   to the last testimony.  Mr. Binford said that -- pertaining to

20   something about the bank accounts of the person in the

21   tracksuit.  Mr. Binford said that he wasn't asking to admit it

22   for the truth of the matter, but to demonstrate the

23   defense's -- the defendant's reaction to what he said.  So I

24   overruled your objection.  Mr. Binford then elicited the

25   statement, but he never made any attempt to elicit testimony

1    about the defendant's reaction.  So my inclination is to

2    instruct the jury to disregard what the gentleman in the

3    tracksuit said because I don't -- but I also know that you have

4    reservations and concerns about limiting instructions.  So

5    before we bring them in, I just wanted to check with you about

6    how you would like to handle that.

7            MS. WEIDNER:  If I could have a moment, Your Honor.

8            THE COURT:  You may.

9                    (Pause in proceedings.)

10           MS. WEIDNER:  Your Honor, I think we're okay with a

11   limiting instruction on this.

12           THE COURT:  All right.  Just instruct them to

13   disregard what the gentleman in the tracksuit said about his

14   bank account?

15           MS. WEIDNER:  Yes, Your Honor.

16           THE COURT:  All right.  Does the government wish to be

17   heard?

18           MR. BINFORD:  Well, Your Honor, I guess I didn't make

19   it clear when I elicited the testimony from Special Agent

20   Kenney, but the reaction I mentioned when I responded to the

21   objection was the reaction of Mr. Costanzo continuing to engage

22   in the transaction after hearing that statement.  We're not

23   trying to prove that this unidentified individual's bank

24   accounts were frozen or not frozen.  We simply wanted to show

25   that after hearing that information, whether it was true or

UNITED STATES DISTRICT COURT

1    not, Mr. Costanzo reacted by continuing to engage in the

2    transaction instead of stopping.

3              THE COURT:  Well, is there any reason why somebody

4    whose bank accounts are frozen can't engage in a Bitcoin

5    transaction?

6              MR. BINFORD:  Ah...

7              THE COURT:  So I'm going to grant Ms. Weidner's 403

8    objection, and I'm going to -- and I would have done that, you

9    know, to the extent that you didn't mean to overlook it or you

10   didn't mean for me to misunderstand, which I did, the basis on

11   which you were seeking to introduce the testimony, I would have

12   granted the objection had I understood what you intended to do

13   with it, because I think under 403, in that case, the

14   prejudicial value, even though there may be some probative

15   value, the prejudice -- potential prejudice outweighs it.  So

16   I'm going to instruct the jury to disregard what the gentleman

17   in the tracksuit said to the defendant.

18             MR. BINFORD:  May I at least have an opportunity to

19   make a record regarding the 403 objection?  I was only

20   referring to the 401 -- or the -- I'm sorry -- the 801 hearsay

21   objection.

22             I think in terms of relevance, I think one of the

23   burdens that the government is going to have to prove beyond a

24   reasonable doubt in this case is that the defendant was not

25   entrapped.  I think this evidence does go to predisposition.

1    It shows that he was willing to engage in --

2              THE COURT:  Again, is there anything illegal about

3    buying Bitcoin just because your bank accounts have been

4    frozen?

5              MR. BINFORD:  I think it shows that he was willing to

6    engage --

7              THE COURT:  And again, as with Ms.-- as was the case

8    with Ms. Escalante, don't we have to accept the truth of the

9    matter asserted to have it go to predisposition?  I think in

10   either case, it was inappropriate, and I'm striking.

11             MR. BINFORD:  Thank you, Your Honor.

12             THE COURT:  Bring in the jury.

13                 (Jury enters the courtroom at 3:22 p.m.)

14             THE COURT:  Thank you, ladies and gentlemen.

15             Hope you had a pleasant break, and you're ready for

16   the rest of the afternoon.

17             As I indicated -- please be seated.

18             As I indicated to you in my initial instructions, I

19   may from time to time instruct you to disregard evidence that

20   you have heard.  I am now going to invoke that instruction, and

21   I'm going to instruct you to disregard anything that the

22   gentleman -- any testimony about what the gentleman in the

23   black tracksuit told the defendant.  Do you all understand what

24   I am telling you to disregard?

25             So if you have it in your notes, please strike it out.

```
 1    You should not consider it in any way in making your

 2    determination about what the verdict should be in this case.

 3              Any question about that?

 4              All right.  Thank you.

 5              Next witness -- oh, I'm sorry.  Yes.  Ms. Weidner.

 6              MS. WEIDNER:  Your Honor, I -- I think that the

 7    government had finished with direct on Special Agent Kenney --

 8              THE COURT:  Yes.

 9              MS. WEIDNER:  -- and it is time for cross.

10              THE COURT:  You're right.  I apologize.

11              (SCHUYLER KENNEY resumes the witness stand.)

12                         CROSS-EXAMINATION

13    BY MS. WEIDNER:

14    Q.  Good afternoon, Agent Kenney.

15              You testified on direct that you were part of the

16    surveillance team on two occasions.

17    A.  At least.  Yes, ma'am.

18    Q.  Yes.  And you were actually on the surveillance team on

19    December 14th, 2016.  You testified to that.

20    A.  Yes, ma'am.

21    Q.  As well as November 16th, 2016.

22    A.  Yes, ma'am.

23    Q.  And then in addition, you were also on the team in February

24    and April of 2017; correct?

25    A.  Quite possibly, ma'am.  Yes.
```

1   Q.  I'd like to start first with asking you a couple questions

2   about the November 2016 surveillance that you were on.

3           Now, this operation that you were engaged in, that was

4   part of the DEA investigation of Mr. Costanzo; correct?

5   A.  Yes, ma'am.

6   Q.  And you're familiar with this investigation as a whole, or

7   just the surveillance part?

8   A.  Mainly my role as a surveillance agent, but I am familiar

9   with the investigation.

10  Q.  So you're aware that this DEA portion of the investigation

11  was a continuation of an earlier IRS investigation?

12  A.  I'm not fully aware of what you're referring to though.  I

13  don't have a comment on that.  I don't know.

14  Q.  All right.  But you can confirm that the portion of the

15  investigation that you're involved in was -- were involved in

16  was the DEA portion?

17  A.  Yes, ma'am.

18  Q.  All right.  And on November 16th, you were part of the

19  surveillance team --

20  A.  Yes.

21  Q.  -- correct?

22          And you had testified that that started at the

23  Starbucks in Tempe -- or a Starbucks in Tempe?

24  A.  Yes, ma'am, or an adjacent business.

25  Q.  Okay.  And that surveillance began about noon that day?

 1   A.  Approximately.

 2   Q.  Now, by my count, including you, there were eight law

 3   enforcement officers on the surveillance team in total?

 4   A.  I don't know the exact number, ma'am.

 5   Q.  But it wasn't just you?

 6   A.  No.

 7   Q.  Would it refresh your recollection to see the report

 8   produced from that date?

 9   A.  Yes.

10         MS. WEIDNER:  Just a moment.

11         Kathleen, could you please provide the witness with

12   Defense Exhibit 307.

13   BY MS. WEIDNER:

14   Q.  Have you had a chance to -- to look it over, Agent Kenney?

15   A.  I have not re-read it right now, but is there specific

16   question that you're referring to?

17   Q.  Yes.  On the first page, which is Bates 30, if I could

18   direct your attention to -- at the top it lists other officers,

19   and then a list of names, including yours.

20   A.  Yes, ma'am.

21   Q.  And those would be the officers that were involved in this

22   operation?

23   A.  Yes, ma'am.

24   Q.  On that day?

25   A.  Yes, ma'am.  On this day of the report.

UNITED STATES DISTRICT COURT

1   Q.  And looks like a total of eight.  And then with TFO Martin,

2   who is the undercover, it would be nine; is that right?

3   A.  No, ma'am.

4   Q.  Did I miscount?

5   A.  I believe it would be 10.

6   Q.  Oh.  I miscounted.

7        So it was 10 officers on this particular part of the

8   investigation on that day?

9   A.  If you include Officer Martin.

10  Q.  Yes.

11       Okay.  Now I want to turn to the surveillance that you

12  conducted on December 14th, 2016.  Now, that time, the

13  surveillance was not in connection with an undercover meeting,

14  was it?

15  A.  That is correct.

16  Q.  That time, it was surveillance of Mr. Costanzo's home?

17  A.  Yes, ma'am.

18  Q.  And of Mr. Costanzo's movements himself?

19  A.  Yes.

20  Q.  And when I say "Mr. Costanzo's home," it's correct that

21  that was at 417 North Loma Vista in Mesa?

22  A.  To the best of my knowledge, yes.

23  Q.  And that was the second floor apartment, number 202?

24  A.  Yes.

25  Q.  And you were on the team that day.  Did you see his

 1    apartment?

 2    A.  I saw the general neighborhood where he lived.  I did not

 3    actually see his apartment.

