UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) 2:17-cr-00585-GMS-1 |
| | ) |
| vs. | ) Phoenix, Arizona |
| | ) March 27, 2018 |
| Thomas Mario Costanzo, | ) 9:05 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


TRIAL – Day 4

(Pages 646 – 858)


Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 40
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2


 3    For the Government:

 4                  U.S. Attorney's Office
                    By:  GARY M. RESTAINO,  ESQ.
 5                        MATTHEW H. BINFORD, ESQ.
                          FERNANDA CAROLINA ESCALANTE KONTI, ESQ.
 6                  40 North Central Avenue, Suite 1200
                    Phoenix, AZ  85004
 7


 8    For the Defendant Thomas Mario Costanzo:

 9                  Federal Public Defenders Office - Phoenix
                    By:  MARIA T. WEIDNER, ESQ.
10                        ZACHARY D. CAIN, ESQ.
                    850 W. Adams Street, Suite 201
11                  Phoenix, AZ  85007

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## INDEX

2

SUMMARY OF COURT PROCEEDINGS                                    PAGE

3

Discussion Re:  Motion in Limine                                 652

4

Defense Rule 29 motion                                           807

5

Discussion Re:  Jury instructions/verdict forms                 819

6

7

8

9

## INDEX OF WITNESSES

10

| WITNESSES FOR THE GOVERNMENT's: | Direct | Cross | Redirect |
|---|---|---|---|
| CHAD MARTIN (cont'd) | 658 | 725 | 740 |
| JOHN NELSON | 742 | 746 | |
| KEITH LANDA | 749 | 759 | |
| DONALD ELLSWORTH | 763 | 799 | 805 |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1                           INDEX OF EXHIBITS

2       EXHIBIT NO.:              DESCRIPTION:              RECEIVED:

3       EX.  1          Arrest Photo Wallet Currency        755

4       EX.  2          Arrest Photo Fanny Pack             755
                        Currency Stacked
5
        EX.  3          Arrest Photo Currency Sprawled      755
6                       Out and Precious Metals 3

7       EX.  4          Arrest Photo Fanny Pack with        754
                        Knife
8
        EX. 33          Miscellaneous Items Contained       757
9                       in Fanny Pack

10      EX. 42          9/14/16 Screen Captures             667

11      EX. 45          9/14/16 Money 1                     663

12      EX. 46          9/14/16 Money 2                     663

13      EX. 47          9/14/16 Money 3                     664

14      EX. 48          Screenshot Bitcoin Transfer         711
                        4/21/17 #1
15
        EX. 49          Screenshot Bitcoin Transfer         712
16                      4/21/17 #2

17      EX. 50          Text Message with Morpheus          666
                        9/14/16
18
        EX. 53          11/16/16 Text Messages              671
19
        EX. 54          Trezor Photo 11/16/16               679
20
        EX. 55          2/2/17 Buy Money Scan               683
21
        EX. 56          2/2/17 Bitcoin Transfer             692
22                      Screenshots

23      EX. 57          2/2/17 Text Conversation            681
                        with Costanzo
24

25

                    UNITED STATES DISTRICT COURT

INDEX OF EXHIBITS   (continued)

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| EX. 58 | 4/20/17 Counting Money 1 | 708 |
| EX. 59 | 4/20/17 Counting Money 2 | 708 |
| EX. 60 | 4/10/17 Photo of Peter Steinmetz | 701 |
| EX. 62 | 4/20/17 UC Money Scan | 704 |
| EX. 63 | 4/20/17 Screenshots of 100K Bitcoin Seizure | 710 |
| EX. 64 | Telegram Screenshots with Costanzo 3/29/17 to 4/2/17 | 698 |
| EX. 65 | Telegram Text Shots 4/9/17 to 4/20/17 | 699 |
| EX. 69 | 3/29/17 Text Message with Morpheus | 696 |
| EX. 79 | Placeholder precious metals seized at arrest | 758 |
| EX. 84 | Summary Chart of Transaction Flow 5/20/15 | 784 |
| EX. 85 | Summary Chart of Transaction Flow 10/7/15 | 788 |
| EX. 86 | Summary Chart of Transaction Flow 11/21/15 | 790 |
| EX. 87 | Summary Chart of Transaction Flow 2/2/17 | 793 |
| EX. 88 | Summary Chart of Transaction Flow 4/10/17 | 795 |
| EX. 98 | Screenshot of green bag from 2/2/17 | 688 |

UNITED STATES DISTRICT COURT

```
 1                      INDEX OF EXHIBITS (continued)

 2      EXHIBIT NO.:              DESCRIPTION:              RECEIVED:

 3      EX. 106          Audio Transaction 6, 11/16/16        676
                         (Clips A, B, D & E)
 4
        EX. 107          Audio Transaction 7, 2/2/17          684
 5                       (Clips A through G)

 6      EX. 109          Audio Transaction 9, 4/20/17         705
                         (Clips A through D)
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2              (Proceedings resume at 9:05 a.m.)

 3         THE COURT:  Please be seated.  I'm informed the

 4   parties need to see me before we bring the jury in.

 5         MS. WEIDNER:  Yes, Your Honor.

 6         This is Maria Weidner for Mr. Costanzo.

 7         Your Honor, we filed a motion for judicial notice on

 8   Friday.  The government filed its Response and an additional

 9   briefing, I guess, yesterday or the day before.

10         I was also concerned about getting to work on jury

11   instructions regarding the regulations.  The government is

12   alleging Mr. Costanzo intended to avoid -- and also have

13   concerns regarding the necessity of playing and continuing to

14   play uncharged exchanges for the jury.  So just those three

15   issues.

16         THE COURT:  Well, as it pertains to the motion in

17   limine and the request for judicial notice, what adjudicative

18   fact do you want me to notice, Ms. Weidner?

19         MS. WEIDNER:  Your Honor, I think it goes to the state

20   of mind of Mr. Costanzo.

21         THE COURT:  No.  No.  No.  No.  No.  No.

22         What adjudicative fact do you wish me to take judicial

23   notice of?

24         MS. WEIDNER:  Oh.  That the Office of the Inspector

25   General has recently criticized asset seizure and forfeiture
```

UNITED STATES DISTRICT COURT

1    practices of the DEA as possibly being violative of

2    individuals' civil rights.

3              THE COURT:  All right.  I don't think that's an

4    appropriate thing to take judicial notice of.  I think I could

5    take judicial notice of an adjudicative fact if there was a

6    question as to whether or not the report was published.

7              As it relates to what the adjudicative fact you're

8    trying to get me to notice is, it seems to me that you can -- I

9    mean, to the extent the government has moved to preclude it in

10   limine, I'm not going to do that either.

11             It seems to me like it may be admissible into

12   evidence.  And if it is and/or if it's the topic as the

13   government suggests in its Response of cross-examination, that

14   may not be inappropriate.

15             So I'm not going to grant the government's motion in

16   limine and I'm not going to grant the defendant's motion to

17   take judicial notice of a fact that I think is not -- not

18   adjudicative, not uncontested and I don't -- you know, it -- to

19   the extent that you're trying to get me to take notice of

20   something that is contained in two huge reports, I think that's

21   more appropriate for you to try to handle, if you can,

22   appropriate, through cross-examination.

23             That's issue one.  What was issue two?

24             MS. WEIDNER:  Your Honor, as the Court knows, the

25   parties are not in agreement regarding the substantive jury

1   instruction on -- on -- on Money Laundering and we are working

2   to -- I don't -- I don't think actually that we're going to

3   resolve that issue.

4   　　　　　THE COURT:  All right.  So why don't we end up early

5   today.  At 4:30 we'll start -- we'll take a look at that.

6   　　　　　MS. WEIDNER:  And, in addition to that, Your Honor, I

7   think that additional substantive jury instructions are

8   necessary to -- to instruct the jury as to the particular

9   reporting requirements that the government is alleging

10  Mr. Costanzo intended to violate.

11  　　　　　THE COURT:  All right.  Have you submitted those?

12  　　　　　MS. WEIDNER:  Your Honor, I haven't submitted those

13  and it was -- over the weekend was something that occurred to

14  me.  I know that the Court specifically addressed this somewhat

15  when we were discussing the motion to preclude SA Ellsworth

16  from testifying as to matters of law.

17  　　　　　But my concern is as we get closer to the end of

18  trial, we should have, at least in circulation between the

19  parties and with the Court, some kind of framework for that

20  instruction so that we're not basically bickering about it

21  while the jury is sitting around waiting.

22  　　　　　THE COURT:  Have you discussed it with the government?

23  　　　　　MS. WEIDNER:  Just briefly, Your Honor, in an email.

24  　　　　　THE COURT:  Mr. Restaino?

25  　　　　　MR. RESTAINO:  Your Honor, we're not going to get

1    there as to the elements of the offense with the defendants.

2    But I do think that we will get there on some suggested

3    snippets of regulations that the Court could read.  So I

4    anticipate there's room for us to work with them today in

5    advance of 4:30 or after our colloquy with the Court.

6          THE COURT:  All right.  Then I'll ask you to do that

7    at noon and be ready to discuss any jury instructions that are

8    not agreed to tonight at 4:30.  We'll see how far we can get

9    accomplished -- how much we can get accomplished.

10          MS. WEIDNER:  And, Your Honor, you asked us to do that

11    at noon?

12          THE COURT:  Well --

13          MS. WEIDNER:  No.  I was just --

14          THE COURT:  Sometime other than during trial.

15          MS. WEIDNER:  Yes.  I -- I need to meet with my

16    client, so we'll try to figure something out.

17          Your Honor, the last item that the defense is

18    concerned about is the necessity of playing and continuing to

19    play exchanges from uncharged Bitcoin exchange meetings,

20    particularly the remainder of the September -- the

21    September 14th, 2016, exchange and November 16, 2016, exchange.

22          These are meetings in which there was a Bitcoin

23    exchange but there are no related charges.  The jury has

24    already heard extensive playback from other recordings, has

25    already heard Mr. Costanzo's anti -- well, Mr. Costanzo's

1   distrust of -- of the banking system, of the government, of all

2   of that.

3           And I think that we are at the point where such is

4   cumulative.  We do not object to the government eliciting

5   testimony from its -- its -- its witness, from Detective Martin

6   about these items.  I just question the value of going

7   painstakingly through all of these clips, that it's getting to

8   the point of being cumulative and wasting the jury's time.

9           MS. ESCALANTE:  Your Honor, if I may, the government

10  believes that it is not cumulative because this is an

11  interaction with a different agent.  The government thinks it's

12  important for the jury to hear this because it puts into

13  context the investigation as it pertains specifically to Agent

14  Martin.

15          The uncharged portion sets the stage for the three

16  charged -- or the subsequent charged interaction.  In them the

17  defendant talks about "suspicious activity reports."  It's the

18  first time with Agent Martin that he does so in the following

19  text messages.

20          There are things that he -- are his own statement,

21  adopted as true, and acted on them.  I think that it wouldn't

22  waste the jury's time at all.  In fact, it just provides a

23  context.  It's the best evidence.  And I'm not going to ask too

24  many questions as each clip goes by.  I'm just going to try and

25  play them for the jury to try and speed things up.

```
 1              THE COURT:  All right.  It does -- I does strike me
 2      that this is not the kind of an objection that I can rule on
 3      just in generalities.  It does seem to me that some of what you
 4      may play has already been sufficiently covered and does not
 5      relate to items that would have anything specifically to do
 6      with Agent Martin.
 7              I think we've covered, for example, the idea
 8      sufficiently that it is harder for government agents to track
 9      Bitcoin transactions and that kind of thing.  And if we're
10      going to go through that again and you want to object to its
11      cumulative nature, I may well be inclined to grant such
12      objections.  But I cannot say as we sit here, Ms. Weidner, that
13      the government won't have new information that will be helpful
14      to the jury and relevant as it pertains to these recordings,
15      having not heard them and not taking them piecemeal.
16              So that's where we're at.  Anything else?
17              MR. RESTAINO:  Just one housekeeping matter from the
18      government, Your Honor.  Agent Michael Fleischmann was our
19      first witness.  We don't intend to re-call him.  The defense
20      does not intend to call him.  And so going forward, you may see
21      him in the courtroom.  Just wanted to alert you to that.
22              THE COURT:  Any objection?
23              MS. WEIDNER:  No objection, Your Honor.
24              THE COURT:  All right.  Then can we bring in the jury?
25              (Jury enters the courtroom at 9:14 a.m.)
```

1          THE COURT:  Please be seated.  We do thank you for

2     being here.  We hope you had a pleasant weekend.  It's nice to

3     see that you all made it and ready for another day of trial.

4          Are we ready to resume, Ms. Escalante?

5          MR. RESTAINO:  Yes, Your Honor.

6          THE COURT:  Please do so.

7          MS. ESCALANTE:  Thank you.

8          (Chad Martin, Government's witness, previously sworn.)

9                DIRECT EXAMINATION (continued)

10    BY MS. ESCALANTE:

11    Q.  Detective Martin, when we were last here on Thursday, we

12    were going over audio recordings of your first exchange with

13    the defendant from September 14, 2016.

14    A.  Yes, ma'am.

15    Q.  I believe we left off on the clip where he mentions a

16    customer who was sending things to Russia?

17    A.  Yes.

18    Q.  Before we get into the next clip, Detective Martin, can you

19    tell the jury what you were wearing during that transaction?

20    A.  During that first meeting, I was wearing blue jeans and a

21    T-shirt.  Specifically, it was a T-shirt with a marijuana leaf

22    on it that said "Rocky Mountain High."

23          MS. ESCALANTE:  Okay.  And now, permission to publish,

24    Your Honor, to remaining audio portions with the transcript.

25          COURTROOM DEPUTY:  Counsel, I apologize.  Are you

```
 1    using VGA or digital?

 2              MR. BINFORD:  Digital.

 3              COURTROOM DEPUTY:  Okay.  That's what I have it on.

 4              MS. ESCALANTE:  We will now play 105J.

 5                     (Portion of audio played.)

 6    BY MS. ESCALANTE:

 7    Q.  Detective Martin, what is the 10 percent that the defendant

 8    is referencing?

 9    A.  That's the fee being charged by Mr. Costanzo.

10              THE COURT REPORTER:  I'm sorry, that's the "fee" being

11    charged?

12              THE WITNESS:  Yes, ma'am.

13                     (Portion of audio played.)

14              MS. ESCALANTE:  We'll continue with 105K.

15                     (Portion of audio played.)

16    BY MS. ESCALANTE:

17    Q.  Detective Martin, what was defendant referring to when

18    "there is no regulation" on this?

19    A.  I believe he was explaining to me it wasn't regulated and

20    no -- this money can be sent anywhere it wants to go to.

21              MS. ESCALANTE:  And now we will go to 105L.

22                     (Portion of audio played.)

23              MS. WEIDNER:  Objection, Your Honor, relevance of this

24    clip.  Cumulative.

25       (Portion of audio continuing to play during objection.)
```

```
 1              THE COURT:  This clip has already been admitted into
 2    evidence and you've had no objections.  And so I'm going to
 3    overrule your objection.
 4              MS. ESCALANTE:  Okay.  I think that was the end of the
 5    clip.
 6              And next is 105M.
 7                        (Portion of audio played.)
 8              MS. ESCALANTE:  105N.
 9                        (Portion of audio played.)
10              MS. ESCALANTE:  105O.
11                        (Portion of audio played.)
12    BY MS. ESCALANTE:
13    Q.  Detective Martin, what is the belly -- what is the belly
14    bag?
15    A.  I think he was referring to his fanny pack that he wore.
16    That's where we observed him keep most of the currency he was
17    obtaining.
18              MS. ESCALANTE:  Okay.  We'll go to 105P next.
19                        (Portion of audio played.)
20    BY MS. ESCALANTE:
21    Q.  Detective Martin, what system is being discussed here?
22    A.  I think he's talking about the banking system, the Federal
23    Reserve.
24              MS. ESCALANTE:  Okay.  We'll continue to 105Q.
25                        (Portion of audio played.)
```

```
 1    BY MS. ESCALANTE:

 2    Q.  Detective Martin, what is the defendant doing at this

 3    point?

 4    A.  So here he's explaining to me how his -- my ceiling

 5    application works.  That's how he sent the Bitcoin to me.  So

 6    he's explaining that it actually took eight Bitcoin out of his

 7    wallet.  It shuffled that up and sent 2.9 of it to me and then

 8    returned the remainder of that to him to a separate address as

 9    his change.

10    Q.  Okay.  At this point had you already conducted the

11    exchange?

12    A.  Yes.  I already -- I'd already given him the cash and he

13    was in the process of sending me the Bitcoin.

14    Q.  And how did you hand him the cash?

15    A.  This was $2,000.  It was just a wad of cash that I kind of

16    slid him over the table.

17    Q.  And did he count it in your presence?

18    A.  Yeah.  He kind of held it down underneath the table and

19    counted it.

20                      (Portion of audio played.)

21    BY MS. ESCALANTE:

22    Q.  Okay.  Detective Martin, did you video record this

23    interaction with the defendant?

24    A.  Yes, I did.

25    Q.  And were you able to take screenshots of the video?
```

1    A.  Yes.

2    Q.  I'm going to show you three exhibits that have been marked.

3    We'll begin with Exhibit 45.

4              COURTROOM DEPUTY:  Are these in evidence?

5              MS. ESCALANTE:  (Shakes head in the negative.)

6    BY MS. ESCALANTE:

7    Q.  And at this point, it will just appear before you and we

8    won't have it published yet.

9    A.  Okay.  Do you recognize that exhibit?

10             MS. ESCALANTE:  Well, 45.

11             COURTROOM DEPUTY:  You want me to --

12             MS. ESCALANTE:  -- show it to --

13             We can do it one-by-one on the screen.

14             COURTROOM DEPUTY:  It's up to you.  I can pull it or

15   you can show it.

16             MS. ESCALANTE:  I can show it.

17   BY MS. ESCALANTE:

18   Q.  Do you recognize that exhibit?

19   A.  Yes, I do.

20   Q.  And what is that?

21   A.  It's a screenshot from the covert video I took during that

22   transaction.

23   Q.  And is it a true and accurate depiction?

24   A.  Yes, it is.

25             MS. ESCALANTE:  Your Honor, the government would move

1   to admit Exhibit 45 into evidence.

2            MS. WEIDNER:  No objection.

3            THE COURT:  Exhibit 45 is admitted.

4              (Exhibit 45 is received into evidence.)

5   BY MS. ESCALANTE:

6   Q.  Now I'm going to show you what's been marked as Exhibit 46.

7            Do you recognize that picture?

8   A.  Yes, ma'am.

9   Q.  And is that a true and accurate depiction of --

10  A.  Yes, it is -- oh.  I should note the dates are correct on

11  here.  I think the times might be off just because the

12  recording device that I was using might have had a different

13  time setting on it, but that is from that September 14th

14  transaction.

15           MS. ESCALANTE:  Okay.  Your Honor, the government

16  would move to admit Exhibit 46 into evidence.

17           MS. WEIDNER:  No objection.

18           THE COURT:  Exhibit 46 is admitted.

19             (Exhibit 46 is received into evidence.)

20  BY MS. ESCALANTE:

21  Q.  And now Exhibit 47.  Do you also recognize that picture?

22  A.  Yes, ma'am.

23  Q.  And is that a true and accurate depiction of a screenshot

24  from the video that you took of that interaction?

25  A.  Yes, it is.

1          MS. ESCALANTE:  Your Honor, the government would move

2    to admit Exhibit 47 into evidence.

3          MS. WEIDNER:  Objection.  Cumulative.  Relevance.

4          THE COURT:  Overruled.  Exhibit 47 is admitted.

5              (Exhibit 47 is received into evidence.)

6          MS. ESCALANTE:  And, Your Honor, permission to publish

7    Exhibits 45 through 47.

8          THE COURT:  You may.

9    BY MS. ESCALANTE:

10   Q.  We'll begin with Exhibit 45.

11          Detective Martin, can you explain that to members of

12   the jury.

13   A.  Yes.  The man in the blue shirt is Mr. Costanzo and that's

14   my hand handing him a wad of cash for that deal.  It was

15   $2,000.

16   Q.  And in the photograph we see a device on a table.  What is

17   that?

18   A.  That is Mr. Costanzo's cell phone.

19   Q.  And is that the cell phone you used to conduct the Bitcoin

20   transaction?

21   A.  Yes.

22   Q.  And what kind of cell phone is that?

23   A.  It's a Blackberry.

24          MS. ESCALANTE:  We will now publish Exhibit 46.

25

1   BY MS. ESCALANTE:

2   Q.  Can you explain that to the jury, please?

3   A.  That's Mr. Costanzo receiving the wad of hundred-dollar

4   bills from me.

5           MS. ESCALANTE:  And we'll now go to Exhibit 47.

6   BY MS. ESCALANTE:

7   Q.  Can you explain that?

8   A.  And that's -- he was starting to hold it down under the

9   table while he was counting it.

10  Q.  Now, I'm also going to show you what has been marked as

11  Exhibit 50.  It has not been admitted yet, so this will only

12  appear on your screen.

13          What is that, Detective Martin?

14  A.  That is a text message to me from Mr. Costanzo on

15  September 14th.

16  Q.  And did this text message contain a message before you met

17  and subsequently after the transaction was completed?

18  A.  Yes.  So it's me describing to Mr. Costanzo what I was

19  wearing before we met and then the actual link he was referring

20  to during the audio that he sent me after the transaction.

21  Q.  And is that a true and accurate depiction?

22  A.  Yes, it is.

23          MS. ESCALANTE:  Your Honor, the government would move

24  to admit Exhibit 50.

25          MS. WEIDNER:  No objection.

1              THE COURT:  Exhibit 50 is admitted.

2                  (Exhibit 50 is received into evidence.)

3              MS. ESCALANTE:  Permission to publish, Your Honor?

4              THE COURT:  You may.

5    BY MS. ESCALANTE:

6    Q.  Detective Martin, can you explain that text to the members

7    of the jury?

8    A.  So the top part is to Morpheus from me.

9              I'm saying:  What do you look like?  I'm in a green

10   shirt and jeans, describing what I was wearing.

11             And then the part in purple is the message I received

12   from Mr. Costanzo after the transaction of the link he wanted

13   me to go see.

14   Q.  Okay.  Now I'm going to show you what has been marked as

15   Exhibit 42 which will only appear on your screen.

16             This exhibit has multiple pages, so I will scroll down

17   them and then when we get to the bottom one, if you could just

18   look up.  Okay?

19   A.  Okay.

20   Q.  That's page 1, page 2, page 3, page 4, page 5, page 6,

21   page 7, page 8, 9, 10, 11, 12.

22             Detective Martin, do you recognize all those pages?

23   A.  Yes, I do.

24   Q.  And what is it?

25   A.  Those are screen captures I took during the Bitcoin

DIRECT EXAMINATION - CHAD MARTIN

1    transaction, so the Bitcoin that I received from Mr. Costanzo

2    and then the transactions afterwards.

3    Q.  And those came from your telephone?

4    A.  Yes.  From my phone and from my undercover computer where I

5    was taking the screenshots also.

6    Q.  Okay.  And are those true and accurate depictions of the

7    Bitcoin exchange and what subsequently happened to the Bitcoin

8    on September 14th, 2016?

9    A.  Yes, they are.

10           MS. ESCALANTE:  Your Honor, the government would move

11   to admit Exhibit 42 into evidence.

12           MS. WEIDNER:  Objection.  Relevance, since this is

13   uncharged conduct.

14           THE COURT:  Overruled.  42 is admitted.

15               (Exhibit 42 is received into evidence.)

16           MS. ESCALANTE:  Permission to publish, Your Honor?

17           THE COURT:  You may publish.

18   BY MS. ESCALANTE:

19   Q.  Let's begin with the first page, Detective Martin.

20           Can you explain to the jury what this is?

21   A.  So this is a screen capture of my undercover cell phone

22   that I took during the transaction.  It shows that I received

23   2.9571 Bitcoin from Mr. Costanzo.

24   Q.  What --

25   A.  The date on there is in the universal coordinated time, so

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

```
 1    it shows September 15th.  It's seven hours ahead.  So it
 2    actually happened seven hours before that on the 14th.
 3    Q.  What's the cash value for the Bitcoin?
 4    A.  What was stamped on here is $1,798.66.
 5    Q.  And was the transaction not for $2,000?
 6    A.  Yes.  It was a 2,000-dollar transaction but he only sent me
 7    approximately $1,800 with his 10 percent deducted.
 8    Q.  And under "transaction," what is that?
 9    A.  So this is showing that the transaction has one
10    confirmation and that 8.85 Bitcoin is actually sent from him
11    and that's what he explained in the audio.
12             And you can hear when I said:  I received eight
13    Bitcoin.
14             That was actually 8 Bitcoin that was sent.  I received
15    the 2.95 of that and the remainder returned to a change wallet
16    controlled by Mr. Costanzo.
17    Q.  So the first alphanumeric address that says "12F4."  What
18    is that?
19    A.  I would have to see the full address to be sure.  I believe
20    that's -- I believe that was Mr. Costanzo's, that it came from
21    him.  And one of the addresses below is mine.  And then the
22    subsequent address would be his change wallet address.
23    Q.  Okay.  We'll continue to the next page.
24             What is this?
25    A.  So now that's showing two confirmations on the Blockchain.
```

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

1           The left side of the screen is a repeat screenshot.

2   The right side is just additional information about the

3   transaction showing that 8.85 Bitcoin was input by Mr. Costanzo

4   and the Bitcoin actually transacted to me.  At the bottom of

5   that is the 2.95.

6   Q.  So we'll go to the third page.

7           That does this show?

8   A.  Again, on the right side of the screen, it shows the 2.95,

9   that it was received and it's been confirmed.  The left side

10  just shows like a network area for the nodes, I believe -- for

11  the nodes, the Bitcoin nodes that actually processed our

12  transaction.

13          So they had nothing to do with us personally.  It was

14  just the Blockchain network confirming the transaction.

15  Q.  And now this page, it shows three confirmations?

16  A.  Yes.

17  Q.  What are you doing here?

18  A.  So here I'm sending from one of my UC wallets the 2.95

19  Bitcoin into another undercover wallet controlled by myself.

20  Q.  And why do you do that?

21  A.  To separate myself from Mr. Costanzo in case someone is

22  trying to track where the Bitcoin goes that he's sending me.

23  Part of my undercover persona is I want to separate myself from

24  the money, so I'm basically concealing the money into another

25  wallet.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION – CHAD MARTIN

1    Q.  And did you send all this wallet information to Special

2    Agent Donald Ellsworth with the IRS?

3    A.  Yes, I did.

4    Q.  Okay.  After this transaction was completed, Detective

5    Martin, when did you next meet with the defendant?

6    A.  The next time we met was on November 16th, 2016.

7    Q.  And did you have text communications prior to that meeting?

8    A.  Yes, we did.

9    Q.  Did you preserve them?

10   A.  Yes, I did.

11   Q.  I'm now going to show you what's been marked as Exhibit 53.

12           Do you recognize that?

13   A.  Yes.  That's a screenshot, cut-and-paste from my undercover

14   Google voice account, with a conversation that we had on

15   November 15th and on November 16th.

16   Q.  Are those true and accurate depictions of your text message

17   exchanges?

18   A.  Yes, they are.

19           MS. ESCALANTE:  Your Honor, the government would move

20   to admit Exhibit 53 into evidence.

21           MS. WEIDNER:  Objection, Your Honor.  This does not

22   appear to be the best evidence, does not look like a

23   screenshot.

24           THE COURT:  Well, the testimony is that it is a

25   screenshot, so I'm going to admit the evidence and the evidence

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

1    is admitted.

2                    (Exhibit 53 is received into evidence.)

3                    MS. ESCALANTE:  Thank you.

4                    Permission to publish, Your Honor?

5                    THE COURT:  You may.

6    BY MS. ESCALANTE:

7    Q.  Detective Martin, if you would just briefly explain to the

8    jury what these text messages are.

9    A.  So this is a conversation between me and Mr. Costanzo.  I'm

10   letting him know that I came into some big cash over the

11   weekend and that I would like to purchase $12,000 worth of

12   Bitcoin.

13   Q.  Did you also state that you needed to clean it out?

14   A.  Yes.  I state I needed to clean the cash out for Bitcoin.

15   Q.  Okay.  And when did the transaction occur?

16   A.  The next day, on November 16th.

17   Q.  And where did you guys meet?

18   A.  This time we met at a Starbucks in Tempe.

19   Q.  And how did you arrive to that meeting?

20   A.  I arrived in an undercover vehicle.

21   Q.  I'm going to show you on the overhead what's already been

22   admitted as Exhibit -- Defense Exhibit 362.

23                    Permission to publish, Your Honor?

24                    THE COURT:  You may.

25

DIRECT EXAMINATION – CHAD MARTIN

```
1    BY MS. ESCALANTE:
2    Q.  Detective Martin, is this a photograph of yourself and the
3    defendant during the meeting on November 16th, 2016?
4    A.  Yes, it is.
5    Q.  Did you audio record this interaction?
6    A.  Yes, I did.
7    Q.  Have you had an opportunity to listen to portions of that
8    audio recording --
9    A.  Yes.
10   Q.  -- which has been labeled Exhibit 106A through E?
11   A.  Yes, I have.
12   Q.  Are those a true and accurate depiction of the exchange
13   from that day?
14   A.  Yes.
15        MS. ESCALANTE:  Your Honor, the government would move
16   to admit Exhibit 106A through E into evidence.
17        MS. WEIDNER:  Your Honor, objection.  Various parts,
18   clips.  The objections are cumulative, relevance, 403.  If we
19   could have a sidebar to discuss?
20        THE COURT:  All right.
21      (At sidebar on the record.)
22        MS. WEIDNER:  This is Maria Weidner.  And by my count
23   we have five clips from this November 16th, 2016.
24        I understand that the government wants to get
25   information in about the SARs, and that would be in the first
```

1    clip.

2              As regards the second clip, this is when we revisit

3    the issue of "don't get bit, don't get shot, don't talk to the

4    police," something that's already been presented and reviewed

5    numerous times.  It was already covered in the September 14th,

6    2016, as regards -- I'm sorry -- as regards Martin, and was

7    also covered, I believe, with the other undercovers.

8              The third clip -- it's just, I don't think it's even

9    relevant.  It doesn't talk about regulations.  It's mostly our

10   guy talking about his dentist who accepts Bitcoin.

