UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 28, 2018 |
| Thomas Mario Costanzo, | ) | 9:12 a.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL — Day 5

(Pages 859 — 997)

Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 40
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

```
1

2    For the Government:

3                    U.S. Attorney's Office
                     By:  GARY M. RESTAINO,  ESQ.
4                         MATTHEW H. BINFORD, ESQ.
                          FERNANDA CAROLINA ESCALANTE KONTI, ESQ.
5                    40 North Central Avenue, Suite 1200
                     Phoenix, AZ  85004
6

7    For the Defendant Thomas Mario Costanzo:

8                    Federal Public Defenders Office - Phoenix
                     By:  MARIA T. WEIDNER, ESQ.
9                         ZACHARY D. CAIN, ESQ.
                     850 W. Adams Street, Suite 201
10                   Phoenix, AZ  85007

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1 <u>INDEX</u>

2

<u>SUMMARY OF COURT PROCEEDINGS</u>                                    <u>PAGE</u>

3

4   Instruction conference                                  862

5   Defendant rests                                         884

6   Final instructions read to the jury                     886

7   Closing argument:  Government                           906

8   Closing argument:  Defense                              948

9   Rebuttal closing argument:  Government                  957

10  Bailiff sworn                                           972

11  Jury retires to deliberate                              972

12  Jury question                                           974

13  Verdict read                                            977

14  Supplemental instructions read                          981

15  Argument Re:  Forfeiture:  Government                   987

16  Argument Re:  Forfeiture:  Defense                      990

17  Supplemental verdict read                               993

18  Jury excused                                            995

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        **P R O C E E D I N G S**

2        (Proceedings resume at 9:12 a.m.)

3        THE COURT:  Please be seated.

4        I have sent out the proposed revised -- or the

5    instructions -- jury instructions as we agreed on last night

6    with the proposed revised 8.147A and B.

7        Have the parties had a chance to look at those?

8        MR. RESTAINO:  Yes, Your Honor.  And from the

9    government's perspective, we're fine with 8.147A and B.  We

10   were still having some discussion with the defense over whether

11   specific definitions of CTR, SAR, and KYC were going to be

12   necessary, and some of that depends on the Court's ruling.

13       THE COURT:  It does.  And we can take that up in a

14   minute.

15       MS. WEIDNER:  Your Honor, the defense has had an

16   opportunity to review the 8.174A and B.  And actually, I think

17   that we are fine with both of these as they are.  I don't think

18   that supplemental instruction is necessary regarding the

19   reporting requirement.

20       THE COURT:  All right.

21       Does the defense know at this point whether or not

22   they're going to put on a case?

23       MS. WEIDNER:  Your Honor, we had an opportunity to

24   discuss that with Mr. Costanzo this morning, and we will not be

25   putting on a case.

1          THE COURT:  All right.  So you're going to rest.  And

2     then there is no right to rebuttal since the defense is

3     resting.  So what we're really talking about is settling the

4     final jury instructions and the jury verdict form.

5          I do appreciate the parties briefing the issues I

6     wanted briefed last night.  They have clarified some things, I

7     think, for me, but I didn't want to make my determinations

8     without consulting with the parties.

9          My concern, as you know, on the Rule 29 motion is

10    1956(a)(3)(C).  I do believe and have reviewed the evidence in

11    my mind, and I believe that I did deny and continue to think

12    it's appropriate to deny the Rule 29 motion as it contains --

13    pertains to 1956(a)(3)(B), but (a)(3)(C) is more problematic

14    for me.

15          Accepting for a moment -- and because I'm not sure

16    we'll have to go further, but maybe we will -- accepting for a

17    moment the prosecution's theory of the case is viable and they

18    have provided some support, at least in theory, from some other

19    cases from other circuits.

20          I really am more concerned about the adequacy of the

21    evidence under the counts to even support the government's

22    case, accepting its theory as liable.  And I would like to

23    review those with the government and with the defense.

24          You have conceded on Counts 1 and 5 -- and I'm not

25    really sure that those are the counts you want to concede on,

1    but they may well be and you run your own case.  You then

2    provided what you view as the evidence that would support the

3    instruction as to Count 2, Count 3, and Count 4.

4              So let's take up the evidence on Count 2.  We have

5    text here from Mr. Costanzo and Undercover Agent Tom when he

6    says -- Undercover Tom says:  I haven't moved away from that.

7    I haven't moved away from banking is what he's saying so --

8    what needs to be on my radar screen about --

9              Costanzo says:  As far as losing value?

10             Tom says:  No.

11             And then Costanzo says:  Or --

12             And then Tom says:  Either getting stolen or -- and/or

13   being discovered, what -- what we're really -- what I'm doing

14   with it essentially.

15             And then Costanzo says:  Well, you know, I mean,

16   dealing with me is one way.

17             And Tom says:  Yeah.

18             And Costanzo says:  Because I don't say anything to

19   anybody.

20             To be liable under 1956(a)(3)(C), you -- the

21   government has to demonstrate that the defendant was trying to

22   avoid -- and I accept the government's position that it's a

23   transaction, not necessarily the defendant's transaction -- but

24   to be liable, the government must establish that it was the

25   defendant's specific intent to avoid a transaction reporting

UNITED STATES DISTRICT COURT

1     requirement under state or federal law.

2             Now, you have eliminated state law from your proposed

3     jury instructions.  And I suppose the reason for that is we

4     really haven't had any testimony about state law that's

5     applicable in this case.  I realize we discussed the New York

6     law briefly, but we can take that up in a minute.

7             I see no evidence under 103F that Mr. Costanzo had any

8     knowledge of any federal transaction reporting requirement.

9             He says:  Either it getting stolen or -- and/or being

10    discovered, what -- what we're really -- what I'm doing with

11    it, essentially.

12            That's Tom.

13            Then Costanzo says:  Well, you know, I mean, dealing

14    with me is one way.

15            Tom says:  Yeah.

16            Costanzo says:  Because I don't say anything to

17    anybody.

18            Where is the evidence there that Mr. Costanzo is aware

19    of a federal transaction reporting requirement?

20            MR. RESTAINO:  Your Honor, we -- we never thought of

21    this as being so compartmentalized that the knowledge, as well,

22    had to come from that very specific transaction.  His knowledge

23    is fairly demonstrated, we would say, from Exhibits 101 and 102

24    where there is very specific detail about bank reporting

25    requirements.

1          THE COURT:  All right.  You haven't given me anything

2     on Exhibits 101, 102, have you?  I don't have --

3          MR. RESTAINO:  Well, no, Judge, because I took from

4     our discussion yesterday that you thought that 101 and 102, as

5     to --

6          THE COURT:  Well, let me look at them here.

7          MR. RESTAINO:  I'm not sure that's going to

8     particularly help Your Honor because we don't have the

9     transcripts in there.

10          THE COURT:  Well, remind me what they say or what the

11     testimony was.

12          MR. BINFORD:  Your Honor, in clip 101A there was

13     conversation between Sergei, Special Agent Kushner, and the

14     defendant.

15          And Special Agent Kushner says:  You go to the bank,

16     you know, if you want to deposit more than, like, ten grand,

17     you know.

18          And the defendant responds:  Yeah.  Radar goes off.

19     The bells go off.  It's like you're breaking into a casino.

20          Special Agent Kushner responds:  It's like there's

21     some kind of form they got to fill out.

22          And the defendant says:  Right.

23          And then Special Agent Kushner says:  Yeah.  Yeah.

24     It's all --

25          And then he says:  Yes.

```
 1            THE COURT:  Okay.  That's 101.  What does 102 say?
 2            Is this the first transaction -- first encounter
 3    between Kushner and the defendant?
 4            MR. BINFORD:  Yes.  101 is all of the recordings from
 5    March 20th, 2015.
 6            THE COURT:  All right.  And so 102, what does it say?
 7            MR. BINFORD:  Your Honor, I think the best we have
 8    from that May 20th transaction with specific comments is when
 9    the defendant says:  I like keeping things super-duper, like,
10    confidential.  I don't want to know nothing.
11            THE COURT:  Okay.  So that doesn't add much, right, in
12    terms of demonstrating he had a knowledge of a reporting
13    requirement under federal law?
14            You would rely more on 101 than 102?
15            MR. BINFORD:  Yes, Your Honor.
16            THE COURT:  All right.  Ms. Weidner?
17            MS. WEIDNER:  Your Honor, in looking at the cases the
18    government has cited regarding defendants and, for example,
19    Flores and the structuring of transactions, this was a point
20    that the defense raised in its memorandum.
21            In Flores, in all the cases the government cited, the
22    defendant was transacting with a financial institution by
23    regulation.
24            A bank is a financial institution.  A credit union is
25    a financial institution.  And something that comes up a lot in
```

1    the cases, it's with the sale of cars.  Something like EZ Pay

2    Auto Sales in one of the cases cited by the government, they

3    are required to file transaction reporting requirements.

4              If you look at the Ninth Circuit case that --

5              THE COURT:  Hayes?  Are you talking about Hayes?

6              MS. WEIDNER:  No -- well, Hayes cites -- I think it's

7    DeLa Espriella in its list of cases.  And that was a case in

8    the '80s before the law was amended to make individuals who

9    went to financial institutions and structured transactions

10   liable for their structuring because they were evading a

11   particular financial institution's responsibility to file a

12   report by subterfuge or by omission.

13             And so that extended liability to someone basically

14   trying to pull one over on a financial institution.

15             Here there's no financial institution.  Here we just

16   have basically a private sale between a Bitcoin exchanger and

17   an individual.  And the extension of the law under -- as to

18   financial reporting requirements to the degree that the

19   government's arguing, basically creates a legal obligation for

20   everyone to transact any financial transaction through a

21   financial institution as defined under the law.

22             And that simply -- there's no authority that has been

23   offered to suggest that that is the case.

24             THE COURT:  Well, I do think it would be slightly

25   different, Ms. Weidner.

1          What the government is suggesting is when you have

2     been told that the proceeds are from unlawful activity, you

3     then can't structure your ensuing transactions with the purpose

4     of avoiding a transaction reporting requirement.

5          It seems to me that there's a question of fact for the

6     jury here to decide as to what Mr. Costanzo's intent was.  It

7     may or may not have been to avoid a transaction reporting

8     requirement.  But at least as to the $10,000 reporting

9     requirement, doesn't the colloquy in transcript 101 suggest

10    that Mr. Costanzo was aware of the $10,000 reporting

11    requirement for banks?

12         MS. WEIDNER:  Your Honor, I think that the issue there

13    is whether or not those reporting requirements were applicable

14    to Mr. Costanzo.

15         The government, as we stated in our memorandum, cited

16    a series of regulations in our Response to our Motion for the

17    Bill of Particulars.  They did not cite the one regulation that

18    would seem to obviously apply in these cases.

19         And it was created, I imagine, for people who conduct

20    a trade or business that does not qualify as a financial

21    institution, but in the course of that business, might receive

22    in excess of $10,000.

23         That is, in my opinion, a misstep.  But it is -- but

24    at this point they are constrained in regards to what they may

25    rely on to show the avoidance prong.  And I think that

1    expanding that and expanding their -- their theory, even in

2    this derivative liability way -- which was never suggested

3    prior to -- to yesterday -- is not only unavailable under the

4    law as it would essentially be aiding and abetting.  And aiding

5    and abetting is not available under the money laundering

6    statute.

7            THE COURT:  I have read -- I've read your memorandum

8    and I am aware of that argument.

9            MS. WEIDNER:  And we would assert that allowing this

10   kind of expansion by the government is a constructive amendment

11   or at least a fatal variance.

12           THE COURT:  All right.  So the government concedes on

13   Count 1, because it's not an amount over $10,000; correct?

14           MR. RESTAINO:  I'm not sure that was the basis for the

15   concession, but I think that that --

16           THE COURT:  That is another basis for the concession?

17           MR. RESTAINO:  Judge, the -- the Court's ruling from

18   yesterday seemed to be that we had to have discrete proof of

19   that specific intent within each -- within each clip.

20           To the extent that that's true, we don't have it in

21   102.  We certainly would argue, though, that what starts in 101

22   can lead as proof in the other clips.  For our purposes --

23           THE COURT:  I would tend to agree.  But the only thing

24   I heard in 101 was an awareness of a $10,000 requirement.

25           Was there something more?

UNITED STATES DISTRICT COURT

1    MR. RESTAINO:  That's all in that clip.  We'll likely

2    have additional predication once we get to the Martin

3    transactions.

4         THE COURT:  The what transactions?

5         MR. RESTAINO:  The TFO Martin's transactions in 105

6    and 106, which will, I think, set up additional proof of "know

7    your customer" down the road.

8         THE COURT:  Well, were those involved with any of the

9    counts?

10        And I'm not sure any of those can apply to any

11   previous counts.

12        MR. RESTAINO:  Agreed, Judge.  So as to Count 1, yes,

13   we concede that Count 1 we can't reach that.  Count 2 we think

14   we can as to the CTR requirement.

15        THE COURT:  Why?

16        MR. RESTAINO:  Because that's the transaction in which

17   Klepper transacted more than $10,000.

18        THE COURT:  Yes.  Yes.  Okay.  So just because it was

19   13,000.  Okay.

20        MR. RESTAINO:  That's our argument as to 2.

21        THE COURT:  All right.  As to 3?

22        MR. RESTAINO:  Three, we would argue, flows through,

23   Judge, because it was established in 2.  This is part of the

24   same organization.

25        THE COURT:  All right.  Four?

```
 1          MR. RESTAINO:  Four, we need to give you the
 2   predicating information from the -- from the transactions.  I
 3   believe Mr. Binford has that from the September or November
 4   transaction.
 5          MR. BINFORD:  So, Judge, Exhibit 106A, in that
 6   conversation, the defendant acknowledges -- he actually
 7   describes what a Suspicious Activity Report is to Task Force
 8   Officer Martin during that conversation.  And that's on
 9   November 16th, 2016.
10          So that -- that knowledge or that explanation of the
11   SAR happens before any of those last two transactions that
12   occurred with Task Force Officer Martin before the
13   February 2nd, 2017, transaction and before the April 20th,
14   2017, transaction.
15          In both of the February and the April transactions,
16   Task Force Officer Martin mentions that the money is drug
17   proceeds, that it's cocaine proceeds.  And so his knowledge
18   that a Suspicious Activity Report could be filed is applicable
19   to the subsequent meetings.
20          The jury also heard testimony from Special Agent
21   Ellsworth about suspicious activity reporting and currency
22   transaction reporting.
23          THE COURT:  Well, what they heard from Agent Ellsworth
24   may have established what he believes the requirements are.
25          It doesn't establish what Mr. Costanzo knew, though,
```

UNITED STATES DISTRICT COURT

```
1    does it?
2              MR. BINFORD:  I agree with that.
3              THE COURT:  All right.  So what we have here is a
4    concession on Count 1 that the jury can only use 8.147A.
5              And then do we -- we have no further concessions by
6    the government?
7              MR. RESTAINO:  We do not, Your Honor.
8              THE COURT:  Ms. Weidner?
9              MS. WEIDNER:  Not beyond our prior argument, Your
10   Honor.
11             THE COURT:  All right.  So what I would suggest we do
12   with the jury verdict form is you see where you've got in Count
13   1, "The jury may only consider instruction 8.147A"?
14             Are you following me?
15             MS. WEIDNER:  What was your question about that one,
16   Your Honor?
17             THE COURT:  You submitted a verdict form in which you
18   say in Count 1 -- you have Count 1.
19             In Count 1 the jury may only consider instruction
20   8.147A.
21             Do you see that?
22             MS. WEIDNER:  I am not seeing the verdict form, Your
23   Honor.
24             THE COURT:  Well, here is the gist of what I want to
25   say.  If we don't tell the jury which counts we're talking
```

UNITED STATES DISTRICT COURT

1    about, they'll have no way of knowing.  So I would say in

2    Count 1 -- and then put in paren -- the $30,000 transaction on

3    or around May 20, 2015, the jury may only consider instruction

4    8.147A.

5              Any objection to that?

6              MR. RESTAINO:  No, Your Honor.

7              MS. WEIDNER:  No, Your Honor.

8              THE COURT:  Similarly, in Count 2 -- and then I would

9    move up the $13,000 transaction on or around October 7, 2014,

10   the jury may consider both 8.147A and 8.147B.  And then we

11   would go down, similar -- to make similar adjustments to all

12   the verdict forms so the jury knows which factual transaction

13   we're talking about for each count.

14             MR. RESTAINO:  That would be fine with us, Your Honor.

15   The question that we would have is whether either the Court or

16   the defense want check boxes as to which of the prongs.

17             THE COURT:  Well, it seems to me that we would have

18   check boxes.

19             MR. RESTAINO:  As to 2 through 5?

20             THE COURT:  Yes.  Do you disagree with that,

21   Ms. Weidner?

22             MS. WEIDNER:  Your Honor, we would agree to the check

23   boxes for the counts for which both the three -- (a)(3)(B) and

24   (C) option are available.

25             THE COURT:  All right.

1          Then let's go to 8.147 -- actually, 8.147B -- and see

2     where we've previously taken the language from "transaction

3     reporting requirement" from what you previously submitted.  And

4     we have:  A "transaction reporting requirement," means either

5     the currency transaction reporting requirement for currency

6     deposits or withdrawals exceeding $10,000 into or from a

7     financial institution or the suspicious activity reporting

8     requirements for financial institutions.

9          I don't know that you've established that Mr. Costanzo

10    had any knowledge of the "know your customer" guidelines.

11         MR. RESTAINO:  This has been tricky for us, Judge.

12    We've always sort of considered that.  It's sort of subsidiary

13    to SAR and it's sort of separate.

14         I don't think we'd have an objection to "know your

15    customer" coming out, but I would anticipate that argument

16    about SAR would inevitably get into "know your customer,"

17    because one needs to know the customer in order to fill out the

18    suspicious report.

19         THE COURT:  Well, do you have any evidence that

20    Mr. Costanzo knew about the "know your customer" guidelines?

21         MR. RESTAINO:  We'd like to refer to 105, if we can,

22    Your Honor.

23         So 105D, there's a discussion between Costanzo and TFO

24    Martin.

25         This is the defendant saying:  It's fun.  It's fun,

1    fun, fun, fun, fun.

2              Yeah, says TFO Martin.  I downloaded a bunch of

3    them -- being apps -- but I'm looking for something like -- I

4    wanted something I don't have to link a bank account to because

5    I don't want it to be -- right, to the government.

6              That's one from 105, which comes before any of the

7    charged transactions with TFO Martin.

8              The second thing we would refer to on "know your

9    customer" is in the government's filing which specifically

10   discusses -- which specifically discusses the casino

11   transactions and casinos trying to get the identification from

12   someone.  And that, more specifically, does get at the

13   identification of a person.

14             THE COURT:  Ms. Weidner?

15             MS. WEIDNER:  Your Honor, it would be the position of

16   the defense that simply a reluctance to provide one's

17   identification is not an indication of awareness of "know your

18   customer" guidelines.  It's -- especially in the evidence --

19   well, the information that has not been disputed by the

20   government, which is that Mr. Costanzo distrusts the

21   government, he has chosen to opt out of transacting with

22   banking institutions and makes no secret of that and that this

23   is -- this is -- this is simply how he operates.

24             I would also note that on several occasions, evidence

25   was elicited and not objected to by the government, that it is

```
 1    not a crime not to engage with the banking system in this
 2    country.
 3              THE COURT:  Okay.  I'm going to take out, including
 4    the "know your customer" guidelines.
 5              You can argue what you want to argue, but in order to
 6    have any liability, you're going to have to establish that
 7    Mr. Costanzo knew about the guideline in order to avoid it.
 8              If you feel like you have evidence that says that he
 9    knew about the requirement for identification, then I'll allow
10    you, both sides, to argue the evidence that you've submitted.
11              Do we have any other changes or proposed changes to
12    the jury instructions?
13              MR. RESTAINO:  Well, Your Honor, the government
14    actually, last night about seven o'clock, in an email to the
15    defense, abandoned the 5.7 request.
16              That was, I suppose, good that we did it because I
17    think the Court has abandoned it as well.
18              THE COURT:  I have abandoned it.
19              MR. RESTAINO:  So we have nothing to say on that.
20              THE COURT:  Okay.
21              MS. WEIDNER:  And, Your Honor, the parties have
22    discussed how to deal with 4.3, which is the "other crimes,
23    wrongs or acts of the defendant."
24              THE COURT:  Yes.  Uh-huh.
25              MS. WEIDNER:  And I think that if we tailored this so
```

1    that it is -- specifies, essentially, that the other act that

2    we're talking about is stopped dealing with Nolan Sperling,

3    we're agreed on basically the first sentence, which would now

4    be:  You have heard evidence that the defendant sold Bitcoin to

5    Nolan Sperling, an individual who has pleaded guilty in an

6    unrelated federal case to importation of narcotics.

7            THE COURT:  Slow down, please.  One moment.

8            "Sold Bitcoin to Nolan Sperling" --

9            MS. WEIDNER:  Comma, an individual who has pleaded

10   guilty.

11           THE COURT:  You may think that I am a very fast

12   writer.  I'm not that fast.

13           MS. WEIDNER:  I'm sorry, Your Honor.

14           THE COURT:   -- "an individual who has pleaded

15   guilty" --

16           MS. WEIDNER:  -- in an unrelated federal case to

17   importation of narcotics.  Period.

18           THE COURT:  Okay.

19           MS. WEIDNER:  Defendant was not charged for that

20   conduct.  Period.

21           THE COURT:  Okay.

22           MS. WEIDNER:  And then the rest of the -- the rest of

23   the instruction would follow the standard.

24           We have disagreement on what the evidence may be

25   considered for or what is applicable in this case.  The

UNITED STATES DISTRICT COURT

```
 1    government has advised that it seeks to include intent, motive,

 2    opportunity, plan, absence of mistake, and knowledge.

