JON M. SANDS
Federal Public Defender
**MARIA TERESA WEIDNER**
Assistant Federal Public Defender
State Bar No. 027912
850 W. Adams Street, # 201
Phoenix, AZ  85007
Telephone:  (602) 382-2700
Maria_Weidner@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>    vs.<br><br>Thomas Mario Costanzo,<br><br>              Defendant. | CR-17-585-01-PHX-GMS<br><br>**OBJECTION TO THE OFFENSE LEVEL CALCULATION SET FORTH IN THE DRAFT  PRESENTENCE INVESTIGATION REPORT** |

Defendant, Thomas Mario Costanzo, through undersigned counsel, hereby submits his objections to the offense level calculation set for the in the draft Presentence Investigation Report (PSR). Mr. Costanzo respectfully requests that this Court sustain his objections to the following:

**OBJECTION #1**: **The PSR's calculation of laundered proceeds for which Mr. Costanzo is accountable is incorrect.** The PSR incorrectly calculates that Mr. Costanzo "is accountable for laundering proceeds in the total amount of $210,700." (PSR ¶¶ 26, 33). The PSR does not explicitly provide how this amount was arrived at, but it appears this incorrect calculation includes the following erroneous additions, listed below in subparts (A) and (B):

    **A. $46,000 in uncharged bitcoin trades are erroneously included in the PSR's calculation of laundered proceeds.**

This amount is comprised of (1) $16,000 in uncharged bitcoin exchanges with UCAs (PSR ¶¶ 10, 19, 20), and (2) an uncorroborated estimate provided by a drug-

trafficker-turned-informant that s/he purchased a total of $30,000 worth of bitcoin from Mr. Costanzo in 2015 and 2016 (PSR ⁋ 16).

### i. The $16,000 in uncharged bitcoin trades conducted by undercover agents (UCAs) with Mr. Costanzo does not qualify as laundered proceeds.

This disputed amount is comprised of:

- A $2,000 exchanged by UCA1 with Mr. Costanzo on March 20, 2015 (PSR ¶ 10);
- A $2,000 exchanged by UCA3 with Mr. Costanzo on September 14, 2016 (PSR ¶ 19);
- A $12,000 exchanged by UCA3 with Mr. Costanzo on November 16, 2016 (PSR ¶ 20).

### 1. FACT: Peer-to-peer bitcoin trading is not illegal.

Owning/selling/buying/investing in bitcoin is not *per se* illegal. Peer-to-peer bitcoin trading is not *per se* illegal. Both of these propositions were asserted and confirmed in pretrial litigation and at trial via the testimony of government witnesses SA Fleischmann and SA Ellsworth.

### 2. FACT: UCA1 and UCA3 testified that they each waited before introducing their fictional involvement in drug trafficking to Mr. Costanzo.

At trial, the testimony of UCA1 and UCA3 revealed that each first sought to establish a rapport with Mr. Costanzo prior to introducing the fiction of being drug traffickers and seeking to use drug proceeds to purchase bitcoin.

### 3. FACT: UCA1 did not represent that funds exchanged for bitcoin in March 2015 were proceeds of a SUA.

In the case of UCA1, the subject of drug trafficking was not introduced until the May 2015 exchange (PSR ¶ 11); no mention of drug trafficking was made in the initial $2,000 exchange in March 2015 (PSR ¶ 10).

The March 2015 exchange is therefore not an exchange involving funds represented by law enforcement to be proceeds of a SUA and therefore does not qualify as laundered proceeds for purposes of guidelines calculation.

**4. FACT: UCA3 did not represent that funds exchanged for bitcoin in September and November of 2016 were proceeds of a SUA.**

UCA3 also waited to introduce the SUA element; it was not until his/her third exchange with Mr. Costanzo, in February 2017, that UCA3 announced the money was proceeds of cocaine (PSR ¶ 23). No mention of this element was made in the two exchanges that occurred in the Fall of 2016 (PSR ¶¶ 19, 20).

Therefore, both 2016 exchanges conducted by UCA3 with Mr. Costanzo did not involve funds represented by law enforcement to be proceeds of a SUA and do not qualify as laundered proceeds for purposes if guidelines calculation.

**ii. The unverified $30,000-worth of bitcoin allegedly purchased from Mr. Costanzo over the course of 14 months, divided among an estimated 10 occasions by a government witness and cooperator (PSR ¶ 16). This disputed amount lacks sufficient indicia of accuracy and reliability to support inclusion in the laundered proceeds calculation.**

**1. FACT: No independent corroboration of the estimated funds exchanged for bitcoin with Mr. Costanzo by government informant.**

Aside from the word of a drug trafficker-turned-informant, no evidence has been disclosed that independently corroborates the $30,000 estimate provided.

