ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

MATTHEW BINFORD
Arizona State Bar No. 029019
Matthew.Binford@usdoj.gov
CAROLINA ESCALANTE
Arizona State Bar No. 026233
Fernanda.Escalante.Konti@usdoj.gov
GARY M. RESTAINO
Arizona State Bar No. 017450
Gary.Restaino@usdoj.gov
Assistant U.S. Attorneys
40 N. Central Ave., Suite 1800
Phoenix, Arizona  85004
Telephone:  602-514-7500

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>       v.<br><br>Thomas Mario Costanzo,<br><br>              Defendant. | CR-17-00585-PHX-GMS<br><br>**CONSOLIDATED RESPONSE TO DEFENDANT'S OBJECTIONS TO THE DRAFT PRESENTENCE INVESTIGATION REPORT**<br>**[Docs. 208 & 211]** |

The Court should overrule almost all of Costanzo's objections to the draft Presentence Investigation Report (PSR).  Costanzo raises various objections to the draft PSR.  The United States agrees with objections 5 and 6, but for the reasons set forth below, all of the other objections should be overruled.

**I.      The total amount of laundered proceeds is $194,700.[1]**

The jury convicted Costanzo of laundering money on five separate occasions.  On May 20, 2015, he laundered $3,000.  (Doc. 188, at 1.)  On October 7, 2015, he laundered $13,000.  (Doc. 188, at 1.)  On November 21, 2015, he laundered $11,700.  (Doc. 188, at

---

[1] Objection I.A.i. and I.A.ii. in Doc. 208.

2.) On February 2, 2017, he laundered $30,000. (Doc. 188, at 2.) On April 20, 2017, he laundered $107,000. (Doc. 188, at 3.) Finally, the evidence established that Costanzo laundered approximately $30,000 in drug proceeds for a local drug trafficker who testified at trial. Accordingly, the total amount of laundered proceeds is $194,700.[2] Even assuming, for the sake of argument, that the $30,000 should not be included in the total amount, Costanzo laundered $164,700 with undercover agents in the five counts of conviction—which falls within the range of $150,000 to $350,000 at USSG § 2B1.1(b)(1)(F). So, no matter which calculation the Court uses, it does not impact the offense level computation because the Base Offense Level of 18 is properly listed in the PSR. (Doc. 194, ¶ 33.)

## II.     There was no sentencing entrapment.[3]

Costanzo has failed to meet his burden of establishing sentencing entrapment. His argument rests entirely on the claim that he was not capable of laundering the money provided by the undercover agents—but that claim relies on the wrong legal standard and the evidence presented at trial showed that he completed every transaction, saying things like, "I can come up with as much as you want to do." (Trial Exhibit 102C.) Thus, his claim is contrary to the case law and the record, and should be rejected.

The defendant bears the burden of demonstrating that, prior to any persuasion on the part of the government, he was only predisposed to commit lesser crimes. *See United States v. Staufer*, 38 F.3d 1103, 1108 (9th Cir. 1994); *United States v. Naranjo*, 52 F.3d 245, 250-51 (9th Cir. 1995); *United States v. Parrilla*, 114 F.3d 124, 127-28 (9th Cir. 1997); *see also United States v. Biao Huang*, 687 F.3d 1197, 1200 (9th Cir. 2012). In

---

[2] The Probation Officer makes the reasoned suggestion that the uncharged money exchanges (*see* Trial Exhibits 101, 102, 105, and 106) should also count in the overall amount. On the record here, where the uncharged undercover conversations were unseemly, but not overtly dirty, the government concurs with the defense that the money exchanges in uncharged sting transactions should be excluded from the total. (Doc. 208, at argument I.A.i.)

[3] Objection I.B.ii. and I.B.iii in Doc. 208.

