**INDEX OF EXHIBITS**

United States v. Thomas Mario Costanzo

CR-17-585-PHX-GMS

Exhibit A .......... *LocalBitcoins Trader 'Bitcoin Mavin' Sentenced to Year in Prison*

Exhibit B ................. *Woman who once bought bitcoins for $300,000 cash in paper bags sent to prison*

Exhibit C ........................................ Tetley Information,CR-17-738-R (C. D. Calif.)

Exhibit D ....... *Woman Sentenced for Laundering $6M - $9.5 M in Cash for Bitcoin*

Exhibit E ................................................................. Tetley Judgment & Conviction

Exhibit F ............... *Unlicensed B.C. bitcoin trader jailed in U.S. after federal sting*

Exhibit G ................................... Ong Indictment, CR-17-1919-RSL (W. D. Wash.)

Exhibit H....................................................................Ong Judgement & Conviction

Exhibit I ................................................. *Time – Inside an Undercover Bitcoin Sting*

Exhibit J ............................... Klein Information, CR-17-3056-MDH (W. Dist. Mo.)

Exhibit K....................................................................Klein Judgment & Conviction

# EXHIBIT

# A



Blockchain 101    Technology    Markets    Business    Data & Research    Consensus    Search

Join Us at Consensus: Singapore in September

# LocalBitcoins Trader 'Bitcoin Maven' Sentenced to Year in Prison



🐦 315    f    g+    in    🔴 6    ✉

Muyao Shen ✉ 🐦 🔊                    **NEWS**
🕐 Jul 10, 2018 at 18:10 UTC

A Los Angeles bitcoin trader was sentenced Monday to one year in federal prison after she admitted to operating an unlawful money transmission business.

Theresa Tetley, a former stockbroker and real estate investor based in California, was also fined $20,000 and will give up 40 bitcoins (an amount worth roughly $254,000), nearly $300,000 in cash and 25 assorted gold bars, according to a notice from the U.S. Department of Justice.

As CoinDesk previously reported, Tetley worked as a trader on the LocalBitcoins exchange platform under the name "Bitcoin Maven" between 2014 and 2017 and reportedly exchanged millions of dollars worth of crypto during that period.

The year-long sentence – plus one day – is less than the 30 months Tetley potentially faced as the sentencing process moved forward. It represents a win for Tetley, whose lawyers sought a one-year prison term.

Brian Klein, one of Tetley's attorneys, called the result "a victory," according to LA Times, as it is much shorter than the previous 30-month jail time.

"We are pleased the judge made such a dramatic departure," Klein told the publication.

Tetley's case is considered to be the first of its kind within California's Central District, but other lawsuits in the past couple of years have taken aim at U.S.-based traders who used the LocalBitcoins platform.

In one case from 2017, a bitcoin trader and his father were charged with running an unlawful money services business, resulting in a nine-year sentence for Michael Lord.



Skuchain, Inc.: DevOps Engineer

ConsenSys: Full Stack Developer - Toronto

ConsenSys: Full-stack Engineer, Kaleido

**Don't miss a single story**

Subscribe to our free newsletter and follow us

Email Address        **SUBSCRIBE**

**Have a breaking story?**

Let us know here »



*Image via Shutterstock*

The leader in blockchain news, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a *strict set of editorial policies*. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups.

Money Laundering    California    Bitcoin Trading    Republished    bitcoin money laundering    illegal bitcoin trading



Ads by Revcontent

**New Technology Allows Americans to Cancel Cable TV**
TrueSignalTV

**Take a Peek at the New Honda HR-V and Find One Near Phoenix**
Edmunds

**This Crypto Expert Believes He Knows The Precise Date Bitcoin**
Palm Beach Group

**This Amazon Upgrade Can Save You Even More Than Prime**
Honey

**How To Learn a New Language in 20 Minutes a Day**
The Babbel Magazine

**How to Fix Your Fatigue (Do This Every Day)**
Gundry MD



HISTORY. ARTISTRY. LEGACY.

# EXHIBIT

# B

SUBSCRIPTIONS          SIGN IN

*DIRTY MONEY, DIRTY HANDS —*

# Woman who once bought bitcoins for $300,000 cash in paper bags sent to prison

At one point, Theresa Tetley had an upstanding client named "Pirate Sh*t."

**CYRUS FARIVAR** - 7/11/2018, 2:00 AM



S3studio/Getty Images

**Enlarge**

A woman who for years went by the name "Bitcoin Maven" on
localbitcoins.com—a peer-to-peer website for buying and selling anonymous

bitcoins in person—was sentenced Monday to 366 days in federal prison, three years of supervised release, and a $20,000 fine.

**FURTHER READING**
Report: Bitcoin money laundering suspect spared from prison poison plot

While selling bitcoins is not inherently illegal, doing so in such large volumes without keeping extensive records to mitigate money laundering is.

Federal prosecutors in Los Angeles called the case against Theresa Lynn Tetley—a 50-year-old former stockbroker who bought and sold several million dollars' worth of bitcoins—the first of its kind in the region.

Authorities began intensely investigating Tetley starting in 2016 when, unbeknownst to her, she met with an undercover female agent from the Drug Enforcement Administration. When the DEA agent told Tetley she wanted to stay anonymous, Tetley readily agreed.

Eventually, Tetley was introduced to the woman's "boyfriend," who was also an undercover agent. Over the next several months, the boyfriend conducted increasingly large transactions with Tetley, at one point specifically saying that he possessed a supply of "coke, meth, and weed" that had recently been "stolen."

These deals eventually came to a head in March 2017, when Tetley brought $300,000—held in two Trader Joe's paper grocery bags—to buy an equivalent amount of bitcoins from the fake boyfriend. Tetley was arrested immediately and eventually pleaded guilty to money laundering.

Tetley was known to do business with William James Farber, who was arrested last year. Authorities believe he was behind one of AlphaBay's largest drug rings. Tetley only knew Farber as "David" or "Pirate Shit," according to government filings.

"These circumstances show that defendant knew something was awry, as 'David' coveted that she operated entirely outside of the regulated financial market, that she offered privacy and anonymity, and that she could sustain a high level of business for him," prosecutors wrote in a June 2018 sentencing memorandum. This is also when they asked the judge to impose a 30-month sentence.

"Providing cash in envelopes (and in the significant amounts she did), in coffee shops and restaurants, is no way to conduct legitimate business, certainly when that volume exceeds the millions and someone such as defendant—a former stockbroker and real estate investor—was certainly aware of that."

Tetley must also forfeit nearly $300,000 in cash, 25 gold bars, and 40 bitcoins worth about $255,000 as of Tuesday afternoon.

**UPDATE 7:18pm ET**: Brian Klein, Tetley's attorney, emailed Ars to say: "The sentence Theresa received represents a huge departure from what the prosecutor was seeking, chopping it down by essentially two-thirds. Although we had hoped for a probationary sentence, we are pleased the judge made such a dramatic departure, and in so doing, we believe he validated points we raised and rejected those of the prosecutor."

READER COMMENTS    198                                                    SHARE THIS STORY

CYRUS FARIVAR
Cyrus is a Senior Tech Policy Reporter at Ars Technica, and is also a radio producer and author. His latest book, *Habeas Data*, about the legal cases over the last 50 years that have had an outsized impact on surveillance and privacy law in America, is out now from Melville House. He is based in Oakland, California.

