UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-cr-00585-GMS-1 |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 30, 2018 |
| Thomas Mario Costanzo, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE G. MURRAY SNOW, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CCR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2

    For the Government:
3                U.S. Attorney's Office
                 By: MATTHEW H. BINFORD, ESQ.
4                    GARY RESTAINO, ESQ.
                     FERNANDA CAROLINA ESCALANTE, ESQ.
5                40 North Central Avenue, Suite 1200
                 Phoenix, AZ  85004
6
    For the Defendant Thomas Mario Costanzo:
7                Federal Public Defender's Office
                 By: MARIA TERESA WEIDNER, ESQ.
8                850 W. Adams Street, Suite 201
                 Phoenix, AZ  85007
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
1                      P R O C E E D I N G S

2                      (Proceedings resume.)

3              THE COURT:  Please be seated.

4              COURTROOM DEPUTY:  Criminal case 17-585, United States

5     of America versus Thomas Mario Costanzo.

6              This is the time set for sentencing.

7              MR. BINFORD:  Good afternoon, Your Honor.

8              Matthew Binford, Gary Restaino, and Carolina Escalante

9     for the United States.

10             Task Officer Chad Martin is also present at the

11    counsel table.

12             THE COURT:  Good afternoon.

13             MS. WEIDNER:  Good afternoon, Your Honor.

14             Maria Weidner for Mr. Costanzo.  He's present and in

15    custody.

16             THE COURT:  Good afternoon.

17             Mr. Costanzo, you know that at trial we changed Counts

18    3 through 7 of your superseding indictment, renumbered them

19    Counts 1 through 5.  They remain Counts 3 through 7.  We just

20    didn't want to confuse the jury.

21             You were found guilty on all of those counts as it

22    pertained to the money laundering charge.  You were found not

23    guilty as it pertained to the seeking to evade a reporting

24    requirement charge.

25             You understand and remember that?
```

1          THE DEFENDANT:  Yes.

2          THE COURT:  You're here now to be sentenced for the

3     money laundering guilty verdicts.

4          You understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  I'm just going to -- before I start to

7     undertake the quite numerous issues that I have to address, I'm

8     going to verify a couple of things that I need to verify.

9          Did your counsel, Ms. Weidner, review with you the

10    presentence investigation report that was filed in this case?

11         THE DEFENDANT:  Yes, she did.

12         THE COURT:  Ms. Weidner, I take it -- I know that you

13    filed objections to the presentence investigation report in

14    some specifics.  You have required -- you have filed some other

15    requests for variance and other objections.  I just want to be

16    sure that in doing that, you've consulted and provided a

17    complete review of the report to your client, Mr. Costanzo.

18         MS. WEIDNER:  Yes, Your Honor.  I most recently

19    visited Mr. Costanzo last week at the Detention Center.  I gave

20    him the most recent report revision for the PSR.  I also

21    provided him with the defense counsel objections and pre -- and

22    sentencing memoranda.

23         THE COURT:  Okay.

24         Does the government have any objections to the

25    presentence investigation report?

1          MR. BINFORD:  No, Your Honor.

2          THE COURT:  All right.  So let's take off and pick up

3   with docket 205, Motion for Miscellaneous Relief and Objection

4   to PSR.

5          I take it that that is a more generalized objection.

6          And Ms. Weidner, I must say that I think that it would

7   have more purchase to the extent that it was filed in a case

8   where there wasn't a trial at which I was present for the

9   entire event, but I saw and heard all the evidence, as

10  everybody else did.

11         You have filed more -- more specific objections

12  pertaining to those parts of the PSR to which you objected.

13  And I think it's more profitable, actually, to take those up

14  point by point.  But to the extent that you're arguing that, in

15  effect, the probation officer adopted in some parts mostly

16  word-for-word some of the suggestions made by the government,

17  I'm not going to preclude you from objecting to those specific

18  portions.  But I think that the probation officer can ask for

19  submissions from the government and can ask for submissions

20  from you, and can make a determination about which ones

21  appropriately reflect the facts that should be considered by

22  this Court.  So to the extent that you've made a generalized

23  objection, I'm overruling that objection.

24         You understand what I'm saying?

25         MS. WEIDNER:  I do, Your Honor.  May I be heard for

1     just --

2              THE COURT:  Record preservation purposes?

3              MS. WEIDNER:  Yes, Your Honor.

4              THE COURT:  Well, I don't think you need to do that

5     because you filed your motion, but you can go ahead and be

6     heard for record preservation purposes.

7              MS. WEIDNER:  Just briefly, Your Honor.

8              The defense understands that the government may

9     provide Probation with information.  What the defense objects

10    to is the lack of transparency, and the fact that in the course

11    of after the report was disclosed and raising objections, the

12    defense found itself in the unfortunate position of negotiating

13    with the government about what would go into the presentence

14    investigation report, as that is indicated in Exhibit B of

15    docket 205, where the government notably says they decline to

16    make certain changes requested by the defense, initially to the

17    probation officers cc-ing the government.  But that process,

18    that way of arriving at this report that is purportedly from --

19    for the Court from a neutral party, a party that in every

20    presentence interview that I have sat with with my client,

21    tells me:  I don't work for the defense, I don't work for the

22    government, I work for the Court.  I am neutral.

23             THE COURT:  Perhaps then you should have taken up your

24    objections directly with the probation officer rather than with

25    the government.

1          Does the government wish to be heard?

2          MR. BINFORD:  No, Your Honor.  I think our response as

3    set forth in the response is adequate.

4          THE COURT:  Certainly I'm not denying that the

5    probation office has the independent obligation to evaluate

6    what they receive from the government and what they receive

7    from you, and certainly you don't have to negotiate with the

8    government about what's in the presentence investigation

9    report.  And so I'd suggest that you not negotiate with them,

10   that you negotiate with the probation officer to the extent

11   that you think anything in the report is inappropriate.

12         As it pertains to your objection to the references to

13   the Darknet that appear in paragraphs 5 and 17, it seems to me

14   that those references occur only to the reason why the

15   government desired to investigate peer-to-peer exchanges in the

16   Bitcoin network, and there isn't any -- I don't take, at least,

17   from paragraph 5 or from paragraph 17, any imputation that

18   Mr. Costanzo in any way engaged in Darknet activity.  To the

19   extent that the government is trying to infer that, I reject

20   the inference.  And so I don't see why I can't know that the

21   government began its investigations because it is concerned

22   about Bitcoin and other cryptocurrencies being used on the

23   Darknet.

24         So do you wish to be heard on that point?

25         MS. WEIDNER:  Your Honor, in the objections I

UNITED STATES DISTRICT COURT

1    originally provided to Probation regarding this particular

2    paragraph, my biggest concern was the listing of non-involved

3    potential offenses that's included in the last line of

4    paragraph 5, including, quote:  Narcotics ID theft, credit card

5    fraud, murder-for-hire, and child pornography.  And I felt that

6    was unnecessary to include in the PSR as it is simply

7    inflammatory offense conduct that has nothing to do with the

8    instant case.

9        THE COURT:  Okay.  I'm going to overrule the

10   objection, but I don't disagree with you, and I'm not assuming

11   that Mr. Costanzo engaged in any of those activities.

12        As it pertains to predisposition evidence that you

13   objected to in paragraph 8, paragraph 12, paragraph 16,

14   paragraph 21, paragraph 22, again, it seams to me that

15   predisposition -- the government is completely entitled to

16   introduce at trial evidence of predisposition.  They did

17   introduce that evidence, and it is relevant to the extent that