 4    Q.  Did you see the exterior?

 5    A.  The building, yes.

 6    Q.  And do you recollect that there were photos taken that day?

 7    A.  Yes.

 8    Q.  And if I could have you take a look, you should have up

 9    there with you Exhibit -- I believe it's 363.

10    A.  Yes.

11    Q.  Do you recognize that image?

12    A.  I recognize the photograph.  I was never in a position to

13    actually see this specific portion of the building, his

14    residence -- his unit.

15    Q.  But would you agree -- and I'll just let you know that the

16    government has stipulated that that photograph is consistent

17    with surveillance on that day of Mr. Costanzo's home.

18    A.  Yes.

19            MS. WEIDNER:  Move to publish Exhibit -- Defense

20    Exhibit 363 to the jury, and -- but to admit it into evidence

21    first and then to publish it to the jury.

22            MR. BINFORD:  Yes, Your Honor.  We've stipulated to

23    admission of 363 and 364.

24            THE COURT:  All right.  Then why don't we just admit

25    them both at this time.

```
 1              363 and 364 are admitted.  You may publish either or
 2      both.
 3              (Exhibits 363 and 364 is received into evidence.)
 4      BY MS. WEIDNER:
 5      Q.  And this first image, that's the image I just showed you,
 6      Mr. -- I'm sorry is not "Mister" -- Agent Kenney?
 7      A.  Yes.
 8      Q.  Perfect.
 9              Just a moment, please.
10                      (Pause in proceedings.)
11              MS. WEIDNER:  No further questions, Your Honor.  Thank
12      you, Agent.
13              THE COURT:  Redirect?
14              MR. BINFORD:  I have no questions for this witness,
15      Your Honor.
16              THE COURT:  All right.  Please step down, Agent.
17      Thank you.
18              Next witness?
19              MS. ESCALANTE:  Thank you, Your Honor.
20              The government will call Officer Chad Martin.
21              (CHAD MARTIN, Government's witness, is sworn.)
22                      DIRECT EXAMINATION
23      BY MS. ESCALANTE:
24      Q.  Task Force Officer Martin, please introduce yourself to the
25      jury?
```

1  A.  Sure, ma'am.  My name is Chad Martin.  I'm a detective with

2  the Scottsdale Police Department, Special Investigations

3  Section.  I'm currently assigned to Drug Enforcement

4  Administration, Task Force Group 1.

5  Q.  Is it okay if I call you Detective?

6  A.  Yes, ma'am.

7  Q.  Detective Martin, how long have you worked at Scottsdale

8  Police Department?

9  A.  For just over 10 years.

10  Q.  And what did it take for you to get employed at the

11  Scottsdale Police Department?

12  A.  It was an application process, in-person interview,

13  physical exam, polygraph exam, written test, and from there I

14  was selected.

15  Q.  Did you have any prior law enforcement before joining

16  Scottsdale Police Department?

17  A.  No.

18  Q.  What -- what were you doing prior to joining?

19  A.  Before becoming a police officer, I was a firefighter.

20  Q.  And how long were you a firefighter for?

21  A.  It was about five years.  I was a crew boss and an engine

22  boss with the U.S. Forest Service, a wildland firefighter.

23  Q.  And -- and prior to that, any law enforcement or anything

24  related?

25  A.  No.

1    Q.  Did you have any college experience?

2    A.  I have several college certifications.  My initial career

3    path was to become a full-time city firefighter, so I have

4    certifications in hazardous materials, emergency medical

5    technician, firefighter 1 and 2, CPR, all the basic life-saving

6    firefighter.

7    Q.  Okay.  So you mentioned you've been with Scottsdale Police

8    Department for about 10 years.  What positions have you held

9    while being employed there?

10   A.  So I was hired in 2008.  I was a patrol officer for about

11   eight years after attending our -- our police academy.

12   Q.  What does it mean to be a patrol officer?

13   A.  Assisting the public, public servants.  We go to criminal

14   matters, we go to civil matters, we help people with

15   broken-down cars, we make arrests when need be, when criminal

16   violations have occurred.

17   Q.  And how long were you on patrol for?

18   A.  For about four years.

19   Q.  And where did you go after that?

20   A.  After patrol, I was assigned to the Special Investigation

21   Section, our local city drug enforcement unit.  I was first

22   assigned as an asset forfeiture detective within that unit.

23   Q.  What does asset forfeiture mean?

24   A.  So in Arizona, we have RICO statutes, which are the

25   Racketeering Influence and Corrupt Organization statutes.  And

1   if somebody violates one of those statutes, under civil

2   forfeiture, property that they either used to facilitate that

3   crime or that were proceeds of that crime can be seized.  So I

4   was the detective assigned to process those forfeitures.

5   Q.  Did you have any specific training regarding asset

6   forfeiture?

7   A.  Yes.  It was -- it was mostly on-the-job training for about

8   six months.  Also, I attended numerous forfeiture meetings with

9   the Maricopa County Attorney's Office on updated case law

10  related to forfeiture matters.

11  Q.  And how long were you with that unit for?

12  A.  I was -- I was the asset forfeiture detective for about a

13  year, but I stayed in the drug enforcement.  Unit.  And after

14  about a year, I transitioned from the asset forfeiture

15  detective to a full-time undercover officer.

16  Q.  Did you have to undergo any special training to become an

17  undercover officer?

18  A.  Yes.  That's -- that's a position that you have to apply

19  for, you're selected for it.  Not everybody can meet the

20  standards to be an undercover officer.  Once you're selected,

21  you go through a week-long undercover school.  So you learn

22  basic techniques on how undercover deals are conducted, how

23  drugs are concealed, how -- how drug proceeds is laundered.

24  You study how other criminals have facilitated these crimes,

25  and learn to try to mimic those to gain undercover persona,

1   mimic those roles.

2   Q.  So how long have you been an undercover officer for?

3   A.  Since about 2015.

4   Q.  Approximately how many undercover investigations have you

5   conducted?

6   A.  I'm sorry.  I may have misspoke.  I've been with DEA since

7   about 2015.  I was an undercover officer beginning about 2012.

8   So since then, I have participated in no less than a hundred

9   undercover roles.

10  Q.  When did you go to DEA?

11  A.  2015.

12  Q.  And what is your position with DEA?

13  A.  So I'm -- I'm a federally deputized task force officer.

14  Q.  What does that mean?

15  A.  So I'm -- again-- that's another application process.

16  We -- we meet with a group supervisor of our local drug

17  enforcement administration group.  It's another application

18  process.  And I was selected from a group of several people to

19  fulfill a role, a vacancy in that unit.  From there, I meet

20  when the Assistant Special Agent in charge.  And if I meet the

21  criteria he presents, then I get federally deputized so I can

22  enforce federal laws.

23  Q.  Okay.  So is it fair to say you've had a lot of drug

24  training and experience in those types of drug investigations?

25  A.  Yes, I would say so.

1    Q.   Okay.  When is it -- strike that.

2            While being a task force officer with the DEA, have

3    you worked in your undercover capacity?

4    A.   Yes, I have.

5    Q.   Okay.  When is it determined that an undercover

6    investigation is going to be initiated?

7    A.   Normally if we're going to select a mission for undercover,

8    we do -- we do our initial case work-up.  So we determine that

9    there might be some type of criminal activity that's occurring,

10   we see if there's any -- any informants or any sources who

11   could introduce us to that; and if not, depending on what the

12   group supervisor determines, we may be selected to actually

13   fill an undercover role for that operation.

14   Q.   Okay.  Throughout your career thus far, have you become

15   familiar with virtual currency?

16   A.   Yes.  You could say that.

17   Q.   When did your familiarity with virtual currency begin?

18   A.   I'd say late 2015, early 2016.

19   Q.   Okay.  And approximately how many virtual currency cases

20   have you investigated or been a part of?

21   A.   Oh, I'd say there's at least eight or 10 different

22   investigations that I've been involved in related to virtual

23   currency.

24   Q.   Okay.  And have you attended any trainings regarding

25   virtual currency and investigating crimes related to virtual

1  currency?

2  A.   Yes, I've attended several seminars related to Internet

3  crimes using virtual currency, I've met with CEOs of companies

4  related to virtual currency; I've had specific one-on-one

5  instruction related to Blockchain analysis, trying to identify

6  virtual currency transactions on the Internet.

7  Q.   What is Blockchain analysis, what you just mentioned?

8  A.   So Blockchain analysis would be -- so you -- so the way

9  Bitcoin transactions happen would be a peer-to-peer or an

10  exchange to a peer using Bitcoin applications as we've seen.

11  That's all documented on a public Blockchain.  So that's -- the

12  Blockchain doesn't link any names or personal identifying

13  information to an individual, just -- just the Bitcoin address.

14  And if you research the Blockchain, you can see these

15  transactions happening from address to address, you can see

16  Bitcoin moving, but there's no way to identify who is using

17  those addresses or who is the owner of that Bitcoin.

18  Q.   Are there ever instances where you can potentially identify

19  the owner or user of those addresses?