11             And then the third one revisits the issue of Trezor,

12   and that's already been covered.

13             THE COURT:  When you say "the third one," the third

14   one was the dentist; right?

15             MS. WEIDNER:  Yes.  The third clip is the dentist.

16             THE COURT:  All right.  So is this the fourth one or

17   the fifth one?

18             MS. WEIDNER:  Yes.  The fourth one is when we revisit

19   the issue of the Trezor.

20             And my concern here is that we -- it has already been

21   established in evidence that the encrypted apps are not

22   illegal, that anyone can get them.  The repeated references to

23   these in a way that suggests their illegality is prejudicial to

24   our client and is misleading to the jury.

25             MS. ESCALANTE:  Your Honor, first and foremost, all of

1    these clips were provided to defense prior in efforts to gain a

2    stipulation.  The fourth one, C, where it's talking about the

3    dentist --

4            THE COURT:  C is the third one.

5            MS. ESCALANTE:  Yes.  C.  Third.

6            That is one that was proposed by defense.  That was

7    not included in our original clips provided to them.  I don't

8    think that this is cumulative because it is a new meeting, a

9    new exchange.  The discussion about the Trezor, there is a

10   photograph of the Trezor.  The jury has not seen that before

11   that shows what it is.

12           THE COURT:  Are we going to do more with Trezors after

13   this?

14           MS. ESCALANTE:  It don't believe so.

15           MS. WEIDNER:  Your Honor, if I could respond really

16   quickly?

17           We did work with the government to agree to portions

18   of these long interviews or long meetings that would be entered

19   in evidence and stipulated to the ones that regarded "charged

20   conduct."

21           I specifically advised Mr. Restaino, and I believe

22   that is in his stipulation, that we reserved the right to

23   object to the relevance and cumulative nature of uncharged

24   evidence because it's taking a while.

25           THE COURT:  Well, it is taking a while.  My -- I am

1    going to sustain the objection to C.  It sounds like I'm doing

2    that without objection.

3           I will allow A and B.  D, if we're talking about

4    Trezors.  And this is the last time we're going to discuss it.

5    I will allow it, but I do think that at some point we risk

6    cumulative error and I'm going to start sustaining objections

7    as to Trezors.

8           MS. WEIDNER:  And I would just like to make a quick

9    record, Your Honor, that it is the position of the defense that

10   the government's repeated references to the use of completely

11   legal encrypted apps is prejudicial to our client, is

12   misleading to the jury and should not be allowed any longer.

13          MS. ESCALANTE:  Okay.

14          THE COURT:  Did you want to say something?

15          MS. ESCALANTE:  I was just going to say that the

16   defense can cross as to the legality of the devices.

17          THE COURT:  Well, yeah.  Come back in here.

18          I am allowing it to the extent that it discusses the

19   fact that your client likes to keep things there confidential,

20   but we're not going to go beyond this point.  Because while I'm

21   not sustaining Ms. Weidner's objection, I do think that at a

22   certain point it gets cumulative and arguably prejudicial.

23          Did you have something you were concerned about?

24          COURTROOM DEPUTY:  I do, Judge.

25          THE COURT:  You need to identify yourself on the

1    record.

2              COURTROOM DEPUTY:  This is the courtroom deputy.

3              Judge, you're referring to this exhibit.  It's one

4    exhibit that -- is it 106 or 107?

5              MS. ESCALANTE:  106.

6              COURTROOM DEPUTY:  It contains these clips.  It's not

7    parsed out.  So if you're not going to admit certain portions,

8    the government would need to redact that exhibit.

9              THE COURT:  All right.

10             MS. ESCALANTE:  And we can do that.  And for right

11   now, I will just completely skip Exhibit C and not publish it,

12   and at the end we can create a whole new one.

13             COURTROOM DEPUTY:  Okay.

14             MS. ESCALANTE:  However that works.

15             COURTROOM DEPUTY:  Thank you.

16        (End of discussion at sidebar.)

17             THE COURT:  All right.  The objection is sustained as

18   to 106C.

19             As to 106A, B, D, and E, the objection is overruled.

20        (Exhibit 106, parts A, B, D and E are received.)

21             MS. ESCALANTE:  Permission to publish, Your Honor?

22             THE COURT:  You may.

23                  (Portion of audio played.)

24             MS. ESCALANTE:  Okay.  We will now continue to 106B.

25             MS. WEIDNER:  Objection, Your Honor.  This, I guess,

DIRECT EXAMINATION - CHAD MARTIN

```
1    rule of completeness on the stipulated portion.
2              THE COURT:  Is there any portion on the stipulated
3    portion that wasn't played?
4              MS. WEIDNER:  We're basically missing a line.
5              THE COURT:  Do you want to take a look at it?
6              MS. ESCALANTE:  Yes, Your Honor.
7                        (Pause in proceedings.)
8              MS. ESCALANTE:  Your Honor, permission to just read in
9    the remainder?
10             THE COURT:  Sure.
11             MS. ESCALANTE:  Okay.  This is the last line that the
12   jury heard.
13             And, Your Honor, permission to use a swear word?
14             THE COURT:  Sure.
15             MS. ESCALANTE:  Okay.  Was by the defendant that said:
16   I don't even want to come in your fucking shit hole.  Go fuck
17   yourselves, man.
18             Then Agent Martin states:
19             Well, as long as you are not -- you're not reporting
20   anything on me.
21             And the defendant states:
22             I'll bet on -- I'll bet on Bitcoin.
23             And now we were on 106B, I believe.
24                        (Portion of audio played.)
25
```

1    BY MS. ESCALANTE:

2    Q.  Detective Martin, did the defendant ever ask what your real

3    name was during this exchange?

4    A.  No, he did not.

5              MS. ESCALANTE:  We will now go to 106D.

6                      (Portion of audio played.)

7              MS. ESCALANTE:  And the last clip of this is 106E.

8                      (Portion of audio played.)

9    BY MS. ESCALANTE:

10   Q.  Detective Martin, was this interaction also video recorded?

11   A.  Yes, it was.

12   Q.  And were you able to take a screenshot of the Trezor device

13   that the defendant mentioned in the previous audio clip?

14   A.  Yes.

15   Q.  I'm going to show you what's been marked as Exhibit 54.

16           Do you recognize that?

17   A.  Yes, I do.

18   Q.  Is that a true and accurate depiction of the Trezor that

19   was shown to you on that day?

20   A.  Yes, it is.

21           MS. ESCALANTE:  Your Honor, the government would move

22   to admit Exhibit 54 into evidence.

23           MS. WEIDNER:  No objection, Your Honor.

24           THE COURT:  Exhibit 54 is admitted.

25           MS. ESCALANTE:  Permission to publish?

```
 1              THE COURT:  You may.

 2                  (Exhibit 54 is received into evidence.)

 3   BY MS. ESCALANTE:

 4   Q.  Detective Martin, can you show the members of the jury

 5   where the Trezor device is?

 6   A.  Yes.  I will circle it.

 7   Q.  And what is that device?

 8   A.  As he explained to me, it's a hardware wallet.  Works kind

 9   of like a USB stick and it can hold your Bitcoin and conceal

10   your private keys so they can't be accessed by hackers.

11   Q.  Okay.  Detective Martin, after this interaction, what was

12   the next step in your investigation?

13   A.  After this, I believe we conducted surveillance on

14   Mr. Costanzo.

15   Q.  Did you -- the members of the jury heard witness testimony

16   from Special Agent Schuyler Kenney from the DEA where he

17   discussed conducting surveillance.

18              Were you there with him that day?

19   A.  Yes, I was.

20   Q.  Was that on December 14th, 2016?

21   A.  Yes.

22   Q.  Okay.  And after the surveillance was conducted, when did

23   you next contact the defendant?

24   A.  Our next meeting was on February 2nd, 2017.

25   Q.  And how did you contact him?
```

1   A.  Again, via text message.

2   Q.  And is this the -- actually, let me -- sorry.  Let me back

3   up.

4           The November 2016 exchange, how much was that for?

5   A.  It was for $12,000.

6   Q.  And what exchange rate did the defendant charge you?

7   A.  I was able to talk him down to 7 percent fee.

8   Q.  And there was no drug talk during that exchange?

9   A.  No.

10  Q.  On February 2nd, 2017, how much were you wanting to

11  exchange with the defendant?

12  A.  $30,000.

13  Q.  And is this the first time you introduced drug talk?

14  A.  Yes, it is.

15  Q.  And why is that?

16  A.  I was trying to build a rapport with Mr. Costanzo.  I

17  was -- over the time meeting with him, I was dropping slow

18  hints that I might be involved in some shady activity.  And

19  this was the first time I actually came out and said this is

20  drug money.

21  Q.  And you mentioned you reached out to him via text messages?

22  A.  Yes.

23  Q.  I'm going to show you what's been marked as Exhibit 57.

24          Do you recognize that?

25  A.  Yes, I do.

DIRECT EXAMINATION - CHAD MARTIN

1    Q.   What is that?

2    A.   That is a -- looks like a cut-and-pasted screen capture

3    from our text messaged conversation from February 1st and then

4    the meeting on February 2nd.

5    Q.   How did you create that?

6    A.   Again, it was from my undercover Google Voice profile.  I

7    would cut and paste exactly as the messages are shown on there

8    onto this screen capture.

9    Q.   And are they a true, accurate, and complete depiction of

10   your text message exchange with the defendant on those dates?

11   A.   Yes, they are.

12           MS. ESCALANTE:  Your Honor, the government would move

13   to admit Exhibit 57 into evidence.

14           MS. WEIDNER:  Objection.  Not the best evidence, Your

15   Honor.

16           THE COURT:  One moment.  I'm going to have to read the

17   exhibit, so I may have to have you scroll down.

18           MS. ESCALANTE:  That is all, Your Honor.

19           THE COURT:  The objection is overruled.  The exhibit

20   is admitted.

21               (Exhibit 57 is received into evidence.)

22           MS. ESCALANTE:  Permission to publish, Your Honor?

23           THE COURT:  You may do so.

24   BY MS. ESCALANTE

25   Q.   Detective Martin, just briefly explain to the jury what

UNITED STATES DISTRICT COURT

1   this is?

2   A.  So on February 1st, this was me advising Mr. Costanzo that

3   I have a big trade for him and asked if he could do 30K,

4   meaning $30,000.  And he asked where I'm at.  I let him know

5   that I was in North Scottsdale and I'd be free either later

6   that day or the next day.  And he said, "See you tomorrow."

7   Q.  Detective Martin, why did you say you stashed the cash?

8   A.  I wanted to let him know that I wasn't available any longer

9   on that day because the conversation was going late into the

10  day.  So I wanted to let him know that I had a large amount of

11  cash that I had to hide before we could do the deal.

12  Q.  Where did you end up meeting on February 2nd, 2017?

13  A.  We were at a Starbucks in Tempe.

14  Q.  And how much cash did you take with you?

15  A.  $30,000.

16  Q.  I'm now going to show you what's been marked as Exhibit 55.

17          What is that?

18  A.  So, for -- for this amount of undercover funds which I

19  pulled out, I'm going to run it through a money counter.  It

20  takes an image of the bar codes on the money to document the

21  actual cash used during the transaction.

22  Q.  And why do you do that?

23  A.  Just so we have a record of -- of what currency was

24  transacted.

25  Q.  And when did you create this document?

DIRECT EXAMINATION - CHAD MARTIN

1    A.   This is actually a printout directly from the money counter

2    that was used.

3    Q.   And is it a true and accurate depiction of the $30,000?

4    A.   Yes, it is.

5          MS. ESCALANTE:   Your Honor, the government would move

6    to admit Exhibit 55 into evidence.

7          MS. WEIDNER:   No objection.

8          THE COURT:   Exhibit 55 is admitted.

9             (Exhibit 55 is received into evidence.)

10          MS. ESCALANTE:   Permission to publish, Your Honor?

11          THE COURT:   You may.

12   BY MS. ESCALANTE:

13   Q.   Detective Martin, can you explain to the members of the

14   jury what it is?

15   A.   So this is from the undercover funds that I obtained from

16   the DEA on February 1st.  You can see the date and timestamp at

17   the top and it lists all of the hundred-dollar-bill notes that

18   were scanned.

19   Q.   This exhibit is 21 pages?

20   A.   Yes.  Actually, I believe there were some 50s in there.  I

21   think that says "USD note 50."

22          So there's 50s and hundreds.  And it actually takes an

23   image of all of the bar codes on the cash.

24   Q.   And how did you have this cash packaged?

25   A.   It was bundled up in a green Pei Wei bag, so a large,

UNITED STATES DISTRICT COURT

1   green, like, plastic bag.

2   Q.  And how did the defendant arrive to that meeting?

3   A.  He arrived in a vehicle.

4   Q.  Were you there first or was he there first?

5   A.  I was there first.

6   Q.  And did you audio and video record this meeting?

7   A.  Yes, I did.

8   Q.  Have you had a chance to listen to a portion of the audio

9   recordings?

10  A.  Yes, I have.

11  Q.  They are 107A through G.

12          Are they true and accurate depictions of the

13  interaction that you had with the defendant on February 7th --

14  2nd, 2017?

15  A.  Yes, they are.

16          MS. ESCALANTE:  Your Honor, the government would move

17  to admit Exhibits 107A through G.

18          MS. WEIDNER:  No objection.

19          THE COURT:  107A through G are admitted.

20          (Exhibits 107A-G are received into evidence.)

21          THE COURT:  You may publish.

22          MS. ESCALANTE:  Thank you, Your Honor.

23               (Portion of audio played.)

24  BY MS. ESCALANTE:

25  Q.  Detective Martin, what is going on there?

DIRECT EXAMINATION - CHAD MARTIN

1    A.   So, through the text-messaged conversation, I let him know

2    that I wanted to do a $30,000 transaction.  And it seemed like

3    he forgot the amount we were doing that day, and he wasn't

4    prepared initially to do $30,000.

5    Q.   Okay.

6                      (Portion of audio played.)

7    BY MS. ESCALANTE:

8    Q.   Detective Martin, was the defendant reviewing his text

9    messages there?

10   A.   Yes.

11                     (Portion of audio played.)

12          MS. ESCALANTE:  We'll now go to 107B.

13                     (Portion of audio played.)

14   BY MS. ESCALANTE:

15   Q.   Detective Martin, what's the defendant explaining there

16   about casinos?

17   A.   So I believe he was explaining how he would basically use

18   the casino.  He would have a large amount of small bills from

19   doing these transactions, so he would go to the casino with all

20   his 20s, put them into a machine, pull out the ticket, and then

21   go cash that out at the ATM to get hundreds out, basically to

22   change his small bills out for larger bills.

23   Q.   Detective Martin, what does "86'ed" mean?

24   A.   Basically, kicked out of the casino.

25          MS. ESCALANTE:  We'll now go to 107C.

1                        (Portion of audio played.)

2     BY MS. ESCALANTE:

3      Q.  Detective Martin, in this transaction, did the defendant

4      ask for your ID or your Social?

5      A.  No.  He did not.

6                        (Portion of audio played.)

7            MS. ESCALANTE:  We'll now go to 107D.

8                        (Portion of audio played.)

9     BY MS. ESCALANTE:

10     Q.  Detective Martin, what's going on there at that point

11     during the communication?

12     A.  So I'd already given him the $30,000 in cash and he was

13     trying to stuff it into his fanny pack, his belly bag.  And so

14     I told him he could just take the bag, that green bag that it

15     was in.

16                        (Portion of audio played.)

17     BY MS. ESCALANTE:

18     Q.  Detective Martin, what's the ".07" you're referring to?

19     A.  That's adding in his 7 percent fee, so he would add the .07

20     on top of the going rate for Bitcoin.

21                        (Portion of audio played.)

22     BY MS. ESCALANTE:

23     Q.  Detective Martin, what did you tell the defendant at that

24     point?

25     A.  So, right there is when I told them what the money was

DIRECT EXAMINATION - CHAD MARTIN

1    from.  I said:  This thirty grand's from one key of coke.

2    Meaning one kilo of cocaine.

3    Q.  And that was after he asked you what your claim to fame

4    was?

5    A.  Yes.

6    Q.  And how did the defendant react?

7    A.  Kind of just went "shhh," like don't talk about that.

8    Q.  Did he cease communication with you?

9    A.  Nope.

10   Q.  Did he tell you to leave?

11   A.  No.

12                     (Portion of audio played.)

13   BY MS. ESCALANTE:

14   Q.  Detective Martin, when you're referring to "304," what are

15   you specifically talking about?

16   A.  So, the first time I was explaining one key of coke was

17   about $30,000, so that next part I was talking about three or

18   four, meaning --

19          MS. WEIDNER:  Objection.  Facts not in evidence with

20   regard to --

21          THE COURT:  Overruled.

22   BY MS. ESCALANTE:

23   Q.  You may continue, Detective Martin.

24   A.  So I was explaining "three or four" would mean three or

25   four kilos, which would equal about $100,000.

1                      (Portion of audio played.)

2    BY MS. ESCALANTE:

3    Q.  Prior to going into 107E, Detective Martin, I want to show

4    you what's been marked as Exhibit 98.

5            Do you recognize that photograph?

6    A.  Yes, I do.

7    Q.  And what is that?

8    A.  That is the green Pei Wei bag that I was talking about

9    which contained the $30,000.

10   Q.  Is that a true and accurate depiction of the bag?

11   A.  Yes, it is.

12           MS. ESCALANTE:  Your Honor, the government would move

13   to admit Exhibit 98 into evidence.

14           MS. WEIDNER:  No objection.

15           THE COURT:  98 is admitted.

16              (Exhibit 98 is received into evidence.)

17           MS. ESCALANTE:  Permission to publish it, Your Honor?

18           THE COURT:  You may.

19   BY MS. ESCALANTE:

20   Q.  Detective Martin, how did you hand this bag over to the

21   defendant?

22   A.  It's sitting on the table.  I just kind of slid the bag

23   over to him.

24   Q.  And that bag contained the $30,000 cash?

25   A.  Yes, it did.

DIRECT EXAMINATION - CHAD MARTIN

1    Q.  And did the defendant count it?

2    A.  Yes.  He pulled the cash out of the bag and kind of counted

3    it under the table.  He started to put it in his fanny pack,

4    but he couldn't get it to fit.  So that's when I told him he

5    could put it back in the bag and take the whole bag.

6    Q.  And did he take the whole bag?

7    A.  Yes, he did.

8            MS. ESCALANTE:  We will now go to Exhibit 107E of the

9    audio.

10                     (Portion of audio played.)

11   BY MS. ESCALANTE:

12   Q.  Detective Martin, did the defendant conduct the transaction

13   with the BlackBerry?

14   A.  Yes, he did.

15   Q.  Did he use a BlackBerry for all of your exchanges?

16   A.  Yes, he did.

17            MS. ESCALANTE:  We will now go to 107F.

18                     (Portion of audio played.)

19   BY MS. ESCALANTE:

20   Q.  Detective Martin, the "hundred" that you're referencing to,

21   you had already told the defendant that it was from the sale of

22   cocaine?

23   A.  Yes.  That's when we talked about the three or four kilos

24   would be equal to about $100,000.

25            MS. WEIDNER:  Objection, Your Honor, not the best

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

```
 1      evidence.
 2              THE COURT:  Overruled.
 3                      (Portion of audio played.)
 4  BY MS. ESCALANTE:
 5  Q.  Detective Martin, what are you referring to, that you're
 6  not the boss?
 7  A.  I was letting him know that I'm --
 8              MS. WEIDNER:  Objection.  Supplementing the
 9  recordings.
10              THE COURT:  Overruled.
11              THE WITNESS:  I was letting him know that I wasn't the
12  boss in this group.  I was portraying that I had somebody that
13  I had to report to that was actually in control of the money.
14                      (Portion of audio played.)
15  BY MS. ESCALANTE:
16  Q.  Detective Martin, in all your exchanges, is this the first
17  time the defendant refers you to Telegram?
18  A.  Yes.
19                      (Portion of audio played.)
20              MS. ESCALANTE:  We are now going to 107F.
21                      (Portion of audio played.)
22              MS. CASTILLO:  Sorry, that's the one I just played.
23              107G.
24                      (Portion of audio played.)
25
```

1    BY MS. ESCALANTE:

2    Q.  What are you referring to?

3    A.  One of our goals of -- of raising the amounts of

4    transactions we were doing so high is because we wanted to find

5    out if he had a source of supply for Bitcoin and to find out

6    who his banker was.

7           So after we did that transaction, I asked him if he

8    was going to meet his bank now.  He said "yes."

9    Q.  And did this -- did you complete this transaction?

10   A.  Yes, we did.

11   Q.  And how was that done?

12   A.  Same way.  After he counted the cash, he sent the Bitcoin

13   to my phone.

14   Q.  And did you take screenshots of the transaction from your

15   phone?

16   A.  Yes, I did.

17   Q.  And what did you also do after you received the Bitcoin

18   from the defendant?

19   A.  I -- well, I -- I took screenshots of the transaction and

20   then I -- I sent that money back to a separate undercover

21   Coinbase account.

22   Q.  And did you provide this -- those screenshots and that

23   information to Special Agent Ellsworth from the IRS?

24   A.  Yes, I did.

25   Q.  I'm now going to show you what's been marked as Exhibit 56.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION – CHAD MARTIN

1    This exhibit is about 18 pages.

2         Do you recognize this?

3    A.  Yes, I do.

4    Q.  What is that exhibit?

5    A.  These are screenshots I took of my undercover Coinbase

6    account and Blockchain account.

7    Q.  And what does this show?

8    A.  So, they show basically the "before" and "after," showing

9    that I had a zero balance in my Coinbase account, showing that

10   I received an amount of Bitcoin from Mr. Costanzo and that I

11   moved that Bitcoin into the Coinbase account.

12   Q.  And is it a true and accurate depiction?

13   A.  Yes, it is.

14        MS. ESCALANTE:  Your Honor, the government would move

15   to admit Exhibit 56 into evidence.

16        MS. WEIDNER:  No objection.

17        THE COURT:  Exhibit 56 is admitted.

18            (Exhibit 56 is received into evidence.)

19        MS. ESCALANTE:  Permission to publish just a few pages

20   of this exhibit, Your Honor?

21        THE COURT:  You may.

22   BY MS. ESCALANTE:

23   Q.  Detective Martin, what is the page that is on the screen?

24   A.  So this is a Blockchain.info screen capture that shows the

25   wallet that I received the Bitcoin from from Mr. Costanzo into

DIRECT EXAMINATION - CHAD MARTIN

1    a UC wallet and then the wallet that I transferred it to from

2    there.

3    Q.  Okay.  So after the transaction was completed, what did you

4    do next?

5    A.  I -- you mean other than taking the screenshots and moving

6    the Bitcoin to Coinbase?

7    Q.  Yes.  Where were you next in your investigation?

8    A.  Oh.  We -- I set up another transaction later on.

9    Q.  Okay.

10   A.  We had already spoken about the hundred-thousand-dollar

11   transaction and I was attempting to find out who his banker

12   was.

13   Q.  And I'm going to show you what's been marked as Exhibit 69.

14           MS. ESCALANTE:  One moment.

15                   (Pause in proceedings.)

16           THE COURT:  Ms. Escalante, we're at about time anyway

17   for a morning break.  Do you want to -- should we take a break

18   while you find your exhibit?

19           MS. ESCALANTE:  Yeah.  That would be great.  Thank

20   you, Your Honor.

21           THE COURT:  All right.  Ladies and gentlemen, thank

22   you for your attention this morning.  Please take a 15-minute

23   break.  Remember the admonitions.  We'll see you after.

24           COURTROOM DEPUTY:  All rise.

25                   (Jury leaves the courtroom at 10:24 a.m.)

1            THE COURT:  Thank you.  Any reason we can't go to

2       break; anybody need to raise anything?

3            MS. ESCALANTE:  No, Your Honor.

4            MS. WEIDNER:  Your Honor, actually, I think the

5       defense would like the -- if it's -- well, we would request

6       that the Court, once again, advise the jury that the evidence

7       is actually the recordings.

8            We have concerns about the fact that the government's

9       witness is supplementing parts of the recordings with what he

10      says now he said then.

11           THE COURT:  Well, his testimony is his testimony.

12      That is also evidence; correct?

13           MS. WEIDNER:  Yes, Your Honor.  And -- but the

14      government has chosen to provide these recordings.  And just as

15      this Court --

16           THE COURT:  I'm sorry.  I'm not understanding what

17      your objection is, Ms. Weidner.  I certainly have no problem

18      advising the jury that the exhibit is the recording and not the

19      transcript.

20           Does that satisfy what you are looking for?

21           MS. WEIDNER:  Well, Your Honor, as Ms. Escalante told

22      this Court earlier when we were objecting about transcripts,

23      it's the best evidence.  And that -- the matter in the

24      transcript is -- is being supplemented.

25           THE COURT:  Well, it's being supplemented by

UNITED STATES DISTRICT COURT

```
 1    additional questions asked the witness about the meaning of the
 2    recording.
 3               MS. WEIDNER:  Well, and --
 4               THE COURT:  And if you're objecting that that is a
 5    supplementation of the transcript, your objection is overruled.
 6               MS. WEIDNER:  Thank you, Your Honor.
 7               THE COURT:  Thank you.
 8                  (Proceedings in recess at 10:27 a.m.)
 9                  (Jury enters the courtroom at 10:44 a.m.)
10               THE COURT:  Please be seated.  Thank you.
11               Ready, Ms. Escalante?
12               MS. ESCALANTE:  Yes, Your Honor.  Thank you.
13    BY MS. ESCALANTE:
14    Q.  Detective Martin, we left off at your next contact with the
15    defendant to arrange the 107 -- or the hundred-dollar -- the
16    $100,000 transaction.
17               And how did you contact the defendant?
18    A.  I began using the Telegram Messenger that he informed me to
19    use.
20    Q.  Prior to that did you send text messages on March 27th --
21    29th, 2017?
22    A.  Yes.  We had a few prior messages before that.
23    Q.  Do you see Exhibit 69 before you?
24    A.  Yes, I do.
25    Q.  What is that?
```

1    A.  It's a text message conversation I had with Mr. Costanzo on

2    March 29th.

3    Q.  And how did you preserve this?

4    A.  These were screenshots from my undercover cell phone.

5    Q.  And are they a true and accurate depiction?

6    A.  Yes, they are.

7          MS. ESCALANTE:  Your Honor, the government would move

8    to admit Exhibit 69 into evidence.

9          MS. WEIDNER:  Your Honor, if I may have a moment, I am

10   unable to see Exhibit 69 and I needed to find it.

11                    (Pause in proceedings.)

12         MS. WEIDNER:  No objection, Your Honor.

13         THE COURT:  Exhibit 69 is admitted.

14              (Exhibit 69 is received into evidence.)

15         MS. ESCALANTE:  Permission to publish, Your Honor?

16         THE COURT:  You may.

17   BY MS. ESCALANTE:

18   Q.  Detective Martin, explain this to the jury, please.

19   A.  So, I was contacting Mr. Costanzo.  I said:  Do you

20   remember that big Bitcoin purchase we talked about a couple

21   weeks ago?

22              And he asked me how much I want to do.

23              I informed him that's what I'm trying to get figured

24   out.  I said:  My guy wants me to send him 100K in Bitcoin

25   either next week or the week after and asked if he could go

1    that high.

2    Q.  And what did he respond?

3    A.  It's a little bit cut off.

4           He says:  Sometimes.

5    Q.  Now, we'll go to the next page.

6    A.  So I said:  Okay.  Like I said, I probably won't know the

7    exact amount until next week or the week after.  I just wanted

8    to make sure you wouldn't have problems getting that much.

9           And then he informs me to switch to Telegram.

10   Q.  And what did you respond?

11   A.  And I said:  Okay.  I'll search you on there.

12          And then he sent me an actual link to get Telegram.

13   Q.  And then did you download Telegram?

14   A.  Yes, I did.

15   Q.  And did you communicate with him via Telegram?

16   A.  Yes.

17   Q.  I'm now going to show you what's been marked Exhibit 64 on

18   the screen in front of you.  Just to you.  Okay?

19          Do you see Exhibit 64 before you?

20   A.  I think we still have the ELMO up.

21          COURTROOM DEPUTY:  Oh, I'm sorry.

22          THE WITNESS:  Yes.

23   BY MS. ESCALANTE:

24   Q.  What is that?

25   A.  That is screen captures of the Telegram communication I had

DIRECT EXAMINATION - CHAD MARTIN

1    with Mr. Costanzo.

2    Q.  And how do you know?

3    A.  I had him saved as "Morpheus" on that messenger and I have

4    me listed as "Jake" and the messages started on March 29th.

5    Q.  And are they true and accurate depictions?

6    A.  Yes, they are.

7             MS. ESCALANTE:  Your Honor, the government would move

8    to admit Exhibit 64 into evidence.

9             MS. WEIDNER:  No objection, Your Honor.

10            MS. ESCALANTE:  I'm also going to show you what's been

11   marked as Exhibit 65.

12            THE COURT:  Exhibit 64 is admitted.

13            (Exhibit 64 is received into evidence.)

14            MS. ESCALANTE:  Oh, I'm sorry, Your Honor.  Thank you.

15   BY MS. ESCALANTE:

16   Q.  I'm also going to show you what is been marked as

17   Exhibit 65.

18            What is that, Detective Martin?

19   A.  That looks like a continuation of our Telegram messages.

20   Q.  And how do you know?

21   A.  Again, the names are the same.  I recognize the

22   conversation and they're from April 9th and April 10th.

23   Q.  And do they go all the way through April 20th?

24   A.  I can't tell by this screen, but I believe they do.

25            Yes.  They go all the way up until April 20th.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

1    Q.  And they are a true and accurate depiction?

2    A.  Yes.

3         MS. ESCALANTE:  Your Honor, the government would move

4    to admit Exhibit 65 into evidence.

5         MS. WEIDNER:  No objection.

6         THE COURT:  Exhibit 65 is admitted.

7            (Exhibit 65 is received into evidence.)

8         MS. ESCALANTE:  Permission, Your Honor, to publish

9    Exhibit 64?

10        THE COURT:  You may.

11   BY MS. ESCALANTE:

12   Q.  Okay.  So, Detective Martin, after you sent text messages

13   on your phone, you then switched to the Telegram app; correct?