 3            It is the position of the defense that "intent" is the

 4    only relevant of -- of the bracketed selection for that

 5    sentence.

 6            THE COURT:  Okay.  Let me tell you what my concern is

 7    with the -- with what the parties have agreed to.

 8            It seems to me that evidence was also admitted about

 9    Mr. Costanzo's potential purpose of -- what is it -- DTM and

10    his potential sale to somebody whose wife apparently was

11    concerned that he was using the money to buy drugs.

12            So I'm not sure that I'm inclined to limit this to the

13    Bitcoin sold to Nolan Sperling.  It seems to me like there is

14    some other evidence that was admitted -- and maybe even a few

15    other pieces -- on the predisposition question.

16            So if you want to limit it to Nolan Sperling, I will.

17    However, it seems to me that there are those other acts that

18    may be at issue to which this instruction should equally apply.

19            How does the defense want to proceed on that?

20            MS. WEIDNER:  Well, Your Honor, in that case, I think

21    that we can probably go largely, if the government is amenable

22    to this, with the instruction as it is and then the Court can

23    just decide regarding the -- the bracketed items.

24            Currently, it's "intent, motive, opportunity,

25    preparation, plan, knowledge, absence of mistake, and absence
```

UNITED STATES DISTRICT COURT

```
 1    of accident."
 2              THE COURT:  All right.
 3              MR. RESTAINO:  And for --
 4              THE COURT:  So what you would propose is:  You've
 5    heard evidence that the defendant committed other acts not
 6    charged here.  Defendant was not charged with any conduct
 7    related to those acts -- or something like that?
 8              MS. WEIDNER:  Yes, Your Honor.
 9              THE COURT:  Any objection to that?
10              MR. RESTAINO:  Judge, as long as -- as long as there's
11    a comma at the very end, saying "except as to predisposition,"
12    all of that is fine.
13              We -- the jury needs to be instructed --
14              THE COURT:  I'm not following you, Mr. Restaino.  I'm
15    sorry.  Let's go back and take it one at a time.
16              MR. RESTAINO:  Okay.
17              THE COURT:  "You have heard evidence that the
18    defendant committed other acts not charged here."
19              Are you okay with that?
20              MR. RESTAINO:  Yes, Judge.
21              THE COURT:  "The defendant was not charged with
22    conduct related to these other acts."
23              MR. RESTAINO:  Fine, Judge.
24              THE COURT:  All right.  Then what are you telling me?
25              MR. RESTAINO:  Well, then I had -- I guess if we're
```

UNITED STATES DISTRICT COURT

1    sticking to the orderly way of doing this, with respect to the

2    bracketed information that can be considered for, we defer to

3    the Court.

4            If I were making a hierarchy, "intent and opportunity"

5    are at the top of our list on what we think is most relevant

6    for this to be considered in.

7            THE COURT:  All right.  So how about:  You may

8    consider this evidence only for its bearing, if any, on the

9    question of the defendant's intent, opportunity, predisposition

10   and for no other purpose.

11           MR. RESTAINO:  That's fine, depending on how the last

12   sentence reads then.

13           MS. WEIDNER:  Your Honor, we would be fine with that.

14   The Court said "intent, opportunity, and predisposition."

15           THE COURT:  -- "predisposition and for no other

16   purpose."

17           MS. WEIDNER:  Yes.

18           THE COURT:  Is that all right?

19           MR. RESTAINO:  So there's not going to be a last

20   sentence that says:  You may not consider as evidence the guilt

21   of the crime.

22           THE COURT:  Uh-huh.

23           MR. RESTAINO:  That's fine with us then.  Because that

24   makes it clear that we can argue and the jury can consider it

25   for predisposition.

UNITED STATES DISTRICT COURT

1          THE COURT:  Yes.  Anything else?

2          MS. WEIDNER:  No, Your Honor.

3          THE COURT:  All right.  Are we ready then to go?  Are

4     you ready with your closing arguments?

5          MS. WEIDNER:  Pardon me?

6          MR. BINFORD:  Yes, Your Honor.

7          THE COURT:  Are there other issues or changes to the

8     instructions or the verdict forms?

9          MS. WEIDNER:  No, sir.

10          THE COURT:  Okay.

11          MR. RESTAINO:  Judge, there is one issue on an exhibit

12     that -- whether or not it goes back to the jury.  I think we

13     can sort that out down the road at a break.  But I know the

14     defense wants to remove 97 and we will not have an objection.

15          THE COURT:  All right.  We can sort that out.

16          What I would like to do now, if you will allow me, is

17     I'm going to go revise the verdict form and the instructions

18     and give you copies of those.

19          The jury is, of course, cooling their heels and I

20     would like to get them out here.  I, of course, don't want to

21     rush that beyond when the parties are prepared and happy -- or

22     if not happy with -- at least have stated their case with

23     respect to the instructions and verdict form.

24          MS. WEIDNER:  Yes, Your Honor.

25          Just one quick thing that Mr. Cain brought to my

```
 1    attention.
 2              As to instruction 4.10, we talked about this
 3    yesterday, but I guess it just didn't make it in.  To remove
 4    the "and informants" and the references to "informants" at line
 5    5 and 6.
 6              THE COURT:  Yes.  Thank you.  It looks like we removed
 7    it from part but not from the title and not from line 6 or 5.
 8              All right.  Thank you.
 9              MR. BINFORD:  Your Honor, while you're doing that, may
10    I move the lecturn over in front of --
11              THE COURT:  Oh, yes, you may.
12              MR. BINFORD:  Thank you.
13              MR. RESTAINO:  Do we have a couple of minutes here,
14    Judge?
15              THE COURT:  Yeah.  You'll have a couple minutes.
16              MR. RESTAINO:  Okay.  Thanks.
17              THE COURT:  We can't -- unfortunately, we can't do
18    everything that fast.  It will be a few minutes.  Hopefully,
19    not too many.
20                   (Proceedings in recess at 9:46 a.m.)
21                   (Jury enters the courtroom at 10:25 a.m.)
22                   (Proceedings resume at 10:25 a.m.)
23              THE COURT:  Thank you.  Please be seated.
24              Hope you had a pleasant evening and we thank you for
25    your patience with us this morning.  It took a little longer
```

UNITED STATES DISTRICT COURT

```
 1   than we anticipated, but we do anticipate using the rest of

 2   your time very efficiently.

 3            Ms. Weidner?

 4            MS. WEIDNER:  Yes, Your Honor.

 5            THE COURT:  Does the defense --

 6            MS. WEIDNER:  The defense rests, Your Honor.

 7            THE COURT:  Thank you.

 8            Ladies and gentlemen, we have now come to the end of

 9   the evidence in this case.  And as I stated to you, I am now

10   going to give you, prior to your deliberations, your final

11   instructions.

12            You will have written copies of these instructions,

13   several written copies, to go back with you to the jury room.

14   But for now, instead of giving you each copy, I'm just going to

15   put the instructions as I read them up on the ELMO so they

16   should be appearing on the screen in front of you.

17            MR. RESTAINO:  Your Honor, may we have a quick

18   sidebar?

19            THE COURT:  You may.

20         (At sidebar on the record.)