**2. FACT: No evidence that the drug-trafficker-turned-informant disclosed the nature of his business to Mr. Costanzo.**

In government disclosures and at trial, the drug-trafficker-turned-informant testified that s/he did not disclose the true nature of his/her business to Mr. Costanzo over the course of his/her dealings with him. *See, e.g.,* Exhibit A, Informant ROI, May 11, 2017, at Bates 70 ("[Informant] stated that s/he never told Morpheus what the Bitcoins were going to be used for.") (Filed separately under seal).

**3. LAW: Absent corroboration and/or other indicia of reliability, the drug trafficker-turned-informant's estimate of $30,000 cannot be relied upon to increase Mr. Costanzo's offense level.**

Evidence of other allegedly criminal conduct not resulting in a conviction or sentence qualifies as information that may be considered by a sentencing court. *United States v. Weston*, 448 F.2d 626, 633 (9th Cir. 1971); cert. denied, 404 U.S. 1061 (1972).

3

*See also, United States v. English,* 421 F.2d 133 (9th Cir. 1970)(dictum); *Austin v. United States*, 408 F.2d 808 (9th Cir. 1969). A criminal sentence cannot be predicated on false information without violating due process. *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948). *See also United States v. Tucker*, 404 U.S. 443 (1972). Information that is unreliable or of questionable accuracy cannot serve as the basis for imposition of a greater sentence. *Weston*, 448 F.2d at 634.

In a 2017 free talk, a criminal defendant, facing serious federal charges for international drug trafficking on dark nets, recalled his peer-to-peer interactions with Mr. Costanzo in 2015 and 2016. Exhibit A. While the defense does not dispute that Mr. Costanzo traded bitcoin with the informant, the defense challenges: (1) Mr. Costanzo's knowledge of the extent of the informant's nefarious dealings, given the informant told government agents s/he never told Mr. Costanzo about these activities, Exhibit A; and (2) the accuracy and reliability of the uncorroborated figures provided by the informant. Setting aside the issue of whether or not Mr. Costanzo was aware of the informant's activities as regards his/her bitcoin purchases, the informant's word alone lacks the necessary indicia of reliability and accuracy required prior to inclusion in the calculation of laundered proceeds.

> **B. $137,000 in charged bitcoin trades attributable to sentencing entrapment and/or manipulation and thus should not be included in the laundered proceeds calculation.**

The charged bitcoin trades conducted subsequent to March of 2016 by the Drug Enforcement Administration (DEA) (i.e., Counts 6 and 7 of the superseding indictment, as well as uncharged purchases made in the course of the DEA investigation) are attributable to and the result of sentencing entrapment and/or manipulation by the government and thus should not be included in the laundered proceeds calculation (PSR ¶¶ 23, 24, 26, 33).

> > **i. FACTS: The unnecessarily lengthy investigation pursued by the IRS and DEA in the instant case served no end but increase Mr. Costanzo's sentencing exposure by encouraging him to engage in exchanges he was incapable of satisfying alone.**

The instant case involved a 25-month investigation, initiated by the IRS in late 2014 and turned over to the DEA in 2016. At trial, IRS agents testified as to the objectives of the investigation, which are also reflected in agency operational plans. In pertinent part, the objectives were: (1) to determine whether Mr. Costanzo and/or his associates (i.e., Dr. Steinmetz) would conduct bitcoin exchanges in excess of $10,000; (2) if so, whether or not Mr. Costanzo and/or his associates (i.e., Dr. Steinmetz) would file currency transaction reports (CTRs) for said exchanges; and (3) whether Mr. Costanzo and/or his associates (i.e., Dr. Steinmetz) would conduct the subject exchanges even after being informed that the funds were proceeds of a SUA. *See, e.g.,* Exhibit B, IRS Operational Plan, November 21, 2015 (redacted).

Government disclosures demonstrate that by the close of 2015, the IRS investigation had met all but one of its objectives. Specifically: (1) UCAs succeeded in conducting two bitcoin exchanges with Mr. Costanzo for sums in excess of $10,000; (2) it did not appear that Mr. Costanzo had filed a CTR for either exchange pursuant to federal regulations for financial institutions; (3) Mr. Costanzo proceeded with bitcoin exchanges even after UCAs claimed their funds were drug proceeds. *Id.* Notably, Counts 3, 4, and 5—as well as dismissed Counts 1 and 2—of the superseding indictment reflect the fruit of the IRS portion of the investigation.