- 2 -

determining whether a defendant has established sentencing entrapment, the court looks to the defendant's "predisposition and capacity . . . to engage in a deal of the magnitude for which he or she was convicted." *Staufer*, 38 F.3d at 1107; *see also Naranjo*, 52 F.3d at 250 (noting that the defendant must demonstrate he had "neither the intent nor the resources" for the transaction). The district court must then make "express findings" as to whether a defendant has met his burden of showing lack of predisposition for a sentence entrapment claim. *Naranjo*, 52 F.3d at 250; *see also Biao Huang*, 687 F.3d at 1200 ("The district court must make express factual findings regarding whether the defendant has met his burden."). "In order to show sentencing entrapment, a defendant must show that the government engaged in outrageous official conduct which caused the individual to commit a more significant crime for which a greater penalty attaches." *United States v. Si*, 343 F.3d 1116, 1128 (9th Cir. 2003)(citing *United States v. Davis*, 36 F.3d 1424, 1433 (9th Cir. 1994)).

Costanzo relies heavily on *United States v. Yuman-Hernandez*, 712 F.3d 471 (9th Cir. 2013) in his argument. In fact, his entire argument rests on the notion that his "lack of capability meets the standard necessary to establish sentencing entrapment by a preponderance of the evidence," and that, according to *Yuman-Hernandez*, he "need only show a lack of intent or a lack of capability." (Doc. 208, at 7.) But what Costanzo fails to share with this Court is that the standard articulated in *Yuman-Hernandez* applies only to cases "where the defendant is fooled into conspiring and attempting to steal fictitious drugs." 712 F.3d at 474. For cases where "the defendant either can or cannot procure or produce the amount in question," the standard remains "having to show *both* a lack of intent *and* lack of capability to supply or purchase . . . ." *Id.* at 474 (emphasis added); *see also Mejia*, 559 F.3d at 1118; *Naranjo*, 52 F.3d at 250; *Staufer*, 38 F.3d at 1107. Costanzo's case is not like the case in *Yuman-Hernandez*. Here, "[t]he capability to sell a certain quantity of [bitcoin] has concrete contours." *Cf. Yuman-Hernandez*, 712 F.3d at 474 ("The capability to sell a certain quantity of drugs has concrete contours: the defendant either can

or cannot procure or produce the amount in question.") In this case, Costanzo was given the opportunity sell a certain quantity of bitcoin. And he produced the amount in question every single time.

There is ample other evidence to show that Costanzo had the capability to handle the amounts in involved in the undercover transactions. Before agents ever met Costanzo, he posted advertisements on localbitcoins.com claiming that he could do trades of up to $50,000 at a time. (Trial Exhibit 75.) His lower limit on that specific advertisement was $15,000 at a time. (Trial Exhibit 75.) His website said that he was "semi-retired." (Trial Exhibit 76.) In his first meeting with undercover agents, long before agents suggested higher dollar amounts, Costanzo said, "I've built a multimillion dollar business." (Trial Exhibit 101C.) In the second meeting, a meeting that involved drug proceeds, Costanzo said, "I can come up with as much as you want to do." (Trial Exhibit 102C.) Later, during that same conversation, he said, "I mean, I've done over half a million dollars last year." (Trial Exhibit 101D.) And Costanzo always wanted to do more. He always wanted to engage in additional transactions. After converting $11,700 in heroin proceeds in November of 2015, the undercover agent said, "I gotta run, man," and Costanzo responded, "You wanna do tomorrow or something or what . . . cause I'll probably have some more tomorrow." (Trial Exhibit 104D.)

In September of 2016, when UC3 told Costanzo that he needed to "move probably like 30 grand at a time," Costanzo made no comment on the amount, he just said, "If you're doing anything illegal, I don't want to know about it." (Trial Exhibit 105I.) When agents searched Costanzo's apartment, they found numerous multi-thousand-dollar money bands. (Trial Exhibits 12 and 20.) There is nothing in the record supporting his claim that he was not capable of laundering the money that was involved in this case. In fact, the evidence established beyond a reasonable doubt that he was willing and capable of laundering all of the drug money presented by undercover agents in this case.