EMAIL cyrus.farivar@arstechnica.com // TWITTER @cfarivar

Ars Live
#23:
The

⌄

More videos

# EXHIBIT

# C

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,          CR No. 17-C R 0 0 7 3 8 MWF

12             Plaintiff,               I N F O R M A T I O N

13             v.                       [18 U.S.C. §§ 1960(a), (b)(1)(B):
                                        Operating an Unlicensed Money
14   THERESA TETLEY,                    Transmitting Business; 18 U.S.C.
       aka "Bitcoin Maven,"             § 1956(a)(3)(B): Laundering of
15                                      Monetary Instruments]
               Defendant.
16

17

18        The Acting United States Attorney charges:

19                          COUNT ONE

20              [18 U.S.C. §§ 1960(a), (b)(1)(B)]

21        Beginning in or around January 2014, and continuing until on or

22   about March 22, 2017, in Los Angeles County, within the Central

23   District of California, and elsewhere, defendant THERESA TETLEY, also

24   known as "Bitcoin Maven," knowingly conducted, controlled, managed,

25   supervised, directed, and owned an unlicensed money transmitting

26   business affecting interstate and foreign commerce, namely, a digital

27   currency exchange business, that failed to comply with the money

28   //

1   transmitting business registration requirements under Section 5330 of

2   Title 31, United States Code, and the regulations thereunder.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[18 U.S.C. § 1956(a)(3)(B)]

On or about January 26, 2017, in Los Angeles County, within the Central District of California, defendant THERESA TETLEY, also known as "Bitcoin Maven," with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, that is, the felonious importation, receiving, buying, selling, and otherwise dealing in controlled substances punishable under a law of the United States ("drug trafficking"), knowingly conducted a financial transaction, affecting interstate commerce, involving property represented by an authorized agent of the United States government to be proceeds of specified unlawful activity, that is, drug trafficking, namely, the exchange of 80.35912976 Bitcoin for

///

///

1 | $69,958.00 in U.S. dollars, plus fees (Blockchain transaction ID

2 | 8a3acec41dd41a9085b0856fd00a213a84fd64e261a298922089334723a2f033).

3

4

5 |          SANDRA R. BROWN
         Acting United States Attorney

6

7

8 |          LAWRENCE S. MIDDLETON
         Assistant United States Attorney

9 |          Chief, Criminal Division

10 |          KEVIN M. LALLY
         Assistant United States Attorney

11 |          Chief, Organized Crime Drug
           Enforcement Task Force Section

12

13 |          CAROL A. CHEN
         Assistant United States Attorney
         Deputy Chief, Organized Crime

14 |            Drug Enforcement Task Force
           Section

15

16 |          PUNEET V. KAKKAR
         Assistant United States Attorney
         Organized Crime Drug

17 |            Enforcement Task Force Section

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# D



We use cookies for analytics, advertising and to improve our site. You agree to our use of cookies by closing this message box or continuing to use our site. To find out more, including how to change your settings, see our Cookie Policy

Hot Stock Pick - HMMR
HMMR Is About To Revolutionize The Telecommunications Industry

Home

PRESS RELEASE

# Woman Sentenced for Laundering $6M – $9.5M in Cash for Bitcoin



By
Published: July 13, 2018 2:37 a.m. ET

Jul 13, 2018 (Heraldkeeper via COMTEX) -- Woman Sentenced for Laundering $6M – $9.5M in Cash for Bitcoin

Theresa Tetley, a former stockbroker, called herself the "Bitcoin Maven." The self-proclaimed "Maven" exchanged cash for bitcoin, and one of her clients was a reported online drug dealer. Tetley's money laundering operation has led to a one-year sentence in prison.

Federal authorities also seized 25 gold bars, $270,000 worth of bitcoin and $300,000 in cash from the woman last year. She is required to forfeit all of these assets along with paying a $20,000 fine.

The Justice Department claims that Tetley's operation, which ran from 2014 through 2017, required her to meet with clients at public places, including coffee shops and restaurants. She reportedly exchanged as much as $9.5 million in cash for bitcoin, with envelopes of cash exchanged for bitcoin.

A sting operation, carried out by the U.S. Drug Enforcement Administration, led to Tetley's arrest. The undercover agent, posing as a drug dealer, brought $300,000 in cash to exchange for bitcoin to Tetley.

**Cookie Notice**
We use cookies for analytics, advertising and to improve our site. You agree to our use of cookies by closing this message box or continuing to use our site. To find out more, including how to change your settings, see our Cookie Policy.

She is accused of $6 million in exchanges with William James Farber, a man that has been arrested on **drug charges** and is accused of running drug rings in Atlanta as well as online.

Tetley has been sentenced to a 12-month prison sentence, less than the 30-month sentence federal prosecutors were seeking. Exchanging digital currencies for cash is not illegal, but Tetley failed to obey federal rules that require suspicious activity, which includes large cash transactions, to be reported. Her lawyers claim that her sentence is a "win" for their client, whom could have faced much stiffer sentencing.

Prosecutors claim that exchanging bags of cash for bitcoin is a red flag that Tetley should have noticed and reported to authorities.

Tetley charged higher exchange rates than companies and institutions registered to offer bitcoin transactions through FinCEN. She used online portals to promote her exchange, and it's reported that she knowingly laundered funds for dark web drug sales.

Regulators claim that Tetley helped fuel the black-market financial system, which operated outside of the regulated bank industry.

Bart Smith, Wall Street trader, told CNBC that bitcoin still remains the best option for investors that want to "functionally use" their investment. Smith claims that digital currencies are highly traded among workers that work in one country and send money back to another country, often to family members.

Bitcoin allows for a fast and cheap alternative to Western Union and banks, which can halt transactions and typically have slower processing times.

The post **Woman Sentenced for Laundering $6M – $9.5M in Cash for Bitcoin** appeared first on **Herald Keeper**.

*The MarketWatch News Department was not involved in the creation of the content.*

**SPONSORED CONTENT**



**Man Who Predicted 2008 Meltdown Surprises With New Prediction**

By Casey Research

MARKETWATCH
**PARTNER CENTER**

  

**MOST POPULAR**

 **Stock investors confront the once unthinkable: a new world order**

 **Lawsuit against Navient can proceed — why student loan borrowers should pay attention**

# EXHIBIT

# E

## United States District Court
## Central District of California

**UNITED STATES OF AMERICA vs.**       <u>CR-17-738-R</u>

Defendant<u>: THERESA LYNN TETLEY</u>      S.S.#<u>-------3866</u>

     AKA:<u> Theresas Tetley;                </u>
         <u>Bitcoin Maven; Theresa Eltman</u>

---

### JUDGMENT AND PROBATION/COMMITMENT ORDER

---

     In the presence of the attorney for the government, the defendant appeared in person, on:<u>     July 9, 2018     </u>
                  Month / Day / Year

COUNSEL:<u> XX </u> WITH COUNSEL<u>  Brian E. Klein, retained            </u>

<u> X </u>PLEA:
     <u> X </u>GUILTY, and the Court being satisfied that there is a factual basis for the plea.
     <u>    </u>NOLO CONTENDERE         <u>    </u>NOT GUILTY

FINDING:
     There being a FINDING of <u> X </u> GUILTY, defendant has been convicted as charged of the offense(s) of:  Operating an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. §§ 1960(a), (b)(1)(B), as charged in count one of the Information; Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(3)(B), as charged in count two of the Information.

JUDGMENT AND PROBATION/COMMITMENT ORDER:
   The Court asked whether defendant had anything to say why judgment should not be pronounced.  Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgement of the court the defendant is hereby committed to the Bureau of Prisons to be imprisoned for a term of:

**Twelve (12) months and one day** on counts one and two of the two-count Information.  This term consists of twelve months and one day on each of counts one and two of the two-count Information, to be served concurrently.