18   you have raised both a sentencing entrapment and a sentencing

19   manipulation count, which you continue to raise even at

20   sentencing.  And so I don't know why it would be inappropriate

21   to consider evidence of the defendant's previous position, but

22   I am certainly willing to hear from you before I overrule your

23   objection without knowing what it is, if the basis of your

24   objection is other than what I've just stated.

25        MS. WEIDNER:  Your Honor, the -- with respect to the

1   sentencing manipulation assertion raised by the defense, the

2   law provides that in determining issues of sentencing

3   manipulation, the Court should be looking primarily to -- to

4   the government and it motives and the way that it proceeded

5   with the investigation.

6          THE COURT:  I agree that that applies to sentencing

7   manipulation.  But that is one of the -- that is the primary

8   concern under sentencing manipulation.

9          MS. WEIDNER:  Is -- is the government's --

10         THE COURT:  Yes.  But that --

11         MS. WEIDNER:   -- investigation --

12         THE COURT:   -- but that is not the case in sentencing

13  entrapment, and I don't even think it's absolutely irrelevant

14  in sentencing manipulation.

15         So I'm going to overrule your objection.  I do think

16  that the -- I think that the information that's contained in

17  paragraphs 8, 12, 16, 21, and 22 is a fair summary of what I

18  heard at trial, as it pertains to the disposition --

19  pre-disposition of Mr. Costanzo to independently engage in the

20  offense of money laundering.

21         MS. WEIDNER:  Just a moment, Your Honor.

22         Your Honor, I do not believe that those -- it is not

23  the position of the defense that those paragraphs show a

24  pre-disposition to commit the crime of money laundering.  Those

25  paragraphs show the possibility that Mr. Costanzo has a drug

1   problem, which is something different, and also that he doesn't

2   necessarily care what people use the Bitcoin they purchase from

3   him for, which is something altogether different from money

4   laundering.

5           THE COURT:  Well, we already tried this matter,

6   Ms. Weidner.  We're not going to retry it.  The government, to

7   the extent that it states what the evidence was at trial, I

8   think it's a fair summary of the statement at trial.  So your

9   objection is overruled.  You, of course, are not prohibited

10  from arguing that all that it means is that Mr. Costanzo had a

11  drug problem and/or that he didn't care what people were

12  purchasing his money -- or purchasing his cryptocurrency for,

13  and I don't mean to intend to imply that you can't make that

14  argument.  But I'm certainly not going to strike the paragraphs

15  in the presentence investigation report because it seems to me

16  that the government is perfectly capable of making a contrary

17  argument in light of those same facts.

18          So to the extent that you want them stricken from the

19  predisposition report, your objection is overruled.

20          To the extent that you object to paragraphs 5, 7, 25,

21  10, 12, 30, 13, and 70 based on your concern that they have an

22  implication that the activities mentioned in those paragraphs

23  are illegal when they are not, I am not going to strike the

24  paragraphs because I -- because the conduct stated in those

25  paragraphs about which you are concerned is not illegal, and I

UNITED STATES DISTRICT COURT

1    do not view it as being illegal.  But it nevertheless provides

2    a factual predicate that I have to understand -- that a viewer

3    would have or a reader would have to understand -- to

4    understand what happened in this case.

5           But to the extent that you are concerned that I --

6    that there's any implication that those activities that you

7    object to are illegal in those paragraphs, they aren't illegal,

8    and I do not view them as being illegal.

9           Do you wish to say anything more about that?

10          MS. WEIDNER:  Only, Your Honor, that the other aspect

11   that the defense was concerned about was obviously not just

12   this Court, but also the Bureau of Prisons who will receive

13   this report, and if Mr. Costanzo is sentenced to further time,

14   be designating him based on the information herein, and that

15   was part of my concern, as well, that they -- that

16   mischaracterizations could affect Mr. Costanzo's designation.

17          THE COURT:  Well, again, I don't see

18   mischaracterizations.  You even refer to implications, and I

19   don't even think there's necessarily an implication.  So I'm

20   not going to strike those paragraphs.

21          However, I will say explicitly on the record for the

22   benefit of the Bureau of Prisons that dealing in cryptocurrency

23   is not in any way illegal.

24          Let's see if there's anything else that you were

25   concerned about.

1      MS. WEIDNER:  Your Honor, there was a filing under

2   seal in connection -- it was document 213.

3      THE COURT:  Do you know, you filed so many documents I

4   have no idea.  If you want to talk to me at sidebar, I'm glad

5   to talk to you about document 213.

6      MS. WEIDNER:  Yes, Your Honor.

7      May I approach?

8      THE COURT:  All right.

9              (Bench conference.)

10      THE COURT:  All right.  Do we have other motions to

11   seal that we should take up at this point?

12      MS. WEIDNER:  Nothing further, Your Honor.

13      COURTROOM DEPUTY:  There are two pending.

14          (Discussion was had off the record.)

15      THE COURT:  Okay.  So I'm informed that we have 209

16   and 212, which are pending.  I think I just granted 209.

17      MR. BINFORD:  And 212 should have been the

18   government's motion to seal the response.

19      THE COURT:  All right.  So 209 and 212 are both

20   granted.  And as I've indicated, the objection limited to the

21   parties' discussion at sidebar is granted.  Ms. Weidner's

22   objection is granted.  And so paragraph 64 and 77 of the

23   presentence investigation report will be stricken.

24      All right.  Back to where we were.

25      Estimates regarding the amount of Bitcoin funded to

1    Nolan Sperling.  I believe those are relevant.  I will tell

2    you, Ms. Weidner, that I'm not sure that I will accept them as

3    specific enough -- I will hear from the government on this

4    point when we get to this point.  We're not there yet.  I'm not

5    sure that I will accept the estimates by Mr. Sperling as being

6    specific enough or knowing enough to attribute a specific

7    amount in the calculation of a criminal offense level.  But I

8    certainly think that Mr. Nolan's testimony that would suggest

9    that Mr. Costanzo knew what he was doing with the Bitcoin is

10   relevant, and it may be that the amounts that he estimated are

11   relevant too.  But to the extent that you are reserving an

12   objection that I should not include those amounts in the

13   calculation of a criminal offense level, I'll hear that at the

14   appropriate time.  But to the extent that was part of 209, I'm

15   going to overrule the objection because I think it's too

16   broadly stated.

17            All right.  So that takes care of 209, 212, 205 -- at

18   least the first part of 205.  And 205 -- yeah.  And 206 was

19   granted.  208 was the objection to the offense level

20   calculation; is that correct?  Are we tracking?

21            MS. WEIDNER:  Yes.

22            Your Honor, just to clarify, actually, I think you

23   were referring to 209, but you meant 211.  That was the --

24   those were the specific objections to the information in the

25   presentence report, and we have dispensed with 211.  We've also

| | |
|---|---|
| 1 | dispensed with 205, which was the objection to the procedure by |
| 2 | which the presentence report was prepared, and also 213, which |
| 3 | was the sealed objection submitted by the defense. |
| 4 | So that leaves us with 208, which was the objections |
| 5 | that related to the offense level calculation. |
| 6 | THE COURT:  All right. |
| 7 | MR. BINFORD:  Judge, just -- just to be clear, in |
| 8 | document 211, there were two objections, objections numbered 5 |
| 9 | and 6 that were addressed by the probation officer and were |
| 10 | changed in the final presentence investigation report.  Those |
| 11 | were -- |
| 12 | THE COURT:  Correct, having to do with the |
| 13 | mischaracterization of the verdict -- |
| 14 | MR. BINFORD:  I think those moot now. |
| 15 | THE COURT:  -- and the revision. |
| 16 | Yeah.  I think any objection to paragraphs 3 and |
| 17 | paragraph 4 that you filed, Ms. Weidner, were addressed in the |
| 18 | revision, were they not? |
| 19 | MS. WEIDNER:  Yes, Your Honor.  They were. |
| 20 | THE COURT:  All right.  So I've just dealt with your |
| 21 | specific objections and your objection number 7.  So objections |
| 22 | 5, 6, and 7 have been taken care of. |
| 23 | Objection 8 has been taken care of. |
| 24 | MS. WEIDNER:  Yes. |
| 25 | THE COURT:  And we're back to the objection to the |