20  A.   So to my knowledge, the only success we've had in

21  identifying that would be through a commercial exchange where

22  personal identifying information has been obtained, or if we

23  know the owner of an address.  Say if an undercover owns a

24  Bitcoin address, from there we can backtrack.  And if we know

25  who that undercover is dealing with, we can determine who those

1    addresses belong to.

2    Q.   Okay.   Have you ever presented anywhere on the topic of

3    virtual currency?

4    A.   Yes.   I've done several presentations.   I've acted as an

5    instructor for virtual currency investigations.   Recently I --

6    I just returned from the White House doing a presentation on

7    virtual currency.

8    Q.   Have you presented in other foreign countries?

9    A.   Yes.   I've done presentations in Canada, briefings to other

10   law enforcement agencies about virtual currency and Internet

11   investigations.

12   Q.   Detective Martin, when did you become involved in the

13   investigation involving Thomas Costanzo?

14   A.   In March 2016.

15   Q.   And how did your involvement come about?

16   A.   I was contacted by IRS Agent Donald Ellsworth.   I work in

17   an offsite DEA task force, and Agent Ellsworth is also assigned

18   to our group to assist with Internal Revenue Service matters.

19   Q.   What is a task force?

20   A.   So, a task force is a group of multiple law enforcement

21   agencies.   So, the one I'm involved in is Scottsdale Police

22   Department, full-time Drug Enforcement Administration agents.

23   We have some IRS agents, we have some analysts, and sometimes

24   we have border patrol agents with us.

25   Q.   Are financial investigations commonly conducted

1   simultaneously with drug investigations?

2   A.   Yes.  So, typically every drug investigation we do is --

3   has a simultaneous money laundering investigation, financial

4   investigation, linked to it because in order for somebody to

5   purchase drugs, they have to use some type of object --

6   typically cash in this case, virtual currency -- which would

7   institute a money laundering charge.

8   Q.   And what are investigative techniques that are used when

9   conducting a financial investigation?

10  A.   There's -- there's numerous techniques used, depending on

11  the type of financial transaction being conducted.  So if it's

12  a cash transaction, we can investigate a lot of physical

13  surveillance trying to actually locate the cash and find out

14  where it's going; if it's related to bank accounts, then we

15  open a financial investigation within the IRS and we try and

16  obtain financial records, with Court authorization, of course.

17  We'll obtain banking records, tax records sometimes.  With

18  virtual currency, we don't really have anyone we can turn to,

19  so it's -- it's basically on the agent's knowledge of virtual

20  currency and how it can be tracked.

21  Q.   Now, the task force that you are on with the IRS, is there

22  a specific mission or specific crimes that this task force

23  targets, or is it general drug and financial crimes?

24  A.   So, this is a specialized task force.  We're part of an

25  OCDEFT task force.  OCDEFT is Organized Crime and Drug

CHAD MARTIN - DIRECT EXAMINATION

1    Enforcement Task Force.  So we investigate Internet-based drug

2    trafficking.  We've found recently that the most drug

3    trafficking occurring on the Internet utilizes virtual

4    currency.

5    Q.  Okay.  So you became involved in March of 2016 after being

6    contacted by IRS Special Agent Donald Ellsworth?

7    A.  Yes.

8    Q.  And what did you do upon becoming involved?

9    A.  So, Agent Ellsworth first, he spoke to me about -- about

10   what his IRS investigation's about, an individual that he

11   identified as Morpheus Titania -- well, which they later

12   identified as Thomas Costanzo.  He informed me that

13   Mr. Costanzo was -- had met with prior undercover agents of the

14   IRS, and that they conducted cash for Bitcoin transactions that

15   they believed related to drug trafficking represented by the

16   undercover agents.  From there, I -- I initiated my own

17   investigation.  I wanted to verify this information, so I did

18   research on Morpheus Titania and Thomas Costanzo, and confirmed

19   that that was the same person.

20   Q.  In researching Morpheus Titania, did you come across a

21   Bitcoin meet-up web page?

22   A.  Yes.

23   Q.  And was Morpheus Titania an organizer of the Bitcoin

24   meet-up?

25   A.  Yes, he was.

1    Q.  And did you attend a Bitcoin meet-up?

2    A.  Yes.  In March 2016, I attended a Bitcoin meet-up.

3    Q.  I would like to show you what has been marked as

4    Exhibit 24.  And that's on your screen only at this time.

5            Do you recognize what that is?

6    A.  Yes, I do.

7    Q.  Is this something that you reviewed after becoming involved

8    in the investigation of Morpheus Titania?

9    A.  Yes, ma'am.

10   Q.  And is that a true and accurate depiction of what you

11   reviewed?

12   A.  Yes, it is.

13           MS. ESCALANTE:  Your Honor, the government would move

14   to admit Exhibit 24.

15           MS. WEIDNER:  Objection, Your Honor.  Foundation.

16           THE COURT:  Overruled.  Exhibit 24 is admitted.

17             (Exhibit 24 is received into evidence.)

18           MS. ESCALANTE:  Permission to publish, Your Honor.

19           THE COURT:  You may publish it.

20   BY MS. ESCALANTE:

21   Q.  Detective Martin, explain to the members of the jury what

22   this is.

23   A.  So, this appears to be about a -- a user account under the

24   name Morpheus.  It's on Arizona Bitcoin meet-up page, and it

25   lists him has an assistant organizer for meet-up events.

1   Q.   Okay.  What caught your attention as an investigator when

2   you were reviewing this page?

3   A.   So, there were a couple things.  First, it listed that

4   hometown was Tempe, so I knew he was in the area of Tempe where

5   he was represented to be by Agent Ellsworth.  He had attended

6   several past meet-ups.  It lists there 106 past meet-ups.  And

7   specifically it shows a question:  Are you new to Bitcoin?  And

8   it says:  Doing money trades?  I know enough to be dangerous.

9   Q.   Okay.  After you reviewed this, did you attend a Bitcoin

10  meet-up?

11  A.   Yes, I did.

12  Q.   And approximately when was that?

13  A.   I believe it was March 8th, 2016.

14  Q.   And did you see the defendant at that meet-up?

15  A.   No.  Based on this information, I believed he might be

16  there.  So for surveillance purposes, I attended, but I did not

17  see the defendant there.

18  Q.   Okay.  And after reviewing the Bitcoin meet-up and this

19  profile, did you ever go to localbitcoins.com?

20  A.   Yes, I did.

21  Q.   And why did you do that?

22  A.   So, again, Agent Ellsworth represented that Mr. Costanzo

23  was advertising his -- his Bitcoin activity on LocalBitcoins,

24  so I wanted to independently confirm that and see if I could

25  locate him myself.

CHAD MARTIN - DIRECT EXAMINATION

1   Q.   And were you able to do so?

2   A.   Yes.

3   Q.   And how quickly did that happen?

4   A.   Very quickly.  I went to localbitcoins.com, I searched for

5   cash peer-to-peer Bitcoin exchangers in the Phoenix area, and

6   he was the first one to pop up on the list.

7   Q.   Prior to reviewing or seeing his profile on the date that

8   you went, had you reviewed the profile that has already been

9   admitted into evidence and other agents discussed?

10  A.   Yes.

11  Q.   And was the profile you reviewed in, I believe it was,

12  September 2016 --

13  A.   Yes.

14  Q.   -- was it any different?

15  A.   No -- well, it was slightly different.  It looked like it

16  had been updated.  But it was the same general information,

17  just with some more detail, I believe.

18  Q.   Okay.  I'm going to show you what's been marked as

19  Exhibit 74.

20       Do you recognize that?

21  A.   Yes, I do.

22  Q.   What is that?

23  A.   That is the Bitcoin -- one of the Bitcoin advertisements on

24  LocalBitcoins for Morpheus Titania.

25  Q.   And is that the one that you reviewed approximately in

1    September of 2016?

2    A.  Yes.  I can see a -- there is a timestamp at the top from

3    when I took that screenshot, which was was September 7th, I

4    believe, 2016.

5    Q.  And is this a true and accurate depiction?

6    A.  Yes, it is.

7              MS. ESCALANTE:  Your Honor, the government would move

8    to admit Exhibit 74 into evidence.

9              MS. WEIDNER:  No objection.

10              THE COURT:  Exhibit 74 is admitted.

11                  (Exhibit 74 is received into evidence.)

12    BY MS. ESCALANTE:

13    Q.  Okay.  Is there anything on the first page of that caught

14    your attention?

15              MS. ESCALANTE:  Oh, permission to publish?

16              THE COURT:  You may publish.

17              THE WITNESS:  Yes.  I noticed that the first page

18    lists the price he's charging in U.S. dollars per Bitcoin,

19    which I realized to be slightly above the market price, just

20    based on my own analysis.  It was -- his feedback score is

21    100 percent, and it shows his trade limits to be between 12,000

22    and $30,000 for the Scottsdale area.