14   A.  Yes, ma'am.

15   Q.  And are these those text messages?

16   A.  Yes, they are.

17   Q.  We'll start with the first page.

18        Can you explain this to the jury, please?

19        MS. WEIDNER:  Objection, Your Honor.  It speaks for

20   itself.

21        THE COURT:  I'll allow some explanation.

22   BY MS. ESCALANTE:

23   Q.  Can we just -- what are you discussing here?

24   A.  So this is a continuation from our regular text

25   conversation.  I was asking him if his banker could do that

UNITED STATES DISTRICT COURT

 1      much.

 2                  Mr. Costanzo starts the conversation by saying:

 3                  I sent him a message.

 4                  And then he asked me with a question mark, "Cash."

 5      Q.  We'll go to the next -- we'll go to the next page.

 6                  What are you discussing here?

 7      A.  So we're trying to discuss the timing --

 8                  MS. WEIDNER:  The document speaks for itself.

 9      Objection.

10                  THE COURT:  Overruled.

11                  THE WITNESS:  So we're -- we're discussing the time

12      for a meeting with his banker.

13      BY MS. ESCALANTE:

14      Q.  Did you set up a meeting with the defendant and his banker?

15      A.  Yes, I did.

16      Q.  And what day was that?

17      A.  It was on April 10th, 2017.

18      Q.  And where did you meet?

19      A.  We met at a different Starbucks location also in Tempe.

20      Q.  And who arrived to that meeting?

21      A.  A man arrived.  He identified himself as Amideo, which I

22      was able to identify as Peter Steinmetz.

23      Q.  And the defendant also arrived?

24      A.  Yes.  And Mr. Costanzo was with him.

25      Q.  And who was Amideo that you identified as Peter Steinmetz?

DIRECT EXAMINATION - CHAD MARTIN

1    A.  He's -- Peter Steinmetz, he was basically the banker

2    Mr. Costanzo had been talking about.

3    Q.  Now, I'm going to show you what's been marked as

4    Exhibit 60.

5           Do you recognize that photograph?

6    A.  Yes.  That is Mr. Steinmetz.

7    Q.  Is that a true and accurate depiction of the gentleman that

8    arrived at the meeting on April 10th, 2017?

9    A.  Yes, it is.

10          MS. ESCALANTE:  Your Honor, the government would move

11   to admit Exhibit 60 into evidence.

12          MS. WEIDNER:  No objection.

13          THE COURT:  Is that 60?

14          MS. ESCALANTE:  Yes, Your Honor.

15          THE COURT:  Exhibit 60 is admitted.

16             (Exhibit 60 is received into evidence.)

17          MS. ESCALANTE:  Permission to publish?

18          THE COURT:  You may.

19   BY MS. ESCALANTE:

20   Q.  Detective Martin, so is this the defendant's banker?

21   A.  Yes, it is.

22   Q.  And after meeting with the defendant on April 10th, did you

23   communicate with him again to arrange the larger transaction?

24   A.  Yes, we did.

25          MS. ESCALANTE:  Your Honor, permission to publish

1    Exhibit 65?

2              THE COURT:  You may.

3    BY MS. ESCALANTE:

4    Q.  Detective Martin, how did you communicate with the

5    defendant to establish that meeting?

6    A.  Via Telegram.

7    Q.  These are exchanges for the 19th.

8              What day did you set up the meeting for?

9    A.  We were establishing the April 20th deal the next day.

10   Q.  And at the bottom of the screen here, what are you talking

11   about?

12   A.  Let him know I was good to meet at Starbucks again and told

13   him I'd try and get the cash bundled in stacks of a hundred --

14   or $10,000.

15   Q.  And why did you do that?

16   A.  From our previous communications, Mr. Costanzo advised that

17   he prefers hundreds, hundred-dollar bills.

18   Q.  And do you eventually meet on that day?

19   A.  Yes, we did.

20   Q.  Approximately what time?

21   A.  At the bottom of the message I told him I was there at

22   11:04.

23   Q.  And how did you arrive?

24   A.  Arrived in an undercover vehicle by myself.

25   Q.  Did you arrive prior to the defendant?

DIRECT EXAMINATION - CHAD MARTIN

1    A.   Yes, I did.

2    Q.   And where did you sit?

3    A.   At some tables outside of Starbucks.

4    Q.   And how long after you arrived did the defendant arrive?

5    A.   Pretty shortly after, I believe.  I'd have to see --

6             Are there any more messages or was that the last one?

7    Q.   That was the last one.

8    A.   Yeah.  That was our last communication letting him know

9    that I was there, so it would have been shortly after that.

10   Q.   And how much cash did you have with you to exchange that

11   day?

12   A.   I brought $107,000.

13   Q.   And where did that cash come from?

14   A.   It came from a Department of Public Safety flash fund, so

15   funds that they utilize for undercover operations for showing,

16   like, flashing purposes.

17   Q.   I'm going to show you what has not been admitted yet.  It's

18   marked as Exhibit 62.

19             Do you recognize this?

20   A.   Yes.  That's the -- the money counter printout.  It was

21   printed on the 19th, April 19th, the day before our

22   transaction.

23   Q.   And what does this all account for?

24   A.   So this accounts for the USD note, the serial number and

25   then an image of the serial number on each bill for the

1    $107,000.

2    Q.  And how was this document created?

3    A.  Directly -- printed directly from the money counter.

4    Q.  And why is it --

5            MS. ESCALANTE:  Your Honor, the government would move

6    to admit Exhibit 62 into evidence.

7            MS. WEIDNER:  No objection, Your Honor.

8            THE COURT:  Exhibit 52 -- 62 is admitted.

9            (Exhibit 62 is received into evidence.)

10   BY MS. ESCALANTE:

11   Q.  Why is it $107,000 instead of a hundred, Detective Martin?

12   A.  Because we had previously discussed his 7 percent fee.  So

13   I let him know that I was bringing $107,000.

14           The $7,000 was for his fee so I would actually get an

15   even hundred thousand dollars in Bitcoin.

16   Q.  And how did you have the cash packaged?

17   A.  It was rubber band and $10,000 stacks inside of a brown

18   paper Chipotle bag.

19   Q.  And did you record both audio and video of the interaction

20   with the defendant on this day?

21   A.  Yes, I did.

22   Q.  And have you had an opportunity to review portions of that

23   recording?

24   A.  Yes, I have.

25   Q.  And that's Exhibit 109A through D.

1          Were they true and accurate depictions of your

2    interaction with the defendant?

3    A.  Yes, ma'am.

4          MS. ESCALANTE:  Your Honor, the government would move

5    to admit Exhibit 109 into evidence.

6          MS. WEIDNER:  No objection.

7          THE COURT:  Exhibit 109 is admitted.

8          (Exhibit 109 is received into evidence.)

9          MS. ESCALANTE:  Permission to publish, Your Honor?

10         THE COURT:  You may.

11               (Portion of audio played.)

12   BY MS. ESCALANTE:

13   Q.  Detective Martin, who was out of town?

14   A.  So we were talking about his banker, Mr. Steinmetz, who was

15   out of town.

16               (Portion of audio played.)

17   BY MS. ESCALANTE:

18   Q.  Detective Martin, when you met with the defendant and

19   Mr. Steinmetz, did they ask you for identification?

20   A.  No.  They didn't.

21   Q.  Any personal identifying information?

22   A.  No.

23               (Portion of audio played.)

24         MS. ESCALANTE:  Okay.  We'll now go to 109B.

25               (Portion of audio played.)

```
 1              MS. ESCALANTE:  Okay.  We'll move on to 109C.
 2                   (Portion of audio played.)
 3   BY MS. ESCALANTE:
 4    Q.  Detective Martin, what are you referring to there?
 5              MS. WEIDNER:  It speaks for itself.  Objection.
 6              THE  COURT:  I'll allow it.
 7              THE WITNESS:  I was explaining to him that I have all
 8    hundreds, which is no easy feat when you're dealing with a
 9    bunch of drug dealers.  And I was explaining to Mr. Costanzo
10    about I thought I did pretty good when I met with this bank
11    about not referencing drugs.
12   BY MS. ESCALANTE
13    Q.  When you told the defendant that it was no easy feat
14    because you were dealing with a bunch of drug dealers, how did
15    he react?
16    A.  He didn't even flinch.
17    Q.  What was his demeanor?
18    A.  He was calm.  Seemed like he didn't even care.
19                   (Portion of audio played.)
20   BY MS. ESCALANTE:
21    Q.  What were you doing at this point, Detective Martin?
22    A.  So I handed him the cash and he started going through it
23    and counting it.
24    Q.  How did you hand him the cash?
25    A.  I -- I just handed him the whole paper Chipotle bag.
```

DIRECT EXAMINATION - CHAD MARTIN

```
 1                    (Portion of audio played.)
 2              THE WITNESS:  So he's going through, checking for
 3      counterfeit bills.
 4                    (Portion of audio played.)
 5              MS. ESCALANTE:  And now 109D.
 6                    (Portion of audio played.)
 7  BY MS. ESCALANTE:
 8    Q.  Detective Martin, who is the defendant referring to?
 9    A.  I believe he was referring to his banker.
10                    (Portion of audio played.)
11  BY MS. ESCALANTE:
12    Q.  Okay.  Detective Martin, what's going on at this portion of
13      the audio where there's not too much conversation?
14    A.  He's still counting the money.  It's just taking him a long
15      time to count the large amount.
16                    (Portion of audio played.)
17  BY MS. ESCALANTE:
18    Q.  And, Detective Martin, did you guys complete a transaction?
19    A.  Yes, we did.
20    Q.  And how did you do it?
21    A.  He -- he accepted the $107,000 in cash and he sent over 80
22      Bitcoin to my undercover cell phone.
23    Q.  Okay.  I'm going to show you what has been marked as
24      Exhibit 59.  It's not been admitted yet.
25              Do you recognize that picture?
```

1    A.  Yes, I do.

2    Q.  And how do you recognize it?

3    A.  The timestamp and it's a screenshot taken from the

4    undercover video recording device I had.

5    Q.  And is it a true and accurate depiction?

6    A.  Yes, it is.

7            MS. ESCALANTE:  Your Honor, the government would move

8    to admit Exhibit 59 into evidence.

9            MS. WEIDNER:  No objection.

10           THE COURT:  Exhibit 59 is admitted.

11               (Exhibit 59 is received into evidence.)

12   BY MS. ESCALANTE:

13   Q.  I'm also going to show you what's been marked as

14   Exhibit 58.  It's not been admitted yet.

15           Do you recognize that photograph?

16   A.  Yes, I do.

17   Q.  How?

18   A.  It's the same video from my undercover recording device.

19   Q.  Is it a true and accurate depiction?

20   A.  Yes, it is.

21           MS. ESCALANTE:  Your Honor, the government would move

22   to admit Exhibit 58 into evidence.

23           MS. WEIDNER:  No objection.

24           THE COURT:  Exhibits 58 and 59 are admitted.

25               (Exhibits 58 and 59 are received.)

 1              MS. ESCALANTE:  May I publish those exhibits, Your

 2    Honor?

 3              THE COURT:  Yes.  Exhibit 58 and 59 are admitted.  You

 4    may publish either or both.

 5    BY MS. ESCALANTE:

 6    Q.  I'll start with Exhibit 58 which is on the screen.

 7              Can you explain that to the jury, Detective Martin?

 8    A.  Yes.  That's Mr. Costanzo.  He's holding a hundred-dollar

 9    bill, and I believe he was checking for counterfeit, so he's

10    inspecting the bill.

11    Q.  Okay.  And I will publish Exhibit 59.

12              Please explain that one as well.

13    A.  He's holding one of the bundles of $10,000 and he's

14    counting out the hundred-dollar bills.

15    Q.  After the defendant sent you the Bitcoin, did you take

16    screenshots on your phone of that transaction?

17    A.  Yes, I did.

18    Q.  And what did you do subsequently to receiving that Bitcoin?

19    A.  So I received the Bitcoin on the phone.  I took screen

20    captures as it came in and documented it.  It was later sent to

21    the U.S. Marshals.

22    Q.  Did you provide copies of that transaction to Special Agent

23    Donald Ellsworth with the IRS?

24    A.  Yes, I did.

25    Q.  I'm going to show you what's been marked as Exhibit 63.

1          This one is a few pages, so I will scroll through them

2     first to allow you to review them all.

3     A.  All right.

4     Q.  Do you recognize that exhibit?

5     A.  Yes, I do.

6     Q.  What is that an exhibit of?

7     A.  Those are our screen captures from my UC cell phone and

8     also from my undercover laptop showing the movement of the

9     Bitcoin on the Blockchain.

10    Q.  And how did you create this document?

11    A.  I took the screen captures myself.

12    Q.  And is it a true and accurate depiction of the transaction

13    from April 20th, 2017?

14    A.  Yes, it is.

15    Q    BY MS. ESCALANTE:  Your Honor, the government would move to

16    admit Exhibit 63 into evidence.

17          MS. WEIDNER:  No objection.

18          THE COURT:  Exhibit 63 is admitted.

19             (Exhibit 63 is received into evidence.)

20    BY MS. ESCALANTE:

21    Q.  Now, you mentioned you sent the Bitcoin to the U.S.

22    Marshal's Office.

23    A.  Yes, I did.

24    Q.  And why did you do that?

25    A.  Because we planned to seize that Bitcoin that was used to

1    facilitate that transaction.

2             So the U.S. Marshals has a pre-forfeiture holding

3    account where they retain custody of the Bitcoin while we go

4    through the legal process.

5    Q.  And did you document your transfer to the marshals?

6    A.  Yes, I did.

7    Q.  I'm going to show you what's been marked as Exhibit 48.

8             Do you recognize that?

9    A.  Yes, I do.

10   Q.  What is that?

11   A.  That's one page of a -- of a couple pages documenting the

12   transfer of the Bitcoin to the U.S. Marshals.

13   Q.  And is this a true and accurate depiction of that transfer?

14   A.  Yes, it is.

15             MS. ESCALANTE:  Your Honor, the government would move

16   to admit Exhibit 48 into evidence.

17             MS. WEIDNER:  No objection.

18             THE COURT:  Exhibit 48 is admitted.

19                 (Exhibit 48 is received into evidence.)

20   BY MS. ESCALANTE:

21   Q.  And now I will show you what's been marked as Exhibit 49.

22             What is this a photograph of?

23   A.  That would be the other photograph documenting the transfer

24   of the Bitcoin to the U.S. Marshals.

25   Q.  Is this a true and accurate depiction?

 1    A.  Yes, it is.

 2            MS. ESCALANTE:  Your Honor, the government would move

 3    to admit Exhibit 49 into evidence.

 4            MS. WEIDNER:  No objection.

 5            THE COURT:  Exhibit 49 is admitted.

 6            (Exhibit 49 is received into evidence.)

 7            MS. ESCALANTE:  Permission to publish Exhibit 48 and

 8    49, Your Honor?

 9            THE COURT:  You may.

10    BY MS. ESCALANTE

11    Q.  Really briefly, Detective Martin, can you just explain to

12    the jury what this is?

13    A.  So this is one of the ways that I documented transferring

14    the Bitcoin that I received from Mr. Costanzo to the Marshals.

15            So in the description I put our DEA evidence exhibit

16    number, the 80.9 Bitcoin and then it was sent to the U.S.

17    Marshals.

18    Q.  And this is Exhibit 49.

19            I will now show you Exhibit 48.  Is that similar?

20    A.  Yes, ma'am.  It's the same information related to the

21    transfer.

22    Q.  What happened after the transaction was complete at the

23    Starbucks on April 20th, 2017?

24    A.  After the transaction was complete and I had received the

25    Bitcoin, my -- I gave a pre-determined arrest signal and

DIRECT EXAMINATION - CHAD MARTIN

1    Mr. Costanzo was placed under arrest.

2    Q.  And what happened after that?

3    A.  There was a search warrant served at his house later.

4    Q.  Did you attend that?

5    A.  I briefly attended.  I did a walk-through of the residence

6    before the search began.

7    Q.  And did you see some of the items that were seized?

8    A.  Yes, I did.

9    Q.  Were you also given some of the items for impounding?

10   A.  Yes.

11   Q.  Explain what "impounding" is?

12   A.  So there are people who collect the evidence.  They

13   document where the evidence was found and collect it and bag

14   it.  And then we also have a person that was there who

15   collected the evidence and also a separate witness document the

16   impounding of evidence into our evidence custodian just for

17   chain of custody purposes.

18   Q.  Okay.  I'm going to show you what's already been admitted

19   as Exhibit 11.

20          MS. ESCALANTE:  Permission to publish, Your Honor?

21          THE COURT:  You may.

22   BY MS. ESCALANTE:

23   Q.  What is that?

24   A.  That is a decorative Bitcoin.  Not a real, like, electronic

25   Bitcoin but a decorative Bitcoin with a QR code that was found

1    in Mr. Costanzo's residence.

2    Q.  I will zoom in.

3            Is that the QR code?

4    A.  Yes.  I believe that's the QR code that was on there which

5    would allow Bitcoin to actually be held within this device,

6    kind of like a paper wallet would.

7    Q.  And how much Bitcoin can you hold on this?

8    A.  Well, if it's a true private key or public key, then it

9    could hold any amount of Bitcoin.  It could have millions of

10   dollars.

11           MS. WEIDNER:  Objection.  Relevance.

12           THE COURT:  What's the relevance?

13           MS. ESCALANTE:  It's relevant, Your Honor, because it

14   shows that you can store an infinite amount of Bitcoin on a

15   small device.

16           THE COURT:  All right.  I'll allow it.

17   BY MS. ESCALANTE:

18   Q.  Now, I'm going to show you another photograph.

19           MS. ESCALANTE:  Permission to publish Exhibit 18, Your

20   Honor?

21           THE COURT:  All right.

22   BY MS. ESCALANTE:

23   Q.  Detective Martin, did you get a chance to look at these

24   cards that were taken in the search warrant?

25   A.  Yes, I did.

DIRECT EXAMINATION - CHAD MARTIN

1   Q.   Is that the phone number where you contacted the defendant?

2   A.   Yes, it is.

3   Q.   Now, I'm going to show you what's been already admitted as

4   Exhibit 19.

5           MS. ESCALANTE:   Permission to publish, Your Honor?

6           THE COURT:   You may.

7   BY MS. ESCALANTE:

8   Q.   What is that, Detective Martin?

9   A.   That is a Samsung cell phone.

10  Q.   Where did it come from?

11  A.   That was located -- just like the picture shows, it was

12  plugged in in the kitchen of Mr. Costanzo's residence.

13  Q.   And you heard from computer forensic analyst Shadle earlier

14  last week as to the forensic analysis on the phone?

15  A.   Yes.

16  Q.   And did you review the downloads of some of the text

17  messages from that phone?

18  A.   Yes, I did.

19  Q.   I'm now going to show you what has been conditionally

20  admitted as Exhibit 67.

21          MS. ESCALANTE:   Permission to publish, Your Honor?

22          THE COURT:   You may.

23  BY MS. ESCALANTE:

24  Q.   Detective Martin, what is this a photograph of?

25  A.   This looks like a Telegram communication I had with

1    Mr. Costanzo.

2    Q.  And have you had a chance to review all of Exhibit 67?

3    A.  Yes, I have.

4    Q.  And are those the same messages that you had on the

5    screenshots that you provided?

6    A.  Yes, they are.

7    Q.  Do you see the title under "Participants"?

8    A.  Yes.

9    Q.  What does that say?

10   A.  That says, "Jake mcds" -- I think that means McDonald's --

11   "Dobson, jogging deal, when car crapped."

12   Q.  Do you see a telephone number?

13   A.  Yes.  I believe that's like a Telegram identification

14   number.

15   Q.  That's not your phone number?

16   A.  No.

17   Q.  How do you get a Telegram identification number?

18   A.  So when you create an account, you can use your name which

19   links to your phone number -- and I'm not a Telegram expert,

20   but I believe that's how Telegram documents it.  It associates

21   a number with the name you create.

22   Q.  Okay.  Did you get an opportunity to review what's been

23   conditionally admitted as Exhibit 120?

24   A.  Yes.

25            MS. ESCALANTE:  Permission to publish, Your Honor?

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - CHAD MARTIN

1              THE COURT:  You may.

2    BY MS. ESCALANTE:

3    Q.  Detective Martin, what is this an exhibit of?

4    A.  This appears to be a text message conversation Mr. Costanzo

5    had with someone he has listed as "Kuro."

6    Q.  And what does Kuro --

7              MS. WEIDNER:  Objection, Your Honor.  Relevance, 403

8    and rebuttal evidence.

9              THE COURT:  Overruled.

10   BY MS. ESCALANTE:

11   Q.  In conversation number one, what is sent from Kuro?

12   A.  That shows that Kuro sent a message that said:  Did you

13   still want that DMT?

14   Q.  And what about number two?

15   A.  Message sent from Mr. Costanzo says:  Let's use Telegraph

16   app for text.

17             MS. WEIDNER:  Objection, Your Honor, to further

18   questioning along these lines.  The messages speak for

19   themselves.

20             THE COURT:  Overruled.

21   BY MS. ESCALANTE:

22   Q.  Detective Martin, what is "DMT"?

23   A.  DMT is dimethyltryptamine.  It's a psychodelic Schedule I

24   controlled substances.

25   Q.  How does Kuro respond after using --

DIRECT EXAMINATION - CHAD MARTIN

1          MS. WEIDNER:  Foundation.  Objection.

2          THE COURT:  Sustained.

3  BY MS. ESCALANTE:

4  Q.  Detective Martin, throughout your career, have you

5  investigated several different types of drugs, controlled

6  substance and narcotics?

7  A.  Yes, I have.

8  Q.  How long in your career have you been doing investigations

9  on narcotics?

10  A.  I've been assigned to drug-specific units for about six

11  years.  I've been investigating drugs ever since I was hired on

12  patrol in 2008.

13  Q.  And what sorts of training have you received regarding the

14  recognition of narcotics?

15  A.  I've received several trainings.  I'm actually a

16  field-test-certified officer for cocaine, methamphetamine,

17  marijuana.

18  Q.  And in those trainings, do you receive education upon the

19  street names of narcotics?

20  A.  Yes, I do.

21  Q.  Have you ever received training regarding DMT?

22  A.  Yes.

23  Q.  Have you ever had any investigations involving DMT?

24  A.  Yes.

25  Q.  Based on your training and experience, what is DMT?

1    A.  I know DMT to be a street name for dimethyltryptamine,

2    which is a controlled substance.

3            MS. WEIDNER:  Objection, Your Honor.  Foundation.

4    Request a sidebar.

5            THE COURT:  Overruled.

6            Do you want a sidebar for something else?

7            MS. WEIDNER:  It is related to the objection, Your

8    Honor, yes.

9         (At sidebar on the record.)

10           MS. WEIDNER:  This is Maria Weidner.

11           I guess our concern here is that Detective Martin's

12   ability to identify and field test narcotics is not relevant

13   here.  We have a word --

14           THE COURT:  Do you know, I sustained the objection not

15   even knowing it had to do with DMT because that already came in

16   without objection.

17           I actually thought you were objecting to something

18   else.  She then laid foundation.  And so if you are objecting

19   to the discussion of DMT, I agree that this may be more subject

20   to 403 unless predisposition wasn't at issue in this case and

21   it is at issue in this case.

22           MS. WEIDNER:  Yes, Your Honor.  We, nonetheless, think

23   that someone's drug use does not -- is not indicative of a

24   predisposition to launder money, which is what Ms. Costanzo is

25   charged with.  They're two totally different things.

DIRECT EXAMINATION - CHAD MARTIN

1          THE COURT:  Well, I believe that to the extent -- and

2    if I misrecall, you can tell me, Ms. Weidner -- but I believe

3    that this demonstrates that Bitcoin was exchanged for the drug

4    here.  And that drugs -- that Bitcoins can be purchased -- or

5    Bitcoins can be used in drug purchases is relevant to the

6    predisposition of the defendant to engage in transactions where

7    he may be -- may or may not be aware that Bitcoins are used

8    in -- for illegal purposes.

9          MS. WEIDNER:  In that case, Your Honor, this is also

10   cumulative, given that the government already set this forth

11   with their witness Nolan Sperling adequately.

12          THE COURT:  Well, I'm not recalling.

13          Have you already gone through this email chain?

14          MS. ESCALANTE:  No, Your Honor.  This is the first

15   time.  And I was just going to move by the DMT really quickly.

16   But when the foundation objection came, that's when --

17          THE COURT:  Yeah.  I don't even know that that was to

18   the DMT.  I didn't interpret it to be as much, but I doesn't

19   matter now.  It's admitted.  I think we're going to go ahead

20   and move forward.

21          MS. ESCALANTE:  Thank you.

22                    (End of discussion at sidebar.)

23   BY MS. ESCALANTE:

24   Q.  Okay, Detective Martin, let's continue.  Number 2 of the

25   text messages.

UNITED STATES DISTRICT COURT

1   A.  So that is sent from Mr. Costanzo's phone.  It says:  Let's

2   use Telegraph app for text.

3   Q.  Number 3?

4   A.  It was received by Mr. Costanzo from Kuro.  Says:  I can't.

5   They won't let me.  Ha-ha.

6   Q.  Number 4?

7   A.  And Mr. Costanzo sent a message saying he needs an address.

8   Q.  Number 5?

9         MS. WEIDNER:  Your Honor, objection.  These statements

10  speak for themselves and do not need to be read by the witness.

11        THE COURT:  Well, to the extent you're just going to

12  have the witness read the exhibit, I think that we can just

13  summarize the exhibit, if you want.

14        MS. ESCALANTE:  Okay, Your Honor.

15  BY MS. ESCALANTE:

16  Q.  Let's go to number 5 and then we'll move into summary from

17  there.

18        Detective Martin, what does number 5 say?

19  A.  It's read by Costanzo.  It says:  Can you do cash?  Sorry.

20  Ha-ha.

21  Q.  How does the defendant respond to that?

22  A.  I believe he asked if it's related to using a Bitcoin

23  transaction.

24  Q.  And how does Kuro respond?

25  A.  He sends a Bitcoin address.

1    Q.   What is that?

2    A.   So that's a Bitcoin address that was received by

3    Mr. Costanzo from Kuro.

4            MS. WEIDNER:  Calls for speculation.  Objection.

5            THE COURT:  Well, it's -- the objection was made after

6    the answer was given, so the -- it's in evidence.

7    BY MS. ESCALANTE:

8    Q.   Detective Martin, on the next page do they discuss how much

9    Bitcoin or what the purchase price is?

10   A.   Yes.  It looks like Mr. Kuro was charging 80 per gram.

11   Q.   And what does number 11 say?

12   A.   Mr. Costanzo is saying --

13           MS. WEIDNER:  Objection, Your Honor.  Rechallenge the

14   competency of this witness to testify to a text string that he

15   was not engaged in.

16           THE COURT:  I'm going to see parties at sidebar one

17   more time.

18       (At sidebar on the record.)

19           THE COURT:  All right, Ms. Weidner.  I've warned you

20   before.  You have a tendency to give speaking objections.  You

21   continue doing it and I'm going to take some action.

22           The appropriate objection is "speculation" in that

23   case, just one or two words.

24           MS. WEIDNER:  Yes, sir.

25           THE COURT:  And I do believe there is a speculation

DIRECT EXAMINATION - CHAD MARTIN

```
 1    objection as to what some of this means, unless you can lay a
 2    foundation that he was actually involved in the conversation.
 3              MS. ESCALANTE:  I would just say I just asked what it
 4    stated.  I wasn't asking what his opinion was to it.
 5              THE COURT:  Okay.
 6              MS. ESCALANTE:  And then I'll move on.
 7              THE COURT:  Well, I'm not sure you did say -- I don't
 8    think that was your question.  Just a moment.  I'm going to
 9    check it.
10                     (Pause in proceedings.)
11              THE COURT:  It wasn't your question.
12              I'm going to sustain the objection.
13              MS. ESCALANTE:  Your Honor, so if I just ask "what did
14    you say" -- "what does it state," that's fine.
15              THE COURT:  Yeah.  But I don't want to read the whole
16    exhibit.
17              MS. ESCALANTE:  No.  That's the last one.
18          (End of discussion at sidebar.)
19              THE COURT:  Objection is sustained.
20    BY MS. ESCALANTE:
21    Q.  Detective Martin, what does it say for text 11?
22    A.  Text 11 says:  Please be way more discreet.
23    Q.  Now I'm going to show you what's been conditionally
24    admitted as Exhibit 122.
25              MS. ESCALANTE:  Permission to publish, Your Honor.
```

```
 1              THE COURT:  You may.

 2   BY MS. ESCALANTE:

 3   Q.  Detective Martin, have you reviewed these text messages?

 4   A.  Sorry.  I can't see them.  They're a little blurry.

 5   Q.  Here.  I'll just zoom in.

 6   A.  Yes.  I've reviewed them.

 7   Q.  Now we'll go on to the next page.

 8              Have you reviewed these?

 9   A.  Yes, ma'am.

10   Q.  What is the sender of the text messages complaining to the

11   defendant about?

12              MS. WEIDNER:  Objection.  Calls for speculation.

13              THE COURT:  I'll sustain that.

14   BY MS. ESCALANTE:

15   Q.  Can you read text 12?

16   A.  Yes.  Text 12 says:  He's trying to get them so he can buy

17   drugs online.

18   Q.  And what is "them"?

19   A.  I think he's referring to Bitcoin.

20                      (Pause in proceedings.)

21   BY MS. ESCALANTE:

22   Q.  One last question, Detective Martin, regarding these text

23   messages.

24              On 13, what does the defendant state?

25   A.  It says:  That's none of my business.  I sell Bitcoins.
```

CROSS-EXAMINATION - CHAD MARTIN

```
 1    That's it.
 2              MS. ESCALANTE:  No further questions.
 3              THE COURT:  Cross-examination?
 4              Ms. Weidner, we'll be looking to break for lunch in
 5    about 20 minutes --
 6              MS. WEIDNER:  Okay.
 7              THE COURT:  -- just so you can plan your examination.
 8              MS. WEIDNER:  Your Honor, if I could just quickly
 9    consult with Ms. Zoratti to make sure we have the exhibits we
10    need.
11              THE COURT:  You may.
12              MS. WEIDNER:  Thank you.
13                      (Pause in proceedings.)
14                       CROSS-EXAMINATION
15    BY MS. WEIDNER:
16    Q.  Good afternoon, Detective -- well, we're not to afternoon
17    yet.
18              Good morning, Detective Martin.
19    A.  Good morning.
20    Q.  So in this investigation, there were five covert meetings
21    between you, the undercover agent, and Mr. Costanzo?
22    A.  Yes, with me.
23    Q.  And you conducted a Bitcoin exchange with Mr. Costanzo in
24    all but one of those meetings; correct?
25    A.  Yes.
```

CROSS-EXAMINATION - CHAD MARTIN

1   Q.  The exchanges you conducted with Mr. Costanzo typically

2   occurred during the day?