21            MR. BINFORD:  We wanted to show -- this is Matt

22   Binford with the U.S. Attorney's Office, Judge.

23            We don't want to show 4.6 to the jury or to read it.

24            THE COURT:  Oh, yeah.

25            4.6 needs to be removed.
```

1              LAW CLERK:  Okay.

2              THE COURT:  All right.  Take it out.

3              LAW CLERK:  Okay.

4              THE COURT:  And we'll have Armie do a final version,

5    taking it out of the index and taking it out to go back to the

6    jury.

7              MS. WEIDNER:  Okay.

8              THE COURT:  You know what?  I've got -- I've got an

9    old version -- I picked up an old version, so can you get

10   Kathleen to give me hers just temporarily?

11             MR. BINFORD:  I have one more issue since your clerk

12   is here.

13             The verdict form under Count 4, it refers to Count 3

14   or under Count 3 refers to Count 4.  I just wanted to bring

15   that to your attention now that we're fixing things.

16             It says Count 4 under Count 3.

17             THE COURT:  Okay.

18             LAW CLERK:  Kathleen doesn't have the verdict form.

19             THE COURT:  Okay.  So if you make that change as well,

20   I'm going to go ahead and go over it with the jury but do we

21   have an extra version of those jury instructions that I can

22   get?

23             LAW CLERK:  Charlotte has one.

24             THE COURT:  4.6.  We'll proceed.

25        (End of discussion at sidebar.)

1          THE COURT:  So, ladies and gentlemen, the first page

2    that you'll see is just a title page.  It says:  Final Jury

3    Instructions.

4          And the second page that we'll -- that exists is just

5    the index.

6          What it does is it indicates the title of the

7    instruction and a number off to the left.  The number off to

8    the left is just a reference for attorneys for -- it indicates

9    legal sources.  You don't need to worry about it, except to the

10   extent that it might help you in finding an instruction if you

11   want to consult it during your deliberations.

12         The first instruction is entitled 3.1.

13         Members of the jury, now that you've heard all the

14   evidence, it is my duty to instruct you on the law that applies

15   to this case.  A copy of these instructions will be available

16   in the jury room for you to consult.

17         It is your duty to weigh and evaluate all the evidence

18   received in the case and, in that in process, to decide the

19   facts.  It is also your duty to apply the law as I give it to

20   you to the facts as you find them, whether you agree with the

21   law or not.  You must decide the case solely on the evidence

22   and the law.  Do not allow personal likes or dislikes,

23   sympathy, prejudice, fear, or public opinion to influence you.

24   You should also not be influenced by any person's race, color,

25   religion, national ancestry, or gender, sexual orientation,

JURY INSTRUCTIONS

1   profession, occupation, celebrity, economic circumstances, or

2   position in life or in the community.  You will recall that you

3   took an oath promising to do so at the beginning of the case.

4           You must follow all these instructions and not single

5   out some and ignore others; they are all important.  Please do

6   not read into these instructions or into anything I may have

7   said or done any suggestion as to what verdict you should

8   return.  That is a matter entirely up to you.

9           The indictment is not evidence.  The defendant has

10  pleaded not guilty to the charges.  The defendant is presumed

11  to be innocent unless and until the government proves the

12  defendant guilty beyond a reasonable doubt.  In addition, the

13  defendant does not have to testify or present any evidence.

14  The defendant does not have to prove innocence; the government

15  has the burden of proving every element of the charges beyond a

16  reasonable doubt.

17          A defendant in a criminal case has a constitutional

18  right not to testify.  In arriving at your verdict, the law

19  prohibits you from considering in any manner that the defendant

20  did not testify.

21          Proof beyond a reasonable doubt is proof that leaves

22  you firmly convinced the defendant is guilty.  It is not

23  required that the government prove guilt beyond all possible

24  doubt.

25          A reasonable doubt is a doubt based upon reason and

1    common sense and is not based purely on speculation.  It may

2    arise from a careful and impartial consideration of all the

3    evidence, or from lack of evidence.

4          If after a careful and impartial consideration of all

5    the evidence, you are not convinced beyond a reasonable doubt

6    that the defendant is guilty, it is your duty to find the

7    defendant not guilty.  On the other hand, if after a careful

8    and impartial consideration of all the evidence, you are

9    convinced beyond a reasonable doubt that the defendant is

10   guilty, it is your duty to find the defendant guilty.

11         The evidence you are to consider in deciding what the

12   facts are consists of:

13         One, the sworn testimony of any witness; and,

14         Two, the exhibits received in evidence; and,

15         Three, any facts to which the parties have agreed.

16         In reaching your verdict, you may consider only the

17   testimony and exhibits received in evidence.  The following

18   things are not evidence and you may not consider them in

19   deciding what the facts are:

20         Number 1:  Questions, statements, objections, and

21   arguments by the lawyers are not evidence.  The lawyers are not

22   witnesses.  Although you must consider a lawyer's questions to

23   understand the answers of a witness, the lawyer's questions are

24   not evidence.  Similarly, what the lawyers have said in their

25   opening statements, will say in their closing arguments and at

1   other times is intended the help you interpret the evidence,

2   but it is not evidence.  If the facts as you remember them

3   differ from the way the lawyers state them, your memory of them

4   controls.

5            Any testimony that I have excluded, stricken, or

6   instructed you to disregard is not evidence.

7            Anything you may have seen or heard when the court was

8   not in session is not evidence.  You are to decide the case

9   solely on the evidence received at the trial.

10           Evidence may be direct or circumstantial.  Direct

11  evidence is direct proof of a fact, such as testimony by a

12  witness about what that witness personally saw or heard or did.

13  Circumstantial evidence is indirect evidence, that is, it is

14  proof of one or more facts from which you can find another

15  fact.

16           You are to consider both direct and circumstantial

17  evidence.  Either can be used to prove any fact.  The law makes

18  no distinction between the weight to be given to either direct

19  or circumstantial evidence.  It is for you to decide how much

20  weight to give to any evidence.

21           In deciding the facts in this case, you may have to

22  decide -- pardon me -- which testimony to believe and which

23  testimony not to believe.  You may believe everything a witness

24  says, or part of it, or none of it.

25           In considering the testimony of any witness, you may

1   take into account:

2           One, the opportunity and ability of the witness to see

3   or hear or know the things testified to;

4           Two, the witness's memory;

5           Three, the witness's manner while testifying;

6           Four, the witness's interest in the outcome of the

7   case, if any;

8           Five, the witness's bias or prejudice, if any;

9           Six, whether other evidence contradicted the witness's

10  testimony;

11          Seven, the reasonableness of the witness's testimony

12  in light of all the evidence; and

13          Eight, any other factors that bear on believability.

14          Sometimes a witness may say something that is not

15  consistent with something else he or she said.  Sometimes

16  different witnesses will give different versions of what

17  happened.  People often forget things or make mistakes in what

18  they remember.  Also, two people may see the same event but

19  remember it differently.  You may consider these differences,

20  but do not decide that testimony is untrue just because it

21  differs from other testimony.

22          However, if you decide that a witness has deliberately

23  testified untruthfully about something important, you may

24  choose not to believe anything that witness said.  On the other

25  hand, if you think the witness testified untruthfully about

1  some things but told the truth about others, you may accept the

2  part you think is true and ignore the rest.

3          The weight of the evidence as to a fact does not

4  necessarily depend on the number of witnesses who testify.

5  What is important is how believable the witnesses were and how

6  much weight you think their testimony deserves.

7          You are here only to determine whether the defendant

8  is guilty or not guilty of the charges in the indictment.  The

9  defendant is not on trial for any conduct or offense not

10 charged in the indictment.

11         A separate crime is charged against the defendant in

12 each count.  You must decide each count separately.  Your

13 verdict on one count should not control your verdict on any

14 other count.

15         You have heard evidence that the defendant committed

16 other acts not charged here.  Defendant was not charged with

17 conduct related to these other acts.  You may consider this

18 evidence only for its bearing, if any, on the question of the

19 defendant's intent, opportunity, and/or predisposition and for

20 no other purpose.

21         You have heard testimony from an undercover agent or

22 agents who were involved in the government's investigation in

23 this case.  Law enforcement officials may engage in stealth and

24 deception, such as the use of undercover agents, in order to

25 investigate criminal activities.  Undercover agents may use

false names and appearances and assume the roles of members in criminal organizations.

You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may consider the various factors mentioned in these instructions concerning credibility of witnesses.

In addition to those factors, in evaluating eyewitness identification testimony, you may also consider:

One:  The capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observation and the conditions at the time of observation, including lighting and distance;

Two, whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness;

Three, any inconsistent identifications made by the eyewitness;

Four, the witness's familiarity with the subject identified;

Five, the strength of early and later identifications;

Six, lapses of time between the event and the identifications; and

Seventh, the totality of circumstances surrounding the eyewitness's identification.

You have heard testimony from Agent Ellsworth, who

1    testified to opinions and the reasons for his opinions.  This

2    opinion testimony is allowed because of the education or

3    experience of this witness.

4            Such opinion testimony should be judged like any other

5    testimony.  You may accept it or reject it, and give it as much

6    weight as you think it deserves, considering the witness's

7    education and experience, the reasons given for the opinion,

8    and all the other evidence in the case.

9            You have heard testimony from Agent Ellsworth, who

10   testified to both facts and opinions and the reasons for his

11   opinions.

12           Fact testimony is based on what the witness saw,

13   heard, or did.  Opinion testimony is based on the education or

14   experience of the witness.

15           As to the testimony about facts, it is your job to

16   decide which testimony to believe and which testimony not to

17   believe.  You may believe everything a witness says, or part of

18   it, or none of it.  Take into account the factors discussed

19   earlier in these instructions that were provided to assist you

20   in weighing the credibility of witnesses.

21           As to the testimony about the witness's opinions, this

22   opinion testimony is allowed because of the education or

23   experience of this witness.  Opinion testimony should be judged

24   like any other testimony.  You may accept all of it, part of

25   it, or none of it.  You should give it as much weight as you

1    think it deserves, considering the witness's education and

2    experiences -- and experience -- sorry -- the reasons given for

3    the opinion, and all the other evidence in the case.

4           Certain charts have been admitted in evidence.  Charts

5    are only as good as the underlying supporting material.  You

6    should, therefore, give them only such weight as you think the

7    underlying material deserves.

8           The defendant contends that he was entrapped by a

9    government agent.  The government has the burden of proving

10    beyond a reasonable doubt that the defendant was not entrapped.

11    The government must prove either:

12           One, the defendant was predisposed to commit the crime

13    before being contacted by government agents, or

14           Two, the defendant was not induced by the government

15    agents to commit the crime.

16           When a person, independent of and before government

17    contact, is predisposed to commit the crime, it is not

18    entrapment if government agents merely provide an opportunity

19    to commit the crime.  In determining whether the defendant was

20    predisposed to commit the crime before -- before being

21    approached by government agents, you may consider the

22    following:

23           One, whether the defendant demonstrated reluctance to

24    commit the offense;

25           Two, the defendant's character and reputation;

1          Three, whether government agents initially suggested

2     the criminal activity;

3          Four, whether the defendant engaged in the criminal

4     activity for profit; and

5          Five, the nature of the government's inducement or

6     persuasion.

7          In determining whether the defendant was induced by

8     government agents to commit the offense, you may consider any

9     government conduct creating a substantial risk that an

10    otherwise innocent person would commit an offense, including

11    persuasion, fraudulent representations, threats, coercive

12    tactics, harassment, promises of reward or pleas based on need,

13    sympathy, or friendship.

14         When you begin your deliberations, elect one member of

15    the jury as your foreperson who will preside over the

16    deliberations and speak for you here in court.

17         You will then discuss the case with your fellow jurors

18    to reach agreement if you can do so.  Your verdict, whether

19    guilty or not guilty, must be unanimous.

20         Each of you must decide the case for yourself, but you

21    should do so only after you have considered all the evidence,

22    discussed it fully with the other jurors, and listened to the

23    views of your fellow jurors.

24         Do not be afraid to change your opinion if the

25    discussion persuades you that you should.  But do not come to a

1    decision simply because other jurors think it is right.

2            It is important that you attempt to reach a unanimous

3    verdict but, of course, only each -- only if each of you can do

4    so after having made your own conscientious decision.  Do not

5    change an honest belief about the weight and effect of the

6    evidence simply to reach a verdict.

7            Perform these duties fairly and impartially.  Do not

8    allow personal likes or dislikes, sympathy, prejudice, fear, or

9    public opinion to influence you.  You should also not be

10   influenced by any person's race, color, religion, national

11   ancestry, or gender, sexual orientation, profession,

12   occupation, celebrity, economic circumstances, or position in

13   life or in the community.

14           It is your duty as jurors to consult with one another

15   and to deliberate with one another with a view towards reaching

16   an agreement if you can do so.  During your deliberations, you

17   should not hesitate to reexamine your own views and change your

18   opinion if you become persuaded that it is wrong.

19           Because you must base your verdict only on the

20   evidence received in the case and on these instructions, I

21   remind you that you must not be exposed to any other

22   information about the case or to the issues it involves.

23   Except for discussing the case with your fellow jurors during

24   your deliberations:

25           Do not communicate with anyone in any way and do not

1    let anyone else communicate with you in any way about the

2    merits of the case or anything to do with it.  This includes

3    discussing the case in person, in writing, by phone or

4    electronic means, via email, text messaging, or any Internet

5    chat room, blog, website, or other feature.  This applies to

6    communicating with your family members, your employer, the

7    media or press, and the people involved in the trial.  If you

8    are asked or approached in any way about your jury service or

9    anything about this case, you must respond that you have been

10   ordered not to discuss the matter and to report to contact to

11   the Court.

12          Do not read, watch, or listen to any news or media

13   accounts or commentary about the case or anything to do with

14   it; do not do any research, such as consulting dictionaries,

15   searching the Internet, or using other reference materials; and

16   do not make any investigation or in any other way try to learn

17   about the case on your own.

18          The law requires these restrictions to ensure the

19   parties have a fair trial based on the same evidence that each

20   party has had an opportunity to address.  A juror who violates

21   these restrictions jeopardizes the fairness of these

22   proceedings, and a mistrial could result that would require the

23   entire trial process to start over.  If any juror is exposed to

24   any outside information, please notify the Court immediately.

25          Some of you have taken notes during the trial.

1    Whether or not you took notes, you should rely on your own

2    memory of what was said.  Notes are only to assist your memory.

3    You should not be overly influenced by your notes or those of

4    your fellow jurors.

5              The punishment provided by law for this crime is for

6    the Court to decide.  You may not consider punishment in

7    deciding whether the government has proved its case against the

8    defendant beyond a reasonable doubt.

9              A verdict form has been prepared for you.

10             Do you want to put to form up, Carmel?

11             Because you've been asked to decide on several counts,

12   and because the counts involve different instructions, the

13   verdict form is a little more detailed than several forms, so I

14   want to go over it with you.  And if any of you have any

15   questions regarding the forms, do not hesitate to now ask those

16   questions where I and the lawyers can consult concerning an

17   appropriate answer.

18             You will see that the jury form has headings that

19   pertain to Counts 1, 2, 3, 4, and 5.

20             Count 1, as you can see by the heading, refers -- and

21   it's repeated several times throughout -- refers to the $3,000

22   Bitcoin transaction that occurred on or around May 20th, 2015.

23             In considering whether the defendant is guilty or not

24   guilty on Count 1, which is, again, the $3,000 Bitcoin

25   transaction, the jury may only consider instruction 8.147A.

1        Now, we have not yet read 8.147A.  We'll read it in a

2   few minutes.  That may be a little confusing to you.  Let me

3   explain to you what it means.

4        You should consider all of the jury instructions.  But

5   the defendant is charged in each of these counts with violating

6   a statute that you may violate in one of two ways.

7        8.147A advises you as to one of the ways in which the

8   defendant may have or may not have violated the law.

9        Instruction 8.147B, which we will discuss also a

10  little later on, discusses the other way that the defendant can

11  violate the law contained in the statute.

12        Sometimes there may be evidence from which you can

13  conclude the defendant violated either or both of those --

14  those ways you could violate the statute.  But as to Count 1,

15  the only way you can consider that the defendant may have

16  violated the statute is contained in jury instruction 8.147A.

17        Is that clear to all of you?

18        Do you all understand that?

19        Any questions about that?

20        All right.

21        Then, if we go down to Count 2, which is the $13,000

22  Bitcoin transaction on or around October 7, 2015, you'll see

23  that in considering whether the defendant is guilty or not

24  guilty on Count 2, you may consider both instructions 8.147A

25  and/or 8.147B.

1        In other words, you may -- there is evidence from

2   which you may determine that the defendant violated -- may or

3   may not determine that the defendant violated the statute using

4   one or both of those -- of the instructions that I will give

5   you in just a few minutes.

6        Then you will see that if you find the defendant

7   guilty on Count 2, you need to check one or both boxes below

8   the counts to indicate whether or not you found the defendant

9   intended to avoid a transaction reporting requirement or

10  whether he intended to disguise -- conceal or disguise the

11  nature, location, source, ownership, or control of property

12  believed to be the proceeds of specified unlawful activity.

13       You can check one of those boxes.  You can check none

14  of those boxes.  Or you can check both of those boxes.  You are

15  not -- you are only to check any of those boxes if you

16  define -- if you find the defendant guilty of violating Count

17  2.

18       Does everybody understand that?

19       Any confusion?  Or can I clarify that for anyone?

20       You will find as we go down then through Counts 3, 4,

21  and 5, that they are all -- they require you to do the same.

22  They allow you to consider both ways that the statute may have

23  been violated and they require you, if you determine that the

24  defendant, in fact, violated the statute, to indicate how the

25  defendant violated the statute in either or both or no ways.

1          Do you understand that?

2          Are there any questions as to the jury verdict form?

3          Are there any concerns by counsel as to how I have

4    instructed the jury concerning the verdict form?

5          MS. WEIDNER:  No, Your Honor.

6          MR. BINFORD:  No, Your Honor.

7          THE COURT:  All right.

8          So a verdict form has been prepared for you.  After

9    you have reached unanimous agreement on a verdict, the

10   foreperson should complete the verdict form according to your

11   deliberations, sign and date it, and advise the bailiff that

12   you are ready to return to the courtroom.

13         I am going to add -- and, Counsel, pay attention

14   because this is not in the jury verdict instructions -- that

15   you should consider each count separately.  You should consider

16   the guilt or innocence of the defendant with respect to each

17   count separately.  So you should have -- you should make a

18   determination as to each count.  I think that's probably clear

19   by the form, but I just want to make it clearer.

20         If it becomes necessary during your deliberations to

21   communicate with me, you may send a note through the bailiff,

22   signed by any one or more of you.  No member of the jury should

23   ever attempt to communicate with me except by a signed writing,

24   and I will respond to the jury concerning the case only in

25   writing or here in open court.  If you send out a question, I

1   will consult with the lawyers before answering it, which may

2   take some time.  You may continue your deliberations while

3   waiting for the answer to any question.  Remember that you are

4   not to tell anyone, including me, how the jury stands,

5   numerically or otherwise, on any question submitted to you,

6   including the question of the guilt of the defendant, until

7   after you have reached a unanimous verdict or have been

8   discharged.

9           You have heard testimony from Nolan Sperling, a

10  witness who pleaded guilty to a separate crime and who received

11  a cooperation benefit from the government.

12          Mr. Sperling's guilty plea is not evidence against

13  Mr. Costanzo and you may consider it only in determining

14  Mr. Sperling's believability as a witness in this trial.

15          For this reason, in evaluating the testimony of Nolan

16  Sperling, you should consider the extent to which or whether

17  his testimony may have been influenced by the benefit he

18  received or hopes to receive from the government in exchange

19  for testifying against Mr. Costanzo.  In addition, you should

20  examine the testimony of Nolan Jack Sperling with greater

21  caution than that of other witnesses.

22          The defendant is charged with conducting a financial

23  transaction involving property represented to be the proceeds

24  of specified unlawful activity in violation of Sections

25  1956(a)(3)(B) and (C) of Title 18 of the United States Code.

1   There are two ways in which the defendant can violate the

2   statute.  In order for the defendant to be found guilty of

3   either charge, the government must prove each of the following

4   elements beyond a reasonable doubt.

5          This is 8.147A which involves the concealment of

6   proceeds of specified unlawful activity.

7          First, to be liable under this charge, you must find

8   that, first, the defendant -- well, let me correct that.

9          For you to find the defendant liable for this charge,

10  you must find each of the elements beyond a reasonable doubt.

11         First, that the defendant conducted or attempted to

12  conduct a financial transaction;

13         Second, that the property involved in the transaction

14  was represented by an undercover law enforcement officer to be

15  the proceeds of specified unlawful activity; and

16         Third, the defendant conducted the transaction with

17  the specific intent to conceal or disguise the nature,

18  location, source, ownership, or control of property believed to

19  be the proceeds of specified unlawful activity.

20         A financial transaction is a transaction involving one

21  or more monetary instruments, or the movement of funds by wire

22  or other means, that affects interstate or foreign commerce in

23  any way.  The term "funds" includes any currency, money, or

24  other medium of exchange that can be used to pay for goods and

25  services.

1          "Proceeds" means any property derived from or obtained

2     or retained, directly or indirectly, through some form of

3     illegal activity, including the gross receipts of such

4     activity.

5          The term "specified unlawful activity" means the

6     manufacture, importation, receiving, concealment, buying,

7     selling, or otherwise dealing in a controlled substance or

8     listed chemical -- chemical under the Controlled Substances

9     Act.  The government need not show that the undercover law

10    enforcement officers explicitly stated that the cash in

11    question was the direct product of unlawful activity.

12         Second, the second way you can violate the statute is

13    the avoidance of federal transaction reporting requirements.

14         You may find the defendant guilty if, in fact, you

15    find that the government has proved each of the following

16    elements beyond a reasonable doubt:

17         First, the defendant conducted or attempted to conduct

18    a financial transaction;

19         Second, the property involved in the transaction was

20    represented by an undercover law enforcement officer to be the

21    proceeds of specified unlawful activity; and

22         Third, the defendant conducted the transaction with

23    the specific intent to avoid a transaction reporting

24    requirement under federal law.

25         A financial transaction is a transaction involving one

or more monetary instruments, or the movement of funds by wire

or other means, that affects interstate or foreign commerce in

any way.  The term "funds" includes any currency, money, or

other medium of exchange that can be used to pay for goods and

services.

          "Proceeds" means any property derived from or obtained

or retained, directly or indirectly -- indirectly, through some

form of illegal activity, including the gross receipts of such

activity.

          The term "specified unlawful activity" means the

manufacture, importation, receiving, concealment, buying,

selling, or otherwise dealing in a controlled substance or

listed chemical under the Control Substances Act.  The

government need not show that the undercover law enforcement

officers explicitly stated that the cash in question was the

direct product of unlawful activity.

          A "transaction reporting requirement" means either the

currency transaction reporting requirement for currency

deposits or withdrawals exceeding $10,000 into or from a

financial institution, or the suspicious activity reporting

requirements for financial institutions.

          Ladies and gentlemen, those are your jury

instructions.

          Does either party have any objections or additions to

the instructions as I have given them?

```
 1              MR. BINFORD:  No, Your Honor.
 2              MS. WEIDNER:  No, Your Honor.
 3              THE COURT:  Okay.
 4              You ready to begin your closing argument?
 5              MR. BINFORD:  Yes, Your Honor.
 6              THE COURT:  All right.
 7              Ladies and gentlemen, I am going to explain to you
 8   that the government, as I've explained to you before, bears the
 9   burden of proof in this case.  It is their responsibility to
10   establish beyond a reasonable doubt that the defendant is
11   guilty of each of the elements of the crimes for which he has
12   been charged.
13              Because the government has that burden, they are
14   allowed to address you first.  Then the defendant will address
15   you.  And because the government has the burden, they are
16   allowed to address the comments made by the defendant.
17              After you have heard then from the government, the
18   defendant and the government, again on rebuttal, we will
19   designate the three of you who will be alternate jurors and the
20   12 of you will then be excused to begin your deliberations.
21              All right.  Mr. Binford.
22              MR. BINFORD:  Thank you, Judge.
23              THE COURT:  Please.
24              MR. BINFORD:  Ladies and gentlemen, you've now heard
25   the evidence.  You've heard that on five separate occasions
```

GOVERNMENT'S CLOSING STATEMENT

1    Thomas Costanzo, Morpheus, the defendant, took drug money from

2    undercover agents and he turned that drug money into Bitcoin

3    and he did that in order to help the undercover agents hide

4    that drug money, to conceal that drug money, and to avoid

5    transaction reporting requirements.

6          That's money laundering.

7          You heard that Bitcoin, while completely legal to own

8    or purchase, is hard to trace.  You heard that while Bitcoin

9    does have legitimate uses, it has features that make it

10   attractive to money launderers and to drug dealers.

11         The defendant knew that, and that's why he charged

12   ten percent.  That's why he charged a fee that was five times

13   higher than what someone would expect to pay with a commercial

14   exchange, a commercial exchange that they could access from the

15   convenience of their home, instead of having to go down to

16   Panda Express or McDonald's or Starbucks and meet with someone

17   with a lot of cash.

18         You've heard that Bitcoin transactions on the

19   Blockchain don't include names.  They don't include street

20   addresses, Social Security numbers or birth dates.

21         Those records include limited information such as the

22   amount of Bitcoin exchanged, the date and time of the

23   transaction, and the Bitcoin wallet address, which is that long

24   string of numbers and letters.

25         As the defendant told the undercover agents during his

 1    meetings with them, Bitcoin was perfect for what they were

 2    doing.  It was the perfect way to conceal and disguise their

 3    drug proceeds and it was the perfect way to avoid federal

 4    transaction reporting requirements.

 5              That's why the defendant's on trial.  That's money

 6    laundering.

 7              There are five counts charged in this case.  You can

 8    see them there on your screen.

 9              Count 1 was the May 20th transaction with Sergei where

10    he said that the money was heroin proceeds.  That was the

11    $3,000 transaction.

12              Then there was the deal on October 7th.  That was the

13    $13,000 deal with Sergei's business partner Tom, where Tom said

14    that it was heroin proceeds.

15              On November 21st, 2015, Sergei again met with the

16    defendant.  He told him that this was part of his business and

17    he had $11,700 in drug proceeds that he wanted to exchange for

18    Bitcoin.

19              For Counts 4 and 5, that was once DEA got involved.

20    That's when Jake, Undercover Jake, met with the defendant and

21    told him that he had $30,000 worth of cocaine proceeds that he

22    wanted to turn into Bitcoin.  He told him that he had just sold

23    a key of coke.  That was February 2nd.

24              An April 20th, he, again, met with the defendant.  He

25    told him he had sold a few more keys and now had $100,000 worth

GOVERNMENT'S CLOSING STATEMENT

1   of Bitcoin that he wanted to buy.  He brought $107,000 in cash

2   to that transaction because he wanted to cover that 7 percent

3   fee that the defendant was charging him, the $7,000 that he was

4   charging him to exchange that dirty drug money.

5           Each count is based on a different deal, and you're to

6   independently consider each count when you go back.

7           You just heard in your instructions from Judge Snow

8   that in order to find the defendant guilty, you have to find,

9   one, that the defendant conducted a financial transaction; two,

10  that the property involved in that transaction was represented

11  by an undercover law enforcement officer to be the proceeds of

12  specified unlawful activity, which in this case is drug

13  trafficking; and then three -- for Counts 2 through 5, is

14  either the defendant conducted the transaction with the intent

15  to avoid a transaction reporting requirement under federal law

16  or that the defendant conducted the transaction with the intent

17  to conceal or disguise the nature, location, source, ownership,

18  or control of the property that the defendant believed was the

19  proceeds of specified unlawful activity.

20          For Count 1 you're just considering whether he

21  intended to conceal or disguise the nature, location, source,

22  ownership or control of that property that he believed was the

23  proceeds of specified unlawful activity.

24          In a moment I'm going to go into detail about each of

25  these transactions.  I'm going to go into detail about the

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1  evidence you heard for each of these transactions.  But first,

2  I want to talk to you about entrapment.

3          You will have the opportunity to decide whether the

4  defendant was entrapped by the government.  But you heard for

5  yourself that the defendant was given numerous opportunities to

6  walk away.

7          Now, ask yourself:  Did he ever walk away?

8          No.  He was willing to do a $3,000 transaction when

9  there was drug money involved and he was willing to do a

10  $107,000 transaction when there was drug money involved.

11          He took drug money from four different individuals

12  over a two-year period.  He continued to take drug money and

13  conceal it from early 2015 up until the time of his arrest in

14  April of 2017.

15          During that time he took drug money from Sergei, who

16  you now know as Special Agent Kushner.  He took drug money from

17  Tom, who you now know as Special Agent Klepper.  He took drug

18  money from Jake, who you now know as Task Force Officer Martin.

19  And he took drug money from Nolan Sperling, the kid -- or the

20  young man who was getting drugs from overseas and importing

21  them here to the United States.

22          Now, there are two ways that the government can show

23  that the defendant was not entrapped.  You only have to find

24  one or the other, but there is evidence for you to find both

25  beyond a reasonable doubt.

GOVERNMENT'S CLOSING STATEMENT

1           The first is predisposition.  That means the defendant

2    had done it before or he was willing to do it before agents

3    ever approached him.

4           Keep in mind that information gained after government

5    conduct can be used to prove predisposition.  So let's look at

6    how you know the defendant was predisposed to commit money

7    laundering.

8           You heard he was using Bitcoin to buy drugs.  He was

9    asked:  Do you still want that DMT?

10          And he said:  Let's use Telegraph app for text.

11          When he asked "how much" and the person selling the

12   DMT said "80 per gram," he said:  Please be way more discreet.

13          In January of 2015 before agents ever approached him,

14   you heard that when someone told him that their husband was

15   using Bitcoin to buy drugs, he said:  That's none of my

16   business.

17          This conversation occurred long before he was ever

18   approached by Sergei.

19          He was selling Bitcoin to Nolan Sperling, who was a

20   drug dealer.  Nolan Sperling was not a federal agent.  He was a

21   young man who came in here and talked about the charges he

22   faced for selling drugs, for importing drugs.  You heard that

23   the defendant was at Panda Express talking about how banks were

24   evil, doing deals with what appeared to be $10,000 in cash.

25          You heard that he was at McDonald's doing cash deals

GOVERNMENT'S CLOSING STATEMENT                      912

1    under the table.

2                    (Portion of audio played.)

3              MR. BINFORD:  He bragged about previously converting

4    $20 bills into $100 bills at the casino.

5              Does that sound like someone who didn't know anything

6    about money laundering?

7              The second way that we can show that the defendant was

8    not entrapped is by showing that there was no inducement.  That

9    means the defendant was not forced or pressured into the crime.

10             In your instructions you'll see them talk about

11   threats, coercive tactics, harassment, pleas based on need,

12   sympathy, or friendship.  None of that was present here.

13             You heard for yourselves what the defendant told the

14   undercover agents.  You heard and saw how he reacted after

15   drugs were introduced into the conversation.  He was eager to

16   continue to do more deals.

17             This is what he sent after the May 20th meeting where

18   Sergei mentioned heroin:  Thank you for your business.  Use

19   Mycelium to connect.  Has encrypted chat.

20             Does that seem like someone who didn't want to engage

21   in future transactions?  Does that seem like someone who was

22   pressured or forced into engaging in these transactions?

23             Here's the message he sent after the October 7th

24   transaction where Tom mentioned "heroin."

25             Thank you for your business, Tom.

GOVERNMENT'S CLOSING STATEMENT

```
 1              Tom says:  Thanks.
 2              And then he accidentally calls the defendant by his
 3    name:  Thanks, Tom.
 4              And then they get into this whole conversation:  Who's
 5    Tom?  I'm Morpheus.  Your name is Tom.
 6              Was he forced?  He would push back when needed.  But
 7    did he ever push pack when drugs are were talked about?  Did he
 8    ever push back when he was asked how he would conceal drug
 9    money?
10              After the November 21st, 2015, transaction, he said:
11    Thank you for your business, bro.  I have more.
12              He was willing to continue to engage.  He was never
13    forced.  He was never measured.  He wanted to keep doing this
14    business.  He wanted to engage in this type of activity.  There
15    was no inducement.
16                     (Portion of audio played.)
17              MR. BINFORD:  So that's at the end of the
18    February 2nd, 2017, transaction once he hears that the money is
19    from cocaine sales.
20              He doesn't say:  No.  No.  No.  I don't know if I can
21    do this anymore.  I don't want to be involved in this type of
22    activity.
23              He says:  Hey.  Have you heard of Telegram?  Let's use
24    Telegram.  Let's make sure our conversations are secure.
25              That's not someone who's induced.  That's not someone
```

GOVERNMENT'S CLOSING STATEMENT                    914

```
 1    who's forced to engage in these transactions.