Dr. Steinmetz was identified as an associate of Mr. Costanzo by the IRS in 2015. Exhibit B. UCA1 first conducted a small bitcoin exchange with Dr. Steinmetz at the November 21, 2015 bitcoin meetup. Exhibit C, IRS MOA, November 21, 2015. UCA1 then arranged another meeting with Dr. Steinmetz, alone, under the auspices of conducting a $20,000 bitcoin exchange. *See* Exhibit D, IRS MOA, March 8, 2016 (redacted). When UCA1 claimed the cash he brought to exchange was drug proceeds, Dr. Steinmetz "refused to do the trade and explained that because he now knew it was drug proceeds, he couldn't do it because it would be money laundering under federal laws." *Id.*

5

Active DEA involvement in the investigation began months later, in September of 2016. *See* Exhibit E, DEA ROI, September 14, 2016 (filed separately under seal).[1] The only differences: a new UCA and much higher dollar amounts, as reflected in Counts 6 and 7 of the superseding indictment. Purportedly, the DEA's goal was to corner Dr. Steinmetz, as he was believed to be the "source of supply" for Mr. Costanzo's larger bitcoin exchanges. *See, e.g.,* Exhibit C. But rather than pursue an operational plan that might accomplish that end, the DEA kept sending UCA3 out to meet with Mr. Costanzo in strip malls. Needless to say, Dr. Steinmetz was not caught by the DEA's instant replay of the IRS investigation. Moreover, Dr. Steinmetz's response to IRS UCA1 in March 2016 told the IRS and the DEA all they needed to know: Steinmetz won't bite, but we can use Costanzo for practice. Exhibit D. That is precisely what the DEA did.

### ii. LAW: Sentencing entrapment.

Sentencing entrapment occurs "when a defendant is predisposed to commit a lesser crime, but is entrapped by the government into committing a crime subject to more severe punishment." *United States v. Biao Huang*, 687 F.3d 1197, 1202 (9th Cir. 2012)(citing *United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir.2009)). The defense of sentencing entrapment serves to prevent the government from " 'structur[ing] sting operations in such a way as to maximize the sentences imposed on defendants' without regard for the defendant's culpability or ability to commit the crime on his own." *Id.* at 12012-03 (citing *United States v. Schafer*, 625 F.3d 629, 640 (9th Cir.2010) (quoting *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir.1994)).

A defendant "bears the burden of proving sentencing entrapment by a preponderance of the evidence." *Id.* (citing *United States v. Parrilla*, 114 F.3d 124, 127 (9th Cir.1997)). Specifically, the defendant must show he was predisposed to commit only

---

[1] While government disclosures indicate the actual date for DEA case initiation in this investigation was March 1, 2016, no contact or surveillance was conducted by the DEA in this case prior to September 14, 2016.

1    a lesser crime, *Staufer*, 38 F.3d at 1108, i.e., that he lacked the intent and capability to

2    produce the larger quantity of drugs, *Mejia*, 559 F.3d at 1118; *United States v. Naranjo*, 52

3    F.3d 245, 250 n. 13 (9th Cir.1995); *see also United States v. Si*, 343 F.3d 1116, 1128 (9th

4    Cir.2003) (explaining that a defendant must show the government engaged in "outrageous

5    official conduct which caused the individual to commit a more significant crime"). The

6    district court must make express factual findings regarding whether the defendant has met

7    his burden. *United States v. Riewe*, 165 F.3d 727, 729 (9th Cir.1999) (per curiam).

8         Where a sentencing court determines that a defendant has met his burden of proof,

9    the court ordinarily may grant a downward departure from the applicable sentencing range.

10   *Id.* In reverse sting cases, the Ninth Circuit has held that given the control exercised by the

11   government over the operation, "a defendant need only show a lack of intent *or* a lack of

12   capability to establish sentencing entrapment." *United States v. Yunan-Hernandez*, 712

13   F.3d 471, 476 (9th Cir. 2013)(emphasis in original).

14                    **iii.   ARGUMENT: Sentencing entrapment.**

15        Discussions of sentencing entrapment in the case law focus on reverse narcotics

16   stings where government agents determine the quantities involved in a manner that drives

17   up statutory and guideline sentences. *See, e.g., Biao Huang*, 687 F.3d at 1202. However,

18   the circumstances of these reverse sting narcotics cases is more than analogous to the

19   instant money laundering sting case as the quantities here—of cash rather than drugs—

20   were controlled entirely by the government. It is thus the position of the defense that the

21   standard set in *Yunan-Hernandez*, that "a defendant need only show a lack of intent or a

22   lack of capability to establish sentencing entrapment." is properly applicable in the instant

23   money laundering case.