Furthermore, as the information above shows, there is no evidence of the type of

- 4 -

reluctance and inducement present in cases where the Ninth Circuit has found sentencing entrapment. *See United States v. McClelland*, 72 F.3d 717, 726 n.6 (9th Cir. 1995) (affirming district court's entrapment finding where defendant was emotionally vulnerable and resisted government agent's repeated efforts to convince him to kill his wife); *Naranjo*, 52 F.3d at 251 (suggesting entrapment might exist where DEA had no evidence defendant previously engaged in drug trafficking, defendant resisted undercover agent's repeated efforts to buy large quantity of cocaine, and defendant could not pay for large quantity); *Staufer*, 38 F.3d at 1105, 1108 (finding entrapment where undercover agent and confidential informant, motivated by a possible lower sentence for his own crimes, insisted over defendant's reluctance that he sell an unusually large quantity of drugs for an inflated price). Finally, as mentioned above, "[i]n order to show sentencing entrapment, a defendant must show that the government engaged in outrageous official conduct which caused the individual to commit a more significant crime for which a greater penalty attaches." *United States v. Si*, 343 F.3d 1116, 1128 (9th Cir. 2003). This Court previously denied Costanzo's Motion to Dismiss based on alleged "outrageous" conduct. *See* R.T. 1/4/2018, at 41–42.

To be clear, Costanzo must show lack of intent *and* lack of capability⸺neither of which he is able to show here. Thus, the objection should be overruled.[4] Costanzo was not subject to sentencing entrapment because he had the intent and capacity to convert all of the drug proceeds provided by the undercover agents, and he acted on that intent without hesitation. *See Biao Huang*, 687 F.3d at 1200.

---

[4] Costanzo alternately seeks a downward departure or a downward variance. (Doc. 208 at 8:5-6 & 8:18-20.) No grounds exist for a downward departure. The government defers its assessment of the request for a downward variance until the filing of its Sentencing Memorandum on or before July 20.

### III. There was no sentencing manipulation.[5]

Costanzo has likewise failed to meet his burden of establishing sentencing manipulation. There is no evidence of sentencing manipulation, simply solid investigative work that eventually identified the source of the bitcoin that Costanzo was using in his virtual currency exchange and money laundering business.

"The Ninth Circuit has not always been careful in recognizing the distinction between 'sentencing entrapment' and 'sentencing manipulation.'" *United States v. Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015). Sentencing manipulation "occurs when the government increases a defendant's guideline sentence by conducting a lengthy investigation which increases the number of drug transactions and quantities for which the defendant is responsible." *Id.* (citing *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009)). "In other words, what sets 'sentencing entrapment' apart from 'sentencing manipulation' is that, in the latter, 'the judicial gaze should, in the usual case, focus primarily—though not necessarily exclusively—on the government's conduct and motives.' *Boykin*, 785 F.3d at 1360 (quoting *United States v. Fontes*, 415 F.3d 174, 181–82 (1st Cir. 2005)). "To prove sentencing manipulation, a defendant must show that the officers engaged in the later drug transactions solely to enhance his potential sentence." *Boykin*, 785 F.3d at 1360 (internal quotations omitted). "Cases from other circuits have granted relief for sentencing manipulation in 'only the extreme and unusual case' involving 'outrageous governmental conduct.'" *Id.* at 1360–61.

Costanzo cannot meet his burden of establishing by a preponderance of the evidence that the later transactions in this case occurred "solely to enhance his potential sentence." *See Boykin*, 785 F.3d at 1360. Nor can Costanzo show that this is an "extreme and unusual case involving outrageous government conduct." *Id.* at 1360–61 (internal quotations omitted). As discussed above, this Court has already denied Costanzo's claims of

---

[5] Objection I.B.iv. and I.B.v. in Doc. 208.

- 6 -

1  "outrageous government conduct."  (Doc. 109.)  Furthermore, the evidence shows that the
2  investigation here continued so that the agents could identify Costanzo's source of bitcoins,
3  which they ultimately were able to do following the final charged transaction.