     Upon release from imprisonment, the defendant shall be placed on supervised release for a term of two years. This term consists of two years on each of counts 1 and 2 of the 2-count information, all such terms to run concurrently under the following terms and conditions:

1.   The defendant shall comply with the rules and regulations of the United States Probation Office, General Order 05-02, and General Order 01-05, including the three special conditions delineated in General Order 01-05.

2.   During the period of community supervision, the defendant shall pay the special assessment and fine in accordance with this judgment's orders pertaining to such payment.

**-- GO TO PAGE TWO --**           <u>     CCH     </u>
                                        Deputy Clerk

**U.S.A. V. THERESA LYNN TETLEY**          **CR-17-738-R**

**-- CONTINUED FROM PAGE ONE --**          **PAGE TWO**

==========================================================

### JUDGMENT AND PROBATION/COMMITMENT ORDER

==========================================================

3.    The defendant shall not engage, as whole or partial owner, employee, consultant, volunteer, or otherwise, in any business involving money services business, without the express approval of the Probation Officer prior to engaging in such employment, and notification to the employer of this conviction. Further, the defendant shall provide the Probation Officer with access to any and all business records, client lists, and other records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer

4.    The defendant shall not be employed in any position that requires licensing and/or certification by any local, state, or federal agency without the prior written approval of the Probation Officer.

5.    The defendant shall apply all monies received from income tax refunds to the outstanding Court-ordered financial obligation. In addition, the defendant shall apply all monies received from lottery winnings, inheritance, judgments and any anticipated or unexpected financial gains to the outstanding Court-ordered financial obligation.

6.    The defendant shall cooperate in the collection of a DNA sample from the defendant.

IT IS FURTHER ORDERED that the drug testing condition mandated by statute is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

IT IS FURTHER ORDERED that the defendant shall pay to the United States a special assessment of $200, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

IT IS FURTHER ORDERED that the defendant shall pay to the United States a total fine of $ 20,000, consisting of the following: Count 1, a fine of $10,000; and Count 2, a fine of $10,000. The total fine shall bear interest as provided by law.

IT IS FURTHER ORDERED that the fine shall be paid in full no later than 60 days after sentencing.

IT IS FURTHER ORDERED that the defendant shall comply with General Order No. 01-05.

The Court has entered a money judgment of forfeiture against the defendant, which is hereby incorporated by reference into this judgment and is final.

**-- GO TO PAGE THREE --**          _____CCH_____
                                                       Deputy Clerk

<u>U.S.A. V. THERESA LYNN TETLEY</u>                                    <u>CR-17-738-R</u>
-- CONTINUED FROM PAGE TWO --                                    PAGE THREE
================================================================

### JUDGMENT AND PROBATION/COMMITMENT ORDER
================================================================

    IT IS FURTHER ORDERED that the defendant surrender herself to the institution designated by the Bureau of Prisons **at or before 10 AM of August 15, 2018**. In the absence of such designation, the defendant shall report on or before the same date and time, to the United States Marshal located at the Roybal Federal Building, 255 East Temple Street, Los Angeles, California 90012.

    IT IS RECOMMENDED that the defendant shall be designated at an institution located in Southern California.

Signed by:              District Judge  _____
                                          MANUEL L. REAL

                                          Kiry Gray, Clerk of Court
Dated/Filed: July 9, 2018              By  /s/ Christine Chung
             Month / Day / Year            Christine Chung, Deputy Clerk

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

### STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

X    The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

**STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS**

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
    Private victims (individual and corporate),
    Providers of compensation to private victims,
    The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

---

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered to
on _____   _____

Defendant noted on
appeal on _____

Defendant released
on _____

Mandate issued on _____

Defendant's appeal
determined on _____

Defendant delivered to
on _____   _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

B
y

_____          _____
Date                                      Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

B
y

_____                    _____
        Filed                                         Deputy Clerk
        Date

**FOR U.S. PROBATION OFFICE USE ONLY**

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed)_____        _____
        Defendant                                        Date


_____                _____
   U. S. Probation Officer/Designated Witness            Date

# EXHIBIT

# F

 **CBC**

# Unlicensed B.C. bitcoin trader jailed in U.S. after federal sting

Louis Ong told agents to stop talking about drug dealing because he needed 'plausible deniability'

Jason Proctor · CBC News · Posted: May 19, 2018 7:30 AM PT | Last Updated: May 20



Vancouver's Louis Ong has been sentenced to 20 days in a U.S. jail after admitting to unlicensed trading of bitcoin. (Jack Guez/AFP/Getty Images)

A DIY Vancouver bitcoin trader who begged federal agents posing as drug dealers to stop talking about where their money came from has been sentenced to 20 days in a U.S. jail — equal to time served.

Louis Ong pleaded guilty last week in Seattle U.S. District Court to operating an unlicensed money transmission business.

- **Beware of scammers asking for bitcoin payouts this tax season: fraud watchdog**

According to court documents, the 37-year-old told undercover operatives it was best if he didn't know anything about the sale of narcotics.

"I didn't hear that," Ong explained to one agent. "So there is one thing I tell people is I don't really care what ... they use the bitcoin for ... it's better that I don't actually know. 'Cause then I can have plausible deniability."

# 'I get the job done'

In addition to the jail sentence, Ong has also agreed to forfeit cash and bitcoin worth more than $1.1 million US.

According to the original complaint, the U.S. department of Homeland Security began investigating Ong in December 2016 after responding to an online advertisement advertising the anonymous buying and selling of bitcoin.

- **Suspected bitcoin bandit escapes prison and makes getaway on Icelandic PM's flight**

After an exchange of text messages, an agent met Ong in a McDonald's parking lot in Tukwila, Wash. to exchange $12,000 US for bitcoin.





Louis Ong pleaded guilty to operating an unlicensed money transmission business after he was caught in a sting by federal authorities in the United States. (Twitter)

Ong used a money counter to verify the amount and then transmitted bitcoin to a digital wallet using an iPhone. He claimed a fee of 7.3 per cent.

Agents later followed Ong as he deposited cash to a number of banks.

At the next meeting, the same agent asked Ong to trade $50,000 US for a fee of slightly more than nine per cent.

"I am charging ... higher than a lot of people, but because ... I get the job done, people come to me," he was recorded as saying.

## 'Your friends seem to be a bit open'

At one point in March 2017, Ong asked an agent who was acting as the 'boss' of the operation if his underlings could stop talking about drugs.

"I am not interested in what you buy or sell (bitcoin) for, so please do not mention it or have your friends mention it either," he said.

"Your friends seem to be a bit open about what you do when there is really no need to be."



According to U.S. court documents, Ong transferred crypto-currency to a bitcoin wallet after receiving cash from undercover agents. (Simon Dawson/Bloomberg)

After a uniformed agent confronted Ong, he registered with the federal U.S. agency tasked with stopping money laundering.

But then he proceeded to make three more transactions with undercover agents in violation of the rules.

According to Ong's sentencing memorandum, he moved to Canada from Singapore with his mother in 1987, graduating from the University of B.C. with a degree in computer science.

He is described as an entrepreneur who worked to develop video game software.

The U.S. government claims a forensic review of his digital device revealed that he had been involved in the world of bitcoin since at least 2013.

## 'He wanted to be his own boss'

Ong's friends and family filed a number of glowing letters with the U.S. court.

Ong has been living in Los Angeles with his sister pending the outcome of the charges. He volunteers with a church and a number of charities that help the homeless.