```
1   offense level calculation; correct?
2            MS. WEIDNER:  Yes, Your Honor.
3            THE COURT:  All right.  Go ahead.
4            Which is the first objection?
5            Do you wish to be heard?  I've read it all.  Clearly,
6    I think -- and the government doesn't object -- to the extent
7    that the report calculates the amounts that were tendered to
8    Mr. Costanzo by undercover agent number 1 and undercover agent
9    number 3, those amounts should not be attributed to
10   Mr. Costanzo as it -- as it pertains to UCA1 until May 2015,
11   because prior to that time he didn't make it clear that his
12   source of those funds was drug activity.
13           And as it pertains to UCA3, it doesn't pertain until
14   the third exchange, which occurred on February 2017.
15           And I believe that the government does not oppose
16   that; is that correct?
17           MR. BINFORD:  That's correct, Your Honor.  And those
18   items -- those numbers have been adjusted by the probation
19   officer in the final presentence investigation report.
20           THE COURT:  All right.
21           As it pertains to the amounts in paragraph 16, do you
22   wish to be heard, Ms. Weidner?
23           MS. WEIDNER:  Your Honor, there is not much more
24   argument to make beyond what was submitted to the Court as far
25   as the reliability and accuracy of these figures, which were
```

1    recalled by the witness at a much later date.  It does not

2    appear that the witness or Mr. Costanzo kept records.  And also

3    in the exhibit provided to the Court under seal of the free

4    talk with this individual, which did not happen until the month

5    after Mr. Costanzo was arrested, that individual specifically

6    said that he never told Mr. Costanzo what the Bitcoin was going

7    to be used for.

8         MR. BINFORD:  Judge, if -- if you hold Mr. Costanzo

9    accountable for the charge, money laundering transactions, the

10   five charged transactions, the total amount is 164,700.  So

11   even if the Court were not to include the 30,000 by the

12   cooperating witness in this case, Mr. Costanzo would still be

13   in the same offense level under 2B1.1(b)(1)(F), which is 150 to

14   350,000.  So I don't think that the Court needs to make a

15   ruling because it will not have an impact on his advisory

16   guideline range.

17        To the extent the Court thinks it does need to make a

18   ruling, we stand by the testimony that was given by the

19   cooperating witness on the stand, that he estimated $30,000

20   worth of sales.

21        THE COURT:  Well, I'll tell you what my predisposition

22   is on this case.  It's my predisposition.  It's not my

23   decision.  I will allow both sides to address my

24   predisposition.

25        My predisposition is that the defense counsel cannot

1    establish sentencing entrapment because the defendant has not

2    successfully shown that, quote, he lacked the intent and

3    capability to produce the larger quantity of laundered funds.

4    Nor under the circumstances do I think that the government's

5    conduct was outrageous.

6         I similarly don't believe, even though it is a much

7    closer call, that the defense can establish sentencing

8    manipulation, and that is because here is how I view this case,

9    after having heard all the evidence like everybody else:

10   Mr. Costanzo was somewhat of a dupe for Dr. Steinmetz.  The

11   government has chosen not to proceed with respect to

12   Dr. Steinmetz, for whatever reason.  That's up to the

13   government.  I don't think it was necessarily unreasonable,

14   however, even after Dr. Steinmetz declined to engage in a drug

15   transaction, for the government to increase the amount that it

16   sought to trade in because:  A, they either wanted to trace it

17   back to Dr. Steinmetz, or they believed that the increased

18   amount made it likely or relevant to demonstrate that

19   Dr. Steinmetz well knew that these were drug transactions,

20   despite the fact that he might not engage in a person-to-person

21   transaction.  So I cannot conclude that the officers engaged in

22   later drug transactions solely to enhance the defendant's

23   potential sentence.

24        Nevertheless, even though I do not conclude that that

25   was sentencing entrapment or sentencing manipulation, I am

| | |
|---|---|
| 1 | inclined to give Mr. Costanzo a variance in the amount of the |
| 2 | increased transaction because I don't think that given the |
| 3 | circumstances where I view Mr. Costanzo as almost akin to a |
| 4 | drug mule, somebody who was doing his principal's bidding in a |
| 5 | rather naive -- I don't think he's a stupid man -- but he was |
| 6 | so enthusiastic about Bitcoin, and I think he clearly knew -- I |
| 7 | think the evidence is clear that he knew some of this was |
| 8 | engaging in drug transactions, so he's not -- he is not without |
| 9 | culpability.  But where, in fact, these aren't real |
| 10 | transactions and the government can just provide increasing |
| 11 | amounts and -- as I said, I think they can legitimately do it |
| 12 | in the hope of -- in the hope of trapping the larger -- really, |
| 13 | the source entity for these funds -- I'm not sure that it is |
| 14 | fair to Mr. Costanzo not to give him some sort of downward |
| 15 | variance in light of the fact that it is a bit of a |
| 16 | manipulation whose legitimate target really isn't Mr. Costanzo, |
| 17 | and only serves to enhance his sentence. |
| 18 | So I've given you what my predisposition is on all of |
| 19 | these issues.  I have not made a determination, and I will hear |
| 20 | from both parties, if you want to address it. |
| 21 | MR. BINFORD:  Well, Your Honor, to the extent you're |
| 22 | contemplating not considering the cooperating witnesses' |
| 23 | estimate of 30,000 at this point, given the Court's position |
| 24 | on -- on the increase of the dollar amount, I think that it's |
| 25 | entirely appropriate to consider that 30,000 in the dollar |

1    amount because this is a real live person.

2         THE COURT:  I would say that he, to me, is more

3    relevant than the later transactions, based on what I've told

4    you.

5         MR. BINFORD:  I also think that --

6         THE COURT:  However, I still think you need to address

7    Ms. Weidner's point -- and I do recall his testimony -- he was

8    rather -- he was rather iffy about whether or not -- to the

9    extent to which he actually directly told Mr. Costanzo that

10   these were drug funds.  Nevertheless, my recollection of the

11   evidence, which I think is pretty good, is he told him enough

12   that Mr. Costanzo would have well-known that he was involved --

13   that he was involved in drug funds with the cooperating

14   witness.

15        MR. BINFORD:  And Judge, as I'm sure you --

16        THE COURT:  But -- but the estimates provided were

17   only estimates.

18        MR. BINFORD:  I agree.

19        And Judge, I'm sure you remember the cooperating

20   witness testified that Mr. Costanzo had actually requested for

21   him to get drugs at one point.

22        THE COURT:  I do recall that.

23        MR. BINFORD:  In terms of the total amounts,

24   Mr. Costanzo's online postings, his advertisements from the

25   beginning said that he could engage in transactions up to

1    $50,000 at a time.  He also had lower amounts.  I think his

2    lower amount on one of the scales was $15.  But he put it out

3    there that he could engage in transactions of up to $50,000 at

4    a time.

5              THE COURT:  True enough.  But again, in terms of my

6    concerns, that's actually Dr. Steinmetz' Bitcoin he's dealing

7    with; right?

8              MR. BINFORD:  Well, according -- yes.  But according

9    to our investigation, it was only the last transaction where

10   Dr. Steinmetz actually, for lack of a better word, fronted --

11             THE COURT:  Yeah, but is there any reason to believe,

12   especially given the lifestyle the defendant lived, that the

13   defendant had sufficient funds to be funding these transactions

14   by himself?

15             MR. BINFORD:  He certainly had the money bands in his

16   house that could account --

17             THE COURT:  Sure.

18             MR. BINFORD:  -- for a large amount of his cash.

19             THE COURT:  Sure.  But that doesn't indicate that he

20   had the financial means to come up with that kind of money,

21   does it?

22             MR. BINFORD:  No, and nobody is saying that he lived a

23   lavish lifestyle.  I think some of the letters written in

24   support of him said that he -- he led a pretty plain lifestyle,

25   didn't focus on material things.  But to date we've had no

1   opportunity to find out the size of his business or what he

2   made because he did not file tax returns, he refused to

3   cooperate with the probation officer and provide information

4   about the income he made.  So we really don't know.  There

5   could potentially be a thumb drive somewhere with millions of

6   dollars on it in cryptocurrency.  We just don't know.

7         THE COURT:  You know, that is true.  Certainly it's

8   true, Mr. Binford.  What I'm trying to do here, though, is

9   justice, the best I can do within the range of what the

10  guidelines allow me and my sense of justice dictates.

11        And so what I'm considering is only based on the

12  evidence I've heard.  And I recognize -- and the government has

13  a legitimate point -- that Mr. Costanzo never filed his tax

14  returns.  And I take that into account.  So what is there about

15  his life -- certainly there isn't anything the government has

16  demonstrated about his life that would indicate that this is a

17  man who could front tens of thousands of dollars in

18  cryptocurrency transactions, is there?

19        MR. BINFORD:  Well, if you look to the claim he made

20  against the items that were subject to forfeiture, the virtual

21  currency in this case, Steinmetz claimed 30 of those Bitcoins,

22  Mr. Costanzo claimed 49 of those Bitcoins to himself.  So when

23  we're talking about 80 or so Bitcoin which have a substantial

24  value now and had a substantial value back then, Mr. Costanzo

25  claimed the majority of those Bitcoin, and Mr. Steinmetz --

1    Dr. Steinmetz did not make a claim on those.

2            This investigation --

3            THE COURT:  Did he make any claim on those?

4            MR. BINFORD:  Did Dr. Steinmetz?

5            THE COURT:  Yes.

6            MR. BINFORD:  Yes, he did.  He made a claim to 30, and

7    we're currently in the process of a settlement agreement with

8    Dr. Steinmetz where he will be subject to certain conditions

9    over the next couple years regarding his use of virtual

10   currency, or he will be forfeiting a large sum of money to the

11   United States, along with his interests in the Bitcoin that

12   were seized, the 30 Bitcoin, along with some other requirements

13   regarding his possession of certain firearms and other things.

14   And that process is scheduled to complete any day now.  We've

15   been in negotiations with Dr. Steinmetz's attorneys for several

16   months, including during the pendency of this trial and since

17   then.

18           THE COURT:  Well, how much money -- well, how much of

19   the Bitcoin then -- and to the extent that you cannot represent

20   this, please feel free to tell me, because what I am trying to

21   do here is arrive at a just sentence for Mr. Costanzo.

22           Are you negotiating with Mr. Costanzo as it pertains

23   to Bitcoin and the Bitcoin seized by the government?

24           MR. BINFORD:  No.  The jury found that all the Bitcoin

25   involved in this transaction were subject to forfeiture.

1          THE COURT:  Right.

2          MR. BINFORD:  And we have the --

3          THE COURT:  So to the extent that Dr. Steinmetz claims

4     30 of those Bitcoin, and the jury has forfeited the rest, then

5     the benefit has gone to the government; correct?

6          MR. BINFORD:  The jury has forfeited Mr. Costanzo's

7     interest in those 80 Bitcoins.

8          THE COURT:  That's correct.  If I didn't say that --

9          MR. BINFORD:  Mr. Steinmetz still has an interest that

10    he must give up, and that's --

11         THE COURT:  That's what you're negotiating.

12         MR. BINFORD:  Yes, Your Honor.

13         THE COURT:  All right.

14         Do you have any other evidence -- well, first off,

15    Ms. Weidner, did Mr. Costanzo claim 50 of the Bitcoin to be his

16    own?

17         MS. WEIDNER:  Your Honor, I believe the answer to that

18    is no.  And I had no idea that there were ongoing negotiations

19    with Mr. Steinmetz.  I have only heard regarding the fact that

20    the government advised me that Mr. Steinmetz' home should not

21    be forfeited, as it was in the original version of the

22    presentence report.  But basically a bunch of what I've heard

23    is news to me.

24         THE COURT:  Where do you get the claim that

25    Mr. Costanzo claimed 50 of the Bitcoin?