23    BY MS. ESCALANTE:

24    Q.  Was the feedback store significant to you?

25    A.  Yes.  Obviously for investigative purposes, it was

1    important that he have a good feedback score.  We didn't want

2    him to be someone who might rip us off.

3    Q.   Okay.  And what do the trade limits signify to you?

4    A.   So, going along with our money laundering investigation and

5    what was related to me by Agent Ellsworth, one of the goals of

6    the investigation was to see if trades were being conducted in

7    excess of $10,000, which would require a reporting requirement.

8    Q.   Okay.  I'm going to scroll to the next page.

9             Did you review the terms of trade?

10   A.   Yes, I did.

11   Q.   And what caught your attention on these terms of trade?

12   A.   It listed that he's available anytime.  He can get Bitcoins

13   immediately and discreetly.

14   Q.   What did that mean to you?

15   A.   This really would mean anonymously, without anyone knowing

16   the transaction was occurring.

17   Q.   All right.  Did he list his phone number?

18   A.   Yes.  This one he has it listed alphanumerically and fully

19   written out.  So it actually spells out 602, and then 431725.

20   Q.   And where -- he lists all transactions are done, complete

21   anonymity.  What does that signify to you?

22   A.   That, again, signified to me that he was going to do

23   everything completely anonymous and wouldn't be filing any

24   paperwork on our transaction.

25   Q.   And the statement that follows:  The only -- only record of

1   the transaction is on the Blockchain.  What does that mean?

2   A.  Again, I felt that by this message, he's letting his

3   customers know that any transaction you do with him are going

4   to be anonymous and there won't be any record of them.

5   Q.  Was it of any significance that he stated he likes working

6   with newbies?

7   A.  Yes.

8           MS. WEIDNER:  Objection.  Speculation.

9   BY MS. ESCALANTE:

10  Q.  As part of your investigation, what did that signify to

11  you?

12          THE COURT:  I'll allow that with the specification.

13          THE WITNESS:  So that signified that he's -- he's

14  trying to get new customers, he's -- he's looking for business,

15  even if you don't know how Blockchain works, he's looking for

16  people to seek him out and meet with.

17          MS. WEIDNER:  Objection.  Rule of completeness.

18          MS. ESCALANTE:  I can complete the entire sentence,

19  Your Honor.

20          THE COURT:  Okay.  Go ahead.

21  BY MS. ESCALANTE:

22  Q.  The statement is:  I love working with newbies and pros.

23  Hit me up and you'll see why my customers come back to me again

24  and again.  I tell you straight how it is.

25          What did that signify to you in your investigation,

1   Detective Martin?

2   A.  That he would work with anyone, whether you didn't know

3   anything about Bitcoin or whether you were a pro.  He wants --

4   he wants customers and he wants them to keep coming back.

5   Q.  At the very bottom of the terms of trade is this statement:

6   Lately I also trade on Mycelium app under Morpheus T.

7            What is the Mycelium app, Detective Martin?

8   A.  It's my understanding, Mycelium is a Bitcoin application

9   that you would download from the application store on an iPhone

10  or Android smartphone.  It can contain a Bitcoin wallet so you

11  can conduct trades through that wallet, and it also has an

12  encrypted messaging application so you can securely communicate

13  back and forth while conducting transactions.

14  Q.  Okay.  Anywhere on the terms of trade, did Morpheus Titania

15  list his true legal name?

16  A.  No.

17  Q.  Prior to reviewing this profile, you had become aware of

18  his true name; correct?

19  A.  Yes.

20  Q.  So did it signify anything to you in your investigation

21  that his correct name was not on his LocalBitcoins profile?

22  A.  It just showed me that he didn't want to be identified, he

23  wasn't -- he wasn't listing his true identity on there.

24  Q.  Continuing with the terms of trade on this same exhibit,

25  just the next page, did -- was there a website listed?

1   A.  Yes, www.titanians.org, slash, who-is-morpheus.

2   Q.  And prior -- or as part of your investigation, did you go

3   to that website?

4   A.  Yes, I did.

5   Q.  Now, continuing with the profile on the -- on the following

6   page, still the same exhibit, what did this that's on the

7   screen mean to you?

8   A.  He only listed his payment methods in USD.  So I took that

9   to mean that he would meet, by these advertisements, in

10  Chandler, Avondale, and also in Scottsdale, through the other

11  advertisement, and that he could conduct trades as low as $200

12  and up to -- well, $30,000 from the first page, and on this

13  page, 11,999.

14  Q.  Okay.  And did those amounts signify anything in your

15  investigation?

16  A.  Yes.  They -- just like we confirmed on the first page,

17  they show that he's willing to do a transaction over $10,000,

18  which was significant.

19  Q.  Okay.  Did it have any significance on suspicious activity

20  reporting?

21  A.  Yes.

22       MS. WEIDNER:  Objection.  Foundation.  And, Your

23  Honor, may we have a sidebar?

24       THE COURT:  Yes.

25     (At sidebar on the record.)

```
1              MS. WEIDNER:  This is Maria Weidner.

2              THE COURT:  Wait.  Wait until they're here.

3              MS. WEIDNER:  Oh, sorry.

4              This is Maria Weidner.  My concern here is that Chad

5    Martin is a fact witness.  He has not been noticed as an

6    expert.  The government noticed -- what's his name? --

7    Ellsworth as their expert, that he would be testing --

8    testifying about regulations, about -- that the government

9    believes are applicable in this case.  And I understand that as

10   part of his testimony, Ms.-- you know, Agent -- Detective

11   Martin needed to testify about Bitcoin, but he is simply not, I

12   think, sufficiently -- whatever the -- he has not shown that he

13   knows the applicable financial regulations.

14             THE COURT:  If you could keep --

15             MS. WEIDNER:  Sorry.  Sorry.  Applicable financial

16   regulations.  I can see Ellsworth would know that because he's

17   an IRS agent, but this is a TFO.

18             THE COURT:  Well, do you want to lay a foundation?

19             MS. ESCALANTE:  Yes, Your Honor, I can.

20             THE COURT:  You don't need to with me, but --

21             MS. ESCALANTE:  Yes.

22             THE COURT:  Okay.  So if you get foundation?  So we'll

23   see if you can lay the foundation.

24             MS. WEIDNER:  The concern is that this was -- this was

25   noticed as expert testimony as to Ellsworth, and yet --
```

CHAD MARTIN - DIRECT EXAMINATION

1          THE COURT:  Well --

2          MS. WEIDNER:  -- it's --

3          THE COURT:  -- are you going have him pronouncing what

4    the law is or what they investigated?

5          MS. ESCALANTE:  What they investigated and why it was

6    significant to him, because they were investigating the lack of

7    reporting.

8          THE COURT:  Yeah.  Okay.  So I'll allow you, if you

9    can lay a proper foundation, to elicit what this agent was

10   investigating, but you need to -- I do think you need to lay a

11   little bit of foundation of what he was investigating and why.

12         MS. ESCALANTE:  Okay.

13         THE COURT:  I do want to say one thing.

14         I know this may be silly and nitpicky, but I indicated

15   when I overruled the 403 and then directed the jury to

16   disregard something that you did something that was

17   inappropriate.  I didn't mean that.  I just meant it was not --

18   in my view, the evidentiary rules wouldn't allow it.  I didn't

19   mean to suggest inappropriate conduct on your part, and I

20   wanted to make that clear.

21         MS. ESCALANTE:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MS. WEIDNER:  Thank you.

24      (End of discussion at sidebar.)

25

1   BY MS. ESCALANTE:

2   Q.  Detective Martin, as -- in your career, how long have

3   you -- or what's the approximation that you've dedicated as

4   part of your career to investigating financial crimes?

5   A.  Oh, I'd say since I became a detective in 2012.

6   Q.  And have you gone to trainings regarding financial crimes

7   and how to investigate them?

8   A.  Yes, I have.

9   Q.  Have you learned in those trainings about reporting

10  requirements?

11  A.  Yes.

12  Q.  And why are reporting requirements significant to financial

13  investigations?

14  A.  Um --

15  Q.  Or the investigations that you conduct.

16  A.  So it's my understanding that there are federal regulations

17  related to reporting requirements.  Typically in a bank

18  setting, a reporting requirement would be a -- cash

19  transactions over $10,000, or any transaction of any amount

20  that's suspicious in nature.

21  Q.  And have you learned this from your training --

22  A.  Yes.

23  Q.   -- as a officer?

24          And in this particular case, were you investigating

25  the lack of reporting?

1    A.  Yes.  In this -- in this case.

2    Q.  And when you started this investigation, and that was one

3    of the items you were investigating, had you had all that

4    previous training regarding financial investigations?

5    A.  Yes.

6    Q.  So why are the amounts here, particularly the lower

7    amounts, significant to your investigation?

8    A.  So, I recognize that although there are amounts listed that

9    would be, one, over $10,000 and require a cash transaction

10   report if conducted with cash, there are also lower amounts

11   which, just as listed would not be illegal, but if they're

12   suspicious in nature they might also trigger a transaction

13   reporting requirement.