3   A.  Yes.

4   Q.  You always met at a public place?

5   A.  Yes.

6   Q.  Like McDonald's, Starbucks, Jersey Mike's?

7   A.  Yes.

8   Q.  When you conducted the exchanges with Mr. Costanzo, it was

9   just him?

10  A.  Well, we were alone at a table.

11  Q.  Right.  But he didn't bring a friend or any kind of back-up

12  or anything like that?

13  A.  No, other than the meeting with Mr. Steinmetz.

14  Q.  Yet the only time that you met with Mr. Costanzo to talk

15  about an exchange where another person was involved was that

16  April 10th, 2017, meeting you testified about on direct?

17  A.  Yes.

18  Q.  And you met with Mr. Costanzo and Dr. Peter Steinmetz on

19  that date to hammer out the logistics of a very large Bitcoin

20  exchange?

21  A.  Yes, ma'am.

22  Q.  That was one was worth $100,000?

23  A.  Yes.

24  Q.  And your investigation had indicated that Mr. Costanzo

25  didn't have access to enough Bitcoin on his own to cover a

CROSS-EXAMINATION - CHAD MARTIN

1   large trade like that?

2   A.  I -- I would be speculating to say that.  I'm not sure

3   where his Bitcoin -- where all of it was coming from.

4   Q.  You testified that he spoke of his personal banker.

5   A.  Yes.

6   Q.  And on your February 2nd, 2017, meeting with him -- you

7   recall that one?  That was for the $30,000.

8   A.  Yes.

9   Q.  And Mr. Costanzo showed up to that meeting and he didn't

10  have the Bitcoin?

11  A.  I -- I'm not sure where he got it from.

12  Q.  But he didn't have the Bitcoin when the meeting started?

13  A.  He -- he was trying to get -- I don't know.  Like I said, I

14  would be speculating.  He may have had it in his Trezor or one

15  of his other wallets.

16  Q.  You said that he had to call in some transfers?

17  A.  Yeah.  He was texting people.  I'm not sure who or where it

18  came from.

19  Q.  And at the end of that meeting we heard the audio of this.

20  You asked him if he was going to go meet his bank.

21  A.  Yes.

22  Q.  And he said yes?

23  A.  Yes.

24  Q.  And that suggests that he was able to get the Bitcoin from

25  his bank for that exchange?

UNITED STATES DISTRICT COURT

```
 1              MS. ESCALANTE:  Objection.  Argumentative.

 2              MS. WEIDNER:  Your Honor, it's just confirming --

 3              THE COURT:  I'll allow it.

 4              THE WITNESS:  Yes.

 5   BY MS. WEIDNER:

 6   Q.  Now, I want to just jump back because this -- we're talking

 7   about February.  But I want to jump back to March of 2016 when

 8   your case -- when your part -- when you got into this case.

 9              Do you remember that?

10   A.  Yes.

11   Q.  And you drafted a Case Initiation Memo?

12   A.  Yes.

13   Q.  And that memo documents the briefing that you received from

14   SA Ellsworth about the investigation up to that point?

15   A.  Yes.  Some of what he told me.

16   Q.  Yes.  And at the end of that memo, it notes that another

17   Bitcoin exchanger of interest had been identified in the

18   investigation, Dr. Peter Steinmetz.

19   A.  Okay.  I can review it.  I believe it says something like

20   that.

21   Q.  And that Dr. Steinmetz had been identified as a wholesaler

22   of Bitcoin?

23   A.  Okay.  I can -- I can review it if you'd like.

24   Q.  Meaning that he worked in the transfer of larger quantities

25   of Bitcoin?
```

CROSS-EXAMINATION - CHAD MARTIN

1    A.  I -- I'm not sure.  I can review it.

2    Q.  Let's see.  You have some exhibits up there?

3    A.  Yes.

4    Q.  And if you could look to -- pardon me -- Exhibit 354 at

5    Bates 19, paragraph 6.

6         And just take a moment to review that and let me know

7    when you're done.

8    A.  Okay.  I read it.

9    Q.  And now I need to review it really quick again.

10        And so just to revisit the questions I asked you where

11   you did not seem sure of the answers, the investigation prior

12   to you coming onboard had identified Dr. Peter Steinmetz as a

13   Bitcoin exchanger of interest?

14   A.  What I'm referring to in paragraph 6 is what I was briefed

15   about Mr. Steinmetz during the prior undercover meetings that I

16   was involved in, yes.

17   Q.  Yes.

18        And now let's go back to that February 2nd, 2017,

19   meeting.

20        We established at the end of that meeting you asked

21   Mr. Costanzo if he was going to meet his bank and he said yes?

22   A.  Yes.

23   Q.  And at each one of the meetings that you arranged with

24   Mr. Costanzo, you were the only undercover agent who met with

25   him for your meetings with him?

1    A.  Yes, for the DEA meetings.

2    Q.  Yes.  But on each of these instances, you also had a

3    surveillance team backing you?

4    A.  Yes.

5    Q.  And it was usually at least five officers, sometimes as

6    many as eight?

7    A.  Yeah.  I'd have to review the report from each one, but

8    there are usually several officers.

9    Q.  And while you might have not been aware of what they were

10   doing while you were meeting with Mr. Costanzo, if it was

11   something that they did was relevant to the investigation, you

12   learned about it, didn't you?

13   A.  I'm not sure what you mean.

14   Q.  Well, as the case agent, if a surveillance team were to

15   conduct surveillance relevant to the overall investigation --

16   for instance, on February 2nd, 2017, I assume you're aware that

17   other members of the task force and your surveillance team

18   continued surveillance on Mr. Costanzo?

19   A.  Yes.  I would read the reports after.

20   Q.  You're aware that they followed Mr. Costanzo after he left

21   the meeting at Starbucks with you?

22   A.  Yes.  I believe there was surveillance after that meeting.

23   Q.  And they followed him to a single-family residence in

24   Tempe?

25   A.  I can confirm on the reports.  I wasn't involved in that

1    one.

2    Q.  All right.  So I'll direct your attention to Exhibit 357.

3         Special Agent Keith Landa, he was on the task force

4    with you.  That's his report.  Take a moment to review it and

5    let me know when you're finished.

6    A.  Yes, ma'am.

7                   (Pause in proceedings.)

8         THE WITNESS:  Okay.  I've reviewed it.

9    BY MS. WEIDNER:

10   Q.  Thank you.

11        So did that refresh your recollection about everything

12   that happened on February 2nd?

13   A.  Yes, what happened when I wasn't there.

14   Q.  Great.  So you're aware that after the $30,000 exchange you

15   conducted with Mr. Costanzo, he was followed by the

16   surveillance team?

17   A.  Yes.

18   Q.  And that he was followed to a single-family home in Tempe

19   known to be the home of Dr. Steinmetz?

20        MS. ESCALANTE:  Objection.  Hearsay.

21        THE COURT:  Sustained.

22   BY MS. WEIDNER:

23   Q.  You learned in the course of your role as case agent on

24   this investigation that Mr. Costanzo was followed to the

25   single-family home in Tempe belonging to Dr. Steinmetz?

 1              MS. ESCALANTE:  Same objection, Your Honor.

 2              THE COURT:  Same ruling.  Sustained.

 3              MS. WEIDNER:  Just a moment, Your Honor.

 4                      (Pause in proceedings.)

 5   BY MS. WEIDNER:

 6   Q.  So, Detective Martin, to your knowledge did the

 7   investigation reveal where Mr. Costanzo went after he completed

 8   the $30,000 exchange with you?

 9   A.  Yes.  By reading the other agents' reports, I can tell

10   where he went.

11   Q.  And he -- to your knowledge, the investigation revealed

12   that Mr. Costanzo went to the home of Dr. Peter Steinmetz?

13              MS. ESCALANTE:  Objection.  Hearsay.

14              THE COURT:  One moment, please.

15              I'm going to sustain the objection.

16   BY MS. WEIDNER:

17   Q.  To your knowledge as case agent on this investigation, was

18   your team able to determine where Mr. Costanzo obtained the

19   Bitcoin to complete the exchange on February 2nd, 2017?

20   A.  I'm not -- are you referring to the surveillance team or --

21   I'm not sure what team you're referring to.

22   Q.  The investigation.

23              Was the investigation able to determine the source of

24   Bitcoin for Mr. Costanzo?  "Yes" or "no"?

25   A.  I believe the source of Bitcoin came from Mr. Steinmetz.

CROSS-EXAMINATION - CHAD MARTIN

1  Q.  Detective Martin, over the course of this trial, we've

2  heard recorded -- well, excerpts of recorded conversations

3  between you and Mr. Costanzo.

4  A.  Yes, ma'am.

5  Q.  And they were just excerpts; correct?

6  A.  Well, yes.  It wasn't the entire meeting.

7  Q.  Each time you met with Mr. Costanzo, would you say it was

8  about an hour, more or less?

9  A.  Sometimes two hours.

10  Q.  And during these meetings, Mr. Costanzo -- well, he liked

11  to talk?

12  A.  Yes.

13  Q.  And he was very enthusiastic about Bitcoin?

14  A.  Yes.  I do not dispute that.

15  Q.  And he also talked about a host of other topics?

16  A.  He talked about several things.  Can you be more specific?

17  Q.  No, just that it was a lot of different things.

18  A.  Yeah, mostly about Bitcoin and the government.

19  Q.  He was also at times during his meetings with you taking

20  calls or texting, playing with his phone essentially?

21  A.  Sometimes.  He told me he had to set up other deals

22  sometimes.

23  Q.  Uh-huh.

24       Actually, to respond your question about the other

25  things, I guess a good example would be on the recording when

1   we heard him talking about that insurance policy stuff; do you

2   recall that?

3   A.  Yes.

4   Q.  Now, you testified on direct that before each exchange you

5   would text Mr. Costanzo to set up a meeting?

6   A.  Yes.

7   Q.  You initiated each meeting that you had with Mr. Costanzo?

8   A.  Well, yeah.  I contacted him based on his advertisements.

9   Q.  And you used his phone number?

10  A.  Yes.

11  Q.  And it was the same phone number from the beginning of the

12  investigation?

13  A.  Yes.

14  Q.  He didn't change it?

15  A.  Not until we switched to Telegram.  Then it really wasn't a

16  phone number.

17  Q.  But you could always reach him with that phone number?

18  A.  Yes.

19  Q.  So after the $30,000 exchange when Mr. Costanzo had to call

20  his bank, you expressed to him that you wanted to do a $100,000

21  exchange?

22  A.  Yes.

23  Q.  That's obviously more than three times the amount of the

24  $30,000 deal?

25  A.  Yes.  That's what I explained to him.

CROSS-EXAMINATION - CHAD MARTIN

1   Q.  And Mr. Costanzo, he talked a lot about what he believed

2   were the possibilities of Bitcoin but he never proposed the

3   exchange amounts?

4   A.  Our first meeting he said we can go up to 100,000, if you

5   want.

6   Q.  He liked to talk about the possibilities of Bitcoin.  He

7   also --

8           Well, he did not propose to you the $100,000 exchange?

9   He was talking about potentials.

10  A.  Well, he -- he let me know right up front that he could do

11  large amounts.

12  Q.  But you were aware already of all the Bitcoin exchanges

13  conducted in the course of this investigation with

14  Mr. Costanzo, all of the exchanges that had been conducted by

15  you, by SA Kushner, by agent -- I'm sorry -- SA Klepper?

16  A.  Yes.  I was aware.

17  Q.  And the $100,000 exchange was more than all of the previous

18  undercover exchanges completed combined?

19  A.  Yes.  It was a large transaction.

20  Q.  And we already discussed that to work out the logistics of

21  that exchange, you actually had to meet with Mr. Costanzo and

22  his bank in the days before it was supposed to happen?

23  A.  Yes.

24  Q.  This is because Dr. Steinmetz was the source for the

25  Bitcoin?

UNITED STATES DISTRICT COURT

```
 1              MS. ESCALANTE:  Objection.  Argumentative and hearsay.
 2              THE COURT:  I'll allow it.
 3              THE WITNESS:  Yes.  He had -- I believed he was one of
 4    the sources.
 5              THE COURT:  Ms. Weidner.
 6              MS. WEIDNER:  Yes, sir?
 7              THE COURT:  It's noon.
 8              MS. WEIDNER:  All right.
 9              THE COURT:  I don't know if this is a good time to
10    break --
11              MS. WEIDNER:  All right.  We can break.
12              THE COURT:  -- or if you want a few more minutes.
13              MS. WEIDNER:  This is fine.
14              THE COURT:  All right.  Ladies and gentlemen, have a
15    nice lunch.  Remember the admonitions.  We'll see you back at
16    1:15.
17                  (Jury leaves the courtroom at 12:00 p.m.)
18              THE COURT:  Thank you.  You may step down.
19              THE WITNESS:  Yes, sir.
20              THE COURT:  We'll see you back at 1:15, unless there's
21    an issue somebody feels like we should raise.
22              MR. RESTAINO:  Nothing from the government, Judge.
23              MR. CAIN:  Nothing, Your Honor.
24              MS. WEIDNER:  Oh.  I'm sorry, Your Honor.
25              THE COURT:  All right.  See you at 1:15.
```

```
 1                    (Proceedings in recess at 12:02 p.m.)

 2                    (Jury enters the courtroom at 1:20 p.m.)

 3                    (Proceedings resume at 1:21 p.m.)

 4          THE COURT:  Thank you.  Please be seated.  I hope your

 5   lunch was good.

 6          Ms. Weidner?

 7          MS. WEIDNER:  Thank you, Your Honor.

 8   BY MS. WEIDNER:

 9   Q.  Detective Martin, I would like to ask you now about the

10   surveillance you conducted on September 14th, 2016.

11   A.  Okay.

12   Q.  Do you recall that?

13   A.  Yes, ma'am.

14   Q.  Part of the reason for that surveillance was to confirm

15   where Mr. Costanzo lived?

16   A.  Yes.

17   Q.  You believed it was an apartment complex on North Loma

18   Vista in Mesa?

19   A.  Yes, ma'am.

20   Q.  And during that surveillance --

21          Well, let me back up.

22          It started about -- it started in the morning, about

23   close to 9:00?

24   A.  I believe so.

25   Q.  And you actually saw Mr. Costanzo leave the second floor --
```

CROSS-EXAMINATION - CHAD MARTIN

1    leave a second-floor apartment that morning?

2    A.  Yes.

3    Q.  You took photos during the course of that surveillance?

4    A.  Yes.

5    Q.  You took a photo of the exterior of Mr. Costanzo's

6    apartment?

7    A.  Yes.

8    Q.  And that photo has been admitted into evidence as

9    Exhibit 363.

10             MS. WEIDNER:  Permission to publish to the jury?

11             THE COURT:  You may.

12   BY MS. WEIDNER:

13   Q.  Do you recognize that photo, Detective Martin?

14   A.  Yes, ma'am.

15   Q.  Sort of a brownish apartment building?

16   A.  Yeah, brown or tan.

17   Q.  And some -- looks like white plastic chairs out front?

18   A.  Yes.

19   Q.  As you saw it when you conducted surveillance on

20   December 14th (sic)?

21   A.  Yes.

22             MR. RESTAINO:  We can unpublish, please.

23   BY MS. WEIDNER:

24   Q.  I also want to go back, Detective Martin, to a statement

25   you made earlier about Mr. Costanzo's sources for Bitcoin.

CROSS-EXAMINATION - CHAD MARTIN

1              Your investigation only identified one source for

2    Bitcoin, Detective Martin, for Mr. Costanzo?

3    A.  Is that a question?

4    Q.  Yes, it is.  Your investigation identified one source of

5    Bitcoin for Mr. Costanzo.

6    A.  We were only able to link some of these transactions to one

7    source.

8    Q.  So one source was identified by your investigation?

9    A.  Yes.  We were unable to identify anyone else.

10   Q.  And that source was Dr. Peter Steinmetz?

11   A.  Well, that's -- we can't say for sure that's where all the

12   Bitcoin was coming from, but he was one of the sources.

13   Q.  Detective Martin, let me back up.

14              I am asking about the investigation that was conducted

15   and the source of Bitcoin that was identified.  Your

16   investigation identified one source of Bitcoin for

17   Mr. Costanzo?

18              MS. ESCALANTE:  Objection.  Asked and answered.

19              THE COURT:  I'll allow it.

20              THE WITNESS:  I can't say for sure that there was only

21   one source.  He was just the only one that we were able to --

22   to link to Mr. Costanzo.

23   BY MS. WEIDNER:

24   Q.  Detective Martin, I am asking about the results of your

25   investigation.  One source was identified.

UNITED STATES DISTRICT COURT

1    A.   That's what I'm saying.   There's only one source for what

2    we have identified, but we don't have all of the sources

3    identified.

4    Q.   So you'd agree that your investigation identified a single

5    source?

6    A.   No.   There could be more sources that are not yet

7    identified.

8    Q.   Perhaps I didn't ask the question correctly.

9         You would agree that your investigation identified no

10   more than one source of supply for Bitcoin that Mr. Costanzo

11   accessed?

12   A.   That's correct.   We were only able to identify the one

13   source.

14   Q.   And that source was Dr. Steinmetz?

15   A.   Yes.

16        MS. WEIDNER:   Thank you, Detective Martin.

17        One moment, please.

18             (Pause in proceedings.)

19        MS. WEIDNER:   No further questions, Your Honor.

20        THE COURT:   Thank you.   Redirect?

21        MS. ESCALANTE:   Yes, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MS. ESCALANTE:

24   Q.   Detective Martin, while my colleague, Mr. Binford, sets up

25   the computer, what do you mean you were only able to identify

REDIRECT EXAMINATION - CHAD MARTIN

1    one source?

2    A.  As I spoke about earlier, Bitcoin is nearly untraceable.

3    There could be multiple sources that we haven't yet been able

4    to identify.  We were just able to link Mr. Steinmetz to a

5    couple of these transactions.

6    Q.  Were you able to identify more than one address from where

7    Bitcoin came from that was sent to the defendant?

8    A.  Yes.  We were able to identify several addresses that we

9    haven't been able to link to any person.

10   Q.  Now, defense asked you if you were the one that initiated

11   contact with the defendant on each occasion.  Do you recall?

12   A.  Yes.

13   Q.  And who was the individual or person that set the location,

14   the final location, for each transaction?

15   A.  Mr. Costanzo.

16   Q.  And when you would request the amounts that you were

17   seeking to exchange, did you give the defendant the option to

18   not provide those amounts?

19   A.  Yes.  I -- I would just ask him if he's able to do these

20   amounts.

21   Q.  And was he able to on every occasion?

22   A.  Yes.

23   Q.  And every time that you received Bitcoin from the

24   defendant, who was the only person directly giving you Bitcoin?

25   A.  Mr. Costanzo.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - JOHN NELSON

1    Q.  On the meeting of April 10th, 2017, where you met with the

2    defendant and Peter Steinmetz, did you mention drugs?

3    A.  No.  I did not.

4    Q.  Did the amounts that you asked to conduct transactions with

5    fit within the amounts advertised on the LocalBitcoins profile?

6    A.  Yes, they did.

7    Q.  Did they match the amounts that the defendant stated he was

8    willing and able to do?

9    A.  Yes.

10            MS. ESCALANTE:  Hold on one second.

11                    (Pause in proceedings.)

12            MS. ESCALANTE:  No further questions, Your Honor.

13            THE COURT:  You may step down.  Thank you.

14            Next witness?

15            MR. BINFORD:  The United States calls Special Agent

16   John Nelson.

17            COURTROOM DEPUTY:  Please state and spell your first

18   and last name for the record.

19            (JOHN NELSON, Government witness, is sworn.)

20                    DIRECT EXAMINATION

21   BY MR. BINFORD:

22   Q.  Good afternoon, Agent Nelson.

23   A.  Afternoon.

24   Q.  Where do you work?

25   A.  I work for the Drug Enforcement Administration, Phoenix,

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - JOHN NELSON

1    Arizona.

2    Q.  And what do you do for the DEA?

3    A.  I am a Special Agent.

4    Q.  And how long have you been doing that?

5    A.  A little over 21 years.

6    Q.  And have you had -- have all those years been here in

7    Phoenix?

8    A.  No.  I started my career in San Diego.  Then I came to

9    Phoenix for several years.  From there I went overseas to --

10   did some time in Pakistan, Afghanistan, and Kurdistan, and then

11   returned back to Phoenix.

12   Q.  What were you doing while you were overseas?

13   A.  I was working for the Drug Enforcement Administration.

14   Q.  What did you do prior to joining the DEA?

15   A.  I was a deputy sheriff and a police officer in the state of

16   Utah.

17   Q.  And did you do anything prior to that?

18   A.  Yes.  Prior to that I was a missionary.

19   Q.  And where did you serve your mission?

20   A.  In Japan.

21   Q.  Did you have any involvement in the investigation of Thomas

22   Costanzo?

23   A.  I did.

24   Q.  What was your involvement?

25   A.  Surveillance.

DIRECT EXAMINATION - JOHN NELSON

1    Q.  And do you recall conducting surveillance on February 2nd,

2    2017?

3    A.  Yes, I do.

4    Q.  Where was that surveillance conducted?

5    A.  Initially, it was at the Starbucks in Tempe, and later I

6    was redirected over to an address in a residential area in

7    Tempe.

8    Q.  And do you recall why you went to that residential area in

9    Tempe?

10   A.  It was anticipated that our target of the surveillance

11   would be eventually going to be showing up at that location.

12   Q.  And who was the target of your surveillance that day?

13   A.  Mr. Costanzo.

14   Q.  And do you see Mr. Costanzo here in the courtroom?

15   A.  I do.

16   Q.  Will you please point him out and describe him?

17   A.  He's wearing glasses, blue -- blue tie, light-colored

18   shirt, seated in the center position at the defense table.

19           MR. BINFORD:  Your Honor, may the record reflect that

20   the witness has identified the defendant?

21           THE COURT:  Yes.

22   BY MR. BINFORD:

23   Q.  Now, you said that it was believed that the defendant would

24   travel to the location where you were at that day.

25           What did you see while you were at that location?

DIRECT EXAMINATION - JOHN NELSON

1   A.   I was -- I was also listening to the radio, listening to

2   the other surveillance units.  And I heard -- both heard and

3   saw the defendant's vehicle arrive to the front of the

4   residence that I had established surveillance on.

5   Q.   Do you remember which street that residence was on?

6   A.   Julie Street.

7   Q.   And when the defendant arrived, what did you see him do?

8   A.   He exited his vehicle and walked to the front of the

9   residence.

10  Q.   Was he carrying anything?

11  A.   He was carrying what appeared to be a bag.

12  Q.   And was your observation of the bag consistent with

13  information that other agents had provided you?

14  A.   Yes.

15  Q.   Did you see Mr. Costanzo leave the residence?

16  A.   I did.

17  Q.   And did he appear to be carrying the bag when he left the

18  residence?

19  A.   At that point it had become too dark.  I was not able to

20  see if he was carrying anything when he left.

21  Q.   And did he ultimately depart?

22  A.   He did.

23  Q.   How did he leave?

24  A.   He left in the same vehicle that he arrived in and drove

25  west past where I was parked.

```
1              MR. BINFORD:  Thank you.

2              No further questions on direct, Your Honor.

3              THE COURT:  Cross-examination?

4              Pardon me.

5              MS. WEIDNER:  Yes, Your Honor, if I could have just a

6       moment.

7              THE COURT:  You may.

8                          (Pause in proceedings.)

9              MS. WEIDNER:  Your Honor, may I advise Ms. Zoratti of

10      the exhibit that we need?

11             THE COURT:  Sure.

12             MS. WEIDNER:  Thank you.

13                         (Pause in proceedings.)

14                         CROSS-EXAMINATION

15      BY MS. WEIDNER:

16      Q.  Good afternoon, Agent Nelson.

17      A.  Good afternoon.

18      Q.  You were just asked questions about surveillance you

19      conducted.

20      A.  Yes.

21      Q.  On February 2nd, 2017.

22      A.  Yes.

23      Q.  This was surveillance of Mr. Costanzo?

24      A.  Yes.

25      Q.  After a Bitcoin transaction that he had just conducted.
```

CROSS-EXAMINATION - JOHN NELSON

1    A.  Yes.

2    Q.  With Detective Martin.

3    A.  Yes.

4    Q.  You testified that you observed Mr. Costanzo arrive at a

5    single-family residence in Tempe?

6    A.  That's correct.

7    Q.  That was on Julie Street?

8    A.  Yes.

9    Q.  The investigation revealed this was the home of Dr. Peter

10   Steinmetz?

11   A.  Yes.  That's -- I believe it was, yes.

12   Q.  You observed Mr. Costanzo park his car outside the

13   residence?

14   A.  Yes.

15   Q.  You observed him exit his car?

16   A.  I did.

17   Q.  You observed him to be carrying a bag consistent with the

18   bag that had been given to him by Detective Martin in the

19   $30,000 exchange?

20   A.  Yes.

21   Q.  You saw Mr. Costanzo carry that bag up to the door of the

22   home?

23   A.  Yes, I did.

24   Q.  And you saw him enter the home with that bag?

25   A.  Yes.

CROSS-EXAMINATION - JOHN NELSON

1    Q.  When Mr. Costanzo left the home a short while later, you

2    did not see him to be in possession of the bag?

3    A.  That's correct.

4    Q.  You saw him get into his car?

5    A.  Yes.

6    Q.  And drive away?

7    A.  Yes.

8    Q.  At no time did you see that he still had that large bag

9    consistent with the bag of $30,000 that Detective Martin had

10   given him?

11   A.  Yes.

12             MS. WEIDNER:  One moment.

13                       (Pause in proceedings.)

14             MS. WEIDNER:  No further questions.  Thank you.

15             THE COURT:  Thank you.  Redirect?

16             MR. BINFORD:  I have no questions, Your Honor.

17             THE COURT:  You may step down.  Thank you.

18             THE WITNESS:  Thanks, Your Honor.

19             MR. RESTAINO:  United States calls Keith Landa, Your

20   Honor.

21             COURTROOM DEPUTY:  Would you please state and spell

22   your first and last name for the record?

23             THE WITNESS:  Keith Landa.  K-E-I-T-H.  L-A-N-D-A.

24             (Keith Landa, Government witness, is sworn.)

25             MR. RESTAINO:  Your Honor, may we have the courtroom

```
 1     deputy bring loose Exhibits 79 and 80 to the witness?

 2               THE COURT:  You may.

 3                      (Pause in proceedings.)

 4                      DIRECT EXAMINATION

 5   BY MR. RESTAINO:

 6   Q.  Good afternoon, Agent Landa.

 7   A.  Good afternoon.

 8   Q.  Please introduce yourself to the jury.

 9   A.  My name is Keith Landa.  I'm a Special Agent with the DEA

10   here in Phoenix, Arizona.

11   Q.  And what was your involvement in the investigation that led

12   to this case?

13   A.  I assisted TFO Martin's investigation as a surveillance

14   agent.

15   Q.  Let's talk about your background.

16               Did you go to college?

17   A.  Yes, sir.

18   Q.  Where?

19   A.  St. Louis University.

20   Q.  And did you get a degree?

21   A.  I did, in business management.

22   Q.  Do you have any military service?

23   A.  Yes, sir.  I served for approximately seven years in the

24   United States Marine Corps.

25   Q.  Where did you serve?
```

1    A.  The majority of the time in Camp Pendleton, California.

2    Q.  And what type of work did you do?

3    A.  I was an intelligence officer.

4    Q.  For how long have you now been a DEA agent?

5    A.  Just over 18 years.

6    Q.  In which parts of the world or the country have you worked

7    as a DEA agent?

8    A.  I served my first eleven years in Chicago, Illinois, then

9    four years in Guadalajara, Mexico, and then the past

10   three-and-a-half years here in Phoenix, Arizona.

11   Q.  What types of cases have you worked?

12   A.  All types of investigations, from wiretap investigations,

13   undercover buys, working with informants, money laundering

14   investigations; the whole gamut of drug investigations.

15   Q.  Let's talk about your surveillance in this investigation.

16        Who did you surveil here?

17   A.  This investigation, we surveilled Thomas Costanzo.

18   Q.  Do you recognize Mr. Costanzo here in the courtroom today?

19   A.  Yes, sir.  He's the gentleman at the defense table in the

20   glasses.

21        MR. RESTAINO:  Your Honor, may the record reflect that

22   the witness has identified the defendant?

23        THE COURT:  Yes.

24   BY MR. RESTAINO:

25   Q.  Now, what was the date of the first surveillance that you

1    did in this investigation?

2    A.  It was September 14th, 2016.

3    Q.  What was going on in the investigation on that date?

4    A.  TFO Martin and Costanzo had agreed to a meeting in Mesa,

5    Arizona.

6    Q.  Where was the meeting?

7    A.  At a McDonald's restaurant.

8    Q.  What time of day?

9    A.  Approximately 6:00 p.m.

10   Q.  And what did you do on that day?

11   A.  I established surveillance in the vicinity of that

12   restaurant.

13   Q.  Where did you first see the defendant?

14   A.  We first seen the defendant as he was jogging towards the

15   restaurant on Rio Salado.

16   Q.  Was he in a vehicle?

17   A.  He was not in a vehicle at this time.

18   Q.  How was he dressed?

19   A.  In jeans and I don't recall what type of top.

20   Q.  And how did he -- were you able to see him actually arrive

21   and go into the restaurant?

22   A.  I observed him as he was jogging there and he was moving at

23   a pretty good pace and he was working up an sweat, but I did

24   not observe him walk into the restaurant.

25   Q.  All right.  Any other involvement in the investigation on

1    that date?

2    A.  No, sir.

3    Q.  Were you involved in a surveillance in February of 2017?

4    A.  Yes, sir, I was.

5    Q.  What did you do on that date?

6    A.  I was a surveillance agent also.

7    Q.  Where was that meeting?

8    A.  That was at a Starbucks restaurant in Tempe, Arizona.

9    Q.  And were you able to follow the defendant anywhere after

10   that meeting?