 2           He always provided his own transportation.  You heard

 3    that sometimes he was running to meet people.  You heard other

 4    times he was using this motorized bike to get around.  He took

 5    the light rail.  He was on buses.  He drove his own car.  He

 6    always provided his own transportation.  He was always the one

 7    who suggested the use of encrypted apps, whether it was

 8    Telegram or Mycelium that he used with Sergei.  He always said

 9    he could provide larger amounts.

10           Every time he was asked:  Can you do that?

11           He said:  Yeah.  I can do that.

12           He was never threatened.  He was never harassed.  He

13    was never promised a reward.  And he was always eager to engage

14    in more transactions.

15           So what type of person would take drug money and say:

16    Bitcoin is great for what you're doing because tracing it is

17    extremely difficult.

18           Well, the defendant said that.

19           What type of person would say:  By using Bitcoin as

20    part of your drug trafficking business model, you can cut your

21    risk in half.

22           The defendant said that.

23           MS. WEIDNER:  Misstatement of the evidence.

24           THE COURT:  Ladies and gentlemen, as I indicated to

25    you, you'll have to recall what the evidence is.
```

1          MR. BINFORD:  What type of person would say:  Oh, it's

2     drug money?  Well, I don't want to know it's drug money.  But

3     in that case, let's use this encrypted messaging app.

4          The defendant.

5          What type of person would say:  Please be way more

6     discreet when talking about the purchase of drugs with Bitcoin.

7          Well, we just saw the exhibit.  That was the defendant

8     that said that.  He said those things.  And because of that,

9     ladies and gentlemen, you can find beyond a reasonable doubt

10    that he was not entrapped.  You can find that he was pre-dis --

11    predispose -- pre-disposed -- sorry about that -- to commit

12    money laundering and you can find that he wasn't induced.

13         And given the testimony from Nolan Sperling, you know

14    that the defendant was not induced and would have taken drug

15    money, whether or not federal agents were ever involved in this

16    case.

17         Only a money launderer would accept drug money and

18    turn it into something that's hard to trace, something that's

19    not linked to a name, an address, a Social Security number,

20    something that can be transported across state lines or

21    internationally, on a cell phone or a piece of paper without

22    anyone other than the holder ever knowing.

23         So let's go back to why agents were interested in the

24    defendant.  You heard that there are two types of exchanges,

25    commercial exchanges like Coinbase.  That's the one that you

GOVERNMENT'S CLOSING STATEMENT

1    heard was insured by the FDIC, the one that charges between

2    one-and-a-half to two percent.

3         And then you heard that there are peer-to-peer

4    exchangers like those advertised by the defendant on

5    localbitcoins.com.  That's the website that you heard was

6    hosted in a foreign country.

7         You heard that drugs can be bought on the Internet

8    using Bitcoin.  You heard that peer-to-peer exchangers like the

9    defendant make that possible.  So, yeah, they were interested.

10         What did they see when they reviewed his online

11    profiles?  Well, they saw that he advertised up to $50,000 in

12    cash transactions.  He's out there online saying:  Yeah, bring

13    me $50,000 in cash.

14         What else is he saying?  I don't need a license.  I

15    don't need a bank.  I don't need a permit to do it.  All I need

16    is a phone.

17         His ad said:  I will get you Bitcoins immediately and

18    discreetly.  All transactions are done with complete anonymity.

19    He emphasized being discreet.  He emphasized being anonymous.

20         Yeah, that's appealing to federal agents.  And, he

21    said, he knew enough to be dangerous, whatever that means.

22              (Portion of audio played.)

23         MR. BINFORD:  So agents meet with him.  This is the

24    first meeting.  Sergei sits down with the defendant and he

25    talks about depositing more than $10,000.  And the defendant

UNITED STATES DISTRICT COURT

1    immediately says:  Oh, yeah, the bells go off.  That's going to

2    set off some alarms.

3            So he knows about these reporting requirements.  This

4    is before drug talk is ever mentioned.  This is right off the

5    bat.  This is how he leads into his business conversations.

6                    (Portion of audio played.)

7            MR. BINFORD:  So he talks about concealment of

8    financial transactions.  This is right off the bat.  This is

9    before anyone has ever said, hey, I'm doing something illegal.

10   I'm a drug trafficker.  I'm a heroin drug trafficker.

11           He's talking about concealment of financial

12   transactions.  And you'll see on these slides -- you won't get

13   these slides back with you -- these are not evidence.  But they

14   refer you to the evidence you can look at while you're

15   deliberating.

16           At the top there it says Exhibit 101B.  That's the

17   exhibit number.

18           While you're back there deliberating, you're free to

19   listen or look at any of the evidence that has been admitted in

20   this trial.  So, if you see something during this that you want

21   to consider in your deliberations, take note of those exhibit

22   numbers.  Go back and listen for yourself to see what you hear

23   on that audio.

24           The defendant talked about his business model.  He

25   talked about the websites he uses.  We just talked about one of

1    those tools, localbitcoins.com, and this is what the defendant

2    said:

3                    (Portion of audio played.)

4         MR. BINFORD:  How much money did he make doing what he

5    was doing?  Was Agent Ellsworth ever able on find out?

6                    (Portion of audio played.)

7         MR. BINFORD:  So Sergei says:  Hey, I want to wire

8    money and it might attract a little attention.

9              This is before any dirty drug talk.  What does the

10   defendant say:  Untraceable.  Untraceable.

11             He's talking about concealing that fund.  He doesn't

12   know it's drug money at that point, but he's talking about

13   concealing funds.  He's talking about hiding funds.  He's

14   talking about making that money anonymous.  Maybe it's so the

15   government cannot track where that drug money is going.

16             You also heard about the defendant's rules.  He

17   repeated them several times.

18                    (Portion of audio played.)

19         MR. BINFORD:  In what job as a financial person or as

20   an exchanger do you have to worry about getting shot unless

21   you're dealing with drug dealers?

22             And what job do you have to worry about talking to

23   policemen and getting shot unless you're dealing with drug

24   dealers on a daily basis, unless you're dealing with shady

25   people?

GOVERNMENT'S CLOSING STATEMENT

1          Think about his rules.  Why is it that those things

2    were so important to him that he repeated them thought this

3    two-year investigation?

4                    (Portion of audio played.)

5          MR. BINFORD:  It's a good way to lower your

6    visibility.  The defendant tells Sergei that Bitcoin is the way

7    to get the IRS off his back.  Because guess what?  Because now

8    there's no income.

9          Well, doesn't that seem like he's trying to hide

10   something there?

11                   (Portion of audio played.)

12         MR. BINFORD:  Tracing Bitcoin is very difficult.  You

13   heard it from the defendant.  You heard it from the agents.

14   It's very difficult.

15         The defendant knew that and that's why he engaged in

16   these transactions.  To help these people that he thought were

17   drug dealers to conceal their drug money, to hide their drug

18   money, and to avoid federal reporting requirements.

19         Keep in mind, this is still that March 20th meeting.

20   This is before drugs are ever mentioned.  He's talks about all

21   the benefits of his Bitcoin business.

22                   (Portion of audio played.)

23         MR. BINFORD:  Again, one of the many, many benefits of

24   using Bitcoin to conceal drug proceeds.  Using something that's

25   otherwise legal, something that has good uses, something that's

1    legitimate, as you heard, but instead using it in a criminal

2    way, instead, use can it to hide drug proceeds.

3               (Portion of audio played.)

4          MR. BINFORD:  Ask yourself.  Who has to worry about

5    getting shot?  Who has to worry about talking to policemen if

6    they've got a legitimate business, if they're not engaged in

7    criminal activity, if they're not pre-disposed to engage in

8    money laundering?

9          So that's the first meeting.  Those are all from that

10   first meeting.  But in the next meeting Sergei drops the drug

11   talk; right?

12              (Portion of audio played.)

13         MR. RESTAINO:  Does the defendant walk away at that

14   point? Does he say:  Whoa.  Whoa.  Whoa.  Drugs?  I'm out of

15   here.  I can't do this.

16         He doesn't.

17              (Portion of audio played.)

18         MR. BINFORD:  It's not that he doesn't want to do the

19   deal.  It's that he doesn't want to know that the money is drug

20   money.  He never says:  No.  No.  I don't want to do the deal.

21         He says:  I don't want to know what you're doing.

22              (Portion of audio played.)

23         MR. BINFORD:  Don't say "heroin" out loud.  Why not?

24         He knows what he's going to say.  He says:  Don't say

25   it out loud.

1          He knows what he's going to say.  What difference does

2    it make if he says it out loud?  He knew what he was talking

3    about.  Why be concerned about what something is being said out

4    loud unless you don't want to get caught.

5          Now, you heard his statements throughout.  I heard his

6    statements during this May 20th meeting.  He never said:  Oh, I

7    can't do that much.  I don't want to do that much.  I feel like

8    I'm being pressured into this.

9          No.  He said:

10         (Portion of audio played.)

11         MR. BINFORD:  Does that sound like someone that's

12   being pressured or forced?  "I can come up with as much as you

13   want to do."

14         (Portion of audio played.)

15         MR. BINFORD:  "I've done over a half a million dollars

16   last year."  Does that sound like someone who's being induced?

17         All right.  So around this same time that he's taking

18   drug money from Sergei, you heard that the defendant was

19   selling Bitcoin to Nolan Sperling and you heard that Nolan

20   Sperling was using Bitcoin to buy drugs online from overseas.

21         He was buying drugs from Germany and The Netherlands,

22   among other places.  You heard that he only used Bitcoin to buy

23   drugs.

24         Now, Nolan started out using Coinbase.  But as you

25   heard him say, he got worried.  He was worried that his

GOVERNMENT'S CLOSING STATEMENT

1    activity might be reported to law enforcement.  He was worried

2    because it was a joint bank account with his parents.  He

3    didn't want his parents to know what was going on.

4          He was worried because it was linked to his identity.

5    He said something in general about it defeats the purpose of

6    using Bitcoin.

7          So Nolan went to localbitcoins.com, this website

8    that's hosted overseas, and he found the defendant.  And he

9    told you that the defendant never asked for his ID or his

10   Social Security number or date of birth.  He told you that he

11   met with the defendant every four to six weeks.

12         And every time he gave the defendant somewhere between

13   $2,000 and $10,000 in cash.  He estimated that he gave the

14   defendant a total of thirty to $35,000 in cash throughout the

15   course of meeting with him.  That seems like a lot of cash for

16   a young man to have meeting with the defendant.

17         You heard that Nolan told the defendant about the

18   seizure and that the defendant did not stop doing business with

19   him at that point.

20         You heard instead, he asked Nolan -- or he asked --

21   the defendant asked Nolan Sperling to get DMT, some drug.

22         You also heard that he told Nolan to use Telegram, an

23   encrypted messaging app.  You heard Nolan tell you that the

24   defendant charged him a 10 percent rate on the Bitcoin but it

25   was a small price to pay for what he was getting.

GOVERNMENT'S CLOSING STATEMENT

1      The defendant then met with Tom, Special Agent Tom

2  Klepper.  And right off the bat, what does he say?

3              (Portion of audio played.)

4      MR. BINFORD:  Don't confuse reluctance to hear where

5  the money is from with reluctance to engage in money

6  laundering.

7      Prior to this meeting the defendant knew what Sergei's

8  business was, he knew what it was all about and he knew what he

9  was doing when he was meeting with Sergei's business partner.

10     Tom asked the defendant --

11     Well, he talked to him about keeping things safe.

12             (Portion of audio played.)

13     MR. BINFORD:  Bitcoin is a lot safer for drug

14  traffickers; right?  You heard Special Agent Ellsworth talk

15  about the benefits of virtual currency and what made Bitcoin

16  attractive to drug traffickers.  What made it attractive to

17  money launderers?  The anonymity.

18             (Portion of audio played.)

19     MR. BINFORD:  The defendant knows that Bitcoin is a

20  problem for the government.  He knows that Bitcoin is a problem

21  for law enforcement.  But what does he call it?  He says:

22  That's beautiful.

23     What person doesn't want to engage in money laundering

24  that's not predisposed to commit money laundering, talks about

25  government not being able to track it, law enforcement not

1    being able to see it and says:  That's a beautiful thing.

2              Especially, when they're talking to someone who they

3    think is a heroin drug dealer.

4                     (Portion of audio played.)

5         MR. BINFORD:  Remember the premium they were paying?

6    Ten percent.  That's about five times as much as one of these

7    commercial exchanges that you can access from home; one of

8    these commercial exchanges that's insured by the FDIC and also

9    privately insured.

10                    (Portion of audio played.)

11        MR. BINFORD:  Ten percent is a significant amount.

12   It's a significant amount to pay.

13                    (Portion of audio played.)

14        MR. BINFORD:  His business model is perfect for money

15   laundering.  No questions asked.  Every drug dealer's dream.

16                    (Portion of audio played.)

17        MR. BINFORD:  Are you firmly convinced that the

18   defendant knew the money he was turning into was drug money?

19                    (Portion of audio played.)

20        MR. BINFORD:  Who ups it here?  Is this someone that's

21   being induced?  Is this someone that feels forced?  Or does he

22   say:  Let's take it to the next level.  Let's make it

23   impossible for anyone to know that Tom and Sergei are giving

24   the defendant drug money, that they're moving drug money across

25   to United States.

GOVERNMENT'S CLOSING STATEMENT

```
 1              (Portion of audio played.)

 2         MR. BINFORD:  So that advice was pretty accurate;

 3    right?  You cut your exposure in half.  Think of Nolan

 4    Sperling.  How did he get caught?  Did federal agents ever

 5    intercept the money?  Did they ever intercept the Bitcoin?

 6         No.  They intercepted parcels that were coming from

 7    overseas.

 8         Nolan Sperling used Bitcoin to buy drugs and he cut

 9    his exposure in half.  The defendant was absolutely right.  He

10    knew how to help drug dealers limit their exposure.  He

11    intended to do it for Sergei.  He intended to do it for Tom.

12    He intended to do it for Jake.  And he did it for Nolan

13    Sperling, but it wasn't good enough for Nolan Sperling because

14    he got caught.  He got charged with a federal crime for

15    bringing those drugs in.  But he was never caught on the money

16    side.  It was the product side.

17         So we're now in November of 2015.  The defendant's met

18    with Tom.  He's met with Sergei.  What does he know at this

19    point?  He knows that Sergei is a drug trafficker.  He knows

20    that he gets heroin here and gets it back to New York.  And

21    maybe he ships things in car parts back to Eastern Europe.  He

22    knows that Tom is Sergei's business partner.

23         Does he refuse to engage in these transactions?  No.

24    He does a deal for $11,700 and he tells Sergei:  Low profile is

25    way, way, way better.
```

1                   (Portion of audio played.)

2              MR. BINFORD:  You heard him say -- I know the audio is

3    low in here.  You'll have this exhibit.  This is Exhibit 104A.

4    If you feel that you need to go back and listen to this, you

5    can go back there.  You can review it.  You can turn the volume

6    all the way up.

7              But at this point the defendant knows what's going on.

8    He knows what he's doing.  And that's why he's telling him:

9    Low profile is way better.  I know that, you know what I mean,

10   but I don't want to know.

11             At the end of this transaction, you heard him, he was

12   eager to do more business.  Sergei is trying to get out of

13   there, and what does the defendant say?  Hey.  I can get more.

14   Do you want to do more?  Do you want to do more?

15             I mean, he is eager to do this.  This is not someone

16   that was induced.

17                  (Portion of audio played.)

18             MR. BINFORD:  Does he seem reluctant?  No.  He's not

19   reluctant at all.  He's extremely eager to continue to engage

20   in these drug-money-laundering Bitcoin transactions.

21             And even after that he continues to talk about how

22   Bitcoin is hard to track.

23                  (Portion of audio played.)

24             MR. BINFORD:  And you may recall at this point he's

25   talking about online gaming.  He's talking about poker robots,

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

```
 1    I believe, was the testimony that we heard.

 2            But he's talking about how Bitcoin is not traceable.

 3    Whether they're using it for a poker robot to make some money

 4    online or you're using it to move heroin proceeds across the

 5    country or to move cocaine proceeds from Arizona to California,

 6    there's no tracking or anything.

 7            You heard from Agent Ellsworth:  This is one of the

 8    things that makes Bitcoin so attractive to drug dealers and

 9    money launderers.

10            So no more transactions with Tom or Sergei.  They're

11    done.  They told him all about their heroin business.  They got

12    their Bitcoin.  DEA gets involved in this investigation.  Task

13    Force Officer Chad Martin takes the lead on the undercover

14    assignment.

15            He becomes Jake, this guy who is trying to get cocaine

16    money converted into Bitcoin so that he can get it back to his

17    guy in California.  And Jake meets with the defendant a couple

18    times before he drops, "Hey, this is from cocaine."  Right?

19            The first time he meets him, September of 2016, what

20    does the defendant say to him?

21                    (Portion of audio played.)

22            MR. BINFORD:  He's right.  Again, he's right.  It's

23    very difficult.  It's difficult to track.  It's difficult to

24    narrow down.