24        Throughout the investigation of the instant case, Mr. Costanzo was very open with

25   UCAs. In recorded meetings played for the jury at trial, he explained that if he did not have

26   enough bitcoin to complete an exchange, he would borrow bitcoin from a friend. That is,

27   he was not capable on his own of satisfying the larger exchanges pushed by UCAs.

28

                                              7

1   Moreover, the IRS investigation revealed that this friend was Dr. Steinmetz.

2   Nonetheless, UCA3, driving for the $30,000 and $107,000 exchanges, pushed Mr.

3   Costanzo beyond his capabilities. This lack of capability meets the standard necessary to

4   establish sentencing entrapment by a preponderance of the evidence in the instant case.

5   Thus, a downward variance nullifying the effect of this $137,000 on Mr. Costanzo's

6   guideline calculation is appropriate and necessary.

7   ### iv. LAW: Sentencing manipulation.

8   Sentencing manipulation occurs "when the government increases a defendant's

9   guideline sentence by conducting a lengthy investigation which increases the number of

10   drug transactions and quantities for which the defendant is responsible." *United States v.*

11   *Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015) (citing *United States v. Torres*, 563 F.3d 731,

12   734 (8th Cir.2009)). "[W]hat sets 'sentencing entrapment' apart from 'sentencing

13   manipulation' is that, in the latter, 'the judicial gaze should, in the usual case, focus

14   primarily—though not necessarily exclusively—on the government's conduct and

15   motives.' *Id.* (citing *United States v. Fontes*, 415 F.3d 174, 181–82 (1st Cir.2005)). To

16   prove sentencing manipulation, a defendant must show "that the officers engaged in the

17   later drug transactions solely to enhance [the defendant's] potential sentence." *Id.* (citing

18   *Torres*, 563 F.3d at 734). If a court finds sentencing manipulation, a downward departure

19   should be applied to the guidelines range, "since such manipulation artificially inflates the

20   offense level by increasing the quantity of drugs included in the relevant conduct." *Id.*

21   ### v. ARGUMENT: Sentencing manipulation.

22   Discussions of sentencing manipulation in the case law focus on reverse narcotics

23   stings where government agents determine the quantities involved in a manner that drives

24   up statutory and guideline sentences. *See, e.g., Boykin*, 785 F. 3d at 1360-63. Courts have

25   found that downward departure may be appropriate pursuant to Application Note 5 of

26   §2D1.1 where facts and circumstances created and/or controlled by the government unduly

27   and unnecessarily increased sentencing exposure. *Id.* (discussing cases).

28

8

The circumstances under which a court may find sentencing manipulation in a narcotics investigation are present in the instant case. Thus, it is advanced that this concept is applicable to the facts of the instant case and a downward variance may be appropriate, notwithstanding the fact that the area is money laundering rather than narcotics.

Here, the IRS initiated an investigation. Objectives were set and met: the agency had all it needed to proceed to the grand jury against Mr. Costanzo by the close of 2015. In the first quarter of 2016, the IRS hit a dead end with Dr. Steinmetz when he told UCA1 in no uncertain terms that he would not exchange bitcoins for drug money *because he knew doing so would violate federal law*. The trouble with stopping at that juncture: the laundered proceeds totaled only $27,700 at the close of 2015. Enter the DEA.

The DEA portion of the investigation mirrored that of the IRS: a UCA contacted and arranged meetings with Mr. Costanzo, notwithstanding the fact that it had been demonstrated in the IRS investigation that Dr. Steinmetz, the self-described bitcoin wholesaler, would meet with individuals in his home to exchange bitcoin (and UCA1 had done just that in March of 2016. That is to say: there was no need for the DEA to continue to use Mr. Costanzo as a middleman; they could have gone straight to the source had that been their object. It was not.

Moreover, while narcotics trafficking was the SUA selected by IRS UCAs, this fiction was the sole connection to narcotics trafficking in the instant case. As such, this was not a case that would be in the purview of the DEA; there was no real world correlation to real drug trafficking that would call for that agency's involvement.[2]

Finally, it was clear after UCA1's March 8, 2016 operation that Dr. Steinmetz, the second target of the investigation, would not accept funds characterized as drug money. The only reason to drag the investigation out another 13 months was to increase the

---

[2] While the government will doubtless point to evidence of Mr. Costanzo's recreational drug use, such miniscule amounts are typically handled by the local police, not a federal task force. The DEA's involvement in this case is the very embodiment of overkill.

laundered proceeds amount from $27,700 at the close of the IRS portion of the investigation, to a more respectable $157,700. Based on this clear case of sentencing manipulation, a downward variance is appropriate and necessary to nullify the effect of this sentencing manipulation on Mr. Costanzo's guideline calculation.