4  In *United States v. Baker*, 63 F.3d 1478, 1500 (9th Cir. 1995), the Ninth Circuit
5  "decline[d] to adopt a rule that, in effect, would find 'sentencing manipulation' whenever
6  the government, even though it has enough evidence to indict, opts instead to wait in favor
7  of continuing its investigation" because "[s]uch a rule 'would unnecessarily and unfairly
8  restrict the discretion and judgment of investigators and prosecutors,'" and "[p]olice . . .
9  must be given leeway to probe the depth and extent of a criminal enterprise, to determine
10 whether coconspirators exist, and to trace . . . deeper into the distribution hierarchy."
11 (internal quotations and citations omitted)

12 In this case, the evidence showed that federal agents were seeking "to determine
13 whether coconspirators exist" and to trace deeper "into the distribution hierarchy."  *See*
14 *Baker*, 63 F.3d at 1500.  Costanzo had no bank accounts, no exchange accounts, and he
15 had not filed taxes.  Agents were never able to determine the amount of money involved in
16 Costanzo's activity.  In the early part of the investigation, agents were not even able to
17 identify his source of bitcoin, or what he was doing with the drug money he was receiving
18 from federal agents.  It was not until later in the investigation, when agents increased the
19 dollar amount, that agents identified Peter Steinmetz as the source of Costanzo's bitcoin
20 (and as the recipient of the drug money provided by agents) when Costanzo took the bag
21 containing $30,000 directly to Steinmetz's house.  Then, once Steinmetz was identified,
22 agents were able to successfully lure him out to a meeting (and obtain incriminating
23 statements) by increasing the dollar amount on the final charged transaction.

24 Beyond the investigative strategy successfully identifying Costanzo's source of
25 bitcoin, there is at least one example of an incident where the agents could have increased
26 the dollar amount, but did not.  Specifically, for the October 7, 2015, transaction, UCA2
27 tried to give Costanzo $15,000 in drug proceeds.  *See* R.T. 3/21/2018, at 416.  Costanzo
28

1  told UCA2 that he could do $13,000, but was unable to do $15,000 at that time. Costanzo
2  later reached out to UCA2 and said he was able to do the remaining $2,000, but UCA2
3  talked to the case agents and they decided there was no need to do a transaction with the
4  additional $2,000. *See* R.T. 3/22/2018, at 449. If the goal was as Costanzo claims, and
5  just to increase the dollar amount at sentencing, then they would have completed the
6  additional $2,000 transaction. But, they did not, because it was always about the
7  investigation, not the dollar amount at sentencing.

8  Costanzo calls the DEA's involvement in this case "overkill" and completely
9  ignores the fact that people like Costanzo allow millions of dollars' worth of drugs to be
10 purchased online—including places like the dark net. (Doc. 208, at 9.) He similarly claims
11 that "there was no real world correlation to real drug trafficking that would call for [the
12 DEA]'s involvement," again completely ignoring the testimony at trial by the cooperator
13 who explained that he purchased bitcoin from Costanzo in order to purchase drugs online
14 from overseas and distribute the drugs in the Phoenix area. (Doc. 208, at 9.) Without any
15 other justification, Costanzo claims that the amount of laundered money that he should be
16 held accountable for is a mere $27,700, which was the amount involved in Counts 1–3,
17 before the DEA was involved in the investigation. (Doc. 208, at 10.) Costanzo's argument
18 is without logic and completely ignores the facts of this case.

19 As explained above, for many of the same reasons that Costanzo's sentencing
20 entrapment argument should be rejected, his sentencing manipulation argument should also
21 be rejected. The government had non-sentencing related reasons to increase the dollar
22 amount and to continue the investigation. This was not an "extreme and unusual case
23 involving outrageous government conduct." *Boykin*, 785 F.3d at 1360–61. He has failed
24 to meet his burden of showing sentencing manipulation and the objection should be
25 overruled.

### IV. Costanzo was in the business of laundering funds.[6]

The Court should find that Costanzo was in the business of laundering funds because he referred to money laundering transactions as business, and he laundered funds with several individuals over an extended period of time. Additionally, he used advertisements and had other business-like promotional material related to money laundering in his apartment. Costanzo also failed to report any other source of legitimate income during the period when he was laundering money.