The references provide little insight as to how Ong got into bitcoin trading, though one letter from a Vancouver-area doctor describes Ong as a natural entrepreneur.

"Louis was forever looking for another (legal and honest) way to make money and he always seemed to have his fingers in several pies. He wanted to be his own boss and did not like the restrictions of a regular, 'nine-to-five' job," the letter says.

"When Louis called me recently, he explained to me what he had been doing and how in doing so, he had broken a law in the state of Washington."

- **Bought bitcoin in 2017? Here's how cryptocurrency is taxed in Canada**

- **Bitcoin farm proposed for former B.C. sawmill site**

According to a news release from the department of Homeland Security, Ong tearfully told the court he realized how his activities had "facilitated more people being exposed to addictive substances."

In addition to his jail sentence, Ong was also given three years of supervised release and will likely be unable to return to the U.S.

His lawyer told CBC News he was satisfied with the outcome.

"We are very pleased the judge recognized Louis' genuine remorse and let him leave court a free man as we had requested," read an email. "He has a very bright future in front of him."

## Clarifications

- A previous version of this story suggested Ong would spend 20 more days in jail than already served.
*May 20, 2018 9:48 AM PT*

©2018 CBC/Radio-Canada. All rights reserved.

Visitez Radio-Canada.ca

# EXHIBIT

# G

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

_August 16_, 20 _17_

WILLIAM M. McCOOL, Clerk

By _____ Deputy

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| UNITED STATES OF AMERICA, | NO. **CR17-191** RSL |
|---|---|
| Plaintiff, | |
| v. | INDICTMENT |
| LOUIS ONG, | |
| Defendant. | |

The Grand Jury charges that:

## COUNT 1
### (Laundering of Monetary Instruments)

On or about February 1, 2017, in King County, in the Western District of
Washington, LOUIS ONG, with the intent to conceal and disguise the nature, location,
source, ownership, and control, of property believed to be the proceeds of specified
unlawful activity, that is, $50,000 in United States currency, did knowingly conduct and
attempt to conduct a financial transaction affecting interstate and foreign commerce
involving property represented by a law enforcement officer, to be proceeds of specified
unlawful activity, and property used to conduct and facilitate specified unlawful activity,
to wit, distribution of controlled substances, in violation of Title 21, United States Code,
Section 841(a).

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

INDICTMENT/ONG – 1

## COUNT 2
### (Laundering of Monetary Instruments)

On or about March 1, 2017, in Snohomish County, in the Western District of Washington, LOUIS ONG, with the intent to conceal and disguise the nature, location, source, ownership, and control, of property believed to be the proceeds of specified unlawful activity, that is, $20,000 in United States currency, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity, and property used to conduct and facilitate specified unlawful activity, to wit, distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a).

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

## COUNT 3
### (Laundering of Monetary Instruments)

On or about June 12, 2017, in Whatcom County, in the Western District of Washington, LOUIS ONG, with the intent to conceal and disguise the nature, location, source, ownership, and control, of property believed to be the proceeds of specified unlawful activity, that is, $20,000 in United States currency, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity, and property used to conduct and facilitate specified unlawful activity, to wit, distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a).

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

## COUNT 4
### (Laundering of Monetary Instruments)

On or about July 7, 2017, in King County, in the Western District of Washington, LOUIS ONG, with the intent to conceal and disguise the nature, location, source, ownership, and control, of property believed to be the proceeds of specified unlawful

INDICTMENT/ONG – 2

1  activity, that is, $9,000 in United States currency, did knowingly conduct and attempt to

2  conduct a financial transaction affecting interstate and foreign commerce involving

3  property represented by a law enforcement officer, to be proceeds of specified unlawful

4  activity, and property used to conduct and facilitate specified unlawful activity, to wit,

5  distribution of controlled substances, in violation of Title 21, United States Code, Section

6  841(a).

7        All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

8                              **COUNT 5**

9                   **(Laundering of Monetary Instruments)**

10        On or about July 21, 2017, in King County, in the Western District of Washington,

11  LOUIS ONG, with the intent to conceal and disguise the nature, location, source,

12  ownership, and control, of property believed to be the proceeds of specified unlawful

13  activity, that is, $200,000 in United States currency, did knowingly conduct and attempt

14  to conduct a financial transaction affecting interstate and foreign commerce involving

15  property represented by a law enforcement officer, to be proceeds of specified unlawful

16  activity, and property used to conduct and facilitate specified unlawful activity, to wit,

17  distribution of controlled substances, in violation of Title 21, United States Code, Section

18  841(a).

19        All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

20                              **COUNT 6**

        **(Operating an Unlicensed Money Transmission Business)**

21        Beginning at a time unknown, but not later than December 2016, and continuing

22  until on or about July 21, 2017, in King County, within the Western District of

23  Washington, and elsewhere, the defendant, LOUIS ONG, knowingly conducted,

24  controlled, managed, supervised, directed, and owned all or part of an unlicensed money

25  transmitting business affecting interstate and foreign commerce, without an appropriate

26  money transmitting license in a State, to wit, the State of Washington, where such

27  operation is punishable as a misdemeanor and a gross misdemeanor under State law.

28

INDICTMENT/ONG – 3

1    All in violation of Title 18, United States Code, Sections 1960(b)(1)(A) and 2.

2    <u>**ASSET FORFEITURE ALLEGATION**</u>

3    The allegations contained in Counts 1-6 of this Indictment are hereby realleged

4    and incorporated by reference for purpose of alleging forfeitures pursuant to Title 18,

5    United States Code, Section 982(a)(1).

6    Upon conviction of the violations alleged in Counts 1-6 of this Indictment, the

7    defendant, LOUIS ONG, shall forfeit to the United States, pursuant to Title 18, United

8    States Code, Section 982(a)(1), any and all of his right, title and interest in all property,

9    real or personal, constituting proceeds of or involved in the offenses, or all property

10   traceable to such property, including but not limited to the following:

11           a.     All Bitcoin seized from the Defendant's Mycelium, Green Address,

12   Co-Pay, and Breadwallet wallets;

13           b.     All U.S. currency seized from the Defendant's rental vehicle, *i.e*, a

14   white 2017 Ford F-150 Super Crew Cab truck, on or about July 27, 2017;

15           c.     All U.S. currency seized from the Defendant's safe deposit box, *i.e.*,

16   Box #294 located at Wells Fargo in Ferndale, Washington, on or about July 28, 2017; and

17           d.     All U.S. currency seized from Express Mail parcel EL513437218US

18   on or about April 11, 2017.

19   <u>**SUBSTITUTE PROPERTY**</u>

20   If, as a result of any act or omission of the defendant, any of the property subject to

21   forfeiture, including the above-described property:

22           a.     cannot be located upon the exercise of due diligence;

23           b.     has been transferred or sold to, or deposited with, a third party;

24           c.     has been placed beyond the jurisdiction of the Court;

25           d.     has been diminished in value; or,

26           e.     has been commingled with other property which cannot be divided

27                 without difficulty,

28

INDICTMENT/ONG – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   it is the intent of the United States to seek forfeiture, pursuant to Title 21, United States

2   Code, Section 853(p), of any other property belonging to the defendant up to the value of

3   the forfeitable property.