```
1          MR. RESTAINO:  Judge, it's referenced in, I think, the

2    motion to dismiss the -- the money transmitting counts.  We

3    itemized in that the different amounts that they each claimed.

4    It actually comes to the United States Attorney's Office

5    through the CATS system, which is the asset forfeiture system,

6    so we know that each of the defendants have made those

7    individual claims.  But I'm pretty sure it's memorialized in

8    that motion to dismiss those counts.

9          THE COURT:  Well, we have here -- defendant's attorney

10   who has no knowledge that he's made such claims.

11         MR. RESTAINO:  Judge, I think we've actually talked

12   about this as well when we talked about the return of property

13   when there was an effort on the part of the defendant to get

14   those Bitcoins back, pending a final resolution.

15         THE COURT:  Well, I remember that, but I don't know

16   that he was -- I don't know that that necessarily implies that

17   he was dividing up the interest between himself and/or

18   Dr. Steinmetz at that point.  Do you?

19         MR. RESTAINO:  Judge, I know it's on the record in the

20   context of the motion to dismiss.  What's not on the record

21   probably --

22         THE COURT:  Why don't you find it for me then, if it's

23   on the record.

24         MS. WEIDNER:  And, Your Honor, I will add that I do

25   recall, and just briefly discussing with Mr. Steinmetz, that we
```

1    did file -- or send a response to asset forfeiture back over a
2    year ago.  But I do not recall the substance of that, and I did
3    not realize that that's something that we were going to be
4    discussing today.
5                THE COURT:  All right.  Do you want to be heard on the
6    issue of what -- of who was fronting these funds for
7    Mr. Costanzo's advertisements?
8                MS. WEIDNER:  Your Honor, it has always been the
9    position of the defense that Mr. Costanzo, as an entrepreneur,
10   had some aspirational claims that were made in his
11   advertisements about his ability to do different sizes of -- of
12   transactions.  There has been no evidence to show that he ever
13   did a transaction anywhere near as big as even the
14   30,000-dollar transaction he did with the DEA agent, which was
15   the penultimate one in this case.  In fact, in his -- in the
16   recordings that were played at trial and -- and that were
17   disclosed, instead he recounts a lot of much smaller
18   transactions, and regular customers who do small amounts on a
19   weekly basis, or something like that.  And by "small amounts,"
20   I'm talking $200.  And without repeating anything that is in
21   the filings regarding sentencing entrapment and sentencing --
22   in particular, sentencing manipulation, I would refer the Court
23   to the cases that -- the Bitcoin cases that have happened all
24   over the country that were referenced in the defense sentencing
25   memorandum because I think --

1      THE COURT:  I've read those.  But we'll get to those

2  in a minute.

3      MS. WEIDNER:  And I think that those give some support

4  for defense argument.

5      THE COURT:  All right.  So I'm going to move on into

6  then whether or not Mr. Costanzo was in the business of money

7  laundering, which is a four-level increase.

8      It seems to me, unfortunately for Mr. Costanzo, that

9  he engaged in money laundering, and what he knew to be money

10  laundering, over an extended period.  There were multiple

11  sources for that money laundering.  He made statements during

12  the course of the money laundering that would suggest that he

13  was deliberately indifferent at least, if he didn't have

14  knowledge that he was engaging in that laundering.  And I think

15  he did make a number of statements that indicated he had actual

16  knowledge over the course of time.

17      I'm going to also say that while I have -- I'm not

18  saying that necessarily Mr. Costanzo engaged in sophisticated

19  means.  It does seem to me that one of the natures of

20  cryptocurrency is -- and the advantages it provides that are an

21  incentive to an increased income a peer-to-peer network is the

22  peer-to-peer exchange that provides for the increased profit

23  margin, is that the nature of peer-to-peer exchanges of

24  cryptocurrency gives rise to the inference that -- or the

25  increased knowledge that your clients want to engage in

1    confidential, unreported monetary exchanges; that when that is

2    the case, it does inform all of the other factors that

3    determine whether someone is engaged in money laundering, and

4    that that factor, combined with what Mr. Costanzo actually

5    said, the multiple times that he engaged and multiple sources

6    that he engaged in money laundering with -- not just the

7    undercover officers in this case -- supported a determination

8    that he was involved in the business of laundering funds.

9         It may be, and I rather suspect that it was, that

10   Mr. Costanzo was a Bitcoin enthusiast, that he was a Bitcoin

11   enthusiast who didn't care who he was selling to; and when he

12   had actual knowledge that those -- or he believed he had actual

13   knowledge that they were engaged in drug transactions, he still

14   didn't care.  And so I think he meets the standards set forth

15   as being engaged in the business of laundering funds.

16        Do you want to be heard on that, Ms. Weidner?

17        MS. WEIDNER:  Your Honor, the only thing that I would

18   add to that is simply using Blockchain and Bitcoin, which are

19   sophisticated in and of themselves -- or, I'm sorry.  I was

20   jumping to a different one.

21        THE COURT:  That's right.

22        MS. WEIDNER:  Your Honor, with respect to being in the

23   business of money laundering, I think that the government's

24   investigation failed to show that.  The government's

25   investigation was focused on doing their own sting operation.

1    They did not amass a group of people that would indicate that

2    Mr. Costanzo was in the business of laundering funds, that

3    Mr. Costanzo was even in the business of -- of doing large

4    Bitcoin transactions.  That wasn't -- that wasn't their goal.

5    Their goal was just to see if he would do the deals that their

6    UCAs went and presented to him.  They stumbled across

7    Mr. Sperling and had a free talk with him, but that was a month

8    after Mr. Costanzo had been arrested.

9               THE COURT:  What difference does that make?

10              MS. WEIDNER:  That goes to show not so much multiple

11   sources, because UCA1 and UCA2 were connected.  They were

12   business partners, as presented to Mr. -- so that between them

13   and UCA3 and then Nolan Sperling, we've got three different

14   groups as opposed to --

15              THE COURT:  What about the spouse who said, my husband

16   is using your Bitcoins to buy drugs?

17              MS. WEIDNER:  Your Honor, she did not identify

18   herself --

19              THE COURT:  And so?

20              MS. WEIDNER:  -- and that is not money laundering.

21   That is like somebody calling me because I own a liquor store

22   and say:  Stop selling my husband liquor.  He's getting drunk

23   every night and beating me.

24              I'm, like, well, I don't know your name.  Who are you?

25   What's going on?

1          THE COURT:  All right.  I still think it establishes

2    multiple sources, and unfortunately I do believe that it

3    evidences that Mr. Costanzo was in the business of laundering

4    funds.

5          Again, as I've said, his primary motivation might have

6    been to sell Bitcoin, might have been a real Bitcoin

7    enthusiast, but he knew what he was doing, and he did it with

8    multiple sources.

9          In addition, there are other transactions that have

10   been listed in the presentence investigation report where

11   undercover agents observed large money exchanges between

12   Mr. Costanzo and others that I think give rise to that

13   inference.  And so I am going to say that the plus four is

14   appropriate.  Keep in mind I've also said the plus six is

15   appropriate.  I'm just going to likely give a downward variance

16   on that level, and I might consider one for the plus four.  But

17   that is going to await the final argument.

18         As for specific defense characteristics, I have real

19   doubts that Mr. Costanzo was involved, according to the

20   definition set forth in the federal sentencing guidelines, in

21   sophisticated transactions.  What he did -- I mean, to the

22   extent that you want to say his use of the moniker Morpheus

23   Titania, I'm not convinced from the trial evidence I heard that

24   that really provided him much of anything.  It is true that as

25   it pertained to certain transactions he suggested that they use

1    specific apps.  I mean, I will take that into account.  But the

2    underlying argument that merely because he was dealing in

3    Bitcoin makes it a sophisticated transaction, I don't think I'm

4    inclined to buy, as I look at what the requirements are under

5    the 2S1.1.  Very little of that, if any of it, was done by

6    Mr. Costanzo.  He didn't launder using fictitious entities, he

7    didn't launder using shell corporations, he didn't launder

8    using two or more levels.  What he did was he sold a different

9    kind of currency.  Would you be arguing that he was engaged in

10   sophistication -- sophisticated transactions if it was French

11   francs he was offering instead of Bitcoin?  What's the

12   distinction?

13           MR. BINFORD:  Your Honor, I think even if Mr. Costanzo

14   was laundering funds through some sort of business, like a used

15   car dealership or a video rental store that didn't involve

16   virtual currency, he would still be guilty -- or he would still

17   be liable under sophisticated laundering because of his use of

18   layering.

19           Here we had some trial exhibits that showed the

20   Bitcoin transactions.  Special Agent Ellsworth --

21           THE COURT:  I'm not saying that Bitcoin itself is not

22   sophisticated.  It seems to me it is pretty sophisticated.  But

23   that is the nature of the currency.  That isn't what

24   Mr. Costanzo did.

25           MR. BINFORD:  The transactions don't always have to be

1    layered.  Mr. Costanzo did intentionally -- well, we -- our

2    position is that he did intentionally layer those -- some of

3    those transactions, and those were shown in the trial exhibits.

4         When I asked Special Agent Ellsworth on the stand, he

5    specifically used the term "layering" to describe the type of

6    transactions that he used, where he used -- where he

7    transferred them from one Bitcoin wallet to another, and then

8    ultimately to the undercover agents.  He went in and did that

9    analysis, looked at those graphs.  So there was layering.

10   There was more than one step involved in the transactions here.

11        I think the use of encrypted technology, connected

12   with the virtual currency, also shows a level of sophistication

13   that is beyond standard money laundering transaction.  He used

14   these encrypted apps to coordinate the times, locations, and

15   amounts of meetings.  He did that with UCA2, he did that with

16   UCA3, and UCA1, and he was the one that suggested the use of

17   that technology.

18        THE COURT:  Ms. Weidner?

19        MS. WEIDNER:  Your Honor, we agree with the Court on

20   this.  The -- it is also position of the defense, because I

21   recall that portion of the testimony, and Mr. Costanzo was

22   explaining how if he needs to give someone more Bitcoin, he

23   moves it from one area to another and then sends the entire

24   amount to somebody else.  That is not layering.  That's just

25   saying, I have some money in this pocket and I have some money

1    in this pocket.  So I'm going to pull it out from both so I can

2    give you the full amount I owe you.

3          I think that if you want to see what true layering and

4    true, true sophistication is, you can look to the Lord charging

5    document in the sentencing memorandum where there was not just

6    using legal platforms that are sophisticated or legal

7    applications, but creating fictitious things, a subterfuge, an

8    attempt to trick or fool someone into thinking you're not doing

9    what you're doing.  This was just, as the Court said, using a

10   system that is sophisticated and complex, but not anything

11   beyond that.

12         THE COURT:  Well, I am going to uphold the objection

13   as it pertains to paragraph 36.  I do appreciate the

14   government's argument.  It is a close question.  But for the

15   most part, I do not recall that there would be layering as it

16   is suggested, at least as I interpret the comment here.