14   Q.  Okay.  Did you -- so you stated you went to -- strike that.

15        Did you review the confirmed transactions that were

16   associated with the defendant's local Bitcoin profile?

17   A.  Yes.  The -- like the reviews page.

18   Q.  Okay.  I would like to show you now what's been marked as

19   Exhibit 28.  It will appear on your screen.

20        Can you tell me what that document is?

21   A.  It appears to be a screenshot I took from September 7,

22   2016, related to trade activity and information on Morpheus

23   Titania.

24   Q.  And, I'm sorry, you stated you took that screenshot?

25   A.  Yes.

```
 1    Q.  And is that a true and accurate depiction of the screenshot
 2    you took?
 3    A.  Yes, it is.
 4           MS. ESCALANTE:  Your Honor, the government would move
 5    to admit Exhibit 28 into evidence.
 6           MS. WEIDNER:  Objection, Your Honor.  Foundation,
 7    hearsay.
 8           THE COURT:  I do think I need to have some foundation
 9    on where this came from.
10    BY MS. ESCALANTE:
11    Q.  Detective Martin, where did Exhibit 28 come from?
12    A.  So, this is the page that comes up on localbitcoins.com.  I
13    clicked on the Morpheus Titania user name, and this takes me to
14    his -- his information page.
15    Q.  And is this the information you reviewed when you clicked
16    on that in September of 2016?
17    A.  Yes, it is.
18    Q.  And this is a screenshot taken by you?
19    A.  Yes, it is.
20    Q.  And did you review this to further your investigation in
21    this case?
22    A.  Yes, I did.
23    Q.  And is that a part of what you do in your investigations?
24    A.  Yes, it is.
25           MS. ESCALANTE:  Your Honor, the government would move
```

```
 1    to admit Exhibit 28.

 2            MS. WEIDNER:  Objection, Your Honor.  There is

 3    insufficient information in this foundation to certify the

 4    reliability of the information that seems to have been compiled

 5    by the website.

 6            THE COURT:  Are you offering the information for the

 7    truth of what it states?

 8            MS. ESCALANTE:  No, Your Honor.  The government is

 9    offering it to show the officer's state of mind in conducting

10    this investigation.

11            THE COURT:  Well, I'll allow it to indicate what the

12    website says about Morpheus Titania.

13                (Exhibit 28 is received into evidence.)

14    BY MS. ESCALANTE:

15    Q.  Okay.  And to be fair, Detective Martin, you don't know if

16    localbitcoins.com runs a sort of quality assurance test on

17    these reviews and constantly updates or verifies them; correct?

18    A.  No, I'm -- I'm not sure how LocalBitcoins processes their

19    information.  This is just who I believe to be the stats listed

20    for that user name.

21            MS. ESCALANTE:  Permission to publish, Your Honor?

22            THE COURT:  You may.

23    BY MS. ESCALANTE:

24    Q.  Detective Martin, why was it important for you to review

25    this page as part of your investigation?
```

1    A.  So, when I initiated the investigation, Agent Ellsworth and

2    Agent Fleischmann both relayed that they had previously

3    reviewed Morpheus Titania's page and documented the trade

4    volume, which at that time I believe was 70 trades with

5    100 percent feedback.  So I wanted to -- to revisit that same

6    information and see if the statistics had changed at all, to

7    see if this activity was still occurring.

8    Q.  And had the statistics changed?

9    A.  Yes, it showed -- it lists under trade volume, higher than

10   150 Bitcoin with 100-plus confirmed trades with 107 different

11   partners.

12   Q.  And all of that information that's coming from the website.

13   No independent way for you to verify that; correct?

14   A.  No.  This -- this was just information obtained from

15   LocalBitcoins.

16   Q.  What did it signify to you in your investigation?

17   A.  It -- two things.  It -- it confirmed the initial

18   information I'd learned from the IRS that he had -- he still

19   had a 100 percent feedback score; that he now had over 100-plus

20   trades so that his -- his trade volume had grown since the

21   initial IRS investigation.  And also showed that he had been

22   online recently within 10 hours of when I took that screenshot.

23   And that his account had been active for more than three years.

24   Q.  Did you go to the website that was listed on the

25   defendant's terms of trade?

CHAD MARTIN - DIRECT EXAMINATION

1   A.  Yes, the who-is-Morpheus page?

2   Q.  Yes.

3         I am now going to show you what's been marked as

4   Exhibit 73.

5   A.  Okay.

6   Q.  Detective Martin, what is on the screen?

7   A.  So this is the who-is-Morpheus page.  This was a screenshot

8   I took in November 17th, 2016.

9   Q.  Okay.  And this -- you reviewed this on that date?

10  A.  Yes, I did.  I -- I reviewed it before that date.  I

11  reviewed it on the -- on the same day I reviewed the

12  LocalBitcoins page.  I just -- I didn't take this screenshot

13  until later.

14  Q.  Did the -- did this website change from the first day you

15  reviewed it to when you took the screenshot?

16  A.  No, I don't believe so.  It was -- it was the same

17  information.

18  Q.  Okay.  And is it a true and accurate depiction of that

19  screenshot of the website?

20  A.  Yes, it is.  I believe this one may have been redacted

21  some.  But the original screenshot is was the same.

22  Q.  Okay.  And why was it important for you to review this in

23  your investigation?

24  A.  I want -- I wanted to compare it to what the IRS

25  investigation had already shown, and I wanted to see if the

UNITED STATES DISTRICT COURT

```
 1    information changed, and also read some of the statements

 2    contained in this.

 3              MS. ESCALANTE:  Your Honor, the government would move

 4    to admit Exhibit 73.

 5              MS. WEIDNER:  No objection.

 6              THE COURT:  Exhibit 73 is admitted.

 7                  (Exhibit 73 is received into evidence.)

 8              MS. ESCALANTE:  Permission to publish?

 9              THE COURT:  You may.

10    BY MS. ESCALANTE:

11    Q.  Detective Martin, can you tell us what was significant to

12    you from this website in your investigation?

13    A.  So, the part you have highlighted there, he talks about how

14    he used to have previous jobs, but now he says:  I mostly sell

15    Bitcoin.  The main reason being I don't need a license, bank or

16    permit to do it.  All I need is a phone number.  And that he

17    hasn't had a job since February 2014.  And that he makes a

18    living selling Bitcoin.

19    Q.  Okay.  Now, did you eventually contact the defendant?

20    A.  Yes, I did.

21    Q.  And where did you contact him?

22    A.  His phone number that was posted on localbitcoins.com, I

23    sent a text message to it.

24    Q.  Okay.  And were you able to compare that phone number with

25    the phone number where IRS undercover agents contacted the
```

1    defendant?

2    A.  Yes, that was the same phone number.

3    Q.  And I'm going to show you what's been marked as Exhibit 43.

4         Do you recognize that, Detective Martin?

5    A.  Yes.  That is a text message conversation that I had

6    with -- I have it listed as Morpheus on there, but it's

7    Mr. Costanzo -- from September 14th, 2016.

8    Q.  And how was this created?

9    A.  So, when I communicated with him, I sent him text messages

10   through my undercover cell phone, and I use a Google voice

11   phone number for that, for -- for undercover purposes.  A way

12   to document those messages is to log in to the Google voice

13   website, you can actually copy those messages directly and

14   paste them into a Word document to save as evidence.

15   Q.  And are these a true and accurate depiction of the text

16   message exchange you had with the defendant on September 14th,

17   2016?

18   A.  Yes.  They're -- they're listed just like they were in

19   Google voice.

20   Q.  Okay.

21        MS. ESCALANTE:  Your Honor, the government would move

22   to admit Exhibit 43.

23        MS. WEIDNER:  No objection.

24        MS. ESCALANTE:  Permission to publish, Your Honor.

25        THE COURT:  Exhibit 43 is admitted.  You may publish.

1          (Exhibit 43 is received into evidence.)

2    BY MS. ESCALANTE:

3    Q.  Detective Martin, explain to the members of the jury about

4    these text message and the exchange that occurred.

5    A.  So, on September 14th, this was the first time I contacted

6    Mr. Costanzo.  Where it's listed as me, that's my phone, that's

7    how I am in my phone, and then Morpheus is how Mr. Costanzo was

8    saved in my contact list.  I advised him that I found him on

9    LocalBitcoins, and I was looking to buy Bitcoin, and asked when

10   he was free to meet.

11   Q.  And did he -- was he available to meet that day?

12   A.  Yes.  He asked what my name was.  That was the only

13   question he asked.  And what part of town I'm in.  And we set

14   up a meeting for later that day.

15   Q.  And did you meet the -- the very same day that you

16   contacted him?

17   A.  Yes.

18   Q.  And where did you meet?

19   A.  We met at McDonald's in the Mesa Riverview.

20   Q.  And how did the defendant arrive to that meeting?

21   A.  He arrived on foot.

22   Q.  And why is that?

23   A.  He informed me that his car had broken down, and that he

24   had jogged to the meeting.