11   A.  Yes.  After Mr. Costanzo had left the meeting with TFO

12   Martin, we followed him to 1700 East Julie Drive in Tempe.

13   Q.  Were you able to see anything that the defendant did when

14   he arrived at that location?

15   A.  I did not.

16   Q.  And finally, were you involved in the investigation on

17   April 20th, 2017?

18   A.  Yes, sir.

19   Q.  What happened on that date?

20   A.  On that date Mr. Costanzo and TFO Martin met at the same

21   Starbucks as the February meeting in Tempe, Arizona and they

22   conducted a transaction at that location.  Afterwards,

23   Mr. Costanzo was placed into custody.

24   Q.  Were you involved in that arrest?

25   A.  I was present, but I was not involved in the arrest.

DIRECT EXAMINATION - KEITH LANDA

1   Q.   What was your involvement -- or did you have involvement

2   after the arrest?

3   A.   Yes, sir, I took Mr. Costanzo's property into custody and

4   recovered the official government funds that were used during

5   that transaction.

6   Q.   Let's talk about, first, the official government funds used

7   in that transaction.   What do you mean by that?

8   A.   That was the buy money that TFO Martin used to conduct the

9   transaction.

10   Q.   And what did you do with respect to his property?

11   A.   We inventoried it and we relinquished some of it back to

12   his significant other and the rest of it we maintained in

13   custody.

14   Q.   Was the defendant wearing any gear?

15   A.   He was wearing a fanny pack at the time of his arrest.

16   Q.   Let me show you what's been marked for identification

17   purposes only as Exhibit 4.

18            Taking a look at Exhibit 4, do you recognize this

19   document?

20   A.   Yes, sir.   That is the fanny pack that Mr. Costanzo was

21   wearing on the day of his arrest.

22   Q.   Is this a true and accurate representation of that fanny

23   pack as it was on that date?

24   A.   Yes, sir.

25            MR. RESTAINO:   Your Honor, the government would move

1    for the admission of Exhibit 4 into evidence.

2              MR. CAIN:  No objection.

3              THE COURT:  Exhibit 4 is admitted.

4                  (Exhibit 4 is received into evidence.)

5              MR. RESTAINO:  And may we publish?

6              THE COURT:  You may.

7    BY MR. RESTAINO:

8    Q.  So describe the two packs in this photo.

9    A.  One pack was worn around his waist and then the other green

10   small pack that was attached to the fanny pack contained

11   Mr. Costanzo's wallet and other miscellaneous items.

12   Q.  All right.  What was found in the larger fanny pack?

13   A.  In the larger fanny pack we seized $451.36 U.S. currency.

14   Q.  And was there other cash that was found in the green

15   smaller one?

16   A.  Yes, sir.  Mr. Costanzo's wallet was found in the green --

17   the green pouch attached -- attached to the fanny pack and that

18   contained $176.

19   Q.  And so all told, how much money was it that was taken from

20   those packs?

21   A.  It was $627.36.

22   Q.  What did you do with that cash?

23   A.  We impounded that cash and then it was subsequently taken

24   to Loomis Bank.  The DEA has a contract with Loomis to count

25   our money, process it and then we electronically wire it to the

1    U.S. Marshals Service.

2    Q.  Let's take a look at some additional exhibits marked for

3    identification purposes only.

4            MR. RESTAINO:  And if we could unpublish?

5    BY MR. RESTAINO:

6    Q.  First is Exhibit 1.  What is this photo?

7    A.  This is money that was recovered from Mr. Costanzo's wallet

8    which was in that green pack.

9    Q.  Next we'll go to 2.  What does the photo in number 2 show?

10   A.  This is the currency that agents seized from Mr. Costanzo's

11   fanny pack.

12   Q.  And how about photo 3?

13   A.  This is that same currency, just laid out so that we could

14   count it.

15   Q.  And are all three of these photos true and accurate

16   representations of the money taken from the packs that day?

17   A.  Yes, they are.

18           MR. RESTAINO:  Your Honor, the government would move

19   for the admission of Exhibits 1 to 3 into evidence.

20           MR. CAIN:  No objection.

21           THE COURT:  Exhibits 1, 2, and 3 are admitted.

22        (Exhibits 1, 2 and 3 are received into evidence.)

23           MR. RESTAINO:  And if we may publish?

24           THE COURT:  You may.

25

1    BY MR. RESTAINO:

2    Q.  So first, Exhibit 3, the money that's just all spread out;

3    correct?

4    A.  Yes, sir.

5    Q.  And 2 is that same money?

6    A.  Yes, sir.

7    Q.  And the money in number one came from where?

8    A.  From Mr. Costanzo's wallet which was contained in the green

9    bag attached to his fanny pack.

10   Q.  Did you also find coins?

11   A.  Yes, sir.  There were several miscellaneous coins and other

12   objects in his fanny pack.

13   Q.  Let's take a look for identification purposes -- and

14   unpublish -- at what's been marked as Exhibit 33.

15          Do you recognize this document?

16   A.  Yes, sir.

17   Q.  And what is this?

18   A.  These are items that were in Mr. Costanzo's fanny pack.

19   Q.  Also true and correct representation of the items from the

20   fanny pack on that day?

21   A.  Yes, sir.

22          MR. RESTAINO:  Your Honor, the government moves for

23   admission of Exhibit 33 into evidence.

24          MR. CAIN:  No objection.

25          THE COURT:  Exhibit 33 is admitted.

1                    (Exhibit 33 is received into evidence.)

2              MR. RESTAINO:  And if we may publish?

3              THE COURT:  You may.

4    BY MR. RESTAINO:

5    Q.  And so taking a look at Exhibit 33, can you point out the

6    coins that you discussed?

7    A.  Yes, sir.  Do I touch the screen?

8    Q.  Please do.

9    A.  One gold coin and then one silver -- silver coin from his

10   fanny pack.

11   Q.  What did you do with those coins?

12   A.  They were processed into evidence and subsequently taken to

13   a precious metal dealer for an appraisal.

14   Q.  And after that?

15   A.  They were relinquished -- relinquished to the U.S. Marshals

16   Service.

17   Q.  Taking a look at the bag in front of you that's marked as

18   Exhibit 79 --

19   A.  Yes, sir.

20   Q.  -- are you able to recognize what's in the envelope in

21   Exhibit 79?

22   A.  Yes, sir.  These are the gold and silver coins that we took

23   from -- that we seized from Mr. Costanzo's fanny pack.

24   Q.  And what helps you identify those as the coins that you

25   took?

1    A.   There is an internal DEA number marked on this bag.

2              MR. RESTAINO:  Your Honor, at this time the government

3    would move for admission of Exhibit 79 into evidence.

4              MR. CAIN:  No objection.

5              THE COURT:  Exhibit 79 is admitted.

6              (Exhibit 79 is received into evidence.)

7    BY MR. RESTAINO:

8    Q.   You also have Exhibit 80 in front of you.

9    A.   Yes, sir.

10   Q.   What is Exhibit 80?

11   A.   Exhibit 80 are precious metals that were taken from

12   Mr. Costanzo's residence subsequent to a search warrant on that

13   same afternoon.

14   Q.   Did you have any responsibility with respect to those

15   precious metals?

16   A.   I did remove these from evidence and I took them to the

17   same appraiser to get an appraised value.

18   Q.   And did those also go to the Marshals Service?

19   A.   Yes, sir.  They did.

20             MR. RESTAINO:  Your Honor, may I approach the witness

21   or have the courtroom deputy approach the witness to retrieve

22   Exhibit 79?

23             THE COURT:  You may.

24             Kathleen, would you please do that?

25             COURTROOM DEPUTY:  Uh-huh.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Thank you.

 2              MR. RESTAINO:  And if I may publish on the camera,

 3      Your Honor?

 4              THE COURT:  You may.

 5     BY MR. RESTAINO:

 6     Q.  So taking a look at Exhibit 79 on the document camera, is

 7     this the gold coin that was taken from the defendant on

 8     April 20th, 2017?

 9     A.  Yes, sir.

10              MR. RESTAINO:  Thank you, Agent Landa.

11              Your Honor, I have no further questions for Agent

12     Landa at this time.

13              THE COURT:  Thank you.

14              Mr. Cain, cross-examination?

15              MR. CAIN:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17     BY MR. CAIN:

18     Q.  Agent Landa, with respect to Exhibit 33, which was the gold

19     coin and the silver coin that we just spoke about --

20     A.  Yes, sir.

21     Q.  -- your investigation did not reveal when Mr. Costanzo

22     came into possession of those coins?

23     A.  That is correct.

24     Q.  The precious metals that you identified that were found in

25     the apartment -- you know what I'm referring to?
```

```
 1    A.  Yes, sir, I do.

 2    Q.  And I believe those were Exhibit 80?

 3    A.  Yes, sir.

 4    Q.  Your investigation did not reveal when Mr. Costanzo would

 5    have come into possession of those precious metals, did it?

 6    A.  It did not.

 7              MR. CAIN:  No further questions, Your Honor.

 8              THE COURT:  Redirect?

 9              MR. RESTAINO:  No thank you, Your Honor.

10              THE COURT:  You may step down.

11              THE WITNESS:  Thank you, sir.

12              MR. BINFORD:  Your Honor, may we have a brief sidebar

13    before which call the next witness?

14              THE COURT:  Yes.

15         (At sidebar on the record.)

16              MR. BINFORD:  Thank you, Judge.  This is Matt Binford.

17              The reason I requested the sidebar, we alerted defense

18    counsel during the break that we planned to call Special Agent

19    Ellsworth at this time.

20              We knew that they wanted their expert to be present

21    during his testimony.  They have attempted to contact their

22    expert.

23              MS. WEIDNER:  I have not heard yet.  We did it right

24    before we came back in, so if I could just have a second to

25    ask?
```

1    MR. BINFORD:  So I wanted to give defense counsel an

2  opportunity to try to get in contact with their expert that

3  they intend to call so he can be here for the expert's

4  testimony.

5    THE COURT:  Do you want to take a break or what?

6    I mean, I hate to do that.

7    MS. WEIDNER:  Your Honor, if I could just have a

8  moment to check?

9    THE COURT:  Sure.

10    (Pause in proceedings.)

11    MS. WEIDNER:  This is Maria Weidner.

12    I'm advised that our expert is about 15, 20 minutes

13  away.

14    THE COURT:  How do you want to proceed?

15    MS. WEIDNER:  Your Honor, if we could just take a

16  15-minute break?

17    THE COURT:  I'm going to just allow that.

18    I know that both parties had sort of anticipated

19  allowing each other to hear their expert witnesses.  And if you

20  just gave Ms. Weidner fairly recent notice of that, I'm not

21  going to hold her responsible for having the expert witness

22  here right at this moment.

23    So I'll give you 15 minutes, if that's all right.

24    MS. WEIDNER:  Yes.

25    THE COURT:  Any objection?

1          MR. BINFORD:  No, Your Honor.  No objection.  I think

2     that's fair.

3          MS. WEIDNER:  Thank you.

4       (End of discussion at sidebar.)

5          THE COURT:  Ladies and gentlemen of the jury, we do

6     apologize.

7          Occasionally, there are little glitches in what we had

8     hoped would be a smooth procedure.  We're going to need to take

9     15 minutes to arrange for the next testimony.  And so there's

10    no reason why you should sit here while we do that, so please

11    take 15 minutes, remember the admonitions, and we'll see you

12    back here in 15 minutes.

13         COURTROOM DEPUTY:  All rise.

14         (Jury leaves the courtroom at 1:57 p.m.)

15         THE COURT:  All right.  Ms. Weidner, if you'll just

16    notify us when your expert arrives, that would be helpful.

17         And if he doesn't arrive in 15 or 20 minutes, then we

18    will have given him the time that he's due and we will resume

19    testimony without him.

20         MS. WEIDNER:  Understood, Your Honor.

21         THE COURT:  All right.  Thank you.

22         (Proceedings in recess at 1:57 p.m.)

23         (Jury enters the courtroom at 2:25 p.m.)

24         THE COURT:  Ladies and gentlemen, thank you for your

25    patience.

1              Are we ready to proceed?

2              MR. BINFORD:  Yes, Your Honor.  The United States

3     calls Special Agent Don Ellsworth.

4              THE COURT:  You may be seated.

5              JURORS:  (Laughing.)

6              COURTROOM DEPUTY:  Please state and spell your first

7     and last name for the record.

8              THE WITNESS:  Donald Ellsworth.  D-O-N-A-L-D

9     E-L-L-S-W-O-R-T-H.

10         (Donald Ellsworth, Government witness, is sworn.)

11                        DIRECT EXAMINATION

12    BY MR. BINFORD:

13    Q.  Good afternoon, sir.

14    A.  Hello.

15    Q.  Will you please introduce yourself to the jury.

16    A.  My name is Don Ellsworth.  I'm a Special Agent with the IRS

17    Criminal Investigation.

18    Q.  How long have you been a Special Agent?

19    A.  For over 16 years.

20    Q.  And have all those years been with IRS Criminal

21    Investigations?

22    A.  Yes.

23    Q.  During that time have you had any specialized assignments?

24    A.  Yes.

25    Q.  What are those?

DIRECT EXAMINATION - DONALD ELLSWORTH

1    A.  I've been on various task forces since I've been an agent.

2    I was on the mortgage fraud task force for a couple years

3    during the -- during the real estate meltdown a couple years

4    ago and was investigating the money laundering and financial

5    charges relating to that.

6             I have been -- more recently I've been on an OCDETF

7    task force, which is a -- narcotics-related investigations, and

8    we've been investigating online criminal activity relating to

9    drug trafficking and also the movement of money with virtual

10   currency.

11   Q.  Have you also served as an undercover agent?

12   A.  Yes, I have.

13   Q.  In what types of cases have you served as an undercover

14   agent?

15   A.  I've been in undercover roles on a variety of -- on a

16   variety of operations specifically relating to online activity

17   and virtual currency.

18            I've had quite a bit of experience creating virtual

19   currency wallets, creating various accounts, buying things,

20   buying items online, using Bitcoin.  I've exchanged Bitcoin

21   with others and I've done a variety of other roles that the IRS

22   investigates.

23   Q.  Have you had any training relevant to your work?

24   A.  Yes, I have.  I -- when I became an agent, I did -- I was

25   trained for six months in Glynco, Georgia, and here there's

DIRECT EXAMINATION - DONALD ELLSWORTH

1    intensive training on the various financial charges that we

2    investigate.

3              I've also been to countless number of conferences and

4    trainings on financial frauds and regulations and money

5    laundering, tax evasion-type trainings.

6    Q.  Have you had training on the Bank Secrecy Act?

7    A.  Yes, I have.

8    Q.  Do you have any specific firsthand experience with virtual

9    currency?

10   A.  Yes.

11   Q.  Have you ever used a Bitcoin wallet?

12   A.  Yes, I have.

13   Q.  And have you created Bitcoin wallets?

14   A.  Yes.

15   Q.  Have you opened accounts with Bitcoin exchanges?

16   A.  Yes.

17   Q.  Have you purchased Bitcoin from peer-to-peer exchangers?

18   A.  Yes, I have.

19   Q.  Have you purchased Bitcoin from commercial exchanges?

20   A.  Yes.

21   Q.  Have you identified peer-to-peer exchangers for further

22   investigation?

23   A.  Yes.

24   Q.  And have you attempted to trace Bitcoin transactions?

25   A.  Yes.

DIRECT EXAMINATION - DONALD ELLSWORTH

1    Q.   Have you provided any training to others?

2    A.   Yes.

3    Q.   What type of training have you provided and to who?

4    A.   Seeing how online criminal activity and virtual currency is

5    a relatively new thing, starting a couple years ago, probably

6    three years ago, I started giving -- I've given presentations

7    and workshops to various law enforcement associations.  I've

8    given workshops to -- to the judicial branch, to judges and to

9    prosecutors.

10             I have been to foreign countries and I've advised --

11   I've advised foreign countries on this type of activity with

12   virtual currency and online criminal activity.

13   Q.   Can you briefly tell us what is "Bitcoin"?

14   A.   Bitcoin is a --

15             MS. WEIDNER:  Objection.  Cumulative.

16             THE COURT:  Overruled.

17             THE WITNESS:  Bitcoin is a -- it's known as

18   "cryptocurrency."  It's -- it's a digital currency held in a

19   digital wallet used to purchase goods and services.

20   BY MR. BINFORD

21   Q.   Can you explain the difference between a "centralized

22   currency" and a "decentralized currency"?

23   A.   Yes.  So an example -- an example of a centralized currency

24   would be the U.S. dollar.  It's -- there's a central authority

25   behind it.  There's -- you know, it's backed by the U.S.