25            He was being honest with those agents.  He was telling
```

GOVERNMENT'S CLOSING STATEMENT

```
 1   them, hey, these are some of the attributes of Bitcoin that
 2   might work for your business model.
 3            At this point he doesn't know cocaine is the business
 4   model, but he knows he wants to move money without it being
 5   discovered by the government.
 6            And we're not just talking about the United States
 7   here, because the defendant says:
 8                     (Portion of audio played.)
 9        MR. BINFORD:  Now, he's talking about moving money
10   internationally, outside of the United States, overseas,
11   like -- it sounds like Nolan Sperling was doing, without
12   anybody tracing it, without anybody tracking it.  That money
13   could be going anywhere.
14                     (Portion of audio played.)
15        MR. BINFORD:  What type of business are you engaged in
16   where you constantly have to tell people you don't want to get
17   shot?  You don't want to talk to police.  Does he say:  If
18   you're doing something illegal, I don't want to be involved in
19   it?
20            No.
21            He says:  If you're doing anything illegal, I don't
22   want to know about it.
23                     (Portion of audio played.)
24        MR. BINFORD:  What's the point of the defendant
25   telling Jake this at this point?  This is September.  This is
```

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1    before Jake ever mentions, hey, I'm moving cocaine, a key of

2    cocaine.

3         He's telling him about some other transaction where

4    somebody told him about shipping stuff in car parts overseas.

5         Well, why would he tell him that?  Is the defendant

6    hinting that, you know, if you're doing something illegal, it's

7    okay with it.  I'll go through with the transaction, but I

8    don't want to know.

9         What purpose would he have in telling Jake, telling

10   this -- this young man who is talking about moving $30,000?

11   Why would he say that?  Why would he bring that up?  Unless

12   that's something that he was hoping to do.

13              (Portion of audio played.)

14        MR. BINFORD:  All right.  So earlier we heard him

15   talk.  He knows what a Cash Transaction Report is, a Currency

16   Transaction Report.  He said:  Someone goes in with $10,000.

17   Alarm bells go off.

18        Now, we also know that he knows what a Suspicious

19   Activity Report is.  So he's familiar with these federal

20   reporting requirements.  The defendant knows all about these

21   federal reporting requirements and he's working with these

22   undercover agents to avoid those requirements.

23        He's taking their drug money so they don't have to go

24   into a traditional financial institution and get reported.

25   Have to provide their ID.  Have to provide their name, address,

UNITED STATES DISTRICT COURT

1    employment information.  By dealing with the defendant, they

2    can avoid all of that and that's what makes what the defendant

3    was doing attractive to drug dealers and money launderers.

4                    (Portion of audio played.)

5            MR. BINFORD:  He doesn't say:  I don't want to do

6    business with you.

7            He says:  I don't even know what people's real names

8    are.  I don't even want to know.  I don't want to know their

9    name.

10           Well, what person engaged in legitimate business

11   transactions is going to say something like that?  What person

12   that's selling Bitcoin because they're really all about Bitcoin

13   and not about money laundering is going to say that?  Is going

14   to say:  I don't want to know your name.  I don't want to know

15   your address.  I don't want to know.

16           Do you ever hear him ask about anybody's family

17   throughout all of these recordings?  When you go in there,

18   listen, see.  Does he ask about people's family?  Is he really

19   trying to get to know these people?  Or is he trying to charge

20   ten percent, seven percent, get his cut and have his hands over

21   his ears like he doesn't know what's going on?

22           So you'll recall around this same time in the

23   investigation the defendant is at Panda Express.  He's seen

24   handing what looks like $10,000 -- or taking what looks like

25   $10,000 in cash from another person.

GOVERNMENT'S CLOSING STATEMENT                    931

1          He's seen at McDonald's taking a wad of cash -- again,

2     underneath the table.  He's meeting with these people.  He's

3     taking large amounts of cash.  And so he's not just doing this

4     with Jake.  He's not just doing this with Sergei.  He's not

5     just doing this with Tom or Nolan Sperling.

6          This is his business model.  He goes around telling

7     people:  Don't get bit.  Don't get shot.  Don't talk to police.

8     Give me your cash.  I'll charge you ten percent.  I won't say

9     anything to anyone.

10          That's what he does all day, every day.

11          But then we get into the February 2nd transaction, and

12     this is Count 4.  And when Jake talks about drugs, what does

13     the defendant say?

14                    (Portion of audio played.)

15          MR. BINFORD:  What's that noise?  What's he doing?  He

16     doesn't want to know; right?  He's trying to sound it out.

17     He's trying to sound out the fact that this is drug proceeds.

18          Why doesn't he want to know?  It's not like he

19     stops -- not like he stops the transaction.  He doesn't say:

20     Oh, you know, I'm not going to do this.

21          He just says:  I don't want to know.  I don't want to

22     get in trouble; right?  I don't want to get arrested.  Not:  I

23     don't want to do this deal.

24          I don't want to get arrested.

25          So Jake tells him:  Hey, this is from a key of coke,

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1    and what does the defendant suggest?

2                    (Portion of audio played.)

3             MR. BINFORD:  So I think you've heard this before.

4    Once someone drops the drug talk, like, hey, Nolan Sperling or,

5    hey, do you still want that DMT?  He says:  Oh, let's use

6    Telegram.  Let's switch to an encrypted app.  I don't want to

7    get arrested.  I don't want to get in trouble for the crimes

8    that I'm committing.

9             Now, the audio is quiet.  You can go back and listen

10   to it.  You can determine for yourself whether it says "one key

11   of coke" there.  But there's no doubt -- there should be no

12   doubt after listening to that that that's what you've heard,

13   that's what the evidence shows.

14            Now, we move on to the April 20th meeting.  And at

15   that meeting, again, Jake mentions that:  Hey, this is drug

16   proceeds.  And he makes it abundantly clear.

17                    (Portion of audio played.)

18            MR. BINFORD:  "I don't need to know."

19            Ask yourself.  Are you firmly convinced that the

20   defendant knew he was getting drug money?

21            Remember, to prove these charges, we have to prove

22   each element beyond a reasonable doubt.  And to prove it beyond

23   a reasonable doubt means evidence that leaves you firmly

24   convinced.

25            Are you firmly convinced that he engaged in a cash

GOVERNMENT'S CLOSING STATEMENT

1    transaction each of these five times?

2           Are you firmly convinced that he knew that the money

3    he was taking was drug proceeds?

4           So after that April 20th incident, he's arrested;

5    right?

6           Agents go and they search the Loma Vista residence.

7    They go out there, and what do they find?  They find this

8    whiteboard in the middle of his living room.

9           That stuff must have been pretty important to hang up

10   in the middle of his living room.  Things like "encrypted

11   coms."  "Avoid banks" and "hand to hand."

12          This is Exhibit 16.  You'll have it back there with

13   you.  Ask yourself:  Why would someone think that these things

14   are so important that they have to be on a whiteboard in the

15   middle of their living room?

16          They find money bands at his house; right?  This is

17   someone who's dealing with a lot of cash.  He's got $5,000

18   money bands.  $2,000 money bands.  He's got different

19   denominations.  This is someone who is taking cash on a daily

20   basis.

21          And we know -- well, I think the evidence shows beyond

22   a reasonable doubt that in five of those transactions, he did

23   it knowing that it was drug proceeds and with the intent to

24   avoid -- with the intent to conceal the nature of those funds;

25   and in four of the counts, to avoid transaction reporting

UNITED STATES DISTRICT COURT

1    requirements.

2            What else did they find at his house?  They find this

3    pamphlet; right?  What does it say?  No frozen accounts.  No

4    bank.  No government forms.  You can open an account without

5    showing identification.

6            Do you remember Agent Ellsworth's testimony?  Do you

7    remember why this type of system was attractive to drug

8    dealers?  Anonymity.  The same thing the defendant stressed in

9    his online ads, that he stressed in person when he was talking

10   to the undercover agents.

11           So now I want to go through each count and just give

12   you a little clip of audio to show you each element.

13           So this first one is from Count 1.  This is May 20th,

14   2015.  And this was a $3,000 financial transaction.

15           How do you know it's a financial transaction?

16                   (Portion of audio played.)

17       MR. BINFORD:  Normally, he has $3,000 worth of Bitcoin

18   on him.  Right.  Are you firmly convinced that this was a

19   $3,000 financial transaction?

20           Next element, the proceeds of specified unlawful

21   activity.

22                   (Portion of audio played.)

23       MR. BINFORD:  I know nothing.  He says:  You know it's

24   drugs; right?

25           He says:  I know nothing.

GOVERNMENT'S CLOSING STATEMENT

 1        That was the responsive answer to his question.

 2                (Portion of audio played.)

 3        MR. BINFORD:  Black tar heroin from Mexico, 27 a key

 4   here.  More than that back East.

 5        Are you firmly convinced that the defendant knew that

 6   Sergei was talking about heroin, that he was talking about drug

 7   proceeds?

 8        So the third element for Count 1 -- and this is the

 9   one that's different than the other four:  Did the defendant

10   intend to conceal or disguise the nature, location, source,

11   ownership, or control of the property?

12        Well, let's listen to what he had to say.

13                (Portion of audio played.)

14        MR. BINFORD:  He doesn't want to know anything.

15        Is that an intent to conceal location, source,

16   ownership, or control of property?  Well, who owned the

17   property before giving it to the defendant?  Sergei owned that

18   drug money.

19        He said:  I don't want to know.  He never asked his

20   full legal name, his ID, any of that.

21                (Portion of audio played.)

22        MR. BINFORD:  "Don't tell me anything I don't need to

23   know."

24        Ask yourself:  Are you firmly convinced that his

25   intent there was to conceal or disguise the nature, location,

GOVERNMENT'S CLOSING STATEMENT                    936

1    source, ownership, or control of the property?

2            Based on the evidence, you should be.

3            Now, Count 2 is October 7th, 2015.  This is the

4    transaction with Tom.  This was a $13,000 transaction.  And how

5    do you know that?

6                    (Portion of audio played.)

7            MR. BINFORD:  The next element is that it was the

8    proceeds of specified unlawful activity; in this case, heroin,

9    heroin trafficking.

10                   (Portion of audio played.)

11           MR. BINFORD:  Count 2, the third element of that is an

12   intent to avoid a transaction reporting requirement or intent

13   to conceal or disguise the nature, location, source, ownership,

14   or control of the property.

15           Let's listen to what the defendant said about those

16   things.

17                   (Portion of audio played.)

18           MR. BINFORD:  It's a lot safer.

19           Well, why is it safer?

20                   (Portion of audio played.)

21           MR. BINFORD:  Tom wants to conceal the nature of that

22   drug money.

23           And what does the defendant say?  That's why you're

24   paying me.  What's why you're paying me 10 percent.

25           Count 1, this is the $11,700 transaction.  This is

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1   with Sergei.  And how do we know that it's a financial

2   transaction?

3                    (Portion of audio played.)

4            MR. BINFORD:  Talking about money; right?  Money is

5   exchanging hands.

6            You have the graphs.  They're in evidence.

7   Exhibits 84, 85, 86, 87, and 88 are all exhibits that you can

8   turn to back in the jury room if you want to turn to them and

9   those are the graphs that show these Bitcoin transactions that

10  show the approximate amount of Bitcoin that was exchanged on

11  each of those days.

12           You heard the testimony from Special Agent Ellsworth

13  that the Bitcoin transacted was about the same amount

14  approximated with the fee.

15           Now, this transaction, how do we know that the

16  defendant knew it was the proceeds of specified unlawful

17  activity?

18                    (Portion of audio played.)

19           MR. BINFORD:  "I don't ever want to hear what you do

20  again."  And this is November 21st.  So we've had the May 20th

21  meeting at this point.  The May 20th meeting he says:  I get

22  heroin from Arizona to New York and then on in car parts.

23           October 7th.  He meets with Tom, who he thinks is

24  Sergei's business partner.

25           He says:  Yeah.  It's heroin; right?  This is our

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1    security.  We want you to know it's heroin because we don't

2    want you to walk away; or we want to know you're not walking

3    away right now.  You're going to say:  Hey, I'm not involved in

4    this illegal activity.

5            This is November 21st.  So this after all that, after

6    he's built up all this knowledge of their business plan.  He

7    says:  I don't ever want to hear what you do again.

8            And that is something you can go back and listen to in

9    the jury room.

10           Now, how do we know that the defendant intended to

11   avoid a transaction reporting requirement and intend to conceal

12   or disguise the nature, location, source, ownership, or control

13   of the property?

14           Well, listen to his own statements.

15                   (Portion of audio played.)

16           MR. BINFORD:  Low profile is way, way, way better.

17           The defendant understands that this is drug money and

18   that Sergei doesn't want it to get out there.

19           That's why he tells him:  Don't say anything to

20   anyone.  Low profile is way, way, way, way better.

21                   (Portion of audio played.)

22           MR. BINFORD:  Again, he's talking about this casino

23   website, but he's talking about Bitcoin.  He's talking about

24   how there's no tracking.  And at this point it's clear to him

25   what that business model is.  Heroin.  Heroin drug sales,

UNITED STATES DISTRICT COURT

GOVERNMENT'S CLOSING STATEMENT

1   getting money somewhere else without being seized by the

2   government, without being reported to the government.

3          The next count is Count 4.  This is the February 2nd,

4   2017, transaction with Jake.  How do we know it's a financial

5   transaction?  Well, you heard about the bag.  You heard about

6   the bag with $30,000 in it.

7          You heard that the defendant tried to fit it into his

8   fanny pack and it was just too much cash to fit in there that

9   day with the bag and everything, so Jake told him:  Hey, go

10  ahead, take the bag.

11         And then he was seen driving away.  He's even showing

12  up at someone else's house with that bag of money, going into

13  the house with that bag of money.

14         How do we know that the defendant knew it was the

15  proceeds of specified unlawful activity?  Well, you heard the

16  recording.  You heard that Jake, the Task Force Officer Martin

17  said:  This is cocaine money.

18                    (Portion of audio played.)

19         MR. BINFORD:  So for Count 4 you can find that the

20  defendant intended to avoid a transaction reporting requirement

21  and that he intended to conceal or disguise the nature,

22  location, source, ownership, or control of the property.

23         And you know that because of his prior statements.

24  What did he tell Jake on November 16th?

25                    (Portion of audio played.)

UNITED STATES DISTRICT COURT

1        MR. BINFORD:  So that's three months before this

2   February 2nd transaction.

3        He's telling Jake:  Yeah, I know what a suspicious

4   activity report is.  I know what these reports are.  But when

5   they go to the defendant, those reports aren't being filed.

6                   (Portion of audio played.)

7        MR. BINFORD:  Think about it again.  What person who

8   is engaged in legitimate business says:  I don't want to get

9   shot.  I don't want to talk to the police throughout the day.

10        Those are words of a money launderer.

11                   (Portion of audio played.)

12        MR. BINFORD:  All right.  After the drug talk comes

13   up, he says:  Use Telegram.  This is a way to further protect

14   it.

15        As he mentioned previously in a prior transaction to

16   Tom, he -- he wanted to up it.  He wanted to take things to the

17   next level.

18        Count 5.  That's the last charged transaction.  That's

19   the $107,000 transaction on April 20th, 2017.  That's the

20   transaction where Task Force Officer Martin, who was Jake, as

21   the defendant knew him, showed up and met him at the Starbucks

22   in Tempe.

23        You saw Exhibit 58 and Exhibit 59.  You saw the

24   defendant counting the cash.  You know that that was a

25   financial transaction because he's counting the cash.  He

 1    counted to $107,000.  Remember that $7,000, Jake put a binder

 2    clip on it to distinguish it from the $10,000 bundles, the ten

 3    $10,000 bundles.

 4          How do we know that he's talking about cocaine at that

 5    meeting?

 6                    (Portion of audio played.)

 7          MR. BINFORD:  "I don't need to know."  I don't need to

 8    know that that's street money.  That that's your drug money.

 9                    (Portion of audio played.)

10          MR. BINFORD:  He talks about concealing the location.

11    It's hard to track.  That's concealing the location.  Bitcoin

12    is great for your drug money because the location can be

13    concealed.  It can't be tracked by the government.

14                    (Portion of audio played.)

15          MR. BINFORD:  So let's talk about the tools of the

16    trade.  Everyone in their profession has tools that they use.

17    Whatever your profession, you have tools that are go-to tools

18    in your line of business.

19          Well, let's say that the go-to tools for the

20    defendant, for a money launderer --

21          THE COURT:  Mr. Binford, do you have a lot longer?

22          MR. BINFORD:  I have less than five minutes, Judge.

23          THE COURT:  All right.

24          MR. BINFORD:  This first one here:  A Trezor, right?

25    You need a secure device to store your Bitcoins if you're a

GOVERNMENT'S CLOSING STATEMENT

1   Bitcoin money launderer.

2           You need a fanny pack because you've got to carry tons
3   of cash around; sometimes it's 10,000, sometimes it's 30,000,
4   sometimes it's 107,000.  But you've got to have that fanny pack
5   and the accessories.

6           You need some gold and silver coins so you can bash
7   fiat currency.  You can talk about how the U.S. dollar is
8   worthless.  So you can explain why Bitcoin is better to conceal
9   your drug money.

10          You've got to have those props.  Those things are
11  important to someone who's a salesman, someone who is trying to
12  sell drug dealers on converting drug money to Bitcoin and the
13  benefits of it.

14          You need some ads with subtle hints about your
15  business model:  I will get you Bitcoin immediately and
16  discreetly.  All transactions are done with complete anonymity.

17          Remember?  That's the word that Nolan Sperling
18  struggled with on the stand.  He said "anonymity."  But that
19  was what was important to him and that's why he went to the
20  defendant.

21          This is a guy who says:  Bring me $50,000 cash.

22          So, yeah, online ads is a big part of it.

23          You need a Bitcoin wallet that can send Bitcoin from
24  multiple addresses and that has an encrypted app so you can
25  have illegal conversations.

GOVERNMENT'S CLOSING STATEMENT

1          And, of course, you need Telegram; right?  So you can

2    talk about drugs.  You can talk about providing Bitcoin in

3    exchange for drug money.  All of these things can happen on

4    Telegram because it's not on the servers.

5          The defendant had these tools in his business.  I'm

6    guessing that these tools are a lot different than any tools

7    that you use in your businesses.  But he had these tools and he

8    showed the undercover agents.  He showed Nolan Sperling these

9    tools to help them be better, to help them launder their dirty

10   drug money.

11               (Portion of audio played.)

12          MR. BINFORD:  That's why they were paying him.  That's

13   why they were paying 10 percent.

14          Ten percent is a small price to pay to remain

15   anonymous.  Nolan Sperling, who moved away from Coinbase

16   because it was linked to his bank account, because it was -- he

17   thought his activity might be reported to the government, said

18   something generally along the lines of:  It was a small price

19   to maintain anonymity.

20          And that should stand out to you because he struggled

21   with that word on the stand; but that was important to him.

22          So let's take a look at this.  The defendant, he was

23   pre-disposed to commit money laundering.

24          The evidence shows that.  He had experience converting

25   cash at casinos; twenties for one hundreds.

1          He was providing Bitcoin to Nolan Sperling, a drug

2     dealer.

3          The defendant was not induced.  He provided all of his

4     own tools.  He was always eager to engage in more transactions.

5     He knew it was drug money.  There's no question that he took

6     drug money.  You've heard the evidence.  You'll go back.  You

7     can listen to it again.

8          Those agents are incredibly clear when they say

9     "heroin," when they say "drug money," when they say "a key of

10    coke."  He took that drug money and he converted it into

11    Bitcoin with the intent to conceal and disguise the nature of

12    the money, the location of the money, the source of the money.

13    And he also did it in Counts 2 through 5 to avoid federal

14    transaction reporting requirements.

15         The evidence in this case establishes beyond a

16    reasonable doubt that the defendant sitting over there, he's

17    guilty.  And that's why we're asking you to hold him

18    accountable for his actions and to find him guilty on all five

19    counts of money laundering.

20         Thank you, Judge.

21         THE COURT:  Thank you.

22         Ladies and gentlemen, we're going to take the lunch

23    break now.  I'm going to ask you to be back at 1:20, and

24    remember the admonitions.

25         And so we'll see you then.  Have a pleasant lunch.

1          COURTROOM DEPUTY:  All rise.

2              (Jury leaves the courtroom at 12:05 p.m.)

3          THE COURT:  Were there issues, Ms. Weidner, between

4     you and the government with respect to the instructions that we

5     need to give for forfeiture if, in fact, there is a guilty

6     verdict?

7          MS. WEIDNER:  No, Your Honor.  I went over the

8     instructions that I was provided and I told Mr. Restaino that

9     we were fine with them.

10         I do have a quick issue I want to raise before we

11    break for lunch.

12         THE COURT:  All right.  Hold that for just a second.

13         Do the parties object if I indicate to the jurors that

14    depending upon their verdict, we may -- before I dismiss them

15    to retire, if I instruct them that depending upon the nature of

16    their verdict, we may have one further inquiry for them?

17         MR. RESTAINO:  We don't object, Your Honor.

18         MS. WEIDNER:  Neither do we, Your Honor.

19         THE COURT:  All right.  So, Ms. Weidner, what issue

20    did you need to raise?

21         MS. WEIDNER:  Your Honor, I wanted to preserve our

22    right to make a motion for mistrial.  There were a number of

23    selections of audio clips that were played, some of them were

24    linked to an actual exhibit and then there were some that

25    weren't.  Some, I was able to identify have actually been

1    admitted into evidence; some, it was not clear.

2           THE COURT:  If he can demonstrate that they played

3    exhibits that weren't introduced into evidence, I will allow

4    you to preserve your right to move for a mistrial.

5           MS. WEIDNER:  Thank you, Your Honor.

6           I would ask to get access to -- to the government's

7    presentation because I just was unable to determine.

8           MR. BINFORD:  Yeah, Judge.  I'm happy to provide the

9    defense with a copy of the PowerPoint.

10          THE COURT:  All right.  Please do that over lunch and

11   then we'll see you at 1:20 for the defense's closing argument.

12          MS. WEIDNER:  And, Your Honor, today I'm not going to

13   have the opportunity to -- to look at the government's --

14          THE COURT:  You have preserved your motion.

15          MS. WEIDNER:  Right.  Thank you.

16          THE COURT:  Uh-huh.

17                (Proceedings in recess at 12:08 p.m.)

18                (Proceedings resume at 1:27 p.m.)

19          THE COURT:  Thank you.  Please be seated.

20          I just wanted to see the parties briefly because I

21   wasn't sure I understood whether or not there was going to be a

22   second evidentiary hearing at all related to forfeiture, if, in

23   fact, there is a guilty verdict rendered.

24          MR. BINFORD:  Your Honor, if we do proceed to that

25   stage, we're prepared to make argument to the jury based on the

UNITED STATES DISTRICT COURT

DEFENDANT'S CLOSING STATEMENT

```
1    evidence they've already heard without presenting any

2    additional evidence.