### C. CONCLUSION: Correct calculation of laundered proceeds: $27,700

Based on all the above, it is the position of the defense that the correct amount for purposes of determining the base offense level in this case is $27,700, not $210,700 (the amount urged by the PSR), or $157,700 (the total amount for the charges of conviction). Twenty-seven thousand seven hundred dollars is the amount of cash that UCAs working for the Internal Revenue Service (IRS) exchanged for bitcoin with Mr. Costanzo *after* representing that their funds offered were proceeds of a specified unlawful activity (PSR ¶¶ 11, 14, 15). The correct base offense level is therefore 12, not 18.

**OBJECTION #2: Evidence is insufficient to support enhancement for being "in the business of laundering funds."** The PSR incorrectly applies a 4-level enhancement on the theory that Mr. Costanzo "was in the business of laundering funds" pursuant to U.S.S.G. § 2S1.1(b)(2)(c) (PSR ¶ 35).

### A. FACTS: The PSR recommends the enhancement for "being in the business of laundering funds" yet offers no facts or analysis to justify this conclusion.

The PSR simply applies the 4-level enhancement for being "in the business of laundering funds" without providing any explanation or rationale for that conclusion (PSR ₱ 35). The 25-month investigation of Mr. Costanzo revealed that he is a "retail" bitcoin trader. He was surveilled meeting with individuals at cheap restaurants all across the valley, and publicly advertised his willingness to conduct bitcoin trades large and small.

Over the course of the 25-month investigation, the government was finally able to identify one individual who claimed to use the bitcoin he purchased from Mr. Costanzo to buy drugs on dark net sites; but that individual never told Mr. Costanzo of his/her intent to use the bitcoin in that manner. Exhibit A at Bates 70. Finally, evidence from surveillance and the executed search warrant revealed, at trial, that Mr. Costanzo was a man of very modest means both before and at the time of his arrest. That is, not someone who appeared

to have generated a lot of money trading bitcoin generally speaking, the entire question of revenues from laundering aside.

It is also noted that government counsel advised that it provided the PSR writer with a recommended guideline calculation when the draft offense conduct was provided, *see* Dkt. #205. The government's computation also includes the challenged enhancement. *See* Exhibit F, USAO Offense Level Computation, disclosed May 30, 2018.

**B. LAW: Analysis and justification required to support enhancement for being "in the business of money laundering."**

First, the government bears the burden of proof when it seeks sentence enhancements. *United States v. Ameline,* 409 F.3d 1073, 1086 (9th Cir. 2005)(citing *United States v. Howard*, 894 F.2d 1085, 1089 (9th Cir. 1990). It is assumed the government also will seek this enhancement, given it is included in the draft calculation submitted to the PSR writer. Exhibit F. At this point however, the burden is not met.

Application Note 4(A) to § 2S1.1 provides that the "totality of the circumstances" is to be considered in determining whether this enhancement applies. Also provided are a series of factors for consideration:

(i)    Whether the defendant regularly engaged in laundering funds;

(ii)   Whether the defendant engaged in laundering funds during an extended period of time;

(iii)  Whether the defendant engaged in laundering funds from multiple sources;

(iv)   Whether defendant generates a substantial amount of revenue in return for laundering funds;

(v)    Whether defendant had sustained prior convictions related to money laundering or international financial transactions;

(vi)   If defendant made statements as regards items (i)-(v) during the course of an undercover government investigation.

§ 2S1.1, Application Note 4(B); *see also United States v. Lucena-Rivera*, 750 F.3d 43, 52 (1st Cir. 2014).