The Application Note to Section 2S1.1 of the Sentencing Guidelines lists a series of factors that the Court should consider when determining whether this enhancement should apply. Those factors include "[w]hether the defendant engaged in laundering funds during an extended period of time," "[w]hether the defendant engaged in laundering funds from multiple sources," "[w]hether the defendant generate[d] a substantial amount of revenue in return for laundering funds," and "[i]f the defendant made statements [regarding those factors] during the course of an undercover government investigation." USSG § 2S1.1. Note 4(B). The Commentary to Amendment 634, which revised § 2S1.1 and consolidated the money laundering guidelines in 2003, states, "[t]he Commission determined that, similar to a professional 'fence,' *see* § 2B1.1(b)(4)(B), defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct." *See* USSG App. C, Vol. II, at 223 (2003).

In this case, the evidence revealed that Costanzo laundered money for at least six different individuals over a three-year period. In addition to the three different undercover agents—whose heroin and cocaine money Costanzo gladly accepted—Costanzo also took drug money from the cooperator who testified at trial, and provided bitcoin to at least two other people who were involved in drug transactions. (Trial Exhibits 120 & 122). In

---

[6] Objection 2 in Doc. 208.

addition to engaging in money laundering over a multi-year period, Costanzo also charged above-market rates[7], which presumably was profitable for him. Indeed, on several occasions, he told the agents that he had made significant sums of money (that we know were never reported). He told agents that he built "a multimillion dollar business" using localbitcoins.com, (Exhibit 101C), and that he had "done over a half a million dollars last year," (Exhibit 102D). He was even so bold as to say, "That's why you're paying me," essentially acknowledging that his high rates were based on the fact that he would keep illegal transactions to himself and not "say anything to anybody." (Trial Exhibit 103F.)

Costanzo also used advertisements as part of his money laundering business model. His online advertisements said things like, "I will get you Bitcoins immediately and discretely!" and "All transactions are done complete anonymity. The only record of the transaction is on the blockchain." (Trial Exhibit 74.) Agents also found promotional pamphlets in Costanzo's residence. One of those pamphlets said, "no frozen accounts" and "Bitcoin has no regard for any national borders anywhere." (Trial Exhibit 35.) In addition to the online postings and pamphlets, Costanzo also made podcasts and then sent text messages promoting those podcasts to individuals that he knew were drug traffickers. While the podcasts on their own were perfectly legal, they were advertisements and he sent them to the cooperator and the undercover agents, knowing that all four of them were involved in drug trafficking. These were business advertisements directly targeting individuals looking to launder money.

Costanzo repeatedly referred to his money laundering transactions as "business" and talked about his "business model." For example, on May 20, 2015, Costanzo sent a message to UCA1, stating, "Thank u for ur business Sam. Use mycelium to connect has

---

[7] For example, the fees that Costanzo charged were far greater than those charged by Coinbase, a registered digital currency exchange institution. *See, e.g.*, https://support.coinbase.com/customer/portal/articles/2109597-buy-sell-bank-transfer-fees.

- 10 -

encrypted chat." (Trial Exhibit 70.) In October of 2015, Costanzo sent a message to UCA2, stating, "Thank u for ur buzoness tom . . . ." (Trial Exhibit 124.) On November 22, 2015, Costanzo sent a message to UCA1, stating, "Ty for ur business bro." (Trial Exhibit 70.) In his money laundering deals with the undercover agents, Costanzo also mentioned his business model: Don't get bit, don't get shot, and don't talk to the police. (Trial Exhibits 101G, 101Q, 105I.) In his October meeting with UCA2, Costanzo specifically said, "You know, I don't really ask a lot of questions" and then followed up with, "You know, like I said, it's part of my business model." (Trial Exhibit 103G.)

Finally, there is no evidence in the record to show that Costanzo had a legitimate source of income during the time period he was laundering drug money. In fact, Costanzo did not report any legitimate income to the Internal Revenue Service. When interviewed by the Probation Officer, Costanzo declined to provide information regarding his income. His failure to report his income to federal officials (as required by law), along with his refusal to provide the same income information to the Probation Officer after his conviction, coupled with the fact that he was laundering money with at least six different individuals over a multi-year period makes it all the more likely that his primary source of income was derived from money laundering.