4                                          A TRUE BILL:

5                                          DATED:

6

7                                          (Signature of Foreperson redacted
                                            pursuant to the policy of the Judicial
8                                           Conference of the United States
                                            FOREPERSON
9

10

11  ANNETTE L. HAYES
12  United States Attorney

13

14  KATHERYN FRIERSON
15  Assistant United States Attorney

16

17

18  JOSEPH SILVIO
19  Special Assistant United States Attorney

20

21

22

23

24

25

26

27

28

INDICTMENT/ONG – 5

**DEFENDANT STATUS SHEET** (One for each defendant)

I. CASE STATUS

NAME OF DEFENDANT **Louis Ong** _____   USAO# **2017R00178** _____

_X_/ MAGISTRATE'S NO. **MJ17-304** _____   _/ DOCKET NO. (If Superseding Indictment) CR _____

*******************************************************************************************

II. CUSTODIAL STATUS

HAS DEFENDANT HAD INITIAL APPEARANCE IN THIS CASE? _X_/ yes   _/ no
IF YES:

    _X_/ DEFENDANT HAS BEEN RELEASED ON THE FOLLOWING CONDITIONS: **See bond order** _____

  ***  _/ A DETENTION HEARING HAS BEEN SCHEDULED FOR: _____.

    _/ A DETENTION ORDER HAS BEEN ENTERED.

    ***  _/ TEMPORARY DETENTION

    **⁎  _/ PERMANENT DETENTION

       _/ IF THE DEFENDANT HAS HAD INITIAL APPEARANCE IN ANOTHER DISTRICT, THE ABOVE RELEASE ON
           CONDITIONS OR DETENTION ORDER WAS ENTERED IN THE _____ DISTRICT OF _____ AND THE
           DEFENDANT'S FIRST APPEARANCE IN THIS DISTRICT IS EXPECTED TO BE/HAS BEEN SET FOR _____.
           (Date)

_/ DEFENDANT IS IN CUSTODY ON OTHER CHARGES:

    _/ SERVING A FEDERAL SENTENCE AT _____.

    _/ PENDING FEDERAL CHARGES IN THE _____ DISTRICT OF _____.

    _/ PENDING STATE CHARGES AT _____.

*******************************************************************************************

III. ARRAIGNMENT

_/ WARRANT TO ISSUE.   (IF SO, PLEASE COMPLETE REVERSE)

_/ SUMMONS TO BE ISSUED FOR APPEARANCE ON _____ CALENDAR. (DEFENDANT'S ADDRESS REQUIRED.)
                    (Date)

    DEFENDANT'S ADDRESS: _____

_X_/ LETTER TO DEFENSE COUNSEL FOR APPEARANCE ON **Thursday following Indictment** ____ CALENDAR.
                         (Date)

    DEFENSE ATTORNEY'S NAME: **Greg Murphy** _____

    DEFENSE ATTORNEY'S ADDRESS: **1601 Fifth Ave., Suite 700, Seattle, WA 98101** _____

*******************************************************************************************

IV. CONDITIONS OF RELEASE

    _/ NOT PREVIOUSLY SET, SHOULD BE: _____.
                  [e.g., P.R.; BAIL (listing conditions); DETENTION]

    _X_/ PREVIOUSLY SET, SHOULD BE:

        _X_/ CONTINUE CONDITIONS OF RELEASE

        _/ CONTINUE DETENTION

        _/ MODIFIED AS FOLLOWS (state reasons for modifying): _____

*******************************************************************************************

HAS THE FPD represented any subject or witness in this case?   _/ Yes   _X_/ No

*******************************************************************************************

THE ESTIMATED TRIAL TIME IS _7_ TRIAL DAYS.   **August 9, 2017** _____
                                 (Date Form filled out)

(Revised June 2000)

# EXHIBIT

# H

AO245B    (Rev. 11/16) Judgment in a Criminal Case
          Sheet 1

# UNITED STATES DISTRICT COURT
### Western District of Washington

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| v. | |
| Louis Ong | Case Number:    2:17CR00191RSL-001 |
| | USM Number:    48506-086 |
| | Brian Klein |
| | Defendant's Attorney |

**THE DEFENDANT:**

☒   pleaded guilty to count(s) _6 of the Indictment_

☐   pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐   was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 1960(a) and (b)(1)(A) | Operating an Unlicensed Money Transmission Business | July 21, 2017 | 6 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant has been found not guilty on count(s) _____

☒   Count(s) _1-5_      ☐ is   ☒ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Assistant United States Attorney, Joseph C. Silvio

_5/11/18_
Date of Imposition of Judgment

Signature of Judge

Robert S. Lasnik, United States District Judge
Name and Title of Judge

_May 11, 2018_
Date

AO245B        (Rev. 11/16) Judgment in a Criminal Case
              Sheet 2 — Imprisonment

Judgment — Page 2 of 7

DEFENDANT:        **Louis Ong**
CASE NUMBER:      2:17CR00191RSL-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

*time-served.*

☐   The court makes the following recommendations to the Bureau of Prisons:


☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m.   ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☒   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☒   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:




Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.


_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO245B      (Rev. 11/16) Judgment in a Criminal Case
              Sheet 3 — Supervised Release

Judgment — Page 3 of 7

DEFENDANT:      **Louis Ong**
CASE NUMBER:    2:17CR00191RSL-001

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
*three (3) years* .

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☒  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.  *(check if applicable)*
4.  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.  *(check if applicable)*
5.  ☒  You must cooperate in the collection of DNA as directed by the probation officer.  *(check if applicable)*
6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense.  *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence.  *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached pages.

AO245B    (Rev. 11/16) Judgment in a Criminal Case
          Sheet 3A — Supervised Release

Judgment — Page 4 of 7

DEFENDANT:       **Louis Ong**
CASE NUMBER:     2:17CR00191RSL-001

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at www.uscourts.gov.

Defendant's Signature _____     Date _____

AO245B      (Rev. 11/16) Judgment in a Criminal Case
            Sheet 3D — Supervised Release

Judgment — Page 5 of 7

DEFENDANT:       **Louis Ong**
CASE NUMBER:     2:17CR00191RSL-001

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer with access to any requested financial information including authorization to conduct credit checks and obtain copies of the defendant's federal income tax returns.

2. The defendant shall disclose all assets and liabilities to the probation office. The defendant shall not transfer, sell, give away, or otherwise convey any asset, without first consulting with the probation office.

3. If deported, the defendant shall not reenter the United States without permission of the Secretary of the Department of Homeland Security. If granted permission to reenter, the defendant shall contact the nearest U.S. Probation Office within 72 hours of reentry.

4. The defendant shall submit his or her person, property, house, residence, storage unit, vehicle, papers, computers (as defined in 18 U.S.C.§1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

AO245B      (Rev. 11/16) Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

Judgment — Page 6 of 7

DEFENDANT:      **Louis Ong**
CASE NUMBER:    2:17CR00191RSL-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $  100 | $  N/A | $  None | $  N/A |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $  0.00 | $  0.00 | |

☐   Restitution amount ordered pursuant to plea agreement $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:
      ☐   the interest requirement is waived for the·  ☐   fine      ☐   restitution
      ☐   the interest requirement for the    ☐   fine      ☐   restitution is modified as follows:

☒   The court finds the defendant is financially unable and is unlikely to become able to pay a fine and, accordingly, the imposition of a fine is waived.

  *   Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
 **   Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO245B      (Rev. 11/16) Judgment in a Criminal Case
                Sheet 6 — Schedule of Payments

Judgment — Page 7 of 7

DEFENDANT:      **Louis Ong**
CASE NUMBER:    2:17CR00191RSL-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

☒    PAYMENT IS DUE IMMEDIATELY.  Any unpaid amount shall be paid to
      Clerk's Office, United States District Court, 700 Stewart Street, Seattle, WA 98101.