17         It is true, certainly, that Bitcoin is in and of

18   itself a sophisticated kind of currency.  And as I have already

19   indicated, I think that Mr. -- I think that that weighs against

20   Mr. Costanzo as a factor in whether or not he was engaged and

21   knew he was engaged in a money laundering business.  But I

22   don't think that because the currency itself is sophisticated

23   means that the exchange of the currency in and of itself

24   constitutes a sophisticated money laundering transaction.

25   Otherwise, anybody who was involved in the legitimate use of

1    cryptocurrency could be charged with that if you weren't able

2    to come up with any other crime in which they supposedly

3    engaged.  I just don't think that qualifies.

4            So I'm not going to give any -- on 36, I'm not going

5    to give any uptick, and I'm going to sustain the objection.

6            Now, the only question that remains, I think, is the

7    extent to which I may or may not give -- and so just so we're

8    clear, we have a level 18 with -- a base offense level of 18

9    that is calculated using the -- under 2(b)1.1, I have found

10   that that means at least Mr. Costanzo was involved in the

11   exchange of $95,000 or more in money laundering assets.  And so

12   I find that that is appropriate, although I've indicated I may

13   be inclined to give him a downward variance, although I don't

14   find that there's an error in that base offense level.

15           Nor do I find any error in paragraph 34.  Six levels

16   are added, as the defendant knew that the laundered funds were

17   the proceeds of or were intended to promote a controlled --

18   manufacture, importation, or distribution of a controlled

19   substance.

20           I have also upheld 35, four levels are added as the

21   defendant was in the business of laundering funds.

22           36 I have stricken, that -- and the question then

23   remains as to whether or not the defendant should receive any

24   points for acceptance of responsibility.  I'm not inclined to

25   so find.  It doesn't seem to me that the -- I do think that

1    just because the defendant exercised his trial rights doesn't

2    mean that he can't claim this, but in this case I think that

3    there were other defenses other than you were just arguing the

4    constitutionality of the statute as it applied to Mr. Costanzo.

5            Do you want to be heard on that, Ms. Weidner?

6            MS. WEIDNER:  Your Honor, first I just had a quick

7    question for the Court.  In discussing the base offense level,

8    because paragraph 33 states that the offense level is 18

9    because it was more than 150,000, but less than 350,000, and

10   the Court said more than 95,000.  So I just wanted to make sure

11   that we were --

12           THE COURT:  Thank you.  I'll double-check myself.

13           This is 2B1.1; right?

14           MS. WEIDNER:  Yes, Your Honor.

15           THE COURT:  Actually, it should have been more than

16   101,500.  If the loss exceeded 6,500, increase the offense

17   level as follows.

18           So the base offense level is -- is -- well, let me get

19   this straight.

20           The base offense level would be 8 -- I see.  Yeah.

21           I just still think that 18 is correct because I found

22   that all of the increased funds that were offered by the

23   government late are appropriately attributable, so you do have

24   more than 150,000.

25           MS. WEIDNER:  Okay.

1          THE COURT:  And the question that I'm reserving is

2     whether or not I'm going to give a downward variance on that

3     amount.

4          Okay.  Does that answer your question?

5          MS. WEIDNER:  Yes, Your Honor.

6          THE COURT:  Thank you.

7          MS. WEIDNER:  Your Honor, on the question of

8     acceptance of responsibility, I think as -- I would -- I rest

9     largely on the arguments that we have made in our objection, as

10    well as Mr. Costanzo's statements to the Court regarding what

11    he learned in the course of his trial, and also just the time

12    that he has had to -- to reflect on his actions and to think

13    about how he wants to proceed once this is all over.

14         I -- I think that Mr. Costanzo is -- is an intelligent

15    man, is a very thoughtful man, and has given this whole

16    situation quite a bit of thought.  And I have every reason to

17    believe that as he sits here -- and months ago -- he has been

18    on a path of rehabilitation.

19         Now, do we agree with everything that happened in

20    trial?  Absolutely not.  But as far as recognizing the

21    wrongfulness of agreeing to do business with people who say

22    that they are doing things that are destructive to our society,

23    I don't think Mr. Costanzo is ever going to do that again, and

24    I think that it shames him that he did.

25         THE COURT:  All right.  But to the extent that you're

1    arguing variance rather than acceptance of responsibility, I'll

2    still let you argue that.  I do find, though, that acceptance

3    of responsibility hasn't been met, and so that means that I am

4    finding a criminal offense level of 28 with a Criminal History

5    Category of I, and the range there is 78 to 97 months, unless I

6    missed out.

7            Did you want to be heard, Mr. Binford?

8            MR. BINFORD:  I believe the Criminal History Category

9    is III, not I.

10           THE COURT:  Ah.  Thank you.  That's correct.

11           So that would be 28 with a Criminal History Category

12   of III, and that would be 97 to 121-month range.

13           Is everybody in agreement on that?

14           MR. BINFORD:  Yes, Your Honor.

15           MS. WEIDNER:  Your Honor, if I could have a moment.

16                       (Pause in proceedings.)

17           MR. BINFORD:  While counsel is looking for that, I

18   just wanted to make a record regarding where that claim was

19   that we talked about earlier you asked counsel to look up.

20   There was a claim made for 49-and-some-change Bitcoin out of

21   the 80.9 Bitcoin.  That was docket number 95, page 2, at lines

22   11 to 12.

23           MR. RESTAINO:  It's actually, Judge, the defense

24   motion to return property.  It was the defense that itemized

25   the 49 Bitcoin.

1          THE COURT:  All right.  Would you print that out for

2     me, please.

3          COURTROOM DEPUTY:  What is it, Judge?

4          THE COURT:  Docket 95, page 2.  You can print off the

5     whole document, if you would.

6               (Pause in proceedings.)

7          THE COURT:  Thank you.

8          I really don't find that's very persuasive.  It just

9     says the amount seized from Mr. Costanzo.  It doesn't say that

10    it was his Bitcoin.

11         Do you want to look at it, Mr. Restaino?  You can.

12    I've printed it off.

13         MR. RESTAINO:  Judge, I think we've made our record on

14    this one.  I can tell you the claim is for 49.  The fact that

15    the defense recognizes it as 49 supports the fact that it was

16    his claim.  But that's all the record we sought to make.

17         THE COURT:  I appreciate it.

18         I guess I'm going to say that as it pertains to any of

19    my consideration on the variance, which we're now about to take

20    up, I don't find that particularly persuasive as being evidence

21    that Mr. Costanzo owned those Bitcoin.  It merely says that

22    they were seized from him.  It may be that he owned them, but

23    he sure lived in pretty modest circumstances for somebody who

24    owned what then he estimated to be $880,000 worth of Bitcoin.

25         All right.  So, Ms. Weidner?

UNITED STATES DISTRICT COURT

1          MS. WEIDNER:  Your Honor, just to be clear, are we now

2     at sentencing arguments?

3          THE COURT:  Yes, except for I asked you to confirm

4     that with a criminal offense level of 28, Criminal History

5     Category III, we're talking a range from 97 to 121.

6          MS. WEIDNER:  Yes, Your Honor.  We are.

7          THE COURT:  All right.

8          MS. WEIDNER:  Now are we?

9          THE COURT:  Yes.

10         MS. WEIDNER:  Sorry.

11         Your Honor, the defense is requesting a sentence in

12    this case of credit for time served.  And, Your Honor, that is

13    a significant downward variance from the 97 months that is the

14    low end of the guidelines and the 121 months which is the high

15    end.  However, I think one of the strongest arguments for that

16    sentence is the need to avoid unwarranted sentencing

17    disparities in situations where others were found guilty or at

18    least convicted of similar conduct and are similarly situated.

19         This is the first Bitcoin money laundering case to be

20    prosecuted in the District of Arizona, but it is not the first

21    in this country.  The first that I was able to find was out of

22    the Southern District of New York involving Faiella, et al.

23    These were individuals who were actually actively involved in

24    money laundering in connection with the mother of all Darknets,

25    the Silk Road.  And in that case, Mr. Faiella, who was the

1    principal, was sentenced to four years.  Mr. Shrem, who was

2    aiding and abetting, was sentenced to two years.  This is an

3    actual money laundering case.

4          Also identified a number of cases involving money

5    laundering strings.  Most recently on the week of July the 9th,

6    Ms. Tetley in California was sentenced to 12 months and a day

7    for laundering between 6- and $9 million.  Now, she was charged

8    with having laundered significantly less.  In fact, her

9    charging document, which is in the sentencing memorandum, notes

10   she was charged with unlicensed -- in the 1960 charge,

11   operating an unlicensed money-transmitting business and also

12   with money laundering, but only $70,000.  She got 12 months and

13   a day.

14         Mr. Ong in the Western District of Washington got 20

15   days.

16         Interestingly, Ms. Tetley was arrested in the course

17   of completing a 300,000-dollar Bitcoin exchange with undercover

18   agents acting as drug traffickers.

19         Mr. Ong conducted a 200,000-dollar Bitcoin exchange

20   with undercover agents setting themselves forth as drug

21   traffickers.

22         Then we have Mr. Klein in the Western District of

23   Missouri.  He got five years' probation.  He also was engaged

24   in transactions with government agents posing as drug

25   traffickers.  But ultimately, he pled to a 1960 charge.  Money

1    laundering charges weren't even brought.

2         We have the case of -- I think it's the case out of

3    the Western District of Pennsylvania with the kid who committed

4    the crime of unlicensed money transmitting and likely also

5    money laundering, given that he was doing Bitcoin trades

6    upwards of $50,000 with undercover agents while he was still

7    completing a sentence for heroin trafficking.  He got 12 months

8    and a day.

9         What all this indicates very strongly is that in the

10   world of Bitcoin, which is fairly new, even today, there has

11   been a kind of Wild West mentality about operating in this

12   decentralized environment where, you know, people convinced

13   themselves or want to believe that no rules apply.  And in that

14   weird fantasy world, people do things that are perhaps out of

15   character for them.  They agree to engage in the kinds of

16   exchanges that they probably wouldn't in what I'm going to call

17   real life.

18        Look at the things that Mr. Ong said, was recorded

19   saying, to undercover agents.  They sound very similar to the

20   things that Mr. Costanzo was recorded saying to undercover

21   agents.  When they said:  Oh, you know, we're drug dealers.  He

22   was, like:  Don't say that.  I didn't need to hear that.  I

23   don't need to know that.  Why are you being so open?  I want to

24   have plausible deniability.  Don't mention it.

25        That's that Mr. Ong said.  He still got 20 days.

1          Ultimately these Bitcoin traders, whether they are

2    exploited or whether they are complicit with the true targets,

3    the people that our government should really be after, they are

4    ultimately just like you said, Your Honor, at the beginning of

5    this hearing, they are essentially mules, they are essentially

6    couriers, only what they are dealing with -- what they are

7    carrying is not something that is inherently dangerous or

8    inherently illegal like heroin, or cocaine, or methamphetamine.

9    It's Bitcoin.  And I think that's why we see the much lower

10   sentences.

11         There is not a Bitcoin case in this country that has

12   been prosecuted where there has been a -- for Bitcoin trading