25   Q.  How did he inform you that his car was broken down?

```
 1    A.  As -- as you can see, we already had the meeting
 2    established via text.  He called me, after I had already
 3    arrived at McDonald's, and just advised me over the phone that,
 4    hey, my car broke down, but I still want to do the deal.  I'm
 5    going to come to you on foot.
 6    Q.  Okay.  Do you see the defendant in the courtroom here
 7    today?
 8    A.  Yes, I do.
 9    Q.  Can you identify him and tell us where he is seated and
10    what he's wearing?
11    A.  He is the gentleman to my left, your right, sitting in
12    between the two defense attorneys, black suit, and glasses on.
13            MS. ESCALANTE:  Your Honor, may the record reflect
14    that Detective Martin has identified the defendant?
15            THE COURT:  Yes.
16    BY MS. ESCALANTE:
17    Q.  Okay.  Describe how the meeting occurred, how -- how it
18    went from the beginning to the end.
19    A.  Well, Mr. Costanzo arrived.  He seemed eager to do the
20    deal.  He seemed eager to explain what Bitcoin was.  At that
21    point, I -- I already had an undercover identity, and I already
22    had an undercover persona that I was representing.
23    Q.  Okay.  And what were you wearing at that meeting?
24    A.  Part of my undercover persona was to portray myself as a
25    drug dealer, so --
```

1  Q.  But you didn't -- you didn't do that at this meeting;

2  right?

3  A.  No, not at this meeting.  This was just how I was dressed.

4  Q.  Okay.

5  A.  So I wanted to drop small hints throughout our first

6  meeting.

7  Q.  And let me just fast-forward.  How many meetings did you

8  have with the defendant?

9  A.  We had five meetings.

10  Q.  And at what meeting was it that you introduced that you

11  were a drug dealer?

12  A.  Not until the third meeting.

13  Q.  And why is that?

14  A.  Based on my training and experience, it's -- it's not

15  common for someone involved in drug activity to walk up to

16  somebody and say, hey, I'm a drug dealer, the first time you

17  meet them.  You need to build a rapport, you need to get to

18  know somebody, get an understanding for -- for who they are.

19  Q.  Okay.

20  A.  And if...

21  Q.  And during your first two meetings, were you setting the

22  stage to do that introduction?

23  A.  Yes.

24  Q.  Approximately how much money were you wanting to exchange

25  during your first meeting?

1   A.   This meeting was $2,000.

2   Q.   Okay.  I'm now going to show you what's been marked as

3   Exhibit 41.

4          Do you recognize that?

5   A.   Yes.  That is the -- the undercover funds I obtained for

6   that transaction.

7   Q.   And is that a true and accurate depiction of the funds that

8   you gave the defendant?

9   A.   Yes, it is.

10         MS. ESCALANTE:  Your Honor, the government would move

11  to admit Exhibit 41 into evidence.

12         MS. WEIDNER:  No objection.

13         THE COURT:  Exhibit 41 is admitted.

14         MS. ESCALANTE:  Permission to publish, Your Honor.

15         THE COURT:  You may.

16         (Exhibit 41 is received into evidence.)

17  BY MS. ESCALANTE:

18  Q.   Detective Martin, how did you have this cash during the

19  meeting?

20  A.   It was -- it was just stacked up in a large, folded bundle.

21  Q.   And where did you have it prior to the defendant arriving?

22  A.   In my pocket.

23  Q.   Okay.  And did you record the meeting?

24  A.   Yes.  It was -- it was audio and video recorded, and I also

25  had a transmitting device.  The audio and transmitting device

1    were contained in the cell phone.

2    Q.  Okay.  And have you had the opportunity to review the audio

3    portion of those recordings and the transcripts prior to today?

4    A.  Yes, I have.

5    Q.  And were those portions a true and accurate depiction of

6    the audio recording that occurred on that day of the exchange?

7    A.  Yes, they were.

8            MS. ESCALANTE:  Your Honor, the government would move

9    to admit Exhibit 105 with subparts A through Q, and it would be

10   the same previous instruction as with audio and transcripts.

11           MS. WEIDNER:  No objection.

12           THE COURT:  All right.  105A through Q are admitted.

13           And again, ladies and gentlemen, what I've told you

14   before, what you hear is the evidence.  The transcript of what

15   is said is merely for your assistance.  But if it disagrees

16   with what you hear, what you hear is what you should credit.

17           MS. ESCALANTE:  Your Honor, permission to publish or

18   play?

19           THE COURT:  You may play it.

20           MS. ESCALANTE:  Thank you.

21           Okay.  We'll begin with 105A.

22               (Exhibit 105 is received into evidence.)

23                   (Portion of audiotape played.)

24   BY MS. ESCALANTE:

25   Q.  So Detective Martin, despite the car problems, defendant

1   still made it to the meeting.

2   A.  Yes.  He was eager.  He showed up.  He had ran there.

3   That's why he took that short pause at the beginning because he

4   was sweating from running there.

5              MS. ESCALANTE:  Okay.  Now we'll go to 105B.

6                   (Portion of audiotape played.)

7   BY MS. ESCALANTE:

8   Q.  What did the defendant refer to when he said:  Honestly,

9   it's like drugs?

10  A.  He says:  It's like drugs for me, doing Bitcoin.

11                  (Portion of audiotape played.)

12  BY MS. ESCALANTE:

13  Q.  What significance did it have to you in your investigation

14  when he stated:  It's like building a relationship.

15  A.  I took that to mean that he wanted to get to know me, too.

16  He wanted to meet me in person and wanted me to get to know

17  him.

18                  (Portion of audiotape played.)

19             MS. ESCALANTE:  Okay.

20             We'll go to 105C.

21                  (Portion of audiotape played.)

22  BY MS. ESCALANTE:

23  Q.  Detective Martin, does Bitcoin weigh anything?

24  A.  No.  Bitcoin is digital.  It can be held in your wallet.

25  Q.  What role does a currency that is weightless and is digital

CHAD MARTIN - DIRECT EXAMINATION

1    have on your types of investigations?

2    A.   That was significant to me because I realized that if I'm

3    going to be attempting to conceal large amounts of cash, that's

4    quite hard to do.  You have a big, bulky item of cash to try

5    and conceal or transport.  Whereas he's explaining to me that

6    Bitcoin doesn't weigh anything.  You could have a million

7    dollars sitting in your cell phone and no one would ever know.

8    Q.   Okay.

9                    (Portion of audiotape played.)

10   BY MS. ESCALANTE:

11   Q.   Detective Martin, did you find the defendant by Googling

12   him on localbitcoins.com?

13   A.   Yes.

14                   (Portion of audiotape played.)

15   BY MS. ESCALANTE:

16   Q.   Detective Martin, what did that final statement signify to

17   you, that the government system is stacked against us and wants

18   to make everything harder?

19              MS. WEIDNER:  Objection.  Calls for speculation.

20              THE COURT:  I believe she asked what it meant to him,

21   so I'll allow that question.

22              THE WITNESS:  Yeah.  What I understood that to mean

23   is, I mean, we had just met, we're new to this conversation.

24   And the first thing he's getting out is he's telling me -- he's

25   explaining his side for the government, how he thinks the

1   government is trying to makes thing harder.

2   Q.  And he also referenced the banking system.  What

3   significance did that have to you?

4   A.  So, I -- I recognized that, and I understood that he had a

5   dislike for the banking system.  And based on my prior

6   investigation related to his accounts, know that he didn't use

7   bank accounts, and that he -- he was trying to avoid the

8   government and banking.

9   Q.  Okay.

10          MS. ESCALANTE:  Next we'll go to 105D.

11              (Portion of audiotape played.)

12  BY MS. ESCALANTE:

13  Q.  Detective Martin, why did you introduce that portion of the

14  bank account in the conversation?

15  A.  I -- I wanted to see how he would answer.  I let him know

16  right upfront that I don't want to use a bank account and I

17  don't want to be linked to anything the government could track.

18  Q.  Did the defendant end or cease any communication or

19  interaction with you when you stated that?

20  A.  No.

21          THE COURT REPORTER:  Counsel, I'm sorry.  I lost you.

22          MS. ESCALANTE:  Okay.

23  BY MS. ESCALANTE:

24  Q.  Did the government --

25          THE COURT REPORTER:  "The defendant."

1   BY MS. ESCALANTE:

2   Q.  Did the defendant end or cease any communication with you

3   when you introduced that notion?

4   A.  No, he did not stop communicating with me.

5                   (Portion of audiotape played.)

6   BY MS. ESCALANTE:

7   Q.  Detective Martin, what did that signify to you:  I don't

8   buy anything off the exchange?

9   A.  So, I was already aware how commercial exchanges operate,

10  how they -- they typically follow government regulations and

11  know-your-customer rules.

12              MS. WEIDNER:  Objection.  Foundation.

13              THE COURT:  Well, if the witness is going to testify

14  how exchanges work, then you are going to have to lay

15  foundation.