```
 1    government.
 2            A decentralized currency such as Bitcoin, there's no
 3    central authority.  There's no bank behind it.  It's -- it's
 4    operated by the -- by the network of people that use it.
 5    Q.  You've mentioned "peer-to-peer exchanges" and "commercial
 6    exchanges."
 7            Are those the two main ways to obtain virtual
 8    currency?
 9    A.  Yes.
10    Q.  How do you buy virtual currency like Bitcoin from a
11    peer-to-peer exchange?
12            MS. WEIDNER:  Objection.  Cumulative.
13            THE COURT:  I'm going to allow it.
14            THE WITNESS:  To purchase from a peer-to-peer
15    exchanger, that is, one individual purchasing from another
16    individual, there's a variety of ways to do it.
17            You can -- the normal way they do it is by meeting
18    face-to-face in a public location.  One person has cash and the
19    other person has Bitcoin and they -- they exchange it back and
20    forth.
21    BY MR. BINFORD:
22    Q.  Do the people meeting up at these peer-to-peer exchanges
23    need any equipment to complete the exchange?
24    A.  Yes.  They usually need a cell phone that's used to hold
25    the Bitcoin wallet.
```

DIRECT EXAMINATION - DONALD ELLSWORTH

1    Q.  And how are the Bitcoin held on the cell phone?

2    A.  In a digital wallet.

3    Q.  Can you give some examples of digital wallet apps?

4    A.  Sure.  They are -- the majority of them are free.  You can

5    get them with an iPhone or an android.

6         If you download the wallets or Bit-wallet, Mycelium

7    wallet, breadwallet, Blockchain wallet, those are some of the

8    larger ones that are around right now.

9    Q.  How do you get Bitcoin from a commercial exchange?

10   A.  The commercial exchange?

11        MS. WEIDNER:  Objection.  Cumulative.

12        THE COURT:  I'm going to see counsel at sidebar.

13      (At sidebar on the record.)

14        THE COURT:  How much of this are we going to go

15   through?

16        MR. BINFORD:  Less than five minutes.

17        THE COURT:  All right.  I'm going to allow five

18   minutes' worth.  But it does seem to me that at least -- not

19   all of these questions, but some of them are tracing over

20   ground that we've already been over a couple of times.

21        I do think it makes sense in conjunction with his

22   testimony to allow it, as long as it's brief.

23        MR. BINFORD:  And I'm trying to keep it brief, Judge.

24        THE COURT:  All right.

25        MR. BINFORD:  Thank you.

1          (End of discussion at sidebar.)

2    BY MR. BINFORD:

3    Q.  So how can you obtain Bitcoin from a commercial exchange?

4    A.  Well, the commercial exchange, it's much like -- it's much

5    like an online bank.  You have to -- you have to get an account

6    with them, usually tying a bank account or a credit card and

7    you can buy -- you can buy Bitcoin this way or other virtual

8    currency.

9    Q.  Can you provide cash to a commercial exchange?

10   A.  No.

11   Q.  Have you ever heard of anyone providing cash to a

12   commercial exchange?

13   A.  I have not.

14   Q.  Are there any rules and regulations that commercial

15   exchanges are required to follow?

16   A.  Yes.  They are -- they're required to follow the same

17   regulations that U.S. banks do.  They need financial

18   institutions too because they are -- these commercial exchanges

19   are considered financial institutions.

20   Q.  Can you give some examples of the main requirements that a

21   commercial exchange or financial institution would be required

22   to follow?

23          MS. WEIDNER:  Objection.  Improper -- well, objection.

24   Improper expert testimony.

25          THE COURT:  I'm going to see the parties again at

DIRECT EXAMINATION - DONALD ELLSWORTH

1    sidebar.

2         (At sidebar on the record.)

3              THE COURT:  I am going to allow the witness to testify

4    as to what kind of things he investigates as crimes.  I'm not

5    going to allow him to give legal opinions.

6              I assume that's what your objection is about?

7              MS. WEIDNER:  That's correct, Your Honor.  I think

8    that is what the Court said.

9              MR. BINFORD:  Can he give his perception of what --

10   what would happen in a certain situation if someone did a

11   certain thing in a bank, for example, hypothetical situation?

12             THE COURT:  He can say if he would consider that a

13   crime.  That's all.  Or if he -- if that would be the sort of

14   thing he would investigate as a criminal conduct.

15             MR. BINFORD:  So just from my understanding, you would

16   not want him to answer --

17             THE COURT:  I'm not going to have him say "this is

18   against the law, this is a crime."

19             MR. BINFORD:  And that's certainly not the testimony I

20   would elicit from him.

21             THE COURT:  That is the question you asked, virtually.

22             MR. BINFORD:  And I may not have asked him clearly.

23             My questions intend to ask him what his understanding

24   of the reporting requirements are and what would happen

25   in hypothetical situations.

UNITED STATES DISTRICT COURT

1              THE COURT:  I will allow him to testify as to what his

2    understanding of the reporting requirements are.

3              MR. BINFORD:  Okay.

4              THE COURT:  But I'm not going to allow him to opine as

5    to what the law is.

6              MR. BINFORD:  Yes, Judge.

7         (End of discussion at sidebar.)

8    BY MR. BINFORD:

9    Q.  Have you heard the term "CTR" before?

10   A.  Yes, I have.

11   Q.  Do you know what that stands for?

12   A.  Currency Transaction Report.

13   Q.  What is your understanding of a Currency Transaction

14   Report?

15   A.  Currency -- sorry -- Currency Transaction Report is when an

16   individual goes into a bank and either deposits or withdraws an

17   aggregate of $10,000 or more.

18   Q.  Are you familiar with the term "SAR" or S-A-R?

19   A.  Yes.

20   Q.  What is your understanding of that term?

21   A.  A "SAR" stands for Suspicious Activity Report, commonly

22   referred to as a "SAR."

23              And this is pretty broad in nature and the officers at

24   a financial institution are basically required to file these

25   reports if they suspect anything suspicious of any

1    transactions.

2    Q.  Are you familiar with the term "KYC"?

3    A.  Yes.

4    Q.  What does that mean to you?

5    A.  KYC means Know Your Customer.

6    Q.  And what is your understanding of KYC or Know Your

7    Customer?

8    A.  My understanding of KYC, Know Your Customer, are

9    regulations that are required by financial institutions to

10   basically know who their customers are and verifying who they

11   are, verifying their identities.

12   Q.  Now, are you familiar with -- who would you expect to file

13   those types of reports.  SARs?  CTRs?

14   A.  Usually -- well, not usually -- institutions are required

15   to do this and they usually have a compliance officer.

16           MS. WEIDNER:  Objection.  Improper expert testimony.

17           THE COURT:  Overruled.

18           THE WITNESS:  These institutions usually have -- they

19   have employees that do this and they're usually called

20   "compliance officers."

21   BY MR. BINFORD:

22   Q.  And what is your understanding of where those reports are

23   sent to?

24   A.  My understanding is they were sent to FinCEN, and it stands

25   for the Financial Crimes Enforcement Network.

DIRECT EXAMINATION - DONALD ELLSWORTH

1  Q.  Is there anything about virtual currency that makes it

2  attractive for money laundering?

3  A.  Yes.

4          MS. WEIDNER:  Objection.  Calls for a narrative.

5          THE COURT:  Overruled.  The answer was sufficient.

6          You may proceed.

7  BY MR. BINFORD:

8  Q.  What is it about virtual currency that makes it attractive

9  for money laundering?

10          MS. WEIDNER:  Objection.  Calls for speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  What makes this attractive for -- for

13  the criminal element is the untraceability of Bitcoin or very

14  hard to trace.

15          And because it is decentralized, there is no central

16  authority.  There's no bank that law enforcement can subpoena.

17  It's -- to store it is easy.  You can store -- you can store a

18  million dollars on a cell phone so you're not carrying bags of

19  money around.

20          And so it's very -- it has some very attractive

21  characteristics.

22  BY MR. BINFORD:

23  Q.  Why would someone like a drug dealer prefer to use virtual

24  currency over a traditional financial institution?

25          MS. WEIDNER:  Objection.  Calls for speculation.

1              THE COURT:  Overruled.

2              MS. WEIDNER:  Objection.  Foundation.

3              THE COURT:  Give me a minute.

4         I'm just going to review what the witness testified

5     his experience was to see if you need to lay any more.

6                    (Pause in proceedings.)

7              THE COURT:  I do think he would need a little more

8     foundation on that point.

9     BY MR. BINFORD:

10    Q.  Agent Ellsworth, during the course of your career with the

11    IRS, have you had the opportunity to investigate drug

12    trafficking activity?

13    A.  Yes, I have.

14    Q.  Approximately how many drug trafficking cases have you been

15    involved with?

16    A.  Half a dozen, maybe more, that I've been involved --

17    directly involved with, probably four or five, but I've been

18    involved with many throughout my career.

19    Q.  Why would someone ask an IRS criminal investigator to get

20    involved in a drug trafficking case?

21    A.  Specifically, the movement of money in the cases and the

22    expertise we have with tracing financial transactions are

23    usually valuable in these types of cases.

24    Q.  And during the course of your career, have you had an

25    opportunity to involve -- to interview individuals that were

1    involved with drug trafficking?

2    A.  Yes.

3    Q.  And have you had the opportunity to interview individuals

4    that were laundering money?

5    A.  Yes, I have.

6    Q.  And based on your experience as it pertains to drug

7    investigations and money laundering, why would a drug

8    trafficker prefer virtual currency over a traditional financial

9    institution?

10   A.  Because of the characteristics of the virtual currency, the

11   non-traceability of it is probably the biggest factor because

12   you're not going to know where it came from or where it's going

13   if virtual currency is used.

14        Where traditional banking, we know the source and we

15   know who receives -- or who the money is sent to.

16   Q.  Is there anything about peer-to-peer exchangers that make

17   them attractive for money launderers?

18   A.  Yes.

19        MS. WEIDNER:  Objection.  Cumulative.

20        THE COURT:  Overruled.

21   BY MR. BINFORD:

22   Q.  What is that?

23   A.  When going to a peer-to-peer exchanger, there's typically

24   no information shared between -- for identification-wise shared

25   between the two individuals.  There's none -- usually they may

1    know each other's first name and that's it.

2    Q.  All right.  I'd like to talk with you now about some

3    hypothetical situations.

4            Let's say someone walks into a bank with $15,000 in

5    cash.  What would you expect to happen?

6    A.  If they were to deposit that cash, I would expect a CTR,

7    Currency Transaction Report, to be filed.

8    Q.  Now, let's say that same person walks into a bank with

9    $15,000 in cash in a plastic bag and the cash smells like

10   marijuana.  What would you expect to happen?

11   A.  Two things will most likely happen.  A CTR will be filed

12   and a SAR, a Suspicious Activity Report, will also be filed.

13   Q.  Now, if that same person walked into the bank with $15,000

14   in cash, it was in a briefcase, it didn't smell like anything,

15   but they told the bank teller that it was heroin proceeds, what

16   would you expect to happen?

17   A.  I would expect that that transaction would not be -- would

18   not take place, and in addition, an SAR would be filed.

19   Q.  Why do you think an SAR would be filed even if there was no

20   transaction?

21   A.  Because they are required, any kind of suspicious --

22           MS. WEIDNER:  Objection.  Improper expert testimony.

23           THE COURT:  You can ask him about what his belief is.

24   BY MR. BINFORD:

25   Q.  Why do you believe that an SAR would be filed, even though

DIRECT EXAMINATION - DONALD ELLSWORTH

1    there was no transaction?

2    A.  Because they're required to.  If it's suspicious --

3          MS. WEIDNER:  Objection.  Still improper expert

4    testimony.

5          THE COURT:  His knowledge -- let's make it clear,

6    ladies and gentlemen of the jury, that the expert witness is

7    testifying about his knowledge and his opinion.  Okay?

8          And that is why he is -- well, I'm going to allow him

9    to testify as to his opinion on this topic.

10   BY MR. BINFORD:

11   Q.  I have two more hypotheticals for you here, Agent

12   Ellsworth.

13         What if someone walked into a bank with $3,000 in

14   cash.  What would you expect to happen then?

15   A.  Nothing.  They can deposit.  The normal recordkeeping would

16   happen.

17   Q.  And that same situation:  Someone walks into a bank with

18   $3,000 but they ask the bank teller whether the money could be

19   traced back to them.

20         What would you expect to happen?

21   A.  I would imagine the SAR would be filed.  A CTR wouldn't be

22   filed because it wasn't ten but they are asking how to break

23   those rules.

24   Q.  In your opinion what makes that statement suspicious and

25   worthy of a report?

UNITED STATES DISTRICT COURT

1    A.   So there's a -- there's a federal crime called

2    "structuring" and that --

3              MS. WEIDNER:   Objection.   Improper expert testimony.

4              THE COURT:   Again, ladies and gentlemen of the jury, I

5    am only -- I am allowing the witness to testify as to what his

6    opinion is.   I will give you the instructions as to what the

7    law is at the end of the case.

8              This witness is not allowed to testify as to what --

9    he is allowed to testify as to his opinions about what the law

10   is.   He is not allowed to testify as to what the law is.   I

11   will give you such instructions at the end of the case.

12             That may be sort of a refined distinction, but do you

13   all understand what I am talking about?

14             JURY PANEL:   (Nodding heads in the affirmative.)

15             THE COURT:   All right.   Thank you.

16   BY MR. BINFORD:

17   Q.   So why would you expect -- what about asking about

18   traceability makes that suspicious?

19   A.   So, in my opinion, if someone asks, you know, when does a

20   report need to be filed and he has $3,000, they are likely

21   trying to avert the currency transaction reporting

22   requirements.   And that in itself is a law and they are trying

23   to go around that which would make it suspicious and we would

24   expect a Suspicious Activity Report.

25   Q.   Now, you said that's a law, but that's just your opinion;

1    right?

2    A.  Yes.

3             MR. BINFORD:  May I have a moment, Your Honor?

4             THE COURT:  You may.

5                      (Pause in proceedings.)

6    BY MR. BINFORD:

7    Q.  All right.  Special Agent Ellsworth, I won't be asking you

8    any more opinion questions at this time.  I want to ask you

9    about specific facts related to this case.  Okay?

10   A.  Okay.

11   Q.  I want to talk about some of the transactions specific in

12   this investigation.

13           Are you familiar with the five transactions where

14   Thomas Costanzo is alleged to have engaged in exchanging drug

15   money for Bitcoin?

16   A.  Yes, I am.

17   Q.  And how are you aware of those transactions?

18   A.  I was one of the original case agents.

19   Q.  Do you recall the dates of those transactions?

20   A.  Yes.

21   Q.  What are those dates?

22   A.  May 20th, 2015, October 7th, 2015, November 21st, 2015,

23   February 2nd, 2017, and April 20th, 2017.

24   Q.  Now, prior to trial did you go and look at information that

25   was recorded on the Blockchain for each of those dates?

DIRECT EXAMINATION - DONALD ELLSWORTH

1    A.  Yes.

2    Q.  And how did you do that?

3    A.  Well, every transaction that occurred with an undercover

4    agent, they were able to give me the information and give me

5    their wallet address that they received the Bitcoin into.

6    Q.  So what did you do once you had the undercover wallet

7    address?

8    A.  So I can take that address and I can query the Blockchain

9    and I can verify transactions that way.

10   Q.  When you say you can "query the Blockchain," can you

11   explain to the jury how you query the Blockchain?

12   A.  So, the Blockchain is the public ledger containing all the

13   transactions that have ever occurred on the Bitcoin network.

14          And you can query the Blockchain with either a hash

15   transaction number or the wallet -- or, I'm sorry, not the

16   wallet -- the address that accepted the money or sent the

17   money.  And it's -- it's a public website.  You can -- it's

18   Blockchain.info.

19          And you can go on there and it pulls up any and every

20   transaction that's ever occurred.

21   Q.  When you entered the undercover information or you queried

22   the Blockchain, what type of information showed up?

23   A.  Information that you can get are the date and time that it

24   happened, the sending wallet, the sending address, the

25   receiving address and the amount, the amount of Bitcoin that

1   was exchanged.

2   Q.  All right.  I'd like to bring your attention to the monitor

3   in front of you.  I want to show you what's been previously

4   marked as Exhibit 84A.

5          Do you see that in front of you?

6   A.  Yes.

7   Q.  Does that look familiar to you?

8   A.  Yes.

9   Q.  Without going into what's in there, what is Exhibit 84A?

10  A.  It's the Blockchain transaction that occurred on May 20th,

11  2015.

12  Q.  And is that a fair and accurate screenshot of the

13  information you obtained when you looked up the information on

14  the Blockchain?

15  A.  Yes.

16         MR. BINFORD:  At this time I'd like to publish

17  Exhibit 84A for the jury without admitting it into evidence.

18         THE COURT:  You'd like to publish it for the jury

19  without admitting it into evidence?

20         MR. BINFORD:  Just as a demonstrative aid, Your Honor.

21         MS. WEIDNER:  No objection, Your Honor.

22         THE COURT:  All right.  You may do so.

23  BY MR. BINFORD:

24  Q.  All right.  Taking a look at that screen shown in front of

25  you, can you talk about the things that you just mentioned, the

1    things you're able to identify by looking at this document?

2    A.  Yes.

3    Q.  And I think if you touch the screen there in front of you,

4    you can make marks, if you like, if you want to circle things,

5    but --

6    A.  Okay.

7    Q.  Just kind of orient us to what information is available

8    there.

9    A.  So this address right here as the sending address would be

10   Mr. Costanzo's address.

11          This is the address, the receiving address, so this

12   would be the undercover agent's Bitcoin address.

13          Here's the date and time that it occurred.

14          And this shows the amount that was transferred.

15   Q.  Let's talk about the date and time on there.  Is there

16   anything unique about the timestamp there?

17   A.  Yes.  The time isn't reported in Arizona time.  It's

18   reported in UTC time, which is a Universal Coordinated Time.

19   Q.  Does Mr. Costanzo's name appear anywhere in that sheet?

20   A.  No, it does not.

21   Q.  Does the undercover agent's name appear anywhere on that

22   page?

23   A.  No.

24   Q.  Does that show the amount of the transaction?

25   A.  In Bitcoin it does.

1   Q.  And what was the amount that was sent to the undercover

2   wallet?

3   A.  11.8111.

4   Q.  Do you know the approximate dollar value of those Bitcoins

5   at the time of the transaction?

6   A.  It was just under $3,000.

7   Q.  Now, prior to trial did you create anything to help the

8   jury visualize this transaction?

9   A.  Yes.

10  Q.  And was that chart or graph that you created based on this

11  information?

12  A.  Yes.

13          MR. BINFORD:  At this time I would like to show the

14  witness only what's been previously marked as Exhibit 84.

15          THE COURT:  You may.

16  BY MS. ESCALANTE:

17  Q.  Do you recognize that, Agent Ellsworth?

18  A.  Yes.

19  Q.  What is that?

20  A.  It's the chart representing the transaction, the Blockchain

21  transaction that was just up.

22  Q.  At this time I would move --

23          And is that a fair and accurate graph of the

24  information contained on that previous screen?

25  A.  Yes, it is.

1              MR. BINFORD:  At this time I would move to admit

2    Exhibit 84 into evidence.

3              MS. WEIDNER:  No objection.

4              THE COURT:  Exhibit 84 is admitted.

5              You may publish.

6              (Exhibit 84 is received into evidence.)

7    BY MR. BINFORD:

8    Q.  All right.  Now, walk us through what we're looking at

9    here.

10   A.  So this circle right here, that is Morpheus.  That was

11   his -- that was the address sending the 12.19 -- the address

12   contained 12.19 Bitcoin in it.

13             And it went to another wallet controlled by Morpheus,

14   and that wallet sent 11.81 to the first UCA.

15             And these down here are the wallet -- the wallet

16   addresses that the Bitcoin flowed -- that it flew through -- or

17   flowed through.

18   Q.  Thank you.

19             All right.  At this time I'd like to move on to

20   exhibits that have been previously marked as Exhibits 85A and

21   85B, and these are just for the witness at this time.

22             Do you see those two screenshots on your screen?

23   A.  Yes.

24   Q.  And what are those screenshots of?

25   A.  These are representative -- or not representative -- these

UNITED STATES DISTRICT COURT

 1   are the transaction records contained on the Blockchain of the

 2   October 7th, 2015, exchange between Mr. Costanzo and UCA number

 3   two.

 4   Q.  And are those both fair and accurate representations of the

 5   information from the Blockchain?

 6   A.  Yes, they are.

 7           MR. BINFORD:  At this time I'd move to admit -- or

 8   rather just publish Exhibits 85A and 85B but not admit.

 9           MS. WEIDNER:  Objection, Your Honor.  Cumulative.

10           May we have a sidebar just briefly?

11           THE COURT:  Yes.

12       (At sidebar on the record.)

13           MS. WEIDNER:  Sorry.  This is Maria Weidner.

14           I thought that we had gone through the screenshots of

15   each of the Bitcoin exchanges with the undercover who did the

16   Bitcoin exchange.  So are we just repeating everything that we

17   went through with the undercover agents who testified?

18           MR. BINFORD:  This is Matt Binford.

19           We certainly didn't go through the screenshots with

20   Special Agent Kushner for either of the transactions.  The

21   testimony elicited from him was that he had provided his

22   undercover wallet address through Special Agent Ellsworth -- or

23   to Special Agent Ellsworth.

24           I know that we got into some of the Blockchain

25   confirmations for Task Force Officer Martin to show the chain

UNITED STATES DISTRICT COURT

1    of custody into U.S. Marshals, but those were not these

2    screenshots.

3          I'm certainly happy to move along and just get the

4    graphs in if you're concerned about the underlying Blockchain.

5    But I think the graphs are important for the jurors to see.

6    And I think that they're not cumulative because each one is a

7    separate charged count in the Indictment.

8          THE COURT:  It does seem to me that these are not

9    cumulative to the extent that we're talking about different

10   transactions that Agent Ellsworth has gone back and verified

11   through the Blockchain.

12         I don't remember that before, in any event.

13         MS. WEIDNER:  Okay.  Well, Your Honor, I was just

14   concerned about --

15         MS. ESCALANTE:  If I may, Your Honor, just because I

16   did the examination of Agent Ellsworth, he did go through

17   Blockchain messages for the very first transaction, the

18   September one, but not for any of the charges.

19         They were admitted into evidence and he testified he

20   provided that to Agent Ellsworth.  We didn't elicit any

21   testimony about the Blockchain confirmations or anything.

22         THE COURT:  All right.

23       (End of discussion at sidebar.)

24         THE COURT:  Based on a "cumulative" objection, I'm

25   going to overrule the objection.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - DONALD ELLSWORTH

1          You may -- you may show these to the jury.

2          MR. BINFORD:  Thank you, Judge.

3    BY MR. BINFORD:

4    Q.  So, Agent Ellsworth, last time when we talked about the

5    May 20th transaction, there was only one screenshot.

6          Why are there two screenshots for this transaction?

7    A.  This transaction was broken into two different

8    transactions, but it occurred at the same -- it was part of the

9    same transaction, if that makes any sense.

10   Q.  So do you recall the total amount of Bitcoin that was

11   received by the agent on this day in exchange for the cash?

12   A.  Yes.  It was approximately 50 Bitcoin.

13   Q.  And you're saying that 50 was broken into two transactions?

14   A.  Yes.

15   Q.  Did you create a graph based on these two transactions or

16   based on the October 7th transaction with Special Agent

17   Klepper?

18   A.  Yes, I did.

19         MR. BINFORD:  All right.  At this time, I would like

20   to show you what's been marked as Exhibit 85, and this is just

21   for you, not for the jury at this point.

22   BY MR. BINFORD:

23   Q.  Do you recognize that?

24   A.  Yes.

25   Q.  What is that?

1    A.  It's a chart depicting the transactions that occurred that

2    day between Mr. Costanzo and Special Agent Klepper.

3    Q.  And is that a fair and accurate chart based on the

4    underlying Blockchain information that you observed?

5    A.  Yes, it is.

6         MR. BINFORD:  At this time I'd move to admit

7    Exhibit 85.

8         MS. WEIDNER:  No objection.

9         THE COURT:  Exhibit 85 is admitted.

10        MR. BINFORD:  And publish for the jury, please.

11        THE COURT:  You may do so.

12        (Exhibit 85 is received into evidence.)

13   BY MR. BINFORD:

14   Q.  Agent Ellsworth, would you walk us through this graph.  It

15   looks a little different.

16   A.  Yes.  So on the far right-hand side, Special Agent

17   Klepper's wallet on the far left-hand side, this was a wallet

18   that was controlled by Mr. Costanzo.  And at the -- at the same

19   time he broke the transaction into two different addresses and

20   then moved them back to one address -- or with Special Agent

21   Klepper.  And at the bottom, again, you have the addresses.

22   Q.  All right.  At this time I would like to bring your

23   attention to Exhibits 86A, 86B, and 86C, and these will show up

24   just on your monitor right now.

25        That is Exhibit 86A.  Do you recognize that?

DIRECT EXAMINATION - DONALD ELLSWORTH

1    A.  Yes, I do.

2    Q.  And that's Exhibit 86B.  Do you recognize that?

3    A.  Yes.

4    Q.  And Exhibit 86C, do you recognize that?

5    A.  Yes.

6    Q.  What are those three documents or exhibits?

7    A.  These are the transactions that happened -- that occurred

8    that day between Mr. Costanzo and Special Agent Kushner.

9    Q.  And how do you know that those are those transactions?

10   A.  Because I received Special Agent Kushner's wallet address

11   that received this money from Costanzo and was able to find out

12   who sent it to him -- or at least find the address.

13   Q.  Does Mr. Costanzo's name appear anywhere in that Blockchain

14   information?

15   A.  No, it does not.

16   Q.  Does Special Agent Kushner's real name or undercover name

17   appear anywhere in that Blockchain?

18   A.  No.

19   Q.  Did you create a visual representation based on these three

20   graphs?

21   A.  Yes, I did.

22   Q.  All right.  At this time I want to bring your attention to

23   Exhibit 86.

24        Do you recognize that?

25   A.  Yes.

1   Q.  What is that?

2   A.  This is a chart depicting the transactions that occurred

3   that day.

4   Q.  And is that a fair and accurate representation of the three

5   previous exhibits that you looked at:  86A, 86B, and 86C?

6   A.  Yes.

7           MR. BINFORD:  At this time I would move to admit

8   Exhibit 86 into evidence and publish.

9           MS. WEIDNER:  No objection.

10          THE COURT:  Exhibit 86 is admitted.

11              (Exhibit 86 is received in evidence.)

12          THE COURT:  You may publish.

13  BY MR. BINFORD:

14  Q.  Agent Ellsworth, what is the date of these transactions?

15  A.  December 21st, November 21st, 2015.

16  Q.  All right.  And like with the other graphs, can you kind of

17  explain what -- what we're looking at here?

18  A.  Yes.  So on the left-hand side, these are the -- the circle

19  represents the address.  Well -- and here is the actual

20  addresses.  And I'm not sure why they're broken up into so many

21  different addresses, but -- and then they were sent to

22  undercover Agent Kushner in these three different addresses.

23          It was all the same wallet but just different

24  addresses within that wallet.

25  Q.  Do you recall the total amount of Bitcoin that was

DIRECT EXAMINATION - DONALD ELLSWORTH

1    transferred that day?

2    A.  Approximately $12,000.

3    Q.  And do you remember the Bitcoin amount?

4    A.  Yeah.  The Bitcoin amount was approximately 29 -- 28 or 29

5    Bitcoin.

6    Q.  All right.  Now, I want to show the witness only what's

7    previously been marked as Exhibit 87A.

8            Do you recognize that?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  The transaction that occurred between -- between TFO Martin

12   and Costanzo -- and Mr. Costanzo, February 2nd, 2017.

13   Q.  And more specifically, is that the information that you

14   obtained after inserting the undercover wallet address into the

15   Blockchain?

16   A.  Yes.

17   Q.  Does Mr. Costanzo's name appear anywhere on that

18   transaction record?

19   A.  No.

20           MS. WEIDNER:  Objection.  Relevance.  Foundation.

21           THE COURT:  Overruled.

22   BY MR. BINFORD:

23   Q.  Does Task Force Officer Martin's name appear anywhere on

24   that?

25   A.  No.  It does not.

DIRECT EXAMINATION - DONALD ELLSWORTH

1   Q.  Does that show the total amount of Bitcoin that were

2   transferred on that day?

3   A.  Yes.

4   Q.  And what was that amount?

5   A.  Total 35.47 Bitcoin.

6   Q.  Now, were all of those transferred to TFO Martin or is it

7   your understanding that some of those were sent back somehow?

8   A.  Yes, not all were.  The amount that was sent to undercover

9   Agent Martin was 27.7.

10  Q.  And can you explain the difference there?

11  A.  Yes.  So the total amount sent was sent from Mr. Costanzo's

12  wallet address was 35.47 but only 27.7 of that Bitcoin actually

13  went to TFO Chad Martin and the rest of it was returned in

14  what's known as a "change wallet" and it went back to

15  Mr. Costanzo.

16          It's like paying somebody a $20 bill and them giving

17  change for that $20 bill.

18  Q.  So the Bitcoin received by Task Force Officer Martin was

19  actually the 27.7 number?

20  A.  Yes.

21  Q.  And do you know the approximate dollar value of that amount

22  on February 2nd, 2017?

23  A.  Yes.  It was approximately $28,000.

24  Q.  Did you create a visual representation of the information

25  contained on this chart -- or from this screen?

UNITED STATES DISTRICT COURT

1    A.  Yes, I did.

2    Q.  And I'd now like to show you what's been previously marked

3    as Exhibit 87.

4           Do you recognize that?

5    A.  Yes.

6    Q.  What is that?

7    A.  This is the chart showing the transaction between

8    Mr. Costanzo and TFO Chad Martin, February 2nd, 2017.

9    Q.  And is that a fair and accurate visual representation of

10   the data from the previous exhibit, Exhibit 87A?

11   A.  Yes, it is.

12          MR. BINFORD:  At this time I'd move to admit

13   Exhibit 87.

14          MS. WEIDNER:  No objection.

15          MR. BINFORD:  And publish for the jury, please.

16          THE COURT:  Exhibit 87 is admitted.

17          (Exhibit 87 is received into evidence.)

18          THE COURT:  You may publish.

19   BY MR. BINFORD:

20   Q.  What are we looking at here?

21   A.  This is the chart created from the Blockchain information:

22   The date, February 2nd, 2017, Mr. Costanzo's address, TFO Chad

23   Martin's address, and the Bitcoin amount.

24   Q.  All right.  The last set of exhibits I'd like to show you

25   here -- and these are just for the witness -- are Exhibits 88A,

DIRECT EXAMINATION - DONALD ELLSWORTH

1    88B, and 88C.  You should see on the screen Exhibit 88A.

2            Do you recognize that?

3    A.  Yes, I do.

4    Q.  And now Exhibit 88B, do you recognize that?

5    A.  Yes.

6    Q.  And 88C, do you recognize that?

7    A.  Yes, I do.

8    Q.  What are those three exhibits?

9    A.  This is the transaction report from the Blockchain showing

10   the transaction happened on April 20th, 2017, between

11   Mr. Costanzo and TFO Chad Martin.

12   Q.  And did Mr. Costanzo's name appear on any of those

13   documents?

14   A.  No.

15   Q.  Did Task Force Officer Martin's name appear on any of those

16   documents?

17   A.  No.

18   Q.  Did you create anything to help the jury visualize these

19   three documents prior to trial?

20   A.  Yes.

21   Q.  Now, I'd like to bring your attention to Exhibit 88.

22            Do you see that?

23   A.  Yes.

24   Q.  And is that a fair and accurate representation of what was

25   contained on Exhibits 88A, 88B, and 88C?

1    A.  Yes, it is.

2              MR. BINFORD:  At this time I'd move to admit

3    Exhibit 88 and publish.

4              MS. WEIDNER:  No objection.

5              THE COURT:  Exhibit 88 is admitted.

6              (Exhibit 88 is received into evidence.)

7              THE COURT:  You may publish.

8    BY MR. BINFORD:

9    Q.  All right.  Would you please walk us through this one.

10   A.  Yes.  Right-hand side, that is TFO Chad Martin's wallet

11   address.

12             On the left-hand side you have Mr. Costanzo's with the

13   addresses.

14             And it shows the amount transferred to TFO Martin's

15   three different addresses.

16   Q.  And, yeah, I want to ask you about that.

17             So under where it says "UCA3-Chad," there are three

18   lines, whereas on the other side there's just one line.

19             Why are there three lines on that side?

20   A.  It was the same wallet that the money -- that the Bitcoin

21   was transferred into, but there were three different addresses

22   in that wallet that -- you can see that there were 10 Bitcoin,

23   40 Bitcoin and 30.95.  They all went into separate -- three

24   separate wallets -- I mean, three separate addresses in that

25   wallet.

DIRECT EXAMINATION - DONALD ELLSWORTH

1    Q.   Approximately how many Bitcoin were transferred to the

2    undercover wallets on that day?

3    A.   Approximately 80.

4    Q.   And do you know the approximate value of those 80 Bitcoin

5    on April 20th, 2017?

6    A.   It was approximately $100,000.

7         MR. BINFORD:  Thank you.

8         May I have a moment, Your Honor?

9         THE COURT:  You may.

10                  (Pause in proceedings.)

11   BY MR. BINFORD:

12   Q.   All right.  I just have a few final questions for you.

13        Are you familiar with the statements made by Thomas

14   Costanzo about the size of his business --

15   A.   Yes.

16   Q.   -- during the course of the investigation?

17   A.   Yes.

18   Q.   During this investigation have you attempted to find out

19   how much money Thomas Costanzo made as a Bitcoin exchanger?

20   A.   Yes.

21   Q.   Did you attempt to identify bank accounts?

22   A.   Yes.

23   Q.   Were you able to identify any?

24   A.   No.

25   Q.   Did you also review Treasury information?

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - DONALD ELLSWORTH

1    A.  Yes.

2    Q.  And was that done pursuant to a court order?

3    A.  Yes.

4    Q.  Does the IRS regularly keep records of tax filings?

5    A.  Yes.

6          MS. WEIDNER:  Objection.  Relevance.  403.

7          THE COURT:  I'll allow the answer.

8          THE WITNESS:  Yes.  They do keep records of tax

9    filings.

10   BY MR. BINFORD:

11   Q.  Are those records regularly made and preserved as part of

12   the public business of the IRS?

13   A.  Yes.

14   Q.  Have you conducted a diligent search to determine whether

15   Thomas Costanzo has made any tax filings in the years --

16         MS. WEIDNER:  Objection.  Relevance.  403.

17         THE COURT:  I'll see the parties at sidebar.

18       (At sidebar on the record.)

19         THE COURT:  Ms. Weidner?

20         MS. WEIDNER:  Yes, Your Honor.

21         Our objection as to relevance and 403 is that

22   Mr. Costanzo is on trial for Money Laundering.

23         The government is now introducing -- or seeking to

24   introduce evidence that he has not filed taxes.  He is not

25   charged with tax evasion or failing to file a return.  This

UNITED STATES DISTRICT COURT

1   will confuse and mislead the jury and is also more prejudicial

2   than probative of any relevant fact in this case.

3           MR. BINFORD:  Your Honor, I think this is --

4           This is Matt Binford from the U.S. Attorney's Office.

5           I think this is important for two reasons.

6           One, I believe the questioning elicited from previous

7   witnesses is an attempt to portray Mr. Costanzo as someone who

8   did not have a lot of wealth.  There has been a lot of talk

9   about the size of his apartment, the clothes he was wearing,

10  the types of transportation that he took.

11          But I think secondly, more importantly, it's relevant

12  to show that he was predisposed to commit money laundering

13  because long before the agents ever approached him, he was not

14  filing required documents.  And he's now charged with helping

15  people avoid the filing of required transaction records.

16          And the evidence that would be elicited from Special

17  Agent Ellsworth was that he did not file tax returns in 2014,

18  2015, or 2016.

19          MS. WEIDNER:  The government has also not shown that

20  Mr. Costanzo made a sufficient amount of money to trigger a

21  responsibility to file taxes.

22          THE COURT:  I just think I am going to grant the 403

23  objection.  It just seems to me to get too confusing in terms

24  of what really is going on here.  So I am going to sustain the

25  403 objection.

CROSS-EXAMINATION - DONALD ELLSWORTH

```
 1          (End of discussion at sidebar.)
 2              THE COURT:  Objection is sustained.
 3   BY MR. BINFORD
 4   Q.  Were you ever able to find out how much money Thomas
 5   Costanzo made as part of his Bitcoin exchange business?
 6   A.  No.
 7              MR. BINFORD:  No further questions on direct, Your
 8   Honor.
 9              THE COURT:  Cross-examination?
10              MS. WEIDNER:  Thank you, Your Honor.  May I have just
11   a moment?
12              THE COURT:  You may.
13              MS. WEIDNER:  Thank you.
14                   (Pause in proceedings.)
15                   CROSS-EXAMINATION
16   BY MS. WEIDNER:
17   Q.  Good afternoon, Agent Ellsworth.
18   A.  Good afternoon.
19   Q.  You testified early on in direct that you had conducted a
20   number of Bitcoin exchanges?
21   A.  Myself?
22   Q.  Yes.
23   A.  On different cases?
24   Q.  Yes.
25   A.  Yes.
```

1    Q.  You did not conduct any Bitcoin exchanges with Mr. Costanzo

2    though?

3    A.  No.  I did not.

4    Q.  You also testified regarding your experience in assisting

5    and sometimes even directly on drug trafficking cases?

6    A.  Yes.

7    Q.  This was a sting case.  There were no actual -- there were

8    no drugs involved; correct?

9    A.  Correct.

10   Q.  Now, I know that Bitcoin and other Altcoins are often

11   referred to as "cryptocurrencies"?

12   A.  Yes.

13   Q.  But they're also referred to as "virtual commodities"?

14   A.  I've never heard it called the "virtual commodity."

15   Q.  But a Bitcoin is a store value.  Would you agree with that?

16   A.  Yes.

17   Q.  It is decentralized, like you testified?

18   A.  Yes.

19   Q.  It is essentially independent source in the sense that it

20   is not the currency of any government?

21   A.  Correct.

22   Q.  And as a result, it's not insured by any government?

23   A.  Yes.

24   Q.  For instance, the FDIC doesn't insure Bitcoin the way that

25   the FDIC insures our holdings in banks with our bank accounts?

1    A.  Right.

2    Q.  So if someone who owns Bitcoin were to lose their wallet or

3    if it were to be hacked --

4            Well, let me just back up because it's a compound

5    question.  Sorry.

6            If someone were to lose their Bitcoin wallet, it's

7    gone?

8    A.  No.

9    Q.  It still exists.  But if one were to lose their wallet and

10   lose their personal key, they would no longer have access to

11   their Bitcoin?

12   A.  Probably the majority of the time that would be the case.

13   Q.  Okay.  And if one's wallet were to be hacked and the

14   Bitcoin stolen, then very likely -- it would be very hard to

15   get that Bitcoin back?

16   A.  Yes.

17   Q.  And you would agree that while Bitcoin is not the currency

18   of any government on this planet, it can be exchanged for

19   currency?

20   A.  Yes.

21   Q.  In that sense it is valuable like gold or silver?

22   A.  Yes.

23   Q.  Only Bitcoin is digital?

24   A.  Yes.

25   Q.  Bitcoin has been around since about 2010?

CROSS-EXAMINATION - DONALD ELLSWORTH

1   A.  Yes.

2   Q.  And to your knowledge, Congress has passed no law on

3   Bitcoin?

4   A.  It's a little hard to answer that they --

5   Q.  To your knowledge has a law been passed by Congress on that

6   particular topic?

7   A.  On the trading of Bitcoin, it has.

8   Q.  On -- on Bitcoin, defining Bitcoin?

9   A.  Okay.  I guess on Bitcoin itself, no, that I'm aware of.

10  Q.  And you testified about peer-to-peer transactions?

11  A.  Yes.

12  Q.  To your knowledge peer-to-peer transactions are another way

13  to exchange Bitcoin?

14  A.  Yes.

15  Q.  They have not been outlawed, peer-to-peer transactions?

16  A.  No.  They have not been outlawed.

17  Q.  LocalBitcoins.com is a platform for peer-to-peer

18  transactions?

19  A.  Yes.

20  Q.  And it is still up and running?

21  A.  Yes, it is.

22  Q.  The government showed you and showed the jury a series of

23  charts that you would produce in preparation for this case?

24  A.  Yes.

25  Q.  And those charts created essentially a chart view of the

1    Bitcoin transactions that took place with the undercover

2    agents?

3    A.   Yes.

4    Q.   And sometimes those transactions were singular and direct?

5    A.   Yes.

6    Q.   And sometimes they were broken up into more than one, like

7    three or two?

8    A.   Yes.

9    Q.   And when that occurs in the course of the transfer of

10   Bitcoin, it might be because of the fact that someone might

11   have more than one wallet?

12   A.   Yes.

13   Q.   It might be because of limited space on a block in the

14   Blockchain?

15   A.   Yes.

16   Q.   So it is not unusual to see the break-up of a transaction,

17   particularly a larger transaction?

18   A.   I'd say it is unusual.

19        I think most transactions are -- are direct, at least

20   the transactions that I have been personally involved with.

21   Q.   But you testified earlier that limited space on a block --

22   in the Blockchain can result in a necessity of basically

23   multiple addresses?

24   A.   I just meant usually -- I'm sure there are times when that

25   causes transactions to be --

1   Q.  Agent Ellsworth, that's what you said earlier; correct?

2   A.  Okay.  Yes.

3   Q.  You also testified regarding some screenshots of Blockchain

4   transactions?

5   A.  Yes.

6   Q.  You testified that in those Blockchain transactions,

7   Mr. Costanzo's name did not appear on the screenshot?

8   A.  Right.

9   Q.  And you also testified that the undercover agents' names

10  did not appear on the screenshot?

11  A.  Right.

12  Q.  But in a Blockchain transaction, individual names do not

13  appear on the screenshot as --

14          Names do not typically appear on a Blockchain

15  transaction screenshot?

16  A.  They never appear.

17  Q.  And that is -- never mind that.

18          MS. WEIDNER:  One moment, please.

19                  (Pause in proceedings.)

20          MS. WEIDNER:  No further questions, Your Honor.

21          Thank you, Agent.

22          THE WITNESS:  Thank you.

23          THE COURT:  Redirect?

24                  REDIRECT EXAMINATION

25

REDIRECT EXAMINATION - DONALD ELLSWORTH

1    BY MR. BINFORD:

2    Q.  Agent Ellsworth, you were just asked about insurance.  Are

3    you aware of any commercial exchanges that are insured?

4    A.  Yes.

5    Q.  Which one?

6    A.  The largest one, Coinbase.

7    Q.  And what types of things do they insure?

8    A.  They insure -- they insure the -- both the deposit of -- of

9    your cash and they also insure the Bitcoin amount that's held

10   with them.

11   Q.  How is the cash insured?

12   A.  By FDIC.

13   Q.  And how is the virtual currency insured?

14   A.  It's underwritten by a private insurance company.  I forget

15   the name of the insurance company but it's -- it's -- it is

16   underwritten by a private insurer.

17   Q.  Do you happen to know where LocalBitcoins is based?

18   A.  Yes.

19   Q.  Is it outside of the United States?

20   A.  Yes, it is.

21   Q.  You testified the names did not appear in the Blockchain

22   screenshots and that they do not appear in any of the

23   Blockchain info; is that correct?

24   A.  Yes.

25   Q.  So are you able to go into the Blockchain and search a

1    transaction by name?

2    A.  No.  You are not.

3    Q.  Does that make your job difficult?

4            MS. WEIDNER:  Objection, Your Honor.  Cumulative.

5            THE COURT:  Overruled.

6            THE WITNESS:  It would be impossible.

7    BY MR. BINFORD:

8    Q.  You also testified that you weren't familiar with any

9    legislation regarding Bitcoin.

10           Are you familiar with law enforcement efforts that

11   have been directed towards peer-to-peer exchanges?

12   A.  Yes.

13   Q.  And would you describe those efforts as considerable?

14   A.  Yes.

15           MR. BINFORD:  No further questions, Your Honor.

16           THE COURT:  Thank you.

17           You may step down.

18           Next witness?

19           MR. BINFORD:  United States rests.

20           THE COURT:  Okay.  Ready for the defense case?

21           MS. WEIDNER:  Your Honor, I think that we would like

22   to have a brief sidebar.

23           THE COURT:  All right.

24        (At sidebar on the record.)

25           MS. WEIDNER:  Your Honor, we would -- so, Your Honor,

```
 1    since we're not in front of the jury, this is Maria Weidner.