3              THE COURT:  All right.  And the defense has been

4    apprised of that?

5              MS. WEIDNER:  The government did not apprise us of

6    that, Your Honor.  But given how the trial will proceed, we

7    assumed that the evidence regarding forfeiture was coming in,

8    especially with Agent Landa at the end yesterday.

9              THE COURT:  That's what I had assumed.  Does the

10   defense want to present any evidence relating to the forfeiture

11   counts?

12             MS. WEIDNER:  No, Your Honor.

13             THE COURT:  So are you ready to do your closing?  I

14   don't know whether it's Mr. Cain or Ms. Weidner.

15             MS. WEIDNER:  Yes, Honor.  It's me.

16             THE COURT:  All right.  Kathleen, can we get the jury?

17             COURTROOM DEPUTY:  Yes, Judge.

18             THE COURT:  All right.  Thank you very much.

19                 (Jury enters the courtroom at 1:28 p.m.)

20             THE COURT:  Thank you so much.  I hope you had a

21   pleasant lunch and you're ready for the afternoon.

22             Please be seated.

23             Ms. Weidner, are you ready for your closing argument?

24             MS. WEIDNER:  Yes, Your Honor.

25             THE COURT:  Thank you.
```

**DEFENDANT'S CLOSING STATEMENT**

1          MS. WEIDNER:  Good afternoon.

2          You've heard all the evidence now and you know that

3     this case is not about dirty drug money.  Far from it.  It's

4     not nearly that interesting.  It's about a storyline, a

5     fairytale, a ruse that was manufactured, envisioned, produced,

6     and packaged by agents of our own federal government.

7          Now, most of the federal agents you heard from told

8     you the same thing, that this new technology, Blockchain, and

9     the altcoins that rely on Blockchain technology, like Bitcoin,

10    have made law enforcement's job harder for now.

11         But the tools available to law enforcement will change

12    as the law adapts, as technology marches on.  And you know that

13    to date, law enforcement hasn't gotten any favors from Congress

14    in that respect.  You heard again and again from federal agents

15    who testified about how, to their knowledge, Congress has yet

16    to act on the issue of the movement of digital value, of

17    Blockchain or Bitcoin.

18         And don't you think that if Congress had thrown them a

19    bone like that, had at least set the ground rules, that law

20    enforcement agents would be among the first to know?  That they

21    do everything in their power to utilize that tool in this

22    emerging environment?

23         But the absence of a tool is not a license to target

24    and effectively hunt down a person otherwise involved in legal

25    activity.  And that is what this case is about.

**UNITED STATES DISTRICT COURT**

DEFENDANT'S CLOSING STATEMENT

1        You know now that when government agents envisioned

2   this case, when they built it from the ground up, they went off

3   a profile, an ad on a website.  That website, as you know, is

4   localbitcoins.com, an online platform for peer-to-peer Bitcoin

5   exchanges.

6        You heard testimony from the government's expert,

7   Special Agent Don Ellsworth, that localbitcoins.com is still in

8   operation.  It still provides a platform for peer-to-peer

9   exchangers, because peer-to-peer exchanges are not inherently

10  illegal.  It's not illegal to buy, sell, own, or invest in

11  Bitcoin.  It is perfectly legal to buy or sell Bitcoin on a

12  commercial exchange or in a peer-to-peer exchange.

13       The localbitcoins.com profile for Thomas Costanzo was

14  the profile selected by government agents for this

15  investigation.  There was no ongoing investigation that led the

16  government to Mr. Costanzo and his profile.  No anonymous tip

17  or information from an informant that pointed agents in his

18  direction.

19       It was a shot in the dark.  And with that, the

20  government with its team of highly trained and experienced

21  agents, rolled out an extensive operation that would last

22  nearly two years.  This operation involved undercover agents,

23  surveillance teams, federal and state law enforcement.

24       And the target of that operation, Bitcoin enthusiast

25  and peer-to-peer exchanger Thomas Costanzo.

UNITED STATES DISTRICT COURT

DEFENDANT'S CLOSING STATEMENT

1          And how did the government approach their target?  The

2  same way a hunter would.  First, identify the target.  Second,

3  identify and exploit the target's vulnerabilities.  Finally,

4  take down the target, lured into range, and if you're a hunter,

5  kill it.  If you're the government, entrap him, lock him up.

6          So after the agents chose Mr. Costanzo as their

7  target, they identified his vulnerabilities, specifically, his

8  distrust of the government and commercial banking, his

9  unbridled enthusiasm for Bitcoin, his commitment to the idea

10  that Bitcoin provides a complete alternative to a system he

11  believes is inherently corrupt and the fact that he was

12  supporting himself through his Bitcoin exchanges.  He was

13  self-employed, so to speak.

14          Undercover agents were employed with their sensitive

15  recording equipment to arrange meetings with Mr. Costanzo.

16  Prior to these meetings the agents would set an amount for the

17  exchange.  They started small but got increasingly larger.

18          You heard evidence that Mr. Costanzo had never done

19  exchanges that big.  He told Sergei, the first undercover

20  agent, that the largest he had ever done was $25,000.  But the

21  government pushed and pushed for larger and larger exchanges.

22  And the last exchange, $100,000, exceeded the trading limit

23  even posted on Mr. Costanzo's localbitcoins ad, which was just

24  $50,000.

25          And by that time the government knew that Mr. Costanzo

UNITED STATES DISTRICT COURT

DEFENDANT'S CLOSING STATEMENT

1   didn't have access to the Bitcoin necessary to complete these

2   big exchanges, that he had to go to his bank, and he learned

3   that his bank is Dr. Peter Steinmetz.

4           Mr. Costanzo couldn't do the deals without him.  The

5   surveillance team even followed Mr. Costanzo to Dr. Steinmetz's

6   home after one exchange, a visit where it definitely looked

7   like Mr. Costanzo was dropping off the money for his bank.

8           Detective Martin asked him at the end of that $30,000

9   exchange:  Are you going to see your bank?

10          Mr. Costanzo said:  Yes.

11          And that's exactly what he did.

12          The government has argued that Mr. Costanzo was solely

13  a money launderer.  They played a statement for you where he

14  claimed to have built a multimillion-dollar business.  But the

15  evidence you've seen shows something different.  You've seen

16  where he lives.  You saw the photo of the exterior of his

17  apartment.

18          When you look at the search photos in evidence, you

19  will see, again, the inside of his apartment.  Not a

20  multimillionaire's apartment.  You heard about what he drives,

21  the car that broke down in September 2016, when he went to meet

22  UCA Jake on their first meeting, wasn't fixed until February.

23  He was on a bike in between.  Not the kind of vehicle you would

24  expect a multimillionaire to have.

25          You heard about where he goes:  McDonald's, Starbucks,

UNITED STATES DISTRICT COURT

1    Jersey Mike's, not the dining establishments of a

2    multimillionaire.

3         Mr. Costanzo was not living the life.  The evidence

4    makes that very clear.  His claims of success were about as

5    real as the undercover agents' story lines, meaning not at all.

6         The undercover agents in their meetings with

7    Mr. Costanzo, they chose their words very carefully.  They knew

8    their objective, their goal, their target.  They were working

9    to lay a trap.

10        Mr. Costanzo, on the other hand, it's evident from

11   even the excerpts that you all heard -- and those were not the

12   entire meetings -- that he was talking a mile a minute about

13   Bitcoin, about a bunch of other topics in addition to Bitcoin.

14   He was messing with his phone, setting up other meetings.

15        It's hardly even apparent that he was paying attention

16   in some of these meetings that he had with undercover agents.

17   And this is important, because for each charge, you must

18   consider whether he had an intent to conceal the source of the

19   funds.

20        Another aspect of that is the fact that Bitcoin was

21   involved, which affects the nature of that inquiry.  The

22   evidence shows that Mr. Costanzo's intention when he made

23   Bitcoin exchanges was to promote Bitcoin, to expand the

24   audience for Bitcoin, and, of course, to profit from it himself

25   and hopefully become successful someday.

DEFENDANT'S CLOSING STATEMENT 953

1          The fact that Bitcoin is pseudonymous, which, as you

2     heard, basically means that it's not anonymous, but it is

3     difficult to track.  That's just the nature of how it functions

4     for any exchange, for any party involved in the exchange.

5          Recall the words you heard from Special Agent

6     Ellsworth:  There are never any names on the Blockchain.

7     That's not being tricky.  That's just how it is.

8          So that has nothing to do with anyone's intent.  It's

9     just how Blockchain and Bitcoin work.  And as you have heard so

10    many times, none of that is illegal.

11         Second, as you consider the question of whether

12    Mr. Costanzo acted with the intent to avoid a federal

13    transaction reporting requirement, you must consider whether

14    the government established that he had sufficient knowledge of

15    applicable regulations to understand when a duty to comply

16    arises.

17         The government didn't get there in its case.  Tossing

18    around terms like SAR, that doesn't mean anything.  The

19    government is arguing to you that because the undercover agents

20    said they didn't want to deal with banks, that Mr. Costanzo, in

21    that way, intended to avoid a transaction reporting requirement

22    that a bank, in this case, the undercover agent's imaginary

23    bank, that said imaginary bank otherwise would have had a legal

24    obligation to file.  And, again, there's no real bank in this

25    case.

UNITED STATES DISTRICT COURT

DEFENDANT'S CLOSING STATEMENT

1          That is so many layers of fiction that my head spins
2     when I try to think about it.
3          Turning to the testimony of Nolan Sperling.  You have
4     to question the government's judgment in presenting you with
5     Mr. Sperling in this case.  They want you to convict
6     Mr. Costanzo so badly, they want so badly for you to find that
7     Mr. Costanzo was not entrapped by this plot they manufactured,
8     that they're willing to get a person that they know is an
9     international drug dealer, thirty to forty times over, who
10    imported real illegal drugs from Canada, Germany, and The
11    Netherlands into this country.
12         The government is relying on Mr. Sperling, someone who
13    would be a convicted felon, convicted of international drug
14    trafficking, but for the truly amazing deal he got from the
15    government.  And it was a deal of a lifetime.
16         In exchange for his testimony and keeping his nose
17    clean for now, Mr. Nolan gets to withdraw his guilty plea to
18    Importation of Narcotics.  He gets to walk away without a
19    federal conviction, without a single day in jail, without the
20    indignity of a public arrest even.
21         That is unheard of preferential treatment for an
22    individual involved in real international drug trafficking.
23    His prosecution was not a shot in the dark, like this case
24    against Mr. Costanzo.  It was not manufactured, produced, and
25    packaged by the government.

DEFENDANT'S CLOSING STATEMENT

1          Nolan Sperling's criminal conduct was very real in

2     every way.  Real packages that Mr. Sperling had imported from

3     foreign countries came to our country.  Real packages that

4     Mr. Sperling imported were seized by agents, not just in the

5     United States, in Chicago and San Francisco, but in Canada.

6          Frankly, Mr. Sperling is exactly the kind of target

7     someone known to be heavily involved in illegal activities,

8     that we expect our government to protect us from, to protect

9     our children from, to protect our society from.  Because

10    Mr. Sperling didn't just import drugs, he sold them.  And he

11    gets to walk.  And that's something to think about.

12          The government marched Mr. Sperling into this trial to

13    try to show a real-world connection to their story, this

14    construction they created to ensnare Mr. Costanzo, to entrap

15    him.

16          And remember that the case of Mr. Sperling is not

17    related to Mr. Costanzo's case, save for the fact that well

18    after the investigation of Mr. Costanzo was underway, it was

19    separately learned that Mr. Sperling had purchased Bitcoin from

20    Mr. Costanzo in 2015.

21          Also, consider what Mr. Sperling said on

22    cross-examination about the information he gave Mr. Costanzo

23    about his business.  And if you think about it, very little

24    comes to mind because he kept his mouth shut.  That's what real

25    drug dealers do.  That's what real drug traffickers do.  They

UNITED STATES DISTRICT COURT

DEFENDANT'S CLOSING STATEMENT