11

It does not appear the Ninth Circuit has considered this issue, but other circuits have opined on the question. For instance, a 2015 unpublished Fifth Circuit opinion concluded that the enhancement was improper where the defendant, Mr. Delgado, only attempted to be in the business of laundering funds but was not actually in such business. *United States v. Delgado*, 608 F. App'x. 230, 235-36 (5th Cir. 2015). In so concluding, the Court considered the factors set forth in the Application Note 4(B) of § 2S1.1 and observed that despite his own best efforts, Delgado did not regularly engage in laundering funds, that there was no evidence of multiple sources, or that he obtained substantial revenue from money laundering. *Id.* The Court thus distinguished the situation before it from one where the enhancement would apply: Delgado "regularly *presented himself* as an individual in the business of laundering funds," but evidence failed to show that he was someone who is in fact in the business of laundering funds. *Id.* (emphasis in original)

By way of contrast, the Fifth Circuit, in a 2013 unpublished opinion, found application of the enhancement was proper in a case where evidence showed that the defendant "regularly laundered money from numerous customers over the course of two years, and…made a substantial amount of money doing so—earning $638,000 on gross sales of $2.6 million." *United States v. Arledge*, 524 Fed. App'x. 83, 88 (5th Cir. 2013).

The Eighth Circuit remanded to the District Court when the enhancement was applied where significant questions remained regarding the actual amount of revenue generated. *United States v. Mitchell*, 613 F.3d 862, 868-70 (8th Cir. 2010).

**C. ARGUMENT: To the extent that Mr. Costanzo was "in business," his business was trading bitcoin, not money laundering.**

The focus of the investigation conducted by the IRS and the DEA in the instant case was not on the nature and content of Mr. Costanzo's bitcoin trading, but rather on his willingness to conduct transactions with UCAs under certain circumstances (e.g., for amounts in excess of $10,000, or after the UCA claims the funds are proceeds of drug trafficking).

The government apparently stumbled upon an individual who purchased bitcoin from Mr. Costanzo and turned out to actually be a drug dealer. Exhibit A. However, the

government did not pursue using this individual to shed more light on the questions that need to be answered to properly determine the nature of Mr. Costanzo's trades with non-UCAs as regards whether he was "in the business of money laundering." We have only the evidence collected in the course of this case, which is insufficient to justify the enhancement because the government's investigation never answered—or even sought to answer—questions critical to the applicability of the challenged enhancement.

Information in the record and government disclosures reveals the following:

- Outside of the charged transactions with UCAs, there is no evidence that Mr. Costanzo ever knowingly laundered funds at all. The government's informant said s/he never told Mr. Costanzo the purpose of the bitcoins s/he purchased from him.

- Mr. Costanzo is a man of decidedly modest means: his apartment and its contents were low-end, as was his phone and car. This together with his clear preference for conducting bitcoin exchanges publicly in cheap restaurants and cafes suggests that he was accustomed to dealing with much smaller amounts of cash than those pushed by the UCAs. He was retail; money laundering, as demonstrated by the government's investigation, is a wholesale operation.

- To the extent that Mr. Costanzo expressed enthusiasm and eagerness to work with UCAs, even after the narcotics fiction was introduced, show that, like the defendant in *Delgado*, he was at most *presenting* himself to be in the business, despite the fact that he was not.

There is thus insufficient evidence to support a finding that Mr. Costanzo was in the business of money laundering; the 4-level enhancement recommended in the PSR—and by the government—is thus inapplicable. Further, if this Court sustains Mr. Costanzo's objection to the enhancement for being in the business of money laundering, the enhancement for sophisticated laundering is inapplicable per § 2S1.1(b)(3), which is triggered only if (b)(2)(B) is found to apply.

13

**OBJECTION #3: Evidence insufficient to support enhancement for "sophisticated laundering."** The PSR incorrectly applies a 2-level enhancement on the theory that Mr. Costanzo's offense involved "sophisticated laundering" pursuant to U.S.S.G. § 2S1.1(b)(3) (PSR ¶ 36).

> **A. FACTS: The PSR recommends an enhancement for sophisticated laundering solely on the basis of the use of encryption technology.**

The PSR recommends the 2-level enhancement for "sophisticated laundering" because Mr. Costanzo used "encrypted applications" (PSR ¶ 35). No other justification or rationale is provided. *Id.* It is also noted that this challenged enhancement was included in the computation provided by the government to the PSR writer, along with the offense conduct draft. Exhibit F; *see also* Dkt. #205.

> **B. LAW: Analysis is necessary for the "sophisticated laundering" enhancement to be applied. Encrypted applications are not "sophisticated" in this day and age, they are the norm.**

First, it is noted that the enhancement for sophisticated laundering is inapplicable unless the enhancement for being in the business of money laundering is first found to apply. *See* § 2S1.1(b)(3) ("If (A) subsection (b)(2)(B) applies; and (B) the offense involved sophisticated laundering, increase by 2 levels.")