Costanzo was in the business of laundering money. He laundered money for multiple people over a multi-year period. He used advertisements and referred to money laundering transactions as business—even describing his money laundering business model—and made enough money to live comfortably, all without ever reporting any legitimate income before or after his arrest and conviction. The objection claiming that Costanzo was not "in the business" of laundering money should be overruled.

**V.    Costanzo's money laundering operation was extremely sophisticated.[8]**

Costanzo's money laundering operation was sophisticated because he used emerging technology, including encrypted applications and blockchain technology, as well as false identities and layering, to launder heroin and cocaine proceeds. The United States Sentencing Commission has stated that money laundering operations involving sophisticated means warrant additional punishment because they are difficult and time consuming for law enforcement to detect. *See* USSG App. C, Vol. II, at 223 (2003). ("similar to fraud and tax offenses that involve sophisticated means . . . violations of 18 U.S.C. § 1956 that involve sophisticated laundering warrant additional punishment because such offenses are more difficult and time consuming for law enforcement to detect than less sophisticated laundering.")

Here, Costanzo used emerging technology to launder money and his use of layering in those transactions was evidenced in the bitcoin transaction graphs. (Trial Exhibits 84–88.) He also used of a series of encrypted applications, which suggest a level of sophistication far beyond the average participant in criminal activity. There is no case law directly on point as to the use of encrypted platforms in the sophisticated means assessment, but it is analogous to the efforts by defendants in other fraud schemes to conceal identity and income, *see United States v Niko*, 584 Fed.Appx 693 (9th Cir. 2014) (mem. op.), as well as to use and develop strategies to bypass observation by the authorities, *see United States v. Markosian*, 637 Fed.Appx 289 (9th Cir. 2015) (mem. op.).

Additionally, there was concealment of identity—beyond the mere use of "Morpheus" as a fake name—through the use of Mycelium, Telegram, and the other platforms, and there was concealment of income through Costanzo's failure to file income tax returns (or even provide that information to the Probation Office after his conviction). During the discussions with the undercover agents, Costanzo laid out his strategies for

---

[8] Objection 3 in Doc. 208.

laundering money without triggering reporting requirements or government scrutiny. At one point during a conversation with an undercover agent, he discussed previously exchanging small bills for larger bills using a casino ATM. Sure, Costanzo made some mistakes, but "the fact that the concealment might not have been total does not mean that there was no effort at concealment or that the method employed was not sophisticated." *Nico*, 584 Fed. Appx. at 694. In *United States v. Fish*, 731 F.3d 277, 280 (3rd Cir. 2013), the Third Circuit affirmed a two-level enhancement that was based in part on "efforts to evade detection by the use of codes and untraceable electronic devices."

Additional specific examples of sophistication in this case include the following facts supported by testimony and/or trial exhibits:

- Costanzo told UCA1 that bitcoin transactions with him were "untraceable" and that he "keeps no records at all, of anything." (Trial Exhibit 101F.)
- Costanzo explained that bitcoin was "a good way to lower your visibility" to the government, and that bitcoin makes it "very difficult" to trace back to a person involved in a transaction. (Trial Exhibits 101J, 101M.)
- Costanzo told UCA2 to use Telegram, an encrypted messaging application. (Trial Exhibit 124.) UCA2 and Costanzo then used Telegram to coordinate the time, date, and amount of their upcoming money laundering transaction. (Trial Exhibit 125.)
- When talking about bitcoin, Costanzo said, "See, and that's the beautiful thing is that, you know, this--this is a really big problem for the government" (Trial Exhibit 103D.)
- During one transaction, Costanzo showed UCA3 a device called a "Trezor" and suggested using it to store bitcoins securely. (Trial Exhibit 54.)
- On February 2, 2017, UCA3 met with Costanzo to exchange $30,000 for bitcoin. During the transaction, UCA3 told Costanzo that the money was from selling one kilogram of cocaine. Costanzo told UCA3, "Let's start communicating with Telegram." (Trial Exhibit 107F.)

- At Costanzo's home, agents recovered a pamphlet that stated, "The Bitcoin network uses state-of-the-art cryptography to provide superior privacy protection, making it difficult to confiscate by governments and other thieves, but accessible from any WiFi connection or mobile device." (Trial Exhibit 35.)