    ☒    During the period of imprisonment, no less than 25% of their inmate gross monthly income or $25.00 per quarter,
    whichever is greater, to be collected and disbursed in accordance with the Inmate Financial Responsibility Program.

    ☒    During the period of supervised release, in monthly installments amounting to not less than 10% of the defendant's gross
    monthly household income, to commence 30 days after release from imprisonment.

    ☐    During the period of probation, in monthly installments amounting to not less than 10% of the defendant's gross monthly
    household income, to commence 30 days after the date of this judgment.

The payment schedule above is the minimum amount that the defendant is expected to pay towards the monetary
penalties imposed by the Court. The defendant shall pay more than the amount established whenever possible. The
defendant must notify the Court, the United States Probation Office, and the United States Attorney's Office of any
material change in the defendant's financial circumstances that might affect the ability to pay restitution.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary
penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through
the Federal Bureau of Prisons' Inmate Financial Responsibility Program are made to the United States District Court,
Western District of Washington. For restitution payments, the Clerk of the Court is to forward money received to the
party(ies) designated to receive restitution specified on the Criminal Monetaries (Sheet 5) page.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several
    Amount, and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☒    The defendant shall forfeit the defendant's interest in the following property to the United States:
      As detailed in the Preliminary Order of Forfeiture, signed on May 7, 2018. Dkt. 47.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# EXHIBIT

# I

# TIME

## This Bitcoin-Trading Family Man Faced Years in Prison. Now He's Telling His Story



Jason Klein in Springfield, Mo., Feb. 28, 2018.      Barrett Emke for TIME

By **KATY STEINMETZ / SPRINGFIELD, MO.** March 1, 2018

"When I first got into this, I'd have to explain what it was because no one would have any idea," says Jason Klein, as he sips tea at a cafe in the Ozarks on a cold winter day. "Now it seems like I could walk up to almost anyone in this room and they'd know."

Klein, a small business owner who lives in Nixa, Mo., is talking about bitcoin, a sensational invention that recently turned his life upside down. His story — involving undercover federal agents, courtroom drama and a community's outpouring of support — is one he hasn't shared until now. The tale highlights how entrancing this new technology can be, as well as the legal confusion surrounding cryptocurrencies like bitcoin: digital tokens that are minted, essentially, by computers doing puzzles.

These days it seems like everyone has gone bananas about cryptocurrencies, which many refer to as crypto (despite the grumblings of prescriptivists). Investors in Silicon Valley are obsessing over the technology that underpins these tokens, known as blockchain; crypto-related startups and hedge funds are popping up one after the other; regulators around the world are on high alert, as cryptocurrencies become more interwoven with financial systems. As prices have soared (and plummeted) over the last year, the fever has spread to

America's living rooms too, where regular people are running up credit card debt to invest in something many of us don't really understand.

"It's been crazy," Klein says of the hype and what happened to him after he got hooked on bitcoin. "When you see something like that explode, go from – when I got involved – $14 apiece to over $14,000 apiece, that's going to show up on people's radars, whether it's a bubble or not." That includes the radar of the U.S. Attorney's Office in the Western District of Missouri.

**It's hard to imagine Klein behind bars**. Sitting in this strip-mall coffee shop in Springfield, Mo., the 38-year-old gives off the vibe of a patient high school teacher. Hailing from a small Kansas town, Klein describes himself as a tinkerer who got into tech in high school, back in the dial-up Internet days. Educating himself in basements and garages, he built his first computer at age 14 and learned about programming alongside other local enthusiasts. At 21, he started his first tech company, which helped link the various locations of a non-profit fighting drug and alcohol abuse throughout the state. (Klein says he still has a plaque from the organization, thanking him for "launching them into the 21st century.")

That company, Datility, is one of two small businesses that he currently owns. It continues to provide internet hosting services to clients in Kansas. The other, a firm called Logic Forte, helps restaurant owners with analytics and currently serves about 300 restaurants across 19 states.

Like many tech guys, Klein has a history of adopting promising innovations before the masses, and his curiosity is often piqued as he tries to spot the next big thing. So he paid attention when online circles started buzzing about bitcoin in the years following its launch in 2009. An anonymous coder known as Satoshi Nakamoto created software that slowly brings digital tokens into existence, through a process known as mining, and allows people to exchange them electronically. Harnessing cryptography and mathematics, the system provided a way for two strangers to trust each other in such transactions without requiring some middle man — like a bank — to oversee their dealings.

Technology known as a blockchain keeps a public account of how much bitcoin everyone has (though individuals' identities are concealed behind long strings of numbers and letters), so people cannot spend bitcoin that they do not possess. The upshot is that, in theory, bitcoin could function like dollars or Euros, stores of value we all trade for goods and services, while cutting out governments and fee-charging financial institutions. Especially because Nakamoto capped the amount of bitcoin that could be created, the digital tokens are also able to function like stocks, assets that rise and fall in value depending on what the market is thinking. Today, bitcoin is just one of many digital "coins" in existence.

When he first read about the innovation, Klein had a common reaction: he thought the underlying tech was "genius" but saw the tokens as more of a concept than a currency because so few people were using them. Then, one day in early 2013, he came across an online TV guide-type service that was actually accepting bitcoin as a form of payment. That made the experiment feel real.

Klein decided to buy $100 worth. Poking around, he found few easy options for purchasing the tokens and ended up mailing off a money order to an exchange based in Atlanta. "It was play money as far as I was concerned," says Klein, who had by this time moved to Missouri, married his wife, Pam, and adopted a daughter. "It was no different than saying 'I'm going to take a hundred bucks to the casino.'" By mid-2013, that gamble looked pretty good: the seven bitcoins he had purchased had soared in value and were suddenly worth about $1,000. Seeing this as a "first wave of legitimacy," Klein bought more, using the same means of plopping a money order in the mail and waiting for the exchange to turn his U.S. dollars into bitcoins that he kept in a virtual wallet.

Klein felt the process was inefficient and he started sniffing around for better ways to buy and sell, which is how he found a site called localbitcoins.com. The platform allowed him to locate nearby people who would meet up in person to do a trade. Klein posted an ad on the site, offering to sell bitcoins for cash plus a roughly 10% fee. Over the next couple years, Klein says he made a few trades a month, netting a few thousand dollars in fees each year. But he says he was at least as interested in the meet-ups as the profits, seeing each trade as an opportunity to act as a bitcoin evangelist, and to learn about what led others down the rabbit hole.

If you've ever met someone who is into crypto, you have probably found that they love nothing more than to talk about crypto, to debate its ability to upend financial systems and discuss which coins have more potential. Klein met students doing research papers and investors looking to make some dough in an increasingly hot market. One man wanted an easier way to hire and pay overseas software developers and had been drawn to bitcoin because it is borderless, unlike the U.S. dollar. "It was exciting," Klein says, "because it felt like other people are starting to get involved." A currency needs to be widely adopted in order to work, however revolutionary it might be in theory, and Klein felt like he was helping to usher along the adoption process, in a part of the country that was just starting to take notice.

**One day in 2015, Klein met someone** he would come to view as a "weird guy." To some extent, being weird is par for the course when your universe is individuals who are really into bitcoin. "Sometimes they're super nerdy. Sometimes they're very anti-social. Sometimes they're very anti-government," says Klein, sitting in an armchair at the coffee shop and occasionally refilling his cup of tea. Yet this would prove to be uncharted territory.

Referenced in court documents only as "Undercover Agent #1," the guy seemed normal enough at first, Klein says: He presented himself as a business person, someone fascinated with bitcoin and wanting to learn more. They met at an Einstein Bros. Bagels shop and Klein sold him $1,000 worth of bitcoin, making his usual commission of about 10%. Then the guy asked if he could bring in a business partner who also wanted to understand what this bitcoin business was all about. "Unbeknownst to me," Klein says, that person was Undercover Agent #2.