13   that has received a sentence even close to what the government

14   is asking for.  I do not know if it is that the government is

15   not aware of these other cases or -- because I don't see a

16   difference between what Mr. Costanzo was doing and what

17   Ms. Tetley was doing or Mr. Ong or Mr. Klein.  And in the Lord

18   case, they -- the government did a sting just like they did in

19   this case and the others, but they actually found a real drug

20   conspiracy, a real one, involving one of the defendants.  And

21   even that defendant, who not only was convicted of operating an

22   unlicensed money transmitting business, but was also convicted

23   of a conspiracy to possess with intent distribute a schedule --

24   a scheduled substance, got a total of 46 months for the 1960

25   charge, and 60 months for the drug trafficking charge.

1          What the guidelines provide as a sentencing range

2    here, and what the government is asking for are completely out

3    of step with what courts in our own jurisdiction, the Ninth

4    Circuit, and what courts across this country have done in New

5    York, in Pennsylvania, Missouri, Louisiana.  And in all of the

6    argument that I've seen from the government, I've seen nothing

7    that justifies such an extreme increase above this -- the

8    sentences that similarly situated individuals who were

9    convicted of committing the same kind of conduct -- only more

10   so because the amounts that they were trading in were much

11   larger -- what they got.

12          And so based on that, Your Honor, a sentence of credit

13   for time served is sufficient but not greater than necessary to

14   achieve the goals of sentencing in this case.  It is a sentence

15   that will avoid unwarranted disparities between other people

16   convicted of similar conduct, and it takes into consideration

17   that even though this Court found that Mr. Costanzo has not

18   accepted responsibility, he has changed his ways of looking,

19   not just at himself, but at our very system of justice here.  I

20   was struck and moved even by the things that he had to say in

21   his letter, and it -- it boggles my mind that someone else who

22   reads that letter wouldn't see it as I do.  But that's what it

23   is.

24          But, Your Honor, we ask for credit for time -- a

25   sentence of credit for time served.

1          Thank you.

2          THE COURT:  Thank you.

3          Mr. Costanzo, do you have anything you would like to

4     say, sir?

5          THE DEFENDANT:  Sure.

6          THE COURT:  If it's more --

7          THE DEFENDANT:  Well, I prepared something.  I don't

8     know if I'll keep to it, but I'll do my best here.

9          Anyway --

10         THE COURT:  Mr. Costanzo, if it would be more

11    comfortable, you can come up to the podium.

12         THE DEFENDANT:  Judge Snow, I want to thank you for

13    your time today in sentencing me.

14         When I heard the tapes of what I said presented at

15    trial, I -- and how I sounded to the jury, I felt embarrassed

16    and ashamed of what I said.  And I had not -- I do not -- it is

17    not how I see myself or how I wish to present myself in the

18    world.  This is a lesson I will not forget as the importance of

19    words and actions so my impact is positive and beneficial to

20    the community as a whole.

21         I disagree with not accepting responsibility here.  I

22    don't know how you made that determination exactly.  I thought

23    I laid that out in my letter.  I thought I mentioned that to

24    the Probation, and I -- I want to say I'm sorry and I -- I, you

25    know, it's -- it's very interesting, the whole situation in its

1    entirety, and I've -- I've actually learned a lot out of it.

2            Thank you.

3            THE COURT:  Thank you.

4            MS. WEIDNER:  Thank you.

5            THE COURT:  Mr. Binford?

6            MR. BINFORD:  Your Honor, Mr. Costanzo is asking for a

7    17-level variance to a time-served sentence.  We had previously

8    asked for a two-level variance in this case.  We thought that

9    was appropriate based on the prior calculations.  We still

10   think that's appropriate.  A two-level variance from the

11   current level of 28 down to 26 at the bottom of the guideline

12   range would be 78 months.

13           Now, this -- defense counsel has said that this is out

14   of character.  This isn't out of character.  Mr. Costanzo was

15   first arrested over 35 years ago.  He was 18 then.  He was

16   arrested three times that year.  He's always had a problem with

17   authority, and this is just a continuation of that.

18           The arrests he had when he was 18 were resisting

19   arrest, failure to appear, felony fleeing.  Since that time,

20   his criminal activity has increased.  It's intensified:  He's

21   used fraudulent or invalid identity documents; he's possessed

22   drugs; he's been convicted of contempt of court; carrying a

23   concealed weapon when he was charged of carrying a concealed

24   weapon when he tried to bring a gun into a court in Scottsdale;

25   he's also had the conviction for assault and battery.  And now

1    he's convicted of federal money laundering.  This is someone

2    who has 17 convictions and committed this offense while he was

3    under a criminal justice sentence for a prior felony

4    conviction.

5            This is someone who has no respect for the law -- and

6    I'll get to it, but that's why he's different than some of the

7    other cases that have been mentioned.

8            His own statements provide insight into the type of

9    person he is, and these are part of his history and

10   characteristics.  He's eager to engage in criminal behavior.

11   He uses curse words and derogatory words in referring to banks

12   or the government, and his three rules are:  Don't get bit,

13   don't get shot, and don't talk to the police.  He repeatedly

14   used those rules throughout this investigation with different

15   individuals who he had no reason to think they were related to

16   one another.  Those were the rules he lived his life by, and

17   that's why he's here today.

18           The sentence should also reflect the seriousness of

19   the offense and provide respect for the law.  His 17

20   convictions show that -- that he has no respect for the law.

21   His own statements show that he has no respect for the law.

22           He used emerging technology, state-of-art technology,

23   something that should be celebrated, something that's good; and

24   instead, used it as a tool for criminal activity.

25           In our opening statements, we said that buying/selling

1  Bitcoin, it's legal.  We said in our closing arguments, you've

2  said it again today, Judge.  There's nothing illegal about

3  owning Bitcoin.  But he used that technology, he used the

4  encrypted technology, the Blockchain, to engage in crime, to

5  launder what he thought was heroin and cocaine proceeds, to

6  launder thousands of dollars -- tens of thousand of dollars for

7  a young kid who was buying drugs on the Internet and selling

8  them here in Phoenix.  He made all of this happen.

9          In terms of the argument for the need to avoid

10  unwarranted sentencing disparities, the courts have said the

11  best way to do that is to sentence someone within the advisory

12  guideline range.  He points to several cases -- Tetley, Ong,

13  Klein, and Lord.  Those are cases where the defendants pleaded

14  guilty to different charges.  They pleaded guilty to operating

15  an unlicensed money transmission business.  A 1960 charge is

16  very different and has different consequence than a money

17  laundering charge.

18          The people in those cases also didn't have near the

19  criminal history of Mr. Costanzo, if any.  Ms. Tetley had no

20  criminal history or any law enforcement interaction, as opposed

21  to Mr. Costanzo's 17 prior convictions.  Mr. Ong had no

22  criminal history or any adverse law enforcement interaction.

23  Mr. Klein had no criminal history.

24          So these people we're talking about were first-time

25  offenders, and they didn't have 35 years of repeated criminal

1    activity in their background.  And they also, for the most

2    part, weren't convicted of money laundering, and certainly

3    weren't convicted after going to trial instead of accepting

4    responsibility for their actions.

5            I think deterrence is important here for someone like

6    Mr. Costanzo that has showed that prior convictions aren't

7    going to stop him from what he's doing; whether it's assaulting

8    women, the woman that he pushed over the picnic bench; or

9    fleeing from police at over 100 miles per hour; or providing

10   fraudulent or invalid documents to law enforcement; fighting

11   with law enforcement, fleeing from law enforcement.  He just

12   doesn't get that he has to adjust his behavior.

13           So I think specific deterrence is important here, but

14   I also think general deterrence is important.  The Court has

15   seen the people that attended this trial that care about

16   virtual currency, that are passionate about it.  And some of

17   them still believe that what Mr. Costanzo did was legal.  They

18   don't see it as a crime.  They were out outside the courthouse

19   during trial, taking photographs of witnesses, government

20   witnesses, posting them online.  They were wearing T-shirts in

21   the courtroom, trying to get the jury to nullify the verdict.

22           And I think if the Court imposes an unnecessarily

23   light sentence, a sentence that isn't reasonable, it's going to

24   send a message to them that this type of behavior is okay, that

25   they can go out and they -- they can do this.  They won't be

1    held accountable.  There won't be harsh consequences.

2           Virtual currency is emerging.  People are buying buy

3    drugs with it online.  There's no question about that.  Whether

4    we refer to it as the Darknet or the Internet, people are

5    buying drugs, people are selling drugs.  They're buying and

6    selling a lot more bad things out there, as outlined

7    paragraph 1 of the offense conduct.  People like Mr. Costanzo

8    make that possible.  And if we can't deter people from taking

9    dirty cash or giving people Bitcoin to buy prohibited items,

10   they're going to continue to do it, and the market is going to

11   be open.  And it's people like him that make that possible.

12          In terms of the last 3553(a) factor I want to address,

13   it's the nature and circumstance of the offense.  He was

14   laundering what he thought was drug money.  And these were hard

15   drugs:  Heroin, cocaine.  These were hard drugs.  He believed

16   the people were working internationally, and he had no problem

17   helping them move their currency.

18          I know some talk has been mentioned that he was a

19   mule.  But he was the number one trader in Phoenix.  If you

20   went on Local Bitcoins, he had the number one profile.  There

21   was testimony to that.  He wasn't a low-level person.  Sure, he

22   was working hand-in-hand with Steinmetz, we learned at the end,

23   with Dr. Steinmetz.  But he was the number one trader.  He

24   wasn't a mule.  He was at the top of the hierarchy.

25          And so we're asking for a below-guideline sentence.

1   We think the two-level variance is appropriate, and we think

2   the bottom of that range is appropriate.  We think that's fair

3   and that's sufficient, but not greater than necessary to meet

4   all the factors set forth under Section 3553(a).

5                THE COURT:  Thank you.

6                MS. WEIDNER:  Your Honor, may I very briefly respond?

7                THE COURT:  Very briefly.

8                MS. WEIDNER:  I promise.

9                Your Honor, I would just bring to the Court's

10  attention that Ms. Tetley did plead guilty and was thus

11  convicted of money laundering.  The apparent resolutions made

12  available to these defendants were resolutions that were not

13  available to Mr. Costanzo; specifically to avoid pleading

14  guilty to money laundering and to plead guilty to a 1960

15  charge.  In some cases, the government didn't even allege money

16  laundering when it could have, such as Klein and arguably Ross.

17  Ross is the Western District of Pennsylvania case where the

18  person who committed it had been recently convicted of heroin

19  trafficking.

20               The Petix case, which is also referenced, was a case

21  involving an individual who was illegally trading Bitcoin, but

22  who was also a convicted sex offender.

23               Nonetheless, Mr. Ross received 12 months and a day,

24  and he was reportedly someone who traded 1.5 million in Bitcoin

25  in a very short amount of time, a lot of it with undercover