16              MS. ESCALANTE:  Okay.

17  BY MS. ESCALANTE:

18  Q.  Detective Martin, have you learned about commercial

19  exchanges in your trainings that you've attended for virtual

20  currency?

21  A.  Yes, I have.

22  Q.  Have you set up any accounts with any commercial exchanges?

23  A.  Yes, I have an undercover account at local -- or not

24  LocalBitcoins -- well, I do at LocalBitcoins -- but also at

25  Coinbase.

1    Q.  Okay.  And based on your actual experience with a

2    commercial exchange and your training, have you developed an

3    understanding as to how commercial exchanges operate?

4    A.  Yes.  Based on setting up those accounts, I've learned

5    what -- what documents are required to -- to establish an

6    account.

7    Q.  Okay.  And based on the -- I believe you said it was nine

8    or 10 investigations involving is virtual currencies, have you

9    been able to distinguish or find differences between commercial

10   exchanges and peer-to-peer exchanges?

11   A.  Yes.

12   Q.  Okay.

13           MS. ESCALANTE:  Is that sufficient --

14           MS. WEIDNER:  Objection.  Cumulative.

15           THE COURT:  It's already been testified to, so I'm

16   going to leave it on the record.

17           MS. ESCALANTE:  Is that sufficient foundation, Your

18   Honor?

19           THE COURT:  Yes.

20   BY MS. ESCALANTE:

21   Q.  So Detective Martin, what did it signify to you when it was

22   stated --

23           MS. WEIDNER:  Your Honor, objection.  Cumulative.  We

24   request a sidebar.  This has already been testified to by other

25   witnesses.

```
1              THE COURT:  If you want a sidebar, then don't give me
2   speaking objections.  Okay?
3              MS. WEIDNER:  Apologize, Your Honor.
4         (At sidebar on the record.)
5              MS. WEIDNER:  This is Maria Weidner.  Your Honor, the
6   government introduced this initially through SA Fleischmann.
7   We did not object because the foundation -- the foundation --
8   this case needed to be laid.  However --
9              THE COURT:  So what are we specifically objecting
10  to --
11             MS. WEIDNER:  Objecting to --
12             THE COURT:  -- how an exchange works?
13             MS. WEIDNER:  -- test -- offering the testimony about
14  it again.  This is -- Agent Fleischmann provided this.
15  Supposedly Agent Ellsworth is going to prove it again, and now
16  Agent Martin is going to provide it in the middle.
17             MS. ESCALANTE:  If I may, Your Honor, the only reason
18  it came up was due to the response of lack of foundation.  I
19  just wanted to ask Detective Martin what it signified to him in
20  his interaction with the defendant.  And I believe that because
21  this is a new undercover agent and he's testifying to his
22  specific experience with the defendant --
23             THE COURT:  Well --
24             MS. ESCALANTE:  -- overcomes the cumulative objection.
25             THE COURT:  -- let me just say that it seems to me
```

1    that the whole thing has gone a little awry here because you

2    asked what it signified to him and he started being

3    nonresponsive.  But that wasn't the objection that you have

4    made though.  You made the lack of foundation to what he

5    started to testifying to.

6           Maybe we can avoid all of this by simply asking what,

7    did this signify to you, and see if he can be responsive to

8    what it signified to him as opposed to trying to talk about all

9    kinds of other stuff.  I'm not yet going to grant a cumulative

10   objection, but I'm going to get there.  So if you're going to

11   introduce all this stuff through Agent Ellsworth, if you want

12   me to grant the cumulative objection when he's testifying, if

13   you want to avoid that, then let's not be going through --

14   tracking through all that here, if you're going to -- if it's

15   your intention to introduce this through Ellsworth.

16           MS. ESCALANTE:  Okay.

17           THE COURT:  All right.  Any unclarity about any of

18   that?

19                 (Pause in proceedings.)

20           THE COURT:  You're the one that has to talk to me.

21           MS. ESCALANTE:  No, no.

22           THE COURT:  All right.

23       (End of discussion at sidebar.)

24   BY MS. ESCALANTE:

25   Q.  Okay.  Detective Martin, so the defendant stated he does

```
 1    not purchase off an exchange; correct?

 2    A.  Yes.

 3                    (Portion of audiotape played.)

 4    BY MS. ESCALANTE:

 5    Q.  Detective Martin, what was the amount that the defendant

 6    stated he had done with this buddy of his?

 7    A.  A quarter of a million dollars.

 8                    (Portion of audiotape played.)

 9    BY MS. ESCALANTE:

10    Q.  Detective Martin, what was your understanding as to where

11    the defendant was purchasing his Bitcoin?

12    A.  It was my understanding that he had a Bitcoin source who

13    was not a Bitcoin exchange, but another person.

14    Q.  Okay.  And what did it signify to you in your investigation

15    when he talked about, you know, you have to get to know another

16    person before you start moving big quantities of money?

17    A.  I understood that to mean he wanted to know what this money

18    was for so he could start working with me.

19    Q.  Okay.

20                    (Portion of audiotape played.)

21    BY MS. ESCALANTE:

22    Q.  Detective Martin, the defendant said that there is no

23    customer service, that no one takes a part of it.

24         Did he charge you a fee for this transaction?

25    A.  Yes, he did.
```

1   Q.  And approximately what percentage was that?

2   A.  10 percent for this deal.

3           MS. ESCALANTE:  Okay.

4           We'll go to 105E.

5               (Portion of audiotape played.)

6   BY MS. ESCALANTE:

7   Q.  Who was the "evil organization" that the defendant referred

8   to?

9   A.  He said the Federal Reserve.

10          MS. ESCALANTE:  I'm going to go to 105F.

11              (Portion of audiotape played.)

12  BY MS. ESCALANTE:

13  Q.  Detective Martin, what is the defendant doing when he's

14  telling you "this is not money"?

15  A.  He was showing me a -- I believe it was a hundred-dollar

16  bill.

17  Q.  Okay.

18              (Portion of audiotape played.)

19  BY MS. ESCALANTE:

20  Q.  Detective Martin, what is he doing at that point?

21  A.  So he was wearing a -- a fanny pack around his waist, and

22  he pull out a silver coin and showed me, this is what a dollar

23  is and explained how much it weighed and that that's a true

24  dollar.

25  Q.  I'm now going to show you what has been marked as

 1      Exhibit 3.

 2              One second.  I'm sorry.  I think it's Exhibit 11.

 3              Nope.

 4              Okay.  Let's just continue with 105G.

 5              COURTROOM DEPUTY:  Counsel, give me just one moment.

 6      Sorry.

 7                      (Portion of audiotape played.)

 8      BY MS. ESCALANTE:

 9      Q.  Detective Martin, what is all this conversation about, the

10      numbers and SHA-256?

11      A.  I believe he's explaining --

12              MS. WEIDNER:  Objection.  Improper expert testimony.

13              MS. ESCALANTE:  I can --

14              THE COURT:  I'll allow it.

15              THE WITNESS:  It's my belief he was just explaining to

16      me the mechanics of how Bitcoin transactions operate with the

17      encryption algorithms and the verification process.

18              MS. ESCALANTE:  Okay.

19                      (Portion of audiotape played.)

20      BY MS. ESCALANTE:

21      Q.  Detective Martin, what do you mean by:  How does this work,

22      the tracking of it?

23      A.  So I was asking him if Bitcoin is traceable, if it could be

24      tracked.

25                      (Portion of audiotape played.)

1    BY MS. ESCALANTE:

2    Q.  And what was your purpose in asking if the government could

3    track that?

4    A.  I was slowly dropping hints that I didn't want to be

5    tracked by the government.

6                    (Portion of audiotape played.)

7    BY MS. ESCALANTE:

8    Q.  Detective Martin, in your virtual currency investigations,

9    does it take is a lot of energy to track Bitcoin?

10   A.  I'm not aware of a way to track it unless you have one

11   address identified.  So I'm not sure what he means by "the

12   energy" there.

13   Q.  Is it difficult?

14   A.  Yes.

15                   (Portion of audiotape played.)

16   BY MS. ESCALANTE:

17   Q.  What did you understand the defendant was referring to when

18   he said there are ways to make it more obscure?

19   A.  I -- I understood he was explaining to me how -- how to

20   make it more obscure, how to conceal it from the government.

21                   (Portion of audiotape played.)

22   BY MS. ESCALANTE:

23   Q.  Okay.  Now I'm going to show you what's marked as

24   Exhibit 33.

25            Have you seen that picture before?

1    A.  Yes, I have.

2    Q.  And do you see a coin on the bottom right-hand picture?

3    A.  Yes, I do.

4    Q.  Have you seen that coin before?

5    A.  Yes.  That's the silver coin he showed me when he was

6    explaining to me what a true dollar is in silver.

7    Q.  Okay.

8            MS. ESCALANTE:  Your Honor, if I could use this as a

9    demonstrative aid to show the jury.