 2            We'd like to make a Rule 29 motion.

 3            THE COURT:  Okay.  Do you want to -- all right.  Do

 4    you -- are you ready to start your case after the Rule 29

 5    motion?

 6            MS. WEIDNER:  Your Honor, actually, I discussed this

 7    with Mr. Cain.  And I think it would be a good time to recess

 8    for the day.  It will give us a chance to talk to Mr. Costanzo,

 9    to talk to our expert to see what, if any -- anything -- I

10    doubt that anything, you know, at most what will happen

11    tomorrow is either jury instructions --

12            THE COURT:  Keep your voice down.

13            MS. WEIDNER:  Sorry.  Sorry.  Sorry.  I'm sorry.

14            Either jury instructions and closing or we'll have one

15    witness, tops.

16            THE COURT:  All right.

17            What does the government think?  Do you object to

18    dismissing today?

19            MS. ESCALANTE:  No, Your Honor.

20            Catalina Escalante.  No.

21            THE COURT:  Okay.  So what we'll do -- and settle jury

22    instructions as well as we can.  We going to have to discuss

23    those apparently at some length, at least a few of them.

24            So I will tell the jury that we've got some legal

25    business to do and we'll have them back tomorrow.
```

UNITED STATES DISTRICT COURT

1      MS. WEIDNER:  Thank you, Your Honor.

2      MR. CAIN:  And, Judge, just for the record, we need

3  some time today to be able to confer with Mr. Costanzo on his

4  right to testify so he can make a decision and advise us so we

5  can advise the Court.

6      THE COURT:  Well, I understand that, but I would like

7  to get the jury instructions settled.

8      MR. CAIN:  Oh, no.  I'm not saying we can't accomplish

9  that.

10      I'm just saying we're hoping we can spend some time

11  with him today.

12      THE COURT:  Okay.

13      MS. WEIDNER:  Thank you.

14   (End of discussion at sidebar.)

15      THE COURT:  Ladies and gentlemen of the jury, what

16  we're going to do, because we're at the end of the government's

17  case, there's some legal matters we have to handle.

18      I'm not going to have you sit here and wait while we

19  handle those matters.  So we're going to let you go home early

20  today.  And I promise that if we do that, we will be all the

21  more efficient tomorrow with your time.

22      So you are excused for the day.  Please remember the

23  admonitions.  Please return tomorrow morning, as you have done

24  faithfully.  And I appreciate that.  We will then continue with

25  the case.

1              Please be careful on your drive home and remember the

2    admonitions.

3              Thank you.

4              COURTROOM DEPUTY:  All rise.

5                  (Jury leaves the courtroom at 3:33 p.m.)

6              THE COURT:  All right.  Do you want to break before we

7    go over jury instructions?  I did -- I did receive the ones

8    that you sent on Monday, Mr. Restaino.

9              Do you have those, Ms. Weidner?

10             MS. WEIDNER:  Your Honor, are you speaking of the

11   forfeiture?

12             THE COURT:  No.  The forfeiture ones, yes, but I'm

13   talking about all of the jury instructions.

14             MS. WEIDNER:  Oh.  Your Honor is speaking of the model

15   jury instructions --

16             THE COURT:  Yes.

17             MS. WEIDNER:   -- that we --

18             THE COURT:  The ones you've stipulated to, the ones

19   you've not stipulated to, the ones that you have disagreed on

20   as far as I'm aware.

21             And so what I intend to do is give you a break for

22   maybe ten minutes so you can organize your papers and thoughts.

23   We're just going to go through even the ones you agree on just

24   to be sure you agree on them and then we will spend most of the

25   time on the ones in which there are issues and we'll resolve

1    them.

2             MS. WEIDNER:  Okay.

3             MR. RESTAINO:  Your Honor, do you want to see -- I

4    sketched out some supplemental definitions and have shared them

5    with the defense, but I haven't had a chance to discuss those.

6             Do you want to see those now as well or maybe --

7             THE COURT:  Well, maybe during the break you can see

8    what the defense thinks of them and then I'll take them when we

9    come back.

10             MR. RESTAINO:  Great.

11             MS. ESCALANTE:  Your Honor, I'm sorry.

12             I know the defense stated that they wanted to do their

13    Motion for Rule 29.

14             THE COURT:  Oh, that's right.

15             Let's have your motion on Rule 29 then, Ms. Weidner.

16             MS. WEIDNER:  Yes, Your Honor.

17             This is a general Rule 29 that the government has not

18    provided sufficient evidence for a rational jury to find, based

19    on what we've seen thus far, that he committed the Money

20    Laundering offenses under either subsection (a)(3)(B) or (C).

21             THE COURT:  Does the government wish to be heard?

22             MS. ESCALANTE:  Briefly, Your Honor.

23             Viewing the light -- viewing the evidence in the light

24    most favorable to the government, we believe that there is

25    sufficient evidence that reasonable jurors could find that the

1    defendant is guilty of Money Laundering.

2              Under the sting provision for all five counts and for

3    each transaction, undercover agents represented to the

4    defendant that the proceeds were from drug trafficking and that

5    they did not want their money seized by the government.

6              And all the transactions they indicated in some way or

7    form that they didn't want the money linked back to them and

8    the defendant completed the transactions, never got

9    identifications from either of the undercover agents.

10             THE COURT:  I do think that there is sufficient

11   evidence from which, viewed in the light most favorable to the

12   government, a jury might find that the defendant had committed

13   18, 1956(3)(B).

14             Do you want to address (C)?

15             MS. ESCALANTE:  Yes, Your Honor.

16             In all of the transactions, the defendant never sought

17   the requisite information to even file a transaction reporting

18   requirement.

19             In order to do so, whether it was an amount of $10,000

20   or more, or Suspicious Activity Report, some sort of PI would

21   need to be gathered initially to do such filings.  None of that

22   was evident here, which also leads to believe that because he

23   didn't even get that information, there's no way that he was

24   going to be able to do such.

25             THE COURT:  Well, we haven't had any testimony.  I

1    realize the law is what the law is, but we haven't had any

2    testimony that the law applied to individuals.

3            We've had testimony that it applied to financial

4    institutions.

5            MS. ESCALANTE:  And he also is, Your Honor, guided the

6    agents to avoid banks -- to avoid banks for that particular

7    reason.  For instance, in the recorded transaction with Agent

8    Martin, I believe it was the February 2nd, 2017, one, he

9    specifically discussed Suspicious Activity Reports when they're

10   filed and stated that he does not --

11           THE COURT:  I get all that.

12           MS. ESCALANTE:  -- anything --

13           THE COURT:  I get all that.

14           But is there any obligation for a peer-to-peer trader

15   to file a Suspicious Activity Report?

16           MS. ESCALANTE:  If I may have a moment, Your Honor.

17                   (Pause in proceedings.)

18           MS. ESCALANTE:  Your Honor, he -- it is -- that was

19   not introduced.  There is nothing that came out in the trial

20   that would require peer-to-peer exchange to file such a form,

21   but that's not what is being evaded.

22           THE COURT:  Okay.  What is being evaded?

23           MS. ESCALANTE:  He's helping people avoid the

24   requirements that they would had they gone to a bank where such

25   things are required.

1          THE COURT:  Do you have any legal precedent that

2  suggests, for example, that somebody who suggests that a person

3  engage in a cash transaction between individuals as opposed to

4  using a bank violated this law?

5          MS. ESCALANTE:  One moment, Your Honor.

6              (Pause in proceedings.)

7          MS. ESCALANTE:  Your Honor, we do not have any case

8  law at this moment.  But just reading the plain language of the

9  statute, it just says:  Whoever, with the intent to avoid a

10  transaction reporting requirement under state or federal law.

11          Undercover agents relayed to the defendant that they

12  wanted to avoid banks for that particular reason.  The

13  defendant agreed with them.  He said he didn't use banks

14  himself, talked about knowing about SARs and completed these

15  transactions, helping further what the undercover agents' goal

16  was, which was to avoid banks for the -- to avoid reporting

17  requirements.

18          THE COURT:  Ms. Weidner, did you want to be heard?

19          MS. WEIDNER:  One moment, Your Honor.

20              (Pause in proceedings.)

21          MS. WEIDNER:  Your Honor, the defense wishes to keep

22  our Rule 29 motion and intends to keep it as broad as possible.

23          But since the Court inquired, we are willing to

24  respond to the concerns, the specific concern that the Court

25  has addressed in response to our general Rule 29 motion.  That

1    is, Your Honor, that the government offered no evidence in its

2    case in chief that Mr. Costanzo was a financial institution.

3              Additionally, Your Honor, the Court's earlier ruling

4    in this case regarding the government's response to our Bill of

5    Particulars which listed a series of specific regulations on

6    which they intended to rely, are limited to financial

7    institutions.  And then under that chapter of the 31 CFR,

8    casinos and banks.

9              There was also no evidence offered that Mr. Costanzo

10   is either a bank or a casino.  And so based on the government's

11   choice of regulation before this trial began and evidence that

12   appeared in its case-in-chief, we share the Court's concerns

13   regarding section -- well, Section 1956(a)(3)(C).

14             MS. ESCALANTE:  Your Honor, if I may, a lot of it is

15   because that's what we have been trying to avoid this whole

16   trial is getting into the defendant being unlicensed money

17   exchange.

18             We've agreed that that was something we were never

19   going to get into.  But it doesn't change the fact that the

20   undercover agents transmitted to the defendant that they wanted

21   to avoid banks and that the defendant --

22             THE COURT:  Well, here is -- I'm just going to share

23   with you my very basic concern.

24             If there is a legal way -- if there is a way to do

25   something that does not have transaction reporting requirements

1    that are attached to it, merely because the defendant can do

2    that and holds that open as a possibility, are you saying that

3    they have committed a crime because they have done so with the

4    intent to avoid a transaction reporting requirement under state

5    or federal law that would have applied if a bank was used?

6           Is that what the government's case is?

7           MS. ESCALANTE:  Yes, Your Honor.  It would have to

8    involve drug proceeds.

9           So, the government believes that the way that the

10   defendant was committing --

11          THE COURT:  That's not my concern.

12          I mean, I think that you've established that the

13   property was represented -- or you've not established -- I'm

14   not the determiner of that -- but you've put forth evidence

15   from which a reasonable jury could determine that the property

16   was represented to be the proceeds of specified unlawful

17   activity.  That, you have done.

18          But if there are no transaction or reporting

19   requirements that pertain to peer-to-peer exchanges and what

20   the defendant does is engage in peer-to-peer exchanges, do you

21   have any case law or any authority for the proposition that

22   because the defendant wants to engage in something that is not

23   otherwise unlawful, he is violating the statute merely because

24   he does so with the intent -- well --

25          So you're saying, if I understand the gist of the

UNITED STATES DISTRICT COURT

1    government's case, that someone can engage in a perfectly legal

2    transaction, a perfectly legal financial transaction that is

3    unregulated.  But if they choose that form of transaction

4    because it will avoid what are federal transaction reporting

5    requirements that apply to institutions, that makes it a

6    federal crime?

7              MS. ESCALANTE:  Yes, Your Honor.

8              THE COURT:  You know, I'm going to think about this

9    one overnight.  I'm going to defer ruling.

10              But if you can't provide me with authority that

11    suggests that that can be a crime, I'm going to dismiss that

12    count.

13              MS. ESCALANTE:  Okay.

14              MS. WEIDNER:  Your Honor, if I could be heard?

15              The troubling thing that the government is suggesting

16    is -- and which runs counter to testimony we heard during their

17    case-in-chief -- is that despite the fact that it is not

18    illegal to not have a bank account or transact financial --

19              THE COURT:  Ms. Weidner.

20              MS. WEIDNER:  Yes, sir.

21              THE COURT:  Are you going to add anything to what I've

22    just said?

23              MS. WEIDNER:  No, Your Honor.

24              THE COURT:  Do you have any authority that suggests

25    the other side of the issue?

1          In other words, do you have any authority that

2    suggests that merely intending -- merely intending to avoid the

3    transactions that apply -- or merely intending to avoid the

4    reporting requirements that apply to institutions is sufficient

5    to criminalize activity that is not otherwise unlawful is not a

6    crime?

7          Did you understand my question?

8          MS. WEIDNER:  Yes, Your Honor.

9          I have researched these issues.  I have not seen a

10   case where there has been an attempt to prosecute someone

11   simply for not conducting their financial transactions through

12   a bank.

13         THE COURT:  And are you aware of any authority that

14   says that if you do so in a legal way --

15         Well, I've already asked the question.

16         MS. WEIDNER:  Yes, sir.

17         THE COURT:  I am going -- I'm going to defer -- I am

18   going to deny the Defendant's Rule 29 Motion as it pertains to

19   the count relating to (3)(B).

20         I do believe that there is sufficient evidence that a

21   reasonable jury could determine that the defendant acted with

22   the intent to conceal or disguise the nature, the location, the

23   source, the ownership, or the control of the property believed

24   to be the proceeds of specified unlawful activity; and that he

25   conducted or intended to conduct a financial transaction

UNITED STATES DISTRICT COURT

1    involving property represented to be the proceeds of specified

2    unlawful activity in a way that violates the statute.

3            So as it pertains to the count for 29(b), the motion

4    is denied.

5            I am deferring ruling on 29(c).  And I suggest that

6    the parties -- I'm going to defer it until tomorrow morning.

7            I suggest that the parties provide me any legal

8    authority they have that suggests that engaging in a lawful

9    transaction, doing so because it avoids -- because it avoids

10   reporting requirements that might apply to another lawful

11   transaction -- can constitute a federal crime that violates

12   this statute.

13           MS. ESCALANTE:  Your Honor, if I may just ask.

14           So you're taking out the fact that it's drug proceeds

15   out of that analysis?

16           Because by virtue of it being drug proceeds, it's

17   already an unlawful transaction.

18           THE COURT:  Well, you didn't charge that, did you?  Or

19   have I misunderstood what you're trying to tell me?

20           MS. ESCALANTE:  Well, that because it's drug proceeds,

21   that's why they went to Mr. Costanzo to exchange that to avoid

22   banks.  Period.

23           THE COURT:  Well, I'll look at that.  I'll look at the

24   statute carefully tonight and see if I think that it could

25   support that kind of a ruling.  But I would still suggest that

```
 1    you look for the kind of authority I've mentioned.

 2           All right.  Ten minutes, we're going to start going

 3    over the jury instructions.

 4           Under what count has the government charged (3)(B)

 5    independent of it being a desire to avoid transaction reporting

 6    requirements?

 7           Do you understand what I'm asking you?

 8           MR. BINFORD:  Your Honor, in counts -- all Counts 1

 9    through 5 we've charged (a)(3)(B) and (a)(3)(C).

10           THE COURT:  All right.

11               (Proceedings in recess at 3:53 p.m.)

12               (Proceedings resume at 4:07 p.m.)

13           THE COURT:  Thank you.

14           Please be seated.

15           All right.  I've looked at things a little bit more

16    and I think I have a little bit more clarity on the government

17    and the defense's position which may lead somewhere as we get

18    into the rest of these instructions in terms of clarity and

19    what I may be looking for with a little bit more detail.

20           But I suggest we start with the instructions as they

21    are so we can get down to what we need clarity on and what we

22    don't.

23           3.1.  Any objection?

24           MR. RESTAINO:  No, Your Honor.

25           MS. WEIDNER:  No, Your Honor.
```

1          THE COURT:  I presume that we should remove the

2     brackets there and make it clear they shouldn't be influenced

3     by race, color, religion, national ancestry, gender, sexual

4     orientation, profession, occupation, and all those.

5          In other words, I'm going to give the information in

6     the brackets; is that all right?

7          MS. WEIDNER:  Yes, Your Honor.

8          MR. RESTAINO:  Yes, Your Honor.

9          THE COURT:  3.2.  Any issues?

10         MS. WEIDNER:  None from the defense, Your Honor.

11         MR. RESTAINO:  No, Your Honor.

12         THE COURT:  I understand that the defendant may yet

13    testify, so we are not going to give both 3.3 and 3.4.  He may

14    or may not testify.

15         If he does, then we'll give 3.4.  If he does not, then

16    we'll give 3.3.

17         Any concern about this phrasing in either of those?

18         MR. RESTAINO:  No, Your Honor.

19         MS. WEIDNER:  No, Your Honor.

20         THE COURT:  3.5?

21         MR. RESTAINO:  No objection.

22         MS. WEIDNER:  No objection, Your Honor.

23         THE COURT:  3.6?

24         MR. RESTAINO:  No objection.

25         MS. WEIDNER:  No objection.

```
 1              THE COURT:  3.7?

 2              MR. RESTAINO:  No objection.

 3              I was just trying to think if there was "limited

 4    purpose" evidence, but I don't think that there was at the end

 5    of the day.

 6              THE COURT:  I do not think there was "limited purpose"

 7    evidence, although one time I did instruct the jury to

 8    disregard some evidence that was introduced.  But I don't think

 9    that would be "limited purpose."

10              I think you're right, Mr. Restaino.  I think I just

11    instructed them to disregard it.

12              Do you have a different memory?

13              MS. WEIDNER:  I do not, Your Honor.  That is accurate.

14              THE COURT:  All right.  So we will not give the

15    "limited purpose" material in the instruction in the

16    next-to-the-last paragraph or paragraph two in 3.7.

17              3.8?

18              MR. RESTAINO:  No objection.

19              MS. WEIDNER:  No objection.

20              THE COURT:  3.9?

21              MR. RESTAINO:  No objection.

22              MS. WEIDNER:  No objection.

23              THE COURT: 3.10?

24              MR. RESTAINO:  No objection.

25              MS. WEIDNER:  No objection.
```

```
 1              THE COURT:  3.11?

 2              MR. RESTAINO:  No objection.

 3              MS. WEIDNER:  No objection.

 4              THE COURT:  3.20.  If I'm not going to read the

 5    Indictment, which you suggested I shouldn't do, Mr. Restaino,

 6    do we even need this?

 7              MR. RESTAINO:  No, Your Honor, not from our

 8    perspective.

 9              MS. WEIDNER:  Your Honor, we also believe it is

10    unnecessary.

11              THE COURT:  Okay.  So 3.20 is stricken.

12              4.3?

13              How would you like me to phrase it, Ms. Weidner?

14              You've heard the evidence the defendant committed

15    other -- do you want "crimes," "wrongs," or "acts"?

16              MS. WEIDNER:  Well, Your Honor, at this point we don't

17    know if he is going to testify.

18              And the government still has expressed a wish, if he

19    does, to impeach him with that -- you know, that felony from

20    the '80s.

21              THE COURT:  Well, I indicated they're going to have a

22    hard time doing that.

23              MS. WEIDNER:  And so in that case, I will call it

24    "other acts."

25              THE COURT:  We'll do "acts."  And then if you convince
```

```
 1    me -- if the government convinces me that I should let in the

 2    other crimes, we'll put "crimes or acts."

 3              You may consider this evidence only for its bearing on

 4    the question of the defendant's intent, motive, knowledge --

 5              I'm not sure there's anything that pertains to

 6    opportunity that's really at issue; is there, Mr. Restaino?

 7              MR. RESTAINO:  "Opportunity" sort of goes towards

 8    "inducement."  It's going to be part of --

 9              THE COURT:  All right.  All right.  I see that.

10              "Opportunity."

11              "Preparation"?

12              MR. RESTAINO:  I would think the same thing, Judge.  I

13    know this seems broad, but all of these 404(b) terms really can

14    take off in this case.

15              THE COURT:  Are you going to have any specific

16    objections as to any one of those?

17              MR. RESTAINO:  "Identity" we don't need there.

18              MS. WEIDNER:  Pardon?

19              MR. RESTAINO:  "Identity" we don't need there.

20              MS. WEIDNER:  I did not understand what the government

21    said.

22              THE COURT:  They said that we could take out

23    "identity."

24              MS. WEIDNER:  Okay.  Your Honor, I think that

25    "knowledge," given the nature of the other acts and that the
```

UNITED STATES DISTRICT COURT

1    other acts are not the same or often even related to the acts

2    charged --

3         And I'm also concerned about "opportunity."  I object

4    to it.

5         THE COURT:  Well, I'll leave it in just because it

6    does seem to me that "predisposition" is an issue.

7         What about "knowledge," Mr. Restaino?

8         MR. RESTAINO:  I mean, there's knowledge that Bitcoin

9    can be used to purchase DMT.  Not as crucial as "opportunity,"

10   but we do think it fits.

11        THE COURT:  All right.  I do think that it's possible,

12   so I'll leave that in.

13        And the problem I now have is with the second bracket.

14   It seems to me that they may consider it as evidence of guilt

15   of the crime for which the defendant is now on trial to the

16   extent that it bears on predisposition.

17        Ms. Weidner?

18        MS. WEIDNER:  I'm sorry, Your Honor.  Could you repeat

19   what you said?

20        THE COURT:  You see that last bracket there?

21        "You may not consider this evidence as evidence of

22   guilt of the crime for which the defendant is now on trial."

23        MS. WEIDNER:  Yes, Your Honor.  I hear you.

24        THE COURT:  I'm uncomfortable giving that, because I

25   think to the extent "predisposition" is an issue, the jury may

```
1    consider that for predisposition.

2          And "predisposition" needs to be -- needs to be proven

3    by the government.

4          MS. WEIDNER:  Yes, Your Honor.  And I think there's an

5    issue with the fact that the government noticed certain

6    evidence as 404(b) and then certain evidence they were able to

7    get in in their case-in-chief as predisposition evidence.

8          And so perhaps it is appropriate to somehow separate

9    these from each other.  Because, for instance, the -- the

10   information regarding Mr. Sperling's conduct that was presented

11   to the jury, it would be our argument that that should not bear

12   in the jury's decision on the guilt of Mr. Costanzo as to the

13   charged offenses in that uncharged-conduct case.

14         THE COURT:  Well, maybe what you can do is consider

15   language that you might propose overnight --

16         MS. WEIDNER:  Yes, sir.

17         THE COURT:   -- to the prosecution and see what they

18   think.

19         MS. WEIDNER:  Yes, sir.

20         THE COURT:  4.6 may or may not be needed, depending on

21   how I rule if the defendant testifies.

22         MR. RESTAINO:  That's right, Your Honor.

23         THE COURT:  Okay.  I don't know that we have --

24         Moving to 4.10, Ms. Weidner, unless you're not ready

25   to move on to 4.10?
```

1          MS. WEIDNER:  I'm ready, Your Honor.

2          THE COURT:  Okay.  I don't know that we have any

3    informant who testified in this case.  We clearly had

4    undercover agents.

5          Did we have any informants that I'm not focusing on?

6          MR. RESTAINO:  No, Your Honor.

7          THE COURT:  Okay.

8          4.11.  Any objection?

9          MR. RESTAINO:  Not from the government.

10         MS. WEIDNER:  No, Your Honor.

11         THE COURT:  4.14.  We have heard testimony that I've

12   allowed, this opinion testimony, but there is an instruction

13   that pertains to dual role testimony.  You've also got that in

14   here.  Good.

15         Do we have any other experts other than our last

16   witness?

17         From the government?

18         MR. RESTAINO:  No, Your Honor.

19         THE COURT:  Is the defense going to call an expert?

20         MS. WEIDNER:  Possibly, Your Honor.

21         THE COURT:  All right.  So let me have the names of

22   the two experts.

23         We heard testimony from agent -- sorry, I've I

24   forgotten.

25         MR. RESTAINO:  From Agent Ellsworth.

```
 1    E-L-L-S-W-O-R-T-H.

 2            THE COURT:  All right.  And what is the name of the

 3    defense's potential expert?

 4            MS. WEIDNER:  His name is Todd, T-O-D-D, Kandaris,

 5    K-A-N-D-A-R-I-S.

 6            THE COURT:  All right.  We'll be ready in case that

 7    is -- you decide to call Mr. Kandaris.

 8            MR. RESTAINO:  And, Your Honor, it seems like the

 9    Court would read -- would read 4.14A rather than 4.14.  But I

10    can't say that I'm sure of that from looking at the model

11    instructions.

12            THE COURT:  Well, the only problem is that unless I'm

13    mistaken, Agent Kandaris is not going to be able to testify as

14    to facts.

15            MR. RESTAINO:  Okay.  Got it.

16            THE COURT:  So if agent -- not "Agent Kandaris" --

17    Mr. Kandaris is not going to be able to testify as to facts.

18    So I think we're going to need to read them separately since it

19    seems to me that 4.14A only would apply to Agent Ellsworth.

20            MS. WEIDNER:  I agree.

21            THE COURT:  On 4.14A, any problem if I give that

22    second bracket:  Take into account the factors discussed

23    earlier in these instructions that were provided to assist you

24    in weighing the credibility of witnesses.

25            MR. RESTAINO:  No objection from the government.
```

1        MS. WEIDNER:  No objection, Your Honor.

2        THE COURT:  Did we have any summaries not received in

3   evidence?  It seems to me like the only summary was received in

4   evidence.

5        MR. RESTAINO:  That's -- that's true as to all the

6   charts.  I don't think there's anything else, Your Honor.

7        There was some demonstrative evidence, the videos, but

8   nothing that would be encompassed by 4.15.

9        THE COURT:  So can we strike that, Ms. Weidner?  Do

10  you object?

11       MS. WEIDNER:  No, Your Honor.

12       THE COURT:  All right.

13       We do have summaries that have -- well, maybe we

14  don't.  But it does seem to me that we do have charts that have

15  been admitted in evidence, which is Agent Ellsworth's charts,

16  at least.

17       Are you going to have any charts or summaries,

18  Ms. Weidner?

19       MS. WEIDNER:  No, Your Honor.

20       THE COURT:  Any objection if I give this instruction?

21       MS. WEIDNER:  No, Your Honor.  I think that the "and

22  summaries" probably can be removed from the title.

23       THE COURT:  The what?

24       MS. WEIDNER:  The "and summaries."

25       THE COURT:  Any objection to that?

```
 1              MR. RESTAINO:  No, Your Honor.

 2              THE COURT:  5.7?

 3              MS. WEIDNER:  Defense objects to that one, Your Honor.

 4              THE COURT:  Do you object that deliberate ignorance

 5     can constitute knowledge?

 6              MS. WEIDNER:  Your Honor, "knowledge" is the mens rea

 7     for 1956(a), whereas, "specific intent" is the mens rea for

 8     1956 -- well (a)(1), I'm sorry -- is knowledge and (a)(3) is

 9     specific intent or the subjective belief of the defendant.

10              And so I don't think that "deliberate ignorance" is

11     appropriate.

12              MR. RESTAINO:  If it were just a specific-intent case,

13     Your Honor, we would agree with the defense.

14              The problem is there is the "belief" element that is

15     in the concealment prong for money laundering sting.  And we do

16     think that "deliberate ignorance" can go towards the belief.

17     And we think it would be called for here because of the dual

18     ways in which the defendant comes through on those admitted

19     audio clips, sometimes saying, essentially, yeah, let's keep on

20     going; sometimes, I don't want to know; sometimes, why did you

21     tell me that.

22              And so it would fit if it were "knowledge."  We think

23     that it can fit as well on the "belief" prong, limited to that

24     "belief" prong.

25              THE COURT:  Well, in any case, it's not -- it's not
```

1    going to be this instruction; right?  Because it doesn't have

2    to do with whether the defendant acted knowingly.  It has to do

3    with whether or not he acted with the belief.

4            MR. RESTAINO:  That would be correct.

5            THE COURT:  All right.  So do you want to refashion

6    that instruction in the way you propose it and run it by the

7    defense and then we'll look at it tomorrow.

8            MR. RESTAINO:  We will do that, Judge.

9            THE COURT:  Entrapment.

10           MS. WEIDNER:  Your Honor, we believe an entrapment

11   instruction in this case is appropriate.  We would raise the

12   fact that the case law says that very little is required to

13   merit an entrapment defense.

14           In this case it was evident in the government's

15   case-in-chief that the -- this case, for example, initiated

16   with little to no knowledge of Mr. Costanzo's -- well,

17   basically, no knowledge of Mr. Costanzo's Bitcoin exchanging

18   activities except for a review of his profile on a website.

19           Additionally, Your Honor, I think given the volume of

20   predisposition evidence, that the government has admitted in

21   its case-in-chief that it is also in the interests of justice

22   to permit the defense to proceed with an entrapment defense in

23   this case.

24           MR. RESTAINO:  Your Honor, I think we essentially

25   agree with the defense.

```
 1              Just to make a record, we still don't agree that there
 2    was enough at the outset to start arguing entrapment at the
 3    opening statements and the like.  But there is a fairness issue
 4    here.
 5              We have proceeded on this trial, anticipating that
 6    there would be an entrapment defense given.  We have gotten in
 7    the predisposition evidence that in some cases otherwise might
 8    not have been admissible.  I don't see that there's a way
 9    around giving that instruction and having us argue that.
10              THE COURT:  I am going to give the instruction.
11              And there's no objection to the way it's worded?
12              MR. RESTAINO:  No, Your Honor.  That's -- that's the
13    model.
14              MS. WEIDNER:  That's correct, Your Honor.
15              THE COURT:  7.1.  Duty to deliberate.
16              Any objection?
17              MR. RESTAINO:  No, Your Honor.
18              MS. WEIDNER:  No, Your Honor.
19              THE COURT:  7.2?
20              MS. WEIDNER:  No objection from the defense, Your
21    Honor.
22              MR. RESTAINO:  No objection, Your Honor.
23              THE COURT:  7.3?
24              MR. RESTAINO:  No objection.
25              MS. WEIDNER:  No objection.
```

```
 1              THE COURT:  7.4?