```
 1    keep their mouth shut around people who aren't in the business.
 2            You also heard that Mr. Costanzo bought a small amount
 3    of a narcotic hallucinogen from Mr. Sperling months into their
 4    dealing together.  Evidence indicates this happened once, but
 5    it does not in any way suggest that Mr. Costanzo knew or could
 6    have known about the extent or Mr. Sperling's activities.  He
 7    was very good, as he put it, at not being dishonest, but being
 8    devious.  His own parents had no idea what he was up to.  So
 9    how was Mr. Costanzo, who only met him a handful of times,
10    supposed to figure it out?
11            And after two years of investigation, this
12    coincidental discovery that Mr. Sperling had purchased Bitcoin
13    from Mr. Costanzo, even though Mr. Sperling kept his mouth shut
14    about what the Bitcoin was for -- and let me just emphasize
15    here, on cross -- on cross-examination, Mr. Sperling clarified
16    that he told Mr. Costanzo he had lost the money -- lost some
17    money -- I believe about $10,000 -- but not about the seizure
18    of a package.  He did not sufficiently recall.  But that is all
19    the government was able to gather as far as any real-world
20    connection to Mr. Costanzo's Bitcoin activities.
21            So we're left with a situation that was manufactured
22    and packaged and produced by the government against
23    Mr. Costanzo.  And you heard the frustration, I think,
24    definitely in the government's closing arguments, I guess,
25    about their lack of tools they have currently to address these
```

UNITED STATES DISTRICT COURT

1    issues.  But the absence of a tool is not a license to target

2    and effectively hunt down a person otherwise involved in legal

3    activities.

4            This time Mr. Costanzo was the target.  Who knows who

5    it's going to be next time?

6            So thank you for your time.  Thank you for your

7    consideration.  We urge that you find Mr. Costanzo was not

8    guilty of the charges against him, and to the extent that you

9    question that, that he was very clearly entrapped.

10           Thank you.

11           THE COURT:  Rebuttal?

12           MR. RESTAINO:  Members of the jury, did Morpheus seem

13   reluctant to you to engage in those transactions for money he

14   believed to be dirty money from drug deals?

15           You heard many, many audio clips and you're not going

16   to hear any more out here in the courtroom.  You heard the

17   enthusiasm in his voice for Bitcoins, but you also heard that

18   desire in his voice for the profit margin that comes with doing

19   shady transactions, seven to ten percent above that much more

20   reasonable rate at a Coinbase or commercial exchange.

21           You listened to Nolan Sperling -- and we'll talk about

22   him a little later on in more detail.  But you listened to what

23   he told you about his dealings with the defendant and you heard

24   about Nolan Sperling's friend Jake from Montana's dealings with

25   the defendant as well.

GOVERNMENT'S REBUTTAL STATEMENT

1          You also read the text exchanges between the defendant

2    and Kuro trying to sell that DMT hallucinogen discreetly and

3    between the defendant and that angry wife whose husband was

4    engaged in drug purchases with Bitcoins.

5          Ladies and gentlemen, who is doing the hunting here?

6          Now, again, you'll hear no more audio clips out in the

7    courtroom.  I want to echo Ms. Weidner's thanks and

8    appreciation for your service here today.  And in just a few

9    moments you'll be able to listen and review whatever evidence

10   you want as you deliberate.  And you'll have the instructions

11   with you, as well, as you deliberate.  And in particular,

12   you'll have all of the instructions you want to see.

13         Let me talk about the reasonable doubt instruction

14   which says that a reasonable doubt is a doubt based on reason

15   and common sense and is not based purely on speculation.  And

16   so as you consider the evidence, use that common sense and

17   decide and analyze for yourselves.

18         Sure, this is a newer technology, this Bitcoin.  It's

19   a newer platform.  It's a newer platform that Congress has not

20   addressed.  But it's a newer platform that can be used to

21   commit an older, existing crime, money laundering.

22         Now, you know and you've heard the evidence that the

23   law enforcement agents did not induce the defendant to engage

24   in these transactions.  And you'll have the instructions in

25   front of you as you deliberate.

1          Was there a substantial risk that an otherwise

2     innocent person would commit the offense?  And there are a

3     number of factors for you to consider and weigh.  And after

4     considering those factors, you may consider for yourselves and

5     find for yourselves that the evidence establishes he was not,

6     in fact, induced.

7          Let's walk through those.

8          Fraudulent representations is one.  Were there

9     fraudulent representations made by the agent?  Well, sure, that

10    they were drug dealers, as part of the ruse.  You also got

11    another instruction that says that law enforcement agents are

12    permitted to use stealth and deception.

13         But there's a little bit of fraudulent representation

14    there.  Sure.  Not a whole lot though, and there weren't lies

15    about the number of people that would be coming to the

16    transactions.

17         When agents said they were coming alone, they came

18    alone.  When agents said they wanted to do a deal, they showed

19    up usually and did the deal.  All of the other factors weigh

20    heavily in favor of a finding that there was no inducement.

21         Was there persuasion?  This was a person who was eager

22    to go, revved up from the beginning, chuckling when he heard

23    the references to drugs and wanting to engage in the

24    transactions.  There was no persuasion needed for him.

25         Were there threats?  Of course not.  The agents were

1    engaged in their discussions with him out in the open,

2    typically during the day or late noon.  There was no

3    overbearing of his will or coercive tactics.

4           Was there harassment?  Not on the part of the agents.

5    If you consider the spam messages that the defendant sent with

6    his text, "Hey, did you listen to my podcast the other day?"

7    maybe you would find that there was harassment there.  Again,

8    who is doing the hunting here?

9           Was there promises of a reward?  Well, no, just to the

10   contrary.  The agents didn't promise the defendant more money

11   and more of a percentage if they could do more deals with him.

12   They nickel-and-dimed him going from ten percent to

13   seven percent on the larger transactions.  That's just the

14   opposite of a reward.

15          And finally, there were no pleas here to need or

16   sympathy or friendship.  You heard a lot about what the

17   defendant likes to do when he gets out of his apartment that

18   may not be such a great apartment.  He takes yoga retreats, for

19   example.  The agents never offered to go on a yoga retreat with

20   him or to attend a Rand Paul convention or to go and see the

21   latest Snowden movie.  There was no inducement here.

22          Nor was there predisposition.  And these are other

23   factors that you'll have in front of you.  Was there reluctance

24   on the part of this defendant, Morpheus?

25          To the contrary.  He had energy, energy to ride around

961

1    town in that bicycle and take it on the light rail and go from

2    place to place and engage in transactions, stuffing bills into

3    his fanny pack all the while.  He had a shtick and an energy to

4    him in pitching the value of Bitcoin which, sure, can be used

5    legitimately and can be used to clean money that's represented

6    to be dirty money as happened on the five charged transactions.

7         Now, did the agents initially suggest the criminal

8    activity?  Yes.  That's the one factor there for predisposition

9    that cuts against the government.  But take that in context

10   using your reason and common sense with the very first

11   conversation with Agent Kushner where the defendant, on his

12   own, without prodding from Agent Kushner, said that this is

13   good for the untraceability.  That starts the conversation and

14   the discussion that leads to drugs.  That is evidence as well

15   of pre-disposition.

16        Look towards his character and his reputation.  To the

17   agents it was important that he had done 74 confirmed

18   transactions, wanting to get to more transactions.  Someone

19   that had been engaged in this activity throughout a course of

20   years.

21        Was it for profit?  Yes, a heavy, heavy profit, the

22   difference, again, between one-and-a-half percent at a Coinbase

23   and the up-to-ten percent of the transaction when conducted

24   peer-to-peer with the defendant.

25        Again, who is doing the hunting here?

GOVERNMENT'S REBUTTAL STATEMENT

1        And the nature of the persuasion is the final factor

2   that you can consider.  The nature of the persuasion is a

3   business relationship.  This is a business opportunity, not

4   false promises of friendship or need or anything else.  And you

5   have sufficient evidence to determine, as an element of the

6   crime, beyond a reasonable doubt, that Mr. Costanzo, that

7   Morpheus, was predisposed to commit this crime.

8        Look to the way he used the technology as well.  The

9   technology is not illegal, but its use can support a crime.

10       He went to that Telegram app every time a conversation

11  was about to get dirty.

12       Kuro 7 and DMT and quoting the grams:  Be more

13  discreet.  Go to Telegram.

14       TFO Martin talks about the very first dirty

15  transaction in February of 2017:  Let's shift to Telegram.

16       The same with Agent Klepper and a similar discussion

17  with the different mechanism with Agent Kushner.

18       You can also hear contrast, what the bank did.  You

19  heard about how the defendant was surveilled to the bank's

20  house and went in with the bag; couldn't see whether he came

21  out with the bag.

22       Now, it would be speculation to think that the entire

23  contents of the bag were left in the bank's house.  But the

24  bank was involved in a relationship providing a source of

25  Bitcoin to the defendant.  Except, when Agent Kushner talked to

GOVERNMENT'S REBUTTAL STATEMENT

1   the bank in March of 2016, the bank said:  I don't do dirty

2   deals.  And the bank turned down the money laundering

3   opportunity that Morpheus so very energetically leapt at.

4          You know, there's another contrast here as well.  A

5   small point from one of the earlier recordings, 102C.  You

6   heard the defendant talking with Agent Kushner about his

7   interactions with a guy that he really liked who was selling

8   deities, the Ganesh statues and the like.

9          He said, you know, I got this guy hooked up with

10  Coinbase so he can get his Bitcoins and he can sell his

11  statues.  You never heard the defendant suggest the use of

12  Coinbase to any of the undercover agents and that's an

13  interesting fact.

14         And you've heard all about the various tools that the

15  defendant had at his disposal here with respect to his

16  pre-disposition.

17         You know he's got the phone.  Really, you know, he had

18  the Samsung phone and the BlackBerry phone.  He's got that

19  knowledge.  That's a tool.  It's fun, fun, fun, fun, fun, fun.

20  He knows this stuff.  On audio 107D, they're doing these

21  complex transactions of Bitcoin into dollars.

22         What does the defendant say?

23         I could do this stuff in my sleep.

24         He's got to hustle.  He is running, jogging, in street

25  clothes to get to that first deal with TFO Martin because

1    there's a buck to be made.  And then later on, once he realizes

2    that it's drug money, there's some concealment to be had.

3            And finally, who sets the location of these meetings?

4    This is something that the defendant typically did in

5    suggesting where he wanted to be.

6            Doesn't the defendant also have a sophisticated

7    understanding of how a drug trafficking operation might work.

8    In that discussion with Agent Klepper about how the use of

9    Bitcoin cuts half of your exposure.  You might have to move the

10   product one way, but there's no more dirty cash coming back

11   around.

12           Now, let's talk a little bit about Nolan Sperling.

13   You heard Ms. Weidner discussing him at some length.

14           And you have an instruction.  Follow that instruction.

15   And that instruction says to examine his testimony with greater

16   care.

17           And what that means is you should look to

18   corroboration.  How does one corroborate?  Well, in this case,

19   you've got a huge and large text string between Nolan Sperling

20   and the defendant.  Look at the text chain.  This is also a

21   transaction, by the way, in which Sperling is paying that seven

22   to ten percent which he considers to be a sacrifice in order to

23   keep himself off the grid.  Not only that, but Sperling turns

24   out to be a supplier of that DMT hallucinogen for the

25   defendant.  Again, who is ensnaring whom here?

1      You've also got this bit about him being an

2   international drug dealer which, sure, he is, in that he is a

3   drug dealer and he got product internationally.  But you know

4   the scope.  You heard the scope on cross-examination during the

5   time he's working, getting Bitcoin from the defendant.

6      Spends about 30- to 35,000 on the drugs.  Nets --

7   nets, now, about 30- to 35,000.  Because he had the money

8   seized and he has another batch of money that's seized out of

9   the -- out of the parents' home where he's got the product

10  seized on one place and the money seized out of the parents'

11  home.

12      That takes the $15,000 profit.  It's gone.  The only

13  person making profit from Nolan Sperling's transactions is

14  that.  And you've got the circumstantial evidence to

15  corroborate Nolan Sperling's recollections of what the

16  defendant knew.

17      You've got that large transaction coming in August of

18  2015.  They're going to really ramp it up.  You've got the

19  Xanax seizures sometime in 2015.  And you can decide for

20  yourselves what was and was not said about that.  And then

21  you've got that November, 2015, text.

22      Again, it's sort of a spanning text; right.

23      It's:  Did you see me on Localbitcoin last night on my

24  podcast?

25      And he says:  So your customers will understand.

1        That's circumstantial evidence as to the defendant's

2   intent and knowledge of what transactions were going on with

3   Nolan Sperling.  You should consider his testimony with greater

4   care, but you should also look to the corroboration on that.

5        Now, as to the defendant's knowledge with which

6   Ms. Weidner spoke of, you've got the belief that the -- that

7   the funds were drug money.  And the audio establishes his

8   belief, at least, that those representations were true.

9        And then you've got the issue of the transaction

10  reporting where he has to know what those transaction reporting

11  requirements are.  That is, he has to have the specific intent

12  to evade them.  And in order to evade them, one must know what

13  they are.

14        That's a little bit different than the concealment

15  prong of money laundering which simply means he's got to have

16  the intent to conceal, which we'll talk about in a bit.

17  There's no regulations on what it means to conceal.

18        What it means to conceal is up to you and your common

19  sense.  But what it means to avoid a transaction reporting

20  requirement is the currency transaction reporting requirement

21  for more than 10,000 and the suspicious activity report that

22  Agent Ellsworth testified to and that you heard the defendant

23  speak about in the audio.

24        And so does he have a specific intent here with

25  respect to avoiding that requirement?  Look to his purpose and

1    look to those other transactions to get at his intent.  Look to

2    Kuro.  Look to the angry wife.  Look to Nolan Sperling and his

3    friend Jake from Montana.  Look to the manner in which those

4    three undercover transactions took place.

5         And you can and should find that there is avoidance of

6    a transaction reporting requirement, as well as the specific

7    intent to conceal.

8         Indeed, if one listens to the -- if you listen to the

9    audio, you can listen to 101J in which the defendant says:

10   Now, with Bitcoin, there's no income.

11        Bitcoin, therefore, can be used to conceal and this

12   defendant had the specific intent to conceal the money that was

13   handed over by those undercover agents.

14        To conceal what?  The source.  The location of it.

15   The ownership of the money.

16        This is a defendant, ladies and gentlemen, that is

17   hunting around for that seven to ten percent windfall, for

18   shady transactions, five of which in this case were done by

19   undercover officers offering drug money for the defendant to

20   attempt to conceal and for the defendant to intend to avoid the

21   reporting requirements on the transactions.

22        He engaged in all five of those transactions.  And at

23   this time the United States asks that you hold that man,

24   Morpheus, Thomas Costanzo, the defendant in this case, guilty

25   on all five counts in the indictment.

1          Thank you.

2          THE COURT:  Ladies and gentlemen, we've appreciated

3    your attention throughout trial.

4          As I indicated at the beginning, both parties are

5    entitled to have their case deliberated on by no more and no

6    less than 12 jurors.  We seated 15 of you to be sure that we

7    would have 12 at the end.  And so now we must designate three

8    alternates.

9          Let me explain that while the 12 jurors will be

10   released -- the 12 jurors from the admonition -- I'm sorry.

11         The 12 jurors who will deliberate this case will be

12   released from the admonition, at least insofar as they should

13   discuss this case among themselves.

14         The three alternates will not be released from the

15   admonition.  We may need you during the course of the

16   deliberations.  And so we can't have you discussing this case

17   with yourself or with anyone else.  And we will ask you to

18   leave your phone numbers with Kathleen so that if we need to

19   contact you, we can get in touch with you in case we need to

20   have you come in and substitute for an unavailable juror.

21         Is there any question about that by anyone?

22         All right.  Obviously, we appreciate very much, those

23   of you, who are going to serve as jurors.  But we equally

24   appreciate -- and in some ways appreciate more -- those who

25   will be designated as alternates, because it's difficult to sit

```
 1    throughout trial, hear all the evidence and then not be allowed
 2    to sit through deliberations.
 3            And so before we designate who you are, whoever you
 4    are, I want you to know we thank you.  We appreciate your
 5    dedication and your service to your country.
 6            Because this is a federal court, we designate
 7    alternates in only the most sophisticated manner.  We have 15
 8    numbers on little tiles.  We put them in a cup.  We shake up
 9    the cup and we draw the first three numbers.  And those numbers
10    are the ones that are designated as the alternates.
11            Have both parties had a chance to verify that numbers
12    one through 15 are in the cup?
13            If you haven't --
14            MR. RESTAINO:  We deferred, Your Honor.
15            THE COURT:  I'm sorry.  What?
16            MR. RESTAINO:  We deferred, Your Honor.
17            THE COURT:  Well, you know you don't need to defer.
18            If you want, you can come see that we have numbers one
19    through 15 and not any double numbers or anything else.
20            MR. CAIN:  We trust the Court, Your Honor.
21            THE COURT:  All right.
22            Sir, you're Juror Number 1.
23            Number 2.
24            Number 3.
25            Ma'am, you're Juror Number 4.
```

1           Number 5.

2           Number 6.

3           Number 7.

4           Number 8.

5           Juror Number 9.

6           Juror Number 10.

7           Eleven, 12, 13, 14, and 15.

8           Kathleen, will you please draw out three numbers.

9           COURTROOM DEPUTY:  Juror Number 10.

10          THE COURT:  Juror Number 10.

11          COURTROOM DEPUTY:  Juror Number 3.

12          And Juror Number 4.

13          THE COURT:  Yes.  So that would be, ma'am, you, Juror

14   Number 3, Juror Number 4, Juror Number 10.

15          We would ask you to be sure that Kathleen has your

16   telephone numbers, as I've indicated, to be sure that we can

17   get in touch with you if we need to.

18          Please, also, you're not released from the

19   admonitions.  Don't discuss this case with anyone.  When the

20   case is over, we will call you, if you wish, to let you know

21   what the verdict is and also to let you know you're released

22   from the admonitions and you can then discuss the case with

23   whomever you wish.

24          If you have items in the jury room, we would ask you

25   when we dismiss the rest of the jurors to begin their

1    deliberations, just to pick up your items and go.  And please,

2    do not discuss this case with any of the existing jurors or

3    anyone else.

4         Again, I do wish to reemphasize to each of the three

5    of you how grateful we are for your service.

6         As to the rest of you, I do not dictate how long your

7    deliberations will be.  And I need to inform you that depending

8    upon what your verdict is, we may ask you to consider one more

9    question.  So you may actually have to do two separate

10   deliberations.

11        And as I said, we do not dictate how long you

12   deliberate for or how you decide the case.  But I will say that

13   if you go until five o'clock today and you haven't reached a

14   verdict, I'm going to ask you to go home and come back tomorrow

15   and resume your deliberations.  You'll be free to do so.  The

16   jury room will be open and everything will be available.

17        When you elect a foreperson and you go on break, just,

18   please call my chambers so that I know that you're on break and

19   I'm aware that you're out and about.

20        And then when you reassemble and begin deliberations,

21   call and let me know that too so I can be sure that the bailiff

22   knows where you're at and what you're doing and can provide you

23   with the appropriate support.

24        You don't need the write out requests for coffee,

25   phone calls, checking on your car, stuff like that that doesn't

1    have anything to do with this case.

2           But if you have any questions during your

3    deliberations which pertain to evidence, the instructions or

4    the verdict, you need to write them down and give them to the

5    bailiff and to continue your deliberations, because while I

6    will give an answer to your question, it may not be an answer

7    you want, number one; and number two, I need to consult with

8    both parties before I answer any of your questions.

9           So you should continue your deliberations.  You're not

10   to use the telephone or your telephones or the books in the

11   courtroom for any purpose.

12          I am now going to have the bailiff sworn in and she

13   will escort you to the courtroom and you may begin your

14   deliberations.

15          (Bailiff sworn.)

16          THE COURT:  All right.  Ladies and gentlemen of the

17   jury, you are now excused.

18          Alternate jurors, again, thank you very much.

19          COURTROOM DEPUTY:  All rise.

20          (Jury leaves the courtroom at 2:13 p.m.)

21          THE COURT:  All right.  I am informed that counsel

22   have reviewed and approved the exhibits to be sent back to the

23   jury; is that correct?

24          MR. RESTAINO:  It is correct with one nagging issue,

25   Judge.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.

 2              MR. RESTAINO:  Exhibit 97 is one that was shown.  It

 3    was admitted through -- sorry.  It was admitted with Jason

 4    Shadle.  It was referred to but not actually published.

 5              The defense had preserved an objection.  We would have

 6    no objection to it simply being withdrawn from evidence that

 7    goes back to the jury.

 8              MS. WEIDNER:  You know, Your Honor, having considered

 9    that issue some more over the time since it was first raised,

10    we would not object to withdrawing that either.  It's -- I

11    think it's just kind of a weird, extraneous, non-informative

12    piece of information.

13              THE COURT:  All right.  Well, with the stipulation of

14    the parties, then Exhibit 97 is withdrawn with no further

15    corrective action needed to be taken, I take it.

16              MR. RESTAINO:  Correct, Your Honor.

17              MS. WEIDNER:  Yes, Your Honor.

18              THE COURT:  I am also informed that the parties are

19    aware that the Court is providing a laptop, which is otherwise

20    blank, to go into the jury room in case they wish to listen to

21    any of the recordings; is that correct?

22              MR. RESTAINO:  Yes, Your Honor.

23              MS. WEIDNER:  I have -- I -- this is -- Your Honor, I

24    did not -- I knew that the jury would have the recordings in

25    evidence and the Court, in fact, made statements about that.
```

1          -- I wasn't aware of the computer and I have -- if --

2          THE COURT:  Would you like to check out the computer?

3     You have the right to do so, if you wish.

4          MS. WEIDNER:  You know, I think for the purposes of

5     the record, it is a good idea.  And if you would just give us a

6     moment with our paralegal who is much more skilled in that than

7     I am?

8          THE COURT:  Sure.

9          MS. WEIDNER:  Thank you.

10         THE COURT:  Then will both parties hold themselves

11    close to the courtroom in case we have any questions or can

12    inform you of a verdict.

13         And does Kathleen have your telephone numbers?

14         MS. WEIDNER:  I will get my telephone number to

15    Kathleen, Your Honor.

16         MR. RESTAINO:  And we'll make sure of that as well,

17    Judge.

18         THE COURT:  All right.  Thank you.

19              (Proceedings in recess at 2:16 p.m.)

20              (Proceedings resumed at 3:40 p.m.)

21         THE COURT:  Please be seated.

22         You both have read and reviewed the question?

23         MS. WEIDNER:  Yes, Your Honor.

24         MR. RESTAINO:  Yes, Your Honor.

25         THE COURT:  Seems to me the answer is "no."

1          Is there any dispute between the parties?

2          MS. WEIDNER:  None from the defense, Your Honor.

3          MR. RESTAINO:  I think that likely is the answer here,

4     Judge.  I mean, just for the record, you know our position that

5     apart from this trial, money-transmitting businesses and

6     peer-to-peer exchangers must been licensed under 18 U.S.C.

7     1960.

8          But for the purposes of the evidence in the trial and

9     based on the Court's questioning of the parties last night and

10    tonight, that there's no question that we did not present this

11    as him having an obligation to file those.

12         THE COURT:  All right.  And so do you object if we

13    just answer "no"?

14         MR. RESTAINO:  I think that's the smartest thing,

15    easiest way to do it, Judge.

16         MS. WEIDNER:  No objection, Your Honor.

17         THE COURT:  All right.  That's what we'll do.

18         Thank you.

19              (Proceedings in recess at 3:41 p.m.)

20              (Proceedings resume at 3:58 p.m.)

21         THE COURT:  Please be seated.  All right.

22         I just want to be prepared against any eventuality.

23    And should the jury return a guilty verdict on any one of the

24    counts, I take it from both parties that there is no new

25    evidence that is presumed on the forfeiture verdict.

```
 1              MR. BINFORD:  That's correct, Your Honor.

 2              THE COURT:  Do you want to make argument?

 3              MS. WEIDNER:  Yes, Your Honor.

 4              THE COURT:  How long is your argument going to take?

 5              MS. WEIDNER:  Very brief, Your Honor, for the defense.

 6              MR. BINFORD:  Much less than five minutes.

 7              THE COURT:  Okay.  So we could ask the jury if they

 8    want to proceed to the forfeiture part of the case and just go?

 9              MR. BINFORD:  I would be prepared to do that, if

10    they -- if they have a guilty verdict.

11              MS. WEIDNER:  So will I, Your Honor.

12              THE COURT:  All right.

13              Kathleen, will you please get the jury.

14                  (Jury enters the courtroom at 4:00 p.m.)

15              THE COURT:  Thank you.  Please be seated.

16              Can I please have the Foreperson identify himself or

17    herself.

18              Madam Foreperson, has the jury reached a unanimous

19    verdict as to each of the counts contained in the verdict form?

20              JUROR NUMBER 12:  Yes.

21              THE COURT:  Would you please then give that verdict

22    form to Kathleen.

23              Oh, by the way, have you signed the form?

24              JUROR NUMBER 12:  Yes.

25              THE COURT:  Thank you.
```

UNITED STATES DISTRICT COURT

1        THE COURT:  The Clerk will please read the verdict.

2        COURTROOM DEPUTY:  We, the Jury, find the defendant,

3   Thomas Mario Costanzo:

4        Count 1 — $3,000 Bitcoin transaction on or around

5   May 20, 2015, guilty of Money Laundering, as charged in Count 1

6   of the Indictment.  $3,000 on or around May 20, 2015.

7        Count 2 — $13,000 Bitcoin transaction on or around

8   October 7, 2015, guilty of Money Laundering, as charged in

9   Count 2 of the Indictment.  $13,000 on or around October 7,

10  2015.

11       The second box is checked:  The defendant intended to

12  conceal or disguise the nature, location, source, ownership, or

13  control of property believed to be the proceeds of specified

14  unlawful activity.

15       THE COURT:  Just to be clear, Kathleen, the first box

16  is not checked?

17       COURTROOM DEPUTY:  Correct.  The first box is not

18  checked.

19       Count 3 — $11,700 Bitcoin transaction on or around

20  November 21, 2015, guilty of Money Laundering as charged in

21  Count 3 of the Indictment.  $11,700 on or around November 21st,

22  2015.

23       The first box is unchecked.

24       The second box is checked:  The defendant intended to

25  conceal or disguise the nature, location, source, ownership or

UNITED STATES DISTRICT COURT

control of property believed to be the proceeds of specified
unlawful activity.

Count 4 - $30,000 Bitcoin transaction on or around
February 2, 2017, guilty of Money Laundering as charged in
Count 4 of the Indictment.  $30,000 on or around February 2,
2017.

The first box is unchecked.

The second box is checked:  The defendant intended to
conceal or disguise the nature, location, source, ownership, or
control of property believed to be the proceeds of specified
unlawful activity.

Count 5 - $107,000 Bitcoin transaction on or around
April 20, 2017, guilty of Money Laundering as charged in Count
5 of the Indictment.  $107,000 on or around April 20, 2017.

The first box is unchecked.