Second, § 2S1.1's Application Note 5(A) notes that for purposes of the disputed enhancement, "sophisticated laundering" means "complex or intricate offense conduct pertaining to the execution or concealment" of the offense. Further, in the typical case, sophisticated laundering involves use of one or more of the following:

    (i)     Fictitious entities;

    (ii)    Shell corporations;

    (iii)   Two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

    (iv)    Offshore financial accounts.

§ 2S1.1, Application Note 5(A).

1   Third, encryption and encrypted applications have become the norm in our society.

2   This reality was noted by the Supreme Court with respect to security features available on

3   cell phones, in its opinion finding a warrant is required prior to searching a cell phone. *See*

4   *Riley v. California*, 134 S. Ct. 2473 (2014).

5   The Ninth Circuit does not appear to have addressed this question. In considering

6   when laundering methods qualify as "sophisticated," the Eighth and Fifth Circuits have

7   looked to Application Note 5(A). *See, e.g., United States v. Pizano*, 421 F.3d 707, 730-31

8   (8th Cir. 2005) (finding enhancement applied where defendant engaged in layering);

9   *United States v. Alaniz*, 726 F.3d 586, 625-26 (5th Cir. 2013) (same).

10   The Third and Sixth Circuits concluded that even where offense conduct did not

11   include any of the four methods set forth in Application Note 5(A), the enhancement was

12   applicable where the complexity and level of subterfuge involved were extensive. *See, e.g.,*

13   *United States v, Fish,* 731 F.3d 277, 279-81 (3d Cir. 2013)(affirming sentencing court's

14   application of enhancement on finding "the offense conduct involved "…a long-running

15   scheme, ... [that] became difficult to uncover because it used multiple outlets for cash

16   exchanges…multiple couriers, multiple locations for the transactions[,] ... [,] there was an

17   effort made to evade detection because there [was] the use of codes and there [were]

18   electronic devices which had been changed and moved around, changing SIM cards, et

19   cetera, and we also know that the incoming cash necessarily originated from numerous

20   other accounts or sources."); *United States v. Myers,* 854 F.3d 341, 358 (6th Cir. 2017),

21   cert. denied, 138 S. Ct. 638 (2018)(finding enhancement appropriate where defendant went

22   to great lengths to clone titles to stolen motor homes before selling them by posing as the

23   legitimate owner—conduct that separately qualified defendant for the sophisticated

24   laundering enhancement).

        **C. ARGUMENT: Even if this Court concludes Mr. Costanzo was in the business of money laundering, the means he used were not sophisticated.**

25   The instant case involved none of the typical attributes of sophisticated laundering

26   set forth in Application Note 5(A). Moreover, the encrypted applications used by Mr.

27   Costanzo—Trezor and Telegraph—are commonplace and publicly available. There is

28

15

simply not the presence of subterfuge that existed in the *Fish* and *Myers* cases. The simple use of publicly available privacy enhancing tools is not criminal or "sophisticated" and does not justify a more severe sentence.

Should this Court conclude Mr. Costanzo was not in the business of money laundering, the sophisticated laundering enhancement is expressly inapplicable per § 2S1.1(b)(3).

In the alternative, should this Court conclude that Mr. Costanzo was in the business of money laundering, evidence is insufficient to support a further enhancement for sophisticated laundering.

**OBJECTION #4: Mr. Costanzo has accepted responsibility for agreeing to engage in bitcoin exchanges with UCAs after they claimed to be involved in a specified unlawful activity.** The PSR incorrectly denies Mr. Costanzo a 2-level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) (PSR ¶ 42).

### A. FACTS: The PSR offers no reasoning for its denial of a reduction for acceptance of responsibility.

The PSR repeats verbatim the first sentence of guidance provided in Application Note 2 to § 3E1.1 but does not provide a rationale applying that aspect of the guidance to the instant case in support of its recommendation to deny Mr. Costanzo a reduction for acceptance of responsibility (PSR ¶ 42). The PSR specifically provides that acceptance of responsibility has not been "clearly demonstrated," yet also observes that Mr. Costanzo was interviewed by Probation for the Presentence Investigation, during which interview, he expressly recognized that it was wrong of him to proceed with the charged interactions, and asserted that he will never repeat that conduct again (PSR ¶¶ 29,30). Additionally, Mr. Costanzo has prepared a letter for this Court that elaborates more on this topic. *See* Letters in Support of Thomas Costanzo, submitted under separate cover.

### B. LAW: Exercising one's constitutional right to a jury trial does not foreclose the possibility of a downward adjustment for acceptance of responsibility.