There was substantial evidence presented in this case to show that Costanzo's money laundering business was sophisticated. Thus, the Probation Officer properly added two levels under Section 2S1.1(b)(3), and the objection should be overruled.

**VI. Costanzo has not accepted responsibility for his criminal acts.[9]**

The United States Sentencing Guidelines state that a defendant's offense level should be decreased by two levels, if "the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "It is the defendant's burden to demonstrate acceptance of responsibility." *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001). The Application Notes to Section 3E1.1 provide further guidance, stating that this adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment. (n.2). The notes also state that, "[i]n *rare* situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." U.S.S.G. § 3E1.1, comment. (n.2) (emphasis added). But even a defendant who does not go to trial, and instead "enters a guilty plea[,] is not entitled to an adjustment . . . as a matter of right." U.S.S.G. § 3E1.1, comment. (n.3).

There is nothing in the PSR suggesting that Costanzo has accepted responsibility for his actions. Indeed, there is nothing in the record of this case suggesting that this a "rare" situation in which Costanzo should receive the benefit of a two-level reduction. To

---

[9] Objection 4 in Doc. 208.

- 14 -

the contrary, Costanzo refused to accept responsibility for his actions and continues to deny any acceptance, remorse, or responsibility for his criminal acts. Costanzo's statements certainly do not place this case in one of the "rare" situations where a defendant who goes to trial is entitled to a two-level reduction for acceptance of responsibility—especially when Costanzo has yet to acknowledge any responsibility for his actions.

It is Costanzo's burden to demonstrate acceptance of responsibility. To date, he has done nothing to meet that burden. Of course, the objection should not be overruled solely because Costanzo exercised his constitutional right to go to trial—that is not allowed. *See United States v. Lopez-Patino*, 391 F.3d 1034, 1038 (9th Cir. 2004) ("[A] judge cannot rely upon the fact that a defendant refuses to plead guilty and insists on his right to trial as the basis for denying an acceptance of responsibility adjustment."). Instead, the objection should be overruled because Costanzo has taken no steps to display acceptance, remorse, or responsibility for his criminal acts and has therefore failed to meet his burden of demonstrating acceptance of responsibility.

The Government respectfully asks the Court to overrule Costanzo's objection to this portion of PSR. As detailed above, he has not accepted responsibility in this case and does not deserve the corresponding reduction.

**VII. Paragraph 3 of the PSR incorrectly states that Costanzo was convicted under 18 U.S.C. § 1956(a)(3)(C).[10]**

Costanzo was convicted under 18 U.S.C. § 1956(a)(3)(B). He was not convicted under 18 U.S.C. § 1956(a)(3)(C). Thus, paragraph 3 of the draft PSR should be corrected. Objection 5 should be sustained.

//

//

---

[10] Objection 5 in Doc. 211.

**VIII. Paragraph 4 of the PSR should say "dismissed" instead of "subsequently dismissed."[11]**

Costanzo correctly points out that the word "subsequently" should be deleted from paragraph 4 of the draft PSR. Objection 6 should be sustained.

**IX. The government previously recommended clarifications to the Offense Conduct.[12]**

The government has already responded in writing to Costanzo's concerns about the drafting of the offense conduct. (*See* Doc. 214.) The government has no objection if the PSR includes the additional clarifying language for paragraphs 5 to 26 of the PSR, as outlined in the May 30, 2018, letter to counsel. (Doc. 207-B, filed under seal.)

**X. Conclusion.**

The Court should overrule all of the objections, except for the objections to Paragraph 3 and Paragraph 4 of the PSR. For the reasons set forth above, the remaining objections are without merit and lack factual and legal support.

Respectfully submitted this 16th day of July, 2018.

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Matthew Binford*
MATTHEW BINFORD
CAROLINA ESCALANTE
GARY M. RESTAINO
Assistant U.S. Attorneys

---

[11] Objection 6 in Doc. 211.

[12] Objection 7 in Doc. 211.

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Maria Teresa Weidner & Zachary Cain
Assistant Federal Public Defenders
*Attorneys for Defendant*

 *s/M. Binford*
U.S. Attorney's Office