The U.S. Attorney's Office in Missouri's Western District declined multiple requests to comment for this article, including answering questions about why Klein was targeted in an undercover operation. Court documents show that Klein met with these two federal agents on several occasions over the next year and a half. "I enjoyed meeting with them," he says. "I loved talking about bitcoin." But he says the agents also pushed him to do bigger trades, wondering if he could sell them up to $10,000 worth of bitcoin. "I said, 'I'm not your guy. It's a hobby for me," Klein says, emphasizing that the money he earned from trades generated a small amount of his annual household income. (He estimates it at about 3%.)

Yet Klein continued to meet with them, and as the value of his bitcoin grew, he did do bigger trades. He also offered to introduce them to another seller he had met through the website. According to the documents, he conducted five trades with the agents in total. On his own, he sold them up to $7,640 worth of bitcoin, and in one trade conducted with a second seller who is unnamed in the official record, the two sold them $15,000 worth. Klein made $2,122.68 in fees from these trades, according to the documents.

During one meeting these contacts suggested they would use the bitcoin to buy "Girl Scout cookies," a reference to drugs that Klein says he didn't understand at the time. Then, one day in late 2015, he met them to do a trade and afterward the pair outright said they were going to use the digital tokens to buy cocaine, suggesting they were drug dealers.

Klein says he found the suggestion unbelievable and wondered if his contacts were trying to impress him. "I just would never peg them for drug dealers," says Klein. "I never saw drugs. I never felt like I was in harm's way. The only thing I saw that would have been a side effect of that was the cash."

In hindsight, he says, he should have known better; he should have walked away and cut off contact. Klein says he did stay away for some months, feeling weirded out. But eventually he met with the undercover agents again and did another trade. It was summer 2016. "And the next Monday morning at 7 a.m., they were on my front doorstep with like seven or eight black SUVs," says Klein, recalling how he agonized over what his neighbors must be thinking.

At first, Klein didn't understand why agents wearing badges that identified them as part of the Internal Revenue Service's Criminal Investigation division had showed up at his house. Then he saw the word *bitcoin* in the search warrant they handed him, and he put everything together. The weird guys. The trade he had done the week before. He says the agents were professional, waiting until his 9-year-old daughter was safely out of the house before they started sifting through the closets and taking tech equipment. "I honestly think that they expected to find hundreds of thousands of dollars or something," he says, "like I was some bitcoin kingpin."

Klein wasn't arrested or immediately charged with any crimes, but in the wake of the search he says he was presented with a list of potential violations that the government might bring before a grand jury. It included serious offenses like money laundering, which alone can carry a sentence of 10 years or more in prison, according to Bureau of Justice Statistics. "With the family and business and everything, I couldn't even comprehend that," Klein says. "Obviously I erred in continuing to meet with those guys, but I never felt like I was doing anything wrong."

Months of negotiating began. The Kleins refinanced their home and depleted their savings, anticipating that they would go to trial and be saddled with as much as $150,000 in legal fees. Klein also sold much of the bitcoin he was holding to foot the bills, he says. At the time, each token was worth about $642. By the end of 2017, those same tokens would fetch nearly $20,000 apiece. "So that sort of stinks," he says.

**Klein recalls agents carrying around** a picture of a device known as a hardware wallet when they searched his house. To him, that was a sign of how new they were to the world of bitcoin. In general, the case law regarding cryptocurrencies is "early and inconsistent," says Angela Walch, an associate professor at St. Mary's University School of Law in San Antonio, whose research focuses on the intersection of governance and emerging technologies.

Klein got caught in the crosshairs at a time when regulators, law enforcement and Congress are all scrambling to catch up with the implications of the cryptocurrency boom, including how officials might control digital tokens that have no physical existence and were designed to sidestep traditional financial institutions.

While criminals have turned to this hard-to-trace form of payment for nefarious reasons, investors are heralding the underlying technology as "the new Internet." In court documents in Klein's case, the government said that while bitcoin is not illegal in itself and has legitimate uses, it is also "ripe for use as a financial tool within criminal enterprise." Klein's lawyers, in turn, quoted legendary venture capitalist Marc Andreessen, who once wrote that, "Bitcoin at its most fundamental level is a breakthrough in computer science."

# EXHIBIT

# J

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JASON R. KLEIN,
[DOB: 02/13/1980]

Defendant.

No. 17- 3056-01-CR-S-MDH

18 U.S.C. § 1960(a)
NMT 5 Years Imprisonment
NMT $250,000 Fine
NMT 3 Years Supervised Release
Class D Felony

$100 Special Assessment

I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES THAT:

Introduction and Background

At all times relevant and material to this Information, with all dates being approximate and all date ranges both approximate and inclusive:

1.    Bitcoin are a decentralized form of electronic currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer-to-peer" network. Bitcoin transactions are processed collectively by the software-enabled computers composing the network.

2.    To acquire bitcoin in the first instance, a user typically must purchase them from a bitcoin "exchanger." In return for a commission, bitcoin exchangers accept payments of currency in some conventional form, including cash, and exchange the money for a corresponding number of bitcoin, based on a fluctuating exchange rate. Exchangers also accept payments of bitcoin and exchange the bitcoin back for conventional currency, again, charging a commission for the service.

3.     Once a user acquires bitcoin from an exchanger, the bitcoin are kept in a "wallet" associated with a bitcoin "address," designated by a complex string of letters and numbers. The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically stored. Once a bitcoin user funds his wallet, the user can then use bitcoin in the wallet to conduct financial transactions over the Internet by transferring bitcoin from his bitcoin address to the bitcoin address of another user.

4.     All bitcoin transactions are recorded on a public ledger known as the "block chain," which is stored on the peer-to-peer network on which the bitcoin system operates. The block chain serves, among other purposes, to prevent a user from spending the same bitcoin more than once. However, the block chain reflects only the movement of funds between anonymous bitcoin addresses and, therefore, cannot by itself be used to determine the identities of the persons involved in the transactions. Only if one knows the identities associated with each bitcoin address involved in a set of transactions is it possible to meaningfully trace funds through the system.

5.     Bitcoin are not illegal in and of themselves and have legitimate uses.

6.     The defendant, **JASON R. KLEIN**, was the founder of two technology-based companies: Logic Forte and Datality Networks. Logic Forte purportedly provided consulting and computer programming assistance for the restaurant industry. Datality Networks purportedly provided Internet housing and network consulting.

7.     The defendant was also the President of the Association of Information Technology Professionals ("AITP") – Southwest Missouri. AITP was a professional association that focused on technology education for business professionals. AITP's southwest Missouri chapter had approximately 230 members and was the largest chapter in the United States.

2

8.      The defendant was a resident of Christian County, in the Western District of Missouri.

9.      From at least in or about November 2014, through in or about July 2016, the defendant represented himself on the Internet to be a bitcoin exchanger, through the use of the username "jrklein" on the website www.localbitcoins.com.

10.     On or between February 6, 2015, and July 27, 2016, the defendant met with Undercover Agent #1 ("UCA1") and/or Undercover Agent #2 ("UCA2").  During these meetings, UCA1 and/or UCA2 stated to the defendant that they possessed currency and they needed to exchange their currency for bitcoin.  On numerous occasions during this timeframe, the defendant, acting with others, accepted said currency from UCA1 and/or UCA2 and exchanged it for varying amounts of bitcoin, which he then gave to UCA1 and/or UCA2.