```
 1      agents.  And Mr. Petix received a non-custodial sentence.
 2              THE COURT:  Thank you.
 3              Do you wish to approach with your client?
 4              MS. WEIDNER:  Yes.
 5              THE COURT:  Mr. Costanzo, when I sentence somebody, I
 6      have to follow a statute.
 7              THE DEFENDANT:  Uh-huh.
 8              THE COURT:  It's at 18 United States Code Section
 9      3553(a).
10              You've probably gone over it with your counsel before.
11              THE DEFENDANT:  Yes.
12              THE COURT:  And so you know the factors I have to look
13      at.
14              I'm going to discuss with you how I applied it in your
15      case in just a minute.  But you have indicated -- let me just
16      say that I enjoyed your letter.  I don't often enjoy letters
17      that I get from defendants.
18              THE DEFENDANT:  Well, thank you.
19              THE COURT:  But I found it quite engaging.  I enjoyed
20      reading and looking at what you read in prison.  And I think
21      you're somebody who I might enjoy having a conversation with,
22      if it were under different circumstances.
23              But I am going to have a little bit of a conversation
24      with you.  I'm going to explain some things to you that you
25      might not want to hear, but I'm going to -- I feel like I can
```

UNITED STATES DISTRICT COURT

1    just be frank with you.  Okay?

2          THE DEFENDANT:  You can.

3          THE COURT:  You indicated you disagree with me as to

4    my ruling on acceptance of responsibility.  And I understand

5    now that you accept responsibility.  I do.  It doesn't merit a

6    reduction in points, however, in most cases because the rules

7    themselves say this:  This adjustment, meaning the lowering for

8    acceptance of responsibility, is not intended to apply to a

9    defendant who puts the government to its burden of proof at

10   trial by denying the essential factual elements of guilt, is

11   convicted, and only then admits guilt and expresses remorse.

12         In your case, you did put your -- put the government

13   to its burden of proof at trial.  It does -- and that doesn't

14   necessarily in and of itself disqualify you.  But I felt that

15   you didn't meet the requirements to have done that and still

16   get acceptance of responsibility in this case, and I sort of

17   shorthanded my explanation of that.

18         But I want you to understand that -- that it wasn't

19   like you were arguing for the unconstitutionality of the

20   statute.  And the government fortunately or unfortunately can

21   charge you with whatever crimes they wish that they feel like

22   they can convict you for, and that's what they did in this

23   case.  That's why I didn't give you the points for acceptance

24   of responsibility.

25         As it pertains to the statute, it requires me to

consider the nature and circumstances of the offense.

Well, it may well be that you're just a super Bitcoin enthusiast.  But when you pursued that, you pursued it without any consideration of the requirements of society as to who you were selling your Bitcoins to.  And it is true that the government, to the extent that they were engaged in a sting operation, can -- could -- and I don't think they did in this case -- but they could manipulate things to really make things a whole lot worse for you than they otherwise would have been.

But you have to deal with the government's confidential informant, and it may be that they'd only found him after they arrested you.  But it was pretty convincing to me -- his testimony was pretty convincing to me that you actually were selling to people, not just the government, under circumstances which you would have known they were dealing in drugs.  That's not a good thing.

I realize that your own personal views about drugs may be different than society's, but you are bound by society's rules, and it is not -- it is a violation of the law, and a fairly serious one, to be engaged in allowing people, even through legitimate currencies like Bitcoin, to launder their money so that they can escape the consequences of engaging in drug transactions.

So your crime is a serious one.  It is also one in which I was convinced, after listening to all the evidence --

1    and it may well be that you feel differently now -- I hope it

2    is true -- but at the time, you were pretty -- from your own

3    legitimate political views or otherwise, you didn't really care

4    whether that was the case.  You just wanted to sell Bitcoin.

5            I think the government is right.  I've referred to you

6    a little bit as a "mule," and I really don't think you are as

7    guiltless as a mule, because a mule is somebody who basically

8    just brings drugs across the border one time, gets caught, and

9    we give them departures, usually, in this court.  I don't think

10   you were guiltless as a mule, because I think you knew what you

11   were doing and I think you did it in multiple transactions and

12   multiple times.

13           On the other hand, I don't really view you as somebody

14   who was financing this operation, and nor do I view you as

15   somebody who really stood to substantially profit from the

16   operation.  I think you and Steinmetz may have split the

17   profits in some way or other -- it's beyond the evidence, I

18   realize -- but you certainly weren't living much of a lifestyle

19   that would suggest that you were enriching yourself, and I want

20   to take that into account.  But I do think that the government

21   has a point.  You were a big -- you were a big operator in

22   peer-to-peer exchanges.  You knew what you were doing, you knew

23   it was wrong.  You did it anyway.

24           I think that they're right, that there is some

25   specific deterrence that needs to be sent to you.  And I also

think that they're right when they talk about general

deterrence, meaning not necessarily so much that the sentence

is dictated to you only, but sends a message to the community

of Bitcoin traders that, hey, you can trade in Bitcoin.  It's

not illegal.  But if you do it when you know you're financing

illicit activity, then you're engaged in a crime.  I think they

need to be aware of that, whether they agree with it or not.

And that there are negative consequences from that.  So I take

that into account when I sentence you as well.

I -- and I do think it poses a danger to the safety of

the public and to young people like the undercover informant;

although, of course, he didn't get the idea to deal in drugs

from you, but you did facilitate that dealing.

After having taken that into account -- and those are

the bad things -- I also want to take into account what I

consider to be the good things.

I take your letter at face value.  I think you

benefited from the trial.  When you tell me you did, I believe

you, that it gave you some sense that the government -- or that

the system wasn't just intent upon railroading you.

And I also can't really -- I'm not comfortable.  I

think that what the government did is perfectly legitimate in

terms of a law enforcement operation.  But I'm not comfortable

in a sting operation, letting them set the range of sentence by

the amount that they offered you, and that -- even though you

1   agreed to supply the funds and you did.  And so in my sentence,

2   I'm going to protect you from any unfairness that you would

3   have received from what I view to be exaggerated amounts that

4   you did supply when the government proposed them to you.  So I

5   am going -- even though I believe that the appropriate -- the

6   base level was appropriately calculated at 18, I'm going to

7   reduce it by six points, and that means that you will be held

8   accountable for offering something between 15,000 and 40,000,

9   and that really is giving you the benefit of the doubt because

10  I think that with that third-party informant, I think you

11  engaged in trade in something close to $30,000.  And I think

12  with the IRS agents you engaged in something close to $27,000.

13  So you're already over 40,000 there.  So I don't think it's

14  unfair to hold you responsible for between 15 and $40,000, and

15  it takes out any possibility that the government was

16  manipulating you in this sentence by the amounts that they

17  offered you.

18          Do you understand what I'm saying?

19          THE DEFENDANT:  Thank you.

20          THE COURT:  I'm also going to reduce it by another two

21  levels, and that is because four levels were added as you were

22  in the business of laundering funds.  As I've said, I think you

23  knew you were in the business of laundering funds, even though

24  I believe you that that was not your intent.  And -- but it

25  strikes me that because you get six levels for knowing that you

were financing drugs, that's a pretty serious uptick.  And
because I think in your enthusiasm you lost control of what
should be a moral judgment, I'm only going to give you the
equivalent of a two-level upward adjustment for being involved
in the business of laundering funds.

I have considered carefully what Ms. Weidner, who has
provided you with excellent, and I think even passionate,
representation, has said about requiring that similar
circumstances be sentenced similarly.  I have looked at all
those cases.  I do think they're distinguishable because of the