10           THE COURT:  Any objection?

11           MS. WEIDNER:  One moment, Your Honor.

12                      (Pause in proceedings.)

13           MS. WEIDNER:  Your Honor, no objection.

14           THE COURT:  You may do so.

15           MS. ESCALANTE:  Permission to publish, Your Honor.

16           THE COURT:  You may.

17   BY MS. ESCALANTE:

18   Q.  Detective Martin, can you identify for the jury which is

19   the coin that the defendant showed you?

20   A.  Yes.  I can highlight on it on the screen, if you like.

21   Q.  Sure.

22   A.  (Witness complies.)

23   Q.  Was it one of those?

24   A.  Yes, the -- yeah, the silver coin right there.

25   Q.  Okay.

1          MS. ESCALANTE:  Okay.  Now we'll go to 105H.

2                    (Portion of audio played.)

3    BY MS. ESCALANTE:

4    Q.  Detective Martin, what are you doing at this point in the

5    conversation?

6    A.  I'm setting the foundation for my undercover role.  I'm

7    explaining to him that I transport large amounts of currency.

8    I didn't tell him exactly what it was for, but I told him that

9    I transport large currency amounts over state lines.

10   Q.  In your training and experience and years as a police

11   officer, do the police just stop and take people's money when

12   it's in excess of $20,000 or large amounts?

13   A.  No.

14   Q.  When is money seized?

15   A.  There would have to be probable cause from a criminal

16   violation or civil violation.  Okay.

17                   (Portion of audiotape played.)

18          MS. ESCALANTE:  We'll go to 105I.

19                   (Portion of audiotape played.)

20   BY MS. ESCALANTE:

21   Q.  Detective Martin, what did you understand that statement by

22   the defendant to mean:  You know --

23          MS. WEIDNER:  Objection, Your Honor.  Speculation.

24          THE COURT:  Well, he's only asked for his

25   understanding, so I'll allow him to testify.

UNITED STATES DISTRICT COURT

1              MS. ESCALANTE:  Thank you, Your Honor.

2     BY MS. ESCALANTE:

3     Q.  The statement where he is says:  But then what happens is,

4     you know, you do $100,000 together, you're going to talk.

5              MS. WEIDNER:  Objection, Your Honor.  Foundation.

6              THE COURT:  Overruled.

7     BY MS. ESCALANTE:

8     Q.  What did you understand that to mean, Detective Martin?

9     A.  So, it's my understanding that while I wasn't telling him

10    exactly what the money was from, I was starting to lay some

11    stronger hints.  And he said:  Over time, we do more deals, we

12    get to know each other, he'll get to know what the source of my

13    money is.

14    Q.  And when you started laying those hints, did he ever cease

15    conversation with you?

16    A.  No.

17              (Portion of audiotape played.)

18    BY MS. ESCALANTE:

19    Q.  Detective Martin, you were present during the testimony of

20    IRS Special Agent Sergei Kushner; correct?

21    A.  Yes, I was.

22    Q.  And did he portray himself as a Russian drug dealer?

23    A.  Yes, he did.

24    Q.  And during his testimony, did you hear him state that

25    during his undercover transactions, he stated to the defendant

UNITED STATES DISTRICT COURT

CHAD MARTIN – DIRECT EXAMINATION

1    that he was going to send stuff in car parts to Russia?

2    A.  Yes.

3           MS. WEIDNER:  Restating testimony.  Objection.

4           THE COURT:  Ladies and gentlemen, you may remember

5    that at the start of this case I told you you would have to

6    remember what the testimony was and what the witnesses said,

7    and whether or not to believe it or not to believe it.

8    Occasionally we have an objection where the assertion is that

9    the testimony has been misstated.  When that is the case,

10   except for in rare circumstances, I instruct the jury, as I am

11   instructing you now, which is I instruct you at the start of

12   the case to pay as close attention as you could to the

13   evidence.  And so you need to decide whether the question

14   misstates the evidence or not.

15          With that said, I am going to overrule the objection

16   and allow the question to be asked.

17          MS. WEIDNER:  Apologies.  Just to clarify.  The

18   objection was not a misstatement, but rather a restatement of

19   already presented evidence and, thus, it would be cumulative.

20          THE COURT:  Overruled.

21   BY MS. ESCALANTE:

22   Q.  Detective Martin, who did you believe the defendant to be

23   referring to in this portion of the conversation?

24   A.  I believed he was referring to IRS Agent Sergei Kushner.

25               (Portion of audiotape played.)

UNITED STATES DISTRICT COURT

1        MS. ESCALANTE:  We will now go to 105J.

2        THE COURT:  I am -- we are approaching the end of the

3   day.  I don't know if this is a good time to stop, but if not

4   here, in this next five minutes or so, we're going to need to

5   stop.

6        MS. ESCALANTE:  We can stop here, Your Honor, because

7   there's still three or four more clips to this audio portion

8   still.

9        THE COURT:  All right.

10        I do thank you for your attention and diligence this

11   week.  I do want to remind you that you shouldn't come in

12   tomorrow, and you should not come in on Monday.  But on Tuesday

13   morning, nine o'clock, we will resume the testimony in this

14   case.

15        Be careful over the weekend.  I don't like to lose

16   jurors.  And so, be careful, have a nice weekend, enjoy the

17   weather.  And remember the admonitions, and we will see you on

18   Tuesday.

19        COURTROOM DEPUTY:  All rise.

20          (Jury leaves the courtroom at 4:58 p.m.)

21        THE COURT:  You may sit down.

22        Do we need anything done before the weekend?

23        MR. RESTAINO:  Judge, if I could just ask a couple

24   questions on jury instructions.

25        First of all, the forfeiture instruction, we have

1   circulated that to the defense.  I'm hoping that we can file

2   something that is either joint or at least as close as we can

3   get to joint on Monday.  Is that okay for the Court?

4          THE COURT:  Well, I suppose I ought to ask, where are

5   you in your case?

6          MR. RESTAINO:  Oh, sure, Judge.  We're -- we're on

7   track.  Officer Martin is going to be on for a while, I

8   anticipate.

9          After him, we have a couple of smaller surveillance

10  agent testimony blocks, and then we'll be finishing up with

11  Agent Ellsworth.  So my guess is late Tuesday afternoon or more

12  likely Wednesday before lunch, I think we are likely resting.

13         THE COURT:  Does the defense have any idea where it's

14  at, what kind of length of time it will take for its case?

15         MS. WEIDNER:  Your Honor, I would say no more than

16  half a day.

17         THE COURT:  So that's going to leave us with all the

18  testimony done next Thursday.  Did you say no more than half of

19  the day on Wednesday?

20         MS. WEIDNER:  I -- Your Honor --

21         THE COURT:  You said -- I was -- I actually wasn't

22  making it clear.  I was talking to Mr. Restaino.

23         MS. WEIDNER:  Oh, I'm sorry.

24         THE COURT:  So you'll be done when?

25         MR. RESTAINO:  My best guess at this point would be by

```
 1    noon on Wednesday, but I -- I confess I can't be sure of the
 2    length of Agent Ellsworth's expert testimony through Agent --
 3    through my colleague, Mr. Binford, or the length of the cross.
 4    But I'm guessing mid day or early afternoon on Wednesday we
 5    would be finished.
 6            THE COURT:  All right.  So by the end of the day
 7    Wednesday, and then we could do closing arguments in the
 8    morning on Thursday, is what you're thinking?
 9            MR. RESTAINO:  Or possibly drag into the afternoon on
10    Thursday, depending how quickly we get done with our case in
11    chief.
12            THE COURT:  Well, I haven't gotten to the point yet --
13    I will say, I'm making the observation -- I haven't gotten to
14    the point yet of granting a cumulative testimony, and
15    sometimes -- but I do think at a certain level the jury is
16    starting to understand what Bitcoin is, and so maybe we can
17    speed through a lot of that.
18            MR. RESTAINO:  The transcripts are, of course,
19    difficult, the audio difficult to speed through, but I think
20    you've given us some good things to think about this weekend,
21    Judge, to see if we can retool a little bit.
22            THE COURT:  All right.
23            Anything, Ms. Weidner?
24            MS. WEIDNER:  Nothing further, Your Honor.
25            THE COURT:  We'll see you Tuesday morning.
```

UNITED STATES DISTRICT COURT

1          (Proceedings in recess at 5:00 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1                    C E R T I F I C A T E

2

3            I, CHARLOTTE A. POWERS, do hereby certify that I am

4      duly appointed and qualified to act as Official Court Reporter

5      for the United States District Court for the District of

6      Arizona.

7            I FURTHER CERTIFY that the foregoing pages constitute

8      a full, true, and accurate transcript of all of that portion of

9      the proceedings contained herein, had in the above-entitled

10     cause on the date specified therein, and that said transcript

11     was prepared under my direction and control.

12           DATED at Phoenix, Arizona, this 16th day of May, 2018.

13

14                              s/Charlotte A. Powers
                                Charlotte A. Powers, RMR, FCRR
15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**