 2              MR. RESTAINO:  No objection.

 3              MS. WEIDNER:  No objection.

 4              THE COURT:  7.5?

 5              MR. RESTAINO:  No objection.  Just noting that we did

 6    tinker with the verdict form when we submitted these with a

 7    reduction in the amount on one of the counts.

 8              MS. WEIDNER:  Yes, Your Honor.  No objection.

 9              THE COURT:  No objection to the form or the

10    instruction?

11              MS. WEIDNER:  That's correct, Your Honor.

12              THE COURT:  All right.

13              MS. WEIDNER:  No objection to either.

14              THE COURT:  Well --

15              MS. WEIDNER:   The updated form that the government

16    provided is the one we don't object to.

17              THE COURT:  And I may have some issues myself and

18    we'll discuss them when we raise some of the other issues that

19    I've got.

20              7.6?

21              MR. RESTAINO:  No objection.

22              MS. WEIDNER:  No objection.

23              THE COURT:  I take it there is no objection to the

24    stipulated non-model instruction which is modified 4.9?

25              MR. RESTAINO:  Let me double-check that the middle
```

```
 1    name -- let me just double-check, Your Honor, that the middle
 2    name came out.
 3            I'm not sure that the middle name came out.  We would,
 4    I suppose, propose just doing "Nolan Sperling" in lieu of
 5    "Nolan Jack Sperling."
 6            MS. WEIDNER:  We wouldn't object to that, Your Honor.
 7            THE COURT:  All right.  Now we're going to get to the
 8    heart of what some of my concerns are.
 9            We're talking about government's proposed non-model
10    instructions.
11            Modified 1.2.  Are we all on the same place?
12            MS. WEIDNER:  Yes, Your Honor.
13            THE COURT:  Okay.  So, Mr. Restaino, here we come.
14            I listened carefully to what Ms. Escalante said in
15    terms of why I should not grant the motion with respect to the
16    (C) charge, pointing out that really the distinction would be
17    that what we have here is an attempt to avoid financial
18    reporting requirements when there is a belief that specified
19    the proceeds involved were the result of unlawful activity.
20            So I considered that over the break.  And if she is
21    right, maybe -- maybe that is a crime.  But if it is a crime,
22    it requires that Mr. Costanzo's -- Mr. Costanzo's intent -- and
23    this is a specific-intent requirement -- not be to merely
24    engaged in a Bitcoin transaction but be specifically to avoid a
25    specific financial reporting requirement.
```

1          Do you agree with that?

2          MR. RESTAINO:  Yes.

3          THE COURT:  Well, then I've got a problem that I want

4     you to answer for me, and that is, we have a number of

5     different transactions that you have charged and you've merged

6     them together with a money laundering transaction in the

7     counts.

8          But the problem is that the specific intent, as I

9     understand it, is different as to those two requirements.  And

10    I'm not sure that you have evidence as to some of the specific

11    counts, that even if I accept Ms. Escalante's argument -- which

12    I may well do after having considered it -- but even if I

13    accept her argument, you're going to have to have specific

14    evidence as to each count that there was a specific financial

15    transaction reporting requirement that Mr. Costanzo was trying

16    to avoid.

17         I don't think -- I mean, I think you may have it to a

18    few counts, but I don't think you've got it to all counts.  And

19    I'm not going to allow you to sort of merge what he said on one

20    count into another.

21         MR. RESTAINO:  Judge, we wholly agree that it would

22    have to be count-specific on that as to the transaction

23    reporting on that -- or as to the evasion.

24         THE COURT:  Well, what do I do now with the

25    Indictment, with the terms of the Indictment, where you've

```
 1    merged both of those charges into each count for each

 2    transaction when it seems to me that there are different --

 3    there are different specific-intent requirements with respect

 4    to the two subcounts -- or to (B) and (C) is what I'm saying.

 5            Do you understand what I'm saying?

 6            MR. RESTAINO:  At least to the extent that there's

 7    going to be different scienters for (B) and (C).

 8            THE COURT:  Yeah.  So there's going to be different

 9    scienter requirements for (B) and (C).  And yet you've charged

10    (B) and (C) in each of the counts, each single count, relating

11    to each dated transaction.

12            Are you following me now?

13            MR. RESTAINO:  I am following.  I'm probably not

14    seeing the problem.

15            THE COURT:  Okay.  But if the defense doesn't see any

16    problem, then we will proceed, but here is my deal.

17            The instructions now, when you say, like:

18            Third, either the defendant conducted the transaction

19    with the intent to avoid a transaction reporting requirement

20    under federal law or the defendant conducted the transaction

21    with the intent to conceal or disguise the nature, location,

22    source, ownership or control of the property.

23            It strikes me that you're describing two separate

24    crimes there.  They are both under the same statute.  They're

25    both subsections under the same statute, but they require
```

1    different proof.

2             Do you understand what I'm saying now?

3             MR. RESTAINO:  Yes.  I mean, if this is the time for

4    me to say that any challenge -- time for challenges to the

5    Indictment has passed at this point and all of these things can

6    generally be cured in an Indictment.

7             THE COURT:  They may be, I think, by the instructions.

8             MR. RESTAINO:  Correct.

9             THE COURT:  But I'm not sure that they're cured by

10   these instructions.

11            MR. RESTAINO:  I get it, Judge.  Sure.

12            THE COURT:  So what we have here is you're going to

13   have count -- I don't know.  Let's just look back in the

14   Indictment.

15            You've got -- so Count 1 and Count 2 are gone, as well

16   as Count 8; correct?

17            So what we're dealing with is Count 3, 4, 5, 6, and 7.

18            MR. RESTAINO:  Which we were hoping you would call "1,

19   2, 3, 4, and 5," but yeah.

20            THE COURT:  Well, I mean, it makes a lot of sense to

21   do that but -- and if I'm not going to read the Indictment.

22            But here we have:  On or about May 20, 2015, in the

23   District or Arizona, the defendant, Thomas Mario Costanzo, with

24   the intent to conceal and disguise the nature, location,

25   source, ownership, and control of property believed to be the

1     proceeds of specified unlawful activity, and with the intent to

2     avoid a transaction reporting requirement under federal law,

3     did knowingly conduct and attempt to conduct a financial

4     transaction involving property represented by a law enforcement

5     officer to be proceeds of specified unlawful activity.

6           Okay.  So where in the evidence on May 20 was there

7     any evidence that Mr. Costanzo -- well, this is just the first

8     thing.  It may not be related to instruction.

9           But I'm going to say where is the -- any evidence that

10    in the May 20th transaction Mr. Costanzo and anybody else

11    discussed a desire to avoid a specific financial reporting

12    transaction requirement?

13          MR. RESTAINO:  And I anticipate that will be part of

14    what we're doing tonight, Your Honor, is putting those facts

15    with our legal analysis on why these charges should proceed.  I

16    think we're going to get there on the facts.

17          THE COURT:  All right.  So even if we do get there on

18    the facts -- and I'm not going to make that determination right

19    now -- although I think that it's possible there may be a lack

20    of evidence as to at least some of these counts on the

21    financial transaction part, you still commit that crime

22    differently than you commit the money laundering crime; right?

23          MR. RESTAINO:  They're both money laundering crimes.

24          THE COURT:  They are both money laundering crimes, but

25    they are separately described crimes; right?

1          MR. RESTAINO:  Correct.

2          THE COURT:  And the elements of the crime themselves

3     are separate, are they not, because they are different, at

4     least as I read the statute.

5          First, it seems to me that under the statute, under

6     (B) -- I'm talking (B) now -- there has to be a representation

7     to be the proceeds as specified unlawful activity because that

8     applies to all three subprongs.

9          Right?  You agree with that?

10         MR. RESTAINO:  That's correct.

11         THE COURT:  But in addition, under sub (B),

12    Mr. Costanzo has to believe those proceeds to be the proceeds

13    of specified unlawful activity.  It's different -- it is a

14    different requirement for him personally to believe it, and for

15    the agents to tell him that that's what it is.

16         Do you understand what I'm saying?

17         MR. RESTAINO:  Yes.

18         THE COURT:  And the cases, even though neither of you

19    have cited it to me, there is a case with a footnote by the

20    Ninth Circuit that says that (B) and (C) have different

21    elements.

22         Or it didn't actually decide that, it said this wasn't

23    argued, but it sure seems to us that the statute does indicate

24    that these are different.

25         And so (B) is that there has to be -- it has to be

1   property represented to be the proceeds of specified unlawful

2   activity, and in addition, Mr. Costanzo has to believe that the

3   proceeds were of specified unlawful activity to get a

4   conviction on (B); right?

5          MR. RESTAINO:  Yes.

6          THE COURT:  He doesn't have to have that belief,

7   apparently, on (C), but he does have to act with a hope to

8   avoid reporting requirements under state or federal law;

9   correct?

10          MR. RESTAINO:  Correct.

11          THE COURT:  Ms. Weidner?

12          MS. WEIDNER:  Your Honor, the defense disagrees.  The

13  offense under 1956(a)(3)(C) criminalizes the intent to avoid a

14  federal transaction reporting requirement, where we believe the

15  defendant -- it has been represented and the defendant believes

16  that the funds are the source -- are sourced from a specified

17  unlawful activity.

18          The reason why, Your Honor, is if it weren't for that

19  fact, if it wasn't for the defendant's belief, this would be a

20  different crime.

21          Under Title 31, Chapter 53 of the U.S. Code -- and we

22  can look to 31 U.S.C. 5322, Chapter 53 sets forth domestic

23  reporting requirements for transactions and currency.  And a

24  violation of those, avoiding those, causing a financial

25  institution to not file a report, those are offenses that can

1    be criminally prosecuted.

2         And under 5322 of that title, the maximum sentence is

3    five years.

4         Do the same thing without "belief," as the government

5    is arguing is the case and as the Court has suggested, and

6    somehow, arbitrarily, we go from a five-year stat max to a

7    20-year stat max.

8         And I think that to get past the due process issues

9    and arbitrariness issues, between the penalties for simply

10   avoiding, intending to avoid a currency transaction reporting

11   requirement, strongly suggests, logically suggests, that that

12   belief that you are dealing with the proceeds of a specified

13   unlawful activity is what Congress decided would uptick the

14   possible punishment from five years max to 20 years max.

15        And that's -- that's our difference with the

16   government and why we are still advocating for our money

17   laundering, the defense money laundering suggestion.

18        And we would strike our request for the "mens rea

19   specific-intent willfully" aspect because I've spoken with our

20   appellate folks and we don't think it's necessary if we get the

21   defense proposed money laundering instruction.

22        THE COURT:  Well, I'm not -- I'm not sure I understand

23   what your argument is.  Do you want to repeat it again in just

24   two or three sentences?

25        MS. WEIDNER:  Yes, sir.

1           We have two different parts of the U.S. Code, 18

2      U.S.C. 1956 and 31 U.S.C. 5322, that punish the same thing;

3      that being, avoiding or not filing currency transaction

4      reporting requirements.

5           Under Title 31, Chapter 53, the maximum punishment is

6      five years.  For the same conduct under 18 U.S.C. 1956, it's 20

7      years.

8           The only possible --

9           THE COURT:  Can I ask a question?

10          MS. WEIDNER:  Yes, sir.

11          THE COURT:  Under Title 31, Chapter 53 is there a

12     requirement that the defendant be told that this involves the

13     proceeds of unlawful activity?

14          MS. WEIDNER:  No, Your Honor.

15          THE COURT:  Might that be the distinction?

16          MS. WEIDNER:  Yes, Your Honor.

17          And I think that the specific-intent aspect of what

18     Congress said was the mens rea for the sting portion of the

19     money laundering statute also supports the conclusion that it's

20     not just a representation, but also the digestion of that

21     representation, the belief in that registration --

22     representation by the defendant.

23          THE COURT:  Well --

24          MS. WEIDNER:  For example, an unheard representation,

25     how can one be liable for that?

1          THE COURT:  Well, I'll tell you, Ms. Weidner.

2          Like I promised Ms. Escalante, I would consider her

3   argument.  And after having considering it, it made some sense

4   to me.  I'll consider your argument and research it overnight.

5          But assume for the time being that the distinction in

6   the statute is enough for me to draw the difference, it still

7   seems to me that there is a specific-intent requirement in (C)

8   that is different than (B).

9          And the specific-intent requirement, as I would

10  understand it, would be that the defendant acted with the

11  desire to avoid a transaction reporting requirement under state

12  or federal law.  And that would be different than if the

13  defendant acted under the desire to do a Bitcoin exchange.

14         Do you understand what I'm saying, Mr. Restaino?

15         In other words, what we're doing is criminalizing

16  something that is totally dependent on the defendant's intent.

17         MR. RESTAINO:  Yes.  We understand.

18         THE COURT:  And so I am telling you while you look

19  overnight at stuff, you realize that unless there is specific

20  evidence of specific intent to avoid a specific transaction

21  reporting requirement, I'm not going to allow that count to

22  stand.

23         MR. RESTAINO:  Got it.

24         MS. WEIDNER:  And, Your Honor, just one last thing for

25  the record.

```
 1              It is a concern of the defense that in arguing to
 2   maintain the (3)(a)(C) aspect of the charges, that they alluded
 3   to Mr. Costanzo assisting or helping or essentially aiding and
 4   abetting the undercover agents.
 5              And I think just like "conspiracy," aiding and
 6   abetting a pretend crime is not possible.
 7              THE COURT:  You know, it would be great -- I'd sure
 8   appreciate some authority if you can give it to me by tomorrow
 9   morning.
10              MS. WEIDNER:  Okay.
11              THE COURT:  Okay.  So now that we've aired what I
12   think is going to be the prevailing view tomorrow -- and I
13   don't know that because I am going to consider what you've
14   said, Ms. Weidner, and I'm going to further consider what
15   you've said, Ms. Escalante.  And I may change my mind, but I'm
16   trying to give you my best read at this moment.
17              We're not going to give the modified 1.2 anyway,
18   because we're not going to give the 1s all over again; right?
19              MR. RESTAINO:  Right.
20              THE COURT:  So we can strike this one.
21              Any objection to that, Ms. Weidner?
22              MS. WEIDNER:  No, Your Honor.
23              THE COURT:  All right.  So modified 8.147, are you
24   both satisfied with it?
25              MS. WEIDNER:  Your Honor, the defense -- we've already
```

1    made our arguments.  I won't make them again.  But the defense

2    stands by the defense version of this.

3           I've discussed -- I've discussed it with Mr. Restaino,

4    I think, at the end of last week.  I'm pretty sure the

5    government is not on the same page as we are.  And so I think

6    the decision, ultimately, will have to be the Court's.

7           THE COURT:  Mr. Restaino?

8           MR. RESTAINO:  Your Honor, you had provided to us

9    your -- the Court's modified 8.147 on the day of opening

10   statements.  We are fine with all of that, recognizing that

11   something would have to be tinkered with on the "intent" prong

12   of that instruction.

13          THE COURT:  What would you think about dividing up the

14   third element to say that the crime can be -- something to the

15   effect that the crime can be committed in one of two ways?

16          One -- and then list the first element, the second

17   element, and the first third element.

18          Or then the first element, the second element, and the

19   second third element.

20          Do you understand what I'm trying to get at here?

21          MR. RESTAINO:  That makes some good sense, I think,

22   Your Honor, particularly to the extent that we are able to

23   proceed on at least some of the evasion prongs of this,

24   treating it as two separate crimes in that regard.

25          THE COURT:  Yeah.  And the other thing we're going to

1    have to think about is if I don't allow you to proceed with all

2    of the evasion counts, I'm going to have to specify in which

3    counts they can consider one or the other or both.

4           Can either of you think of an easy way to do that?

5           Do you understand what I'm asking?  Because I realize

6    it's kind of obscure and you have to have been involved in this

7    conversation.  And maybe even if you were, you don't get what I

8    just said.

9           MR. RESTAINO:  I think there would be a way, Judge, to

10   do that.  Let's say, just arbitrarily, you thought that it came

11   out cleaner in the later transactions than the earlier

12   transactions.

13          And so Counts 1, 2, and 3 would have just the one

14   concealment method of establishing the crime, and Counts 4 and

15   5 would have both prongs in the disjunctive.

16          THE COURT:  Ms. Weidner, do you want to think about

17   that or do you have some thoughts about it now?

18          MS. WEIDNER:  Your Honor, I do want to think about

19   that.  At this juncture I'm inclined to maintain our objection

20   for the record and that --

21          THE COURT:  Let me just be clear, Ms. Weidner.

22          MS. WEIDNER:  Yes, sir.

23          THE COURT:  I think you've preserved your objection

24   for the record.

25          MS. WEIDNER:  Okay.

1          THE COURT:  And so to the extent you're worried about

2    making sure you do that, you've done it as far as I'm

3    concerned.

4          But now, understanding where I'm going, unless I

5    change my mind, I would welcome the defense's participation to

6    the extent the defense wants to participate, in fashioning an

7    instruction that would be fair to the defendant, given the

8    legal theory that the Court is inclined to accept.

9          MS. WEIDNER:  Your Honor, we are more than willing to

10   do that and we'll hopefully get to work with the government on

11   it tonight.

12         THE COURT:  And I will just tell you both that it

13   seems to me the way to do that is to say there is a way to --

14   there -- you know, I don't want to do it in a pejorative way,

15   but there are two different ways you can launder money under

16   the statute.

17         One has to do with concealing proceeds that the

18   defendant believes and has been told are unlawful proceeds or

19   proceeds of unlawful activity.

20         The other is -- and list those elements.

21         The other is for the defendant to have engaged in the

22   transaction in order to avoid specific federal transaction --

23   federal or state transaction reporting requirements for

24   proceeds that the defendant has been told are the proceeds of

25   unlawful activity, listing the three elements.

1          And then say:  The Court finds that you can consider

2     these as to counts blah-blah-blah and blah and these as to --

3     and we're going to have the figure that out.  All right?

4          MS. WEIDNER:  That sounds good, Your Honor.

5          THE COURT:  Mr. Restaino?

6          MR. RESTAINO:  Yes, Your Honor.  That's fine.

7          THE COURT:  All right.  So we're not going to worry

8     about any modified 1.2 submitted by either the defendant or by

9     the plaintiff.

10         I understand and the defendant has preserved their

11    objections to the extent that they would require the "belief"

12    in the instruction as to both counts (B) and (C).

13         What do we get then, Ms. Weidner, by a mens rea

14    instruction?  I think we've just going over what the mens rea

15    is going to have to be and we will make it clear in the

16    instructions.

17         MS. WEIDNER:  Your Honor, if the Court is alluding to

18    the defense proposed mens rea instruction --

19         THE COURT:  Yes.

20         MS. WEIDNER:   -- we withdraw that.

21         THE COURT:  All right.

22         Then let's take a look -- and I'm not sure I have it

23    in front of me, Mr. Restaino -- let's take a look at your jury

24    verdict -- or the proposed jury verdict form.

25         Do you have it in front of you?

1          MR. RESTAINO:  I'm not sure that I do either.

2          THE COURT:  The problem that I have, as you will

3    anticipate from the conversation we've just had, is if the --

4    if I'm not going to send the financial transaction -- "avoiding

5    financial transaction requirement" back to the jury on all

6    counts and I am going to send the "drug concealment" back on

7    all counts or at least some of the counts, I think we need to

8    specify on the jury verdict form which counts they would be

9    allowed to find the "transaction reporting" count and which

10   they wouldn't.

11         Do you understand what I'm saying?

12         MR. RESTAINO:  Sure.  But I think that's relatively

13   easily done on the format that we've proposed.  You would just

14   take out the second check box in -- or flip the check boxes and

15   take out one of the check boxes for the ones that didn't apply.

16         THE COURT:  That may be true, but I don't have it in

17   front of me, so I can't --

18         MS. WEIDNER:  Your Honor, would you like our copy?  I

19   can bring it up.

20         THE COURT:  Sure.  But before you give me your copy,

21   why don't you evaluate what Mr. Restaino said and see if you

22   agree with him.

23         MS. WEIDNER:  No, Your Honor.  I was -- I was looking

24   at it and I think it does make sense.  It would simply require

25   deleting one of the checks -- one of the boxes with the

| | |
|---|---|
| 1 | associated way that the law could be violated. |
| 2 | THE COURT:  All right. |
| 3 | MS. WEIDNER:  But let me bring it up so the Court can |
| 4 | see it. |
| 5 | THE COURT:  I do see that.  I think it's possible.  If |
| 6 | it's acceptable to the parties, it will be acceptable to the |
| 7 | Court.  Except for, of course, we would have to remove the |
| 8 | boxes if they're no longer applicable.  If there's only one way |
| 9 | that they could find it, we would say "you can only find on |
| 10 | this" -- well, here is my concern. |
| 11 | Let's say that I leave in "drug concealment" on |
| 12 | Count 1 but I don't leave in the "avoiding transaction |
| 13 | requirements." |
| 14 | It seems odd to leave in any of the boxes, because if |
| 15 | they find him guilty -- they clearly can't find him guilty for |
| 16 | avoiding financial transaction requirement because I would have |
| 17 | removed that.  And the only way they could have found him |
| 18 | guilty was by finding the "drug concealment" charge. |
| 19 | And I want the jury to understand that that is the |
| 20 | only one they can consider on Count 1. |
| 21 | MR. RESTAINO:  Another way to do it, Judge, |
| 22 | recognizing that, from the government's perspective, we sort of |
| 23 | would like to preserve it if the jury were to find both prongs, |
| 24 | we would like to preserve that for appellate purposes. |
| 25 | THE COURT:  Well, if I'm going to let them have both |

1    prongs, I don't have any problem with the box approach.

2                MR. RESTAINO:  If it turns out that the Court is

3    permitting that to go back on some but not all of the prongs,

4    we could also do special interrogatories that said that:

5                As to Counts 3, 4, and 5, do you also find that it was

6    for the transaction reporting requirement?

7                And see if they check that box.  That would be another

8    way of trying to get that out.

9                THE COURT:  Now, why don't we do something like this.

10   Why don't we say, like, if I determine that Count 1, they can

11   only conceal the drug concealment charge, I could say:

12               On this count you are only allowed to consider whether

13   or not the defendant is guilty of subsection (A) -- or however

14   we do it -- you are not allowed to consider whether or not

15   he --

16               I don't know whether we need to say "you are not

17   allowed."  We could just say "you are only entitled to

18   consider" -- "in considering whether or not the defendant is

19   guilty or innocent, you are only allowed to consider this

20   branch of the instruction, not that branch."

21               MR. RESTAINO:  That would be fine.  Under that way of

22   doing it, would the Court still be amenable to listing out the

23   boxes for any counts on which it deemed appropriate for the

24   jury to consider both?

25               THE COURT:  I would, as long as the defense has no

1   problem with it.  It seems to me that that limits any possible

2   confusion by the jury.

3           MS. WEIDNER:  Yes.  As to the counts where both ways

4   of violating the law are still before the jury, we do not

5   object to that.

6           I think that what the Court has suggested makes sense

7   because I am -- and I am -- just to make sure so I

8   understand -- the Court is suggesting that, in part, because if

9   there are counts for which there are two methods for their

10  consideration, it is advising the jury that they could only

11  consider the ways to violate the law that are listed in the

12  verdict form as to that count.

13          THE COURT:  Well, I am, except for -- just to make

14  sure that you're understanding what I'm saying.

15          If I find that there is an evidentiary basis on which

16  a reasonable jury could find the defendant guilty on either

17  count, I have no problem with the box system proposed in the

18  present jury verdict form.

19          If, however, I find that there is not sufficient basis

20  to send this case to the jury on the financial transaction --

21  evading the financial transaction reporting requirement, the

22  box system doesn't seem to me to make any sense at all.

23  Because the only way you could get it in there is if they

24  determine that the defendant is guilty of trying to conceal the

25  proceeds of a drug transaction in this case.

1          And so rather than leaving either of the boxes in --

2     because what's the purpose of checking the only box that you

3     would consider it for -- and I don't want to leave the other

4     box in because I would have removed it from the jury -- I would

5     remove both boxes and just instruct the jury that they could

6     only find the defendant guilty on Count 1 if they find that the

7     elements set forth in this instruction are met.

8          And maybe for that reason, we need to -- as I've said,

9     we need to separate the two ways you can commit this crime,

10    maybe even into separate instructions.

11         Do you understand what I'm saying now?

12         MS. WEIDNER:  Yes, sir.

13         MR. RESTAINO:  Yes, Your Honor.

14         THE COURT:  Okay.

15         Anything more that we need to discuss?

16         I've given you plenty of assignments.

17         Do you want to be here at 8:30 tomorrow morning so

18    that we can go over all of this?

19         MR. RESTAINO:  That's fine, Your Honor.

20         MR. CAIN:  Your Honor, as I indicated to you at

21    sidebar, we are requesting some time to meet and confer with

22    Mr. Costanzo regarding his right to testify.

23         Given the schedule that the marshals are going to have

24    to transport him back to CoreCivic now, we're not going to have

25    an opportunity to do that.  We will meet with him as early as

1    we can in the morning.  But it's my understanding that the

2    earliest we're going to be able to meet with him is probably

3    eight o'clock.  And so at least one of us needs to be able to

4    meet with him and --

5         THE COURT:  And I don't want to rush you.  I hate to

6    keep the jury waiting.

7         But what I would ask you then to do is come prepared

8    at nine o'clock, having consulted with each other, about

9    possible fixes and what you can agree on and what you can't.

10        I've given you both assignments in terms of proposing

11   various instructions or alternatives if you want them to be

12   considered.  But I need to have you come here prepared and not

13   expect, you know, to redraft the Constitution beginning at

14   nine o'clock.

15        MR. RESTAINO:  So just so I understood the homework in

16   its entirety, Judge, you do want us to take the first crack at

17   8.147 and the verdict form?

18        THE COURT:  Well, I will do you both the favor of

19   having my clerk -- giving my clerk the obligation to try and

20   implement my wishes and then reviewing it and giving you a copy

21   of what I would propose.

22        Probably what I'm inclined to do now is an 8.147A and

23   an 8.147B and labeling one "Concealment of Unlawful Activity"

24   and the other one something -- "Concealment of Proceeds of

25   Unlawful Activity" and the other one something like "Avoiding

```
 1    Financial Transaction Reporting Requirements."

 2           And then what we would do, once we've settled whether

 3    or not there is an evidentiary basis for giving a particular

 4    assign -- a particular charge on a particular count, we could

 5    put in the jury verdict form:  In considering whether or not

 6    the defendant is guilty of Count 1, you may only consider

 7    8.147A or 8.147B -- or you may consider both 8.147A, paren,

 8    8.147B.

 9           Any problem with that?

10           MR. RESTAINO:  No, Your Honor.

11           MS. WEIDNER:  No, Your Honor.

12           THE COURT:  All right.  Anything else we need to

13    discuss?

14           And so what I'm really going to want you to do, both

15    sides, is tell me what evidence -- what specific evidence you

16    have as to each count, that the government has of each count,

17    that there was a specific financial transaction reporting

18    requirement that you have sufficient evidence that Mr. Costanzo

19    was trying to avoid by entering into the particular

20    transaction.

21           You seem quizzical, Ms. Weidner.  Do you not

22    understand what I'm trying to say?

23           MS. WEIDNER:  I understand that, Your Honor.  I just

24    think that that is -- we are happy to provide information on

25    those -- on counts for which we feel there is no evidence.
```

UNITED STATES DISTRICT COURT

1        THE COURT:  That's fine.

2        MS. WEIDNER:  It's the government's burden to show

3   that they elicited the evidence.

4        THE COURT:  Yeah.  That's fine.

5        Anything else?

6        It is your motion, however.

7        MS. WEIDNER:  Oh, my Rule 29 motion?

8        THE COURT:  Yeah.  It is.

9        MS. WEIDNER:  Yes.  It is.  But I think that we have

10  created the government's need to respond by our --

11       THE COURT:  I'm going to be interested in hearing

12  whatever both parties have that they can tell me overnight --

13       MS. WEIDNER:  Yes, sir.

14       THE COURT:  -- based on what the evidence has been.

15       Mr. Restaino?

16       MR. RESTAINO:  Judge, let me just quickly on a

17  housekeeping matter for the record.

18       So we had some exhibits that were admitted

19  conditionally; 67, 120, and 122.

20       After speaking to your courtroom deputy, those were

21  already published.  I think they're in.  They're in on the

22  Court's chart.  Is there anything you need us to do more with

23  those?

24       THE COURT:  No.

25       MR. RESTAINO:  Okay.

1          THE COURT:  You may have admitted them -- you may have

2     moved them conditionally, but I admitted them.

3          MR. RESTAINO:  Okay.  That's sort of what I thought.

4     I just wanted to clarify that.  That's all I had.

5          Thank you, Your Honor.

6          THE COURT:  Anything else?

7          MS. WEIDNER:  Nothing from the defense, Your Honor.

8          THE COURT:  All right.  So I won't see you until

9     nine o'clock tomorrow, Mr. Cain.  That way, hopefully, you'll

10    both have enough time and both be able to be present as you

11    review with Mr. Costanzo his right not to testify and whether

12    or not he wishes to do so.

13         MR. CAIN:  Thank you, Judge.

14         THE COURT:  By the way, can I ask, just for purposes

15    of calculation?  You are going to put on a case if Mr. Costanzo

16    does not testify or you're not sure yet?

17         MS. WEIDNER:  We're not sure yet, Your Honor.

18         THE COURT:  All right.  But even if Mr. Costanzo does

19    not testify, you may still put on a case?

20         MS. WEIDNER:  Yes.  That is possible, but unlikely.

21         THE COURT:  But unlikely?

22         MS. WEIDNER:  Yes.

23         THE COURT:  All right.  Well, in that event, I would

24    ask that you both be very prepared so that we not keep the jury

25    waiting forever while we try and iron out the jury instructions

UNITED STATES DISTRICT COURT

1    and verdict forms.

2          MS. WEIDNER:  Yes, Your Honor.

3          THE COURT:  Thank you.

4              (Proceedings in recess at 5:02 p.m.)

5                      * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4           I, CHARLOTTE A. POWERS, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8                    I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 16th day of May, 2018.

14

15

16

17

18

19                    s/Charlotte A. Powers
                  Charlotte A. Powers, RMR, FCRR
20

21

22

23

24

25

                 **UNITED STATES DISTRICT COURT**