The second box is checked:  The defendant intended to
conceal or disguise the nature, location, source, ownership, or
control of property believed to be the proceeds of specified
unlawful activity.

Signed by the Foreperson this date.

Is this your true verdict, so say you one and all?

(Jury panel responds in the affirmative.)

THE COURT:  Would the clerk please poll the jury.

COURTROOM DEPUTY:  Juror Number 1, is this your true
verdict?

1          JUROR NUMBER 1:  Yes.

2          COURTROOM DEPUTY:  Juror Number 2, is this your true

3   verdict?

4          JUROR NUMBER 2:  Yes.

5          THE COURT:  Juror Number 5, is this your true verdict?

6          JUROR NUMBER 5:  Yes.

7          COURTROOM DEPUTY:  Juror Number 6, is this your true

8   verdict?

9          JUROR NUMBER 6:  Yes.

10         COURTROOM DEPUTY:  Juror Number 7, is this your true

11  verdict?

12         JUROR  NUMBER 7:  Yes.

13         THE COURT:  Juror Number 8, is this your true verdict?

14         JUROR NUMBER 8:  Yes.

15         COURTROOM DEPUTY:  Juror Number 9, is this your true

16  verdict?

17         JUROR NUMBER 9:  Yes.  Sorry.

18         COURTROOM DEPUTY:  Juror Number 11, is this your true

19  verdict?

20         JUROR NUMBER 11:  Yes.

21         COURTROOM DEPUTY:  Juror Number 12, is this your true

22  verdict?

23         JUROR NUMBER 12:  Yes.

24         COURTROOM DEPUTY:  Juror Number 13, is this your true

25  verdict?

1          JUROR NUMBER 13:  Yes.

2          COURTROOM DEPUTY:  Juror Number 14, is this your true

3  verdict?

4          JUROR NUMBER 14:  Yes.

5          COURTROOM DEPUTY:  And Juror Number 15, is this your

6  true verdict?

7          JUROR NUMBER 15:  Yes.

8          THE COURT:  Ladies and gentlemen, we thank you for

9  your services in this case.

10          You may recall that I indicated to you that depending

11  upon your verdict, we might have you make one more important

12  determination.  And because your verdict on five of the counts

13  is Guilty, we do need to make you -- we do need to have you

14  make a final determination.

15          And that determination is as to whether or not the

16  particular items seized from the -- or taken from the defendant

17  during the course of this investigation belonged to the

18  Government or can be seized by the Government or remain the

19  property of the defendant.

20          I have a supplemental list of jury instructions which

21  I am now going to read to you as soon as they come in, which

22  should be very shortly.  And then I'm going to allow the

23  parties briefly, very briefly, to make argument to you on that

24  point.

25          Both have represented to me that they have fewer than

| | |
|---|---|
| 1 | five minutes.  But, again, the Government gets the final chance |
| 2 | to make the final argument.  And then we'll have you retire |
| 3 | again to make the determination as to whether or not the |
| 4 | defendant has forfeited the property. |
| 5 | Are there any questions about that? |
| 6 | (Jury panel shakes heads in the negative.) |
| 7 | THE COURT:  All right.  Any questions by the parties? |
| 8 | In other words, I am going to give the jury |
| 9 | instructions and show the verdict form to the jury before you |
| 10 | make your final arguments. |
| 11 | Any objections to that? |
| 12 | MS. WEIDNER:  No, Your Honor. |
| 13 | MR. BINFORD:  No, Your Honor. |
| 14 | THE COURT:  All right. |
| 15 | So, ladies and gentlemen of the jury, I'm going to |
| 16 | show you first -- are we ready? |
| 17 | LAW CLERK:  Yes. |
| 18 | THE COURT:  Carmel?  Okay. |
| 19 | Again, the first sheet is the title page which says |
| 20 | Supplemental Jury Instructions Regarding Forfeiture. |
| 21 | All right.  At this time because there are relatively |
| 22 | few jury instructions, I'm not going to give you an index. |
| 23 | You'll just have to leaf through, if you want to find |
| 24 | something. |
| 25 | Instruction number 1:  Ladies and Gentlemen of the |

UNITED STATES DISTRICT COURT

Jury, in view of your verdict that Defendant Thomas Mario Costanzo is guilty of offenses as charged in Counts 1 through 5 of the Indictment, you have one more task to perform before you are discharged.  I now must ask you to render special verdicts concerning property the United State Government has alleged is subject to forfeiture to the United States, in connection with the offenses for which the defendant was convicted.

As to each item of property for which the Government seeks forfeiture, you must determine whether the Government has established the requisite nexus between the property and the offense or offenses committed by the defendant.  In other words, you must find whether that property is connected to the underlying crime in the way the statute provides.

The particular properties alleged to be forfeitable to the United States are as follows:

A.  $627.36 in United States currency;

B.  Assorted precious metals found in Mr. Costanzo's residence;

C.  Assorted precious metals, found on Mr. Costanzo's person; and

D.  80.94512167 Bitcoins.

As explained above, it is the Government's burden to establish to required connection between the property and the offenses committed by the defendant which would make the property subject to forfeiture.  You should find that the

1    Government has met its burden if it has established that

2    connection by a "preponderance of the evidence."

3         This is different from the standard that applied to

4    the guilt or innocence of the defendant.  At that stage of the

5    case, the Government was required to meet its burden "beyond a

6    reasonable doubt."  At this forfeiture stage, however, the

7    Government need only establish -- need only establish its proof

8    by a "preponderance of the evidence."

9         "Preponderance of the evidence" means that the

10   Government has to produce evidence which, considered in light

11   of all of the facts, leads you to believe that what the

12   Government claims is more likely true than not true.  To put it

13   differently, if you were to put the Government's evidence and

14   the defendant's evidence on opposite sides of a balance scale,

15   the Government's evidence would have to make the scale tip

16   slightly on its side of the balance.  If the Government's

17   evidence fails to do this, then the Government has not met its

18   burden of proof.

19        You may consider any evidence, including testimony,

20   offered by the parties at any time during the guilt phase of

21   the trial and during the forfeiture phase of the trial.

22        But I will tell you, we're not going to have evidence

23   during the forfeiture phase of the trial.  We're only going to

24   have argument.

25        You are instructed that your previous determination

1    that the defendant is guilty of the offenses with which he was

2    charged in Counts 1 through 5 is binding on this part of the

3    proceedings, and you must not discuss or determine anew whether

4    he is guilty or not guilty on those charges.

5            You are also instructed that what happens to any

6    property that you find has a connection to those offenses is

7    exclusively a matter for the Court to decide.  You should not

8    consider what might happen to the property in making your

9    determination.  You should disregard any claims of ownership

10   that other persons may have to the property.  The interests

11   that other persons may have in the property will be taken into

12   account by the Court at a later time.  Similarly, any claims

13   that the forfeiture of the property would constitute excessive

14   punishment will be taken into account by the Court at a later

15   time.  Your only concern is to determine whether the property

16   has the required connection to the defendant's offenses.

17           You are further instructed that, other than the

18   standard of proof, all of the instructions previously given to

19   you concerning your consideration of the evidence, the

20   credibility or believability of the witnesses, your duty to

21   deliberate together and the necessity of a unanimous verdict,

22   will all continue to apply during your deliberations concerning

23   to forfeiture claims.

24           Section 982(a)(1) of Title 18 of the United States

25   Code provides, in part, that whomever is convicted of a money

laundering offense shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

The Government alleges that certain properties are forfeitable because they are real or personal properties that were involved in the commission of a money laundering offense.

These properties are set out in a Special Verdict Form which follows at the end of these instructions.  As to each such property, you must determine whether or not the applicable connection exists.

Certain properties may be held in the name of a person or entity other than or in addition to that of the defendant. You may have also noted evidence suggesting a person or persons other than the defendant may have or claim an interest in some part of a property sought to be forfeited.

I charge you that in reaching your decision as to each item of property you should simply disregard any such title or claim of ownership of such property.  Instead, you should focus only on deciding, as I have previously charged, whether the property was connected to an offense or offenses in a way or ways that make it forfeitable.

Any interest that another person may have or claim to have in such property will be taken into account later by this Court in a separate proceeding and is not for your consideration as jurors.

1    It is your duty to determine what property, if any, is

2    connected to the defendant's offense, in one or more ways that

3    make the property forfeitable as the result of the defendant's

4    conviction.  While deliberating, you may consider any evidence,

5    including testimony, offered by the parties at any time during

6    this trial.

7    Now, I'm going to show you -- or I'm going to have --

8    do you not have -- you need the verdict form.

9    LAW CLERK:  Yes.

10    THE COURT:  This is the verdict form that we will be

11    giving you.

12    And as you see, it is broken down into the

13    determination whether or not it is trace -- whether or not you

14    can unanimously find by a preponderance of the evidence that

15    this is property that was involved in a money laundering

16    offense.

17    And then you just answer simply "yes" or "no" as to

18    each item of property asserted by the Government which it

19    claims is subject to forfeiture.

20    Are there any questions about the jury verdict form?

21    Everybody understand it?

22    Everybody seems to be saying yes, so no questions?

23    A Special Verdict Form for Forfeiture has been

24    prepared for your use.  You may answer by simply putting an "X"

25    or checkmark in the space provided next to the words "Yes" or

GOVERNMENT'S ARGUMENT

1    "No" in the space provided.  You will take the Special

2    Forfeiture Verdict Form to the jury room and when you have

3    reached unanimous agreement as to each item of property, you

4    will have your foreperson fill in the form and notify the Court

5    Bailiff.  The foreperson must then sign and date the Special

6    Forfeiture Verdict Form.

7         All right.  Thank you.

8         Any questions by the jury before we have the final

9    closing arguments?

10        I see no questions.

11        Government?

12        MR. BINFORD:  Thank you, Your Honor.  May I approach

13   the lecturn?

14        THE COURT:  Yes, Mr. Binford.

15        MR. BINFORD:  Ladies and gentlemen, thank you for

16   taking the time to be with us for the past few weeks.

17        I know there's been a lot of evidence.  We certainly

18   appreciate your service.  We appreciate you taking the time to

19   deliberate and seriously consider the charges that were at

20   issue in this case.

21        At this point in the trial you have the opportunity to

22   make a decision regarding forfeiture.  There are four items

23   that the United States is seeking to forfeit in this case.

24        The first item is $627.36 in U.S. currency.

25        The second item is precious metals that were found at

```
 1    Mr. Costanzo's apartment.

 2            The third item is precious metals that were found in

 3    his fanny pack.

 4            And the fourth item is 80.94512167 Bitcoins.

 5            The standard that we have to prove to you is

 6    preponderance of the evidence.

 7            You heard the Judge say that that means it's more

 8    likely than not that this was involved in the offense.  We have

 9    to prove that to you.  You also heard that any property, real

10    or personal, involved in these money laundering offenses or any

11    property traceable to those offenses is subject to forfeiture.

12            The first, the $627.36.  All of these items were found

13    on April 20th of 2017.  They were all found either on the

14    defendant's person or at his apartment on the day of his

15    arrest.  The $627.36 was the money that you saw during trial.

16    It was the money that was recovered from his fanny pack and

17    from the accessory to the fanny pack that was with him.

18            Exhibit 79, which you still have, are the precious

19    metals from the fanny pack.  And when we say "precious metals,"

20    we're talking about those coins.  I mentioned them in my

21    closing argument.

22            It was the silver and gold coin.  And those were the

23    tools of the trade.  Those were tools that he used to show

24    people why virtual currency was good for money laundering.  He

25    used those as props when he was selling virtual currency to the
```

1    undercover agents in this case.

2           Exhibit 80 is the precious metals that were seized

3    from the apartment.  Those were also -- we believe that those

4    were also used as props during the course of this

5    investigation.  Those were used much like the other coins that

6    the defendant had in his possession at the time of his arrest

7    to talk about fiat currency and to talk about why -- what he

8    was doing -- why Bitcoin was good for these drug dealers.

9           The last item, I think, is the easiest for you to make

10   a decision on.  That's the 80.94512167 Bitcoins.  Those are the

11   Bitcoins that were involved in the $107,000 transaction.

12          You heard testimony from Special Agent Ellsworth

13   during trial that there was 80.95 Bitcoin transmitted on the

14   day of that transaction and that the approximate dollar value

15   of that was $100,000.

16          That is the Bitcoin that was involved in that

17   transaction.  It was directly involved in a money laundering

18   transaction that you found the defendant guilty of.

19          And so we would ask you to forfeit all four of those

20   items, because the defendant used them in his money laundering

21   business.

22          THE COURT:  Thank you.

23          MR. BINFORD:  Thank you.

24          THE COURT:  Ms. Weidner?

25          MS. WEIDNER:  Thank you.

DEFENDANT'S ARGUMENT

1    The government overstates the findings on the verdict

2    form that were announced by the Judge.  This jury found

3    Mr. Costanzo guilty of five counts of money laundering.  But

4    the government did not allege, nor has any determination been

5    made, about all of the other Bitcoin-exchanging activities that

6    the evidence has shown Mr. Costanzo was involve in on almost a

7    daily basis.

8    The seizure of the items in the Forfeiture Form

9    occurred on April 20th of 2017, like government counsel said.

10   That was the date of the last Bitcoin exchange between

11   undercover agents and Mr. Costanzo.

12   Prior to that the last time they had met with him was

13   February 2nd, more than two months before.  In the interim,

14   assuming there was no change in Mr. Costanzo's activity as

15   observed by agents when they surveilled him, he was meeting

16   with other people, conducting Bitcoin exchanges that have not

17   been charged, that we have no reason to think were not

18   legitimate.

19   That is the issue with number A, the $627.36.  The

20   fact that he had that in his fanny pack when he was arrested in

21   no way indicates that that money was connected to the

22   convictions that -- well, to his convictions on the money

23   laundering counts in this case.

24   The same goes with the assorted precious metals.

25   Those were items that Mr. Costanzo used in his Bitcoin exchange

1    business, his self-employment.  The government, as you'll

2    recall when Special Agent Landa testified, confirmed that they

3    did not know when Mr. Costanzo came into ownership of those

4    precious metals.

5            And I think likewise, the government did not establish

6    in evidence that they had any idea when he came into possession

7    of those $627.36.  What we do know is there was a two-month lag

8    between the last time he saw undercover agents and when he was

9    arrested.

10           What we do know is he clearly, as government counsel

11   argued on their rebuttal, Mr. Costanzo has basically something

12   of a script that he follows when he talks to people about

13   Bitcoin, and part of it involves those coins.  And that holds

14   true for any transaction, not just the transactions with the

15   undercover agents, the evidence suggests.

16           The last item is the 80.94512167 Bitcoin and that, the

17   government has met their burden there.  Clearly, that was the

18   Bitcoin that was transferred on that last exchange.

19           And given the conviction on Count 5, it is clear that

20   the government has met their burden there.  But as to items A,

21   B, and C, we submit to you that they haven't, not even by a

22   preponderance of the evidence.

23           Thank you.

24           THE COURT:  Any rebuttal?

25           MR. BINFORD:  No, Your Honor.

1          THE COURT:  All right.

2          Ladies and gentlemen, I'm going to ask you to retire

3     to make your determination on the forfeiture allegations.

4          Again, if you get to five o'clock and can't reach a

5     determination, just recess and come back tomorrow.  Otherwise,

6     we will be waiting for your result.

7          Thank you.

8            (Jury leaves the courtroom at 4:23 p.m.)

9          THE COURT:  All right.  I'm going to specify what I

10    think we've already agreed to but make it clear on the record.

11         We agreed, for purposes of not confusing the jury

12    about of the counts of the superseding -- First Superseding

13    Intervening Indictment that were dismissed; that we would just

14    refer to the counts as "1 through 5."

15         That doesn't change the fact that the defendant was

16    found guilty on Counts 3 through 7 of the Superseding

17    Indictment.

18         Is there any dispute about that?

19         MS. WEIDNER:  No, Your Honor.

20         MR. BINFORD:  No, Your Honor, and the dates match up

21    with the corresponding counts in the Superseding Indictment.

22         THE COURT:  All right.  So I'm just going to make that

23    clear on the record.

24         So that would mean that the defendant was found guilty

25    on Counts 3, 4, 5, 6, and 7 and has been previously -- well, at

1    least -- well, let me be clear.

2              The defendant has been found guilty on Counts 3, 4, 5,

3    6, and 7 as it pertains to the sub "B" charge and not the sub

4    "C" charge.

5              Was found not guilty on the sub "C" charge and found

6    guilty on the sub "B" charge.

7              Is there any dispute as to that?

8              MR. BINFORD:  No, Your Honor.

9              MS. WEIDNER:  No, Your Honor.

10             THE COURT:  All right.  Then unless there's something

11   else, we'll wait and see what we have by way of a forfeiture

12   determination.

13             MS. WEIDNER:  Yes.

14                 (Proceedings in recess at 4:25 p.m.)

15                 (Jury enters the courtroom at 4:35 p.m.)

16                 (Proceedings resume at 4:35 p.m.)

17             THE COURT:  Please be seated.

18             Madam Foreperson, has the jury reached a unanimous

19   verdict as to all of the matters involved in the forfeiture

20   allegations?

21             JUROR NUMBER 12:  Yes.

22             THE COURT:  Would you please provide the form to

23   Kathleen.

24             You may read the verdict form.

25             COURTROOM DEPUTY:  We, the Jury, return the following

UNITED STATES DISTRICT COURT

```
1    Special Verdict, as to Defendant Thomas Mario Costanzo

2    regarding the properties described below.

3              We, the Jury, unanimously find by a preponderance of

4    the evidence that this is real -- excuse me -- that this is

5    property, real or personal, that was involved in a money

6    laundering offense, 18 U.S.C., Section 1956 or any property

7    traceable to such property.

8              A.   $627.36 in United States currency.

9         Answer:  No.

10             B.   Assorted precious metals found in Mr. Costanzo's

11   residence.

12        Answer:  No.

13             C.   Assorted precious metals found on Mr. Costanzo's

14   person.

15        Answer:  No.

16             D.   80.94512167 Bitcoins.

17        Answer:  Yes.

18             Signed by the Foreperson this date.

19             THE COURT:  Does anybody want the jury polled on this

20   question?

21             MR. BINFORD:  No, Your Honor.

22             MS. WEIDNER:  No, Your Honor.

23             THE COURT:  All right.

24             Ladies and gentlemen, we thank you very much for your

25   services in this case.  You are now released from the
```

UNITED STATES DISTRICT COURT

1    admonitions.  You are free to discuss this case with whoever

2    you wish.

3            The lawyers are instructed not to approach you about

4    the case, so you will not feel bothered, but you may discuss

5    the case with them if you would like.

6            I would like to personally thank you.  I have just

7    one-half minute of business -- or one minute of business here,

8    but I always like to meet with those members of the jury who

9    want to remain and meet and answer what questions I can that

10   they ask and give them personal thanks.

11           You should not feel at all obligated to stay.  If you

12   want to get home early and try and beat the traffic, go ahead.

13   But otherwise, I'd be glad to meet you and thank you.

14           And if you choose to go ahead, please receive the

15   thanks of the government and this court system and all of the

16   parties here.

17           The jury is now dismissed.

18             (Jury leaves the courtroom at 4:38 p.m.)

19           THE COURT:  If you'll give us just a moment, we're

20   trying to find a date for sentencing.

21           COURTROOM DEPUTY:  June 11th at 4:00 p.m.

22           THE COURT:  June 11th at 4:00 p.m. will be the

23   sentencing date.

24           So the defendant is remanded to the custody of the

25   marshal and it is ordered affirming -- and the sentencing date

UNITED STATES DISTRICT COURT

1     is set for June 11th at 4:00 p.m.

2              Any further matters to be raised?

3              MR. BINFORD:  No, Your Honor.

4              MS. WEIDNER:  No, Your Honor.

5              THE COURT:  Thank you all.

6                 (Proceedings in recess at 4:40 p.m.)

7                          * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                          C E R T I F I C A T E

3

4              I, CHARLOTTE A. POWERS, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8                     I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13                   DATED at Phoenix, Arizona, this 16th day of May, 2018.

14

15

16

17

18

19                        s/Charlotte A. Powers
                     Charlotte A. Powers, RMR, FCRR
20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**