The second sentence of Application Note 2 to § 3E1.1 provides that "[c]onviction by trial…does not automatically preclude a defendant from consideration" for a downward

adjustment for acceptance of responsibility. The Ninth Circuit has relied on this guidance to find that if a defendant manifests "appropriate contrition, exercise of his constitutionally protected rights cannot be held against him. *United States v. Cortes*, 299 F.3d 1030, 1038 (9th Cir. 2002)(citing *United States v. Vance*, 62 F.3d 1152, 1157 (9th Cir.1995). In particular, a defendant is not required to forego his right to a trial by jury and plead guilty in order to receive the acceptance of responsibility reduction. *Id.* Although a guilty plea is undoubtedly significant evidence of an acceptance of responsibility, if a defendant otherwise demonstrates sincere contrition, he remains eligible for the reduction. *Id.*

Application Note 2 also provide two circumstances where a defendant may clearly demonstrate an acceptance of responsibility even though he exercised his constitutional right to a trial: Where trial was pursued to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." However, the Ninth Circuit has also concluded that this short list of circumstances is not exhaustive, and reversed a District Court's conclusion that a defendant who proceeded was not eligible for acceptance f responsibility where a constitutional challenge is not made. *Cortes* 299 F.3d at 1038-39 (citing United States v. McKinney, 15 F.3d 849, 852 (9th Cir. 1994)(for the proposition that the list of circumstances is not exhaustive), and *United States v. Ochoa-Gaytan*, 265 F.3d 837, 842 (9th Cir. 2001)(for the proposition that acceptance of responsibilities not foreclosed to those who proceed to trial but do not bring a constitutional challenge)).

**C. ARGUMENT: Mr. Costanzo has clearly demonstrated acceptance of responsibility and merits a 2-level downward adjustment.**

Mr. Costanzo's letter to this Court, as well as his statements to Probation during his Presentence Interview, demonstrate the transformative effect that proceedings in this case have had on the way he looks at the legal system and what he sees as his role in society. His letter is a genuine account of the effect that his legal journey in this case has had on him. Moreover, this journey is one that would have been impossible without proceeding to trial. The reason for this is that this process has demonstrated to Mr. Costanzo the value of

17

our legal system in this country, and the dedication of all participants to the realization and preservation of constitutional rights, in particular the rights of the accused.

Moreover, the theory of defense in this case is not one that contested the facts presented, in particular the substance of hours of recorded interviews presented by the government at trial. Rather, the theory of defense challenged the applicability of the law as set forth in the charged to Mr. Costanzo.

With respect to the § 1956(a)(3)(B) charges, it is the position of the defense that despite the fact that Mr. Costanzo accepted funds characterized as drug proceeds, he did nothing to "conceal or disguise the nature, location, source, ownership or control of [that] property." This is because all he did was sell bitcoin; the mechanics of the interaction were no different than they would have been for any bitcoin exchange. The fact that the blockchain on which bitcoin relies is decentralized and thus difficult for the government to supervise in the same way it supervises banks and other centralized financial institutions is not the invention of Mr. Costanzo; it is, rather, the nature of this beast. Mr. Costanzo was not convicted of any of the § 1956(a)(3)(C) charges filed against him in this case.

Mr. Costanzo has manifested "appropriate contrition" for the wrongfulness of his acts and thus merits a 2-level downward adjustment pursuant to § 3E.1.1(a).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**C O N C L U S I O N**

2        Based on all the above, it is respectfully requested that this Court sustain all of Mr.

3    Costanzo's objections to the draft PSR's guideline calculation.

4        Should this Court sustain all objections set forth in this filing, the Total Offense

5    Level will be 16, not 30. With Mr. Costanzo's criminal history category of III, the

6    recommended sentencing range is 27-33 months, rather than the PSR's recommended

7    range of 121-151 months.

8        Respectfully submitted:  July 5, 2018.

9                                JON M. SANDS
10                               Federal Public Defender

11                               *s/Maria Teresa Weidner*
12                               MARIA TERESA WEIDNER
                                 Asst. Federal Public Defender
13

14    Copy of the foregoing transmitted by ECF for filing July 5, 2018 to:

15    CLERK'S OFFICE
      United States District Court
16

17    MATTHEW H. BINFORD
      FERNANDA CAROLINA ESCALANTE KONTI
18    GARY RESTAINO
      Assistant U.S. Attorneys
19    Phoenix, Arizona

20

21    Copy emailed to:

22    DANIEL JOHNSON
      United States Probation Officer
23    Phoenix, Arizona

24

25    Copy mailed to:

26    THOMAS MARIO COSTANZO
      Defendant
27

28    *s/yc*