11.     On or about the dates set forth below, in Greene County, within the Western District of Missouri, the defendant, **JASON R. KLEIN**, acting with another, knowingly conducted a financial transaction affecting interstate commerce:

| DATE | FINANCIAL TRANSACTION |
|---|---|
| February 6, 2015 | The defendant paid approximately 4.095 bitcoin for United States currency, in the amount of $1,000.00. |
| March 4, 2015 | The defendant, acting with another, paid approximately 6.4 bitcoin for United States currency, in the amount of $2,000.00. |
| July 14, 2015 | The defendant paid approximately 24 bitcoin for United States currency, in the amount of $7,640.00. |
| September 9, 2015 | The defendant, acting with another, paid approximately 58 bitcoin for United States currency, in the amount of $15,000.00. |
| July 27, 2016 | The defendant paid approximately 5 bitcoin for United States currency, in the amount of $3,600.00. |

3

Each of these transactions occurred through the in-person exchange of United States currency and an electronic transfer of bitcoin to and through Missouri, and elsewhere, through the use of the Internet. Additionally, each transaction included the payment of a fee to Klein, or another individual.

### 18 U.S.C. § 1960(a) Violation

12.    The facts alleged in paragraphs 1 through 11 are hereby re-alleged and incorporated by reference as if set forth in full herein.

13.    On or between February 6, 2015, and July 27, 2016, in Greene County, within the Western District of Missouri, the defendant, **JASON R. KLEIN**, acting with another, knowingly and willfully conducted, controlled, managed, supervised, directed, and owned all and part of a money transmitting business affecting interstate commerce, to wit, a bitcoin exchange service, operated under username "jrklein," which (i) was operated without an appropriate money transmitting license from the State of Missouri, where such operation is punishable as misdemeanor or a felony, and (ii) failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations promulgated thereunder, to wit: the defendant transmitted thousands of dollars by means of electronic transfers to and through Missouri and elsewhere without an appropriate license

4

from the State of Missouri and without registering as a money transmitting business under Federal

law, all in violation of Title 18, United States Code, Sections 1960(a) and 2.

Respectfully submitted,

THOMAS M. LARSON
Acting United States Attorney

CASEY CLARK
Assistant United States Attorney

DATED:     May 2, 2017
               Springfield, Missouri

5

# EXHIBIT

# K

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **JUDGMENT IN A CRIMINAL CASE** |
| | § | |
| v. | § | |
| | § | Case Number: **17-3056-01-CR-S-MDH** |
| **JASON R. KLEIN** | § | USM Number: **32374-045** |
| | § | **Mark C Milton** |
| | § | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s) 1 of the Information on 5/2/17.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18 USC section 1960(a) (Class D Felony)/Conducting an Unlicensed and Unregistered Money Transmitting Business | 07/27/2016 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**September 6, 2017**

Date of Imposition of Judgment

s/Douglas Harpool

Signature of Judge

**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**

Name and Title of Judge

**September 7, 2017**

Date

AO 245B (Rev. TXN 11/16) Judgment in a Criminal Case                                                      Judgment -- Page 2 of 6

DEFENDANT:           JASON R. KLEIN
CASE NUMBER:         17-3056-01-CR-S-MDH

# PROBATION

The defendant is hereby sentenced to probation for a term of: 5 years

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of
    release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☒   The above drug testing condition is suspended, based on the court's determination that you
        pose a low risk of future substance abuse. (*check if applicable*)

4.  ☒   You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable*)

5.  ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.)
        as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you
        reside, work,are a student, or were convicted of a qualifying offense. (*check if applicable*)

6.  ☐   You must participate in an approved program for domestic violence. (*check if applicable*)

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the
attached page.

AO 245B (Rev. TXN 11/16) Judgment in a Criminal Case                                    Judgment -- Page 3 of 6

DEFENDANT:          JASON R. KLEIN
CASE NUMBER:        17-3056-01-CR-S-MDH

## STANDARD CONDITIONS OF PROBATION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature  _____        Date  _____

AO 245B (Rev. TXN 11/16) Judgment in a Criminal Case                                            Judgment -- Page 4 of 6

DEFENDANT:          JASON R. KLEIN
CASE NUMBER:        17-3056-01-CR-S-MDH

## SPECIAL CONDITIONS OF PROBATION

a) The defendant shall apply all monies received from income tax refunds, tax refunds, lottery/gambling winnings, judgments, and/or other anticipated or unexpected financial gains to the outstanding Court-ordered financial obligation. The defendant shall immediately notify the probation officer of the receipt of any indicated monies.

b) Provide the Probation Office with access to any requested financial information.

c) Not incur new credit charges or open additional lines of credit without the approval of the Probation Office.

d) Perform 120 hours of community service during the period of supervision.

e) The defendant shall submit his person and any property, house, residence, office, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to a search, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

f) The defendant is to cooperate with the IRS in paying all outstanding taxes, penalties and interest.

g) The defendant shall not participate in any action that would subject him to money transmitting licensing or registration requirements.

## ACKNOWLEDGMENT OF CONDITIONS

I have read or have read the conditions of supervision set forth in this judgment and I fully understand them. I have been provided a copy of them.

I understand that upon finding of a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

_____          _____

Defendant                                        Date

_____          _____

United States Probation Officer                  Date

AO 245B (Rev. TXN 11/16) Judgment in a Criminal Case                                                Judgment -- Page 5 of 6

DEFENDANT:            JASON R. KLEIN
CASE NUMBER:         17-3056-01-CR-S-MDH

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|              | Assessment | JVTA Assessment* | Fine | Restitution |
|--------------|-----------|------------------|------|-------------|
| **TOTALS**   | $100.00   |                  | $10,000.00 | $2,122.68 |

☒            The defendant must make restitution (including community restitution) to the following payees in the amount
            listed below.

            IRS-RACS                    $2,122.68
            Attn: Mail Stop 6261, Restitution
            333 Pershing Avenue
            Kansas City, MO 64108

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment. However, pursuant to 18
U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after
September 13, 1994, but before April 23, 1996.

AO 245B (Rev. TXN 11/16) Judgment in a Criminal Case                                                    Judgment -- Page 6 of 6

DEFENDANT:          JASON R. KLEIN
CASE NUMBER:        17-3056-01-CR-S-MDH

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

Special instructions regarding the payment of criminal monetary penalties:

It is ordered that the Defendant shall pay to the United States a special assessment of $100.00, Fine in the amount of $10,000.00 and Restitution in the amount of $2,122.68 which shall be due immediately. A lump sum payment of the full amount is ordered due immediately.   If unable to pay the full amount immediately,  the defendant shall make monthly payments of $100 or 10 percent of gross income, whichever is greater, while on probation. While a fine is still owed, the defendant shall notify the United States Attorney of any change of residence within 30 days.

Since the Court finds that the defendant does not have the ability to pay interest, any interest is waived.

Notwithstanding any other provision of this order, the Government may enforce restitution at any time.

Pursuant to 18 U.S.C. 3612(g), the defendant may be subject to delinquent and default penalties.

The defendant shall notify, within 30 days, the Clerk of the Court and the United States Attorney's Office, Financial Litigation Unit, 400 East 9th Street, Room 5510, Kansas City, MO  64106 of:
   1)   Any change of name, residence, or mailing address; and
   2)   Any material change in economic circumstances that affects the ability to pay restitution.

All payment shall be made through the Clerk of the Court, United States District Court, 400 East 9th Street, Room 1150, Kansas City, MO  64106.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.