charges brought by the government, and I also don't agree
necessarily with the judges that imposed those sentences, and
because I do think that money laundering is a serious crime.

I do think that even though your enthusiasm may have
been for Bitcoin and not for money laundering, you still knew
you were money laundering and you did it.  I think that that
is -- I think that that merits significant punishment.

I do not think it merits punishment in the range that
the government has suggested, although I believe that they have
made a persuasive argument that it could be that.  My job is to
try to do justice, to weigh the interests of society with
justice to you.  And as I do that, I am going to, for the
reasons that I've just told you, give you the low end of the
variance that I've just described, and that will be 41 months'
incarceration.

1    Do you understand the basis for my sentence that I'm

2  going to impose?

3    THE DEFENDANT:  Yes.

4    THE COURT:  All right.

5    Pursuant to the Sentencing Reform Act of 1984, it is

6  the judgment of the Court that Thomas Mario Costanzo is hereby

7  committed to the Bureau of Prisons for an imprisonment term of

8  41 months.  This consists of 41 months on Count 3, 4, 5, 6, and

9  7 -- we renumbered them, remember, at trial, 1 through 5, so

10  the jury wasn't confused -- with all terms to run concurrently.

11    The defendant shall pay a special assessment of $500,

12  which shall be due immediately.

13    The Court finds that the defendant does not have the

14  ability to pay, and orders that the fine be waived, which means

15  that the total amount you'll pay in criminal monetary penalties

16  is $500, which is $100 per count as required by a statutory

17  special assessment.

18    Having assessed the defendant's ability to pay,

19  payment of the total criminal monetary penalties is due as

20  follows:  The balance is due in equal monthly installments of

21  $25 over a period of 20 months to commence 60 days after

22  release from imprisonment.

23    During incarceration, payment of criminal monetary

24  penalties is due at a rate of not less than $25 per quarter,

25  and payment shall be made through the Bureau of Prisons inmate

UNITED STATES DISTRICT COURT

1    financial responsibility program.

2            Criminal monetary payments shall be made to the Clerk

3    of the United States District Court, Attention: Finance,

4    Suite 130, 401 West Washington Street, SPC1, Phoenix, Arizona,

5    85003-2118.

6            Payment should be credited to the various monetary

7    penalties imposed by the Court in the priority established

8    under 18 United States Code Section 3612(c).

9            The Court hereby waives the imposition of interest and

10   penalties on any unpaid balance.

11           Upon your release from imprisonment, you shall be

12   placed on supervised release 36 months as to each count, with

13   each count to run concurrently.

14           While on supervised release, you shall comply with the

15   standard conditions of supervision as adopted by this Court in

16   General Order 17-18.  Of particular importance, you shall not

17   commit another federal, state, or local crime during the term

18   of supervision.

19           Within 72 hours of sentencing and release from the

20   custody of the Bureau of Prisons, you shall report in person to

21   the probation office in the district to which you were

22   released, if you are not deported.

23           You shall comply with the following additional

24   conditions:  You must cooperate in the collection of DNA as

25   directed by the probation officer.

1        You must participate as instructed by the probation

2    officer in a program of substance abuse treatment, outpatient

3    and/or inpatient, which may include testing for substance

4    abuse.  You must contribute to the cost of treatment in an

5    amount to be determined by the probation officer.

6        You shall abstain from all use of alcohol or alcoholic

7    beverages.

8        You are prohibited from making major purchases,

9    incurring new financial obligations, or entering into any

10   financial contracts in excess of $500 without the prior

11   approval of the probation officer.

12       You must provide the probation officer with access to

13   any requested financial information, and authorize the release

14   of any financial information.

15       The probation office may share financial information

16   with the United States Attorney's Office.

17       You must comply with the standard condition of

18   supervision requiring full-time employment at a lawful

19   occupation.  This may include participation in training,

20   counseling, and/or daily job searching as directed by the

21   probation officer.

22       If you are not in compliance with the condition of

23   supervision, you may be required to perform up to 20 hours of

24   community service per week until employed as approved or

25   directed by the probation officer.

UNITED STATES DISTRICT COURT

1          You must submit your person, property, house,

2     residence, vehicles, papers, or office to a search conducted by

3     a probation officer.  Failure to submit to a search may be

4     grounds for revocation of release.

5          You must warn any other occupants that the premises

6     may be subject to searches pursuant to this condition.

7          You must submit your computers as defined in 18 United

8     States Code Section 1030(e)(1) or other electronic

9     communications or data storage devices or media to a search.

10    You must warn any other person who uses these computers or

11    devices capable of accessing the Internet that the devices may

12    be subject to searches pursuant to this condition.  Failure to

13    submit to a search may be ground for revocation of release.

14          A probation officer may conduct a search pursuant to

15    this condition only when reasonable suspicion exists that there

16    is a violation of a condition of supervision and that the

17    computer or device contains evidence of this violation.

18          You must consent to and cooperate with the seizure and

19    removal of any hardware and/or data storage media for further

20    analysis by law enforcement or the probation officer with

21    reasonable suspicion concerning a violation of a condition of

22    supervision or unlawful conduct.

23          Any search will be conducted at a reasonable time and

24    in a reasonable manner.

25          Your interest in the following property shall be

UNITED STATES DISTRICT COURT

1    forfeited to the United States:  80.94512167 Bitcoins.

2           Do you understand the sentence as I have imposed it

3    upon you?

4           THE DEFENDANT:  Yes.

5           THE COURT:  All right.

6           Now, I do want to make a comment to you, Mr. Costanzo,

7    I realize, it seems to me, that much of your criminal history

8    comes from resenting intrusion into your private life that you

9    perceive by government authorities.  I have imposed conditions

10   of supervised release.  I can understand that you might not be

11   too enthusiastic about those when you get out.  But I'm going

12   to require that you comply with them.  And I'm not going to

13   feel very good if you violate them because they're imposed to

14   make sure that you transition well into society over a number

15   of years when, for most purposes, you will be completely free.

16   And in light of the fact that I have given you substantial

17   reductions from what would be the recommended applicable

18   guideline range to try to fit your offense -- to try and fit

19   your punishment to the offense, I'm going to ask that you

20   understand that these intrusions, while you may not appreciate

21   them, are designed to protect society while you reintegrate

22   yourself into it.

23          Do you understand what I'm talking about?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.

1          Now, you have preserved your right to appeal.  If you

2   believe that any part of the trial was unfair to you or if you

3   believe the sentence was unfair, or any mistake was made, you

4   have the right to appeal the conviction and/or the sentence.

5          You have also preserved the right to apply for leave

6   to appeal in forma pauperis.  If you do that, the Clerk of the

7   Court will prepare and file a Notice of Appeal on your behalf.

8   But with few exceptions, any such notice -- pardon me -- must

9   be filed within 14 days of today's judgment.

10          Do you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Ms. Weidner, anything else on behalf of

13   your client?

14          MS. WEIDNER:  Nothing further, Your Honor.

15          THE COURT:  Ms. Binford -- Mr. Binford, anything else

16   on behalf of the United States?

17          MR. BINFORD:  No, Your Honor.  Thank you.

18          THE COURT:  Thank you.

19                    (Proceedings in recess.)

20

21

22

23

24

25

1

<u>C E R T I F I C A T E</u>

2

3         I, CHARLOTTE A. POWERS, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7         I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12        DATED at Phoenix, Arizona, this 17th day of August,

13   2018.

14

15                              s/Charlotte A. Powers

16                         Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT